**COMMONWEALTH OF MASSACHUSETTS**
**ESSEX COUNTY**
**Docket Report**

**2277CV01000 John Doe Individually and on Behalf of All others similarly situated et al vs. Emerson Hospital**

| | | | |
|---|---|---|---|
| **CASE TYPE:** | Torts | **FILE DATE:** | 10/19/2022 |
| **ACTION CODE:** | B99 | **CASE TRACK:** | F - Fast Track |
| **DESCRIPTION:** | Other Tortious Action | | |
| **CASE DISPOSITION DATE:** | 12/02/2025 | **CASE STATUS :** | Closed |
| **CASE DISPOSITION:** | Transferred to another Court | **STATUS DATE :** | 12/02/2025 |
| **CASE JUDGE:** | | **CASE SESSION:** | Civil D |

## PARTIES

| | |
|---|---|
| **Plaintiff**<br>James Doe Individually and on Behalf of All others similarly situated | **Attorney** **681627**<br>Jonathan Tucker Merrigan<br>Sweeney Merrigan Law, LLP<br>Sweeney Merrigan Law, LLP<br>268 Summer St<br>Boston, MA 02210<br>Work Phone (617) 391-9001<br>Added Date: 11/03/2025<br><br>**Attorney** **686289**<br>Ryan Hawkins<br>Sweeney Merrigan Law LLP<br>Sweeney Merrigan Law LLP<br>45 Braintree Off Hill Park<br>Braintree, MA 02184<br>Work Phone (617) 830-5767<br>Added Date: 11/03/2025<br><br>**Attorney** **703701**<br>Erin E McHugh<br>Sweeney Merrigan Law, LLP<br>Sweeney Merrigan Law, LLP<br>268 Summer St<br>Boston, MA 02210<br>Work Phone (617) 391-9001<br>Added Date: 11/03/2025<br><br>A TRUE COPY, ATTEST<br>DEPUTY/ASST. CLERK |

CRTR2709-CR

**COMMONWEALTH OF MASSACHUSETTS**
**ESSEX COUNTY**
**Docket Report**

| Plaintiff | Attorney |
|---|---|
| **Plaintiff**<br>Jane Doe Individually and on Behalf of All others similarly situated | **Attorney** **681627**<br>Jonathan Tucker Merrigan<br>Sweeney Merrigan Law, LLP<br>Sweeney Merrigan Law, LLP<br>268 Summer St<br>Boston, MA 02210<br>Work Phone (617) 391-9001<br>Added Date: 11/03/2025<br><br>**Attorney** **686289**<br>Ryan Hawkins<br>Sweeney Merrigan Law LLP<br>Sweeney Merrigan Law LLP<br>45 Braintree Off Hill Park<br>Braintree, MA 02184<br>Work Phone (617) 830-5767<br>Added Date: 11/03/2025<br><br>**Attorney** **703701**<br>Erin E McHugh<br>Sweeney Merrigan Law, LLP<br>Sweeney Merrigan Law, LLP<br>268 Summer St<br>Boston, MA 02210<br>Work Phone (617) 391-9001<br>Added Date: 11/03/2025 |

CRTR2709-CR

**COMMONWEALTH OF MASSACHUSETTS**
**ESSEX COUNTY**
**Docket Report**

| Plaintiff | Attorney |
|---|---|
| **Plaintiff**<br>John Doe Individually and on Behalf of All others similarly situated | **Attorney** **343480**<br>Thomas Tucker Merrigan<br>Sweeney Merrigan Law<br>Sweeney Merrigan Law<br>268 Summer St LL<br>Boston, MA 02210<br>Work Phone (413) 522-2557<br>Added Date: 04/12/2023<br><br>**Attorney** **681627**<br>Jonathan Tucker Merrigan<br>Sweeney Merrigan Law, LLP<br>Sweeney Merrigan Law, LLP<br>268 Summer St<br>Boston, MA 02210<br>Work Phone (617) 391-9001<br>Added Date: 10/19/2022<br><br>**Attorney** **686289**<br>Ryan Hawkins<br>Sweeney Merrigan Law LLP<br>Sweeney Merrigan Law LLP<br>45 Braintree Off Hill Park<br>Braintree, MA 02184<br>Work Phone (617) 830-5767<br>Added Date: 12/12/2023<br><br>**Attorney** **703701**<br>Erin E McHugh<br>Sweeney Merrigan Law, LLP<br>Sweeney Merrigan Law, LLP<br>268 Summer St<br>Boston, MA 02210<br>Work Phone (617) 391-9001<br>Added Date: 10/28/2022<br><br>**Attorney** **706672**<br>Justin C Kenney<br>Ahmad, Zavitsanos, and Mensing PLLC<br>Ahmad, Zavitsanos, and Mensing PLLC<br>1221 McKinney St<br>Suite 2500<br>Houston, TX 77010<br>Work Phone (802) 258-7114<br>Added Date: 12/04/2023<br><br>**Attorney** **HV24097455TX**<br>Nathan B Campbell<br>Ahmad, Zavitsanos & Mensing, P.C.<br>1221 McKinney<br>Suite 2500<br>Houston, TX 77010<br>Added Date: 02/28/2023<br><br>**Attorney** **HV24076463TX**<br>Foster C Johnson<br>Ahmad, Zavitsanos & Mensing, P.C. |

CRTR2709-CR

**COMMONWEALTH OF MASSACHUSETTS**
**ESSEX COUNTY**
**Docket Report**

| | |
|---|---|
| | 1221 McKinney<br>Suite 2500<br>Houston, TX 77010<br>Added Date: 02/28/2023 |
| | **Attorney** **HV20856750TX**<br>David E Warden<br>Ahmad, Zavitsanos & Mensing, P.C.<br>1221 McKinney<br>Suite 2500<br>Houston, TX 77010<br>Added Date: 02/28/2023 |
| | **Attorney** **PHV6299686IL**<br>Alex J Dravillas<br>Keller Postman LLC<br>150 N. Riverside Plaza<br>Suite 4100<br>Chicago, IL 60606<br>Work Phone (312) 741-5220<br>Added Date: 02/28/2023 |
| | **Attorney** **PHV1029692DC**<br>Sara Aguiniga<br>Keller Postman LLC<br>1100 Vermon Avenue, N.W.<br>12th Floor<br>Washington, DC 20005<br>Work Phone (209) 918-1123<br>Added Date: 09/26/2023 |
| | **Attorney** **HV24125261TX**<br>Carl J Gustafson<br>Ahmad, Zavitsanos & Mensing, P.C.<br>1221 McKinney<br>Suite 2500<br>Houston, TX 77010<br>Work Phone (713) 600-4924<br>Added Date: 09/28/2023 |
| | **Attorney** **HV00941100TX**<br>Joseph Y. Ahmad<br>Ahmad, Zavitsanos & Mensing, P.C.<br>1221 McKinney St.<br>Suite 2500<br>Houston, TX 77010<br>Work Phone (713) 655-1101<br>Added Date: 09/22/2025 |

CRTR2709-CR

**COMMONWEALTH OF MASSACHUSETTS**
**ESSEX COUNTY**
**Docket Report**

**Plaintiff**
Joseph Doe Individually and on Behalf of All others similarly situated

**Attorney** **681627**
Jonathan Tucker Merrigan
Sweeney Merrigan Law, LLP
Sweeney Merrigan Law, LLP
268 Summer St
Boston, MA 02210
Work Phone (617) 391-9001
Added Date: 11/03/2025

**Attorney** **686289**
Ryan Hawkins
Sweeney Merrigan Law LLP
Sweeney Merrigan Law LLP
45 Braintree Off Hill Park
Braintree, MA 02184
Work Phone (617) 830-5767
Added Date: 11/03/2025

**Attorney** **703701**
Erin E McHugh
Sweeney Merrigan Law, LLP
Sweeney Merrigan Law, LLP
268 Summer St
Boston, MA 02210
Work Phone (617) 391-9001
Added Date: 11/03/2025

CRTR2709-CR

**COMMONWEALTH OF MASSACHUSETTS**
**ESSEX COUNTY**
**Docket Report**

| | |
|---|---|
| **Defendant**<br>Emerson Hospital | **Attorney** **666841**<br>Lisa Oliver White<br>Shook, Hardy and Bacon L.L.P.<br>Shook, Hardy and Bacon L.L.P.<br>One Federal St<br>Suite 2620<br>Boston, MA 02110<br>Work Phone (617) 531-1411<br>Added Date: 03/21/2024<br>**Attorney** **704156**<br>Emyr Remy<br>Shook, Hardy and Bacon L.L.P.<br>Shook, Hardy and Bacon L.L.P.<br>One Federal St<br>Suite 2620<br>Boston, MA 02110<br>Work Phone (617) 531-1411<br>Added Date: 02/09/2023<br>**Attorney** **PHV0178195FL**<br>Alfred J. Saikali<br>Shook, Hardy & Bacon, LLP<br>201 S. Biscayne Blvd., Suite 3200<br>Miami, FL 33131<br>Work Phone (305) 960-6923<br>Added Date: 09/26/2023<br>**Attorney** **PHV6299667IL**<br>Justin R. Donoho<br>Shook Hardy and Bacon LLP<br>111 S. Wacker Drive<br>Suite 4700<br>Chicago, IL 60606<br>Added Date: 07/03/2023<br>**Attorney** **PHV69742MO**<br>Jenn O. Hatcher<br>Shook, Hardy & Bacon, LLP<br>2555 Grand Blvd<br>Kansas City, MO 64108<br>Work Phone (816) 559-0306<br>Added Date: 09/26/2023<br>**Attorney** **PHV321887CA**<br>Jessica N. Wahl<br>Shook, Hardy & Bacon, LLP<br>2049 Century Park East<br>#3000<br>Los Angeles, CA 90067<br>Work Phone (424) 324-3477<br>Added Date: 09/26/2023<br>**Attorney** **PHV2275CA**<br>Tammy B. Webb<br>Shook, Hardy & Bacon, LLP |

CRTR2709-CR

COMMONWEALTH OF MASSACHUSETTS
ESSEX COUNTY
Docket Report

| | |
|---|---|
| | 555 Mission Street<br>Suite 2300<br>San Francisco, CA 94105<br>Work Phone (415) 544-1904<br>Added Date: 09/26/2023 |
| | **Attorney** **PHV6320909IL**<br>Tara D. Kennedy<br>Shook, Hardy & Bacon, LLP<br>111 South Wacker Drive<br>Suite 4700<br>Chicago, IL 60606<br>Work Phone (312) 704-7700<br>Added Date: 01/07/2025 |
| | **Attorney** **PHV6324641IL**<br>Jad Sheikali<br>Shook, Hardy & Bacon, LLP<br>111 S. Wacker Dr.<br>Suite 4700<br>Chicago, IL 60606<br>Work Phone (312) 704-7754<br>Added Date: 09/03/2025 |

**FINANCIAL DETAILS**

| Date | Fees/Fines/Costs/Charge | Assessed | Paid | Dismissed | Balance |
|---|---|---|---|---|---|
| 10/19/2022 | Civil Filing Fee (per Plaintiff) Receipt: 38104 Date: 10/20/2022 | 240.00 | 240.00 | 0.00 | 0.00 |
| 10/19/2022 | Civil Security Fee (G.L. c. 262, § 4A) Receipt: 38104 Date: 10/20/2022 | 20.00 | 20.00 | 0.00 | 0.00 |
| 10/19/2022 | Civil Surcharge (G.L. c. 262, § 4C) Receipt: 38104 Date: 10/20/2022 | 15.00 | 15.00 | 0.00 | 0.00 |
| 10/19/2022 | Fee for Blank Summons or Writ (except Writ of Habeas Corpus) MGL 262 sec 4b Receipt: 38104 Date: 10/20/2022 | 5.00 | 5.00 | 0.00 | 0.00 |
| 11/10/2022 | Fee for Blank Summons or Writ (except Writ of Habeas Corpus) MGL 262 sec 4b Receipt: 38336 Date: 11/10/2022 | 5.00 | 5.00 | 0.00 | 0.00 |
| | **Total** | **285.00** | **285.00** | **0.00** | **0.00** |

CRTR2709-CR

**COMMONWEALTH OF MASSACHUSETTS**
**ESSEX COUNTY**
**Docket Report**

## INFORMATIONAL DOCKET ENTRIES

| Date | Ref | Description | Judge |
|---|---|---|---|
| 10/19/2022 | | Case assigned to:<br>DCM Track F - Fast Track was added on 10/20/2022 | |
| 10/19/2022 | 1 | Complaint electronically filed. | |
| 10/19/2022 | 2 | Civil action cover sheet filed. | |
| 10/19/2022 | | Demand for jury trial entered. | |
| 10/19/2022 | | Class action filed under Mass. R. Civ. P. 23 | |
| 10/20/2022 | | EDocument sent:<br>A Tracking Order was generated and sent to:<br>Plaintiff, Attorney: Jonathan Tucker Merrigan, Esq.<br>tucker@sweeneymerrigan.com | |
| 10/25/2022 | 3 | Plaintiff John Doe In his/her capacity Individually and on befalf of all others similarly situated's Motion for<br>Impoundment of Personal Identifying Information | |
| 10/25/2022 | 3.1 | Affidavit of Attorney J. Tucker Merrigan in Support of Plaintiff's Motion for Impoundment of Personal Identifying Information | |
| 10/27/2022 | | Endorsement on Motion for Impoundment (#3.0): DENIED<br>Although this motion requests impoundment, it appears that the Plaintiff is, in fact, requesting a protective order regarding the disclosure of information during discovery. Such a request should be filed under Superior Court Rule 9A after the defendant files a responsive pleading. | Karp |
| 10/28/2022 | | EDocument sent:<br>A Clerk's Notice (eDoc) was generated and sent to:<br>Plaintiff, Attorney: Jonathan Tucker Merrigan, Esq.<br>tucker@sweeneymerrigan.com | |
| 12/05/2022 | 4 | Service Returned for Emerson Hospital delivering in hand to Christina Trotta, agent, person in charge at the time of service for Emerson Hospital, at Nine Acres Corner Concord, MA, 01742. | |
| 01/30/2023 | 5 | Amended: First amended complaint filed by John Doe In his/her capacity Individually and on befalf of all others similarly situated<br>Demand for Jury Trial | |
| 02/09/2023 | | Attorney appearance electronically filed.<br><br>Applies To: Wong, Esq., Alan Ye-Hung (Attorney) on behalf of Emerson Hospital (Defendant) | |
| 02/09/2023 | | Attorney appearance electronically filed.<br><br>Applies To: Remy, Esq., Emyr (Attorney) on behalf of Emerson Hospital (Defendant) | |
| 02/09/2023 | 6 | Defendant's notice to dismiss plaintiff's complaint MRCP 12(b)<br><br>Applies To: Emerson Hospital (Defendant) | |

CRTR2709-CR

**COMMONWEALTH OF MASSACHUSETTS**
**ESSEX COUNTY**
**Docket Report**

| | | | |
|---|---|---|---|
| 02/13/2023 | 7 | Party(s) file Agreement<br>to Extend Deadline for Service of Plaintiff's Opposition to Defendant's Motion to Dismiss<br><br>Applies To: Merrigan, Esq., Jonathan Tucker (Attorney) on behalf of John Doe In his/her capacity Individually and on befalf of all others similarly situated (Plaintiff); Wong, Esq., Alan Ye-Hung (Attorney) on behalf of Emerson Hospital (Defendant) | |
| 02/20/2023 | 8 | Plaintiff John Doe In his/her capacity Individually and on befalf of all others similarly situated's Motion for<br>Admission Pro Hac Vice of Foster Johnson | |
| 02/20/2023 | 8.1 | Affidavit of Foster Johnson | |
| 02/20/2023 | 9 | Plaintiff John Doe In his/her capacity Individually and on befalf of all others similarly situated's Motion for<br>Admission Pro Hac Vice of Alex Dravillas | |
| 02/20/2023 | 9.1 | Affidavit of Alex Dravillas | |
| 02/20/2023 | 10 | Plaintiff John Doe In his/her capacity Individually and on befalf of all others similarly situated's Motion for<br>Admission Pro Hac Vice of Nathan Campbell | |
| 02/20/2023 | 10.1 | Affidavit of Nathan Campbell | |
| 02/20/2023 | 11 | Plaintiff John Doe In his/her capacity Individually and on befalf of all others similarly situated's Motion for<br>Pro Hac Vice of Seth Meyer | |
| 02/20/2023 | 11.1 | Affidavit of Seth Meyer | |
| 02/20/2023 | 12 | Plaintiff John Doe In his/her capacity Individually and on befalf of all others similarly situated's Motion for<br>Admission Pro Hac Vice of David Warden | |
| 02/20/2023 | 12.1 | Affidavit of David Warden | |
| 02/21/2023 | 12.2 | Rule 9A notice of filing<br><br>and Listing of Documents | |
| 02/21/2023 | 12.3 | Affidavit of compliance with Superior Court Rule 9A<br><br>Applies To: Merrigan, Esq., Jonathan Tucker (Attorney) on behalf of John Doe In his/her capacity Individually and on befalf of all others similarly situated (Plaintiff) | |
| 02/21/2023 | 12.4 | Certificate of service of attorney or Pro Se:<br><br>Jonathan Tucker Merrigan, Esq. | |
| 02/23/2023 | | Endorsement on Motion for (#8.0): ALLOWED<br>without opposition | Buxton |
| 02/23/2023 | | Endorsement on Motion for (#9.0): ALLOWED<br>without opposition | Buxton |
| 02/23/2023 | | Endorsement on Motion for (#10.0): ALLOWED<br>without opposition | Buxton |

CRTR2709-CR

**COMMONWEALTH OF MASSACHUSETTS**
**ESSEX COUNTY**
**Docket Report**

| | | | |
|---|---|---|---|
| 02/23/2023 | | Endorsement on Motion for (#11.0): ALLOWED<br>without opposition | Buxton |
| 02/23/2023 | | Endorsement on Motion for (#12.0): ALLOWED<br>without opposition | Buxton |
| 02/27/2023 | | EDocument sent:<br>A Clerk's Notice (eDoc) was generated and sent to:<br>Plaintiff, Attorney: Victoria M Santoro, Esq. victoria@sweeneymerrigan.com<br>Plaintiff, Attorney: Jonathan Tucker Merrigan, Esq.<br>tucker@sweeneymerrigan.com<br>Plaintiff, Attorney: Erin E McHugh, Esq. emchugh@sweeneymerrigan.com<br>Defendant, Attorney: Alan Ye-Hung Wong, Esq. awong@shb.com<br>Defendant, Attorney: Emyr Remy, Esq. remy@shb.com | |
| 02/27/2023 | | EDocument sent:<br>A Clerk's Notice (eDoc) was generated and sent to:<br>Plaintiff, Attorney: Victoria M Santoro, Esq. victoria@sweeneymerrigan.com<br>Plaintiff, Attorney: Jonathan Tucker Merrigan, Esq.<br>tucker@sweeneymerrigan.com<br>Plaintiff, Attorney: Erin E McHugh, Esq. emchugh@sweeneymerrigan.com<br>Defendant, Attorney: Alan Ye-Hung Wong, Esq. awong@shb.com<br>Defendant, Attorney: Emyr Remy, Esq. remy@shb.com | |
| 02/27/2023 | | EDocument sent:<br>A Clerk's Notice (eDoc) was generated and sent to:<br>Plaintiff, Attorney: Victoria M Santoro, Esq. victoria@sweeneymerrigan.com<br>Plaintiff, Attorney: Jonathan Tucker Merrigan, Esq.<br>tucker@sweeneymerrigan.com<br>Plaintiff, Attorney: Erin E McHugh, Esq. emchugh@sweeneymerrigan.com<br>Defendant, Attorney: Alan Ye-Hung Wong, Esq. awong@shb.com<br>Defendant, Attorney: Emyr Remy, Esq. remy@shb.com | |
| 02/27/2023 | | EDocument sent:<br>A Clerk's Notice (eDoc) was generated and sent to:<br>Plaintiff, Attorney: Victoria M Santoro, Esq. victoria@sweeneymerrigan.com<br>Plaintiff, Attorney: Jonathan Tucker Merrigan, Esq.<br>tucker@sweeneymerrigan.com<br>Plaintiff, Attorney: Erin E McHugh, Esq. emchugh@sweeneymerrigan.com<br>Defendant, Attorney: Alan Ye-Hung Wong, Esq. awong@shb.com<br>Defendant, Attorney: Emyr Remy, Esq. remy@shb.com | |
| 02/27/2023 | | EDocument sent:<br>A Clerk's Notice (eDoc) was generated and sent to:<br>Plaintiff, Attorney: Victoria M Santoro, Esq. victoria@sweeneymerrigan.com<br>Plaintiff, Attorney: Jonathan Tucker Merrigan, Esq.<br>tucker@sweeneymerrigan.com<br>Plaintiff, Attorney: Erin E McHugh, Esq. emchugh@sweeneymerrigan.com<br>Defendant, Attorney: Alan Ye-Hung Wong, Esq. awong@shb.com<br>Defendant, Attorney: Emyr Remy, Esq. remy@shb.com | |
| 03/24/2023 | 13 | Plaintiff John Doe In his/her capacity Individually and on befalf of all others<br>similarly situated's Motion to<br>Appoint Interim Class Counsel | |
| 03/24/2023 | 13.1 | Jonathan Tucker Merrigan, Esq.'s Memorandum in support of Plaintiff's<br>Motion to Appoint Interim Class Counsel | |

CRTR2709-CR

**COMMONWEALTH OF MASSACHUSETTS**
**ESSEX COUNTY**
**Docket Report**

| | | | |
|---|---|---|---|
| 03/24/2023 | 13.2 | Affidavit<br><br>Applies To: Merrigan, Esq., Jonathan Tucker (Attorney) on behalf of John Doe In his/her capacity Individually and on befalf of all others similarly situated (Plaintiff) | |
| 03/24/2023 | 13.3 | Affidavit In Support of Plaintiff's Motion to Appoint Interim Class Counsel<br><br>Applies To: Meyer, Seth A (Attorney) on behalf of John Doe In his/her capacity Individually and on befalf of all others similarly situated (Plaintiff) | |
| 03/24/2023 | 13.4 | Affidavit In Support of Plaintiff's Motion to Appoint Interim Class Counsel<br><br>Applies To: Johnson, Foster C (Attorney) on behalf of John Doe In his/her capacity Individually and on befalf of all others similarly situated (Plaintiff) | |
| 03/24/2023 | 13.5 | Rule 9A notice of filing<br><br>Applies To: Merrigan, Esq., Jonathan Tucker (Attorney) on behalf of John Doe In his/her capacity Individually and on befalf of all others similarly situated (Plaintiff) | |
| 03/24/2023 | 13.6 | Affidavit of compliance with Superior Court Rule 9A<br><br>Applies To: Merrigan, Esq., Jonathan Tucker (Attorney) on behalf of John Doe In his/her capacity Individually and on befalf of all others similarly situated (Plaintiff) | |
| 03/24/2023 | 13.7 | Certificate of service of attorney or Pro Se:<br><br>Jonathan Tucker Merrigan, Esq. | |
| 03/24/2023 | 13.8 | Certificate of service of attorney or Pro Se:<br><br>Jonathan Tucker Merrigan, Esq. | |
| 03/31/2023 | | Endorsement on Motion to Appoint Interim Class Counsel (#13.0): ALLOWED<br>After review, the motion unopposed motion to appoint interim class counsel is allowed. | Howe |
| 03/31/2023 | | EDocument sent:<br>A Clerk's Notice (eDoc) was generated and sent to:<br>Plaintiff, Attorney: Victoria M Santoro, Esq. victoria@sweeneymerrigan.com<br>Plaintiff, Attorney: Jonathan Tucker Merrigan, Esq. tucker@sweeneymerrigan.com<br>Plaintiff, Attorney: Erin E McHugh, Esq. emchugh@sweeneymerrigan.com<br>Defendant, Attorney: Alan Ye-Hung Wong, Esq. awong@shb.com<br>Defendant, Attorney: Emyr Remy, Esq. remy@shb.com | |
| 03/31/2023 | 14 | ORDER: Appointing Interim Class Counsel<br>... IT IS HEREBY ORDERED: 1. J. Tucker Merrigan, Foster Johnson, and Seth Meyer are hereby appointed Co-Lead Interim Class Counsel...<br>(For Full Text, see scanned Order) | Howe |
| 04/03/2023 | 15 | Plaintiff John Doe In his/her capacity Individually and on befalf of all others similarly situated's Motion to strike | |

CRTR2709-CR

**COMMONWEALTH OF MASSACHUSETTS**
**ESSEX COUNTY**
**Docket Report**

| | | | |
|---|---|---|---|
| 04/07/2023 | 16 | Defendant Emerson Hospital's Request for Leave to Exceed the Page Limit, Allow Additional Time for Its Reply Brief in Support of its Motion to Dismiss and Allow Additional Time to Serve its Response to Plaintiffs' Motion to Strike | |
| 04/10/2023 | 16.1 | Opposition to Motion for Additional Pages filed by John Doe In his/her capacity Individually and on befalf of all others similarly situated | |
| 04/12/2023 | | Attorney appearance electronically filed.<br>Applies To: Merrigan, Esq., Thomas Tucker (Attorney) on behalf of John Doe In his/her capacity Individually and on befalf of all others similarly situated (Plaintiff) | |
| 04/13/2023 | | Endorsement on Motion for Leave (#16.0): DENIED | Barrett |
| 04/13/2023 | | EDocument sent:<br>A Clerk's Notice (eDoc) was generated and sent to:<br>Plaintiff, Attorney: Thomas Tucker Merrigan, Esq. tom@sweeneymerrigan.com<br>Plaintiff, Attorney: Victoria M Santoro, Esq. victoria@sweeneymerrigan.com<br>Plaintiff, Attorney: Jonathan Tucker Merrigan, Esq. tucker@sweeneymerrigan.com<br>Plaintiff, Attorney: Erin E McHugh, Esq. emchugh@sweeneymerrigan.com<br>Defendant, Attorney: Alan Ye-Hung Wong, Esq. awong@shb.com<br>Defendant, Attorney: Emyr Remy, Esq. remy@shb.com | |
| 04/24/2023 | 17 | Plaintiff John Doe In his/her capacity Individually and on befalf of all others similarly situated's Motion to strike | |
| 04/24/2023 | 17.1 | John Doe In his/her capacity Individually and on befalf of all others similarly situated's Memorandum in support of Motion to Strike | |
| 04/24/2023 | 17.2 | Opposition to Motion to Strike filed by Emerson Hospital | |
| 04/24/2023 | 17.3 | Reply/Sur-reply<br><br>Applies To: John Doe In his/her capacity Individually and on befalf of all others similarly situated (Plaintiff) | |
| 04/24/2023 | 17.4 | Certificate of Compliance Superior Court Rule 9C<br><br>Applies To: Merrigan, Esq., Jonathan Tucker (Attorney) on behalf of John Doe In his/her capacity Individually and on befalf of all others similarly situated (Plaintiff) | |
| 04/24/2023 | 17.5 | Rule 9A list of documents filed.<br><br>and Notice of Filing with Certificate of Service | |
| 04/24/2023 | 18 | Defendant Emerson Hospital's Motion to Dismiss | |
| 04/24/2023 | 18.1 | Emerson Hospital's Memorandum in support of Motion to Dismiss the first amended Complaint | |
| 04/24/2023 | 18.2 | Opposition to to Motion to Dismiss filed by John Doe In his/her capacity Individually and on befalf of all others similarly situated | |
| 04/24/2023 | 18.3 | Reply/Sur-reply<br><br>Reply In Support of Its Motion to Dismiss the first Amended Complaint | |

CRTR2709-CR

**COMMONWEALTH OF MASSACHUSETTS**
**ESSEX COUNTY**
**Docket Report**

| | | | |
|---|---|---|---|
| 04/24/2023 | 18.4 | Plaintiff John Doe In his/her capacity Individually and on befalf of all others similarly situated's Notice of<br>Plaintiff's Motion to Strike | |
| 04/24/2023 | 18.5 | Opposition to to Motion to Strike of Defendant's Materials Attached to Its Memorandum in Support of Its Motion to Dismiss filed by Emerson Hospital | |
| 04/24/2023 | 18.6 | Rule 9A notice of filing<br><br>and List of Documents filed | |
| 04/24/2023 | 18.7 | Plaintiff(s) John Doe In his/her capacity Individually and on befalf of all others similarly situated motion filed to strike | |
| 04/24/2023 | 18.8 | John Doe In his/her capacity Individually and on befalf of all others similarly situated's Memorandum in support of | |
| 04/25/2023 | | Endorsement on Motion to strike (#17.0): DENIED<br>Plaintiff's Motion to Strike is denied for failure to comply with Superior Court Rule 9C | Howe |
| 04/25/2023 | | EDocument sent:<br>A Clerk's Notice (eDoc) was generated and sent to:<br>Plaintiff, Attorney: Thomas Tucker Merrigan, Esq. tom@sweeneymerrigan.com<br>Plaintiff, Attorney: Victoria M Santoro, Esq. victoria@sweeneymerrigan.com<br>Plaintiff, Attorney: Jonathan Tucker Merrigan, Esq. tucker@sweeneymerrigan.com<br>Plaintiff, Attorney: Erin E McHugh, Esq. emchugh@sweeneymerrigan.com<br>Defendant, Attorney: Alan Ye-Hung Wong, Esq. awong@shb.com<br>Defendant, Attorney: Emyr Remy, Esq. remy@shb.com | |
| 04/27/2023 | | Endorsement on Motion to strike (#17.0): DENIED<br>After further review, the motion is DENIED. | Howe |
| 04/28/2023 | | EDocument sent:<br>A Clerk's Notice (eDoc) was generated and sent to:<br>Plaintiff, Attorney: Thomas Tucker Merrigan, Esq. tom@sweeneymerrigan.com<br>Plaintiff, Attorney: Victoria M Santoro, Esq. victoria@sweeneymerrigan.com<br>Plaintiff, Attorney: Jonathan Tucker Merrigan, Esq. tucker@sweeneymerrigan.com<br>Plaintiff, Attorney: Erin E McHugh, Esq. emchugh@sweeneymerrigan.com<br>Defendant, Attorney: Alan Ye-Hung Wong, Esq. awong@shb.com<br>Defendant, Attorney: Emyr Remy, Esq. remy@shb.com | |
| 05/03/2023 | | EDocument sent:<br><br>Notice to Appear was generated and sent to:<br>Plaintiff: Jonathan Tucker Merrigan, Esq. tucker@sweeneymerrigan.com<br>Plaintiff: Victoria M Santoro, Esq. victoria@sweeneymerrigan.com<br>Plaintiff: Erin E McHugh, Esq. emchugh@sweeneymerrigan.com<br>Plaintiff: Thomas Tucker Merrigan, Esq. tom@sweeneymerrigan.com<br>Defendant: Alan Ye-Hung Wong, Esq. awong@shb.com<br>Defendant: Emyr Remy, Esq. remy@shb.com<br>Sent On: 05/03/2023 08:33:34 | |

CRTR2709-CR

**COMMONWEALTH OF MASSACHUSETTS**
**ESSEX COUNTY**
**Docket Report**

| | | | |
|---|---|---|---|
| 05/19/2023 | | Attorney appearance withdrawal electronically filed.<br>Applies To: Wong, Esq., Alan Ye-Hung (Attorney) on behalf of Emerson Hospital (Defendant) | |
| 05/31/2023 | 19 | Plaintiff John Doe In his/her capacity Individually and on befalf of all others similarly situated's Motion for<br>Admission Pro Hac Vice | |
| 05/31/2023 | 19.1 | Affidavit of Sara Aguiniga | |
| 05/31/2023 | 19.2 | Affidavit of compliance with Superior Court Rule 9A<br><br>Applies To: Merrigan, Esq., Jonathan Tucker (Attorney) on behalf of John Doe In his/her capacity Individually and on befalf of all others similarly situated (Plaintiff) | |
| 05/31/2023 | 19.3 | Rule 9A notice of filing | |
| 05/31/2023 | 19.4 | Certificate of service of attorney or Pro Se:<br><br>Jonathan Tucker Merrigan, Esq. | |
| 06/01/2023 | | Endorsement on Motion for Admission Pro Hac Vice ` (#19.0): ALLOWED<br>After review, the unopposed motion is Allowed.<br><br>Judge: Howe, Hon. Janice W | Howe |
| 06/02/2023 | | EDocument sent:<br>A Clerk's Notice (eDoc) was generated and sent to:<br>Plaintiff, Attorney: Thomas Tucker Merrigan, Esq. tom@sweeneymerrigan.com<br>Plaintiff, Attorney: Victoria M Santoro, Esq. victoria@sweeneymerrigan.com<br>Plaintiff, Attorney: Jonathan Tucker Merrigan, Esq. tucker@sweeneymerrigan.com<br>Plaintiff, Attorney: Erin E McHugh, Esq. emchugh@sweeneymerrigan.com<br>Plaintiff, Attorney: Nathan B Campbell 1221 McKinney Suite 2500, Houston, TX 77010<br>Plaintiff, Attorney: Foster C Johnson 1221 McKinney Suite 2500, Houston, TX 77010<br>Plaintiff, Attorney: David E Warden 1221 McKinney Suite 2500, Houston, TX 77010<br>Plaintiff, Attorney: Seth A Meyer 150 N. Riverside Plaza Suite 4100, Chicago, IL 60606<br>Plaintiff, Attorney: Alex J Dravillas 150 N. Riverside Plaza Suite 4100, Chicago, IL 60606<br>Defendant, Attorney: Emyr Remy, Esq. remy@shb.com | |
| 06/05/2023 | 20 | Defendant Emerson Hospital's Assented to Motion for<br>Leave to Admit Alfred J. Saikali Pro Hac Vice | |
| 06/05/2023 | 21 | Defendant Emerson Hospital's Assented to Motion for<br>Leave to Admit Jenn O. Hatcher Pro Hac Vice | |
| 06/05/2023 | 22 | Defendant Emerson Hospital's Assented to Motion for<br>Leave to Admit Jessica N. Wahl Pro Hac Vice | |
| 06/05/2023 | 23 | Defendant Emerson Hospital's Assented to Motion for<br>Leave to Admit Tammy B. Webb Pro Hac Vice | |

CRTR2709-CR

**COMMONWEALTH OF MASSACHUSETTS**
**ESSEX COUNTY**
**Docket Report**

| | | | |
|---|---|---|---|
| 06/29/2023 | 24 | Defendant Emerson Hospital's Assented to Motion for<br>leave to admit Justin R. Donoho Pro Hac Vice | |
| 06/30/2023 | | Endorsement on Motion for leave to admit Justin R. Donoho Pro Hac Vice (#24.0): ALLOWED<br><br>Judge: Barrett, Hon. C. William | Barrett |
| 06/30/2023 | | EDocument sent:<br><br>Clerk's Notice (eDoc)<br>Sent On: 06/30/2023 14:53:44<br>Notice Sent To: Thomas Tucker Merrigan, Esq. tom@sweeneymerrigan.com<br>Notice Sent To: Victoria M Santoro, Esq. victoria@sweeneymerrigan.com<br>Notice Sent To: Jonathan Tucker Merrigan, Esq. tucker@sweeneymerrigan.com<br>Notice Sent To: Erin E McHugh, Esq. emchugh@sweeneymerrigan.com<br>Notice Sent To: Nathan B Campbell 1221 McKinney Suite 2500, Houston, TX 77010<br>Notice Sent To: Foster C Johnson 1221 McKinney Suite 2500, Houston, TX 77010<br>Notice Sent To: David E Warden 1221 McKinney Suite 2500, Houston, TX 77010<br>Notice Sent To: Seth A Meyer 150 N. Riverside Plaza Suite 4100, Chicago, IL 60606<br>Notice Sent To: Alex J Dravillas 150 N. Riverside Plaza Suite 4100, Chicago, IL 60606<br>Notice Sent To: Alan Ye-Hung Wong, Esq. alan.y.wong@gmail.com<br>Notice Sent To: Emyr Remy, Esq. remy@shb.com<br>Notice Sent To: Sara Aguiniga, Esq. 1100 Vermon Avenue, N.W. 12th Floor, Washington, DC 20005 | |
| 07/05/2023 | 25 | Plaintiff John Doe In his/her capacity Individually and on befalf of all others similarly situated's Motion for<br>Entry of Stipulated Protective Order | |
| 07/05/2023 | | Exhibits/Appendix | |
| 07/10/2023 | | Endorsement on motion for protective order (#25.0): ALLOWED | Barrett |
| 07/10/2023 | | EDocument sent:<br><br>Clerk's Notice (eDoc)<br>Sent On: 07/10/2023 14:31:35<br>Notice Sent To: Thomas Tucker Merrigan, Esq. tom@sweeneymerrigan.com<br>Notice Sent To: Victoria M Santoro, Esq. victoria@sweeneymerrigan.com<br>Notice Sent To: Jonathan Tucker Merrigan, Esq. tucker@sweeneymerrigan.com<br>Notice Sent To: Erin E McHugh, Esq. emchugh@sweeneymerrigan.com<br>Notice Sent To: Emyr Remy, Esq. remy@shb.com | |
| 07/10/2023 | 26 | ORDER: STIPULATED PROTECTIVE ORDER | Barrett |
| 07/12/2023 | 27 | Plaintiff(s) John Doe In his/her capacity Individually and on befalf of all others similarly situated Joint motion filed for protective order | |
| 07/12/2023 | | Exhibits/Appendix | |

CRTR2709-CR

**COMMONWEALTH OF MASSACHUSETTS**
**ESSEX COUNTY**
**Docket Report**

| | | | |
|---|---|---|---|
| 07/13/2023 | | Endorsement on Motion for entry of Stipulated ESI Protocol (#27.0): ALLOWED | Barrett |
| 07/13/2023 | 28 | ORDER: Stipulated Order on ESI Protocol | Barrett |
| 07/14/2023 | | EDocument sent:<br><br>Clerk's Notice (eDoc)<br>Sent On: 07/14/2023 08:43:04<br>Notice Sent To: Thomas Tucker Merrigan, Esq. tom@sweeneymerrigan.com<br>Notice Sent To: Victoria M Santoro, Esq. victoria@sweeneymerrigan.com<br>Notice Sent To: Jonathan Tucker Merrigan, Esq. tucker@sweeneymerrigan.com<br>Notice Sent To: Erin E McHugh, Esq. emchugh@sweeneymerrigan.com<br>Notice Sent To: Nathan B Campbell 1221 McKinney Suite 2500, Houston, TX 77010<br>Notice Sent To: Foster C Johnson 1221 McKinney Suite 2500, Houston, TX 77010<br>Notice Sent To: David E Warden 1221 McKinney Suite 2500, Houston, TX 77010<br>Notice Sent To: Seth A Meyer 150 N. Riverside Plaza Suite 4100, Chicago, IL 60606<br>Notice Sent To: Alex J Dravillas 150 N. Riverside Plaza Suite 4100, Chicago, IL 60606<br>Notice Sent To: Emyr Remy, Esq. remy@shb.com<br>Notice Sent To: Sara Aguiniga, Esq. 1100 Vermon Avenue, N.W. 12th Floor, Washington, DC 20005<br>Notice Sent To: Justin R. Donoho 111 S. Wacker Drive Suite 4700, Chicago, IL 60606<br>Notice Sent To: Emerson Hospital No addresses available | |

CRTR2709-CR

**COMMONWEALTH OF MASSACHUSETTS**
**ESSEX COUNTY**
**Docket Report**

| | | | |
|---|---|---|---|
| 07/14/2023 | | EDocument sent:<br><br>Clerk's Notice (eDoc)<br>Sent On: 07/14/2023 08:49:19<br>Notice Sent To: Thomas Tucker Merrigan, Esq. tom@sweeneymerrigan.com<br>Notice Sent To: Victoria M Santoro, Esq. victoria@sweeneymerrigan.com<br>Notice Sent To: Jonathan Tucker Merrigan, Esq. tucker@sweeneymerrigan.com<br>Notice Sent To: Erin E McHugh, Esq. emchugh@sweeneymerrigan.com<br>Notice Sent To: Nathan B Campbell 1221 McKinney Suite 2500, Houston, TX 77010<br>Notice Sent To: Foster C Johnson 1221 McKinney Suite 2500, Houston, TX 77010<br>Notice Sent To: David E Warden 1221 McKinney Suite 2500, Houston, TX 77010<br>Notice Sent To: Seth A Meyer 150 N. Riverside Plaza Suite 4100, Chicago, IL 60606<br>Notice Sent To: Alex J Dravillas 150 N. Riverside Plaza Suite 4100, Chicago, IL 60606<br>Notice Sent To: Emyr Remy, Esq. remy@shb.com<br>Notice Sent To: Sara Aguiniga, Esq. 1100 Vermon Avenue, N.W. 12th Floor, Washington, DC 20005<br>Notice Sent To: Justin R. Donoho 111 S. Wacker Drive Suite 4700, Chicago, IL 60606<br>Notice Sent To: Emerson Hospital No addresses available | |
| 07/17/2023 | 29 | Plaintiff John Doe In his/her capacity Individually and on befalf of all others similarly situated's Motion for entry of agreed scheduling order | |
| 07/17/2023 | | Event Result:: Rule 12 Hearing scheduled on:<br>07/20/2023 02:30 PM<br>Has been: Rescheduled For the following reason: By Court prior to date<br>Hon. C. William Barrett, Presiding<br>Staff:<br>Debra Vernava, Assistant Clerk Magistrate | Barrett |
| 07/18/2023 | | Endorsement on Motion for entry of agreed scheduling order (#29.0): ALLOWED<br>after review, the agreed Motion is ALLOWED | Howe |

CRTR2709-CR

COMMONWEALTH OF MASSACHUSETTS
ESSEX COUNTY
Docket Report

| | | | |
|---|---|---|---|
| 07/19/2023 | | EDocument sent:<br><br>Clerk's Notice (eDoc)<br>Sent On: 07/19/2023 08:51:23<br>Notice Sent To: Thomas Tucker Merrigan, Esq. tom@sweeneymerrigan.com<br>Notice Sent To: Victoria M Santoro, Esq. victoria@sweeneymerrigan.com<br>Notice Sent To: Jonathan Tucker Merrigan, Esq. tucker@sweeneymerrigan.com<br>Notice Sent To: Erin E McHugh, Esq. emchugh@sweeneymerrigan.com<br>Notice Sent To: Nathan B Campbell 1221 McKinney Suite 2500, Houston, TX 77010<br>Notice Sent To: David E Warden 1221 McKinney Suite 2500, Houston, TX 77010<br>Notice Sent To: Seth A Meyer 150 N. Riverside Plaza Suite 4100, Chicago, IL 60606<br>Notice Sent To: Alex J Dravillas 150 N. Riverside Plaza Suite 4100, Chicago, IL 60606<br>Notice Sent To: Foster C Johnson 1221 McKinney Suite 2500, Houston, TX 77010<br>Notice Sent To: Alan Ye-Hung Wong, Esq. alan.y.wong@gmail.com<br>Notice Sent To: Emyr Remy, Esq. remy@shb.com<br>Notice Sent To: Sara Aguiniga, Esq. 1100 Vermon Avenue, N.W. 12th Floor, Washington, DC 20005<br>Notice Sent To: Justin R. Donoho 111 S. Wacker Drive Suite 4700, Chicago, IL 60606<br>Notice Sent To: Emerson Hospital No addresses available | |
| 07/25/2023 | 30 | ORDER: Agreed Scheduling Order<br><br>Judge: Howe, Hon. Janice W | Howe |
| 07/25/2023 | | EDocument sent:<br><br>Clerk's Notice (eDoc)<br>Sent On: 07/25/2023 14:23:11<br>Notice Sent To: Thomas Tucker Merrigan, Esq. tom@sweeneymerrigan.com<br>Notice Sent To: Victoria M Santoro, Esq. victoria@sweeneymerrigan.com<br>Notice Sent To: Erin E McHugh, Esq. emchugh@sweeneymerrigan.com<br>Notice Sent To: Nathan B Campbell 1221 McKinney Suite 2500, Houston, TX 77010<br>Notice Sent To: Foster C Johnson 1221 McKinney Suite 2500, Houston, TX 77010<br>Notice Sent To: David E Warden 1221 McKinney Suite 2500, Houston, TX 77010<br>Notice Sent To: Seth A Meyer 150 N. Riverside Plaza Suite 4100, Chicago, IL 60606<br>Notice Sent To: Alex J Dravillas 150 N. Riverside Plaza Suite 4100, Chicago, IL 60606<br>Notice Sent To: Emyr Remy, Esq. remy@shb.com<br>Notice Sent To: Sara Aguiniga, Esq. 1100 Vermon Avenue, N.W. 12th Floor, Washington, DC 20005<br>Notice Sent To: Justin R. Donoho 111 S. Wacker Drive Suite 4700, Chicago, IL 60606 | |

CRTR2709-CR

**COMMONWEALTH OF MASSACHUSETTS**
**ESSEX COUNTY**
**Docket Report**

| | | |
|---|---|---|
| 07/25/2023 | EDocument sent:<br><br>Notice to Appear was generated and sent to:<br>Plaintiff: Jonathan Tucker Merrigan, Esq. tucker@sweeneymerrigan.com<br>Plaintiff: Victoria M Santoro, Esq. victoria@sweeneymerrigan.com<br>Plaintiff: Erin E McHugh, Esq. emchugh@sweeneymerrigan.com<br>Plaintiff: Foster C Johnson 1221 McKinney Suite 2500, Houston, TX 77010<br>Plaintiff: Alex J Dravillas 150 N. Riverside Plaza Suite 4100, Chicago, IL 60606<br>Plaintiff: Nathan B Campbell 1221 McKinney Suite 2500, Houston, TX 77010<br>Plaintiff: Seth A Meyer 150 N. Riverside Plaza Suite 4100, Chicago, IL 60606<br>Plaintiff: David E Warden 1221 McKinney Suite 2500, Houston, TX 77010<br>Plaintiff: Victoria M Santoro, Esq. victoria@sweeneymerrigan.com<br>Plaintiff: Erin E McHugh, Esq. emchugh@sweeneymerrigan.com<br>Plaintiff: Foster C Johnson 1221 McKinney Suite 2500, Houston, TX 77010<br>Plaintiff: Alex J Dravillas 150 N. Riverside Plaza Suite 4100, Chicago, IL 60606<br>Plaintiff: Nathan B Campbell 1221 McKinney Suite 2500, Houston, TX 77010<br>Plaintiff: Seth A Meyer 150 N. Riverside Plaza Suite 4100, Chicago, IL 60606<br>Plaintiff: David E Warden 1221 McKinney Suite 2500, Houston, TX 77010<br>Plaintiff: Thomas Tucker Merrigan, Esq. tom@sweeneymerrigan.com<br>Defendant: Emyr Remy, Esq. remy@shb.com<br>Defendant: Sara Aguiniga, Esq. 1100 Vermon Avenue, N.W. 12th Floor, Washington, DC 20005<br>Defendant: Justin R. Donoho 111 S. Wacker Drive Suite 4700, Chicago, IL 60606<br>Sent On: 07/25/2023 14:42:21 | |
| 07/27/2023 | Endorsement on Motion for Leave to Admit Alfred J. Saikali Pro Hac Vice (#20.0): ALLOWED | Barrett |

CRTR2709-CR

**COMMONWEALTH OF MASSACHUSETTS**
**ESSEX COUNTY**
**Docket Report**

| | | |
|---|---|---|
| 07/27/2023 | EDocument sent:<br><br>Clerk's Notice (eDoc)<br>Sent On: 07/27/2023 14:37:02<br>Notice Sent To: Thomas Tucker Merrigan, Esq. tom@sweeneymerrigan.com<br>Notice Sent To: Victoria M Santoro, Esq. victoria@sweeneymerrigan.com<br>Notice Sent To: Jonathan Tucker Merrigan, Esq. tucker@sweeneymerrigan.com<br>Notice Sent To: Erin E McHugh, Esq. emchugh@sweeneymerrigan.com<br>Notice Sent To: Nathan B Campbell 1221 McKinney Suite 2500, Houston, TX 77010<br>Notice Sent To: Foster C Johnson 1221 McKinney Suite 2500, Houston, TX 77010<br>Notice Sent To: David E Warden 1221 McKinney Suite 2500, Houston, TX 77010<br>Notice Sent To: Seth A Meyer 150 N. Riverside Plaza Suite 4100, Chicago, IL 60606<br>Notice Sent To: Alex J Dravillas 150 N. Riverside Plaza Suite 4100, Chicago, IL 60606<br>Notice Sent To: Emyr Remy, Esq. remy@shb.com<br>Notice Sent To: Sara Aguiniga, Esq. 1100 Vermon Avenue, N.W. 12th Floor, Washington, DC 20005<br>Notice Sent To: Justin R. Donoho 111 S. Wacker Drive Suite 4700, Chicago, IL 60606 | |
| 07/27/2023 | Endorsement on Motion for Leave to Admit Jenn O. Hatcher Pro Hac Vice (#21.0): ALLOWED<br><br>Judge: Barrett, Hon. C. William | Barrett |
| 07/27/2023 | EDocument sent:<br><br>Clerk's Notice (eDoc)<br>Sent On: 07/27/2023 14:40:54<br>Notice Sent To: Thomas Tucker Merrigan, Esq. tom@sweeneymerrigan.com<br>Notice Sent To: Victoria M Santoro, Esq. victoria@sweeneymerrigan.com<br>Notice Sent To: Jonathan Tucker Merrigan, Esq. tucker@sweeneymerrigan.com<br>Notice Sent To: Erin E McHugh, Esq. emchugh@sweeneymerrigan.com<br>Notice Sent To: Nathan B Campbell 1221 McKinney Suite 2500, Houston, TX 77010<br>Notice Sent To: Foster C Johnson 1221 McKinney Suite 2500, Houston, TX 77010<br>Notice Sent To: David E Warden 1221 McKinney Suite 2500, Houston, TX 77010<br>Notice Sent To: Seth A Meyer 150 N. Riverside Plaza Suite 4100, Chicago, IL 60606<br>Notice Sent To: Alex J Dravillas 150 N. Riverside Plaza Suite 4100, Chicago, IL 60606<br>Notice Sent To: Emyr Remy, Esq. remy@shb.com<br>Notice Sent To: Sara Aguiniga, Esq. 1100 Vermon Avenue, N.W. 12th Floor, Washington, DC 20005<br>Notice Sent To: Justin R. Donoho 111 S. Wacker Drive Suite 4700, Chicago, IL 60606 | |

CRTR2709-CR

**COMMONWEALTH OF MASSACHUSETTS**
**ESSEX COUNTY**
**Docket Report**

| | | |
|---|---|---|
| 07/27/2023 | Endorsement on Motion for Leave to Admit Jessica N. Wahl Pro Hac Vice (#22.0): ALLOWED<br><br>Judge: Barrett, Hon. C. William | Barrett |
| 07/27/2023 | EDocument sent:<br><br>Clerk's Notice (eDoc)<br>Sent On: 07/27/2023 14:43:20<br>Notice Sent To: Thomas Tucker Merrigan, Esq. tom@sweeneymerrigan.com<br>Notice Sent To: Victoria M Santoro, Esq. victoria@sweeneymerrigan.com<br>Notice Sent To: Jonathan Tucker Merrigan, Esq. tucker@sweeneymerrigan.com<br>Notice Sent To: Erin E McHugh, Esq. emchugh@sweeneymerrigan.com<br>Notice Sent To: Nathan B Campbell 1221 McKinney Suite 2500, Houston, TX 77010<br>Notice Sent To: Foster C Johnson 1221 McKinney Suite 2500, Houston, TX 77010<br>Notice Sent To: David E Warden 1221 McKinney Suite 2500, Houston, TX 77010<br>Notice Sent To: Seth A Meyer 150 N. Riverside Plaza Suite 4100, Chicago, IL 60606<br>Notice Sent To: Alex J Dravillas 150 N. Riverside Plaza Suite 4100, Chicago, IL 60606<br>Notice Sent To: Emyr Remy, Esq. remy@shb.com<br>Notice Sent To: Sara Aguiniga, Esq. 1100 Vermon Avenue, N.W. 12th Floor, Washington, DC 20005<br>Notice Sent To: Justin R. Donoho 111 S. Wacker Drive Suite 4700, Chicago, IL 60606 | |
| 07/27/2023 | Endorsement on Motion for Leave to Admit Tammy B . Webb Pro Hac Vice (#23.0): ALLOWED<br><br>Judge: Barrett, Hon. C. William | Barrett |

CRTR2709-CR

**COMMONWEALTH OF MASSACHUSETTS**
**ESSEX COUNTY**
**Docket Report**

| | | | |
|---|---|---|---|
| 07/27/2023 | | EDocument sent:<br><br>Clerk's Notice (eDoc)<br>Sent On: 07/27/2023 14:46:16<br>Notice Sent To: Thomas Tucker Merrigan, Esq. tom@sweeneymerrigan.com<br>Notice Sent To: Victoria M Santoro, Esq. victoria@sweeneymerrigan.com<br>Notice Sent To: Jonathan Tucker Merrigan, Esq. tucker@sweeneymerrigan.com<br>Notice Sent To: Erin E McHugh, Esq. emchugh@sweeneymerrigan.com<br>Notice Sent To: Nathan B Campbell 1221 McKinney Suite 2500, Houston, TX 77010<br>Notice Sent To: Foster C Johnson 1221 McKinney Suite 2500, Houston, TX 77010<br>Notice Sent To: David E Warden 1221 McKinney Suite 2500, Houston, TX 77010<br>Notice Sent To: Seth A Meyer 150 N. Riverside Plaza Suite 4100, Chicago, IL 60606<br>Notice Sent To: Alex J Dravillas 150 N. Riverside Plaza Suite 4100, Chicago, IL 60606<br>Notice Sent To: Emyr Remy, Esq. remy@shb.com<br>Notice Sent To: Sara Aguiniga, Esq. 1100 Vermon Avenue, N.W. 12th Floor, Washington, DC 20005<br>Notice Sent To: Justin R. Donoho 111 S. Wacker Drive Suite 4700, Chicago, IL 60606 | |
| 08/08/2023 | | Attorney withdrawal electronically filed.<br><br>Applies To: Meyer, Seth A (Attorney) on behalf of John Doe In his/her capacity Individually and on befalf of all others similarly situated (Plaintiff) | |
| 09/25/2023 | 31 | Defendant Emerson Hospital's Notice of Supplemental Authority in Support of Defendant's Motion to Dismiss the First Amended Complaint | |
| 09/25/2023 | 32 | Thomas Tucker Merrigan, Esq.'s MOTION to admit counsel pro hac vice: Carl J. Gustafson | |
| 09/25/2023 | 32.1 | Affidavit of Carl J. Gustafson | |
| 09/25/2023 | 32.2 | Affidavit of compliance with Superior Court Rule 9A<br><br>Applies To: Merrigan, Esq., Jonathan Tucker (Attorney) on behalf of John Doe In his/her capacity Individually and on befalf of all others similarly situated (Plaintiff) | |
| 09/25/2023 | 32.3 | Rule 9A list of documents filed.<br><br>Notice of Filing/Certificate of Service | |
| 09/26/2023 | | Endorsement on Motion for Admission Pro Hac Vice Carl J. Gustafson (#32.0): ALLOWED | Barrett |

CRTR2709-CR

**COMMONWEALTH OF MASSACHUSETTS**
**ESSEX COUNTY**
**Docket Report**

| | | |
|---|---|---|
| 10/02/2023 | | EDocument sent:<br><br>Notice to Appear was generated and sent to:<br>Plaintiff: Jonathan Tucker Merrigan, Esq. tucker@sweeneymerrigan.com<br>Plaintiff: Victoria M Santoro, Esq. victoria@sweeneymerrigan.com<br>Plaintiff: Erin E McHugh, Esq. emchugh@sweeneymerrigan.com<br>Plaintiff: Foster C Johnson 1221 McKinney Suite 2500, Houston, TX 77010<br>Plaintiff: Alex J Dravillas 150 N. Riverside Plaza Suite 4100, Chicago, IL 60606<br>Plaintiff: Nathan B Campbell 1221 McKinney Suite 2500, Houston, TX 77010<br>Plaintiff: David E Warden 1221 McKinney Suite 2500, Houston, TX 77010<br>Plaintiff: Thomas Tucker Merrigan, Esq. tom@sweeneymerrigan.com<br>Plaintiff: Sara Aguiniga, Esq. 1100 Vermon Avenue, N.W. 12th Floor, Washington, DC 20005<br>Plaintiff: Carl J Gustafson 1221 McKinney Suite 2500, Houston, TX 77010<br>Defendant: Emyr Remy, Esq. remy@shb.com<br>Defendant: Justin R. Donoho 111 S. Wacker Drive Suite 4700, Chicago, IL 60606<br>Defendant: Tammy B. Webb, Esq. 555 Mission Street Suite 2300, San Francisco, CA 94105<br>Defendant: Jessica N. Wahl, Esq. 2049 Century Park East #3000, Los Angeles, CA 90067<br>Defendant: Jenn O. Hatcher, Esq. 2555 Grand Blvd, Kansas City, MO 64108<br>Defendant: Alfred J. Saikali Asaikali@shb.com<br>Sent On: 10/02/2023 09:53:26<br><br>Notice to Appear was generated and sent to:<br>Plaintiff: Jonathan Tucker Merrigan, Esq. tucker@sweeneymerrigan.com<br>Plaintiff: Victoria M Santoro, Esq. victoria@sweeneymerrigan.com<br>Plaintiff: Erin E McHugh, Esq. emchugh@sweeneymerrigan.com<br>Plaintiff: Foster C Johnson 1221 McKinney Suite 2500, Houston, TX 77010<br>Plaintiff: Alex J Dravillas 150 N. Riverside Plaza Suite 4100, Chicago, IL 60606<br>Plaintiff: Nathan B Campbell 1221 McKinney Suite 2500, Houston, TX 77010<br>Plaintiff: David E Warden 1221 McKinney Suite 2500, Houston, TX 77010<br>Plaintiff: Thomas Tucker Merrigan, Esq. tom@sweeneymerrigan.com<br>Plaintiff: Sara Aguiniga, Esq. 1100 Vermon Avenue, N.W. 12th Floor, Washington, DC 20005<br>Plaintiff: Carl J Gustafson 1221 McKinney Suite 2500, Houston, TX 77010<br>Defendant: Emyr Remy, Esq. remy@shb.com<br>Defendant: Justin R. Donoho 111 S. Wacker Drive Suite 4700, Chicago, IL 60606<br>Defendant: Tammy B. Webb, Esq. 555 Mission Street Suite 2300, San Francisco, CA 94105<br>Defendant: Jessica N. Wahl, Esq. 2049 Century Park East #3000, Los Angeles, CA 90067<br>Defendant: Jenn O. Hatcher, Esq. 2555 Grand Blvd, Kansas City, MO 64108<br>Defendant: Alfred J. Saikali Asaikali@shb.com<br>Sent On: 10/02/2023 09:53:54 |
| 10/05/2023 | 33 | Plaintiff John Doe In his/her capacity Individually and on befalf of all others similarly situated's Notice of<br>Supplemental Authority |

CRTR2709-CR

**COMMONWEALTH OF MASSACHUSETTS**
**ESSEX COUNTY**
**Docket Report**

| | | | |
|---|---|---|---|
| 10/06/2023 | 34 | Plaintiff(s) John Doe In his/her capacity Individually and on befalf of all others similarly situated motion filed to compel and to remove certain objections | |
| 10/06/2023 | 34.1 | John Doe In his/her capacity Individually and on befalf of all others similarly situated's Memorandum in support of plaintiff's Motion to Compel and remove certain objections | |
| 10/06/2023 | 34.2 | Opposition to to plaintiff's Motion to Compel and to remove certain objections filed by Emerson Hospital | |
| 10/06/2023 | 34.3 | Plaintiff John Doe In his/her capacity Individually and on befalf of all others similarly situated's Request for Hearing | |
| 10/06/2023 | 34.4 | Rule 9A notice of filing | |
| 10/09/2023 | 35 | Defendant Emerson Hospital's Motion for Protective Order and to Stay Discovery | |
| 10/09/2023 | 35.1 | John Doe In his/her capacity Individually and on befalf of all others similarly situated's Memorandum in opposition to Emerson's Motion for Protective Order and to Stay Discovery | |
| 10/10/2023 | 35.2 | John Doe In his/her capacity Individually and on befalf of all others similarly situated's Memorandum in support of Plaintiff's Opposition to Defendant's Motion for Protective order and to Stay Discovery | |
| 10/10/2023 | 35.3 | Rule 9A notice of filing | |
| 10/12/2023 | | Matter taken under advisement: Rule 12 Hearing scheduled on: 10/12/2023 02:00 PM<br>Has been: Held - Under advisement<br>Comments: Prior Denial of Motion to Strike [#17] was VACATED by Judge Howe. Plaintiff's (refiled) Motion to Strike was improperly docketed (now properly docketed as #18.7). Once docketing issue is resolved court will either schedule a new hearing on the Motion to Strike (which Defense Counsel indicated he was not prepared to argue) or will take action on the papers.<br><br>Motion to Dismiss taken Under Advisement.<br><br>FTR - Courtroom 2<br>Hon. Janice W Howe, Presiding<br>Staff:<br>Stefano J Cornelio, Assistant Clerk Magistrate | Howe |
| 10/17/2023 | | Endorsement on Motion to strike (#17.0): Other action taken<br>The denial of this motion is dated 9/27/2023 is hereby VACATED. Current Motion to Strike paper #18.7 remains pending. | Howe |
| 10/19/2023 | | Endorsement on Motion to strike (#18.7): ALLOWED<br>Upon consideration of the parties' submissions including the exhibits attached to the defendant's motion to dismiss, and the complaint, the motion to strike is ALLOWED. in so far as it seeks to strike exhibits 1,2,3 and 4. The defendant represents that it no longer objects to the court striking exhibit 5; therefore EXHIBIT 5 is stricken. further, by agreement of the parties, Exhibit 6 shall not be stricken, so the motion is DENIED as to EXHIBIT 6. | Howe |

CRTR2709-CR

**COMMONWEALTH OF MASSACHUSETTS**
**ESSEX COUNTY**
**Docket Report**

| | | | |
|---|---|---|---|
| 10/25/2023 | | EDocument sent:<br><br>Clerk's Notice (eDoc)<br>Sent On: 10/25/2023 13:49:44<br>Notice Sent To: Thomas Tucker Merrigan, Esq. tom@sweeneymerrigan.com<br>Notice Sent To: Victoria M Santoro, Esq. victoria@sweeneymerrigan.com<br>Notice Sent To: Jonathan Tucker Merrigan, Esq. tucker@sweeneymerrigan.com<br>Notice Sent To: Erin E McHugh, Esq. emchugh@sweeneymerrigan.com<br>Notice Sent To: Nathan B Campbell 1221 McKinney Suite 2500, Houston, TX 77010<br>Notice Sent To: Foster C Johnson 1221 McKinney Suite 2500, Houston, TX 77010<br>Notice Sent To: David E Warden 1221 McKinney Suite 2500, Houston, TX 77010<br>Notice Sent To: Alex J Dravillas 150 N. Riverside Plaza Suite 4100, Chicago, IL 60606<br>Notice Sent To: Sara Aguiniga, Esq. 1100 Vermon Avenue, N.W. 12th Floor, Washington, DC 20005<br>Notice Sent To: Carl J Gustafson 1221 McKinney Suite 2500, Houston, TX 77010<br>Notice Sent To: Emyr Remy, Esq. remy@shb.com<br>Notice Sent To: Alfred J. Saikali Asaikali@shb.com<br>Notice Sent To: Justin R. Donoho 111 S. Wacker Drive Suite 4700, Chicago, IL 60606<br>Notice Sent To: Jenn O. Hatcher, Esq. 2555 Grand Blvd, Kansas City, MO 64108<br>Notice Sent To: Jessica N. Wahl, Esq. 2049 Century Park East #3000, Los Angeles, CA 90067<br>Notice Sent To: Tammy B. Webb, Esq. 555 Mission Street Suite 2300, San Francisco, CA 94105 | |
| 10/25/2023 | 36 | Defendant Emerson Hospital's Assented to Motion for leave to admit Tara D. Kennedy Pro Hac Vice | |
| 10/30/2023 | | Endorsement on Motion for Leave to Admit Tara D. Kennedy Pro Hac Vice (#36.0): ALLOWED<br><br>Judge: Dunigan, Hon. Elizabeth | Dunigan |

CRTR2709-CR

**COMMONWEALTH OF MASSACHUSETTS**
**ESSEX COUNTY**
**Docket Report**

| | |
|---|---|
| 10/30/2023 | EDocument sent:<br><br>Clerk's Notice (eDoc)<br>Sent On: 10/30/2023 14:27:15<br>Notice Sent To: Thomas Tucker Merrigan, Esq. tom@sweeneymerrigan.com<br>Notice Sent To: Victoria M Santoro, Esq. victoria@sweeneymerrigan.com<br>Notice Sent To: Jonathan Tucker Merrigan, Esq. tucker@sweeneymerrigan.com<br>Notice Sent To: Erin E McHugh, Esq. emchugh@sweeneymerrigan.com<br>Notice Sent To: Nathan B Campbell 1221 McKinney Suite 2500, Houston, TX 77010<br>Notice Sent To: Foster C Johnson 1221 McKinney Suite 2500, Houston, TX 77010<br>Notice Sent To: David E Warden 1221 McKinney Suite 2500, Houston, TX 77010<br>Notice Sent To: Alex J Dravillas 150 N. Riverside Plaza Suite 4100, Chicago, IL 60606<br>Notice Sent To: Sara Aguiniga, Esq. 1100 Vermon Avenue, N.W. 12th Floor, Washington, DC 20005<br>Notice Sent To: Carl J Gustafson 1221 McKinney Suite 2500, Houston, TX 77010<br>Notice Sent To: Emyr Remy, Esq. remy@shb.com<br>Notice Sent To: Alfred J. Saikali Asaikali@shb.com<br>Notice Sent To: Justin R. Donoho 111 S. Wacker Drive Suite 4700, Chicago, IL 60606<br>Notice Sent To: Jenn O. Hatcher, Esq. 2555 Grand Blvd, Kansas City, MO 64108<br>Notice Sent To: Jessica N. Wahl, Esq. 2049 Century Park East #3000, Los Angeles, CA 90067<br>Notice Sent To: Tammy B. Webb, Esq. 555 Mission Street Suite 2300, San Francisco, CA 94105 |

CRTR2709-CR

**COMMONWEALTH OF MASSACHUSETTS**
**ESSEX COUNTY**
**Docket Report**

| | | | |
|---|---|---|---|
| 11/22/2023 | | EDocument sent:<br><br>Clerk's Notice (eDoc)<br>Sent On: 11/22/2023 13:13:04<br>Notice Sent To: Thomas Tucker Merrigan, Esq. tom@sweeneymerrigan.com<br>Notice Sent To: Victoria M Santoro, Esq. victoria@sweeneymerrigan.com<br>Notice Sent To: Jonathan Tucker Merrigan, Esq. tucker@sweeneymerrigan.com<br>Notice Sent To: Erin E McHugh, Esq. emchugh@sweeneymerrigan.com<br>Notice Sent To: Nathan B Campbell 1221 McKinney Suite 2500, Houston, TX 77010<br>Notice Sent To: Foster C Johnson 1221 McKinney Suite 2500, Houston, TX 77010<br>Notice Sent To: David E Warden 1221 McKinney Suite 2500, Houston, TX 77010<br>Notice Sent To: Alex J Dravillas 150 N. Riverside Plaza Suite 4100, Chicago, IL 60606<br>Notice Sent To: Sara Aguiniga, Esq. 1100 Vermon Avenue, N.W. 12th Floor, Washington, DC 20005<br>Notice Sent To: Carl J Gustafson 1221 McKinney Suite 2500, Houston, TX 77010<br>Notice Sent To: Emyr Remy, Esq. remy@shb.com<br>Notice Sent To: Alfred J. Saikali Asaikali@shb.com<br>Notice Sent To: Justin R. Donoho 111 S. Wacker Drive Suite 4700, Chicago, IL 60606<br>Notice Sent To: Jenn O. Hatcher, Esq. 2555 Grand Blvd, Kansas City, MO 64108<br>Notice Sent To: Jessica N. Wahl, Esq. 2049 Century Park East #3000, Los Angeles, CA 90067<br>Notice Sent To: Tammy B. Webb, Esq. 555 Mission Street Suite 2300, San Francisco, CA 94105 | |
| 11/22/2023 | 37 | MEMORANDUM & ORDER:<br><br>MEMORANDUM OF DECISION AND ORDER ON DEFENDANT'S MOTION TO DISMISS<br><br>ORDER: Defendant's motion to dismiss is DENIED. SO ORDERED<br><br>Judge: Howe, Hon. Janice W | Howe |

CRTR2709-CR

**COMMONWEALTH OF MASSACHUSETTS**
**ESSEX COUNTY**
**Docket Report**

| | |
|---|---|
| 11/29/2023 | EDocument sent:<br><br>Notice to Appear was generated and sent to:<br>Plaintiff: Jonathan Tucker Merrigan, Esq. tucker@sweeneymerrigan.com<br>Plaintiff: Victoria M Santoro, Esq. victoria@sweeneymerrigan.com<br>Plaintiff: Erin E McHugh, Esq. emchugh@sweeneymerrigan.com<br>Plaintiff: Foster C Johnson 1221 McKinney Suite 2500, Houston, TX 77010<br>Plaintiff: Alex J Dravillas 150 N. Riverside Plaza Suite 4100, Chicago, IL 60606<br>Plaintiff: Nathan B Campbell 1221 McKinney Suite 2500, Houston, TX 77010<br>Plaintiff: David E Warden 1221 McKinney Suite 2500, Houston, TX 77010<br>Plaintiff: Thomas Tucker Merrigan, Esq. tom@sweeneymerrigan.com<br>Plaintiff: Sara Aguiniga, Esq. 1100 Vermon Avenue, N.W. 12th Floor, Washington, DC 20005<br>Plaintiff: Carl J Gustafson 1221 McKinney Suite 2500, Houston, TX 77010<br>Defendant: Emyr Remy, Esq. remy@shb.com<br>Defendant: Justin R. Donoho 111 S. Wacker Drive Suite 4700, Chicago, IL 60606<br>Defendant: Tammy B. Webb, Esq. 555 Mission Street Suite 2300, San Francisco, CA 94105<br>Defendant: Jessica N. Wahl, Esq. 2049 Century Park East #3000, Los Angeles, CA 90067<br>Defendant: Jenn O. Hatcher, Esq. 2555 Grand Blvd, Kansas City, MO 64108<br>Defendant: Alfred J. Saikali Asaikali@shb.com<br>Sent On: 11/29/2023 11:38:35 |

| | |
|---|---|
| 11/29/2023 | EDocument sent:<br><br>Notice to Appear was generated and sent to:<br>Plaintiff: Jonathan Tucker Merrigan, Esq. tucker@sweeneymerrigan.com<br>Plaintiff: Victoria M Santoro, Esq. victoria@sweeneymerrigan.com<br>Plaintiff: Erin E McHugh, Esq. emchugh@sweeneymerrigan.com<br>Plaintiff: Foster C Johnson 1221 McKinney Suite 2500, Houston, TX 77010<br>Plaintiff: Alex J Dravillas 150 N. Riverside Plaza Suite 4100, Chicago, IL 60606<br>Plaintiff: Nathan B Campbell 1221 McKinney Suite 2500, Houston, TX 77010<br>Plaintiff: David E Warden 1221 McKinney Suite 2500, Houston, TX 77010<br>Plaintiff: Thomas Tucker Merrigan, Esq. tom@sweeneymerrigan.com<br>Plaintiff: Victoria M Santoro, Esq. victoria@sweeneymerrigan.com<br>Plaintiff: Erin E McHugh, Esq. emchugh@sweeneymerrigan.com<br>Plaintiff: Foster C Johnson 1221 McKinney Suite 2500, Houston, TX 77010<br>Plaintiff: Alex J Dravillas 150 N. Riverside Plaza Suite 4100, Chicago, IL 60606<br>Defendant: Jenn O. Hatcher, Esq. 2555 Grand Blvd, Kansas City, MO 64108<br>Plaintiff: Thomas Tucker Merrigan, Esq. tom@sweeneymerrigan.com<br>Sent On: 11/29/2023 11:41:09<br>Defendant: Emyr Remy, Esq. remy@shb.com<br>Defendant: Justin R. Donoho 111 S. Wacker Drive Suite 4700, Chicago, IL 60606<br>Defendant: Tammy B. Webb, Esq. 555 Mission Street Suite 2300, San Francisco, CA 94105<br>Defendant: Jessica N. Wahl, Esq. 2049 Century Park East #3000, Los Angeles, CA 90067<br>Defendant: Jenn O. Hatcher, Esq. 2555 Grand Blvd, Kansas City, MO 64108<br>Defendant: Alfred J. Saikali Asaikali@shb.com<br>Sent On: 11/29/2023 11:41:09<br><br>Notice to Appear was generated and sent to:<br>Plaintiff: Jonathan Tucker Merrigan, Esq. tucker@sweeneymerrigan.com<br>Plaintiff: Victoria M Santoro, Esq. victoria@sweeneymerrigan.com<br>Plaintiff: Erin E McHugh, Esq. emchugh@sweeneymerrigan.com<br>Plaintiff: Foster C Johnson 1221 McKinney Suite 2500, Houston, TX 77010<br>Plaintiff: Alex J Dravillas 150 N. Riverside Plaza Suite 4100, Chicago, IL 60606<br>Plaintiff: Nathan B Campbell 1221 McKinney Suite 2500, Houston, TX 77010<br>Plaintiff: David E Warden 1221 McKinney Suite 2500, Houston, TX 77010<br>Plaintiff: Thomas Tucker Merrigan, Esq. tom@sweeneymerrigan.com<br>Plaintiff: Sara Aguiniga, Esq. 1100 Vermon Avenue, N.W. 12th Floor, Washington, DC 20005<br>Plaintiff: Carl J Gustafson 1221 McKinney Suite 2500, Houston, TX 77010<br>Defendant: Emyr Remy, Esq. remy@shb.com<br>Defendant: Justin R. Donoho 111 S. Wacker Drive Suite 4700, Chicago, IL 60606<br>Defendant: Tammy B. Webb, Esq. 555 Mission Street Suite 2300, San Francisco, CA 94105<br>Defendant: Jessica N. Wahl, Esq. 2049 Century Park East #3000, Los Angeles, CA 90067<br>Defendant: Jenn O. Hatcher, Esq. 2555 Grand Blvd, Kansas City, MO 64108<br>Defendant: Alfred J. Saikali Asaikali@shb.com |

CRTR2709-CR

**COMMONWEALTH OF MASSACHUSETTS**
**ESSEX COUNTY**
**Docket Report**

| | | | |
|---|---|---|---|
| | | Sent On: 11/29/2023 11:41:52<br><br>Notice to Appear was generated and sent to:<br>Plaintiff: Jonathan Tucker Merrigan, Esq. tucker@sweeneymerrigan.com<br>Plaintiff: Victoria M Santoro, Esq. victoria@sweeneymerrigan.com<br>Plaintiff: Erin E McHugh, Esq. emchugh@sweeneymerrigan.com<br>Plaintiff: Foster C Johnson 1221 McKinney Suite 2500, Houston, TX 77010<br>Plaintiff: Alex J Dravillas 150 N. Riverside Plaza Suite 4100, Chicago, IL 60606<br>Plaintiff: Nathan B Campbell 1221 McKinney Suite 2500, Houston, TX 77010<br>Plaintiff: David E Warden 1221 McKinney Suite 2500, Houston, TX 77010<br>Plaintiff: Thomas Tucker Merrigan, Esq. tom@sweeneymerrigan.com<br>Plaintiff: Sara Aguiniga, Esq. 1100 Vermon Avenue, N.W. 12th Floor, Washington, DC 20005<br>Plaintiff: Carl J Gustafson 1221 McKinney Suite 2500, Houston, TX 77010<br>Defendant: Emyr Remy, Esq. remy@shb.com<br>Defendant: Justin R. Donoho 111 S. Wacker Drive Suite 4700, Chicago, IL 60606<br>Defendant: Tammy B. Webb, Esq. 555 Mission Street Suite 2300, San Francisco, CA 94105<br>Defendant: Jessica N. Wahl, Esq. 2049 Century Park East #3000, Los Angeles, CA 90067<br>Defendant: Jenn O. Hatcher, Esq. 2555 Grand Blvd, Kansas City, MO 64108<br>Defendant: Alfred J. Saikali Asaikali@shb.com<br>Sent On: 11/29/2023 11:42:29 | |
| 11/30/2023 | 38 | Defendant Emerson Hospital's Assented to Motion for extension of time to respond to complaint | |
| 12/01/2023 | | Attorney appearance electronically filed.<br><br>Applies To: Kenney, Esq., Justin C (Attorney) on behalf of John Doe In his/her capacity Individually and on befalf of all others similarly situated (Plaintiff) | |
| 12/05/2023 | | Endorsement on Motion for extension of time to respond to complaint (#38.0): ALLOWED | Rooney |
| 12/05/2023 | | EDocument sent:<br><br>Clerk's Notice (eDoc)<br>Sent On: 12/05/2023 11:46:08<br>Notice Sent To: Thomas Tucker Merrigan, Esq. tom@sweeneymerrigan.com<br>Notice Sent To: Victoria M Santoro, Esq. victoria@sweeneymerrigan.com<br>Notice Sent To: Jonathan Tucker Merrigan, Esq. tucker@sweeneymerrigan.com<br>Notice Sent To: Erin E McHugh, Esq. emchugh@sweeneymerrigan.com<br>Notice Sent To: Justin C Kenney, Esq. jkenneytx@gmail.com<br>Notice Sent To: Emyr Remy, Esq. remy@shb.com<br>Notice Sent To: Alfred J. Saikali Asaikali@shb.com<br>Notice Sent To: Jenn O. Hatcher, Esq. 2555 Grand Blvd, Kansas City, MO 64108<br>Notice Sent To: Jessica N. Wahl, Esq. 2049 Century Park East #3000, Los Angeles, CA 90067<br>Notice Sent To: Tammy B. Webb, Esq. 555 Mission Street Suite 2300, San Francisco, CA 94105 | |

CRTR2709-CR

**COMMONWEALTH OF MASSACHUSETTS**
**ESSEX COUNTY**
**Docket Report**

| | | | |
|---|---|---|---|
| 12/12/2023 | 39 | Answer to amended complaint<br><br>Applies To: Emerson Hospital (Defendant) | |
| 12/12/2023 | | Attorney appearance electronically filed.<br><br>Applies To: Hawkins, Esq., Ryan (Attorney) on behalf of John Doe In his/her capacity Individually and on befalf of all others similarly situated (Plaintiff) | |
| 12/20/2023 | 40 | Defendant's Notice of intent to file motion Notice of Motion to Report<br><br>Applies To: Emerson Hospital (Defendant) | |
| 12/20/2023 | 41 | Defendant's Notice of intent to file motion Notice of Motion to Stay<br><br>Applies To: Emerson Hospital (Defendant) | |
| 12/21/2023 | | Event Result:: Motion Hearing to Compel scheduled on:<br>12/21/2023 02:00 PM<br>Has been: Not Held For the following reason: Event Changed<br>Comments: FTR courtroom 1<br><br>Court received Defendant's Notice of intent to file motion Notice of Motion to Stay and Defendant's Notice of intent to file motion Notice of Motion to Report. Court scheduled a new date for discovery motions due to the filing of the motion to stay and motion to report. Court made counsel aware to be ready to argue all outstanding motions on 1/30/24.<br><br>Hon. Lynn C Rooney, Presiding<br>Staff:<br>Dawn Mansfield, Assistant Clerk Magistrate | Rooney |
| 12/21/2023 | | Event Result:: Hearing for Protective Order scheduled on:<br>12/21/2023 02:00 PM<br>Has been: Not Held For the following reason: Event Changed<br>Hon. Lynn C Rooney, Presiding<br>Staff:<br>Debra Vernava, Assistant Clerk Magistrate | Rooney |
| 12/22/2023 | 42 | Defendant Emerson Hospital's Notice of Single Justice Petition | |
| 12/28/2023 | | EDocument sent:<br><br>Notice to Appear was generated and sent to:<br>Plaintiff: Jonathan Tucker Merrigan, Esq. tucker@sweeneymerrigan.com<br>Plaintiff: John Doe In his/her capacity Individually and on befalf of all others similarly situated No addresses available<br>Sent On: 12/28/2023 13:18:17 | |
| 01/02/2024 | 43 | Notice of docket entry received from Appeals Court<br>ORDER: Appellate proceedings stayed to 2/2/2024, pending a decision on the motion to report to be filed in the trial court. Status report due 2/2/2024, or within 7 days of a decision on the motion, whichever date is sooner. | |
| 01/22/2024 | 44 | Defendant Emerson Hospital's Motion to report | |

CRTR2709-CR

**COMMONWEALTH OF MASSACHUSETTS**
**ESSEX COUNTY**
**Docket Report**

| | | | |
|---|---|---|---|
| 01/22/2024 | 44.1 | Emerson Hospital's Memorandum in support of its motion to report | |
| 01/22/2024 | 44.2 | Opposition to defendants motion to report filed by John Doe In his/her capacity Individually and on befalf of all others similarly situated | |
| 01/22/2024 | 44.3 | Reply/Sur-reply<br><br>Emerson Hospital's Reply in support of its motion to report | |
| 01/22/2024 | | Exhibits/Appendix<br><br>Exhibit Index to Emerson Hospital's Reply in support of its Motion to Report | |
| 01/22/2024 | 44.4 | Rule 9A notice of filing | |
| 01/22/2024 | 45 | Defendant Emerson Hospital's Motion to stay | |
| 01/22/2024 | 45.1 | Emerson Hospital's Memorandum in support of its motion to stay | |
| 01/22/2024 | 44.2 | Opposition to defendants' motion to stay filed by John Doe In his/her capacity Individually and on befalf of all others similarly situated | |
| 01/22/2024 | 44.3 | Reply/Sur-reply<br><br>Emerson Hospital's Reply in support of its motion to stay | |
| 01/22/2024 | | Exhibits/Appendix<br><br>Exhibit index to Emerson Hospital's Reply in support of its motion to stay | |
| 01/22/2024 | 44.4 | Rule 9A notice of filing | |
| 01/30/2024 | | Event Result:: Hearing for Protective Order scheduled on:<br>01/30/2024 02:00 PM<br>Has been: Not Held For the following reason: By Court prior to date<br>Hon. Elizabeth Dunigan, Presiding<br>Staff:<br>Dawn Mansfield, Assistant Clerk Magistrate | Dunigan |
| 01/30/2024 | | Event Result:: Motion Hearing to Compel scheduled on:<br>01/30/2024 02:00 PM<br>Has been: Not Held For the following reason: By Court prior to date<br>Hon. Elizabeth Dunigan, Presiding<br>Staff:<br>Dawn Mansfield, Assistant Clerk Magistrate | Dunigan |
| 01/30/2024 | | Event Result:: Motion Hearing scheduled on:<br>01/30/2024 02:00 PM<br>Has been: Held as Scheduled<br>Comments: FTR Law(3)<br>Hon. Elizabeth Dunigan, Presiding<br>Staff:<br>Dawn Mansfield, Assistant Clerk Magistrate | Dunigan |

CRTR2709-CR

**COMMONWEALTH OF MASSACHUSETTS**
**ESSEX COUNTY**
**Docket Report**

| | | |
|---|---|---|
| 01/31/2024 | Endorsement on Motion to report (#44.0): DENIED<br>After hearing, motion Denied. Case is stayed pending SJC decision on 2 Vita cases (see Paper #45). The issue of the wire tap statute as it applies to internet tracking is squarely before the SJC. This issue- section F.of Howe, J. memo and order on defendant's motion to dismiss (Paper#37) is before the SJC and reporting the decision would cause additional unreasonable delay. Dated 1/30/24. | Dunigan |
| 01/31/2024 | EDocument sent:<br><br>Clerk's Notice (eDoc)<br>Sent On: 01/31/2024 08:38:04<br>Notice Sent To: Thomas Tucker Merrigan, Esq. tom@sweeneymerrigan.com<br>Notice Sent To: Victoria M Santoro, Esq. victoria@sweeneymerrigan.com<br>Notice Sent To: Jonathan Tucker Merrigan, Esq. tucker@sweeneymerrigan.com<br>Notice Sent To: Ryan Hawkins, Esq. rmh@sweeneymerrigan.com<br>Notice Sent To: Erin E McHugh, Esq. emchugh@sweeneymerrigan.com<br>Notice Sent To: Justin C Kenney, Esq. jkenneytx@gmail.com<br>Notice Sent To: Nathan B Campbell 1221 McKinney Suite 2500, Houston, TX 77010<br>Notice Sent To: Foster C Johnson 1221 McKinney Suite 2500, Houston, TX 77010<br>Notice Sent To: David E Warden 1221 McKinney Suite 2500, Houston, TX 77010<br>Notice Sent To: Alex J Dravillas 150 N. Riverside Plaza Suite 4100, Chicago, IL 60606<br>Notice Sent To: Sara Aguiniga, Esq. 1100 Vermon Avenue, N.W. 12th Floor, Washington, DC 20005<br>Notice Sent To: Carl J Gustafson 1221 McKinney Suite 2500, Houston, TX 77010<br>Notice Sent To: Emyr Remy, Esq. remy@shb.com<br>Notice Sent To: Alfred J. Saikali Asaikali@shb.com<br>Notice Sent To: Justin R. Donoho 111 S. Wacker Drive Suite 4700, Chicago, IL 60606<br>Notice Sent To: Jenn O. Hatcher, Esq. 2555 Grand Blvd, Kansas City, MO 64108<br>Notice Sent To: Jessica N. Wahl, Esq. 2049 Century Park East #3000, Los Angeles, CA 90067<br>Notice Sent To: Tammy B. Webb, Esq. 555 Mission Street Suite 2300, San Francisco, CA 94105 | |
| 01/31/2024 | Endorsement on Motion to stay (#45.0): ALLOWED<br>After hearing, motion Allowed. Case stayed pending SJC decision on "wiretap" issues. DAR allowed by SJC on 1/17/2024 regarding Vita cases. Dated 1/30/2024. | Dunigan |

CRTR2709-CR

**COMMONWEALTH OF MASSACHUSETTS**
**ESSEX COUNTY**
**Docket Report**

| | |
|---|---|
| 01/31/2024 | EDocument sent:<br><br>Clerk's Notice (eDoc)<br>Sent On: 01/31/2024 08:49:05<br>Notice Sent To: Thomas Tucker Merrigan, Esq. tom@sweeneymerrigan.com<br>Notice Sent To: Victoria M Santoro, Esq. victoria@sweeneymerrigan.com<br>Notice Sent To: Jonathan Tucker Merrigan, Esq. tucker@sweeneymerrigan.com<br>Notice Sent To: Ryan Hawkins, Esq. rmh@sweeneymerrigan.com<br>Notice Sent To: Erin E McHugh, Esq. emchugh@sweeneymerrigan.com<br>Notice Sent To: Justin C Kenney, Esq. jkenneytx@gmail.com<br>Notice Sent To: Nathan B Campbell 1221 McKinney Suite 2500, Houston, TX 77010<br>Notice Sent To: Foster C Johnson 1221 McKinney Suite 2500, Houston, TX 77010<br>Notice Sent To: David E Warden 1221 McKinney Suite 2500, Houston, TX 77010<br>Notice Sent To: Alex J Dravillas 150 N. Riverside Plaza Suite 4100, Chicago, IL 60606<br>Notice Sent To: Sara Aguiniga, Esq. 1100 Vermon Avenue, N.W. 12th Floor, Washington, DC 20005<br>Notice Sent To: Carl J Gustafson 1221 McKinney Suite 2500, Houston, TX 77010<br>Notice Sent To: Emyr Remy, Esq. remy@shb.com<br>Notice Sent To: Alfred J. Saikali Asaikali@shb.com<br>Notice Sent To: Justin R. Donoho 111 S. Wacker Drive Suite 4700, Chicago, IL 60606<br>Notice Sent To: Jenn O. Hatcher, Esq. 2555 Grand Blvd, Kansas City, MO 64108<br>Notice Sent To: Jessica N. Wahl, Esq. 2049 Century Park East #3000, Los Angeles, CA 90067<br>Notice Sent To: Tammy B. Webb, Esq. 555 Mission Street Suite 2300, San Francisco, CA 94105 |

CRTR2709-CR

**COMMONWEALTH OF MASSACHUSETTS**
**ESSEX COUNTY**
**Docket Report**

| | | |
|---|---|---|
| 02/01/2024 | | EDocument sent:<br><br>Clerk's Notice (eDoc)<br>Sent On: 02/01/2024 08:31:20<br>Notice Sent To: Thomas Tucker Merrigan, Esq. Sweeney Merrigan Law 393 Main St, Greenfield, MA 01301<br>Notice Sent To: Victoria M Santoro, Esq. Sweeney Merrigan Law 268 Summer St LL, Boston, MA 02210<br>Notice Sent To: Jonathan Tucker Merrigan, Esq. Sweeney Merrigan Law, LLP 268 Summer St, Boston, MA 02210<br>Notice Sent To: Ryan Hawkins, Esq. Sweeney Merrigan Law LLP 268 Summer St LL, Boston, MA 02210<br>Notice Sent To: Erin E McHugh, Esq. Sweeney Merrigan Law, LLP 268 Summer St, Boston, MA 02210<br>Notice Sent To: Justin C Kenney, Esq. Ahmad, Zavitsanos, and Mensing PLLC 1221 McKinney St Suite 2500, Houston, TX 77010<br>Notice Sent To: Nathan B Campbell 1221 McKinney Suite 2500, Houston, TX 77010<br>Notice Sent To: Foster C Johnson 1221 McKinney Suite 2500, Houston, TX 77010<br>Notice Sent To: David E Warden 1221 McKinney Suite 2500, Houston, TX 77010<br>Notice Sent To: Alex J Dravillas 150 N. Riverside Plaza Suite 4100, Chicago, IL 60606<br>Notice Sent To: Sara Aguiniga, Esq. 1100 Vermon Avenue, N.W. 12th Floor, Washington, DC 20005<br>Notice Sent To: Carl J Gustafson 1221 McKinney Suite 2500, Houston, TX 77010<br>Notice Sent To: Emyr Remy, Esq. Shook, Hardy and Bacon L.L.P. One Federal St Suite 2540, Boston, MA 02110<br>Notice Sent To: Alfred J. Saikali 201 S. Biscayne Blvd., Suite 3200, Miami, FL 33131<br>Notice Sent To: Justin R. Donoho 111 S. Wacker Drive Suite 4700, Chicago, IL 60606<br>Notice Sent To: Jenn O. Hatcher, Esq. 2555 Grand Blvd, Kansas City, MO 64108<br>Notice Sent To: Jessica N. Wahl, Esq. 2049 Century Park East #3000, Los Angeles, CA 90067<br>Notice Sent To: Tammy B. Webb, Esq. 555 Mission Street Suite 2300, San Francisco, CA 94105 |
| 02/02/2024 | 46 | Defendant Emerson Hospital's Submission of<br>Status Report in support of single justice interlocutory review |
| 02/08/2024 | 47 | Notice of docket entry received from Appeals Court<br>ORDER (RE#1): This case is before the single justice on the defendant's petition for leave to take an interlocutory appeal of the denial of its motion to dismiss...It would not be a prudent exercise of my discretion to allow an interlocutory appeal useful only if the hospital in Vita loses, the Supreme Judicial Court ignores the defendant's amicus brief, and the defendant here ultimately prevails on its narrow, additional theory. Accordingly, the petition is denied. |

CRTR2709-CR

**COMMONWEALTH OF MASSACHUSETTS**
**ESSEX COUNTY**
**Docket Report**

| | | | |
|---|---|---|---|
| 03/21/2024 | | Attorney appearance electronically filed.<br>Applies To: White, Esq., Lisa Oliver (Attorney) on behalf of Emerson Hospital (Defendant) | |
| 05/10/2024 | | Withdrawal of Attorney appearance electronically filed.<br><br>Applies To: Santoro, Esq., Victoria M (Attorney) on behalf of John Doe In his/her capacity Individually and on befalf of all others similarly situated (Plaintiff) | |
| 01/07/2025 | | Attorney appearance<br>On this date Tara D. Kennedy added for Defendant Emerson Hospital | |
| 03/17/2025 | 48 | ORDER sent for Status Review, if notice is not received by 04/17/2025 the complaint will be dismissed. | Rooney |
| 03/17/2025 | | EDocument sent:<br><br>Notice of Status Review of Docket<br>Sent On: 03/17/2025 15:01:05<br>Notice Sent To: Thomas Tucker Merrigan, Esq. tom@sweeneymerrigan.com<br>Notice Sent To: Jonathan Tucker Merrigan, Esq. tucker@sweeneymerrigan.com<br>Notice Sent To: Ryan Hawkins, Esq. rmh@sweeneymerrigan.com<br>Notice Sent To: Erin E McHugh, Esq. emchugh@sweeneymerrigan.com<br>Notice Sent To: Justin C Kenney, Esq. jkenneytx@gmail.com<br>Notice Sent To: Lisa Oliver White, Esq. lowhite@shb.com<br>Notice Sent To: Emyr Remy, Esq. remy@shb.com<br>Notice Sent To: Alfred J. Saikali Asaikali@shb.com | |
| 04/08/2025 | 49 | Status review notice returned Plaintiffs will be moving to amend the complaint to add Federal wiretap claims and request a scheduling conference<br><br>Applies To: Hawkins, Esq., Ryan (Attorney) on behalf of John Doe In his/her capacity Individually and on befalf of all others similarly situated (Plaintiff) | |

CRTR2709-CR

**COMMONWEALTH OF MASSACHUSETTS**
**ESSEX COUNTY**
**Docket Report**

| | | |
|---|---|---|
| 08/18/2025 | EDocument sent:<br><br>Notice to Appear was generated and sent to:<br>Plaintiff: Jonathan Tucker Merrigan, Esq. tucker@sweeneymerrigan.com<br>Plaintiff: Erin E McHugh, Esq. emchugh@sweeneymerrigan.com<br>Plaintiff: Foster C Johnson 1221 McKinney Suite 2500, Houston, TX 77010<br>Plaintiff: Alex J Dravillas 150 N. Riverside Plaza Suite 4100, Chicago, IL 60606<br>Plaintiff: Nathan B Campbell 1221 McKinney Suite 2500, Houston, TX 77010<br>Plaintiff: David E Warden 1221 McKinney Suite 2500, Houston, TX 77010<br>Plaintiff: Thomas Tucker Merrigan, Esq. tom@sweeneymerrigan.com<br>Plaintiff: Sara Aguiniga, Esq. 1100 Vermon Avenue, N.W. 12th Floor, Washington, DC 20005<br>Plaintiff: Carl J Gustafson 1221 McKinney Suite 2500, Houston, TX 77010<br>Plaintiff: Justin C Kenney, Esq. jkenneytx@gmail.com<br>Plaintiff: Ryan Hawkins, Esq. rmh@sweeneymerrigan.com<br>Defendant: Emyr Remy, Esq. remy@shb.com<br>Defendant: Justin R. Donoho 111 S. Wacker Drive Suite 4700, Chicago, IL 60606<br>Defendant: Tammy B. Webb, Esq. 555 Mission Street Suite 2300, San Francisco, CA 94105<br>Defendant: Jessica N. Wahl, Esq. 2049 Century Park East #3000, Los Angeles, CA 90067<br>Defendant: Jenn O. Hatcher, Esq. 2555 Grand Blvd, Kansas City, MO 64108<br>Defendant: Alfred J. Saikali Asaikali@shb.com<br>Defendant: Lisa Oliver White, Esq. lowhite@shb.com<br>Defendant: Tara D. Kennedy 111 South Wacker Drive Suite 4700, Chicago, IL 60606<br>Sent On: 08/18/2025 13:16:53 | |
| 08/18/2025 | Event Result:: Rule 16 Conference scheduled on:<br>10/01/2025 02:00 PM<br>Has been: Rescheduled For the following reason: By Court prior to date<br>Comments: Date scheduled in error<br>Hon. Salim Tabit, Presiding<br>Staff:<br>Debra Vernava, Assistant Clerk Magistrate | Tabit |

CRTR2709-CR

**COMMONWEALTH OF MASSACHUSETTS**
**ESSEX COUNTY**
**Docket Report**

| | | | |
|---|---|---|---|
| 08/18/2025 | | EDocument sent:<br><br>Notice to Appear was generated and sent to:<br>Plaintiff: Jonathan Tucker Merrigan, Esq. tucker@sweeneymerrigan.com<br>Plaintiff: Erin E McHugh, Esq. emchugh@sweeneymerrigan.com<br>Plaintiff: Foster C Johnson 1221 McKinney Suite 2500, Houston, TX 77010<br>Plaintiff: Alex J Dravillas 150 N. Riverside Plaza Suite 4100, Chicago, IL 60606<br>Plaintiff: Nathan B Campbell 1221 McKinney Suite 2500, Houston, TX 77010<br>Plaintiff: David E Warden 1221 McKinney Suite 2500, Houston, TX 77010<br>Plaintiff: Thomas Tucker Merrigan, Esq. tom@sweeneymerrigan.com<br>Plaintiff: Sara Aguiniga, Esq. 1100 Vermon Avenue, N.W. 12th Floor, Washington, DC 20005<br>Plaintiff: Carl J Gustafson 1221 McKinney Suite 2500, Houston, TX 77010<br>Plaintiff: Justin C Kenney, Esq. jkenneytx@gmail.com<br>Plaintiff: Ryan Hawkins, Esq. rmh@sweeneymerrigan.com<br>Defendant: Emyr Remy, Esq. remy@shb.com<br>Defendant: Justin R. Donoho 111 S. Wacker Drive Suite 4700, Chicago, IL 60606<br>Defendant: Tammy B. Webb, Esq. 555 Mission Street Suite 2300, San Francisco, CA 94105<br>Defendant: Jessica N. Wahl, Esq. 2049 Century Park East #3000, Los Angeles, CA 90067<br>Defendant: Jenn O. Hatcher, Esq. 2555 Grand Blvd, Kansas City, MO 64108<br>Defendant: Alfred J. Saikali Asaikali@shb.com<br>Defendant: Lisa Oliver White, Esq. lowhite@shb.com<br>Defendant: Tara D. Kennedy 111 South Wacker Drive Suite 4700, Chicago, IL 60606<br>Sent On: 08/18/2025 14:30:30 | |
| 08/26/2025 | 50 | Defendant Emerson Hospital's Motion for leave to admit Jad Sheikali Pro Hac Vice | |
| 08/27/2025 | 51 | Plaintiff John Doe In his/her capacity Individually and on befalf of all others similarly situated's Joint Motion to Convert Rule 16 Hearing to Virtual | |
| 08/27/2025 | | Endorsement on Motion to continue / reschedule an event Plaintiff John Doe In his/her capacity Individually and on behalf of all others similarly situated's Joint Motion to Convert Rule 16 Hearing to Virtual (#51.0): ALLOWED ALLOWED. Dated 8/27/2025. | Tabit |

CRTR2709-CR

**COMMONWEALTH OF MASSACHUSETTS**
**ESSEX COUNTY**
**Docket Report**

| | | |
|---|---|---|
| 08/27/2025 | EDocument sent:<br><br>Clerk's Notice (eDoc)<br>Sent On: 08/27/2025 12:39:20<br>Notice Sent To: Thomas Tucker Merrigan, Esq. tom@sweeneymerrigan.com<br>Notice Sent To: Jonathan Tucker Merrigan, Esq. tucker@sweeneymerrigan.com<br>Notice Sent To: Ryan Hawkins, Esq. rmh@sweeneymerrigan.com<br>Notice Sent To: Erin E McHugh, Esq. emchugh@sweeneymerrigan.com<br>Notice Sent To: Justin C Kenney, Esq. jkenneytx@gmail.com<br>Notice Sent To: Nathan B Campbell 1221 McKinney Suite 2500, Houston, TX 77010<br>Notice Sent To: Foster C Johnson 1221 McKinney Suite 2500, Houston, TX 77010<br>Notice Sent To: David E Warden 1221 McKinney Suite 2500, Houston, TX 77010<br>Notice Sent To: Alex J Dravillas 150 N. Riverside Plaza Suite 4100, Chicago, IL 60606<br>Notice Sent To: Sara Aguiniga, Esq. 1100 Vermon Avenue, N.W. 12th Floor, Washington, DC 20005<br>Notice Sent To: Carl J Gustafson 1221 McKinney Suite 2500, Houston, TX 77010<br>Notice Sent To: Lisa Oliver White, Esq. lowhite@shb.com<br>Notice Sent To: Emyr Remy, Esq. remy@shb.com<br>Notice Sent To: Alfred J. Saikali Asaikali@shb.com<br>Notice Sent To: Justin R. Donoho 111 S. Wacker Drive Suite 4700, Chicago, IL 60606<br>Notice Sent To: Jenn O. Hatcher, Esq. 2555 Grand Blvd, Kansas City, MO 64108<br>Notice Sent To: Jessica N. Wahl, Esq. 2049 Century Park East #3000, Los Angeles, CA 90067<br>Notice Sent To: Tammy B. Webb, Esq. 555 Mission Street Suite 2300, San Francisco, CA 94105<br>Notice Sent To: Tara D. Kennedy 111 South Wacker Drive Suite 4700, Chicago, IL 60606 | |
| 08/27/2025 | Event Result:: Rule 16 Conference scheduled on:<br>09/03/2025 02:00 PM<br>Has been: Rescheduled For the following reason: Request of Defendant<br>Comments: Rescheduled to Zoom. See 8/27/25 Endorsement on Paper No. 51.<br>Hon. Salim Tabit, Presiding<br>Staff:<br>Anne Mitchell, Assistant Clerk Magistrate | Tabit |

CRTR2709-CR

**COMMONWEALTH OF MASSACHUSETTS**
**ESSEX COUNTY**
**Docket Report**

| | | |
|---|---|---|
| 08/27/2025 | EDocument sent:<br><br>Notice to Appear was generated and sent to:<br>Plaintiff: Jonathan Tucker Merrigan, Esq. tucker@sweeneymerrigan.com<br>Plaintiff: Erin E McHugh, Esq. emchugh@sweeneymerrigan.com<br>Plaintiff: Foster C Johnson 1221 McKinney Suite 2500, Houston, TX 77010<br>Plaintiff: Alex J Dravillas 150 N. Riverside Plaza Suite 4100, Chicago, IL 60606<br>Plaintiff: Nathan B Campbell 1221 McKinney Suite 2500, Houston, TX 77010<br>Plaintiff: David E Warden 1221 McKinney Suite 2500, Houston, TX 77010<br>Plaintiff: Thomas Tucker Merrigan, Esq. tom@sweeneymerrigan.com<br>Plaintiff: Sara Aguiniga, Esq. 1100 Vermon Avenue, N.W. 12th Floor, Washington, DC 20005<br>Plaintiff: Carl J Gustafson 1221 McKinney Suite 2500, Houston, TX 77010<br>Plaintiff: Justin C Kenney, Esq. jkenneytx@gmail.com<br>Plaintiff: Ryan Hawkins, Esq. rmh@sweeneymerrigan.com<br>Defendant: Emyr Remy, Esq. remy@shb.com<br>Defendant: Justin R. Donoho 111 S. Wacker Drive Suite 4700, Chicago, IL 60606<br>Defendant: Tammy B. Webb, Esq. 555 Mission Street Suite 2300, San Francisco, CA 94105<br>Defendant: Jessica N. Wahl, Esq. 2049 Century Park East #3000, Los Angeles, CA 90067<br>Defendant: Jenn O. Hatcher, Esq. 2555 Grand Blvd, Kansas City, MO 64108<br>Defendant: Alfred J. Saikali Asaikali@shb.com<br>Defendant: Lisa Oliver White, Esq. lowhite@shb.com<br>Defendant: Tara D. Kennedy 111 South Wacker Drive Suite 4700, Chicago, IL 60606<br>Sent On: 08/27/2025 12:47:04 | |
| 08/27/2025 | Docket Note: On 8/27/25, Clerk Keller mailed Notice of Zoom hearing to all counsel and emailed it to in-state counsel requesting they forward the same to out of state counsel. | |
| 08/27/2025 | Endorsement on Motion for Defendant Emerson Hospital's Motion for leave to admit Jad Sheikali Pro Hac Vice (#50.0): ALLOWED<br>ALLOWED. Dated 8/27/2025. | Tabit |

CRTR2709-CR

**COMMONWEALTH OF MASSACHUSETTS**
**ESSEX COUNTY**
**Docket Report**

| | | |
|---|---|---|
| 08/27/2025 | EDocument sent:<br><br>Clerk's Notice (eDoc)<br>Sent On: 08/27/2025 13:17:51<br>Notice Sent To: Thomas Tucker Merrigan, Esq. tom@sweeneymerrigan.com<br>Notice Sent To: Jonathan Tucker Merrigan, Esq. tucker@sweeneymerrigan.com<br>Notice Sent To: Ryan Hawkins, Esq. rmh@sweeneymerrigan.com<br>Notice Sent To: Erin E McHugh, Esq. emchugh@sweeneymerrigan.com<br>Notice Sent To: Justin C Kenney, Esq. jkenneytx@gmail.com<br>Notice Sent To: Nathan B Campbell 1221 McKinney Suite 2500, Houston, TX 77010<br>Notice Sent To: Foster C Johnson 1221 McKinney Suite 2500, Houston, TX 77010<br>Notice Sent To: David E Warden 1221 McKinney Suite 2500, Houston, TX 77010<br>Notice Sent To: Alex J Dravillas 150 N. Riverside Plaza Suite 4100, Chicago, IL 60606<br>Notice Sent To: Sara Aguiniga, Esq. 1100 Vermon Avenue, N.W. 12th Floor, Washington, DC 20005<br>Notice Sent To: Carl J Gustafson 1221 McKinney Suite 2500, Houston, TX 77010<br>Notice Sent To: Lisa Oliver White, Esq. lowhite@shb.com<br>Notice Sent To: Emyr Remy, Esq. remy@shb.com<br>Notice Sent To: Alfred J. Saikali Asaikali@shb.com<br>Notice Sent To: Justin R. Donoho 111 S. Wacker Drive Suite 4700, Chicago, IL 60606<br>Notice Sent To: Jenn O. Hatcher, Esq. 2555 Grand Blvd, Kansas City, MO 64108<br>Notice Sent To: Jessica N. Wahl, Esq. 2049 Century Park East #3000, Los Angeles, CA 90067<br>Notice Sent To: Tammy B. Webb, Esq. 555 Mission Street Suite 2300, San Francisco, CA 94105<br>Notice Sent To: Tara D. Kennedy 111 South Wacker Drive Suite 4700, Chicago, IL 60606 | |
| 09/03/2025 | Pleading titled, Notice to Appear for Rule 16 Conference, filed with the court on 08/29/2025, returned to Jessica N. Wahl, Esq. | |
| 09/03/2025 | Event Result:: Rule 16 Conference scheduled on:<br>09/03/2025 02:00 PM<br>Has been: Held via Video/Phone<br>Comments: (Zoom) - FTR - 2:23:15 p.m., courtroom 1<br>Hon. Salim Tabit, Presiding<br>Staff:<br>Anne Mitchell, Assistant Clerk Magistrate | Tabit |

CRTR2709-CR

**COMMONWEALTH OF MASSACHUSETTS**
**ESSEX COUNTY**
**Docket Report**

| | | | |
|---|---|---|---|
| 09/03/2025 | 52 | ORDER: PROCEDURAL ORDER<br>As stated on the record this date, the plaintiff is granted leave to file an Amended Complaint, which Amended Complaint shall be filed on or before 11/3/25. Any motion to remove this case to federal court shall be filed on or before 12/3/25.<br><br>So Ordered.<br><br>/s/ Salim R. Tabit, J.<br><br>Judge: Tabit, Hon. Salim | Tabit |
| 09/04/2025 | | EDocument sent:<br><br>Clerk's Notice (eDoc)<br>Sent On: 09/04/2025 08:17:00<br>Notice Sent To: Thomas Tucker Merrigan, Esq. tom@sweeneymerrigan.com<br>Notice Sent To: Jonathan Tucker Merrigan, Esq. tucker@sweeneymerrigan.com<br>Notice Sent To: Ryan Hawkins, Esq. rmh@sweeneymerrigan.com<br>Notice Sent To: Erin E McHugh, Esq. emchugh@sweeneymerrigan.com<br>Notice Sent To: Justin C Kenney, Esq. jkenneytx@gmail.com<br>Notice Sent To: Nathan B Campbell 1221 McKinney Suite 2500, Houston, TX 77010<br>Notice Sent To: Foster C Johnson 1221 McKinney Suite 2500, Houston, TX 77010<br>Notice Sent To: David E Warden 1221 McKinney Suite 2500, Houston, TX 77010<br>Notice Sent To: Alex J Dravillas 150 N. Riverside Plaza Suite 4100, Chicago, IL 60606<br>Notice Sent To: Sara Aguiniga, Esq. 1100 Vermon Avenue, N.W. 12th Floor, Washington, DC 20005<br>Notice Sent To: Carl J Gustafson 1221 McKinney Suite 2500, Houston, TX 77010<br>Notice Sent To: Lisa Oliver White, Esq. lowhite@shb.com<br>Notice Sent To: Emyr Remy, Esq. remy@shb.com<br>Notice Sent To: Alfred J. Saikali Asaikali@shb.com<br>Notice Sent To: Justin R. Donoho 111 S. Wacker Drive Suite 4700, Chicago, IL 60606<br>Notice Sent To: Jenn O. Hatcher, Esq. 2555 Grand Blvd, Kansas City, MO 64108<br>Notice Sent To: Jessica N. Wahl, Esq. 2049 Century Park East #3000, Los Angeles, CA 90067<br>Notice Sent To: Tammy B. Webb, Esq. 555 Mission Street Suite 2300, San Francisco, CA 94105<br>Notice Sent To: Tara D. Kennedy 111 South Wacker Drive Suite 4700, Chicago, IL 60606 | |

CRTR2709-CR

**COMMONWEALTH OF MASSACHUSETTS**
**ESSEX COUNTY**
**Docket Report**

| | | |
|---|---|---|
| 09/11/2025 | | Pleading titled, Notice to Appear for Rule 16 Conference, filed with the court on 09/11/2025, returned to<br>Essex County Superior Court<br>Return to Sender<br>Jessica N. Wahl, Esq.<br>2049 Century Park East<br>#3000<br>Los Angeles, CA 90067l<br>Not Deliverable as Addressed<br>Unable to Forward |
| 09/18/2025 | | Pleading titled, Clerk's Notice, filed with the court on 09/18/2025, returned to the Court. Originally mailed to:<br>Jessica N. Wahl, Esq.<br>2049 Century Park East<br>#3000<br>Los Angeles, CA 90067<br>ATTEMPTED NOT KNOWN<br>UNABLE TO FORWARD |
| 09/19/2025 | 53 | Plaintiff John Doe Individually and on Behalf of All others similarly situated's Motion for<br>Admission for Pro Hac Vice |
| 09/19/2025 | 53.1 | Affidavit of Joseph Y. Ahmad |
| 09/19/2025 | 53.2 | Affidavit in Compliance with Superior Court Rule 9A |
| 09/19/2025 | 53.3 | Rule 9A notice of filing<br><br>and List of Documents |
| 09/19/2025 | 53.4 | Certificate of service of attorney or Pro Se:<br><br>Jonathan Tucker Merrigan, Esq. |
| 09/22/2025 | | Endorsement on Motion for admission pro hac vice (#53.0): ALLOWED Tabit |

CRTR2709-CR

**COMMONWEALTH OF MASSACHUSETTS**
**ESSEX COUNTY**
**Docket Report**

| | | |
|---|---|---|
| 09/22/2025 | | EDocument sent:<br><br>Clerk's Notice (eDoc)<br>Sent On: 09/22/2025 13:24:04<br>Notice Sent To: Thomas Tucker Merrigan, Esq. tom@sweeneymerrigan.com<br>Notice Sent To: Jonathan Tucker Merrigan, Esq. tucker@sweeneymerrigan.com<br>Notice Sent To: Ryan Hawkins, Esq. rmh@sweeneymerrigan.com<br>Notice Sent To: Erin E McHugh, Esq. emchugh@sweeneymerrigan.com<br>Notice Sent To: Justin C Kenney, Esq. jkenneytx@gmail.com<br>Notice Sent To: Nathan B Campbell 1221 McKinney Suite 2500, Houston, TX 77010<br>Notice Sent To: Foster C Johnson 1221 McKinney Suite 2500, Houston, TX 77010<br>Notice Sent To: David E Warden 1221 McKinney Suite 2500, Houston, TX 77010<br>Notice Sent To: Alex J Dravillas 150 N. Riverside Plaza Suite 4100, Chicago, IL 60606<br>Notice Sent To: Sara Aguiniga, Esq. 1100 Vermon Avenue, N.W. 12th Floor, Washington, DC 20005<br>Notice Sent To: Carl J Gustafson 1221 McKinney Suite 2500, Houston, TX 77010<br>Notice Sent To: Lisa Oliver White, Esq. lowhite@shb.com<br>Notice Sent To: Emyr Remy, Esq. remy@shb.com<br>Notice Sent To: Alfred J. Saikali Asaikali@shb.com<br>Notice Sent To: Justin R. Donoho 111 S. Wacker Drive Suite 4700, Chicago, IL 60606<br>Notice Sent To: Jenn O. Hatcher, Esq. 2555 Grand Blvd, Kansas City, MO 64108<br>Notice Sent To: Jessica N. Wahl, Esq. 2049 Century Park East #3000, Los Angeles, CA 90067<br>Notice Sent To: Tammy B. Webb, Esq. 555 Mission Street Suite 2300, San Francisco, CA 94105<br>Notice Sent To: Tara D. Kennedy 111 South Wacker Drive Suite 4700, Chicago, IL 60606<br>Notice Sent To: Jad Sheikali Jsheikali@shb.com |
| 11/03/2025 | 54 | Amended: Second amended complaint filed by John Doe Individually and on Behalf of All others similarly situated |
| 12/02/2025 | 55 | Notice of Removal to the United States District Court filed by<br><br>Applies To: White, Esq., Lisa Oliver (Attorney) on behalf of Emerson Hospital (Defendant) |
| 12/03/2025 | | Certified Copy of Notice of Removal (e-filed) |
| 12/19/2025 | | Case transferred to another court. |

icket Number - Essex

1

COMMONWEALTH OF MASSACHUSETTS

ESSEX, S.S.

SUPERIOR COURT

JOHN DOE,
INDIVIDUALLY AND ON
BEHALF OF ALL OTHERS SIMILARLY
SITUATED,

Plaintiff

v.

EMERSON HOSPITAL,

Defendant.

C.A. No. 2277CV01000-D

10/19/2022

RECEIVED

A TRUE COPY, ATTEST

DEPUTY ASS'T. CLERK

# CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff John Doe ("Plaintiff"), individually and on behalf of all other persons similarly situated, brings suit against Defendant Emerson Hospital ("Defendant"), and upon personal knowledge as to Plaintiff's own conduct and on information and belief as to all other matters based upon investigation by counsel, alleges as follows:

## NATURE OF ACTION AND ALLEGATIONS

1. This case arises from Defendant's systematic violation of the medical privacy rights of its patients, exposing highly sensitive personal information to third parties without those patients' knowledge or consent.

2. Defendant's "Notice of Privacy Practices" tells patients that "[p]rotecting your medical information is an important priority for Emerson Hospital."[1] Indeed, Defendant assures patients that Defendant will *never* use or share patients' "personal information for marketing

[1] https://www.emersonhospital.org/patients-visitors/patient-rights-responsibilities/patient-privacy

purposes" without "specific authorization."[2] Contrary to these assurances, however, Defendant does not follow these policies, nor the law prohibiting such disclosures.

3. At all relevant times, Defendant disclosed information about its patients—including their status as patients, their physicians, their medical treatments, the hospitals they visited, and their personal identities—to Facebook and other third parties without their patients' knowledge, authorization, or consent.

4. Defendant discloses this protected health information through the deployment of various digital marketing and automatic rerouting tools embedded on its websites that purposefully and intentionally redirect patients' personal health information to third parties who exploit that information for advertising purposes. Defendant's use of these rerouting tools causes its patients' personally identifiable information and the contents of its patients' communications exchanged with Defendant to be automatically redirected to third parties in violation of those patients' reasonable expectations of privacy, their rights as patients, their rights as citizens of Massachusetts, and both the express and implied promises of Defendant.

5. Defendant's conduct in disclosing such protected health information about its patients to Facebook and other third parties violates Massachusetts law, including G.L. c. 272, § 99 (Interception of Wire and Oral Communications), G.L. c.214, § 1B (Right to Privacy), and G.L. c. 111, § 70E (Patients' and Residents' Rights).

6. On behalf of themselves and all similarly situated persons, Plaintiff seeks an order enjoining Defendant from further unauthorized disclosures of his personal information; awarding liquidated damages in the amount of $1,000 per violation, attorney's fees and costs; and granting any other preliminary or equitable relief the Court deems appropriate.

---

[2] https://www.emersonhospital.org/patients-visitors/patient-rights-responsibilities/patient-privacy

## PARTIES TO THE ACTION

7. Defendant Emerson Hospital is a Massachusetts corporation with its principal office at Nine Acres Corner, Concord, Massachusetts, 01742. Defendant is a private health system serving over 300,000 individuals in 25 towns in Massachusetts.[3] Defendant owns and manages numerous healthcare facilities in Massachusetts, including Emerson Hospital, health centers in Westford, Groton, and Sudbury, the Center for Specialty Care in Concord, the Clough Family Center for Rehabilitation and Sports Therapies, the Hermel Breast Health Center, the Steinberg Wellness Center for Mind and Body, urgent care centers in Hudson and Littleton, and numerous ancillary facilities, including Cantu Concussion Center.[4]

8. Plaintiff, John Doe, is an individual residing in Essex County, Massachusetts, has been treated by Defendant's physicians, and has been a patient Cantu Concussion Center,[5] and thus also a patient of Defendant.

## JURISDICTION AND VENUE

9. This Court has personal jurisdiction over Defendant because it regularly conducts business throughout Massachusetts and has its principal place of business at Nine Acres Corner, Concord, Massachusetts, 01742. G.L. c. 223A, § 2; G.L. c. 223A, § 3.

10. Venue is appropriate in this Court because Plaintiff, John Doe, resides in Essex County and the acts or conduct giving rise to the cause of action took place in Essex County. G.L. c. 223, § 8(4).

---

[3] https://www.emersonhospital.org/about-emerson/from-our-president-ceo
[4] https://www.emersonhospital.org/about-emerson/from-our-president-ceo; *see also https://www.emersonhospital.org/locations*
[5] https://www.emersonhospital.org/locations/concussion-center

## FACTUAL BACKGROUND

**A. Defendant routinely discloses the protected health information of its patients to third parties including Facebook.**

11. Plaintiff John Doe is a patient of Defendant who has received treatment from Defendant at the Cantu Concussion Center.[6]

12. Under G.L. c. 214, § 1B, all persons "have a right against unreasonable, substantial, or serious interference" with their privacy.

13. Medical patients in Massachusetts such as John Doe have a legal interest in preserving the confidentiality of their communications with healthcare providers and have reasonable expectations of privacy that their personally identifiable information and communications will not be disclosed to third parties by Defendant without their express written consent and authorization.

14. As a health care provider, Defendant has fiduciary, common law, and statutory duties to protect the confidentiality of patient information and communications.

15. Defendant expressly and impliedly promises patients that it will maintain and protect the confidentiality of personally identifiable patient information and communications.

16. Defendant operates websites for patients, including www.emersonhospital.org.

17. Defendant's websites are designed for interactive communication with patients, including scheduling appointments, searching for physicians, paying bills, requesting medical records, learning about medical issues treatment options, and joining support groups.

18. Notwithstanding patients' reasonable expectations of privacy, Defendant's legal duties of confidentiality, and Defendant's express promises to the contrary, Defendant discloses the contents of patients' communications and protected healthcare information via automatic re-

[6] https://www.emersonhospital.org/locations/concussion-center

routing mechanisms embedded in the websites operated by Defendant without patients' knowledge, authorization, or consent.

**B. The nature of Defendant's unauthorized disclosure of patients' health care information.**

19. Defendant's disclosures of patients' personal healthcare information occur because Defendant intentionally deploys source code on the websites it operates, including https://www.emersonhospital.org/find-a-doctor, that causes patients' personally identifiable information (as well as the exact contents of their communications) to be transmitted to third parties.

20. By design, third parties receive and record the exact contents of patient communications before the full response from Defendant to patients has been rendered on the screen of the patient's computer device and while the communication between Defendant and the patient remains ongoing.

21. Websites like those maintained by Defendant are hosted by a computer server through which the business in charge of the website exchanges and communicates with internet users via their web browsers.

22. The basic command that web browsers use to exchange data and user communications is called a GET request.[7] For example, when a patient types "heart failure treatment" into the search box on Defendant's website and hits 'Enter,' the patient's web browser makes a connection with the server for Defendant's website and sends the following request: "GET search/q=heart+failure+treatment."

23. The other basic transmission command utilized by web browsers is POST, which is typically employed when a user enters data into a form on a website and clicks 'Enter' or some

[7] https://www.w3schools.com/tags/ref_httpmethods.asp

other form of submission button. POST sends the data entered in the form to the server hosting the website that the user is visiting.

24. In response to receiving a GET or POST command, the server for the website with which the user is exchanging information will send a set of instructions to the web browser and command the browser with source code that directs the browser to render the website's responsive communication.

25. Unbeknownst to most users, however, the website's server may also redirect the user's communications to third parties. Typically, users are provided no notice that these disclosures are being made. Third parties (such as Facebook and Google) use the information they receive to track user data and communications for marketing purposes.

26. In many cases, third-party marketing companies acquire the content of user communications through a 1x1 pixel (the smallest dot on a user's screen) called a tracking pixel, a web-bug, or a web beacon. These tracking pixels are tiny and are purposefully camouflaged to remain invisible to users.

27. Tracking pixels can be placed directly on a web page by a developer, or they can be funneled through a "tag manager" service to make the invisible tracking run more smoothly. A tag manager further obscures the third parties to whom user data is transmitted.

28. These tracking pixels can collect dozens of data points about individual website users who interact with a website. One of the world's most prevalent tracking pixels, called the Meta Pixel, is provided by Facebook.

29. A web site developer who chooses to deploy third-party source code, like a tracking pixel, on their website must enter the third-party source code directly onto their website

ıperior Court - Essex
›cket Number

for every third party they wish to send user data and communications. This source code operates invisibly in the background when users visit a site employing such code.

**C. Tracking pixels provide third parties with a trove of personally identifying data permitting them to uniquely identify the individuals browsing a website.**

30. Tracking pixels are lines of source code embedded in websites such as Defendant's. Tracking pixels are particularly pernicious because they result in the disclosure of a variety of data that permits third parties to determine the unique personal identities of website visitors. While most users believe that the internet provides them with anonymity when, for example, they browse a hospital website for treatment information about a medical condition, that is not the case when the hospital website has embedded third party tracking devices, as Defendant has.

31. For example, an IP address is a number that identifies a computer connected to the internet. IP addresses are used to identify and route communications on the internet. IP addresses of individual users are used by internet service providers, websites, and tracking companies to facilitate and track internet communications and content. IP addresses also offer advertising companies like Facebook a unique and semi-persistent identifier across devices—one that has limited privacy controls.[8]

32. Because of their uniquely identifying character, IP address are considered protected personally identifiable information. Tracking pixels can (and typically do) collect website visitors' IP addresses.

33. Likewise, internet cookies also provide personally identifiable information. Cookies are small text files that web servers can place on a user's browser and computer when a user's browser interacts with a website server. Cookies are typically designed to acquire and

---

[8] https://adtechexplained.com/the-future-of-ip-address-as-an-advertising-identifier/

record an individual internet user's communications and activities on websites and were developed by programmers to aid with online advertising.

34. Cookies are designed to operate as a means of identification for internet users. Advertising companies like Facebook and Google have developed methods for monetizing and profiting from cookies. These companies use third-party tracking cookies to help them acquire and record user data and communications in order to sell targeted advertising that is customized to a user's personal communications and browsing history. To build individual profiles of internet users, third party advertising companies assign each user a unique (or a set of unique) identifiers to each user.

35. Cookies are considered personal identifiers protected, and tracking pixels can collect cookies from website visitors.

36. A third type of personally identifying information is what data companies refer to as a "browser-fingerprint." A browser-fingerprint is information collected about a computing device that can be used to identify the specific device.

37. These browser-fingerprints can be used to uniquely identify individual users when a computing device's IP address is hidden or cookies are blocked and can provide a wide variety of data. As Google explained, "With fingerprinting, developers have found ways to use tiny bits of information that vary between users, such as what device they have or what fonts they have installed to generate a unique identifier which can then be used to match a user across websites."[9] The value of browser-fingerprinting to advertisers (and trackers who want to monetize aggregated data) is that they can be used to track website users just as cookies do, but it

[9] https://www.blog.google/products/chrome/building-a-more-private-web/

ıperıor Court - Essex
ıcket Number

employs much more subtle techniques.[10] Additionally, unlike cookies, users cannot clear their fingerprint and therefore cannot control how their personal information is collected.[11]

38. In 2017, researchers demonstrated that browser fingerprinting techniques can successfully identify 99.24 percent of all users.[12]

39. Browser-fingerprints are considered personal identifiers, and tracking pixels can collect browser-fingerprints from website visitors.

40. A fourth kind of personally identifying information is the unique user identifier (such as Facebook's "Facebook ID") that permits companies like Facebook to quickly and automatically identify the personal identity of its user across the internet whenever the identifier is encountered. A Facebook ID is a number string that is connected to a user's Facebook profile.[13] Anyone with access to a user's Facebook ID can locate a user's Facebook profile.[14]

41. Unique personal identifiers such as a person's Facebook are likewise capable of collection through pixel trackers.

**D. Facebook**

42. Facebook, a social media platform founded in 2004 and today operated by Meta Platforms, Inc., was originally designed as a social networking website for college students.

43. Facebook describes itself as a "real identity" platform.[15] This means that users are permitted only one account and must share "the name they go by in everyday life."[16] To that end, Facebook requires users to provide their first and last name, along with their birthday,

---

[10] https://pixelprivacy.com/resources/browser-fingerprinting/
[11] https://www.blog.google/products/chrome/building-a-more-private-web/
[12] https://www.ndss-symposium.org/ndss2017/ndss-2017-programme/cross-browser-fingerprinting-os-and-hardware-level-features/
[13] https://www.facebook.com/help/211813265517027
[14] https://smallseotools.com/find-facebook-id/
[15] https://www.wsj.com/articles/how-many-users-does-facebook-have-the-company-struggles-to-figure-it-out-11634846701#:~:text=Facebook%20said%20in%20its%20most,of%20them%20than%20developed%20ones.
[16] https://transparency.fb.com/policies/community-standards/account-integrity-and-authentic-identity/

iperior Court - Essex
icket Number

telephone number and/or email address, and gender, when creating an account.[17]

44. In 2007, realizing the value of having direct access to millions of consumers, Facebook began monetizing its platform by launching "Facebook Ads," proclaiming this service to be a "completely new way of advertising online," that would allow "advertisers to deliver more tailored and relevant ads."[18] Facebook has since evolved into one of the largest advertising companies in the world.[19] Facebook can target users so effectively because it surveils user activity both on and off its website through the use of tracking pixels.[20] This allows Facebook to make inferences about users based on their interests, behavior, and connections.[21]

45. Today, Facebook provides advertising on its own social media platforms, as well as other websites through its Facebook Audience Network. Facebook has more than 2.9 billion users.[22]

46. Facebook maintains profiles on users that include users' real names, locations, email addresses, friends, likes, and communications. These profiles are associated with personal identifiers, including IP addresses, cookies, and other device identifiers. Facebook also tracks non-users across the web through its internet marketing products and source code.

47. Facebook offers several advertising options based on the type of audience that an advertiser wants to target. Those options include targeting "Core Audiences," "Custom Audiences," "Look Alike Audiences," and even more granulated approaches within audiences called "Detailed Targeting." Each of Facebook's advertising tools allow an advertiser to target users based, among other things, on their personal data, including geographic location,

[17] https://www.facebook.com/help/406644739431633
[18] https://about.fb.com/news/2007/11/facebook-unveils-facebook-ads/
[19] https://www.pewresearch.org/fact-tank/2021/06/01/facts-about-americans-and-facebook/
[20] https://www.facebook.com/business/help/742478679120153?id=1205376682832142
[21] https://www.facebook.com/business/ads/ad-targeting
[22] https://www.statista.com/statistics/264810/number-of-monthly-active-facebook-users-worldwide/

demographics (e.g., age, gender, education, job title, etc.), interests, (e.g., preferred food, movies), connections (e.g., particular events or Facebook pages), and behaviors (e.g., purchases, device usage, and pages visited). This audience can be created by Facebook, the advertiser, or both working in conjunction.

48. Ad Targeting has been extremely successful due to Facebook's ability to target individuals at a granular level. For example, among many possible target audiences, "Facebook offers advertisers 1.5 million people 'whose activity on Facebook suggests that they're more likely engage with/distribute liberal political content' and nearly seven million Facebook users who 'prefer high-value goods in Mexico.'"[23] Aided by highly granular data used to target specific users, Facebook's advertising segment quickly became Facebook's most successful business unit, with millions of companies and individuals utilizing Facebook's advertising services.

**E. Facebook's Meta Pixel tool allows Facebook to track the personal data of individuals across a broad range of third-party websites.**

49. To power its advertising business, Facebook uses a variety of tracking tools to collect data about individuals, which it can then share with advertisers. These tools include software development kits incorporated into third-party applications, its "Like" and "Share" buttons (known as "social plug-ins"), and other methodologies, which it then uses to power its advertising business.

50. One of Facebook's most powerful tools is called the "Meta Pixel."

51. The Meta Pixel is a snippet of code embedded on a third-party website that tracks users' activities as users navigate through a website.[24] Once activated, the Meta Pixel "tracks the

---

[23] https://www.nytimes.com/2018/04/11/technology/facebook-privacy-hearings.html
[24] https://developers.facebook.com/docs/meta-pixel/

iperior Court - Essex
ocket Number

people and type of actions they take."[25] Meta Pixel can track and log each page a user visits, what buttons they click, as well as specific information that users input into a website.[26]

52. For example, if Meta Pixel is incorporated on a shopping website, it may log what searches a user performed, which items of clothing a user clicked on, whether they added an item to their cart, as well as what they purchased. Along with this data, Facebook collects identifying information like IP addresses, Facebook IDs, and other data that allow Facebook to identify the user. Once Facebook receives this information, Facebook processes it, analyzes it, and assimilates it into datasets like its Core Audiences and Custom Audiences.

53. Facebook can then share analytic metrics with the website host, while at the same time sharing the information it collects with third-party advertisers who can then target users based on the information collected and shared by Facebook.

54. Facebook touted Meta Pixel (which it originally called "Facebook Pixel") as "a new way to report and optimize for conversions, build audiences and get rich insights about how people use your website."[27] According to Facebook, the Meta Pixel is an analytics tool that allows business to measure the effectiveness of their advertising by understanding the actions people take on their websites."[28]

55. Facebook warns web developers that its Pixel is a personal identifier because it enables Facebook "to match your website visitors to their respective Facebook User accounts."[29]

56. Facebook recommends that its Meta Pixel code be added to the base code on every website page (including the website's persistent header) to reduce the chance of browsers

[25] https://www.facebook.com/business/goals/retargeting
[26] https://www.facebook.com/business/help/742478679120153?id=1205376682832142
[27] https://developers.facebook.com/ads/blog/post/v2/2015/10/14/announcing-facebook-pixel/
[28] https://www.oviond.com/understanding-the-facebook-pixel
[29] https://developers.facebook.com/docs/meta-pixel/get-started

or code from blocking Pixel's execution and to ensure that visitors will be tracked.[30]

57. Once Meta Pixel is installed on a business's website, the Meta Pixel tracks users as they navigate through the website and logs which pages are visited, which buttons are clicked, the specific information entered in forms (including personal information), as well as "optional values" set by the business website.[31] Meta Pixel tracks this data regardless of whether a user is logged into Facebook.[32]

58. For Facebook, the Meta Pixel tool embedded on third-party websites acts as a conduit for information, sending the information it collects to Facebook through scripts running in a user's internet browser, similar to how a "bug" or wiretap can capture audio information. The information is sent in data packets, which include personally identifying data such as a user's IP address.

59. For example, the Meta Pixel is configured to automatically collect "HTTP Headers" and "Pixel-specific data."[33] HTTP headers collect data including "IP addresses, information about the web browser, page location, document, referrer and person using the website."[34] Pixel-specific data includes such data as the "Pixel ID and the Facebook Cookie."[35]

60. Meta Pixel takes the information it harvests and sends it to Facebook with personally identifiable information, such as a user's IP address, name, email, phone number, and specific Facebook ID, which identifies an individual's Facebook user account. Anyone who has access to this Facebook ID can use this identifier to quickly and easily locate, access, and view a user's corresponding Facebook profile. Facebook stores this information on its servers, and, in

[30] https://developers.facebook.com/docs/meta-pixel/get-started
[31] https://developers.facebook.com/docs/meta-pixel/
[32] https://themarkup.org/pixel-hunt/2022/06/15/facebook-and-anti-abortion-clinics-are-collecting-highly-sensitive-info-on-would-be-patients
[33] https://developers.facebook.com/docs/meta-pixel/
[34] https://developers.facebook.com/docs/meta-pixel/
[35] https://developers.facebook.com/docs/meta-pixel/

ıperior Court - Essex
ıcket Number

some instances, maintains this information for years.[36]

61. Facebook has a number of ways to uniquely identify the individuals whose data is being forwarded from third-party websites through the Meta Pixel.

62. If a user has a Facebook account, the user data collected is linked to the individual user's Facebook account. For example, if the user is logged into their Facebook account when the user visits a third-party website where the Meta Pixel is installed, many common browsers will attach third-party cookies allowing Facebook to link the data collected by Meta Pixel to the specific Facebook user.

63. Alternatively, Facebook can link the data to a user's Facebook account through the "Facebook Cookie."[37] The Facebook Cookie is a workaround to recent cookie-blocking applications used to prevent websites from tracking users.[38]

64. Facebook can also link user data to Facebook accounts through identifying information collected through Meta Pixel through what Facebook calls "Advanced Matching." Thise are two forms of Advanced Matching: manual matching and automatic matching.[39] Manual matching requires the website developer to manually send data to Facebook so that users can be linked to data. Automatic matching allows Meta Pixel to scour the data it receives from third-party websites to search for recognizable fields, including names and email addresses that correspond with users' Facebook accounts.

65. While the Meta Pixel tool "hashes" personal data—obscuring it through a form of cryptography before sending the data to Facebook—that hashing does not prevent *Facebook*

---

[36] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites
[37] https://clearcode.cc/blog/facebook-first-party-cookie-adtech/
[38] https://clearcode.cc/blog/difference-between-first-party-third-party-cookies/
[39] https://www.facebook.com/business/help/611774685654668?id=1205376682832142

iperior Court - Essex
icket Number

from using the data.[40] In fact, Facebook explicitly uses the hashed information it gathers to link pixel data to Facebook profiles.[41]

66. Facebook also receives personally identifying information in the form of user's unique IP addresses that stay the same as users visit multiple websites. When browsing a third-party website that has embedded Facebook code, a user's unique IP address is forwarded to Facebook by GET requests, which are triggered by Facebook code snippets. The IP address enables Facebook to keep track of the website page visits associated with that address.

67. Facebook also places cookies on visitors' computers. It then uses these cookies to store information about each user. For example, the "c_user" cookie is a unique identifier that identifies a Facebook user's ID. The c_user cookie value is the Facebook equivalent of a user identification number. Each Facebook user has one—and only one—unique c_user cookie. Facebook uses the c_user cookie to record user activities and communications.

68. The data supplied by the c_user cookie allows Facebook to identify the Facebook account associated with the cookie. One simply needs to log into Facebook, and then type www.facebook.com/#, with the c_user identifier in place of the "#." For example, the c_user cookie for Mark Zuckerberg is 4. Logging into Facebook and typing www.facebook.com/4 in the web browser retrieves Mark Zuckerberg's Facebook page: www.facebook.com/zuck.

69. Similarly, the "lu" cookie identifies the last Facebook user who logged in using a specific browser. Like IP addresses, cookies are included with each request that a user's browser makes to Facebook's servers. Facebook employs similar cookies such as "datr," "fr," "act," "presence," "spin," "wd," "xs," and "fbp" cookies to track users on websites across the

[40] https://www.facebook.com/business/help/611774685654668?id=1205376682832142

[41] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites

internet.[42] These cookies allow Facebook to easily link the browsing activity of its users to their real-world identities, and such highly sensitive data as medical information, religion, and political preferences.[43]

70. Facebook also uses browser fingerprinting to uniquely identify individuals. Web browsers have several attributes that vary between users, like the browser software system, plugins that have been installed, fonts that are available on the system, the size of the screen, color depth, and more. Together, these attributes create a fingerprint that is highly distinctive. The likelihood that two browsers have the same fingerprint is at least as low as 1 in 286,777, and the accuracy of the fingerprint increases when combined with cookies and the user's IP address. Facebook recognizes a visitor's browser fingerprint each time a Facebook button is loaded on a third-party website page. Using these various methods, Facebook can identify individual users, watch as they browse third-party websites like www.emersonhospital.org and target users with advertising based on their web activity.

**D. Defendant has discretely embedded the Meta Pixel tool on its website, resulting in the capture and disclosure of patients' protected health information to Facebook.**

71. A third-party website that incorporates Meta Pixel benefits from the ability to analyze a user's experience and activity on the website to assess the website's functionality and traffic. The third-party website also gains information from its customers through Meta Pixel that can be used to target them with advertisements, as well as to measure the results of advertisement efforts.

72. Facebook's intrusion into the personal data of the visitors to third-party websites incorporating the Meta Pixel is both significant and unprecedented. When Meta Pixel is

---

[42] https://techexpertise.medium.com/facebook-cookies-analysis-e1cf6ffbdf8a#:~:text=browser%20session%20ends.-,%E2%80%9Cdatr%E2%80%9D,security%20and%20site%20integrity%20features.
[43] https://securehomes.esat.kuleuven.be/~gacar/fb_tracking/fb_plugins.pdf

ıperior Court - Essex
ıcket Number

incorporated into a third-party website, unbeknownst to users and without their consent, Facebook gains the ability to surreptitiously gather every user interaction with the website ranging from what the user clicks on to the personal information entered on a website search bar. Facebook aggregates this data against all websites.[44] Facebook benefits from obtaining this information because it improves its advertising network, including its machine-learning algorithms and its ability to identify and target users with ads.

73. Facebook provides websites using Meta Pixel with the data it captures in the "Meta Pixel page" in Events Manager, as well as tools and analytics to reach these individuals through future Facebook ads.[45] For example, websites can use this data to create "custom audiences" to target the specific Facebook user, as well as other Facebook users who match "custom audience's" criteria.[46] Businesses that use Meta Pixel can also search through Meta Pixel data to find specific types of users to target, such as men over a certain age.

74. Meta Pixel is wildly popular and embedded on millions of websites. Shockingly, Meta Pixel is incorporated on many websites that are used to store and convey sensitive medical information, that by law must be kept private. Recently, investigative journalists have determined that Meta Pixel is embedded on the websites of many of the top hospitals in the United States and on the password-protected patient portals of many healthcare systems.[47] This results in sensitive medical information being collected and then sent to Facebook when a user interacts with these hospital websites. For example, when a user on many of these hospital websites clicks on a "Schedule Online" button next to a doctor's name, Meta Pixel sends the text of the button, the doctor's name, and the search term (such as "cardiology") used to find the

[44] https://www.facebook.com/business/help/742478679120153?id=1205376682832142
[45] https://www.facebook.com/business/help/742478679120153?id=1205376682832142
[46] https://developers.facebook.com/docs/marketing-api/reference/custom-audience/
[47] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites

doctor to Facebook. If the hospital's website has a drop-down menu to select a medical condition in connection with locating a doctor or making an appointment, that condition is also transmitted to Facebook through Meta Pixel.

75. Facebook has designed the Meta Pixel such that Facebook receives information about patient activities on hospital websites as they occur in real time. Indeed, the moment that a patient takes any action on a webpage that includes the Meta Pixel—such as clicking a button to register, login, or logout of a patient portal or to create an appointment—Facebook code embedded on that page redirects the content of the patient's communications to Facebook while the exchange of information between the patient and hospital is still occurring.

76. Defendant is among the hospital systems who have embedded Meta Pixel on their websites. When a patient enters their personal information through Defendant's websites that incorporate Meta Pixel, such as to locate a doctor or make an appointment, this information, including what the patient is being treated for, is transmitted to Facebook via the Meta Pixel. The acquisition and disclosure of these communications occurs contemporaneously with the transmission of these communications by patients.

77. This data, which can include health conditions (e.g., addiction, Alzheimer's, heart disease), diagnoses, procedures, test results, the treating physician, medications, and other personally identifying information ("Personal Health Information"), is obtained and used by Facebook, as well as other parties, for the purpose of targeted advertising.

78. For example, a patient searching for a doctor on Defendant's website is asked to provide a variety of information to filter the various physicians available to treat various medical conditions, including the doctor's specialty, the patient's condition, the patient's hometown, the patient's language preference, and other information that the patient provides.

perior Court - Essex
cket Number




79. All this data is disclosed to Facebook in real time as patients transmit their information, along with other data, such as patient's unique Facebook ID that is captured by the c_user cookie, which allows Facebook to link this information to patients' unique Facebook accounts. Defendant also discloses other personally identifying information to Facebook, such as patient IP addresses, cookie identifiers, browser-fingerprints, and device identifiers.

80. Defendant discloses such personally identifying information and sensitive medical information even when patients are searching for doctors to assist with them conditions such as substance abuse and addiction.

perior Court - Essex
cket Number




81. Likewise, a patient who desires an appointment with a specific doctor is asked to fill out an extensive online questionnaire, which includes information such as the doctor's name, the patient's name, telephone number, physical address, and email address. All this information is acquired by Defendant and forwarded to Facebook via the Meta Pixel contemporaneously with its transmission by patients.

perior Court - Essex
cket Number



REQUEST AN APPOINTMENT

Fill out the below form to request an appointment with Dr. Roomi. A member of our staff will get back to you during normal business hours.

Privacy Policy

| | |
|---|---|
| First name: | John |
| Last name: | Doe |
| Home address: | 268 Summer St LL |
| City: | Boston |
| State: | MA |
| Zip code: | 02210 |
| Email: | johndoe@yahoo.com |
| Phone number: | 555.555.5555 |

I'm not a robot

reCAPTCHA

Privacy - Terms

SUBMIT

82. Defendant also discloses patient information from other sections of its website including (but not limited to) communications that are captured by the website's search bar, communications that are captured when a patient searches for "Services" offered by Defendant, communications made by patients using the website's Bill Pay/Financials function, and communications made when patients are researching specific medical conditions such as COVID-19.

83. By compelling visitors to its websites to disclose personally identifying data and sensitive medical information to Facebook and other third parties, Defendant knowingly discloses information that allows Facebook and other advertisers to link its patients' Personal

iperior Court - Essex
icket Number

Health Information to their private identities and target them with advertising.

84. Defendant facilitated the disclosure of Plaintiff John Doe's Personal Health information, including sensitive medical information, to Facebook without his consent or authorization when he entered information on the website that Defendant maintains at www.emersonhospital.org. Plaintiff continued to have his privacy violated when Defendant permitted Facebook and other companies to send him targeted advertising related to her medical condition.

85. For example, Plaintiff John Doe visited Defendant's website in 2022 at www.emersonhospital.org and entered data, including sensitive medical information, such as details about his medical condition and doctor. The information that Plaintiff John Doe transmitted included queries about treatment for his concussion.

86. Defendant knew that by embedding Meta Pixel—a Facebook advertising tool—it was permitting Facebook to collect, use, and share Plaintiff's and the Class Members' Personal Health Information, including sensitive medical information and personally identifying data.

**F. Plaintiff and the Class Members did not consent to the interception and disclosure of their protected health information.**

87. Plaintiff and Class Members had no idea when they interacted with Defendant's websites that their personal data, including sensitive medical data, was being collected and transmitted to Facebook. That is because, among other things, Meta Pixel is seamlessly integrated into Defendant's websites and is invisible to patients visiting those websites.

88. For example, when Plaintiff John Doe visited Defendant's website in 2022 at www.emersonhospital.org, there was no indication that Meta Pixel was embedded on that website or that it would collect and transmit his sensitive medical data to Facebook.

89. Plaintiff and his fellow Class Members could not consent to Defendant's conduct

ıperior Court - Essex
ıcket Number

when there was no indication that their sensitive medical information would be collected and transmitted to Facebook in the first place.

90. While Defendant purports to have "Privacy Practices," those Privacy Practices are effectively hidden from patients, buried inside a link labeled "Notice of Privacy Practices" that is concealed at the bottom of Defendant's homepage in type so small as to be unreadable to many visitors:




91. Defendant's "Notice of Privacy Practices" gives no indication to patients that Defendant routinely allows Facebook to capture and exploit patients' Personal Health Information. Indeed, Defendant expressly promises[48] in its "Notice of Privacy Practices" that it would never share patient's medical information with marketing companies without express authorization from patients:

[48] https://www.emersonhospital.org/patients-visitors/patient-rights-responsibilities/patient-privacy

## USES OR DISCLOSURES OF INFORMATION THAT REQUIRE YOUR WRITTEN PERMISSION

Using and/or sharing health information for most purposes other than treatment, payment or health care operations requires your specific authorization. The following will occur only with authorization from the individual:

- most uses and disclosures of psychotherapy notes
- uses and sharing of personal health information for marketing purposes, including communications related to subsidized treatment
- disclosures that constitute a sale of personal health information

92. Even if a patient stumbled upon Defendant's carefully hidden "Notice of Privacy Practices," nothing in that notice would be understood by any reasonable patient to mean that Defendant is routinely allowing Facebook to capture and exploit patients' Personal Health Information.

93. Defendant does not have a legal right to share Plaintiff and Class Members' Protected Health Information with Facebook, because this information is protected from such disclosure by law. Defendant is not permitted to disclose patients' Protected Health Information to an advertising and marketing company like Facebook without express written authorization from patients.

94. Defendant failed to obtain a valid written authorization from Plaintiff or any of the Class Members to allow the capture and exploitation of their personally identifiable information and the contents of their communications for marketing purposes.

95. A patient's reasonable expectation that their health care provider will not share their information with third parties for marketing purposes is not subject to waiver via an inconspicuous privacy policy hidden away on a company's website. Such "Browser-Wrap"

statements do not create an enforceable contract against consumers. Further, Defendant expressly promised its patients that it would never sell or use their Personal Health Information for marketing purposes without express authorization.

96. Accordingly, Defendant lacked authorization to intercept, collect, and disclose Plaintiff and Class Members' Personal Health Information to Facebook or aid in the same.

**G. The disclosures of personal patient data to Facebook are unnecessary.**

97. There is no information anywhere on the websites operated by Defendant that would alert patients that their most private information (such as their identifiers, their medical conditions, and their medical providers) is being automatically transmitted to Facebook. Nor are any of the disclosures of patient Personal Health Information to Facebook necessary for Defendant to maintain its healthcare website.

98. For example, it is possible for a healthcare website to provide a doctor search function without allowing disclosures to third-party advertising companies about patient sign ups or appointments. It is also possible for a website developer to utilize tracking tools without allowing disclosure of patients' Personal Healthcare Information to companies like Facebook.

99. Despite these possibilities, Defendant willfully chose to implement Meta Pixel on its websites and aid in the disclosure of personally identifiable information and sensitive medical information about its patients, as well as the contents of their communications with Defendant, to third-parties, including Facebook.

**H. Plaintiff and Class Members have a reasonable expectation of privacy in their Personal Health Information, especially with respect to sensitive medical information.**

100. Plaintiff and Class Members have a reasonable expectation of privacy in their Personal Health Information, including personally identifying data and sensitive medical information. Defendant's surreptitious interception, collection, and disclosure of patients'

ıperior Court - Essex
ıcket Number

Personal Health Information to Facebook violated Plaintiff and Class Member's privacy interests.

101. Patient health information is specifically protected by law. The prohibitions against disclosing patient Personal Health Information include prohibitions against disclosing personally identifying data such patient names, IP addresses, and other unique characteristics or codes. And Massachusetts law subject medical providers who treat conditions such as substance abuse to heightened duties of confidentiality. G.L. c. 111B, § 11. This legal framework applies to health care providers, such as Defendant.

102. Given the application of these laws to Defendant, Plaintiff and the Members of the Class had a reasonable expectation of privacy in their protected health information.

103. Several studies examining the collection and disclosure of consumers' sensitive medical information confirm that the disclosure of sensitive medical information violates expectations of privacy that have been established as general social norms.

104. Privacy polls and studies also uniformly show that the overwhelming majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its customers' data.

105. For example, a recent study by *Consumer Reports* showed that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumers' data, and the same percentage believed that internet companies and websites should be required to provide consumers with a complete list of the data that has been collected about them.[49]

106. Users act consistently with these preferences. For example, following a new

[49] https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907/

rollout of the iPhone operating software—which asks users for clear, affirmative consent before allowing companies to track users—85 percent of worldwide users and 94 percent of U.S. users chose not to share data when prompted.[50]

107. The concern about sharing personal medical information is compounded by the reality that advertisers view this type of information as particularly valuable. Indeed, having access to the data women share with their healthcare providers allows advertisers to obtain data on children before they are even born. As one recent article noted, "What is particularly worrying about this process of datafication of children is that companies like [Facebook] are harnessing and collecting multiple typologies of children's data and have the potential to store a plurality of data traces under unique ID profiles."[51]

108. Many privacy law experts have expressed serious concerns about patients' sensitive medical information being disclosed to third-party companies like Facebook. As those critics have pointed out, having a patient's personal health information disseminated in ways the patient is unaware of could have serious repercussions, including affecting their ability to obtain life insurance, how much they might pay for such coverage, the rates they might be charged on loans, and the likelihood of their being discriminated against.

**I. Plaintiff's Personal Health Data that Defendant collected, disclosed, and used is Plaintiff's property, has economic value, and its illicit disclosure has caused Plaintiff harm.**

109. It is common knowledge that there is an economic market for consumers' personal data—including the kind of data that Defendant has collected and disclosed from Plaintiff and Class Members.

110. In 2013, the *Financial Times* reported that the data-broker industry profits from

[50] https://www.wired.co.uk/article/apple-ios14-facebook
[51] https://thereader.mitpress.mit.edu/tech-companies-are-profiling-us-from-before-birth/

ıperıor Court - Essex
ıcket Number

the trade of thousands of details about individuals, and that within that context, "age, gender and location information" were being sold for approximately "$0.50 per 1,000 people."[52]

111. In 2015, *TechCrunch* reported that "to obtain a list containing the names of individuals suffering from a particular disease," a market participant would have to spend about "$0.30" per name.[53] That same article noted that "Data has become a strategic asset that allows companies to acquire or maintain a competitive edge" and that the value of a single user's data can vary from $15 to more than $40 per user.[54]

112. In a 2021 Washington Post article, the legal scholar Dina Srinivasan said that consumers "should think of Facebook's cost as [their] data and scrutinize the power it has to set its own price."[55] This price is only increasing. According to Facebook's own financial statements, the value of the average American's data in advertising sales rose from $19 to $164 per year between 2013 and 2020.[56]

113. Despite the protections afforded by law, there is an active market for health information. Medical information obtained from health providers garners substantial value because of the fact that it is not generally available to third party data marketing companies because of the strict restrictions on disclosure of such information by state laws and provider standards, including the Hippocratic oath. Even with these restrictions, however, a multi-billion-dollar market exists for the sale and purchase of such private medical information.[57]

114. Further, individuals can sell or monetize their own data if they so choose. For

---

[52] https://ig.ft.com/how-much-is-your-personal-data-worth/
[53] https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/
[54] https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/
[55] https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/
[56] https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/
[57] https://revealnews.org/blog/your-medical-data-is-for-sale-and-theres-nothing-you-can-do-about-it/; *see also https://slate.com/technology/2022/06/health-data-brokers-privacy.html*

example, Facebook has offered to pay individuals for their voice recordings,[58] and has paid teenagers and adults up to $20 a month plus referral fees to install an app that allows Facebook to collect data on how individuals use their smart phones.[59]

115. A myriad of other companies and apps such as DataCoup, Nielsen Computer, Killi, and UpVoice also offer consumers money in exchange for access to their personal data.[60]

116. Given the monetary value that data companies like Facebook have already paid for personal information in the past, Defendant has deprived Plaintiff and the Class Members of the economic value of their sensitive medical information by collecting, using, and disclosing that information to Facebook and other third parties without consideration for Plaintiff and the Class Member's property.

**J. Defendant is enriched by making unlawful, unauthorized, and unnecessary disclosures of its patients' protected health information.**

117. In exchange for disclosing Personal Health Information about its patients, Defendant is compensated by Facebook with enhanced online advertising services, including (but not limited to) retargeting and enhanced analytics functions.

118. Retargeting is a form of online targeted advertising that targets users with ads based on their previous internet actions, which is facilitated through the use of cookies and tracking pixels. Once an individual's data is disclosed and shared with a third-party marketing company, the advertiser is able to show ads to the user elsewhere on the internet.

119. For example, retargeting could allow a web-developer to show advertisements on other websites to customers or potential customers based on the specific communications

---

[58] https://www.theverge.com/2020/2/20/21145584/facebook-pay-record-voice-speech-recognition-viewpoints-prounciations-app
[59] https://www.cnbc.com/2019/01/29/facebook-paying-users-to-install-app-to-collect-data-techcrunch.html
[60] https://www.creditdonkey.com/best-apps-data-collection.html; *see also* *https://www.monetha.io/blog/rewards/earn-money-from-your-data/*

exchanged by a patient or their activities on a website. Using the Meta Pixel, a website could target ads on Facebook itself or on the Facebook advertising network. The same or similar advertising can be accomplished via disclosures to other third-party advertisers and marketers.

120. Once personally identifiable information relating to patient communications is disclosed to third parties like Facebook, Defendant loses the ability to control how that information is subsequently disseminated and exploited.

121. The monetization of the data being disclosed by Defendant, both by Defendant and Facebook, demonstrates the inherent value of the information being collected.

**K. Facebook's history of egregious privacy violations.**

122. Defendant knew or should have known that Facebook could not be trusted with its patients' sensitive medical information.

123. Due to its ability to target individuals based on granular data, Facebook's ad-targeting capabilities have frequently come under scrutiny. For example, in June 2022, Facebook entered into a settlement with the Department of Justice regarding its Lookalike Ad service, which permitted targeted advertising by landlords based on race and other demographics in a discriminatory manner. That settlement, however, reflected only the latest in a long history of egregious privacy violations by Facebook.

124. In 2007, when Facebook launched "Facebook Beacon," users were unaware that their online activity was tracked, and that the privacy settings originally did not allow users to opt-out. As a result of widespread criticism, Facebook Beacon was eventually shut down.

125. Two years later, Facebook made modifications to its Terms of Service, which allowed Facebook to use anything a user uploaded to its site for any purpose, at any time, even after the user ceased using Facebook. The Terms of Service also failed to provide for any way

ıperıor Court - Essex
ıcket Number

for users to completely delete their accounts. Under immense public pressure, Facebook eventually returned to its prior Terms of Service.

126. In 2011, Facebook settled charges with the Federal Trade Commission relating to its sharing of Facebook user information with advertisers, as well as its false claim that third-party apps were able to access only the data they needed to operate when—in fact—the apps could access nearly all of a Facebook user's personal data. The resulting Consent Order prohibited Facebook from misrepresenting the extent to which consumers can control the privacy of their information, the steps that consumers must take to implement such controls, and the extent to which Facebook makes user information available to third parties.[61]

127. Facebook found itself in another privacy scandal in 2015 when it was revealed that Facebook could not keep track of how many developers were using previously downloaded Facebook user data. That same year, it was also revealed that Facebook had violated users' privacy rights by harvesting and storing Illinois' users' facial data from photos without asking for their consent or providing notice. Facebook ultimately settled claims related to this unlawful act for $650 million.[62]

128. In 2018, Facebook was again in the spotlight for failing to protect users' privacy. Facebook representatives testified before Congress that a company called Cambridge Analytics may have harvested the data of up to 87 million users in connection with the 2016 election. This led to another FTC investigation in 2019 into Facebook's data collection and privacy practices, resulting in a record-breaking five-billion-dollar settlement.

129. Likewise, a different 2018 report revealed that Facebook had violated users'

[61] https://www.ftc.gov/legal-library/browse/cases-proceedings/092-3184-182-3109-c-4365-facebook-inc-matter
[62] A similar case is pending in Texas.

privacy by granting access to user information to over 150 companies.[63] Some companies were even able to read users' private messages.

130. In June 2020, after promising users that app developers would not have access to data if users were not active in the prior 90 days, Facebook revealed that it still enabled third-party developers to access this data.[64] This failure to protect users' data enabled thousands of developers to see data on inactive users' accounts if those users were Facebook friends with someone who was an active user.

131. On February 18, 2021, the New York State Department of Financial Services released a report detailing the significant privacy concerns associated with Facebook's data collection practices, including the collection of health data. The report noted that while Facebook maintained a policy that instructed developers not to transmit sensitive medical information, Facebook received, stored, and analyzed this information anyway. The report concluded that "[t]he information provided by Facebook has made it clear that Facebook's internal controls on this issue have been very limited and were not effective … at preventing the receipt of sensitive data."[65]

132. The New York State Department of Financial Service's concern about Facebook's cavalier treatment of private medical data is not misplaced. In June 2022, the FTC finalized a different settlement involving Facebook's monetizing of sensitive medical data. In that case, the more than 100 million users of Flo, a period and ovulation tracking app, learned something startling: the company was sharing their data with Facebook.[66] When a user was having her period or informed the app of her intention to get pregnant, Flo would tell Facebook, which

[63] https://www.cnbc.com/2018/12/19/facebook-gave-amazon-microsoft-netflix-special-access-to-data-nyt.html
[64] https://fortune.com/2020/07/01/facebook-user-data-apps-blunder/
[65] https://www.dfs.ny.gov/system/files/documents/2021/02/facebook_report_20210218.pdf
[66] https://slate.com/technology/2022/06/health-data-brokers-privacy.html

perior Court - Essex
cket Number

could then use the data for all kinds of activities including targeted advertising. In 2021, Flo settled with the Federal Trade Commission for lying to its users about secretly sharing their data with Facebook, as well as with a host of other internet advertisers, including Google, Fabric, AppsFlyer, and Flurry. The FTC reported that Flo "took no action to limit what these companies could do with users' information."[67]

133. More recently, Facebook employees admitted to lax protections for sensitive user data. Facebook engineers on the ad business product team conceded in a 2021 privacy review that "We do not have an adequate level of control and explainability over how our systems use data, and thus we can't confidently make controlled policy changes or external commitments such as 'we will not use X data for Y purpose.'"[68]

134. These revelations were confirmed by an article published by the Markup in 2022, which found during the course of its investigation that Facebook's purported "filtering" failed to discard even the most obvious forms of sexual health information. Worse, the article found that the data that the Meta Pixel was sending Facebook from hospital websites not only included details such as patients' medications, descriptions of their allergic reactions, details about their upcoming doctor's appointments, but also included patients' names, addresses, email addresses, and phone numbers.[69]

135. Despite knowing that the Meta Pixel code embedded in its websites was sending patients' Personal Health Information to Facebook, Defendant did nothing to protect its patients from egregious intrusions into its patients' privacy, choosing instead to benefit at those patients' expense.

[67] https://slate.com/technology/2022/06/health-data-brokers-privacy.html
[68] https://www.vice.com/en/article/akvmke/facebook-doesnt-know-what-it-does-with-your-data-or-where-it-goes
[69] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites

ıperıor Court - Essex
ıcket Number

## TOLLING, CONCEALMENT, AND ESTOPPEL

136. The applicable statutes of limitation have been tolled as a result of Defendant's knowing and active concealment and denial of the facts alleged herein.

137. Defendant seamlessly incorporated Meta Pixel and other trackers into its websites, providing no indication to users that they were interacting with a website enabled by Meta Pixel. Defendant had knowledge that its websites incorporated Meta Pixel and other trackers yet failed to disclose that by interacting with Meta-Pixel enabled websites that Plaintiff and Class Members' sensitive medical information would be intercepted, collected, used by, and disclosed to Facebook.

138. Plaintiff and Class Members could not with due diligence have discovered the full scope of Defendants' conduct, because there were no disclosures or other indication that they were interacting with websites employing Meta Pixel.

139. The earliest that Plaintiff and Class Members, acting with due diligence, could have reasonably discovered this conduct would have been on June 15, 2022, following the release of the Markup's investigation.

140. All applicable statutes of limitation have also been tolled by operation of the discovery rule and the doctrine of continuing tort. Defendant's illegal interception and disclosure of patients' Personal Health Information has continued unabated through the date of the filing of Plaintiff's Original Complaint. What's more, Defendant was under a duty to disclose the nature and significance of their data collection practices but did not do so. Defendant is therefore estopped from relying on any statute of limitations defenses.

## CLASS ACTION ALLEGATIONS

141. Defendant's conduct violates the law and breaches its express and implied privacy promises.

142. Defendant's unlawful conduct has injured Plaintiff and Class Members.

143. Defendant's conduct is ongoing.

144. Plaintiff brings this action individually and as a class action against Defendant.

145. Plaintiff seeks class certification for the following proposed Class:

> **The Emerson Hospital Class:** During the fullest period allowed by law, all Massachusetts residents who are, or were, patients of Emerson Hospital or any of its affiliates and who exchanged communications at Emerson Hospital's websites, including www.emersonhospital.org and any other Emerson Hospital affiliated website that caused disclosures of patient personally identifiable information and communications to third parties, including (but not limited to) Facebook.

146. Excluded from the proposed Class are: (1) any Judge or Magistrate presiding over this action and members of their families; (2) the Defendant, Defendant's subsidiaries, affiliates, parents, successors, predecessors, and any entity in which the Defendant or its parent has a controlling interest and their current or former employees, officers, and directors; and (3) Plaintiff's counsel and Defendant's counsel.

147. Plaintiff reserves the right to redefine the Class and/or add Subclasses at, or prior to, the class certification stage, in response to discovery or pursuant to instruction by the Court.

148. This action is properly maintainable as a class action as specifically defined in Massachusetts Rule of Civil Procedure 23.

149. **Numerosity:** While the exact number of Class Members is unknown to Plaintiff at this time, the Class, based on information and belief, consists of thousands of people dispersed throughout the Commonwealth of Massachusetts, such that joinder of all members is

impracticable. The exact number of Class Members can be determined by review of information maintained by Defendants.

150. **Commonality and Predominance:** There are questions of law and fact common to Class Members and which predominate over any questions affecting only individual members. A class action will generate common answers to the questions below, which are apt to drive resolution:

a. Whether Defendant's acts and practices violated Plaintiff and Class Members' privacy rights;

b. Whether Defendant's acts and practices violate G.L. c. 272, § 99;

c. Whether Defendant's acts and practices violate G.L. c. 214, § 1B;

d. Whether Defendant's acts and practices violate G.L. c. 111, § 70E;

e. Whether Defendant knowingly allowed the surreptitious collection and disclosure of Plaintiff and Class Members' Personal Health Information to Facebook;

f. Whether Defendant's acts and practices constitute a breach of fiduciary duty;

g. Whether Defendant profited from disclosures of patient Personal Health Information to third parties including Facebook;

h. Whether Defendant was unjustly enriched;

i. Whether Defendant's acts and practices harmed and continue to harm Plaintiff and Class Members and, if so, the extent of that injury;

j. Whether Plaintiff and Class Members are entitled to equitable relief including, but not limited to, injunctive relief, restitution, and disgorgement; and

k. Whether Plaintiff and Class Members are entitled to actual, statutory, punitive or other forms of damages, and other monetary relief.

151. These common questions of law and fact predominate over any questions affecting only the individual Class Members.

152. **Typicality:** Plaintiff's claims are typical of the claims of other Class Members and Plaintiff have substantially the same interest in this matter as other Class Members. Plaintiff

has no interests that are antagonist to, or in conflict with, the interests of other members of the Class. Plaintiff's claims arise out of the same set of facts and conduct as all other Class Members. Plaintiff and all Class Members are patients of Defendant who used the websites set up by Defendant for patients and are victims of Defendant's respective unauthorized disclosures to third parties including Facebook. All claims of Plaintiff and Class Members are based on Defendant's wrongful conduct and unauthorized disclosures.

153. **Adequacy of Representation:** Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are coincident with, and not antagonistic to, those of other Class Members he seeks to represent. Plaintiff has no disabling conflicts with Class Members. Accordingly, Plaintiff is an adequate representative of the Class and, along with counsel, will fairly and adequately protect the interests of the Class and any Subclasses.

154. **Superiority:** A class action is the superior method for fair and efficient adjudication of the controversy. Although all Class Members have claims against Defendant, the likelihood that individual Class Members will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation. Serial adjudication in numerous venues is not efficient, timely, or proper. Judicial resources would be unnecessarily depleted by prosecution of individual claims. The prosecution of separate actions by individual Class Members could create a risk of inconsistent or varying adjudications with respect to individual members of the Cass, which could establish incompatible standards of conduct for Defendant or adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the members of the Class Members who are not parties to the

adjudications. If a class action is not permitted, Class Members will continue to suffer losses and Defendant's misconduct will continue without proper remedy.

155. Plaintiff anticipates no unusual difficulties in the management of this litigation as a class action. The Class is readily ascertainable and direct notice can be provided from the records maintained by Defendant, electronically or by publication, the cost of which is properly imposed on Defendant.

156. For the above reasons, among others, a class action is superior to other available methods for the fair and efficient adjudication of this action.

## CAUSES OF ACTION

### COUNT I
### Interception of Wire Communications in Violation of G.L. c. 272, § 99
### (On Behalf of Plaintiff and the Class)

157. Plaintiff re-alleges and incorporates by reference all paragraphs above as if fully set forth herein.

158. Plaintiff brings this claim on behalf of themselves and all members of the Class.

159. All conditions precedent to this action have been performed or have occurred.

160. G.L. c. 272, § 99 prohibits any person from willfully and secretly intercepting the contents of any wire communications through the use of any intercepting device unless given prior authority by all parties to a communication to do so.

161. Any person aggrieved by a violation G.L. c. 272, § 99 "shall have a civil cause of action against any person who so intercepts, discloses, or uses such communications or who so violates his personal, property, or privacy interest."

162. Defendant qualifies as a person under the statute.

163. All alleged communications between Plaintiff or Class Members and Defendant qualify as wire communications under Massachusetts law because each communication is made using personal computing devices (e.g., computers, smartphones, tablets) that send and receive communications in whole or in part through the use of facilities used for the transmission of communications aided by wire, cable, or other like connections.

164. An "interception" under the statute means "to secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire ... communication through the use of any intercepting device by any person other than a person given prior authority by all parties to such communication." G.L. c. 272, § 99B(4).

165. Defendant engaged in and continues to engage in an "interception" by aiding others (including Facebook) to secretly record the contents of Plaintiff's and Class Members' wire communications.

166. An "intercepting device" is "any device or apparatus which is capable of transmitting, receiving, amplifying, or recording a wire ... communication." G.L. c. 272, § 99B(3).

167. The "intercepting devices" used in this case include, but are not limited to:

a. Plaintiff and Class Members' personal computing devices;

b. Plaintiff and Class Members' web browsers;

c. Plaintiff and Class Members' browser-managed files;

d. Facebook's Meta Pixel;

e. Internet cookies;

f. Defendant's computer servers;

g. Third-party source code utilized by Defendant; and

ıperıor Court - Essex
ıcket Number

h. Computer servers of third parties (including Facebook) to which Plaintiff and Class Members' communications were disclosed.

168. Under the statute, "contents" are defined to mean "any information concerning the identity of the parties to such communication or the existence, contents, substance, purport, or meaning of that communication." G.L. c. 272, § 99B(5).

169. Defendant aided in, and continues to aid in, the interception of contents in that the data from the communications between Plaintiff and/or Class Members and Defendant that were redirected to and recorded by the third parties include information which identifies the parties to each communication, their existence, and their contents.

170. Defendant aided in the interception of "contents" in at least the following forms:

a. The parties to the communications;

b. The precise text of patient search queries;

c. Personally identifying information such as patients' IP addresses, Facebook IDs, browser fingerprints, and other unique identifiers;

d. The precise text of patient communications about specific doctors;

e. The precise text of patient communications about specific medical conditions;

f. The precise text of patient communications about specific treatments;

g. The precise text of patient communications about scheduling appointments with medical providers;

h. The precise text of patient communications about billing and payment;

i. The precise text of specific buttons on Defendant's website(s) that patients click to exchange communications, including Log-Ins, Registrations, Requests for Appointments, Search, and other buttons;

j. The precise dates and times when patients click to Log-In on Defendant's website(s);

k. Information that is a general summary or informs third parties of the general subject of communications that Defendant sends back to patients in response to search queries and requests for information about specific doctors, conditions, treatments, billing, payment, and other information; and

l. Any other content that Defendant has aided third parties in scraping from webpages or communication forms at web properties.

171. Plaintiff and Class Members reasonably expected that their Personal Health Information was not being intercepted, recorded, and disclosed to Facebook and other third parties.

172. Neither Plaintiff nor Class Members consented to the disclosure of their Personal Health Information by Defendant to Facebook and other third parties. Nor could they have consented, given that Defendant never sought Plaintiff or Class Members' consent.

173. Plaintiff and Class Members' electronic communications were intercepted during transmission, without their consent, for the unlawful and/or wrongful purpose of monetizing their Personal Health Information, including using their sensitive medical information to develop marketing and advertising strategies.

174. Under the statute, aggrieved persons are entitled to recover appropriate injunctive relief and "(1) actual damages but not less than liquidated damages computed at the rate of $100 per day for each violation or $1,000, whichever is higher; (2) punitive damages; and (3) a reasonable attorney's fee and other litigation disbursements reasonably incurred."

175. In addition to statutory damages, Defendant's breach caused Plaintiff and Class Members the following damages:

a. Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private;

b. Defendant eroded the essential confidential nature of the doctor-patient relationship;

c. Defendant took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members' knowledge or informed consent and without sharing the benefit of such value;

d. Plaintiff and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain confidentiality; and

e. Defendant's actions diminished the value of Plaintiff and Class Members' personal information.

**COUNT II**
**Invasion of Privacy in Violation of G.L. c. 214, § 1B**
**(On Behalf of Plaintiff and the Class)**

176. Plaintiff re-alleges and incorporates by reference all paragraphs above as if fully set forth herein.

177. Plaintiff bring this claim on behalf of herself and all members of the Class.

178. G.L. c. 214, § 1B provides that "a person shall have a right against unreasonable, substantial, or serious interference with his privacy. The superior court shall have jurisdiction in equity to enforce such right and in connection therewith to award damages."

179. All health care providers owe their patients a duty not to disclose medical information about a patient without a patient's informed consent.

180. G.L. c. 111, § 70E provides that every patient or resident of a Massachusetts health care facility shall have the right to "confidentiality of all records and communications to the extent provided by law."

181. Maintaining the confidentiality of the doctor-patient relationship is a cardinal rule of the medical profession which has come to be justifiably relied on by patients seeking advice and treatments.

182. Plaintiff and Class Members are patients of Defendant.

183. Defendant owes Plaintiff and Class Members a duty of confidentiality.

184. Despite its duty not to disclose Personal Health Information without informed consent and written authorization, Defendant disclosed information relating to Plaintiff and Class Members' medical treatment to third parties without their knowledge, consent, or authorization.

185. The information disclosed included personally identifiable information, Plaintiff and Class Members' statuses as patients of Defendant, and the exact contents of communications exchanged between Plaintiff and/or Class Members with Defendant, including but not limited to information about treating doctors, potential doctors, conditions, treatments, appointments, search terms, bill payment, and logins to Defendant's website.

186. The disclosure of personally identifiable medical information constitutes an unreasonable, substantial, and serious interference with Plaintiff and Class Members' rights to privacy.

187. Plaintiff and Class Members did not consent to, authorize, or know about Defendant's disclosure of their Personal Health Information to Facebook and other third parties at the time it occurred. Plaintiff and Class Members never agreed that their sensitive medical information could be collected, used, and monetized by Facebook.

188. Defendant's intentional disclosure of patients' Personal Health Information to a third-party advertising company like Facebook without consent would be highly offensive to a reasonable person. Plaintiff and Class Members reasonably expected that their Personal Health Information would not be collected, used, and monetized by third party advertising companies.

189. Defendant's disclosure of Personal Health Information from thousands of individuals was highly offensive because it violated expectations of privacy that have been established by social norms. Privacy polls and studies show that Americans believe that one of the most important privacy rights is the need for an individual's affirmative consent before their personal data is collected, shared, or used.

190. Given the nature of the Personal Health Information that Defendant disclosed to Facebook, such as patients' names, email addresses, phone numbers, information entered into forms, doctor's names, potential doctor's names, the search terms used to locate doctors (i.e. "Alzheimer's"), the condition selected from dropdown menus (i.e. "Heart Disease"), medications, and details about upcoming doctor's appointments, this kind of intrusion would be (and in fact is) highly offensive to a reasonable person.

191. Defendant's breach caused Plaintiff and Class Members, at minimum, the following damages:

a. Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private;

b. Defendants eroded the essential confidential nature of the doctor-patient and provider-patient relationship;

ıperıor Court - Essex
ıcket Number

c. Defendants took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff and Class Members' knowledge, consent, or authorization and without sharing the benefit of such value;

d. Plaintiff and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain the confidentiality of their Personal Health Information; and

e. Defendant's actions diminished the value of Plaintiff and Class Members' personal information.

192. Plaintiff and Class Members have suffered harm and injury, including but not limited to the invasion of their privacy rights.

193. Plaintiff and Class Members have been damaged as a direct and proximate result of Defendant's invasion of their privacy and are entitled to seek just compensation, including monetary damages.

194. Plaintiff and Class Members seek appropriate relief for their injuries, including but not limited to damages that will reasonably compensate Plaintiff and Class Members for the harm to their privacy interests as well as a disgorgement of profits made by Defendant as a result of its intrusions on Plaintiff and Class Members' privacy.

195. Plaintiff and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's actions, which caused injury to Plaintiff and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

196. Plaintiff and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

ıperıor Court - Essex
ıcket Number

**COUNT III**
**Breach of Fiduciary Duty and/or Common Law Duty of Confidentiality**
**(On Behalf of Plaintiff and the Class)**

197. Plaintiff re-alleges and incorporates by reference all paragraphs above as if fully set forth herein.

198. Plaintiff brings this claim on behalf of themselves and all members of the Class.

199. All conditions precedent to this action have been performed or occurred.

200. In *Alberts v. Devine*, 479 N.E.2d 113, 120 (1985), the Massachusetts Supreme Court held that a duty of confidentiality arises from the physician-patient relationship and that a violation of that duty gives rise to a cause of action sounding in tort.

201. As medical provider for Plaintiff and Class Members, Defendant owes Plaintiff and Class Members a fiduciary duty of confidentiality in the data and content of communications exchanged between Defendant and Plaintiff or Class Members.

202. Defendant breached its duty of confidentiality by disclosing Personal Health Information about Plaintiff and Class Members, including their status as patients, the content of their communications, and information about their doctors, potential doctors, conditions, treatments, appointments, search terms, and bill payment.

203. Defendant's breach caused Plaintiff and Class Members the following damages:

a. Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private;

b. Defendants eroded the essential confidential nature of the doctor-patient and provider-patient relationship;

c. Defendants took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff and Class Members' knowledge, consent, or authorization and without sharing the benefit of such value;

d. Plaintiff and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain the confidentiality of their Personal Health Information; and

e. Defendant's actions diminished the value of Plaintiff and Class Members' personal information.

**COUNT IV**
**Breach of Express Contract**
**(On Behalf of Plaintiff and the Class)**

204. Plaintiff re-alleges and incorporates by reference all paragraphs above as if fully set forth herein.

205. Plaintiff bring this claim on behalf of herself and all members of the Class.

206. Plaintiff and Class Members entered into written agreements with Defendant as part of the medical services Defendant provided to Plaintiff and Class Members. The agreements involved a mutual exchange of consideration whereby Defendant provided these services in exchange for payment from Class Members, Class Members' insurance carriers, and/or government programs remitting payment on Class Members' behalf.

207. Plaintiff and Class Members and/or their insurance carriers paid Defendant for its services and performed under these agreements.

208. Defendant's disclosure of Plaintiff and Class Members' Private Health Information without their consent constitutes a material breach of the terms of these agreements by Defendant.

209. As a direct and proximate result of Defendant's breach of contract with Plaintiff and Class Members, Plaintiff and Class Members have been irreparably harmed.

210. Accordingly, Plaintiff, individually and on behalf of the Class, respectfully request this Court award all available damages for Defendant's breach of express contract.

**COUNT V**
**Breach of Implied Contract**
**(On Behalf of Plaintiff and the Class)**

211. Plaintiff re-alleges and incorporates by reference all paragraphs above as if fully set forth herein.

212. Plaintiff brings this claim on behalf of herself and all members of the Class.

213. Through their course of conduct, Defendant, Plaintiff, and Class Members entered into implied contracts for the provision of medical care and treatment, as well as implied contracts for the Defendant to retain and protect the privacy of Plaintiff's and Class Members' Private Health Information.

214. Specifically, Plaintiff and the Class Members entered into valid and enforceable implied contracts with Defendant when they first went for medical treatment at one of Defendant's facilities.

215. The valid and enforceable implied contracts to provide medical healthcare services that Plaintiff and Class Members entered into with Defendant included Defendant's promise to not disclose nonpublic Private Health Information given to Defendant without their consent. Plaintiff and Class Members provided this Private Health Information in reliance of that promise.

216. Defendant solicited and invited Plaintiff and Class Members to provide their Private Health Information on its website as part of Defendant's regular business practices.

ιperior Court - Essex
ιcket Number

Plaintiff and Class Members accepted Defendant's offers and provided their Private Health Information to Defendant as part of acquiring Defendant's medical services.

217. In entering into such implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendant's complied with relevant laws and regulations, and would not allow third parties to collect or exploit their communications with Defendant without their consent.

218. Plaintiff and Class Members who paid money to Defendant reasonably believed and expected that Defendant would use part of those funds to operate its websites free of surreptitious collection and exploitation of communications between the parties. Defendant failed to do so.

219. Under the implied contracts, Defendant and/or its affiliated healthcare providers promised and were obligated to: (a) provide healthcare to Plaintiff and Class Members; and (b) protect Plaintiff and the Class Members' Private Health Information provided to obtain such healthcare. In exchange, Plaintiff and Class Members agreed to pay money for these services, and to turn over their Private Health Information through the use of Defendant's websites.

220. Both the provision of medical services healthcare and the protection of Plaintiff and Class Members' Private Health Information were material aspects of these implied contracts.

221. The implied contracts for the provision of medical services—contracts that include the contractual obligations to maintain the privacy of Plaintiff and Class Members' Private Health Information unless they consent—are also acknowledged, memorialized, and embodied in multiple documents, including (among other documents) Defendant's published Notice of Privacy Practices.

perior Court - Essex
cket Number

222. Defendant's express representations, including, but not limited to the express representations found in its Notice of Privacy Practices, memorialize and embody an implied contractual obligation requiring Defendant refrain from aiding or allowing third parties to collect or Plaintiff and Class Members' Private Health Information without consent.

223. Consumers of healthcare value their privacy, the privacy of their dependents, and the ability to keep their Private Health Information associated with obtaining healthcare private. To customers such as Plaintiff and the Class Members, healthcare that allows third parties to secretly collect their Private Health Information without consent is fundamentally less useful and less valuable than healthcare that refrains from such practices. Plaintiff and Class Members would not have entrusted their Private Health Information to Defendant and entered into these implied contracts with Defendant without an understanding that their Private Health Information would be safeguarded and protected or entrusted their Private Health Information to Defendant in the absence of its implied promise to do so.

224. A meeting of the minds occurred when Plaintiff and the Class Members agreed to, and did, provide their Private Health Information to Defendant and/or its affiliated healthcare providers, and paid for the provided healthcare in exchange for, amongst other things, (a) the provision of healthcare and medical services and (b) the protection of their Private Health Information.

225. Plaintiff and the Class Members performed their obligations under the contract when they paid for their healthcare services and provided their Private Health Information.

226. Defendant materially breached its contractual obligation to protect the nonpublic Private Health Information Defendant gathered when it allowed third parties to collect and exploit that information without Plaintiff and Class Members' consent.

227. As a result of Defendant's failure to fulfill the data privacy promised in these contracts, Plaintiff and Class Members did not receive the full benefit of their bargains, and instead received healthcare and other services that were of a diminished value compared to those described in the contracts. Plaintiff and Class Members were therefore damaged in an amount at least equal to the difference in the value of the healthcare with data privacy they paid for and the healthcare they received.

228. Had Defendant disclosed that it would allow third parties to secretly collect Plaintiff and Class Members' Private Health Information without consent, neither the Plaintiff, the Class Members, nor any reasonable person would have purchased healthcare from Defendant and/or its affiliated healthcare providers.

229. As a direct and proximate result of these failures, Plaintiff and the Class Members have been harmed and have suffered, and will continue to suffer, actual damages and injuries, including, without limitation, the release and disclosure of their Private Health Information, the loss of control of their Private Health Information, and the loss of the benefit of the bargain they had struck with Defendant.

230. Plaintiff and the Class Members are entitled to compensatory and consequential damages suffered as a result.

231. Plaintiff and the Class Members are also entitled to injunctive relief requiring Defendant to cease all website operations that allow for the third-party capture of Private Health Information.

ıperior Court - Essex
ıcket Number

**COUNT VI**
**Unjust Enrichment**
**(On Behalf of Plaintiff and the Class)**

232. Plaintiff re-alleges and incorporates by reference all paragraphs above as if fully set forth herein.

233. Plaintiff hereby pleads this Count in the alternative to Counts IV and V.

234. Plaintiff brings this claim on behalf of herself and all members of the Class.

235. Plaintiff and Class Members conferred a benefit on Defendant in the form of valuable sensitive medical information that Defendant collected from Plaintiff and Class Members under the guise of keeping this information private. Defendant collected, used, and disclosed this information for its own gain, including for advertisement purposes, sale, or trade for valuable services from third parties. Additionally, Plaintiff and the Class Members conferred a benefit on Defendant in the form of monetary compensation.

236. Plaintiff and the Class Members would not have used the Defendant's services, or would have paid less for those services, if they had known that Defendant would collect, use, and disclose this information to third parties.

237. Defendant unjustly retained those benefits at the expense of Plaintiff and Class Members because Defendant's conduct damaged Plaintiff and Class Members, all without providing any commensurate compensation to Plaintiff and Class Members.

238. The benefits that Defendant derived from Plaintiff and Class Members rightly belong to Plaintiff and Class Members. It would be inequitable under unjust enrichment principles for Defendant to be permitted to retain any of the profit or other benefits it derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

ıperior Court - Essex
ıcket Number

239. Defendant should be compelled to disgorge in a common fund for the benefit of Plaintiff and Class Members all unlawful or inequitable proceeds that Defendant received, and such other relief as the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demand a trial by jury on all issues so triable.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of themselves and all others similarly situated, ask for judgment in his favor, and that the Court enter an order as follows:

a. Certifying the Class and appointing Plaintiff as the Class's representatives;

b. Appoint the law firms of Sweeny Merrigan Law, Keller Postman LLC, and Ahmad, Zavitsanos, & Mensing P.C. as proposed interim class counsel;

c. Finding that Defendant's conduct as alleged herein was unlawful;

d. Awarding such injunctive and other equitable relief as the Court deems just and proper, including enjoining Defendant from making any further disclosure of Plaintiff or Class Members' communications to third parties without the Plaintiff or Class Members' express, informed, and written consent;

e. Awarding statutory damages of $1,000 per Plaintiff and Class Members pursuant to G.L. c. 272, § 99;

f. Imposing a constructive trust against Defendant through which Plaintiff and Class Members can be compensated for any unjust enrichment gained by Defendant;

g. Awarding damages for violations of Plaintiff and Class Members' right to privacy;

h. Awarding Plaintiff and Class Members statutory, actual, compensatory, consequential, punitive, and nominal damages, as well as restitution and/or disgorgement of profits unlawfully obtained;

i. Awarding Plaintiff and Class Members pre-judgment and post-judgment interest as provided by law;

j. Awarding Plaintiff and Class Members reasonable attorney's fees, costs, and expenses;

k. Awarding costs of suit; and

l. Such other and further relief to which Plaintiff and Class Members may be entitled.

erior Court - Essex
ket Number

**RESPECTFULLY SUBMITTED,
COUNSEL FOR PLAINTIFF JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED**

*/s/ Jonathan T. Merrigan*
J. Tucker Merrigan, BBO# 681627
Victoria Santoro Mair, BBO# 679120
Erin E. McHugh, BBO# 703701
Sweeney Merrigan Law
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Foster C. Johnson (*pro hac vice forthcoming*)
David Warden (*pro hac vice forthcoming*)
Nathan Campbell (*pro hac vice forthcoming*)
AHMAD, ZAVITSANOS, & MENSING, P.C.
1221 McKinney Street, Suite 3460
Houston, Texas 77010
(713) 655-1101
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

Seth Meyer (*pro hac vice forthcoming*)
Alex Dravillas (*pro hac vice forthcoming*)
Keller Postman LLC
150 N. Riverside Plaza
Suite 4100
Chicago, Illinois 60606
(312) 741-5220
sam@kellerpostman.com
adj@kellerpostman.com

Dated: October 19, 2022

# CIVIL ACTION COVER SHEET

DOCKET NUMBER 2277CV01180-D

Trial Court of Massachusetts
The Superior Court 2

COUNTY Essex

Plaintiff John Doe
ADDRESS: c/o Sweeney Merrigan Law
268 Summer St., LL
Boston, MA 02210

Plaintiff Attorney: Jonathan T. Merrigan
ADDRESS: Sweeney Merrigan Law
268 Summer Street, LL
Boston, MA 02210
BBO: 681627

Defendant: Emerson Hospital
ADDRESS: Nine Acres Corner
Concord, MA 01742

10/19/2022
RECEIVED

Defendant Attorney:
ADDRESS:
BBO:

**TYPE OF ACTION AND TRACK DESIGNATION (see instructions section below)**

| CODE NO. | TYPE OF ACTION (specify) | TRACK | HAS A JURY CLAIM BEEN MADE? |
|---|---|---|---|
| B99 | Violation of MA Wiretapping Law | F | ☒ YES ☐ NO |

***If "Other" please describe:**

**Is there a claim under G.L. c. 93A?** ☐ YES ☒ NO

**Is there a class action under Mass. R. Civ. P. 23?** ☒ YES ☐ NO

**STATEMENT OF DAMAGES PURSUANT TO G.L. c. 212, § 3A**

The following is a full, itemized and detailed statement of the facts on which the undersigned plaintiff or plaintiff's counsel relies to determine money damages. For this form, disregard double or treble damage claims; indicate single damages only.

**TORT CLAIMS**

A TRUE COPY, ATTEST
[signature]
DEPUTY ASS'T. CLERK

A. Documented medical expenses to date
1. Total hospital expenses
2. Total doctor expenses
3. Total chiropractic expenses
4. Total physical therapy expenses
5. Total other expenses (describe below)

Subtotal (1-5): $0.00

B. Documented lost wages and compensation to date
C. Documented property damages to date
D. Reasonably anticipated future medical and hospital expenses
E. Reasonably anticipated lost wages
F. Other documented items of damages (describe below)

Plaintiffs and Class Members have suffered damages pursuant to G.L.c.272 Â§99. $50,000,000.00+

TOTAL (A-F): $50,000,000+

G. Briefly describe plaintiff's injury, including the nature and extent of injury:
Defendant disclosed Plaintiffs and Class Members' personal health information to third parties in violation of G.L. c. 272 Â§ 99.

**CONTRACT CLAIMS**

☐ This action includes a claim involving collection of a debt incurred pursuant to a revolving credit agreement. Mass. R. Civ. P. 8.1(a).

| Item # | Detailed Description of Each Claim | Amount |
|---|---|---|
| 1. | Defendant breached express and implied contractual duties by disclosing Class Members' personal information. | $14,000,000.00+ |
| | Total | $14,000,000.00+ |

Signature of Attorney/Unrepresented Plaintiff: X /s/ Jonathan T. Merrigan Date: October 19, 2022

**RELATED ACTIONS:** Please provide the case number, case name, and county of any related actions pending in the Superior Court.

**CERTIFICATION PURSUANT TO SJC RULE 1:18**

I hereby certify that I have complied with requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods of dispute resolution.

Signature of Attorney/Unrepresented Plaintiff: X /s/ Jonathan T. Merrigan Date: October 19, 2022

**CIVIL TRACKING ORDER**
**(STANDING ORDER 1- 88)**

DOCKET NUMBER
**2277CV01000**

**Trial Court of Massachusetts**
**The Superior Court**

CASE NAME:
John Doe In his/her capacity Individually and on befalf of all others similarly situated vs. Emerson Hospital

Thomas H. Driscoll, Jr., Clerk of Courts

TO: File Copy

COURT NAME & ADDRESS
Essex County Superior Court - Lawrence
43 Appleton Way
Lawrence, MA 01841

**TRACKING ORDER - F - Fast Track**

You are hereby notified that this case is on the track referenced above as per Superior Court Standing Order 1-88. The order requires that the various stages of litigation described below must be completed not later than the deadlines indicated.

**STAGES OF LITIGATION** | **DEADLINE**

| | SERVED BY | FILED BY | HEARD BY |
|---|---|---|---|
| Service of process made and return filed with the Court | | 01/17/2023 | |
| Response to the complaint filed (also see MRCP 12) | | 02/16/2023 | |
| All motions under MRCP 12, 19, and 20 | 02/16/2023 | 03/20/2023 | 04/18/2023 |
| All motions under MRCP 15 | 02/16/2023 | 03/20/2023 | 04/18/2023 |
| All discovery requests **and depositions** served and non-expert depositions completed | 08/15/2023 | | |
| All motions under MRCP 56 | 09/14/2023 | 10/16/2023 | |
| Final pre-trial conference held and/or firm trial date set | | | 02/12/2024 |
| Case shall be resolved and judgment shall issue by | | | 10/18/2024 |

A TRUE COPY, ATTEST
[signature]
DEPUTY ASST. CLERK

**The final pre-trial deadline is <u>not the scheduled date of the conference</u>.** You will be notified of that date at a later time.
**Counsel for plaintiff must serve this tracking order on defendant before the deadline for filing return of service.**
This case is assigned to

DATE ISSUED
**10/20/2022**

ASSISTANT CLERK
**Debra Vernava**

PHONE
**(978)242-1900**

Date/Time Printed: 10-20-2022 08:35:58

SCV026\ 08/2018

COMMONWEALTH OF MASSACHUSETTS

ESSEX, S.S. SUPERIOR COURT

| | | |
|---|---|---|
| JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, Plaintiff | § | C.A. No. 2277CV01000 D |
| v. | § | A TRUE COPY, ATTEST |
| EMERSON HOSPITAL, Defendant. | § | DEPUTY ASS'T. CLERK |

**PLAINTIFF'S MOTION FOR IMPOUNDMENT OF PERSONAL IDENTIFYING INFORMATION**

Now comes the Plaintiff, John Doe, individually and on behalf of all others similarly situated, to impound their names and/or other identifying information for the pendency of this case pursuant to Massachusetts Uniform Rules on Impoundment Procedure ("URIP") Rule 2[1]. The material sought to be impounded are the plaintiffs' names and/or other identifying information[2] for the pendency of this matter. Impoundment is necessary in this matter because the facts of the underlying action relate directly and specifically to all plaintiffs' sensitive medical information. Specifically, the claim arises from Defendant's systematic violation of the medical privacy rights of its patients, exposing highly sensitive personal information to third parties without those patients' knowledge or consent. Therefore, in order to protect the medical information that will

[1] URIP Rule 2 provides: "The motion shall describe with particularity (i) the material sought to be impounded, (ii) the duration for which impoundment is sought, (iii) the reasons impoundment is necessary, and (iv) the reasons other alternatives to impoundment will not afford adequate protection."

[2] This could include social media handles, IP addresses, etc.

necessarily be disclosed as part of the factual allegations and discovery in this matter, it is necessary to file this Complaint and proceed with the use of a pseudonym.

Alternatives to impoundment would not serve the same function and would not adequately protect the plaintiff, whose personal medical information has already been improperly used by the Defendant. Plaintiffs recognize that Massachusetts adheres to a presumption of openness, but this presumption is offset by the equally if not more important premise that the citizens of Massachusetts have a right to the privacy and confidentiality of their medical information, a right which is protected by statute, including G.L. c. 272, § 99 (Interception of Wire and Oral Communications), G.L. c.214, § 1B (Right to Privacy), and G.L. c. 111, § 70E (Patients' and Residents' Rights).

Perhaps as importantly, proceeding with the Plaintiffs' full names would have the unwelcome effect of making impoundment a more laborious, tedious and inefficient task. For each piece of discovery regarding the Plaintiffs' medical information, Plaintiffs would have to seek impoundment of those materials. It would impact the ability to move forward efficiently in both written and oral discovery. An impoundment order (attached at Exhibit B) would serve both purposes of protecting the Plaintiffs' private medical information and also allowing efficient prosecution of this case.

WHEREFORE, Plaintiff respectfully requests this court ALLOW Plaintiff's Motion for Impoundment of Personal Identifying Information and request a hearing on the same.

**COUNSEL FOR PLAINTIFF JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED**

Respectfully submitted,

*/s/ Jonathan T. Merrigan*
J. Tucker Merrigan, BBO# 681627
Victoria Santoro Mair, BBO# 679120
Erin E. McHugh, BBO# 703701
Sweeney Merrigan Law
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Foster C. Johnson (*pro hac vice forthcoming*)
David Warden (*pro hac vice forthcoming*)
Nathan Campbell (*pro hac vice forthcoming*)
AHMAD, ZAVITSANOS, & MENSING, P.C.
1221 McKinney Street, Suite 3460
Houston, Texas 77010
(713) 655-1101
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

Seth Meyer (*pro hac vice forthcoming*)
Alex Dravillas (*pro hac vice forthcoming*)
Keller Postman LLC
150 N. Riverside Plaza
Suite 4100
Chicago, Illinois 60606
(312) 741-5220
sam@kellerpostman.com
adj@kellerpostman.com

Dated: October 25, 2022

COMMONWEALTH OF MASSACHUSETTS

ESSEX, S.S. SUPERIOR COURT

| | | |
|---|---|---|
| JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | § | C.A. No. 2277CV01000 |
| Plaintiff | § | |
| v. | § | |
| EMERSON HOSPITAL, | § | |
| Defendant. | § | |

**ORDER**

SO ORDERED, that Plaintiff's name and any identifying information shall be impounded for the pendency of this litigation. The Court finds that good cause for impoundment of the plaintiff's name has been shown by the movant to protect the plaintiff's interest in their private, sensitive and confidential medical records. The Court finds that there is no less restrictive measure available to protect this interest and that the degree, duration and manner of impoundment ordered herein are no broader than necessary.

It is ORDERED that the Clerk of this Court shall impound the Plaintiff's name in this case. Any such materials that identify the plaintiff shall be kept separate and apart from those materials to which the public has access. The filer of any document shall ensure that the Plaintiff's name is redacted from all public filings. The Clerk shall redact any individual docket entries as necessary. The docket and case filings shall otherwise remain available to the public.

By the Court

COMMONWEALTH OF MASSACHUSETTS

ESSEX, S.S. SUPERIOR COURT

| | | |
|---|---|---|
| JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | § | C.A. No. 2277CV01000 |
| Plaintiff | § | |
| v. | § | |
| EMERSON HOSPITAL, | § | |
| Defendant. | § | |

**AFFIDAVIT OF ATTORNEY J. TUCKER MERRIGAN IN SUPPORT OF PLAINTIFF'S MOTION FOR IMPOUNDMENT OF PERSONAL IDENTIFYING INFORMATION**

I, J. Tucker Merrigan, hereby state and depose:

1. I am counsel for the Plaintiff in the above-captioned case.
2. The information inappropriately obtained by the Defendant in this matter is of a highly sensitive, personal and confidential nature.
3. In order to protect the privacy interests of the Plaintiffs in this case, it is necessary to proceed under a pseudonym so as not to cause further harm by additional, repeated disclosure of highly confidential medical information throughout the course of this litigation.
4. Allowing the plaintiffs to file under a pseudonym also allows for the most efficient disclosure of documents and discovery.

A TRUE COPY, ATTEST

DEPUTY ASS'T. CLERK

Signed under the pains and penalties of perjury this 25th day of October, 2022.

*/s/ Jonathan T. Merrigan*
J. Tucker Merrigan, BBO# 681627
Sweeney Merrigan Law
268 Summer St. LL
Boston, MA 02210
(413) 774-5300
tucker@sweeneymerrigan.com

| Summons | CIVIL DOCKET NO. 2277CV01000-D | Trial Court of Massachusetts The Superior Court |
|---|---|---|
| CASE NAME: John Doe, Indiv & on behalf others similarly situated, Plaintiff(s) vs. Emerson Hospital, Defendant(s) | | Thomas H. Driscoll, Jr., Clerk of Courts, Essex County |
| | | COURT NAME & ADDRESS: Essex Superior Court - LAWRENCE, 43 Appleton Way, Lawrence, MA 01840 |

A TRUE COPY, ATTEST
DEPUTY ASST. CLERK

THIS SUMMONS IS DIRECTED TO Emerson Hospital (Defendant's name)

**You are being sued.** The Plaintiff(s) named above has started a lawsuit against you. A copy of the Plaintiff's Complaint filed against you is attached to this Summons and the original Complaint has been filed in the Lawrence Superior Court.

**YOU MUST ACT PROMPTLY TO PROTECT YOUR RIGHTS.**

**1. You must respond to this lawsuit in writing within 20 days.**
If you do not respond, the Court may decide the case against you and award the Plaintiff everything asked for in the Complaint. You will also lose the opportunity to tell your side of the story. You must respond to this lawsuit in writing even if you expect to resolve this matter with the Plaintiff. **If you need more time to respond, you may request an extension of time in writing from the Court.**

**2. How to Respond.**
To respond to this lawsuit, you must file a written response with the Court <u>and</u> mail a copy to the Plaintiff's attorney (or the Plaintiff, if unrepresented). You can do this by:

a) Filing your **signed original** response with the Clerk's Office for Civil Business, Lawrence Superior Court 43 Appleton Way, Lawrence, MA 01840 (address), by mail, in person, or electronically through the web portal www.eFileMA.com if the Complaint was e-filed through that portal, <u>AND</u>

b) Delivering or mailing **a copy** of your response to the Plaintiff's attorney/Plaintiff at the following address: 260 Summer St, LL, Boston, MA, 02210

**3. What to Include in Your Response.**
An "Answer" is one type of response to a Complaint. Your Answer must state whether you agree or disagree with the fact(s) alleged in each paragraph of the Complaint. Some defenses, called affirmative defenses, must be stated in your Answer or you may lose your right to use them in Court. If you have any claims against the Plaintiff (referred to as "counterclaims") that are based on the same facts or transaction described in the Complaint, then you must include those claims in your Answer. Otherwise, you may lose your right to sue the Plaintiff about anything related to this lawsuit. If you want to have your case heard by a jury, you must **specifically** request a jury trial in your Court no more than 10 days after sending your Answer.

3. (cont.) Another way to respond to a Complaint is by filing a "Motion to Dismiss," if you believe that the Complaint is legally invalid or legally insufficient. A Motion to Dismiss must be based on one of the legal deficiencies or reasons listed under **Rule 12 of the Massachusetts Rules of Civil Procedure.** If you are filing a Motion to Dismiss, you must follow the filing rules for "Civil Motions in Superior Court," available at:

www.mass.gov/law-library/massachusetts-superior-court-rules

**4. Legal Assistance.**
You may wish to get legal help from a lawyer. If you cannot get legal help, some basic information for people who represent themselves is available at www.mass.gov/courts/selfhelp.

**5. Required Information on All Filings.**
The "Civil Docket No." appearing at the top of this notice is the case number assigned to this case and must appear on the front of your Answer or Motion to Dismiss. You should refer to yourself as the "Defendant."

Witness Hon. Heidi E. Brieger, Chief Justice on ____________, 20____. (Seal)

Clerk Thomas H. Driscoll, Jr.

**Note:** The docket number assigned to the original Complaint by the Clerk should be stated on this Summons before it is served on the Defendant(s).

PROOF OF SERVICE OF PROCESS

**Middlesex Sheriff's Office** • 40 Brick Kiln Rd, Chelmsford, MA 01824 • 617-547-1171
**Middlesex, ss.**

**November 30, 2022**

I hereby certify and return that on 11/29/2022 at 11:46 AM I served a true and attested copy of the **SUMMONS AND COMPLAINT & DEMAND FOR JURY DUTY** in this action in the following manner: To wit, by delivering in hand to **CHRISTINA TROTTA**, agent, person in charge at the time of service for **EMERSON HOSPITAL**, at **NINE ACRES CORNER CONCORD, MA 01742**. Fees: Attest ($5.00) Basic Service Fee ($30.00) Postage and Handling ($3.00) Travel ($13.76) Conveyance ($3.30) Total: $55.06

Richard Moran
Deputy Sheriff

Date:

rev. 7/2022

| Summons | CIVIL DOCKET NO. 2277CV01000-D | Trial Court of Massachusetts The Superior Court |
|---|---|---|
| CASE NAME: John Doe, Indiv & on behalf others similarly situated, Plaintiff(s) vs. Emerson Hospital, Defendant(s) | | Thomas H. Driscoll, Jr. Clerk of Courts; Essex County; COURT NAME & ADDRESS: Essex Superior Court - LAWRENCE 43 Appleton Way Lawrence, MA 01840 |

A TRUE COPY, ATTEST
DEPUTY ASS'T. CLERK

THIS SUMMONS IS DIRECTED TO Emerson Hospital (Defendant's name)

**You are being sued.** The Plaintiff(s) named above has started a lawsuit against you. A copy of the Plaintiff's Complaint filed against you is attached to this Summons and the original Complaint has been filed in the Lawrence Superior Court. **YOU MUST ACT PROMPTLY TO PROTECT YOUR RIGHTS.**

**1. You must respond to this lawsuit in writing within 20 days.** If you do not respond, the Court may decide the case against you and award the Plaintiff everything asked for in the Complaint. You will also lose the opportunity to tell your side of the story. You must respond to this lawsuit in writing even if you expect to resolve this matter with the Plaintiff. **If you need more time to respond, you may request an extension of time in writing from the Court.**

**2. How to Respond.** To respond to this lawsuit, you must file a written response with the Court and mail a copy to the Plaintiff's attorney (or the Plaintiff, if unrepresented). You can do this by:

a) Filing your **signed original** response with the Clerk's Office for Civil Business, Lawrence Superior Court 43 Appleton Way, Lawrence, MA 01841 (address), by mail, in person, or electronically through the web portal www.eFileMA.com if the Complaint was e-filed through that portal, AND

b) Delivering or mailing **a copy** of your response to the Plaintiff's attorney/Plaintiff at the following address: 268 Summer St, LL, Boston, MA, 02210

**3. What to Include in Your Response.** An "Answer" is one type of response to a Complaint. Your Answer must state whether you agree or disagree with the fact(s) alleged in each paragraph of the Complaint. Some defenses, called affirmative defenses, must be stated in your Answer or you may lose your right to use them in Court. If you have any claims against the Plaintiff (referred to as "counterclaims") that are based on the same facts or transaction described in the Complaint, then you must include those claims in your Answer. Otherwise, you may lose your right to sue the Plaintiff about anything related to this lawsuit. If you want to have your case heard by a jury, you must **specifically** request a jury trial in your Court no more than 10 days after sending your Answer.

3. (cont.) Another way to respond to a Complaint is by filing a "Motion to Dismiss," if you believe that the Complaint is legally invalid or legally insufficient. A Motion to Dismiss must be based on one of the legal deficiencies or reasons listed under **Rule 12 of the Massachusetts Rules of Civil Procedure**. If you are filing a Motion to Dismiss, you must follow the filing rules for "Civil Motions in Superior Court," available at:
www.mass.gov/law-library/massachusetts-superior-court-rules

**4. Legal Assistance.**
You may wish to get legal help from a lawyer. If you cannot get legal help, some basic information for people who represent themselves is available at www.mass.gov/courts/selfhelp.

**5. Required Information on All Filings.**
The "Civil Docket No." appearing at the top of this notice is the case number assigned to this case and must appear on the front of your Answer or Motion to Dismiss. You should refer to yourself as the "Defendant."

Witness Hon. Heidi E. Brieger, Chief Justice on ______________, 20___. (Seal)

Clerk Thomas H. Driscoll, Jr.

**Note:** The docket number assigned to the original Complaint by the Clerk should be stated on this Summons before it is served on the Defendant(s).

PROOF OF SERVICE OF PROCESS

**Middlesex Sheriff's Office** • 40 Brick Kiln Rd, Chelmsford, MA 01824 • 617-547-1171
**Middlesex, ss.**

**November 30, 2022**

**I hereby certify and return that on 11/29/2022 at 11:46 AM I served a true and attested copy of the SUMMONS AND COMPLAINT & DEMAND FOR JURY DUTY in this action in the following manner: To wit, by delivering in hand to CHRISTINA TROTTA, agent, person in charge at the time of service for EMERSON HOSPITAL, at NINE ACRES CORNER CONCORD, MA 01742 . Fees: Attest ($5.00) Basic Service Fee ($30.00) Postage and Handling ($3.00) Travel ($13.76) Conveyance ($3.30) Total: $55.06**

Richard Moran
Deputy Sheriff

Date:

rev. 7/2022

| Summons | CIVIL DOCKET NO. 2277CV01000-D | Trial Court of Massachusetts The Superior Court |
|---|---|---|
| CASE NAME: John Doe, Indiv & on behalf others similarly situated, Plaintiff(s) vs. Emerson Hospital, Defendant(s) | | Thomas H. Driscoll, Jr. Clerk of Courts, Essex County. COURT NAME & ADDRESS: Essex Superior Court - LAWRENCE, 43 Appleton Way, Lawrence, MA 01840 |

A TRUE COPY, ATTEST
[signature]
DEPUTY ASS'T. CLERK

THIS SUMMONS IS DIRECTED TO Emerson Hospital (Defendant's name)

**You are being sued.** The Plaintiff(s) named above has started a lawsuit against you. A copy of the Plaintiff's Complaint filed against you is attached to this Summons and the original Complaint has been filed in the Lawrence Superior Court. **YOU MUST ACT PROMPTLY TO PROTECT YOUR RIGHTS.**

**1. You must respond to this lawsuit in writing within 20 days.** If you do not respond, the Court may decide the case against you and award the Plaintiff everything asked for in the Complaint. You will also lose the opportunity to tell your side of the story. You must respond to this lawsuit in writing even if you expect to resolve this matter with the Plaintiff. **If you need more time to respond, you may request an extension of time in writing from the Court.**

**2. How to Respond.** To respond to this lawsuit, you must file a written response with the Court <u>and</u> mail a copy to the Plaintiff's attorney (or the Plaintiff, if unrepresented). You can do this by:

a) Filing your signed original response with the Clerk's Office for Civil Business, Lawrence Superior Court 43 Appleton Way, Lawrence, MA 01840 (address), by mail, in person, or electronically through the web portal www.eFileMA.com if the Complaint was e-filed through that portal, <u>AND</u>

b) Delivering or mailing a copy of your response to the Plaintiff's attorney/Plaintiff at the following address: 268 Summer St, LL, Boston, MA, 02210

**3. What to Include in Your Response.** An "Answer" is one type of response to a Complaint. Your Answer must state whether you agree or disagree with the fact(s) alleged in each paragraph of the Complaint. Some defenses, called affirmative defenses, must be stated in your Answer or you may lose your right to use them in Court. If you have any claims against the Plaintiff (referred to as "counterclaims") that are based on the same facts or transaction described in the Complaint, then you must include those claims in your Answer. Otherwise, you may lose your right to sue the Plaintiff about anything related to this lawsuit. If you want to have your case heard by a jury, you must **specifically** request a jury trial in your Court no more than 10 days after sending your Answer.

**3. (cont.)** Another way to respond to a Complaint is by filing a "Motion to Dismiss," if you believe that the Complaint is legally invalid or legally insufficient. A Motion to Dismiss must be based on one of the legal deficiencies or reasons listed under **Rule 12 of the Massachusetts Rules of Civil Procedure**. If you are filing a Motion to Dismiss, you must follow the filing rules for "Civil Motions in Superior Court," available at:

www.mass.gov/law-library/massachusetts-superior-court-rules

**4. Legal Assistance.**

You may wish to get legal help from a lawyer. If you cannot get legal help, some basic information for people who represent themselves is available at www.mass.gov/courts/selfhelp.

**5. Required Information on All Filings.**

The "Civil Docket No." appearing at the top of this notice is the case number assigned to this case and must appear on the front of your Answer or Motion to Dismiss. You should refer to yourself as the "Defendant."

Witness Hon. Heidi E. Brieger, Chief Justice on __________, 20__. (Seal)

Clerk Thomas H. Driscoll, Jr.

**Note:** The docket number assigned to the original Complaint by the Clerk should be stated on this Summons before it is served on the Defendant(s).

PROOF OF SERVICE OF PROCESS

**Middlesex Sheriff's Office** • 40 Brick Kiln Rd, Chelmsford, MA 01824 • 617-547-1171
**Middlesex, ss.**

November 30, 2022

I hereby certify and return that on 11/29/2022 at 11:46 AM I served a true and attested copy of the SUMMONS AND COMPLAINT & DEMAND FOR JURY DUTY in this action in the following manner: To wit, by delivering in hand to CHRISTINA TROTTA, agent, person in charge at the time of service for EMERSON HOSPITAL, at NINE ACRES CORNER CONCORD, MA 01742 . Fees: Attest ($5.00) Basic Service Fee ($30.00) Postage and Handling ($3.00) Travel ($13.76) Conveyance ($3.30) Total: $55.06

Richard Moran
Deputy Sheriff

Date:

rev. 7/2022

COMMONWEALTH OF MASSACHUSETTS

ESSEX, S.S. SUPERIOR COURT

JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,

Plaintiff

v.

EMERSON HOSPITAL,

Defendant.

§ § § § § § § § § § § § § § §

C.A. No. 2277CV01000

A TRUE COPY, ATTEST

DEPUTY ASS'T CLERK

## FIRST AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff John Doe ("Plaintiff"), individually and on behalf of all current citizens of the Commonwealth of Massachusetts similarly situated ("Class Members"), brings suit against Defendant Emerson Hospital ("Defendant"), and upon personal knowledge as to Plaintiff's own conduct and on information and belief as to all other matters based upon investigation by counsel, alleges as follows:

## NATURE OF ACTION AND ALLEGATIONS

1. This case arises from Defendant's systematic violation of the medical privacy rights of its patients, exposing highly sensitive personal information to third parties without those patients' knowledge or consent.

2. Defendant's "Notice of Privacy Practices" tells patients that "[p]rotecting your medical information is an important priority for Emerson Hospital."[1] Indeed, Defendant assures patients that Defendant will *never* use or share patients' "personal information for marketing

[1] https://www.emersonhospital.org/patients-visitors/patient-rights-responsibilities/patient-privacy

purposes" without "specific authorization."[2] Contrary to these assurances, however, Defendant does not follow these policies, nor the law prohibiting such disclosures.

3. As recently as October 17, 2023, Defendant disclosed information about its patients—including their status as patients, their physicians, their medical treatments, the hospitals they visited, and their personal identities—to Facebook and other third parties without its patients' knowledge, authorization, or consent.

4. Defendant disclosed this protected health information through the deployment of various digital marketing and automatic rerouting tools embedded on its websites that purposefully and intentionally redirect patients' personal health information to third parties who exploit that information for advertising purposes. Defendant's use of these rerouting tools caused its patients' personally identifiable information and the contents of its patients' communications exchanged with Defendant to be automatically redirected to third parties in violation of those patients' reasonable expectations of privacy, their rights as patients, their rights as citizens of Massachusetts, and both the express and implied promises of Defendant.

5. Defendant's conduct in disclosing such protected health information about its patients to Facebook and other third parties violates Massachusetts law, including G.L. c. 272, § 99 (Interception of Wire and Oral Communications), G.L. c.214, § 1B (Right to Privacy), and G.L. c. 111, § 70E (Patients' and Residents' Rights).

6. On behalf of himself and all similarly situated persons who are current citizens of Massachusetts, Plaintiff seeks an order enjoining Defendant from further unauthorized disclosures of his personal information; awarding liquidated damages in the amount of $1,000 per violation, attorney's fees and costs; and granting any other preliminary or equitable relief the Court deems appropriate.

---

[2] https://www.emersonhospital.org/patients-visitors/patient-rights-responsibilities/patient-privacy

## PARTIES TO THE ACTION

7. Defendant Emerson Hospital is a Massachusetts corporation with its principal office at Nine Acres Corner, Concord, Massachusetts, 01742. Defendant is a private health system serving over 300,000 individuals in 25 towns in Massachusetts.[3] Defendant owns and manages numerous healthcare facilities in Massachusetts, including Emerson Hospital, health centers in Westford, Groton, and Sudbury, the Center for Specialty Care in Concord, the Clough Family Center for Rehabilitation and Sports Therapies, the Hermel Breast Health Center, the Steinberg Wellness Center for Mind and Body, urgent care centers in Hudson and Littleton, and numerous ancillary facilities, including Cantu Concussion Center.[4]

8. Plaintiff, John Doe, is an individual residing in Essex County, Massachusetts, has been treated by Defendant's physicians, and has been a patient at the Cantu Concussion Center,[5] and thus also a patient of Defendant.

## JURISDICTION AND VENUE

9. This Court has personal jurisdiction over Defendant because it regularly conducts business throughout Massachusetts and has its principal place of business at Nine Acres Corner, Concord, Massachusetts, 01742. G.L. c. 223A, § 2; G.L. c. 223A, § 3.

10. Venue is appropriate in this Court because Plaintiff, John Doe, resides in Essex County and the acts or conduct giving rise to the cause of action took place in Essex County. G.L. c. 223, § 8(4).

---

[3] https://www.emersonhospital.org/about-emerson/from-our-president-ceo

[4] https://www.emersonhospital.org/about-emerson/from-our-president-ceo; *see also https://www.emersonhospital.org/locations*

[5] https://www.emersonhospital.org/locations/concussion-center

## FACTUAL BACKGROUND

**A. Defendant routinely discloses the protected health information of its patients to third parties including Facebook.**

11. Plaintiff John Doe is a patient of Defendant who has received treatment from Defendant at the Cantu Concussion Center.[6]

12. Under G.L. c. 214, § 1B, all persons "have a right against unreasonable, substantial, or serious interference" with their privacy.

13. Medical patients in Massachusetts such as John Doe have a legal interest in preserving the confidentiality of their communications with healthcare providers and have reasonable expectations of privacy that their personally identifiable information and communications will not be disclosed to third parties by Defendant without their express written consent and authorization.

14. As a health care provider, Defendant has fiduciary, common law, and statutory duties to protect the confidentiality of patient information and communications.

15. Defendant expressly and impliedly promises patients that it will maintain and protect the confidentiality of personally identifiable patient information and communications.

16. Defendant operates websites for patients, including www.emersonhospital.org.

17. Defendant's websites are designed for interactive communication with patients, including scheduling appointments, searching for physicians, paying bills, requesting medical records, learning about medical issues treatment options, and joining support groups.

18. Notwithstanding patients' reasonable expectations of privacy, Defendant's legal duties of confidentiality, and Defendant's express promises to the contrary, Defendant disclosed the contents of patients' communications and protected healthcare information via automatic re-

[6] https://www.emersonhospital.org/locations/concussion-center

routing mechanisms embedded in the websites operated by Defendant without patients' knowledge, authorization, or consent.

**B. The nature of Defendant's unauthorized disclosure of patients' health care information.**

19. Defendant's disclosures of patients' personal healthcare information occurred because Defendant intentionally deployed source code on the websites it operates, including https://www.emersonhospital.org/find-a-doctor, that caused patients' personally identifiable information (as well as the exact contents of their communications) to be transmitted to third parties.

20. By design, third parties (including Facebook) receive and record the exact contents of patient communications before the full response from Defendant to patients has been rendered on the screen of the patient's computer device and while the communication between Defendant and the patient remains ongoing.

21. Websites like those maintained by Defendant are hosted by a computer server through which the business in charge of the website exchanges and communicates with internet users via their web browsers.

22. The basic command that web browsers use to exchange data and user communications is called a GET request.[7] For example, when a patient types "heart failure treatment" into the search box on Defendant's website and hits 'Enter,' the patient's web browser makes a connection with the server for Defendant's website and sends the following request: "GET search/q=heart+failure+treatment."

23. When a server receives a GET request, the information becomes appended to the next URL (or "Uniform Resource Locator") accessed by the user. For example, if a user enters

[7] https://www.w3schools.com/tags/ref_httpmethods.asp

"respiratory problems" into the query box of a website search engine, and the search engine transmits this information using a GET request method, then the words "respiratory" and "problems" will be appended to the query string at the end of the URL of the webpage showing the search results.

24. The other basic transmission command utilized by web browsers is POST, which is typically employed when a user enters data into a form on a website and clicks 'Enter' or some other form of submission button. POST sends the data entered in the form to the server hosting the website that the user is visiting.

25. In response to receiving a GET or POST command, the server for the website with which the user is exchanging information will send a set of instructions to the web browser and command the browser with source code that directs the browser to render the website's responsive communication.

26. Unbeknownst to most users, however, the website's server may also redirect the user's communications to third parties. Indeed, Google warns website developers and publishers that installing its ad tracking software on webpages employing GET requests will result in users' personally identifiable information being disclosed to Google.[8] Typically, users are provided no notice that these disclosures are being made.

27. Third parties (such as Facebook and Google) use the information they receive to track user data and communications for marketing purposes.

28. In many cases, third-party marketing companies acquire the content of user communications through a 1x1 pixel (the smallest dot on a user's screen) called a tracking pixel, a web-bug, or a web beacon. These tracking pixels are tiny and are purposefully camouflaged to remain invisible to users.

---

[8] https://support.google.com/platformspolicy/answer/6156630?hl=en

29. Tracking pixels can be placed directly on a web page by a developer, or they can be funneled through a "tag manager" service to make the invisible tracking run more smoothly. A tag manager further obscures the third parties to whom user data is transmitted.

30. These tracking pixels can collect dozens of data points about individual website users who interact with a website. One of the world's most prevalent tracking pixels, called the Meta Pixel, is provided by Facebook.

31. A web site developer who chooses to deploy third-party source code, like a tracking pixel, on their website must enter the third-party source code directly onto their website for every third party they wish to send user data and communications. This source code operates invisibly in the background when users visit a site employing such code.

**C. Tracking pixels provide third parties with a trove of personally identifying data permitting them to uniquely identify the individuals browsing a website.**

32. Tracking pixels are lines of source code embedded in websites such as Defendant's. Tracking pixels are particularly pernicious because they result in the disclosure of a variety of data that permits third parties to determine the unique personal identities of website visitors. While most users believe that the internet provides them with anonymity when, for example, they browse a hospital website for treatment information about a medical condition, that is not the case when the hospital website has embedded third party tracking devices, as Defendant has.

33. For example, an IP address is a numerical identifier that identifies each computer connected to the internet. IP addresses are used to identify and route communications on the internet. IP addresses of individual users are used by internet service providers, websites, and tracking companies to facilitate and track internet communications and content. IP addresses

also offer advertising companies like Facebook a unique and semi-persistent identifier across devices—one that has limited privacy controls.[9]

34. Because of their uniquely identifying character, IP address are considered protected personally identifiable information. Tracking pixels can (and typically do) collect website visitors' IP addresses.

35. Likewise, internet cookies also provide personally identifiable information. Cookies are small text files that web servers can place on a user's browser and computer when a user's browser interacts with a website server. Cookies are typically designed to acquire and record an individual internet user's communications and activities on websites and were developed by programmers to aid with online advertising.

36. Cookies are designed to operate as a means of identification for internet users. Advertising companies like Facebook and Google have developed methods for monetizing and profiting from cookies. These companies use third-party tracking cookies to help them acquire and record user data and communications in order to sell targeted advertising that is customized to a user's personal communications and browsing history. To build individual profiles of internet users, third party advertising companies assign each user a unique (or a set of unique) identifiers to each user.

37. Cookies are considered personal identifiers protected, and tracking pixels can collect cookies from website visitors.

38. A third type of personally identifying information is what data companies refer to as a "browser-fingerprint." A browser-fingerprint is information collected about a computing device that can be used to identify the specific device.

[9] https://adtechexplained.com/the-future-of-ip-address-as-an-advertising-identifier/

39. These browser-fingerprints can be used to uniquely identify individual users when a computing device's IP address is hidden or cookies are blocked and can provide a wide variety of data. As Google explained, "With fingerprinting, developers have found ways to use tiny bits of information that vary between users, such as what device they have or what fonts they have installed to generate a unique identifier which can then be used to match a user across websites."[10] The value of browser-fingerprinting to advertisers (and trackers who want to monetize aggregated data) is that they can be used to track website users just as cookies do, but it employs much more subtle techniques.[11] Additionally, unlike cookies, users cannot clear their fingerprint and therefore cannot control how their personal information is collected.[12]

40. In 2017, researchers demonstrated that browser fingerprinting techniques can successfully identify 99.24 percent of all users.[13]

41. Browser-fingerprints are considered personal identifiers, and tracking pixels can collect browser-fingerprints from website visitors.

42. A fourth kind of personally identifying information protected by law against disclosure are unique user identifiers (such as Facebook's "Facebook ID") that permit companies like Facebook to quickly and automatically identify the personal identity of its user across the internet whenever the identifier is encountered. A Facebook ID is a number string that is connected to a user's Facebook profile.[14] Anyone with access to a user's Facebook ID can locate a user's Facebook profile.[15]

---

[10] https://www.blog.google/products/chrome/building-a-more-private-web/
[11] https://pixelprivacy.com/resources/browser-fingerprinting/
[12] https://www.blog.google/products/chrome/building-a-more-private-web/
[13] https://www.ndss-symposium.org/ndss2017/ndss-2017-programme/cross-browser-fingerprinting-os-and-hardware-level-features/
[14] https://www.facebook.com/help/211813265517027
[15] https://smallseotools.com/find-facebook-id/

43. Unique personal identifiers such as a person's Facebook are likewise capable of collection through pixel trackers.

**D. Facebook's Business Model: Exploiting Users' Personal Data to Sell Advertising.**

44. Facebook, a social media platform founded in 2004 and today operated by Meta Platforms, Inc., was originally designed as a social networking website for college students.

45. Facebook describes itself as a "real identity" platform.[16] This means that users are permitted only one account and must share "the name they go by in everyday life."[17] To that end, Facebook requires users to provide their first and last name, along with their birthday, telephone number and/or email address, and gender, when creating an account.[18]

46. In 2007, realizing the value of having direct access to millions of consumers, Facebook began monetizing its platform by launching "Facebook Ads," proclaiming this service to be a "completely new way of advertising online," that would allow "advertisers to deliver more tailored and relevant ads."[19] Facebook has since evolved into one of the largest advertising companies in the world.[20] Facebook can target users so effectively because it surveils user activity both on and off its website through the use of tracking pixels.[21] This allows Facebook to make inferences about users based on their interests, behavior, and connections.[22]

47. Today, Facebook provides advertising on its own social media platforms, as well as other websites through its Facebook Audience Network. Facebook has more than 2.9 billion users.[23]

---

[16] https://www.wsj.com/articles/how-many-users-does-facebook-have-the-company-struggles-to-figure-it-out-11634846701#:~:text=Facebook%20said%20in%20its%20most,of%20them%20than%20developed%20ones.
[17] https://transparency.fb.com/policies/community-standards/account-integrity-and-authentic-identity/
[18] https://www.facebook.com/help/406644739431633
[19] https://about.fb.com/news/2007/11/facebook-unveils-facebook-ads/
[20] https://www.pewresearch.org/fact-tank/2021/06/01/facts-about-americans-and-facebook/
[21] https://www.facebook.com/business/help/742478679120153?id=1205376682832142
[22] https://www.facebook.com/business/ads/ad-targeting
[23] https://www.statista.com/statistics/264810/number-of-monthly-active-facebook-users-worldwide/

48. Facebook maintains profiles on users that include users' real names, locations, email addresses, friends, likes, and communications. These profiles are associated with personal identifiers, including IP addresses, cookies, and other device identifiers. Facebook also tracks non-users across the web through its internet marketing products and source code. Facebook employs algorithms, powered by machine learning tools, to determine what advertisements to show users based on their habits and interests, and utilizes tracking software such as the Meta Pixel to monitor and exploit users' habits and interests.

49. Tracking information about users' habits and interests is a critical component of Facebook's business model because it is precisely this kind of information that allows Facebook to sell advertising to its customers. Facebook uses plug-ins and cookies to track user's browsing histories when they visit third-party websites. Facebook then compiles these browsing histories into personal profiles which are sold to advertisers to generate profits.

50. Facebook offers several advertising options based on the type of audience that an advertiser wants to target. Those options include targeting "Core Audiences," "Custom Audiences," "Look Alike Audiences," and even more granulated approaches within audiences called "Detailed Targeting." Each of Facebook's advertising tools allow an advertiser to target users based, among other things, on their personal data, including geographic location, demographics (e.g., age, gender, education, job title, etc.), interests, (e.g., preferred food, movies), connections (e.g., particular events or Facebook pages), and behaviors (e.g., purchases, device usage, and pages visited). This audience can be created by Facebook, the advertiser, or both working in conjunction.

51. Ad Targeting has been extremely successful due to Facebook's ability to target individuals at a granular level. For example, among many possible target audiences, "Facebook

offers advertisers 1.5 million people 'whose activity on Facebook suggests that they're more likely engage with/distribute liberal political content' and nearly seven million Facebook users who 'prefer high-value goods in Mexico.'"[24] Aided by highly granular data used to target specific users, Facebook's advertising segment quickly became Facebook's most successful business unit, with millions of companies and individuals utilizing Facebook's advertising services.

**E. Facebook's Meta Pixel tool allows Facebook to track the personal data of individuals across a broad range of third-party websites.**

52. To power its advertising business, Facebook uses a variety of tracking tools to collect data about individuals, which it can then share with advertisers. These tools include software development kits incorporated into third-party applications, its "Like" and "Share" buttons (known as "social plug-ins"), and other methodologies, which it then uses to power its advertising business.

53. One of Facebook's most powerful tools is called the "Meta Pixel." Once a third-party like Defendant installs the Meta Pixel on its website, by default it begins sending user information to Facebook automatically.[25]

54. The Meta Pixel is a snippet of code embedded on a third-party website that tracks users' activities as users navigate through a website.[26] Once activated, the Meta Pixel "tracks the people and type of actions they take."[27] Meta Pixel can track and log each page a user visits, what buttons they click, as well as specific information that users input into a website.[28] The Meta Pixel code works by sending Facebook a detailed log of a user's interaction with a website

[24] https://www.nytimes.com/2018/04/11/technology/facebook-privacy-hearings.html
[25] https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector
[26] https://developers.facebook.com/docs/meta-pixel/
[27] https://www.facebook.com/business/goals/retargeting
[28] https://www.facebook.com/business/help/742478679120153?id=1205376682832142

such as clicking on a product or running a search via a query box. The Meta Pixel also captures information such as what content a user views on a website or how far down a web page they scrolled.[29]

55. When someone visits a third-party website page that includes the Meta Pixel code, the Meta Pixel code is able to replicate and send the user data to Facebook through a separate (but simultaneous) channel in a manner that is undetectable by the user.[30] This information is disclosed to Facebook regardless of whether a user is logged into their Facebook account at the time.

56. The information Meta Pixel captures and discloses to Facebook includes a referrer header (or "URL"), which includes significant information regarding the user's browsing history, including the identity of the individual internet user and the web server, as well as the name of the web page and the search terms used to find it.[31] When users enter a URL address into their web browser using the 'http' web address format, or click hyperlinks embedded on a web page, they are actually telling their web browsers (the client) which resources to request and where to find them. Thus, the URL provides significant information regarding a user's browsing history, including the identity of the individual internet user and the web server, as well as the name of the web page and the search terms that the user used to find it.

57. These search terms and the resulting URLs divulge a user's personal interests, queries, and habits on third-party websites operating outside of Facebook's own platform. In this

[29] https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector
[30] *See, e.g.*, *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589, 596 (9th Cir. 2020) (explaining functionality of Facebook software code on third-party websites).
[31] *In re Facebook*, 956 F.3d at 596.

manner, Facebook tracks users browsing histories on third-party websites, and compiles these browsing histories into personal profiles which are sold to advertisers to generate revenue.[32]

58. For example, if Meta Pixel is incorporated on a shopping website, it may log what searches a user performed, which items of clothing a user clicked on, whether they added an item to their cart, as well as what they purchased. Along with this data, Facebook collects identifying information like IP addresses, Facebook IDs, and other data that allow Facebook to identify the user. All this personally identifying data is available each time the Meta Pixel forwards a user's interactions with a third-party website to Facebook's servers. Once Facebook receives this information, Facebook processes it, analyzes it, and assimilates it into datasets like its Core Audiences and Custom Audiences. Facebook can then sell this information to companies who wish to display advertising for products similar to what the user looked at on the original shopping website.

59. These communications with Facebook happen silently, without users' knowledge. By default, the transmission of information to Facebook's servers is invisible. Facebook's Meta Pixel allows third-party websites to capture and send personal information a user provides to match them with Facebook or Instagram profiles, even if they are not logged into Facebook at the time.[33]

60. In exchange for installing its Meta Pixel, Facebook provides website owners like Defendant with analytics about the ads they've placed on Facebook and Instagram and tools to target people who have visited their website.[34] The Meta Pixel collects data on website visitors

[32] *In re Facebook*, 956 F.3d at 596.
[33] https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector
[34] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites

regardless of whether they have Facebook or Instagram accounts.[35]

61. Facebook can then share analytic metrics with the website host, while at the same time sharing the information it collects with third-party advertisers who can then target users based on the information collected and shared by Facebook.

62. Facebook touted Meta Pixel (which it originally called "Facebook Pixel") as "a new way to report and optimize for conversions, build audiences and get rich insights about how people use your website."[36] According to Facebook, the Meta Pixel is an analytics tool that allows business to measure the effectiveness of their advertising by understanding the actions people take on their websites."[37]

63. Facebook warns web developers that its Pixel is a personal identifier because it enables Facebook "to match your website visitors to their respective Facebook User accounts."[38]

64. Facebook recommends that its Meta Pixel code be added to the base code on every website page (including the website's persistent header) to reduce the chance of browsers or code from blocking Pixel's execution and to ensure that visitors will be tracked.[39]

65. Once Meta Pixel is installed on a business's website, the Meta Pixel tracks users as they navigate through the website and logs which pages are visited, which buttons are clicked, the specific information entered in forms (including personal information), as well as "optional values" set by the business website.[40] Meta Pixel tracks this data regardless of whether a user is logged into Facebook.[41] It is unclear how Facebook exploits the data collected from nonusers, but when asked by Congress about Facebook's business practices, Mark Zuckerberg conceded

---

[35] https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector
[36] https://developers.facebook.com/ads/blog/post/v2/2015/10/14/announcing-facebook-pixel/
[37] https://www.oviond.com/understanding-the-facebook-pixel
[38] https://developers.facebook.com/docs/meta-pixel/get-started
[39] https://developers.facebook.com/docs/meta-pixel/get-started
[40] https://developers.facebook.com/docs/meta-pixel/
[41] https://themarkup.org/pixel-hunt/2022/06/15/facebook-and-anti-abortion-clinics-are-collecting-highly-sensitive-info-on-would-be-patients

that the company maintains "shadow profiles" on nonusers of Facebook.[42]

66. For Facebook, the Meta Pixel tool embedded on third-party websites acts as a conduit for information, sending the information it collects to Facebook through scripts running in a user's internet browser, similar to how a "bug" or wiretap can capture audio information.

67. For example, the Meta Pixel is configured to automatically collect "HTTP Headers" and "Pixel-specific data."[43] HTTP headers collect data including "IP addresses, information about the web browser, page location, document, referrer and person using the website."[44] Pixel-specific data includes such data as the "Pixel ID and the Facebook Cookie."[45]

68. Meta Pixel takes the information it harvests and sends it to Facebook with personally identifiable information, such as a user's IP address, name, email, phone number, and specific Facebook ID, which identifies an individual's Facebook user account. Anyone who has access to this Facebook ID can use this identifier to quickly and easily locate, access, and view a user's corresponding Facebook profile. Facebook stores this information on its servers, and, in some instances, maintains this information for years.[46]

69. Facebook has a number of ways to uniquely identify the individuals whose data is being forwarded from third-party websites through the Meta Pixel.

70. If a user has a Facebook account, the user data collected is linked to the individual user's Facebook account. For example, if the user is logged into their Facebook account when the user visits a third-party website where the Meta Pixel is installed, many common browsers will attach third-party cookies allowing Facebook to link the data collected by Meta Pixel to the

[42] https://techcrunch.com/2018/04/11/facebook-shadow-profiles-hearing-lujan-zuckerberg/
[43] https://developers.facebook.com/docs/meta-pixel/
[44] https://developers.facebook.com/docs/meta-pixel/
[45] https://developers.facebook.com/docs/meta-pixel/
[46] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites

specific Facebook user.

71. Alternatively, Facebook can link the data to a user's Facebook account through the "Facebook Cookie."[47] The Facebook Cookie is a workaround to recent cookie-blocking applications used to prevent websites from tracking users.[48]

72. Facebook can also link user data to Facebook accounts through identifying information collected through Meta Pixel through what Facebook calls "Advanced Matching." Thise are two forms of Advanced Matching: manual matching and automatic matching.[49] Manual matching requires the website developer to manually send data to Facebook so that users can be linked to data. Automatic matching allows Meta Pixel to scour the data it receives from third-party websites to search for recognizable fields, including names and email addresses that correspond with users' Facebook accounts.

73. While the Meta Pixel tool "hashes" personal data—obscuring it through a form of cryptography before sending the data to Facebook—that hashing does not prevent *Facebook* from using the data.[50] In fact, Facebook explicitly uses the hashed information it gathers to link pixel data to Facebook profiles.[51]

74. Facebook also receives personally identifying information in the form of user's unique IP addresses that stay the same as users visit multiple websites. When browsing a third-party website that has embedded Facebook code, a user's unique IP address is forwarded to Facebook by GET requests, which are triggered by Facebook code snippets. The IP address enables Facebook to keep track of the website page visits associated with that address.

[47] https://clearcode.cc/blog/facebook-first-party-cookie-adtech/
[48] https://clearcode.cc/blog/difference-between-first-party-third-party-cookies/
[49] https://www.facebook.com/business/help/611774685654668?id=1205376682832142
[50] https://www.facebook.com/business/help/611774685654668?id=1205376682832142
[51] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites

75. Facebook also places cookies on visitors' computers. It then uses these cookies to store information about each user. For example, the "c_user" cookie is a unique identifier that identifies a Facebook user's ID. The c_user cookie value is the Facebook equivalent of a user identification number. Each Facebook user has one—and only one—unique c_user cookie. Facebook uses the c_user cookie to record user activities and communications.

76. The data supplied by the c_user cookie allows Facebook to identify the Facebook account associated with the cookie. One simply needs to log into Facebook, and then type www.facebook.com/#, with the c_user identifier in place of the "#." For example, the c_user cookie for Mark Zuckerberg is 4. Logging into Facebook and typing www.facebook.com/4 in the web browser retrieves Mark Zuckerberg's Facebook page: www.facebook.com/zuck.

77. Similarly, the "lu" cookie identifies the last Facebook user who logged in using a specific browser. Like IP addresses, cookies are included with each request that a user's browser makes to Facebook's servers. Facebook employs similar cookies such as "datr," "fr," "act," "presence," "spin," "wd," "xs," and "fbp" cookies to track users on websites across the internet.[52] These cookies allow Facebook to easily link the browsing activity of its users to their real-world identities, and such highly sensitive data as medical information, religion, and political preferences.[53]

78. Facebook also uses browser fingerprinting to uniquely identify individuals. Web browsers have several attributes that vary between users, like the browser software system, plugins that have been installed, fonts that are available on the system, the size of the screen, color depth, and more. Together, these attributes create a fingerprint that is highly distinctive. The likelihood that two browsers have the same fingerprint is at least as low as 1 in 286,777, and

[52] https://techexpertise.medium.com/facebook-cookies-analysis-e1cf6ffbdf8a#:~:text=browser%20session%20ends.-,%E2%80%9Cdatr%E2%80%9D,security%20and%20site%20integrity%20features.
[53] https://securehomes.esat.kuleuven.be/~gacar/fb_tracking/fb_plugins.pdf

the accuracy of the fingerprint increases when combined with cookies and the user's IP address. Facebook recognizes a visitor's browser fingerprint each time a Facebook button is loaded on a third-party website page. Using these various methods, Facebook can identify individual users, watch as they browse third-party websites like www.emersonhospital.org and target users with advertising based on their web activity.

**D. Defendant has discretely embedded the Meta Pixel tool on its website, resulting in the capture and disclosure of patients' protected health information to Facebook.**

79. A third-party website that incorporates Meta Pixel benefits from the ability to analyze a user's experience and activity on the website to assess the website's functionality and traffic. The third-party website also gains information from its customers through Meta Pixel that can be used to target them with advertisements, as well as to measure the results of advertisement efforts.

80. Facebook's intrusion into the personal data of the visitors to third-party websites incorporating the Meta Pixel is both significant and unprecedented. When Meta Pixel is incorporated into a third-party website, unbeknownst to users and without their consent, Facebook gains the ability to surreptitiously gather every user interaction with the website ranging from what the user clicks on to the personal information entered on a website search bar. Facebook aggregates this data against all websites visited by a specific user.[54] Facebook benefits from obtaining this information because it improves its advertising network, including its machine-learning algorithms and its ability to identify and target users with ads.

81. Facebook provides websites using Meta Pixel with the data it captures in the "Meta Pixel page" in Events Manager, as well as tools and analytics to reach these individuals

[54] https://www.facebook.com/business/help/742478679120153?id=1205376682832142

through future Facebook ads.[55] For example, websites can use this data to create "custom audiences" to target the specific Facebook user, as well as other Facebook users who match "custom audience's" criteria.[56] Businesses that use Meta Pixel can also search through Meta Pixel data to find specific types of users to target, such as men over a certain age.

82. Meta Pixel is wildly popular and embedded on millions of websites. Businesses install the Meta Pixel software code to help drive and decode key performance metrics from visitor traffic to their websites.[57] Businesses also use the Meta Pixel to build custom audiences on Facebook that can be used for their own advertising purposes.[58]

83. Shockingly, Meta Pixel is incorporated on many websites that are used to store and convey sensitive medical information, that by law must be kept private. Recently, investigative journalists have determined that Meta Pixel is embedded on the websites of many of the top hospitals in the United States.[59] This results in sensitive medical information being collected and then sent to Facebook when a user interacts with these hospital websites. For example, when a user on many of these hospital websites clicks on a "Schedule Online" button next to a doctor's name, Meta Pixel sends the text of the button, the doctor's name, and the search term (such as "cardiology") used to find the doctor to Facebook. If the hospital's website has a drop-down menu to select a medical condition in connection with locating a doctor or making an appointment, that condition is also transmitted to Facebook through Meta Pixel.

84. Facebook has designed the Meta Pixel such that Facebook receives information about patient activities on hospital websites as they occur in real time. Indeed, the moment that a

---

[55] https://www.facebook.com/business/help/742478679120153?id=1205376682832142
[56] https://developers.facebook.com/docs/marketing-api/reference/custom-audience/
[57] https://instapage.com/blog/meta-pixel
[58] https://instapage.com/blog/meta-pixel
[59] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites

patient takes any action on a webpage that includes the Meta Pixel—such as clicking a button to register, login, or to create an appointment—Facebook code embedded on that page redirects the content of the patient's communications to Facebook while the exchange of information between the patient and hospital is still occurring.

85. Defendant is among the hospital systems who have embedded Meta Pixel on their websites. When a patient enters their personal information through Defendant's websites that incorporate Meta Pixel, such as to locate a doctor or make an appointment or search for treatment information, these communications, including what the patient is being treated for, are immediately and instantaneously routed to Facebook via the Meta Pixel. The acquisition and disclosure of these communications occurs contemporaneously with the transmission of these communications by patients.

86. This data, which can include health conditions (e.g., addiction, Alzheimer's, heart disease), diagnoses, procedures, test results, the treating physician, medications, and other personally identifying information ("Personal Health Information"), is obtained and used by Facebook, as well as other parties, for the purpose of targeted advertising. Worse, by correlating users' Facebook profiles—profiles that include such details as a user's employment history and age—Facebook gains an intimate personal profile of patients without patients' consent. Indeed, these tracking practices allow Facebook to gain an unprecedented degree of personalized information, including an individual's health history, likes, dislikes, interests, and habits over a significant amount of time, without affording users meaningful opportunity to control or prevent the unauthorized exploration of their private lives.

87. For example, a patient searching for a doctor on Defendant's website is asked to provide a variety of information to filter the various physicians available to treat various medical

conditions, including the doctor's specialty, the patient's condition, the patient's hometown, the patient's language preference, and other information that the patient provides.




88. All this data about the medical treatments that patients are seeking is disclosed to Facebook simultaneously in real time as patients transmit their information, along with other data, such as patient's unique Facebook ID that is captured by the c_user cookie, which allows Facebook to link this information to patients' unique Facebook accounts. Defendant also discloses other personally identifying information to Facebook, such as patient IP addresses, cookie identifiers, browser-fingerprints, and device identifiers.

89. Defendant disclosed such personally identifying information and sensitive medical information even when patients are searching for doctors to assist with them conditions such as substance abuse and addiction.




90. In other words, Facebook learned not just that patients are seeking treatment, but where and typically when they are seeking treatment, along with other information that patients would reasonably assume that Defendant is not sharing with third party marketing companies.

91. Likewise, a patient who desires an appointment with a specific doctor is asked to fill out an extensive online questionnaire, which includes information such as the doctor's name, the patient's name, telephone number, physical address, and email address. All this information is acquired by Defendant and forwarded to Facebook via the Meta Pixel contemporaneously with its transmission by patients.

## REQUEST AN APPOINTMENT

Fill out the below form to request an appointment with Dr. Roomi. A member of our staff will get back to you during normal business hours.

Privacy Policy

| | |
|---|---|
| **First name:** | John |
| **Last name:** | Doe |
| **Home address:** | 268 Summer St LL |
| **City:** | Boston |
| **State:** | MA |
| **Zip code:** | 02210 |
| **Email:** | johndoe@yahoo.com |
| **Phone number:** | 555.555.5555 |

I'm not a robot reCAPTCHA Privacy - Terms

SUBMIT

92. Defendant also disclosed patient information from other sections of its website including (but not limited to) communications that were captured by the website's search bar, communications that were captured when a patient searched for "Services" offered by Defendant, communications made by patients using the website's Bill Pay/Financials function, and communications made when patients are researched specific medical conditions such as COVID-19.

93. As the above demonstrates, knowing what information a patient is reviewing on Defendant's website can reveal deeply personal and private information. For example, a simple search for "pregnancy" on Defendant's website tells Facebook that the patient is likely pregnant.

Indeed, Facebook might know that the patient is pregnant before the patient's close family and friends. Likewise, most patients would not want it made public that they were seeking treatment for substance abuse. But there is nothing visible on Defendant's website that would indicate to patients that, when they use Defendant's search function, their personally identifiable data and the precise content of their communications with Defendant are being automatically captured and made available to Facebook, who can then use that information for advertising purposes even when patients search for treatment options for sensitive medical conditions such as cancer or substance abuse.

94. The amount of data collected is significant. Via the Meta Pixel, when patients interact with its website, Defendant discloses a full-string, detailed URL to Facebook, which contains the name of the website, folder and sub-folders on the webserver, and the name of the precise file requested. For example, when a patient types a search term into the search bar on Defendant's website, the website returns links to information relevant to the search term. When patients then click these links, a communication is created that contains a GET request and a full-string detailed URL.

95. Facebook's Meta Pixel collects and forwards this data to Facebook, including the full referral URL (including the exact subpage of the precise terms being reviewed) and Facebook then correlates the URL with the patient's Facebook user ID, time stamp, browser settings, and even the type of browser used. In short, the URLs, by virtue of including the particular document within a website that a patient views, reveal a significant amount of personal data about a patient. The captured search terms and the resulting URLs divulge a patient's medical issues, personal interests, queries, and interests on third-party websites operating outside of Facebook's platform.

96. The transmitted URLs contain both the "path" and the "query string" arising from patients' interactions with Defendant's websites. The path identifies where a file can be found on a website. For example, a patient reviewing information about the "Clinical Services" that Defendant offers patients such as "Maternity" will generate a URL with the path https://www.emersonhospital.org/clinical-services/maternity.

97. Likewise, a query string provides a list of parameters. An example of a URL that provides a query string is https://www.emersonhospital.org/site-search?searchtext=HIV. The query string parameters in this search indicate that a search was done at Defendant's website for information about HIV. In other words, the Meta Pixel captures information that connects a particular user to a particular healthcare provider.

98. Defendant also provides Facebook with details about online forms that patients fill out in the form of POST requests, such as when a patient utilizes the Emerson Hospital website's "Find A Doctor" function.[60] All the information that patients provide when filling out these forms are also disclosed to Facebook.

99. The contents of patients' search terms shared with Facebook plainly relate to (and disclose) the past, present, or future physical or mental health or condition of individual patients who interact with Defendant's website. Worse, no matter how sensitive the area of the Defendant's website that a patient reviews, the referral URL is acquired by Facebook along with cookies that precisely identify the patient.

100. The nature of the collected data is also important. Defendant's unauthorized disclosures result in Facebook obtaining a comprehensive browsing history of an individual patient, no matter how sensitive the patient's medical condition. Facebook is then able to correlate that history with the time of day and other user actions on Defendant's website. This

[60] https://www.emersonhospital.org/find-a-doctor

process results in Facebook acquiring a vast repository of personal data about patients—all without their knowledge or consent.

101. By compelling visitors to its websites to disclose personally identifying data and sensitive medical information to Facebook and other third parties, Defendant knowingly discloses information that allows Facebook and other advertisers to link its patients' Personal Health Information to their private identities and target them with advertising. Defendant intentionally shared the Personal Health Information of its patients with Facebook in order to gain access to the benefits of the Meta Pixel tool.

102. Defendant facilitated the disclosure of Plaintiff John Doe's Personal Health information, including sensitive medical information, to Facebook without his consent or authorization when he entered information on the website that Defendant maintains at www.emersonhospital.org. Plaintiff continued to have his privacy violated when Defendant permitted Facebook and other companies to send him targeted advertising related to his medical condition.

103. For example, Plaintiff John Doe is an individual with a Facebook account who visited Defendant's website in 2022 at www.emersonhospital.org and entered data, including sensitive medical information, such as details about his medical condition and doctor. The information that Plaintiff John Doe transmitted included queries about treatment for his concussion.

104. Defendant knew that by embedding Meta Pixel—a Facebook advertising tool—it was permitting Facebook to collect, use, and share Plaintiff's and the Class Members' Personal Health Information, including sensitive medical information and personally identifying data. Defendant was also aware that such information would be shared with Facebook simultaneously

with patients' interactions with its websites. Defendant made the decision to barter its patients' Personal Health Care Information to Facebook because it wanted access to the Meta Pixel tool. While that bargain may have benefited Defendant and Facebook, it also betrayed the privacy rights of Plaintiff and Class Members.

**F. Plaintiff and the Class Members did not consent to the interception and disclosure of their protected health information.**

105. Plaintiff and Class Members had no idea when they interacted with Defendant's websites that their personal data, including sensitive medical data, was being collected and transmitted to Facebook. That is because, among other things, Meta Pixel is seamlessly integrated into Defendant's websites and is invisible to patients visiting those websites.

106. For example, when Plaintiff John Doe visited Defendant's website in 2022 at www.emersonhospital.org, there was no indication that Meta Pixel was embedded on that website or that it would collect and transmit his sensitive medical data to Facebook.

107. Plaintiff and his fellow Class Members could not consent to Defendant's conduct when there was no indication that their sensitive medical information would be collected and transmitted to Facebook in the first place.

108. While Defendant purports to have "Privacy Practices," those Privacy Practices are effectively hidden from patients, buried inside a link labeled "Notice of Privacy Practices" that is concealed at the bottom of Defendant's homepage in type so small as to be unreadable to many visitors:




109. Defendant's "Notice of Privacy Practices" gives no indication to patients that Defendant routinely allows Facebook to capture and exploit patients' Personal Health Information. Indeed, Defendant expressly promises[61] in its "Notice of Privacy Practices" that it would never share patient's medical information with marketing companies without express authorization from patients:

[61] https://www.emersonhospital.org/patients-visitors/patient-rights-responsibilities/patient-privacy

**USES OR DISCLOSURES OF INFORMATION THAT REQUIRE YOUR WRITTEN PERMISSION**

Using and/or sharing health information for most purposes other than treatment, payment or health care operations requires your specific authorization. The following will occur only with authorization from the individual:

- most uses and disclosures of psychotherapy notes
- uses and sharing of personal health information for marketing purposes, including communications related to subsidized treatment
- disclosures that constitute a sale of personal health information

110. Even if a patient stumbled upon Defendant's carefully hidden "Notice of Privacy Practices," nothing in that notice would be understood by any reasonable patient to mean that Defendant is routinely allowing Facebook to capture and exploit patients' Personal Health Information.

111. Defendant's "Notice of Privacy Practices" states that "using and/or sharing health information for most purposes other than treatment, payment or health care operations requires [the patient's] specific authorization" and assures patients that Defendant would only use or share patients' Personal Health Information for marketing purposes "with authorization from the individual."[62]

112. Defendant does not have a legal right to share Plaintiff and Class Members' Protected Health Information with Facebook, because this information is protected from such disclosure by law. Defendant is not permitted to disclose patients' Protected Health Information to an advertising and marketing company like Facebook without express written authorization from patients.

---

[62] https://www.emersonhospital.org/patients-visitors/patient-rights-responsibilities/patient-privacy

113. Defendant failed to obtain a valid written authorization from Plaintiff or any of the Class Members to allow the capture and exploitation of their personally identifiable information and the contents of their communications for marketing purposes.

114. A patient's reasonable expectation that their health care provider will not share their information with third parties for marketing purposes is not subject to waiver via an inconspicuous privacy policy hidden away on a company's website. Further, Defendant expressly promised its patients that it would never sell or use their Personal Health Information for marketing purposes without express authorization.

115. Accordingly, Defendant lacked authorization to intercept, collect, and disclose Plaintiff and Class Members' Personal Health Information to Facebook or aid in the same.

**G. The disclosures of personal patient data to Facebook are unnecessary.**

116. There is no information anywhere on the websites operated by Defendant that would alert patients that their most private information (such as their identifiers, their medical conditions, and their medical providers) is being automatically transmitted to Facebook. Nor are any of the disclosures of patient Personal Health Information to Facebook necessary for Defendant to maintain its healthcare website or provide medical services to patients.

117. For example, it is possible for a healthcare website to provide a doctor search function without allowing disclosures to third-party advertising companies about patient sign ups or appointments. It is also possible for a website developer to utilize tracking tools without allowing disclosure of patients' Personal Healthcare Information to companies like Facebook. Likewise, it is possible for Defendant to provide medical services to patients without sharing their Personal Health Information with Facebook so that this information can be exploited for advertising purposes. Indeed, after Plaintiff filed his original complaint, Defendant removed the Meta Pixel from its website, confirming that use of the Meta Pixel is unnecessary for Defendant

to provide medical services to its patients.

118. Despite this, Defendant willfully chose to implement Meta Pixel on its websites and aid in the disclosure of personally identifiable information and sensitive medical information about its patients, as well as the contents of their communications with Defendant, to third-parties, including Facebook.

**H. Plaintiff and Class Members have a reasonable expectation of privacy in their Personal Health Information, especially with respect to sensitive medical information.**

119. Plaintiff and Class Members have a reasonable expectation of privacy in their Personal Health Information, including personally identifying data and sensitive medical information. Defendant's surreptitious interception, collection, and disclosure of patients' Personal Health Information to Facebook violated Plaintiff and Class Member's privacy interests.

120. Patient health information is specifically protected by law. The prohibitions against disclosing patient Personal Health Information include prohibitions against disclosing personally identifying data such patient names, IP addresses, and other unique characteristics or codes. And Massachusetts law subject medical providers who treat conditions such as substance abuse to heightened duties of confidentiality. G.L. c. 111B, § 11. This legal framework applies to health care providers, such as Defendant.

121. Given the application of these laws to Defendant, Plaintiff and the Members of the Class had a reasonable expectation of privacy in their protected health information.

122. Several studies examining the collection and disclosure of consumers' sensitive medical information confirm that the disclosure of sensitive medical information violates expectations of privacy that have been established as general social norms.

123. Privacy polls and studies also uniformly show that the overwhelming majority of

Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its customers' data.

124. For example, a recent study by *Consumer Reports* showed that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumers' data, and the same percentage believed that internet companies and websites should be required to provide consumers with a complete list of the data that has been collected about them.[63]

125. Users act consistently with these preferences. For example, following a new rollout of the iPhone operating software—which asks users for clear, affirmative consent before allowing companies to track users—85 percent of worldwide users and 94 percent of U.S. users chose not to share data when prompted.[64]

126. The concern about sharing personal medical information is compounded by the reality that advertisers view this type of information as particularly valuable. Indeed, having access to the data women share with their healthcare providers allows advertisers to obtain data on children before they are even born. As one recent article noted, "What is particularly worrying about this process of datafication of children is that companies like [Facebook] are harnessing and collecting multiple typologies of children's data and have the potential to store a plurality of data traces under unique ID profiles."[65]

127. Many privacy law experts have expressed serious concerns about patients' sensitive medical information being disclosed to third-party companies like Facebook. As those critics have pointed out, having a patient's personal health information disseminated in ways the

---

[63] https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907/
[64] https://www.wired.co.uk/article/apple-ios14-facebook
[65] https://thereader.mitpress.mit.edu/tech-companies-are-profiling-us-from-before-birth/

patient is unaware of could have serious repercussions, including affecting their ability to obtain life insurance, how much they might pay for such coverage, the rates they might be charged on loans, and the likelihood of their being discriminated against.

**I. Plaintiff's Personal Health Data that Defendant collected, disclosed, and used is Plaintiff's property, has economic value, and its illicit disclosure has caused Plaintiff harm.**

128. It is common knowledge that there is an economic market for consumers' personal data—including the kind of data that Defendant has collected and disclosed from Plaintiff and Class Members.

129. In 2013, the *Financial Times* reported that the data-broker industry profits from the trade of thousands of details about individuals, and that within that context, "age, gender and location information" were being sold for approximately "$0.50 per 1,000 people."[66]

130. In 2015, *TechCrunch* reported that "to obtain a list containing the names of individuals suffering from a particular disease," a market participant would have to spend about "$0.30" per name.[67] That same article noted that "Data has become a strategic asset that allows companies to acquire or maintain a competitive edge" and that the value of a single user's data can vary from $15 to more than $40 per user.[68]

131. In a 2021 Washington Post article, the legal scholar Dina Srinivasan said that consumers "should think of Facebook's cost as [their] data and scrutinize the power it has to set its own price."[69] This price is only increasing. According to Facebook's own financial statements, the value of the average American's data in advertising sales rose from $19 to $164

---

[66] https://ig.ft.com/how-much-is-your-personal-data-worth/
[67] https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/
[68] https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/
[69] https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/

per year between 2013 and 2020.[70]

132. Despite the protections afforded by law, there is an active market for health information. Medical information obtained from health providers garners substantial value because of the fact that it is not generally available to third party data marketing companies because of the strict restrictions on disclosure of such information by state laws and provider standards, including the Hippocratic oath. Even with these restrictions, however, a multi-billion-dollar market exists for the sale and purchase of such private medical information.[71]

133. Further, individuals can sell or monetize their own data if they so choose. For example, Facebook has offered to pay individuals for their voice recordings,[72] and has paid teenagers and adults up to $20 a month plus referral fees to install an app that allows Facebook to collect data on how individuals use their smart phones.[73]

134. A myriad of other companies and apps such as DataCoup, Nielsen Computer, Killi, and UpVoice also offer consumers money in exchange for access to their personal data.[74]

135. Given the monetary value that data companies like Facebook have already paid for personal information in the past, Defendant has deprived Plaintiff and the Class Members of the economic value of their sensitive medical information by collecting, using, and disclosing that information to Facebook and other third parties without consideration for Plaintiff and the Class Member's property.

---

[70] https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/
[71] https://revealnews.org/blog/your-medical-data-is-for-sale-and-theres-nothing-you-can-do-about-it/; *see also https://slate.com/technology/2022/06/health-data-brokers-privacy.html*
[72] https://www.theverge.com/2020/2/20/21145584/facebook-pay-record-voice-speech-recognition-viewpoints-prounciations-app
[73] https://www.cnbc.com/2019/01/29/facebook-paying-users-to-install-app-to-collect-data-techcrunch.html
[74] https://www.creditdonkey.com/best-apps-data-collection.html; *see also https://www.monetha.io/blog/rewards/earn-money-from-your-data/*

**J. Defendant is enriched by making unlawful, unauthorized, and unnecessary disclosures of its patients' protected health information.**

136. In exchange for disclosing Personal Health Information about its patients, Defendant is compensated by Facebook with enhanced online advertising services, including (but not limited to) retargeting and enhanced analytics functions.

137. Retargeting is a form of online targeted advertising that targets users with ads based on their previous internet actions, which is facilitated through the use of cookies and tracking pixels. Once an individual's data is disclosed and shared with a third-party marketing company, the advertiser is able to show ads to the user elsewhere on the internet.

138. For example, retargeting could allow a web-developer to show advertisements on other websites to customers or potential customers based on the specific communications exchanged by a patient or their activities on a website. Using the Meta Pixel, a website could target ads on Facebook itself or on the Facebook advertising network. The same or similar advertising can be accomplished via disclosures to other third-party advertisers and marketers.

139. Once personally identifiable information relating to patient communications is disclosed to third parties like Facebook, Defendant loses the ability to control how that information is subsequently disseminated and exploited.

140. The monetization of the data being disclosed by Defendant, both by Defendant and Facebook, demonstrates the inherent value of the information being collected.

**K. Facebook's history of egregious privacy violations.**

141. Defendant knew or should have known that Facebook could not be trusted with its patients' sensitive medical information.

142. Due to its ability to target individuals based on granular data, Facebook's ad-targeting capabilities have frequently come under scrutiny. For example, in June 2022,

Facebook entered into a settlement with the Department of Justice regarding its Lookalike Ad service, which permitted targeted advertising by landlords based on race and other demographics in a discriminatory manner. That settlement, however, reflected only the latest in a long history of egregious privacy violations by Facebook.

143. In 2007, when Facebook launched "Facebook Beacon," users were unaware that their online activity was tracked, and that the privacy settings originally did not allow users to opt-out. As a result of widespread criticism, Facebook Beacon was eventually shut down.

144. Two years later, Facebook made modifications to its Terms of Service, which allowed Facebook to use anything a user uploaded to its site for any purpose, at any time, even after the user ceased using Facebook. The Terms of Service also failed to provide for any way for users to completely delete their accounts. Under immense public pressure, Facebook eventually returned to its prior Terms of Service.

145. In 2011, Facebook settled charges with the Federal Trade Commission relating to its sharing of Facebook user information with advertisers, as well as its false claim that third-party apps were able to access only the data they needed to operate when—in fact—the apps could access nearly all of a Facebook user's personal data. The resulting Consent Order prohibited Facebook from misrepresenting the extent to which consumers can control the privacy of their information, the steps that consumers must take to implement such controls, and the extent to which Facebook makes user information available to third parties.[75]

146. Facebook found itself in another privacy scandal in 2015 when it was revealed that Facebook could not keep track of how many developers were using previously downloaded Facebook user data. That same year, it was also revealed that Facebook had violated users' privacy rights by harvesting and storing Illinois' users' facial data from photos without asking

[75] https://www.ftc.gov/legal-library/browse/cases-proceedings/092-3184-182-3109-c-4365-facebook-inc-matter

for their consent or providing notice. Facebook ultimately settled claims related to this unlawful act for $650 million.[76]

147. In 2018, Facebook was again in the spotlight for failing to protect users' privacy. Facebook representatives testified before Congress that a company called Cambridge Analytics may have harvested the data of up to 87 million users in connection with the 2016 election. This led to another FTC investigation in 2019 into Facebook's data collection and privacy practices, resulting in a record-breaking five-billion-dollar settlement.

148. Likewise, a different 2018 report revealed that Facebook had violated users' privacy by granting access to user information to over 150 companies.[77] Some companies were even able to read users' private messages.

149. In June 2020, after promising users that app developers would not have access to data if users were not active in the prior 90 days, Facebook revealed that it still enabled third-party developers to access this data.[78] This failure to protect users' data enabled thousands of developers to see data on inactive users' accounts if those users were Facebook friends with someone who was an active user.

150. On February 18, 2021, the New York State Department of Financial Services released a report detailing the significant privacy concerns associated with Facebook's data collection practices, including the collection of health data. The report noted that while Facebook maintained a policy that instructed developers not to transmit sensitive medical information, Facebook received, stored, and analyzed this information anyway. The report concluded that "[t]he information provided by Facebook has made it clear that Facebook's internal controls on this issue have been very limited and were not effective … at preventing the

[76] A similar case is pending in Texas.
[77] https://www.cnbc.com/2018/12/19/facebook-gave-amazon-microsoft-netflix-special-access-to-data-nyt.html
[78] https://fortune.com/2020/07/01/facebook-user-data-apps-blunder/

receipt of sensitive data."[79]

151. The New York State Department of Financial Service's concern about Facebook's cavalier treatment of private medical data is not misplaced. In June 2022, the FTC finalized a different settlement involving Facebook's monetizing of sensitive medical data. In that case, the more than 100 million users of Flo, a period and ovulation tracking app, learned something startling: the company was sharing their data with Facebook.[80] When a user was having her period or informed the app of her intention to get pregnant, Flo would tell Facebook, which could then use the data for all kinds of activities including targeted advertising. In 2021, Flo settled with the Federal Trade Commission for lying to its users about secretly sharing their data with Facebook, as well as with a host of other internet advertisers, including Google, Fabric, AppsFlyer, and Flurry. The FTC reported that Flo "took no action to limit what these companies could do with users' information."[81]

152. More recently, Facebook employees admitted to lax protections for sensitive user data. Facebook engineers on the ad business product team conceded in a 2021 privacy review that "We do not have an adequate level of control and explainability over how our systems use data, and thus we can't confidently make controlled policy changes or external commitments such as 'we will not use X data for Y purpose."[82]

153. These revelations were confirmed by an article published by the Markup in 2022, which found during the course of its investigation that Facebook's purported "filtering" failed to discard even the most obvious forms of sexual health information. Worse, the article found that the data that the Meta Pixel was sending Facebook from hospital websites not only included

[79] https://www.dfs.ny.gov/system/files/documents/2021/02/facebook_report_20210218.pdf
[80] https://slate.com/technology/2022/06/health-data-brokers-privacy.html
[81] https://slate.com/technology/2022/06/health-data-brokers-privacy.html
[82] https://www.vice.com/en/article/akvmke/facebook-doesnt-know-what-it-does-with-your-data-or-where-it-goes

details such as patients' medications, descriptions of their allergic reactions, details about their upcoming doctor's appointments, but also included patients' names, addresses, email addresses, and phone numbers.[83]

154. Despite knowing that the Meta Pixel code embedded in its websites was sending patients' Personal Health Information to Facebook, Defendant did nothing to protect its patients from egregious intrusions into its patients' privacy, choosing instead to benefit at those patients' expense.

## TOLLING, CONCEALMENT, AND ESTOPPEL

155. The applicable statutes of limitation have been tolled as a result of Defendant's knowing and active concealment and denial of the facts alleged herein.

156. Defendant seamlessly incorporated Meta Pixel and other trackers into its websites, providing no indication to users that they were interacting with a website enabled by Meta Pixel. Defendant had knowledge that its websites incorporated Meta Pixel and other trackers yet failed to disclose that by interacting with Meta-Pixel enabled websites that Plaintiff and Class Members' sensitive medical information would be intercepted, collected, used by, and disclosed to Facebook.

157. Plaintiff and Class Members could not with due diligence have discovered the full scope of Defendants' conduct, because there were no disclosures or other indication that they were interacting with websites employing Meta Pixel.

158. The earliest that Plaintiff and Class Members, acting with due diligence, could have reasonably discovered this conduct would have been on June 15, 2022, following the release of the Markup's investigation.

[83] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites

159. All applicable statutes of limitation have also been tolled by operation of the discovery rule and the doctrine of continuing tort. Defendant's illegal interception and disclosure of patients' Personal Health Information has continued unabated through the date of the filing of Plaintiff's Original Complaint. What's more, Defendant was under a duty to disclose the nature and significance of their data collection practices but did not do so. Defendant is therefore estopped from relying on any statute of limitations defenses.

## CLASS ACTION ALLEGATIONS

160. Defendant's conduct violates the law and breaches its express and implied privacy promises.

161. Defendant's unlawful conduct has injured Plaintiff and Class Members.

162. Defendant's conduct is ongoing.

163. Plaintiff brings this action individually and as a class action against Defendant.

164. Plaintiff seeks class certification for the following proposed Class:

> **The Emerson Hospital Class:** During the fullest period allowed by law, all current Massachusetts citizens who are, or were, patients of Emerson Hospital or any of its affiliates and who exchanged communications at Emerson Hospital's websites, including www.emersonhospital.org and any other Emerson Hospital affiliated website.

165. Excluded from the proposed Class are: (1) any Judge or Magistrate presiding over this action and members of their families; (2) the Defendant, Defendant's subsidiaries, affiliates, parents, successors, predecessors, and any entity in which the Defendant or its parent has a controlling interest and their current or former employees, officers, and directors; and (3) Plaintiff's counsel and Defendant's counsel.

166. Plaintiff reserves the right to redefine the Class and/or add Subclasses at, or prior to, the class certification stage, in response to discovery or pursuant to instruction by the Court.

167. This action is properly maintainable as a class action as specifically defined in Massachusetts Rule of Civil Procedure 23.

168. **Numerosity:** While the exact number of Class Members is unknown to Plaintiff at this time, the Class, based on information and belief, consists of thousands of people dispersed throughout the Commonwealth of Massachusetts, such that joinder of all members is impracticable. The exact number of Class Members can be determined by review of information maintained by Defendants.

169. **Commonality and Predominance:** There are questions of law and fact common to Class Members and which predominate over any questions affecting only individual members. A class action will generate common answers to the questions below, which are apt to drive resolution:

a. Whether Defendant's acts and practices violated Plaintiff and Class Members' privacy rights;

b. Whether Defendant's acts and practices violate G.L. c. 272, § 99;

c. Whether Defendant's acts and practices violate G.L. c. 214, § 1B;

d. Whether Defendant's acts and practices violate G.L. c. 111, § 70E;

e. Whether Defendant knowingly allowed the surreptitious collection and disclosure of Plaintiff and Class Members' Personal Health Information to Facebook;

f. Whether Defendant's acts and practices constitute a breach of fiduciary duty;

g. Whether Defendant profited from disclosures of patient Personal Health Information to third parties including Facebook;

h. Whether Defendant was unjustly enriched;

i. Whether Defendant's acts and practices harmed and continue to harm Plaintiff and Class Members and, if so, the extent of that injury;

j. Whether Plaintiff and Class Members are entitled to equitable relief including, but not limited to, injunctive relief, restitution, and disgorgement; and

k. Whether Plaintiff and Class Members are entitled to actual, statutory, punitive or

other forms of damages, and other monetary relief.

170. These common questions of law and fact predominate over any questions affecting only the individual Class Members.

171. **Typicality:** Plaintiff's claims are typical of the claims of other Class Members and Plaintiff have substantially the same interest in this matter as other Class Members. Plaintiff has no interests that are antagonist to, or in conflict with, the interests of other members of the Class. Plaintiff's claims arise out of the same set of facts and conduct as all other Class Members. Plaintiff and all Class Members are patients of Defendant who used the websites set up by Defendant for patients and are victims of Defendant's respective unauthorized disclosures to third parties including Facebook. All claims of Plaintiff and Class Members are based on Defendant's wrongful conduct and unauthorized disclosures.

172. **Adequacy of Representation:** Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are coincident with, and not antagonistic to, those of other Class Members he seeks to represent. Plaintiff has no disabling conflicts with Class Members. Accordingly, Plaintiff is an adequate representative of the Class and, along with counsel, will fairly and adequately protect the interests of the Class and any Subclasses.

173. **Superiority:** A class action is the superior method for fair and efficient adjudication of the controversy. Although all Class Members have claims against Defendant, the likelihood that individual Class Members will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation. Serial adjudication in numerous venues is not efficient, timely, or proper. Judicial resources would be unnecessarily depleted by prosecution of individual claims. The prosecution of separate actions by individual Class Members could create a risk of inconsistent or varying adjudications with respect to individual

members of the Cass, which could establish incompatible standards of conduct for Defendant or adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the members of the Class Members who are not parties to the adjudications. If a class action is not permitted, Class Members will continue to suffer losses and Defendant's misconduct will continue without proper remedy.

174. Plaintiff anticipates no unusual difficulties in the management of this litigation as a class action. The Class is readily ascertainable and direct notice can be provided from the records maintained by Defendant, electronically or by publication, the cost of which is properly imposed on Defendant.

175. For the above reasons, among others, a class action is superior to other available methods for the fair and efficient adjudication of this action.

## CAUSES OF ACTION

### COUNT I
### Interception of Wire Communications in Violation of G.L. c. 272, § 99
### (On Behalf of Plaintiff and the Class)

176. Plaintiff re-alleges and incorporates by reference all paragraphs above as if fully set forth herein.

177. Plaintiff brings this claim on behalf of himself and all members of the Class.

178. All conditions precedent to this action have been performed or have occurred.

179. G.L. c. 272, § 99 prohibits any person from willfully and secretly intercepting the contents of any wire communications through the use of any intercepting device unless given prior authority by all parties to a communication to do so.

180. Any person aggrieved by a violation G.L. c. 272, § 99 "shall have a civil cause of action against any person who so intercepts, discloses, or uses such communications or who so violates his personal, property, or privacy interest."

181. Defendant qualifies as a person under the statute.

182. All alleged communications between Plaintiff or Class Members and Defendant qualify as wire communications under Massachusetts law because each communication is made using personal computing devices (e.g., computers, smartphones, tablets) that send and receive communications in whole or in part through the use of facilities used for the transmission of communications aided by wire, cable, or other like connections.

183. An "interception" under the statute means "to secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire ... communication through the use of any intercepting device by any person other than a person given prior authority by all parties to such communication." G.L. c. 272, § 99B(4).

184. Defendant engaged in and continues to engage in an "interception" by aiding others (including Facebook) to secretly record the contents of Plaintiff's and Class Members' wire communications.

185. An "intercepting device" is "any device or apparatus which is capable of transmitting, receiving, amplifying, or recording a wire ... communication." G.L. c. 272, § 99B(3).

186. The "intercepting devices" used in this case include, but are not limited to:

a. Plaintiff and Class Members' personal computing devices;

b. Plaintiff and Class Members' web browsers;

c. Plaintiff and Class Members' browser-managed files;

d. Facebook's Meta Pixel;

e. Internet cookies;

f. Defendant's computer servers;

g. Third-party source code utilized by Defendant; and

h. Computer servers of third parties (including Facebook) to which Plaintiff and Class Members' communications were disclosed.

187. Under the statute, "contents" are defined to mean "any information concerning the identity of the parties to such communication or the existence, contents, substance, purport, or meaning of that communication." G.L. c. 272, § 99B(5).

188. Defendant aided in, and continues to aid in, the interception of contents in that the data from the communications between Plaintiff and/or Class Members and Defendant that were redirected to and recorded by the third parties include information which identifies the parties to each communication, their existence, and their contents.

189. Defendant aided in the interception of "contents" in at least the following forms:

a. The parties to the communications;

b. The precise text of patient search queries;

c. Personally identifying information such as patients' IP addresses, Facebook IDs, browser fingerprints, and other unique identifiers;

d. The precise text of patient communications about specific doctors;

e. The precise text of patient communications about specific medical conditions;

f. The precise text of patient communications about specific treatments;

g. The precise text of patient communications about scheduling appointments with medical providers;

h. The precise text of patient communications about billing and payment;

i. The precise text of specific buttons on Defendant's website(s) that patients click to exchange communications, including Log-Ins, Registrations, Requests for Appointments, Search, and other buttons;

j. The precise dates and times when patients click to Log-In on Defendant's website(s);

k. Information that is a general summary or informs third parties of the general subject of communications that Defendant sends back to patients in response to search queries and requests for information about specific doctors, conditions, treatments, billing, payment, and other information; and

l. Any other content that Defendant has aided third parties in scraping from webpages or communication forms at web properties.

190. Plaintiff and Class Members reasonably expected that their Personal Health Information was not being intercepted, recorded, and disclosed to Facebook and other third parties.

191. Neither Plaintiff nor Class Members consented to the disclosure of their Personal Health Information by Defendant to Facebook and other third parties. Nor could they have consented, given that Defendant never sought Plaintiff or Class Members' consent.

192. Plaintiff and Class Members' electronic communications were intercepted during transmission, without their consent, for the unlawful and/or wrongful purpose of monetizing their Personal Health Information, including using their sensitive medical information to develop marketing and advertising strategies.

193. Under the statute, aggrieved persons are entitled to recover appropriate injunctive relief and "(1) actual damages but not less than liquidated damages computed at the rate of $100 per day for each violation or $1,000, whichever is higher; (2) punitive damages; and (3) a reasonable attorney's fee and other litigation disbursements reasonably incurred."

194. In addition to statutory damages, Defendant's breach caused Plaintiff and Class Members the following damages:

a. Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private;
b. Defendant eroded the essential confidential nature of the doctor-patient relationship;
c. Defendant took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members' knowledge or informed consent and without sharing the benefit of such value;
d. Plaintiff and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain confidentiality; and
e. Defendant's actions diminished the value of Plaintiff and Class Members' personal information.

**COUNT II**
**Invasion of Privacy in Violation of G.L. c. 214, § 1B**
**(On Behalf of Plaintiff and the Class)**

195. Plaintiff re-alleges and incorporates by reference all paragraphs above as if fully set forth herein.

196. Plaintiff bring this claim on behalf of himself and all members of the Class.

197. G.L. c. 214, § 1B provides that "a person shall have a right against unreasonable, substantial, or serious interference with his privacy. The superior court shall have jurisdiction in equity to enforce such right and in connection therewith to award damages."

198. All health care providers owe their patients a duty not to disclose medical information about a patient without a patient's informed consent.

199. G.L. c. 111, § 70E provides that every patient or resident of a Massachusetts health care facility shall have the right to "confidentiality of all records and communications to the extent provided by law."

200. Maintaining the confidentiality of the doctor-patient relationship is a cardinal rule of the medical profession which has come to be justifiably relied on by patients seeking advice and treatments.

201. Plaintiff and Class Members are patients of Defendant.

202. Defendant owes Plaintiff and Class Members a duty of confidentiality.

203. Despite its duty not to disclose Personal Health Information without informed consent and written authorization, Defendant disclosed information relating to Plaintiff and Class Members' medical treatment to third parties without their knowledge, consent, or authorization.

204. The information disclosed included personally identifiable information, Plaintiff and Class Members' statuses as patients of Defendant, and the exact contents of communications exchanged between Plaintiff and/or Class Members with Defendant, including but not limited to information about treating doctors, potential doctors, conditions, treatments, appointments, search terms, bill payment, and logins to Defendant's website.

205. The disclosure of personally identifiable medical information constitutes an unreasonable, substantial, and serious interference with Plaintiff and Class Members' rights to privacy.

206. Plaintiff and Class Members did not consent to, authorize, or know about Defendant's disclosure of their Personal Health Information to Facebook and other third parties

at the time it occurred. Plaintiff and Class Members never agreed that their sensitive medical information could be collected, used, and monetized by Facebook.

207. Defendant's intentional disclosure of patients' Personal Health Information to a third-party advertising company like Facebook without consent would be highly offensive to a reasonable person. Plaintiff and Class Members reasonably expected that their Personal Health Information would not be collected, used, and monetized by third party advertising companies.

208. Defendant's disclosure of Personal Health Information from thousands of individuals was highly offensive because it violated expectations of privacy that have been established by social norms. Privacy polls and studies show that Americans believe that one of the most important privacy rights is the need for an individual's affirmative consent before their personal data is collected, shared, or used.

209. Given the nature of the Personal Health Information that Defendant disclosed to Facebook, such as patients' names, email addresses, phone numbers, information entered into forms, doctor's names, potential doctor's names, the search terms used to locate doctors (i.e. "Alzheimer's"), the condition selected from dropdown menus (i.e. "Heart Disease"), medications, and details about upcoming doctor's appointments, this kind of intrusion would be (and in fact is) highly offensive to a reasonable person.

210. Defendant's breach caused Plaintiff and Class Members, at minimum, the following damages:

a. Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private;

b. Defendants eroded the essential confidential nature of the doctor-patient and provider-patient relationship;

c. Defendants took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff and Class Members' knowledge, consent, or authorization and without sharing the benefit of such value;

d. Plaintiff and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain the confidentiality of their Personal Health Information; and

e. Defendant's actions diminished the value of Plaintiff and Class Members' personal information.

211. Plaintiff and Class Members have suffered harm and injury, including but not limited to the invasion of their privacy rights.

212. Plaintiff and Class Members have been damaged as a direct and proximate result of Defendant's invasion of their privacy and are entitled to seek just compensation, including monetary damages.

213. Plaintiff and Class Members seek appropriate relief for their injuries, including but not limited to damages that will reasonably compensate Plaintiff and Class Members for the harm to their privacy interests as well as a disgorgement of profits made by Defendant as a result of its intrusions on Plaintiff and Class Members' privacy.

214. Plaintiff and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's actions, which caused injury to Plaintiff and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

215. Plaintiff and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

**COUNT III**
**Breach of Fiduciary Duty and/or Common Law Duty of Confidentiality**
**(On Behalf of Plaintiff and the Class)**

216. Plaintiff re-alleges and incorporates by reference all paragraphs above as if fully set forth herein.

217. Plaintiff brings this claim on behalf of himself and all members of the Class.

218. All conditions precedent to this action have been performed or occurred.

219. In *Alberts v. Devine*, 479 N.E.2d 113, 120 (1985), the Massachusetts Supreme Court held that a duty of confidentiality arises from the physician-patient relationship and that a violation of that duty gives rise to a cause of action sounding in tort.

220. As medical provider for Plaintiff and Class Members, Defendant owes Plaintiff and Class Members a fiduciary duty of confidentiality in the data and content of communications exchanged between Defendant and Plaintiff or Class Members.

221. Defendant breached its duty of confidentiality by disclosing Personal Health Information about Plaintiff and Class Members, including their status as patients, the content of their communications, and information about their doctors, potential doctors, conditions, treatments, appointments, search terms, and bill payment.

222. Defendant's breach caused Plaintiff and Class Members the following damages:

a. Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private;

b. Defendants eroded the essential confidential nature of the doctor-patient and provider-patient relationship;

c. Defendants took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff and Class Members' knowledge, consent, or authorization and without sharing the benefit of such value;

d. Plaintiff and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain the confidentiality of their Personal Health Information; and

e. Defendant's actions diminished the value of Plaintiff and Class Members' personal information.

**COUNT IV**
**Breach of Implied Contract**
**(On Behalf of Plaintiff and the Class)**

223. Plaintiff re-alleges and incorporates by reference all paragraphs above as if fully set forth herein.

224. Plaintiff brings this claim on behalf of himself and all members of the Class.

225. Defendant's website promises patients that "[p]rotecting your medical information is an important priority for Emerson Hospital."[84] Indeed, Defendant assures patients that Defendant will *never* use or share patients' "personal information for marketing purposes" without "specific authorization."[85]

226. Defendant solicited and invited Plaintiff and Class Members to provide their Private Health Information on its website as part of Defendant's regular business practices. Plaintiff and Class Members accepted Defendant's offers and provided their Private Health Information to Defendant as part of acquiring Defendant's medical services. Per its contractual, legal, ethical, and fiduciary duties, Defendant was obligated to take adequate measures to protect

[84] https://www.emersonhospital.org/patients-visitors/patient-rights-responsibilities/patient-privacy
[85] https://www.emersonhospital.org/patients-visitors/patient-rights-responsibilities/patient-privacy

Plaintiff's and Class Members' Personal Health Information from unauthorized disclosure to third parties such as Facebook. These facts give rise to the inference that Defendant took on obligations outside the plain terms of any express contracts that they may have had with Plaintiff and Class Members.

227. Plaintiff and the Class Members entered into valid and enforceable implied contracts with Defendant when they sought medical treatment from Defendant. Specifically, through their course of conduct, Defendant, Plaintiff, and Class Members entered into implied contracts for the provision of medical care and treatment, which included an implied agreement for Defendant to retain and protect the privacy of Plaintiff's and Class Members' Personal Health Information.

228. Defendant required and obtained Plaintiff's and Class Members' Personal Health Information as part of the physician-patient relationship, evincing an implicit promise by Defendant to act reasonably to protect the confidentiality of Plaintiff's and Class Members' Personal Health Information. Defendant, through its privacy policies, codes of conduct, company security practices, and other conduct, implicitly that it would safeguard Plaintiff's and Class Members' Personal Health Information in exchange for access to that information and the opportunity to treat Plaintiff and Class Members.

229. Implied in the exchange was a promise by Defendant to ensure that the Personal Health Information of Plaintiff and Class Members in its possession would only be used for medical treatment purposes and would not be shared with third parties such as Facebook without the knowledge or consent of Plaintiff and Class Members. By asking for and obtaining Plaintiff's and Class Members' Personal Health Information, Defendant assented to protecting the confidentiality of that information. Defendant's implicit agreement to safeguard the

confidentiality of Plaintiff's and Class Members' Personal Health Information was necessary to effectuate the contract between the parties.

230. Plaintiff and Class Members provided their Personal Health Information in reliance on Defendant's implied promise that this information would not be shared with third parties without their consent.

231. These exchanges constituted an agreement and meeting of the minds between the parties: Plaintiff and Class Members would provide their Personal Health Information in exchange for the medical treatment and other benefits provided by Defendant (including the protection of their confidential personal and medical information). A portion of the price of each payment that Plaintiff and the Class Members made to Defendant for medical services was intended to ensure the confidentiality of their Personal Health Information.

232. In entering into such implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendant would comply with its promises to protect the confidentiality of their Personal Health Information as well as applicable laws and regulations governing the disclosure of such information and that Defendant would not allow third parties to collect or exploit their communications with Defendant without their consent.

233. It is clear by these exchanges that the parties intended to enter into an agreement and mutual assent occurred. Plaintiff and Class Members would not have disclosed their Personal Health Information to Defendant but for the prospect of Defendant's promise of medical treatment and other benefits. Conversely, Defendant presumably would not have taken Plaintiff and Class Members' Personal Health Information if it did not intend to provide them with medical treatment and other benefits.

234. Defendant was therefore required to reasonably safeguard and protect the Personal Health Information of Plaintiff and Class Members from unauthorized disclosure and/or use by third parties.

235. Plaintiff and Class Members accepted Defendant's medical services offer and fully performed their obligations under the implied contract with Defendant by providing their Personal Health Information to Defendant among other obligations. Plaintiff and Class Members would not have provided and entrusted their Personal Health Information to Defendant in the absence of their implied contracts with Defendant and would have instead retained the opportunity to control their Personal Health Information for uses other than the benefits offered by Defendant.

236. Plaintiff and Class Members relied on Defendant's implied promises to safeguard their Personal Health Information to their detriment. Defendant breached the implied contracts with Plaintiff and Class Members by failing to reasonably safeguard and protect Plaintiff's and Class Members' Personal Health Information from disclosure to Facebook and other third parties.

237. Defendant's failure to implement adequate measures to protect the Personal Health Information of Plaintiff and Class Members and Defendant's intentional disclosure of the same to Facebook violated the purpose of the agreement between the parties: Plaintiff's and Class Members' provision of money and Personal Health Information in exchange for medical services and other benefits.

238. Instead of safeguarding Plaintiff's and Class Members' Personal Health Information, Defendant intentionally shared that information with Facebook thereby breaching the implied contracts it had with Plaintiff and Class Members.

239. Plaintiff and Class Members who paid money to Defendant reasonably believed and expected that Defendant would use part of those funds to operate its websites free of surreptitious collection and exploitation of communications between the parties. Defendant failed to do so. Plaintiff and Class Members would not have purchased medical services from Defendant if they knew that Defendant would share their Personal Health Information with Facebook without their knowledge or written consent.

240. Under the implied contracts, Defendant and/or its affiliated healthcare providers promised and were obligated to: (a) provide healthcare to Plaintiff and Class Members; and (b) protect Plaintiff and the Class Members' Personal Health Information provided to obtain such healthcare. In exchange, Plaintiff and Class Members agreed to pay money for these services, and to turn over their Personal Health Information through the use of Defendant's websites.

241. Both the provision of medical services healthcare and the protection of Plaintiff and Class Members' Private Health Information were material aspects of these implied contracts.

242. The implied contracts for the provision of medical services—contracts that include the contractual obligations to maintain the privacy of Plaintiff and Class Members' Private Health Information unless they consent—are also acknowledged, memorialized, and embodied in multiple documents, including (among other documents) Defendant's published Notice of Privacy Practices.

243. Defendant's express representations, including, but not limited to the express representations found in its Notice of Privacy Practices, memorialize and embody an implied contractual obligation requiring Defendant refrain from aiding or allowing third parties to collect or Plaintiff and Class Members' Private Health Information without consent. By soliciting and acquiring Plaintiff's and Class Members' Personal Health Information Defendant assumed an

independent duty to handle Plaintiff's and Class Members' Personal Health Information with due care and consistent with industry standards to prevent the foreseeable harm that arises from a breach of that duty.

244. Consumers of healthcare value their privacy, the privacy of their dependents, and the ability to keep their Private Health Information associated with obtaining healthcare private. To customers such as Plaintiff and the Class Members, healthcare that allows third parties to secretly collect their Private Health Information without consent is fundamentally less useful and less valuable than healthcare that refrains from such practices. Plaintiff and Class Members would not have entrusted their Private Health Information to Defendant and entered into these implied contracts with Defendant without an understanding that their Private Health Information would be safeguarded and protected or entrusted their Private Health Information to Defendant in the absence of its implied promise to do so.

245. A meeting of the minds occurred when Plaintiff and the Class Members agreed to, and did, provide their Private Health Information to Defendant and/or its affiliated healthcare providers, and paid for the provided healthcare in exchange for, amongst other things, (a) the provision of healthcare and medical services and (b) the protection of their Private Health Information.

246. Plaintiff and the Class Members performed their obligations under the contract when they paid for their healthcare services and provided their Private Health Information.

247. Defendant materially breached its contractual obligation to protect the nonpublic Private Health Information Defendant gathered when it allowed third parties to collect and exploit that information without Plaintiff's and Class Members' consent.

248. Defendant also materially breached its contractual obligation to protect Plaintiff's and Class Members' non-public Personal Health Information when it failed to implement adequate security measures and policies to protect the confidentiality of that information. For example, on information and belief, Defendant (1) failed to implement internal policies and procedures prohibiting the disclosure of patients' Personal Health Information without consent to third-party advertising companies like Facebook, (2) failed to implement adequate reviews of the software code and java script installed on its websites to ensure that patients' Personal Health Information was not being automatically routed without consent to third party advertising companies like Facebook, (3) failed to provide adequate notice to the public that visitors to its websites risked having their Personal Health Information shared with third party advertising companies like Facebook, (4) failed to take other industry standard privacy protection measures such as providing a "cookie" acceptance button on its website homepages, (5) failed to provide visitors to its websites with a means to opt out of the automatic transfer of data regarding their website interactions to third party advertising companies like Facebook, (6) failed to implement internal policies and educational programs to ensure that Defendants' website managers and coders were familiar with the legal regulations governing the disclosure patient Personal Health Information to third parties, and (7) failed to install adequate firewalls or take similar measures to prevent the automatic routing of patients' Personal Health Information to third party advertising companies like Facebook.

249. As a result of Defendant's failure to fulfill the data privacy protections promised in these contracts, Plaintiff and Class Members did not receive the full benefit of their bargains, and instead received healthcare and other services that were of a diminished value compared to those described in the contracts. Plaintiff and Class Members were therefore damaged in an

amount at least equal to the difference in the value of the healthcare services with data privacy they paid for and the healthcare services they received.

250. As a result of Defendant's material breaches, Plaintiff and Class Members were deprived of the benefit of their bargain with Defendant because they spent more on medical services with Defendant than they would have if they had known that Defendant was not providing the reasonable data security and confidentiality of patient communications that Defendant represented that it was providing in its privacy policies. Defendant's failure to honor its promises that it would protect the confidentiality of patient communications thus resulted in Plaintiff and Class Members overpaying Defendant for the services they received.

251. The services that Plaintiff and Class Members ultimately received in exchange for the monies paid to Defendant were worth quantifiably less than the services that Defendant promised to provide, which included Defendant's promise that any patient communications with Defendant would be treated as confidential and would never be disclosed to third parties for marketing purposes without the express consent of patients.

252. The medical services that Defendant offers are available from many other health care systems who do protect the confidentiality of patient communications. Had Defendant disclosed that it would allow third parties to secretly collect Plaintiff and Class Members' Private Health Information without consent, neither the Plaintiff, the Class Members, nor any reasonable person would have purchased healthcare from Defendant and/or its affiliated healthcare providers.

253. Defendant's conduct in sharing Plaintiff's and Class Members' Personal Health Information with Facebook also diminished the sales value of that information. There is a robust market for the type of information that Plaintiff and Class Members shared with Defendant

(which Defendant then shared with Facebook). Indeed, Facebook itself has offered to pay the public to acquire similar information in the past so that Facebook could use such information for marketing purposes. Plaintiff and Class Members were harmed both by the dissemination of their Personal Health Information and by losing the sales value of that information.

254. As a direct and proximate result of these failures, Plaintiff and the Class Members have been harmed and have suffered, and will continue to suffer, actual damages and injuries, including, without limitation, the release and disclosure of their Private Health Information, the loss of control of their Private Health Information, the diminution in value of their Personal Health Information, and the loss of the benefit of the bargain they had struck with Defendant.

255. Plaintiff and the Class Members are entitled to compensatory and consequential damages suffered as a result.

256. Plaintiff and Class Members also face a real and immediate threat of future injury to the confidentiality of their Personal Health information both because such information remains within Defendant's control and because anytime that Plaintiff and/or Class Members interact with Defendant's websites to make appointments, such information about their medical conditions, search for a doctor, or otherwise seek assistance with their medical conditions they risk further disclosure of their Personal Health Information. Plaintiff and the Class Members are therefore also entitled to injunctive relief requiring Defendant to cease all website operations that allow for the third-party capture of Private Health Information.

**COUNT V**
**Unjust Enrichment**
**(On Behalf of Plaintiff and the Class)**

257. Plaintiff re-alleges and incorporates by reference all paragraphs above as if fully set forth herein.

258. Plaintiff hereby pleads this Count in the alternative to Counts IV.

259. Plaintiff brings this claim on behalf of himself and all members of the Class.

260. Plaintiff and Class Members conferred a benefit on Defendant in the form of valuable sensitive medical information that Defendant collected from Plaintiff and Class Members under the guise of keeping this information private. Defendant collected, used, and disclosed this information for its own gain, including for advertisement purposes, sale, or trade for valuable services from third parties. Additionally, Plaintiff and the Class Members conferred a benefit on Defendant in the form of monetary compensation.

261. Plaintiff and the Class Members would not have used the Defendant's services, or would have paid less for those services, if they had known that Defendant would collect, use, and disclose this information to third parties.

262. Defendant unjustly retained those benefits at the expense of Plaintiff and Class Members because Defendant's conduct damaged Plaintiff and Class Members, all without providing any commensurate compensation to Plaintiff and Class Members.

263. The benefits that Defendant derived from Plaintiff and Class Members rightly belong to Plaintiff and Class Members. It would be inequitable under unjust enrichment principles for Defendant to be permitted to retain any of the profit or other benefits it derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

264. Defendant should be compelled to disgorge in a common fund for the benefit of Plaintiff and Class Members all unlawful or inequitable proceeds that Defendant received, and such other relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of themselves and all others similarly situated, ask for judgment in his favor, and that the Court enter an order as follows:

a. Certifying the Class and appointing Plaintiff as the Class's representatives;

b. Appoint the law firms of Sweeny Merrigan Law, Keller Postman LLC, and Ahmad, Zavitsanos, & Mensing P.C. as proposed interim class counsel;

c. Finding that Defendant's conduct as alleged herein was unlawful;

d. Awarding such injunctive and other equitable relief as the Court deems just and proper, including enjoining Defendant from making any further disclosure of Plaintiff or Class Members' communications to third parties without the Plaintiff or Class Members' express, informed, and written consent;

e. Awarding statutory damages of $1,000 per Plaintiff and Class Members pursuant to G.L. c. 272, § 99;

f. Imposing a constructive trust against Defendant through which Plaintiff and Class Members can be compensated for any unjust enrichment gained by Defendant;

g. Awarding damages for violations of Plaintiff and Class Members' right to privacy;

h. Awarding Plaintiff and Class Members statutory, actual, compensatory, consequential, punitive, and nominal damages, as well as restitution and/or disgorgement of profits unlawfully obtained;

i. Awarding Plaintiff and Class Members pre-judgment and post-judgment interest as provided by law;

j. Awarding Plaintiff and Class Members reasonable attorney's fees, costs, and expenses;

k. Awarding costs of suit; and

l. Such other and further relief to which Plaintiff and Class Members may be entitled.

**RESPECTFULLY SUBMITTED,
COUNSEL FOR PLAINTIFF JOHN DOE,
INDIVIDUALLY AND ON BEHALF OF ALL
OTHERS SIMILARLY SITUATED**

*/s/ Jonathan T. Merrigan*
J. Tucker Merrigan, BBO# 681627
Victoria Santoro Mair, BBO# 679120
Erin E. McHugh, BBO# 703701
Sweeney Merrigan Law
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Foster C. Johnson (*pro hac vice forthcoming*)
David Warden (*pro hac vice forthcoming*)
Nathan Campbell (*pro hac vice forthcoming*)
AHMAD, ZAVITSANOS, & MENSING, P.C.
1221 McKinney Street, Suite 3460
Houston, Texas 77010
(713) 655-1101
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

Seth Meyer (*pro hac vice forthcoming*)
Alex Dravillas (*pro hac vice forthcoming*)
Keller Postman LLC
150 N. Riverside Plaza
Suite 4100
Chicago, Illinois 60606
(312) 741-5220
sam@kellerpostman.com
ajd@kellerpostman.com

Dated: January 30, 2022

Date Filed 2/9/2023 9:00 PM
Superior Court - Essex
Docket Number 2277CV01000



COMMONWEALTH OF MASSACHUSETTS

ESSEX, ss.

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT

JOHN DOE, and on behalf of all others similarly situated,

Plaintiffs,

v.

EMERSON HOSPITAL,

Defendants.

Civil Action No. 2277-CV-01000D

**NOTICE OF MOTION TO DISMISS**

Pursuant to Superior Court Rule 9E, the Defendant **EMERSON HOSPITAL**, hereby notifies the Superior Court of its timely response to Plaintiff's First Amended Complaint in this case. On Thursday, February 9, 2023, Defendant, pursuant to Superior Court Rule 9A(b)(2), served its "Motion To Dismiss Plaintiff's First Amended Complaint" on all parties.

A TRUE COPY, ATTEST

DEPUTY ASS'T. CLERK

Date Filed 2/9/2023 9:00 PM
Superior Court - Essex
Docket Number 2277CV01000

Dated: February 9, 2023

Respectfully submitted,

**EMERSON HOSPITAL**

By: /s/ *Alan Y. Wong*

Alan Y. Wong (BBO# 687618)
awong@shb.com
Emyr Remy (BBO # 740156)
remy@shb.com
SHOOK, HARDY & BACON L.L.P.
One Federal Street, Suite 2540
Boston, MA 02110
Tel: (617) 531-1411 | Fax: (617) 531-1602

Alfred J. Saikali (*pro hac vice* forthcoming)
asaikali@shb.com
SHOOK, HARDY & BACON L.L.P.
201 South Biscayne Blvd., Suite 3200
Miami, Florida 33131
Tel: (305) 358-5171 | Fax: (305) 358-7470

Josh Becker (*pro hac vice* forthcoming)
jbecker@shb.com
SHOOK, HARDY & BACON L.L.P.
1230 Peachtree St., Suite 1200
Atlanta, GA 30309
Tel: (470) 867-6000 | Fax: (470) 867-6001

Michael Rayfield (*pro hac vice* forthcoming)
mrayfield@shb.com
SHOOK, HARDY & BACON L.L.P.
1325 Avenue of the Americas, 28th Floor
New York, NY 10019
Tel: (212) 989-8844 | Fax: (929) 501-5455

Lindsey M. Knapton (*pro hac vice* forthcoming)
lknapton@shb.com
SHOOK, HARDY & BACON L.L.P.
1600 17th Street, Suite 450
Denver, CO 80202
Tel: (303) 285-5300 | Fax: (303) 285-5301

**CERTIFICATE OF SERVICE**

I hereby certify that on February 9, 2023, the foregoing was filed via the Court's Electronic Filing System. Notice of this filing will be sent by operation of the Court's Electronic Filing System to all parties of record:

Jonathan Tucker Merrigan, (BBO# 681627 )
Victoria Santoro Mair, (BBO# 679120)
Erin E. McHugh, (BBO# 703701)
**SWEENEY MERRIGAN LAW**
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
mchugh@sweeneymerrigan.com
*Attorney for Plaintiff*

Foster C. Johnson (pro hac vice forthcoming)
David Warden (pro hac vice forthcoming)
Nathan Campbell (pro hac vice forthcoming)
**AHMAD, ZAVITSANOS, & MENSING, P.C.**
1221 McKinney Street, Suite 3460
Houston, Texas 77010
(713) 655-1101
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com
*Attorney for Plaintiff*

Seth Meyer (pro hac vice forthcoming)
Alex Dravillas (pro hac vice forthcoming)
**KELLER POSTMAN LLC**
150 N. Riverside Plaza
Suite 4100
Chicago, Illinois 60606
(312) 741-5220
sam@kellerpostman.com
adj@kellerpostman.com
*Attorney for Plaintiff*

*/s/ Alan Y. Wong*
Alan Y. Wong

Date Filed 2/13/2023 10:06 AM
Superior Court - Essex
Docket Number 2277CV01000



COMMONWEALTH OF MASSACHUSETTS

ESSEX, S.S. SUPERIOR COURT

JOHN DOE,
INDIVIDUALLY AND ON
BEHALF OF ALL OTHERS SIMILARLY
SITUATED,

Plaintiff

v.

EMERSON HOSPITAL,

Defendant.

C.A. No. 2277CV01000

A TRUE COPY. ATTEST
DEPUTY ASST. CLERK

**PARTIES' AGREED STIPULATION TO EXTEND DEADLINE FOR SERVICE OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

NOW COME the parties in the above-captioned civil action, and stipulate by agreement that the deadline for Plaintiff to serve its Opposition to Defendant's Motion to Dismiss pursuant to Mass. Sup. Ct. Rule 9A be extended from 10 days to 32 days. The parties hereby stipulate that the service deadline for Plaintiff's Opposition to Defendant's Motion to Dismiss shall be extended through Monday, April 3, 2023.

SO STIPULATED this 13th day of February 2023.

Counsel for Plaintiff:

*/s/ J. Tucker Merrigan*
J. Tucker Merrigan, BBO #681628
Erin E. McHugh, BBO #703701
**Sweeney Merrigan Law, LLP**
268 Summer Street, LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Counsel for Defendant:

*/s/ Alan Y. Wong*
Alan Y. Wong, BBO #687618
Emyr Remy, BBO #740156
**Shook, Hardy & Bacon, LLP**
One Federal Street, Suite 2540
Boston, MA 02110
Tel.: (617) 531-1411
Fax: (617) 531-1602
awong@shb.com
remy@shb.com

Date Filed 2/13/2023 10:06 AM
Superior Court - Essex
Docket Number 2277CV01000

Foster C. Johnson (*pro hac vice forthcoming*)
David Warden (*pro hac vice forthcoming*)
Nathan Campbell (*pro hac vice forthcoming*)
**Ahmad, Zavitsanos & Mensing, P.C.**
1221 McKinney St., Suite 3460
Houston, TX 77010
Tel.: (713) 655 1101
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

Seth Meyer (*pro hac vice forthcoming*)
Alex Dravillas (*pro hac vice forthcoming*)
**Keller Postman LLC**
150 N. Riverside Plaza, Suite 4100
Chicago, IL 60606
Tel.: (312) 741-5220
sam@kellerpostman.com
adj@kellerpostman.com

Alfred J. Saikali (*pro hac vice forthcoming*)
**Shook, Hardy & Bacon, LLP**
210 South Biscayne Blvd., Suite 3200
Miami, FL 33131
Tel.: (305) 358-5171
Fax: (305) 358-7470
asaikali@shb.com

Josh Becker (*pro hac vice forthcoming*)
**Shook, Hardy & Bacon LLP**
1230 Peachtree St., Suite 1200
Atlanta, GA 30309
Tel.: (407) 867-6000
Fax: (470) 867-6001
jbecker@shb.com

Michael Rayfield (*pro hac vice forthcoming*)
**Shook, Hardy & Bacon LLP**
1325 Avenue of the Americas, 28th Floor
New York, NY 10019
Tel.: (212) 989-8844
Fax: (929) 501-5455
mrayfield@shb.com

Lindsey Knapton (*pro hac vice forthcoming*)
**Shook, Hardy & Bacon LLP**
1600 17th Street, Suite 450
Denver, CO 80202
Tel.: (303) 285-5300
Fax: (303) 285-5301
lknapton@shb.com

Dated: February 13, 2023

Date Filed 2/21/2023 10:19 AM
Superior Court - Essex
Docket Number 2277CV01000

8

COMMONWEALTH OF MASSACHUSETTS

ESSEX, S.S. SUPERIOR COURT

JOHN DOE,
INDIVIDUALLY AND ON
BEHALF OF ALL OTHERS SIMILARLY
SITUATED,

Plaintiff

v.

EMERSON HOSPITAL,

Defendant.

C.A. No. 2277CV01000

A TRUE COPY, ATTEST
DEPUTY ASST. CLERK

allowed without opposition
Budzin, J.
2/23/23

**MOTION FOR ADMISSION PRO HAC VICE**

Jonathan Tucker Merrigan, a member in good standing in the bar of this Court, as provided in the Local Rules, respectfully moves for the admission *pro hac vice* of Foster Johnson, for the purposes of entering an appearance on behalf of John Doe individually and on behalf of all others similarly situated. In support of this motion, the undersign counsel states as follows:

1. I am a member in good standing of the bar of this Court and have filed an appearance in the above-captioned action.
2. I move for the admission *pro hac vice* of Foster Johnson to appear before this Court as co-counsel for the plaintiffs in the above captioned case.
3. As evidenced by his Affidavit attached, Mr. Johnson is a member in good standing in the Bars of The State of Texas, The State of California, The US District Court for the Central District of California, the US District Court for the Eastern District of Texas, the US District Court for the Southern District of Texas, and the US District Court for the Northern District of Texas. He is familiar with the local rules of this Court.

Docket Number 2277CV01000

WHEREFORE, Johnathan Tucker Merrigan respectfully requests that this Honorable Court grant leave for Foster Johnson to be admitted *pro hac vice* to appear on behalf of John Doe and all other similarly situated plaintiffs in this action.

Respectfully Submitted
By Plaintiffs' Counsel:

*/s/ Jonathan T. Merrigan*
J. Tucker Merrigan, BBO #681627
**Sweeney Merrigan Law, LLP**
268 Summer Street, LL
Boston, MA 02210
Tel.: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com

Dated: February 20, 2023

Date Filed 2/10/2023 3:53 PM
Superior Court - Essex
Docket Number 2277CV01000

8.1

COMMONWEALTH OF MASSACHUSETTS

ESSEX, S.S. SUPERIOR COURT

| | | |
|---|---|---|
| JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | § | C.A. No. 2277CV01000 |
| Plaintiff | § | |
| v. | § | A TRUE COPY, ATTEST |
| EMERSON HOSPITAL, | § | DEPUTY ASS'T. CLERK |
| Defendant. | § | |

**AFFIDAVIT OF FOSTER JOHNSON**

I, Foster Johnson, state and depose as follows:

1. I am an attorney licensed to practice in the states of Texas and California.
2. I am an attorney at Ahmad, Zavitsanos & Mensing, located at 1221 McKinney, Suite 2500, Houston, Texas 77010. The phone number is (713) 600-4915.
3. I was admitted to practice law in the state of:
   a. Texas in 2011;
   b. California in 2013;
   c. US District Court, Eastern District of Texas in 2011;
   d. US District Court, Southern District of Texas in 2019;
   e. US District Court, Northern District of Texas in 2019; and
   f. US District Court, Central District of California in 2022.
4. I am a member of good standing and duly licensed and admitted to practice in each of the jurisdictions listed above.
5. I have never been suspended or disbarred in my jurisdictions.
6. I am familiar with the Local Rules in Massachusetts.
7. If the Court allows the Motion for me to appear *pro hac vice* in this matter, I will represent the Plaintiffs in this proceeding until the final determination thereof, and with reference to all matters, incidents, or proceedings, I agree that I shall be subject

to the orders and the disciplinary action and the civil jurisdiction of this Court in all respects as if I were admitted.

Signed under the pains and penalties of perjury this 14th day of November, 2022.

Foster Johnson, Esq.

Date Filed 2/20/2023 3:53 PM
Superior Court - Essex
Docket Number 2277CV01000

Please note that ONLY THIS FORM, FILLED OUT ON THE WEBSITE, WILL BE ACCEPTED. Handwritten, annotated, copied, scanned or modified forms will be returned.

# BOARD OF BAR OVERSEERS

## REGISTRATION STATEMENT FOR *PRO HAC VICE* ATTORNEYS

Attorney name (first MI last, suffix): **Foster C. Johnson**
Email address: **fjohnson@azalaw.com**
Complete Business/Mailing Address:

**Foster C. Johnson**
**Ahmad, Zavitsanos & Mensing, P.C.**
**1221 McKinney, Suite 2500**
**Houston, Texas 77010**

Board of Bar Overseers
Administrative Use Only

Date Received: 12-02-22
Amount Paid: $355.00
Date confirmation mailed: 12-02-22

Business phone: **(713) 655-1101**

Court in which pro hac vice admission is sought: **Essex Superior Court**

Contact number for court: **(978) 744-5500**

Party to be represented: **John Doe, Individually and on Behalf of All Others Similarly Situated**

Docket number of case (if available): **2277CV01000**

Jurisdictions to which you have been admitted: (Use second page for additional jurisdictions.)

| Type | Jurisdiction | License number |
|---|---|---|
| **State** | **Texas** | **24076463** |
| **State** | **California** | **289055** |
| **Federal** | **US District Court, Central District of California** | |
| **Federal** | **US District Court, Eastern District of Texas** | |
| **Federal** | **US District Court, Southern District of Texas** | |
| **Federal** | **US District Court, Northern District of Texas** | |

RECEIVED
DEC 2 - 2022
MASSACHUSETTS BOARD OF BAR OVERSEERS

I certify that (check one): ( ) the party I am representing in the case for which I am seeking pro hac vice admission is an indigent client, and I understand that no pro hac vice fee is due, or (✓) I have included the required pro hac vice fee.

Further, I certify, under the pains and penalties of perjury, that I am admitted to practice and in good standing in every jurisdiction where I am admitted, and I acknowledge that I am subject to discipline by the Massachusetts Supreme Judicial Court and the Board of Bar Overseers. I understand I am limited in my legal practice in Massachusetts to the case identified above.

I certify the information I have supplied the Board of Bar Overseers is true and complete.

**Signature** (Please sign inside box above.) **Date:**

Sign, print and mail original form to: Board of Bar Overseers, 99 High Street, 2nd Floor, Boston, MA 02110-2320

PHC-125

Jurisdictions continued:

**Foster C. Johnson**

| Type | Jurisdiction | License number |
|---|---|---|

Please remember to sign and date first page and mail original form to: Board of Bar Overseers, 99 High Street, 2nd Floor, Boston, MA 02110-2320

COMMONWEALTH OF MASSACHUSETTS

ESSEX, S.S. SUPERIOR COURT

JOHN DOE,
INDIVIDUALLY AND ON
BEHALF OF ALL OTHERS SIMILARLY
SITUATED,

Plaintiff

v.

EMERSON HOSPITAL,

Defendant.

§ C.A. No. 2277CV01000

A TRUE COPY, ATTEST
DEPUTY ASST. CLERK

## MOTION FOR ADMISSION PRO HAC VICE

Buxton, J. 2/23/23

Jonathan Tucker Merrigan, a member in good standing in the bar of this Court, as provided in the Local Rules, respectfully moves for the admission *pro hac vice* of Alex Dravillas, for the purposes of entering an appearance on behalf of John Doe individually and on behalf of all others similarly situated. In support of this motion, the undersign counsel states as follows:

1. I am a member in good standing of the bar of this Court and have filed an appearance in the above-captioned action.
2. I move for the admission *pro hac vice* of Alex Dravillas to appear before this Court as co-counsel for the plaintiffs in the above captioned case.
3. As evidenced by his Affidavit attached, Mr. Dravillas is a member in good standing in the Bar of the State of Illinois. He is familiar with the local rules of this Court.

WHEREFORE, Johnathan Tucker Merrigan respectfully requests that this Honorable Court grant leave for Alex Dravillas to be admitted *pro hac vice* to appear on behalf of John Doe and all other similarly situated plaintiffs in this action.

Respectfully Submitted
By Plaintiffs' Counsel:

*/s/ Jonathan T. Merrigan*
J. Tucker Merrigan, BBO #681627
**Sweeney Merrigan Law, LLP**
268 Summer Street, LL
Boston, MA 02210
Tel.: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com

Dated: February 20, 2023

COMMONWEALTH OF MASSACHUSETTS

ESSEX, S.S. SUPERIOR COURT

JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,

Plaintiff

v.

EMERSON HOSPITAL,

Defendant.

§ § § § § § § § § § § § § §

C.A. No. 2277CV01000

A TRUE COPY, ATTEST

DEPUTY ASST. CLERK

**AFFIDAVIT OF ALEX DRAVILLAS**

I, Alex Dravillas, state and depose as follows:

1. I am an attorney licensed to practice in the state of Illinois.
2. I am an attorney at Keller Postman LLC, located at 150 N. Riverside Plaza, Suite 4100, Chicago, Illinois 60606. The phone number is (312) 741-5220.
3. I was admitted to practice law in the state of Illinois in 2009.
4. I am a member of good standing and duly licensed and admitted to practice in Illinois.
5. I have never been suspended or disbarred in Illinois.
6. I am familiar with the Local Rules in Massachusetts.
7. If the Court allows the Motion for me to appear *pro hac vice* in this matter, I will represent the Plaintiffs in this proceeding until the final determination thereof, and with reference to all matters, incidents, or proceedings, I agree that I shall be subject to the orders and the disciplinary action and the civil jurisdiction of this Court in all respects as if I were admitted.

Signed under the pains and penalties of perjury this 14 day of November, 2022.

DocuSigned by:

Alex T. Dravillas

28A46A0B7459497...

Alex Dravillas, Esq.

Docket Number 2277CV01000

Please note that ONLY THIS FORM, FILLED OUT ON THE WEBSITE, WILL BE ACCEPTED. Handwritten, annotated, copied, scanned or modified forms will be returned.

# BOARD OF BAR OVERSEERS

## REGISTRATION STATEMENT FOR *PRO HAC VICE* ATTORNEYS

Attorney name (first MI last, suffix): **Alex J. Dravillas**
Email address: **ajd@kellerpostman.com**
Complete Business/Mailing Address:

**Alex J. Dravillas**
**Keller Postman LLC**
**150 N. Riverside Plaza, Suite 4100**
**Chicago, Illinois 60606**

Board of Bar Overseers
Administrative Use Only

Date Received: 12-02-22
Amount Paid: $355.00
Date confirmation mailed: 12-02-22

Business phone: **(312) 741-5220**

Court in which pro hac vice admission is sought: **Essex Superior Court**

Contact number for court: **(978) 744-5500**

Party to be represented: **John Doe, Individually and on Behalf of All Others Similarly Situated**

Docket number of case (if available): **2277CV01000**

Jurisdictions to which you have been admitted: (Use second page for additional jurisdictions.)

| Type | Jurisdiction | License number |
|---|---|---|
| **State** | **Illinois** | **6299686** |

RECEIVED
DEC 2 - 2022
MASSACHUSETTS BOARD OF BAR OVERSEERS

I certify that (check one): ( ) the party I am representing in the case for which I am seeking pro hac vice admission is an indigent client, and I understand that no pro hac vice fee is due, or (✓) I have included the required pro hac vice fee.

Further, I certify, under the pains and penalties of perjury, that I am admitted to practice and in good standing in every jurisdiction where I am admitted, and I acknowledge that I am subject to discipline by the Massachusetts Supreme Judicial Court and the Board of Bar Overseers. I understand I am limited in my legal practice in Massachusetts to the case identified above. I certify the information I have supplied the Board of Bar Overseers is true and complete.

DocuSigned by:
Alex J. Dravillas
28A46A0B7459497...

Signature (Please sign inside box above.)

Date: 11/14/2022

Sign, print and mail original form to: Board of Bar Overseers, 99 High Street, 2nd Floor, Boston, MA 02110-2320

Jurisdictions continued:

**Alex J. Dravillas**

| Type | Jurisdiction | License number |
| --- | --- | --- |

Please remember to sign and date first page and mail original form to: Board of Bar Overseers, 99 High Street, 2nd Floor, Boston, MA 02110-2320

COMMONWEALTH OF MASSACHUSETTS

ESSEX, S.S.

SUPERIOR COURT

JOHN DOE,
INDIVIDUALLY AND ON
BEHALF OF ALL OTHERS SIMILARLY
SITUATED,

Plaintiff

v.

EMERSON HOSPITAL,

Defendant.

§ § § § § § § § § § § § § §

C.A. No. 2277CV01000

A TRUE COPY. ATTEST
DEPUTY ASS'T. CLERK

Buxton, J. 2/23/23

## MOTION FOR ADMISSION PRO HAC VICE

Jonathan Tucker Merrigan, a member in good standing in the bar of this Court, as provided in the Local Rules, respectfully moves for the admission *pro hac vice* of Nathan Campbell, for the purposes of entering an appearance on behalf of John Doe individually and on behalf of all others similarly situated. In support of this motion, the undersign counsel states as follows:

1. I am a member in good standing of the bar of this Court and have filed an appearance in the above-captioned action.
2. I move for the admission *pro hac vice* of Nathan Campbell to appear before this Court as co-counsel for the plaintiffs in the above captioned case.
3. As evidenced by his Affidavit attached, Mr. Campbell is a member in good standing in the Bars of The State of Texas, The Supreme Court of Texas, The US District Court for the Eastern District of Texas, The US District Court for the Southern District of Texas, and the Fifth Circuit Court of Appeals. He is familiar with the local rules of this Court.

WHEREFORE, Johnathan Tucker Merrigan respectfully requests that this Honorable Court grant leave for Nathan Campbell to be admitted *pro hac vice* to appear on behalf of John Doe and all other similarly situated plaintiffs in this action.

Respectfully Submitted
By Plaintiffs' Counsel:

*/s/ Jonathan T. Merrigan*
J. Tucker Merrigan, BBO #681627
**Sweeney Merrigan Law, LLP**
268 Summer Street, LL
Boston, MA 02210
Tel.: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com

Dated: February 20, 2023

Date Filed 2/20/2023 3:53 PM
Superior Court - Essex
Docket Number 2277CV01000

10.1

COMMONWEALTH OF MASSACHUSETTS

ESSEX, S.S. SUPERIOR COURT

| | | |
|---|---|---|
| JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | § | C.A. No. 2277CV01000 |
| Plaintiff | § | |
| v. | § | |
| EMERSON HOSPITAL, | § | |
| Defendant. | § | |

A TRUE COPY, ATTEST
DEPUTY ASS'T. CLERK

**AFFIDAVIT OF NATHAN CAMPBELL**

I, Nathan Campbell, state and depose as follows:

1. I am an attorney licensed to practice in the state of Texas.

2. I am an attorney at Ahmad, Zavitsanos & Mensing, located at 1221 McKinney, Suite 2500, Houston, Texas 77010. The phone number is (713) 600-4915.

3. I was admitted to practice law in the state of:
   a. Texas in 2015;
   b. The Supreme Court of Texas in 2015;
   c. US District Court, Eastern District of Texas in 2016;
   d. US District Court, Southern District of Texas in 2016;
   e. Fifth Circuit Court of Appeals in 2016.

4. I am a member of good standing and duly licensed and admitted to practice in each of the jurisdictions listed above.

5. I have never been suspended or disbarred in my jurisdictions.

6. I am familiar with the Local Rules in Massachusetts.

7. If the Court allows the Motion for me to appear *pro hac vice* in this matter, I will represent the Plaintiffs in this proceeding until the final determination thereof, and with reference to all matters, incidents, or proceedings, I agree that I shall be subject to the orders and the disciplinary action and the civil jurisdiction of this Court in all respects as if I were admitted.

Date Filed 2/20/2023 3:53 PM
Superior Court - Essex
Docket Number 2277CV01000

Signed under the pains and penalties of perjury this 14th day of November, 2022.

Nathan Campbell, Esq.

Date Filed 2/20/2023 3:53 PM
Superior Court - Essex
Docket Number 2277CV01000

Please note that ONLY THIS FORM, FILLED OUT ON THE WEBSITE, WILL BE ACCEPTED. Handwritten, annotated, copied, scanned or modified forms will be returned.

# BOARD OF BAR OVERSEERS

## REGISTRATION STATEMENT FOR *PRO HAC VICE* ATTORNEYS

Attorney name (first MI last, suffix): **Nathan B. Campbell**
Email address: **ncampbell@azalaw.com**
Complete Business/Mailing Address:

**Nathan B. Campbell**
**Ahmad, Zavitsanos & Mensing, P.C.**
**1221 McKinney, Suite 2500**
**Houston, Texas 77010**

Board of Bar Overseers
Administrative Use Only

Date Received: 12-02-22
Amount Paid: $355.00
Date confirmation mailed: 12-02-22

Business phone: **(713) 655-1101**

Court in which pro hac vice admission is sought: **Essex Superior Court**

Contact number for court: **(978) 744-5500**

Party to be represented: **John Doe, Individually and on Behalf of All Others Similarly Situated**

Docket number of case (if available): **2277CV01000**

Jurisdictions to which you have been admitted: (Use second page for additional jurisdictions.)

| Type | Jurisdiction | License number |
|---|---|---|
| **State** | **Texas** | **24097455** |
| **Federal** | **US District Court, Eastern District of Texas** | |
| **Federal** | **Fifth Circuit Court of Appeals** | |
| **Federal** | **US District Court, Southern District of Texas** | |
| **State** | **Supreme Court of Texas** | |

RECEIVED
DEC 2 - 2022
MASSACHUSETTS BOARD OF BAR OVERSEERS
REGISTRATION DEPARTMENT

I certify that (check one): ( ) the party I am representing in the case for which I am seeking pro hac vice admission is an indigent client, and I understand that no pro hac vice fee is due, or (✓) I have included the required pro hac vice fee.

Further, I certify, under the pains and penalties of perjury, that I am admitted to practice and in good standing in every jurisdiction where I am admitted, and I acknowledge that I am subject to discipline by the Massachusetts Supreme Judicial Court and the Board of Bar Overseers. I understand I am limited in my legal practice in Massachusetts to the case identified above.

I certify the information I have supplied the Board of Bar Overseers is true and complete.

[signature]

Signature (Please sign inside box above.) Date:

Sign, print and mail original form to: Board of Bar Overseers, 99 High Street, 2nd Floor, Boston, MA 02110-2320

PHC-125

Date Filed 2/20/2023 3:53 PM
Superior Court - Essex
Docket Number 2277CV01000



Jurisdictions continued:

**Nathan B. Campbell**

| Type | Jurisdiction | License number |
| --- | --- | --- |

Please remember to sign and date first page and mail original form to: Board of Bar Overseers, 99 High Street, 2nd Floor, Boston, MA 02110-2320

COMMONWEALTH OF MASSACHUSETTS

ESSEX, S.S. SUPERIOR COURT

| | | |
|---|---|---|
| JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | § | C.A. No. 2277CV01000 |
| Plaintiff | § | |
| v. | § | A TRUE COPY, ATTEST |
| EMERSON HOSPITAL, | § | DEPUTY ASST. CLERK |
| Defendant. | § | |

**MOTION FOR ADMISSION PRO HAC VICE**

Jonathan Tucker Merrigan, a member in good standing in the bar of this Court, as provided in the Local Rules, respectfully moves for the admission *pro hac vice* of Seth Meyer, for the purposes of entering an appearance on behalf of John Doe individually and on behalf of all others similarly situated. In support of this motion, the undersign counsel states as follows:

1. I am a member in good standing of the bar of this Court and have filed an appearance in the above-captioned action.
2. I move for the admission *pro hac vice* of Seth Meyer to appear before this Court as co-counsel for the plaintiffs in the above captioned case.
3. As evidenced by his Affidavit attached, Mr. Meyer is a member in good standing in the Bars of the State of Illinois, the State of Michigan, the State of New York, the State of Texas, the State of Utah, and the State of Wyoming. He is familiar with the local rules of this Court.

allowed without opposition Burton J. 2/23/23

Date Filed 2/20/2023 3:53 PM
Superior Court - Essex
Docket Number 2277CV01000

WHEREFORE, Johnathan Tucker Merrigan respectfully requests that this Honorable Court grant leave for Seth Meyer to be admitted *pro hac vice* to appear on behalf of John Doe and all other similarly situated plaintiffs in this action.

Respectfully Submitted
By Plaintiffs' Counsel:

/s/ Jonathan T. Merrigan
J. Tucker Merrigan, BBO #681627
**Sweeney Merrigan Law, LLP**
268 Summer Street, LL
Boston, MA 02210
Tel.: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com

Dated: February 20, 2023

Date Filed 2/20/2023 3:53 PM
Superior Court - Essex
Docket Number 2277CV01000

11.1

COMMONWEALTH OF MASSACHUSETTS

ESSEX, S.S. SUPERIOR COURT

| | | |
|---|---|---|
| JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | § | C.A. No. 2277CV01000 |
| Plaintiff | § | |
| v. | § | A TRUE COPY, ATTEST DEPUTY ASS'T. CLERK |
| EMERSON HOSPITAL, | § | |
| Defendant. | § | |

**AFFIDAVIT OF SETH MEYER**

I, Seth Meyer, state and depose as follows:

1. I am an attorney licensed to practice in the states of Illinois, Michigan, New York, Texas, Utah, and Wyoming.

2. I am a Partner at Keller Postman LLC, located at 150 N. Riverside Plaza, Suite 4100, Chicago, Illinois 60606. The phone number is (312) 741-5220.

3. I was admitted to practice law in the state of:
   a. New York in 2014;
   b. Illinois in 2016;
   c. Michigan in 2018;
   d. Texas in 2020;
   e. Utah in 2021; and
   f. Wyoming in 2021.

4. I am a member of good standing and duly licensed and admitted to practice in each of the jurisdictions listed above.

5. I have never been suspended or disbarred in my jurisdictions.

6. I am familiar with the Local Rules in Massachusetts.

7. If the Court allows the Motion for me to appear *pro hac vice* in this matter, I will represent the Plaintiffs in this proceeding until the final determination thereof, and with reference to all matters, incidents, or proceedings, I agree that I shall be subject

to the orders and the disciplinary action and the civil jurisdiction of this Court in all respects as if I were admitted.

Signed under the pains and penalties of perjury this 14th day of November, 2022.

*/s/ Seth Meyer*

Seth Meyer, Esq.

Date Filed 2/20/2023 3:53 PM
Superior Court - Essex
Docket Number 2277CV01000

Please note that ONLY THIS FORM, FILLED OUT ON THE WEBSITE, WILL BE ACCEPTED. Handwritten, annotated, copied, scanned or modified forms will be returned.

# BOARD OF BAR OVERSEERS

## REGISTRATION STATEMENT FOR *PRO HAC VICE* ATTORNEYS

Attorney name (first MI last, suffix): **Seth A. Meyer**
Email address: **sam@kellerpostman.com**
Complete Business/Mailing Address:

**Seth A. Meyer**
**Keller Postman LLC**
**150 N. Riverside Plaza, Suite 4100**
**Chicago, Illinois 60606**

Board of Bar Overseers
Administrative Use Only

Date Received: 12-02-22
Amount Paid: $355.00
Date confirmation mailed: 12-02-22

Business phone: **(312) 741-5220**

Court in which pro hac vice admission is sought: **Essex Superior Court**

Contact number for court: **(978) 744-5500**

Party to be represented: **John Doe, Individually and on Behalf of All Others Similarly Situated**

Docket number of case (if available): **2277CV01000**

Jurisdictions to which you have been admitted: (Use second page for additional jurisdictions.)

| Type | Jurisdiction | License number |
|---|---|---|
| State | New York | 5191283 |
| State | Illinois | 6324349 |
| State | Michigan | P83182 |
| State | Texas | 24121979 |
| State | Utah | 17626 |
| State | Wyoming | 86588 |

RECEIVED
DEC 2 - 2022
MASSACHUSETTS BOARD OF BAR OVERSEERS

I certify that (check one): ( ) the party I am representing in the case for which I am seeking pro hac vice admission is an indigent client, and I understand that no pro hac vice fee is due, or (✓) I have included the required pro hac vice fee.

Further, I certify, under the pains and penalties of perjury, that I am admitted to practice and in good standing in every jurisdiction where I am admitted, and I acknowledge that I am subject to discipline by the Massachusetts Supreme Judicial Court and the Board of Bar Overseers. I understand I am limited in my legal practice in Massachusetts to the case identified above.

I certify the information I have supplied the Board of Bar Overseers is true and complete.

Seth Meyer

Signature (Please sign inside box above.)

Date: November 14, 2022

Sign, print and mail original form to: Board of Bar Overseers, 99 High Street, 2nd Floor, Boston, MA 02110-2320

PHC-125

Page 2

Jurisdictions continued:

**Seth A. Meyer**

| Type | Jurisdiction | License number |
|---|---|---|

Please remember to sign and date first page and mail original form to: Board of Bar Overseers, 99 High Street, 2nd Floor, Boston, MA 02110-2320

COMMONWEALTH OF MASSACHUSETTS

ESSEX, S.S. SUPERIOR COURT

JOHN DOE,
INDIVIDUALLY AND ON
BEHALF OF ALL OTHERS SIMILARLY
SITUATED,

Plaintiff

v.

EMERSON HOSPITAL,

Defendant.

C.A. No. 2277CV01000

A TRUE COPY, ATTEST
DEPUTY ASS'T. CLERK

Barton, J. 2/23/23

## MOTION FOR ADMISSION PRO HAC VICE

Jonathan Tucker Merrigan, a member in good standing in the bar of this Court, as provided in the Local Rules, respectfully moves for the admission *pro hac vice* of David Warden, for the purposes of entering an appearance on behalf of John Doe individually and on behalf of all others similarly situated. In support of this motion, the undersign counsel states as follows:

1. I am a member in good standing of the bar of this Court and have filed an appearance in the above-captioned action.
2. I move for the admission *pro hac vice* of David Warden to appear before this Court as co-counsel for the plaintiffs in the above captioned case.
3. As evidenced by his Affidavit attached, Mr. Warden is a member in good standing in the Bars of the State of Texas, the US District Court for the Southern District of Texas, the US District Court for the Southern District of New York, the Patent & Trademark Appeal Board, the Federal Circuit Court of Appeals, and the US Court of Appeals for the Fifth Circuit. He is familiar with the local rules of this Court.

WHEREFORE, Johnathan Tucker Merrigan respectfully requests that this Honorable Court grant leave for David Warden to be admitted *pro hac vice* to appear on behalf of John Doe and all other similarly situated plaintiffs in this action.

Respectfully Submitted
By Plaintiffs' Counsel:

*/s/ Jonathan T. Merrigan*
J. Tucker Merrigan, BBO #681627
**Sweeney Merrigan Law, LLP**
268 Summer Street, LL
Boston, MA 02210
Tel.: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com

Dated: February 20, 2023

COMMONWEALTH OF MASSACHUSETTS

ESSEX, S.S. SUPERIOR COURT

| | | |
|---|---|---|
| JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>Plaintiff<br><br>v.<br><br>EMERSON HOSPITAL,<br><br>Defendant. | § § § § § § § § § § § § § | C.A. No. 2277CV01000<br><br>A TRUE COPY, ATTEST<br>[signature]<br>DEPUTY ASS'T CLERK |

**AFFIDAVIT OF DAVID WARDEN**

I, David Warden, state and depose as follows:

1. I am an attorney licensed to practice in the state of Texas.

2. I am an attorney at Ahmad, Zavitsanos & Mensing, located at 1221 McKinney, Suite 2500, Houston, Texas 77010. The phone number is (713) 600-4915.

3. I was admitted to practice law in the following bars:
   a. Texas in 1982;
   b. US District Court, Southern District of Texas in 1985;
   c. Patent & Trademark Appeal Board in 1986;
   d. US Court of Appeals for Fifth Circuit in 1986;
   e. Federal Circuit Court of Appeals in 1990; and
   f. US District Court, Southern District of New York in 2012.

4. I am a member of good standing and duly licensed and admitted to practice in each of the jurisdictions listed above.

5. I have never been suspended or disbarred in my jurisdictions.

6. I am familiar with the Local Rules in Massachusetts.

7. If the Court allows the Motion for me to appear *pro hac vice* in this matter, I will represent the Plaintiffs in this proceeding until the final determination thereof, and with reference to all matters, incidents, or proceedings, I agree that I shall be subject

to the orders and the disciplinary action and the civil jurisdiction of this Court in all respects as if I were admitted.

Signed under the pains and penalties of perjury this 14th day of November, 2022.

David Warden, Esq.

Date Filed 2/20/2023 3:53 PM
Superior Court - Essex
Docket Number 2277CV01000

Please note that ONLY THIS FORM, FILLED OUT ON THE WEBSITE, WILL BE ACCEPTED. Handwritten, annotated, copied, scanned or modified forms will be returned.

# BOARD OF BAR OVERSEERS

## REGISTRATION STATEMENT FOR *PRO HAC VICE* ATTORNEYS

Attorney name (first MI last, suffix): **David E. Warden**
Email address: **dwarden@azalaw.com**
Complete Business/Mailing Address:

**David E. Warden**
**Ahmad, Zavitsanos & Mensing, P.C.**
**1221 McKinney, Suite 2500**
**Houston, Texas 77010**

Board of Bar Overseers
Administrative Use Only

Date Received: 12-02-22
Amount Paid: $355.00
Date confirmation mailed: 12-02-22

Business phone: **(713) 655-1101**

Court in which pro hac vice admission is sought: **Essex Superior Court**

Contact number for court: **(978) 744-5500**

Party to be represented: **John Doe, Individually and on Behalf of All Others Similarly Situated**

Docket number of case (if available): **2282CV00982**

Jurisdictions to which you have been admitted: (Use second page for additional jurisdictions.)

| Type | Jurisdiction | License number |
|---|---|---|
| **State** | **Texas** | **20856750** |
| **Federal** | **US District Court, Southern District of Texas** | |
| **Federal** | **US District Court, Southern District of New York** | |
| **Federal** | **Patent & Trademark Appeal Board** | |
| **Federal** | **Federal Circuit Court of Appeals** | |
| **Federal** | **US Court of Appeals for Fifth Circuit** | |

RECEIVED
DEC 2 - 2022
MASSACHUSETTS BOARD OF BAR OVERSEERS

I certify that (check one): ( ) the party I am representing in the case for which I am seeking pro hac vice admission is an indigent client, and I understand that no pro hac vice fee is due, or (✓) I have included the required pro hac vice fee.

Further, I certify, under the pains and penalties of perjury, that I am admitted to practice and in good standing in every jurisdiction where I am admitted, and I acknowledge that I am subject to discipline by the Massachusetts Supreme Judicial Court and the Board of Bar Overseers. I understand I am limited in my legal practice in Massachusetts to the case identified above.

I certify the information I have supplied the Board of Bar Overseers is true and complete.

[signature]

Signature (Please sign inside box above.) Date:

Sign, print and mail original form to: Board of Bar Overseers, 99 High Street, 2nd Floor, Boston, MA 02110-2320

PHC-125

Jurisdictions continued:

**David E. Warden**

| Type | Jurisdiction | License number |
| --- | --- | --- |

Please remember to sign and date first page and mail original form to: Board of Bar Overseers, 99 High Street, 2nd Floor, Boston, MA 02110-2320

Date Filed 2/20/2023 3:53 PM
Superior Court - Essex
Docket Number 2277CV01000

12.2

COMMONWEALTH OF MASSACHUSETTS

ESSEX, S.S. SUPERIOR COURT

| | | |
|---|---|---|
| JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | § | C.A. No. 2277CV01000 |
| Plaintiff | § | |
| v. | § | |
| EMERSON HOSPITAL, | § | |
| Defendant. | § | |

A TRUE COPY, ATTEST
DEPUTY ASS'T. CLERK

**RULE 9A NOTICE OF FILING AND LISTING OF DOCUMENTS**

I, J. Tucker Merrigan, one of the counsel for Plaintiff, John Doe, Individually and on Behalf of All Others Similarly Situated, hereby state that the following list of documents have been submitted for filing with the Court pursuant to Superior Court Rule 9A:

1. Motion for Admission Pro Hac Vice of Foster C. Johnson, with accompanying Affidavit;
2. Motion for Admission Pro Hac Vice of David Warden, with accompanying Affidavit;
3. Motion for Admission Pro Hac Vice of Nathan Campbell, with accompanying Affidavit;
4. Motion for Admission Pro Hac Vice of Seth Meyer, with accompanying Affidavit; and
5. Motion for Admission Pro Hac Vice of Alex Dravillas, with accompanying Affidavit; and
6. Affidavit in Compliance with Superior Court Rule 9A.

Date Filed 2/20/2023 3:53 PM
Superior Court - Essex
Docket Number 2277CV01000

Respectfully Submitted
The Plaintiffs
By their Attorney,

*/s/ J. Tucker Merrigan*

J. Tucker Merrigan, BBO# 681627
**SWEENEY MERRIGAN LAW, LLP**
268 Summer Street, LL
Boston, MA 02210
Phone: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com

Dated: February 20, 2023

COMMONWEALTH OF MASSACHUSETTS

ESSEX, S.S. SUPERIOR COURT

| | | |
|---|---|---|
| JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | § | C.A. No. 2277CV01000 |
| Plaintiff | § | |
| v. | § | A TRUE COPY, ATTEST |
| EMERSON HOSPITAL, | § | DEPUTY ASS'T. CLERK |
| Defendant. | § | |

**AFFIDAVIT IN COMPLIANCE WITH SUPERIOR COUR RULE 9A**

I, J. Tucker Merrigan, hereby depose and say the following:

1. I am an attorney at the law firm of Sweeney Merrigan Law, LLP, 268 Summer Street, LL, Boston, Massachusetts 02210;

2. On February 20, 2023, I emailed a copy of the within, *Motions for Pro Hac Vice* on all counsel involved in this action;

3. On February 20, 2023, defense counsel indicated via email that they do not object to the *Motions for Pro Hac Vice*; and

4. The original pleadings are now being filed with the Court.

Signed under the penalties of perjury this 20th day of February 2023.

*/s/ J. Tucker Merrigan*
J. Tucker Merrigan

**CERTIFICATE OF SERVICE**

I, J. Tucker Merrigan, hereby certify that on February 20, 2023, in accordance with Superior Court Rule 9A, I served the within document(s):

- Motion for Admission Pro Hac Vice of Foster C. Johnson, with accompanying Affidavit;
- Motion for Admission Pro Hac Vice of David Warden, with accompanying Affidavit;
- Motion for Admission Pro Hac Vice of Nathan Campbell, with accompanying Affidavit;
- Motion for Admission Pro Hac Vice of Seth Meyer, with accompanying Affidavit; and
- Motion for Admission Pro Hac Vice of Alex Dravillas, with accompanying Affidavit;

on all counsel of record, via electronic mail to the following parties of interest:

Alan Y. Wong, Esq.
Emyr Remy, Esq.
Shook, Hardy & Bacon, LLP
One Federal Street, Suite 2540
Boston, MA 02110
awong@shb.com
remy@shb.com

*/s/ Jonathan T. Merrigan*
J. Tucker Merrigan

A TRUE COPY, ATTEST
DEPUTY ASST. CLERK

**CERTIFICATE OF SERVICE**

I, J. Tucker Merrigan, hereby certify that on February 20, 2023, in accordance with Superior Court Rule 9A, I served the within document(s):

1. *Affidavit in Compliance with Superior Court Rule 9A; and*
2. *Rule 9A Notice of Filing and Listing of Documents,*

on all counsel of record, via electronic mail to the following parties of interest:

Alan Y. Wong, Esq.
Emyr Remy, Esq.
Shook, Hardy & Bacon, LLP
One Federal Street, Suite 2540
Boston, MA 02110
awong@shb.com
remy@shb.com

*/s/ Jonathan T. Merrigan*
J. Tucker Merrigan

COMMONWEALTH OF MASSACHUSETTS

ESSEX, S.S. SUPERIOR COURT

| | | |
|---|---|---|
| JOHN DOE, individually and on behalf of all others similarly situated,<br><br>*Plaintiff,*<br><br>v.<br><br>EMERSON HOSPTIAL<br><br>*Defendant.* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | C.A. No. 2277CV01000 |

**MOTION TO APPOINT INTERIM CLASS COUNSEL**

Pursuant to Massachusetts Rule of Civil Procedure Rule 23(d), Plaintiff John Doe, individually and on behalf of all others similarly situated, respectfully submits this Motion to Appoint Interim Class Counsel. In support of the Motion to Appoint Interim Class Counsel, Plaintiff files the accompanying memorandum of law.

3/21/23 After review, the unopposed motion to appoint interim class counsel is ALLOWED. Janice W. Howe, J.

A TRUE COPY, ATTEST
DEPUTY ASST. CLERK

Dated: March 24, 2023

Respectfully submitted,

*/s/ J. Tucker Merrigan*

J. Tucker Merrigan, BBO# 681627
Erin E. McHugh, BBO# 703701
SWEENEY MERRIGAN LAW
268 Summer St. LL
Boston, MA 02210
(413) 774-5300
tucker@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Foster C. Johnson (*admitted pro hac vice*)
David Warden (*admitted pro hac vice*)
Nathan Campbell (*admitted pro hac vice*)
AHMAD ZAVITSANOS & MENSING PLLC
1221 McKinney Street, Suite 2500
Houston, Texas 77010
(713) 655-1101
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

Seth Meyer (*admitted pro hac vice*)
Alex Dravillas (*admitted pro hac vice*)
KELLER POSTMAN LLC
150 N. Riverside Plaza
Suite 4100
Chicago, Illinois 60606
(312) 741-5220
sam@kellerpostman.com
ajd@kellerpostman.com

**COUNSEL FOR PLAINTIFF JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED**

**CERTIFICATE OF CONFERENCE**

I hereby certify that on March 14, 2023, I conferred with counsel for Defendant Emerson Hospital. Emerson is not opposed to the relief requested in the Motion.

*/s/ Foster C. Johnson*
Foster Johnson

COMMONWEALTH OF MASSACHUSETTS

ESSEX, S.S. SUPERIOR COURT

JOHN DOE, individually and on behalf of all others similarly situated, §

*Plaintiff,* §

v. §

EMERSON HOSPTIAL §

*Defendant.* §

C.A. No. 2277CV01000

A TRUE COPY, ATTEST

DEPUTY ASS'T. CLERK

**MEMOADUNDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION TO APPOINT INTERIM CLASS COUNSEL**

Plaintiff John Doe ("Plaintiff"), individually and on behalf of all others similarly situated, bring this Motion to Appoint Interim Class Counsel under Massachusetts Rule of Civil Procedure Rule 23(d).

To promote the efficient and orderly prosecution of their claims, Plaintiff requests, on behalf of itself and the putative class ("Class Members"), the appointment of interim class counsel. Specifically, Plaintiff requests that the Court appoint J. Tucker Merrigan from the law firm Sweeney Merrigan Law, LLP ("Sweeney Merrigan"), Seth Meyer from the law firm Keller Postman LLC ("KP"), and Foster Johnson from the law firm Ahmad Zavitsanos & Mensing, PLLC ("AZA") as Co-Lead Interim Class Counsel ("Proposed Interim Class Counsel") in this case.

Sweeney Merrigan is a Boston-based firm specializing in plaintiff class and mass action litigation. KP is one of the nation's leading class action firms and stands at the forefront of prosecuting data privacy claims against some of the nation's largest companies, including Meta Platforms and Amazon. AZA is a successful commercial litigation firm with an expertise in sophisticated intellectual property matters that currently represents plaintiffs and putative class

members in more than two dozen class actions in state and federal court around the country against defendant hospitals based on the same privacy violations at issue in this case.

Mr. Merrigan from Sweeney Merrigan, Mr. Meyer from KP, and Mr. Johnson from AZA are qualified, and their appointment as interim class counsel will serve to protect the interests of the putative Class Members before the class is certified, promote judicial efficiencies, and advance the litigation to resolution.

## BACKGROUND

On January 20, 2023, Plaintiff filed its First Amended Class Action Complaint. Plaintiff alleges that Defendant violated their privacy rights by selling and/or bartering their personal health information to Facebook in exchange for access to Facebook's Meta Pixel tool. Jan. 30, 2023 1st Am. Compl. ¶¶ 85-140. Plaintiff alleges that Defendant installed the Meta Pixel tool to run surreptitiously on its websites in order to intercept and disclose patient communications to Facebook for marketing purposes. *Id.* Plaintiff alleges multiple state law claims on behalf of themselves and the proposed class. Id. ¶¶ 176-264.

Before filing the Original Complaint, Proposed Interim Class Counsel researched publicly available sources regarding hospitals' use of Facebook's Meta Pixel tool. Proposed Interim Class Counsel also studied the technical aspects of the Meta Pixel and interviewed potential class representatives.

In the last six months, Proposed Interim Class Counsel have drafted and filed multiple class action lawsuits in Massachusetts arising from hospitals' surreptitious use of the Meta Pixel tool to intercept and disclose their patients' private health information to Facebook, Google, and other third parties. As part of their continuing investigation, AZA has already retained a consulting

expert to assist with the litigation, served discovery, and have conferred with opposing counsel about the logistics of managing and potentially resolving the case.

## ARGUMENT

### I. Legal standard for appointing interim class counsel.

Massachusetts law requires courts to ensure that both class representatives and class counsel are capable of adequately representing and protecting the interests of all class members. Mass. R. Civ. P. 23(d). As such, the Court may "impose such terms as shall fairly and adequately protect the interests of the class in whose behalf the action is brought or defended." *Id.*

"[Massachusetts] Rule 23 was written in the light of Fed. R. Civ. P. 23," and "case law construing the Federal rule is analogous and extremely useful." *Kingara v. Secure Home Health Care Inc.*, 489 Mass. 393, 394–95 (2022); *Chambers v. RDI Logistics, Inc.*, 476 Mass. 95, 111 (2016). In the federal system, Rule 23 "authorizes the court to designate interim counsel during the pre-certification period if necessary to protect the interests of the putative class." Advisory Committee Notes to Rule 23(g)(2)(A). Furthermore, the *Manual of Complex Litigation* instructs that courts ensure that lawyers seeking appointment as class counsel will fairly and adequately represent the interests of the class. § 21.27 (4th ed.); *see Gelboim v. Bank of Am. Corp.*, 574 U.S. 405, 410 (2015); *Gov't Employees Hosp. Ass'n v. Serono Intern., S.A.*, 246 F.R.D. 93, 96 (D. Mass. 2007).

Federal courts regularly appoint interim class counsel before certifying a class to ensure the interests of all putative class members are adequately represented. *See Gamboa v. Ford Motor Co.*, 381 F. Supp. 3d 853, 867 (E.D. Mich. 2019); *Ekin v. Amazon Servs., LLC, No.* 14-CV-0244, 2014 WL 12028588, at *3 (W.D. Wash. May 23, 2014).

The attorneys designated by the court "assume a responsibility to the court and an obligation to act fairly, efficiently, and economically in the interests of all parties and parties' counsel." Fed. R. Civ. P. 23(g); *In re Municipal Derivatives Antitrust Litig.*, 252 F.R.D. 184, 185 (S.D.N.Y. 2008) (internal citations committed) (Implementing an organization structure early in a consolidated case is helpful because it "clarifies responsibility for protecting the interests of the class during precertification activities."). "[D]esignation of interim counsel clarifies responsibility for protecting the interests of the class during precertification activities, such as making and responding to motions, conducting any necessary discovery, moving for class certification, and negotiating settlement." *Manual for Complex Litigation* § 21.11 (4th ed.); *accord* Advisory Committee Notes to Rule 23(g)(2)(A) (Rule 23 "authorizes [a] court to designate interim counsel during the pre-certification period if necessary to protect the interests of the putative class.").

Likewise, Massachusetts Rule of Civil Procedure 23 permits courts to impose terms to "fairly and adequately protect the interests of the class." Under the analogous Federal Rule 23(g)(1)(A), courts consider the four factors in determining the appropriateness of class counsel, along with interim class counsel. *See Ark. Teacher Ret. Sys. v. State St. Corp.*, No. 11-CV-10230, 2012 WL 13118446, at *2 (D. Mass. Jan. 12, 2012); *In re Air Cargo Shipping Serv. Antitrust Litig.*, 240 F.R.D. 56, 57 (E.D.N.Y. 2006); *Kingara*, 489 Mass. at 394–95 (in evaluating Massachusetts Rule 23, "case law construing the Federal rule is analogous and extremely useful").

(i) the work counsel has done in identifying or investigating potential claims in the action;

(ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;

(iii) counsel's knowledge of the applicable law; and

(iv) the resources that counsel will commit to representing the class.

Fed. R. Civ. P. 23(g)(1)(A)(i)-(iv). "In evaluating prospective class counsel, the court should weigh all pertinent factors. No single factor should necessarily be determinative in a given case." Advisory Committee Notes to the 2003 Amendments to Fed. R. Civ. P. 23(g). Each of these factors supports Proposed Interim Class Counsel's application for appointment as counsel for the class. The Court may also "consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B).

## II. The Court should appoint Proposed Interim Class Counsel.

### A. Proposed Interim Class Counsel have done extensive work investigating and prosecuting Plaintiff's claims.

Proposed Interim Class Counsel have already spent significant time and energy investigating the merits and vetting the potential claims in this case. Ex. A ¶ 4 (Merrigan Decl.); Ex. B ¶ 4 (Meyer Decl.); Ex. C ¶ 4 (Johnson Decl.). Proposed Interim Class Counsel have interviewed class representatives, conferred with proposed Class Members, conducted significant factual and legal research, and retained a consulting expert to assist with vetting Plaintiff's and Class Members' claims. Ex. C ¶ 5 (Johnson Decl.). These investigations are informed by Proposed Interim Class Counsel's extensive experience in class action litigation. *See* Ex. A ¶ 4 (Merrigan Decl.); Ex. B ¶ 4 (Meyer Decl.); Ex. C ¶ 4 (Johnson Decl.). The eighty-page complaint filed on behalf of Plaintiff is a testament to the time and resources counsel have expended thus in this litigation on behalf of the Class Members.

Courts have commented that the effort put in by the attorneys and the skill required to investigate and draft a thorough complaint is an important consideration in deciding who to appoint as interim class counsel. "'All other things being equal,' if an attorney has performed the investigatory and analytical tasks necessary to draft the complaint, unless that attorney has merely copied a complaint from another action, 'he or she is in a better position to represent the class

fairly and adequately than attorneys who have not undertaken those tasks.'" *In re iPhone 4S Consumer Litig.*, No. 12-CV-1127, 2012 WL 12960637, at *1 (N.D. Cal. July 5, 2012) (quoting 5 Moore's Federal Practice § 23.120[3][a]). That test is more than satisfied here.

**B. The Class Members will benefit from the appointment of interim class counsel.**

The Court should appoint interim class counsel in order to protect the interests of the class. Appointing Proposed Interim Class Counsel facilitates a cooperative and organized prosecution and protects the putative Class Members' interests. For example, appointing interim class counsel is necessary to avoid the complications that arise from duplicative suits asserting the same claims, or even the risk of such filings. Multiple identical or similar actions prevent efficient prosecution of claims, result in disjointed legal strategy, and cause prejudice to both defendants, plaintiffs, and putative class members. *See Gamboa*, 381 F. Supp. 3d at 867 ("Designation of interim counsel is particularly appropriate when a number of lawyers have filed related 'copycat' actions."); *Ekin*, 2014 WL 12028588, at *3 ("[D]esignation of interim counsel clarifies responsibility for protecting the interests of the class during precertification activities, such as making and responding to motions, conducting any necessary discovery, moving for class certification, and negotiating settlement.") (quoting Manual of Complex Litigation § 21.11 (4th ed.)).

These concerns are not unfounded. Proposed Interim Class Counsel have already seen multiple copycat filings in related Meta Pixel cases in Massachusetts. Ex. C ¶ 10 (Johnson Decl.). Even if no other cases are filed, however, courts regularly consider the risk or likelihood of such filings as counseling in favor of appointing interim class counsel. *See, e.g., Tolmasoff v. General Motors, LLC*, No. 16-11747, 2016 WL 3548219, at *9 (E.D. Mich. June 30, 2016) (appointing two law firms as interim class counsel where "other[] [similar cases] may follow.").

Appointing Proposed Interim Class Counsel will also benefit the Class Members by allowing the firms to pool their resources, coordinate litigation efforts, and remove redundancies. For example, Proposed Interim Class Counsel will allocate resources for briefing, attending hearings, reviewing documents, taking and defending depositions, and coordinating with expert witnesses. Proposed Interim Class Counsel have already started this process by drafting and serving discovery on Defendants and conferring with opposing counsel on case management. Ex. A ¶ 13 (Merrigan Decl.); Ex. B ¶ 13 (Meyer Decl.); Ex. C ¶ 15 (Johnson Decl.). In short, appointing interim class counsel will streamline the prosecution of this case by allowing the attorneys to work towards one coordinated class certification strategy.

**C. Mr. Merrigan, Mr. Meyer and Mr. Johnson are eminently qualified to be Co-Lead Interim Class Counsel.**

**1. Mr. Merrigan is the co-managing partner of Boston-based law firm Sweeney Merrigan.**

Sweeney Merrigan is a Boston-based law firm that has extensive experience handling complex litigation and class actions, including class action and consolidated mass tort litigation. Ex. A ¶ 6 (Merrigan Decl.) For instance, it served as local counsel litigating on behalf of 123 Massachusetts cities and towns against manufacturers and distributors of prescription opioid medications for alleged consumer protection violations. *Id.; In re National Prescription Opiate Litigation*, Master Docket Number 1:17-MD-2804 (N.D. Ohio). It successfully prosecuted these claims and obtained settlements of more than $500 million for Massachusetts and its municipal entities. Ex. A ¶ 6 (Merrigan Decl.). Likewise, Sweeney Merrigan is prosecuting a class action for residents of Westminster, Massachusetts per- and polyfluorinated substance (PFAS) contamination. Ex. A ¶ 6 (Merrigan Decl.); *see Ryan et al. v. Greif et al.*, No. 22-cv-40089 (D. Mass.).

Lawyers at Sweeney Merrigan have also served on attorney leadership committees and as liaison counsel in mass and class actions in Massachusetts federal court and state court. Ex. A ¶ 7 (Merrigan Decl.); *In re Shield Health Care Group, Inc.*, No. 1-22-cv-10901-PBS (D. Mass.) (Executive Committee); *In re Columbia Gas*, Civil Action No. 1877CV01343G (Mass. Super. Ct.) (Liaison Counsel). Finally, Sweeney Merrigan has experience in data breach security class actions, *In re Shield Health Care Group, Inc.*, No.: 1-22-cv-10901 (D. Mass.) (case impacting over two million patients' private data and information), and currently represents other putative classes in Massachusetts state and federal court against hospitals for state law violations arising from their use of the Meta Pixel tool to intercept and disclose patient health information, including the four pending in Massachusetts. Ex. A ¶ 8 (Merrigan Decl.).

Mr. Merrigan has extensive experience in class and mass action litigation. Ex. A ¶ 9 (Merrigan Decl.). He is co-managing partner at Sweeney Merrigan and is currently a member a member of the American Association for Justice, Massachusetts Academy of Trial Attorneys, the Boston Bar Association, and Massachusetts Bar Association. *Id.* Mr. Merrigan graduated from New England School of Law and earned his bachelor's degree in Political Science at Tufts University. *Id.*

**2. Seth Meyer created and leads KP's data privacy practice group.**

KP is one of the nation's preeminent firms specializing in complex civil litigation. Ex. B ¶ 5 (Meyer Decl.). Its practice includes numerous high-profile privacy, antitrust, and consumer protection class actions. It has also been at the forefront of complex litigation related to data breach issues. *Id.*

In the class action arena, KP has litigated several significant matters, including the following:

- *West et al v. Amazon.com Inc.*, No. 2:21-cv-00694, United States District Court for the Western District of Washington
- *C.O., a minor, v. Amazon.com Inc. et al*, No. 2:19-cv-00910, United States District Court for the Western District of Washington
- *Fishon et al v. Peloton Interactive, Inc.*, No. 1:19-cv-11711, United States District Court for the Southern District of New York
- *Richard A. Ross and Fieldstone Ventures, LLC v. EQT Corporation et al.*, No. GD-21-011948, Fifth Judicial District of Pennsylvania, County of Allegheny
- *Hestrup & Peiss v. DuPage Medical Group. Ltd. d/b/a DuPage Medical Group*, Case No. 2021L000937, 18th Judicial Court, DuPage County, Illinois
- *Gilbert v. AFTRA Retirement Fund et al*, Case No. 1:20-cv-10834, United States District Court for the Southern District of New York
- *Hall, et al v. AspenPointe, Inc., et al*, Case No. 2020CV32175, 4th District Court, County of El Paso, Texas
- *Hackerott v. Central Kansas Orthopedic Group, Inc.*, et al, Case No. 2020-cv-000120, District Court of Barton County, Kansas

Ex. B ¶ 7 (Meyer Decl.). Lawyers at KP recently served as counsel for a putative class and secured a favorable settlement in Massachusetts federal court. *Barr et al. v. Drizly*, No. 1:20-cv-11492 (D. Mass.). *Id.*

In 2021, KP's innovative approach and successful outcomes led it to be named Trial Strategy Innovation Law Firm of the Year by the National Law Journal and American Lawyer Media at the Elite Trial Lawyers Awards. More recently, KP was named the National Law Journal's 2022 Privacy & Data Breach Law Firm of the Year. Ex. B ¶ 6 (Meyer Decl.).

Mr. Meyer has been appointed as class counsel for numerous certified and putative classes of individuals whose information has been compromised through one or more data breaches. Ex. B ¶ 8 (Meyer Decl.). Mr. Meyer has over eight years of experience litigating class action cases like the instant case. Ex. B ¶ 9 (Meyer Decl.). He received his J.D. from the University of Virginia Law

School where he was a member of the Order of the Coif. *Id.* After law school, he clerked for the Honorable Richard F. Suhrheinrich on the United States Court of Appeals for the Sixth Circuit. *Id.*

**3. Foster Johnson and AZA have extensive experience handling complex commercial cases and class actions.**

AZA is a fifty-lawyer firm specializing in commercial and patent technology litigation with extensive experience handling complex litigation and class actions. Ex. C ¶ 6 (Johnson Decl.). Chambers USA, the independent and prestigious legal guide, has consistently ranked AZA among the top Texas law firms for both commercial litigation and intellectual property work. *Id.* AZA's attorneys have litigated and tried all types of breach of contract and business tort cases in federal and state courts and arbitration panels across the country. *Id.* Major corporations and senior executives regularly hire AZA to prosecute and defend their high-profile, difficult, and complex cases. *Id.* For instance, last year, AZA won a $62.65 million verdict after a seven-week trial from a Nevada jury in a nationally watched case for emergency room physician group clients who were underpaid by United Healthcare, the largest insurer in the nation. In 2019, AZA defended a midstream oil and gas company against a claim for $250 million related to the building of an oil refining unit. *Id.*

AZA has similar experience in intellectual property litigation and is consistently ranked by Chambers USA in this area. Ex. C ¶ 7 (Johnson Decl.). For example, AZA's attorneys have successfully prosecuted patent infringement cases involving complex technology against some of the biggest technology companies in the world, including Apple, Samsung, Motorola, and Garmin. *Id.*

AZA also routinely handles mass and class actions from both the plaintiff and defense side. Ex. C ¶ 8 (Johnson Decl.). For instance, lawyers at the firm have recovered nearly $1 billion on behalf of nationwide class of homeowners whose homes had defective plumbing systems. *Id.*

Lawyers at AZA have also recovered more than $450 million on behalf of nationwide class of investors in the Courtyard, Fairfield Inn and Residence Inn limited partnerships and more than $425 million in a mass action on behalf of individuals who underwent unnecessary heart valve surgeries. *Id.* AZA is also representing more than 120 clients whose homes were flooded during Hurricane Harvey because of government action at the Addicks Barker dams. *In re Upstream Addicks and Barker (Texas Flood Control Reservoirs*, Sub-Master Docket No. 17-9001 (Fed. Cl. 2021).

In the data privacy space, AZA is currently prosecuting more than two dozen data privacy class actions in multiple states on behalf of patients whose personal health information was shared with Facebook in violation of state and federal law. Ex. C ¶ 9 (Johnson Decl.). These include multiple class actions in Massachusetts:

- *Jane Doe, Individually and on Behalf of All Others Similarly Situated v. Atrius Health, Inc.;* C.A. No. 2282CV00982; Norfolk Superior Court
- *John Doe, James Doe, and Jane Doe, Individually and on Behalf of All Others Similarly Situated v. Southcoast Hospitals Group, Inc. d/b/a St. Luke's Hospital, Tobey Hospital, Southcast Behavioral Health, and Charleston Memorial Hospital*; C.A. No. 2273cv00673; Bristol Superior Court
- *John Doe Individually and on Behalf of All Others Similarly Situated v. UMass Memorial Health Care*; C.A. No. 2285CV01205; Worcester Superior Court
- *John Doe Individually and on Behalf of All Others Similarly Situated v. Cape Cod Healthcare, Inc.* No. 1:23-cv-10080, United States District Court for the District of Massachusetts (removed from the Barnstable Superior Court, 2272CV00493)

*Id.*

Mr. Johnson is a partner at AZA and has extensive experience in class action litigation as counsel for both plaintiffs and defendants. Ex. C ¶¶ 1, 11 (Johnson Decl.). He is a charter member

of AZA's Class Action Group, and currently spearheads more than two dozen of class action cases filed against hospitals for state law violations arising from their use of the Meta Pixel tool to intercept and disclose patient health information, including the four pending in Massachusetts. Ex. C ¶ 11 (Johnson Decl.).

Mr. Johnson received his J.D. and undergraduate degrees from Stanford University. Ex. C ¶ 12 (Johnson Decl.). After law school, Mr. Johnson clerked for the Honorable Priscilla Owen of the United States Court of Appeals for the 5th Circuit. *Id.*

**C. Proposed Interim Class Counsel have a deep understanding of the applicable law.**

Proposed Interim Class Counsel have strong backgrounds in complex commercial and class action litigation. They have a demonstrated ability to manage intensive and complex fact and expert discovery in all types of commercial cases, including ones involving the technology at issue. Accordingly, they have requisite knowledge of the applicable facts and law necessary to navigate the challenges that will arise in these types of litigation. *See* Fed. R. Civ. P. 23(g)(1)(A)(iii).

**D. Proposed Interim Class Counsel are committed to and will jointly expend all necessary efforts and resources to vigorously pursue litigation.**

Sweeney Merrigan, KP, and AZA have the resources necessary to lead this litigation and have extensive experience successfully managing complex, resource-intensive cases of all sorts. Ex. A ¶ 10 (Merrigan Decl.); Ex. B ¶ 10 (Meyer Decl.); Ex. C ¶ 13 (Johnson Decl.). For instance, the firms have the necessary technology to handle voluminous discovery, including the types of discovery anticipated in this case. Ex. A ¶ 10 (Merrigan Decl.); Ex. B ¶ 10 (Meyer Decl.); Ex. C ¶ 13 (Johnson Decl.). Furthermore, they have the experienced attorneys and support professionals to staff the case. Ex. A ¶ 10 (Merrigan Decl.); Ex. B ¶ 10 (Meyer Decl.); Ex. C ¶ 13 (Johnson Decl.). Each firm has designated a list of attorneys who will bring their unique skills and

experience to representing the Class. Ex. A ¶ 10 (Merrigan Decl.); Ex. B ¶ 10 (Meyer Decl.); Ex. C ¶ 13 (Johnson Decl.).

Proposed Interim Class Counsel regularly advance the costs of litigation and are committed to dedicating substantial resources to vigorously prosecute the claims in this case for the potential class. Ex. A ¶ 11 (Merrigan Decl.); Ex. B ¶ 11 (Meyer Decl.); Ex. C ¶ 14 (Johnson Decl.). Proposed Interim Class Counsel will also strive to avoid waste and duplication in favor of efficiency. Ex. A ¶ 11 (Merrigan Decl.); Ex. B ¶ 11 (Meyer Decl.); Ex. C ¶ 15 (Johnson Decl.).

Proposed Interim Class Counsel fully understand the substantial investment of time and resources necessary to properly pursue and lead such litigations and are committed to devoting the necessary resources to this case. Ex. A ¶ 12 (Merrigan Decl.); Ex. B ¶ 12 (Meyer Decl.); Ex. C ¶ 15 (Johnson Decl.). Proposed Interim Class Counsel are committed to prosecuting this action in the best interests of the Class Members and indicating their rights. Ex. A ¶ 12 (Merrigan Decl.); Ex. B ¶ 12 (Meyer Decl.); Ex. C ¶ 15 (Johnson Decl.).

## CONCLUSION

Proposed Interim Class Counsel are the attorneys who have already done the "heavy lifting" with respect to investigating and crafting the claims at issue. The Proposed Interim Class Counsel and their respective law firms bring the decades of experience dealing with complex and class action cases to successfully prosecute and resolve this suit. In short, Proposed Interim Class Counsel represents the best choice to lead this case and protect the interests of the Class Members.

Dated: March 24, 2023

Respectfully submitted,

*/s/ J. Tucker Merrigan*

J. Tucker Merrigan, BBO# 681627
Erin E. McHugh, BBO# 703701
SWEENEY MERRIGAN LAW
268 Summer St. LL
Boston, MA 02210
(413) 774-5300
tucker@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Foster C. Johnson (*admitted pro hac vice*)
David Warden (*admitted pro hac vice*)
Nathan Campbell (*admitted pro hac vice*)
AHMAD ZAVITSANOS & MENSING PLLC
1221 McKinney Street, Suite 2500
Houston, Texas 77010
(713) 655-1101
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

Seth Meyer (*admitted pro hac vice*)
Alex Dravillas (*admitted pro hac vice*)
KELLER POSTMAN LLC
150 N. Riverside Plaza
Suite 4100
Chicago, Illinois 60606
(312) 741-5220
sam@kellerpostman.com
ajd@kellerpostman.com

**COUNSEL FOR PLAINTIFF JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED**

COMMONWEALTH OF MASSACHUSETTS

ESSEX, S.S. SUPERIOR COURT

JOHN DOE, individually and on behalf of all others similarly situated, § C.A. No. 2277CV01000

*Plaintiff,*

v.

EMERSON HOSPTIAL

*Defendant.*

A TRUE COPY, ATTEST
DEPUTY ASST. CLERK

**DECLARATION OF J. TUCKER MERRIGAN IN SUPPORT OF PLAINTIFF'S MOTION FOR APPOINTMENT OF INTERIM CLASS COUNSEL**

I, J. Tucker Merrigan Johnson, hereby declare as follows:

1. I am an attorney and co-managing partner at Sweeney Merrigan Law, LLP ("Sweeney Merrigan") and counsel for Plaintiff ("Plaintiff") in the above-captioned case.

2. I am fully familiar with the facts and circumstances surrounding this matter, and I have prepared this Declaration in Support of Plaintiff's Motion to Appoint Interim Class Counsel.

3. The following statements are based on my personal knowledge and review of the facts and, if called on to do so, I could and would testify competently thereto.

4. Sweeney Merrigan has spent significant amounts of time and energy investigating the merits and vetting the potential claims in this case. Sweeney Merrigan first researched the complex Meta Pixel tools that hospitals are using and then investigated whether Defendant's websites were using them and to what extent. Sweeney Merrigan then conducted extensive research regarding Defendant's potential liability, including claims for wiretapping, breach of fiduciary duty, and invasion of privacy arising from Defendant's disclosure of its patients' personal health information to third parties, including Facebook and Google.

5. Sweeney Merrigan has interviewed potential fact witnesses concerning evidence and conferred with proposed Class Members.

6. Sweeney Merrigan is a Boston-based law firm that has extensive experience handling complex litigation and class actions, including class action and consolidated mass tort litigation. For instance, it served as local counsel litigating on behalf of 123 Massachusetts cities and towns against manufacturers and distributors of prescription opioid medications for alleged consumer protection violations. *In re National Prescription Opiate Litigation*, Master Docket Number 1:17-MD-2804 (N.D. Ohio). In that case, it successfully prosecuted these claims and obtained settlements of more than $500 million for Massachusetts and its municipal entities. Sweeney Merrigan is also prosecuting a class action for residents of Westminster, Massachusetts per- and polyfluorinated substance (PFAS) contamination. Ex. A ¶ 6 (Merrigan Decl.); *see Ryan et al. v. Greif et al.*, No. 22-cv-40089 (D. Mass.).

7. Lawyers at Sweeney Merrigan have also served on attorney leadership committees and liaison counsel in mass and class actions, in Massachusetts federal court and state court. *In re Shield Health Care Group, Inc.*, No. 1-22-cv-10901 (D. Mass.) (Executive Committee); *In re Columbia Gas*, Civil Action No. 1877CV01343G (Mass. Super. Ct.) (Liaison Counsel).

8. Sweeney Merrigan has experience in data breach security class actions, *In re Shield Health Care Group, Inc.*, No.: 1-22-cv-10901 (D. Mass.) (case impacting over 2 million patients' private data and information), and currently represents other putative classes in Massachusetts state and federal court against hospitals for state law violations arising from their use of the Meta Pixel tool to intercept and disclose patient health information:

- *Jane Doe, Individually and on Behalf of All Others Similarly Situated v. Atrius Health, Inc.;* C.A. No. 2282CV00982; Norfolk Superior Court

- *John Doe, James Doe, and Jane Doe, Individually and on Behalf of All Others Similarly Situated v. Southcoast Hospitals Group, Inc. d/b/a St. Luke's Hospital, Tobey Hospital, Southcast Behavioral Health, and Charleston Memorial Hospital*; C.A. No. 2273cv00673; Bristol Superior Court

- *John Doe Individually and on Behalf of All Others Similarly Situated v. UMass Memorial Health Care*; C.A. No. 2285CV01205; Worcester Superior Court

- *John Doe Individually and on Behalf of All Others Similarly Situated v. Cape Cod Healthcare, Inc.* No. 1:23-cv-10080, United States District Court for the District of Massachusetts (removed from the Barnstable Superior Court, 2272CV00493)

9. I have extensive experience in class and mass action litigation. I am the co-managing partner at Sweeney Merrigan and am currently a member a member of the American Association for Justice, Massachusetts Academy of Trial Attorneys, the Boston Bar Association, and Massachusetts Bar Association. I graduated from New England School of Law and earned his bachelor's degree in Political Science at Tufts University.

10. Sweeney Merrigan has the resources necessary to lead this litigation and has extensive experience successfully managing complex, resource-intensive cases of all sorts. Sweeney Merrigan has the necessary technology to handle voluminous and complex discovery, including the types of discovery anticipated in this case. Furthermore, we have experienced attorneys and support professionals to staff the case. We have designated a list of primary of attorneys who will bring their unique skills and experience to representing the Class.

11. Sweeney Merrigan regularly advances the costs of litigation and is committed to dedicate substantial resources to vigorously prosecute the claims in this case for the potential class.

12. If appointed Interim Class Counsel, I will strive to avoid waste and duplication in favor of efficiency. I fully understand the substantial investment of time and resources necessary to properly pursue and lead such litigations and are committed to devoting the necessary resources

to this case. I and Sweeney Merrigan are absolutely committed to prosecuting this action in the best interests of the proposed class and indicating their rights.

13. Sweeney Merrigan, AZA, and Keller Postman, have also jointly served discovery in this case and have conferred with opposing counsel about the logistics of managing and resolving the case.

14. A copy of Sweeney Merrigan's firm resume is attached hereto as Exhibit 1.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 22nd day of March 2023, in Boston, Massachusetts.

*/s/ Tucker Merrigan*
J. TUCKER MERRIGAN

# J. Tucker Merrigan

J. Tucker Merrigan is co-managing partner at Sweeney Merrigan Law, LLP. He started Sweeney Merrigan Law with his brother and fellow co-managing partner, Peter M. Merrigan, in 2010. Since, Sweeney Merrigan Law has become a Massachusetts and National powerhouse in the practice of plaintiff's litigation. It has been many years since the firm began with its first settlement of $9,500.00 and has evolved to recovering over $84 Million in its most recent litigation.

Much of the success attributable to Sweeney Merrigan is a direct product of Attorney Merrigan's commitment the firm's reputation as practicing with the highest integrity and genuine commitment to the craft of passionately advocating for his clients. Along with his brother, Peter, they have assembled a team of New England's very best and most aggressive litigators and trial attorneys in the area of plaintiff's injury litigation.

Attorneys Tucker and Peter Merrigan have devoted much of their practice to representing over 125 Massachusetts Cities and Towns in the National Opioid Litigation, filing lawsuits against some of the world's largest companies for their roles in causing the Opioid Crisis. Born in Greenfield, Massachusetts, Tucker takes great pride that his hometown of Greenfield was the first City to file suit in the Opioid Litigation in December 2017.

Boston personal injury attorney Tucker Merrigan is admitted to practice law in the Commonwealth of Massachusetts. His practice concentrates on cases involving personal injury, defective medical devices, dangerous drugs, wrongful death, premises liability, products liability, medical malpractice, and insurance law.

Attorney Merrigan is currently a member of the American Association for Justice, Massachusetts Academy of Trial Attorneys, the Boston Bar Association, and Massachusetts Bar Association. From 2015-2021, J. Tucker Merrigan was named a Top 40 Under 40 Trial Attorney by National Trial Lawyers. From 2018-2021, Attorney Merrigan was named a Rising Star by Super Lawyers. Tucker graduated from New England School of Law and earned his bachelor's degree in Political Science at Tufts University.

J. Tucker Merrigan is a graduate of New England Law, Boston. While in undergraduate at Tufts University, Tucker was captain of the Varsity Men's lacrosse team at Tufts, earning All-American and Scholar All-America honors. He volunteers as a Big-Brother in the Big-Brother Big-Sister foundation of the greater Boston area.

EXHIBIT
1
exhibitsticker.com

# Areas of Practice in Boston, Massachusetts:

Personal Injury – Plaintiff

Motor Vehicle Accidents

Mass Torts: Dangerous Drugs & Defective Medical Devices

Products Liability

Medical Malpractice

Bicycle Accidents

# Professional Associations and Memberships:

American Association for Justice

Massachusetts Academy of Trial Attorneys

Boston Bar Association, Member

Massachusetts Bar Association, Member

# Education:

New England School of Law, Boston, Massachusetts

Tufts University, Medford, Massachusetts

Loomis Chaffee, Windsor, Connecticut

# Litigation Percentage:

100% of Practice Devoted to Litigation

# Bar Admissions:

Massachusetts

United States District Court, Massachusetts

# Awards and Honors:

2023 Best Lawyers in America – Medical Malpractice Law – Plaintiffs

2018-2022 Rising Star, Super Lawyers

2015-2022 Top 40 Under 40, National Trial Lawyers

2020-2022 Lawyer.com Top Attorney Award

Superb Attorney, Avvo Rating

COMMONWEALTH OF MASSACHUSETTS

ESSEX, S.S. SUPERIOR COURT

| | | |
|---|---|---|
| JOHN DOE, individually and on behalf of all others similarly situated,<br><br>*Plaintiff,*<br><br>v.<br><br>EMERSON HOSPTIAL<br><br>*Defendant.* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | C.A. No. 2277CV01000<br><br>A TRUE COPY, ATTEST<br>DEPUTY ASST. CLERK |

**DECLARATION OF SETH MEYER IN SUPPORT OF PLAINTIFF'S MOTION FOR APPOINTMENT OF INTERIM CLASS COUNSEL**

I, Seth Meyer, hereby declare as follows:

1. I am an attorney and partner at Keller Postman LLC ("KP") and counsel for Plaintiffs John Doe ("Plaintiff") in the above-captioned case.

2. I am fully familiar with the facts and circumstances surrounding this matter, and I have prepared this Declaration in Support of Plaintiff's Motion to Appoint Interim Class Counsel.

3. The following statements are based on my personal knowledge and review of the facts and, if called on to do so, I could and would testify competently thereto.

4. KP has spent significant amounts of time and energy investigating the merits and vetting the potential claims in this case. KP first researched the complex Meta Pixel tools that hospitals are using and then investigated whether Defendant's websites were using them and to what extent. KP then conducted extensive research regarding Defendant's potential liability, including claims for wiretapping, breach of fiduciary duty, and invasion of privacy arising from Defendant's disclosure of its patients' personal health information to third parties, including Facebook and Google.

5. KP is one of the nation's preeminent firms specializing in complex civil litigation. Its practice includes numerous high-profile privacy, antitrust, and consumer protection class actions. It has been at the forefront of complex litigation related to data breach issues.

6. In 2021, KP was named Trial Strategy Innovation Law Firm of the Year by the National Law Journal and American Lawyer Media at the Elite Trial Lawyers Awards. More recently, KP was named the National Law Journal's 2022 Privacy & Data Breach Law Firm of the Year.

7. Lawyers at KP recently served as counsel for a putative class and secured a favorable settlement in Massachusetts federal court. *Barr et al. v. Drizly*, No. 1:20-cv-11492 (D. Mass.). KP and my significant class action experience includes the following:

- *West et al v. Amazon.com Inc.*, No. 2:21-cv-00694, United States District Court for the Western District of Washington
- *C.O., a minor, v. Amazon.com Inc. et al*, No. 2:19-cv-00910, United States District Court for the Western District of Washington
- *Fishon et al v. Peloton Interactive, Inc.*, No. 1:19-cv-11711, United States District Court for the Southern District of New York
- *Richard A. Ross and Fieldstone Ventures, LLC v. EQT Corporation et al.*, No. GD-21-011948, Fifth Judicial District of Pennsylvania, County of Allegheny
- *Hestrup & Peiss v. DuPage Medical Group. Ltd. d/b/a DuPage Medical Group*, Case No. 2021L000937, 18th Judicial Court, DuPage County, Illinois
- *Gilbert v. AFTRA Retirement Fund et al*, Case No. 1:20-cv-10834, United States District Court for the Southern District of New York
- *Hall, et al v. AspenPointe, Inc., et al*, Case No. 2020CV32175, 4th District Court, County of El Paso, Texas
- *Hackerott v. Central Kansas Orthopedic Group, Inc.*, et al, Case No. 2020-cv-000120, District Court of Barton County, Kansas.

8. I have been appointed class counsel for numerous certified and putative classes of individuals whose information has been compromised by one or more data breaches.

9. I have over eight years of experience litigating class action cases like the instant case. I received my J.D. from the University of Virginia Law School where I was a member of the Order of the Coif. After law school, I clerked for the Honorable Richard F. Suhrheinrich on the United States Court of Appeals for the Sixth Circuit.

10. KP has the resources necessary to lead this litigation and has extensive experience successfully managing complex, resource-intensive cases of all sorts. KP has the necessary technology to handle voluminous and complex discovery, including the types of discovery anticipated in this case. Furthermore, we have experienced attorneys and support professionals to staff the case. KP has also designated a list of attorneys who will bring their unique skills and experience to representing the Class.

11. KP regularly advances the costs of litigation and is committed to dedicating substantial resources to vigorously prosecute the claims in this case for the class members.

12. If appointed Interim Class Counsel, I will strive to avoid waste and duplication in favor of efficiency. I fully understand the substantial investment of time and resources necessary to pursue and lead such litigations, and my firm is committed to devoting the necessary resources to this case and prosecuting this action in the best interests of the proposed class.

13. Additionally, AZA and KP have also jointly served discovery in this case and have conferred with opposing counsel about the logistics of managing and resolving the case.

14. A copy of KP's firm resume is attached hereto as Exhibit 1.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 23rd day of March 2023, in Chicago, Illinois.

*/s/ Seth A. Meyer*
SETH A. MEYER

# Keller | Postman

EXHIBIT
1
exhibitsticker.com

Firm Resume

# Table of Contents

About Keller Postman ....................3

About Our Team ....................4

Why Keller Postman ....................5

Awards ....................6

Privacy Practice & Case Highlights ....................7

Attorney Biographies ....................12

# About Keller Postman

**Keller Postman** is a leading complex litigation firm for plaintiffs, specializing in mass actions. We represent clients in class actions, mass torts, and mass arbitrations, at the trial and appellate levels, in federal and state courts.



## Our Mission

To achieve exceptional results for our clients, drive innovation in the practice of law, and pursue unparalleled excellence in everything we do.

## Our Approach

Serving hundreds of thousands of clients in litigation and arbitration, Keller Postman has prosecuted high-profile antitrust, privacy, product-liability, employment, and consumer-rights cases and secured substantial settlements for our clients. Our firm also acts as plaintiffs' counsel in high-stakes public-enforcement actions.

Keller Postman seeks out complicated cases and takes on groundbreaking legal challenges where our legal and strategic counsel can add significant value. Our innovative approach combines high-end legal expertise with best practices in business operations and technology to deliver superlative representation for plaintiffs.

Our greatest asset is our team of smart, dedicated professionals. Keller Postman lawyers honed their skills at AmLaw 100 law firms, national trial boutiques, corporate in-house legal departments, prestigious government posts, and successful business startups. Every member of our team shares a commitment to client service and a spirit of determination, dedication, creativity, and excellence.

**OUR TEAM**

7 PARTNERS

21 ASSOCIATES

11 STAFF ATTORNEYS & COUNSEL

20 LEGAL SUPPORT TEAM MEMBERS

26 CLIENT SERVICES TEAM MEMBERS

18 CASE MANAGEMENT TEAM MEMBERS

29 BUSINESS, OPERATIONS & IT TEAM MEMBERS

**OUR OFFICES**

CHICAGO

WASHINGTON, D.C.

AUSTIN

MIAMI





# About Our Team

## Keller Postman is home to one of the most exceptional teams representing plaintiffs in the United States.

We're powered by a talented team with top-notch credentials and real-world experience. Our lawyers have litigated "bet the company" cases for plaintiffs and defendants, studied and taught at some of the top law schools in the country, served at the highest levels of government, and managed more than $1 billion of litigation-related investments.

THE FIRM COMPRISES MORE THAN **FOUR DOZEN LAWYERS** AND MORE THAN **140 PROFESSIONAL STAFF MEMBERS.**

**CLIENT SERVICES & CASE MANAGEMENT TEAM**
We have established large, in-house client-services and case-management teams to serve our clients from the early stages of litigation to the final moments of settlement distributions. We expertly and efficiently cover all aspects of our cases, including client intake, case workup, and litigation at all levels of the judiciary.

**TECHNOLOGY, DATA & ANALYTICS TEAM**
Keller Postman operates a dedicated, in-house technology, data, and analytics team, led by an accomplished graduate of the Massachusetts Institute of Technology. Our firm utilizes cutting-edge technology and processes to ensure successful litigation for thousands of claims at once.

**OF KELLER POSTMAN'S PARTNERS AND ASSOCIATES:**

**82%**

hail from **national defense-oriented law firms**, and 71% from AmLaw 25 firms and elite trial boutiques.

**71%**

were **law clerks** at a federal court of appeals or district court.

**78%**

attended a **Top 15 U.S. News ranked law school.**

**4**

of Keller Postman's attorneys were **law clerks at the Supreme Court of the United States.**

# Why Keller Postman

CLIENTS FIRST APPROACH

Our primary goal is always to achieve exceptional results for our clients—we are tireless in our pursuit of justice on their behalf. We move with speed and efficacy. We genuinely care about each individual client, and we demonstrate that by providing outstanding client service.

FEARLESS INNOVATION

We drive innovation in the practice of law, sharing an ambition to do things differently—and to do them better. It is not enough merely to advocate for our clients. We prize creativity, develop and harness our own technology, and commit the resources necessary to succeed.

COMMITTED TO EXCELLENCE

We pursue unparalelled excellence in everything we do. We challenge ourselves to perform at the highest level and deliver outstanding results. At every level of the firm, we take pride in serving as trusted advisors and provide exceptional client service.

STRENGTH TO WIN

Our team has the skills and resources to go head-to-head with the largest, most well-resourced corporations in the country. Plus, our lawyers have experience on both sides of the courtroom and the negotiating table, allowing us the unique ability to anticipate our opponents' moves.

## Industry Recognition

**THE NEW YORK TIMES**

Keller Postman is driven "by a legal reformist spirit and entrepreneurial zeal."

**WALL STREET JOURNAL**

"[Keller Postman is calling] companies on their bluff and saying, 'You think you're going to get out of liability by going to arbitration? We'll show you what the arbitration system can do when you face tens of thousands of claims.'"

**THE AMERICAN LAWYER**

Part of the vision was to make plaintiff-side work attractive to folks with clerkship and Big Law experience like [Keller Postman's] founders. So far, the approach seems to be working."

**LAWDRAGON MAGAZINE**

ccelerated by a well-curated culture of excellence, innovation, and rvice, Keller Postman [leads] litigation across some of the biggest oduct liability MDLs in history."



# Awards

We're proud of the recognition we've received as leaders of the plaintiffs' bar.



**ELITE TRIAL LAWYERS LAW FIRM OF THE YEAR**

In 2021, the *National Law Journal* named Keller Postman the Trial Strategy Innovation Law Firm of the Year. **And in 2022, Keller Postman was named the Privacy & Data Breach Law Firm of the Year.**

**ELITE TRIAL LAWYERS RISING STARS & ELITE WOMEN**

Our lawyers have been named 2021 & 2022 Elite Trial Lawyers' Rising Stars of the Plaintiffs' Bar and the 2022 Elite Trial Lawyers' Elite Women of the Plaintiffs' Bar.

**NATIONAL LAW JOURNAL & AMERICAN LAWYER TRAILBLAZERS**

Our team has been named 2021 and 2022 Plaintiffs' Lawyers Trailblazers and 2022 Employment Law Trailblazers by the *National Law Journal.* Our lawyers have also been named 2022 Midwest Trailblazers and South Trailblazers by *American Lawyer.*

**LAW360 MVP**

Partner **Warren Postman** is named a 2021 Law360 MVP for leadership of Keller Postman's arbitration practice.

**WOMEN WORTH WATCHING IN LEADERSHIP**

Partner **Zina Bash** is named to the 2022 Women Worth Watching in Leadership by *Profiles in Diversity Journal.*

**CRAIN'S CHICAGO NOTABLE RISING STARS IN LAW**

Partners **Nicole Berg** and **Seth Meyer** are named to Crain's Chicago 2021 Notable Rising Stars in Law.

**KELLER POSTMAN ATTORNEYS NAMED TO MANY EXCLUSIVE LEGAL DIRECTORIES,** including Chambers & Partners, National Trial Lawyers Top 100, Super Lawyers, Best Lawyers, and Lawdragon's 500 Leading Lawyers in America, 500 Leading Plaintiff Consumer Lawyers, and Leading Plaintiff Financial Lawyers.

# Privacy Practice Overview & Case Highlights

# Privacy Practice

As we become more dependent on technology, we are increasingly susceptible to companies that use illegal practices to access our data for their own commercial gain. At Keller Postman, we firmly believe that no one should have to sacrifice a reasonable expectation of privacy in exchange for modern convenience, particularly without knowledge or consent. **Our firm is committed to helping protect our clients' personal privacy through cases based on state and federal statutes.**

# Case Highlights

## AMAZON ALEXA MASS ARBITRATION

As reported by *The Wall Street Journal*, Keller Postman filed roughly 75,000 individual arbitration demands on behalf of Amazon Alexa users who had been recorded without permission. Faced with arbitrating so many individual claims at once, in May 2021, Amazon eliminated its arbitration clause, allowing consumers (for the first time) to pursue their rights in court. Keller Postman's arbitration practice has caused the world's largest retailer to shift away from forced arbitration—a once-unthinkable result that significantly benefits consumers.

After individual and class-action lawsuits against Amazon became permissible, Keller Postman filed a federal antitrust lawsuit against Amazon for the same illegal conduct (the very first lawsuit filed against the company since it began including an arbitration clause into contracts with consumers). In *De Coster et al. v. Amazon.com, Inc.*, Keller Postman represents individual consumers who were charged unfairly high prices by Amazon because of the company's most favored nation clause against third-party merchants. Our firm was also named Co-Lead Class Counsel. In conjunction with the filing of this lawsuit, Keller Postman also separately filed another 75,000 individual arbitration demands for related claims.

The matters have resolved. This matter is significant because of Amazon's move to drop its arbitration clause nationwide and restore access to the courts for over 140 million Amazon consumers. The unprecedented—and astounding—rescission by Amazon of its arbitration requirement marked a significant victory for consumers and access to justice.

Across all of Keller Postman's arbitration matters to date, we've secured millions in settlements for more than 500,000 individuals.

# Case Highlights

## BARR V. DRIZLY, LLC F/K/A DRIZLY, INC. ET AL

This class action lawsuit was filed in August 2020 against Drizly, the largest online alcohol delivery marketplace in North America. The complaint alleged that Drizly's security measures were deficient in protecting consumers' personal information and that the company was slow to report the breach. As a result of the data breach, customers were exposed to fraud, identity theft, and other injuries.

Drizly moved to compel arbitration. However, after Keller Postman made an appearance with co-counsel, Drizly agreed to settlement terms within a week. This matter further emphasizes how Keller Postman's innovative strategy in arbitration has come to the aid of consumers whose private information was stolen. We've leveled up our arbitration strategy through making appearances with co-counsel partners after defendants compelled arbitration. We're extremely proud that our firm's reputation in mass arbitration has helped to swiftly secure favorable resolutions for both consumers and employees—and has also prevented defendants from using arbitration to evade liability.

## STATE OF TEXAS V. META PLATFORMS INC.

Keller Postman represents the State of Texas in a lawsuit against Facebook parent Meta Platforms Inc. for its decade-long use of facial-recognition technology to exploit Texans' biometric information in violation of Texas law. The suit alleges that the social media giant, formerly known as Facebook, unlawfully captured Texans' biometric identifiers for a commercial purpose without informed consent, disclosed those identifiers to others, and failed to destroy them within a reasonable time—all in violation of the Texas Capture or Use of Biometric Identifier Act ("CUBI"). The State also alleges that Facebook engaged in false, misleading, and deceptive acts and practices in violation of the Texas Deceptive Trade Practices-Consumer Protection Act. The suit seeks civil penalties in the hundreds of billions of dollars.

According to the complaint, for more than a decade, Facebook built an artificial-intelligence empire on the backs of Texans by deceiving them while capturing their most intimate data, thereby putting their well-being, safety, and security at risk. Filed in the state district court in Marshall, TX, the suit seeks civil penalties in the hundreds of billions of dollars.

Attorney General Ken Paxton emphasized the significance of this matter in his statement: "Facebook has been secretly harvesting Texans' most personal information—photos and videos— for its own corporate profit... Texas law has prohibited such harvesting without informed consent for over 20 years. While ordinary Texans have been using Facebook to innocently share photos of loved ones with friends and family, we now know that Facebook has been brazenly ignoring Texas law for the last decade."

# Case Highlights

## DATA BREACH LITIGATION OVERVIEW

Keller Postman is leading numerous class actions on behalf of hundreds of thousands of individuals whose sensitive personal information—including social security numbers, health/medical records, and financial information—has been stolen. The lawsuits accuse defendants of negligently handling consumers' personal data and private information. Defendants failed to take appropriate precautions to protect this data, did not appropriately and speedily resolve data breach occurrences, and also failed to adequately recompense the plaintiffs.

These class actions include:

- *Hestrup et al. v. DuPage Medical Group. Ltd. d/b/a DuPage Medical Group*
- *William Biscan v. Shields Health Care Group Inc.*
- *Alexander, et al. v. Otis R. Bowen Center for Human Services, Inc.*
- *Gilbert v. AFTRA Retirement Fund et al.*
- *Greco v. Syracuse ASC, LLC d/b/a Specialty Surgery Center of Central New York*
- *Hall, et al. v. AspenPointe, Inc., et al.*
- *Harrington v. Elekta, Inc.*
- *Kirsten v. California Pizza Kitchen, Inc.*
- *Miller v. Syracuse University*
- *Valencia v. North Broward Hospital District d/b/a Broward*
- *Vogelman v. Central Texas Medical Specialists, PLLC, d/b/a Austin Cancer Centers*
- *Esposito et al v. Refuel Health Center, Inc.*
- *Abbott et al v. Taylor County Hospital District Health Facilities Corporation d/b/a Taylor Regional Hospital*
- *Cain et al v. Lavaca Medical Center; Crawford v. Ascension Michigan*

Unlike a compromised credit card, these individuals can't change their fingerprints or social security numbers on a whim without facing years of frustration. With serious data breaches occurring every day, liability for these matters must be addressed in a quickly transforming digital world. Furthermore, we are briefing cutting-edge legal issues in these cases and hope to have a lasting impact in ensuring that consumers' interests are protected in these situations long into the future.

## HESTRUP & PEISS V. DUPAGE MEDICAL GROUP, LTD

‹eller Postman filed the first lawsuit against DuPage Medical Group (DMG) on behalf of patients whose ensitive medical information was stolen in a massive data breach. In the breach, highly sensitive ersonal information of nearly 650,000 patients were compromised, including names, addresses, dates birth, diagnosis codes, medical procedure data, treatment dates, social security numbers, and other otected health information as defined by HIPAA.

e complaint alleges negligence, breach of contract, and violation of the Illinois Consumer Fraud and ceptive Business Practices Act, among other allegations. Keller Postman seeks to obtain compensation l further protections for victims as well as improvements to DMG's data security systems.

# Case Highlights

## WILLIAM BISCAN V. SHIELDS HEALTH CARE GROUP INC.

Keller Postman filed the first lawsuit against Shields Health Care Group Inc. on behalf of more than two million patients whose sensitive medical information was stolen from Shields' computer network in a colossal data breach. Shields is the largest network of MRI centers in New England, with more than 40 facilities throughout the area. Cyberthieves had unauthorized access to Shields' network for approximately two weeks, accessing patient names, addresses, Social Security numbers, and more.

On behalf of Plaintiff William Biscan as class representative, the complaint alleges negligence, breach of contract, breach of implied contract, invasion of privacy, breach of fiduciary duty, breach of confidence, and violation of the Massachusetts Regulation of Business Practices for Consumers' Protection Act, Mass. Gen. Laws Ann. ch. 93A, § 1 et seq., and unjust enrichment. Plaintiffs seeks to obtain compensatory damages, such as for lost time needed to take appropriate measures to avoid unauthorized and fraudulent charges. They also seek reimbursement of out-of-pocket cost related to credit monitoring services, credit freezes, and other protective measures to deter and detect identity theft.

## BIPA LITIGATION OVERVIEW

Keller Postman represents thousands of clients in the state of Illinois who assert violations of the Illinois Biometric Information Privacy Act (BIPA). Our clients' biometric information has been wrongfully captured without consent by employers and technology platforms. We have been litigating cases against numerous entities, including against MOD Pizza, Vonachen Service, Inc., Heartland Beef, Inc., Wireless Vision LLC, and Sydell Hostel Manager LLC, d/b/a Freehand Chicago.

BIPA is one of the country's most stringent biometric privacy laws, prohibiting private companies from capturing, obtaining, storing, transferring, and/or using the biometric identifiers and/or information (such as fingerprints) of another individual for any purpose without first providing such individual with certain written disclosures and obtaining written consent. BIPA requires anyone who records biometric information to get informed consent before doing so and to create a publicly available retention policy so people can be assured that their sensitive biometric data won't be disclosed without their knowledge.

Although BIPA has existed for more than a decade, companies are still capturing biometric information (which can easily be used to perpetrate identity fraud in the wrong hands) in Illinois without explaining the implications of that capture to their employees and customers. While corporations often loosely interpret new laws, Keller Postman is actively influencing the enforceability of these laws, setting a clear path forward for those seeking reprieve from improper collection and storage of private information.

**Results:**

- *Soper v. Sydell Hostel Manager LLC*: Secured $250,000 settlement for class of ~300
- *Pratz v. MOD Super Fast Pizza, LLC*: Secured $1.3 million settlement for class of ~1,134
- We also recently received preliminary approval for a class settlement in *Corey v. Wireless Vision, LLC.*

# Attorney Biographies



# Seth Meyer

*Partner*

## EDUCATION

J.D., University of Virginia Law School

B.S., Northwestern University

## CLERKSHIPS

Hon. Richard F. Suhrheinrich, U.S. Court of Appeals for the Sixth Circuit

## AWARDS

*Crain's Chicago Business* Rising Stars in Law (2021)

Elite Trial Lawyers' Rising Stars of the Plaintiffs' Bar (2021)

Super Lawyers Illinois Rising Stars (2022)

National Trial Lawyers' 40 Under 40 (2021, 2022)

Lawdragon's 500 Leading Plaintiff Consumer Lawyers (2021)

Lawdragon's 500 Leading Plaintiff Financial Lawyers (2021, 2022)

## CONTACT

m@kellerpostman.com
2.741.5226

Seth represents clients in arbitration and litigation at the trial and appellate levels and has handled cases on a broad array of subject matters, including antitrust, class actions, data breach, labor & employment, privacy, and product liability.

At Keller Postman, Seth leads the firm's data breach litigation, from case identification and origination to managing co-counsel partnerships. Seth also acts on behalf of state and local government entities in connection with the opioid crisis, representing the State of Arizona as well as municipalities across Idaho, Minnesota, Nevada, and Wisconsin. In addition to this work, Seth's practice also focuses on various antitrust, class action, appellate, and bankruptcy matters.

Before joining Keller Postman, Seth was an attorney at Kirkland & Ellis LLP in Chicago and Williams & Connolly LLP in Washington, D.C. At those firms, he handled trial, appellate, and arbitral matters for companies and sovereigns involving contract disputes, government and internal investigations, mass torts, class action claims, and other issues.

Seth is an adjunct professor at the Northwestern University Weinberg College of Arts and Sciences Center for Legal Studies, where he teaches an undergraduate course on legal education and practice.

Seth served as a law clerk for Judge Richard F. Suhrheinrich of the U.S. Court of Appeals for the Sixth Circuit. He graduated from the University of Virginia School of Law, where he was elected to Order of the Coif and served as In Brief Editor on the Managing Board of the *Virginia Law Review*. He earned his undergraduate degree in three years, *summa cum laude*, from Northwestern University where he played viola with the Northwestern University Philharmonia.



# Alex Dravillas

*Associate*

## EDUCATION

J.D., University of Chicago Law School

B.S., Loyola University Chicago

B.A., Loyola University Chicago

## AWARDS

Super Lawyers Illinois Rising Stars (2022)

## CONTACT

ajd@kellerpostman.com
312.948.8474

Alex has litigated cases as a member of both the plaintiffs' and defense bars, maintaining a focus on complex civil litigation throughout his career.

At Keller Postman, Alex represents public and private entities across the nation in trial and appellate litigation. His practice focuses on governmental, consumer-protection, and data-privacy issues.

Alex helps manage and lead litigation across pivotal privacy-related matters at Keller Postman. He drives Keller Postman's data breach claims, drafting complaints, managing mediations, and handling negotiation with opposing counsel. He represents clients throughout Illinois who assert violations of the Illinois Biometric Information Privacy Act (BIPA). Our clients' biometric information was wrongfully captured without their consent by employers and technology platforms alike. Alex manages the ongoing litigation in cases against numerous entities.

Alex also focuses on a broad range of consumer protection matters (including claims for false advertising), supports the firm's representation of state and local government entities in connection with the opioid crisis, and represents the State of Texas in its case against Meta Platforms, Inc. for its capture of biometric identifiers in violation of Texas law.

Alex is listed as a 2022 Illinois Super Lawyers Rising Star, recognized for his outstanding professional achievement.

Alex is a graduate of the University of Chicago Law School. He earned his undergraduate degrees in political science, economics, finance, and psychology *summa cum laude* from Loyola University Chicago.

13.4

COMMONWEALTH OF MASSACHUSETTS

ESSEX, S.S. SUPERIOR COURT

| | | |
|---|---|---|
| JOHN DOE, individually and on behalf of all others similarly situated, | § | C.A. No. 2277CV01000 |
| *Plaintiff,* | § | |
| v. | § | |
| EMERSON HOSPTIAL | § | A TRUE COPY, ATTEST |
| *Defendant.* | § | DEPUTY ASS'T. CLERK |

**DECLARATION OF FOSTER JOHNSON IN SUPPORT OF PLAINTIFF'S MOTION FOR APPOINTMENT OF INTERIM CLASS COUNSEL**

I, Foster Johnson, hereby declare as follows:

1. I am an attorney and partner at Ahmad Zavitsanos & Mensing PLLC ("AZA") and counsel for Plaintiffs John Doe ("Plaintiff") in the above-captioned case.

2. I am fully familiar with the facts and circumstances surrounding this matter, and I have prepared this Declaration in Support of Plaintiff's Motion to Appoint Interim Class Counsel.

3. The following statements are based on my personal knowledge and review of the facts and, if called on to do so, I could and would testify competently thereto.

4. AZA has spent significant amounts of time and energy investigating the merits and vetting the potential claims in this case. AZA first researched the complex Meta Pixel tools that hospitals are using and then investigated whether Defendant's websites were using them and to what extent. AZA then conducted extensive research regarding Defendant's potential liability, including claims for wiretapping, breach of fiduciary duty, and invasion of privacy arising from Defendant's disclosure of its patients' personal health information to third parties, including Facebook and Google.

5. AZA has interviewed potential fact witnesses concerning evidence and conferred with proposed Class Members. AZA has also retained a consulting expert to assist with vetting and prosecuting Plaintiffs' and Class Members' claims.

6. AZA is a fifty-lawyer firm specializing in commercial and patent technology litigation with extensive experience handling complex litigation and class actions. Chambers USA, the independent and prestigious legal guide, has consistently ranked AZA among the top Texas law firms for both commercial litigation and intellectual property work. AZA's attorneys have litigated and tried all types of breach of contract and business tort cases in federal and state courts and arbitration panels across the country. Major corporations and senior executives regularly hire AZA to prosecute and defend their high-profile, difficult, and complex cases. For instance, last year, AZA won a $62.65 million verdict after a seven-week trial from a Nevada jury in a nationally watched case for emergency room physician group clients who were underpaid by United Healthcare, the largest insurer in the nation. In 2019, AZA defended a midstream oil and gas company against a claim for $250 million related to the building of an oil refining unit. KP is one of the nation's preeminent firms specializing in complex civil litigation. Its practice includes numerous high-profile privacy, antitrust, and consumer protection class actions. It has been at the forefront of complex litigation related to data breach issues.

7. AZA has similar experience in intellectual property litigation and is consistently ranked by Chambers USA in this area. For example, AZA's attorneys have successfully prosecuted patent infringement cases involving complex technology against some of the biggest technology companies in the world, including Apple, Samsung, Motorola, and Garmin.

8. AZA also routinely handles mass and class actions from both the plaintiff and defense side. For instance, lawyers at the firm have recovered nearly $1 billion on behalf of

nationwide class of homeowners whose homes had defective plumbing systems. *McDonald, et al v. Shell Oil Co, et al*, No. 89-28469, in the 334th District Court of Harris County, Texas. .Lawyers at AZA have also recovered $450+ million on behalf of nationwide class of investors in the Courtyard, Fairfield Inn and Residence Inn limited partnerships, *Milkes v. Marriott International, et al*, Case No. 96-CI-08327, 285th District Court of Bexar County, Texas, and $425+ million in a mass action on behalf of individuals who underwent unnecessary heart valve surgeries. *Tenet Healthcare Cases III*, Judicial Council Coordination Proceeding No. 4301, in Shasta County, California. AZA is also representing more than 120 clients whose homes were flooded during Hurricane Harvey because of government action at the Addicks Barker dams. *In re. Upstream Addicks and Barker (Texas) Flood-Control Reservoirs*, Sub-Master Docket No. 17-9001, in the United States Court of Federal Claims.

9. In the data privacy space, AZA is currently prosecuting more than two dozen data privacy class actions in multiple states on behalf of patients whose personal health information was shared with Facebook in violation of state and federal law. These include multiple class actions in Massachusetts:

- *Jane Doe, Individually and on Behalf of All Others Similarly Situated v. Atrius Health, Inc.;* C.A. No. 2282CV00982; Norfolk Superior Court
- *John Doe, James Doe, and Jane Doe, Individually and on Behalf of All Others Similarly Situated v. Southcoast Hospitals Group, Inc. d/b/a St. Luke's Hospital, Tobey Hospital, Southcast Behavioral Health, and Charleston Memorial Hospital;* C.A. No. 2273cv00673; Bristol Superior Court
- *John Doe Individually and on Behalf of All Others Similarly Situated v. UMass Memorial Health Care;* C.A. No. 2285CV01205; Worcester Superior Court
- *John Doe Individually and on Behalf of All Others Similarly Situated v. Cape Cod Healthcare, Inc.* No. 1:23-cv-10080, United States District

Court for the District of Massachusetts (removed from the Barnstable Superior Court, 2272CV00493)

10. I have experience in class action litigation as counsel for both plaintiffs and defendants. I am a charter member of AZA's Class Action Group. I currently spearhead more than two dozen of class action cases filed against hospitals for state law violations arising from their use of the Meta Pixel tool to intercept and disclose patient health information, including the four pending in Massachusetts. Since filing those class actions in the fall, AZA and Keller Postman have seen multiple copycat filings in the related Massachusetts class action cases.

11. I received my J.D. and undergraduate degrees from Stanford University. After law school, I clerked for the Honorable Priscilla Owen of the United States Court of Appeals for the 5th Circuit.

12. AZA has the resources necessary to lead this litigation and has extensive experience successfully managing complex, resource-intensive cases of all sorts. AZA has the necessary technology to handle voluminous and complex discovery, including the types of discovery anticipated in this case. Furthermore, we have experienced attorneys and support professionals to staff the case. We have designated a list of primary of attorneys who will bring their unique skills and experience to representing the Class.

13. AZA regularly advances the costs of litigation and is committed to dedicate substantial resources to vigorously prosecute the claims in this case for the potential class.

14. If appointed Interim Class Counsel, I will strive to avoid waste and duplication in favor of efficiency. I fully understand the substantial investment of time and resources necessary to properly pursue and lead such litigations and are committed to devoting the necessary resources to this case. I and AZA are absolutely committed to prosecuting this action in the best interests of the proposed class and indicating their rights.

15. Sweeney Merrigan, AZA, and Keller Postman LLC have also jointly served discovery in this case and have conferred with opposing counsel about the logistics of managing and resolving the case.

16. A copy of AZA firm resume is attached hereto as Exhibit 1.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 24th day of March 2023, in Houston, Texas.

FOSTER JOHNSON

# Mass/Class Actions

AZA's commercial litigation, trial experience and appellate expertise set it apart from the typical mass/class action firms in this sector. Our lawyers have handled cases from sign up, through class briefing, screening, discovery, trial and all aspect of the appellate process. We have also developed case specific allocation methodologies to ensure each client's individual circumstances, when appropriate, are considered in the allocation of common funds.

And we've handled mass/class actions from both the plaintiff and the defense side.

Principal members of the group are Kevin Leyendecker, David Warden, Foster Johnson, Joe Ahmad, Sammy Ford IV and Nathan Campbell.

<u>Current Mass/Class Actions</u>

- Multiple data privacy class actions in Massachusetts, Louisiana, Missouri, and California on behalf of patients whose personal health information was shared with Facebook in violation of state and federal law.
- More than 120 clients whose homes were flooded during Hurricane Harvey because of government action at the Addicks Barker dams.

<u>Past Wins for members of this team:</u>

- Defeated certification in a Texas class that sought in excess of $5 billion in statutory damages under Texas' civil barratry statute.
- Recovered $900+ million on behalf of nationwide class of homeowners whose homes had defective plumbing systems.
- Recovered $450+ million on behalf of nationwide class of investors in the Courtyard, Fairfield Inn and Residence Inn limited partnerships.
- Recovered $425+ million on behalf of individuals who underwent unnecessary heart valve surgeries.
- Recovered $100+ million on behalf of investors in limited partnerships sponsored by a major investment firm.
- Recovered $45+ million on behalf of children who underwent unnecessary dental procedures.
- Recovered $100+ million on behalf of children who were unnecessarily hospitalized in psychiatric hospitals and kept until their insurance ran out.
- Recovered $50+ million on behalf of limited partnerships sponsored by a major investment firm.

EXHIBIT
1
exhibitsticker.com



AZA

# Foster C. Johnson

Partner

P: 713-600-4915
F: 713-655-0062
fjohnson@azalaw.com

---

Foster C. Johnson is a trial lawyer who focuses on complex commercial litigation. He has represented Fortune 100 companies in a variety civil actions, including contract disputes, oil and gas matters, non-compete claims, intellectual property litigation, and consumer and employment class actions.

His recent successes include a six-week trial that ended in a $41.6 million jury verdict against Lloyd's of London. The case was one of the top 100 2017 verdicts in the nation according to the National Law Journal.

Mr. Johnson has also handled numerous appeals and mandamus proceedings in state and federal courts, including the United States Courts of Appeals for the 3rd, 5th, 9th, and D.C. Circuits, the Supreme Courts of Texas and California, numerous intermediate state courts of appeals, and the Judicial Panel on Multidistrict Litigation.

Mr. Johnson was selected to the Texas Rising Stars list in 2018-2021 for his excellence in business litigation. The list honors the best lawyers in the state who are 40 or younger or those who have practiced no more than ten years. Fewer than 2.5 percent of eligible Texas attorneys earn this recognition each year.

EXHIBIT
2

Before joining AZA, Mr. Johnson was a litigator at Baker Botts LLP. He is a graduate of Stanford Law School, where he served on both the Stanford Law and Policy Review and the Stanford Technology Law Review. After law school, he served as a law clerk to the Honorable Priscilla Owen of the United States Court of Appeals for the 5th Circuit. Mr. Johnson is the author of *Judicial Magic: the Use of Dicta as Equitable Remedy*, published in The University of San Francisco Law Review in 2012.

*Texas Lawbook* published a feature story in 2021 about Mr. Johnson's first career as a rock and roll star. The author explained how the creativity he cultivated writing, singing and playing music and the on-stage experience he had made him a better trial lawyer. See "For Aza Musician-turned-lawyer, the Courtroom Is Just a Different Stage." (https://azalaw.com/for-aza-musician-turned-lawyer-the-courtroom-is-just-a-different-stage/)

## REPRESENTATIVE ENGAGEMENTS

- Obtained a $41.6 million jury verdict against Lloyd's of London after the insurer refused to pay for hurricane damage to an offshore oil rig.
- Won dismissal of a multi-million-dollar employment class action in the Federal District of New Jersey.
- Won dismissal of a multi-million-dollar employment claim in the Northern District of California.
- Helped energy company win multi-million business tort against former executive.
- Drafted winning appeal in a $16 million arbitration dispute.
- Drafted winning appeal in $10 million oil lease dispute.
- Secured permanent injunction against former high-ranking executives in non-compete dispute.
- Secured permanent injunction against former employee in trade secret theft dispute.
- Obtained favorable settlement for web-based auto loan broker in breach of contract dispute.
- Obtained multi-million-dollar settlement for plaintiff in construction defect suit.
- Secured walk-away settlement for defendant in $20 million environmental coverage dispute.

## EDUCATION

Stanford Law School, J.D.

- Stanford Law and Policy Review, Features Editor
- Stanford Law and Technology Review, Executive Notes Editor
- Kirkwood Moot Court Board, Vice President

Stanford University, M.A.

Stanford University, B.A., with honors

## BAR ADMISSIONS

- Texas 2011
- California 2013
- U.S. Court of Appeals for the Federal Circuit
- U.S. Court of Appeals for the Third Circuit
- U.S. Court of Appeals for the District of Columbia Circuit
- U.S. District Court for the Southern District of Texas
- U.S. District Court for the Northern District of Texas
- U.S. District Court for the Eastern District of Texas
- U.S. District Court for the Northern District of California
- U.S. District Court for the Central District of California

## LEGAL PUBLICATIONS AND CLE PRESENTATIONS

- "Financial Damages Calculations and Valuations in US Litigation: 2019 Perspective" webinar, Knowledge Group CLE, May 2019
- "Non-Compete Agreements: Understanding Trial Techniques and Litigation Strategies" webinar, Knowledge Group CLE, February 2018
- *Judicial Magic: the Use of Dicta as Equitable Remedy*, 46 U.S.F. L. REV. 883 (2012)

## HONORS AND AWARDS

- 2018-2021 Texas Rising Star honors for business litigation, a list compiled by Texas Super Lawyers, a Thomson Reuters business

## IN THE NEWS

- **AZA Names Five New Partners for 2023 (https://azalaw.com/aza-names-five-new-partners-for-2023/)**
- **AZA's Rocker-Lawyer Foster Johnson Featured in Texas Lawbook (https://azalaw.com/azas-rocker-lawyer-foster-johnson-featured-in-texas-lawbook/)**
- **AZA Prevails for Apache Corp. at the Supreme Court of Texas (https://azalaw.com/aza-prevails-for-apache-corp-at-the-supreme-court-of-texas/)**
- **Eleven AZA Lawyers Make the 2021 Texas Rising Stars List (https://azalaw.com/eleven-aza-lawyers-make-the-2021-texas-rising-stars-list/)**

- **Nine AZA Lawyers Earn 2020 Texas Rising Stars Accolades (https://azalaw.com/nine-aza-lawyers-earn-2020-texas-rising-stars-accolades/)**
- **Ten AZA Lawyers Earn 2019 Texas Rising Stars Accolades (https://azalaw.com/ten-aza-lawyers-earn-2019-texas-rising-stars-accolades/)**
- **AZA Scores One of the Nation's Top 100 Verdicts of 2017 (https://azalaw.com/aza-scores-one-of-the-nations-top-100-verdicts-of-2017/)**
- **Fourteen AZA Lawyers Earn 2018 Texas Rising Stars Accolades (https://azalaw.com/fourteen-aza-lawyers-earn-2018-texas-rising-stars-accolades/)**
- **Prime Natural Resources Wins $41.6 Million in Wellsure Insurance Dispute (https://azalaw.com/prime-natural-resources-wins-41-6-million-wellsure-insurance-dispute/)**
- **ZKey Sues Facebook in California (https://azalaw.com/zkey-sues-facebook-in-california/)**
- **9 Reasons We Are Even Stronger (https://azalaw.com/landing/9-new-lawyers/)**

RATED BY
Super Lawyers
Foster C. Johnson
SELECTED IN 2021
THOMSON REUTERS

A TRUE COPY, ATTEST
DEPUTY ASST. CLERK

COMMONWEALTH OF MASSACHUSETTS

ESSEX, S.S. SUPERIOR COURT

| | | |
|---|---|---|
| JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | § | C.A. No. 2277CV01000 |
| Plaintiff | § | |
| v. | § | A TRUE COPY, ATTEST |
| EMERSON HOSPITAL, | § | DEPUTY ASS'T. CLERK |
| Defendant. | § | |

## RULE 9A NOTICE OF FILING AND LISTING OF DOCUMENTS

I, J. Tucker Merrigan, one of the counsel for Plaintiff, John Doe, Individually and on Behalf of All Others Similarly Situated, hereby state that the following list of documents have been submitted for filing with the Court pursuant to Superior Court Rule 9A:

1. Motion to Appoint Interim Class Counsel;
2. Memorandum of Law in Support of Plaintiff's Motion to Appoint Interim Class Counsel;
3. Declaration of J. Tucker Merrigan in Support of Plaintiff's Motion for Appointment of Interim Class Counsel;
4. Declaration of Seth Meyer in Support of Plaintiff's Motion for Appointment of Interim Class Counsel;
5. Declaration of Foster C. Johnson in Support of Plaintiff's Motion for Appointment of Interim Class Counsel; and
6. [Proposed] Order Appointing Interim Class Counsel; and
7. Affidavit in Compliance with Superior Court Rule 9A.

Respectfully Submitted
The Plaintiff
By his Attorney,

*_/s/ J. Tucker Merrigan_*
J. Tucker Merrigan, BBO# 681627
**SWEENEY MERRIGAN LAW, LLP**
268 Summer Street, LL
Boston, MA 02210
Phone: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com

Dated: March 24, 2023

COMMONWEALTH OF MASSACHUSETTS

ESSEX, S.S. SUPERIOR COURT

| | | |
|---|---|---|
| JOHN DOE,<br>INDIVIDUALLY AND ON<br>BEHALF OF ALL OTHERS SIMILARLY<br>SITUATED,<br><br>Plaintiff<br><br>v.<br><br>EMERSON HOSPITAL,<br><br>Defendant. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | C.A. No. 2277CV01000<br><br>A TRUE COPY, ATTEST<br>DEPUTY ASS'T. CLERK |

**AFFIDAVIT IN COMPLIANCE WITH SUPERIOR COUR RULE 9A**

I, J. Tucker Merrigan, hereby depose and say the following:

1. I am an attorney at the law firm of Sweeney Merrigan Law, LLP, 268 Summer Street, LL, Boston, Massachusetts 02210;

2. On March 24, 2023, I emailed a copy of the within, *Motion to Appoint Interim Class Counsel, Memorandum in Support of Motion, Declaration of J. Tucker Merrigan, Declaration of Seth Meyer; and Declaration of Foster C. Johnson,* on all counsel involved in this action;

3. On March 24, 2023, defense counsel indicated via email that they do not object to the *Motion to Appoint Interim Class Counsel*; and

4. The original pleadings are now being filed with the Court.

Signed under the penalties of perjury this 24th day of March, 2023.

*/s/ J. Tucker Merrigan*
J. Tucker Merrigan

**CERTIFICATE OF SERVICE**

I, J. Tucker Merrigan, hereby certify that on March 24, 2023, in accordance with Superior Court Rule 9A, I served the within document(s):

- Motion to Appoint Interim Class Counsel;
- Memorandum of Law in Support of Plaintiff's Motion to Appoint Interim Class Counsel;
- Declaration of J. Tucker Merrigan in Support of Plaintiff's Motion for Appointment of Interim Class Counsel;
- Declaration of Seth Meyer in Support of Plaintiff's Motion for Appointment of Interim Class Counsel;
- Declaration of Foster C. Johnson in Support of Plaintiff's Motion for Appointment of Interim Class Counsel; and
- [Proposed] Order Appointing Interim Class Counsel;

on all counsel of record, via electronic mail to the following parties of interest:

Alan Y. Wong
awong@shb.com
Emyr Remy
remy@shb.com
SHOOK, HARDY & BACON L.L.P.
One Federal Street, Suite 2540
Boston, MA 02110
Tel: (617) 531-1411 | Fax: (617) 531-1602

Alfred J. Saikali
asaikali@shb.com
SHOOK, HARDY & BACON L.L.P.
201 South Biscayne Blvd., Suite 3200
Miami, Florida 33131
Tel: (305) 358-5171 | Fax: (305) 358-7470

A TRUE COPY, ATTEST
DEPUTY ASS'T. CLERK

Josh Becker (pro hac vice forthcoming)
jbecker@shb.com
SHOOK, HARDY & BACON L.L.P.
1230 Peachtree St., Suite 1200
Atlanta, GA 30309
Tel: (470) 867-6000 | Fax: (470) 867-6001

Michael Rayfield (pro hac vice forthcoming)
mrayfield@shb.com
SHOOK, HARDY & BACON L.L.P.
1325 Avenue of the Americas, 28th Floor
New York, NY 10019

Tel: (212) 989-8844 | Fax: (929) 501-5455

Lindsey M. Knapton (pro hac vice forthcoming)
lknapton@shb.com
SHOOK, HARDY & BACON L.L.P.
1600 17th Street, Suite 450
Denver, CO 80202
Tel: (303) 285-5300 | Fax: (303) 285-5301

/s/ Jonathan T. Merrigan
J. Tucker Merrigan

13.8

# CERTIFICATE OF SERVICE

I, J. Tucker Merrigan, hereby certify that on March 24, 2023 in accordance with Superior Court Rule 9A, I served the following documents:

1. Affidavit in Compliance with Superior Court Rule 9A;
2. Rule 9A Notice of Filing and Listing of Documents.

on all counsel of record, via electronic mail to the following parties of interest:

Alan Y. Wong
awong@shb.com
Emyr Remy
remy@shb.com
SHOOK, HARDY & BACON L.L.P.
One Federal Street, Suite 2540
Boston, MA 02110
Tel: (617) 531-1411 | Fax: (617) 531-1602

Alfred J. Saikali
asaikali@shb.com
SHOOK, HARDY & BACON L.L.P.
201 South Biscayne Blvd., Suite 3200
Miami, Florida 33131
Tel: (305) 358-5171 | Fax: (305) 358-7470

Josh Becker
jbecker@shb.com
SHOOK, HARDY & BACON L.L.P.
1230 Peachtree St., Suite 1200
Atlanta, GA 30309
Tel: (470) 867-6000 | Fax: (470) 867-6001

Michael Rayfield (pro hac vice forthcoming)
mrayfield@shb.com
SHOOK, HARDY & BACON L.L.P.
1325 Avenue of the Americas, 28th Floor
New York, NY 10019
Tel: (212) 989-8844 | Fax: (929) 501-5455

A TRUE COPY, ATTEST
DEPUTY ASS'T. CLERK

Lindsey M. Knapton (pro hac vice forthcoming)
lknapton@shb.com
SHOOK, HARDY & BACON L.L.P.
1600 17th Street, Suite 450
Denver, CO 80202
Tel: (303) 285-5300 | Fax: (303) 285-5301

*/s/ Johnathan T. Merrigan*
J. Tucker Merrigan

14

COMMONWEALTH OF MASSACHUSETTS

ESSEX, S.S.

| | | |
|---|---|---|
| JOHN DOE, individually and on behalf of all others similarly situated, *Plaintiff,* | § | SUPERIOR COURT |
| v. | § | C.A. No. 2277CV01000 |
| EMERSON HOSPTIAL *Defendant.* | § | A TRUE COPY, ATTEST DEPUTY ASS'T CLERK |

**~~[PROPOSED]~~ ORDER APPOINTING INTERIM CLASS COUNSEL**

~~On this day, the~~ the Court ~~heard~~ has reviewed the Motion to Appoint Interim Class Counsel of Plaintiff John Doe seeking an order appointing J. Tucker Merrigan of Sweeney Merrigan Law, LLP; Seth Meyer of Keller Postman LLC; and Foster Johnson of Ahmad Zavitsanos & Mensing, PLLC as Co-Lead Interim Class Counsel (the "Motion").

Having considered the Motion, the Court finds good cause to **GRANT** the Motion.

IT IS HEREBY ORDERED:

1. J. Tucker Merrigan, Foster Johnson, and Seth Meyer are hereby appointed Co-Lead Interim Class Counsel.

2. The above firms (collectively, "Interim Counsel") are appointed based on the firms': (a) work in identifying or investigating potential claims in the action; (b) experience in handling class actions, other complex litigation, and claims of the type asserted in the action; (c) knowledge of the applicable law; and (d) resources the firms will commit to representing the putative Class.

3. Interim Counsel, collectively and not individually, shall have responsibility for, and authority over, the following matters for this case and any related cases against Defendant Emerson

Hospital assigned to this Court regardless of whether such related cases include defendants in addition to Defendant or were filed after entry of this Order:

a. Determining and presenting in pleadings, motions, briefs, oral argument or such other fashion as may be appropriate, the position of Plaintiff and the putative class ("Plaintiff") as to all matters arising during all pretrial and trial proceedings;
b. Conducting discovery on behalf of Plaintiff;
c. Communicating with the Court;
d. Communicating with Defense Counsel;
e. Assigning work assignments to all Plaintiff's Counsel;
f. Ensuring that work assignments to all Plaintiff's Counsel are made in the best interests of Plaintiff and the proposed Class and are made on the basis of the qualifications and expertise of the person assigned particular tasks or responsibilities, counsel's knowledge of the law, facts and issues, efficiency, and costs-effectiveness;
g. Directing, supervising, and monitoring the activities of additional Plaintiff's Counsel, if any, and implementing procedures to ensure that schedules are met and unnecessary expenditures of time and funds by counsel are avoided;
h. Employing and consulting with experts;
i. Calling meetings of all Plaintiff's Counsel when appropriate;
j. Conducting settlement discussions with Defense Counsel on behalf of the Plaintiff and the putative Class and the related authority to resolve this litigation as Interim Counsel deem appropriate and subject to approval of this Court where required;

k. Informing Plaintiff and Plaintiff's Counsel of the progress of this litigation as necessary;

l. Assessing litigation costs as appropriate and to collect such assessments;

m. Reviewing time, lodestar, and expense reports from each Plaintiff's Counsel, including paralegals and any other staff members, as frequently as Interim Counsel see fit;

n. Allocating attorneys' fees and costs among Plaintiff's Counsel

o. Overseeing the conduct of the litigation so that it proceeds smoothly and efficiently and performing such other duties as necessary or as authorized by further order of the Court.

**IT IS SO ORDERED.**

SIGNED this 31st day of March, 2023.

Janice W. Howe, J.
JUDGE PRESIDING

COMMONWEALTH OF MASSACHUSETTS

**ESSEX, S.S.** **SUPERIOR COURT**

**JOHN DOE, Individually and on Behalf of All Others Similarly Situated,**

***Plaintiffs,***

**v.**

**EMERSON HOSPTIAL**

***Defendant.***

§ § § § § § § § § §

**C.A. No. 2277CV01000**

**NOTICE OF PLAINTIFF'S MOTION TO STRIKE**

The plaintiff hereby gives Notice that it has served a Motion to Strike exhibits appended to the defendant's Memorandum filed in support of the defendant's Motion to Dismiss.

On April 3, 2023, the plaintiff, pursuant to Superior Court Rule 9A(b)(2), served its Motion to Strike on all parties.

A TRUE COPY, ATTEST
DEPUTY ASST. CLERK

Dated: April 3, 2023

Respectfully submitted,

*/s/ J. Tucker Merrigan*

J. Tucker Merrigan, BBO# 681627
Thomas T. Merrigan, BBO# 343480
Erin E. McHugh, BBO# 703701
Sweeney Merrigan Law
268 Summer St. LL
Boston, MA 02210
(413) 774-5300
tucker@sweeneymerrigan.com
tom@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Foster C. Johnson (*admitted pro hac vice*)
David Warden (*admitted pro hac vice*)
Nathan Campbell (*admitted pro hac vice*)
Ahmad Zavitsanos & Mensing PLLC
1221 McKinney Street, Suite 2500
Houston, Texas 77010
(713) 655-1101
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

Seth Meyer (*admitted pro hac vice*)
Alex Dravillas (*admitted pro hac vice*)
Keller Postman LLC
150 N. Riverside Plaza
Suite 4100
Chicago, Illinois 60606
(312) 741-5220
sam@kellerpostman.com
ajd@kellerpostman.com

**COUNSEL FOR PLAINTIFF JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED**

**CERTIFICATE OF SERVICE**

I, J. Tucker Merrigan, hereby certify that on April 3, 2023, in accordance with Superior Court Rule 9A, I served the within document(s):

- Notice of Plaintiff's Motion to Strike;

and on all counsel of record, electronic mail to the following parties of interest and filed via the Court's Electronic Filing System:

Alan Y. Wong
awong@shb.com
Emyr Remy
remy@shb.com
SHOOK, HARDY & BACON L.L.P.
One Federal Street, Suite 2540
Boston, MA 02110
Tel: (617) 531-1411 | Fax: (617) 531-1602

Alfred J. Saikali
asaikali@shb.com
SHOOK, HARDY & BACON L.L.P.
201 South Biscayne Blvd., Suite 3200
Miami, Florida 33131
Tel: (305) 358-5171 | Fax: (305) 358-7470

Josh Becker (pro hac vice forthcoming)
jbecker@shb.com
SHOOK, HARDY & BACON L.L.P.
1230 Peachtree St., Suite 1200
Atlanta, GA 30309
Tel: (470) 867-6000 | Fax: (470) 867-6001

Michael Rayfield (pro hac vice forthcoming)
mrayfield@shb.com
SHOOK, HARDY & BACON L.L.P.
1325 Avenue of the Americas, 28th Floor
New York, NY 10019
Tel: (212) 989-8844 | Fax: (929) 501-5455

Lindsey M. Knapton (pro hac vice forthcoming)
lknapton@shb.com
SHOOK, HARDY & BACON L.L.P.
1600 17th Street, Suite 450
Denver, CO 80202
Tel: (303) 285-5300 | Fax: (303) 285-5301

*/s/ Jonathan T. Merrigan*
J. Tucker Merrigan

COMMONWEALTH OF MASSACHUSETTS

ESSEX, ss

TRIAL COURT DEPARTMENT
SUPERIOR COURT
DOCKET NO. 2277CV01000D

JOHN DOE, individually and on behalf of all other similarly situated,

Plaintiff,

v.

EMERSON HOSPITAL,

Defendant.

A TRUE COPY, ATTEST
DEPUTY ASS'T. CLERK

**DEFENDANT'S, EMERSON HOSPITAL, REQUEST PURSUANT TO RULE 9A(a)(6) FOR LEAVE OF COURT TO EXCEED THE PAGE LIMIT, ALLOW ADDITIONAL TIME FOR ITS REPLY BRIEF IN SUPPORT OF ITS MOTION TO DISMISS, AND ALLOW ADDITIONAL TIME TO SERVE ITS RESPONSE TO PLAINTIFF'S MOTION TO STRIKE**

Defendant Emerson Hospital ("Emerson") hereby requests, pursuant to Superior Court Rule 9A(a)(6), leave of court to (1) exceed the page limit for its Reply in Support of its Motion to Dismiss ("Reply"); (2) a date certain (April 24, 2023) to file its response to its Motion to Dismiss; and (3) a date certain (April 18, 2023) to serve its response to Plaintiff's Motion to Strike.

1. Pursuant to Massachusetts Superior Court Rule 9A(a)(5)(iv), the reply of all papers must not exceed five (5) pages. However, under Massachusetts Superior Court Rule 9A(a)(6), a party may exceed the pages in length (not counting the caption and title) with leave of court.

2. Plaintiff's Complaint totals 64 pages and alleges five causes of action seeking novel applications of law. Given the complexities of this case and number of counts at issue, Emerson requests a total of ten (10) pages (not to include the caption, title, and signature block) for its Reply. Granting this five-page extension of the page limitation would streamline the arguments before this Court and allow for a full briefing of the matters.

DOCKET NO. 2277CV01000D

3. On April 3, 2023, Plaintiff served its Opposition to Emerson's Motion to Dismiss, and separately served a Motion to Strike certain exhibits supporting Emerson's Motion to Dismiss. This renders Emerson's 9A Motion to Dismiss package, inclusive of Plaintiff's Motion to Strike, due April 17, 2023.

4. Pursuant to Massachusetts Superior Court Rule 9C, the undersigned certifies that counsel for Emerson conferred, in good faith, with all parties who may be affected by the relief sought in this Request. The Plaintiff has opposes this Request for an additional five pages but agreed to a seven-day extension, to April 24, 2023 for Emerson to file its 9A Motion to Dismiss package. Plaintiff also provided an extension, to April 18, 2023, for Emerson to serve its response to Plaintiff's Motion to Strike.

WHEREFORE, Emerson respectfully requests leave to (1) file a ten-page Reply in Support of its Motion to Dismiss, (2) an April 24, 2023 deadline to file its Motion to Dismiss, and (3) an April 18, 2023 deadline to serve its response to Plaintiff's Motion to Strike.

DATED: April 7, 2023

DOCKET NO. 2277CV01000D

Respectfully submitted,

**EMERSON HOSPITAL**

/s/ Emyr T. Remy
Alan Y. Wong (BBO# 687618)
awong@shb.com
Emyr Remy (BBO # 740156)
remy@shb.com
SHOOK, HARDY & BACON L.L.P.
One Federal Street, Suite 2540
Boston, MA 02110
Tel: (617) 531-1411 | Fax: (617) 531-1602

Alfred J. Saikali (*pro hac vice* forthcoming)
asaikali@shb.com
SHOOK, HARDY & BACON L.L.P.
201 South Biscayne Blvd., Suite 3200
Miami, Florida 33131
Tel: (305) 358-5171 | Fax: (305) 358-7470

Tammy B. Webb (*pro hac vice* forthcoming)
tbwebb@shb.com
SHOOK, HARDY & BACON L.L.P.
555 Mission Street, Suite 2300
San Francisco, CA 94105
Tel: 415.544.1904 | Fax: 415.391.0281

Jenn Odell Hatcher (*pro hac vice* forthcoming)
jhatcher@shb.com
SHOOK, HARDY & BACON L.L.P.
2555 Grand Blvd.
Kansas City MO 64108
Tel: 816.559.0306 | Fax: 816.421.5547

Jessica N. Wahl (*pro hac vice* forthcoming)
jwahl@shb.com
SHOOK, HARDY & BACON L.L.P.
2049 Century Park East, Suite 3000
Los Angeles, CA 90067
Tel: 424.324.3477 | Fax: 424.204.9093

**CERTIFICATE OF SERVICE**

I hereby certify that on April 7, 2023, the foregoing was filed via the Court's Electronic Filing System. Notice of this filing will be sent by operation of the Court's Electronic Filing System to all parties of record:

J. Tucker Merrigan (BBO# 681627)
Victoria Santoro (BBO# 679120)
Erin E, McHugh (BBO# 703701)
**SWEENEY MERRIGAN LAW**
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com
*Attorneys for Plaintiff*

Foster C. Johnson (*pro hac vice forthcoming*)
David Warden (*pro hac vice forthcoming*)
Nathan Campbell (*pro hac vice forthcoming*)
**AHMAD, ZAVITSANOS & MENSING, P.C.**
1221 McKinney St., Suite 3460
Houston, TX 77010
Tel: (713) 655-1101
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com
*Attorneys for Plaintiff*

Seth Meyer (*pro hac vice forthcoming*)
Alex Dravillas (*pro hac vice forthcoming*)
**KELLER POSTMAN LLC**
150 N. Riverside Plaza, Suite 4100
Chicago, IL 60606
Tel: (312) 741-5220
sam@kellerpostman.com
adj@kellerpostman.com
*Attorney for Plaintiff*

*/s/ Emyr T. Remy*
Emyr T. Remy

16.1

COMMONWEALTH OF MASSACHUSETTS

ESSEX, S.S. SUPERIOR COURT

JOHN DOE, Individually and on Behalf of All Others Similarly Situated, §
§
*Plaintiffs,* § C.A. No. 2277CV01000
§
v. §
§
EMERSON HOSPTIAL §
§
*Defendant.* §

A TRUE COPY, ATTEST
DEPUTY ASS'T. CLERK

## OPPOSITION TO DEFENDANT'S REQUEST FOR ADDITIONAL PAGES [1]

Plaintiff opposes defendant's request for leave to file a 10-page Reply because the request is neither fair to plaintiff nor justified by the requirements of Rule 9A.

In responding to defendant's motion to dismiss, plaintiff complied with the page limits established by Rule 9A. Plaintiff submits that it is not fair or reasonable that defendant be given a 100% increase in the number of pages established by Rule 9A for its Reply. This is especially so

[1] By April 7, 2023 letter to Debra Vernava, Session Clerk for Hon. Janice W. Howe, defendant requested an extension of time and additional pages for its Reply. The plaintiff agrees to an extension to the filing date of April 18, 2023; this concession by plaintiff is unacceptable to the defendant who instead insists on a filing date of April 24, 2023. Plaintiff has already agreed to multiple requests for additional time by the defendant's firm to file its Motion to Dismiss. This is a class case affecting a wide range of individuals, and although plaintiff did accommodate those requests, plaintiff is committed to prosecuting this case on behalf of the putative class without unnecessary delay. Plaintiff's counsel submits that recent experiences in similar Superior Court cases informs that courts are strictly enforcing deadlines and case progression to reduce the inventory backlog that has only been exacerbated since Covid. Plaintiff also notes that defendant's counsel (Shook, Hardy & Bacon LLP) has over 500 lawyers, several of whom are copied on defense counsel's several emails. Respectfully, defense counsel has more than sufficient resources to draft a Reply with an additional seven-day extension, i.e., by April 18, 2023.

where the defendant fails to identify *any specific material issues* raised in plaintiff's Opposition that were not foreseeable or would otherwise justify the need to exceed the allotted 5 pages.

By email to plaintiff's counsel, defendant's counsel stated, "Emerson believes those additional pages are necessary in light of the number of arguments both sides have made, the recent *Rush* decision, and the novelty of the underlying claims." *See* Ex. A. But, defendant misapprehends the purpose of a Reply memorandum. The defendant was given ample opportunity to address "the novelty of the underlying claims" in its Motion to Dismiss. It is unfair to give the defendant a second bite beyond the allotted 5 pages. *See Baranofsky v. Rousselot Peabody, Inc.*, 2020 WL 4049942 at *5 (Salinger, J., Mass. Super., 2020) ("Any reply to memorandum may only address 'matters raised in the opposition that ... could not reasonably have been anticipated and addressed in the ... initial memorandum.' Rule 9A(a)(3). Arguments raised for the first time in a reply to memorandum, that could have been addressed in the initial memorandum, come too late. Rule 9A's requirements ensure that the moving party provides sufficient notice of and support for its arguments and that the opposing party has the opportunity to respond in writing. Moreover, the *Rush* decision referred to in defense counsel's email—a decision from an Illinois District Court addressing claims brought under Illinois law—can be succinctly and sufficiently addressed in a 5-page Reply.

Finally, while defendant undoubtedly would like the strategic advantage of getting significantly more pages than plaintiff to brief the same issues, defendant's desire for such an advantage is insufficient. The defendant has failed to show good cause. Indeed, defendant fails to show it will be prejudiced at all if not allowed to increase its Reply page limit by 100%. Much less has defendant shown that oral argument will not provide it with a full opportunity to be heard on all issues that it believes are important.

**Conclusion**

For these reasons, Plaintiff does not agree to defendant's request for additional pages, and asks that the Court deny defendant's request for the same.

Respectfully submitted,

COUNSEL FOR PLAINTIFF JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED

*/s/ J. Tucker Merrigan*
J. Tucker Merrigan, BBO# 681627
Thomas T. Merrigan, BBO# 343480
Erin E. McHugh, BBO# 703701
**SWEENEY MERRIGAN LAW**
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
tom@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Foster Johnson (*admitted pro hac vice*)
State Bar No. 289055
David Warden (*admitted pro hac vice*)
Texas Bar No. 20856750
Nathan Campbell (*admitted pro hac vice*)
Texas Bar No. 24097455
**AHMAD, ZAVITSANOS & MENSING, PLLC**
1221 McKinney, Suite 2500
Houston, Texas 77010
(713) 655-1101 -Phone
(713) 655-0062 – Fax
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

Seth A. Meyer (*admitted pro hac vice*)
Alex Dravillas (*admitted pro hac vice*)
**KELLER POSTMAN LLC**
150 N. Riverside Plaza, Suite 4100
Chicago, IL 60606
(312) 741-5226
sam@kellerpostman.com
adj@kellerpostman.com

**CERTIFICATE OF SERVICE**

I, J. Tucker Merrigan, hereby certify that on April 9, 2023, in accordance with Superior Court Rule 9A, served the Plaintiff's Opposition to Defendant's Request for Additional Pages on all counsel of record, via electronic mail to the following parties of interest:

Alan Y. Wong
awong@shb.com
Emyr Remy
remy@shb.com
SHOOK, HARDY & BACON L.L.P.
One Federal Street, Suite 2540
Boston, MA 02110
Tel: (617) 531-1411 | Fax: (617) 531-1602

Alfred J. Saikali
asaikali@shb.com
SHOOK, HARDY & BACON L.L.P.
201 South Biscayne Blvd., Suite 3200
Miami, Florida 33131
Tel: (305) 358-5171 | Fax: (305) 358-7470

Josh Becker (*pro hac vice forthcoming*)
jbecker@shb.com
SHOOK, HARDY & BACON L.L.P.
1230 Peachtree St., Suite 1200
Atlanta, GA 30309
Tel: (470) 867-6000 | Fax: (470) 867-6001

Michael Rayfield (*pro hac vice forthcoming*)
mrayfield@shb.com
SHOOK, HARDY & BACON L.L.P.
1325 Avenue of the Americas, 28th Floor
New York, NY 10019
Tel: (212) 989-8844 | Fax: (929) 501-5455

Lindsey M. Knapton (*pro hac vice forthcoming*)
lknapton@shb.com
SHOOK, HARDY & BACON L.L.P.
1600 17th Street, Suite 450
Denver, CO 80202
Tel: (303) 285-5300 | Fax: (303) 285-5301

*<u>/s/ Jonathan T. Merrigan</u>*
J. Tucker Merrigan

17

**COMMONWEALTH OF MASSACHUSETTS**

**ESSEX, S.S.** — **SUPERIOR COURT**

| | | |
|---|---|---|
| **JOHN DOE, Individually and on Behalf of All Others Similarly Situated,** | § | **C.A. No. 2277CV01000** D |
| ***Plaintiffs,*** | § | |
| **v.** | § | |
| **EMERSON HOSPTIAL** | § | A TRUE COPY, ATTEST |
| ***Defendant.*** | § | DEPUTY ASS'T. CLERK |

DENIED
Janice W. Howe

1/27/23 Plaintiff's motion to strike is DENIED for failure to comply with Superior Court Rule 9C. After further review, the motion is DENIED. Janice W. Howe, J.

Paper #18.7, remains pending. Howe, J. Attest: A Clerk

## PLAINTIFF'S MOTION TO STRIKE

Plaintiff John Doe moves to strike extraneous materials attached to the Defendant's Memorandum submitted in support of its Motion to Dismiss.

The Memorandum contains 150 pages, 18 pages of which constitute written argument. The remaining 132 pages start with a two page Affidavit of Alan Y. Wong, defendant's legal counsel. The Wong Affidavit consists of six exhibits, the first five of which Plaintiff seeks to strike.

**Exhibit 1** appears to be a copy of a Meta press release titled "Introducing Meta: A Social Technology Company" and dated October 28, 2021, accessed at https://about.fb.com/news/2021/10/facebook-company-is-now-meta/ on February 9, 2023.

**Exhibit 2** appears to be an undated copy of Meta's Terms of Service, accessed at https://www.facebook.com/legal/terms/plain_text_terms on February 7, 2023.

**Exhibit 3** appears to be a copy of Meta's Privacy Policy, effective January 1, 2023, accessed at https://mbasic.facebook.com/privacy/printable on February 7, 2023.

**Exhibit 4** appears to be a copy of Meta's Cookies Policy, effective October 5, 2022, accessed at http://mbasic.facebook.com/privacy/policiesy/cookies/printable/ on February 27, 2023.

**Exhibit 5** appears to be an undated copy of the webpage titled "Off-Facebook Activity" accessed at https://www.facebook.com/off-facebook-activity on February 9, 2023.

**Exhibit 6** appears to be a copy of the Emerson Hospital Patient Privacy policy accessed at of the Emerson Hospital Patient Privacy policy accessed at https://www.emersonhospital.org/patients-visitors/patients-rights-responsiblities/patient-privacy on February 9, 2023.

Exhibits 1–5 are improperly before the court on Emerson's motion to dismiss. Plaintiff submits a memorandum in support of this motion explaining how the motion to dismiss should be decided based on the allegations in the complaint, and not with reference to extraneous evidence such as these exhibits.

Plaintiff therefore respectfully moves that Exhibits 1 through 5 attached to the Wong Affidavit be stricken.

Dated: April 3, 2023

Respectfully submitted,

*/s/ J. Tucker Merrigan*
J. Tucker Merrigan, BBO# 681627
Thomas T. Merrigan, BBO# 343480
Erin E. McHugh, BBO# 703701
Sweeney Merrigan Law
268 Summer St. LL
Boston, MA 02210
(413) 774-5300
tucker@sweeneymerrigan.com
tom@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Foster C. Johnson (*admitted pro hac vice*)
David Warden (*admitted pro hac vice*)
Nathan Campbell (*admitted pro hac vice*)
Ahmad Zavitsanos & Mensing PLLC
1221 McKinney Street, Suite 2500
Houston, Texas 77010
(713) 655-1101
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

Seth Meyer (*admitted pro hac vice*)
Alex Dravillas (*admitted pro hac vice*)
Keller Postman LLC
150 N. Riverside Plaza
Suite 4100
Chicago, Illinois 60606
(312) 741-5220
sam@kellerpostman.com
ajd@kellerpostman.com

**COUNSEL FOR PLAINTIFF JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED**

17.1

COMMONWEALTH OF MASSACHUSETTS

ESSEX, S.S. SUPERIOR COURT

**JOHN DOE, Individually and on Behalf of All Others Similarly Situated,**

***Plaintiffs,***

**v.**

**EMERSON HOSPTIAL**

***Defendant.***

§ § § § § § § § § §

**C.A. No. 2277CV01000**

A TRUE COPY, ATTEST
DEPUTY ASS'T CLERK

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION TO STRIKE

### I. It is improper for the Cout to consider Exhibits 1 through 5 when ruling on Emerson's motion to dismiss.

The defendant's 12(b)(6) Motion to Dismiss appends six exhibits to its Memorandum. According to the Affidavit of Alan Y. Wong, defendant's counsel, the exhibits are offered "in support of Emerson Hospital's Motion to Dismiss the above-captioned case." Each of the defendant's exhibits is evidentiary support for the motion to dismiss, and exhibits 1 through 5 are all improper for the Court to consider at this stage in the litigation.

"In evaluating a rule 12(b)(6) motion, we take into consideration 'the allegations in the complaint, although matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint, also may be taken into account.'" *Schaer v. Brandeis Univ.*, 432 Mass. 474, 477 (2000) (quoting 5A Wright & Miller, Federal Practice and Procedure § 1357, at 299 (1990)); *see also Mogavero v. Elephant Biotechnologies, Inc.*, No. SUCV20173878BLS2, 2018 WL 4326367, at *2 (Mass. Super. July 16, 2018) ("[W]here a document is not attached to the complaint or explicitly incorporated by reference, a

'plaintiff's *reliance* on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion.'") (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)); *cf. Lalchandani v. Roddy*, 86 Mass. App. Ct. 819, 824 (2015) (plaintiff's complaint quoted extensively from the contract in issue).

Exhibits 1 through 5 are not attached to Plaintiff's Complaint. Nor are they relied on by Plaintiff in making his allegations against Emerson. Plaintiff's complaint includes but a single reference to Facebook's Terms of Service, buried in paragraph 144 of Plaintiff's 64-page complaint. First Am. Compl. ("Compl.") at ¶ 144 ("Two years later, Facebook made modifications to its Terms of Service, which allowed Facebook to use anything a user uploaded to its site for any purpose, at any time, even after the user ceased using Facebook. The Terms of Service also failed to provide for any way for users to completely delete their accounts. Under immense public pressure, Facebook eventually returned to its prior Terms of Service."); *contra* Mem. Law in Support of Mot. Dismiss First Am. Compl. ("Mem.") at n. 4 ("Plaintiff extensively refers to and relies upon Facebook and Meta's policies in his First Amended Complaint"). This contextual reference about Facebook's history of privacy violations is hardly "integral" to Plaintiff's allegations against Emerson. *Contra* Mem. at n. 4. Moreover, Exhibits 1 through 5 are not judicial orders, or documents found in public records (such as land deeds). Accordingly, the court is without authority to rely on them in ruling on the defendant's 12(b)(6) motion.

## II. Emerson's reliance on Massachusetts case law is misplaced.

Emerson's citation to *Marram v. Kobrick Offshore Fund, Ltd.*, 442 Mass. 43, 45 (2004), is unavailing. Mem. at n. 4. There, extraneous documents could be considered so long as "the plaintiff

had notice of the[] documents and relied on them in framing the complaint." Emerson does not establish that Plaintiff relied on Exhibits 1 through 5, its conclusory statements to the contrary.

The defendant also cites *Lalchandani v. Roddy*, 86 Mass. App. Ct. 819 (2015). *Lalchandani* stands for the proposition that: "[i]n evaluating a motion to dismiss … matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint, also may be taken into account." 86 Mass. App. Ct. at 824. Yet, the defendant fails to show that any of its exhibits qualify as "public record, orders, items appearing in the record of the case, and exhibits attached to the complaint."

Moreover, at no time in its Memorandum does Emerson argue specifically that *any* identified exhibit constitutes a document that qualifies for consideration in ruling on defendant's 12(b)(6) motion. Instead, the defendant makes cursory references to its exhibits to urge the court to make fact-finding rulings based on the exhibits. Rather than explain the application of the exhibits to its 12(b)(6) theory, the defendant leaves it to the court to figure out.

**III. Exhibits 1 through 5 are in any event incompetent evidence.**

Finally, Exhibits 1 through 5 are evidentiarily incompetent. Exhibits 1 through 5 are hearsay documents, and there is an insufficient foundation to establish their authenticity. *See* MASS. RS. EVID. 801, 901. Moreover, as submitted, these exhibits are not relevant. MASS. RS. EVID. 401–402. Plaintiff's amended complaint was filed on January 30, 2023. The downloads Emerson attaches to its motion were downloaded in February 2023—after the date of the amended complaint.[1] Exhibits 2 and 5 are undated documents, so there is no apparent connection between

[1] The plaintiff's original complaint was filed on October 19, 2022; the amended complaint was filed on January 30, 2023. A reasonable reading of the plaintiff's complaint and amended complaint demonstrate that plaintiff's injuries preceded the February 2023 download dates of defendant's exhibits. Attorney Wong's Affidavit fails to connect the dates of any of the challenged

these documents and the allegations in the complaint. Although Exhibit 1, Exhibit 3, and Exhibit 4 all appear to have effective dates that pre-date the filing of the First Amended Complaint, Emerson nowhere establishes that these were the effective policies at the time of the allegations in the complaint. Without such foundation, Emerson cannot even prove that Exhibit 1 through 5 are relevant.

## Conclusion

Plaintiff respectfully asks that Emerson's Exhibits 1–5 all be striken.

exhibits to the relevant timeframes in the plaintiff's amended complaint. It is left to speculation whether the policies set forth in the exhibits are the same that plaintiff litigates in this proceeding.

Dated: April 3, 2023

Respectfully submitted,

*/s/ J. Tucker Merrigan*

J. Tucker Merrigan, BBO# 681627
Thomas T. Merrigan, BBO# 343480
Erin E. McHugh, BBO# 703701
Sweeney Merrigan Law
268 Summer St. LL
Boston, MA 02210
(413) 774-5300
tucker@sweeneymerrigan.com
tom@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Foster C. Johnson (*admitted pro hac vice*)
David Warden (*admitted pro hac vice*)
Nathan Campbell (*admitted pro hac vice*)
Ahmad Zavitsanos & Mensing PLLC
1221 McKinney Street, Suite 2500
Houston, Texas 77010
(713) 655-1101
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

Seth Meyer (*admitted pro hac vice*)
Alex Dravillas (*admitted pro hac vice*)
Keller Postman LLC
150 N. Riverside Plaza
Suite 4100
Chicago, Illinois 60606
(312) 741-5220
sam@kellerpostman.com
ajd@kellerpostman.com

**COUNSEL FOR PLAINTIFF JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED**

## CERTIFICATE OF SERVICE

I, J. Tucker Merrigan, hereby certify that on April 3, 2023, in accordance with Superior Court Rule 9A, I served the within document(s):

- Notice of Plaintiff's Motion to Strike;
- Plaintiff's Motion to Strike;
- Memorandum in Support of Plaintiff's Motion to Strike;

on all counsel of record, via electronic mail to the following parties of interest:

Alan Y. Wong
awong@shb.com
Emyr Remy
remy@shb.com
SHOOK, HARDY & BACON L.L.P.
One Federal Street, Suite 2540
Boston, MA 02110
Tel: (617) 531-1411 | Fax: (617) 531-1602

Alfred J. Saikali
asaikali@shb.com
SHOOK, HARDY & BACON L.L.P.
201 South Biscayne Blvd., Suite 3200
Miami, Florida 33131
Tel: (305) 358-5171 | Fax: (305) 358-7470

Josh Becker (pro hac vice forthcoming)
jbecker@shb.com
SHOOK, HARDY & BACON L.L.P.
1230 Peachtree St., Suite 1200
Atlanta, GA 30309
Tel: (470) 867-6000 | Fax: (470) 867-6001

Michael Rayfield (pro hac vice forthcoming)
mrayfield@shb.com
SHOOK, HARDY & BACON L.L.P.
1325 Avenue of the Americas, 28th Floor
New York, NY 10019
Tel: (212) 989-8844 | Fax: (929) 501-5455

Lindsey M. Knapton (pro hac vice forthcoming)
lknapton@shb.com
SHOOK, HARDY & BACON L.L.P.
1600 17th Street, Suite 450
Denver, CO 80202
Tel: (303) 285-5300 | Fax: (303) 285-5301

*/s/ Jonathan T. Merrigan*
J. Tucker Merrigan

17.2

COMMONWEALTH OF MASSACHUSETTS

ESSEX, ss

TRIAL COURT DEPARTMENT
SUPERIOR COURT
DOCKET NO. 2277CV01000D

JOHN DOE, individually and on behalf of all other similarly situated,

Plaintiffs,

v.

EMERSON HOSPITAL,

Defendants.

A TRUE COPY, ATTEST
DEPUTY ASST. CLERK

**DEFENDANT'S OPPOSITION TO MOTION TO STRIKE OF DEFENDANT'S MATERIALS ATTACHED TO ITS MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS**

NOW COMES Defendant Emerson Hospital who submits this Opposition to Plaintiff's Motion to Strike Extraneous Materials Attached to Defendant's Memorandum submitted in Support of its Motion to Dismiss.

Plaintiff John Doe seeks to strike Defendant's Exhibits One (1) through Five (5). Exhibits One (1) and Five (5) consist of a Facebook press release and a webpage related to "Off-Facebook Activity," respectively, while Exhibits Two (2) through Four (4) consist of Facebook's Terms of Service, Privacy Policy, and Cookies Policy, respectively. As noted in Defendant's Motion to Dismiss, for ease of reference, Facebook and Meta will be used simultaneously throughout this Opposition as the two companies have merged.

## I. THIS MOTION TO STRIKE SHOULD BE DENIED AS IT IS IN VIOLATION OF RULE 9C.

Plaintiff's Motion to Strike should be denied because it was filed in violation of this Court's local rules. Under Rule 9C(a), "each of the parties shall confer in advance of filing any motion . .

. and make a good faith effort to narrow areas of disagreement to the fullest extent." L.R. 9C(a) (emphasis supplied). This rule specifically requires a meet and confer attempt by counsel for all parties when there is a motion pursuant to Mass. R. Civ. P. 12, which includes a Motion to Strike under Mass. R. Civ. P. 12(f). *See id.* This rule is necessary to preserve both the parties' and judicial resources and to promote judicial economy.

Here, there was no attempt by Plaintiff's counsel to meet and confer prior to serving this subject Motion to Strike. As such, this Court should deny Plaintiff's Motion to Strike pursuant to Rule 9C(a).

## *II.* DEFENDANT SUBMITS TO EXHIBIT FIVE BEING STRICKEN FROM THE MOTION TO DISMISS

Plaintiff seeks to exclude Emerson's Exhibit Five (5), which includes a Facebook webpage related to "Off-Facebook Activity." The webpage features an article describing how users can turn off data sharing. Although this information is relevant and being used as evidentiary support in support of Emerson's Motion to Dismiss, Emerson will agree to strike Exhibit 5 in support of its Motion to Dismiss.

## *II.* EXHIBITS 1, 2, 3, AND 4 SHOULD NOT BE STRICKEN BECAUSE PLAINTIFF RELIED ON THEM IN FORMING HIS FIRST AMENDED COMPLAINT

Plaintiff argues that Exhibits One (1) through Four (4) should be stricken from Emerson's on to Dismiss because the exhibits are not attached to the First Amended Complaint and are ied upon by Plaintiff in forming the basis of the First Amended Complaint. (Motion to Strike, Exhibits One (1) through Four (4) are all documents that Plaintiff relied upon in preparing Amended Complaint. When a plaintiff "had notice of [] documents and relied on them in e complaint, the attachment of such documents to a motion to dismiss does not convert o one for summary judgment." *Marram v. Kobrick Offshore Fund, Ltd.*, 442 Mass. 43,

44-45. See, e.g., *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47-48 (2d Cir. 1991), cert denied sub nom. *Cortec Indus., Inc. v. Westinghouse Credit Corp.*, 503 U.S. 960, 118 L. Ed. 2d 208, 112 S. Ct. 1561 (1992) ("Where plaintiff has actual notice of all the information in the movant's papers and has relied upon [the prospectus] in framing the complaint the necessity of translating a rule 12 [b] [6] motion into one under [Mass. R. Civ. P. 56, 365 Mass. 824 (1974),] is largely dissipated"); *In re Computervision Corp. Sec. Litig.*, 869 F. Supp. 56, 59-60 (D. Mass. 1994) (holding that court could consider prospectus, attached to defendant's motion to dismiss, without converting it to a motion summary judgment); *Doucette v. Mass. Parole Bd.*, 18 N.E.3d 1096 (Mass. App. 2014); *Polay v. McMahon*, 10 N.E.3d 1122 (Mass. 2014) (matters of public record or documents plaintiffs relied on in framing their complaint are appropriately considered on a motion to dismiss under Mass. R. Civ. P. 12(b)); *Watterson v. Page*, 987 F.2d 1,3 (1st Cir. 1993) (holding that a court may look at documents sufficiently referred to in the complaint when assessing a motion to dismiss); *Fromm v. Boston Redevelopment Auth.*, 2005 Mass. Super. LEXIS 318, at *26 (holding that the problem arises when a court reviews external documents to a complaint and the plaintiff does not have notice of these documents, but when a plaintiff has actual notice and has relied upon the documents in framing the complaint, the court may consider the external documents in considering the motion to dismiss.)

***Exhibit 1:*** Exhibit 1 is a press release issued by Meta on October 28, 2021which explains that Facebook and its related companies will now operate under the umbrella of Meta. In Plaintiff's First Amended Complaint ("FAC"), Plaintiff pleads that Facebook is now operated by Meta Platforms, Inc. *See* FAC ¶ 44. Plaintiff clearly relied on the publicly available information that Facebook is now part of Meta in pleading this allegation.

***Exhibits 2-4:*** Exhibit 2 is Meta's Terms of Service dated July 26, 2022, which explains to its users what Meta is responsible for and what its user obligations are for continuation of the platform service; Exhibit 3 is Meta's Privacy Policy dated January 1, 2023, which describes what user information is collected by Meta, how that information is used, and how that information is shared; and Exhibit 4 is Meta's Cookies Policy dated October 5, 2022, which describes what cookies are, why cookies are used, examples of cookies on third party websites, and how users can control the use of cookies. These three exhibits are properly attached to Emerson's Motion to Dismiss and should not be stricken because they helped form the basis of Plaintiff's First Amended Complaint.

Plaintiff references Facebook and/or Meta four hundred and thirty-seven (437) times. He references seventy (70) articles throughout the footnotes, twenty-four (24) of which are Facebook and/or Meta published articles. Plaintiff discusses Facebook, Facebook's use of cookies, Facebook's practices around data privacy from paragraph eleven (11) through paragraph one hundred and fifty-four (154). That equates to one hundred and forty-three (143) paragraphs exclusively dedicated to discussing the use and practice of Facebook's privacy practices and how it utilizes user's data. Despite this, Plaintiff argues that it did not, not even once, consider Facebook's privacy policy, cookies policy, or terms of service in preparing the First Amended Complaint. (Motion to Strike, p. 2.) The First Amended Complaint makes clear, however, in one hundred and forty-three (143) paragraphs that Plaintiff relied heavily on Facebook's policies surrounding cookies, privacy, etc. Plaintiff cannot now claim it did not rely on these policies when nearly the entire First Amended Complaint is focused on Facebook's privacy practices and policies.

Further, Plaintiff explicitly references Exhibit 2 (Facebook's Terms of Service) in the First Amended Complaint at Paragraph 144. Plaintiff admits as such in its Opposition to the Motion to Dismiss. Plaintiff argues that Facebook's Terms of Service should not be considered as "integral" to the First Amended Complaint and, therefore, stricken as an exhibit, because **Plaintiff** only referenced the Terms of Service one time. This argument has no merit. The rule, and subsequent case law, does not require that the external document be mentioned a certain number of times for it to be considered as part of the First Amended Complaint. In fact, the case law does not even require that the external document be referenced explicitly in the First Amended Complaint at all. Instead, the standard is that the external document be *relied upon*. *Cortec*, 949 F.2d at 47 (italics added.) Plaintiff demonstrated his reliance by consistently referring to Facebook's privacy practice in one-hundred and forty-three (143) paragraphs of the First Amended Complaint, and by explicitly referencing Facebook's Terms and Conditions in paragraph 144. Exhibit 2 should not be stricken.

Similarly, Plaintiff relies heavily on Exhibit 3 (Facebook's Privacy Policy) in forming the basis of the First Amended Complaint. Facebook's Privacy Policy illustrates to users the type of information that is collected, how the information is collected, how the information is used, and how to control data sharing. Starting at paragraph 44 of Plaintiff's First Amended Complaint, Plaintiff describes, in pain-staking detail, in sixty (60) paragraphs, the types of information that Facebook receives, how Facebook uses this information for advertising purposes, how Facebook tracks personal data through the use of a pixel, how Facebook utilizes this process through third parties, and more. (First Amended Complaint, ¶¶ 44-104.) Plaintiff supports these allegations with seventy (70) different articles and webpages, including Facebook's articles and webpages that explain the same information that is included in Facebook's Privacy Policy. Because Facebook's

Privacy Policy forms the basis of a multitude of the allegations in the First Amended Complaint, Exhibit 3 should not be stricken.

Finally, Exhibit 4 (Facebook's Cookie Policy) should not be stricken. Plaintiff references the use of internet "cookies" thirty-nine (39) times (First Amended Complaint, ¶¶ 35-37, 39, 48, 49, 67, 70, 71, 75-78, 88, 99, 137, 186, 248) with twenty-five (25) of those times directly explicitly describing "Facebook cookies". (First Amended Complaint, ¶¶ 36, 48, 49, 67, 70, 71, 75-78, 88, 99.) Plaintiff uses three footnotes to discuss how cookies work, two of which specifically explain what Facebook cookies are and how they are used. (First Amended Complaint, n.47, n.48, and n.52.) Plaintiff cannot now seek to strike a document while simultaneously referencing the contents of that document in the First Amended Complaint. *See Golchin v. Liberty Mut.Ins. Co.*, 460 Mass. 222, 224 (2011) (finding that defendant's exhibits attached to its motion to dismiss were properly considered because these documents and the contents thereof helped form the basis of the plaintiff's complaint); *Ryan v. Mary Ann Morse Healthcare Corp.*, 483 Mass. 612, 614, n. 5 (finding document attached to defendant's motion to dismiss but not in the plaintiff's complaint was appropriately considered with the motion to dismiss as both parties knew of its existence, did not dispute what was in the document, and it was relied upon in support of the briefing); *see also, Marram v. Kobrick Offshore Fund, Ltd.*, 442 Mass. 43, 45 n.4 (2004) (because "the plaintiff had notice of these documents and relied on them in framing the complaint, the attachment of such documents to a motion to dismiss does not convert the motion to one for summary judgment, as required by Mass. R. Civ. P. 12 [b] [6], 365 Mass. 754 [1974]"); *Berkowitz v. President & Fellows of Harvard College*, 58 Mass. App. Ct. 262, 270 n.7 (2003).

This Court should reject Plaintiff's attempt to plead around the existence of Facebook's policies by failing to name them in the First Amended Complaint, all the while relying on them to

support his claims. As courts have held, a plaintiff may not escape the consequences of not attaching documents it relied upon in drafting its complaint. *See Cortec*, 949 F.2d at 47 (holding that when a plaintiff chooses not to attach to the complaint a document upon which it relies in drafting the complaint, the defendant may produce the document when attacking the complaint on a motion to dismiss because the plaintiff should not so easily be allowed to escape the consequences of its own failure.)

## IV. EXHIBITS 1 THROUGH 4 ARE COMPETENT EVIDENCE

The exhibits at issue in the Motion to Strike are competent evidence that the Court should consider when assessing Emerson's Motion to Dismiss.

Plaintiff argues that these exhibits should be disregarded because they were downloaded after the filing of Plaintiff's Amended Complaint. Plaintiff's First Amended Complaint was filed on January 30, 2023 and Emerson's Motion to Dismiss was served on February 9, 2023. Plaintiff's argument that these exhibits were downloaded after the filing of Plaintiff's First Amended Complaint has no merit. All three exhibits have effective dates prior to the filing of Plaintiff's Amended Complaint. Specifically, Exhibit 2 has an effective date of July 26, 2022, Exhibit 3 has an effective date of January 1, 2023, and Exhibit 4 has an effective date of October 5, 2022. Plaintiff's argument that Emerson does not establish these policies were effective at the time of the allegations in the Complaint is futile for multiple reasons. First, Plaintiff does not plead the date to which the allegations occurred, and Plaintiff has sued anonymously, making it impossible for Emerson to determine anything with respect to the named plaintiff. (First Amended Complaint, ¶ 103.) The only date certain that Plaintiff pleads is that Emerson allegedly first "injured" Plaintiff on October 17, 2023, a date which has not occurred. (First Amended Complaint, ¶ 3.)

Second, Plaintiff argues that Emerson did not establish that the policies were "effective policies at the time of the allegations in the complaint." (Motion to Strike, p. 4.) This argument lacks merit for several reasons. First, as discussed above, not only has Plaintiff yet to identify himself, he also fails to allege when he became a Facebook user. Without that information, it is impossible for Facebook to provide a policy "at the time of the allegations in the complaint." Plaintiff also alleges that he is a Facebook user, which Emerson assumes means that he is a *current* Facebook user, and as such the current Facebook policies would apply to him. Lastly, even if the current Facebook policy was not in effect at the time Plaintiff signed up for Facebook—Plaintiff's Motion to Strike should still be denied. Plaintiff does not claim that Facebook's privacy policies have materially differed over time. And, at any rate, the validity of the policies is only relevant to this Court's ruling on Emerson's motion to dismiss, not Plaintiff's Motion to Strike.

## V. CONCLUSION

For the foregoing reasons, Plaintiff's Motion to Strike Emerson's Exhibits 1 through 4 in support of its Motion to Dismiss should be denied. Should the Court grant Plaintiff's Motion to Strike Defendant's Materials Attached to its Motion to Dismiss, Emerson requests that this Court allow Emerson an opportunity to cure the Motion to Dismiss, especially considering Plaintiff's failure to meet and confer with Emerson prior to the filing of this motion as required by Rule 9C.

Respectfully submitted,

**EMERSON HOSPITAL**

*/s/ Tammy Webb*
Tammy B. Webb (*pro hac vice* forthcoming)
tbwebb@shb.com
SHOOK, HARDY, & BACON L.L.P.
555 Mission Street, Suite 2300
San Francisco, CA 94105
Tel: (415) 544-1900 | Fax: (415) 391-0281

Alan Y. Wong (BBO# 687618)
awong@shb.com
Emyr Remy (BBO # 740156)
remy@shb.com
SHOOK, HARDY & BACON L.L.P.
One Federal Street, Suite 2540
Boston, MA 02110
Tel: (617) 531-1411 | Fax: (617) 531-1602

Alfred J. Saikali (*pro hac vice* forthcoming)
asaikali@shb.com
SHOOK, HARDY & BACON L.L.P.
201 South Biscayne Blvd., Suite 3200
Miami, Florida 33131
Tel: (305) 358-5171 | Fax: (305) 358-7470

Michael Rayfield (*pro hac vice* forthcoming)
mrayfield@shb.com
SHOOK, HARDY & BACON L.L.P.
1325 Avenue of the Americas, 28th Floor
New York, NY 10019
Tel: (212) 989-8844 | Fax: (929) 501-5455

# CERTIFICATE OF SERVICE

I hereby certify that on April 19, 2023, in accordance with Superior Court Rule 9A, I served DEFENDANT'S OPPOSITION TO MOTION TO STRIKE OF DEFENDANT'S MATERIALS ATTACHED TO ITS MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS on all counsel of record, cia electronic mail to the following parties of record:

J. Tucker Merrigan (BBO# 681627)
Victoria Santoro (BBO# 679120)
Erin E, McHugh (BBO# 703701)
**SWEENEY MERRIGAN LAW**
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com
*Attorneys for Plaintiff*

Foster C. Johnson (*pro hac vice forthcoming*)
David Warden (*pro hac vice forthcoming*)
Nathan Campbell (*pro hac vice forthcoming*)
**AHMAD, ZAVITSANOS & MENSING, P.C.**
1221 McKinney St., Suite 3460
Houston, TX 77010
Tel: (713) 655-1101
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com
*Attorneys for Plaintiff*

Seth Meyer (*pro hac vice forthcoming*)
Alex Dravillas (*pro hac vice forthcoming*)
**KELLER POSTMAN LLC**
150 N. Riverside Plaza, Suite 4100
Chicago, IL 60606
Tel: (312) 741-5220
sam@kellerpostman.com
adj@kellerpostman.com
*Attorney for Plaintiff*

*/s/ Emyr T. Remy*
Emyr T. Remy

17.3

COMMONWEALTH OF MASSACHUSETTS

ESSEX, S.S. SUPERIOR COURT

| | | |
|---|---|---|
| JOHN DOE, Individually and on Behalf of All Others Similarly Situated, | § | C.A. No. 2277CV01000 |
| *Plaintiffs,* | § | |
| v. | § | |
| EMERSON HOSPTIAL | § | |
| *Defendant.* | § | |

A TRUE COPY, ATTEST
DEPUTY ASS'T. CLERK

## PLAINTIFF'S REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION TO STRIKE

### I. Emerson does not correct the evidentiary problems with its exhibits.

Emerson's Opposition fails to address plaintiff's evidentiary objections to exhibits attached to the defendant's Motion to Dismiss. First, Emerson ignores altogether the hearsay and authenticity objections plaintiff made. *Compare* Mem. Supp. Pl.'s Mot. Strike 4, *with* Opp. Mot. Strike 7–8. Second, Emerson assumes without establishing that the documents it downloaded in February 2023 are relevant to a complaint filed on January 30, 2023. Plaintiff respectfully submits that the court may not infer that the February 2023 downloaded exhibits reflect the same policies that were in force on the injury dates alleged in plaintiff's Amended Complaint. Likewise, defendant's exhibits are not the same web pages referenced in the footnotes in plaintiff's Amended Complaint, despite Emerson's indications to the contrary.[1]

[1] The Affidavit of Alan Y. Wong, Exhibit A to Motion to Dismiss, makes no attempt to connect the February 2023 exhibit download dates to any dates referred to in plaintiff's January 30, 2023 Amended Complaint.

**II. The parties conferred multiple times before <u>filing</u> the motion to strike.**

Doe <u>served</u> his Motion to Strike on defendant on April 3, 2023. However, *before* <u>filing</u> plaintiff's Motion to Strike on April 24, 2023, Doe's counsel complied with Superior Court Rule 9C by conferring with Emerson's counsel concerning Doe's objections to the inclusion of evidentiary exhibits with defendant's Motion to Dismiss.[2] First, in an attempt to reach agreement, after serving its Motion to Strike on April 3, 2023, Doe's counsel conferred with Emerson's counsel both by email and by telephone on April 17, 2023 concerning the Motion to Strike. Second, on April 20, 2023, Doe's counsel again conferred with Emerson's counsel concerning the Motion to Strike. These attempts to reach agreement concerning plaintiff's objections to defendant's exhibits failed. *See* Pl.'s Attached 9C Certificate.

**III. Doe's Amended Complaint does not rely on the Facebook terms and policies.**

In effect, Emerson claims that solely because Doe provides context about how Facebook and Meta operate in the Amended Complaint, that the defendant may include *any* documents it chooses that relate to Facebook's policies and terms of service. *See* Memorandum at 3 (counting up the number of times the Amended Complaint references Facebook and Meta). This argument is without merit. None of Doe's claims against Emerson depends on any policy or term of service that Facebook published; plaintiff's allegations against Emerson rely <u>only</u> on Emerson's misconduct, i.e., neither Facebook nor Meta are defendants or parties to this litigation. Plaintiff alleges that Emerson ignored its privacy and confidentiality obligations to Doe and those similarly situated to him. Because Doe does not rely on Facebook's terms of service and policies for bringing

[2] Defendant misapprehends the requirements of Rule 9C. The defendant objects because the plaintiff did not confer prior to <u>serving</u> the Motion to Strike. The rule requires conferring with opposing counsel before <u>filing</u>. *See* Superior Court Rule 9C: *Counsel to confer prior to filing motions. See* plaintiff's document filed herewith captioned 9C Certificate.

suit against Emerson, the defendant's reasons for including exhibits with its Motion to Dismiss are legally wanting.

## Conclusion

Plaintiff respectfully submits that defendant's arguments concerning the exhibits attached to its Motion to Dismiss are without merit.

**Respectfully submitted,**

**COUNSEL FOR PLAINTIFF JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED**

*/s/ Jonathan T. Merrigan*
J. Tucker Merrigan, BBO# 681627
Thomas T. Merrigan, BBO # 343480
Erin E. McHugh, BBO# 703701
**SWEENEY MERRIGAN LAW**
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
tom@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Foster Johnson (*admitted pro hac vice*)
State Bar No. 289055
David Warden (*admitted pro hac vice*)
Texas Bar No. 20856750
Nathan Campbell (*admitted pro hac vice*)
Texas Bar No. 24097455
**AHMAD, ZAVITSANOS & MENSING, PLLC**
1221 McKinney, Suite 2500
Houston, Texas 77010
(713) 655-1101 -Phone
(713) 655-0062 – Fax
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

Seth A. Meyer (*admitted pro hac vice*)
Alex Dravillas (*admitted pro hac vice*)
**KELLER POSTMAN LLC**
150 N. Riverside Plaza, Suite 4100
Chicago, IL 60606
(312) 741-5226
sam@kellerpostman.com
adj@kellerpostman.com

**CERTIFICATE OF SERVICE**

I hereby certify that, on April 24, 2023, a copy of this reply was electronically served on all counsel of record in accordance with Rule 9A of the Superior Court Rules.

*/s/ Jonathan T. Merrigan*
J. Tucker Merrigan

COMMONWEALTH OF MASSACHUSETTS

174

ESSEX, S.S.

SUPERIOR COURT

| | | |
|---|---|---|
| **JOHN DOE, Individually and on Behalf of All Others Similarly Situated,** | § | **C.A. No. 2277CV01000** |
| ***Plaintiffs,*** | § | |
| **v.** | § | |
| **EMERSON HOSPTIAL** | § | |
| ***Defendant.*** | § | |

A TRUE COPY, ATTEST
DEPUTY ASS'T. CLERK

**PLAINTIFF'S 9C CERTIFICATE re: MOTION TO STRIKE**

I, Jonathan T. Merrigan, certify as follows.

In accordance with Superior Court Rule 9C, *Counsel to confer prior to filing motions,* plaintiff's counsel did confer with counsel for the defendants as follows:

1. Plaintiff served his Motion to Strike on defendant on April 3, 2023;

2. Following service of plaintiff's Motion to Strike on defendant, plaintiff's counsel Foster C. Johnson did confer on April 17, 2023 by email and telephone (prior to filing plaintiff's Motion to Strike) with defendant's counsel Alfred J. Saikali concerning the Motion to Strike;

3. Following receipt of defendant's Opposition to plaintiff's Motion to Strike on April 19, 2023, defendant wherein defendant raised 9C objections to plaintiff's Motion to Strike, plaintiff's counsel Jonathan T. Merrigan did on April 20, 2023 confer (prior to filing plaintiff's Motion to Strike) with defendant's counsel Emyr T. Remy concerning the Motion to Strike;

4. Plaintiff's counsel did confer as required my Superior Court Rule 9C prior to filing Plaintiff's Motion to Strike.

/s/ Jonathan T. Merrigan
Jonathan T. Merrigan

**Respectfully submitted,**

**COUNSEL FOR PLAINTIFF JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED**

/s/ Jonathan T. Merrigan
J. Tucker Merrigan, BBO# 681627
Thomas T. Merrigan, BBO # 343480
Erin E. McHugh, BBO# 703701
**SWEENEY MERRIGAN LAW**
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
tom@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Foster Johnson (*admitted pro hac vice*)
State Bar No. 289055
David Warden (*admitted pro hac vice*)
Texas Bar No. 20856750
Nathan Campbell (*admitted pro hac vice*)
Texas Bar No. 24097455
**AHMAD, ZAVITSANOS & MENSING, PLLC**
1221 McKinney, Suite 2500
Houston, Texas 77010
(713) 655-1101 -Phone
(713) 655-0062 – Fax
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

Seth A. Meyer (*admitted pro hac vice*)
Alex Dravillas (*admitted pro hac vice*)
**KELLER POSTMAN LLC**
150 N. Riverside Plaza, Suite 4100
Chicago, IL 60606
(312) 741-5226
sam@kellerpostman.com
adj@kellerpostman.com

**CERTIFICATE OF SERVICE**

I hereby certify that, on April 24, 2023, a copy of this document was electronically served on all counsel of record in accordance with Rule 9A of the Superior Court Rules.

*/s/ Nathan Campbell*
Nathan Campbell

17.5

COMMONWEALTH OF MASSACHUSETTS

ESSEX, S.S. SUPERIOR COURT

JOHN DOE,
INDIVIDUALLY AND ON
BEHALF OF ALL OTHERS SIMILARLY
SITUATED,

Plaintiff

v.

EMERSON HOSPITAL,

Defendant.

§ C.A. No. 2277CV01000

A TRUE COPY, ATTEST
DEPUTY ASST. CLERK

**RULE 9A NOTICE OF FILING AND LISTING OF DOCUMENTS**

I, J. Tucker Merrigan, one of the counsel for Plaintiff, John Doe, Individually and on Behalf of All Others Similarly Situated, hereby state that the following list of documents have been submitted for filing with the Court pursuant to Superior Court Rule 9A:

1. Plaintiff's Motion to Strike;
2. Memorandum in Support of Plaintiff's Motion to Strike;
3. Defendant's Opposition to Motion to Strike of Defendant's Materials Attached to Its Memorandum in Support of Its Motion to Dismiss;
4. Plaintiff's Reply to Defendant's Opposition to Plaintiff's Motion to Strike; and
5. Plaintiff's 9C Certificate re: Motion to Strike.

Respectfully Submitted
The Plaintiff
By his Attorney,

*/s/ Jonathan T. Merrigan*
J. Tucker Merrigan, BBO# 681627
**SWEENEY MERRIGAN LAW, LLP**
268 Summer Street, LL
Boston, MA 02210
Phone: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com

Dated: April 24, 2023

**CERTIFICATE OF SERVICE**

I, J. Tucker Merrigan, hereby certify that on April 24, 2023 in accordance with Superior Court Rule 9A, I electronically filed via Odyssey file and serve the following documents:

1. Plaintiff's Motion to Strike;
2. Memorandum in Support of Plaintiff's Motion to Strike;
3. Defendant's Opposition to Motion to Strike of Defendant's Materials Attached to Its Memorandum in Support of Its Motion to Dismiss;
4. Plaintiff's Reply to Defendant's Opposition to Plaintiff's Motion to Strike;
5. Plaintiff's 9C Certificate re: Motion to Strike; and
6. Rule 9A Notice of Filing and Listing of Documents.

and served on all counsel of record, via electronic mail to the following parties of interest:

Alan Y. Wong
awong@shb.com
Emyr Remy
remy@shb.com
SHOOK, HARDY & BACON L.L.P.
One Federal Street, Suite 2540
Boston, MA 02110
Tel: (617) 531-1411 | Fax: (617) 531-1602

Alfred J. Saikali
asaikali@shb.com
SHOOK, HARDY & BACON L.L.P.
201 South Biscayne Blvd., Suite 3200
Miami, Florida 33131
Tel: (305) 358-5171 | Fax: (305) 358-7470

Josh Becker
jbecker@shb.com
SHOOK, HARDY & BACON L.L.P.
1230 Peachtree St., Suite 1200
Atlanta, GA 30309
Tel: (470) 867-6000 | Fax: (470) 867-6001

Michael Rayfield (pro hac vice forthcoming)
mrayfield@shb.com
SHOOK, HARDY & BACON L.L.P.
1325 Avenue of the Americas, 28th Floor
New York, NY 10019
Tel: (212) 989-8844 | Fax: (929) 501-5455

Lindsey M. Knapton (pro hac vice forthcoming)
lknapton@shb.com
SHOOK, HARDY & BACON L.L.P.
1600 17th Street, Suite 450
Denver, CO 80202
Tel: (303) 285-5300 | Fax: (303) 285-5301

*/s/ Johnathan T. Merrigan*
J. Tucker Merrigan

COMMONWEALTH OF MASSACHUSETTS

ESSEX, ss

TRIAL COURT DEPARTMENT
SUPERIOR COURT

JOHN DOE, individually and on behalf of all other similarly situated,

Plaintiff,

v.

EMERSON HOSPITAL,

Defendant.

DOCKET NO. 2277CV01000D

A TRUE COPY, ATTEST
DEPUTY ASST. CLERK

**DEFENDANT'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

Defendant Emerson Hospital moves, pursuant to Massachusetts Rule of Civil Procedure 12(b)(6), to dismiss Plaintiff's First Amended Complaint for Plaintiff's failure to state a claim upon which relief can be granted. As explained more thoroughly in the supporting memorandum of law, Plaintiff's First Amended Complaint should be dismissed for the following reasons:

- Plaintiff has failed to allege an actionable injury;
- Plaintiff's claim for breach of fiduciary duty fails because he has not adequately pled any of the elements of that claim;
- Plaintiff's claim for breach of implied contract fails because he does not identify any contract terms that Emerson could have breached, consequently rendering mutual assent impossible;
- Plaintiff's claim for unjust enrichment fails because he has not adequately pled any of the elements of that claim;

- Plaintiff's claim under the Commonwealth's "Wiretap Statute," G.L. c. 272, § 99, fails because he had not pled that Emerson "secretly intercepted" his information using an "intercepting device";
- Plaintiff's claim foran invasion of privacy under G.L. c. 214, § 1B fails because he has not alleged an unreasonable interference; and
- To the extent Plaintiff is claiming that Emerson failed to safeguard data that would be considered "Protected Health Information" under the Health Insurance Portability and Accountability Act, his claims are preempted by that statute.

For these reasons, Emerson Hospital requests that this Court grant its Motion to Dismiss.

Dated: February 9, 2023

Respectfully submitted,

**EMERSON HOSPITAL**

By: */s/ Alan Y. Wong*

Alan Y. Wong (BBO# 687618)
awong@shb.com
Emyr Remy (BBO # 740156)
remy@shb.com
SHOOK, HARDY & BACON L.L.P.
One Federal Street, Suite 2540
Boston, MA 02110
Tel: (617) 531-1411 | Fax: (617) 531-1602

Alfred J. Saikali (*pro hac vice* forthcoming)
asaikali@shb.com
SHOOK, HARDY & BACON L.L.P.
201 South Biscayne Blvd., Suite 3200
Miami, Florida 33131
Tel: (305) 358-5171 | Fax: (305) 358-7470

Josh Becker (*pro hac vice* forthcoming)
jbecker@shb.com
SHOOK, HARDY & BACON L.L.P.
1230 Peachtree St., Suite 1200
Atlanta, GA 30309
Tel: (470) 867-6000 | Fax: (470) 867-6001

Michael Rayfield (*pro hac vice* forthcoming)
mrayfield@shb.com
SHOOK, HARDY & BACON L.L.P.
1325 Avenue of the Americas, 28th Floor
New York, NY 10019
Tel: (212) 989-8844 | Fax: (929) 501-5455

Lindsey M. Knapton (*pro hac vice* forthcoming)
lknapton@shb.com
SHOOK, HARDY & BACON L.L.P.
1600 17th Street, Suite 450
Denver, CO 80202
Tel: (303) 285-5300 | Fax: (303) 285-5301

DOCKET NO. 2277CV01000D

**CERTIFICATE OF SERVICE**

I hereby certify that on February 9, 2023, the foregoing was filed via the Court's Electronic Filing System. Notice of this filing will be sent by operation of the Court's Electronic Filing System to all parties of record:

J. Tucker Merrigan (BBO# 681627)
Victoria Santoro (BBO# 679120)
Erin E, McHugh (BBO# 703701)
**SWEENEY MERRIGAN LAW**
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com
*Attorneys for Plaintiff*

Foster C. Johnson (*pro hac vice forthcoming*)
David Warden (*pro hac vice forthcoming*)
Nathan Campbell (*pro hac vice forthcoming*)
**AHMAD, ZAVITSANOS & MENSING, P.C.**
1221 McKinney St., Suite 3460
Houston, TX 77010
Tel: (713) 655-1101
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com
*Attorneys for Plaintiff*

Seth Meyer (*pro hac vice forthcoming*)
Alex Dravillas (*pro hac vice forthcoming*)
**KELLER POSTMAN LLC**
150 N. Riverside Plaza, Suite 4100
Chicago, IL 60606
Tel: (312) 741-5220
sam@kellerpostman.com
adj@kellerpostman.com
*Attorney for Plaintiff*

*/s/ Alan Y. Wong*
Alan Y. Wong

18.1

COMMONWEALTH OF MASSACHUSETTS

ESSEX, ss

TRIAL COURT DEPARTMENT
SUPERIOR COURT

JOHN DOE, individually and on behalf of all other similarly situated,

Plaintiff,

v.

EMERSON HOSPITAL,

Defendant.

DOCKET NO. 2277CV01000D

A TRUE COPY, ATTEST

DEPUTY ASS'T. CLERK

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

DOCKET NO. 2277CV01000D

# TABLE OF CONTENTS

**Introduction** .......... 1

**Background** .......... 3

A. The Meta Pixel. .......... 3

B. Meta's Extensive Policies And Plaintiff's Consent. .......... 4

C. Hospital Patient Portals. .......... 5

D. Emerson's Limited Use Of The Meta Pixel, And Plaintiff's Alleged Activity On Emerson's Website. .......... 5

**Legal Standard** .......... 5

**Argument** .......... 6

I. Plaintiff Has Not Identified A Cognizable Injury. .......... 6

II. The Complaint Fails To State A Claim For Breach Of Fiduciary Duty. .......... 8

III. The Complaint Fails To State A Claim For Breach Of An Implied Contract. .......... 10

IV. The Complaint Fails To State A Claim For Unjust Enrichment. .......... 13

V. The Complaint Fails To State A Claim Under The Wiretap Statute. .......... 14

A. Plaintiff Does Not Allege That Emerson Used An "Intercepting Device." .......... 14

B. Emerson Could Not Have "Secretly" Recorded Plaintiff's Communications Because He Consented. .......... 16

VI. The Complaint Fails To State A Claim For Invasion Of Privacy. .......... 16

VII. HIPAA Preempts Plaintiff's Claims Against Emerson .......... 17

**Conclusion** .......... 18

DOCKET NO. 2277CV01000D

## INTRODUCTION

Defendant Emerson Hospital moves under Mass R. Civ. P. 12(b)(6) to dismiss this case for failure to state a claim[1]. Plaintiff claims that when he visited a website operated by Emerson, his browser sent Facebook "protected health information" (which he does not specifically describe) by operation of "Meta Pixel" technology created and managed by Facebook (which is not a party to this suit). At bottom, First Amended Complaint ("FAC" or Complaint) is little more than a criticism of how the Internet works. It does not even attempt to allege an actual injury. And it asserts causes of action that have nothing to do with the technology at issue. The Complaint rests entirely on barebones, conclusory allegations, and appears to be nothing more than a hasty copy-and-paste job, mirroring similar lawsuits filed across the country. The Court should dismiss this copycat Complaint for multiple reasons.

First, Plaintiff has failed to allege an actionable injury. He does not claim that his data was affected by Emerson's use of the Meta Pixel, or how it was affected, or how he was harmed as a result. His Complaint *asserts*—in a variety of ways—that the "value" of his data was somehow diminished when it was sent to Facebook,[2] but he does not elaborate on that allegation. Nor could he, because his anonymous Complaint avoids *any* specific discussion of what data was shared.

Second, Plaintiff's claim for breach of fiduciary duty fails because he has not adequately pled any of the elements of that claim. Plaintiff attempts to extend the common-law physician-patient fiduciary duty of confidentiality to an entire health system. But without an allegation that

---

[1] Emerson reserves its rights to challenge class certification.

[2] Meta, formerly known as The Facebook Company, is the developer and proprietor of the social media network also known as Facebook. *See* Declaration of Alan Wong (attached hereto as Ex. A), ¶ 4. To avoid confusion and be consistent with Plaintiff's Complaint, Emerson refers to the social media company as both "Meta" and "Facebook" herein, interchangeably.

"the defendant knew that the plaintiff would rely on his services," there can be no such duty. *Van Brode Grp., Inc. v. Bowditch & Dewey*, 36 Mass. App. Ct. 509, 516 (1994).

Third, Plaintiff's claim for breach of implied contract should be dismissed because he does not identify any contract terms that Emerson could have breached. Plaintiff avers that he "entered into valid and enforceable implied contracts with Defendant when [he] sought *medical treatment* from Defendant," but the Complaint fails to identify when Plaintiff received care from Emerson or what assurances Emerson made to Plaintiff about its website. FAC ¶ 227.

Fourth, Plaintiff's claim for unjust enrichment fails because he has not adequately pled any of the elements of that claim. He has not claimed that he conferred any measurable benefit on Emerson, let alone that this benefit was unjust. Plaintiff paid Emerson for the provision of *health services*. And to the extent Emerson derives a benefit from its use of the Meta Pixel, that use simply permits Emerson to provide better services to its potential customers.

Fifth, Plaintiff attempts to fit his allegations within two Massachusetts statutes that have no connection to Emerson's alleged conduct. Plaintiff brings a claim under the Commonwealth's "Wiretap Statute," G.L. c. 272, § 99, but he has not claimed anything that resembles a "wiretap." And nothing in the Complaint suggests that Emerson "secretly intercepted" Plaintiff's information; his *own browser* caused the data at issue to be sent to Emerson and Facebook. Nor has Plaintiff adequately claimed an invasion of privacy under G.L. c. 214, § 1B, which requires a showing that Emerson "substantially and seriously interfered with his privacy by disclosing facts of highly personal or intimate nature." *Spencer v. Roche*, 755 F. Supp. 2d 250, 271-72 (D. Mass. 2010). Again, the Complaint alleges nothing of the sort; it is based on processes that are public and commonplace throughout the Internet.

Finally, to the extent Plaintiff is claiming that Emerson failed to safeguard data that would be considered "Protected Health Information" under the Health Insurance Portability and Accountability Act ("HIPAA"), his claims are preempted by that statute—which has no private right of action.

## BACKGROUND

Emerson is a small, non-profit health system that owns and manages healthcare facilities in Massachusetts, including the Cantu Concussion Center. FAC ¶ 7. Plaintiff John Doe alleges that he received care at Cantu Concussion Center. FAC ¶ 11. He claims that in 2022, he visited Emerson's website at www.emersonhospital.org and that he "entered data" on Emerson's website, including "details about his medical condition and doctor." FAC ¶ 103. He further alleges that, by operation of the pixel technology created by Facebook and embedded in Emerson's website, his browser sent Emerson and Facebook the data he entered. FAC ¶ 84. This technology—and Emerson's limited use of it—are detailed below.

### A. The Meta Pixel.

People navigate the Internet using web browsers—such as Google Chrome, Safari, and Microsoft Edge—that send, receive, and display content on computers and other electronic devices. FAC ¶ 22. When someone types a web address into their browser (like emersonhospital.org), the browser sends a command to the website. FAC ¶ 21. The website responds with instructions to the browser, which the browser uses to build the webpage that appears on the visitor's computer screen. FAC ¶ 25.

Although a webpage appears on a person's screen as a complete product, it is actually an assembly of independent parts, often including content operated by third parties like Facebook. The "Meta Pixel" is a piece of Facebook code "embedded on millions websites" that is designed

to assist with marketing. FAC ¶ 82. Once the Meta Pixel is added to a webpage, the pixel "tracks the people and type of actions they take." FAC ¶ 54. For example, a business may decide that it wants to know how many people are interested in a particular product or service that it sells. FAC ¶ 58. By adding the Meta Pixel to the specific webpage dedicated to that product or service, the business can gain insights on visitor engagement with the webpage. The Meta Pixel logs *only* the activity on the specific web pages that include the pixel code. When a user visits a webpage containing the Meta Pixel, the user's browser and website sends Facebook a defined set of information about the browser's interactions with that particular page. Facebook uses this information—along with any "cookies"[3] that it had previously placed on the browser—to attempt to match the user with a Facebook account. *See* FAC ¶¶ 59, 70, 88. Facebook then sends aggregated information back to the website owner (like how many people accessed a specific page on the site), which the owner can use to improve its services. FAC ¶ 60–62.

**B. Meta's Extensive Policies And Plaintiff's Consent.**

People who use Facebook (like Plaintiff) consent to the transmission and use of data sent to Facebook via the Meta Pixel. When they sign up for a Facebook account, they agree to Meta's Terms of Service, Privacy Policy, and Cookies Policy.[4] Meta's Terms of Service state that Facebook will "collect and use your personal data in order to provide" services including "personalized ads, offers, and other sponsored or commercial content." Ex. A, ¶ 5. Similarly,

---

[3] "Cookies are small text files that web servers can place on a user's browser and computer when a user's browser interacts with a website server." FAC ¶ 35.

[4] Plaintiff extensively refers to and relies upon Facebook and Meta's policies in his First Amended Complaint. Accordingly, the Court may consider these documents in its consideration of a motion to dismiss. *See Marram v. Kobrick Offshore Fund, Ltd.*, 442 Mass. 43, 45 (2004) (permitting a court to take into account matters of public record and documents integral to, referred to or explicitly relied on in the complaint, attached or not, without converting the motion to a motion for summary judgment); *see also Lalchandani v. Roddy*, 86 Mass. App. Ct. 819 (2015) ("In evaluating a motion to dismiss … matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint, also may be taken into account.").

Facebook users agree to Meta's Privacy Policy allowing it to "collect and receive information from Partners, measurement vendors, and third parties about a variety of your information and activities on and off our Products." Ex. A, ¶ 6. Meta also explains in its Cookies Policy that it "use[s] cookies if you have a Facebook account" to "understand the information that we receive about you, including information about your use of other websites and apps, whether or not you are registered or logged in." Ex. A, ¶ 7.

### C. Hospital Patient Portals.

Plaintiff alleges only that he visited Emerson's public website, emersonhospital.org. Unlike a public website that is available to anyone and is not password-protected, a patient portal is a secure website that provides patients with convenient, 24-hour access to their personal health information. Emerson's patient portal requires users to register and log in with a username and password at each visit. Notably, Plaintiff does not allege that the Meta Pixel was installed on Emerson's password-protected patient portal.

### D. Emerson's Limited Use Of The Meta Pixel, And Plaintiff's Alleged Activity On Emerson's Website.

The Complaint offers sparse detail about Plaintiff's alleged visit to Emerson's website—including an absence of foundational information such as when it occurred, how he entered any information, what details were provided, or even the specific webpages he visited on the website. Plaintiff alleges only that he "visited Defendant's website in 2022 at www.emersonhospital.org and entered data . . . such as details about his medical condition and doctor" and "queries about treatment for his concussion." FAC ¶ 103.

## LEGAL STANDARD

To survive a Rule 12(b)(6) challenge, a complaint must "plausibly suggest an entitlement to relief, raising the right to relief above the speculative level." *Glovsky v. Roche Bros.*

*Supermarkets, Inc.*, 469 Mass. 752, 754 (2014) (citation and quotation marks omitted). The pleading "must contain allegations plausibly suggesting (not merely consistent with) an entitlement to relief." *Lipsitt v. Plaud*, 466 Mass. 240, 252 (2013) (citation and quotation marks omitted). "[A] formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also, e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."); *Iannacchino v. Ford Motor Co.*, 451 Mass. 623, 635 (2008) ("adopt[ing] the . . . standard that was recently articulated by the United States Supreme Court in *Bell Atl. Corp. v. Twombly*). Nor will "legal conclusions cast in the form of factual allegations." *Edwards v. Commonwealth*, 477 Mass. 254, 260 (2017) (quotation marks omitted).

## ARGUMENT

### I. Plaintiff Has Not Identified A Cognizable Injury.

Plaintiff has not claimed that he suffered any cognizable injury from Emerson's alleged conduct. For this reason, the Court should dismiss Plaintiff's common-law claims. Each of the common-law claims require a legally cognizable injury. *See, e.g.*, *Xiao Wei Yang Catering Linkage In Inner Mongolia Co. v. Inner Mongolia Xiao Wei Yang USA, Inc.*, 340 F. Supp. 3d 70, 82 (D. Mass. 2018) (requiring a breach of fiduciary duty claim to show harm to the plaintiff); *TransCanada Power Mktg. Ltd. v. Narragansett Elec. Co.*, 542 F. Supp. 2d 127, 139 (D. Mass. 2008), *order clarified,* 2008 WL 11512024 (D. Mass. July 10, 2008) ("The essential elements of a contract claim [include] damage to the plaintiff.") (citation and internal quotation marks omitted); *Depianti v. Jan-Pro Franchising Int'l, Inc.*, 39 F. Supp. 3d 112, 142 (D. Mass. 2014) (The elements of . . . unjust enrichment "are 'unjust enrichment of one party and unjust detriment to the other party.'") (citation and internal quotation marks omitted).

Here, Plaintiff has tried to assert a boilerplate list of alleged injuries, all of which are too generalized to establish damages. Specifically, Plaintiff alleges: (1) "sensitive and confidential information that [he] intended to remain private is no longer private;" (2) an erosion of the physician-patient relationship; (3) lost benefit of the bargain (i.e., that Emerson should have permitted him to share in the benefit of the value of his information); (4) that he "did not get the full value of the medical services for which [he] paid"; and (5) diminished value of his personal information. FAC ¶¶ 194, 210, 222.

However, none of those allegations is legally sufficient. Plaintiff's core allegation is that Emerson's use of the Meta Pixel resulted in information about his activities on Emerson's website being sent to Facebook. Plaintiff does not allege that his information was used improperly or even that any entity other than Facebook received it. The Complaint does not contain any *factual* allegations about *what* information of Plaintiff's was disclosed, *when and how* it was disclosed, or how it was *used*, much less how Plaintiff was *injured* by that use. *See* FAC ¶ 103. Plaintiff simply claims that the transmission of his data to Facebook—on its own—violated his privacy rights because he did not know that it would be shared. These bare allegations are insufficient to support his lawsuit.

Nor *could* Plaintiff claim that he suffered any injury, because he (like every Facebook user) consented to the very conduct he is complaining about. *See* discussion of Meta's policies and Plaintiff's consents, *supra*, pp. 4–5. Additionally, Meta gives users the ability to control the use of information about their off-Facebook activity (such as activity on third-party websites like Emerson's) for advertising purposes. Ex. A, ¶ 8. At any time, Plaintiff can permanently dissociate information about his off-Facebook activity from his Facebook profile. *Id.* In other words, even if Facebook collected any Protected Health Information about Plaintiff via the Meta Pixels on

Emerson's website—an allegation that Emerson strenuously denies—any privacy concerns can be immediately alleviated with the simple click of a button. Moreover, Plaintiff does not even explain how any of his data was affected. Thus, because Plaintiff's common-law claims do not allege actual injury, the claims should all be dismissed.

## II. The Complaint Fails To State A Claim For Breach Of Fiduciary Duty.

Plaintiff fails to state a claim for breach of fiduciary duty because he has not shown that Emerson owed him a fiduciary duty. *See Baker v. Wilmer Cutler Pickering Hale and Dorr, LLP*, 91 Mass. App. Ct. 835, 842 (2017) (stating under "a breach of fiduciary duty claim, a plaintiff must show: '(1) the existence of a fiduciary duty; (2) breach of that duty; (3) damages; and (4) a causal connection between breach of the duty and the damages.'"). The hallmark of a fiduciary duty is "when one reposes faith, confidence, and trust in another's judgment and advice." *Doe v. Harbor Sch., Inc.*, 446 Mass. 245, 252 (2006) (quoting *Van Brode Group, Inc.*, 36 Mass. App. Ct. at 516) (additional citation omitted). This relationship does not arise from a visit to a website.

Although "a duty of confidentiality [generally] arises from the physician-patient relationship," Emerson did not owe such duty to Plaintiff as a visitor to its public website. *See Alberts v. Devine*, 395 Mass. 59, 69 (1985) (relating only to information that a psychiatrist received in order to treat the plaintiff). A website visit is not necessarily connected to the receipt of healthcare. It is not clear whether Plaintiff visited Emerson's website before or after he sought medical care from a provider at an Emerson facility or whether he received healthcare services on Emerson's website. Absent this factual basis, the Court cannot conclude that a physician-patient relationship existed. *Van Brode Group.*, 36 Mass. App. Ct. at 516 ("The [fiduciary] duty does not arise unless 'the defendant knew that the plaintiff would rely on his services.'").

Even if the Court finds that Plaintiff had a physician-patient relationship with one of Emerson's medical providers before Plaintiff visited the website, his breach of fiduciary duty claim still fails for two additional reasons. First, Plaintiff's status as a patient does not automatically trigger the physician-patient relationship. His "communications" with the website must have been related to his *treatment*, which Plaintiff does not allege. Second, for the fiduciary duty to extend beyond a one-to-one relationship, Plaintiff must articulate a factual basis for the extension. *See, e.g., Petrell v. Rakoczy*, 2005 WL 1683600, at *4 (Mass. Super. July 11, 2005) (finding defendants do not owe a fiduciary duty where they had no "awareness that individual parishioners relied upon them for guidance or advice" due to the organizational structural and absence of personal contact); *Van Brode Group.*, 36 Mass. App. Ct. at 516 (contemplating the extension of a lawyer's fiduciary duty "to nonclients who the attorney knows will rely on the services rendered.").

Here, Plaintiff has not articulated any factual basis supporting the extension of the physician-patient duty of confidentiality (from Plaintiff's physician) to the broader health system (Emerson). Nothing about Plaintiff's use of Emerson's website reflects a unique or intimate relationship or a means for Emerson to know that Plaintiff would rely on any information available on its website. *See* FAC ¶ 103. In fact, according to the Complaint, Plaintiff's relationship with Emerson wasn't special at all—he was just browsing Emerson's public website. Without specifying what actions Plaintiff took on Emerson's website, the Complaint alleges "the information that Plaintiff John Doe transmitted included queries about treatment for his concussion."). FAC ¶ 103. For these reasons, the Court must dismiss the claim for breach of fiduciary duty.

**III. The Complaint Fails To State A Claim For Breach Of An Implied Contract.**

Plaintiff's claim for breach of an implied contract fails as a matter of law. "Contract formation requires a bargain in which there is a manifestation of mutual assent to the exchange." *Sea Breeze Ests., LLC v. Jarema*, 94 Mass. App. Ct. 210, 215 (2018). "[A] contract implied in fact requires the same elements as an express contract and differs only in the method of expressing mutual assent." *Katz v. Pershing, LLC*, 672 F.3d 64, 74 (1st Cir. 2012). Here, Plaintiff's claim based on implied contract must be dismissed for at least two reason: (1) there was no meeting of the minds, and (2) there was no consideration.

As a basis for his breach of an implied contract claim, Plaintiff alleges that an implied contract arose "when [Plaintiff and the Class Members] sought medical treatment from Defendant." FAC ¶ 227. According to Plaintiff, by asking for and obtaining Plaintiff's personal information, Defendant assented to protecting its confidentiality, (FAC ¶ 229); and agreed that "[a] portion of the price . . . for medical services was intended to ensure the confidentiality of their Personal Health Information." FAC ¶ 231. These terms, according to Plaintiff, arise from Emerson's "privacy policies, codes of conduct, company security practices, and other conduct." But Emerson's policies and practices make no such assurances about information Emerson or third parties collect from Emerson's website—the policies cited by Plaintiff relate to information that is collected at doctor's appointments.

First, an implied contract must be supported by the same elements as any other contract, including a meeting of the minds as to the implied contract's essential terms. *Situation Mgmt. Sys., Inc. v. Malouf, Inc.*, 430 Mass. 875, 878 (2000). Here, Plaintiff alleges the parties entered an implied contract whereby Emerson "promised and [was] obligated to: (a) provide healthcare to Plaintiff and Class Members; and (b) protect Plaintiff and the Class Members' Personal Health

Information provided to obtain such healthcare," and "[i]n exchange, Plaintiff and Class Members agreed to pay money for these services, and to turn over their Personal Health Information through the use of Defendant's websites." FAC ¶ 240. But this implied contract ignores that the information Plaintiff complains of being disclosed to Facebook was done so without Emerson knowing whether the website visitor was a patient. The fact that Plaintiff allegedly provided personal information through the use of Emerson's public-facing website does not suggest that Emerson agreed to guarantee the protection of the information, or even the provision of healthcare. *See In re Am. Med. Collection Agency, Inc. Customer Data Sec. Breach Litig.*, 2021 WL 5937742, at *18 (D.N.J. Dec. 16, 2021).

Further, according to Plaintiff, Emerson agreed to protect "Personal Health Information"[5] through its "privacy policies, codes of conduct, company security practices, and other conduct." FAC ¶ 228. But it is not clear what promises Emerson made to Plaintiff about the use of data from its public-facing website. Emerson's Patient Privacy policy does not make any assurances about information Emerson or third-parties might collect from Emerson's website. Instead, the Patient Privacy policy addresses only the health information that is generated "[e]ach time you visit a hospital, physician or other health care provider." Ex. A, ¶ 9. For this reason, there could not have been a meeting of the minds sufficient to give rise to contract formation and this claim should be dismissed.

Moreover, Plaintiff failed to allege facts supporting the essential element of consideration. "[A] promise that is offered freely and equally to all people—without regard to who has provided consideration and who has not—is not a contract." *Austin-Spearman v. AARP & AARP Servs. Inc.*,

[5] Plaintiff defines "Personal Health Information" to "include health conditions (e.g., addiction, Alzheimer's, heart disease), diagnoses, procedures, test results, the treating physician, medications, and other personally identifying information." FAC ¶ 86.

119 F. Supp. 3d 1, 11–12 (D.D.C. 2015) (citing *See Trustees of Dartmouth Coll. v. Woodward*, 17 U.S. 518, 612 (1819)). To allege sufficient consideration, a plaintiff must allege that they "provided [a] bargained-for benefit or suffered [a] bargained-for detriment in exchange for the defendant's supposed promises." *Katz*, 672 F.3d at 74. Here, there is no bargained-for benefit or suffered bargained-for detriment that was exchanged for Emerson's supposed promises.

Courts in analogous cases have found that statements in a hospital's privacy policies alone do not form contractual obligations and cannot support a breach of contract claim. In *Brush v. Miami Beach Healthcare Group, Ltd.*, 238 F. Supp. 3d 1359 (S.D. Fla. Feb. 17, 2017), the plaintiff sued a healthcare provider for breach of an implied contract. The court rejected the claim, explaining that "[n]othing in the plaintiff's Complaint gives rise to a factual inference that the Defendants tacitly agreed to secure her personal data in exchange for remuneration." *Id.* at 1369. To the contrary, it was "clear from the plaintiff's allegations that *she transacted to receive healthcare services from the Defendants—not data security services* beyond the privacy requirements already imposed on the Defendants by federal law." *Id.* (emphasis added); *see also*, *Longenecker-Wells v. Benecard Services Inc.*, 658 F. App'x 659, 662 (3d Cir. 2016) (allegations that the defendant "required Plaintiffs' personal information as a prerequisite to employment . . . alone did not create a contractual promise to safeguard that information, especially from third party hackers."); *Corona v. Sony Pictures Entm't Inc.*, 2015 WL 3916744, at *6 (C.D. Cal. June 15, 2015) ("Plaintiff alleges that . . . [t]o receive compensation and other benefits, Plaintiffs were required to provide [defendant] their [personal information]. . . . However, there are no facts indicating that [the defendant's] acts were intended to frustrate the agreed common purpose of the agreement, i.e., employment in exchange for compensation and benefits." (citations omitted)). The same analysis applies here and Plaintiff should face the same result—dismissal of his claim.

## IV. The Complaint Fails To State A Claim For Unjust Enrichment.

Plaintiff's claim for unjust enrichment also fails. At its core, a claim for unjust enrichment requires a plaintiff to "establish not only that the defendant received a benefit, but also that such a benefit was unjust." *Metro. Life Ins. Co. v. Cotter*, 464 Mass. 623, 644 (2013) (quotation marks omitted). "[T]o recover for unjust enrichment, a plaintiff must prove that (1) it conferred a measurable benefit upon the defendant; (2) it reasonably expected compensation from the defendant; and (3) the defendant accepted the benefit with the knowledge, actual or chargeable, of the plaintiff's reasonable expectation." *Stewart Title Guar. Co. v. Kelly*, 97 Mass. App. Ct. 325, 335 (2020) (citing *Finard & Co. v. Sitt Asset Mgt.*, 79 Mass. App. Ct. 226, 229 (2011)).

Plaintiff has failed to adequately allege that he conferred a measurable benefit upon Emerson. He claims that he "and Class Members conferred a benefit on Defendant in the form of valuable sensitive medical information" and "monetary compensation." FAC ¶ 260. According to Plaintiff, Emerson "collected, used, and disclosed this information for its own gain, including advertisement purposes, sale, or trade for valuable services from third parties." *Id.* But these allegations do not give rise to an unjust enrichment claim.

Plaintiff did not confer a measurable benefit on Emerson. Plaintiff's allegation ignores that Emerson is a health care provider and any amounts paid by Plaintiff to Emerson were for the provision of health services. *See Carlsen v. GameStop, Inc.*, 833 F.3d 903, 912 (8th Cir. 2016) (dismissing plaintiff customer's claim for unjust enrichment in cybersecurity case on the grounds that he failed to allege that any specific portion of the subscriber fee he paid went toward data protection or that the defendant online videogame news provider agreed to provide additional protection to paid subscribers that it did not also provide to non-paid subscribers). This is

particularly true here, where there is no factual basis to connect the services Emerson may have provided Plaintiff to his visit to Emerson's public website.

Plaintiff's claim for unjust enrichment additionally fails because Plaintiff cannot show that Emerson's use of the Meta Pixel was unjust. Plaintiff does not allege that he was deprived of an anticipated benefit as a result of the Meta Pixel. See *Quintech Sec. Consultants, Inc. v. Intralot USA, Inc.*, 2011 WL 5105446, at *4 (D.S.C. Oct. 27, 2011) (dismissing unjust enrichment claim in part because the plaintiff had no expectation of compensation). Further, absent allegations about specific information that was disclosed to Facebook, it is impossible to assess what Plaintiff believes he lost as a result of Emerson's use of the Meta Pixel. Therefore, Plaintiff cannot show Emerson's use of the Meta Pixel was unjust, and the unjust enrichment claim fails.

## V. The Complaint Fails To State A Claim Under The Wiretap Statute.

Plaintiff fails to state a viable claim under the Massachusetts Wiretap Statute because Emerson did not use an "intercepting device" or "secretly" share any of Plaintiff's information. The Statute permits a private right of action to "[a]ny aggrieved person whose oral or wire communications were intercepted, disclosed or used." G.L. c. § 99(Q). Before the Wiretap Statute can apply, a defendant must have "intercepted" communications. To "intercept" means to "**secretly** hear, **secretly** record, or aid another to **secretly** hear or secretly record the contents of any wire or oral communication through the use of any ***intercepting device***." G.L. 272 § 99(B)(4) (emphases added).

### A. Plaintiff Does Not Allege That Emerson Used An "Intercepting Device."

Plaintiff's own allegations support the dismissal of this claim because he does not allege the use of an intercepting device. The Wiretap Statute defines an "intercepting device" as "[a]ny ***device*** or ***apparatus*** which is capable of transmitting, receiving, amplifying, or recording a wire

or oral communication." G.L. c. 272 § 99(B)(3) (emphasis added). Interpreting the words of the statute according to "common and approved usage"—as required under Massachusetts law, G.L. c. 4 § 99(B)(3)—a "device" or "apparatus" must be tangible; it does not encompass intangible software code on a website. *See* Black's Law Dictionary (11th ed. 2019) (defining "device" as "[a] mechanical invention that may be "an apparatus or an article of manufacture," and defining "apparatus" with reference to "machine," which is defined as "[a] device or apparatus consisting of fixed and moving parts").

Plaintiff attempts to plead around this issue by naming hardware devices like personal computers and servers as alleged "intercepting devices" here. *See* FAC ¶ 186. But this is a case about pixel technology. The computer hardware used by the parties in this case has virtually nothing to do with Plaintiff's legal claim beyond the fact that the Meta Pixel and Emerson's website require the Internet and computers to function. It is not as though Plaintiff contends that Emerson surreptitiously recorded communications using a physical computer deployed as a tape recorder or video camera.

In fact, courts routinely hold that software code is not a "device" or "apparatus" under similar wiretap laws. *See, e.g.*, *Potter v. Havlicek*, 2008 WL 2556723, at *8 (S.D. Ohio June 23, 2008) (dismissing federal wiretap claim because "the word 'device' does not encompass software"); *Jacome v. Spirit Airlines*, 2021 WL 3087860, at *5 (Fla. Cir. Ct. June 17, 2021) (dismissing Florida wiretap claim because session replay software is not a "device or apparatus"); *Cardoso v. Whirlpool Corp.*, 2021 WL 2820822, at *2 (S.D. Fla. July 6, 2021) (same); *Connor v. Whirlpool Corp.*, 2021 WL 3076477, at *2 (S.D. Fla. July 6, 2021) (same); *cf. United States v. Ackies*, 918 F.3d 190, 199 n.5 (1st Cir. 2019) (rejecting argument that software is a "device" under Federal Stored Communications Act because "software is not a 'device' under its plain meaning");

*In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*, 903 F. Supp. 2d 942, 972 (S.D. Cal. 2012) ("[S]oftware is not a tangible good or service."). Thus, as used in the Wiretap Statute, "intercepting device" does not include the pixel technology at issue in this case, so Plaintiff's claim under the Wiretap Statute should be dismissed.

**B. Emerson Could Not Have "Secretly" Recorded Plaintiff's Communications Because He Consented.**

Additionally, to state a claim under the Wiretap Statute, Plaintiff must allege a "secret" interception of communications. G.L. c. 227, § 99(B)(4); *see also Marquis v. Google, Inc.*, 2014 WL 4180400, at *12 (Mass. Jul. 27, 2014) ("if a recording is not made secretly it does not constitute an 'interception' and there has been no violation of the statute."). As set forth *supra*, when Plaintiff registered as a Facebook user, he consented to Facebook's tracking of his off-Facebook web activities, including specifically those captured on third-party websites via the Meta Pixel. Thus, even if the information collected by the Meta Pixel contained Plaintiff's personal information, Plaintiff cannot state a Wiretap Statute claim against Emerson because there is nothing "secret" about the sharing of that information. His claim under the Wiretap Statute should therefore be dismissed.

**VI. The Complaint Fails To State A Claim For Invasion Of Privacy.**

Plaintiff's invasion of privacy claim should be dismissed because the Complaint lacks any allegations regarding what information Plaintiff provided Emerson during his website visit. Under Massachusetts law, a person has "a right against unreasonable, substantial or serious interference with his privacy." G.L. c. 214, § 1B. To meet this standard, Plaintiff must allege two things. First, he "must show that there was a 'gathering and dissemination of information which [he contends] was private.'" *Nelson*, 446 Mass. 525, 536, (2006) (quoting *Dasey v. Anderson*, 304 F.3d 148, 154 (1st Cir. 2002)). It includes only information that is "*highly personal or intimate*." *Branyan v.*

*Southwest Airlines Co.*, 105 F. Supp. 3d 120, 126 (D. Mass. 2015) (emphasis added). Second, Plaintiff must establish that the information was "*used*" in an unreasonable manner. *Polay v. McMahon*, 468 Mass. 379, 383 (2014) (emphasis added) (explaining that an invasion-of-privacy claim depends on the "location, the means used, the frequency and duration of the intrusion, and the underlying purpose behind the intrusion").

Plaintiff has shown neither here. As explained above, the Complaint reveals little about the information that Plaintiff entered on Emerson's website. There is no way to determine whether Plaintiff entered anything more than a doctor's name, the address of a hospital, or even more innocuous search terms. Nor does Plaintiff identify how his data, once sent to Facebook, was used. All indications are that it was used for advertising practices that are common on the Internet—to give Emerson *aggregated* data about visitors to its website. Courts have found *more* specific allegations insufficient to establish a privacy claim. *See, e.g.*, *In re iPhone App. Litig.*, 844 F. Supp. 2d 1040, 103 (N.D. Cal. 2012) (disclosure of unique device identifier data, personal data, and geolocation information (including physical addresses) does not constitute "an egregious breach of social norms" but rather "routine commercial behavior"). Accordingly, Plaintiff has failed to plead the elements of a claim under G.L. c. 214, § 1B, and that claim should be dismissed.

## VII. HIPAA Preempts Plaintiff's Claims Against Emerson

To the extent information sent to Facebook *was* sensitive, Plaintiff's claims are preempted by HIPAA. Although the Complaint makes no direct reference to HIPAA, the HIPAA term "protected health information" is used throughout the Complaint. Plaintiff attempts to import HIPAA's consent standard into this case, but that statute has no private right of action. *See, e.g.*, *Miller v. Nichols*, 586 F.3d 53, 59-60 (1st Cir. 2009). And he cannot plead around that problem by channeling HIPAA's standards through a common-law claim. Where a statute does not provide a

private right of action, "it would make scant sense to allow [plaintiffs] to sue on a form contract implementing the statute." *Astra USA, Inc. v. Santa Clara Cnty.*, 563 U.S. 110, 114 (2011). If "every statute that specified a standard of care [were] automatically enforceable by tort suits for damages," then "every statute in effect would create an implied private right of action." *Cuyler v. United States*, 362 F.3d 949, 952 (7th Cir. 2004). That "clearly is not the law." *Id.*; *see also Miller v. Elam*, 2011 WL 1549398, at *4 (E.D. Cal. Apr. 21, 2011) ("Because there is no private right of action under HIPAA, Plaintiff's HIPAA claim is not cognizable under 42 U.S.C. § 1983.").

**CONCLUSION**

For the foregoing reasons, Emerson Hospital respectfully requests that this Court dismiss the First Amended Complaint with prejudice.

Dated: February 9, 2022

Respectfully submitted,

**EMERSON HOSPITAL**

By: /s/ *Alan Y. Wong*

Alan Y. Wong (BBO# 687618)
awong@shb.com
Emyr Remy (BBO # 740156)
remy@shb.com
SHOOK, HARDY & BACON L.L.P.
One Federal Street, Suite 2540
Boston, MA 02110
Tel: (617) 531-1411 | Fax: (617) 531-1602

Alfred J. Saikali (*pro hac vice* forthcoming)
asaikali@shb.com
SHOOK, HARDY & BACON L.L.P.
201 South Biscayne Blvd., Suite 3200
Miami, Florida 33131
Tel: (305) 358-5171 | Fax: (305) 358-7470

Josh Becker (*pro hac vice* forthcoming)
jbecker@shb.com
SHOOK, HARDY & BACON L.L.P.
1230 Peachtree St., Suite 1200
Atlanta, GA 30309
Tel: (470) 867-6000 | Fax: (470) 867-6001

Michael Rayfield (*pro hac vice* forthcoming)
mrayfield@shb.com
SHOOK, HARDY & BACON L.L.P.
1325 Avenue of the Americas, 28th Floor
New York, NY 10019
Tel: (212) 989-8844 | Fax: (929) 501-5455

Lindsey M. Knapton (*pro hac vice* forthcoming)
lknapton@shb.com
SHOOK, HARDY & BACON L.L.P.
1600 17th Street, Suite 450
Denver, CO 80202
Tel: (303) 285-5300 | Fax: (303) 285-5301

**CERTIFICATE OF SERVICE**

I hereby certify that on February 9, 2023, the foregoing was filed via the Court's Electronic Filing System. Notice of this filing will be sent by operation of the Court's Electronic Filing System to all parties of record:

J. Tucker Merrigan (BBO# 681627)
Victoria Santoro (BBO# 679120)
Erin E, McHugh (BBO# 703701)
**SWEENEY MERRIGAN LAW**
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com
*Attorneys for Plaintiff*

Foster C. Johnson (*pro hac vice forthcoming*)
David Warden (*pro hac vice forthcoming*)
Nathan Campbell (*pro hac vice forthcoming*)
**AHMAD, ZAVITSANOS & MENSING, P.C.**
1221 McKinney St., Suite 3460
Houston, TX 77010
Tel: (713) 655-1101
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com
*Attorneys for Plaintiff*

Seth Meyer (*pro hac vice forthcoming*)
Alex Dravillas (*pro hac vice forthcoming*)
**KELLER POSTMAN LLC**
150 N. Riverside Plaza, Suite 4100
Chicago, IL 60606
Tel: (312) 741-5220
sam@kellerpostman.com
adj@kellerpostman.com
*Attorney for Plaintiff*

*/s/ Alan Y. Wong*
Alan Y. Wong

# Exhibit A

COMMONWEALTH OF MASSACHUSETTS

ESSEX, ss

TRIAL COURT DEPARTMENT
SUPERIOR COURT
DOCKET NO. 2277CV01000D

JOHN DOE, individually and on behalf of all other similarly situated,

Plaintiffs,

v.

EMERSON HOSPITAL,

Defendants.

**DECLARATION OF ALAN Y. WONG**

I, Alan Y. Wong, hereby declare as follows:

1. I am over 18 years of age, and have personal knowledge of the facts set forth in this Declaration.

2. I am an attorney with Shook, Hardy & Bacon L.L.P. and counsel of record for defendant Emerson Hospital in this action.

3. I supply this declaration in support of Emerson Hospital's Motion to Dismiss the above-captioned case.

4. Attached as **Exhibit 1** is a true and correct copy the Meta press release titled "Introducing Meta: A Social Technology Company" and dated October 28, 2021, accessed at https://about.fb.com/news/2021/10/facebook-company-is-now-meta/ on February 9, 2023.

5. Attached as **Exhibit 2** is a true and correct copy of Meta's Terms of Service, accessed at https://www.facebook.com/legal/terms/plain_text_terms on February 7, 2023.

6. Attached as **Exhibit 3** is a true and correct copy of Meta's Privacy Policy, accessed at https://mbasic.facebook.com/privacy/policy/printable/ on February 7, 2023.

7. Attached as **Exhibit 4** is a true and correct copy of Meta's Cookies Policy, accessed at https://mbasic.facebook.com/privacy/policies/cookies/printable/ on February 7, 2023.

8. Attached as **Exhibit 5** is a true and correct copy of the webpage titled "Off-Facebook Activity: Control your information" accessed at https://www.facebook.com/off-facebook-activity on February 9, 2023.

9. Attached as **Exhibit 6** is a true and correct copy of the Emerson Hospital Patient Privacy policy accessed at https://www.emersonhospital.org/patients-visitors/patient-rights-responsibilities/patient-privacy on February 9, 2023.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 9th day of February 2023, in Newton, Massachusetts.

[signature]
Alan Y. Wong

# Exhibit 1

Meta

Back to Newsroom

:a

# ıtroducing Meta: A Social echnology Company

ber 28, 2021

FACEBOOK

help personalize content, tailor and measure ads, and provide a safer experience, we use cookies. By clicking or 'igating the site, you agree to allow our collection of information on and off Facebook through cookies. Learn more, including about available controls: Cookies Policy

Today at Connect 2021, CEO Mark Zuckerberg introduced Meta, which brings together our apps and technologies under one new company brand. Meta's focus will be to bring the metaverse to life and help people connect, find communities and grow businesses.

The metaverse will feel like a hybrid of today's online social experiences, sometimes expanded into three dimensions or projected into the physical world. It will let you share immersive experiences with other people even when you can't be together — and do things together you couldn't do in the physical world. It's the next evolution in a long line of social technologies, and it's ushering in a new chapter for our company. Mark shared more about this vision in a founder's letter.

Our annual Connect conference brings together augmented and virtual reality developers, content creators, marketers and others to celebrate the industry's momentum and growth. This year's virtual event explored what experiences in the metaverse could feel like over the next decade — from social connection, to entertainment, gaming, fitness, work, education and commerce. We also announced new tools to help people build for the metaverse, including Presence Platform, which will enable new mixed reality experiences on Quest 2, and a $150-million investment in immersive learning to train the next generation of creators.

You can watch the full Connect keynote and learn more about how the metaverse will unlock new opportunities at meta.com. You can also learn more about our work over the past several months to develop the Meta brand on our design blog. Read all our news in the posts below:

- Connect 2021: Our Vision for the Metaverse
- Horizon Home, the Future of Work, Presence Platform, and More
- Project Aria Update
- How VR Is Changing the Way We Collaborate and Get Things Done
- Gaming News
- 'Blade & Sorcery: Nomad' Is Coming to Oculus Quest

To help personalize content, tailor and measure ads, and provide a safer experience, we use cookies. By clicking or navigating the site, you agree to allow our collection of information on and off Facebook through cookies. Learn more, including about available controls: Cookies Policy

Our corporate structure is not changing, however, how we report on our financials will. Starting with our results for the fourth quarter of 2021, we plan to report on two operating segments: Family of Apps and Reality Labs. We also intend to start trading under the new stock ticker we have reserved, MVRS, on December 1. Today's announcement does not affect how we use or share data.

See also: Building the Metaverse Responsibly, Expanding Horizon: New Funding to Support Creators, Introducing Our New Company Brand (2019)

*What is Meta?*

*Meta builds technologies that help people connect, find communities, and grow businesses. When Facebook launched in 2004, it changed the way people connect. Apps like Messenger, Instagram and WhatsApp further empowered billions around the world. Now, Meta is moving beyond 2D screens toward immersive experiences like augmented and virtual reality to help build the next evolution in social technology.*

Downloads

Press Assets

Categories:
Company News, Meta, Meta Quest, Technology and Innovation

Tags:
Augmented Reality, Metaverse, Virtual Reality

To help personalize content, tailor and measure ads, and provide a safer experience, we use cookies. By clicking or navigating the site, you agree to allow our collection of information on and off Facebook through cookies. Learn more, including about available controls: Cookies Policy

# Meta Connect 2022: Meta Quest Pro, More Social VR and a Look Into the Future

We're sharing our progress toward making the metaverse a reality.

October 11, 2022

Topics

- Company News
- Technology and Innovation
- Data and Privacy
- Safety and Expression
- Combating Misinformation
- Economic Opportunity
- Election Integrity
- Strengthening Communities
- Diversity and Inclusion

Featured News

To help personalize content, tailor and measure ads, and provide a safer experience, we use cookies. By clicking or navigating the site, you agree to allow our collection of information on and off Facebook through cookies. Learn more, including about available controls: Cookies Policy

Instagram

Earn Money on Instagram With Gifts

February 8, 2023

WhatsApp

ntroducing New WhatsApp Status Features

February 7, 2023

help personalize content, tailor and measure ads, and provide a safer experience, we use cookies. By clicking or igating the site, you agree to allow our collection of information on and off Facebook through cookies. Learn more, including about available controls: Cookies Policy

Meta

Follow Us

Virtual reality

Smart glasses

About us

Our community

Our actions

Support

Community Standards | Data Policy Terms | Cookie policy

United States (English) ▾

To help personalize content, tailor and measure ads, and provide a safer experience, we use cookies. By clicking or navigating the site, you agree to allow our collection of information on and off Facebook through cookies. Learn more, including about available controls: Cookies Policy

# Exhibit 2

**facebook** Log In

*The Facebook company is now Meta. We've updated our Terms of Use, Data Policy, and Cookies Policy to reflect the new name on January 4, 2022. While our company name has changed, we are continuing to offer the same products, including the Facebook app from Meta. Our Data Policy and Terms of Service remain in effect, and this name change does not affect how we use or share data. Learn more about Meta and our vision for the metaverse.*

## Terms of Service

Meta builds technologies and services that enable people to connect with each other, build communities, and grow businesses. These Terms govern your use of Facebook, Messenger, and the other products, features, apps, services, technologies, and software we offer (the **Meta Products** or **Products**), except where we expressly state that separate terms (and not these) apply. These Products are provided to you by Meta Platforms, Inc.

We don't charge you to use Facebook or the other products and services covered by these Terms, unless we state otherwise. Instead, businesses and organizations, and other persons pay us to show you ads for their products and services. By using our Products, you agree that we can show you ads that we think may be relevant to you and your interests. We use your personal data to help determine which personalized ads to show you.

We don't sell your personal data to advertisers, and we don't share information that directly identifies you (such as your name, email address or other contact information) with advertisers unless you give us specific permission. Instead, advertisers can tell us things like the kind of audience they want to see their ads, and we show those ads to people who may be interested. We provide advertisers with reports about the performance of their ads that help them understand how people are interacting with their content. See Section 2 below to learn more about how personalized advertising under these terms works on the Meta Products.

Our **Privacy Policy** explains how we collect and use your personal data to determine some of the ads you see and provide all of the other services described below. You can also go to your **settings** pages of the relevant Meta Product at any time to review the privacy choices you have about how we use your data.

## 1. The services we provide

Our mission is to give people the power to build community and bring the world closer together. To help advance this mission, we provide the Products and services described below to you:

- **Provide a personalized experience for you:** Your experience on Facebook is unlike anyone else's: from the posts, stories, events, ads, and other content you see in Facebook News Feed or our video platform to the Facebook Pages you follow and other features you might use, such as Facebook Marketplace, and search. For example, we data about the connections you make, the choices and settings you select, and what you share and do on and off our Products - to personalize your experience.
- **Connect you with people and organizations you care about:** We help you find and connect with people, groups, businesses, organizations, and others that matter to you across the Meta Products you use. We use data to make suggestions for you and others - for example, groups to join, events to attend, Facebook Pages to follow or send a message to, shows to watch, and people you may want to become friends with. Stronger ties make for better communities, and we believe our services are most useful when people are connected to people, groups, and organizations they care about.
- **Empower you to express yourself and communicate about what matters to you:** There are many ways to express yourself on Facebook to communicate with friends, family, and others about what matters to you - for example, sharing status updates, photos, videos, and stories across the Meta Products (consistent with your settings), sending messages or making voice or video calls to a friend or several people, creating events or

facebook

Log In

Products.

- **Help you discover content, products, and services that may interest you:** We show you personalized ads, offers, and other sponsored or commercial content to help you discover content, products, and services that are offered by the many businesses and organizations that use Facebook and other Meta Products. Section 2 below explains this in more detail.

- **Promote the safety, security, and integrity of our services, combat harmful conduct and keep our community of users safe:** People will only build community on Meta Products if they feel safe and secure. We work hard to maintain the security (including the availability, authenticity, integrity, and confidentiality) of our Products and services. We employ dedicated teams around the world, work with external service providers, partners and other relevant entities and develop advanced technical systems to detect potential misuse of our Products, harmful conduct towards others, and situations where we may be able to help support or protect our community, including to respond to user reports of potentially violating content. If we learn of content or conduct like this, we may take appropriate action based on our assessment that may include - notifying you, offering help, removing content, removing or restricting access to certain features, disabling an account, or contacting law enforcement. We share data across **Meta Companies** when we detect misuse or harmful conduct by someone using one of our Products or to help keep Meta Products, users and the community safe. For example, we share information with Meta Companies that provide financial products and services to help them promote safety, security and integrity and comply with applicable law. Meta may access, preserve, use and share any information it collects about you where it has a good faith belief it is required or permitted by law to do so. For more information, please review our **Privacy Policy**.

  In some cases, the Oversight Board may review our decisions, subject to its terms and bylaws. Learn more here.

- **Use and develop advanced technologies to provide safe and functional services for everyone:** We use and develop advanced technologies - such as artificial intelligence, machine learning systems, and augmented reality - so that people can use our Products safely regardless of physical ability or geographic location. For example, technology like this helps people who have visual impairments understand what or who is in photos or videos shared on Facebook or Instagram. We also build sophisticated network and communication technology to help more people connect to the internet in areas with limited access. And we develop automated systems to improve our ability to detect and remove abusive and dangerous activity that may harm our community and the integrity of our Products.

- **Research ways to make our services better:** We engage in research to develop, test, and improve our Products. This includes analyzing data we have about our users and understanding how people use our Products, for example by conducting surveys and testing and troubleshooting new features. Our **Privacy Policy** explains how we use data to support this research for the purposes of developing and improving our services.

- **Provide consistent and seamless experiences across the Meta Company Products:** Our Products help you find and connect with people, groups, businesses, organizations, and others that are important to you. We design our systems so that your experience is consistent and seamless across the different **Meta Company Products** that you use. For example, we use data about the people you engage with on Facebook to make it easier for you to connect with them on Instagram or Messenger, and we enable you to communicate with a business you follow on Facebook through Messenger.

- **Ensuring access to our services:** To operate our global services and enable you to connect with people around the world, we need to transfer, store and distribute content and data to our data centers, partners, service providers, vendors and systems around the world, including outside your country of residence. The use of this global infrastructure is necessary and essential to provide our services. This infrastructure may be owned, operated, or controlled by Meta Platforms, Inc., Meta Platforms Ireland Limited, or its affiliates.

## 2. How our services are funded

Instead of paying to use Facebook and the other products and services we offer, by using the Facebook Products

facebook Log In

on and off the **Facebook Company Products**. We use your personal data, such as information about your activity and interests, to show you ads that are more relevant to you.

Protecting people's privacy is central to how we've designed our ad system. This means that we can show you relevant and useful ads without telling advertisers who you are. We don't sell your personal data. We allow advertisers to tell us things like their business goal, and the kind of audience they want to see their ads (for example, people between the age of 18-35 who like cycling). We then show their ad to people who might be interested.

We also provide advertisers with reports about the performance of their ads to help them understand how people are interacting with their content on and off Facebook. For example, we provide general demographic and interest information to advertisers (for example, that an ad was seen by a woman between the ages of 25 and 34 who lives in Madrid and likes software engineering) to help them better understand their audience. We don't share information that directly identifies you (information such as your name or email address that by itself can be used to contact you or identifies who you are) unless you give us specific permission. Learn more about how Facebook ads work here.

We collect and use your personal data in order to provide the services described above to you. You can learn about how we collect and use your data in our **Data Policy**. You have controls over the types of ads and advertisers you see, and the types of information we use to determine which ads we show you. **Learn more**.

## 3. Your commitments to Facebook and our community

We provide these services to you and others to help advance our mission. In exchange, we need you to make the following commitments:

1. Who can use Facebook
   When people stand behind their opinions and actions, our community is safer and more accountable. For this reason, you must:
   - Provide for your account the same name that you use in everyday life.
   - Provide accurate information about yourself.
   - Create only one account (your own) and use it for personal purposes.
   - Not share your password, give access to your Facebook account to others, or transfer your account to anyone else (without our permission).

   We try to make Facebook broadly available to everyone, but you cannot use Facebook if:
   - You are under 13 years old.
   - You are a convicted sex offender.
   - We've previously disabled your account for violations of our Terms or the **Community Standards**, or other terms and policies that apply to your use of Facebook. If we disable your account for a violation of our Terms, the Community Standards, or other terms and policies, you agree not to create another account without our permission. Receiving permission to create a new account is provided at our sole discretion, and does not mean or imply that the disciplinary action was wrong or without cause.
   - You are prohibited from receiving our products, services, or software under applicable laws.

2. What you can share and do on Meta Products
   We want people to use Meta Products to express themselves and to share content that is important to them, but not at the expense of the safety and well-being of others or the integrity of our community. You therefore agree not to engage in the conduct described below (or to facilitate or support others in doing so):
   1. You may not use our Products to do or share anything:
      - That violates these Terms, the **Community Standards**, or other terms and policies that apply to your

facebook Log In

- That is unlawful, misleading, discriminatory or fraudulent (or assists someone else in using our Products in such a way).
- That you do not own or have the necessary rights to share.
- That infringes or violates someone else's rights, including their intellectual property rights (such as by infringing another's copyright or trademark, or distributing or selling counterfeit or pirated goods), unless an exception or limitation applies under applicable law.

2. You may not upload viruses or malicious code, use the services to send spam, or do anything else that could disable, overburden, interfere with, or impair the proper working, integrity, operation, or appearance of our services, systemes, or Products.
3. You may not access or collect data from our Products using automated means (without our prior permission) or attempt to access data you do not have permission to access.
4. You may not proxy, request, or collect Product usernames or passwords, or misappropriate access tokens.
5. You may not sell, license, or purchase any data obtained from us or our services, except as provided in the Platform Terms.
6. You may not misuse any reporting, flagging, dispute, or appeals channel, such as by making fraudulent, duplicative, or groundless reports or appeals.

We can remove or restrict access to content that is in violation of these provisions. We can also suspend or disable your account for conduct that violates these provisions, as provided in Section 4.B.

If we remove content that you have shared in violation of the Community Standards, we'll let you know and explain any options you have to request another review, unless you seriously or repeatedly violate these Terms or if doing so may expose us or others to legal liability; harm our community of users; compromise or interfere with the integrity or operation of any of our services, systems or Products; where we are restricted due to technical limitations; or where we are prohibited from doing so for legal reasons. For information on account suspension or termination, see Section 4.B below.

To help support our community, we encourage you to report content or conduct that you believe violates your rights (including **intellectual property rights**) or our terms and policies, if this feature exists in your jurisdiction.

We also can remove or restrict access to content features, services, or information if we determine that doing so is reasonably necessary to avoid or mitigate misuse of our services or adverse legal or regulatory impacts to Meta.

3. The permissions you give us

We need certain permissions from you to provide our services:

1. Permission to use content you create and share: Some content that you share or upload, such as photos or videos, may be protected by intellectual property laws.

   You retain ownership of the intellectual property rights (things like copyright or trademarks) in any such content that you create and share on Facebook and other **Meta Company Products** you use. Nothing in these Terms takes away the rights you have to your own content. You are free to share your content with anyone else, wherever you want.

   However, to provide our services we need you to give us some legal permissions (known as a "license") to use this content. This is solely for the purposes of providing and improving our Products and services as described in Section 1 above.

   Specifically, when you share, post, or upload content that is covered by intellectual property rights on or in connection with our Products, you grant us a non-exclusive, transferable, sub-licensable, royalty-free, and worldwide license to host, use, distribute, modify, run, copy, publicly perform or display, translate, and

facebook

Log In

those products and services. This license will end when your content is deleted from our systems.

You can delete individual content you share, post, and upload at any time. In addition, all content posted to your personal account will be deleted if you delete your account. **Learn more** about how to delete your account. Account deletion does not automatically delete content that you post as an admin of a page or content that you create collectively with other users, such as photos in Shared Albums which may continue to be visible to other album members.

It may take up to 90 days to delete content after we begin the account deletion process or receive a content deletion request. If you send content to trash, the deletion process will automatically begin in 30 days unless you chose to delete the content sooner. While the deletion process for such content is being undertaken, the content is no longer visible to other users. After the content is deleted, it may take us up to another 90 days to remove it from backups and disaster recovery systems.

Content will not be deleted within 90 days of the account deletion or content deletion process beginning in the following situations:

- where your content has been used by others in accordance with this license and they have not deleted it (in which case this license will continue to apply until that content is deleted);
- where deletion within 90 days is not possible due to technical limitations of our systems, in which case, we will complete the deletion as soon as technically feasible; or
- where immediate deletion would restrict our ability to:
  - investigate or identify illegal activity or violations of our terms and policies (for example, to identify or investigate misuse of our Products or systems);
  - protect the safety, integrity, and security of our Products, systems, services, our employees, and users, and to defend ourselves;
  - comply with legal obligations for the preservation of evidence, including data Meta Companies providing financial products and services preserve to comply with any record keeping obligations required by law; or
  - comply with a request of a judicial or administrative authority, law enforcement or a government agency;

in which case, the content will be retained for no longer than is necessary for the purposes for which it has been retained (the exact duration will vary on a case-by-case basis).

In each of the above cases, this license will continue until the content has been fully deleted.

2. Permission to use your name, profile picture, and information about your actions with ads and sponsored or commercial content: You give us permission to use your name and profile picture and information about actions you have taken on Facebook next to or in connection with ads, offers, and other sponsored or commercial content that we display across our Products, without any compensation to you. For example, we may show your friends that you are interested in an advertised event or have liked a Facebook Page created by a brand that has paid us to display its ads on Facebook. Ads and content like this can be seen only by people who have your permission to see the actions you've taken on Meta Products. You can **learn more** about your ad settings and preferences.
3. Permission to update software you use or download: If you download or use our software, you give us permission to download and install updates to the software where available.

4. Limits on using our intellectual property

If you use content covered by intellectual property rights that we have and make available in our Products (for example, images, designs, videos, or sounds we provide that you add to content you create or share on Facebook), we retain all rights to that content (but not yours). You can only use our copyrights or trademarks (or any similar marks) as expressly permitted by our Brand Usage Guidelines or with our prior written permission. You must obtain our written permission (or permission under an open source license) to modify

facebook Log In

otherwise attempt to extract source code from us, unless an exception or limitation applies under applicable law or your conduct relates to the Meta Bug Bounty Program.

## 4. Additional provisions

1. Updating our Terms
   We work constantly to improve our services and develop new features to make our Products better for you and our community. As a result, we may need to update these Terms from time to time to accurately reflect our services and practices, to promote a safe and secure experience on our Products and services, and/or to comply with applicable law. Unless otherwise required by law, we will notify you before we make changes to these Terms and give you an opportunity to review them before they go into effect. Once any updated Terms are in effect, you will be bound by them if you continue to use our Products.

   We hope that you will continue using our Products, but if you do not agree to our updated Terms and no longer want to be a part of the Facebook community, you can delete your account at any time.

2. Account suspension or termination
   We want Facebook to be a place where people feel welcome and safe to express themselves and share their thoughts and ideas.

   If we determine, in our discretion, that you have clearly, seriously or repeatedly breached our Terms or Policies, including in particular the Community Standards, we may suspend or permanently disable your access to Meta Company Products, and we may permanently disable or delete your account. We may also disable or delete your account if you repeatedly infringe other people's intellectual property rights or where we are required to do so for legal reasons.

   We may disable or delete your account if after registration your account is not confirmed, your account is unused and remains inactive for an extended period of time, or if we detect someone may have used it without your permission and we are unable to confirm your ownership of the account. Learn more about how we disable and delete accounts.

   Where we take such action we'll let you know and explain any options you have to request a review, unless doing so may expose us or others to legal liability; harm our community of users; compromise or interfere with the integrity or operation of any of our services, systems or Products; where we are restricted due to technical limitations; or where we are prohibited from doing so for legal reasons.

   You can learn more about what you can do if your account has been disabled and how to contact us if you think we have disabled your account by mistake.

   If you delete or we disable or delete your account, these Terms shall terminate as an agreement between you and us, but the following provisions will remain in place: 3, 4.2-4.5.

3. Limits on liability
   We work hard to provide the best Products we can and to specify clear guidelines for everyone who uses them. Our Products, however, are provided "as is," and we make no guarantees that they always will be safe, secure, or error-free, or that they will function without disruptions, delays, or imperfections. To the extent permitted by law, we also DISCLAIM ALL WARRANTIES, WHETHER EXPRESS OR IMPLIED, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE, AND NON-INFRINGEMENT. We do not control or direct what people and others do or say, and we are not responsible for their actions or conduct (whether online or offline) or any content they share (including offensive, inappropriate, obscene, unlawful, and other objectionable content).

   We cannot predict when issues might arise with our Products. Accordingly, our liability shall be limited to the

**facebook** Log In

liability, including negligence), even if we have been advised of the possibility of such damages. Our aggregate liability arising out of or relating to these Terms or the Meta Products will not exceed the greater of $100 or the amount you have paid us in the past twelve months.

4. Disputes
We try to provide clear rules so that we can limit or hopefully avoid disputes between you and us. If a dispute does arise, however, it's useful to know up front where it can be resolved and what laws will apply.

You and Meta each agree that any claim, cause of action, or dispute between us that arises out of or relates to these Terms or your access or use of the Meta Products shall be resolved exclusively in the U.S. District Court for the Northern District of California or a state court located in San Mateo County. You also agree to submit to the personal jurisdiction of either of these courts for the purpose of litigating any such claim, and that the laws of the State of California will govern these Terms and any claim, cause of action, or dispute without regard to conflict of law provisions. Without prejudice to the foregoing, you agree that, in its sole discretion, Meta may bring any claim, cause of action, or dispute we have against you in any competent court in the country in which you reside that has jurisdiction over the claim.

5. Other
   1. These Terms (formerly known as the Statement of Rights and Responsibilities) make up the entire agreement between you and Meta Platforms, Inc. regarding your use of our Products. They supersede any prior agreements.
   2. Some of the Products we offer are also governed by supplemental terms. If you use any of those Products, supplemental terms will be made available and will become part of our agreement with you. For instance, if you access or use our Products for commercial or business purposes, such as buying ads, selling products, developing apps, managing a group or Page for your business, or using our measurement services, you must agree to our **Commercial Terms**. If you post or share content containing music, you must comply with our **Music Guidelines**. To the extent any supplemental terms conflict with these Terms, the supplemental terms shall govern to the extent of the conflict.
   3. If any portion of these Terms is found to be unenforceable, the unenforceable portion will be deemed amended to the minimum extent necessary to make it enforceable, and if it can't be made enforceable, then it will be severed and the remaining portion will remain in full force and effect. If we fail to enforce any of these Terms, it will not be considered a waiver. Any amendment to or waiver of these Terms must be made in writing and signed by us.
   4. You will not transfer any of your rights or obligations under these Terms to anyone else without our consent.
   5. You may designate a person (called a legacy contact) to manage your account if it is memorialized. If you enable it in your settings, only your legacy contact or a person who you have identified in a valid will or similar legal document expressing clear consent to disclose your content to that person upon death or incapacity will be able to seek limited **disclosure** of information from your account after it is memorialized.
   6. These Terms do not confer any third-party beneficiary rights. All of our rights and obligations under these Terms are freely assignable by us in connection with a merger, acquisition, or sale of assets, or by operation of law or otherwise.
   7. We may need to change the username for your account in certain circumstances (for example, if someone else claims the username and it appears unrelated to the name you use in everyday life).
   8. We always appreciate your feedback and other suggestions about our products and services. But we may use feedback and other suggestions without any restriction or obligation to compensate you, and we are under no obligation to keep them confidential.

facebook Log In

## 5. Other terms and policies that may apply to you

- **Community Standards**: These guidelines outline our standards regarding the content you post to Facebook and your activity on Facebook and other Meta Products.
- **Commercial Terms**: These terms apply if you also access or use our Products for any commercial or business purpose, including advertising, operating an app on our Platform, using our measurement services, managing a group or a Page for a business, or selling goods or services.
- **Community Payment Terms**: These terms apply to payments made on or through Meta Products.
- **Commerce Policies**: These guidelines outline the policies that apply when you offer products or services for sale on Facebook, Instagram, and WhatsApp.
- **Music Guidelines**: These guidelines outline the policies that apply if you post or share content containing music on any Meta Products.
- **Advertising Policies**: These policies apply to partners who advertise across the Meta Products and specify what types of ad content are allowed by partners who advertise across the Meta Products.
- **Self-Serve Ad Terms**: These terms apply when you use self-serve advertising interfaces to create, submit, or deliver advertising or other commercial or sponsored activity or content.
- **Facebook Pages, Groups and Events Policy**: These guidelines apply if you create or administer a Facebook Page, group, or event, or if you use Facebook to communicate or administer a promotion.
- Meta Platform Policy: These terms apply to the use of the set of APIs, SDKs, tools, plugins, code, technology, content, and services that enables others to develop functionality, retrieve data from MetaProducts, or provide data to us.
- Developer Payment Terms: These terms apply to developers of applications that use Facebook Payments.
- Meta Brand Resources: These guidelines outline the policies that apply to use of Meta trademarks, logos, and screenshots.
- Recommendations Guidelines: **The Facebook Recommendations Guidelines** and Instagram Recommendations Guidelines outline our standards for recommending and not recommending content.
- **Live Policies**: These policies apply to all content broadcast to Facebook Live.

Date of Last Revision: July 26, 2022

English (US) Español Français (France) 中文(简体) العربية Português (Brasil) Italiano 한국어 Deutsch हिन्दी 日本語

Sign Up Log In Messenger Facebook Lite Watch Places Games Marketplace Meta Pay Oculus Portal Instagram Bulletin Fundraisers Services Voting Information Center Privacy Policy Privacy Center Groups

Privacy · Terms · Advertising · Ad Choices · Cookies · More · Meta © 2023

# Exhibit 3

Meta

# Privacy Policy

**Explore the policy**


What is the Privacy Policy and what does it cover?

What information do we collect?

How do we use your information?

How is your information shared on Meta Products or with Integrated Partners?

How do we share information with Partners, vendors, service providers and third parties?

How do the Meta Companies work together?

How can you manage or delete your information and exercise your rights?

How long do we keep your information?

How do we transfer information?

How do we respond to legal requests, comply with applicable law and prevent harm?

How will you know the policy has changed?

Privacy notice for United States residents

How to contact Meta with questions

Why and how we process your information


**Other policies**


Terms of Service

Cookies Policy


## What is the Privacy Policy and what does it cover?

Effective January 1, 2023

We at Meta want you to understand what information we collect, and how we use and share it. That's why we encourage you to read our Privacy Policy. This helps you use Meta Products in the way that's right for you.

In the Privacy Policy, we explain how we collect, use, share, retain and transfer information. We also let you know your rights. Each section of the Policy includes helpful examples and simpler language to make our practices easier to understand. We've also added links to resources where you can learn more about the privacy topics that interest you.

It's important to us that you know how to control your privacy, so we also show you where you can manage your information in the settings of the Meta Products you use. You can update these settings to shape your experience.

Read the full policy below.

What Products does this policy cover? [1]

Learn more in Privacy Center about managing your privacy

1

## What Products does this policy cover?

This policy describes the information we, Meta Platforms, Inc., process to provide Meta Products. Meta Products, which we also call "Products," include:

- Facebook
- Messenger
- Instagram (including apps like Boomerang)
- Facebook Portal products
- Meta Platforms Technologies Products, such as Meta Horizon Worlds or Meta Quest (when using a Facebook or Meta account)
- Shops
- Marketplace
- Spark AR
- Meta Business Tools
- Meta Audience Network
- NPE Team apps
- Facebook View

Some of our Products also have a supplemental privacy policy[2] that adds to the information provided in this policy.

2

## Supplemental policies

- Bulletin
- Facebook Portal products
- Facebook View
- Free Basics
- Meta Platforms Technologies Products
- Oversight Board

# What information do we collect?

The information we collect and process about you depends on how you use our Products. For example, we collect different information if you sell furniture on Marketplace than if you post a reel on Instagram. When you use our Products, we collect some information about you even if you don't have an account[3].

Here's the information we collect:

### Your activity and information you provide



On our Products, you can send messages, take photos and videos, buy or sell things and much more. We call all of the things you can do on our Products "activity." We collect your activity across our Products and information you provide[4], such as:

- Content you create, like posts, comments or audio[5]
- Content you provide through our camera feature or your camera roll settings, or through our voice-enabled features. Learn more[6] about what we collect

from these features, and how we use information from the camera for masks, filters, avatars and effects.

- Messages you send and receive, including their content, subject to applicable law. We can't see the content of end-to-end encrypted messages unless users report them to us for review. Learn more.
- Metadata[7] about content and messages, subject to applicable law
- Types of content you view or interact with, and how you interact with it
- Apps and features you use, and what actions you take in them. See examples[8].
- Purchases or other transactions you make, including credit card information. Learn more[9].
- Hashtags you use
- The time, frequency and duration of your activities on our Products

**Information with special protections**

You might choose to provide information about your religious views, your sexual orientation, political views, health, racial or ethnic origin, philosophical beliefs or trade union membership. These and other types of information could have special protections under the laws of your jurisdiction.

## Friends, followers and other connections

**Information we collect about your friends, followers and other connections**

We collect information about friends, followers, groups, accounts, Facebook Pages and other users and communities you're connected to and interact with. This includes how you interact with them across our Products and which ones you interact with the most.

**Information we collect about contacts**

We also collect your contacts' information, such as their name and email address or phone number, if you choose to upload or import it from a device, like by syncing an address book.

If you don't use Meta Products, or use them without an account, your information might still be collected. Learn more about how Meta uses contact information uploaded by account holders.

Learn how to upload and delete contacts on Facebook and Messenger, or how to connect your device's contact list on Instagram.

**Information we collect or infer about you based on others' activity**

We collect information about you based on others' activity. See some examples[10].

We also infer things about you based on others' activity. For example:

- We may suggest a friend to you through Facebook's People You May Know feature if you both appear on a contact list that someone uploads.
- We take into account whether your friends belong to a group when we suggest you join it.

## App, browser and device information

We collect and receive information from and about the different devices[11] you use and how you use them.

Device information we collect and receive includes:

- The device and software you're using, and other device characteristics. See examples[12].
- What you're doing on your device, like whether our app is in the foreground or if your mouse is moving (which can help tell humans from bots)
- Identifiers that tell your device apart from other users', including Family Device IDs. See examples[13].
- Signals from your device. See examples[14].
- Information you've shared with us through device settings, like GPS location, camera access, photos and related metadata[15]
- Information about the network you connect your device to, including your IP address. See more examples[16].
- Information about our Products' performance on your device. Learn more[17].
- Information from cookies and similar technologies. Learn more.[18]

## Information from Partners, vendors and third parties

**What kinds of information do we collect or receive?**

We collect and receive information from Partners[19], measurement vendors and third parties[20] about a variety of your information and activities on and off our Products.

Here are some examples of information we receive about you:

- Your device information
- Websites you visit and cookie data, like through Social Plugins or the Meta Pixel
- Apps you use
- Games you play

- Purchases and transactions you make
- Your demographics, like your education level
- The ads you see and how you interact with them
- How you use our Partners' products and services, online or in person

Partners also share information like your email address, cookies[18] and advertising device ID with us. This helps us match your activities with your account, if you have one.

We receive this information whether or not you're logged in or have an account on our Products. Learn more about how we connect information from Partners to your account.

Partners also share with us their communications with you if they instruct us to provide services to their business, like helping them manage their communications. To learn how a business processes or shares your information, read their privacy policy or contact them directly.

**Take control**

Off-Facebook activity

**How do we collect or receive this information from partners?**

Partners use our Business Tools, integrations and Meta Audience Network technologies to share information with us.

These Partners collect your information when you visit their site or app or use their services, or through other businesses or organizations they work with. We require Partners to have the right to collect, use and share your information before giving it to us.

## What if you don't let us collect certain information?

Some information is required for our Products to work. Other information is optional, but without it, the quality of your experience might be affected.

Learn more[21]

## Take control in Privacy Center

Manage the information we collect about you

3

## Information we collect if you use our Products but don't have an account

For example, we collect:

- Browser and app logs of your visits to public content, like Facebook Pages, videos and rooms
- Basic information about devices that downloaded our apps, like device model and OS

We also receive information using cookies and similar technologies, like the Meta Pixel or Social Plugins, when you visit other websites and apps that use Meta Products. Read our Cookies Policy to learn more.

### Examples of why we collect information

**Security of our Products**

For example, if we see someone without an account trying to load too many pages, they could be trying to scrape our site in violation of our terms. Then we can take action to prevent it.

**Safety and integrity**

For example, if someone without an account joins a room and shares a harmful video, we can take action according to our Community Standards. We can remove content that violates our terms and policies, or share information with law enforcement when we believe there is a genuine risk of death or imminent bodily harm.

**Advertising**

For example, you may also see ads for the Meta Company Products shown through Meta Audience Network when you visit other apps if we can't recognize you as a registered user of the Meta Products.

**Performance**

For example, we use information we have about people who use our Products, even if they don't have an account, to measure how fast our pages load in different countries. This helps us identify and fix issues with local networks.

4

## Information you provide

For example, when you create a Facebook account, you must provide some information, like a password and your email address or phone number. You might choose to add other details to your account, like a profile photo or payment information.

We also collect information you provide when you:

- Create your avatar

- Fill out a form
- Contact us

5

## Audio content you create

You can create audio content, like if you're a host or speaker in a Live Audio Room. Live Audio can be listened to by anyone in the audience for the broadcast.

6

### What we collect from our camera feature



José likes using Instagram's Camera feature to take pictures of his friends. We collect information about how José uses the Camera feature, including what he sees through the camera lens on his device while he's using the feature. This helps us do things like suggest masks and filters that he might like.

### How filters, effects, masks and avatars work



If you use our camera or allow access to photos and videos, on certain Meta Products you can add filters, effects, masks or avatars.

Some of these features process parts of faces or bodies within the camera frame, photo or video. Then they can do things like fit a mask correctly over the eyes, nose and mouth. The information we use for this process is used to create the feature. It's not used to identify you.

**What we collect from voice-enabled features**



Ren tells Meta's voice-enabled Assistant to take a photo on Ray-Ban Stories. A visual indicator shows that Assistant is activated and listening for Ren's command. We collect this voice interaction, which includes any background sound that occurs when Ren says the command. Collecting Ren's voice interactions lets us provide and, depending on Ren's settings, improve the Assistant feature.

7

## Metadata about content or messages

Metadata is:

- Information about the content itself, like the location where a photo was taken or the date a file was created
- Information about the message itself, like the type of message or the date and time it was sent

8

## Apps and features you use, and how you use them

For example, we log:

- What apps, posts, videos, ads, games, Shops and other content you view or interact with on our Products

- When you use Social Plugins, Facebook Login or autofill

9

## Purchases or other transactions

We collect information when you use our Products to buy or sell things or make other financial transactions.

Some examples are:

- Purchases within an online game
- Donations to a friend's fundraiser
- Purchases in Marketplace, Shops or groups
- Money transfers to friends and family (where available)

**What we collect from transactions**

When you buy things or make other payments in Marketplace, Shops or groups, we collect information about your purchase or other financial transactions, like:

- Credit or debit card number and other card information
- Billing, shipping and contact details
- Items you bought and how many
- Other account and authentication information

**Why we collect this information**

One reason we store this information is to allow you to access and view your payment and transaction history.

And you can use it the next time you shop to give you easier, faster shopping experiences.

## More in the Privacy Policy

How do we use your information? >

How do we respond to legal requests, comply with applicable law and prevent harm? >

10

## When we collect information based on others' activity

For example, we collect information about you on Meta Products when others:

- Share or comment on a photo you're tagged in
- Send you a message
- Invite you to join a conversation
- Upload their address book that has your contact information in it
- Invite you to play a game

11

## Devices

These devices include computers, phones, hardware, connected TVs, Portal devices and other web-connected devices.

12

## What device you're using, and other device characteristics

We collect device information like:

- The type of device
- Details about its operating system
- Details about its hardware and software
- Battery level
- Signal strength
- Available storage
- Browser type
- App and file names and types
- Plugins

13

## Identifiers that tell your device apart from other users'

Identifiers we collect include device IDs, mobile advertiser ID or IDs from games, apps or accounts you use. We also collect Family Device IDs or other

identifiers unique to Meta Company Products associated with the same device or account.

14

## Device signals

Device signals include GPS, Bluetooth signals, nearby Wi-Fi access points, beacons and cell towers.

15

## Related metadata

For example, if you give us permission to access your device's camera roll, we collect metadata. This metadata is from and about your photos and videos and includes the date and time they were made. We use this to do things like remind you when you have new photos to upload.

16

## Information about the network you connect your device to

Information about your network includes:

- The name of your mobile operator or internet service provider (ISP)
- Language
- Time zone
- Mobile phone number
- IP address
- Connection speed
- Information about other devices that are nearby or on your network
- Wi-Fi hotspots you connect to using our Products

One reason we collect this information is to make your experience better. For example, if we know that your phone and TV are connected to the same network, we can help you use your phone to control a video stream on your TV.

## More in the Privacy Policy

How do we use your information?

17

## Information about our Products' performance on your device

We collect device information to prevent, diagnose, troubleshoot and fix errors and bugs. This includes how long the app was running, what model of device you were using and other performance and diagnostic information.

18

## Cookies

Cookies are small pieces of text used to store information on web browsers. We use cookies and similar technologies, including data that we store on your web browser or device, identifiers associated with your device and other software, Social Plugins and the Meta Pixel. They help us provide, protect and improve our Products, such as by personalizing content, tailoring and measuring ads and providing a safer experience.

We collect information from cookies stored on your device, including cookie IDs and settings. Read our cookie policies:

- Facebook Cookies Policy
- Instagram Cookies Policy

19

## Our Partners

Businesses and people can use our Products to advertise, market or support their products and services. When they use our Products, we call them our Partners.

Our Products include our Business Tools and other technologies that allow businesses to advertise or support their products and services, or to understand and measure how people are using their services and how well their ads are working. For example, they might put one of our Business Tools, the Meta Pixel, on their website. Or they might use Meta Audience Network tools to monetize their apps by showing ads from businesses that advertise on Facebook.

Our Products also include technologies where you can make a connection to our Partners through our Products. For example, you might log into their app or

website using Facebook Login. Or you might play their game on Facebook, which we call an integration because you can play without leaving our app. We call the Partners who use these integrated tools our Integrated Partners.

Here are some examples of our Partners:

- Advertisers
- Companies that measure how well ads are doing and provide reports
- Businesses and people that use our Products to sell or offer goods and services
- Publishers (like a website or app) and their business partners
- App developers
- Game developers

20

## Third parties we get information from

Other organizations and bodies share information with Meta but don't use our Products. We refer to them as third parties. We collect and receive information from these third parties, including:

- Publicly available sources, like academic papers and public forums
- Industry peers, such as other online platforms and technology companies
- Marketing and advertising vendors and data providers, who have the rights to provide us with your information
- Law enforcement
- Government authorities
- Professional and non-profit groups, like NGOs, and charities
- Academic and research institutions, like universities, non-profit research groups and think tanks

**Third-party public sources**

For example, we get datasets from publicly available sources, research institutions and professional and non-profit groups. We use these datasets to:

- Detect and stop scraping in violation of our terms
- Take other actions to promote the safety, security and integrity of our Products, our users, the public and our personnel and property
- Improve our AI technologies, such as translations

- Support AI research, like computer vision and natural language processing technologies
- Engage with research survey respondents who choose to participate in additional conversations

## More in the Privacy Policy

How do we use your information? >

21

## What happens if you don't let us collect certain information

For example, if you don't provide an email address or phone number, we won't be able to create an account for you to use our Products.

Or you can choose not to add Facebook friends, but then your Facebook Feed won't show friends' photos and status updates.

# How do we use your information?

We use information we collect to provide a personalized experience to you, including ads, along with the other purposes we explain in detail below.

For some of these purposes, we use information across our Products[22] and across your devices[23]. The information we use for these purposes is automatically processed by our systems. But in some cases, we also use manual review[24] to access and review your information.

To use less information that's connected to individual users, in some cases we de-identify or aggregate information. We might also anonymize it so that it no longer identifies you. We use this information in the same ways we use your information as described in this section.

Here are the ways we use your information:

## To provide, personalize and improve our Products

We use information we have to provide and improve our Products. This includes personalizing features, content and recommendations, such as your Facebook Feed[25], Instagram feed, Stories and ads. We use information with special protections you choose to provide for these purposes, but not to show you ads.

Read more about how we use information to provide, personalize and improve our Products:

## How we show ads and other sponsored or commercial content

When you use our Products, you see ads and sponsored or commercial content, like product listings in Shops. You also see ads shown through Meta Audience Network when you visit other apps. We want everything you see to be interesting and useful to you.

To decide what to show you and others, we use information we have about you, including:

- Your profile information
- Your activity on and off our Products, including information we receive through cookies and similar technologies, according to your settings
- Things we infer about you, like topics we think you may be interested in
- Information about your friends, followers or other connections, including their activity or interests

See some examples.[26]

Learn more about some of the ways we show you ads that we think may be interesting to you, including using machine learning.

**Take control in Privacy Center**



Learn more about how ads work >

## How we use information to improve our Products

We're always trying to make our Products better and create new ones with the features you want. Information we collect from you helps us learn how.

We use information we collect to:

- See if a product is working correctly
- Troubleshoot and fix it when it's not
- Test out new products and features to see if they work
- Get feedback on our ideas for products or features
- Conduct surveys and other research about what you like about our Products and brands and what we can do better

## How we use location-related information

We use location-related information that you allow us to receive if you turn on the Location Services device setting. This includes things like your GPS location and, depending on the operating system you're using, other device signals[27].

We also receive and use some location-related information even if Location Services is turned off. This includes:

- IP addresses[28], which we use to estimate your general location. We can use IP addresses to estimate your specific location if it's necessary to protect the safety and security of you or others.
- Your and others' activity on our Products, like check-ins and events
- Information you give us directly, like if you enter your current city on your profile, or provide your address in Marketplace

We use location-related information, such as your current location, where you live, the places you like to go and the businesses and people you're near, to do the things described in the "How do we use your information?" section of the Policy, like:

- Provide, personalize and improve our Products, including ads, for you and others. See an example[29].
- Detect suspicious activity and help keep your account secure. Learn how.[30]

**More resources**

How to manage Facebook location settings
Facebook Help Center

How to turn Instagram location services on or off
Instagram Help Center

**To promote safety, security and integrity**

We use information we collect to help protect people from harm and provide safe, secure Products.

Learn more >

**To provide measurement, analytics and business services**

Lots of people rely on our Products to run or promote their businesses. We help them measure how well their ads and other content are working.

Learn more >

**To communicate with you**

We communicate with you using information you've given us, like contact information you've entered on your profile.

Learn more >

**To research and innovate for social good**

We use information we have, information from researchers and datasets from publicly available sources, professional groups and non-profit groups to conduct and support research.

Learn more >

### Promoting safety, security and integrity

Here are some ways we promote safety, security and integrity. We work to:

- Verify accounts and activity
- Find and address violations of our terms or policies. In some cases, the decisions we make about violations are reviewed by the Oversight Board. They may use information we have when they review our decisions. Learn more about how the Oversight Board processes information.
- Investigate suspicious activity
- Detect, prevent and combat harmful or unlawful behavior
- Identify and combat disparities and racial bias against historically marginalized communities
- Detect and prevent spam and other bad experiences
- Detect when someone needs help and provide support
- Detect and stop threats to our personnel and property
- Maintain the integrity of our Products

Learn more about how we work to keep Meta a safe place for everyone.

**Take control**

Account security >

### Providing measurement, analytics and business services

To provide measurement and analytics services, we use the information we collect about you across your accounts on our Products.

Our measurement and analytics services help our Partners understand things like:

- How many people see and interact with their content, including posts, videos, Facebook Pages, listings, Shops and ads (including those shown through apps using Meta Audience Network)
- How people interact with their content, websites, apps and services
- What types of people[31] interact with their content or use their services

**More in the Privacy Policy**

How do we share information with Partners, vendors, service providers and third parties? >

## Communicating with you

We communicate with you in a few different ways. For example:

- We send messages about the Products we know you use, using the email you register to your account
- Depending on your settings, we send marketing communications about Products you might like
- We ask you to participate in research based on things like how you use our Products
- We let you know about our policies and terms of service
- When you contact us with questions, we reply to your email
- We facilitate customer support communications with you when you've told us, either directly or through a third party, that you have questions or concerns about our Products

We also use information about how you interact with our messages, like if you open an email from us. This helps us understand the best way to reach you and whether our communications are helpful.

**Take control**

Communication preferences >

## Researching and innovating for social good

We research and innovate to help people around the world. Our goals include:

- Contributing to social good and areas of public interest
- Advancing technology
- Improving safety, health and well-being

Here are some examples of our research:

- We analyze information about where groups of people go during crises. This helps relief organizations get aid to the right places.
- We work with independent researchers to better understand the impact social media might have on elections and democratic processes
- We've collaborated with academics and industry experts to help improve internet access and quality in rural areas

- We support research in areas like artificial intelligence and machine learning to do things like create COVID-19 forecasting models

Learn more about our research programs

## More in the Privacy Policy

Why and how we process your information

22

## Using information across our Products

We use information across your accounts on our Products to:

- Personalize ads for you and others. Learn more.
- Measure the performance of those ads. Learn more.
- Provide more personalized features, content and suggestions across our Products. See examples[32].
- More accurately count people and understand how they use our Products
- Help keep you and others safe. Learn more.

If you set up your Accounts Center, we also use your information to offer connected experiences and improve your experiences across accounts. See an example.[33]

### More resources

How to add or delete accounts in your Accounts Center
Facebook Help Center

23

## Why we use information across devices

One reason we use your information across devices is to help us give you a more personalized experience. For example, we might show you an ad on your phone, and later you might use your laptop to click on the ad and buy the product. By combining that information across your devices, we can understand what ads are relevant to you and help businesses measure how well their ad performed.

24

## Manual review

**Examples of when we use manual review**

- Our reviewers help us promote safety, security and integrity across our Products. For example, reviewers can look for and remove content that violates our terms and policies and keep content that doesn't break our terms and policies available. Their work supplements our technology that detects violations.

- When our algorithms detect that someone might need help, a reviewer can review their post and offer support if needed.

- We also use manual review to analyze content to train our algorithms to review content the same way a person would. This improves our automatic processing, which in turn helps us improve our products.

**Who reviews this information**

Our reviewers work at Meta, for Meta Companies or for a trusted vendor. We require every reviewer who's allowed access to your information to meet privacy and security standards.

Learn more about how Facebook prioritizes content for manual review.

25

## How we personalize your Facebook Feed

Your Facebook Feed is unique to you. We order (or "rank") the content you can see in your Feed, and you can learn more about the different types of signals we use to rank it. We also suggest content that's relevant to you.

Many things influence the content you see in your Feed.

For example:

- If your friends, connections or people you may know interact with a Facebook Page, post or certain topic, we can suggest similar content to you. So if your friend Ahmad comments on a post about national parks, we can suggest the national parks post to you.

- If you and others interact with the same group, Facebook Page or post, we can suggest another group, Page or post that they interact with for you. So if you and Sharmila are in the same cat lovers group and Sharmila likes a Page that sells scarves, we might suggest the scarves Page to you.

- If you've recently engaged with a certain topic on Facebook, we might then suggest other posts that are related to that topic. So if you recently liked or commented on a post from a basketball Page, we could suggest other posts about basketball.

- You might see posts based on where you are and what people near you are interacting with on Facebook. So if you're near a sports stadium, we can suggest games or events occurring at the stadium. Learn more about how we use location-related information.

## More resources

Manage your Facebook Feed preferences
Facebook Help Center

26

### Your activity on our Products



For example, William checks into a local bakery on Facebook, so later we might show him ads on Instagram for other local bakeries.

### Your activity on websites and apps, depending on your settings



For example, Jane buys a pair of shoes from an online shoe store. The store shares Jane's activity with us using our Business Tools, subject to our Business Tools Terms.

Later, Jane sees an ad on Instagram for a discount on her next shoe purchase from the online store.

If she doesn't want to see more ads from this shoe store, she can hide them in her advertisers setting. Or if she doesn't want us to show her any ads based on her activity on other websites and apps, she can make sure that this setting is turned off in her ad settings

**Topics we think you might be interested in**



For example, Jon likes several Facebook Pages about famous musicians, so we think he has an interest in "music."

Based on this interest, we might show him an ad for a local record shop or an online music publication.

**Your connections**



For example, Fiona's friend likes an Instagram account for a local art fair. Based on her friend's activity, we might show Fiona an ad for the art fair.

27

## Other device signals we receive

We receive different types of device signals from different operating systems. They include things like nearby Bluetooth or Wi-Fi connections.

28

## IP addresses

IP address stands for "internet protocol address." It's a unique number assigned to a device, like a phone or computer, that allows it to communicate over the internet. Numbers are assigned according to standard guidelines, or protocols.

Just like you need a mailing address to receive a letter from a friend, your device needs an IP address to receive information on the internet.

29

Personalizing ads for you and others



For example, Marcus is going on a trip and wants to use Find Wi-Fi to find free, public Wi-Fi at the airport. He has turned on Location Services, so we can use his GPS information to help him find the most relevant public Wi-Fi networks. We'll also use this information to show him ads for local businesses near the airport.

Later, Marcus turns off Location Services before he lands, so we don't collect his GPS information anymore. Later on his trip, he opens the Facebook app, and we can use the IP address we receive to estimate Marcus' current location and show him ads for businesses nearby.

30

## Helping to keep your account secure

For example, we use information about the locations you normally log in from, combined with other information, to detect suspicious activity. So if we detect an attempt to log into your account from a new location, we can check that it's really you.

31

### Information we provide about different types of people

For example, we might tell an advertiser that their ad was seen by women aged 25–34 who live in Madrid and like software engineering.

32

### Providing more personalized features, content and suggestions across our Products

For example we can:

- Automatically fill in registration information, like your phone number, from one Meta Product when you sign up for an account on a different Product
- Let others see and search your name and profile photo across our Products and communicate with you
- Show all interactions in one place for content you've cross-posted to different Products

33

### Using your information if you set up your Accounts Center

For example, if you follow your favorite team on Instagram, we can more easily suggest that you follow that team's Page on Facebook.

Learn more about how we use information across accounts if you set up Accounts Center.

## How is your information shared on Meta Products or with Integrated Partners?



## On Meta Products

Learn more about the different cases when your information can be shared on our Products:

### People and accounts you share and communicate with

When you share and communicate using our Products, you can sometimes choose the audience[34] for what you share.

When you interact with people or businesses, they can see:

**What you share with them**

For example, the audience you choose can see when you:

- Share a post you've written
- Share a photo or video
- Create a story
- Share a news article
- Add information to your profile

**What you communicate with them**

People you interact with can see what you send to them. So if you send a person or a business a message on Messenger or Instagram, that person or business can read your message.

**Some of your activity**

People and businesses can also see some of your activity on our Products. This includes when you:

- Comment on or react to others' posts
- Engage with ads or other sponsored or commercial content, like by commenting or liking

- Allow content you've shared about a product in a Shop to be shared across our Products
- View their story on Facebook or Instagram
- Connect a new Meta device, like Portal or Ray-Ban Stories, to your account

**When you're active**

Some of our Products might provide you with settings that allow others to see when you're active on our Products, such as "active status." In some cases, we also offer settings that allow others to see when you're active in a particular section of one of our Products, like a message thread, game or event, or when you last used one of our Products.

Learn how to update your Active Status on Facebook and Messenger, or how to update your Activity Status on Instagram.

## Content others share or reshare about you

**Who can see or reshare your content**

People in your audience can view your content and can choose to share it with others outside your audience, on and off our Products. For example, when you share a post or send a message to specific friends, they can download, screen-shot or reshare it with anyone, on, across or off our Products.

When you comment on a post or react to a photo, your comment or reaction can be seen by anyone who can see the post or photo. This can include people you aren't connected to. The person who shared the post can also change their audience at any time after you've interacted with it.

**How information about you can be shared**

People who use our Products can share information about you with the audi-ence they choose. For example, they can:

- Share a photo or video of you in a post, comment, story, reel or message
- Mention you in a post or story
- Tag you in a post, comment, story or location
- Share details about you in a post, story or message

If you're uncomfortable with what others have shared about you on our Products, you can always choose to report posts and stories.

**More resources**

Remove a tag from a photo or post on Facebook
Facebook Help Center

Remove a tag from a photo or video on Instagram
Instagram Help Center

### Public content

**What content is public?**

Some of your information and activity are always public. This includes your name, Facebook and Instagram username, profile picture and activity on public Facebook Pages and groups.

Other content you can choose to set to Public, like posts, photos and videos you post to your profile, Stories or Reels.

**Who can see public content?**

When content is public, it can be seen by anyone on or across our Products, and in some cases off our Products, even if they don't have an account.

For example, if you comment on Marketplace, a public Facebook Page or a public Instagram account, or if you leave a rating or review, your comment, rating or review will be visible to anyone. It could appear in any of our Products or be seen by anyone, including off our Products.

**Where can public content be shared?**

We, you and people using our Products can send public content (like your profile photo, or information you share on a Facebook Page or public Instagram account) to anyone on, across or off our Products. For example, users can share it in a public forum, or it can appear in search results on the internet.

Public content can also be seen, accessed, reshared or downloaded through third-party services, like:

- Search engines. Learn more[35].
- APIs
- The media, like TV
- Other apps and websites connected to our Products

**More resources**

Public information on Facebook
Facebook Help Center

How to make a public account private on Instagram
Instagram Help Center

## With Integrated Partners

You can choose to connect with Integrated Partners[36] who use our Products. If you do, these Integrated Partners receive information about you and your activity.

These Integrated Partners can always access information that's public on our Products. Learn more about other information they receive and how they handle your information:

## When you use an Integrated Partner's product or service

### Information they receive automatically

When you use an Integrated Partner's products or services, they can access:

- What you post or share from these products or services
- What you use their services to do
- Information from and about the device you're using

See examples[37] of when an Integrated Partner might receive your information.

### Information they receive with your permission

Sometimes these Integrated Partners ask you for permission to access certain additional information from your Facebook, Instagram or Messenger account. In their request, they'll explain what information they'd like to access and let you choose whether to share it.

On Facebook, this includes things like your email address, hometown or birthday. On Instagram, this includes content, like photos and videos, that you've shared from your account when the account was set to private.

Learn what happens if you choose to share your friends list, or if your friends choose to share their friends list.[38]

We automatically log when you receive a request from an Integrated Partner to access your information. These requests to access information are separate from the Apps and Websites access that you manage in your Facebook or Instagram ad settings or in your mobile device settings.

### How long they can access your information

Apps or websites you've logged into using Facebook Login or connected to your Instagram account can access your nonpublic information on Meta Products unless it appears to us that you haven't used the app or website in 90 days. Note that even if an app's access to your data has expired, it can still retain information you shared with it previously.

We encourage you to visit your Apps and Websites settings from time to time to review which apps and websites continue to have access to your information through Facebook Login or Instagram.

### More resources

How to manage apps and websites on Facebook
Facebook Help Center

How to manage apps and websites on Instagram
Instagram Help Center

## When you interact with someone else's content on an Integrated Partner's product or service

Integrated Partners receive information about your activity when you interact with other Facebook, Instagram or Messenger users while they're using the Integrated Partner's product or service.

For example, a gamer livestreams to Facebook using a partner app. Then you comment on that livestream. The app developer will receive information about your comment.

### How Integrated Partners handle your information

Integrated Partners handle the information you share with them according to their own terms and policies, not Meta's. You can review their privacy policy on their website or app to learn how they receive and process your information. In some cases, they use a separate service provider to receive and process your information.

**More resources**

How Meta reviews apps that integrate with our Products
Facebook Developers

## Take control



Learn more about audiences in Privacy Center



Manage apps and websites

34

## Choosing an audience

On Facebook, the audience can be made up of:

- The public, including people on and off Facebook
- Your friends and other connections, such as the friends of people you tag
- A customized list of people
- Yourself
- The members of a single community, such as a group

On Instagram, you can set the audience for what you share by choosing between a private or public account. With a private account, only followers you approve can see what you share. With a public account, your posts and other content on Instagram can be seen by anyone, on or off our Products, including if they don't have an account. You can restrict the audience for your content by

blocking individual accounts from viewing them. You can also create a close friends list for certain types of content that only the people on that list can see.

### Take control

Audience settings
Manage your audience settings on Facebook or Instagram.

**Audience settings are different from app permissions**

Your audience settings are different from the permissions you give to individual apps and websites to access your information. Read our policy about how you may share information with Integrated Partners.

35

## Search engines

You can visit your privacy settings to control whether search engines outside Facebook can link to your profile. But other public content–like if you post with your audience set to Public, or post on public Pages or accounts–might still be accessible through search engines, depending on the settings of that account.

36

## Our Partners

Businesses and people can use our Products to advertise, market or support their products and services. When they use our Products, we call them our Partners.

Our Products include our Business Tools and other technologies that allow businesses to advertise or support their products and services, or to understand and measure how people are using their services and how well their ads are working. For example, they might put one of our Business Tools, the Meta Pixel, on their website. Or they might use Meta Audience Network tools to monetize their apps by showing ads from businesses that advertise on Facebook.

Our Products also include technologies where you can make a connection to our Partners through our Products. For example, you might log into their app or website using Facebook Login. Or you might play their game on Facebook, which we call an integration because you can play without leaving our app. We call the Partners who use these integrated tools our Integrated Partners.

Here are some examples of our Partners:

- Advertisers

- Companies that measure how well ads are doing and provide reports
- Businesses and people that use our Products to sell or offer goods and services
- Publishers (like a website or app) and their business partners
- App developers
- Game developers

37

When an Integrated Partner might receive your information



For example, you might use your Facebook login to play an online game with your Facebook friends. The game developer automatically receives information about your activities in the game.

When an Integrated Partner might receive your information



Or you might use the Facebook Like button on an article posted on a news website. The website developer automatically receives information about your Like on their article.

38

### Sharing friends lists

**When you share your friends list**

If you use Facebook Login to log into an app, the app developer might request access to your list of Facebook friends. Here's what happens if you give the app developer permission to view these lists:

- They can view and access a list of your Facebook friends who use the same app and have given the app permission to access their list of friends. They can't access nonpublic information about your friends or followers through this process. Note that the app developer will receive more information about your friends if your friends choose to share it themselves. They can share it by providing the information directly or giving the developer permission to access information from their account.

- You'll appear on friends lists that your Facebook friends can choose to share with the same app. You can remove this permission, or the app entirely, if you later decide that you don't want to share your friends list with an app, or don't want to appear on other friends lists shared with that app.

**When your friends share their friends list**

Your friends might choose to share their friends lists with app developers through Facebook Login. But your friends can't use Facebook Login to share nonpublic information about you.

## How do we share information with Partners, vendors, service providers and third parties?



We don't sell any of your information to anyone, and we never will. We also require Partners and third parties to follow rules about how they can and cannot use and disclose the information we provide.

Here's more detail about who we share information with:

## Partners

## Advertisers and Audience Network publishers

### Advertisers

We provide advertisers with reports about the number and kinds of people who see and engage with their ads. These reports include information about the general demographics and interests of people who engaged with an advertiser's ad. Then advertisers can better understand their audience. See an example[39].

Meta also provides advertisers and their business partners with information about:

- Ads people engaged with, if any
- When people engaged with ads
- Where that ad was shown (for example, on Instagram, or on Facebook)

But we don't share information with these advertisers and their business partners that by itself can be used to contact or identify you, such as your name or email address, unless you give us permission.[40]

### Audience Network publishers and their business partners

Meta Audience Network lets advertisers place ads with us that will be published on apps outside of Meta.

To help show you ads on their apps, we share information with publishers who use Audience Network, as well as business partners who facilitate that use. For example, we share:

- How many people see and engage with ads on publisher apps
- Information related to or in response to a publisher's request to serve an ad on its app.

But we don't share information with these publishers and their business partners that by itself can be used to contact or identify you, such as your name or email address, unless you give us permission[40].

## Partners who use our analytics services

People rely on our Products, like business accounts, professional tools and Facebook Pages, to run and promote their businesses. Businesses use our analytics services to understand more about how people are using their content and features.

We receive information about how people interact with their posts, listings, Facebook Pages, videos, Shops or other content, on and off our Products. Then we put this information into aggregate reports so they can see how well their content is performing.

These reports aggregate information like:

- How many people interacted with their content

- The general demographics and interests[39] of the people who interacted with it

Partners who advertise with us also receive other information. Read our policy about how we share information with advertisers.

### Partners who offer goods or services on our Products and commerce services platforms

When you choose to make a transaction[41], or otherwise choose to share information with a seller, creator, fundraiser, charity, payment services provider or commerce services platform[42], we share information with them and with any providers acting on their behalf.

Depending on how you interact with them, they receive:

- Information to complete your transaction, like order, payment, contact and shipping information
- Information to help ensure the security of the transaction, like information about your device or connection
- Any information required by applicable regulation
- Other information you choose to share with them

For example, if you make a purchase from an Instagram shop using checkout, the shop will receive information to complete your transaction. This may include your order items, your contact details and shipping information. If the shop uses a payment services provider, such as PayPal, to facilitate the transaction, the provider will receive the transaction amount, a transaction description (to appear on your credit card statement) and your payment card information, such as cardholder name, card number, expiration date and billing address. Learn more about payments on Instagram.

### Integrated Partners

When you choose to use Integrated Partners' products or services, they receive information about you and your activity. Read the policy.

## Vendors

### Measurement and marketing vendors

Measurement and marketing vendors are businesses that provide marketing-related support to Meta and its advertisers. For example, they purchase ads on our behalf, provide market research and measure the effectiveness of our campaigns. Such vendors also support our Partners' advertising.

#### Measurement vendors

We don't create every measurement and analytics report ourselves.

We work with measurement vendors who create reports that help our Partners, like advertisers, understand how their content and ads are performing, who is engaging with them and whether people took an action after seeing their ad.

We share information (like whether people saw an ad or engaged with it) with our measurement vendors, who aggregate it to provide their reports. See an example[43].

### Marketing vendors

We share information about you with companies that help market our Company and Products, measure the effectiveness of our own marketing campaigns and perform advertising research. For example, we share your device identifier or other identifiers with advertising vendors to help us serve you ads most relevant to your interests. Learn more[44] about how vendors support our marketing and advertising efforts.

## Service providers

### Service providers

Service providers provide services to us that help us provide our Products to you. We share the information we have about you to receive these services, which include:

- Investigating suspicious activity
- Detecting and stopping threats to our personnel and property
- Facilitating payments
- Providing customer support
- Improving the functionality of our Products
- Providing technical infrastructure services
- Analyzing how our Products are used
- Conducting research and surveys
- Marketing and promoting our Products
- Analyzing the effectiveness of our ads

## Third parties

### External researchers

We provide information to external researchers. They use it to conduct research that advances scholarship and innovation, and to promote safety, secu-

rity and integrity.

Research goals include supporting:

- Our business or mission
- Social good. Learn more.
- Technological advancement
- Safety and security on our Products
- Public interest
- Health and well-being

When sharing data with external researchers, we ensure the privacy of our users is protected. Learn more about the privacy-safe research we support.

## Other times we share with third parties

We also share information with third parties in response to legal requests, to comply with applicable law or to prevent harm. Read the policy.

And if we sell or transfer all or part of our business to someone else, then we may give the new owner your information as part of that transaction, in line with applicable law.

39

### General demographics and interests

For example, a bike shop creates a Page on Facebook and wants to place an ad to reach an audience of people in Atlanta interested in cycling. We determine whether someone fits in this audience based on, for example, whether they liked a Page about bikes. Then people in that audience could see the bike shop's ad.

You can see the "interests" assigned to you in your ad preferences and remove them if you want.

The bike shop can then see reports showing aggregated statistics about the audience seeing their ads and how their ads are performing. The reports would show statistics to the advertiser that, for example, most of the people who saw or clicked on their ad:

- Were women
- Were between the ages of 25 and 34
- Clicked on the ad from their phone

40

## When you might give us permission

For example, you might request more information from a business by clicking their ad in your Facebook Feed and submitting a form with your name and contact information. Then the advertiser would receive the information you provided.

41

## Transactions you might make

- Subscribing to premium content
- Buying, selling or using products
- Buying, selling or using services
- Donating to charities

42

## Commerce services platforms

Commerce services platforms provide a range of commerce services, including:

- Payments
- Marketing
- Shipping
- Customer engagement tools

43

## How measurement vendors use information to make reports

For example, an advertiser might ask a measurement vendor to help figure out the impact its ads on Facebook have had on sales. The measurement vendor compares information from us about clicks on the advertiser's Facebook ads with information from the advertiser about product purchases. Then the measurement vendor creates and provides aggregated reports that show the advertiser how its ads are performing.

44

### How vendors support our marketing and advertising efforts

For example, vendors:

- Serve our advertisements across the Internet, including on mobile, desktop and connected television devices
- Track and categorize your online and mobile app activity
- Provide us information about your interests and community and advertising interactions

These vendors help us understand who might find our advertising most relevant to their interests, and which of our Products might interest you. This information can be used to personalize which of our ads are shown to you. Vendors also use this information to measure response to our marketing efforts and the effectiveness of our advertising.

## How do the Meta Companies work together?



We are part of the Meta Companies that provide Meta Company Products. Meta Company Products include all the Meta Products covered by this Policy, plus other products like WhatsApp, Novi and more.

We share information we collect, infrastructure, systems and technology with the other Meta Companies. Learn more about how we transfer information to other countries.

We also process information that we receive about you from other Meta Companies, according to their terms and policies and as permitted by applicable law. In some cases, Meta acts as a service provider for other Meta Companies. We act on their behalf and in accordance with their instructions and terms.

### Why we share across the Meta Companies

Meta Products share information with other Meta Companies:

- To promote safety, security and integrity and comply with applicable laws
- To personalize offers, ads and other sponsored or commercial content
- To develop and provide features and integrations
- To understand how people use and interact with Meta Company Products

See some examples[45] of why we share.

## More resources

Review the privacy policies of the other Meta Companies
Facebook Help Center

45

## Why we share across the Meta Companies

**Promoting safety, security and integrity and complying with applicable law**

For example, we share information with Meta Companies that provide financial products and services to help them promote safety, security and integrity and comply with applicable law. This includes:

- Complying with their legal obligations
- Helping keep you and others safe
- Performing account verification
- Investigating suspicious activities
- Creating analytics

For these purposes, we might share your name, email address, who you're friends with and other account information within the Meta Companies.

**Developing and providing features and integrations**

For example, where available in your country, you can choose to use certain integrations that connect your WhatsApp experiences with other Meta Company Products. These integrations let you do things like:

- Use your Facebook Pay account to pay for things on WhatsApp
- Chat with your friends on other Meta Company Products, such as Portal, by connecting your WhatsApp account

We also share information with Meta Companies to support innovation. For example, your videos can help train our products to recognize objects, like trees,

or activities, like when a dog chases a ball. This technology is used to help us offer new products or features in the future.

**Understanding how people use our products**

We count the number of unique users, monthly active users and daily active users on our products. This information helps us understand the community using our products and publicly share important trends about how our products are used.

## How can you manage or delete your information and exercise your rights?

We offer you a variety of tools to view, manage, download and delete your information below. You can also manage your information by visiting the settings of the Products you use. You may also have other privacy rights under applicable laws.

To exercise your rights, visit our Help Centers, your settings for Facebook and Instagram and your device-based settings.

### Take a privacy checkup

Take a privacy checkup
Be guided through Facebook privacy settings

### View and manage your information

- Access your information
- Off-Facebook activity
- Ad preferences
- Manage your data

### Port, download or delete your information

- Port your information [46]
- Download your information
- Delete your information or account [47]

You can learn more about how privacy works on Facebook and on Instagram, and in the Facebook Help Center. If you have questions about this policy, you can contact us as described below. In some countries, you may also be able to contact the Data

Protection Officer for Meta Platforms, Inc., and depending on your jurisdiction, you may also contact your local Data Protection Authority ("DPA") directly.

46

### Port your information

In certain cases and subject to applicable law, you have the right to port your information.

47

### Delete your information or account

To delete your information, you can:

- **Find and delete specific information.** We offer tools you can use to delete certain information. For example, you can use Delete buttons to delete content you've posted to your account. You can also use tools like activity log on Facebook to send content to the trash in bulk. When you delete content, it's no longer visible to other users. Visit the Facebook Help Center or Instagram Help Center to learn what happens when you delete your content or move it to trash.
- **Permanently delete your account.** If you delete your account on Facebook or Instagram, we delete your information, including the things you've posted, such as your photos and status updates, unless we need to keep it as described in "How long do we keep your information?" Once your account is permanently deleted you won't be able to reactivate it, and you won't be able to retrieve information, including content you've posted.

**How long does it take to delete your information?**

If you request that we delete your account or content, it may take up to 90 days to delete your information after we begin the account deletion process or receive a content deletion request. After the information is deleted, it may take us up to another 90 days to remove it from backups and disaster recovery.

If you leave your deleted content in your trash on Facebook or your Recently Deleted folder on Instagram, the deletion process will begin automatically in 30 days. Or you can start the deletion process right away by deleting the content from your trash or Recently Deleted folder.

## How long do we keep your information?

We keep information as long as we need it to provide our Products, comply with legal obligations or protect our or other's interests. We decide how long we need information on a case-by-case basis. Here's what we consider when we decide:

- If we need it to operate or provide our Products. For example, we need to keep some of your information to maintain your account. Learn more[48].
- The feature we use it for, and how that feature works. For example, messages sent using Messenger's vanish mode are retained for less time than regular messages. Learn more[49].
- How long we need to retain the information to comply with certain legal obligations. See some examples[50].
- If we need it for other legitimate purposes, such as to prevent harm; investigate possible violations of our terms or policies; promote safety, security and integrity; or protect ourselves, including our rights, property or products

In some instances and for specific reasons, we'll keep information for an extended period of time. Read our policy[51] about when we may preserve your information.

48

## If we need it to operate or provide our Products

For example, we keep profile information, photos you've posted (and not deleted) and security information for the lifetime of your account.

And when you search for something on Facebook, we keep your search history until you clear the search in your activity log or delete your account. Once you clear a search or delete your account, it will no longer be visible to you, and it will be deleted[52].

But even if you don't clear your search or delete your account, within six months of your search we delete information about that search that isn't necessary to show you your search history, like information about the device you were using, or your location.

49

## The feature we use it for, and how that feature works



For example, May is planning a surprise party for Yang. She sends Cynthia the party details in Messenger using vanish mode so that the message will disappear. The message will no longer be visible to May once she leaves the chat, and Cynthia will see the message only the first time she opens the chat thread.

After Cynthia reads the message, the content is deleted after one hour. If Cynthia never reads it, it's deleted after 14 days.

50

## How long we need to retain the information to comply with certain legal obligations

For example, we retain information for as long as we need it for:

- A legal request or obligation, including obligations of Meta Companies or to comply with applicable law
- A governmental investigation
- A legal claim, complaint, litigation or regulatory proceedings

51

## Why we may preserve your information longer

Your information, including financial transaction data related to purchases or money transfers made on our Products, may be preserved and accessed for a longer time period if it's related to any of the following:

- A legal request or obligation, including obligations of Meta Companies or to comply with applicable law
- A governmental investigation
- An investigation of possible violations of our terms or policies
- To prevent harm
- For safety, security and integrity purposes
- To protect ourselves, including our rights, property or products
- If it's needed in relation to a legal claim, complaint, litigation or regulatory proceedings

See some examples[53].

In some cases, we may preserve your information based on the above reasons even after you request deletion of your account or some of your content. We may also preserve information from accounts that have been disabled and content that has been removed for violations of our terms and policies.

52

## Delete your information or account

To delete your information, you can:

- **Find and delete specific information.** We offer tools you can use to delete certain information. For example, you can use Delete buttons to delete content you've posted to your account. You can also use tools like activity log on Facebook to send content to the trash in bulk. When you delete content, it's no longer visible to other users. Visit the Facebook Help Center or Instagram Help Center to learn what happens when you delete your content or move it to trash.

- **Permanently delete your account.** If you delete your account on Facebook or Instagram, we delete your information, including the things you've posted, such as your photos and status updates, unless we need to keep it as described in "How long do we keep your information?" Once your account is permanently deleted you won't be able to reactivate it, and you won't be able to retrieve information, including content you've posted.

**How long does it take to delete your information?**

If you request that we delete your account or content, it may take up to 90 days to delete your information after we begin the account deletion process or receive a content deletion request. After the information is deleted, it may take us up to another 90 days to remove it from backups and disaster recovery.

If you leave your deleted content in your trash on Facebook or your Recently Deleted folder on Instagram, the deletion process will begin automatically in 30 days. Or you can start the deletion process right away by deleting the content from your trash or Recently Deleted folder.

53

## Examples of why we might preserve your information

**To respond to a legal request**

For example, we might preserve your information after you delete your account when we receive a valid legal request, such as a preservation order or search warrant, related to your account.

**To comply with applicable law**

For example, we preserve certain information about purchases or transactions associated with an account, in line with Meta's accounting obligations.

**For safety, security and integrity purposes**

For example, if we disable an account for violating our terms or policies, we preserve information about that user to prevent them from opening a new account.

We also might preserve some of your account information as part of our review of suspicious activity. This includes any suspicious activity associated with our financial products, like suspected money laundering or terrorist funding.

**For litigation**

We may preserve your information where we deem it necessary for reasons related to a legal claim or complaint. For example, we may be required to defend ourselves in legal proceedings in a claim related to your information.

# How do we transfer information?

## Why is information transferred to other countries?

We share the information we collect globally, both internally across our offices and data centers, and externally with our Partners, vendors, service providers and third parties. Because Meta is global, with users, Partners and employees around the world, transfers are necessary for a variety of reasons, including:

- So we can operate and provide the services stated in the terms of the Meta Product you're using and this Policy. This includes allowing you to share information and connect with your family and friends around the globe.
- So we can fix, analyze and improve our Products

## Where is information transferred?

Your information will be transferred or transmitted to, or stored and processed in:

- Places we have infrastructure or data centers, including the United States, Ireland, Denmark and Sweden, among others
- Countries where Meta Company Products are available
- Other countries where our Partners, vendors, service providers and third parties are located outside of the country where you live, for purposes as described in this Policy

## How do we safeguard your information?

We rely on appropriate mechanisms[54] for international data transfers.

We also make sure that appropriate safeguards are in place whenever we transfer your information. For example, we encrypt your information when it's in transit over public networks to protect it from unauthorized access.

**More resources**

How information is safeguarded as it's transferred
Facebook Newsroom

54

### Mechanisms we use for global data transfers

We rely on appropriate mechanisms for international data transfers. For example, for information we collect:

- We utilize standard contractual clauses approved by the European Commission and by other relevant authorities.
- We rely on determinations from the European Commission, and from other relevant authorities, about whether other countries have adequate levels of data protection.
- We use equivalent mechanisms under applicable laws that apply to data transfers to the United States and other relevant countries.

## How do we respond to legal requests, comply with applicable law and prevent harm?

We access, preserve, use and share your information:

- In response to legal requests, like search warrants, court orders, production orders or subpoenas. These requests come from third parties such as civil litigants, law enforcement and other government authorities. Learn more[55] about when we respond to legal requests.
- In accordance with applicable law
- To promote the safety, security and integrity of Meta Products, users, employees, property and the public. Learn more[56].

We may access or preserve your information for an extended amount of time. Learn more[57].

55

## When we respond to legal requests

We respond to legal requests where we have a good faith belief that we're required by law to do so.

We also respond to certain legal requests where not compelled by law, but where we have a good faith belief that a response:

- Is required by law in that jurisdiction,
- Affects users in that jurisdiction, and
- Is consistent with internationally recognized standards including, for example, our Corporate Human Rights Policy.

Learn more about government requests and how we've responded.

56

## How we promote safety, security and integrity

We share your information with law enforcement, government authorities, Meta Companies, third parties (including industry peers) and others when we have a good faith belief it's necessary to detect, prevent and address a variety of situations, such as:

- Unauthorized use of our Products. See an example.[58]
- Violations of our terms and policies. See an example.[59]
- Investigating suspicious activity
- Protecting ourselves, including our rights, property, personnel or Products
- Preventing abuse, fraud, or other harmful or illegal activity, on and off our Products
- Protecting you or others, including as part of investigations or regulatory inquiries
- Emergency situations, such as risk of death or imminent bodily harm

57

## Why we may preserve your information longer

Your information, including financial transaction data related to purchases or money transfers made on our Products, may be preserved and accessed for a longer time period if it's related to any of the following:

- A legal request or obligation, including obligations of Meta Companies or to comply with applicable law
- A governmental investigation
- An investigation of possible violations of our terms or policies
- To prevent harm
- For safety, security and integrity purposes
- To protect ourselves, including our rights, property or products
- If it's needed in relation to a legal claim, complaint, litigation or regulatory proceedings

See some examples[60].

In some cases, we may preserve your information based on the above reasons even after you request deletion of your account or some of your content. We may also preserve information from accounts that have been disabled and content that has been removed for violations of our terms and policies.

58

## Unauthorized use of our Products

For example, if you unlawfully collect and use Facebook user data, we may share your information to defend ourselves against claims or in litigation.

59

## Violations of our terms and policies

For example, if you post threatening or harmful content, we may share your information across the Meta Companies to protect ourselves and others. This can include blocking your access to certain features or disabling your account across the Meta Companies.

60

## Examples of why we might preserve your information

**To respond to a legal request**

For example, we might preserve your information after you delete your account when we receive a valid legal request, such as a preservation order or search warrant, related to your account.

**To comply with applicable law**

For example, we preserve certain information about purchases or transactions associated with an account, in line with Meta's accounting obligations.

**For safety, security and integrity purposes**

For example, if we disable an account for violating our terms or policies, we preserve information about that user to prevent them from opening a new account.

We also might preserve some of your account information as part of our review of suspicious activity. This includes any suspicious activity associated with our financial products, like suspected money laundering or terrorist funding.

**For litigation**

We may preserve your information where we deem it necessary for reasons related to a legal claim or complaint. For example, we may be required to defend ourselves in legal proceedings in a claim related to your information.

## How will you know the policy has changed?

We'll notify you before we make material changes to this Policy. You'll have the opportunity to review the revised Policy before you choose to continue using our Products.

## Privacy notice for United States residents

You can learn more about the consumer privacy rights that may be available to you by reviewing the United States Regional Privacy Notice.

## How to contact Meta with questions

You can learn more about how privacy works on Facebook and on Instagram and in the Facebook Help Center. If you have questions about this Policy or have questions, complaints or requests regarding your information, you can contact us as described below.

You can contact us online or by mail at:

Meta Platforms, Inc.
ATTN: Privacy Operations
1601 Willow Road
Menlo Park, CA 94025

## Why and how we process your information

The categories of information we use, and why and how information is processed, are set out below:

| Why and how we process your information | Information categories we use (see 'What Information do we collect?' for more information on each information category) The actual information we use depends on your factual circumstances, but could include any of the following: |
|---|---|
| Personalizing the Meta Products: Our systems automatically process information we collect and store associated with you and others to assess and understand your interests and your preferences and provide you personalized experiences across the Meta Products in accordance with our terms. This is how we:<br><br>• Personalize features and content (such as your News Feed, Instagram Feed and Stories);<br>• Personalize the ads people see; and<br>• Make suggestions for you (such as people you may know, groups or events that you may be interested in or topics that you may want to follow) on and off our products.<br><br>Learn more about how we use information about you to personalize your experience on and across Meta Products and how we choose the ads that you see. | Your activity and information you provide:<br><br>• Content you create, like posts, comments or audio<br>• Content you provide through our camera feature or your camera roll settings, or through our voice-enabled features<br>• Metadata about content<br>• Types of content you view or interact with, and how you interact with it<br>• Apps and features you use, and what actions you take in them<br>• Purchases or other transactions you make<br>• Hashtags you use<br>• The time, frequency and duration of your activities on our Products<br><br>Friends, followers and other connections<br><br>App, browser and device information:<br><br>• Device characteristics and device software<br>• What you're doing on your device (like whether our app is in the foreground or if your mouse is moving)<br>• Identifiers that tell your device apart from other users' |

| | |
|---|---|
| | • Device signals<br>• Information you've shared through your device settings (like GPS location)<br>• Information about the network you connect your device to<br>• Reports about our products' performance on your device<br>• Information from cookies and similar technologies<br><br>Information from Partners, vendors and third parties. (You have control over Meta's use of Partner data to tailor ads to you.) |
| Providing and improving our Meta Products: The provision of the Meta Products includes collecting, storing, and, where relevant, sharing, profiling, reviewing and curating, and in some instances not only automated processing but also manual (human) reviewing, to:<br><br>• Create and maintain your account and profile,<br>• Facilitate the sharing of content and status,<br>• Provide and curate features,<br>• Provide messaging services, the ability to make voice and video calls and connect with others,<br>• Provide advertising products, and<br>• Undertake analytics.<br><br>We also use information to develop, research and test improvements to our Products. We use information we have to:<br><br>• See if a product is working correctly,<br>• Troubleshoot and fix it when it's not, | Your activity and information you provide:<br><br>• Content you create, like posts, comments or audio<br>• Content you provide through our camera feature or your camera roll settings, or through our voice-enabled features<br>• Messages you send and receive, including their content, subject to applicable law<br>• Metadata about content and messages, subject to applicable law<br>• Types of content you view or interact with, and how you interact with it<br>• Apps and features you use, and what actions you take in them<br>• Purchases or other transactions you make, including truncated credit card information<br>• Hashtags you use<br>• The time, frequency and duration of your activities on our |

| | |
|---|---|
| • Test out new products and features to see if they work,<br>• Get feedback on our ideas for products or features, and<br>• Conduct surveys and other research about what you like about our Products and brands and what we can do better. | Products<br><br>Friends, followers and other connections<br><br>App, browser and device information:<br>• Device characteristics and device software<br>• What you're doing on your device (like whether our app is in the foreground or if your mouse is moving)<br>• Identifiers that tell your device apart from other users'<br>• Device signals<br>• Information you've shared through your device settings<br>• Information about the network you connect your device to, including your IP address<br>• Information from cookies and similar technologies<br><br>Information from Partners, vendors and third parties |
| Promoting safety, integrity and security on and across the Meta Products: The Meta Products are designed to research and help ensure the safety, integrity and security of those services and those people who enjoy them, on and off Meta Products. We process information we have associated with you and apply automated processing techniques and, in some instances, conduct manual (human) review to:<br>• Verify accounts and activity,<br>• Find and address violations of our terms or policies. In some cases, the decisions we make about violations are reviewed by the Oversight Board,<br>• Investigate suspicious activity, | Your activity and information you provide::<br>• Content you create, like posts, comments or audio<br>• Content you provide through our camera feature or your camera roll settings, or through our voice-enabled features<br>• Messages you send and receive, including their content, subject to applicable law<br>• Metadata about content and messages, subject to applicable law |

| | |
|---|---|
| • Detect, prevent and combat harmful or unlawful behavior, such as to review and, in some cases, remove content reported to us,<br>• Identify and combat disparities and racial bias against historically marginalized communities,<br>• Protect the life, physical or mental health, well-being or integrity of our users or others,<br>• Detect and prevent spam, other security matters and other bad experiences,<br>• Detect and stop threats to our personnel and property, and<br>• Maintain the integrity of our Products.<br><br>For more information on safety, integrity and security generally on Meta Products, visit the Facebook Security Help Center and Instagram Security Tips. | • Types of content you view or interact with, and how you interact with it<br>• Apps and features you use, and what actions you take in them<br>• Purchases or other transactions you make, including truncated credit card information<br>• Hashtags you use<br>• The time, frequency and duration of your activities on our Products<br><br>Friends, followers and other connections<br><br>App, browser and device information:<br><br>• Device characteristics and device software<br>• What you're doing on your device (like whether our app is in the foreground or if your mouse is moving)<br>• Identifiers that tell your device apart from other users'<br>• Device signals<br>• Information you've shared through your device settings<br>• Information about the network you connect your device to, including your IP address<br>• Information from cookies and similar technologies<br><br>Information from Partners, vendors and third parties |
| To communicate with you: We use information you've given us (like contact information on your profile) to send you a communication, like an e-mail or in-product notice, for example: | Your activity and information you provide:<br><br>• Contact information on your profile and your communica- |

| | |
|---|---|
| • We'll contact you via email or in-product notifications in relation to the Meta Products, product-related issues, research or to let you know about our terms and policies.<br><br>We also use contact information like your email address to respond when you contact us. | tions with us<br><br>• Content you create, like posts, comments or audio<br>• Content you provide through our camera feature or your camera roll settings, or through our voice-enabled features<br><br>App, browser and device information:<br><br>• Device characteristics and device software<br>• What you're doing on your device (like whether our app is in the foreground or if your mouse is moving)<br>• Identifiers that tell your device apart from other users'<br>• Device signals<br>• Information you've shared through your device settings<br>• Information about the network you connect your device to, including your IP address<br>• Information from cookies and similar technologies. |
| Transferring, storing or processing your information across borders, including from and to the United States and other countries: We share information we collect globally, both internally across our offices and data centers and externally with our Partners, third parties and service providers. Because Meta is global, with users, Partners, vendors and employees around the world, transfers are necessary:<br><br>• To operate and provide the services described in the terms that apply to the Meta Product(s) you are using. This includes allowing you to share information and connect with your | Your activity and information you provide:<br><br>• Content you create, like posts, comments or audio<br>• Content you provide through our camera feature or your camera roll settings, or through our voice-enabled features<br>• Metadata about content and messages, subject to applicable law<br>• Types of content you view or interact with, and how you interact with it |

| | |
|---|---|
| family and friends around the globe; and<br>• To fix, analyze and improve our Products.<br><br>For more information, see the "How do we transfer information?" section of the Meta Privacy Policy. | • Apps and features you use, and what actions you take in them<br>• Purchases or other transactions you make, including truncated credit card information<br>• Hashtags you use<br>• The time, frequency and duration of your activities on our Products<br><br>Friends, followers and other connections<br><br>App, browser and device information:<br>• Device characteristics and device software<br>• What you're doing on your device (like whether our app is in the foreground or if your mouse is moving)<br>• Identifiers that tell your advice apart from other users'<br>• Device signals<br>• Information you've shared through your device settings<br>• Information about the network you connect your device to, including your IP address<br>• Information from cookies and similar technologies<br><br>Information from Partners, vendors and third parties |
| Processing information subject to special protections under applicable laws that you provide so we can share it with those you choose, to provide, personalize and improve our Products and to undertake analytics. We'll collect, store, publish and apply automated, or sometimes manual (human), processing for these purposes. | Your activity and information you provide:<br>• Any information with special protections that you choose to provide in your profile fields (such as your religious views, political views, or who you are "interested in"), or as part of |

| | |
|---|---|
| | surveys you choose to participate in |
| Receiving and using information from third parties to tailor the ads you see: We'll use information that advertisers, businesses and other partners provide us about activity off Meta Products that we have associated with you to personalize ads that we show you on Meta Products, and on websites, apps and devices that use our advertising services. We receive this information whether or not you're logged in or have an account on our Products. See the Cookies Policy for more information. | Your activity and information you provide:<br>• Information and content you provide, such as your name or email address<br>Information from Partners, vendors and third parties |
| Sharing your contact, profile or other information with third parties upon your request: The type of third party and categories of information shared depend on the circumstances of what you ask us to share. For example:<br>• We share your email (or other contact information) or other information you might choose when you direct us to share it with an advertiser so they can contact you with additional information about a promoted product, and<br>• If you choose to integrate other apps, games or websites with Meta Products and log in, we'll share your information with the app, game or website to log you in. | Your activity and information you provide:<br>• Content you create, like your contact, profile or other information, like posts or comments |
| Providing measurement, analytics and business services:<br>Our systems automatically, as well as with some manual (human) processing, process information we have collected and stored about you and others. We use this information to:<br>• Provide insights and measurement reports to businesses, advertisers and other Partners to help them | Your activity and information you provide:<br>• Content you create, like posts, comments or audio<br>• Content you provide through our camera feature or your camera roll settings, or through our voice-enabled features |

| | |
|---|---|
| measure the effectiveness and distribution of their or their clients' ads, content and services, to understand the kinds of people who are seeing their content and ads, and how their content and ads are performing on and off Meta Products, and<br>• Provide aggregated user analytics and insights reports that help businesses, advertisers and other Partners better understand the audiences with whom they may want to connect, as well as the types of people who use their services and how people interact with their websites, apps and services. | • Types of content you view or interact with, and how you interact with it<br>• Apps and features you use, and what actions you take in them<br>• Purchases or other transactions you make<br>• Hashtags you use<br>• The time, frequency and duration of your activities on our Products<br><br>Friends, followers and other connections<br><br>App, browser and device information:<br>• Device characteristics and device software<br>• What you're doing on your device (like whether our app is in the foreground or if your mouse is moving)<br>• Identifiers that tell your device apart from other users<br>• Device signals<br>• Information you've shared through your device settings<br>• Information about the network you connect your device to, including your IP address<br>• Information from cookies and similar technologies |
| Sharing of information across the Meta Companies:<br>• To provide a seamless, consistent and richer, innovative experience across the Meta Company Products to enable cross app interactions, sharing, viewing and engaging with content, including posts and videos. | Your activity and information you provide:<br>• Content you create, like posts, comments or audio<br>• Content you provide through our camera feature or your camera roll settings, or through our voice-enabled features |

| | |
|---|---|
| | • Metadata about content<br>• Types of content you view or interact with, and how you interact with it<br>• Apps and features you use, and what actions you take in them<br>• Purchases or other transactions you make<br>• Hashtags you use<br>• The time, frequency and duration of your activities on our Products<br><br>Friends, followers and other connections<br><br>App, browser and device information:<br><br>• Device characteristics and device software<br>• What you're doing on your device (like whether our app is in the foreground or if your mouse is moving)<br>• Identifiers that tell your device apart from other users'<br>• Device signals<br>• Information you've shared through your device settings<br>• Information about the network you connect your device to, including your IP address<br>• Information from cookies and similar technologies |
| Business intelligence and analytics:<br><br>• To understand, in aggregate, your usage of and across our Products, to accurately count people and businesses; and | Your activity and information you provide:<br><br>• Content you create, like posts, comments or audio<br>• Content you provide through our camera feature or your |

| | |
|---|---|
| • To validate metrics directly related to these, in order to inform and improve product direction and development and to adhere to (shareholder/earning) reporting obligations. | camera roll settings, or through our voice-enabled features<br>• Metadata about content and messages, subject to applicable law<br>• Types of content you view or interact with, and how you interact with it<br>• Apps and features you use, and what actions you take in them<br>• Purchases or other transactions you make<br>• Hashtags you use<br>• The time, frequency and duration of your activities on our Products<br>Friends, followers and other connections<br>App, browser and device information:<br>• Device characteristics and device software<br>• What you're doing on your device (like whether our app is in the foreground or if your mouse is moving)<br>• Identifiers that tell your device apart from other users'<br>• Device signals<br>• Information you've shared through your device settings<br>• Information about the network you connect your device to, including your IP address<br>• Information from cookies and similar technologies<br>Information from Partners, vendors and third parties |

| | |
|---|---|
| Identifying you as a Meta Product user and personalizing the ads we show you through Meta Audience Network when you visit other apps:<br><br>• When we show you ads through Meta Audience Network when you visit other apps, our systems automatically process the information we have collected and stored about you and others to identify you as a Meta Product user and tailor the ads you see. | Your activity and information you provide:<br><br>• Information you provide<br>• Content you create, like posts, comments or audio<br>• Content you provide through our camera feature or your camera roll settings, or through our voice-enabled features<br>• Metadata about content<br>• Types of content you view or interact with, and how you interact with it<br>• Apps and features you use, and what actions you take in them<br>• Purchases or other transactions you make<br>• Hashtags you use<br>• The time, frequency and duration of your activities on our Products<br><br>Friends, followers and other connections<br><br>App, browser and device information:<br><br>• Device characteristics and device software<br>• What you're doing on your device (like whether our app is in the foreground or if your mouse is moving)<br>• Identifiers that tell your device apart from other users'<br>• Device signals<br>• Information you've shared through your device settings<br>• Information about the network you connect your device to, in- |

| | |
|---|---|
| | cluding your IP address<br>• Information from cookies and similar technologies |
| Providing marketing communications to you:<br>• Depending on your settings and subject to applicable law, we'll share marketing communications with you.<br>• We'll collect and store your information and use it to send marketing communications to you, like an email, subject to applicable laws. | Your activity and information you provide:<br>• Information and content you provide, including your contact information like email address<br>App, browser and device information:<br>• Device identifiers |
| Research and innovate for social good:<br>• We carry out surveys and use information (including from researchers we collaborate with) to conduct and support research and innovation on topics of general social welfare, technological advancement, public interest, health and well-being.<br>• For example, we analyze information that we have about migration patterns during crises. This helps relief organizations get aid to the right places.<br>• We collect, store, combine, analyze and apply automatic processing techniques like aggregation of information as well as manual (human) review, and share information, as necessary to research and innovate for social good in this way. We do this to do things like create COVID-19 forecasting models.<br>Learn more about our research programs. | Your activity and information you provide:<br>• Content you create, like posts, comments or audio<br>• Content you provide through our camera feature or your camera roll settings, or through our voice-enabled features<br>• Metadata about content and messages, subject to applicable law<br>• Types of content you view or interact with, and how you interact with it<br>• Apps and features you use, and what actions you take in them<br>• Purchases or other transactions you make<br>• Hashtags you use<br>• The time, frequency and duration of your activities on our Products<br>Friends, followers and other connections<br>App, browser and device information: |

| | |
|---|---|
| | • Device characteristics and device software<br>• What you're doing on your device (like whether our app is in the foreground or if your mouse is moving)<br>• Identifiers that tell your device apart from other users'<br>• Device signals<br>• Information you've shared through your device settings<br>• Information about the network you connect your device to, including your IP address<br>• Information from cookies and similar technologies<br><br>Information from Partners, vendors and third parties |
| Anonymizing your information<br><br>In some cases, we anonymize information we have associated with you, such as your activity on and off our Products, and use the resulting information, for example, to provide and improve our Meta Products, including ads. | Your activity and information you provide:<br>• Content you create, like posts, comments or audio<br>• Content you provide through our camera feature or your camera roll settings, or through our voice-enabled features<br>• Metadata about content<br>• Types of content you view or interact with, and how you interact with it<br>• Apps and features you use, and what actions you take in them<br>• Purchases or other transactions you make<br>• Hashtags you use<br>• The time, frequency and duration of your activities on our Products |

| | |
|---|---|
| | Friends, followers and other connections<br><br>App, browser and device information:<br><br>• Device characteristics and device software<br>• What you're doing on your device (like whether our app is in the foreground or if your mouse is moving)<br>• Identifiers that tell your device apart from other users'<br>• Device signals<br>• Information you've shared through your device settings<br>• Information about the network you connect your device to, including your IP address<br>• Information from cookies and similar technologies<br><br>Information from Partners, vendors and third parties |
| Share information with others, including law enforcement and to respond to legal requests.<br><br>See the "How do we respond to legal requests, prevent harm and promote safety and integrity?" section of the Meta Privacy Policy for more for information on when we share information with law enforcement and others.<br><br>The categories of information we access, preserve, use and share depend on the specific circumstances. For example, responses to legal requests where not compelled by law will typically include limited information (such as contact details and login information). | Your activity and information you provide:<br><br>• Content you create, like posts, comments or audio<br>• Content you provide through our camera feature or your camera roll settings, or through our voice-enabled features<br>• Metadata about content, subject to applicable law<br>• Types of content you view or interact with, and how you interact with it<br>• Apps and features you use, and what actions you take in them |

| | |
|---|---|
| However, the information we process will depend on the purposes, which could include the following:<br><br>• In response to legal requests from third parties such as civil litigants, law enforcement and other government authorities<br>• To comply with applicable law or legitimate legal purposes<br>• To promote the safety, security and integrity of Meta Companies, Meta Products, users, employees, property and the public<br><br>Learn more about how we promote safety, security and integrity. | • Purchases or other transactions you make<br>• Hashtags you use<br><br>Friends, followers and other connections<br><br>app, browser and device information:<br><br>• Device characteristics and device software<br>• What you're doing on your device (like whether our app is in the foreground or if your mouse is moving)<br>• Identifiers that tell your device apart from other users'<br>• Device signals<br>• Information you've shared through your device settings<br>• Information about the network you connect your device to, including your IP address<br>• Information from cookies and similar technologies<br><br>Information from Partners, vendors and third parties |
| For processing information when the law requires it: Where we are under an obligation to disclose information such as, for example, if we receive a valid legal request for certain information such as a search warrant, we will access, preserve and/or share your information with regulators, law enforcement or others.<br><br>The way in which the information will be processed depends on the specific circumstances. See the "How do we respond to legal requests, prevent harm and promote safety and integrity?" section of the Meta Privacy Policy for more. "Information for Law | The categories of information depend on the specific circumstances of each mandatory request or obligation. Only the information necessary to comply with the relevant legal obligation will be shared or otherwise processed. For example, for civil matters, this will typically include limited information (such as contact details and login information). However, depending on the circumstances it could include the following:<br><br>Your activity and information you provide: |

Enforcement Authorities" provides information on the operational guidelines law enforcement needs to follow.

- Content you create, like posts, comments or audio
- Content you provide through our camera feature or your camera roll settings, or through our voice-enabled features
- Messages you send and receive, including their content, subject to applicable law
- Metadata about content and messages, subject to applicable law
- Types of content you view or interact with, and how you interact with it
- Apps and features you use, and what actions you take in them
- Purchases or other transactions you make, including truncated credit card information
- Hashtags you use
- The time, frequency and duration of your activities on our Products

Friends, followers and other connections

App, browser and device information:

- Device characteristics and device software
- What you're doing on your device (like whether our app is in the foreground or if your mouse is moving)
- Identifiers that tell your device apart from other users'
- Device signals
- Information you've shared through your device settings

| | |
|---|---|
| | • Information about the network you connect your device to, including your IP address<br>• Information from cookies and similar technologies<br><br>Information from Partners, vendors and third parties |

# Exhibit 4

Meta

# Cookies Policy

**Explore the policy**

What are cookies, and what does this policy cover?

Why do we use cookies?

Where do we use cookies?

Do other Companies use cookies in connection with the Meta Products?

How can you control your Information?

---

**Other policies**

Terms of Service

Cookies Policy

## What are cookies, and what does this policy cover?

Effective October 5, 2022

Cookies are small pieces of text used to store information on web browsers. Cookies are used to store and receive identifiers and other information on computers, phones and other devices. Other technologies, including data that we store on your web browser or device, identifiers associated with your device and other software, are used for similar purposes. In this policy, we refer to all of these technologies as "cookies".

We use cookies if you have a Facebook account, use the Meta Products, including our website and apps, or visit other websites and apps that use the Meta Products (including the Like button). Cookies enable Meta to offer the Meta Products to you and to understand the information that we receive about you, including information about your use of other websites and apps, whether or not you are registered or logged in.

This policy explains how we use cookies and the choices you have. Except as otherwise stated in this policy, the Privacy Policy will apply to our processing of the data that we collect via cookies.

## Why do we use cookies?

Cookies help us provide, protect and improve the Meta Products, such as by personalising content, tailoring and measuring ads, and providing a safer experience. The cookies that we use include session cookies, which are deleted when you close your browser, and persistent cookies, which stay in your browser until they expire or

you delete them. While the cookies that we use may change from time to time as we improve and update the Meta Products, we use them for the following purposes:

### Authentication

We use cookies to verify your account and determine when you're logged in so that we can make it easier for you to access the Meta Products and show you the appropriate experience and features.

- For example: We use cookies to keep you logged in as you navigate between Facebook Pages. Cookies also help us remember your browser so you don't have to keep logging in to Facebook and so you can more easily log in to Facebook via third-party apps and websites. For example, we use the "c_user" and "xs" cookies, including for this purpose, which have a lifespan of 365 days.

### Security, site and product integrity

We use cookies to help us keep your account, data and the Meta Products safe and secure.

- For example: Cookies can help us identify and impose additional security measures when someone may be attempting to access a Facebook account without authorisation, for instance, by rapidly guessing different passwords. We also use cookies to store information that allows us to recover your account in the event that you forget your password or to require additional authentication if you tell us that your account has been hacked. This includes, for example, our "sb" and "dbln" cookies, which enable us to identify your browser securely, as well as "datr." "Datr" is a unique identifier for your browser that, amongst other things, helps us protect you from fraud. For example, it helps us identify trusted browsers where you have logged in before. "Datr" has a lifespan of two years.

We also use cookies to combat activity that violates our policies or otherwise degrades our ability to provide the Meta Products.

- For example: Cookies help us fight spam and phishing attacks by enabling us to identify computers that are used to create large numbers of fake Facebook accounts. We also use cookies to detect computers infected with malware and to take steps to prevent them from causing further harm. Our "csrf" cookie, for example, helps us prevent cross-site request forgery attacks. The "datr" cookie also helps us to identify the browsers used by malicious actors and to prevent cyber-security attacks, such as a denial of service attack that could prevent you from accessing the Meta Products. Cookies also help us prevent underage people from registering for Facebook accounts.

### Advertising, recommendations, insights and measurement

We use cookies to help us show ads and to make recommendations for businesses and other organisations to people who may be interested in the prod-

ucts, services or causes they promote.

- For example: Cookies allow us to help deliver ads to people who have previously visited a business's website, purchased its products or used its apps and to recommend products and services based on that activity. Cookies also allow us to limit the number of times that you see an ad so you don't see the same ad over and over again. For example, the "fr" cookie is used to deliver, measure and improve the relevancy of ads, with a lifespan of 90 days.

We also use cookies to help measure the performance of ad campaigns for businesses that use the Meta Products.

- For example: We use cookies to count the number of times that an ad is shown and to calculate the cost of those ads. We also use cookies to measure how often people do things, such as make a purchase following an ad impression. For example, the "_fbp" cookie identifies browsers for the purposes of providing advertising and site analytics services and has a lifespan of 90 days.

Cookies help us serve and measure ads across different browsers and devices used by the same person.

- For example: We can use cookies to prevent you from seeing the same ad over and over again across the different devices that you use.

Cookies also allow us to provide insights about the people who use the Meta Products, as well as the people who interact with the ads, websites and apps of our advertisers and the businesses that use the Meta Products.

- For example: We use cookies to help businesses understand the kinds of people who like their Facebook Page or use their apps so that they can provide more relevant content and develop features that are likely to be interesting to their customers.

We also use cookies, such as our "oo" cookie, which has a lifespan of five years, to help you opt out of seeing ads from Meta based on your activity on third-party websites. Learn more about the information we receive, how we decide which ads to show you on and off the Meta Products and the controls that are available to you.

### Site features and services

We use cookies to enable the functionality that helps us provide the Meta Products.

- For example: Cookies help us store preferences, know when you've seen or interacted with Meta Products' content and provide you with customised content and experiences. For instance, cookies allow us to make suggestions to you and others, and to customise content on third-party sites that integrate our social plugins. If you are a Facebook Page administrator, cookies allow you to switch between posting from your personal Facebook account and the Facebook Page. We use cookies such as the session-based "presence" cookie to support your use of Messenger chat windows.

We also use cookies to help provide you with content relevant to your locale.

- For example: We store information in a cookie that is placed on your browser or device so that you will see the site in your preferred language.

### Performance

We use cookies to provide you with the best experience possible.

- For example: Cookies help us route traffic between servers and understand how quickly Meta Products load for different people. Cookies also help us record the ratio and dimensions of your screen and windows and know whether you've enabled high-contrast mode, so that we can render our sites and apps correctly. For example, we set the "dpr" and "wd" cookies, each with a lifespan of 7 days, for purposes including to deliver an optimal experience for your device's screen.

### Analytics and research

We use cookies to better understand how people use the Meta Products so that we can improve them.

- For example: Cookies can help us understand how people use the Facebook service, analyse which parts of our Products people find most useful and engaging, and identify features that could be improved.

### Third-party websites and apps

Our business partners may also choose to share information with Meta from cookies set in their own websites' domains, whether or not you have a Facebook account or are logged in. Specifically, cookies named _fbc or _fbp may be set on the domain of the business partner whose site you're visiting. Unlike cookies that are set on Meta's own domains, these cookies aren't accessible by Meta when you're on a site other than the one on which they were set, including when you are on one of our domains. They serve the same purposes as cookies set in Meta's own domain, which are to personalise content (including ads), measure ads, produce analytics and provide a safer experience, as set out in this Cookies Policy.

## Where do we use cookies?

We may place cookies on your computer or device and receive information stored in cookies when you use or visit:

- The Meta Products;
- Products provided by other members of the Meta Companies; and

- Websites and apps provided by other companies that use the Meta Products, including companies that incorporate Meta technologies into their websites and apps. Meta uses cookies and receives information when you visit those sites and apps, including device information and information about your activity, without any further action from you. This occurs whether or not you have a Facebook account or are logged in.

## Do other Companies use cookies in connection with the Meta Products?

Yes, other companies use cookies on the Meta Products to provide advertising, measurement, marketing and analytics services to us, and to provide certain features and improve our services for you.

For example, other companies' cookies help tailor ads off of Meta Products, measure their performance and effectiveness and support marketing and analytics. Certain features on the Meta Products use cookies from other companies to function, for example, certain maps, payment and security features. Learn more[1] about the companies that use cookies on the Meta Products.

Third party companies also use cookies on their own sites and apps in connection with the Meta Products. To understand how other companies use cookies, please review their policies.

1

### List of Companies

Listed below are the names and websites of some of the companies that use cookies on the Facebook Services to provide services to us and the businesses that advertise on Facebook.

Last update: September 13, 2021

| Company | Website |
| --- | --- |
| A9 | https://www.a9.com |
| Ada | https://www.ada.support |
| Adclear | https://www.adclear.de |
| Adform | https://site.adform.com |

| | |
|---|---|
| AdGear | https://www.adgear.com |
| Adition | https://www.adition.com |
| Adobe | https://www.mktoresp.com |
| Adobe Business Catalyst | https://www.businesscatalyst.com |
| Adometry | https://www.adometry.com/tv-attribution |
| AdParlor | https://www.adparlor.com |
| Adslot | https://www.adslot.com |
| Akamai | https://akamaihd.net |
| Amazon Web Services | https://www.cloudfront.net |
| Ancestry | https://www.ancestry.com |
| Autodesk | https://www.autodesk.com |
| Clarabridge | https://www.engagor.com |
| comScore | https://www.comscore.com |

| | |
|---|---|
| Conversant Media | https://www.conversantmedia.com |
| Convertro | https://www.convertro.com |
| DA Consortium | https://www.dac.co.jp |
| Datalicious | https://www.datalicious.com |
| DoubleClick | https://www.doubleclickbygoogle.com |
| Eyereturn Marketing | https://www.eyereturnmarketing.com |
| Flashtalking | https://www.flashtalking.com |
| GfK | https://www.gfk.com |
| Giphy | https://www.giphy.com |
| Google | https://www.google.com/ |
| Google | https://www.doubleclick.net/ |
| Google | https://www.google-analytics.com |
| Google | https://www.googleadservices.com |
| Google | https://www.googleapis.com |

| | |
|---|---|
| Google | https://www.googletagmanager.com |
| Google | https://www.gstatic.com |
| Google | https://www.youtube.com |
| Google | https://www.ytimg.com |
| Hive Streaming | https://www.hivestreaming.com |
| Integral Ad Science | https://www.integralads.com/ |
| Intuit | https://www.intuit.com |
| Ipsos | https://www.ipsos.com |
| Jio | https://www.jio.com |
| Kantar World Panel | https://www.kantarworldpanel.com |
| Kenshoo | https://kenshoo.com |
| Linkedin | https://www.linkedin.com |
| Linkedin | https://www.adsymptotic.com |
| Linkedin | https://www.licdn.com |

| | |
|---|---|
| Mapbox | https://www.mapbox.com |
| Markit | https://www.markit.com |
| Maxar | https://www.digitalglobe.com |
| Meetrics | https://www.meetrics.com |
| Megaphone | https://www.megaphone.fm/ |
| Metrix Lab | https://www.metrixlab.com |
| Microsoft | https://www.bing.com |
| Microsoft | https://www.virtualearth.net |
| Millward Brown | https://www.millwardbrowndigital.com |
| Mixpanel | https://www.mixpanel.com |
| Moat | https://moat.com/ |
| Nanigans | https://www.nanigans.com |
| Neustar | https://www.neustar.biz |
| Next Audience | https://next-audience.com |

| | |
|---|---|
| Nielsen | https://www.nielsen.com |
| Paypal | https://www.paypal.com |
| Podsights | https://www.pdst.fm |
| Podtrac | https://analytics.podtrac.com/ |
| Rakuten | https://marketing.rakuten.com |
| Reddit | https://www.redditstatic.com |
| Reddit | https://www.reddit.com |
| Research Now | https://www.researchnow.com |
| Salesforce | https://www.herokuapp.com |
| Sapient | https://publicis.sapient.com |
| Shift | https://www.shiftcomm.com |
| Shopify | https://www.shopify.com |
| Sizmek | https://www.sizmek.com |
| Smart Adserver | https://smartadserver.com |

| | |
|---|---|
| Spreaker | https://www.spreaker.com/ |
| Stackla | https://www.stackla.com |
| Symphony Advanced Media | https://www.symphonyam.com |
| Tealium | https://www.tiqcdn.com |
| Tenor | https://www.tenor.co |
| Tenor | https://www.tenor.com |
| The Trade Desk | https://www.thetradedesk.com/ |
| The Trade Desk | https://www.adsrvr.org |
| ThreatMetrix | https://www.threatmetrix.com/ |
| Trend Research | https://www.trendresearch.com |
| Twitter | https://twitter.com/ |
| Twitter | https://www.ads-twitter.com |
| Twitter | https://www.twimg.com |
| Twitter | https://t.co |

| | |
|---|---|
| UserReport | https://www.userreport.com |
| Visa | https://www.cardinalcommerce.com |
| Visual IQ | https://www.visualiq.com |
| Weborama | https://www.weborama.com |
| White Ops | https://www.whiteops.com/ |
| Xaxis | https://www.xaxis.com |

## How can you control your Information?

We use cookies to help personalise and improve content and services, provide a safer experience and to show you useful and relevant ads on and off Meta Products. You can control how we use data to show you ads and more by using the tools described below.

### If you have a Facebook account

- You can use your ad preferences to learn why you're seeing a particular ad and control how we use information that we collect to show you ads.
- To show you better ads, we use data that advertisers and other partners provide us about your activity off Meta Company Products, including websites and apps. You can control whether we use this data to show you ads in your ad settings.
- The Meta Audience Network is a way for advertisers to show you ads in apps and websites off the Meta Company Products. One of the ways that Audience Network shows relevant ads is by using your ad preferences to determine which ads you may be interested in seeing. You can control this in your ad settings.
- You can review your Off-Facebook activity, which is a summary of activity that businesses and organisations share with us about your interactions with them, such as visiting their apps or websites. They use our business tools, such as Meta Pixel, to share this information with us. This helps us do things

like give you a more personalised experience on Meta Products. Learn more about off-Facebook activity, how we use it and how you can manage it.

### Everyone

You can opt out of seeing online interest-based ads from Meta and other participating companies through the Digital Advertising Alliance in the US, the Digital Advertising Alliance of Canada in Canada or the European Interactive Digital Advertising Alliance in Europe or through your mobile device settings, where available, using Android, iOS 13 or an earlier version of iOS. Please note that ad blockers and tools that restrict our cookie use may interfere with these controls.

### More information about online advertising

The advertising companies we work with generally use cookies and similar technologies as part of their services. To learn more about how advertisers generally use cookies and the choices they offer, you can review the following resources:

- Digital Advertising Alliance
- Digital Advertising Alliance of Canada
- European Interactive Digital Advertising Alliance

### Browser cookie controls

In addition, your browser or device may offer settings that allow you to choose whether browser cookies are set and to delete them. These controls vary by browser, and manufacturers may change both the settings they make available and how they work at any time. As of 23 June 2021, you may find additional information about the controls offered by popular browsers at the links below. Certain parts of the Meta Products may not work properly if you have disabled browser cookie use. Please be aware that these controls are distinct from the controls that we offer you.

- Google Chrome
- Internet Explorer
- Firefox
- Safari
- Safari Mobile
- Opera

# Exhibit 5

facebook

# The best person to be in control of data is you.

You
see
it.



Control is important to you, especially when it comes to your data. Which is why you're seeing changes in how you view and manage your information on Facebook.

facebook

# Off-Facebook Activity. A tool that gives you more control of your data.

## You see it.

View a summary of information Facebook receives about your activity on other apps and websites.

## You control it.

If you'd like, you can disconnect that information from your account, and it will not be associated with you personally.

You will be able to access this tool from Settings in the coming months.

**Help Center >**



facebook




## Understanding Off-Facebook Activity.

facebook



## Data and the internet

Much of what you do online generates data—like when you're searching for vacation spots or buying a backpack. Occasionally, businesses share that data with Facebook.



## Data sent to Facebook

One way that data can be used is to help businesses find the right audience to show ads for things you might like—such as a deal on backpacks. These ads are what make most of the internet available free of charge, including Facebook.



## Data more in your control

Now you can see a summary of information Facebook receives about your activity on other apps and websites. You also have the option to disconnect it from your account.

facebook



Why do ads feel like they are directed to you, personally?

facebook




Where online advertising is headed

## Questions you may have about Off-Facebook Activity.

### If I disconnect my activity, will I stop seeing ads?

No, you'll still see the same number of ads. The ads that you will see may be less personalized to you.

### Does disconnecting my activity mean it's deleted?

The information you disconnect will no longer be connected to your account. This data can still be used without being linked to an individual user to allow us to let businesses know how their website, app or ads are performing.

### Why am I seeing businesses I don't recognize?

facebook

marketing agencies to help with content and ads.

## More about data and control on Facebook.

### Four Ideas to Regulate the Internet

Effective privacy and data protection needs a globally harmonized framework.

See blog post >

### Why Am I Seeing This? We Have an Answer for You

facebook

See blog post >

## Improving Location Settings on Android

An update to Facebook's location controls on Android to give people more choice over how we collect location information and how we store it.

See blog post >

## Guiding You Through Your Privacy Choices

We updated the Privacy Checkup tool to help you strengthen your account security and contral who can see what you share and how your information is used.

See blog post >

facebook

English (US) English (UK) Français (France) Español (España) Deutsch Français (Canada)

More languages >

© 2023 Meta About Developers Careers Privacy Cookies Terms Help Center

facebook



## Data and the internet

Much of what you do online generates data—like when you're searching for vacation spots or buying a backpack. Occasionally, businesses share that data with Facebook.



## Data sent to Facebook

One way that data can be used is to help businesses find the right audience to show ads for things you might like—such as a deal on backpacks. These ads are what make most of the internet available free of charge, including Facebook.



## Data more in your control

Now you can see a summary of information Facebook receives about your activity on other apps and websites. You also have the option to disconnect it from your account.

facebook




Why do ads feel like they are directed to you, personally?

facebook




Where online advertising is headed

## Questions you may have about Off-Facebook Activity.

### If I disconnect my activity, will I stop seeing ads?

No, you'll still see the same number of ads. The ads that you will see may be less personalized to you.

### Does disconnecting my activity mean it's deleted?

The information you disconnect will no longer be connected to your account. This data can still be used without being linked to an individual user to allow us to let businesses know how their website, app or ads are performing.

### Why am I seeing businesses I don't recognize?

facebook

marketing agencies to help with content and ads.

## More about data and control on Facebook.

### Four Ideas to Regulate the Internet

Effective privacy and data protection needs a globally harmonized framework.

See blog post >

### Why Am I Seeing This? We Have an Answer for You

facebook

See blog post >

## Improving Location Settings on Android

An update to Facebook's location controls on Android to give people more choice over how we collect location information and how we store it.

See blog post >

## Guiding You Through Your Privacy Choices

We updated the Privacy Checkup tool to help you strengthen your account security and control who can see what you share and how your information is used.

See blog post >

facebook

English (US) English (UK) Français (France) Español (España) Deutsch Français (Canada)

More languages >

© 2023 Meta About Developers Careers Privacy Cookies Terms Help Center

# Exhibit 6

**OUR EMERGENCY DEPARTMENT IS EXPERIENCING VERY HIGH PATIENT VOLUME.**
**LEARN WHERE TO GO FOR CARE AT EMERSON HEALTH.>>**

PATIENTS & VISITORS

KNOW WHERE TO GO FOR CARE

OUR COMMITMENT TO SAFE CARE

PAY A BILL

PATIENT PORTAL

PRE-REGISTRATION

MEDICAL RECORDS

INSURANCE & FINANCIAL

PATIENT EXPERIENCE

CAMPUS MAP

VISITOR POLICY

VISITING HOURS & PARKING

INTERPRETER SERVICES

INFECTION PREVENTION

PATIENT RIGHTS & RESPONSIBILITIES

- HEALTH CARE PROXY
- PATIENT PRIVACY

PEDIATRIC SERVICES

**QUALITY & SAFETY**

**HOSPITAL AMENITIES**

**GIFT SHOP**

**VISITING THE AREA**

Protecting your medical information is an important priority for Emerson Hospital. This notice describes the way Emerson Hospital may use and share your medical information and how you can obtain access to this information. It also describes your rights, as well as certain obligations that we have relative to your medical information. Please read it carefully.

# ABOUT YOUR PRIVACY

This document describes the way Emerson Hospital may use and share your medical information and how you can obtain access to this information. It also describes your rights, as well as certain obligations that we have relative to your medical information. Please read it carefully.

## WHAT THIS DOCUMENT COVERS

This document describes the privacy practices of:

Emerson Health Systems, Inc. and its related entities. Please refer to Emerson Hospital's website for a full listing

Any health care professional authorized to enter information into your medical record on behalf of Emerson and these entities

All departments and units of these entities

Any member of a volunteer group we allow to help you while you are in the hospital

All employees, staff and other personnel

## OUR PRIVACY OBLIGATIONS TO YOU

Protecting your medical information is an important priority for Emerson Hospital. This document explains what information we collect, with whom we share it and how you can direct us not to share information with certain parties.

We are required by law to:

Maintain the privacy of your health and medical information

Provide you with this document describing our legal duties and privacy practices

Follow the terms described in this document

Notify you following a security breach that affects protected health information

## UNDERSTANDING YOUR MEDICAL RECORD AND INFORMATION

Each time you visit a hospital, physician or other health care provider, a record of your visit is generated. This record typically includes your symptoms, medical history, examination, test results, diagnoses, treatment and a plan for future care or treatment.

This information is your health or medical record, and it serves as a:

Basis for planning your care and treatment

Means of communication among the health professionals who contribute to your care

Legal document describing the care you received

Way for you or a third-party payer to make sure billed services were actually provided

Source of data for medical research

Source of information for public health officials charged with improving the health of the nation

Source of data for facility planning and marketing

Tool we can assess and continually use to improve the care we provide and the outcomes we achieve

Understanding what is in your record and how your health information is used can help you to:

Make sure it is correct

Better understand who, what, when, where and why others may obtain your health information

Make more informed decisions when authorizing disclosures to others

# HOW WE MAY USE AND SHARE YOUR MEDICAL INFORMATION

The following describes the ways Emerson is permitted to use and share medical information.

## TREATMENT

In addition to using your medical information to provide you with necessary medical treatment or services, we may share this information about you with physicians, nurses, technicians or other health care personnel who care for you at Emerson or outside of Emerson. This includes providers at our associated facilities or office locations. A list of our associated facilities can be found on the Emerson Hospital's website.

In addition, we also may share your medical information with people who are involved in maintaining your health or well-being during your hospital stay, as well as after you are discharged. This might include family members, friends, home health services, support agencies or clergy. Our goal is to make sure that everyone caring for you has the information they need.

Emerson Hospital participates in a Health Information Exchange—often referred to as a HIE—which is a secure electronic network that allows us to efficiently share your personal health information with authorized providers who care for you. This is particularly useful during an emergency, because it provides immediate access to information about your medications, allergies and existing health problems, and in general makes caring for you more efficient.

Authorized providers who participate in the network can share key clinical information electronically, which reduces phone calls, scanning and faxing between Emerson and physician offices. Those providers are trained to handle your personal health information with the utmost confidentiality, and they commit to doing so.

## PAYMENT

We may use and share your medical information so that the treatment and services you receive can be billed and payment collected from you, an insurance company or a third party. In some cases, we will inform your health plan about a treatment you are going to receive in order to obtain prior approval or to determine if your health plan will cover the treatment. We also may provide information to a third party who helps pay for your care.

## HEALTH CARE OPERATIONS

We may use and share your medical information for health care operations—activities that are necessary to run the hospital or physician office and assure that our patients receive quality care. We sometimes combine medical information from many patients, which is useful in making decisions about additional services Emerson should offer, services that are not needed and whether certain new treatments are effective.

We also may share information with physicians, nurses, technicians and other personnel for review and educational purposes. Information that identifies you may be removed so that it can be used to study health care and health care delivery without revealing specific patients.

Examples of health care operations include:

Monitoring the quality of care and making improvements where needed

Making sure health care providers are qualified to perform their jobs

Reviewing medical records for completeness and accuracy

Meeting standards set by regulating agencies, such as The Joint Commission

Teaching health professionals

Using outside business services, such as transcription, storage, auditing or legal services

Storing your health information on computers

Managing and analyzing medical information.

## OTHER WAYS WE MAY USE AND SHARE YOUR HEALTH INFORMATION

### COMMUNICATION WITH YOU

Emerson may use and share medical information to contact you as a reminder that you have an appointment. We also may use it for registration/insurance updates, billing or payment matters, pre-procedure assessment or test results.

### TREATMENT ALTERNATIVES

We may use and share medical information to inform you about or recommend possible treatment options or health-related benefits that may interest you.

**WORKERS' COMPENSATION**

We may release your medical information to workers' compensation or similar programs that provide benefits for work-related injuries or illness.

**PUBLIC HEALTH ACTIVITIES**

When requested, we may share your medical information for public health activities:

to prevent or control disease, injury or disability

to report births and deaths

to report abuse and/or neglect of a child, elder or disabled person

to notify people of recalls of products they may be using

to notify someone who may have been exposed to a disease or may be at risk for contracting or spreading a disease or condition.

**FUNDRAISING ACTIVITIES**

Emerson may use your demographic information—such as name, address, phone number, age, gender, dates of service, department or service, treating physician or outcome information—to contact you as part of its fundraising efforts.

If you do not wish to be contacted, you may inform our Development Office at 978-287-3080.

**HOSPITAL DIRECTORIES**

We may include certain limited information about you in the hospital directory while you are an inpatient at Emerson. This typically includes your name, location in the hospital, your general condition (such as good, fair, etc.) and your religious affiliation. This information, except for your religious affiliation, also may be given to members of your family, friends and others who ask for you by name. Your name may be given to a member of the clergy, even if they do not ask for you by name.

If you do not want to be listed in the hospital directory, please inform the registration staff.

You also may ask to limit the information about you that is provided. If you are experiencing a medical emergency and not able to make your wishes known, we will include this information in the directory if

we consider it to be in your best interest. For example, in disaster situations where there are multiple casualties, we may release general information, such as: the hospital is treating four individuals from the accident.

Disclosures to family, friends or others. We may share relevant health information about you with a family member or other person who is close to you if they are involved either in your care or payment of your care. We may use or share your health information—specifically, your location, general medical condition or death—to notify a family member or other person who is responsible for you. If you are able to make health care decisions, we will ask if you want Emerson to share this information with your family members or others.

If you are having a medical emergency and not able to make your wishes known, we will use our best judgment to decide whether to share information. However, if we believe it is in your best interest, we will only share essential information. Note that we also may use or share your health information with a public or private agency that is assisting in disaster relief with the goal of coordinating efforts to notify someone on your behalf. If we can reasonably do so during the emergency, we will attempt to obtain your permission before sharing this information.

**RESEARCH**

We may use or share your medical information for research purposes if our Institutional Review Board, which oversees clinical research, approves a waiver of authorization for such use.

**AS REQUIRED BY LAW**

We will disclose your medical information when required to do so by federal, state or local law.

**TO AVERT A SERIOUS THREAT TO HEALTH OR SAFETY**

We may use and share your medical information when it is necessary to prevent a serious threat to your health and safety or that of the public or another person. Any disclosure would be for the purpose of helping to prevent the threat.

**ORGAN AND TISSUE DONATION**

If you are a potential organ donor, we may release medical information to organ procurement organizations or eye or tissue banks to facilitate organ or tissue donation and transplantation.

**MILITARY AND VETERANS**

If you are a member of the armed forces, we may release your medical information as required by law.

**HEALTH OVERSIGHT ACTIVITIES**

We may, when requested, provide your medical information to a health oversight agency for activities authorized by law, such as audits, certifications, investigations, inspections and licensure. These activities assist the government in monitoring the health care system, government programs and in complying with civil rights laws.

**LAWSUITS AND DISPUTES**

If you are involved in a lawsuit or dispute, we may share your medical information in response to a court order. Under certain circumstances, we also may share your medical information in response to a subpoena or other lawful process. We will do so only if efforts have been made to inform you of the request, to obtain an order protecting the information requested or if you or a court have given written authorization.

**LAW ENFORCEMENT**

If permitted by law, we may release your medical information if asked to do so by a law enforcement official:

in response to a court order, subpoena, warrant, summons or similar process

to identify or locate a suspect, fugitive, material witness or missing person

in reference to the victim of a crime if, under certain, limited circumstances, we are unable to obtain the person's agreement

in reference to a death we believe may be the result of criminal conduct

in reference to criminal conduct at our facility

in emergency circumstances: to report a crime, the location of the crime or victims, or the identity, description or location of the person who committed the crime

### CORONERS, MEDICAL EXAMINERS AND FUNERAL DIRECTORS

We may release medical information to a coroner or medical examiner to identify a deceased person or determine the cause of death. We also may release medical information about Emerson patients to funeral directors or their designees as necessary to carry out their services.

### NATIONAL SECURITY AND INTELLIGENCE ACTIVITIES

If permitted by law, we may release your medical information to authorized federal officials for intelligence, counterintelligence and other national security activities, as authorized by law.

### PROTECTIVE SERVICES FOR THE PRESIDENT AND OTHERS

If permitted by law, we may provide your medical information to authorized federal officials so they may provide protection to the President, other authorized persons or foreign heads of state, or to conduct special investigations.

### INMATES

We may release medical information about inmates of a correctional institution or under the custody of a law enforcement official under certain circumstances if permitted by law. Reasons this release would be necessary:

1. for the institution to provide the inmate with health care
2. to protect the inmate's health and safety or that of others
3. for the safety and security of the correctional institution

## USES OR DISCLOSURES OF INFORMATION THAT REQUIRE YOUR WRITTEN PERMISSION

Using and/or sharing health information for most purposes other than treatment, payment or health care operations requires your specific authorization. The following will occur only with authorization from the individual:

most uses and disclosures of psychotherapy notes

uses and sharing of personal health information for marketing purposes, including communications related to subsidized treatment

disclosures that constitute a sale of personal health information

other uses and disclosures not described in this document.

Certain information that may be contained in your medical record is considered by state and federal law to be highly sensitive. This includes, but is not limited to:

HIV/AIDS testing or test results

behavioral health documentation

sexually transmitted diseases

certain genetic information.

Such sensitive information has additional protection from disclosure; often, your written authorization is required even before disclosure for treatment, payment or health care operations. There are some limited exceptions to these rules where your permission is not necessary before the use/disclosure of sensitive information.

If you are asked, and give, written permission for the use and/or disclosure of your health information, you may withdraw such consent at any time, in writing, except when providers have already acted upon your previously provided consent.

## YOUR RIGHTS REGARDING YOUR HEALTH INFORMATION

You have the following rights regarding health information that Emerson Hospital maintains about you.

### RIGHT TO INSPECT AND COPY

With certain exceptions, you have the right to inspect and/or receive a copy of your health information. Such requests usually include medical and billing records but not psychotherapy notes.

To inspect and/or receive a copy of your health information, please submit your request in writing to:

Emerson Hospital
Medical Records Department
Release of Information Section

133 Old Road to Nine Acre Corner
Concord, MA 01742

Note that, if you request a copy of the information, you may be charged a fee.

For copies of your physician's office records, please contact your physician's office directly.

There are limited circumstances where we may deny your request to see and obtain a copy of your health information. If you are denied access, you may request that the denial be reviewed by a secondary provider. Emerson will comply with the result of the review. We may offer to provide you with a summary or explanation of the information you requested, as long as you agree in advance to this and to any associated fees.

**RIGHT TO REQUEST AN AMENDMENT**

If you feel that Emerson has health information about you that is incorrect or incomplete, you may request that we amend the information for as long as it is kept by or for the hospital. Your request for an amendment will become a legal part of your medical record and will be sent out with the rest of the record whenever a request for a copy is received. No part of the original documentation in your medical record can be changed, deleted or destroyed.

To request an amendment, please send it, in writing, to:

Emerson Hospital
Medical Record Department
Privacy Officer
133 Old Road to Nine Acre Corner
Concord, MA 01742

Note you also must provide a reason that supports your request for the change. Emerson has 60 days to respond to your request.

To request an amendment of your physician's office record, please contact your physician's office directly.

We may deny your request for an amendment if it is not in writing, does not include a reason to support the request, or if you ask that we amend information that:

was not created by Emerson Hospital

was created by a person or entity no longer available to make the amendment

is not part of the information which you would be permitted to inspect and copy

is accurate and complete in the record

If we grant your request, we will ask that you inform us of the individuals you wish to receive the changes. You must agree to have Emerson notify them along with any others who received the information before corrections were made, and who may have relied on incorrect information in providing you with treatment.

**RIGHT TO AN ACCOUNTING OF DISCLOSURES**

You have the right to receive a list of certain disclosures we have made of your health information, either without obtaining an authorization or for purposes of treatment, payment or health care operations.

To request this accounting of disclosures, please submit your request in writing to:

Emerson Hospital
Medical Record Department
Release of Information Section
133 Old Road to Nine Acre Corner
Concord, MA 01742

Your request must include a time period no longer than the six previous years. You are entitled to one such accounting within any 12- month period at no cost. If you request a second accounting within that same 12- month period, there will be a charge.

The following will not be included in a list of disclosures:

sharing your medical information for the purpose of treatment, payment or health care operations

sharing your medical information if you gave permission in writing

sharing information in the facility's directory

sharing information with a person involved in your care

using your information to communicate with you about your health

sharing information for national security intelligence purposes or with correctional institutions or law enforcement officials who have custody of you.

To request a list of disclosures from your physician office record, please contact your physician's office directly.

## RIGHT TO REQUEST RESTRICTIONS

You have the right to request a restriction or limitation on the health information we use or share about you for treatment, payment or health care operations. In addition, you have the right to request a limit on the health information we share about you with someone who is involved in your care or the payment for your care, such as a family member or friend.

We are not required to agree to your request for restrictions. If we do agree, we will comply with your request unless the information is needed to provide you with emergency treatment. You may not ask that we restrict uses and sharing of information that are legally required.

### THE FOLLOWING EXCEPTION MAY APPLY:

If you pay for a health care product or service in full yourself (out of pocket), you may request that we not share any information about that with your health plan for purposes of carrying out payment or health care operations. Note that this restriction will not apply to disclosures for the purpose of carrying out treatment. If we do agree, we will put the restriction in writing and abide by it, unless you need to be treated in an emergency. However, Emerson cannot agree with any request that would prevent the hospital from disclosing information when it is legally required to do so.

To request a restriction, please make your request in writing to:

Emerson Hospital
Medical Records Department

Privacy Officer
133 Old Road to Nine Acre Corner
Concord, MA 01742

In your request, you must describe:

what information you wish to limit

whether you want to limit our use, disclosure or both

to whom you want the limits to apply—for example, only to you and your spouse

**RIGHT TO REQUEST CONFIDENTIAL COMMUNICATIONS**

You have the right to request that we communicate with you about medical matters in a certain way or at a certain location. For example, you may ask that we contact you only at home or only by mail.

To request confidential communications, please make your request in writing to:

Emerson Hospital
Medical Records Department
Privacy Officer
133 Old Road to Nine Acre Corner
Concord, MA 01742

We are happy to accommodate all reasonable requests. Please indicate how or where you wish to be contacted.

**RIGHT TO A PAPER COPY OF THIS DOCUMENT**

You have the right to receive a paper copy of this document. You may request that Emerson provide you with a copy of this document at any time.

Emerson Hospital is required by law to keep your health information private. We also are required to give people notice of our legal duties and privacy practices with respect to their health information.

**CHANGES TO THIS DOCUMENT**

We reserve the right to change this document and make the revision or change effective relative to your current medical information, as well as any information we receive in the future. We will post a copy of the current document on the hospital website. Each time you register or are admitted to Emerson Hospital for treatment or health care services, either as an inpatient or outpatient, you may request a copy of the document currently in effect.

**COMPLAINTS**

If you believe your privacy rights have been violated, or you disagree with any action Emerson has taken with regard to your health information, we encourage you, your family or your guardian to speak with us. Note that if you present a complaint your care will not be affected in any way. Our goal is to provide you with the best care while always respecting your privacy.

You may file a complaint with the hospital or with the Secretary of the Department of Health and Human Services within 180 days of a violation if you believe we are not complying with HIPAA.

To file a complaint with Emerson Hospital:

Privacy Office
978-287-3995

Patient Experience Manager
Quality and Patient Safety
978-287-3385

Compliance and Privacy Hotline
800-342-4239

Please send your privacy requests in writing to:

Privacy Officer

Emerson Hospital

133 Old Road to Nine Acre Corner

Concord, MA 01742

COMMONWEALTH OF MASSACHUSETTS

ESSEX, S.S. SUPERIOR COURT

| | | |
|---|---|---|
| JOHN DOE, Individually and on Behalf of All Others Similarly Situated,<br><br>*Plaintiffs,*<br><br>v.<br><br>EMERSON HOSPTIAL<br><br>*Defendant.* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | C.A. No. 2277CV01000 |

PLAINTIFF'S OPPOSITION
TO EMERSON'S MOTION TO DISMISS

A TRUE COPY, ATTEST

DEPUTY ASS'T. CLERK

# TABLE OF CONTENTS

INTRODUCTION ........................................ i

FACTS ........................................ 1

A. Plaintiff John Doe is an Emerson patient who used its website for his treatment. ........................................ 1

B. Emerson secretly captured Plaintiff's treatment data from its website and shared it with Facebook for Emerson's profit, despite its promises to the contrary. ........................................ 2

LEGAL STANDARD ........................................ 2

ARGUMENT AND AUTHORITIES ........................................ 3

I. PLAINTIFF ADEQUATELY PLEADED HIS STATUTORY CLAIMS. ........................................ 3

A. Plaintiff alleged a viable claim for violations of the Massachusetts Wiretap Act. ........................................ 3

1. Plaintiff adequately alleged that Emerson used an intercepting device. ....... 3

2. Plaintiff did not consent to Emerson's disclosure of his health information. ........................................ 5

B. Plaintiff has pleaded a viable claim of statutory invasion of privacy, contrary to Emerson's mischaracterization of the elements and reliance on inapposite law. ........................................ 9

1. Plaintiff adequately pleaded a statutory invasion of privacy claim. ............ 9

2. Emerson mischaracterizes the elements of a statutory privacy claim........ 10

II. PLAINTIFF ADEQUATELY PLED HIS COMMON LAW CLAIMS ........................................ 12

A. Plaintiff suffered cognizable injuries. ........................................ 12

B. Plaintiff pleaded a viable claim for unjust enrichment. ........................................ 13

C. Plaintiff pleaded a viable claim for breach of fiduciary duty. ........................................ 15

D. Plaintiff has pleaded a viable claim for breach of implied contract. ........................................ 17

III. HIPAA does not preempt PLAINTIFF'S STATE law claims ........................................ 18

CONCLUSION ........................................ 20

## TABLE OF AUTHORITIES

Cases

*Alberts v. Devine*,
395 Mass. 59 (1985) ........ 16

*Astra USA, Inc. v. Santa Clara Cnty.*,
563 U.S. 110 (2011) ........ 20

*Bailey v. United States*,
516 U.S. 137 (1995) ........ 5

*Baum v. Keystone Mercy Health Plan*,
826 F. Supp. 2d 718 (E.D. Pa. 2011) ........ 19

*Biddle v. Warren General Hospital*,
86 Ohio St.3d 395, 715 N.E.2d 518 (1999) ........ 17

*Bratt v. IBM*,
*Corp.*, 392 Mass. 508 (1984) ........ 10

*Calhoun v. Google LLC*,
526 F. Supp. 3d 605 (N.D. Cal. 2021) ........ 7

*Campbell v. Facebook, Inc.*,
77 F. Supp. 3d 836 (N.D. Cal. 2014) ........ 7, 8, 11

*Campiti v. Walonis*,
611 F.2d 387 (1st Cir. 1979) ........ 5, 8

*Carlsen v. GameStop, Inc.*,
833 F.3d 903 (8th Cir. 2016) ........ 14

*Castillo v. Seagate Tech., LLC*,
2016 WL 9280242 (N.D. Cal. Sept. 14, 2016) ........ 18

*Com. v. Brandwein*,
435 Mass. 623 (2002) ........ 10

*Com. v. Jackson*,
370 Mass. 502 (1976) ........ 5, 7

*Cuyler v. United States*,
362 F.3d 949 (7th Cir. 2004) ........ 20

*Fortin v. Roman Cath. Bishop of Worcester*,
416 Mass. 781 (1994) ........ 14

*Foster v. Health Recovery Servs., Inc.*,
493 F. Supp. 3d 622 (S.D. Ohio 2020) ........ 15

*Gilday v. Dubois*,
124 F.3d 277 (1st Cir. 1997) ........ 7

*Gilk v. Cunniffe*,
655 F.3d 78 (1st Cir. 2011) ........ 6

*Greenleaf Arms Realty Trust, LLC v. New Boston Fund, Inc.*,
81 Mass. App. Ct. 282 (2012) ........ 2

*Harmon v. Maury Cnty.*,
2005 WL 2133697 (M.D. Tenn. Aug. 31, 2005) ........ 19

*Hidalgo-Semlek v. Hansa Med., Inc.*,
498 F. Supp. 3d 236 ........ 19

*I.S. v. Washington Univ.*,
2011 WL 2433585 (E.D. Mo. June 14, 2011) ........ 19

*In re Anthem, Inc. Data Breach Litig.*,
162 F. Supp. 3d 953 (N.D. Cal. 2016) ........ 13

*In re Anthem, Inc. Data Breach Litig.*,
2016 WL 3029783 (N.D. Cal. May 27, 2016) ........ 14

*In re iPhone App. Litigation*,
844 F.Supp.2d 1040 (N.D. Cal. 2012) ........ 11

*In re Marriott Int'l, Inc. Customer Data Sec. Breach Litig.*,
440 F.Supp.3d 447 (D. Md. 2020) ........ 18

*In re Meta Pixel Healthcare Litig.*,
2022 WL 17869218 (N.D. Cal. Dec. 22, 2022) ........ 4, 8, 9, 11

*Luis v. Zang*,
833 F.3d 619 (6th Cir. 2016) ........ 4

*Merrell Dow Pharms. Inc. v. Thompson*,
478 U.S. 804, 817 Ed. 2d 650 (1986) ........ 19

*Miller v. Elam*,
2011 WL 1549398 (E.D. Cal. Apr. 21, 2011) ........ 20

*Miller v. Nichols*,
586 F.3d 53 (1st Cir. 2009) ........ 20

*Mogavero v. Elephant Biotechnologies, Inc.*,
2018 WL 4326367 (Mass. Super. July 16, 2018) .......... 6

*Montclair v. Ramsdell*,
107 U.S. 147 (1883) .......... 5

*Nelson v. Salem State Coll.*,
446 Mass. 525 (2006) .......... 9

*Nicosia v. Amazon.com, Inc.*,
834 F.3d 220 (2d Cir. 2016) .......... 6

*Partanen v. Gallagher*,
475 Mass. 632 (2016) .......... 3, 4, 6

*Petrell v. Rakoczy*, Mass.,
Super., 2005 WL 1683600 (July 11, 2005) .......... 17

*Polay v. McMahon*,
468 Mass. 379 (2014) .......... 10

*R.K. v. St. Mary's Med. Ctr., Inc.*,
735 S.E.2d 715 (W. Va. 2012) .......... 19

*Rudolph v. Hudson's Bay Co.*,
2019 WL 2023713 (S.D.N.Y. May 7, 2019) .......... 18

*Santagate v. Tower*,
64 Mass. App. Ct. 324 (2005) .......... 14

*Shedd v. Sturdy Memorial Hosp., Inc.*,
2022 WL 1102524 (Mass. Super. Ct. (Bristol Cty.) Apr. 5, 2022) .......... 10, 12, 18

*Tabata v. Charleston Area Med. Ctr., Inc.*,
759 S.E.2d 459 (W. Va. 2014) .......... 19

*Tower v. Hischorn*,
397 Mass. 581 (1986) .......... 10

*Turk v. Oiler*,
732 F. Supp. 2d 758 (N.D. Ohio 2010) .......... 19

*United States v. Szymuszkiewicz*,
622 F.3d 701 (7th Cir. 2010) .......... 3

*User Profile Litig.*,
402 F. Supp. 3d 767 (N.D. Cal. 2019) .......... 8

*Van Brode Grp., Inc. v. Bowditch & Dewey*,
36 Mass. App. Ct. 509 (1994) ........ 17

*Walker v. Boston Med. Center Corp.*,
2015 WL 9946193, (Mass. Super. Ct. (Suffolk Superior Court) Nov. 20, 2015) ........ 11, 12

Statutes

G.L. c. 4 § 99(B)(3) ........ 5
G.L. c. 111, §§ 70 and 70E ........ 16
G.L. c. 272, § 99B(3) ........ 4
G.L. c. 272, § 99(B)(4) ........ 20
G.L. c. 272, § 99B(3) ........ 3
G.L. c 214, § 1B ........ 9, 20

Regulations

45 C.F.R. § 164.508(a)(1) ........ 8
45 C.F.R. § 164.508(a)(3)(i) ........ 8
65 Fed. Reg. 82462 (Dec. 28, 2000) ........ 19

Other Authorities

RESTATEMENT (SECOND) OF TORTS § 892A (1979) ........ 7

## INTRODUCTION

This is a case about a cardinal rule of the medical profession: a healthcare provider must maintain the confidentiality of its patients' health information. Emerson violated that rule.

Plaintiff is an Emerson patient who used the hospital's website to obtain healthcare. While Plaintiff reasonably believed his sensitive medical information would be protected by Emerson, his communications turned out to have been anything but confidential. Unbeknownst to Plaintiff, Emerson had installed software on its website—including the Meta Pixel tool—that collected Plaintiff's personal health care information and shared it with Facebook.

Emerson cannot dispute Plaintiff's well-pled allegations. Nor does Emerson acknowledge that the arguments it makes here have already been rejected by another Massachusetts court.[1] Instead, Emerson attempts to substitute its own facts—something that is not permitted on a motion to dismiss. Worse, in contesting the privacy violations at issue, Emerson ignores that it is a medical provider, that Plaintiff was one of its patients, and that Emerson caused Plaintiff's health information to be shared with Facebook, Google, and other third parties. Accordingly, because Plaintiff adequately pleaded his causes of action, the Court should deny Emerson's motion to dismiss.

## FACTS

### A. Plaintiff John Doe is an Emerson patient who used its website for his treatment.

Emerson promised patients that "Protecting your medical information is an important priority for Emerson Hospital." Plaintiff's First Amended Complaint ("Compl.") at ¶ 225 (citing to website URL). Emerson also assured patients that it would never use or share patients' "personal

---

[1] *Doe v. Partners Healthcare Sys., et al.*, No. 1984CV01651 (Mass. Super. Ct. Nov. 20, 2020) (denying hospital's motion to dismiss Meta Pixel wiretapping case).

information for marketing purposes" without their "authorization." *Id.* Those promises were untrue.

In 2022, Plaintiff used Emerson's website to transmit information about his treatment at Emerson, including queries about treatment for a concussion. *Id.* at ¶ 103. Plaintiff's communications contained information about his status as an Emerson patient, including information about his doctors, conditions, treatment, and appointments. *Id.* at ¶¶ 203–204.

Plaintiff shared his personal health information in reliance on Emerson's status as a medical provider. *Id.* at ¶¶ 200, 228, 231. Plaintiff also paid Emerson for his medical treatment. *Id.* at ¶ 194(d). Plaintiff expected that his patient status ensured the confidentiality of the medical information he shared with Emerson. *Id.* at ¶ 239.

**B. Emerson secretly captured Plaintiff's treatment data from its website and shared it with Facebook for Emerson's profit, despite its promises to the contrary.**

Without informing its patients, Emerson secretly installed various digital tracking technologies on its website, including Facebook's Meta Pixel, which caused the health information that patients entered on Emerson's website to be transmitted to Facebook and other third parties. *Id.* at ¶¶ 4, 19, 83, 104, 116, 203, 207. Emerson bartered Plaintiff's and other patients' confidential health information to Facebook in return for advertising benefits. *Id.* at ¶¶ 126, 128–140, 260. Plaintiff did not know that Emerson was sharing his treatment information with Facebook, nor did he consent to such disclosures. *Id.* at ¶ 102.

## LEGAL STANDARD

Under Massachusetts law, a motion to dismiss must be denied if the plaintiff's complaint is "adequately detailed so as to plausibly suggest an entitlement to relief." *Greenleaf Arms Realty Trust, LLC v. New Boston Fund, Inc.*, 81 Mass. App. Ct. 282, 288 (2012). This Court must "accept as true the facts alleged in the . . . complaint as well as any favorable inferences that reasonably

can be drawn from them." *Partanen v. Gallagher*, 475 Mass. 632, 635 (2016).

## ARGUMENT AND AUTHORITIES

I. PLAINTIFF ADEQUATELY PLEADED HIS STATUTORY CLAIMS.

**A. Plaintiff alleged a viable claim for violations of the Massachusetts Wiretap Act.**

Emerson challenges the Wiretap claim on two grounds: (1) that the Meta Pixel is not an "intercepting" device and (2) that Plaintiff "consented" to Emerson's disclosures of his confidential health information. Both contentions are meritless.

**1. Plaintiff adequately alleged that Emerson used an intercepting device.**

The Massachusetts Wiretap Act defines "intercepting device" as "***any*** device or apparatus which is capable of transmitting, receiving, amplifying, or recording a wire . . . communication." G.L. c. 272, § 99B(3) (emphasis added).

Plaintiff alleges that Emerson used multiple intercepting devices to intercept (and disseminate) Plaintiff's confidential medical information, including Plaintiff's personal computer; Plaintiff's web browser; Plaintiff's web browser-managed files; the Meta Pixel; internet cookies; Emerson's computer servers; third-party source code (utilized by Emerson); and third-party servers. Compl. at ¶ 186. Indeed, Emerson acknowledges that Plaintiff identified devices "like personal computers and servers" as intercepting devices and does not dispute that computers and servers qualify as intercepting devices. Mem. 15. Nor could it—computers and servers are undeniably "devices" and courts around the country have found they qualify as intercepting devices for the purposes of wiretapping statutes. *See e.g.*., *United States v. Szymuszkiewicz*, 622 F.3d 701, 707 (7th Cir. 2010).

Emerson does not dispute that Plaintiff's allegations, if true, would support a wiretapping claim. Rather, Emerson improperly seeks dismissal based on its own contrary factual conclusions.

Emerson argues that "this is a case about pixel technology" and that only the Meta Pixel (not Emerson's computers, servers, and other alleged devices) is doing the intercepting at issue. Emerson further argues that the Metal Pixel is not an "intercepting device" under the Wiretap Act. Mem. 15–16. This argument necessarily requires the Court to decide, contrary to Plaintiff's allegations, that the *only* thing involved in the interception was the Meta Pixel, not the numerous other devices involved—like computers and servers—none of which Emerson challenges as intercepting devices. But the Court cannot make factual findings about causation at the motion to dismiss stage. *Partanen*, 475 Mass. at 635 (factual allegations must be "accept[ed] as true"). Stated differently, even if the Metal Pixel was not an intercepting device (which it is) Plaintiff has adequately pled additional intercepting devices—which Emerson acknowledges—to establish a wiretapping claim.

Likewise, Emerson claims the Meta Pixel is "software," which cannot be a "device" under several non-Massachusetts cases. Mem. 15–16. That argument ignores well-established law to the contrary, holding that computer code and software—including the Meta Pixel—can function as intercepting devices for wiretapping claims. *See, e.g., In re Meta Pixel Healthcare Litig.*, 2022 WL 17869218, at *11 (N.D. Cal. Dec. 22, 2022) (holding Meta Pixel was intercepting device); *Luis v. Zang*, 833 F.3d 619, 630 (6th Cir. 2016) (software program functioned as an electronic device). Emerson ignores this line of cases.

Worse, Emerson reads the definition of "intercepting device" far too narrowly. The definition includes a "device *or* apparatus" as potential "intercepting devices." G.L. c. 272, § 99B(3) (emphasis added). Emerson collapses the words "device" and "apparatus" as synonyms: both requiring tangible, machine-like things. Mem. at 15. But courts should "give effect, if possible, to every clause and word of a statute" and words must not be treated as superfluous.

*Montclair v. Ramsdell*, 107 U.S. 147, 152 (1883); *Bailey v. United States*, 516 U.S. 137, 146 (1995) (presuming that legislature "used two terms because it intended each term to have a particular, nonsuperfluous meaning"). Thus, even if "device" refers to purely physical machines as Emerson claims, "apparatus" must have its own meaning separate and apart from "device." Because "apparatus" is undefined, it must be understood according to its common and approved usage. G.L. c. 4 § 99(B)(3).

The common meaning of "apparatus" has a far broader definition than Emerson's physical-machine-only interpretation, including "functional processes by means of which systemized activity is carried out."[2] Based on this common meaning of "apparatus," an "intercepting device" includes the "functional processes" of Meta Pixel working in conjunction with the various other devices as Plaintiff alleged to systematically intercept communications.

**2. Plaintiff did not consent to Emerson's disclosure of his health information.**

Massachusetts is a two-party consent state for wiretapping purposes. In other words, "all parties" must give consent before a communication is intercepted or disclosed. G.L. c. 272 §§ (B)(4), C(1), C(3). There is no implied consent exemption to the Massachusetts Wiretap Act. *Campiti v. Walonis*, 611 F.2d 387, 396 (1st Cir. 1979). To establish consent, a defendant must show "actual knowledge of the recording," which requires proof demonstrating "clear and unequivocal manifestations of knowledge." *Com. v. Jackson*, 370 Mass. 502, 507 (1976). For example, in *Jackson*, consent was found when the wiretapped party conceded that he "kn[e]w the phone [was] tapped." *Id.* at 504. Similarly, in *Gilk v. Cunniffe*, the Court found "actual

---

2 *See* Merriam Webster Dictionary ("the functional processes by means of which a systemized activity is carried out") (https://www.merriam-webster.com/dictionary/apparatus).

knowledge" where a party "openly record[ed] the police officers" and the "officers were aware of [the] surveillance." 655 F.3d 78, 88 (1st Cir. 2011). No facts like those are presented here.

Emerson argues that Plaintiff consented to *Emerson's* disclosure of his private medical information when he agreed to *Facebook's* terms of use. Mem. 16. But Emerson comes nowhere close to showing that Plaintiff "consented" to its surreptitious interception of his communications via hidden tracking technologies. Emerson's argument to the contrary fails for multiple reasons.

**First**, Emerson relies on exhibits that *Emerson* attached to its motion to dismiss. But where a document is not attached to the complaint, a "plaintiff's reliance on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion." *Mogavero v. Elephant Biotechnologies, Inc.*, 2018 WL 4326367, at *2 (Mass. Super. July 16, 2018). Plaintiff did not rely on the "terms and effect" of Facebook's terms and conditions when drafting his complaint. Plaintiff's 64-page complaint includes but a single, passing reference to Facebook's terms of service. Compl. at ¶ 144. That reference hardly makes Facebook's terms and conditions "integral" to Plaintiff's complaint. *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 234 (2d Cir. 2016) (holding district court improperly considered documents that were not "integral to the complaint").

**Second,** Emerson offers no explanation for how accepting *Facebook's* terms and conditions could constitute consent to *Emerson's* interception and disclosure of Plaintiff's private health care information. Plaintiff does not allege that Facebook intercepted his personal health information—he alleges that *Emerson* secretly recorded and disclosed this information, without his knowledge or consent. Compl. at ¶¶ 4-5, 85-93, 102, 105–107, 184. Emerson also ignores that it promised it would *never* share patients' "personal information for marketing purposes" without "specific authorization." Compl. at ¶ 2. Accepting those well-pleaded facts as true, *Partanen*, 475

Mass. at 635, Plaintiff has adequately pled that *Emerson* did not have his consent to send his personal health information to third parties for marketing purposes.

**Third,** Emerson ignores that Plaintiff's complaint alleges that Emerson shared his personal health information not just with *Facebook*, but with *multiple* third parties, using *multiple* digital tracking technologies. Compl. at ¶¶ 3-5, 19, 26-27, 101, 188-191. Emerson, of course, has no explanation for how Facebook's terms of service could possibly create consent for Emerson's disclosure of Plaintiff's personal health data to companies like *Google*.

**Fourth,** the mere existence of Facebook's privacy policy does not prove Plaintiff *knew* Emerson was going to send Facebook his medical information. That is critical because, under Massachusetts law, both parties must have "'actual knowledge' of the 'interception'" to avoid a wiretapping violation. *Gilday v. Dubois*, 124 F.3d 277, 289 (1st Cir. 1997). Actual knowledge may be established by "evidence that the parties were informed that their conversation was being intercepted" or by "clear and unequivocal objective manifestations of knowledge" that is "sufficiently probative of a person's state of mind as to allow an inference of knowledge.'" *Gilday*, 124 F.3d at 289 (quoting *Jackson*, 349 N.E.2d at 340)). Neither is present here.

Likewise, for "consent to be actual," disclosures "must explicitly notify users of the practices at issue." *Calhoun v. Google LLC*, 526 F. Supp. 3d 605, 620 (N.D. Cal. 2021) (quotation omitted); *see also Campbell v. Facebook, Inc.*, 77 F. Supp. 3d 836, 847–48 (N.D. Cal. 2014) (explaining that, for a finding of consent, disclosures must give users notice of the "specific practice" at issue). As the Restatement explains, "[i]n order to be effective, the consent must be to the particular conduct of the actor, or to substantially the same conduct." RESTATEMENT (SECOND) OF TORTS § 892A (1979). In other words, "consent to a fight with fists is not consent to an act of

a very different character, such as biting off a finger, stabbing with a knife, or using brass knuckles." *Id.*

Facebook's user policy does not indicate that the Meta Pixel had been installed on the Emerson website or even hospital websites generally. Much less does it indicate that Facebook routinely collects and exploits its users' protected health information. That is insufficient to create "consent." *In re Meta Pixel Healthcare Litig.*, 2022 WL 17869218, at *10 (denying motion to dismiss); *In re Facebook, Inc., Consumer Priv. User Profile Litig.*, 402 F. Supp. 3d 767, 794 (N.D. Cal. 2019) (denying motion to dismiss based on plaintiffs' purported consent).

What Emerson is essentially arguing is that Plaintiff *should have known* about Facebook's user policy and *should have understood* that every page he visited on Emerson's website was subject to recording and disclosure by Emerson despite Emerson's express representations to the contrary. In other words, Emerson suggests that Plaintiff gave his *implied* consent to its interception and disclosure of his health information. But "[t]here is no implied knowledge exemption under the Massachusetts [wiretapping] statute." *Campiti*, 611 F.2d at 396.

**Finally,** while this case does not turn on the interpretation of federal law, Emerson's argument also ignores that HIPAA prohibits healthcare providers like Emerson from disclosing their patients' personal health information to third parties for "marketing" purposes without express written authorization from patients. 45 C.F.R. § 164.508(a)(3)(i) ("[A] covered entity must obtain an authorization for any use or disclosure of protected health information for marketing."); *see also* 45 C.F.R. § 164.508(a)(1) ("[A] covered entity may not use or disclose protected health information without an authorization"). Emerson does not even pretend that it obtained written authorization from Plaintiff before bartering his personal health information to

Facebook. In other words, Plaintiff did not give consent to Emerson's disclosure of his personal health information to Facebook *as a matter of law.*

Indeed, Facebook's own data policy "requires" that any third-party have "lawful rights to collect, use and share your data before providing any data to us." *In re Meta Pixel Healthcare Litig.*, 2022 WL 17869218, at *10 (N.D. Cal. Dec. 22, 2022) (denying motion to dismiss). For just this reason, courts have rejected the argument that accepting Facebook's terms and conditions could constitute "consent" to a healthcare provider's unauthorized disclosure of protected health care information, given HIPAA. *Id.* The same outcome follows here. Accordingly, for all these reasons, Emerson's motion fails.

**B. Plaintiff has pleaded a viable claim of statutory invasion of privacy, contrary to Emerson's mischaracterization of the elements and reliance on inapposite law.**

**1. Plaintiff adequately pleaded a statutory invasion of privacy claim.**

To succeed on an invasion of privacy claim, a "plaintiff must show that there was a gathering and dissemination of information which [he contends] was private." *Nelson v. Salem State Coll.*, 446 Mass. 525, 536 (2006) (quotations omitted); *see also* G.L. c 214, § 1B ("a person shall have a right against unreasonable, substantial or serious interference with his privacy").

Plaintiff easily satisfies this test. Plaintiff alleges that he communicated confidential medical information to Emerson via its website. Compl. at ¶¶ 103, 204. This information was highly personal, private, and the type of information Plaintiff intended to keep private. Compl. at ¶¶ 93, 105-106, 206, 210, 226. And such confidential medical information is not "generally available to third party data marketing companies because of the strict restrictions on disclosures of such information by state laws and provider standards, including the Hippocratic oath." Compl. at ¶ 132. Emerson, in turn, caused this information to be transmitted to third parties like Facebook via the undisclosed installation of Meta Pixel on its website. Compl. at ¶¶ 19, 83, 104, 116, 203,

207. Those allegations are sufficiently robust to survive a dismissal motion. *See Shedd v. Sturdy Memorial Hosp., Inc.*, 2022 WL 1102524, at *11 (Mass. Super. Ct. (Bristol Cty.) Apr. 5, 2022) (denying dismissal of privacy claim based on allegations that unauthorized persons gained access to highly confidential medical information).

Indeed, it is well-settled that the unauthorized disclosure of medical information gives rise to an action for invasion of privacy. *Tower v. Hischorn*, 397 Mass. 581, 586–87 (1986) ("[D]isclosure without consent of the patient, of confidential medical information . . . would be sufficient to warrant a finding of invasion of privacy"); *Bratt v. IBM Corp.*, 392 Mass. 508, 522 (1984) (same); *Com. v. Brandwein*, 435 Mass. 623, 629–30 (2002) (same).

Emerson makes no attempt to distinguish these Massachusetts cases. Emerson likewise does not cite a single case where a medical provider (like Emerson) obtained dismissal of a patient's privacy claim when the medical provider caused an unauthorized disclosure of the patient's confidential medical information. That absence is telling.

**2. Emerson mischaracterizes the elements of a statutory privacy claim.**

Emerson likewise offers a heightened—and **erroneous**—characterization of the elements of a statutory invasion of privacy claim. Specifically, Emerson asserts that "Plaintiff must [also] establish that the information was '*used*' in an unreasonable manner." *Id.* (citing *Polay v. McMahon,* 468 Mass. 379, 383 (2014)) (emphasis in original). That is incorrect.

*Polay* explains that the factors "considered in assessing whether there has been an intrusion that is unreasonable, as well as substantial or serious, include the location of the intrusion, *the means used*, the frequency and duration of the intrusion, and the underlying purpose behind the intrusion." *Id.* (citing cases) (emphasis added). *Polay's* reference to "use" focuses not on *what* a third party like Facebook did with Plaintiff's confidential medical information, but rather *how*

Emerson gathered and disseminated Plaintiff's medical information without his authorization (*i.e.*, "the means used"). In short, there is no requirement that Plaintiff "identify how his data, once sent to Facebook, was used," Mem. 3, to sufficiently plead an invasion of privacy claim. That distinction is logical: the *intrusion* of privacy is the compensable injury, not the subsequent use. *See Walker v. Boston Med. Center Corp.*, 2015 WL 9946193, at *2 (Mass. Super. Ct. (Suffolk Superior Court) Nov. 20, 2015).

Finally, Emerson offers an inapposite out-of-state case, *In re iPhone App. Litigation,* 844 F.Supp.2d 1040 (N.D. Cal. 2012), in support of its motion, summarily claiming—without explanation—that the allegations in that case were more specific than here, yet dismissed. But, unlike here, the *iPhone* case did not involve a *hospital* who bartered its patients' confidential *health information* to third parties for marketing purposes. Much less did that case involve a defendant who was a "covered entity" under HIPAA, subject to multiple regulations to protect patient health information. Emerson is not a generic phone application; it is a medical provider. And the disclosure of geolocation data is not the same as disclosure of medical diagnoses, treatment plans, doctor relationships, medical concerns, and the like. The latter is unambiguously an "egregious breach of social norms."

Emerson boldly claims that its use of Meta Pixel, including its disclosure of patients' confidential medical information, "was used for advertising practices that are common on the Internet." Mem. 17. But as numerous courts have observed "the collection of protected health information from a medical provider is a different matter entirely." *In re Meta Pixel Healthcare Litig.*, 2022 WL 17869218, at *10. What might be acceptable in some commercial relationships does not apply to hospitals, which are subject to multiple statutory, common law, and ethical duties to protect their patients' confidential health information. *See, e.g., Campbell v. Facebook*, 77

F.Supp.3d 836, 844 (N.D. Cal. 2014) (defendant "cannot simply adopt any revenue-generating practice and deem it 'ordinary'").

## II. PLAINTIFF ADEQUATELY PLED HIS COMMON LAW CLAIMS

### A. Plaintiff suffered cognizable injuries.

Emerson's primary challenge to Plaintiff's common law claims is that Plaintiff failed to allege "any cognizable injury from Emerson's alleged conduct." Mem. at 6. That argument ignores both the law and the facts.

Multiple Massachusetts courts have recognized that the unauthorized disclosure of a patient's medical information constitutes a cognizable injury. For example, in *Walker v. Boston Medical Center*, the court denied a similar motion to dismiss, holding that "Plaintiff's general allegation of injury from the data breach" involving access to "confidential medical information by unauthorized persons, is sufficient." 2015 WL 9946193, at *2 (Mass. Super. Nov. 20, 2015). *Walker* further observed that "[a]t the pleading stage, before discovery has determined whether plaintiffs' records were accessed, more specificity regarding the kind of injury suffered by plaintiffs is not required. *Id.* at *2 (emphasis added).

The superior court reached the same conclusion in *Shedd v. Sturdy Memorial Hospital, Inc.*, holding that Plaintiff's allegations that her "confidential health information, such as medical records and prescription history information" had been disclosed without her authorization was more than sufficient to survive a motion to dismiss. 2022 WL 1102524, at *5 (Mass. Super. Apr. 5, 2022) (denying motion to dismiss). The same result follows here.

Plaintiff's allegations of injuries are robust compared to the general averments of injury in *Walker* and *Shedd*. Plaintiff alleges that he was injured when Emerson made unauthorized disclosures of his private medical information to third-party marketing companies like Facebook

and Google. Compl. at ¶¶ 85–104. Plaintiff alleges that he was further injured when Emerson and Facebook monetized his personal health information, without compensating him for the value of that information. Compl. at ¶¶ 128–140; 257–264. Plaintiff also alleges that he has and will continue to suffer actual damages and injuries for these unauthorized disclosures. *Id.* at ¶ 254. That is all that Massachusetts law requires.

**B. Plaintiff pleaded a viable claim for unjust enrichment.**

Emerson has similarly shown no good reason why the Court should dismiss Plaintiff's unjust enrichment claim. To succeed on a claim for unjust enrichment, the plaintiff must show only (1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge of the benefit by the defendant; and (3) that the acceptance or retention of the benefit by the defendant under circumstances which make such acceptance or retention inequitable. *Sweeney v. DeLuca*, at *8 (Mass. Super. Mar. 16, 2006). Emerson challenges the first and third elements.

Emerson argues that Plaintiff's payment for medical services does not constitute "a measurable benefit." Mem. at 13. That argument ignores what Plaintiff actually pled. Plaintiff alleges that he conferred a benefit on Emerson in the form of his confidential health information. Compl. at ¶ 260. Such health information has significant monetary value in the marketplace *precisely* because it is confidential. Compl. at ¶¶ 128–135. Plaintiff provided his health information to Emerson with the expectation that Emerson would protect it—as *Emerson* promised. Compl. at ¶¶ 105–111; 239; 261. Instead, Emerson bartered Plaintiff's health information to Facebook in return for advertising benefits. Compl. at ¶¶ 104, 136; 260. Those allegations are more than sufficient to show that Emerson received "a measurable benefit." *See In re Anthem, Inc. Data Breach Litig.*, 162 F. Supp. 3d 953, 995 (N.D. Cal. 2016) (holding "Loss of Value" of health information represents "a cognizable form of economic injury.").

Plaintiff similarly alleges that he provided a measurable benefit by paying Emerson for services, including Emerson's protection of his confidential health information. Plaintiff alleges that a portion of the payments he made were compensation for such services, the value of which Emerson unjustly retained when it bartered his confidential health information to Facebook and other third parties. Compl. at ¶¶ 194, 231.

Unsurprisingly, Emerson cites no authority for the proposition that Plaintiff must prove the exact amount of economic harm in his complaint. Further, the sole case Emerson cites is distinguishable, because, unlike here, there was no allegation in that case that "any specific portion of the subscriber fee went toward data protection." *Carlsen v. GameStop, Inc.*, 833 F.3d 903, 912 (8th Cir. 2016). By contrast, Plaintiff's complaint specifically alleges that he paid Emerson, in part, to protect the confidentiality of his health information. That is more than sufficient. *In re Anthem, Inc. Data Breach Litig.*, 2016 WL 3029783, at *29 (N.D. Cal. May 27, 2016) (denying motion to dismiss unjust enrichment claim where defendants "knew or should have known that some portion of [plaintiffs'] insurance expenses had been paid by the [plaintiffs'] premiums").

Likewise, in evaluating whether it would be "unjust" for a defendant to retain a conferred benefit, the inquiry turns on "the reasonable expectations of the parties." *Santagate v. Tower*, 64 Mass. App. Ct. 324, 336 (2005). Here, Emerson expressly promised Plaintiff that "protecting your medical information is an important priority" and that it would *never* share his confidential health information for "marketing purposes" without his "authorization." Compl. at ¶¶ 2, 109–111. Betraying these promises, Emerson bartered Plaintiff's confidential health information to Facebook, while retaining all the financial benefit for itself. Emerson's fraud is a textbook example of misconduct justifying restitution for unjust enrichment. *Fortin v. Roman Cath. Bishop of Worcester*, 416 Mass. 781, 789 (1994) ("Under Massachusetts law, a court will declare a party

a constructive trustee of property for the benefit of another if he acquired the property through fraud ... or in other circumstances indicating that he would be unjustly enriched."); *see also Foster v. Health Recovery Servs., Inc.*, 493 F. Supp. 3d 622, 641 (S.D. Ohio 2020) (denying motion to dismiss where plaintiff alleged that hospital "failed to safeguard [his] information but has retained the payment made by Plaintiff for those services").

**C. Plaintiff pleaded a viable claim for breach of fiduciary duty.**

Emerson says it owed no fiduciary duty to Plaintiff because he only alleged that he accessed Emerson's website as a member of the public. Mem. at 8 ("Although a 'duty of confidentiality [generally] arises from the physician-patient relationship,' Emerson did not owe such a duty to Plaintiff as a visitor to its public website."). That is also wrong.

Plaintiff alleged exactly what Emerson says is missing: i.e., that Emerson "disclosed information relating to Plaintiff and Class Members' medical treatment to third parties without their knowledge, consent, or authorization," and the "information disclosed included . . . **Plaintiff and Class Members' statuses as patients of Defendants,** and the exact content of communications exchanged between Plaintiff [and Emerson], including but not limited to information about treating doctors, potential doctors, conditions, treatments, appointments, search terms, bill payment, and logins to Defendant's website." Compl. at ¶¶ 203–204 (emphasis added). In other words, Plaintiff alleged he used Emerson's website *as a patient* and received healthcare services via Emerson's website.

For the same reason, Emerson's alternative argument also lacks merit. Emerson claims the physician-patient relationship has not been sufficiently pleaded because Plaintiff's "'communications' with the website must have been related to his *treatment*, which Plaintiff does not allege." Mem. at 9 (emphasis in original). Plaintiff could hardly be more explicit: the

"information disclosed included the exact content of **communications exchanged between Plaintiff . . . with Defendant**, including but not limited to information about **treating *doctors*,** potential doctors, conditions, **treatments**, appointments, search terms, bill payment, and logins to Defendant's website." Compl. at ¶ 204 (emphasis added).

Finally, Emerson argues that, while individual doctors may owe fiduciary duties to Plaintiff, there is no basis for extending the "physician-patient duty of confidentiality (from Plaintiff's physician) to the broader health system (Emerson)." Mem. at 9. That is nonsense.

The same principle that led the Supreme Judicial Court to recognize a physician's fiduciary duty to protect confidential medical information applies to hospitals generally, both as matter of law and equity. *Alberts v. Devine*, 395 Mass. 59, 71 (1985) ("The principle we announce is but an application of the general rule that a plaintiff may hold liable one who intentionally induces another to commit any tortious act that results in damage to the plaintiff."). What's more, Massachusetts recognizes "a patient's valid interest in preserving the confidentiality of medical facts communicated to a physician." That rule applies whether the communications are made face-to-face or via a hospital website. Indeed, "the Legislature has demonstrated its recognition of a policy favoring confidentiality of medical facts by enacting G.L. c. 111, §§ 70 and 70E, to limit the availability of hospital records." *Id.* at 67. Just as a patient has an expectation that his doctor will "hold in trust confidential information," *id.* at 68, so too does a patient expect that the hospital providing the medical services will protect the confidentiality of that information.

It comes as little surprise that Massachusetts courts, for example, have recognized that a pharmacy like CVS maintains a fiduciary duty to its pharmacists' patients. *Weld v. CVS Pharmacy, Inc.*, Mass. Super., No. CIV. A. 98-0897F (June 29, 1999); *Kelley v. CVS Pharmacy, Inc.*, Mass. Super., No. CIV.A. 98-0897-BLS2 (Aug. 24, 2007). Or that other states' courts have held hospitals

owe a fiduciary duty of confidentiality to their patients. *Biddle v. Warren General Hospital*, 86 Ohio St.3d 395, 401, 715 N.E.2d 518 (1999) ("We hold that in Ohio, an independent tort exists for the unauthorized, unprivileged disclosure to a third party of nonpublic medical information that a … hospital has learned within a physician-patient relationship").

None of Emerson's cases hold differently. In *Petrell v. Rakoczy*, Mass. Super., 2005 WL 1683600, at *4 (July 11, 2005), the defendant Episcopal Diocese, consistent with its "unique organization structure," did not have any "personal contact with the parishioners of each parish so as to create an awareness that individual parishioners relied upon them for guidance or advice." Here, in contrast, Emerson knew Plaintiff was using its website and promised that it would not sell or use his health information for marketing purposes without express authorization. *See* Compl. at ¶¶ 114, 203–204. Likewise, *Van Brode Grp., Inc. v. Bowditch & Dewey*, 36 Mass. App. Ct. 509, 516 (1994) stands for the unremarkable principle that a jury may hear both a legal malpractice claim and a fiduciary duty claim arising from the same subject matter.

Finally, Emerson fundamentally misrepresents the complaint's allegations. Emerson claims, for example, that "according to the Complaint, Plaintiff's relationship wasn't special at all—he was just browsing Emerson's public website." Mem. at 9. That is simply false. *See, e.g.*, Compl. at ¶ 8 (Plaintiff is "a patient of Defendant"); ¶ 103 ("The information that Plaintiff John Doe transmitted included queries about treatment for his concussion."); ¶ 204 (Emerson disclosed "information about treating doctors, potential doctors, conditions, treatments, appointments, search terms, bill payment, and logins to [Emerson's] website."). Accordingly, Emerson's motion fails.

**D. Plaintiff has pleaded a viable claim for breach of implied contract.**

While Emerson argues extensively that Plaintiff failed to sufficiently allege facts in support

of his implied contract claim, Mem. at 10–12, it overlooks that Massachusetts courts have denied motions to dismiss based on analogous allegations. *See Shedd*, 2022 WL 1102524, at *9–10 ("When a patient hands over sensitive information to receive medical care, they expect an implicit assurance that the information will be protected.").

Emerson also ignores that it expressly promised patients that "Protecting your medical information is an important priority for Emerson Hospital" and that Emerson would never share patients' "personal information for marketing purposes" without "authorization." Compl. at ¶ 225. Numerous courts across the country have held that such representations are sufficient to create an implied contract. *In re Marriott Int'l, Inc. Customer Data Sec. Breach Litig.*, 440 F.Supp.3d 447, 482-486 (D. Md. 2020) (denying motion to dismiss); *Castillo v. Seagate Tech., LLC*, 2016 WL 9280242 at *5-9 (N.D. Cal. Sept. 14, 2016) (same); *Rudolph v. Hudson's Bay Co.*, 2019 WL 2023713 at *10-11 (S.D.N.Y. May 7, 2019) (same).

Plaintiff alleged that he entered an implied contract when he provided confidential medical information to Emerson in exchange for medical services, based on Emerson's promises to safeguard his private information from unauthorized disclosure. *See* Compl. at ¶¶ 223–256. Those allegations plausibly suggest that he is entitled to relief. Emerson, however, is effectively asking the Court to ignore Plaintiff's factual allegations and make a contrary determination about consideration and mutual assent. But motions to dismiss do not resolve factual disputes, let alone conclusively in defendants' favor. Accordingly, Plaintiff has sufficiently alleged a claim.

## III. HIPAA DOES NOT PREEMPT PLAINTIFF'S STATE LAW CLAIMS.

Finally, Emerson argues that Plaintiff's claims are preempted by HIPAA. Mem. at 17–18. That Hail Mary argument has no basis in law.

HIPAA has an express preemption provision that sets *the floor* for protecting personal health information. *Hidalgo-Semlek v. Hansa Med., Inc.*, 498 F. Supp. 3d 236, 258, n. 40 (D.N.H. 2020). But, as the Department of Health and Human Services has explained, "a state law [is] not preempted [where] there is no conflict with the analogous federal requirement; in such a situation, both laws can, and must, be complied with." 65 Fed. Reg. 82462, 82581 (Dec. 28, 2000). For just this reason, it is well-established that HIPAA does not preempt state law privacy claims that are commensurate or *more stringent* regarding the protections offered patients. *See R.K. v. St. Mary's Med. Ctr., Inc.*, 735 S.E.2d 715, 724 (W. Va. 2012) (collecting and analyzing cases and holding that "[c]ommon law tort claims based upon the wrongful disclosure of medical or personal health information are not preempted by [HIPAA]"); *Tabata v. Charleston Area Med. Ctr., Inc.*, 759 S.E.2d 459, 464 (W. Va. 2014) (cause of action for breach of confidentiality and for invasion of privacy stands when a medical professional wrongfully violates a person's right to have their medical information kept confidential); *Baum v. Keystone Mercy Health Plan*, 826 F. Supp. 2d 718, 721 (E.D. Pa. 2011) ("In spite of the fact that the personal data at the heart of this case is protected by HIPAA, this is a fairly straightforward state-law tort case."); *Turk v. Oiler*, 732 F. Supp. 2d 758, 771 (N.D. Ohio 2010) (state law more "stringent than HIPAA" was "not preempted, because it prohibits use or disclosure of health information when such use or disclosure would be allowed under HIPAA"); *Harmon v. Maury Cnty.*, 2005 WL 2133697, at *4 (M.D. Tenn. Aug. 31, 2005) ("HIPAA does not completely preempt state law.") (citing *Merrell Dow Pharms. Inc. v. Thompson*, 478 U.S. 804, 817 Ed. 2d 650 (1986)); *see also I.S. v. Washington Univ.*, 2011 WL 2433585, at *5 (E.D. Mo. June 14, 2011) ("Although HIPAA is clearly implicated in the claim for negligence per se, said claim falls within that broad class of state law claims based on federal regulations in the state court.") (quotation omitted).

None of Plaintiff's state law claims conflicts with, much less are *contrary*, to HIPAA. For example, the Massachusetts Wiretap Act protects communications from unauthorized interception. G.L. c. 272, § 99(B)(4) (requiring "prior authority by all parties to [the] communication"). The statute is agnostic about the content of such communications. *Id.* at § 99 (secret interception of "any wire or oral communication" is prohibited"). Accordingly, it is irrelevant whether the intercepted communications concern health issues. The same is true for the statutory invasion of privacy claim. Plaintiff need only show a right of privacy that was violated—not that the violation involved health information governed by federal law. *See* G.L. c 214, § 1B ("right against unreasonable, substantial or serious interference with his privacy").

Emerson's alternative argument is even more frivolous. Emerson argues that Plaintiff cannot sue Emerson for violating HIPAA because HIPAA "does not provide a private right of action." Mem. at 18. But the decisions on which Emerson relies are inapposite. None involves an attempt to enforce Massachusetts law, as here, and each instead sought relief entirely dependent on HIPAA. *See Astra USA, Inc. v. Santa Clara Cnty.*, 563 U.S. 110, 114 (2011) (noting party's contract had no obligation different from or independent of HIPAA, which is not the case here); *Miller v. Nichols*, 586 F.3d 53, 59–60 (1st Cir. 2009) (bringing private claim under HIPAA and conceding HIPAA creates no such claim); *Cuyler v. United States*, 362 F.3d 949, 952 (7th Cir. 2004) (seeking to hold defendant liable for violating federal regulatory standards); *Miller v. Elam*, 2011 WL 1549398, at *4 (E.D. Cal. Apr. 21, 2011) (failing to articulate a theory of relief independent of HIPAA). HIPAA could not exist and all of Plaintiff's claims are still viable. The same cannot be said about the cases cited by Emerson.

## CONCLUSION

For all these reasons, the Court should deny Emerson's motion to dismiss.

Dated: April 3, 2023

Respectfully submitted,

*/s/ J. Tucker Merrigan*

J. Tucker Merrigan, BBO# 681627
Thomas T. Merrigan, BBO# 343480
Erin E. McHugh, BBO# 703701
Sweeney Merrigan Law
268 Summer St. LL
Boston, MA 02210
(413) 774-5300
tucker@sweeneymerrigan.com
tom@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Foster C. Johnson (*admitted pro hac vice*)
David Warden (*admitted pro hac vice*)
Nathan Campbell (*admitted pro hac vice*)
Ahmad Zavitsanos & Mensing PLLC
1221 McKinney Street, Suite 2500
Houston, Texas 77010
(713) 655-1101
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

Seth Meyer (*admitted pro hac vice*)
Alex Dravillas (*admitted pro hac vice*)
Keller Postman LLC
150 N. Riverside Plaza
Suite 4100
Chicago, Illinois 60606
(312) 741-5220
sam@kellerpostman.com
ajd@kellerpostman.com

**COUNSEL FOR PLAINTIFF JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED**

**CERTIFICATE OF SERVICE**

I, J. Tucker Merrigan, hereby certify that on April 3, 2023, in accordance with Superior Court Rule 9A, served the Plaintiff's Opposition to Emerson's Motion to Dismiss on all counsel of record, via electronic mail to the following parties of interest:

Alan Y. Wong
awong@shb.com
Emyr Remy
remy@shb.com
SHOOK, HARDY & BACON L.L.P.
One Federal Street, Suite 2540
Boston, MA 02110
Tel: (617) 531-1411 | Fax: (617) 531-1602

Alfred J. Saikali
asaikali@shb.com
SHOOK, HARDY & BACON L.L.P.
201 South Biscayne Blvd., Suite 3200
Miami, Florida 33131
Tel: (305) 358-5171 | Fax: (305) 358-7470

Josh Becker (pro hac vice forthcoming)
jbecker@shb.com
SHOOK, HARDY & BACON L.L.P.
1230 Peachtree St., Suite 1200
Atlanta, GA 30309
Tel: (470) 867-6000 | Fax: (470) 867-6001

Michael Rayfield (pro hac vice forthcoming)
mrayfield@shb.com
SHOOK, HARDY & BACON L.L.P.
1325 Avenue of the Americas, 28th Floor
New York, NY 10019
Tel: (212) 989-8844 | Fax: (929) 501-5455

Lindsey M. Knapton (pro hac vice forthcoming)
lknapton@shb.com
SHOOK, HARDY & BACON L.L.P.
1600 17th Street, Suite 450
Denver, CO 80202
Tel: (303) 285-5300 | Fax: (303) 285-5301

*/s/ Jonathan T. Merrigan*
J. Tucker Merrigan

COMMONWEALTH OF MASSACHUSETTS

ESSEX, S.S. SUPERIOR COURT

JOHN DOE, individually and on behalf of all others similarly situated,

*Plaintiffs,*

v.

EMERSON HOSPTIAL

*Defendant.*

C.A. No. 2277CV01000

§ § § § § § § § § §

## [PROPOSED] ORDER DENYING DEFENDANT'S MOTION TO DISMISS

This case involves claims by the plaintiff and purported class members against Emerson Hospital alleging violations of their privacy rights. For the reasons stated below, the Court denies Emerson's motion to dismiss.

As to plaintiff's private cause of action alleging violations of G. L. c. 272, § 99, Emerson claims that there are insufficient allegations that it used an "intercepting device" under the Massachusetts Wiretap Act. That is incorrect. Plaintiff alleges that Emerson used the following to intercept Plaintiff's confidential medical information: Plaintiff's personal computer; Plaintiff's web browser; Plaintiff's web browser-managed files; the Meta Pixel; internet cookies; Emerson's computer servers; third-party source code (utilized by Emerson); and third-party servers. The Massachusetts Wiretap Act defines "intercepting device" as "any device or apparatus which is capable of transmitting, receiving, amplifying, or recording a wire . . . communication." G.L. c. 272, § 99B(3). The devices or apparatuses identified in Plaintiff's complaint clearly fit within this definition.

Emerson's argument that Plaintiff consented to Emerson's interception and disclosure of his private medical information when he agreed to Facebook's terms of use is without merit. Emerson improperly asks the court to make a finding of fact as to the terms of plaintiff's Facebook agreement. Additionally, Emerson's consent argument fails for other reasons.

First, "[t]he term 'interception' means to secretly hear, secretly record, or *aid another to secretly hear or secretly record* the contents of any wire or oral communication through the use of any intercepting device by any person other than a person given prior authority by all parties to such communication." G.L. c. 272, § 99(B)(4) (emphasis added). Emerson points to nothing in Facebook's terms of use that would constitute giving "prior authority" from Doe to *Emerson* to "aid [non-party advertising companies to] secretly record the contents" of Plaintiff's personal health information. *Id.*

Second, for consent to be "actual," disclosures like Facebook's terms of use must explicitly give notice of the specific practices at issue. RESTATEMENT (SECOND) OF TORTS § 892A (1979). Emerson, however, cannot point to anything in Facebook's terms of use informing its customers that their health care providers would be providing Facebook with protected health information about their doctors and medical conditions.

Third, Emerson's consent argument is inconsistent with plaintiff's allegation (which the Court must accept as true at this stage in the litigation) that Emerson promises that it would never share patients' personal information for marketing purposes without specific authorization. Fourth, the mere existence of a Facebook privacy policy does not prove that plaintiff actually knew Emerson was going to aid Facebook, or other non-parties, to secretly record Plaintiff's medical information, and "actual knowledge" of the "interception" is required to avoid a wiretapping violation. *Gilday v. Dubois*, 124 F.3d 277, 289 (1st Cir. 1997). Plaintiff alleges that Emerson secretly installed source code on its website that surreptitiously instructed his computer

browser to send Facebook and other third parties duplicate copies of his communications with Emerson. Plaintiff could not give consent to Emerson's surreptitious disclosures when Emerson never informed Plaintiff of its practices in the first place.

Finally, Emerson ignores that plaintiff's operative complaint alleges that Emerson shared his personal health information not just with Facebook, but with multiple third parties, using multiple digital tracking technologies, and Emerson offers no explanation for how Facebook's terms of use could create consent for Emerson's disclosure of plaintiff's personal health data to companies like Google.

Emerson challenges the sufficiency of plaintiff's allegations in support of his statutory invasion of privacy claim. To succeed on an invasion of privacy claim, a "plaintiff must show that there was a gathering and dissemination of information which [he contends] was private." *Nelson v. Salem State Coll.*, 446 Mass. 525, 536 (2006) (quotations omitted); *see also* G.L. c 214, § 1B ("a person shall have a right against unreasonable, substantial or serious interference with his privacy").[1] Here, plaintiff alleges that he communicated confidential medical information to Emerson via its website. This information was personal, private, and the type of information plaintiff intended to keep private. When an individual enters information about their medical condition, diagnosis, or their search for a treating physician via a hospital's public-facing website or inside a hospital's patient portal and that information contains identifying data like an individual's name, IP address, or Facebook ID, such information constitutes "Individually Identifiable Health Information" under HIPAA because it "relates" to the hospital's "provision of care" to an individual. *See* § 160.103 Definitions., 45 C.F.R. § 160.103 (defining "individually identifiable health information"). Such confidential medical information is not generally

[1] Emerson's argument that plaintiff must establish that information was "used" in an unreasonable manner to establish a statutory invasion of privacy claim is an incorrect recitation of law. The statute contains no such requirement. *See* G.L. c 214, § 1B.

available to third party data marketing companies because HIPAA forbids its disclosure to marketing companies like Facebook without express written authorization from a patient or prospective patient. *See* 45 C.F.R. § 164.508 ("Uses and disclosures for which an authorization is required"); 45 C.F.R. § 164.502 ("Uses and disclosures of protected health information: General Rules"). Plaintiff further alleges Emerson caused such confidential information to be transmitted to third parties like Facebook via the undisclosed installation of Meta Pixel on its website. These allegations are sufficient to survive a motion to dismiss.

Emerson argues that plaintiff's common law claims fail to allege any cognizable injury caused by Emerson's alleged conduct. Plaintiff specifically alleges that Emerson disclosed his medical information without authorization. Such unauthorized disclosure is a cognizable injury. *See Walker v. Boston Medical Center*, 2015 WL 9946193 at *2 (Mass. Super. Nov. 20, 2015).

Emerson argues that there are insufficient allegations to support plaintiff's unjust enrichment claim. The court concludes otherwise. To succeed on a claim for unjust enrichment, the plaintiff must show (1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge of the benefit by the defendant; and (3) that the acceptance or retention of the benefit by the defendant under circumstances which make such acceptance or retention inequitable. Emerson challenges the first and third elements. Plaintiff alleges that (1) he conferred a benefit on Emerson in the form of his shared confidential health information (incidental to his purchase of health care services) which Emerson used for its own purposes; (2) such health information has significant monetary value because there is a market for such confidential information; (3) plaintiff provided his health information to Emerson with the expectation that Emerson would protect it—as Emerson promised; and (4) Emerson provided plaintiff's health information to Facebook and others in return for advertising services or other valuable benefits. Such allegations are sufficient to show that Emerson received "a measurable

benefit." Plaintiff further alleged that: (1) Emerson expressly promised plaintiff that Emerson would protect his medical information and never share it for marketing purposes without authorization; and (2) provided such information to third parties such as Facebook while retaining all of the derived financial benefit for Emerson. These allegations are sufficient allegations of misconduct justifying restitution for unjust enrichment.

Emerson argues that it owed no fiduciary duty to plaintiff because he only alleged that he accessed Emerson's website as a member of the public. Emerson ignores key allegations found in the operative Complaint. Plaintiff alleges that he is an Emerson patient, and that Emerson disclosed information related to his medical treatment to multiple third parties without his knowledge, consent, or authorization. Plaintiff alleges that this information included the exact content of communications generated between plaintiff and Emerson solely for medical diagnosis and treatment. The communications included information about his treating doctors, conditions, treatments, appointments, search terms, bill payment, and logins to Emerson's website. These allegations are sufficient to establish that Emerson breached its fiduciary duties to him and other class members.

Emerson's argument that there are insufficient allegations of a physician-patient relationship similarly lacks merit. Plaintiff does not allege that he became a patient by accessing Emerson's website. Plaintiff is an actual patient of Emerson who, at Emerson's suggestion, has used Emerson's website. That is more than sufficient to establish that Plaintiff's interactions with Emerson's website occurred in the context of physician-patient relationship giving rise to confidentiality obligations on Emerson's part to protect against the unauthorized disclosure of those interactions and communications to tech companies. *See Doe v. Bon Secours Mercy Health*, 2021 WL 9939010, at *3 (Ohio Com.Pl. Nov. 22, 2021) ("If in fact defendant caused the disclosure of nonpublic medical information about one of its patients through the operation of its

website, its self-serving proclamation that use of the website is not part of the physician-patient relationship does not in this Court's view make it otherwise."). Plaintiff alleges that the health information disclosed by Emerson to third parties included the content of communications exchanged between himself and Emerson, including, but not limited to, information about treating doctors, medical conditions, treatments, appointments, search terms, bill payment, and logins to Emerson's website.

Likewise, Emerson's argument that as a health system (rather than an individual physician), it owes no fiduciary duties to its patients fails. A patient entrusts a hospital with the confidentiality of the patient's medical information as much as the patient entrusts an individual physician with such information. *Cf. Alberts v. Devine*, 395 Mass. 59 (1985).

Emerson alleges that there are insufficient allegations of breach of an implied contract. Plaintiff alleged that he entered an implied contract when he provided confidential medical information to Emerson in exchange for medical services, based on Emerson's implicit promises as healthcare providers to safeguard his private information from unauthorized disclosure. Plaintiff's allegations plausibly suggest that he is entitled to relief for breach of implied contract.

Emerson argues that plaintiff's claims are preempted by the Health Insurance Portability and Accountability Act ("HIPAA"). That argument ignores the basic test for preemption—whether Massachusetts's law conflicts with or is contrary to federal law. None of plaintiff's claims (e.g., the Massachusetts Wiretap Act, the statutory invasion of privacy claim, the breach of contract claim, the unjust enrichment claim, and the breach of fiduciary duty claim) conflicts with or is preempted by HIPAA.

Emerson argues that plaintiff cannot sue Emerson for violating HIPAA. That argument fails because Plaintiff is not suing under HIPAA. Plaintiff has alleged claims under Massachusetts law.

Therefore, for these reasons, and for failing to carry its burden at this stage in the litigation, Emerson's Motion to Dismiss is **DENIED.**

Dated this __________ day of ____________________, 2023.

BY THE COURT:

______________________________
Honorable Judge Presiding

COMMONWEALTH OF MASSACHUSETTS

ESSEX, ss

TRIAL COURT DEPARTMENT
SUPERIOR COURT

JOHN DOE, individually and on behalf of all other similarly situated,

Plaintiff,

v.

EMERSON HOSPITAL,

Defendant.

DOCKET NO. 2277CV01000D

**DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

A TRUE COPY, ATTEST

DEPUTY ASS'T CLERK

Defendant Emerson Hospital submits this Reply in support of its Motion to Dismiss Plaintiff's First Amended Complaint.

## I. PLAINTIFF FAILED TO PLEAD A COGNIZABLE INJURY

Plaintiff states that the alleged disclosure of his information alone is enough to establish cognizable injury.[1] To support this argument, Plaintiff cites two inapposite data breach cases involving information stolen, publicized, and used by third parties for a benefit.[2] None of that occurred here. Instead, at best, Plaintiff asserts that Meta and other parties were sent information *about his activities on Emerson's website*. Plaintiff fails to assert any *facts* in support of his claims. Nor could Plaintiff make such a claim; the only reason his information is allegedly being sent to Meta is because Plaintiff is a Facebook user who, like every Facebook user, authorized Facebook to install cookies on his device when he created a Facebook account.[3] Plaintiffs' bare allegations are insufficient to establish a cognizable injury.

## II. PLAINTIFF FAILS TO SHOW EMERSON BREACHED A FIDUCIARY DUTY

Plaintiff's claim for breach of fiduciary duty similarly fails, as Plaintiff's interactions with Emerson's website do not create a fiduciary duty. After Emerson's Motion to Dismiss was filed, the Northern District of Illinois dismissed a nearly identical claim for breach of fiduciary duty. In *Kurowski v. Rush System for Health*,[4] the plaintiff alleged that the defendant healthcare provider breached its fiduciary duty to its patients by using the same pixel technology on its website at issue in this case. The plaintiff claimed that the defendant "non-consensually and deceptively embedded third-party source code" on the hospital's website.[5] The court found that, if a physician-patient privilege applies at all, it protects "only the disclosure of 'information relating to the patient's

---

[1] Plaintiff's Opposition to Emerson's Motion to Dismiss ("Opp") at 12; *see, also, e.g.*, *Shaulis v. Nordstrom, Inc.*, 120 F. Supp. 3d 40, 52–53 (D. Mass. 2015).

[2] *Id.* (citing *Walker v. Boston Med. Ctr. Corp.* 2015 WL 9946193 (Mass. Super. Nov. 20, 2015); *Shedd v. Sturdy Mem. Hosp.* 2022 WL 1102524 (Mass. Super. Apr. 5, 2022)).

[3] *See* First Am. Compl. ¶ 103; *see also Smith v. Facebook, Inc.*, 745 F. App'x 8, *9 (9th Cir. 2018) (wherein the Court held that Facebook policies put a reasonable person on notice that "Facebook maintains the practices of (a) collecting its users' data from third-party sites and (b) later using the data for advertising purposes," and that the "[k]nowing authorization of the practice constitutes [that person's] consent.").

[4] *Kurowski v. Rush Sys. for Health*, 2023 WL 2349606 at *1–*3 (N.D. Ill. Mar. 3, 2023).

[5] *Id.* at *1.

mental or physical condition or the physician's diagnosis or treatment.'"[6] As a result, *Kurowski*, like "the overwhelming majority of the courts in the United States," held that the type of information allegedly shared when a person visits a hospital's website is not the "sort of disclosure" that violates a physician-patient privilege, and therefore there was no breach of duty.[7] The court found that the hypothetical disclosures in the complaint, including when a website visitor clicked a button to schedule an appointment, "can be made by any visitor to [the hospital's] website, whether patient or not," and thus it did not constitute a breach of confidentiality.[8] Plaintiff here similarly alleges that the duty of confidentiality arises from a physician-patient relationship.[9] Here, like in *Kurowski*, the duty of confidentiality covers "only the disclosure of 'information relating to the patient's mental or physical condition or the physician's diagnosis or treatment.'"[10] *Kurowski's* reasoning is persuasive here.

Even if Plaintiff had alleged a plausible fiduciary duty, his claim still fails because Emerson did not breach that duty. The information Plaintiff alleges Emerson disclosed is anonymous—at most, it identifies a website user's device, not the individual. As Plaintiff acknowledges, any personal identifiers are stored in third party cookies on the user's browser.[11] If there is any connection made between the allegedly disclosed information and a particular Facebook user, it is Facebook (not Emerson) that does so.[12] Thus, even if Emerson somehow had a fiduciary duty to its website visitors, Emerson did not violate that duty because the information it allegedly disclosed is anonymous and certainly not personally identifying.

## III. PLAINTIFF DID NOT PROPERLY PLEAD AN IMPLIED CONTRACT

Plaintiff cites one Massachusetts case, *Shedd v. Sturdy Memorial Hospital*[13], in support of its argument that an implied contract was formed and subsequently breached between the website

---

6 *Id.* at *13 (citation omitted).
7 *Id.* at *14 (internal quotation omitted).
8 *Id.*
9 First Am. Compl. ¶ 220.
10 *Id.* at 13.
11 *See* First Am. Compl. ¶¶ 35, 49, 70, 75.
12 *See id.* at 70.
13 *Shedd v. Sturdy Mem. Hosp.*, 2022 WL 1102524, at *9–10.

user and the Emerson website. The court in *Shedd* held that a patient can expect an implicit assurance that sensitive information will be protected, *when receiving medical care.*[14] Here, Plaintiff's allegations relate to the use of a *public facing website*. That website collects no information indicating the user is a patient. The information Plaintiff alleges was disclosed was not obtained *through medical care or treatment*. *Shedd* has no bearing here. Instead, *Kurowski* is more on point. *Kurowski* rejected the argument that the hospital breached its contract, reasoning that the hospital's contract was in regards to "care-related patient information," not the information disclosed as a result of the third-party source code.[15] The same reasoning should apply here.

Lastly, Plaintiff *still fails* to adequately allege the elements of a contract, including the essential element of consideration.[16] Without consideration, there is no contract, and therefore there can be no breach. Plaintiff's claim should therefore be dismissed.

## IV. PLAINTIFF FAILS TO STATE A CLAIM FOR UNJUST ENRICHMENT

Massachusetts defines "[u]njust enrichment . . . as 'retention of money or property of another against the fundamental principles of justice or equity and good conscience.'"[17] "To succeed on a claim for unjust enrichment, a plaintiff must show (1) a benefit conferred upon defendant by plaintiff, (2) an appreciation or knowledge by defendant of the benefit, and (3) that acceptance or retention of the benefit under the circumstances would be inequitable without payment for its value."[18]

Plaintiff's First Amended Complaint contains a fatal flaw, one which is not cured by its Opposition: he fails to adequately allege that Emerson benefitted from the "confidential" "health information" at issue, nor how it was unjust. Plaintiff's vague reference to Emerson receiving "advertising benefits" fails to sufficiently allege Emerson was "unjustly enriched." Plaintiff argues that Emerson was unjustly enriched because he conferred a benefit upon Emerson by providing

---

14 *See* Opp. at 17–18.
15 *Kurowski*, 2023 WL 2349606 at *15.
16 *Durbeck v. Suffolk Univ.*, 547 F. Supp. 3d 133, 144–45 (D. Mass. 2021) (holding that under Massachusetts law, the elements of breach of an implied contract include that the agreement was supported by consideration) (citation omitted).
17 *Koufos v. U.S. Bank, N.A.*, 939 F. Supp. 2d 40, 52 (D. Mass. 2013).
18 *Biltcliffe v. CitiMortgage, Inc.*, 952 F.Supp.2d 371, 380 (D.Mass.2013), aff'd, 772 F.3d 925 (1st Cir.2014).

the confidential health information which carries "significant monetary value."[19] Setting aside the accuracy of that description, Plaintiff does not dispute that any information he disclosed when visiting Emerson's website was voluntarily disclosed. Nor does Plaintiff allege that he expected payment or benefit in return for visiting Emerson's public website. Thus, even if Plaintiff's information supposedly "enriched" Emerson, any enrichment was not made at his expense. Nor was the alleged retention of that information "unjust." [20] Plaintiff fails to adequately plead the required elements of an unjust enrichment claim and thus it should be dismissed.

## V. PLAINTIFF FAILS TO STATE A CLAIM UNDER THE WIRETAP ACT

Plaintiff ignores the fact that the crux of the alleged interception in this case occurs by way of computer code—which does not qualify as a device or apparatus under the statute.[21] The computer and server are not making the alleged interception; and the pixel is nothing more than software *code*.

Plaintiff's reliance on *United States v. Symuszkiewicz*, is misplaced.[22] The *Symuszkiewicz* court, which involved allegations of an angered employee using his supervisor's computer to monitor emails discussing his work performance, found that computers that routed the email communication and the router that sent the emails were "devices" under the Federal Wiretap Act.[23] Plaintiff's reliance on *In re Meta Pixel Healthcare Litigation*[24] is similarly misplaced—there, the court never ruled on whether a pixel is a "device" or "apparatus." This Court should follow the overwhelming majority of courts cited in Emerson's Motion to Dismiss and hold that software, including a pixel, does not constitute a "device" or "apparatus."[25]

Plaintiff further argues that Emerson promised on its webpage that it would "never share patients' personal information for marketing purposes" without specific authorization, which

---

[19] Opp. at 13–14.

[20] *JPMorgan Chase Bank, Nat'l Ass'n v. Browning*, 230 N.C. App. 537, 542, (2013) ("More must be shown than that one party voluntarily benefited another or his property.").

[21] First Am. Compl. ¶186.

[22] *United States v. Symuszkiewicz*, 622 F.3d 701 (7th Cir. 2010).

[23] *Id.* at 702, 707.

[24] 2022 WL 17869218 (N.D. Cal. Dec.22, 2022),

[25] Motion to Dismiss at 15 (collecting cases).

Plaintiff asserts he never gave to Emerson.[26] But the policy Plaintiff cites governs medical and treatment records. It is the privacy of *those* records, *not* Emerson's *websites*, which are at issue here.[27] Conveniently, Plaintiff does not object to this exhibit. Plaintiff attempts to argue that this policy governs Emerson's practices for online medical information of its patients—but it does not. Further, Massachusetts law makes clear that there is no interception of information if the recording is *not done secretly*.[28] As a Facebook user, it is Plaintiff sharing any information with Facebook. Plaintiff is bound by his consent to any Facebook tracking activities. There is nothing secret about the sharing of Plaintiff's website activities. His Wiretap Act claim fails.

## VI. PLAINTIFF DID NOT ADEQUATELY PLEAD INVASION OF PRIVACY

Plaintiff still fails to allege that Emerson "gather[ed] and disseminat[ed]" *private*[29] or "*highly personal or intimate*"[30] information. Plaintiff's bare, unclear, and conclusory allegations are not enough to establish that his interactions with Emerson's website rise to the level required to adequately allege a claim for an invasion of privacy.[31] Plaintiff's reference to *Tower v. Hirschhorn*, where the court found that an invasion of privacy cause of action could exist when the plaintiff's doctor discussed plaintiff's medical treatment and diagnosis with two other individuals, is unavailing.[32] Here, Plaintiff has not alleged (because it is not disputed) that Plaintiff's medical records and treatment were collected. Plaintiff's claim for invasion of privacy should be dismissed.

## VII. CONCLUSION

For the foregoing reasons, Emerson respectfully requests this Court dismiss the First Amended Complaint with prejudice.

---

[26] Opp. at 6–7.
[27] Ex. 6, Motion to Dismiss.
[28] *See Marquis v. Google, Inc.* 2014 WL 4180400, at *12 (Mass. Jul. 27, 2014).
[29] *Nelson v. Sale State College*, 446 Mass. 525, 536 (2006).
[30] *Branyan v. Southwest Airlines Co.*, 105 F. Supp. 3d 120, 126 (D. Mass. 2015) (emphasis added).
[31] *See Iannacchino v. Ford Motor Co.*, 451 Mass. 623, 635 (2008).
[32] *Tower v. Hirschhorn*, 397 Mass. 581, 587 (1986).

Dated: April 24, 2023

Respectfully submitted,

**EMERSON HOSPITAL**

*/s/ Alan Y. Wong*
Alan Y. Wong (BBO# 687618)
awong@shb.com
Emyr Remy (BBO # 740156)
remy@shb.com
SHOOK, HARDY & BACON L.L.P.
One Federal Street, Suite 2540
Boston, MA 02110
Tel: (617) 531-1411 | Fax: (617) 531-1602

Tammy B. Webb (*pro hac vice* forthcoming)
tbwebb@shb.com
SHOOK, HARDY, & BACON L.L.P.
555 Mission Street, Suite 2300
San Francisco, CA 94105
Tel: (415) 544-1900 | Fax: (415) 391-0281

Alfred J. Saikali (*pro hac vice* forthcoming)
asaikali@shb.com
SHOOK, HARDY & BACON L.L.P.
201 South Biscayne Blvd., Suite 3200
Miami, Florida 33131
Tel: (305) 358-5171 | Fax: (305) 358-7470

Josh Becker (*pro hac vice* forthcoming)
jbecker@shb.com
SHOOK, HARDY & BACON L.L.P.
1230 Peachtree St., Suite 1200
Atlanta, GA 30309
Tel: (470) 867-6000 | Fax: (470) 867-6001

Michael Rayfield (*pro hac vice* forthcoming)
mrayfield@shb.com
SHOOK, HARDY & BACON L.L.P.
1325 Avenue of the Americas, 28th Floor
New York, NY 10019
Tel: (212) 989-8844 | Fax: (929) 501-5455

Lindsey M. Knapton (*pro hac vice* forthcoming)
lknapton@shb.com
SHOOK, HARDY & BACON L.L.P.
1600 17th Street, Suite 450
Denver, CO 80202
Tel: (303) 285-5300 | Fax: (303) 285-5301

## CERTIFICATE OF SERVICE

I hereby certify that on April 24, 2023, in accordance with Superior Court Rule 9A, I served DEFENDANT'S NOTICE OF FILING AND SUPERIOR COURT RULE 9A LIST OF DOCUMENTS FILED on all counsel of record, via electronic mail to the following parties of record:

J. Tucker Merrigan (BBO# 681627)
Victoria Santoro (BBO# 679120)
Erin E, McHugh (BBO# 703701)
**SWEENEY MERRIGAN LAW**
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com
*Attorneys for Plaintiff*

Foster C. Johnson (*pro hac vice forthcoming*)
David Warden (*pro hac vice forthcoming*)
Nathan Campbell (*pro hac vice forthcoming*)
**AHMAD, ZAVITSANOS & MENSING, P.C.**
1221 McKinney St., Suite 3460
Houston, TX 77010
Tel: (713) 655-1101
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com
*Attorneys for Plaintiff*

Seth Meyer (*pro hac vice forthcoming*)
Alex Dravillas (*pro hac vice forthcoming*)
**KELLER POSTMAN LLC**
150 N. Riverside Plaza, Suite 4100
Chicago, IL 60606
Tel: (312) 741-5220
sam@kellerpostman.com
adj@kellerpostman.com
*Attorney for Plaintiff*

*/s/ Alan Y. Wong*
Alan Y. Wong

18

COMMONWEALTH OF MASSACHUSETTS

ESSEX, S.S.

SUPERIOR COURT

JOHN DOE, Individually and on Behalf of All Others Similarly Situated,

*Plaintiffs,*

v.

EMERSON HOSPTIAL

*Defendant.*

C.A. No. 2277CV01000

§ § § § § § § § § §

## NOTICE OF PLAINTIFF'S MOTION TO STRIKE

The plaintiff hereby gives Notice that it has served a Motion to Strike exhibits appended to the defendant's Memorandum filed in support of the defendant's Motion to Dismiss.

On April 3, 2023, the plaintiff, pursuant to Superior Court Rule 9A(b)(2), served its Motion to Strike on all parties.

A TRUE COPY, ATTEST

DEPUTY ASST. CLERK

Dated: April 3, 2023

Respectfully submitted,

/s/ *J. Tucker Merrigan*
J. Tucker Merrigan, BBO# 681627
Thomas T. Merrigan, BBO# 343480
Erin E. McHugh, BBO# 703701
Sweeney Merrigan Law
268 Summer St. LL
Boston, MA 02210
(413) 774-5300
tucker@sweeneymerrigan.com
tom@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Foster C. Johnson (*admitted pro hac vice*)
David Warden (*admitted pro hac vice*)
Nathan Campbell (*admitted pro hac vice*)
Ahmad Zavitsanos & Mensing PLLC
1221 McKinney Street, Suite 2500
Houston, Texas 77010
(713) 655-1101
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

Seth Meyer (*admitted pro hac vice*)
Alex Dravillas (*admitted pro hac vice*)
Keller Postman LLC
150 N. Riverside Plaza
Suite 4100
Chicago, Illinois 60606
(312) 741-5220
sam@kellerpostman.com
ajd@kellerpostman.com

**COUNSEL FOR PLAINTIFF JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED**

**CERTIFICATE OF SERVICE**

I, J. Tucker Merrigan, hereby certify that on April 3, 2023, in accordance with Superior Court Rule 9A, I served the within document(s):

- Notice of Plaintiff's Motion to Strike;

and on all counsel of record, electronic mail to the following parties of interest and filed via the Court's Electronic Filing System:

Alan Y. Wong
awong@shb.com
Emyr Remy
remy@shb.com
SHOOK, HARDY & BACON L.L.P.
One Federal Street, Suite 2540
Boston, MA 02110
Tel: (617) 531-1411 | Fax: (617) 531-1602

Alfred J. Saikali
asaikali@shb.com
SHOOK, HARDY & BACON L.L.P.
201 South Biscayne Blvd., Suite 3200
Miami, Florida 33131
Tel: (305) 358-5171 | Fax: (305) 358-7470

Josh Becker (pro hac vice forthcoming)
jbecker@shb.com
SHOOK, HARDY & BACON L.L.P.
1230 Peachtree St., Suite 1200
Atlanta, GA 30309
Tel: (470) 867-6000 | Fax: (470) 867-6001

Michael Rayfield (pro hac vice forthcoming)
mrayfield@shb.com
SHOOK, HARDY & BACON L.L.P.
1325 Avenue of the Americas, 28th Floor
New York, NY 10019
Tel: (212) 989-8844 | Fax: (929) 501-5455

Lindsey M. Knapton (pro hac vice forthcoming)
lknapton@shb.com
SHOOK, HARDY & BACON L.L.P.
1600 17th Street, Suite 450
Denver, CO 80202
Tel: (303) 285-5300 | Fax: (303) 285-5301

*/s/ Jonathan T. Merrigan*
J. Tucker Merrigan

18

ESSEX, ss

COMMONWEALTH OF MASSACHUSETTS

TRIAL COURT DEPARTMENT
SUPERIOR COURT
DOCKET NO. 2277CV01000D

JOHN DOE, individually and on behalf of all other similarly situated,

Plaintiffs,

v.

EMERSON HOSPITAL,

Defendants.

A TRUE COPY, ATTEST
DEPUTY ASST. CLERK

**DEFENDANT'S OPPOSITION TO MOTION TO STRIKE OF DEFENDANT'S MATERIALS ATTACHED TO ITS MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS**

NOW COMES Defendant Emerson Hospital who submits this Opposition to Plaintiff's Motion to Strike Extraneous Materials Attached to Defendant's Memorandum submitted in Support of its Motion to Dismiss.

Plaintiff John Doe seeks to strike Defendant's Exhibits One (1) through Five (5). Exhibits One (1) and Five (5) consist of a Facebook press release and a webpage related to "Off-Facebook Activity," respectively, while Exhibits Two (2) through Four (4) consist of Facebook's Terms of Service, Privacy Policy, and Cookies Policy, respectively. As noted in Defendant's Motion to Dismiss, for ease of reference, Facebook and Meta will be used simultaneously throughout this Opposition as the two companies have merged.

**I. THIS MOTION TO STRIKE SHOULD BE DENIED AS IT IS IN VIOLATION OF RULE 9C.**

Plaintiff's Motion to Strike should be denied because it was filed in violation of this Court's local rules. Under Rule 9C(a), "each of the parties shall confer in advance of filing any motion . .

. and make a good faith effort to narrow areas of disagreement to the fullest extent." L.R. 9C(a) (emphasis supplied). This rule specifically requires a meet and confer attempt by counsel for all parties when there is a motion pursuant to Mass. R. Civ. P. 12, which includes a Motion to Strike under Mass. R. Civ. P. 12(f). *See id.* This rule is necessary to preserve both the parties' and judicial resources and to promote judicial economy.

Here, there was no attempt by Plaintiff's counsel to meet and confer prior to serving this subject Motion to Strike. As such, this Court should deny Plaintiff's Motion to Strike pursuant to Rule 9C(a).

## II. DEFENDANT SUBMITS TO EXHIBIT FIVE BEING STRICKEN FROM THE MOTION TO DISMISS

Plaintiff seeks to exclude Emerson's Exhibit Five (5), which includes a Facebook webpage related to "Off-Facebook Activity." The webpage features an article describing how users can turn off data sharing. Although this information is relevant and being used as evidentiary support in support of Emerson's Motion to Dismiss, Emerson will agree to strike Exhibit 5 in support of its Motion to Dismiss.

## III. EXHIBITS 1, 2, 3, AND 4 SHOULD NOT BE STRICKEN BECAUSE PLAINTIFF RELIED ON THEM IN FORMING HIS FIRST AMENDED COMPLAINT

Plaintiff argues that Exhibits One (1) through Four (4) should be stricken from Emerson's Motion to Dismiss because the exhibits are not attached to the First Amended Complaint and are not relied upon by Plaintiff in forming the basis of the First Amended Complaint. (Motion to Strike, pg. 2.) Exhibits One (1) through Four (4) are all documents that Plaintiff relied upon in preparing his First Amended Complaint. When a plaintiff "had notice of [] documents and relied on them in framing the complaint, the attachment of such documents to a motion to dismiss does not convert the motion to one for summary judgment." *Marram v. Kobrick Offshore Fund, Ltd.*, 442 Mass. 43,

44-45. See, e.g., *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47-48 (2d Cir. 1991), cert denied sub nom. *Cortec Indus., Inc. v. Westinghouse Credit Corp.*, 503 U.S. 960, 118 L. Ed. 2d 208, 112 S. Ct. 1561 (1992) ("Where plaintiff has actual notice of all the information in the movant's papers and has relied upon [the prospectus] in framing the complaint the necessity of translating a rule 12 [b] [6] motion into one under [Mass. R. Civ. P. 56, 365 Mass. 824 (1974),] is largely dissipated"); *In re Computervision Corp. Sec. Litig.*, 869 F. Supp. 56, 59-60 (D. Mass. 1994) (holding that court could consider prospectus, attached to defendant's motion to dismiss, without converting it to a motion summary judgment); *Doucette v. Mass. Parole Bd.*, 18 N.E.3d 1096 (Mass. App. 2014); *Polay v. McMahon*, 10 N.E.3d 1122 (Mass. 2014) (matters of public record or documents plaintiffs relied on in framing their complaint are appropriately considered on a motion to dismiss under Mass. R. Civ. P. 12(b)); *Watterson v. Page*, 987 F.2d 1,3 (1st Cir. 1993) (holding that a court may look at documents sufficiently referred to in the complaint when assessing a motion to dismiss); *Fromm v. Boston Redevelopment Auth.*, 2005 Mass. Super. LEXIS 318, at *26 (holding that the problem arises when a court reviews external documents to a complaint and the plaintiff does not have notice of these documents, but when a plaintiff has actual notice and has relied upon the documents in framing the complaint, the court may consider the external documents in considering the motion to dismiss.)

***Exhibit 1:*** Exhibit 1 is a press release issued by Meta on October 28, 2021 which explains that Facebook and its related companies will now operate under the umbrella of Meta. In Plaintiff's First Amended Complaint ("FAC"), Plaintiff pleads that Facebook is now operated by Meta Platforms, Inc. *See* FAC ¶ 44. Plaintiff clearly relied on the publicly available information that Facebook is now part of Meta in pleading this allegation.

***Exhibits 2-4:*** Exhibit 2 is Meta's Terms of Service dated July 26, 2022, which explains to its users what Meta is responsible for and what its user obligations are for continuation of the platform service; Exhibit 3 is Meta's Privacy Policy dated January 1, 2023, which describes what user information is collected by Meta, how that information is used, and how that information is shared; and Exhibit 4 is Meta's Cookies Policy dated October 5, 2022, which describes what cookies are, why cookies are used, examples of cookies on third party websites, and how users can control the use of cookies. These three exhibits are properly attached to Emerson's Motion to Dismiss and should not be stricken because they helped form the basis of Plaintiff's First Amended Complaint.

Plaintiff references Facebook and/or Meta four hundred and thirty-seven (437) times. He references seventy (70) articles throughout the footnotes, twenty-four (24) of which are Facebook and/or Meta published articles. Plaintiff discusses Facebook, Facebook's use of cookies, Facebook's practices around data privacy from paragraph eleven (11) through paragraph one hundred and fifty-four (154). That equates to one hundred and forty-three (143) paragraphs exclusively dedicated to discussing the use and practice of Facebook's privacy practices and how it utilizes user's data. Despite this, Plaintiff argues that it did not, not even once, consider Facebook's privacy policy, cookies policy, or terms of service in preparing the First Amended Complaint. (Motion to Strike, p. 2.) The First Amended Complaint makes clear, however, in one hundred and forty-three (143) paragraphs that Plaintiff relied heavily on Facebook's policies surrounding cookies, privacy, etc. Plaintiff cannot now claim it did not rely on these policies when nearly the entire First Amended Complaint is focused on Facebook's privacy practices and policies.

Further, Plaintiff explicitly references Exhibit 2 (Facebook's Terms of Service) in the First Amended Complaint at Paragraph 144. Plaintiff admits as such in its Opposition to the Motion to Dismiss. Plaintiff argues that Facebook's Terms of Service should not be considered as "integral" to the First Amended Complaint and, therefore, stricken as an exhibit, because **Plaintiff** only referenced the Terms of Service one time. This argument has no merit. The rule, and subsequent case law, does not require that the external document be mentioned a certain number of times for it to be considered as part of the First Amended Complaint. In fact, the case law does not even require that the external document be referenced explicitly in the First Amended Complaint at all. Instead, the standard is that the external document be *relied upon*. *Cortec*, 949 F.2d at 47 (italics added.) Plaintiff demonstrated his reliance by consistently referring to Facebook's privacy practice in one-hundred and forty-three (143) paragraphs of the First Amended Complaint, and by explicitly referencing Facebook's Terms and Conditions in paragraph 144. Exhibit 2 should not be stricken.

Similarly, Plaintiff relies heavily on Exhibit 3 (Facebook's Privacy Policy) in forming the basis of the First Amended Complaint. Facebook's Privacy Policy illustrates to users the type of information that is collected, how the information is collected, how the information is used, and how to control data sharing. Starting at paragraph 44 of Plaintiff's First Amended Complaint, Plaintiff describes, in pain-staking detail, in sixty (60) paragraphs, the types of information that Facebook receives, how Facebook uses this information for advertising purposes, how Facebook tracks personal data through the use of a pixel, how Facebook utilizes this process through third parties, and more. (First Amended Complaint, ¶¶ 44-104.) Plaintiff supports these allegations with seventy (70) different articles and webpages, including Facebook's articles and webpages that explain the same information that is included in Facebook's Privacy Policy. Because Facebook's

Privacy Policy forms the basis of a multitude of the allegations in the First Amended Complaint, Exhibit 3 should not be stricken.

Finally, Exhibit 4 (Facebook's Cookie Policy) should not be stricken. Plaintiff references the use of internet "cookies" thirty-nine (39) times (First Amended Complaint, ¶¶ 35-37, 39, 48, 49, 67, 70, 71, 75-78, 88, 99, 137, 186, 248) with twenty-five (25) of those times directly explicitly describing "Facebook cookies". (First Amended Complaint, ¶¶ 36, 48, 49, 67, 70, 71, 75-78, 88, 99.) Plaintiff uses three footnotes to discuss how cookies work, two of which specifically explain what Facebook cookies are and how they are used. (First Amended Complaint, n.47, n.48, and n.52.) Plaintiff cannot now seek to strike a document while simultaneously referencing the contents of that document in the First Amended Complaint. *See Golchin v. Liberty Mut. Ins. Co.*, 460 Mass. 222, 224 (2011) (finding that defendant's exhibits attached to its motion to dismiss were properly considered because these documents and the contents thereof helped form the basis of the plaintiff's complaint); *Ryan v. Mary Ann Morse Healthcare Corp.*, 483 Mass. 612, 614, n. 5 (finding document attached to defendant's motion to dismiss but not in the plaintiff's complaint was appropriately considered with the motion to dismiss as both parties knew of its existence, did not dispute what was in the document, and it was relied upon in support of the briefing); *see also, Marram v. Kobrick Offshore Fund, Ltd.*, 442 Mass. 43, 45 n.4 (2004) (because "the plaintiff had notice of these documents and relied on them in framing the complaint, the attachment of such documents to a motion to dismiss does not convert the motion to one for summary judgment, as required by Mass. R. Civ. P. 12 [b] [6], 365 Mass. 754 [1974]"); *Berkowitz v. President & Fellows of Harvard College*, 58 Mass. App. Ct. 262, 270 n.7 (2003).

This Court should reject Plaintiff's attempt to plead around the existence of Facebook's policies by failing to name them in the First Amended Complaint, all the while relying on them to

support his claims. As courts have held, a plaintiff may not escape the consequences of not attaching documents it relied upon in drafting its complaint. *See Cortec*, 949 F.2d at 47 (holding that when a plaintiff chooses not to attach to the complaint a document upon which it relies in drafting the complaint, the defendant may produce the document when attacking the complaint on a motion to dismiss because the plaintiff should not so easily be allowed to escape the consequences of its own failure.)

## IV. EXHIBITS 1 THROUGH 4 ARE COMPETENT EVIDENCE

The exhibits at issue in the Motion to Strike are competent evidence that the Court should consider when assessing Emerson's Motion to Dismiss.

Plaintiff argues that these exhibits should be disregarded because they were downloaded after the filing of Plaintiff's Amended Complaint. Plaintiff's First Amended Complaint was filed on January 30, 2023 and Emerson's Motion to Dismiss was served on February 9, 2023. Plaintiff's argument that these exhibits were downloaded after the filing of Plaintiff's First Amended Complaint has no merit. All three exhibits have effective dates prior to the filing of Plaintiff's Amended Complaint. Specifically, Exhibit 2 has an effective date of July 26, 2022, Exhibit 3 has an effective date of January 1, 2023, and Exhibit 4 has an effective date of October 5, 2022. Plaintiff's argument that Emerson does not establish these policies were effective at the time of the allegations in the Complaint is futile for multiple reasons. First, Plaintiff does not plead the date to which the allegations occurred, and Plaintiff has sued anonymously, making it impossible for Emerson to determine anything with respect to the named plaintiff. (First Amended Complaint, ¶ 103.) The only date certain that Plaintiff pleads is that Emerson allegedly first "injured" Plaintiff on October 17, 2023, a date which has not occurred. (First Amended Complaint, ¶ 3.)

Second, Plaintiff argues that Emerson did not establish that the policies were "effective policies at the time of the allegations in the complaint." (Motion to Strike, p. 4.) This argument lacks merit for several reasons. First, as discussed above, not only has Plaintiff yet to identify himself, he also fails to allege when he became a Facebook user. Without that information, it is impossible for Facebook to provide a policy "at the time of the allegations in the complaint." Plaintiff also alleges that he is a Facebook user, which Emerson assumes means that he is a *current* Facebook user, and as such the current Facebook policies would apply to him. Lastly, even if the current Facebook policy was not in effect at the time Plaintiff signed up for Facebook—Plaintiff's Motion to Strike should still be denied. Plaintiff does not claim that Facebook's privacy policies have materially differed over time. And, at any rate, the validity of the policies is only relevant to this Court's ruling on Emerson's motion to dismiss, not Plaintiff's Motion to Strike.

## V. CONCLUSION

For the foregoing reasons, Plaintiff's Motion to Strike Emerson's Exhibits 1 through 4 in support of its Motion to Dismiss should be denied. Should the Court grant Plaintiff's Motion to Strike Defendant's Materials Attached to its Motion to Dismiss, Emerson requests that this Court allow Emerson an opportunity to cure the Motion to Dismiss, especially considering Plaintiff's failure to meet and confer with Emerson prior to the filing of this motion as required by Rule 9C.

Respectfully submitted,

**EMERSON HOSPITAL**

/s/ Tammy Webb
Tammy B. Webb (*pro hac vice* forthcoming)
tbwebb@shb.com
SHOOK, HARDY, & BACON L.L.P.
555 Mission Street, Suite 2300
San Francisco, CA 94105
Tel: (415) 544-1900 | Fax: (415) 391-0281

Alan Y. Wong (BBO# 687618)
awong@shb.com
Emyr Remy (BBO # 740156)
remy@shb.com
SHOOK, HARDY & BACON L.L.P.
One Federal Street, Suite 2540
Boston, MA 02110
Tel: (617) 531-1411 | Fax: (617) 531-1602

Alfred J. Saikali (*pro hac vice* forthcoming)
asaikali@shb.com
SHOOK, HARDY & BACON L.L.P.
201 South Biscayne Blvd., Suite 3200
Miami, Florida 33131
Tel: (305) 358-5171 | Fax: (305) 358-7470

Michael Rayfield (*pro hac vice* forthcoming)
mrayfield@shb.com
SHOOK, HARDY & BACON L.L.P.
1325 Avenue of the Americas, 28th Floor
New York, NY 10019
Tel: (212) 989-8844 | Fax: (929) 501-5455

**CERTIFICATE OF SERVICE**

I hereby certify that on April 18, 2023, in accordance with Superior Court Rule 9A, I served DEFENDANT'S OPPOSITION TO MOTION TO STRIKE OF DEFENDANT'S MATERIALS ATTACHED TO ITS MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS on all counsel of record, cia electronic mail to the following parties of record:

J. Tucker Merrigan (BBO# 681627)
Victoria Santoro (BBO# 679120)
Erin E, McHugh (BBO# 703701)
**SWEENEY MERRIGAN LAW**
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com
*Attorneys for Plaintiff*

Foster C. Johnson (*pro hac vice forthcoming*)
David Warden (*pro hac vice forthcoming*)
Nathan Campbell (*pro hac vice forthcoming*)
**AHMAD, ZAVITSANOS & MENSING, P.C.**
1221 McKinney St., Suite 3460
Houston, TX 77010
Tel: (713) 655-1101
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com
*Attorneys for Plaintiff*

Seth Meyer (*pro hac vice forthcoming*)
Alex Dravillas (*pro hac vice forthcoming*)
**KELLER POSTMAN LLC**
150 N. Riverside Plaza, Suite 4100
Chicago, IL 60606
Tel: (312) 741-5220
sam@kellerpostman.com
adj@kellerpostman.com
*Attorney for Plaintiff*

*/s/ Emyr T. Remy*
Emyr T. Remy

18.6

COMMONWEALTH OF MASSACHUSETTS

ESSEX, ss

TRIAL COURT DEPARTMENT
SUPERIOR COURT

JOHN DOE, individually and on behalf of all other similarly situated,

Plaintiff,

v.

EMERSON HOSPITAL,

Defendant.

DOCKET NO. 2277CV01000D

A TRUE COPY, ATTEST
DEPUTY ASST. CLERK

**NOTICE OF FILING AND SUPERIOR COURT RULE 9A LIST OF DOCUMENTS FILED**

In accordance with Superior Court Rule 9A, the following documents, together with this Notice, have been filed with the Civil Clerk's Office:

1. Defendant Emerson Hospital's Notice of Filing and Superior Court Rule 9A List of Documents Filed;
2. Defendant Emerson Hospital's Motion to Dismiss Plaintiff's First Amended Complaint;
3. Defendant Emerson Hospital's Memorandum of Law in Support of its Motion to Dismiss the First Amended Complaint;
4. Plaintiff John Doe's Opposition to Defendant Emerson Hospital's Motion to Dismiss;
5. Defendant Emerson Hospital's Reply In Support of its Motion to Dismiss the First Amended Complaint;
6. Plaintiff John Doe's Notice of Plaintiff's Motion to Strike, Plaintiff's Motion to Strike, and Memorandum in Support of Plaintiff's Motion to Strike;

7. Defendant's Opposition to Motion to Strike of Defendant's Materials Attached to its Memorandum in Support of its Motion to Dismiss.

Dated: April 24, 2023

Respectfully submitted,

EMERSON HOSPITAL

/s/ Alan Y. Wong
Alan Y. Wong (BBO# 687618)
awong@shb.com
Emyr Remy (BBO # 740156)
remy@shb.com
SHOOK, HARDY & BACON L.L.P.
One Federal Street, Suite 2540
Boston, MA 02110
Tel: (617) 531-1411 | Fax: (617) 531-1602

Tammy B. Webb (pro hac vice forthcoming)
tbwebb@shb.com
SHOOK, HARDY, & BACON L.L.P.
555 Mission Street, Suite 2300
San Francisco, CA 94105
Tel: (415) 544-1900 | Fax: (415) 391-0281

Alfred J. Saikali (pro hac vice forthcoming)
asaikali@shb.com
SHOOK, HARDY & BACON L.L.P.
201 South Biscayne Blvd., Suite 3200
Miami, Florida 33131
Tel: (305) 358-5171 | Fax: (305) 358-7470

Josh Becker (pro hac vice forthcoming)
jbecker@shb.com
SHOOK, HARDY & BACON L.L.P.
1230 Peachtree St., Suite 1200
Atlanta, GA 30309
Tel: (470) 867-6000 | Fax: (470) 867-6001

Michael Rayfield (pro hac vice forthcoming)
mrayfield@shb.com
SHOOK, HARDY & BACON L.L.P.
1325 Avenue of the Americas, 28th Floor
New York, NY 10019
Tel: (212) 989-8844 | Fax: (929) 501-5455

Lindsey M. Knapton (pro hac vice forthcoming)
lknapton@shb.com
SHOOK, HARDY & BACON L.L.P.

DOCKET NO. 2285-CV-00056C

1600 17th Street, Suite 450
Denver, CO 80202
Tel: (303) 285-5300 | Fax: (303) 285-5301

**CERTIFICATE OF SERVICE**

I hereby certify that on April 24, 2023, in accordance with Superior Court Rule 9A, I served DEFENDANT'S NOTICE OF FILING AND SUPERIOR COURT RULE 9A LIST OF DOCUMENTS FILED on all counsel of record, via electronic mail to the following parties of record:

J. Tucker Merrigan (BBO# 681627)
Victoria Santoro (BBO# 679120)
Erin E, McHugh (BBO# 703701)
**SWEENEY MERRIGAN LAW**
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com
*Attorneys for Plaintiff*

Foster C. Johnson (*pro hac vice forthcoming*)
David Warden (*pro hac vice forthcoming*)
Nathan Campbell (*pro hac vice forthcoming*)
**AHMAD, ZAVITSANOS & MENSING, P.C.**
1221 McKinney St., Suite 3460
Houston, TX 77010
Tel: (713) 655-1101
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com
*Attorneys for Plaintiff*

Seth Meyer (*pro hac vice forthcoming*)
Alex Dravillas (*pro hac vice forthcoming*)
**KELLER POSTMAN LLC**
150 N. Riverside Plaza, Suite 4100
Chicago, IL 60606
Tel: (312) 741-5220
sam@kellerpostman.com
adj@kellerpostman.com
*Attorney for Plaintiff*

*/s/ Alan Y. Wong*
Alan Y. Wong

[illegible] the parties' submissions, including the exhibits to the defendant's motion to dismiss, and the Complaint, the motion to strike is ALLOWED insofar as it seeks to strike Exhibits 1, 2, 3, and 4. The defendant represents that it no longer objects to the court striking Exhibit 5. Therefore Exhibit 5 is stricken. Further, by agreement of the parties, Exhibit 6 shall not be stricken, so the motion is DENIED as to Exhibit 6.

Janice W. Howe, J.

# COMMONWEALTH OF MASSACHUSETTS

ESSEX, S.S. SUPERIOR COURT.

JOHN DOE, Individually and on Behalf of All Others Similarly Situated,

*Plaintiffs,*

v.

EMERSON HOSPTIAL

*Defendant.*

C.A. No. 2277CV01000

## PLAINTIFF'S MOTION TO STRIKE

Plaintiff John Doe moves to strike extraneous materials attached to the Defendant's Memorandum submitted in support of its Motion to Dismiss.

The Memorandum contains 150 pages, 18 pages of which constitute written argument. The remaining 132 pages start with a two page Affidavit of Alan Y. Wong, defendant's legal counsel. The Wong Affidavit consists of six exhibits, the first five of which Plaintiff seeks to strike.

**Exhibit 1** appears to be a copy of a Meta press release titled "Introducing Meta: A Social Technology Company" and dated October 28, 2021, accessed at https://about.fb.com/news/2021/10/facebook-company-is-now-meta/ on February 9, 2023.

**Exhibit 2** appears to be an undated copy of Meta's Terms of Service, accessed at https://www.facebook.com/legal/terms/plain_text_terms on February 7, 2023.

**Exhibit 3** appears to be a copy of Meta's Privacy Policy, effective January 1, 2023, accessed at https://mbasic.facebook.com/privacy/printable on February 7, 2023.



A TRUE COPY, ATTEST
[signature]
DEPUTY ASST. CLERK

**Exhibit 4** appears to be a copy of Meta's Cookies Policy, effective October 5, 2022, accessed at http://mbasic.facebook.com/privacy/policiesy/cookies/printable/ on February 27, 2023.

**Exhibit 5** appears to be an undated copy of the webpage titled "Off-Facebook Activity" accessed at https://www.facebook.com/off-facebook-activity on February 9, 2023.

**Exhibit 6** appears to be a copy of the Emerson Hospital Patient Privacy policy accessed at of the Emerson Hospital Patient Privacy policy accessed at https://www.emersonhospital.org/patients-visitors/patients-rights-responsiblities/patient-privacy on February 9, 2023.

Exhibits 1–5 are improperly before the court on Emerson's motion to dismiss. Plaintiff submits a memorandum in support of this motion explaining how the motion to dismiss should be decided based on the allegations in the complaint, and not with reference to extraneous evidence such as these exhibits.

Plaintiff therefore respectfully moves that Exhibits 1 through 5 attached to the Wong Affidavit be stricken.

Dated: April 3, 2023

Respectfully submitted,

*/s/ J. Tucker Merrigan*

J. Tucker Merrigan, BBO# 681627
Thomas T. Merrigan, BBO# 343480
Erin E. McHugh, BBO# 703701
Sweeney Merrigan Law
268 Summer St. LL
Boston, MA 02210
(413) 774-5300
tucker@sweeneymerrigan.com
tom@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Foster C. Johnson (*admitted pro hac vice*)
David Warden (*admitted pro hac vice*)
Nathan Campbell (*admitted pro hac vice*)
Ahmad Zavitsanos & Mensing PLLC
1221 McKinney Street, Suite 2500
Houston, Texas 77010
(713) 655-1101
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

Seth Meyer (*admitted pro hac vice*)
Alex Dravillas (*admitted pro hac vice*)
Keller Postman LLC
150 N. Riverside Plaza
Suite 4100
Chicago, Illinois 60606
(312) 741-5220
sam@kellerpostman.com
ajd@kellerpostman.com

**COUNSEL FOR PLAINTIFF JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED**

18.0

COMMONWEALTH OF MASSACHUSETTS

ESSEX, S.S.

JOHN DOE, Individually and on Behalf of All Others Similarly Situated, §
*Plaintiffs,* §
v. §
EMERSON HOSPTIAL §
*Defendant.* §

SUPERIOR COURT

C.A. No. 2277CV01000

A TRUE COPY, ATTEST
DEPUTY ASST. CLERK

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION TO STRIKE**

**I. It is improper for the Cout to consider Exhibits 1 through 5 when ruling on Emerson's motion to dismiss.**

The defendant's 12(b)(6) Motion to Dismiss appends six exhibits to its Memorandum. According to the Affidavit of Alan Y. Wong, defendant's counsel, the exhibits are offered "in support of Emerson Hospital's Motion to Dismiss the above-captioned case." Each of the defendant's exhibits is evidentiary support for the motion to dismiss, and exhibits 1 through 5 are all improper for the Court to consider at this stage in the litigation.

"In evaluating a rule 12(b)(6) motion, we take into consideration 'the allegations in the complaint, although matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint, also may be taken into account.'" *Schaer v. Brandeis Univ.*, 432 Mass. 474, 477 (2000) (quoting 5A WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 1357, at 299 (1990)); *see also Mogavero v. Elephant Biotechnologies, Inc.*, No. SUCV20173878BLS2, 2018 WL 4326367, at *2 (Mass. Super. July 16, 2018) ("[W]here a document is not attached to the complaint or explicitly incorporated by reference, a

'plaintiff's *reliance* on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion.'") (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)); *cf. Lalchandani v. Roddy*, 86 Mass. App. Ct. 819, 824 (2015) (plaintiff's complaint quoted extensively from the contract in issue).

Exhibits 1 through 5 are not attached to Plaintiff's Complaint. Nor are they relied on by Plaintiff in making his allegations against Emerson. Plaintiff's complaint includes but a single reference to Facebook's Terms of Service, buried in paragraph 144 of Plaintiff's 64-page complaint. First Am. Compl. ("Compl.") at ¶ 144 ("Two years later, Facebook made modifications to its Terms of Service, which allowed Facebook to use anything a user uploaded to its site for any purpose, at any time, even after the user ceased using Facebook. The Terms of Service also failed to provide for any way for users to completely delete their accounts. Under immense public pressure, Facebook eventually returned to its prior Terms of Service."); *contra* Mem. Law in Support of Mot. Dismiss First Am. Compl. ("Mem.") at n. 4 ("Plaintiff extensively refers to and relies upon Facebook and Meta's policies in his First Amended Complaint"). This contextual reference about Facebook's history of privacy violations is hardly "integral" to Plaintiff's allegations against Emerson. *Contra* Mem. at n. 4. Moreover, Exhibits 1 through 5 are not judicial orders, or documents found in public records (such as land deeds). Accordingly, the court is without authority to rely on them in ruling on the defendant's 12(b)(6) motion.

## II. Emerson's reliance on Massachusetts case law is misplaced.

Emerson's citation to *Marram v. Kobrick Offshore Fund, Ltd.*, 442 Mass. 43, 45 (2004), is unavailing. Mem. at n. 4. There, extraneous documents could be considered so long as "the plaintiff

had notice of the[] documents and relied on them in framing the complaint." Emerson does not establish that Plaintiff relied on Exhibits 1 through 5, its conclusory statements to the contrary.

The defendant also cites *Lalchandani v. Roddy*, 86 Mass. App. Ct. 819 (2015). *Lalchandani* stands for the proposition that: "[i]n evaluating a motion to dismiss … matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint, also may be taken into account." 86 Mass. App. Ct. at 824. Yet, the defendant fails to show that any of its exhibits qualify as "public record, orders, items appearing in the record of the case, and exhibits attached to the complaint."

Moreover, at no time in its Memorandum does Emerson argue specifically that *any* identified exhibit constitutes a document that qualifies for consideration in ruling on defendant's 12(b)(6) motion. Instead, the defendant makes cursory references to its exhibits to urge the court to make fact-finding rulings based on the exhibits. Rather than explain the application of the exhibits to its 12(b)(6) theory, the defendant leaves it to the court to figure out.

## III. Exhibits 1 through 5 are in any event incompetent evidence.

Finally, Exhibits 1 through 5 are evidentiarily incompetent. Exhibits 1 through 5 are hearsay documents, and there is an insufficient foundation to establish their authenticity. *See* MASS. RS. EVID. 801, 901. Moreover, as submitted, these exhibits are not relevant. MASS. RS. EVID. 401–402. Plaintiff's amended complaint was filed on January 30, 2023. The downloads Emerson attaches to its motion were downloaded in February 2023—after the date of the amended complaint.[1] Exhibits 2 and 5 are undated documents, so there is no apparent connection between

[1] The plaintiff's original complaint was filed on October 19, 2022; the amended complaint was filed on January 30, 2023. A reasonable reading of the plaintiff's complaint and amended complaint demonstrate that plaintiff's injuries preceded the February 2023 download dates of defendant's exhibits. Attorney Wong's Affidavit fails to connect the dates of any of the challenged

these documents and the allegations in the complaint. Although Exhibit 1, Exhibit 3, and Exhibit 4 all appear to have effective dates that pre-date the filing of the First Amended Complaint, Emerson nowhere establishes that these were the effective policies at the time of the allegations in the complaint. Without such foundation, Emerson cannot even prove that Exhibit 1 through 5 are relevant.

## Conclusion

Plaintiff respectfully asks that Emerson's Exhibits 1–5 all be striken.

exhibits to the relevant timeframes in the plaintiff's amended complaint. It is left to speculation whether the policies set forth in the exhibits are the same that plaintiff litigates in this proceeding.

Dated: April 3, 2023

Respectfully submitted,

*/s/ J. Tucker Merrigan*

J. Tucker Merrigan, BBO# 681627
Thomas T. Merrigan, BBO# 343480
Erin E. McHugh, BBO# 703701
Sweeney Merrigan Law
268 Summer St. LL
Boston, MA 02210
(413) 774-5300
tucker@sweeneymerrigan.com
tom@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Foster C. Johnson (*admitted pro hac vice*)
David Warden (*admitted pro hac vice*)
Nathan Campbell (*admitted pro hac vice*)
Ahmad Zavitsanos & Mensing PLLC
1221 McKinney Street, Suite 2500
Houston, Texas 77010
(713) 655-1101
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

Seth Meyer (*admitted pro hac vice*)
Alex Dravillas (*admitted pro hac vice*)
Keller Postman LLC
150 N. Riverside Plaza
Suite 4100
Chicago, Illinois 60606
(312) 741-5220
sam@kellerpostman.com
ajd@kellerpostman.com

**COUNSEL FOR PLAINTIFF JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED**

## CERTIFICATE OF SERVICE

I, J. Tucker Merrigan, hereby certify that on April 3, 2023, in accordance with Superior Court Rule 9A, I served the within document(s):

- Notice of Plaintiff's Motion to Strike;
- Plaintiff's Motion to Strike;
- Memorandum in Support of Plaintiff's Motion to Strike;

on all counsel of record, via electronic mail to the following parties of interest:

Alan Y. Wong
awong@shb.com
Emyr Remy
remy@shb.com
SHOOK, HARDY & BACON L.L.P.
One Federal Street, Suite 2540
Boston, MA 02110
Tel: (617) 531-1411 | Fax: (617) 531-1602

Alfred J. Saikali
asaikali@shb.com
SHOOK, HARDY & BACON L.L.P.
201 South Biscayne Blvd., Suite 3200
Miami, Florida 33131
Tel: (305) 358-5171 | Fax: (305) 358-7470

Josh Becker (pro hac vice forthcoming)
jbecker@shb.com
SHOOK, HARDY & BACON L.L.P.
1230 Peachtree St., Suite 1200
Atlanta, GA 30309
Tel: (470) 867-6000 | Fax: (470) 867-6001

Michael Rayfield (pro hac vice forthcoming)
mrayfield@shb.com
SHOOK, HARDY & BACON L.L.P.
1325 Avenue of the Americas, 28th Floor
New York, NY 10019
Tel: (212) 989-8844 | Fax: (929) 501-5455

Lindsey M. Knapton (pro hac vice forthcoming)
lknapton@shb.com
SHOOK, HARDY & BACON L.L.P.
1600 17th Street, Suite 450
Denver, CO 80202
Tel: (303) 285-5300 | Fax: (303) 285-5301

*<u>/s/ Jonathan T. Merrigan</u>*
J. Tucker Merrigan

Motion is ALLOWED. Janice W. Howe, J.

COMMONWEALTH OF MASSACHUSETTS

ESSEX, S.S. SUPERIOR COURT

JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,

Plaintiff

v.

EMERSON HOSPITAL,

Defendant.

§ § § § § § § § § § § § § §

C.A. No. 2277CV01000

A TRUE COPY, ATTEST
DEPUTY ASS'T. CLERK

**MOTION FOR ADMISSION PRO HAC VICE**

Jonathan Tucker Merrigan, a member in good standing in the bar of this Court, as provided in the Local Rules, respectfully moves for the admission *pro hac vice* of Sara Aguiniga, for the purposes of entering an appearance on behalf of John Doe individually and on behalf of all others similarly situated. In support of this motion, the undersigned counsel states as follows:

1. I am a member in good standing of the bar of this Court and have filed an appearance in the above-captioned action.
2. I move for the admission *pro hac vice* of Sara Aguiniga to appear before this Court as co-counsel for the plaintiffs in the above captioned case.
3. As evidenced by her Affidavit attached, Ms. Aguinia is licensed to practice law in the District of Columbia. She is familiar with the local rules of this Court.

WHEREFORE, Johnathan Tucker Merrigan respectfully requests that this Honorable Court grant leave for Sara Aguiniga to be admitted *pro hac vice* to appear on behalf of John Doe and all other similarly situated plaintiffs in this action.

*/s/ Jonathan T. Merrigan*
J. Tucker Merrigan, BBO #681627
**Sweeney Merrigan Law, LLP**
268 Summer Street, LL
Boston, MA 02210
Tel.: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com

Dated: May 12, 2023

COMMONWEALTH OF MASSACHUSETTS

ESSEX, S.S. SUPERIOR COURT

| | | |
|---|---|---|
| JOHN DOE,<br>INDIVIDUALLY AND ON<br>BEHALF OF ALL OTHERS SIMILARLY<br>SITUATED,<br><br>Plaintiff<br><br>v.<br><br>EMERSON HOSPITAL,<br><br>Defendant. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | C.A. No. 2277CV01000 |

A TRUE COPY, ATTEST
DEPUTY ASST CLERK

## AFFIDAVIT OF SARA AGUINIGA

I, Sara Aguiniga state and depose as follows:

1. I am an attorney licensed to practice in the District of Columbia.
2. I am an attorney at Keller Postman, 1100 Vermont Avenue, N.W., 12th Floor, Washington, District of Columbia 20005. The phone number is (202) 918-1123.
3. I was admitted to practice law in the District of Columbia in December of 2015. My Bar Number is 1029692, and I am duly licensed and a member of good standing.
4. I have never been suspended or disbarred in my jurisdiction.
5. I am familiar with the Local Rules in Massachusetts.
6. If the Court allows the Motion for me to appear *pro hac vice* in this matter, I will represent the Plaintiffs in this proceeding until the final determination thereof, and with reference to all matters, incidents, or proceedings, I agree that I shall be subject to the orders and the disciplinary action and the civil jurisdiction of this Court in all respects as if I were admitted.

Signed under the pains and penalties of perjury this 9 day of May, 2023.

Sara Aguiniga, Esq.

Please note that ONLY THIS FORM, FILLED OUT ON THE WEBSITE, WILL BE ACCEPTED. Handwritten, annotated, copied, scanned or modified forms will be returned

# BOARD OF BAR OVERSEERS

## REGISTRATION STATEMENT FOR *PRO HAC VICE* ATTORNEYS

Attorney name (first MI last, suffix): **Sara D. Aguiniga**
Email address: **sara.aguiniga@kellerpostman.com**
Complete Business/Mailing Address:

**Sara D. Aguiniga**
**Keller Postman**
**1100 Vermont Avenue, N.W., 12th Floor**
**Washington, District of Columbia, 20005**

Board of Bar Overseers
Administrative Use Only

Date Received: 05-15-23
Amount Paid: $355.00
Date confirmation mailed: 05-15-23

Business phone: **(202) 918-1123**

Court in which pro hac vice admission is sought: **Essex Superior Court**

Contact number for court: **(978) 242-1900**

Party to be represented: **John Doe, Individually and on Behalf of All Others Similarly Situated**

Docket number of case (if available): **2277CV01000**

Jurisdictions to which you have been admitted: (Use second page for additional jurisdictions.)

| Type | Jurisdiction | License number |
|---|---|---|
| **State** | **District of Columbia** | **1029692** |

RECEIVED
MAY 15 2023
Massachusetts Board of Bar Overseers Registration Dept.

I certify that (check one): ( ) the party I am representing in the case for which I am seeking pro hac vice admission is an indigent client, and I understand that no pro hac vice fee is due, or (☑) I have included the required pro hac vice fee.

Further, I certify, under the pains and penalties of perjury, that I am admitted to practice and in good standing in every jurisdiction where I am admitted, and I acknowledge that I am subject to discipline by the Massachusetts Supreme Judicial Court and the Board of Bar Overseers. I understand I am limited in my legal practice in Massachusetts to the case identified above.

I certify the information I have supplied the Board of Bar Overseers is true and complete.

[signature]

**Signature** (Please sign inside box above.)

Date: May 9, 2023

Sign, print and mail original form to: Board of Bar Overseers, 99 High Street, 2nd Floor, Boston, MA 02110-2320

**Jurisdictions continued:**

**Sara D. Aguiniga**

| Type | Jurisdiction | License number |
|---|---|---|

Please remember to sign and date first page and mail original form to: Board of Bar Overseers, 99 High Street, 2nd Floor, Boston, MA 02110-2320

COMMONWEALTH OF MASSACHUSETTS

ESSEX, S.S. SUPERIOR COURT

| | | |
|---|---|---|
| JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, Plaintiff | § | C.A. No. 2277CV01000 |
| v. | § | |
| EMERSON HOSPITAL, Defendant. | § | |

**AFFIDAVIT IN COMPLIANCE WITH SUPERIOR COUR RULE 9A**

I, J. Tucker Merrigan, hereby depose and say the following:

1. I am an attorney at the law firm of Sweeney Merrigan Law, LLP, 268 Summer Street, LL, Boston, Massachusetts 02210;
2. On May 12, 2023, I emailed a copy of the within, *Motions for Pro Hac Vice* of Sara Aguiniga;
3. On May 15, 2023, defense counsel indicated via email that they have no opposition to the *Motion for Pro Hac Vice of Sara Aguiniga*; and
4. The original pleadings are now being filed with the Court.

Signed under the penalties of perjury this 31st day of May 2023.

*/s/ J. Tucker Merrigan*
J. Tucker Merrigan

A TRUE COPY, ATTEST
DEPUTY ASST. CLERK

COMMONWEALTH OF MASSACHUSETTS

ESSEX, S.S. SUPERIOR COURT

| | | |
|---|---|---|
| JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | § | C.A. No. 2277CV01000 |
| Plaintiff | § | |
| v. | § | A TRUE COPY, ATTEST<br>DEPUTY ASST. CLERK |
| EMERSON HOSPITAL, | § | |
| Defendant. | § | |

**RULE 9A NOTICE OF FILING AND LISTING OF DOCUMENTS**

I, J. Tucker Merrigan, one of the counsel for Plaintiff, John Doe, Individually and on Behalf of All Others Similarly Situated, hereby state that the following list of documents have been submitted for filing with the Court pursuant to Superior Court Rule 9A:

1. Motion for Admission Pro Hac Vice of Sara Aguiniga, with accompanying Affidavit; and
2. Affidavit in Compliance with Superior Court Rule 9A.

Respectfully Submitted
The Plaintiffs
By their Attorney,

*/s/ J. Tucker Merrigan*

J. Tucker Merrigan, BBO# 681627
**SWEENEY MERRIGAN LAW, LLP**
268 Summer Street, LL
Boston, MA 02210
Phone: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com

Dated: May 31, 2023

**CERTIFICATE OF SERVICE**

I, J. Tucker Merrigan, hereby certify that on May 12, 2023, in accordance with Superior Court Rule 9A, I served the within document(s):

- Motion for Admission Pro Hac Vice of Sara Aguiniga, with accompanying Affidavit;

on all counsel of record, via electronic mail to the following parties of interest:

Alan Y. Wong, Esq.
Emyr Remy, Esq.
Shook, Hardy & Bacon, LLP
One Federal Street, Suite 2540
Boston, MA 02110
awong@shb.com
remy@shb.com

Alfred J. Saikali
SHOOK, HARDY & BACON L.L.P.
201 South Biscayne Blvd., Suite 3200
Miami, Florida 33131
asaikali@shb.com

Josh Becker
SHOOK, HARDY & BACON L.L.P.
1230 Peachtree St., Suite 1200
Atlanta, GA 30309
jbecker@shb.com

Michael Rayfield (pro hac vice forthcoming)
SHOOK, HARDY & BACON L.L.P.
1325 Avenue of the Americas, 28th Floor
New York, NY 10019
mrayfield@shb.com

Lindsey M. Knapton (pro hac vice forthcoming)
SHOOK, HARDY & BACON L.L.P.
1600 17th Street, Suite 450
Denver, CO 80202
lknapton@shb.com

A TRUE COPY, ATTEST
DEPUTY ASS'T. CLERK

*/s/ Jonathan T. Merrigan*
J. Tucker Merrigan

**CERTIFICATE OF SERVICE**

I, J. Tucker Merrigan, hereby certify that on May 31, 2023, in accordance with Superior Court Rule 9A, I served the within document(s):

1. *Affidavit in Compliance with Superior Court Rule 9A; and*

2. *Rule 9A Notice of Filing and Listing of Documents,*

on all counsel of record, via electronic mail to the following parties of interest:

Alan Y. Wong, Esq.
Emyr Remy, Esq.
Shook, Hardy & Bacon, LLP
One Federal Street, Suite 2540
Boston, MA 02110
awong@shb.com
remy@shb.com

Alfred J. Saikali
SHOOK, HARDY & BACON L.L.P.
201 South Biscayne Blvd., Suite 3200
Miami, Florida 33131
asaikali@shb.com

Josh Becker
SHOOK, HARDY & BACON L.L.P.
1230 Peachtree St., Suite 1200
Atlanta, GA 30309
jbecker@shb.com

Michael Rayfield (pro hac vice forthcoming)
SHOOK, HARDY & BACON L.L.P.
1325 Avenue of the Americas, 28th Floor
New York, NY 10019
mrayfield@shb.com

Lindsey M. Knapton (pro hac vice forthcoming)
SHOOK, HARDY & BACON L.L.P.
1600 17th Street, Suite 450
Denver, CO 80202
lknapton@shb.com

*/s/ Jonathan T. Merrigan*
J. Tucker Merrigan

Date Filed 6/5/2023 2:26 PM
Superior Court - Essex
Docket Number 2277CV01000


COMMONWEALTH OF MASSACHUSETTS

ESSEX, ss

TRIAL COURT DEPARTMENT
SUPERIOR COURT
DOCKET NO. 2277CV01000D

JOHN DOE, individually and on behalf of all other similarly situated,

Plaintiffs,

v.

EMERSON HOSPITAL,

Defendants.

A TRUE COPY, ATTEST
DEPUTY ASS'T. CLERK

7/27/23 Allowed Barrett J.

**ASSENTED-TO MOTION FOR LEAVE TO ADMIT**
**ALFRED J. SAIKALI *PRO HAC VICE***

Defendant, Emerson Hospital, by and through its attorney of record, Emyr T. Remy, hereby moves this court pursuant to G.L. c. 221, § 46A for an Order admitting Alfred J. Saikali *pro hac vice* for the purpose of appearing and practicing in the above-captioned matter. In support of this motion, Emyr T. Remy states as follows:

1. I am counsel of record for Emerson Hospital in this matter, and I am a member in good standing of the bar of this court;

2. Attorney Saikali possesses detailed knowledge of specific relevant issues that will be invaluable in connection with the representation of Emerson Hospital in this matter.

3. The Declaration of Alfred J. Saikali is attached hereto as **Exhibit A**, indicating that (1) he is a member in good standing in every jurisdiction in which he is admitted to practice, (2) there are no disciplinary proceedings against him as a member of the bar in any jurisdiction,

and (3) the jurisdictions in which Attorney Saikali is admitted grant like *pro hac vice* privileges to members of the bar of the Commonwealth of Massachusetts; and

4. The required *pro hac vice* fee of $355 has been sent to the Board of Bar Overseers in accordance with SJC Rule 3:15. Proof of payment is attached hereto as **Exhibit B.**

WHEREFORE, Defendant, Emerson Hospital respectfully requests that the court grant leave for Alfred J. Saikali to appear and practice *pro hac vice* in the above-captioned matter.

Dated: June 5, 2023

Respectfully submitted,

EMERSON HOSPITAL

By its attorneys,

*/s/Emyr T. Remy*
Emyr T. Remy, BBO# 704156
Shook, Hardy & Bacon L.L.P.
One Federal Street, Suite 2540
Boston, MA 02110
Tel.: (617) 531-1411
remy@shb.com

**RULE 9C CERTIFICATE OF CONFERENCE WITH COUNSEL**

Pursuant to Superior Court Rule 9C(a), Defendants' counsel have conferred with Plaintiffs' counsel, and Plaintiffs do not oppose this Motion.

*/s/ Emyr T. Remy*
Emyr T. Remy

DOCKET NO. 2277CV01000D

**CERTIFICATE OF SERVICE**

I hereby certify that on June 5, 2023, the foregoing was filed via the Court's Electronic Filing System. Notice of this filing will be sent by operation of the Court's Electronic Filing System to all parties of record:

J. Tucker Merrigan (BBO# 681627)
Victoria Santoro (BBO# 679120)
Erin E, McHugh (BBO# 703701)
**SWEENEY MERRIGAN LAW**
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com
*Attorneys for Plaintiff*

Foster C. Johnson (*pro hac vice forthcoming*)
David Warden (*pro hac vice forthcoming*)
Nathan Campbell (*pro hac vice forthcoming*)
**AHMAD, ZAVITSANOS & MENSING, P.C.**
1221 McKinney St., Suite 3460
Houston, TX 77010
Tel: (713) 655-1101
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com
*Attorneys for Plaintiff*

Seth Meyer (*pro hac vice forthcoming*)
Alex Dravillas (*pro hac vice forthcoming*)
**KELLER POSTMAN LLC**
150 N. Riverside Plaza, Suite 4100
Chicago, IL 60606
Tel: (312) 741-5220
sam@kellerpostman.com
adj@kellerpostman.com
*Attorney for Plaintiff*

*/s/ Emyr T. Remy*
Emyr T. Remy

# Exhibit A

COMMONWEALTH OF MASSACHUSETTS

ESSEX, ss

TRIAL COURT DEPARTMENT
SUPERIOR COURT
DOCKET NO. 2277CV01000D

JOHN DOE, individually and on behalf of all other similarly situated,

Plaintiffs,

v.

EMERSON HOSPITAL,

Defendants.

**DECLARATION OF ALFRED J. SAIKALI**

I, Alfred J. Saikali, depose and state as follows:

1. I am an attorney with the law firm of Shook, Hardy, and Bacon LLP 201 South Biscayne Blvd., Suite 3200, Miami, FL 33131. I make this affidavit in support of my petition to be admitted *pro hac vice* as counsel to Emerson Hospital in this action.

2. I am an active member in good standing and currently eligible to practice law in the following jurisdictions:

| Jurisdiction | Year Admitted | Bar No. |
|---|---|---|
| Florida | 1999 | 0178195 |
| USDC for the Middle District of Florida | 2001 | 0178195 |
| USDC for the Southern District of Florida | 2001 | |
| Eleventh Circuit Court of Appeals | 2011 | |
| Supreme Court of the United States | 2010 | |

3. There are no disciplinary proceedings pending against me as a member of the bar in any jurisdiction.

4. I am informed and believe that the bars of which I am a member grant like *pro hac vice* privileges to members of the bar of the Commonwealth of Massachusetts.

WHEREFORE, I respectfully request that I be admitted *pro hac vice* to act as counsel for Defendant Emerson Hospital for all purposes in this action.

Signed under the pains and penalties of perjury this 5th day of June 2023.

/s/ Alfred J. Saikali
Alfred J. Saikali

# Exhibit B

Please note that ONLY THIS FORM FILLED OUT ON THE WEBSITE WILL BE ACCEPTED. Handwritten, annotated, copied, scanned or modified forms will be returned.

# BOARD OF BAR OVERSEERS

## REGISTRATION STATEMENT FOR *PRO HAC VICE* ATTORNEYS

Attorney name (first MI last, suffix): **Alfred J. Saikali**
Email address: **ASAIKALI@shb.com**
Complete Business/Mailing Address:

**Alfred J. Saikali**
**Shook, Hardy & Bacon**
**201 South Biscayne Blvd., Suite 3200**
**Miami, FL 33131**

Board of Bar Overseers
Administrative Use Only

Date Received: 05-09-23
Amount Paid: $355.00
Date confirmation mailed: 05-09-23

Business phone: **(305) 960-6923**

RECEIVED
MAY 9 - 2023
Massachusetts Board of Bar Overseers Registration Dept.

Court in which pro hac vice admission is sought: **Essex County Superior Court**

Contact number for court: **(978)242-1900**

Party to be represented: **Emerson Hospital**

Docket number of case (if available): **2277CV01000**

Jurisdictions to which you have been admitted: (Use second page for additional jurisdictions.)

| Type | Jurisdiction | License number |
|---|---|---|
| State | Florida | 0178195 |
| Federal | U.S. District Court, Middle District of Florida | 0178195 |
| Federal | United States District Court for the Southern District of Florida | |
| Federal | Eleventh Circuit Court of Appeals | |
| Federal | Supreme Court of the United States | |

I certify that (check one): ( ) the party I am representing in the case for which I am seeking pro hac vice admission is an indigent client, and I understand that no pro hac vice fee is due, or ( ☑ ) I have included the required pro hac vice fee.
Further, I certify, under the pains and penalties of perjury, that I am admitted to practice and in good standing in every jurisdiction where I am admitted, and I acknowledge that I am subject to discipline by the Massachusetts Supreme Judicial Court and the Board of Bar Overseers. I understand I am limited in my legal practice in Massachusetts to the case identified above.

I certify the information I have supplied the Board of Bar Overseers is true and complete.

[signature]

Signature (Please sign inside box above.) Date: 4/27/23

Sign, print and mail original form to: Board of Bar Overseers, 99 High Street, 2nd Floor, Boston, MA 02110-2320

PHC-125

COMMONWEALTH OF MASSACHUSETTS

ESSEX, ss

TRIAL COURT DEPARTMENT
SUPERIOR COURT
DOCKET NO. 2277CV01000D

JOHN DOE, individually and on behalf of all other similarly situated,

Plaintiffs,

v.

EMERSON HOSPITAL,

Defendants.

A TRUE COPY, ATTEST
DEPUTY ASST. CLERK

**ASSENTED-TO MOTION FOR LEAVE TO ADMIT**
**JENN O. HATCHER *PRO HAC VICE***

Defendant, Emerson Hospital, by and through its attorney of record, Emyr T. Remy, hereby moves this court pursuant to G.L. c. 221, § 46A for an Order admitting Jenn O. Hatcher *pro hac vice* for the purpose of appearing and practicing in the above-captioned matter. In support of this motion, Emyr T. Remy states as follows:

1. I am counsel of record for Emerson Hospital in this matter, and I am a member in good standing of the bar of this court;

2. Attorney Hatcher possesses detailed knowledge of specific relevant issues that will be invaluable in connection with the representation of Emerson Hospital in this matter.

3. The Declaration of Jenn O. Hatcher is attached hereto as **Exhibit A**, indicating that (1) she is a member in good standing in every jurisdiction in which she is admitted to practice, (2) there are no disciplinary proceedings against her as a member of the bar in any

7/27/23 Allowed Barrett J.

jurisdiction, and (3) the jurisdictions in which Attorney Hatcher is admitted grant like *pro hac vice* privileges to members of the bar of the Commonwealth of Massachusetts; and

4. The required *pro hac vice* fee of $355 has been sent to the Board of Bar Overseers in accordance with SJC Rule 3:15. Proof of payment is attached hereto as **Exhibit B**.

WHEREFORE, Defendant, Emerson Hospital respectfully requests that the court grant leave for Jenn O. Hatcher to appear and practice *pro hac vice* in the above-captioned matter.

Dated: June 5, 2023

Respectfully submitted,

EMERSON HOSPITAL

By its attorneys,

*/s/Emyr T. Remy*
Emyr T. Remy, BBO# 704156
Shook, Hardy & Bacon L.L.P.
One Federal Street, Suite 2540
Boston, MA 02110
Tel.: (617) 531-1411
remy@shb.com

**RULE 9C CERTIFICATE OF CONFERENCE WITH COUNSEL**

Pursuant to Superior Court Rule 9C(a), Defendants' counsel have conferred with Plaintiffs' counsel, and Plaintiffs do not oppose this Motion.

*/s/ Emyr T. Remy*
Emyr T. Remy

DOCKET NO. 2277CV01000D

**CERTIFICATE OF SERVICE**

I hereby certify that on June 5, 2023, the foregoing was filed via the Court's Electronic Filing System. Notice of this filing will be sent by operation of the Court's Electronic Filing System to all parties of record:

J. Tucker Merrigan (BBO# 681627)
Victoria Santoro (BBO# 679120)
Erin E, McHugh (BBO# 703701)
**SWEENEY MERRIGAN LAW**
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com
*Attorneys for Plaintiff*

Foster C. Johnson (*PHV24076463TX*)
David Warden (*PHV20856750TX*)
Nathan Campbell (*PHV24097455TX*)
**AHMAD, ZAVITSANOS & MENSING, P.C.**
1221 McKinney St., Suite 3460
Houston, TX 77010
Tel: (713) 655-1101
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com
*Attorneys for Plaintiff*

Seth Meyer (*PHV5191283NY*)
Alex Dravillas (*PHV6299686IL*)
**KELLER POSTMAN LLC**
150 N. Riverside Plaza, Suite 4100
Chicago, IL 60606
Tel: (312) 741-5220
sam@kellerpostman.com
adj@kellerpostman.com
*Attorney for Plaintiff*

*/s/ Emyr T. Remy*
Emyr T. Remy

# Exhibit A

COMMONWEALTH OF MASSACHUSETTS

ESSEX, ss

TRIAL COURT DEPARTMENT
SUPERIOR COURT
DOCKET NO. 2277CV01000D

JOHN DOE, individually and on behalf of all other similarly situated,

Plaintiffs,

v.

EMERSON HOSPITAL,

Defendants.

**DECLARATION OF JENN O. HATCHER**

I, Jenn O. Hatcher, depose and state as follows:

1. I am an attorney with the law firm of Shook, Hardy and Bacon LLP, 2555 Grand Blvd., Kansas City, MO 64108. I make this affidavit in support of my petition to be admitted *pro hac vice* as counsel to Emerson Hospital in this action.

2. I am an active member in good standing and currently eligible to practice law in the following jurisdictions:

| Jurisdiction | Year Admitted | Bar No. |
|---|---|---|
| Missouri | 2017 | 69742 |
| Nevada | 2016 | 14248 |

3. There are no disciplinary proceedings pending against me as a member of the bar in any jurisdiction.

4. I am informed and believe that the bars of which I am a member grant like *pro hac vice* privileges to members of the bar of the Commonwealth of Massachusetts.

WHEREFORE, I respectfully request that I be admitted *pro hac vice* to act as counsel for Defendant Emerson Hospital for all purposes in this action.

Signed under the pains and penalties of perjury this 5th day of June 2023.

*/s/ Jenn O. Hatcher*
Jenn O. Hatcher

# Exhibit B

Please note that ONLY THIS FORM, FILLED OUT ON THE WEBSITE, WILL BE ACCEPTED. Handwritten, annotated, copied, scanned or modified forms will be returned.

# BOARD OF BAR OVERSEERS

## REGISTRATION STATEMENT FOR *PRO HAC VICE* ATTORNEYS

Attorney name (first MI last, suffix): Jenn O. Hatcher
Email address: jhatcher.com
Complete Business/Mailing Address:

Jenn O. Hatcher
Shook, Hardy and Bacon LLP
2555 Grand Blvd.
Kansas City, MO 64108

Board of Bar Overseers
Administrative Use Only

Date Received: 05-01-23
Amount Paid: $355.00
Date confirmation mailed: 05-01-23

Business phone: (816) 559-0306

RECEIVED
MAY 1 - 2023
Massachusetts Board of Bar Overseers Registration Dept.

Court in which pro hac vice admission is sought: Essex County Superior Court

Contact number for court: (978)242-1900

Party to be represented: Emerson Hospital

Docket number of case (if available): 2277CV01000

Jurisdictions to which you have been admitted: (Use second page for additional jurisdictions.)

| Type | Jurisdiction | License number |
|---|---|---|
| State | Missouri | 69742 |
| State | Nevada | 14248 |

I certify that (check one): ( ☐ ) the party I am representing in the case for which I am seeking pro hac vice admission is an indigent client, and I understand that no pro hac vice fee is due, or ( ☑ ) I have included the required pro hac vice fee.

Further, I certify, under the pains and penalties of perjury, that I am admitted to practice and in good standing in every jurisdiction where I am admitted, and I acknowledge that I am subject to discipline by the Massachusetts Supreme Judicial Court and the Board of Bar Overseers. I understand I am limited in my legal practice in Massachusetts to the case identified above.

I certify the information I have supplied the Board of Bar Overseers is true and complete.

JHatcher

Signature (Please sign inside box above.)

Date: 4/19/23

Sign, print and mail original form to: Board of Bar Overseers, 99 High Street, 2nd Floor, Boston, MA 02110-2320

PHC-125

**COMMONWEALTH OF MASSACHUSETTS**

**ESSEX, ss**

**TRIAL COURT DEPARTMENT**
**SUPERIOR COURT**
**DOCKET NO. 2277CV01000D**

JOHN DOE, individually and on behalf of all other similarly situated,

Plaintiffs,

v.

EMERSON HOSPITAL,

Defendants.

A TRUE COPY, ATTEST
DEPUTY ASS'T. CLERK

**ASSENTED-TO MOTION FOR LEAVE TO ADMIT**
**JESSICA N. WAHL *PRO HAC VICE***

Defendant, Emerson Hospital, by and through its attorney of record, Emyr T. Remy, hereby moves this court pursuant to G.L. c. 221, § 46A for an Order admitting Jessica N. Wahl *pro hac vice* for the purpose of appearing and practicing in the above-captioned matter. In support of this motion, Emyr T. Remy states as follows:

1. I am counsel of record for Emerson Hospital in this matter, and I am a member in good standing of the bar of this court;

2. Attorney Wahl possesses detailed knowledge of specific relevant issues that will be invaluable in connection with the representation of Emerson Hospital in this matter.

3. The Declaration of Jessica N. Wahl is attached hereto as **Exhibit A**, indicating that (1) she is a member in good standing in every jurisdiction in which she is admitted to practice, (2) there are no disciplinary proceedings against her as a member of the bar in any

3/21/23 Allowed Barrett J.

jurisdiction, and (3) the jurisdictions in which Attorney Wahl is admitted grant like *pro hac vice* privileges to members of the bar of the Commonwealth of Massachusetts; and

4. The required *pro hac vice* fee of $355 has been sent to the Board of Bar Overseers in accordance with SJC Rule 3:15. Proof of payment is attached hereto as **Exhibit B.**

WHEREFORE, Defendant, Emerson Hospital respectfully requests that the court grant leave for Jessica N. Wahl to appear and practice *pro hac vice* in the above-captioned matter.

Dated: June 5, 2023

Respectfully submitted,

EMERSON HOSPITAL

By its attorneys,

*/s/ Emyr T. Remy*
Emyr T. Remy (BBO# 740156)
SHOOK, HARDY & BACON L.L.P
One Federal St., Suite 2540
Boston, MA 02110
Telephone: (617) 531-1677
remy@shb.com

**RULE 9C CERTIFICATE OF CONFERENCE WITH COUNSEL**

Pursuant to Superior Court Rule 9C(a), Defendants' counsel have conferred with Plaintiffs' counsel, and Plaintiffs do not oppose this Motion.

*/s/ Emyr T. Remy*
Emyr T. Remy

DOCKET NO. 2277CV01000D

**CERTIFICATE OF SERVICE**

I hereby certify that on June 5, 2023, the foregoing was filed via the Court's Electronic Filing System. Notice of this filing will be sent by operation of the Court's Electronic Filing System to all parties of record:

J. Tucker Merrigan (BBO# 681627)
Victoria Santoro (BBO# 679120)
Erin E, McHugh (BBO# 703701)
**SWEENEY MERRIGAN LAW**
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com
*Attorneys for Plaintiff*

Foster C. Johnson (*PHV24076463TX*)
David Warden (*PHV20856750TX*)
Nathan Campbell (*PHV24097455TX*)
**AHMAD, ZAVITSANOS & MENSING, P.C.**
1221 McKinney St., Suite 3460
Houston, TX 77010
Tel: (713) 655-1101
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com
*Attorneys for Plaintiff*

Seth Meyer (*PHV5191283NY*)
Alex Dravillas (*PHV6299686IL*)
**KELLER POSTMAN LLC**
150 N. Riverside Plaza, Suite 4100
Chicago, IL 60606
Tel: (312) 741-5220
sam@kellerpostman.com
adj@kellerpostman.com
*Attorney for Plaintiff*

*/s/ Emyr T. Remy*
Emyr T. Remy

# Exhibit A

COMMONWEALTH OF MASSACHUSETTS

ESSEX, ss

TRIAL COURT DEPARTMENT
SUPERIOR COURT
DOCKET NO. 2277CV01000D

JOHN DOE, individually and on behalf of all other similarly situated,

Plaintiffs,

v.

EMERSON HOSPITAL,

Defendants.

**DECLARATION OF JESSICA N. WAHL**

I, Jessica N. Wahl, depose and state as follows:

1. I am an attorney with the law firm of Shook, Hardy and Bacon LLP, 2049 Century Park East, #3000, Los Angeles, CA 90067. I make this affidavit in support of my petition to be admitted *pro hac vice* as counsel to Emerson Hospital in this action.

2. I am an active member in good standing and currently eligible to practice law in the following jurisdictions:

| Jurisdiction | Year Admitted | Bar No. |
|---|---|---|
| California | 2018 | 321887 |
| Texas | 2016 | 24102618 |

3. There are no disciplinary proceedings pending against me as a member of the bar in any jurisdiction.

4. I am informed and believe that the bars of which I am a member grant like *pro hac vice* privileges to members of the bar of the Commonwealth of Massachusetts.

WHEREFORE, I respectfully request that I be admitted *pro hac vice* to act as counsel for Defendant Emerson Hospital for all purposes in this action.

Signed under the pains and penalties of perjury this 5th day of June 2023.

*/s/ Jessica N. Wahl*
Jessica N. Wahl

# Exhibit B

Please note that ONLY THIS FORM, FILLED OUT ON THE WEBSITE, WILL BE ACCEPTED. Handwritten, annotated, copied, scanned or modified forms will be returned

# BOARD OF BAR OVERSEERS

## REGISTRATION STATEMENT FOR *PRO HAC VICE* ATTORNEYS

Attorney name (first MI last, suffix): **Jessica N. Wahl**
Email address: **jwahl@shb.com**
Complete Business/Mailing Address:

**Jessica N. Wahl**
**Shook, Hardy and Bacon LLP**
**2049 Century Park East, #3000**
**Los Angeles, CA 90067**

Board of Bar Overseers
Administrative Use Only

Date Received: 5/5/2023
Amount Paid: $355.00
Date confirmation mailed: 5/5/2023

Business phone: **(424) 324-3477**

Court in which pro hac vice admission is sought: **Essex County Superior Court**

Contact number for court: **(978)242-1900**

Party to be represented: **Emerson Hospital**

Docket number of case (if available): **2277CV01000**

RECEIVED
MAY 05 2023
MASSACHUSETTS BOARD OF BAR OVERSEERS
REGISTRATION DEPARTMENT

Jurisdictions to which you have been admitted: (Use second page for additional jurisdictions.)

| Type | Jurisdiction | License number |
| --- | --- | --- |
| State | California | 321887 |
| State | Texas | 24102618 |

I certify that (check one): ( ) the party I am representing in the case for which I am seeking pro hac vice admission is an indigent client, and I understand that no pro hac vice fee is due, or (✓) I have included the required pro hac vice fee.

Further, I certify, under the pains and penalties of perjury, that I am admitted to practice and in good standing in every jurisdiction where I am admitted, and I acknowledge that I am subject to discipline by the Massachusetts Supreme Judicial Court and the Board of Bar Overseers. I understand I am limited in my legal practice in Massachusetts to the case identified above.

I certify the information I have supplied the Board of Bar Overseers is true and complete.

Jessica Wahl

Signature (Please sign inside box above.)

Date: 4/25/23

Sign, print and mail original form to: Board of Bar Overseers, 99 High Street, 2nd Floor, Boston, MA 02110-2320

PHC-125

COMMONWEALTH OF MASSACHUSETTS

ESSEX, ss

TRIAL COURT DEPARTMENT
SUPERIOR COURT
DOCKET NO. 2277CV01000D

JOHN DOE, individually and on behalf of all other similarly situated,

Plaintiffs,

v.

EMERSON HOSPITAL,

Defendants.

A TRUE COPY, ATTEST
DEPUTY ASS'T. CLERK

**ASSENTED-TO MOTION FOR LEAVE TO ADMIT**
**TAMMY B. WEBB *PRO HAC VICE***

Defendant, Emerson Hospital, by and through its attorney of record, Emyr T. Remy, hereby moves this court pursuant to G.L. c. 221, § 46A for an Order admitting Tammy B. Webb *pro hac vice* for the purpose of appearing and practicing in the above-captioned matter. In support of this motion, Emyr T. Remy states as follows:

1. I am counsel of record for Emerson Hospital in this matter, and I am a member in good standing of the bar of this court;

2. Attorney Webb possesses detailed knowledge of specific relevant issues that will be invaluable in connection with the representation of Emerson Hospital in this matter.

3. The Declaration of Tammy B. Webb is attached hereto as **Exhibit A**, indicating that (1) she is a member in good standing in every jurisdiction in which she is admitted to practice, (2) there are no disciplinary proceedings against her as a member of the bar in any

jurisdiction, and (3) the jurisdictions in which Attorney Webb is admitted grant like *pro hac vice* privileges to members of the bar of the Commonwealth of Massachusetts; and

4. The required *pro hac vice* fee of $355 has been sent to the Board of Bar Overseers in accordance with SJC Rule 3:15. Proof of payment is attached hereto as **Exhibit B.**

WHEREFORE, Defendant, Emerson Hospital respectfully requests that the court grant leave for Tammy B. Webb to appear and practice *pro hac vice* in the above-captioned matter.

Dated: June 5, 2023

Respectfully submitted,

EMERSON HOSPITAL

By its attorneys,

*/s/ Emyr T. Remy*
Emyr T. Remy (BBO# 740156)
SHOOK, HARDY & BACON L.L.P
One Federal St., Suite 2540
Boston, MA 02110
Telephone: (617) 531-1677
remy@shb.com

**RULE 9C CERTIFICATE OF CONFERENCE WITH COUNSEL**

Pursuant to Superior Court Rule 9C(a), Defendants' counsel have conferred with Plaintiffs' counsel, and Plaintiffs do not oppose this Motion.

*/s/ Emyr T. Remy*
Emyr T. Remy

DOCKET NO. 2277CV01000D

**CERTIFICATE OF SERVICE**

I hereby certify that on June 5, 2023, the foregoing was filed via the Court's Electronic Filing System. Notice of this filing will be sent by operation of the Court's Electronic Filing System to all parties of record:

J. Tucker Merrigan (BBO# 681627)
Victoria Santoro (BBO# 679120)
Erin E, McHugh (BBO# 703701)
**SWEENEY MERRIGAN LAW**
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com
*Attorneys for Plaintiff*

Foster C. Johnson (*PHV24076463TX*)
David Warden (*PHV20856750TX*)
Nathan Campbell (*PHV24097455TX*)
**AHMAD, ZAVITSANOS & MENSING, P.C.**
1221 McKinney St., Suite 3460
Houston, TX 77010
Tel: (713) 655-1101
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com
*Attorneys for Plaintiff*

Seth Meyer (*PHV5191283NY*)
Alex Dravillas (*PHV6299686IL*)
**KELLER POSTMAN LLC**
150 N. Riverside Plaza, Suite 4100
Chicago, IL 60606
Tel: (312) 741-5220
sam@kellerpostman.com
adj@kellerpostman.com
*Attorney for Plaintiff*

*/s/ Emyr T. Remy*
Emyr T. Remy

# Exhibit A

**COMMONWEALTH OF MASSACHUSETTS**

**ESSEX, ss**

**TRIAL COURT DEPARTMENT**
**SUPERIOR COURT**
**DOCKET NO. 2277CV01000D**

JOHN DOE, individually and on behalf of all other similarly situated,

Plaintiffs,

v.

EMERSON HOSPITAL,

Defendants.

**DECLARATION OF TAMMY B. WEBB**

I, Tammy B. Webb, depose and state as follows:

1. I am an attorney with the law firm of Shook, Hardy and Bacon LLP, 555 Mission Street, Suite 2300, San Francisco, CA 94105. I make this affidavit in support of my petition to be admitted *pro hac vice* as counsel to Emerson Hospital in this action.

2. I am an active member in good standing and currently eligible to practice law in the following jurisdictions:

| Jurisdiction | Year Admitted | Bar No. |
|---|---|---|
| California | 2003 | 227593 |
| Missouri | 1996 | 48161 |
| USDC, Central California | 2004 | 227593 |
| USDC, Southern California | 2005 | |

3. There are no disciplinary proceedings pending against me as a member of the bar in any jurisdiction.

4. I am informed and believe that the bars of which I am a member grant like *pro hac vice* privileges to members of the bar of the Commonwealth of Massachusetts.

WHEREFORE, I respectfully request that I be admitted *pro hac vice* to act as counsel for Defendant Emerson Hospital for all purposes in this action.

Signed under the pains and penalties of perjury this 5th day of June 2023.

*/s/ Tammy B. Webb*
Tammy B. Webb

# Exhibit B

Please note that ONLY THIS FORM, FILLED OUT ON THE WEBSITE, WILL BE ACCEPTED. Handwritten, annotated, copied, scanned or modified forms will be returned.

# BOARD OF BAR OVERSEERS

## REGISTRATION STATEMENT FOR *PRO HAC VICE* ATTORNEYS

Attorney name (first MI last, suffix): **Tammy B. Webb**
Email address: **tbwebb@shb.com**
Complete Business/Mailing Address:

**Tammy B. Webb**
**Shook, Hardy and Bacon LLP**
**555 Mission Street, Suite 2300**
**San Francisco, CA 94105.**

Board of Bar Overseers
Administrative Use Only

Date Received: 04-27-23
Amount Paid: $355.00
Date confirmation mailed: 04-27-23

RECEIVED
APR 27 2023
Massachusetts Board of Bar Overseers Registration Dept.

Business phone: **(415) 544-1904**

Court in which pro hac vice admission is sought: **Essex County Superior Court**

Contact number for court: **(978)242-1900**

Party to be represented: **Emerson Hospital**

Docket number of case (if available): **2277CV01000**

Jurisdictions to which you have been admitted: (Use second page for additional jurisdictions.)

| Type | Jurisdiction | License number |
|---|---|---|
| State | California | 227593 |
| State | Missouri | 48161 |
| Federal | United States District Court for the Central District of California | 227593 |
| Federal | United States District Court for the Southern District of California | |

I certify that (check one): ( ☐ ) the party I am representing in the case for which I am seeking pro hac vice admission is an indigent client, and I understand that no pro hac vice fee is due, or (☑) I have included the required pro hac vice fee.

Further, I certify, under the pains and penalties of perjury, that I am admitted to practice and in good standing in every jurisdiction where I am admitted, and I acknowledge that I am subject to discipline by the Massachusetts Supreme Judicial Court and the Board of Bar Overseers. I understand I am limited in my legal practice in Massachusetts to the case identified above.

I certify the information I have supplied the Board of Bar Overseers is true and complete.

Tammy Webb

Signature (Please sign inside box above.)

Date: 4/24/2023

Sign, print and mail original form to: Board of Bar Overseers, 99 High Street, 2nd Floor, Boston, MA 02110-2320

PHC-125

**COMMONWEALTH OF MASSACHUSETTS**

**ESSEX, ss**

**TRIAL COURT DEPARTMENT**
**SUPERIOR COURT**
**DOCKET NO. 2277CV01000D**

JOHN DOE, individually and on behalf of all other similarly situated,

Plaintiffs,

v.

EMERSON HOSPITAL,

Defendants.

**ASSENTED-TO MOTION FOR LEAVE TO ADMIT**
**JUSTIN R. DONOHO *PRO HAC VICE***

Defendant, Emerson Hospital, by and through its attorney of record, Emyr T. Remy, hereby moves this court pursuant to G.L. c. 221, § 46A for an Order admitting Justin R. Donoho *pro hac vice* for the purpose of appearing and practicing in the above-captioned matter. In support of this motion, Emyr T. Remy states as follows:

1. I am counsel of record for Emerson Hospital in this matter, and I am a member in good standing of the bar of this court;

2. Attorney Donoho possesses detailed knowledge of specific relevant issues that will be invaluable in connection with the representation of Emerson Hospital in this matter.

3. The Declaration of Justin R. Donoho is attached hereto as **Exhibit A**, indicating that (1) he is a member in good standing in every jurisdiction in which he is admitted to practice, (2) there are no disciplinary proceedings against him as a member of the bar in any jurisdiction,

Allowed. Barrett, J. 6/30/23
Attest-Pauten AAClerk

and (3) the jurisdictions in which Attorney Donoho is admitted grant like *pro hac vice* privileges to members of the bar of the Commonwealth of Massachusetts; and

4. The required *pro hac vice* fee of $355 has been sent to the Board of Bar Overseers in accordance with SJC Rule 3:15. Proof of payment is attached hereto as **Exhibit B.**

WHEREFORE, Defendant, Emerson Hospital respectfully requests that the court grant leave for Justin R. Donoho to appear and practice *pro hac vice* in the above-captioned matter.

Dated: June 29, 2023

Respectfully submitted,

EMERSON HOSPITAL

By its attorneys,

*/s/ Emyr T. Remy*
Emyr T. Remy (BBO# 740156)
SHOOK, HARDY & BACON L.L.P
One Federal St., Suite 2540
Boston, MA 02110
Telephone: (617) 531-1677
remy@shb.com

**CERTIFICATE OF SERVICE**

I hereby certify that on June 29, 2023, the foregoing was served via electronic mail to all counsel of record:

J. Tucker Merrigan (BBO# 681627)
Victoria Santoro (BBO# 679120)
Erin E, McHugh (BBO# 703701)
**SWEENEY MERRIGAN LAW**
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com
*Attorneys for Plaintiff*

Foster C. Johnson (*PHV24076463TX*)
David Warden (*PHV20856750TX*)
Nathan Campbell (*PHV24097455TX*)
**AHMAD, ZAVITSANOS & MENSING, P.C.**
1221 McKinney St., Suite 3460
Houston, TX 77010
Tel: (713) 655-1101
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com
*Attorneys for Plaintiff*

Seth Meyer (*PHV5191283NY*)
Alex Dravillas (*PHV6299686IL*)
**KELLER POSTMAN LLC**
150 N. Riverside Plaza, Suite 4100
Chicago, IL 60606
Tel: (312) 741-5220
sam@kellerpostman.com
adj@kellerpostman.com
*Attorney for Plaintiff*

*/s/ Emyr T. Remy*
Emyr T. Remy

# Exhibit A

**COMMONWEALTH OF MASSACHUSETTS**

**ESSEX, ss**

**TRIAL COURT DEPARTMENT**
**SUPERIOR COURT**
**DOCKET NO. 2277CV01000D**

JOHN DOE, individually and on behalf of all other similarly situated,

Plaintiffs,

v.

EMERSON HOSPITAL,

Defendants.

**DECLARATION OF JUSTIN R. DONOHO**

I, Justin R. Donoho, depose and state as follows:

1. I am an attorney with the law firm of Shook, Hardy and Bacon LLP, 111 S. Wacker Drive, Suite 4700, Chicago, IL 60606. I make this affidavit in support of my petition to be admitted *pro hac vice* as counsel to Emerson Hospital in this action.

2. I am an active member in good standing and currently eligible to practice law in the following jurisdictions:

| Jurisdiction | Year Admitted | Bar No. |
|---|---|---|
| Illinois | 2009 | 6299667 |
| USDC, Northern District Illinois | 2011 | |
| USDC, Southern District Illinois | 2017 | |
| Seventh Circuit Court of Appeals | 2010 | |
| Ninth Circuit Court of Appeals | 2010 | |

3. There are no disciplinary proceedings pending against me as a member of the bar in any jurisdiction.

4. I am informed and believe that the bars of which I am a member grant like *pro hac vice* privileges to members of the bar of the Commonwealth of Massachusetts.

WHEREFORE, I respectfully request that I be admitted *pro hac vice* to act as counsel for Defendant Emerson Hospital for all purposes in this action.

Signed under the pains and penalties of perjury this 29TH day of June 2023.

*/s/ Justin R. Donoho*
Justin R. Donoho

# Exhibit B

# BOARD OF BAR OVERSEERS

## REGISTRATION STATEMENT FOR *PRO HAC VICE* ATTORNEYS

Attorney name (first MI last, suffix): **Justin R. Donoho**
Email address: jdonoho@shb.com
Complete Business/Mailing Address:

**Justin R. Donoho**
**Shook, Hardy and Bacon LLP**
**111 S. Wacker Dr., Suite 4700**
**Chicago, IL 60606**

Board of Bar Overseers
Administrative Use Only

Date Received: 06-23-23

Amount Paid: $355.00

Date confirmation mailed: 06-23-23

Business phone: (312) 704-7700

RECEIVED
JUN 23 2023
Massachusetts Board of Bar Overseers Registration Dept.

Court in which pro hac vice admission is sought: **Essex County Superior Court**

Contact number for court: (978) 242-1900

Party to be represented: **Emerson Hospital**

Docket number of case (if available): **2277CV01000**

Jurisdictions to which you have been admitted: (Use second page for additional jurisdictions.)

| Type | Jurisdiction | License number |
|---|---|---|
| State | Illinois | 6299667 |
| Federal | N.D. Illinois Trial Bar | |
| Federal | USDC, Northern District Illinois | |
| Federal | USDC, Southern District Illinois | |
| Federal | Seventh Circuit Court of Appeals | |
| Federal | Ninth Circuit Court of Appeals | |

I certify that (check one): ( ) the party I am representing in the case for which I am seeking pro hac vice admission is an indigent client, and I understand that no pro hac vice fee is due, or (✓) I have included the required pro hac vice fee.

Further, I certify, under the pains and penalties of perjury, that I am admitted to practice and in good standing in every jurisdiction where I am admitted, and I acknowledge that I am subject to discipline by the Massachusetts Supreme Judicial Court and the Board of Bar Overseers. I understand I am limited in my legal practice in Massachusetts to the case identified above.

I certify the information I have supplied the Board of Bar Overseers is true and complete.

[signature]

Signature (Please sign inside box above.)

Date: June 14, 2023

Sign, print and mail original form to: Board of Bar Overseers, 99 High Street, 2nd Floor, Boston, MA 02110-2320

PHC-1251

COMMONWEALTH OF MASSACHUSETTS

ESSEX, S.S. SUPERIOR COURT

JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,

Plaintiff

v.

EMERSON HOSPITAL,

Defendant.

C.A. No. 2277CV01000 D

A TRUE COPY, ATTEST
DEPUTY ASS'T. CLERK

**AGREED MOTION FOR ENTRY OF STIPULATED PROTECTIVE ORDER**

Pursuant to the Massachusetts Rules of Civil Procedure, the Parties file this Agreed Motion for Entry of a Stipulated Protective Order. The Parties' Stipulated Protective Order is attached hereto as Exhibit A. The Parties agree to be bound by its terms and respectfully request that the Court enter the Stipulated Protective Order.

SO STIPULATED this 5th day of July 2023.

Counsel for Plaintiff:

/s/ J. Tucker Merrigan
J. Tucker Merrigan, BBO #681628
Erin E. McHugh, BBO #703701
**Sweeney Merrigan Law, LLP**
268 Summer Street, LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
emchugh@sweeneymerrigan.com
tucker@sweeneymerrigan.com

Counsel for Defendant:

/s/ Emyr Remy
Emyr Remy, BBO #740156
**Shook, Hardy & Bacon, LLP**
One Federal Street, Suite 2540
Boston, MA 02110
Tel.: (617) 531-1411
Fax: (617) 531-1602
remy@shb.com

Barrett

Foster C. Johnson (*admitted pro hac vice)*
David Warden (*admitted hac vice)*
Nathan Campbell (*admitted pro hac vice*)
**Ahmad, Zavitsanos & Mensing, P.C.**
1221 McKinney St., Suite 3460
Houston, TX 77010
Tel.: (713) 655 1101
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

Seth Meyer (*admitted pro hac vice)*
Alex Dravillas (*admitted hac vice*)
**Keller Postman LLC**
150 N. Riverside Plaza, Suite 4100
Chicago, IL 60606
Tel.: (312) 741-5220
sam@kellerpostman.com
ajd@kellerpostman.com

Alfred J. Saikali (*admitted pro hac vice*)
**Shook, Hardy & Bacon, LLP**
210 South Biscayne Blvd., Suite 3200
Miami, FL 33131
Tel.: (305) 358-5171
Fax: (305) 358-7470
asaikali@shb.com

Josh Becker (*pro hac vice forthcoming*)
**Shook, Hardy & Bacon LLP**
1230 Peachtree St., Suite 1200
Atlanta, GA 30309
Tel.: (407) 867-6000
Fax: (470) 867-6001
jbecker@shb.com

Michael Rayfield (*pro hac vice forthcoming*)
**Shook, Hardy & Bacon LLP**
1325 Avenue of the Americas, 28th Floor
New York, NY 10019
Tel.: (212) 989-8844
Fax: (929) 501-5455
mrayfield@shb.com

Lindsey Knapton (*pro hac vice forthcoming*)
**Shook, Hardy & Bacon LLP**
1600 17th Street, Suite 450
Denver, CO 80202
Tel.: (303) 285-5300
Fax: (303) 285-5301
lknapton@shb.com

Tammy B. Webb (*admitted pro hac vice*)
**Shook, Hardy, & Bacon LLP**
555 Mission Street, Suite 2300
San Francisco, CA 94105
Tel: (415) 544-1900
Fax: (415) 391-0281
tbwebb@shb.com

**CERTIFICATE OF SERVICE**

I, J. Tucker Merrigan, hereby certify that on June 5, 2023, I served the foregoing Notice of Appearance, via email to all counsel of record.

Respectfully Submitted,

*/s/ J. Tucker Merrigan*

J. Tucker Merrigan, BBO# 681627
**SWEENEY MERRIGAN LAW, LLP**
268 Summer Street, LL
Boston, MA 02210
Phone: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com

26

COMMONWEALTH OF MASSACHUSETTS

ESSEX, S.S. SUPERIOR COURT

| | | |
|---|---|---|
| **JOHN DOE, individually and on behalf of all others similarly situated,** *Plaintiffs,* v. **EMERSON HOSPTIAL** *Defendant.* | § § § § § § § § § § | **C.A. No. 2277CV01000** |

A TRUE COPY, ATTEST
DEPUTY ASS'T. CLERK

**STIPULATED PROTECTIVE ORDER**

WHEREAS, Plaintiff John Doe, on behalf of himself and all others similarly situated, and Defendant, Emerson Hospital (collectively, "Parties"), agree that the proceedings in the above-referenced matter may involve the discovery and disclosure of confidential, non-public, sensitive, and/or proprietary business, employment, tax, financial, and personally identifiable information, protected health information, documents and other materials;

WHEREAS, the Parties agree that such "Confidential" or "Highly Confidential" information should only be disclosed pursuant to the terms of this Stipulated Protective Order ("Order"); and

WHEREAS, the Parties agree that the confidential nature of certain information, particularly personally identifiable information and protected health information, establishes good cause for the issuance of this Stipulated Protective Order.

THEREFORE, the Parties seek entry of an Order, governing the disclosure of documents and information therein designated as "Confidential" or "Highly Confidential" on the terms set forth herein, as well as an Order, governing the return of privileged information, documents, and data and affording the Parties certain protections on the terms set forth herein.

Accordingly, it is ORDERED:

1. The below terms, as used herein, shall be defined as follows:

a. "Action" shall refer to *Doe v. Emerson Hospital*, Case No. 2277CV01000.

b. "Confidential Information" shall mean information that a Designating Party identifies as "Confidential." Only information meeting the following criteria may be designated as "Confidential" (unless the parties expressly agree otherwise): Information (regardless of how generated, stored, or maintained) that the Designating Party in good faith believes: (i) contains sensitive personal identifying information, protected health information, trade secrets, or other confidential research, development, commercial or financial information, the disclosure of which may have the effect of causing harm to any Party, or person from whom the information was obtained, or to the Parties' or third-parties' legitimate privacy interests; or (ii) contains information over which the Designating Party has a duty or obligation to maintain confidentiality.

c. "Designating Party" shall mean the Party or Non-Party that designates information produced in this Action as "Confidential" or "Highly Confidential."

d. "Expert" shall mean any individual with specialized knowledge or expertise who is retained by a Party or its Counsel to serve as an expert witness or as a consultant in the Action.

e. "Highly Confidential Information" shall mean information that a Designating Party identifies as "Highly Confidential." Only information meeting the following criteria may be designated as "Highly Confidential" (unless the parties expressly agree otherwise): Information (regardless of how generated, stored, or maintained) that the Designating Party in good faith believes: (i) concerns or relates to the highly sensitive personal, confidential, financial, commercial, proprietary, cybersecurity, competitively sensitive, or trade secret information of any

Party or any third party; or (ii) contains "PII" or "PHI;" or (iii) contains information over which the Designating Party has a duty or obligation to maintain a high level of confidentiality, including for compliance with applicable data privacy laws or regulations.

f. "Personal identifying information" or "PII" includes every data element protected by state or federal law including, but not limited to, name, payment card numbers, financial account numbers, Social Security numbers, addresses, phone numbers, email addresses, driver's license numbers or other state identification numbers, Employer Identification numbers, Tax Identification numbers, passport numbers, or a foreign government equivalent of any of these numbers or identifiers.

g. "Privileged Material" means material protected by the attorney-client privilege or the attorney work product doctrine, or otherwise privileged or protected under applicable law.

h. "Protected Health Information" or "PHI" shall have the same definition as the definition of "Protected Health Information" under 45 C.F.R. § 160.103.

i. "Producing Party" shall mean a Party or Non-Party that produces information in the Action.

j. "Protected Material" shall refer to any information designated as "Confidential" or "Highly Confidential" pursuant to this Order.

k. "Receiving Party" shall mean a Party that receives information from a Producing Party in the Action.

l. "Vendors" shall refer to individuals or entities engaged for the purpose of providing litigation support services (e.g., ESI vendors; photocopying; videotaping; translating; preparing exhibits or demonstrations; organizing, storing, retrieving data in any form or medium;

investigators and consultants; court reporters), as well as their employees, independent contractors, and subcontractors.

2. The protections conferred by this Order cover not only Protected Material but also any information copied or extracted therefrom, and all copies, excerpts, summaries, or compilations thereof, plus testimony, conversations, or presentations by Parties or Counsel to or in Court or in other settings that might reveal Protected Material.

3. Except as otherwise provided in this Order, all information, documents, and data to be designated as Protected Material must be clearly designated as such prior to any disclosure of same. Designations shall be made in the following manner:

a. Protected Material in documents produced as images shall be marked with the designation "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL" on each page that contains Protected Material. If only a portion of the material on the page qualifies for designation as Protected Material, that portion shall be clearly designated as Protected Material and the level of protection asserted for each such portion must be specified. Documents produced in native formats will have Confidentiality Designations indicated in the production file name or as specified in any Stipulated Protocol on the Discovery of Electronically Stored Information the Parties may enter into. Should the Parties need to identify which portions of a native document qualify as Protected Material, they will meet and confer to resolve the issue.

b. Protected Material disclosed in testimony (in depositions, pre-trial proceedings, or trial proceedings) shall be designated as Protected Material either during the testimony or by written notice to Counsel within twenty-one (21) days of receiving the transcript of the proceedings (or in such other time period as the Parties shall mutually agree is appropriate). Notice after the testimony must specifically designate the portion(s) of the testimony that are to be

designated as Protected Material and the level of protection asserted for each such portion must be specified. All transcripts of any testimony in this Action shall be designated as "HIGHLY CONFIDENTIAL" until twenty-one (21) days have passed following the receipt of the transcript, or the Parties agree to a different designation.

c. Protected Material disclosed in any form other than a document or testimony must be designated "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL," as appropriate, in a prominent manner and in a manner that specifies only those portions of the information or data disclosed that are subject to the designated protection level.

d. If a Designating Party fails to designate information, documents, or data disclosed as Protected Material at the time of disclosure, that Designating Party shall make all reasonable efforts to timely designate the Protected Material and to identify the specific portion of the information, documents, or data disclosed to be designated as Protected Material and the level of protection to be accorded same. Upon notification, the Receiving Party shall make reasonable efforts to assure that any additional material designated as Protected Material is treated in accordance with the provisions of this Order from that point forward.

4. If the Receiving Party wants to challenge either the designation of information, documents, or data as Protected Material or the designation of the Protected Material as "HIGHLY CONFIDENTIAL," it must first notify the Designating Party in writing of both the specific Protected Material challenged and the reason for the challenge. The Parties shall make reasonable efforts to resolve the dispute over the designation of the information, documents, or data as Protected Material. If the dispute cannot be resolved between the Parties, the Designating Party must promptly notify the Receiving Party in writing that it has not changed its position on the Protected Material. The Receiving Party may then seek relief from this Court, though the burden of

proving confidentiality of designated information remains with the party asserting such confidentiality (i.e., the Designating Party). While any dispute over classification is ongoing, the information, document, or data at issue shall be treated in accordance with the protection level identified by the Designating Party.

5. The Receiving Party shall keep all Protected Material secure except as permitted below and shall take reasonable efforts to place such documents in a secure area and limit access to the Protected Material to the extent reasonably necessary for this Action.

6. The Receiving Party may only use Protected Material for the purpose of prosecuting, defending, or attempting to resolve the Action and the Protected Material may only be disclosed in the manner and to the categories of recipients identified below. Until the Action is concluded, all Protected Material must be maintained and stored consistent with its designation.

a. Protected Material that is designated as "CONFIDENTIAL" may be disclosed to:

i. the Receiving Party's counsel and their staff who are assisting counsel in connection with the Action. All such staff shall be subject to the provisions of this Order.

ii. The Receiving Party's Expert(s), and staff of the Expert who are assisting the Expert in connection with the Action. All such staff shall be subject to the provisions of this Order.

iii. The Receiving Party's insurer and its staff who have responsibility for the insurer's obligations in connection with the Action. All such staff shall be subject to the provisions of this Order.

iv. The Court and its personnel.

v. A mediator jointly retained by the parties and the mediator's personnel.

vi. Vendors.

vii. Parties and Parties' staff, including management personnel, to whom disclosure is reasonably necessary to assist the Party in this Action. All such staff shall be subject to the Provisions of this Order.

viii. The author of any document or the source of any information or data designated as Protected Material.

ix. Witnesses providing testimony in either a deposition, hearing, trial, or other proceeding where the Receiving Party deems it reasonably necessary for the witness to review the Protected Material in preparation and/or to provide testimony regarding the Protected Material. Any witness who is not otherwise subject to the terms of this Order shall be required to sign the Declaration attached as Exhibit A hereto.

ix. Such other persons as the Parties mutually agree may be shown the Protected Material. All such persons shall be required to sign the Declaration attached as Exhibit A hereto.

b. All disclosures of Protected Material marked "HIGHLY CONFIDENTIAL" are to be limited and the Receiving Party is to only make such disclosures in the manner and to the degree it deems necessary for this Action, which in no event shall include disclosure of such materials beyond the scope of permissible disclosure of materials designated "CONFIDENTIAL."

7. If a Party is served with a subpoena or a court order issued in other litigation or proceedings before any administrative or legislative body that compels disclosure of any information or items designated in this action as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL" that Party must:

a. promptly notify in writing the Designating Party. Such notification shall include a copy of the subpoena or court order;

b. promptly notify in writing the party who caused the subpoena or order to issue in the other litigation that some or all of the material covered by the subpoena or order is subject to this Protective Order. Such notification shall include a copy of this Stipulated Protective Order; and

c. cooperate with respect to all reasonable procedures sought to be pursued by the Designating Party whose Protected Material may be affected.

If the Designating Party timely seeks a protective order, the Party served with the subpoena or court order shall not produce any information designated in this action as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL" before a determination by the appropriate court, unless the Party has obtained the Designating Party's permission. The Designating Party shall bear the burden and expense of seeking protection in that court of its confidential material - and nothing in these provisions should be construed as authorizing or encouraging a Receiving Party in this action to disobey a lawful directive from another court.

8. If a Receiving Party learns that, by inadvertence or otherwise, it has disclosed Protected Material to any person or entity not authorized to receive the Protected Material under this Order, the Receiving Party must immediately (a) notify in writing the Designating Party of the unauthorized disclosures, (b) use its best efforts to retrieve all copies of the Protected Material,

(c) inform the person or entity to whom the Protected Material was disclosed that the disclosure was not authorized and demand immediate return and/or destruction of any tangible Protected Material that was disclosed, and (d) require the person or entity to whom the Protected Material was disclosed to sign the Declaration attached as Exhibit A hereto.

9. If any Protected Material (or any pleading, motion, or memorandum disclosing them) is proposed to be filed or is filed with the Court, the filing party shall follow this Court's procedures to file documents under seal.

10. Any privileged information, confidential information, or protected information of third parties, that is contained within information, documents, or data being disclosed in this Action shall be redacted to the extent practicable or as subject to the provisions concerning redactions in any Stipulated Protocol on the Discovery of Electronically Stored Information the Parties may enter into.

11. With regard to the disclosure of Privileged Material:

a. If the Producing Party determines, after production, that it has produced information, documents or data that are privileged or protected under the Rules of Evidence or Civil Procedure or other applicable law, the Producing Party may notify the Receiving Party in writing of the discovery with the identification of the Privileged Material by Bates number range or hash value and a detailed statement as to the reason for the assertion that the information, document, or data is Privileged Material. The Receiving Party shall have ten business days following the receipt of notice to either return, sequester, or securely destroy all copies of such Privileged Material, along with any notes, abstracts, or compilations of the content thereof and may promptly present the information to the Court under seal for a determination of the claim.

b. If the Receiving Party challenges the designation of the disclosed information, document, or data as Privileged Material, the procedures set forth in Paragraph 4 for challenging a designation of Protected Material shall also be followed.

12. In the event the party who received PII experiences a data breach, it shall immediately notify the producing party of same and cooperate with the Producing Party to address and remedy the breach. Nothing herein shall preclude the Producing Party from asserting legal claims or constitute a waiver of legal rights and defenses in the event of litigation arising out of the Receiving Party's failure to appropriately protect PII from unauthorized disclosure.

13. Unless otherwise agreed or ordered, this Order shall remain in force after dismissal or entry of final judgment not subject to further appeal.

14. Within sixty (60) days of the termination of this Action (including the expiration of time for any appellate challenge thereto), the Receiving Party must either return all Protected Material to the Producing Party or securely destroy all Protected Material. The Receiving Party must certify in writing that the Protected Material was returned or securely destroyed and that no copies, nor any abstracts, compilations, summaries, or other forms of retaining the Protected Material are in the Receiving Party's possession. Notwithstanding this provision, counsel for the Receiving Party is not expected to access and extract any Protected Material from their disaster recovery systems and counsel are entitled to retain an archival copy of all pleadings, motion papers, transcripts, legal memoranda, correspondence, deposition and trial exhibits, attorney work, and consultant and expert work product, even if such materials contain Protected Material, provided that all PII and PHI must be securely destroyed in the next routine destruction cycle after Termination of the Action. Any such archival copies that contain or constitute Protected Material remain subject to this Order and all of the protections set forth herein. Receiving Party will comply

with all laws that apply to its use, disclosure, storage and processing of the personal information provided to it by the other party hereunder, and shall at all times protect the personal information with reasonable and appropriate administrative, technical and physical security controls.

15. The Court retains the right to allow, *sua sponte* or upon motion, disclosure of any subject covered by this Stipulated Order or to modify this Stipulated Order at any time in the interest of justice.

16. No Prior Judicial Determination. This Order is entered based on the representations and agreements of the parties and for the purpose of facilitating discovery. Nothing herein shall be construed or presented as a judicial determination that any document or material designated Confidential Information or Highly Confidential Information by counsel or the parties is entitled to protection under the Rules of Civil Procedure or otherwise until such time as the Court may rule on a specific document or issue.

17. This Order shall take effect when entered and shall be binding upon all counsel of record and their law firms, the Parties, and persons made subject to this Order by its terms.

It is So Ordered:

Dated: 7/10/23

Hon. Judge
Superior Court of Essex County

WE SO MOVE
and agree to abide by the
terms of this Order

*/s/ Jonathan T. Merrigan*
J. Tucker Merrigan, BBO# 681627
Sweeney Merrigan Law
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
tucker@sweeneymerrigan.com

/s/ Foster C. Johnson
Foster C. Johnson (*pro hac vice*)
Ahmad, Zavitsanos, & Mensing, PLLC
1221 McKinney Street, Suite 2500
Houston, Texas 77010
Tel: (713) 655-1101
fjohnson@azalaw.com

*/s/ Alex Dravillas*
Alex Dravillas (*admitted pro hac vice*)
Keller Postman LLC
150 N. Riverside Plaza
Suite 4100
Chicago, Illinois 60606
Tel: (312) 741-5220
ajd@kellerpostman.com

Attorneys for Plaintiff and the Putative Class

/s/ Tammy Webb
Tammy B. Webb (*pro hac vice forthcoming*)
Shook, Hardy, & Bacon L.L.P.
555 Mission Street, Suite 2300
San Francisco, California 94105
Tel: (415) 544-1900
tbwebb@shb.com

Attorney for Defendants

**EXHIBIT A**

**COMMONWEALTH OF MASSACHUSETTS**

| | | |
|---|---|---|
| **ESSEX, S.S.** | | **SUPERIOR COURT** |
| **JOHN DOE, individually and on behalf of all others similarly situated,** | § § § | **C.A. No. 2277CV01000** |
| ***Plaintiffs,*** | § § | |
| **v.** | § § | |
| **EMERSON HOSPTIAL** | § § | |
| ***Defendant.*** | § | |

**ACKNOWLEDGMENT AND AGREEMENT TO BE BOUND**

The undersigned hereby acknowledges that he/she has read the Stipulated Protective Order, dated _______________ in the above captioned action and attached hereto, understands the terms thereof, and agrees to be bound by its terms. The undersigned submits to the jurisdiction of the Superior Court for Essex County, Massachusetts in matters relating to the Stipulated Protective Order and understands that the terms of the Stipulated Protective Order obligate him/her to use materials designated as Confidential Information in accordance with the Stipulated Protective Order solely for the purposes of the above-captioned action, and not to disclose any such Confidential Information to any other person, firm or concern.

The undersigned acknowledges that violation of the Stipulated Order may result in penalties for contempt of Court.

Name: ______________________________

Job Title: ______________________________

Employer: ______________________________

Business Address: ______________________________

______________________________

______________________________

Date:______________________ ______________________
Signature

COMMONWEALTH OF MASSACHUSETTS

ESSEX, S.S. SUPERIOR COURT

| | | |
|---|---|---|
| JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | § | C.A. No. 2277CV01000 D |
| Plaintiff | § | |
| v. | § | |
| EMERSON HOSPITAL, | § | |
| Defendant. | § | |

**AGREED MOTION FOR ENTRY OF STIPULATED ESI PROTOCOL**

Pursuant to the Massachusetts Rules of Civil Procedure, the Parties file this Agreed Motion for Entry of a Stipulated Order on ESI Protocol. The Parties' Stipulated Order on ESI Protocol is attached hereto as Exhibit A. The Parties agree to be bound by its terms and respectfully request that the Court enter the Stipulated Protective Order.

SO STIPULATED this 12th day of July 2023.

7/13/23 Allowed Barrett

Counsel for Plaintiff:

/s/ J. Tucker Merrigan
J. Tucker Merrigan, BBO #681628
McHugh, BBO #703701
**Sweeney Merrigan Law, LLP**
268 Summer Street, LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
emchugh@sweeneymerrigan.com
tucker@sweeneymerrigan.com

Counsel for Defendant:

/s/ Emyr Remy
Erin E. McHugh, BBO #703701
Emyr Remy, BBO #740156
**Shook, Hardy & Bacon, LLP**
One Federal Street, Suite 2540
Boston, MA 02110
Tel.: (617) 531-1411
Fax: (617) 531-1602
remy@shb.com

A TRUE COPY, ATTEST
DEPUTY ASS'T. CLERK

Foster C. Johnson (*admitted pro hac vice)*
David Warden (*admitted pro hac vice)*
Nathan Campbell (*admitted pro hac vice*)
**Ahmad, Zavitsanos & Mensing, P.C.**
1221 McKinney St., Suite 3460
Houston, TX 77010
Tel.: (713) 655 1101
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

Seth Meyer (*admitted pro hac vice*)
Alex Dravillas (*admitted pro hac vice*)
**Keller Postman LLC**
150 N. Riverside Plaza, Suite 4100
Chicago, IL 60606
Tel.: (312) 741-5220
sam@kellerpostman.com
adj@kellerpostman.com

Alfred J. Saikali (*admitted pro hac vice*)
**Shook, Hardy & Bacon, LLP**
210 South Biscayne Blvd., Suite 3200
Miami, FL 33131
Tel.: (305) 358-5171
Fax: (305) 358-7470
asaikali@shb.com

Josh Becker (*pro hac vice forthcoming*)
**Shook, Hardy & Bacon LLP**
1230 Peachtree St., Suite 1200
Atlanta, GA 30309
Tel.: (407) 867-6000
Fax: (470) 867-6001
jbecker@shb.com

Michael Rayfield (*pro hac vice forthcoming*)
**Shook, Hardy & Bacon LLP**
1325 Avenue of the Americas, 28th Floor
New York, NY 10019
Tel.: (212) 989-8844
Fax: (929) 501-5455
mrayfield@shb.com

Lindsey Knapton (*pro hac vice forthcoming*)
**Shook, Hardy & Bacon LLP**
1600 17th Street, Suite 450
Denver, CO 80202
Tel.: (303) 285-5300
Fax: (303) 285-5301
lknapton@shb.com

Tammy B. Webb (*admitted pro hac vice*)
**Shook, Hardy, & Bacon LLP**
555 Mission Street, Suite 2300
San Francisco, CA 94105
Tel: (415) 544-1900
Fax: (415) 391-0281
tbwebb@shb.com

**CERTIFICATE OF SERVICE**

I, J. Tucker Merrigan, hereby certify that on June 12, 2023, I served the foregoing Agreed Motion for Entry of Stipulated ESI Protocol, via email to all counsel of record.

Respectfully Submitted,

*/s/ J. Tucker Merrigan*

J. Tucker Merrigan, BBO# 681627
**SWEENEY MERRIGAN LAW, LLP**
268 Summer Street, LL
Boston, MA 02210
Phone: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com

28

**COMMONWEALTH OF MASSACHUSETTS**

**ESSEX, S.S.** **SUPERIOR COURT**

| | | |
|---|---|---|
| **JOHN DOE, individually and on behalf of all others similarly situated,** <br><br> ***Plaintiffs,*** <br><br> **v.** <br><br> **EMERSON HOSPTIAL** <br><br> ***Defendant.*** | § § § § § § § § § § | **C.A. No. 2277CV01000** |

**STIPULATED ORDER ON ESI PROTOCOL**

Before the Court is a stipulation for the entry of an Order governing the discovery of electronically stored information ("ESI") in the above-referenced matter. The Court having reviewed the stipulation, hereby orders the following:

**1) PURPOSE**

This Stipulated Order will govern discovery of ESI in this case as a supplement to the Massachusetts Rules of Civil Procedure, the Local Rules for this Court, and any other applicable orders and rules.

**2) GENERAL PRINCIPLES**

The Parties are aware of the importance the Court places on cooperation and commit to cooperate in good faith throughout the matter.

Nothing in this Stipulated Order shall be interpreted to require disclosure of information protected by the attorney-client privilege, work product doctrine, or any other applicable privilege or immunity. Except as expressly provided herein, the parties do not waive any objections as to the production, discoverability, authenticity, admissibility, or confidentiality of any particular documents or ESI.

This Stipulated Order may be modified in the Court's discretion or by agreement of the parties for good cause shown. If the parties cannot resolve their disagreements regarding these



A TRUE COPY, ATTEST
DEPUTY CLERK

modifications, the parties shall seek a resolution pursuant to the Massachusetts Rules of Civil Procedure governing discovery disputes.

This Stipulated Order may only apply to the parties in this matter.

3) **DEFINITIONS**

a. "Document" is defined to be synonymous in meaning and equal in scope to the usage of this term in Rules 26 and 34 of the Massachusetts Rules of Civil Procedure. The term "Document" shall include Hard-Copy Documents, Electronic Documents, and ESI, as defined herein.

b. "Electronic Document or Data" means Documents or Data existing in electronic form at the time of collection, including but not limited to: e-mail or other means of electronic communications, word processing files (e.g. Microsoft Word), computer presentations (e.g. PowerPoint slides), spreadsheets (e.g. Excel), image files (e.g. PDF), chat applications, text messages, and other ephemeral data sources.

c. "Hard-Copy Document" means Documents existing in paper form at the time of collection.

d. "Native Format" means and refers to the format of ESI in which it was generated and/or as used by the producing party in the usual course of its business and in its regularly conducted activities. For example, the native format of an Excel workbook is .xls or .xlsx.

e. "Near-Native Format" means and refers to the format of ESI that preserves the functionality, searchability, and integrity of a Native Format item when it is infeasible or unduly burdensome to produce the item in Native Format, including where redactions to an otherwise Native Format item are made. For example, an MBOX is a suitable near-native format for production of Gmail, an Excel spreadsheet is a suitable near-native format for production of Google Sheets, and EML or MSG files may be suitable near-native formats for production of individual

e-mail messages. Static images are not near-native formats for production of any form except Hard-Copy Documents.

f. "Metadata" means (i) information embedded in or associated with a native file that is not ordinarily viewable or printable from the application that generated, edited, or modified such native file which describes the characteristics, origins, usage, and/or validity of the electronic file; (ii) information generated automatically by the operation of a computer or other information technology system when a native file is created, modified, transmitted, deleted, or otherwise manipulated by a user of such system, (iii) information, such as Bates numbers, created during the course of processing documents or ESI for production, and (iv) information collected during the course of collecting documents or ESI, such as file names, file paths, system dates, name of the media device on which it was stored, or the custodian or noncustodial data source from which it was collected.

g. "Optical Character Recognition" or "OCR" means the process of recognizing and creating a file containing visible text within an image.

**4) PRESERVATION**

The parties have discussed their preservation obligations and preservation needs, and agree that preservation of potentially relevant ESI will be reasonable and proportionate. To reduce the costs and burdens of preservation and to ensure proper ESI is preserved, the parties agree that:

1. The parties shall abide by their common law obligations to preserve relevant documents and information;

2. Pursuant to section 5 below, the parties will exchange a list of the types of ESI they believe should be preserved and the custodians, or general job titles or descriptions of custodians, for whom they believe ESI should be preserved, e.g., "Compliance head," "IT manager," and "marketing manager," etc… The parties may add or remove proposed custodians;

3. The parties will meet and confer regarding the custodians for whom ESI will be preserved;

4. The parties will disclose any data sources that are not reasonably accessible because of undue burden or cost pursuant to Massachusetts Rule of Civil Procedure Fed. R. Civ. P. 26(f)(1) and whether ESI from these sources will be preserved but not searched, reviewed, or produced.

**5) ESI DISCLOSURES**

Prior to conducting searches for ESI in response to discovery requests, and in conjunction with negotiations on discovery requests, each party shall disclose within a reasonable amount of time:

1. Custodians. The names, title, and roles of custodians most likely to have discoverable ESI in their possession, custody, or control. The custodians shall be identified by name, title, connection to the instant litigation, and the type of the information under the custodian's control.

2. Non-custodial Data Sources. A list of non-custodial data sources (e.g., shared drives, servers, internal messaging applications), if any, likely to contain discoverable ESI.

3. Third-Party Data Sources. A list of third-party data sources, if any, likely to contain discoverable ESI (e.g., third-party email providers, mobile device providers, cloud storage, messaging providers) and, for each such source, the extent to which a party is (or is not) able to preserve information stored in the third-party data source.

4. Inaccessible Data. A list of data sources, if any, likely to contain discoverable ESI (by type, date, custodian, electronic system or other criteria sufficient to specifically identify the data source) that a party asserts is not reasonably accessible under Fed. R. Civ. P. 26(f)(1).

5. Documents and ESI from identified custodial and non-custodial data sources will be preserved pending identification of data to be produced in this litigation.

6. Parties have a continuing obligation to identify any other custodial and non-custodial data sources likely to contain discoverable ESI and preserve them.

## 6) SEARCH METHODOLOGY

The parties agree that in responding to discovery requests, they will meet and confer about methods to search ESI in order to identify ESI that is subject to production in discovery and filter out ESI that is not subject to discovery, such as whether to use search terms.

If search terms are requested by the Requesting Party, the parties must meet and confer in good faith regarding search terms and queries, file types and date restrictions, data sources and custodians. The parties shall continue to cooperate in revising the appropriateness of the search methodology, such as by the producing party providing hit count reports. The producing party may identify each search term or query returning overbroad results demonstrating the overbroad results and provide a counter proposal as to revised searches or queries. In the event the parties are unable to reach agreement on search terms, including as to the breadth of proportional document review efforts, the parties shall consider in good faith the possibility of a phased approach to document review and production efforts.

This Order does not preclude a Requesting Party from seeking information pertaining to a Producing Party's network design, types of databases, database dictionaries, access control lists and security access logs and rights of individuals to access systems and specific files and applications, the ESI document retention policy, organizational chart for information systems personnel, or the backup and systems recovery routines, including, but not limited to, tape rotation and destruction/overwrite policy.

If a Party elects to use technology-assisted review or other advanced technology-based analytics to cull unstructured ESI, the parties will meet and confer regarding the parameters that will apply.

To the extent a response to discovery requires production of discoverable ESI contained in a structured database, the Parties shall meet and confer in an attempt to agree upon an appropriate form of production and potential methods of generating a report in a reasonably usable and exportable electronic file format for review by the Requesting Party. Upon review of the exported electronic file(s), the Requesting Party may make reasonable requests for additional information to explain the database schema, codes, abbreviations, and different report formats or to request specific data from identified fields. A potential approach to discovery involving structured database materials may involve the parties meeting and conferring upon a set of queries to be made for discoverable information within the database.

A producing party may always conduct a manual review for responsiveness and privilege, whether or not search terms or technology-aided review is also utilized.

7) **PRODUCTION FORMATS**

***Principles applicable to all productions of ESI and hard-copy documents***

a. The parties agree to make rolling productions.

b. Documents will be produced to the requesting party in the formats addressed below under "Principles applicable to ESI" and "Principles applicable to hard-copy documents."

c. Each document file shall be named with a unique number (Bates Number). File names should not be more than twenty characters long or contain spaces.

d. Only responsive and relevant attachments need to be produced. Non-responsive and non-relevant attachments may be withheld unless necessary to provide full context to the parent document or one or more of the other responsive and relevant attachments. If any single attachment to a document is responsive, then the parent document, unless privileged, shall be produced for context, regardless of the parent document's responsiveness. Document level extracted text or OCR for documents without extracted text will be provided by the producing party for every record, including for scanned hard copy documents as described above. Extracted text will

not be provided for electronic documents that have been redacted because the extracted text would reveal the redacted information. Instead, these files will be OCRed to capture the visible text and those results will be provided in lieu of the original extracted text.

e. The Parties are not obligated to populate manually any of the metadata fields set forth below if such fields cannot be reasonably extracted from a document. The parties reserve the right to request additional metadata fields should the party show good cause for the necessity of such additional metadata.

f. The parties agree that this Stipulated Order does not preclude a party from requesting the production of documents by inspection of hard copy documents as they are kept in the usual course of business.

g. Confidentiality: The parties have entered into a protective order in this matter which specifies various confidentiality treatment levels for use in this case. The confidentiality treatment level for any item will be provided with the created data for that item, in the field entitled "Confidentiality Treatment." For items with no confidentiality requirements, the field will be left blank. The producing party will brand any confidentiality endorsement in a corner on any PDFs or TIFF images representing the produced item. Those endorsements must be in a consistent font type and size and must not obscure any part of the underlying image or Bates number.

***Principles applicable to ESI.***

h. The parties agree that, except as provided herein or otherwise agreed upon by the parties, ESI shall be produced in PDF, native, or single-page Group IV TIFF, 300-dpi format. Such productions shall be accompanied by Opticon and IPRO load files (or other generally acceptable load file format) that contains metadata fields identifying natural document breaks and also includes companion OCT and/or

extracted text files. Each PDF, native, or TIFF file shall be given a unique file name that matches the Bates number label on first page of the document.

i. Documents with hidden content, such as spreadsheets or presentations, shall be produced in native with all content unhidden and notes displayed. If it must be produced in TIFF, it shall be processed with all content unhidden and any notes displayed on the TIFF image. The Parties reserve all rights to meet and confer to request production of documents with hidden content in an alternate format.

j. If a document is more than one page, the parties shall make reasonable efforts, consistent with reasonable industry practices, to provide the logical unitization of the document, any attachments, and/or affixed notes as they exist in the original document.

k. The full text of each electronic document shall be extracted or OCRed ("Extracted Text") and produced in a text file. The Extracted Text shall be provided in searchable ASCII text format (or Unicode text format if the text is in a foreign language) and shall be named with a unique Bates Number (e.g., the unique Bates Number of the first page of the corresponding production version of the document followed by its file extension).

l. The Parties agree to produce documents using the Mountain Standard Time Zone.

m. A producing party may de-duplicate electronic documents and is not obligated to extract or produce entirely duplicate ESI. Removal of duplicate documents shall only be done on either (1) exact duplicate documents based on MD5 hash values across custodians, or (2) emails that contain the same content, sender and recipients as other messages despite not having matching MD5 hash values such that they would be identified as "email duplicate spare messages" by the Relativity document review platform or an equivalent designation in an alternative document review platform. However, family relationships will be maintained and only exact email family groups, including email duplicate spare messages or equivalents, will be de-

duplicated. No email attachment will be de-duplicated against a loose file. Global de-duplication across the entire collection will be employed. This eliminates duplicates to retain only one copy of each document per case. For example, if an identical document resides with three custodians, only the first custodian's copy will be included in the review set. The custodian field will list each custodian, separated by a semicolon, who was a source of that document, or alternatively the Producing Party may utilize a separate "All Custodians" field which identifies all custodians of the subject document.

n. In order to reduce the volume of entirely duplicative content within email threads, the Parties may utilize threading or "email thread suppression." As used in this Protocol, email thread suppression means employing commercially acceptable methods to reduce production of duplicative email threads by producing only the inclusive email messages and their attachments from each email thread. An email message is inclusive when it contains any non-duplicative content or has a document or set of documents attached that does not appear elsewhere within the email thread. Typically, an inclusive email will be either the longest, most recent in time email message containing all of the text from previous, earlier in time email messages within that same thread or an email message with attachments not otherwise attached to a later in time email within that same thread, but any email will be treated as inclusive when it contains non-duplicative content. Non-relevant email within otherwise relevant inclusive threads will typically be produced for context unless redaction of confidential or privileged information is necessary. Accordingly, exact duplicates of emails as well as email messages comprised of text identical to text contained within an inclusive email in the same conversation will be suppressed and not produced, however responsive, non-duplicative attachments will be produced along with their conveying email message even when

the text of that parent email message is fully represented in a longer, later in time email thread.

o. The parties agree that the fields of metadata in Exhibit A shall be preserved, collected, and produced, only to the extent it is reasonably accessible and non-privileged. This list of metadata is intended to be flexible and may be changed by agreement of the parties, particularly in light of advances and changes in technology, vendor, and business practices.

p. Unless otherwise agreed to by the parties, files that are not easily converted to image format, such as spreadsheet, database, and audio or video, will be produced in native format, or near-native format. If particular documents warrant a different format, the parties will cooperate to arrange for the mutually acceptable production of such documents.

q. The original native files, or near-native files as appropriate, should be produced in addition to a single-page TIFF placeholder for each document. The placeholder should be endorsed with "Native Format Document," and endorsed with the Bates number assigned to that document. The produced native file should be named with the Bates number assigned to that document. Any confidentiality or other designations stamped on the placeholder for such a document shall apply to the entire native file and its contents. For documents whose native format is MS Power Point, the original native files shall be produced with any comments and color preserved. The produced native file should be named with the beginning Bates numbers assigned to that document. The parties will meet and confer upon the other types of files that are not easily converted to image format and will therefore be produced in native format.

r. The relative path to the native file should be included in the delimited text file and the produced files should be organized in a "NATIVES" folder in the production media.

s. All documents, native ESI, photographs, and video shall be produced in color if stored in color. Documents produced in color shall be produced as JPEG images, 300 dpi or higher and 24-bit color depth. Except as already specified herein, the parties agree to make a good faith effort to comply with reasonable and specific requests for the production of higher resolution or color images. Nothing in this order shall preclude a producing party from objecting to such requests as unreasonable in number, timing or scope, provided that a producing party shall not object if the document as originally produced is illegible or difficult to read. The producing party shall have the option of responding by producing a native-file version of the document. If a dispute arises with regard to requests for higher resolution or color images, the parties will meet and confer in good faith to try to resolve it.

***Principles applicable to hard-copy documents.***

t. The parties agree that documents existing in hard copy form should be produced in single-page Group IV, 300-dpi TIFF format and accompanied by an Opticon and IPRO load file (or other generally acceptable load file format). Each TIFF file will be given a unique file name that matches the Bates number label on the corresponding page. The accompanying load file shall contain, at a minimum, (a) ProdBeg, (b) ProdEnd, and (c) custodian name, to the extent available. The full extracted or OCR text should be included and produced at a document level and located in the same folder as their respective document image or OCR/TEXT folder.

u. The parties agree that documents existing in hard copy form may be produced in searchable PDF if the parameters in paragraph (t) are unduly burdensome and not proportionate to the needs of the case. Each PDF file will be given a unique file name that matches the Bates number label on the first page of the document.

v. The parties will undertake best efforts to unitize documents correctly. In scanning hard-copy documents, distinct documents should not be merged into a single record, and single documents should not be split into multiple records (i.e., paper documents should be logically unitized).

w. Text of hard-copy documents shall be extracted using industry-standard OCR technology. Text files shall not contain the redacted portions of the documents.

x. Responsive hard copy documents shall not be eliminated as duplicates of responsive ESI.

**8) DOCUMENTS PROTECTED FROM DISCOVERY**

The obligation to provide a log of privileged or work product materials presumptively shall not apply to: (a) Attorney work product created by Outside Counsel for the Parties regarding this litigation created after the filing of the first complaint; (b) Internal communications within Outside Counsel for the Parties regarding this litigation created after the filing of the first complaint; (c) Communications between Outside Counsel and the party they represent regarding this litigation after the filing of the first complaint. The parties agree to confer regarding other categories of information that may be excluded from logging requirements.

The Parties agree that, except as provided herein regarding presumptively privileged documents and ESI, they will produce privilege logs and will exchange information regarding claims of privilege and/or work product protection within 30 days of a production.

For documents and ESI that have been withheld as privileged, the withholding or redacting Party shall provide a privilege log of such documents and ESI, providing the following objective metadata to the extent it is reasonably available: date, author(s), custodian(s), recipient(s), file type, and subject (to the extent the subject does not reveal protected content). In addition, the withholding Party shall also provide for each document on their privilege log an identifier for the privilege being asserted (e.g., "ACP" for attorney client privilege, "WP" for work product, or other descriptions as necessary based on the specific privilege being claimed) and the document's Bates numbers.

Documents redacted for privilege need not be logged as long as (a) for emails, the bibliographic information is not redacted and (b) for non-email documents, the redaction is noted on the TIFF image.

The parties reserve the right to request additional information regarding individual documents on the privilege log.

**a. Limitations and Non-Waiver**

Pursuant to the Massachusetts Rules of Civil Procedure, the production of a privileged or work-product-protected documents, electronically stored information, or information, whether inadvertent or otherwise, is not a waiver of privilege or protection from discovery in this case or in any other federal or state proceeding. Nothing contained within this paragraph is intended to or shall serve to limit a party's right to conduct a review of documents, ESI or information (including metadata) for relevance, responsiveness, confidentiality and/or segregation of privileged and/or protected information before production.

**9) MODIFICATIONS**

a. Any practice or procedure set forth herein may be varied by agreement of the Parties, and first will be confirmed in writing, where such variance is deemed appropriate to facilitate the timely and economical exchange of electronic data or other covered discovery materials.

b. Should any Party subsequently determine in good faith that it cannot proceed as required by this Order or that the Order requires modification, the Parties will meet and confer to resolve any dispute before seeking Court intervention.

**IT IS SO ORDERED.**

Dated: 7/13/23

Hon. Judge
Superior Court of Essex County

WE SO MOVE
and agree to abide by the
terms of this Order

*/s/ Jonathan T. Merrigan*
J. Tucker Merrigan, BBO# 681627
Sweeney Merrigan Law
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
tucker@sweeneymerrigan.com

/s/ Foster C. Johnson
Foster C. Johnson (*admitted pro hac vice*)
Ahmad, Zavitsanos, & Mensing, PLLC
1221 McKinney Street, Suite 2500
Houston, Texas 77010
Tel: (713) 655-1101
fjohnson@azalaw.com

*/s/ Alex Dravillas*
Alex Dravillas (*admitted pro hac vice*)
Keller Postman LLC
150 N. Riverside Plaza
Suite 4100
Chicago, Illinois 60606
Tel: (312) 741-5220
ajd@kellerpostman.com

Attorneys for Plaintiff and the Putative Class

/s/ Tammy Webb
Tammy B. Webb (*admitted pro hac vice*)
Shook, Hardy, & Bacon L.L.P.
555 Mission Street, Suite 2300
San Francisco, California 94105
Tel: (415) 544-1900
tbwebb@shb.com

Attorney for Defendants

**EXHIBIT A**

| **FIELD NAME** | **FIELD DESCRIPTION** |
|---|---|
| DOCID/IMAGEFILENAME | Unique identifier |
| PRODBEG | First Page document number |
| PRODEND | Last Page document number |
| PRODBEGATT | First Page of Family group range number |
| PRODENDATT | Last Page of Family group range number |
| CUSTODIAN | All record owners of the file from whom the data was collected, including copies identified during global deduplication |
| HASH VALUE | A unique, identifying number of a file calculated by a hash algorithm, e.g. MD5. |
| FROM | Email Sender |
| TO | Email Recipient(s) |
| CC | Email Recipient(s) that were Copied |
| BCC | Email Recipient(s) that were Blind Copied |
| SUBJECT | Subject line of emails |
| THREADID | Identification of email threads |
| PARENTID | Identification of email parent relationships |
| FILENAME | Name of file |
| DATESENT | Email sent date |
| TIMESENT | Email sent time |
| DATERECEIVED | Email received date |
| TIMERECEIVED | Email received time |
| DATESAVED | Save date |

| | |
|---|---|
| TIMESAVED | Save time |
| DATELASTPRINT | Date last printed |
| TIMELASTPRINT | Time last printed |
| FILEEXT | File extension of document |
| AUTHOR | Author information as derived from the properties of the document |
| COMPANY | Company that supplied the ESI in its raw format |
| TITLE | Title from document metadata (if applicable) |
| DATECREATED | Date document was created on non-emails |
| TIMECREATED | Time document was created on non-emails |
| DATEMODIFIED | Last date document was modified on non-emails |
| TIMEMODIFIED | Last time document was modified on non-emails |
| FILESIZE | Size of Native file |
| PGCOUNT | Number of pages in document |
| OCRPATH | Path to extracted text of native file or OCR |
| NATIVELINK | Path to email or native file document (if applicable) |
| ORIGINALPATHFOLDER | Path including filename |

COMMONWEALTH OF MASSACHUSETTS

ESSEX, S.S. SUPERIOR COURT

| | | |
|---|---|---|
| JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | § | C.A. No. 2277CV01000 |
| Plaintiff | § | |
| v. | § | |
| EMERSON HOSPITAL, | § | |
| Defendant. | § | |

A TRUE COPY, ATTEST
DEPUTY ASST. CLERK

7/20/23 After review, the agreed motion is ALLOWED
Janice W. Howe, J.

**AGREED MOTION FOR ENTRY OF AGREED SCHEDULING ORDER**

Pursuant to the Massachusetts Rules of Civil Procedure, the Parties file this Agreed Motion for Entry of an Agreed Scheduling Order. The Parties' Agreed Scheduling Order is attached hereto as Exhibit A. The Parties agree to be bound by its terms and respectfully request that the Court enter the Agreed Scheduling Order.

SO STIPULATED this 17th day of July 2023.

Counsel for Plaintiff:

*/s/ J. Tucker Merrigan*
J. Tucker Merrigan, BBO #681628
**Sweeney Merrigan Law, LLP**
268 Summer Street, LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
emchugh@sweeneymerrigan.com
tucker@sweeneymerrigan.com

Foster C. Johnson (*pro hac vice forthcoming)*

Counsel for Defendant:

*/s/ Emyr Remy*
Emyr Remy, BBO #740156
**Shook, Hardy & Bacon, LLP**
One Federal Street, Suite 2540
Boston, MA 02110
Tel.: (617) 531-1411
Fax: (617) 531-1602
remy@shb.com

Alfred J. Saikali (*pro hac vice forthcoming*)

David Warden (*pro hac vice forthcoming*)
Nathan Campbell (*pro hac vice forthcoming*)
**Ahmad, Zavitsanos & Mensing, P.C.**
1221 McKinney St., Suite 3460
Houston, TX 77010
Tel.: (713) 655 1101
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

Seth Meyer (*pro hac vice forthcoming*)
Alex Dravillas (*pro hac vice forthcoming*)
**Keller Postman LLC**
150 N. Riverside Plaza, Suite 4100
Chicago, IL 60606
Tel.: (312) 741-5220
sam@kellerpostman.com
adj@kellerpostman.com

**Shook, Hardy & Bacon, LLP**
210 South Biscayne Blvd., Suite 3200
Miami, FL 33131
Tel.: (305) 358-5171
Fax: (305) 358-7470
asaikali@shb.com

Josh Becker (*pro hac vice forthcoming*)
**Shook, Hardy & Bacon LLP**
1230 Peachtree St., Suite 1200
Atlanta, GA 30309
Tel.: (407) 867-6000
Fax: (470) 867-6001
jbecker@shb.com

Michael Rayfield (*pro hac vice forthcoming*)
**Shook, Hardy & Bacon LLP**
1325 Avenue of the Americas, 28th Floor
New York, NY 10019
Tel.: (212) 989-8844
Fax: (929) 501-5455
mrayfield@shb.com

Lindsey Knapton (*pro hac vice forthcoming*)
**Shook, Hardy & Bacon LLP**
1600 17th Street, Suite 450
Denver, CO 80202
Tel.: (303) 285-5300
Fax: (303) 285-5301
lknapton@shb.com

Tammy B. Webb (*pro hac forthcoming*)
**Shook, Hardy, & Bacon LLP**
555 Mission Street, Suite 2300
San Francisco, CA 94105
Tel: (415) 544-1900
Fax: (415) 391-0281
tbwebb@shb.com

# Exhibit A

**CERTIFICATE OF SERVICE**

I, J. Tucker Merrigan, hereby certify that on July 17, 2023, I served the foregoing Agreed Motion for Entry of Agreed Scheduling Order electonically to all counsel of record.

Respectfully Submitted,

*/s/ J. Tucker Merrigan*
J. Tucker Merrigan, BBO# 681627
**SWEENEY MERRIGAN LAW, LLP**
268 Summer Street, LL
Boston, MA 02210
Phone: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com

**COMMONWEALTH OF MASSACHUSETTS**

**ESSEX, S.S.**

**TRIAL COURT DEPARTMENT
SUPERIOR COURT**

JOHN DOE, individually and on behalf of all other similarly situated,

Plaintiff,

v.

EMERSON HOSPITAL,

Defendant.

DOCKET NO. 2277CV01000D

**[PROPOSED] AGREED SCHEDULING ORDER**

The parties hereby submit the below Agreed Scheduling Order, and the Court being duly advised now **FINDS** and **ORDERS** as follows:

**DISCOVERY**

1. **Amendment of Pleadings**. Any motion to amend the pleadings shall be filed on or before **January 8, 2024**.

2. **Fact Discovery**. Defendants responded to the First Requests for Interrogatories Nos. 1, 2, 3, 4, 7, 8, 10 and First and Second Requests for Production Nos. 1-3, 4, 12-16, 19-20, 40-42, 44, 46-47, 54-56, 58, 92, 142 on June 20, 2023. Defendant will begin a rolling production in response to Plaintiff's document requests by July 17, 2023. In response to the proposed search term list previously submitted by Plaintiff, Defendant will provide an organizational chart and an initial hit list for negotiation purposes by July 24, 2023. Defendant will respond to the remainder of Plaintiff's First Requests for Interrogatories and First and Second Requests for Production by August 31, 2023. All discovery (other than expert witness depositions and any motions to compel) shall be completed by December 31, 2023.

A TRUE COPY, ATTEST
DEPUTY ASST. CLERK

3. **Plaintiffs' Class Certification Expert Designation.** Plaintiffs shall identify the name of any class certification expert witness whom they may call to testify and provide expert report(s) no later than **January 29, 2024.** Plaintiffs shall make such expert(s) available for deposition within 30 days of providing expert reports.

4. **Defendant's Class Certification Expert Designation.** Defendant shall identify the name of any class certification expert witness whom it may call to testify and provide expert report(s) within 30 days of receiving Plaintiff's expert reports. Defendant shall make such expert(s) available for deposition within 60 days of receiving Plaintiff's expert reports.

5. **Close of Class Certification Expert Discovery**. Class certification expert discovery shall be completed by **March 29, 2024.**

**PRE-TRIAL MOTIONS AND CLASS CERTIFICATION**

6. **Class Certification Motion**. Plaintiffs' motion for class certification is to be filed on or before **June 21, 2024**.

7. **Class Certification Response**. Defendant's response in opposition to Plaintiffs' motion for class certification is to be filed no later than 30 days after Plaintiffs file their motion for class certification.

8. **Class Certification Reply**. Plaintiffs' reply brief to Defendant's response in opposition is to be filed no later than 15 days after Defendant files its response in opposition.

9. **Class Certification Hearing.** Plaintiffs' motion for class certification will be called and heard within 30 days after Plaintiffs file their reply.

10. **Status Conference.** Within 30 days of the Court's ruling on class certification, the parties will submit a joint case management order, addressing the remaining deadlines in the case. The parties request that the Court hold a status conference to discuss the remaining deadlines.

**MEDIATION**

11. The parties will meet and confer about a mediation date within 30 days of the Court's ruling on class certification.

**AMENDMENT OF THIS ORDER**

12. Any party may move to amend a deadline in this Order upon a showing of good cause or agreement of all parties.

IT IS ORDERED this 25th day of July, 2023

Janice W. Howe

Dated: ______________________

31

COMMONWEALTH OF MASSACHUSETTS

| | | |
|---|---|---|
| ESSEX, ss | ) | TRIAL COURT DEPARTMENT |
| | ) | SUPERIOR COURT |
| JOHN DOE, individually and on behalf of all others similarly situated, | ) | |
| Plaintiff, | ) | DOCKET NO. 2277CV01000D |
| v. | ) | |
| EMERSON HOSPITAL, | ) | |
| Defendant. | ) | |

**NOTICE OF SUPPLEMENTAL AUTHORITY IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

Defendant Emerson Hospital ("Emerson") respectfully submits this Notice of Supplemental Authority to inform the Court of the following recent decisions relevant to the issues raised in its Motion to Dismiss the First Amended Complaint (Dkt. 18), which was fully briefed on April 24, 2023. Both decisions issued afterward.

In *Dinerstein v. Google, LLC*, 73 F.4th 502 (7th Cir. 2023) (Ex. A), the Seventh Circuit found implausible the same types of overpayment and underpayment damages theories that Plaintiff alleges as his only purported damages for all claims here; namely: (1) that Emerson allegedly deprived him of the value of his alleged PII/PHI without paying for that value (underpayment theory), *see* FAC ¶¶ 194a-c & e, 210a-c & e, 222a-c & e, 253, 260; and (2) that Plaintiff allegedly paid Emerson money for data privacy and did not receive that data privacy in return (overpayment theory), *see id.* ¶¶ 194b, 210b, 222b, 239, 249-51, 260. *See Dinerstein*, 73 F.4th at 516–17 ("[plaintiff] contends that he *overpaid* the University for his medical treatment or, alternatively, that the University *underpaid* him for the interest in his medical records . . . While



A TRUE COPY, ATTEST
DEPUTY ASST. CLERK

[plaintiff] alleges both an overpayment and underpayment theory of financial harm, neither is plausible") (emphasis in original).

In *Cousin v. Sharp Healthcare*, 2023 WL 4484441, at *10 (S.D. Cal. July 12, 2023) (Ex. B), the District Court dismissed a Pixel healthcare case in its entirety, including a claim for breach of fiduciary duty on the basis that state law did not recognize a healthcare provider's fiduciary duty to its patient to maintain confidentiality over patient interactions with the healthcare provider's website.

Dated: September 25, 2023

Respectfully submitted,

EMERSON HOSPITAL

By: */s/Emyr T. Remy*

Emyr T. Remy, BBO# 704156
**SHOOK, HARDY & BACON L.L.P.**
One Federal Street, Suite 2540
Boston, MA 02110
Tel.: (617) 531-1411 | Fax: (617) 531-1602
remy@shb.com

Alfred J. Saikali (FL # 0178195)
**SHOOK, HARDY & BACON L.L.P.**
201 South Biscayne Blvd., Suite 3200
Miami, Florida 33131
Tel: (305) 358-5171 | Fax: (305) 358-7470
asaikali@shb.com

Tammy B. Webb (CA # 227593)
**SHOOK, HARDY & BACON L.L.P.**
555 Mission Street, Suite 2300
San Francisco, CA 94105
Tel: (415) 544-1900 | Fax: (415) 391-0281
twebb@shb.com

Justin R. Donoho (IL # 6299667)
**SHOOK, HARDY & BACON L.L.P.**
111 South Wacker Drive, Suite 4700
Chicago, IL 60606
Tel: (312) 704-7713 | F: (312) 558-1195
jdonoho@shb.com

Jenn O. Hatcher (MO # 69742)
**SHOOK, HARDY & BACON L.L.P.**
2555 Grand Boulevard
Kansas City, MO 64108
Tel: (816) 474-6550 | F: (816) 421-5547
jhatcher@shb.com

Jessica N. Wahl (CA # 321887)
**SHOOK, HARDY & BACON L.L.P.**
2049 Century Park East, Suite 3000
Los Angeles, CA 90067
Tel: (424) 324-3477 | Fax: (424) 204-9093
jwahl@shb.com

**CERTIFICATE OF SERVICE**

I, Emyr T. Remy, hereby certify that on September 25, 2023 a true copy of the above document was served by email upon:

J. Tucker Merrigan (BBO# 681627)
Victoria Santoro (BBO# 679120)
Erin E, McHugh (BBO# 703701)
**SWEENEY MERRIGAN LAW**
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com
*Attorneys for Plaintiff*

Foster C. Johnson (*PHV24076463TX*)
David Warden (*PHV20856750TX*)
Nathan Campbell (*PHV24097455TX*)
**AHMAD, ZAVITSANOS & MENSING, P.C.**
1221 McKinney St., Suite 3460
Houston, TX 77010
Tel: (713) 655-1101
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com
*Attorneys for Plaintiff*

Seth Meyer (*PHV5191283NY*)
Alex Dravillas (*PHV6299686IL*)
**KELLER POSTMAN LLC**
150 N. Riverside Plaza, Suite 4100
Chicago, IL 60606
Tel: (312) 741-5220
sam@kellerpostman.com
ajd@kellerpostman.com
*Attorney for Plaintiff*

*/s/ Emyr T. Remy*
Emyr T. Remy

***John Doe v. Emerson Hospital***
**Docket No. 2277CV01000D**

**INDEX OF EXHIBITS TO NOTICE OF SUPPLEMENTAL AUTHORITY IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

| Ex. | Document | Date |
|---|---|---|
| A | *Dinerstein v. Google, LLC, et al.*, 73 F.4th 502 (7th Cir. 2023) | 7/11/2023 |
| B | *Cousin, et al. v. Sharp Healthcare*, 22-cv-2040-MMA (DD), 2023 WL 4484441 (S.D. Cal. July 12, 2023) | 7/12/2023 |

# EXHIBIT A

73 F.4th 502
United States Court of Appeals, Seventh Circuit.

Matt DINERSTEIN, individually and on behalf of all others similarly situated, Plaintiff-Appellant,
v.
GOOGLE, LLC; University of Chicago; and University of Chicago Medical Center; Defendants-Appellees.

No. 20-3134
|
Argued September 17, 2021
|
Decided July 11, 2023

**Synopsis**
**Background:** Patient at university hospital, whose anonymized electronic health records had been disclosed for research purposes to create predictive health models, filed putative class action against university, university hospital, and research partner, pursuant to Class Action Fairness Act (CAFA), claiming violation of Healthcare Insurance Portability and Accountability Act (HIPAA), violation of Illinois Consumer Fraud and Deceptive Business Practices Act (ICFA), breach of contract, unjust enrichment, tortious interference with contract, and intrusion upon seclusion. Defendants moved to dismiss. The United States District Court for the Northern District of Illinois, Rebecca R. Pallmeyer, Chief Judge, 484 F.Supp.3d 561, granted motion, and patient appealed.

**Holdings:** The Court of Appeals, Sykes, Chief Judge, held that:

patient failed to plausibly allege an injury in fact, and so lacked Article III standing to pursue his privacy claim for breach of medical confidentiality;

neither of patient's alleged pecuniary injuries established Article III standing to pursue his claim for breach of express contract against university; and

patient's allegations of a privacy, pecuniary, or contractual injury were also insufficient to confer Article III standing with respect to his tortious-interference and consumer-fraud claims.

Affirmed as modified.

**Procedural Posture(s):** On Appeal; Motion to Dismiss for Lack of Standing; Motion to Dismiss for Failure to State a Claim.

***507** Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. No. 19 C 4311 — **Rebecca R. Pallmeyer**, *Chief Judge.*

**Attorneys and Law Firms**

Ryan D. Andrews, Roger Perlstadt, Alexander Glenn Tievsky, Attorneys, Edelson P.C., Chicago, IL, for Plaintiff-Appellant.

Jeffrey T. Norberg, Attorney, Neal & McDevitt, LLC, Northfield, IL, Michael Graham Rhodes, Attorney, Cooley LLP, San Francisco, CA, for Defendant-Appellee Google, LLC.

Brian D. Sieve, Michael B. Slade, Esq., Attorneys, Kirkland & Ellis LLP, Chicago, IL, C. Harker Rhodes, IV, Attorney, Kirkland & Ellis LLP, Washington, DC, for Defendants-Appellees University of Chicago, University of Chicago Medical Center.

Before Sykes, Chief Judge, and Flaum and Kirsch, Circuit Judges.

**Opinion**

Sykes, Chief Judge.

This class-action lawsuit arises from a research collaboration between Google and the University of Chicago together with its affiliated Medical Center. (We will refer to the latter two as "the University" unless the context requires otherwise.) Harnessing the power of artificial intelligence, the research partners aspired to develop soft-ware capable of anticipating patients' future healthcare needs. If successful, the software promised to reduce medical complications, eliminate unnecessary hospital stays, and, ultimately, improve patients' healthcare outcomes.

As an initial step in the research effort, the University delivered several years of anonymized patient medical records to Google, thus supplying it with the information needed to "train" the software's algorithms. A Data Use Agreement governed the transfer. Restricting Google's use of ***508** the records to a list of specific research-related

activities, the agreement expressly prohibited the company from attempting to identify any patient whose records were disclosed.

The anonymized electronic records subject to the agreement included those of Matt Dinerstein, twice an inpatient at the hospital during the period covered by the records disclosure. Dinerstein sued Google and the University on behalf of himself and a class of other patients whose anonymized records were disclosed. He alleged several theories of liability. He first claimed that the University had breached either an express or an implied contract traceable to a privacy notice he received and an authorization he signed upon each admission to the Medical Center. Alternatively, he asserted a claim for unjust enrichment. Citing the same notice and authorization, he also alleged that the University had reneged on its promise of patient confidentiality and therefore violated the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILL. COMP. STAT. 505/1 *et seq.* Against Google, he asserted claims for unjust enrichment and tortious interference with his contract with the University. Finally, he brought a privacy claim against all defendants based on allegations of intrusion upon seclusion.

The district judge dismissed the consumer-fraud claim for lack of standing and the rest of the suit for failure to state a claim. We agree with her decision to dismiss the case, but our analysis begins and ends with standing. Dinerstein has not adequately alleged standing to pursue *any* of his claims. To sue in federal court, a plaintiff must plausibly allege (and later prove) that he has suffered an injury in fact that is concrete and particularized, actual or imminent, and traceable to the defendant's conduct. The injuries Dinerstein alleges lack plausibility, concreteness, or imminence (or some combination of the three). Because the complaint fails to plausibly allege an injury in fact, we affirm but modify the judgment to reflect a jurisdictional dismissal for lack of standing.

## I. Background

Our factual account is drawn from Dinerstein's amended complaint. We begin with a description of his inpatient stays at the University Medical Center—and more particularly, the paperwork he received at the start of each admission. Dinerstein alleges that he was first admitted to the Medical Center on June 4, 2015, and was discharged three days later. He was then readmitted on June 25, this time for a two-night stay. Upon each admission Dinerstein received a Notice of Privacy Practices detailing the University's confidentiality obligations and the circumstances in which it might use or disclose patient medical information. Relevant here, the notice stated that the University would obtain "written permission" for the sale of such information. Patient permission was not required, however, for the University to use or share the information in limited research-related circumstances. In addition to the notice, Dinerstein received and signed an Admission and Outpatient Agreement and Authorization. By doing so he affirmed that he understood that his medical information might be shared for approved research purposes and that if so, he would "not be entitled to any compensation." He further acknowledged that "all efforts" would "be made to protect [his] privacy" and that "any use of [his] medical information" would comply with both the notice and "federal and state laws."

During Dinerstein's two hospital stays, the University compiled records of his vital readings, medical procedures, prescriptions, test results, and diagnoses. The records also contained demographic ***509** information. After each discharge from the hospital, the Medical Center maintained electronic copies of his patient records.

Approximately two years after Dinerstein's hospital visits, Google announced that it had partnered with the University to research new healthcare technology. With the help of machine learning, the research partners aspired to develop predictive modeling software that would improve the ability of medical providers to forecast their patients' medical needs and, in turn, to tailor subsequent medical care. As described in promotional statements, the project had the potential to prevent medical complications, reduce hospital visits, and improve overall health and well-being. [1]

To reliably predict medical outcomes, the models needed extensive information from which to learn. The University thus agreed to transfer to Google a large set of anonymized patient medical records. A Data Use Agreement executed by the partners in December 2016 governed the transfer. While most of the agreement's provisions are irrelevant for our purposes, a few deserve mention. First, the agreement contemplated that before disclosure the University would strip the patient records of all direct identifying information except the dates of medical events and services. Second, the agreement delineated the records' authorized uses. In particular, Google was permitted to use the records only to identify key medical information, to develop predictive

models, and to assess the models' efficacy. It could neither disclose information from within the records nor use the records in contravention of federal law. Most importantly, the agreement strictly prohibited Google from using the records "to identify any individual." Third, if the parties' research efforts proved successful, the agreement granted the University a perpetual license to use the predictive models for its own "internal non-commercial research purposes."

The batch of medical records covered by the Data Use Agreement spanned several years. Specifically, the agreement directed the University to transfer to Google anonymized records generated from all inpatient, outpatient, and emergency adult-patient encounters between January 1, 2010, and June 30, 2016. Both of Dinerstein's overnight stays occurred in June 2015, so his medical records were included in the set disclosed to Google. Dinerstein alleges that the University never obtained his consent—written or other-wise—for the third-party record disclosure. Nor did Google seek permission to use his records.

Dinerstein filed suit against the University and Google seeking damages and injunctive relief on behalf of himself and a class of patients whose anonymized records were disclosed. He raised seven claims for relief. Against the University he alleged claims for breach of an express or an implied contract premised on the notice he received and the authorization he signed upon each admission to the Medical Center. More to the point, Dinerstein alleged that in exchange for his payment and personal medical information, the University had agreed to protect and secure his information. By sharing it with Google, the University had failed to uphold its end of the bargain. As an alternative to his contract claims, Dinerstein sought damages for unjust enrichment. He also alleged a claim for violation of the Illinois ***510** Consumer Fraud and Deceptive Business Practices Act. This statutory claim rested on the alleged broken promises, which Dinerstein asserted the University never intended to keep in the first place.

Turning to Google, Dinerstein alleged that the company had tortiously interfered with his contract with the University. He also asserted a claim for unjust enrichment based on the company's receipt of valuable patient medical records. Finally, Dinerstein brought a tort claim against Google and the University for invasion of privacy. More specifically, he alleged that they had intruded upon his seclusion by sending and receiving his sensitive medical information.

Relevant to this last theory of liability, Dinerstein claimed that while he was an inpatient at the Medical Center, he had used a smartphone with geolocation capabilities. Because he had also downloaded various Google apps, he alleged that the phone granted the company access to his precise location during every moment of his hospital stays. He further alleged that if Google compared his location data with the insufficiently anonymized patient records, it could easily ascertain his identity and uncover "intimate private details" in his medical histories. And he alleged that Google could do the same thing with other class members' geolocation data.

The defendants moved to dismiss under Rules 12(b)(1) and (6) of the Federal Rules of Civil Procedure. They argued that Dinerstein had not alleged a concrete injury to support Article III standing and, alternatively, that he had not stated a cognizable claim. The judge granted the motion, agreeing primarily with the latter argument and dismissing the complaint in its entirety.

On the standing issue, the judge construed Dinerstein's allegations about a lost benefit of the bargain as sufficient to support standing to sue on the contract (and contract-alternative) theories against both the University and Google. *Dinerstein v. Google, LLC*, 484 F. Supp. 3d 561, 574 (N.D. Ill. 2020). She also reasoned that the allegations about an invasion of privacy—in the form of a wrongful disclosure of his private medical information—supported Dinerstein's standing to sue for intrusion upon seclusion. *Id.* at 575. But the judge dismissed the consumer-fraud claim for lack of standing because "[a] claim under [the Illinois Consumer Fraud and Deceptive Business Practices Act] requires a showing of actual damages," which Dinerstein had not alleged. *Id.* at 579 (citing 815 ILL. COMP. STAT. 505/10a(a)).

Moving on, the judge dismissed the claims for breach of contract—express or implied—for failure to state a cognizable claim because Dinerstein had not adequately pleaded economic damages, a required element under Illinois law. *Id.* at 590–93; FED. R. CIV. P. 12(b)(6). Next, the judge noted but chose not to decide the question whether Dinerstein's claim for tortious interference with contract necessarily fell with the other contract claims. Instead, she held that the claim failed for a separate reason: Dinerstein had not sufficiently pleaded that Google had *intentionally* caused the University's breach of contract. *Id.* at 593. (Intent is necessary to state a claim of tortious interference with contract in Illinois. *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp.,*

*Inc.*, 131 Ill.2d 145, 137 Ill.Dec. 19, 545 N.E.2d 672, 676 (1989).)

Turning to the privacy claim, the judge observed that Dinerstein had recharacterized his original intrusion-upon-seclusion claim as a novel tort claim for breach of medical confidentiality, a theory not yet recognized in Illinois. The judge thought it unlikely that the Illinois Supreme Court would recognize such a claim, so she declined to permit Dinerstein to pursue it in ***511** federal court. That left only the unjust-enrichment claims. Because unjust enrichment is not an independent cause of action in Illinois, the judge dismissed those claims as well. Dinerstein appealed.

## II. Discussion

The dismissal order rests partly on a failure to allege Article III standing but mostly on the judge's conclusion that Dinerstein failed to state a claim upon which relief can be granted. Our review of either basis for dismissal is de novo. *Nowlin v. Pritzker*, 34 F.4th 629, 632 (7th Cir. 2022). The parties primarily focus on whether the amended complaint satisfies the statutory and common-law pleading requirements particular to each claim. But the threshold question is standing, which "is jurisdictional and cannot be waived." *Nettles v. Midland Funding LLC*, 983 F.3d 896, 899 (7th Cir. 2020).

Standing doctrine traces its origins to Article III of the Constitution, which grants federal courts the power to resolve "Cases" and "Controversies." U.S. CONST. art. III, § 2. The doctrine's elements are well established and familiar. To sue in federal court, a plaintiff must have suffered (1) a concrete, particularized, and actual or imminent injury (an "injury in fact") (2) that is fairly traceable to the defendant and (3) that is likely to be redressed by a favorable judicial decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). "[A]t the pleading stage, the plaintiff must clearly ... allege facts demonstrating eacb element." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338, 136 S.Ct. 1540, 194 L.Ed.2d 635 (2016) (quotation marks omitted). Moreover, "standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion LLC v. Ramirez*, —— U.S. ——, 141 S. Ct. 2190, 2208, 210 L.Ed.2d 568 (2021).

Like many of our recent cases concerning Article III standing, this one hinges on the injury-in-fact element, and in particular, the concreteness and imminence requirements. While the concreteness requirement examines the substance of a plaintiff's asserted injury, the imminence requirement measures its likelihood. In other words, to provide a basis to sue in federal court, an injury must exist "in both a qualitative and [a] temporal sense." *Whitmore v. Arkansas*, 495 U.S. 149, 155, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990).

Starting with the qualitative aspect, "[a] concrete injury must be *de facto*; that is, it must actually exist." *Spokeo*, 578 U.S. at 340, 136 S.Ct. 1540 (quotation marks omitted). Endorsing the term's "usual meaning," the Supreme Court has described a concrete injury as one that is "real[ ] and not abstract." *Id.* (quotation marks omitted). Both tangible and intangible harms may fit the bill, even if tangible harms like "physical or monetary injur[ies]" are perhaps more intuitively concrete. *TransUnion*, 141 S. Ct. at 2204. As the Court has explained, our task—especially when the plaintiff asserts an intangible harm—is to assess whether the alleged injury has "a close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts." *Id.* (quotation marks omitted). The inquiry asks whether the plaintiff has "identified a close historical or common-law analogue" for his asserted injury. *Id.* Put another way, when reviewing a plaintiff's alleged injury for concreteness, "[h]istory and tradition remain our ever-present guides." *Pierre v. Midland Credit Mgmt., Inc.*, 29 F.4th 934, 938 (7th Cir. 2022).

Imminence is more of an "elastic concept." ***512** *Lujan*, 504 U.S. at 564 n.2, 112 S.Ct. 2130. While it lacks a precise framework, the basic function of the imminence requirement "is to ensure that the alleged injury is not too speculative for Article III purposes." *Id.* Accordingly, a plaintiff who has not suffered a past harm cannot simply rest on allegations that he may suffer some "possible future injury," *Whitmore*, 495 U.S. at 158, 110 S.Ct. 1717, "at some indefinite future time," *Lujan*, 504 U.S. at 564 n.2, 112 S.Ct. 2130. His threatened injury instead must be "*certainly* impending" to satisfy Article III. *Id.* And importantly, while an imminent risk of future harm may suffice to support standing to sue for *prospective* relief (i.e., an injunction), a claim for damages requires a concrete harm that has in fact occurred. *TransUnion*, 141 S. Ct. at 2210–11.

With these fundamental standing principles in mind, we turn to the claims presented in this case. At the outset, however, we note that Dinerstein omitted from his opening brief any

discussion about the claims for unjust enrichment or breach of an implied contract. By doing so, he abandoned these claims on appeal, and we need not consider them. *See White v. United States*, 8 F.4th 547, 552 (7th Cir. 2021); *see also* FED. R. APP. P. 28(a)(8)(A) (requiring that the appellant's brief include his "contentions and the reasons for them"). What remains is the privacy claim, the claim for breach of an express contract, the consumer-fraud claim, and the claim for tortious interference with contract. We address each in turn.

**A. Privacy Claim**

We begin with the alleged breach of privacy because the asserted injury underlying this claim is common to all claims that remain live on appeal. In other words, our resolution of the standing issue on this claim necessarily resolves portions of others, streamlining our discussion of the claims that follow.

Before diving into the standing analysis, we must discern what, exactly, Dinerstein's privacy claim is. His complaint characterizes the defendants' conduct as a common-law intrusion upon seclusion, which is potentially actionable when the alleged tortfeasor "intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another." RESTATEMENT (SECOND) OF TORTS § 652(B) (AM. LAW INST. 1977) [hereinafter RESTATEMENT.] The Illinois Supreme Court has adopted this definition of the tort, describing the purpose of the seclusion right as "protecting a person from another's prying into their physical boundaries or affairs." *W. Bend Mut. Ins. Co. v. Krishna Schaumburg Tan, Inc.*, 451 Ill.Dec. 1, 183 N.E.3d 47, 58 (2021); *see also Lovgren v. Citizens First Nat'l Bank*, 126 Ill.2d 411, 128 Ill.Dec. 542, 534 N.E.2d 987, 988–89 (1989).

Apparently accepting that neither defendant's conduct fits the elements of this tort, Dinerstein abandoned his intrusion-upon-seclusion theory below, as the district judge noted. *Dinerstein*, 484 F. Supp. 3d at 594. In his response to the defendants' motion to dismiss, Dinerstein reframed his privacy claim as a breach of medical confidentiality, a novel cause of action that posits a common-law duty of medical providers to maintain patient confidentiality. Several states have recognized some variety of this tort. *See, e.g., Lawson v. Halpern-Reiss*, 210 Vt. 224, 212 A.3d 1213, 1219 (2019); *Byrne v. Avery Ctr. for Obstetrics & Gynecology, P.C.*, 327 Conn. 540, 175 A.3d 1, 17 (2018); *McCormick v. England*, 328 S.C. 627, 494 S.E.2d 431, 437 (S.C. Ct. App. 1997). But Illinois is not one of them. Dinerstein therefore invited the district judge, sitting in diversity, to hold that the Illinois Supreme Court would recognize the tort under Illinois law. *See* ***513** *Zahn v. N. Am. Power & Gas, LLC*, 815 F.3d 1082, 1087 (7th Cir. 2016) ([W]e must use our own best judgment to estimate how the [Illinois] Supreme Court would rule as to its law." (quotation marks omitted)). As we've noted, the judge declined that invitation. *Dinerstein*, 484 F. Supp. 3d at 595.

More importantly for our purposes, however, Dinerstein has chosen to stick with the new version of his privacy claim on appeal. He premises his privacy-related challenges exclusively on the novel medical-confidentiality theory. Following his lead, then, we focus our discussion of standing on the reframed privacy theory.

Dinerstein presents his privacy injury in two forms, one backward-looking and the other forward-looking. But considered in either direction—past or future—his asserted injury does not establish standing to sue.

**1. *Past Harm***

We start with the backward-looking form of injury. Crucially, Dinerstein does *not* allege that Google has already used the disclosed patient records to discern his identity. Instead he focuses on the conduct of the University, arguing that the record transfer was itself an actionable invasion of his medical privacy. This is so, Dinerstein asserts, regardless of whether Google ever actually identifies him.

By referencing a common-law privacy invasion, Dinerstein attempts to compare his asserted injury to a harm "traditionally recognized as providing a basis for lawsuits in American courts." *TransUnion*, 141 S. Ct. at 2204. In other words, he engages with the proper inquiry under the Supreme Court's recent standing caselaw. But as we've explained, an "invasion of privacy" is not a standalone tort; the term "encompasse[s] four *theories* of wrongdoing: intrusion upon seclusion, appropriation of a person's name or likeness, publicity given to private life, and publicity placing a person in a false light." *Pucillo v. Nat'l Credit Sys., Inc.*, 66 F.4th 634, 639–40 (7th Cir. 2023) (quoting *Persinger v. Sw. Credit Sys., L.P.*, 20 F.4th 1184, 1192 (7th Cir. 2021)); *see also* RESTATEMENT §§ 652A–652E. And because *TransUnion* requires us to nail down a particular common-law analogue, we must assess whether any of the recognized privacy torts is sufficiently analogous to Dinerstein's asserted injury. If not, no concrete harm. "No concrete harm, no standing." *TransUnion*, 141 S. Ct. at 2214.

Of the four traditional privacy tort theories, the closest comparator to Dinerstein's new theory is probably the tort of publicity given to private life, which occurs when someone "gives publicity" to a "highly offensive" matter "concerning the private life of another" that "is not of legitimate concern to the public." RESTATEMENT § 652D. Yet Dinerstein has identified no case in which a court has permitted a plaintiff to bring a public-disclosure tort premised on the dissemination of *anonymized* information. [2] Indeed, while the relevant caselaw is sparse, we're skeptical that this alleged factual scenario would give rise to any injury at all—let alone one concrete enough to support Article III standing. *See, e.g., Shulman v. Grp. W Prods., Inc.*, 18 Cal.4th 200, 74 Cal.Rptr.2d 843, 955 P.2d 469, 489 n.12 (1998) ("[*C*]*omplete* lack of identification or identifiability would seemingly defeat a private facts claim, as there could be no injury ...."); ***514** *Harris ex rel. Harris v. Easton Publ'g Co.*, 335 Pa.Super. 141, 483 A.2d 1377, 1385 (1984) ("Absent an ability to identify the complainant, there can be no communication and hence, no publicity."); *cf. Frobose v. Am. Sav. & Loan Ass'n*, 152 F.3d 602, 618 (7th Cir. 1998) (rejecting a false-light claim because the communication neither mentioned the plaintiff by name nor made her "readily identifiable to the public").

Resisting this conclusion, Dinerstein contends that the University's records were insufficiently anonymized. He cites a presentation from the 2017 Google Cloud Next conference by Dr. Samuel Volchenboum, the University's Associate Chief Research Informatics Officer. Dinerstein argues that Dr. Volchenboum's presentation highlighted various deficiencies in the "typical de-identification process." [3] He contends that the process risks leaving identifying clues like the patient's age, place of residence, and family relations scattered throughout the purportedly "deidentified" medical records. According to Dinerstein, such clues are routinely found in the treating physician's "freetext" clinical notes. If these clues are pieced together, reidentification is supposedly simple.

But Dinerstein's complaint omits any allegations linking the so-called "typical de-identification process" described in Dr. Volchenboum's presentation to the University's deidentification process here. Put differently, just because *some* de-identification processes might be deficient, we cannot assume that the University's process was necessarily so. To the contrary, the complaint acknowledges that the challenged record transfer occurred pursuant to the Data Use Agreement, which states that "the majority of [patient] identifiers will be removed," leaving only "actual dates of [medical] service and events." Dinerstein's allegations of insufficient anonymization therefore do not cross the plausibility threshold. *See Silha v. ACT, Inc.*, 807 F.3d 169, 174 (7th Cir. 2015) ("[T]he *Twombly-Iqbal* facial plausibility requirement for pleading a claim is incorporated into the standard for pleading subject matter jurisdiction.").

Moreover, Dinerstein appears to concede that the University adequately discharged its de-identification obligation. Describing a jointly authored article from the University and Google, the complaint states that although "the [date stamps] from the University patients' records were maintained," the records otherwise had been "deidentified." And aside from the date stamps, Dinerstein does not pinpoint any information within the records that he thinks should have been redacted and was not. Nor does he allege that the date stamps alone were impermissibly identifying. At most he alleges that some personally identifying information "may have evaded redaction"—a hypothetical that does not support his repeated but conclusory assertions that the University's records were insufficiently anonymized. "Such ... bare assertion[s] of harm —unsupported by any concrete details"—do not suffice to allege a plausible, concrete injury. *Nowlin*, 34 F.4th at 633.

**2. *Risk of Future Harm***

That brings us to Dinerstein's allegations of a forward-looking privacy injury. Unlike the backward-looking injury, this injury turns on Google's conduct—or more precisely, its *anticipated* conduct. At bottom, Dinerstein worries that the date stamps contained in the transferred medical records, along with the geolocation and ***515** demographic data collected from his smartphone apps, offer Google a "perfect formulation of data points" for later reidentification. In other words, the record transfer created *a risk* that he might someday be reidentified.

To the extent that Dinerstein rests his claim for damages on allegations of future risk, the argument is a nonstarter. In *TransUnion* the Supreme Court clarified that unless a "risk of future harm materializes," a plaintiff may rely on an "imminent and substantial" risk of harm only when "pursu[ing] forward-looking, *injunctive* relief to prevent the harm from occurring." 141 S. Ct. at 2210–11 (emphasis added). Or as our court has summarized: "A plaintiff seeking money damages has standing to sue in federal court only for harms that have in fact materialized." *Pierre*, 29 F.4th at 938. Because Dinerstein alleges no material harm arising from the alleged risk of future reidentification, that future risk cannot support standing to sue for damages.

The alleged risk does not support standing to sue for injunctive relief either, though for a different reason: the risk Dinerstein alleges is not sufficiently imminent. To be sure, Google possesses a wealth of data about most, if not all, Americans. Yet Dinerstein ignores that the governing Data Use Agreement expressly prohibited Google from using the transferred medical records—either by themselves or in tandem with data already in its possession—"to identify any individual." And even if the contractual obligation doesn't itself foreclose the risk of reidentification, Dinerstein has not alleged that Google has taken any steps to identify him. Nor, for that matter, does he allege that Google intends to do so. Without any allegations to that effect, "we cannot simply presume a material risk of concrete harm." *TransUnion*, 141 S. Ct. at 2212 (quoting *Ramirez v. TransUnion LLC*, 951 F.3d 1008, 1040 (9th Cir. 2020) (opinion of McKeown, J.)). The risk of future injury is thus nowhere near "certainly impending"; it is too speculative to satisfy the imminence requirement for a suit for injunctive relief in federal court.

*Clapper v. Amnesty International USA*, 568 U.S. 398, 133 S.Ct. 1138, 185 L.Ed.2d 264 (2013), supports this holding. In *Clapper* attorneys and human-rights organizations raised constitutional challenges to § 1881a of the Foreign Intelligence Surveillance Act, arguing that individuals with whom they regularly communicated were probable targets of foreign electronic surveillance under the Act. *Id.* at 406, 133 S.Ct. 1138. Because of the possibility of surveillance, the plaintiffs claimed that their international communications were likely to be incidentally "acquired under § 1881a at some point in the future." *Id.* at 407, 133 S.Ct. 1138.

The Court rejected this alleged future injury as a basis for standing, reasoning that it rested on multiple layers of "highly speculative fear." *Id.* at 410, 133 S.Ct. 1138. In particular, the "chain of contingencies"—specifically that (1) the government would choose to target their foreign contacts pursuant to its § 1881a authority; (2) the government would succeed in both securing the requisite authorization and intercepting the targeted communications; and (3) the plaintiffs would be parties to those communications—"d[id] not satisfy the requirement that threatened injury must be certainly impending." *Id.* The plaintiffs had offered little more than speculation and assumptions—and importantly, "no specific facts"—that their communications would actually be acquired. *Id.* at 412, 133 S.Ct. 1138. So too here. Dinerstein has expressed only a "highly speculative fear" that Google might, "at some point in ***516** the future," identify him. *Id.* at 407, 410, 133 S.Ct. 1138.

Our decisions in *Remijas v. Neiman Marcus Group, LLC*, 794 F.3d 688 (7th Cir. 2015), and *Lewert v. P.F. Chang's China Bistro, Inc.*, 819 F.3d 963 (7th Cir. 2016), are not to the contrary. As an initial matter, both predate *TransUnion*. While that is not to say that they are no longer authoritative, it is to recognize that *TransUnion* marked a shift in the Court's standing jurisprudence. But even on their own terms, *Remijas* and *Lewert* do not help Dinerstein's standing argument here. In both cases we held that the plaintiffs had sufficiently alleged a substantial risk of future harm stemming from breaches of their credit-card information. *Remijas*, 794 F.3d at 693–94; *Lewert*, 819 F.3d at 967. Motivating our decisions was the common-sense observation that hackers steal private credit-card information for a primary purpose: "to make fraudulent charges or assume ... consumers' identities." *Remijas*, 794 F.3d at 693; *Lewert*, 819 F.3d at 967. Therefore, the plaintiffs' allegations about a substantial risk of future harm had "cross[ed] the line from conceivable to plausible." *Lewert*, 819 F.3d at 968 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

The same cannot be said here. Absent from this case is a comparable indication—rooted in common sense or otherwise—that Google's primary purpose in obtaining the medical records was to reidentify the University's patients. Indeed, the fact that Google explicitly agreed *not* "to identify any individual" is enough to rule out the contention that the threat of reidentification is certainly impending. Quite the opposite; that contention is wholly speculative and implausible. It cannot supply the basis for standing. [4]

**B. Contract Claim**

Next we assess the alleged injuries underlying Dinerstein's claim for breach of an express contract, a claim he brings only against the University. Recall that Dinerstein roots the University's purported contractual duty in the Notice of Privacy Practices he received and the Admission and Outpatient Agreement and Authorization he signed each time he was admitted to the Medical Center. He argues that these documents contractually obligated the University to safeguard his medical information. In his view, transferring his medical records to Google was a flagrant breach of that obligation.

To support standing to bring this claim, Dinerstein asserts three injuries. The first stems from his interest in privacy —i.e., the injury we've already addressed and deemed

insufficient to support standing. The second, presented in two forms, is pecuniary: Dinerstein contends that he *overpaid* the University for his medical treatment or, alternatively, that the University *underpaid* him for the interest in his medical records. The third is contractual: Dinerstein contends that the University's breach of contract is *itself* an actionable concrete injury.

***517 1. *Pecuniary Harms***

We turn first to Dinerstein's alleged pecuniary injuries, which the Supreme Court has described as "traditional tangible harms" that "readily qualify as concrete injuries under Article III." *TransUnion*, 141 S. Ct. at 2204. Even if concrete, however, Dinerstein's allegations of injury must be plausible "to survive dismissal for lack of standing." *Diedrich v. Ocwen Loan Servicing, LLC*, 839 F.3d 583, 588 (7th Cir. 2016) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)); *see also Silha*, 807 F.3d at 174. While Dinerstein alleges both an overpayment and underpayment theory of financial harm, neither is plausible and neither supplies a basis for standing.

Dinerstein's overpayment theory rests on allegations that the medical care he (more precisely, his insurer) purchased came bundled with a promise of medical confidentiality. Because the University failed to deliver on that promise, he contends that he was deprived of the full benefit of his bargain. Not only that, he also would not have purchased the University's medical treatment had he known that it intended to share his private health information.

This is not the first time we've confronted an argument like this one. In *Remijas*, 794 F.3d at 694–95, and *Lewert*, 819 F.3d at 968, the plaintiffs argued that they had overpaid Neiman Marcus and P.F. Chang's, respectively, because the companies had failed to protect their credit-card information. While we did not outright reject the plaintiffs' theories, we expressed serious skepticism. We described the plaintiffs' injuries in *Remijas*, for example, as "problematic." 794 F.3d at 694. And in both cases we explained that courts have not entertained the overpayment theory of injury outside the product-liability context, and we saw no need to extend it "beyond its current scope." *Lewert*, 819 F.3d at 968; *Remijas*, 794 F.3d at 695.

Dinerstein has not alleged a defect in his medical care, and we again are not inclined to recognize the overpayment theory outside the product-liability context. (In this case that would require extending it "from a particular product to the operation of [an] entire" medical facility. *Remijas*, 794 F.3d at 695.) Perhaps anticipating this doctrinal problem, Dinerstein tries to distinguish *Remijas* and *Lewert*, arguing that the overpayment theories in those cases were implausible because the companies had not charged an extra fee for credit-card transactions. In other words, the plaintiffs had not paid for credit-card data security. But this case is no different. It is wholly implausible—and Dinerstein alleges nothing to the contrary—that the University charged a discrete "patient-confidentiality fee." Indeed, the fact that it reserved the right to share patient medical information for approved research purposes suggests exactly the opposite. So too does the fact that Dinerstein signed a release stating that he would "not be entitled to any compensation, regardless of the value of such research or any products or inventions developed therefrom."

Dinerstein's most helpful case is from another circuit. In *Carlsen v. GameStop, Inc.*, 833 F.3d 903, 909 (8th Cir. 2016), the Eighth Circuit held that the plaintiff had alleged an "actual" financial injury "in an amount equal to the difference between the value of [what] he paid for and the value of [what] he received, *i.e.*, a [digital magazine] subscription with compromised privacy protection." As our decisions in *Remijas* and *Lewert* make clear, we're not inclined to extend the overpayment theory of injury to novel contexts. Regardless, *Carlsen* is also distinguishable for the reason we just mentioned: Dinerstein's overpayment injury is particularly implausible ***518** given his express agreement that his medical information "may be used and shared for research." And his argument that he would not have paid for the University's medical services had he known otherwise is similarly implausible.

We are even more skeptical of Dinerstein's second pecuniary theory—that the unauthorized use of his medical information conferred a financial benefit on the University to which he is entitled. This financial benefit apparently came in the form of the perpetual software license reserved for the University in the Data Use Agreement. To remedy the University's unjust benefit, Dinerstein suggests that the court could order disgorgement or "at least a reasonable royalty."

Putting aside the fact that Dinerstein agreed that he was *not* entitled to compensation for the use of his medical information, his asserted injury cannot supply a basis for standing. As an initial matter, Illinois law does not grant a patient a property interest in his medical records; they instead belong to the medical provider. *Young v. Murphy*, 90 F.3d 1225, 1236 (7th Cir. 1996) ("While Illinois law permits a patient to inspect and copy his records ..., there is no basis

for concluding that this grants a property interest in those records to the patient."); *Holtkamp Trucking Co. v. Fletcher*, 402 Ill.App.3d 1109, 342 Ill.Dec. 143, 932 N.E.2d 34, 43–44 (2010).

Additionally, this standing theory is squarely foreclosed by our caselaw. In *Silha* we held "that a plaintiff's claim of injury in fact cannot be based solely on a defendant's gain; it must be based on a plaintiff's loss." 807 F.3d at 174–75. There, students who had taken standardized college admissions tests alleged that the testing agencies had shared their personal information with educational institutions. The students had consented to information sharing, yet the agencies had not disclosed that they had profited from what was really a *sale* of the students' information. *Id.* at 171. While the complaint highlighted the agencies' profits, missing was any allegation that the students had "lost anything of value as a result of the alleged misconduct." *Id.* at 175. Because their claimed injury was "based solely on a gain" to the agencies, we held that the students had not established an injury in fact. *Id.*

So too here. Dinerstein has not alleged that the University's use of his medical information somehow deprived him of its economic value. And although Dinerstein attempts to distinguish *Silha* by arguing that unlike him, the students had consented to disclosure, nothing about our resolution of the case turned on consent. *Silha*'s controlling principle—that a plaintiff cannot base an injury in fact solely on the defendant's gain—likewise controls here. In sum, neither of Dinerstein's alleged pecuniary injuries establishes standing to sue under Article III.

***2. Breach of Contract***

What's left, then, is Dinerstein's argument that a breach of contract is itself a legally cognizable injury in fact. He contends that common-law courts traditionally entertained claims for breach of contract regardless of whether the plaintiff alleged any harm beyond the breach itself. From this he infers that an allegation of a breach of contract is enough, without more, to support Article III standing. In his view, our caselaw supports his interpretation, and the Supreme Court's recent standing cases, namely *Spokeo* and *TransUnion*, do not disturb it.

Even if Dinerstein's historical account is correct, we read the Court's recent standing cases differently. In *TransUnion* the Court confirmed that "an injury in law is ***519** not an injury in fact." 141 S. Ct. at 2205. That statement itself might be enough to resolve Dinerstein's "breach-alone" standing theory. Yet to explain why our view diverges from Dinerstein's and that of one of our sister circuits, some additional unpacking is warranted.

As we've already discussed, establishing an injury in fact requires a plaintiff to show that he has suffered a concrete injury—one that is both "real" and "*de facto*" and that "actually exist[s]." *Spokeo*, 578 U.S. at 340, 136 S.Ct. 1540. Refining the concreteness requirement, the Court in *TransUnion* emphasized the distinction between (1) the cause of action giving a plaintiff the right to sue over a defendant's legal infraction and (2) the injury, if any, that he suffered as a result. 141 S. Ct. at 2205. To sue in federal court, a plaintiff must have both; a suitable cause of action cannot save a plaintiff's case if he has suffered no harm. In other words, only a plaintiff who has been "*concretely harmed*" by the defendant's legal infraction "may sue that private defendant over [it] in federal court." *Id.*

Applying these concepts here, Dinerstein cannot rest on the University's alleged breach of contract as a discrete *de facto* injury supporting his standing to sue in federal court. It is at most an injury in law, which we know from *TransUnion* "is *not* an injury in fact." *Id.* (emphasis added). As one scholar put it:

> The logic of *Spokeo*—that standing cannot rest on violations of legal rights that do not result in factual harms —extends to suits alleging breach of contract. After all, contracts simply establish legal rights. By *Spokeo*'s reasoning, a plaintiff should not have standing to sue for breach of contract if the breach does not result in some additional factual harm.

F. Andrew Hessick, *Standing and Contracts*, 89 GEO. WASH. L. REV. 298, 313 (2021). Slightly rephrased, Dinerstein cannot simply allege a bare breach of contract, "divorced from any concrete harm, and satisfy the injury-in-fact requirement of Article III." *Spokeo*, 578 U.S. at 341, 136 S.Ct. 1540. Without an allegation that the purported breach resulted in some concrete harm, we lack the "freewheeling power" to hold the University accountable for its alleged "legal infraction[ ]."*Casillas v. Madison Ave. Assocs., Inc.*, 926 F.3d 329, 332 (7th Cir. 2019).

Yet Dinerstein retorts that *Spokeo* and *TransUnion* are irrelevant to the standing question here because neither addressed common-law claims like breach of contract. He reads the cases to answer only whether (and if so, when) Congress may "elevate to the status of legally cognizable" an injury that was "previously inadequate in law." *TransUnion*, 141 S. Ct. at 2204–05 (quoting *Spokeo*, 578 U.S. at 341, 136 S.Ct. 1540). To be sure, *Spokeo* and *TransUnion* did address and decide those questions. But we read the standing principles expounded in those cases to extend beyond the statutory context. The Court's opinion in *TransUnion*, for example, set out to answer the broader question: "What makes a harm concrete for purposes of Article III?" *Id.* at 2204. In answering that question, the Court issued important and broadly applicable statements, including those just mentioned, about the boundaries of the federal judicial power. Fairly interpreted, those statements apply to *all* asserted injuries, not just statutory violations.

To give a few more examples of *TransUnion*'s capacious language, the Court observed that where a "plaintiff has not suffered any physical, monetary, or cognizable intangible harm traditionally recognized as providing a basis for a lawsuit in American courts," his "lawsuit may ***520** not proceed." *Id.* at 2206. And it defended "the concrete-harm requirement" as "essential to the Constitution's separation of powers." *Id.* at 2207. Article III does not empower federal courts "to publicly opine on every legal question" or to "exercise general legal oversight ... of private entities." *Id.* at 2203. Yet by asking us to weigh in on the University's alleged breach of contract in the absence of any actual harm, Dinerstein invites us to function "not as an Article III court, but as a moot court," and do exactly that. *Uzuegbunam v. Preczewski*, — U.S. —, 141 S. Ct. 792, 804, 209 L.Ed.2d 94 (2021) (Roberts, C.J., dissenting). We decline the invitation. Taking up such matters "is, by very definition, for a court to act ultra vires." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998).

These general standing principles guided the Court as it then considered when Congress may give a real-world injury "actionable legal status." *TransUnion*, 141 S. Ct. at 2205. And contrary to Dinerstein's view, the Court's framing of this more specific question also supports our reading of its recent caselaw. Rather than ask whether federal courts may depart from established standing doctrine when Congress has attempted to define an injury, in *Spokeo* and *TransUnion* the Court explored when a congressionally defined injury might satisfy the existing doctrine. The cases speak, for example, about Congress's lack of authority to "erase Article III's standing requirements," *Spokeo*, 578 U.S. at 339, 136 S.Ct. 1540 (quotation marks omitted), and about our obligation to "independently decide whether a plaintiff has suffered a concrete harm under Article III" notwithstanding Congress's creation of new statutory duties, *TransUnion*, 141 S. Ct. at 2205. Simply put, *Spokeo* and *TransUnion* established "fundamental standing principles," *id.* at 2207, and those principles control this case.

If *Spokeo* and *TransUnion* leave any doubt about whether a breach of contract is itself a concrete injury, *Thole v. U.S. Bank N.A.*, — U.S. —, 140 S. Ct. 1615, 207 L.Ed.2d 85 (2020), resolves it. *Thole* involved claims for breach of fiduciary duty under ERISA. Two participants in a defined-benefit retirement plan sued the bank contending that it had mismanaged the plan. But crucially, they had sustained no monetary injury from the mismanagement. *Id.* at 1618. The Supreme Court thus affirmed the Eighth Circuit's dismissal for lack of standing and in so doing rejected the participants' attempted trust-law analogy. "[A] defined-benefit plan," the Court reasoned, "is more in the nature of a *contract*. The plan participants' benefits are fixed and will not change, regardless of how well or poorly the plan is managed." *Id.* at 1620 (emphasis added). Because the Court held that the plan participants nonetheless lacked standing to pursue their claims, we understand *Thole* to imply that an alleged breach of contract, without any corresponding actual harm, does not give rise to an Article III case or controversy. [5]

Nor are we persuaded by Dinerstein's argument that the Court's instructions in *Spokeo* and *TransUnion*—that we must compare the plaintiff's asserted injury to harms traditionally recognized at common law—resolves the standing question here. ***521** As we understand the argument, he contends that because common-law courts allowed a plaintiff to vindicate his contractual rights without a further showing of injury, he need not allege anything aside from the University's bare breach of contract.

True, common-law courts historically heard contract cases and awarded nominal damages even when the breach either "caused no loss" or "the amount of the loss [wa]s not proved." RESTATEMENT (SECOND) OF CONTRACTS § 346(2) (AM. LAW INST. 1981); *see also Springer v. Cleveland Clinic Emp. Health Plan Total Care*, 900 F.3d 284, 292–93 (6th Cir. 2018) (Thapar, J., concurring) ("[Common-law courts] entertained breach-of-contract claims even when no

real loss [could] be prove[n]. Such violations at least deserved nominal damages ...." (internal quotation marks omitted)). Yet "[t]he requirements of Art[icle] III are not satisfied merely because a party ... has couched [his] request for forms of relief historically associated with courts of law in terms that have a familiar ring to those trained in the legal process." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 471, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982).

More importantly, however, *Spokeo* and *TransUnion* put an end to federal courts hearing claims premised on *nonexistent* injuries—regardless of historical pedigree. [6] And the Court's recently announced "historical-analogue test" does not suggest otherwise. That test asks whether a modern injury bears a "close relationship" to a harm traditionally recognized by common-law courts. *TransUnion*, 141 S. Ct. at 2204. It does not, however, transform into a concrete factual injury what the common law has historically regarded as a legal injury. Put differently, a historical record is no talisman. It is necessary, but not sufficient, to satisfy the Article III concreteness requirement.

Still, because Dinerstein views *Spokeo, TransUnion*, and *Thole* as inapposite, he argues that our prior decision in *J.P. Morgan Chase Bank, N.A. v. McDonald*, 760 F.3d 646 (7th Cir. 2014), binds us. Relevant here, at issue in *J.P. Morgan* was whether a bank had standing to block an ongoing arbitration proceeding that two investors had initiated after losing approximately a quarter of their initial investment. The contracts governing the investors' accounts included a forum-selection clause that required disputes to be brought in either state or federal court. *Id.* at 649. Seeking to enforce the forum-selection provision, the bank sued the investors in federal court. After months of litigation, the judge dismissed the bank's claims for lack of standing. *Id.* at 650.

Reversing the dismissal, we held that the bank had standing to enforce the clause. To form a bilateral contract, each party must "take on one or more legally binding obligations," we explained. *Id.* "When one party fails to honor its commitments, the other party to the contract suffers a legal injury sufficient to create standing even where that party seems not to have incurred monetary loss or other concrete harm." *Id.* at 650–51. Because the bank had alleged that the investors had "violated the terms of th[eir] bargain" by selecting an improper dispute-resolution ***522** forum, it had established standing to sue. *Id.* at 651.

Dinerstein understandably seizes on this favorable language, but he omits the discussion that follows it. We went on to explain in *J.P. Morgan* that the bank had "a very real financial interest in the arbitration" because it was statutorily and contractually obligated to "foot the bill" for the resulting costs. *Id.* Given this independent financial interest, the standing question was not merely "one of abstract principle"; it was yet another reason why the bank had standing to sue. *Id.*

The concrete harms present in *J.P. Morgan*—being hauled into an improper forum and financing the resulting costs—distinguish it from this case. Moreover, while those harms prevent us from needing to revisit *J.P. Morgan*, we note that some language in the opinion is in tension with the Supreme Court's recent decisions in *Spokeo* and *TransUnion*. No longer is "a legal injury sufficient to create standing." *J.P. Morgan*, 760 F.3d at 651. "[U]nder Article III, an injury in law is not an injury in fact. Only those plaintiffs who have been *concretely harmed*" by a defendant may sue in federal court. *TransUnion*, 141 S. Ct. at 2205. Any portion of our opinion in *J.P. Morgan* that suggests otherwise cannot control here.

Finally, we recognize that some tension also exists between our analysis here and that of a few of our sister circuits. There is no direct conflict, however. For starters, many of the out-of-circuit decisions pointing in the other direction predate *TransUnion*, a watershed decision on the standing doctrine. *See, e.g., Mitchell v. Blue Cross Blue Shield*, 953 F.3d 529, 536 (8th Cir. 2020); *Springer*, 900 F.3d at 287; *Katz v. Pershing, LLC*, 672 F.3d 64, 72 (1st Cir. 2012). Of the circuits to consider the issue post-*TransUnion*, we understand one to agree with our position, *Perry v. Newsom*, 18 F.4th 622, 632 (9th Cir. 2021) ("An analogy to a traditionally recognized cause of action does not relieve a complainant of its burden to demonstrate an injury."); one to leave it unresolved, *Glennborough Homeowners Ass'n v. U.S. Postal Serv.*, 21 F.4th 410, 415–16 (6th Cir. 2021) ("We need not resolve these thorny questions today ...."); and one to come out the other way, *Denning v. Bond Pharmacy, Inc.*, 50 F.4th 445, 451 (5th Cir. 2022) ("[A] breach of contract is a sufficient injury for standing purposes."). But the Fifth Circuit's opinion in *Denning* did not engage with the logic of *Spokeo* and *TransUnion* and rested in part on its own precedent. We therefore do not understand the Fifth Circuit's decision to conflict with our own, nor are we inclined to adopt its approach. As we read *Thole, TransUnion*, and *Spokeo*, a breach of contract alone—without any actual harm—is purely an injury in law, not an injury in fact. And it therefore falls short of the Article III requirements for a suit in federal court.

**C. Remaining Claims**

We need not spend much time addressing the tortious-interference and consumer-fraud claims. Both rest on the same allegations of a privacy, pecuniary, or contractual injury that we've already examined and deemed insufficient to confer standing.

Put simply, Dinerstein seeks to invoke the power of the federal courts to challenge the lawfulness of an event that caused him no harm. But federal courts do not offer "judicial determination[s] that the plaintiffs' interpretation of the law is correct"; we resolve cases and controversies. *Uzuegbunam*, 141 S. Ct. at 804 (Roberts, C.J., dissenting). Because Dinerstein has not alleged a plausible, concrete, and actual or imminent injury to support his standing ***523** to sue, no such case or controversy exists here. We accordingly modify the judgment to reflect a jurisdictional dismissal for lack of standing. As modified, the judgment is

AFFIRMED.

**All Citations**

73 F.4th 502, Med & Med GD (CCH) P 307,762

## Footnotes

1 Matt Wood, *UChicago Medicine Collaborates with Google to Use Machine Learning for Better Health Care*, UCHICAGO MEDICINE (May 17, 2017), https://www.uchicagomedicine.org/forefront/research-and-discoveries-articles/uchicago-medicine-collaborates-with-google-to-use-machine-learning-for-better-health-care.

2 Nor has Dinerstein identified a case in which a court has permitted a plaintiff to bring the novel claim of breach of medical confidentiality in circumstances like these.

3 Google Cloud Tech, *Sensitive Data Management for Collaborative Research Clouds (Google Cloud Next '17)*, YOUTUBE (Mar. 9, 2017), https://www.youtube.com/watch?v=7Si956MXhWQ.

4 Even if Dinerstein's asserted privacy injury—past or future—were sufficient to support standing (it is not), we see no reason to disturb the judge's decision not to recognize a novel claim for breach of medical confidentiality. Illinois courts have not yet weighed in on the issue, and "it is not our role to break new ground in state law." *Roppo v. Travelers Com. Ins. Co.*, 869 F.3d 568, 596 (7th Cir. 2017) (quoting *Lopardo v. Fleming Cos.*, 97 F.3d 921, 930 (7th Cir. 1996)). This is especially true with "[i]nnovative state law claims," which "should be brought in state court." *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 607 (7th Cir. 2000). But because Dinerstein lacks standing, we have no need to address this issue.

5 In fact, the dissent raised this precise point. *Thole v. U.S. Bank N.A.*, — U.S. ——, 140 S. Ct. 1615, 1630, 207 L.Ed.2d 85 (2020) (Sotomayor, J., dissenting) (reasoning that the plan participants had standing because a "breach of contract always creates a right of action, even when no financial harm was caused" (quotation marks omitted)). That the majority was not persuaded by this view further supports our conclusion that a breach of contract does not by itself confer standing to sue.

6 *See* William Baude, *Standing in the Shadow of Congress*, 2016 S. CT. REV. 197, 217 ("[I]t is hard to see how nominal damages are fully consistent with the logic of *Spokeo*. The very premise of nominal damages is that one cannot show any 'actual injury' apart from the violation of the legal right itself." (citing *Carey v. Piphus*, 435 U.S. 247, 266, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978))).

End of Document

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT B

2023 WL 4484441
United States District Court, S.D. California.

Hannah COUSIN, et al., individually and on behalf of all others similarly situated, Plaintiffs,
v.
SHARP HEALTHCARE, Defendant.

Case No.: 22-cv-2040-MMA (DDL)
|
Signed July 12, 2023

**Synopsis**
**Background:** Patients brought consolidated class action against non-profit corporation which operated hospitals and medical groups for breach of fiduciary duty, invasion of privacy, violation of California Confidentiality of Medical Information Act, and violation of California Invasion of Privacy Act (CIPA), alleging that corporation intentionally disclosed patients' sensitive health information without their consent to social media company by embedding internet tracking tool on its website. Defendant moved to dismiss for failure to state a claim.

**Holdings:** The District Court, Michael M. Anello, J., held that:

patients failed to state claim for breach of fiduciary duty under California law;

patients failed to state claims for invasion of privacy under California Constitution and common law;

patients failed to state claim for violation of California Confidentiality of Medical Information Act; and

patients failed to state claim for violation of California Invasion of Privacy Act.

Motion granted.

**Procedural Posture(s):** Motion to Dismiss for Failure to State a Claim.

**Attorneys and Law Firms**

Todd D. Carpenter, Lynch Carpenter, LLP, Del Mar, CA, for Plaintiff Hannah Cousin.

Christopher Stiner, Deborah Marie D. De Villa, Tina Wolfson, Ahdoot & Wolfson, PC, Burbank, CA, John J. Nelson, Milberg Coleman Bryson Phillips Grossman PLLC, San Diego, CA, Todd D. Carpenter, Lynch Carpenter, LLP, Del Mar, CA, for Plaintiffs Linda Camus, Deanna Franklin-Pittman.

Jason S. Hartley, Hartley LLP, San Diego, CA, Jason M. Lindner, Stueve Siegel Hanson LLP, San Diego, CA, Todd D. Carpenter, Lynch Carpenter, LLP, Del Mar, CA, for Plaintiff Edward Barbat.

Alexander Vitruk, Baker & Hostetler LLP, Seattle, WA, Paul G. Karlsgodt, Pro Hac Vice, Baker & Hostetler LLP, Denver, CO, Teresa Carey Chow, Baker & Hostetler LLP, Los Angeles, CA, for Defendant.

**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS**

MICHAEL M. ANELLO, United States District Judge

***1** This action consists of three consolidated cases brought by Hannah Cousin, Linda Camus, Deanna Franklin-Pittman, and Edward Barbat ("Plaintiffs") against Defendant Sharp Healthcare ("Defendant" or "Sharp"). *See* Case Nos. 22-cv-2040-MMA (DDL), 23-cv-33-MMA (DDL), 23-cv-330-MMA (DDL). On March 3, 2022, Plaintiffs filed a Consolidated Class Action Complaint alleging that Defendant intentionally disclosed its patients' sensitive health information, without their consent, to Meta Platforms, Inc. ("Meta") through the procurement and embedding of an internet tracking tool, Meta Pixel, on its website. Doc. No. 14 ("CAC"). On April 4, 2022, the Defendant filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). Doc. No. 15. Plaintiffs filed an opposition, to which Defendant replied. *See* Doc. Nos. 17, 18. The Court found the matter suitable for determination on the papers and without oral argument pursuant to Civil Local Rule 7.1.d.1. *See* Doc. No. 19. For the reasons set forth below, the Court **GRANTS** Defendant's motion to dismiss.

## I. BACKGROUND [1]

Defendant is a non-profit corporation that operates multiple hospitals and medical groups, and offers a healthcare plan, throughout San Diego, California. CAC ¶ 14. One such hospital operated by Defendant is Sharp Memorial Hospital ("Sharp Memorial"). *Id.* Plaintiffs are residents of California and Sharp patients, who used Defendant's website, www.sharp.com, to either search for health care providers, schedule medical appointments, or conduct other health care related matters. *Id.* ¶¶ 10–13, 64.

On June 16, 2022, "The Markup" published an article identifying Sharp Memorial as one of thirty-three hospitals across the nation that had installed and used Meta Pixel on its website. *Id.* ¶¶ 2, 32. The publication reported that Meta Pixel had collected patients' sensitive health and personal information from Defendant's appointment scheduling page and shared it with Meta. *Id.* ¶ 3. The sensitive information included, among other things, a patient's medical condition, prescriptions, diagnoses, and test results. *Id.* ¶ 6. "The Markup" further stated that information sent to Meta included details about patient's medical conditions, prescriptions, doctor's appointments, and when paired with a patient's IP address, could be used in combination with other data to identify a specific individual or household. *Id.* ¶ 30.

Plaintiffs claim that Defendant failed to properly secure and safeguard their sensitive health information submitted on its website by installing and using Meta Pixel. *Id.* ¶¶ 1, 3. Plaintiffs assert that they were previously unaware of Defendant's use of Meta Pixel, and that their information was being shared in such a way, until after the release of this article. *Id.* ¶ 106.

***2** Plaintiffs allege that Meta Pixel collected their sensitive information through the following process. *Id.* ¶¶ 19–29. Meta created Meta Pixel to improve their targeted advertising capability. *Id.* ¶ 19. To do this, Meta Pixel loads JavaScript code on websites and collects detailed data from interactions on the webpages. *Id.* ¶ 20. Meta Pixel tracks information from https headers and button clicks, and tracks at least seventeen standard events including payment info, registration for events, location search information, purchases, scheduling information, information that was searched for, applications, and what content users have viewed. *Id.* ¶ 24. The collected information is simultaneously delivered to Meta in "data packs" labeled with the user's IP address. *Id.* ¶ 27. Meta then matches the information from the "data packs" with existing Facebook and Instagram profiles in a process called "advance matching." *Id.* ¶ 28. Similarly, Meta also collects data on users without Facebook or Instagram profiles and stores it in so-called "shadow profiles." *Id.* ¶ 29. Plaintiffs claim that, without their knowledge or consent, Defendant used Meta Pixel, as described above, to record and transmit their communications and interactions with www.sharp.com and automatically send that information to Meta. *Id.* ¶ 44.

Plaintiffs maintain that the information transmitted by Defendant to Meta included: (1) the patient's unique and persistent Facebook ID; (2) the fact that the patient clicked on a specific medical provider's profile page; (3) the patient's search parameters; and (4) the patient's location filter. *Id.* ¶ 45. As a result, Plaintiffs allege that Defendant intentionally divulged its patients' Personally Identifiable Information ("PII") and Protected Health Information ("PHI") to Meta. *Id.* ¶ 51. Plaintiffs contend that Defendant divulged this sensitive patient information without obtaining their express consent and therefore violated their reasonable expectation of privacy. *Id.* ¶¶ 78, 79.

As a result, Plaintiffs bring the following five causes of action: (1) breach of fiduciary duty; (2) violation of common law invasion of privacy – intrusion upon seclusion; (3) invasion of privacy under the California Constitution, Art. I § 1; (4) violation of the California Confidentiality of Medical Information Act, California Civil Code § 56 *et seq.*; and (5) violation of the California Invasion of Privacy Act, California Penal Code § 630 *et seq.*

## II. LEGAL STANDARD

A Rule 12(b)(6) [2] motion tests the legal sufficiency of the claims made in a complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). A pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief ...." Fed. R. Civ. P. 8(a)(2). However, plaintiffs must also plead "enough facts to state a claim to relief that is plausible on its face." Fed. R. Civ. P. 12(b)(6); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). The plausibility standard demands more than "a formulaic recitation of the elements of a cause of action," or "naked assertions devoid of further factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (internal quotation marks omitted). Instead, the complaint "must contain allegations of

underlying facts sufficient to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).

In reviewing a motion to dismiss under Rule 12(b)(6), courts must assume the truth of all factual allegations and must construe them in the light most favorable to the nonmoving party. *See Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337–38 (9th Cir. 1996). The court need not take legal conclusions as true merely because they are cast in the form of factual allegations. *See Roberts v. Corrothers*, 812 F.2d 1173, 1177 (9th Cir. 1987). Similarly, "conclusory allegations of law and unwarranted inferences are not sufficient to defeat a motion to dismiss." *Pareto v. FDIC*, 139 F.3d 696, 699 (9th Cir. 1998). In deciding whether to dismiss the complaint for failure to state a claim, the court is generally bound by the facts and allegations contained within the four corners of the complaint. *Hydrick v. Hunter*, 500 F.3d 978, 985 (9th Cir. 2007).

***3** Where dismissal is appropriate, a court should grant leave to amend unless the plaintiff could not possibly cure the defects in the pleading. *See Knappenberger v. City of Phoenix*, 566 F.3d 936, 942 (9th Cir. 2009) (quoting *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000)).

## III. INITIAL MATTERS

Plaintiffs' overarching theory of their case, underlying all claims, is that Defendant collected patients' personal and sensitive medical information on Sharp's website and that this information was then improperly shared with Meta without patients' consent. However, Plaintiffs fail to factually explain their personal participation in any of this. Plaintiffs also lump together a variety of alleged activity undertaken by Defendant, some of which is not actionable, with no meaningful factual support as to what activities each Plaintiff engaged in on Sharp's website and what information each Plaintiff provided. Therefore, the Court addresses four matters relating to the plausibility of Plaintiffs' theory of their case at the outset.

First, Plaintiffs allege in a conclusory manner that Defendant disclosed to Meta their personal, confidential, and sensitive medical information; communications and messages with doctors; medical test results; payment information; and, password reset information. *Id.* ¶¶ 10–13. However, these allegations are conclusory and devoid of any factual support. For example, Plaintiffs fail to factually support their contention that these activities took place. Plaintiffs also fail to allege that these activities took place on a page of Sharp's website where Meta Pixel was embedded. Further, Plaintiffs do not explain what information they provided to Defendant. Plaintiffs cannot maintain their theory of the case absent this factual support.

Second, Plaintiffs allege that disclosure of their browsing activity resulted in a disclosure of sensitive medical information. *Id.* However, again these allegations are unsupported factually. While Plaintiffs provide an example of a search by a hypothetical patient, they fail to state what information they each provided to Defendant, via their browsing activity, that was subsequently disclosed to Meta. *Id.* ¶¶ 39–63.

Even assuming Plaintiffs had provided this missing information, their claims, to the extent they are based upon browsing activity, are subject to dismissal. Plaintiffs allege that they used www.sharp.com, a public website, to "research ... doctors," "look for providers," and "search for medical specialists" and that through the sharing of this data, Defendant allowed Meta to collect their sensitive medical information. *Id.* ¶¶ 10–13. However, other courts have held that this type of data collection is not considered "Protected Health Information" because "nothing about [the] information relates specifically to Plaintiffs' health" and the information is "general health information that is accessible to the public at large." *Smith v. Facebook, Inc.*, 262 F. Supp. 3d 943, 954–55 (N.D. Cal. 2017), *aff'd*, 745 F. App'x 8 (9th Cir. 2018). The Court therefore finds that Plaintiffs cannot maintain their claims based upon the theory that Defendant's sharing of their browsing activity, collected on its publicly facing website, is a disclosure of their sensitive medical information.

***4** Third, Plaintiffs contend that Defendant disclosed sensitive information that was collected during the appointment booking function on Sharp's website. In support of this, Plaintiffs provide significant detail but in a hypothetical manner: Plaintiffs allege that a hypothetical patient can click on the "book appointment" button on www.sharp.com, and that Meta Pixel shared this activity with Meta, thus sharing the fact that the patient booked or attempted to book an appointment with a specific provider. *Id.* ¶¶ 51–53. Plaintiffs also allege that when a hypothetical patient clicks the direct link to call a doctor's office, the patient's identity and information would be shared in the same manner. *Id.* ¶¶ 54–55. Plaintiffs summarily contend that they

made, booked, or scheduled appointments through Sharp's website. *Id.* ¶¶ 10, 12, 13. But Plaintiffs do not allege that they used the "book appointment" button or used the direct link to a call a doctor's office. *Id.* ¶¶ 10, 12, 13. Further, Plaintiffs fail to allege that these webpage interactions took them to a patient portal or otherwise plausibly conveyed their patient status. *In re Meta Pixel Healthcare Litig.*, No. 22-cv-03580-WHO, ––– F.Supp.3d ––––, ––––, 2022 WL 17869218, at *9, 2022 U.S. Dist. LEXIS 230754, at *26-30 (N.D. Cal. Dec. 22, 2022) (Navigating to or logging onto a healthcare provider's patient portal differs from the general internet browsing contemplated in *Smith* because it conveys a user's patient status which is Protected Health Information). As such, Plaintiffs fail to plausibly support their claims on this basis.

Lastly, Plaintiffs take issue with Defendant's alleged use of Meta Pixel on Sharp's appointment scheduling page. CAC ¶¶ 2, 3, 32. Plaintiffs claim that they used Defendant's appointment scheduling page to "make," "book," or "schedule" online appointments. *Id.* ¶¶ 10, 12, 13, 64. Plaintiffs allege that Defendant required patients to "fill out medical and personal information such as the reason for the visit, name, email, phone number, address, and, as an option, [their] social security number" when creating appointments online at https://sharp.myhealthdirect.com/bookAppointment. *Id.* ¶ 65. Plaintiffs vaguely then conclude that they entered "sensitive personal and health information" on Defendant's appointment scheduling page when they scheduled medical appointments online. *Id.* ¶ 66. But again, this allegation is utterly devoid of factual enhancement. Plaintiffs do not explain what personal or health information they entered on the webpage, which was then subsequently shared with Meta.

For these reasons, the Court **DISMISSES** all of Plaintiffs' claims with leave to amend. With this in mind, the Court turns to each of Plaintiffs' claims.

## IV. DISCUSSION

### A. Breach of Fiduciary Duty

Plaintiffs' first cause of action is for breach of fiduciary duty. Plaintiffs claim that "as, a healthcare provider, Sharp has a fiduciary duty to its patients[.]" CAC ¶ 120. Plaintiffs further allege that "Sharp breached [their fiduciary] duties ... by installing [ ] Meta Pixel on the appointment scheduling page and disclosing Plaintiffs' ... sensitive health information without their consent to Meta." *Id.* ¶ 123. Sharp argues that Plaintiffs' claim must be dismissed because Sharp has no fiduciary relationship with Plaintiffs. Doc. No. 15 at 12–13.

Under California law, a breach of fiduciary duty claim requires "the existence of a fiduciary relationship, its breach, and damage proximately caused by that breach." *Pierce v. Lyman*, 1 Cal.App.4th 1093, 3 Cal. Rptr. 2d 236, 240 (1991), *superseded by statute on other grounds.* In order to be charged with a fiduciary obligation, a person "must either knowingly undertake to act on behalf and for the benefit of another, or enter into a relationship which imposes that undertaking as a matter of law." *Apollo Capital Fund, LLC v. Roth Capital Partners, LLC*, 158 Cal.App.4th 226, 70 Cal. Rptr. 3d 199, 215 (2007). "Whether a fiduciary duty exists is generally a question of law." *Id.*

Plaintiffs allege in a conclusory manner that because Defendant is a healthcare provider a fiduciary relationship exists between Sharp and its patients. CAC ¶ 120. However, as a matter of law, there is no fiduciary relationship between Sharp and Plaintiffs. *Luiz v. Queen of Angels Hospital*, 53 Cal. App. 2d 310, 313, 127 P.2d 966 (Cal. Ct. App. 1942) ("The relationship of hospital and patient is not per se a fiduciary or confidential one."). The California Supreme Court has expressly held that a healthcare provider does not have a fiduciary relationship with patients and can only be held liable for a breach of fiduciary duty claim on the basis of a recognized theory of secondary liability. *Moore v. Regents of University of California*, 51 Cal.3d 120, 271 Cal. Rptr. 146, 153, 793 P.2d 479 (1990). Accordingly, Plaintiffs fail to plausibly plead that Defendant owed them a fiduciary duty.

***5** The Court is unpersuaded by Plaintiffs' argument that the fiduciary relationship between a doctor and patient "imposes a fiduciary duty upon healthcare providers with respect to their patients as well as a duty to safeguard personal and medical information consistent with medical privacy statutes and industry standards."[3] Doc. No. 17 at 4–5. While Plaintiffs argue that Defendant owed its patients a duty to safeguard personal and medical information, they conflate the duty of reasonable care, relevant to a claim for negligence, with the existence of a fiduciary relationship as a matter of law. *Id.* at 6–7.

The Court therefore **GRANTS** Sharp's motion to dismiss Plaintiffs' breach of fiduciary duty claim.

**B. Invasion of Privacy Under Common Law and the California Constitution**

By way of their second cause of action, Plaintiffs allege that the disclosure of their personal and sensitive health information by Sharp to Meta, via Meta Pixel, constitutes an intrusion upon seclusion. CAC ¶ 127–35. Similarly, Plaintiffs' third cause of action is for a violation of their right to privacy pursuant to Article I, Section 1 of the California Constitution. *Id.* ¶¶ 136–44.

"To state a claim for intrusion upon seclusion under California common law, a plaintiff must show that: (1) a defendant 'intentionally intrude[d] into a place, conversation, or matter as to which the plaintiff has a reasonable expectation of privacy [,]' and (2) that the intrusion 'occurred in a manner highly offensive to a reasonable person.' " *Davis v. Facebook Inc.*, (*In re Facebook, Inc. Internet Tracking Litig.*) 956 F. 3d 589, 601 (9th Cir. 2020) (quoting *Hernandez v. Hillsides, Inc.*, 47 Cal.4th 272, 97 Cal. Rptr. 3d 274, 285, 211 P.3d 1063 (2009)). "A claim for invasion of privacy under the California Constitution involves similar elements." *Id.* Plaintiffs must plead "that: (1) they possess a legally protected privacy interest, (2) they maintain a reasonable expectation of privacy, and (3) the intrusion [is] 'so serious ... as to constitute an egregious breach of the social norms' such that the breach is 'highly offensive.' " *Id.* (quoting *Hernandez*, 97 Cal. Rptr. 3d at 285, 211 P.3d 1063). "Because of the similarity of the tests, courts consider the claims together and ask whether: (1) there exist a reasonable expectation of privacy, and (2) the intrusion was highly offensive." *Id.* at 601.

Plaintiffs contend that they had a "reasonable expectation of privacy in their sensitive health information." CAC ¶ 130. Plaintiffs further claim that Sharp's disclosure of their information, without their consent, "is highly objectionable to a reasonable person ... because Plaintiffs' sensitive health information is private and was intended to remain private and confidential." *Id.* ¶ 133. Defendant does not challenge Plaintiffs' contention that they have a reasonable expectation of privacy. Instead, Defendant argues that Plaintiffs fail to sufficiently plead that the alleged invasion of privacy was "highly offensive" and that the alleged intrusion, if any, was done hy a third party and not the Defendant. *See* Doc. No. 15 at 14, 19. Defendant also argues that monetary damages are not available for the alleged violation of the California Constitution. The Court addresses these arguments in turn.

*1. Highly Offensive*

***6** In considering whether an invasion of a privacy interest is "offensive," courts are required to consider all-inclusive "factors such as the likelihood of serious harm to the victim, the degree and setting of the intrusion, the intruder's motives and objectives, and whether countervailing interests or social norms render the intrusion inoffensive." *Id.* at 606; *Hernandez*, 97 Cal. Rptr. 3d at 293, 211 P.3d 1063. The analysis of whether an invasion of privacy is "highly offensive" must also focus on the degree to which the invasion is "unacceptable as a matter of public policy." *Id.* (citing *Hernandez*, 97 Cal. Rptr. 3d at 286, 211 P.3d 1063) (noting that highly offensive analysis "essentially involves a 'policy' determination as to whether the alleged intrusion is highly offensive under the particular circumstances").

Plaintiffs postulate that Sharp disclosed its patients' information to Meta and that the data could be de-anonymized through the matching of Facebook IDs. But as discussed above, it is not clear that anyone has actually done so, or what information, precisely, Plaintiffs shared with Sharp that was subsequently obtained by Meta. However, it is clear that even if Plaintiffs had alleged all these facts sufficiently, disclosing a user's browsing history does not plausibly reach the level of "highly offensive" conduct under either common law or the California Constitution. Defendant points to multiple cases holding that the collection and disclosure of a user's browsing history and personal information on a public website is "routine commercial behavior" and not "highly offensive." *Low v. LinkedIn Corp.*, 900 F. Supp. 2d 1010, 1025 (N.D. Cal. 2012) (disclosure of user's browsing history URLs and unique ID to third party was not highly offensive); *In re Google, Inc. Privacy Policy Litig.*, 58 F. Supp. 3d 968, 988 (N.D. Cal. 2014) (disclosure of user's personal identifying information, browsing habits, search queries, responsiveness to ads, demographic information, and declared preferences to third party was not highly offensive); *In re iPhone Application Litig.*, 844 F. Supp. 2d 1040, 1063 (N.D. Cal. 2012) (disclosure of unique device identifier number, personal data, and geolocation information to third party was not highly offensive). Here, while Plaintiffs generally allege that names, emails, phone numbers, addresses, social security numbers, browsing histories, and user locations were disclosed to Meta on Sharp's public website, they do not allege they provided this information. And even reading into the Consolidated Class Action Complaint the allegations that they gave such information, none of these alleged disclosures made during routine browsing activity rise to the level of "highly offensive."

Therefore, the Court **GRANTS** Defendant's motion to dismiss Plaintiffs' second and third causes of action to the extent they are based upon browsing activity.

Conversely, Plaintiffs do sufficiently plead that an alleged disclosure of sensitive health information on Sharp's appointment scheduling page is "highly offensive." *Katz-Lacabe v. Oracle Am., Inc.*, No. 22-cv-04792-RS, 2023 WL 2838118 at *7, 2023 U.S. Dist. LEXIS 61306 at *21 (N.D. Cal. Apr. 6, 2023) (holding that, in view of allegations being viewed in the light most favorable to the plaintiff, the general allegation that the defendant collected "sensitive health and personal safety information" from plaintiffs was sufficient to plead a "highly offensive" intrusion for a Rule 12(b)(6) motion).

"Courts are generally hesitant to decide claims of this nature at the pleading stage." *In re Meta Pixel Healthcare Litig.*, No. 22-cv-03580-WHO, 2022 WL 17869218 at *15, 2022 U.S. Dist. LEXIS 230754 at *46 (N.D. Cal. Dec. 22, 2022); *See In re Facebook, Inc.*, 402 F. Supp. 3d 767, 797 (N.D. Cal. 2019) ("Under California law, courts must be reluctant to reach a conclusion at the pleading stage about how offensive or serious the privacy intrusion is."); *In re Facebook, Inc., Internet Tracking Litig.*, 956 F. 3d at 606 (determining whether conduct was highly offensive can rarely be resolved at the pleading stage). Here, the Court finds that Plaintiffs have alleged that disclosure of their sensitive health information on Sharp's appointment scheduling page is "highly offensive" sufficient to withstand dismissal. CAC ¶¶ 66, 127–44. The Court therefore **DENIES** Defendant's motion on this basis.

*2. Intrusion by a Third Party*

*7 Defendant also argues that "the actual alleged intrusion upon [Plaintiffs'] seclusion, if any, [was] carried out by a third party," which should preclude any common law intrusion upon seclusion claim against them as a matter of law. Doc. No. 15 at 15–16. However, Plaintiffs adequately and plausibly plead that Sharp intentionally intruded upon their seclusion by embedding Meta Pixel on their website and sharing their data with Meta without their knowledge or consent. CAC ¶¶ 130–33. The Court finds that Defendant's arguments are best left for resolution at the summary judgment stage. Accordingly, the Court **DENIES** Defendant's motion in this respect.

*3. Availability of Damages*

In connection with their third cause of action, Plaintiffs seek only monetary damages, not an injunction. CAC ¶ 144. Defendant contends that monetary damages are not available for an alleged violation of Article 1, Section 1 of the California Constitution. Doc. No. 15 at 19–20. Plaintiffs argue that the California Constitution "at most might not allow damages claims against governmental entities" and that "there is no such limitation for claims against private defendants." Doc. No. 17 at 13–14.

"California's 'constitutional provision protecting the right of privacy ... supports a cause of action for an injunction' but it does not confer on a litigant a private right of action for damages." *Moore v. Rodriguez*, No. 20-cv-01481-BAS-BGS, 2021 WL 2222590, 2021 U.S. Dist. LEXIS 103725 (S.D. Cal. June 2, 2021) (dismissing an invasion of privacy claim against private defendants under Rule 12(b)(6) because the plaintiffs only sought "damages, and not an injunction, as relief") (citing *Clausing v. San Francisco Unified Sch. Dist.*, 221 Cal.App.3d 1224, 271 Cal. Rptr. 72, 78, (1990)). Therefore, the Court **GRANTS** Defendant's motion to dismiss Plaintiff's claim for monetary damages under Article 1, Section 1 of the California Constitution.

**C. Violation of California Confidentiality of Medical Information Act**

For their fourth cause of action, Plaintiffs plead that Sharp violated California's Confidentiality of Medical Information Act, Cal. Civ. Code § 56 *et seq.* ("CMIA"). *Id.* ¶¶ 145–51. Specifically, Plaintiffs plead that Sharp violated section 56.10 by installing Meta Pixel on its website and disclosing patients' medical information without their authorization. *Id.* ¶ 148. Likewise, Plaintiffs plead that Sharp violated section 56.101, by failing to preserve the confidentially of patients' medical information. *Id.* ¶ 149.

Defendant moves to dismiss this claim, arguing that Plaintiffs "fail[ ] to plead facts sufficient to show that any of their alleged medical information" was actually disclosed. Doc. No. 15 at 20–22. Additionally, Defendants contend that Plaintiffs' claim fails because they do not allege any facts showing that anyone at Meta viewed their allegedly disclosed medical information. *Id.* at 22–23. The Court addresses both of these arguments in turn.

*1. Disclosure of Medical Information*

CMIA prohibits the unauthorized disclosure of medical information and the negligent maintenance or preservation of

medical information. Cal. Civ. Code §§ 56.10(a), 56.101(a). CMIA defines "Medical Information" as "any individually identifiable information, in electronic or physical form, in possession of or derived from a provider of health care, health care service plan ... regarding a patient's medical history, mental health application information, mental or physical condition, or treatment." Cal. Civ. Code § 56.05(i). " 'Individually identifiable' means that the medical information includes or contains any element of personal identifying information sufficient to allow identification of the individual, such as the patient's name, address, electronic mail address, telephone number, or social security number, or other information that, alone or in combination with other publicly available information, reveals the identity of the individual." *Id.*

***8** As discussed above, *supra* Section III, Plaintiffs have not provided sufficient facts to support the claim that their medical information was disclosed by Sharp. For this reason, the Court **GRANTS** Defendant's motion to dismiss Plaintiffs' CMIA claim.

*2. Viewing of Medical Information*

Plaintiffs must also plead that their medical information was "improperly viewed or otherwise accessed." *Stasi v. Inmediata Health Grp. Corp.*, 501 F. Supp. 3d 898, 923 (S.D. Cal. 2020) (citing *Regents of Univ. of Cal. v. Superior Court*, 220 Cal.App.4th 549, 163 Cal. Rptr. 3d 205, 208 (2013)). Additionally, just because medical information has been disclosed in an unauthorized manner does not mean that the information was viewed by an unauthorized person. *Id.* (citing *Sutter Health v. Superior Court*, 227 Cal.App.4th 1546, 174 Cal. Rptr. 3d 653, 661 (2014)). Here, Plaintiffs only allege that data was "collected," "stored," "sent," "delivered," "shared," or "disclosed" to Meta. CAC ¶¶ 3, 4, 27, 32, 39, 90. Plaintiffs do not allege that their medical information was viewed or otherwise accessed by Meta.

In response, Plaintiffs argue that they only need to plead facts sufficient to infer that their medical information has been viewed by an unauthorized party. Doc. No. 17 at 24. However, Plaintiffs do not provide sufficient factual allegations to make such an inference. *In re Solara Med. Supplies, LLC Customer Data Sec. Breach Litig.*, 613 F. Supp. 3d 1284, 1299 (S.D. Cal. 2020) (finding that notification by the defendant of a data breach and allegations of an increase in medical related spam was enough to infer that the plaintiff's information had been viewed); *Stasi v. Inmediata Health Grp. Corp.*, 501 F. Supp. 3d at 924 (finding that the plaintiff's allegations that their information was posted on the internet was sufficient to infer the information had been viewed). Here, a single plaintiff alleges that Sharp shared her data with Meta for use in targeted advertisements. CAC ¶ 10. But this is merely a conclusion without sufficient factual support. She does not allege, for example, that she received or was subjected to an increase in any targeted advertisements. And that Meta could collect and view the information of a hypothetical patient does not support Plaintiff's claim. *Id.* ¶¶ 39–69.

Although Plaintiffs offer some additional facts in their opposition, including that Meta's business model supports the inference that their data must have been viewed in connection with targeted marketing, Doc. No. 17 at 24–25, the Court cannot read into the Consolidated Class Action Complaint allegations that are not contained within it. *Birch v. Family First Life, LLC*, No. 22-cv-815-MMA (NLS), 2023 WL 2940020 at *——, 2023 U.S. Dist. LEXIS 65379 at *19 (S.D. Cal. Apr. 13, 2023); *see also Rojas v. Portfolio Recovery Assocs. LLC*, No. CV 16-9439-FMO-SSx, 2017 WL 2999030, at *2, 2017 U.S. Dist. LEXIS 169120, at *2 (C.D. Cal. June 7, 2017) (explaining that "an opposition is not part of a plaintiff's pleadings"); *Barbera v. WMC Mortg. Corp.*, No C 04-3738, 2006 WL 167632, at *2 n.4, 2006 U.S. Dist. LEXIS 99483, at *2 n.4 (N.D. Cal. Jan. 19, 2006) ("It is axiomatic that the complaint may not be amended by briefs in opposition to a motion to dismiss.") (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984)); *Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 980 (9th Cir. 2002) ("Ordinarily, a court may look only at the fact of the complaint to decide a motion to dismiss."). Accordingly, the Court **GRANTS** Sharp's motion to dismiss Plaintiffs' CMIA claim for this reason as well.

**D. Violation of California Invasion of Privacy Act**

***9** In their fifth cause of action, Plaintiffs allege that Sharp violated California Penal Code § 630 *et seq.*, commonly referred to as the California Invasion of Privacy Act ("CIPA"). CAC ¶¶ 152–64. In particular, Plaintiffs claim that Sharp violated section 631(a) by installing Meta Pixel on its website and scheduling page, and by facilitating Meta's interception, recording, and storage of their information, without their consent. *Id.* ¶¶ 156–60.

Defendant moves to dismiss Plaintiffs CIPA claim on grounds that: (1) Plaintiffs fail to plausibly allege sufficient facts under California Penal Code to show Sharp "aided and abetted" Meta's interception of any communications; (2) "Plaintiffs fail to allege facts showing 'contents' of communications are at

issue;" and (3) any alleged interception of communications did not occur "in transit." Doc. No. 15 at 25. The Court addresses each of these arguments in turn.

*1. Sharp Aided, Agreed With, Employed, or Conspired With Meta*

It is clear from Plaintiffs' pleading that they bring their CIPA claim under the fourth clause of California Penal Code § 631(a). This subsection imposes liability on anyone who "aids, agrees with, employs, or conspires with" someone who violates the previous three clauses of California Penal Code § 631(a). Defendant argues that this is "essentially the 'aiding and abetting' prong of the CIPA" and therefore that Plaintiffs must sufficiently plead facts that allege Sharp "aided and abetted" under California criminal law. Doc. No. 15 at 25–27. The Court is unpersuaded by this argument. Defendant's contention that "aids" means "aiding and abetting" ignores the "agrees with, employs, or conspires with" language of the clause. Defendant provides no case law requiring the Court to analyze "aids, agrees with, employs, or conspires with" as solely "aiding and abetting."

Plaintiffs repeatedly allege throughout their pleading that Sharp intentionally procured Meta Pixel from Meta and installed it on their website. *See* CAC. The Court finds that this is sufficient to plead that Sharp either aided, agreed, employed, or conspired with Meta in the alleged interception of their information and data without their consent. Therefore, the Court **DENIES** Defendant's motion in this respect.

*2. "Contents" of Communications*

"The analysis for a violation of CIPA is the same as that under the federal Wiretap Act." *Hammerling v. Google LLC*, 615 F. Supp. 3d 1069, 1092 (N.D. Cal. 2022) (internal citation omitted). The Wiretap Act defines the term "contents" as "any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510. "Contents" means "the intended message conveyed by the communication" as opposed to "record information regarding the characteristics of the message that is generated in the course of the communication." *In re Zynga Privacy Litigation*, 750 F.3d 1098, 1106 (9th Cir. 2014).

As discussed in the "Initial Matters" section above, *supra* Section III, Plaintiffs do not provide sufficient factual support to plausibly claim their content was intercepted by Meta as a result of installing Meta Pixel on Sharp's webpage. Accordingly, the Court **GRANTS** Sharp's motion to dismiss Plaintiffs' CIPA claim on this basis.

*3. Interception "in Transit"*

CIPA § 631 applies to "communications" intercepted "in transit." *Hammerling*, 615 F. Supp. 3d at 1092. Defendant claims that Meta Pixel creates two separate communications, one between the user's browser and the hospital, and a second between the user's browser and Meta. Doc. No. 15 at 28. Defendant argues that since two separate communications occur, there is no interception in transit and thus Plaintiffs' claim must fail. *Id.*

***10** Defendant relies on *Smith*, 262 F. Supp. 3d at 951, arguing that because "the connection happens independently," Plaintiffs have failed to sufficiently plead that communications were intercepted in transit as a matter of law. However, the *Smith* court's analysis was limited to whether the healthcare defendants had purposefully availed themselves of conducting business in California by embedding third party code on their website. 262 F. Supp. 3d at 951–52 ("embedding third-party code cannot confer personal jurisdiction over a website operator in the forum where the third party resides.").

Similarly, Defendant contends that *In re Facebook Inc., Internet Tracking Litigation*, 956 F.3d at 608, should not apply here because the Northern District of California's analysis is limited to the CIPA "party exception" rule and does not address whether other elements of CIPA were adequately pleaded. Doc. No. 15 at 29. The Court agrees that *In re Facebook Inc., Internet Tracking Litigation* is not dispositive on whether communications were intercepted in transit. 956 F.3d at 608. However, in that case the Ninth Circuit does say that "[p]ermitting an entity to engage in the unauthorized duplication and forwarding of unknowing users' information would render permissible the most common methods of intrusion, allowing the [party] exception to swallow the rule." *Id.*

Plaintiffs repeatedly allege that without their authorization Sharp intentionally installed Meta Pixel on its website and shared user's information with Meta in real time. CAC ¶¶ 2–8, 19–29, 32, 152–64. Therefore, viewing the facts in the light most favorable to Plaintiffs, the Court finds that Plaintiffs plead that communications were intercepted in transit sufficient to survive dismissal under Rule 12(b)(6). Defendant's arguments regarding what constitutes "in transit"

are best left for resolution at the summary judgment stage. The Court therefore **DENIES** Defendants' motion in this respect.

## V. CONCLUSION

Based upon the foregoing, the Court **GRANTS** Sharp's motion and **DISMISSES** Plaintiffs' five claims with leave to amend. If Plaintiffs wish to file an amended complaint curing the deficiencies noted herein, they must do so on or before **August 2, 2023**. Any amended complaint will be the operative pleading as to Defendant, and therefore Defendant must then respond within the time prescribed by Federal Rule of Civil Procedure 15. Any claim not re-alleged in the amended complaint will be considered waived. *See* CivLR 15.1; *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1546 (9th Cir. 1989) ("[A]n amended pleading supersedes the original."); *Lacey v. Maricopa County.*, 693 F.3d 896, 928 (9th Cir. 2012) (noting that claims dismissed with leave to amend which are not re-alleged in an amended pleading may be "considered waived if not repled").

**IT IS SO ORDERED.**

**All Citations**

--- F.Supp.3d ----, 2023 WL 4484441, Med & Med GD (CCH) P 307,766

## Footnotes

1 Reviewing Defendant's motion to dismiss, the Court accepts as true all facts alleged in the Consolidated Class Action Complaint and construes them in the light most favorable to the Plaintiffs. *See Snyder & Assocs. Acquisitions LLC v. United States*, 859 F.3d. 1152, 1157 (9th Cir. 2017).

2 Unless otherwise noted, all "Rule" references are to the Federal Rules of Civil Procedure. Additionally, all citations to electronically filed documents refer to the pagination assigned by the CM/ECF system.

3 The cases Plaintiffs cite to, *Miller v. Cal. Dep't of Corr. & Rehab.*, No. 16-cv-02431-EMC, 2016 WL 3418522 at *5, 2016 U.S. Dist. LEXIS 81361 at *13 (N.D. Cal. June 22, 2016), and *Hahn v. Mirda*, 147 Cal.App.4th 740, 54 Cal. Rptr. 3d 527, 532 (2007), only support the proposition that as part of their fiduciary obligations, physicians are "prohibited from misrepresenting the nature of the patient's medical condition."

End of Document © 2023 Thomson Reuters. No claim to original U.S. Government Works.

32

COMMONWEALTH OF MASSACHUSETTS

ESSEX, S.S. SUPERIOR COURT

JOHN DOE,
INDIVIDUALLY AND ON
BEHALF OF ALL OTHERS SIMILARLY
SITUATED,

Plaintiff

v.

EMERSON HOSPITAL,

Defendant.

C.A. No. 2277CV01000

**MOTION FOR ADMISSION PRO HAC VICE**

Jonathan Tucker Merrigan, a member in good standing in the bar of this Court, as provided in the Local Rules, respectfully moves for the admission *pro hac vice* of Carl J. Gustafson, for the purposes of entering an appearance on behalf of John Doe individually and on behalf of all others similarly situated. In support of this motion, the undersigned counsel states as follows:

1. I am a member in good standing of the bar of this Court and have filed an appearance in the above-captioned action.
2. I move for the admission *pro hac vice* of Carl J. Gustafson to appear before this Court as co-counsel for the plaintiffs in the above captioned case.
3. As evidenced by his Affidavit attached, Mr. Gustafson is licensed to practice law in the State of Texas and Southern District of Texas. He is familiar with the local rules of this Court.

A TRUE COPY, ATTEST

DEPUTY ASS'T CLERK

WHEREFORE, Johnathan Tucker Merrigan respectfully requests that this Honorable Court grant leave for Carl J. Gustafson to be admitted *pro hac vice* to appear on behalf of John Doe and all other similarly situated plaintiffs in this action.

*/s/ Jonathan T. Merrigan*
J. Tucker Merrigan, BBO #681627
**Sweeney Merrigan Law, LLP**
268 Summer Street, LL
Boston, MA 02210
Tel.: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com

Dated: September 11, 2023

**CERTIFICATE OF SERVICE**

I, J. Tucker Merrigan, hereby certify that on September 11, 2023, in accordance with Superior Court Rule 9A, I served the within document(s):

- Motion for Admission Pro Hac Vice of Carl J. Gustafson, with accompanying Affidavit;

on all counsel of record, via electronic mail to the following parties of interest:

Alan Y. Wong, Esq.
Emyr Remy, Esq.
Shook, Hardy & Bacon, LLP
One Federal Street, Suite 2540
Boston, MA 02110
awong@shb.com
remy@shb.com

Alfred J. Saikali
SHOOK, HARDY & BACON L.L.P.
201 South Biscayne Blvd., Suite 3200
Miami, Florida 33131
asaikali@shb.com

Josh Becker
SHOOK, HARDY & BACON L.L.P.
1230 Peachtree St., Suite 1200
Atlanta, GA 30309
jbecker@shb.com

Michael Rayfield (pro hac vice forthcoming)
SHOOK, HARDY & BACON L.L.P.
1325 Avenue of the Americas, 28th Floor
New York, NY 10019
mrayfield@shb.com

Lindsey M. Knapton (pro hac vice forthcoming)
SHOOK, HARDY & BACON L.L.P.
1600 17th Street, Suite 450
Denver, CO 80202
lknapton@shb.com

*/s/ Jonathan T. Merrigan*
J. Tucker Merrigan

32.1

COMMONWEALTH OF MASSACHUSETTS

ESSEX, S.S. SUPERIOR COURT

| | | |
|---|---|---|
| JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | § | C.A. No. 2277CV01000 |
| Plaintiff | § | |
| v. | § | |
| EMERSON HOSPITAL, | § | |
| Defendant. | § | |

**AFFIDAVIT OF CARL J. GUSTAFSON**

I, Carl J. Gustafson, state and depose as follows:

1. I am an attorney licensed to practice in the state of Texas.

2. I am an attorney at Ahmad, Zavitsanos & Mensing, located at 1221 McKinney, Suite 2500, Houston, Texas 77010. The phone number is (713) 600-4924.

3. I was admitted to practice law in the following bars:
   a. Texas on October 8, 2021; and
   b. US District Court, Southern District of Texas on August 23, 2022.

4. I am a member of good standing and duly licensed and admitted to practice in each of the jurisdictions listed above.

5. I have never been suspended or disbarred in my jurisdictions.

6. I am familiar with the Local Rules in Massachusetts.

7. If the Court allows the Motion for me to appear *pro hac vice* in this matter, I will represent the Plaintiffs in this proceeding until the final determination thereof, and with reference to all matters, incidents, or proceedings, I agree that I shall be subject to the orders and the disciplinary action and the civil jurisdiction of this Court in all respects as if I were admitted.

Signed under the pains and penalties of perjury this 11th day of September 2023.

Carl J. Gustafson, Esq.

A TRUE COPY, ATTEST

DEPUTY ASS'T. CLERK

Please note that ONLY THIS FORM, FILLED OUT ON THE WEBSITE, WILL BE ACCEPTED. Handwritten, annotated, copied, scanned or modified forms will be returned.

# BOARD OF BAR OVERSEERS

## REGISTRATION STATEMENT FOR *PRO HAC VICE* ATTORNEYS

Attorney name (first MI last, suffix): **Carl J. Gustafson**
Email address: **cgustafson@azalaw.com**
Complete Business/Mailing Address:

**Carl J. Gustafson**
**Ahmad, Zavitsanos & Mensing**
**1221 McKinney, Suite 2500**
**Houston, Texas 77010**

Board of Bar Overseers
Administrative Use Only

Date Received: 09-19-23
Amount Paid: $355.00
Date confirmation mailed: 09-19-23

Business phone: **(713) 600-4924**

Court in which pro hac vice admission is sought: **Essex Superior Court**

Contact number for court: **(978) 744-5500**

Party to be represented: **John Doe, Individually and on Behalf of All Others Similary Situated**

Docket number of case (if available): **2277CV01000**

Jurisdictions to which you have been admitted: (Use second page for additional jurisdictions.)

| Type | Jurisdiction | License number |
|---|---|---|
| State | **Texas** | **24125261** |
| Federal | **US District Court, Southern District of Texas** | **3783499** |

RECEIVED
SEP 19 2023
Massachusetts Board of Bar Overseers Registration Dept.

I certify that (check one): ( ☐ ) the party I am representing in the case for which I am seeking pro hac vice admission is an indigent client, and I understand that no pro hac vice fee is due, or (☑) I have included the required pro hac vice fee.

Further, I certify, under the pains and penalties of perjury, that I am admitted to practice and in good standing in every jurisdiction where I am admitted, and I acknowledge that I am subject to discipline by the Massachusetts Supreme Judicial Court and the Board of Bar Overseers. I understand I am limited in my legal practice in Massachusetts to the case identified above.

I certify the information I have supplied the Board of Bar Overseers is true and complete.

[signature]

**Signature** (Please sign inside box above.)

**Date:** 9/5/2023

C-123

Sign, print and mail original form to: Board of Bar Overseers, 99 High Street, 2nd Floor, Boston, MA 02110-2320

**Jurisdictions continued:**

**Carl J. Gustafson**

| Type | Jurisdiction | License number |
| --- | --- | --- |

Please remember to sign and date first page and mail original form to: Board of Bar Overseers, 99 High Street, 2nd Floor, Boston, MA 02110-2320

32.2

COMMONWEALTH OF MASSACHUSETTS

ESSEX, S.S. SUPERIOR COURT

| | | |
|---|---|---|
| JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | § | C.A. No. 2277CV01000 |
| Plaintiff | § | |
| v. | § | |
| EMERSON HOSPITAL, | § | |
| Defendant. | § | |

**AFFIDAVIT IN COMPLIANCE WITH SUPERIOR COUR RULE 9A**

I, J. Tucker Merrigan, hereby depose and say the following:

1. I am an attorney at the law firm of Sweeney Merrigan Law, LLP, 268 Summer Street, LL, Boston, Massachusetts 02210;

2. On September 11, 2023, I emailed a copy of the within, *Motion for Pro Hac Vice* of Carl J. Gustafson;

3. Plaintiff's counsel has received no opposition from defense counsel; and

4. The original pleadings are now being filed with the Court.

Signed under the penalties of perjury this 25th day of September 2023.

*/s/ J. Tucker Merrigan*
J. Tucker Merrigan

A TRUE COPY, ATTEST
DEPUTY ASST. CLERK

32.3

COMMONWEALTH OF MASSACHUSETTS

ESSEX, S.S. SUPERIOR COURT

| | | |
|---|---|---|
| JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | § | C.A. No. 2277CV01000 |
| Plaintiff | § | |
| v. | § | |
| EMERSON HOSPITAL, | § | |
| Defendant. | § | |

**RULE 9A NOTICE OF FILING AND LISTING OF DOCUMENTS**

I, J. Tucker Merrigan, one of the counsel for Plaintiff, John Doe, Individually and on Behalf of All Others Similarly Situated, hereby state that the following list of documents have been submitted for filing with the Court pursuant to Superior Court Rule 9A:

1. Motion for Admission Pro Hac Vice of Carl J. Gustafson, with accompanying Affidavit; and
2. Affidavit in Compliance with Superior Court Rule 9A.

Respectfully Submitted
The Plaintiffs
By their Attorney,

*/s/ J. Tucker Merrigan*
J. Tucker Merrigan, BBO# 681627
**SWEENEY MERRIGAN LAW, LLP**
268 Summer Street, LL
Boston, MA 02210
Phone: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com

Dated: September 25, 2023

A TRUE COPY, ATTEST
DEPUTY ASS'T. CLERK

## CERTIFICATE OF SERVICE

I, J. Tucker Merrigan, hereby certify that on September 25, 2023, in accordance with Superior Court Rule 9A, I served the within document(s):

1. *Affidavit in Compliance with Superior Court Rule 9A; and*

2. *Rule 9A Notice of Filing and Listing of Documents,*

on all counsel of record, via electronic mail to the following parties of interest:

Alan Y. Wong, Esq.
Emyr Remy, Esq.
Shook, Hardy & Bacon, LLP
One Federal Street, Suite 2540
Boston, MA 02110
awong@shb.com
remy@shb.com

Alfred J. Saikali
SHOOK, HARDY & BACON L.L.P.
201 South Biscayne Blvd., Suite 3200
Miami, Florida 33131
asaikali@shb.com

Josh Becker
SHOOK, HARDY & BACON L.L.P.
1230 Peachtree St., Suite 1200
Atlanta, GA 30309
jbecker@shb.com

Michael Rayfield (pro hac vice forthcoming)
SHOOK, HARDY & BACON L.L.P.
1325 Avenue of the Americas, 28th Floor
New York, NY 10019
mrayfield@shb.com

Lindsey M. Knapton (pro hac vice forthcoming)
SHOOK, HARDY & BACON L.L.P.
1600 17th Street, Suite 450
Denver, CO 80202
lknapton@shb.com

*/s/ Jonathan T. Merrigan*
J. Tucker Merrigan

COMMONWEALTH OF MASSACHUSETTS

ESSEX, S.S.

TRIAL COURT DEPARTMENT
SUPERIOR COURT

JOHN DOE, Individually and on behalf of herself and all others similarly situated,

Plaintiff,

v.

EMERSON HOSPITAL,

Defendant.

DOCKET NO. 2277CV01000D

# PLAINTIFFS' NOTICE OF SUPPLEMENTAL AUTHORITY

Plaintiffs John Doe and Jane Doe respectfully submit supplemental authority in support of Plaintiffs' Response in Opposition to Defendants' Motion to Dismiss.

1. On September 14, 2023, in *Doe v. Boston Med. Ctr. Corp.*, Case No. 2348CV00326-BLS-1, In the Commonwealth of Massachusetts for Suffolk County (attached as Exhibit 1), the trial court denied a motion to dismiss in a related Pixel case asserting claims under the Massachusetts Wiretap Statute and invasion of privacy under G.L. c. 214 § 1B. The Court denied the motion to dismiss, determining the plaintiff had standing to sue and that allegations of the use of the Meta Pixel and Google Analytics software code on the hospital website were sufficient to support claims for wiretapping and invasion of privacy. Ex. 1 at 4–9.

2. On September 14, 2023, in *Doe v. Children's Hosp. Corp.*, Case No. 2384CV00411-SLA-1, In the Commonwealth of Massachusetts for Suffolk County (attached as Exhibit 2), the trial court denied a motion to dismiss in a related Pixel case asserting claims under



A TRUE COPY, ATTEST
DEPUTY ASST. CLERK

the Massachusetts Wiretap Statute. The Court denied the motion to dismiss, determining that the allegations the hospital's website contained the Meta Pixel and Google Analytics code were sufficient to state claims for wiretapping. Ex. 2 at 4–9.

3. On June 21, 2023, in *Alves v. BJ's Wholesale Club, Inc.*, Case No. 22-2509-BLS1, In the Commonwealth of Massachusetts for Suffolk County (attached as Exhibit 3), the trial court denied the motion to dismiss in a related Pixel case asserting claims for wiretapping and invasion of privacy. In rejecting the defendant's motion to dismiss, the trial court held that the defendant's unauthorized disclosure of Plaintiff's interactions with the defendant's public facing website were sufficient to state claims for wiretapping and invasion of privacy. Ex. 3 at 5-12.

4. On September 7, 2023, in *Doe v. Meta Platforms, Inc.*, Case No. 22-cv-03580-WHO (N.D. Cal. Sep. 7, 2023) (attached as Exhibit 4), the court denied a motion to dismiss wiretap claims under the Electronic Communications Privacy Act where plaintiffs alleged that users entered their personal medical information into forms provided by hospital websites. Ex. 4 at 3-8.

5. On August 25, 2023, *Yockey v. Salesforce, Inc.*, 2023 WL 5519323, (N.D. Cal. Aug. 25, 2023) (attached as Exhibit 5), the court denied a motion to dismiss invasion of privacy claims under section 632 of the California Invasion of Privacy Act. Ex. 5 at *6–7 In so doing, the court rejected the defendant's argument that "plaintiffs had no reasonable expectation of privacy because the communications occurred over the internet." *Id.* at *6.

6. On August 7, 2023, in *Brown v. Google LLC*, 4:20-cv-3664-YGR (N.D. Cal. Aug. 7, 2023) (attached as Exhibit 6), the court denied Google's motion for summary judgement as to each of the plaintiffs' claims and, in doing so, provided a detailed analysis of Article III standing in cases such as this one where the claims arise out of privacy violations. Ex. 1 at 9-12 (holding that "because plaintiffs alleged that the defendant had collected their data without consent," they sufficiently alleged "the concrete privacy interests that statutes like the Wiretap Act and CIPA

protect, regardless of how the collected data was later used.") (internal quotations omitted). The Order rejects Google's argument that the plaintiffs failed to allege an economic injury sufficient to confer standing, stating that "[p]laintiffs have shown that there is a market for their browsing data and Google's alleged surreptitious collection of the data inhibited plaintiffs' ability to participate in that market." Ex. 6 at 36.

7. On May 6, 2023, in *Doe v. Regents of the University of California*, Case No. 23-cv-00598-WHO (N.D. Cal. May 6, 2023) (attached as Exhibit 7), the trial court similarly rejected the defendant hospital's motion to dismiss in a Pixel case, holding that the plaintiff's receipt of advertising related to her conditions on her Facebook page was sufficient to raise "more than a sheer possibility that the defendant acted unlawfully." Ex. 7 at 4.

8. On July 20, 2023, in *Doe v. Boone Health, Inc.*, 2023 WL 4996117, (Mo.Cir. July 20, 2023) (attached as Exhibit 8), the court denied a motion to dismiss, holding the defendant hospital violated patients' privacy rights by disclosing "health information to Facebook and Google [collected] via tracking tools on its website." Ex. 8 at *3.

9. On August 25, 2023, in *Stake v. Knox*, Case No. 23OT01-0026, In the Court of Common Pleas, Knox County, Ohio (attached as Exhibit 9) the trial court denied Knox Community Hospital's motion to dismiss Plaintiffs' privacy claims in an identical Pixel case, holding that Plaintiffs' allegations that "they used Defendant's website to obtain medical services, and transmitted to Defendant via its website details related to their medical conditions, including but not limited to their treating physicians, searches for various kind of doctors, and information related to their ongoing treatment" were sufficient to confer standing to bring their privacy claims against the hospital for unauthorized disclosures of the personal health information. Ex. 9 at 3-4.

10. Finally, on July 20, 2023, the Office of Civil Rights (OCR) at the U.S. Department of Health and Human Services (HHS) and the Federal Trade Commission (FTC) published a Joint

Notice Letter (attached as Exhibit 10) regarding the "Use of Online Tracking Technologies." The HHS and FTC warned hospitals like St. Luke's that the use online tracking technologies that HIPPA regulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to third parties. Specifically, the HHS and the FTC cautioned that "[w]hen consumers visit a hospital's website or seek telehealth services, they should not have to worry that their most private and sensitive health information may be disclosed to advertisers and other unnamed, hidden third parties." Ex. 10.

11. For the reasons stated above, Plaintiffs respectfully submit this Notice of Supplemental Authority, along with Exhibits 1-10.

Dated: October 5, 2023

Respectfully Submitted:

*/s/ J. Tucker Merrigan*
J. Tucker Merrigan, BBO# 681627
Thomas T. Merrigan, BBO# 343480
Erin E. McHugh, BBO# 703701
**SWEENEY MERRIGAN LAW**
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
tom@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Foster Johnson (*admitted pro hac vice*)
Texas Bar No. 24076463
David Warden (*admitted pro hac vice*)
Texas Bar No. 20856750
Carl J. Gustafson (*admitted pro hac vice*)
Texas Bar No. 24125261
**AHMAD, ZAVITSANOS & MENSING, PLLC**
1221 McKinney, Suite 2500
Houston, Texas 77010
(713) 655-1101 -Phone
(713) 655-0062 – Fax
fjohnson@azalaw.com
dwarden@azalaw.com
cgustafson@azalaw.com

Alex Dravillas (*admitted pro hac vice*)
**KELLER POSTMAN LLC**
150 N. Riverside Plaza, Suite 4100
Chicago, IL 60606
(312) 741-5226
adj@kellerpostman.com

Sara Aguiniga (*admitted pro hac vice*)
**KELLER POSTMAN LLC**
1100 Vermont Ave, 12th Floor
Washington, DC 20005
sara.aguiniga@kellerpostman.com

**CERTIFICATE OF SERVICE**

I, J. Tucker Merrigan, hereby certify that on October 5, 2023, I served the Plaintiffs' Notice of Authority on all counsel of record, via electronic mail to the following parties of interest:

Emyr Remy
SHOOK, HARDY & BACON L.L.P.
One Federal Street, Suite 2540
Boston, MA 02110
Tel: (617) 531-1411 | Fax: (617) 531-1602
remy@shb.com

Alfred J. Saikali *(pro hac vice)*
SHOOK, HARDY & BACON L.L.P.
201 South Biscayne Blvd., Suite 3200
Miami, Florida 33131
Tel: (305) 358-5171 | Fax: (305) 358-7470
asaikali@shb.com

Tammy B. Webb *(pro hac vice)*
SHOOK, HARDY & BACON, L.L.P.
555 Mission Street, Suite 2300
San Fransicso, CA 94105
Tel: (415) 544-1900 | Fax: (415) 391-0281
Tbwebb@shb.com

Jessica N. Wahl *(pro hac vice)*
SHOOK, HARDY & BACON L.L.P.
2049 Century Park East, Suite 3000
Los Angeles, CA 90067
Tel: (424) 285-8330 | Fax: (424) 204-9093
jwahl@shb.com

Jenn O. Hatcher *(pro hac vice)*
SHOOK, HARDY & BACON L.L.P.
2555 Grand Blvd
Kansas City, MO 64108
Tel: (816) 474-6550 | Fax: (816) 421-5547
Jhatcher@shb.com

Justin R. Donoho *(pro hac vice)*
SHOOK, HARDY & BACON, L.L.P.
111 South Wacker Drive
Chicago, IL 60606
Tel: (312) 704-7713 | Fax: (312) 558-1195
jdonoho@shb.com

*/s/ Jonathan T. Merrigan*
J. Tucker Merrigan

# EXHIBIT 1

18

NOTIFY

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT
CIVIL ACTION
No. 2384CV00326-BLS-1

JOHN DOE 1 & another,[1]

vs.

BOSTON MEDICAL CENTER CORPORATION

**MEMORANDUM OF DECISION AND ORDER ON DEFENDANT'S MOTION TO DISMISS**

Plaintiffs John Doe 1 and John Doe 2 commenced this putative class action against defendant Boston Medical Center Corporation ("BMC"), alleging that it used digital marketing tools on its website that illegally redirected website users' personal information, and the contents of their communications with BMC's website, to third parties Google and Meta. On the basis of these allegations, the Complaint asserts claims for violations of the Massachusetts Wiretap Statute, G.L. c. 272, § 99, and invasion of privacy under G. L. c. 214, § 1B. Presently before the court is BMC's motion to dismiss. After a hearing on July 18, 2023, and consideration of the parties' submissions, the motion is **DENIED**.

## BACKGROUND

The Complaint sets forth the following facts, with further facts reserved for later discussion. BMC is a 514-bed academic medical center in Boston that provides medical care to patients of all ages. BMC designs, maintains, and/or directs the design and maintenance of its website from its offices in Massachusetts. Plaintiffs are individuals residing in Massachusetts.

The BMC website allows users to, among other things, research health conditions, research doctors and procedures BMC offers, request appointments, and log into BMC's patient

[1] John Doe 2, individually and on behalf of all others similarly situated.

portal known as MyChart. The website contains search bars that aid users in finding specific information on the site. The BMC website includes a viewable privacy policy stating that "Boston Medical Center will not intentionally share the contents of any electronic communications with a third-party entity." It further states that "[o]nline visitors utilizing this site do so anonymously," but notes that certain information may be collected, including "IP address and domain name, Time of visit, [and] Operation system." The website includes additional statements to the effect that BMC prioritizes patient privacy, and maintains privacy and security for its patients' protected health information and other personal and financial information.

Notwithstanding its privacy policy, since at least 2018, BMC has inserted embedded internet tracking software on its website. The software is unrelated to the website's functionality and is invisible to users. When a user visits the BMC website, the software sends data collected from those visits to third parties Meta (the parent company of Facebook) and Google.

In December 2019 or earlier, BMC installed the "Meta Pixel" on its website. The Meta Pixel is a piece of software code that gathers information from a user's internet browser when they are on the BMC website and sends it to Meta, including the user's IP address. If the user is a Facebook subscriber, Meta can use the data gathered, in conjunction with other information it gathers through the use of internet cookies and subscriber information, to identify the website user and target ads specifically for them based on their interaction with the website. Through the use of different internet cookies, Meta can also gather data from non-Facebook users, also for advertising purposes. Businesses employ the Meta Pixel to better tailor their advertising efforts. After a media exposé about the use of the Meta Pixel on hospital websites, BMC removed Meta Pixel from its website in September 2022.

In 2018, BMC installed Google Analytics software code on its website. The code includes and employs "Google tag manager" and internet cookies to send to Google the contents of website users' communications with the BMC website, and users' IP addresses. Google allows site owners to "anonymize" the data collected, which BMC has chosen not to enable. As of the date the Complaint was filed, Google Analytics software remained on the BMC website.

On multiple dates in 2021 and 2022, Plaintiff John Doe 1 used the BMC website, including to log into the MyChart portal, visit the "Make an Appointment" part of the website, and search "local anesthesia" and "hernia repair." John Doe 1 searched these topics around the same time he saw a surgeon at BMC for the same issue. He also used the BMC website to find a urologist, and through that online process became a patient of a BMC urologist. Using the Meta Pixel and Google Analytics software, BMC disclosed to those third parties the substance of John Doe 1's BMC website interactions, including revealing his status as a BMC patient, and the text of his searches on the BMC website. Also disclosed to Meta and Google were John Doe's IP address, and other unique identifiers, such as his Facebook ID. At the time he used the BMC website, John Doe 1 was not aware that his information and the contents of his online interactions with the BMC website were simultaneously being sent to Google and Meta.

Similarly, in 2021 and 2022, Plaintiff John Doe 2 used the BMC website to search for contact information about his doctors, make appointments, research medical conditions, and log into MyChart, all without knowing that the contents of those website interactions and his personal identifying information were being sent to Google and Meta.

## STANDARD OF REVIEW

Rule 12(b)(6) allows for dismissal of a complaint when the factual allegations contained within it do not suggest a plausible entitlement to relief. *Iannacchino v. Ford Motor Co.*, 451

Mass. 623, 635-636 (2008); *Fraelick v. PerkettPR, Inc.*, 83 Mass. App. Ct. 698, 699-700 (2013). In ruling on the motions, the court accepts the factual allegations as true and draws all reasonable inferences in the non-moving party's favor.[2] *Fraelick*, 83 Mass. App. Ct. at 699-700.

## DISCUSSION

BMC argues that Plaintiffs' claims must be dismissed due to lack of standing and failure to meet the requirements of the relevant statutes. As discussed below, the arguments are unavailing.

### 1. Standing

Proof of standing requires that a plaintiff "allege sufficient facts to show that he has suffered a nonspeculative, direct injury." *Pugsley v. Police Dep't of Boston*, 472 Mass. 367, 373 (2015). In addition, "[w]hen a statute confers standing in relation to particular subject matter, that statute, rather than more general ideas about standing, governs who may initiate legal action in relation to the subject matter." *Rizkallah v. Director of Massachusetts Office of Medicaid*, 85 Mass. App. Ct. 1104, 2014 WL 886777, at *1 (2014) (Unpublished Opinion) (quoting *Centennial Healthcare Inv. Corp. v. Commissioner of the Div. of Med. Assistance*, 61 Mass. App. Ct. 320, 326 (2004)). *See Murby v. Children's Hosp. Corp.*, 2016 WL 2678657, at *4 (Mass. Super. 2016). Under the statutes at issue here, the relevant standing requirements have been met.

Looking first at the Massachusetts Wiretap Statute, it contains a liquidated damages provision providing that: "Any aggrieved person . . . shall have a civil cause of action . . . and shall be entitled to recover . . . actual damages but not less than liquidated damages computed at the rate of $100 per day for each day of violation or $1000, whichever is higher." G.L. c. 272, §

[2] The standard of review for a challenge to standing at this stage under Rule 12(b)(1) is functionally the same. *Abate v. Fremont Inv. & Loan*, 470 Mass. 821, 828 (2015).

99(Q). By providing such an award to an aggrieved person under the statute, with no additional showing of harm required, the Legislature necessarily deemed a properly alleged violation of the statute, alone, to constitute injury sufficient to confer standing. *See Pine v. Rust*, 404 Mass. 411, 418 (1989) (Massachusetts Wiretap Statute allows recovery of statutory minimum damages "without any proof of harm"); *In re Lubanski*, 186 B.R. 160, 166-67 (Bankr. D. Mass. 1995) (same). Here, where, as discussed *infra*, Plaintiffs plausibly allege a violation of the Massachusetts Wiretap Statute, more is not required.

As for the Right of Privacy statute, G.L. c. 214, § 1B, it provides: "A person shall have a right against unreasonable, substantial or serious interference with his privacy. The superior court shall have jurisdiction in equity to enforce such right and in connection therewith to award damages." The plain language of the statute provides a cause of action to those whose right to privacy has been invaded in the manner described, with no additional requirement to proof any additional harm or damages, although the superior court has the authority to award damages. Thus, the invasion of privacy alleged — that BMC intentionally disclosed Plaintiffs' personal identifying information, including their IP addresses, along with the contents of their personal health-related website interactions — alone are sufficient to show they suffered a direct injury under the statute for purposes of standing. *See Murby*, 2016 WL 2678657, at *4 (where plaintiffs met statutory requirements to bring cause of action under the determination of need law, no additional showing needed to confer standing).[3]

[3] *Pugsley*, 472 Mass. 367, and *Ginther v. Commissioner of Ins.*, 427 Mass. 319, 323 (1998), upon which BMC relies, are distinguishable on the facts. The court in *Pugsley* determined the plaintiff police candidate had no standing because his alleged injury was speculative and hypothetical. *See* 472 Mass. at 371 (plaintiff's low position on eligibility list was "indicative of the unlikelihood that his name would ever have been reached" regardless of outcome of litigation). In *Ginther*, plaintiffs did not have standing where they did not hold an insurance policy by the "acquired insurer" or "otherwise participate in the Massachusetts insurance market." 427 Mass. at 323. Here,

**2. Massachusetts Wiretap Statute**

General Laws c. 272, § 99(Q) provides a cause of action for "any aggrieved person whose oral or wire communications were intercepted, disclosed or used . . . or whose personal or property interests or privacy were violated by means of an interception," except as permitted or authorized by the Wiretap Statute. "Interception" is defined to mean "to secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire or oral communication through the use of any intercepting device by any person other than a person given prior authority by all parties to such communication." G.L. c. 272, § 99(B)(4). BMC argues that dismissal is required here because the Legislature intended the statute to apply only to "conversations," not internet tracking; the term "intercepting device" does not encompass the software code at issue here; and finally the alleged interceptions did not take place in Massachusetts.

Beginning with legislative intent, "[i]n enacting the wiretap act the Legislature sought to curtail two 'grave dangers': (1) 'the increasing activities of organized crime' and (2) 'the uncontrolled development and unrestricted use of modern electronic surveillance devices,' which the Legislature termed a danger "'to the privacy of all citizens.'" *Commonwealth v. Ennis*, 439 Mass. 64, 68 (2003) (quoting G.L. c. 272, § 99(A)). Nothing in this stated intent or in the language of the statute limits its reach to the equivalent of "in-person conversations" as argued by BMC. Indeed, it is well-established that the statute is to be interpreted broadly, and consistent with that principle, it already has been applied to electronic text messages. *See Commonwealth v. Moody*, 466 Mass. 196, 201, 209 (2013).[4] Plaintiffs' online search for doctors and requests for

by contrast, Plaintiffs fall within the "area of concern" of the statutes, *id.*, and have adequately pleaded aggrievement where their information and communications already have been disclosed.

[4] BMC's contention that *Moody* somehow supports its view is unpersuasive.

appointment are the modern equivalent of telephone inquiries and conversations that would have been made to doctors' offices in the past when the statute was enacted, and are therefore covered under its broad language.

BMC next argues that the statutory term "intercepting device" is limited to only "tangible" objects, and thus does not encompass the Meta Pixel and Google Analytics software at issue here. Again, the argument is unavailing. The Massachusetts Wiretap Statute broadly defines an "intercepting device" as "any device or apparatus which is capable of transmitting, receiving, amplifying, or recording a wire or oral communication." G.L. c. 272, § 99(B)(4). Nothing in this language limits intercepting devices to being physical, tangible objects; neither does the common dictionary definition of "device" so limit that term. *See* Webster's College Dictionary p. 370 (1991) ("device" defined as "a thing made for a particular purpose, esp. a mechanical, electric, or electronic invention or contrivance"). Moreover, where cellphone, tablet, and computer applications and programs, and their interfacing with the internet, all rely on software for their operation, its use is practically implicit in any modern electronic communication. Thus, to restrict software code from being considered an intercepting device as BMC suggests would essentially nullify the statute's application.

Because the software code at issue here is alleged to have recorded and transmitted the contents of Plaintiffs' communications with BMC's website and their personal information to third parties, the Complaint sufficiently alleges the use of an intercepting device. *See Alves v. BJ's Wholesale Club, Inc.*, 22-2509-BLS1, slip op. at 10 (Super. Ct. June 21, 2023), citing *United States v. Hutchins*, 361 F. Supp. 3d 779, 795 (E.D. Wis. 2019) ("The majority of courts to consider this issue have entertained the notion that software may be considered a device for the purposes of the [Federal] Wiretap Act"); *Rich v. Rich*, 2011 WL 3672059, at *6 (Mass. Super.

2011) (key logger software program deemed to be "intercepting device" under Massachusetts Wiretap Statute).[5]

Finally, where BMC is alleged to have added (or directed the addition of) the Meta Pixel and Google Analytics software to its website from its offices in Massachusetts, and Plaintiffs are Massachusetts residents who accessed BMC's website while in Massachusetts, the allegations suffice to show that the interceptions occurred in Massachusetts. In other words, because the sender and the intended recipient/interceptor are both in Massachusetts, the location of Meta and Google in California is not disqualifying, particularly in the absence of controlling authority holding otherwise.[6]

**3. <u>Invasion of Privacy</u>**

An invasion of privacy claim under G.L. c. 214, § 1B may be based either on the public disclosure of private facts or an intrusion upon a plaintiff's solitude or seclusion, i.e., an infringement upon the right to be left alone. *Polay v. McMahon*, 468 Mass. 379, 382 (2014). In either case, a plaintiff must put forward allegations plausibly suggesting that the invasion is both unreasonable and substantial or serious. *Id.* In determining whether a violation occurred, the court should consider "the location of the intrusion, the means used, the frequency and duration of the intrusion, and the underlying purpose behind the intrusion" while balancing the extent of any intrusion "against any legitimate purpose" therefor. *Id.* at 383. Typically, whether an intrusion is unreasonable, substantial, or serious is a question of fact. *Id.*

---

[5] This conclusion is also consistent with the result reached in *Doe v. Partners Healthcare System, Inc.*, 1984CV01651-BLS1, endorsement denying motion to dismiss (Super. Ct. Dec. 7, 2020).

[6] The cases BMC cites in support of its argument are not persuasive because they involve out-of-state individuals directing the alleged interception. *See, e.g., Marquis v. Google, Inc.*, 2015 WL 13037257, at *7 (Mass. Super. 2015) (Google's California-based automated email scanning); *Ross v. Jackson Nat'l Life Ins. Co.*, 2020 WL 2850290, at *8 (D. Mass. 2020) (plaintiff's telephone calls to out-of-state location were recorded out-of-state).

Here, at the motion to dismiss stage, the alleged disclosure of personal and healthcare-related information over multiple website visits for the sole purpose of targeted advertising efforts suffices to advance Plaintiffs' claim. *See generally Ayash v. Dana-Farber Cancer Inst.*, 443 Mass. 367, 383 (2005) ("statute . . . proscribes disclosure of facts about an individual that are of a highly personal or intimate nature when there exists no legitimate countervailing interest" [citation omitted]).

BMC nevertheless argues that Plaintiffs' claim fails for lack of alleged damages. The statute provides the Superior Court with equity jurisdiction, however, to enforce a plaintiff's right to privacy, in addition to the authority to award damages. G.L. c. 214, § 1B. Here, where BMC is alleged to have intentionally placed the Meta Pixel and Google Analytics software on its website, the software's removal, the deletion of data collected, or the addition of appropriate disclaimers, would fall under the court's equity jurisdiction. Indeed, Plaintiffs seek injunctive relief enjoining the disclosures alleged absent a website users' consent. Whether the damages Plaintiffs further allege withstand scrutiny is a matter for later determination.

4. **Conclusion**

For all of these reasons, BMC's motion to dismiss is **DENIED**.

**ORDER**

For the foregoing reasons, BMC's motion to dismiss is **DENIED**.

Dated: September 14, 2023

Hélène Kazanjian
Justice of the Superior Court

# EXHIBIT 2

NOTIFY

18

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT
CIVIL ACTION
No. 2384CV00411-BLS-1

JANE DOE,[1]

vs.

THE CHILDREN'S HOSPITAL CORPORATION

**MEMORANDUM OF DECISION AND ORDER ON DEFENDANT'S MOTION TO DISMISS**

Plaintiff Jane Doe commenced this putative class action against defendant The Children's Hospital Corporation ("Boston Children's"), alleging that it used internet tracking tools on its website that illegally redirected website users' personal information, and the contents of their communications with Boston Children's website, to Google, Meta, and other third parties. On the basis of these allegations, the Complaint asserts a single claim for violation of the Massachusetts Wiretap Statute, G.L. c. 272, § 99. Presently before the court is Boston Children's motion to dismiss. After a hearing on July 26, 2023, and consideration of the parties' submissions, the motion is **DENIED**.

## BACKGROUND

The Complaint sets forth the following facts. Boston Children's provides pediatric medical services at locations in Boston and surrounding communities, including seven hospital campuses and four physician offices. All of Boston Children's facilities share a website, which Boston Children's maintains and controls. Plaintiff is an individual residing in Burlington, Massachusetts..

[1] For herself and the class.

The Boston Children's website allows users to obtain information about the services Boston Children's provides, including information about doctors, services, and treatments provided for particular medical conditions. Website users can also book appointments, access and pay bills, and access private medical information through the MyChildren's Patient Portal. The website contains search bars that aid users in finding specific information on the site, and forms that users may submit to Boston Children's, such as the "Request an Appointment" form.

The Boston Children's "Web Site User Privacy Rights" notice ("Privacy Notice") states that:

> Boston Children's Hospital is strongly committed to protecting the privacy of its online users: patients, families, donors, the media, and others. We do not collect personally identifiable information about individuals, except when it is knowingly provided by such individuals (e.g., web forms). We do not share voluntarily provided, personally identifiable information for any purpose other than its intended use.

(formatting altered). The Privacy Notice also discloses that Boston Children's collects "some basic web log file data about site visitors . . . includ[ing] domain names, website traffic patterns and server usage statistics [which] is used for site management and administration and to improve the overall performance and user experience on our site." The Privacy Notice further states that any web forms a user submits "are located on a secure site," and informs users that Boston Children's does "not sell visitors' personal information to third parties, such as marketers."

Notwithstanding this Privacy Notice, Boston Children's has implemented multiple software-based internet tracking technologies on its website that contemporaneously record and transmit data about users' interactions with Boston Children's website to third parties. The software is unrelated to the website's functionality and is invisible to users. Two such tracking

technologies are Meta Pixel, which transmits data to Meta (the parent company of Facebook), and Google Analytics, which transmits data to Google.

Meta Pixel and Google Analytics operate through the automatic execution of pieces of JavaScript code, embedded in the Boston Children's website, which cause a website user's internet browser to record and send information to those third parties when a user visits the site. The transmitted information can include: the website address (URL); the title of webpages visited; information about the content of the website; search terms or any other information inputted into a form; selections on drop-down menus and the contents thereof; scrolls down a webpage; and button clicks. A website user's internet protocol ("IP") address and web browser configurations are also revealed, which permits Google and Meta to associate the data it receives from the website visit to the identity of a particular individual known to them. The content of the user's communications with Boston Children's website is added to Google's and Meta's collection of information already known about the individual, which can be used to target advertising to that individual. After a media exposé about the use of Meta Pixel on hospital websites, Boston Children's removed it from its website in June 2022. As of the date the Complaint was filed, Google Analytics software remains on the Boston Children's website.

In addition to Meta Pixel and Google Analytics, Boston Children's also employs other software-based internet tracking technologies that work in a similar fashion. Those include Bing Ads, Doubleclick, and LinkedIn Insight. Boston Children's also uses Hotjar, which is a "session replay" provider that allows Boston Children's to "replay" a particular individual's visit to its website, including every mouse move, click, and page loaded.

Plaintiff regularly uses the Boston Children's website to obtain information about Boston Children's doctors (including their credentials and backgrounds); search for information on

particular symptoms, conditions, and medical procedures, both for herself and her children; and obtain and review her children's medical records through the MyChildren's Patient Portal.

**STANDARD OF REVIEW**

Rule 12(b)(6) allows for dismissal of a complaint when the factual allegations contained within it do not suggest a plausible entitlement to relief. *Iannacchino v. Ford Motor Co.*, 451 Mass. 623, 635-636 (2008); *Fraelick v. PerkettPR, Inc.*, 83 Mass. App. Ct. 698, 699-700 (2013). In ruling on the motions, the court accepts the factual allegations as true and draws all reasonable inferences in the non-moving party's favor. *Fraelick*, 83 Mass. App. Ct. at 699-700.

**DISCUSSION**

The Massachusetts Wiretap Statute, G.L. c. 272, § 99(Q), provides a cause of action for "any aggrieved person whose oral or wire communications were intercepted, disclosed or used . . . or whose personal or property interests or privacy were violated by means of an interception," except as permitted or authorized by the Wiretap Statute. "Interception" is defined to mean "to secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire or oral communication through the use of any intercepting device by any person other than a person given prior authority by all parties to such communication." G.L. c. 272, § 99(B)(4).

Boston Children's argues that dismissal is required because the website interactions alleged were not "communications" under the statute, and because software code is not a qualifying "intercepting device." It further argues that internet tracking is not a secret, and that the Complaint fails to plead that the "contents" of a communication were intercepted where only hypothetical rather than actual website usage was alleged. None of the arguments are availing.

**1. Communications**

Boston Children's argues that because the Massachusetts Wiretap Statute was enacted in 1968, the Legislature only could have meant for it to prohibit the interception of communications consisting of human-to-human speech and/or conversation, not the modern website interactions at issue here. The claim is unsupported, both by the statute itself, and the relevant caselaw interpreting it.

To begin, the term "communication" is undefined in the statute. Its common dictionary definition, however, is not limited to human-to-human speech or conversation, but, as common sense would dictate, includes writing and signs. *See* Webster's College Dictionary 274 (1991) ("communication" defined, in part, as "the imparting or interchange of thoughts, opinions, or information by speech, writing, or signs").

An analysis of legislative intent likewise points to the inclusion of the website interactions here as communications under the statute. The preamble to the Massachusetts Wiretap Statute states that it was enacted "to curtail two 'grave dangers': (1) 'the increasing activities of organized crime' and (2) 'the uncontrolled development and unrestricted use of modern electronic surveillance devices,' which the Legislature termed a danger 'to the privacy of all citizens.'" *Commonwealth v. Ennis*, 439 Mass. 64, 68 (2003) (quoting G.L. c. 272, § 99(A)). Nothing in this stated intent or in the remaining statutory language limits its reach to human-to-human speech or conversation as Boston Children's argues. Indeed, the Supreme Judicial Court has established that the statute is to be interpreted broadly, and consistent with that principle, has applied it to electronic text messages, a technology that did not exist in 1968. *See*

*Commonwealth v. Moody*, 466 Mass. 196, 209 (2013).[2] Online searches for doctors and requests for appointment also did not exist in 1968, but, similar to texting, are the modern equivalent of telephone inquiries and conversations with doctors' offices that would have occurred then.[3] As such, they are protected under the statute.

2. **Intercepting Device**

Boston Children's next argues that the statutory term "intercepting device" does not encompass the Meta Pixel and Google Analytics software at issue. Again, the argument is unavailing. As relevant here, the Massachusetts Wiretap Statute broadly defines an "intercepting device" as "any device or apparatus which is capable of transmitting, receiving, amplifying, or recording a wire or oral communication." G.L. c. 272, § 99(B)(3). Nothing in this language limits intercepting devices to being physical, tangible objects; neither does the common dictionary definition of "device" so limit that term. See Webster's College Dictionary 370 (1991) ("device" defined as "a thing made for a particular purpose, esp. a mechanical, electric, or electronic invention or contrivance"). Moreover, where cell phone, tablet, and computer applications and programs, and their interfacing with the internet, all rely on software for their operation, its use is practically implicit in any modern electronic communication. Thus, to restrict software code from being considered an intercepting device as Boston Children's suggests would essentially nullify the statute's application.[4]

---

[2] The court is unpersuaded by Boston Children's citation to *Commonwealth v. Connolly*, 454 Mass. 808, 825 (2009), particularly in light of the above holding in *Moody*.

[3] Boston Children's argues that the website interactions alleged are more like old-fashioned library research than telephone calls with another party. While that might be true of a general internet search of a medical condition, the allegations here include other more targeted online inquiries, as discussed, and also involve a medical provider's website.

[4] For this reason, in the context of the Massachusetts Wiretap Statute, the court does not consider persuasive the more restricted Black's Law Dictionary definition of "device" that Boston Children's cites.

Because the software code at issue is alleged to have recorded and transmitted the contents of Plaintiff's communications with Boston Children's website and her personal information to third parties, the Complaint sufficiently alleges the use of an intercepting device. *See Alves v. BJ's Wholesale Club, Inc.*, 22-2509-BLS1, slip op. at 10 (Super. Ct. June 21, 2023) (citing *United States v. Hutchins*, 361 F. Supp. 3d 779, 795 (E.D. Wis. 2019)) ("The majority of courts to consider this issue have entertained the notion that software may be considered a device for the purposes of the [Federal] Wiretap Act"); *Rich v. Rich*, 2011 WL 3672059, at *6 (Mass. Super. 2011) (key logger software program deemed to be "intercepting device" under Massachusetts Wiretap Statute).[5]

3. **Secret Recording**

Boston Children's argues that Plaintiff consented to the disclosure of information when she visited the Boston Children's website because its Privacy Notice informs users that it gathers information "to enhance the useability of its website." For this reason, Boston Children's asserts that any interception was not secret, as required. *See* G.L. c. 272, § 99(B)(4). The relevant standard under the Massachusetts Wiretap Statute for showing an interception was not secret is "actual [or constructive] knowledge," which is proved through "'clear and unequivocal objective manifestations of knowledge' in the [users'] statements or conduct." *Commonwealth v. Morris*, 492 Mass. 498, 515 (2023) (Budd., J., concurring) (quoting *Commonwealth v. Jackson*, 370 Mass. 502, 507 (1976)). *See Curtatone v. Barstool Sports, Inc.*, 487 Mass. 655, 658 (2021) ("secret" recording under statute means that it is "concealed", and "kept hidden or unexplained" [dictionary citations omitted]).

---

[5] This conclusion is also consistent with the result reached in *Doe v. Partners Healthcare System, Inc.*, 1984CV01651-BLS1, endorsement denying motion to dismiss (Super. Ct. Dec. 7, 2020).

The Privacy Notice here does not prove, as a matter of law, the existence of Plaintiff's actual or constructive knowledge. First, the notice is not alleged to be a prominent disclaimer that requires acknowledgment before website use is allowed. Thus, it is doubtful Plaintiff or other users read it or knew about it before interacting with the Boston Children's website. Second, even if Plaintiff had read it, it likely would not have alerted her to the interceptions alleged. The Privacy Notice's express statement that: "We do not collect personally identifiable information about individuals, except when it is knowingly provided by such individuals (e.g. web forms)" conflicts with the actual interceptions alleged — i.e., that they went far beyond the contents of web form submissions. Likewise, transmitting essentially all website interactions to third parties for advertising purposes is arguably different from collecting some data to enhance website useability. In sum, the Complaint plausibly alleges that the interceptions occurred in secret, without users' knowledge, as they interacted with the Boston Children's website.[6]

**4. Hypothetical Allegations**

Boston Children's argues that the Complaint fails to allege that the "contents" of a communication were intercepted because none of Plaintiff's actual interactions with the website were specified or described. Rather, the site visits the Complaint describes are all hypothetical. The Massachusetts Wiretap Statute broadly defines the "contents" of a communication to include "any information concerning *the identity of the parties to such communication* or the existence, contents, substance, purport, or meaning of that communication." G.L. c. 272, § 99(B)(5)

[6] Boston Children's argument that Plaintiff consented to Facebook and Google monitoring through her accounts with those companies assumes facts that are not in the Complaint. Regardless, even assuming Plaintiff had so consented, fact issues nevertheless remain about Plaintiff's actual or constructive knowledge of that consent and the interceptions alleged.

(emphasis added). *See District Attorney for Plymouth Dist. v. New England Tel. & Tel. Co.*, 379 Mass. 586, 592 (1980).

The Complaint alleges that Plaintiff's children are Boston Children's patients, and that Plaintiff regularly uses the Boston Children's website, including to log into the patient portal. The Complaint also alleges that the Boston Children's website has embedded software code that intercepts users' website interactions and shares with third parties those users' identifying information, including IP addresses and unique browser configurations. Viewing the Complaint as a whole, the court accordingly may infer that during Plaintiff's regular visits to its website, Boston Children's shared her identifying information with third parties. Where the information shared is alleged to have been detailed enough that the third parties could identify a user for targeted advertising purposes, it falls within the meaning of "contents" under the statute. *See generally District Attorney for Plymouth Dist.*, 379 Mass. at 592 (telephone number considered "contents" under statute).[7] In other words, that the Complaint includes several hypothetical website visits to explain the technology and interceptions at issue does not detract from the allegation that Plaintiff herself regularly used the website, and accordingly was subjected to analogous interceptions.

For all of these reasons, Boston Children's motion to dismiss is **DENIED**.

[7] The federal cases Boston Children's cites are unpersuasive where the meaning of "contents" materially differs between the Federal Wiretap Statute and the Massachusetts Wiretap Statue. See 18 U.S.C.A. § 2510(8) (defining "contents" to only include "any information concerning the substance, purport, or meaning of that communication").

**ORDER**

For the foregoing reasons, Boston Children's motion to dismiss is **DENIED**.

Dated: September 14, 2023

Hélène Kazanjian
Justice of the Superior Court

# EXHIBIT 3

2023 WL 4456956 (Mass.Super.) (Trial Order)
Superior Court of Massachusetts.
Suffolk County

Joe ALVES [1], Plaintiff,
v.
BJ'S WHOLESALE CLUB, INC, Defendant.

No. 22-2509-BLS1.
June 21, 2023.

**Memorandum and Order on Motion to Dismiss**

Peter B. Krupp, Judge.

*1 Plaintiff Joe Alves brings this class action to challenge the alleged use by BJ's Wholesale Club, Inc. ("BJ's") of Session Replay Code ("SRC") to record visitors' activity on its website. Alves asserts that use of the code violates the Massachusetts Wiretap Statute, G.L. c. 272, § 99, and is an invasion of privacy actionable under G.L. c. 214, § 1B. BJ's moves to dismiss the Complaint for failure to state a claim. For the following reasons, the motion must be denied.

**BACKGROUND**

The following background (other than footnote 2) is taken from plaintiff's Class Action Complaint ("Complaint").

SRC is a JavaScript computer code that, when embedded on a website, enables website operators to record, save, and replay visitors' interactions with the website. SRC provides online marketers and website designers with insights into the user experience. Typically, the server receiving the data from the code is controlled by a third-party Session Replay Provider ("SRP"), rather than the owner of the website where the code is embedded. SRC goes well beyond normal website analytics. It allows the capture and recording of nearly every action a visitor takes while visiting a website, including mouse movements, clicks, scrolls, zooms, window resizes, keystrokes, text entry, and other forms of a user's navigation and interaction on the website. Recording this data permits SRPs to create a reenactment of a user's visit to the website in the form of a video. Typical analytic services that provide aggregate statistics do not do this.

SRC does not necessarily anonymize user sessions. Personally identifiable information typed by the website visitor and displays of user account information to a logged-in user can be captured by the code. SRPs often create "fingerprints" unique to a particular user's combination of computer and browser settings, screen configuration, and other detectable information. This fingerprint may be collected across all sites that the SRP monitors. If a user identifies themselves to one of these websites (e.g., by filling out an on-line form), the SRP can associate the fingerprint with the user's identity and back reference the user's other browsing activity. In addition to fingerprinting, SRPs also sometimes offer website owners cookie functionality that permits linking a session to an identified user. [2]

*2 BJ's operates brick and mortar stores and a website that sells grocery items, electronics, furniture, and other products. It has embedded SRC from various SRPs on its website. The SRC operates unbeknownst to the website's visitors, to track those visitors' "mouse movements, clicks, keystrokes (such as text being entered into an information field or text box), URLs of web

pages visited, and/or other electronic communications in real-time." [3] Defendant's SRPs create video replays of the behaviors of visitors to defendant's website and provides it to BJ's for analysis.

In late 2021 and early 2022, plaintiff visited defendant's website on his computer and cell phone to shop for tires. His activity was captured using the website's embedded SRC and sent to various SRPs.

## DISCUSSION

### I. The Rule 12(b)(6) Standard

On a motion under Mass. R. Civ. P. 12(b)(6), I must accept as true the factual allegations Dunn v. Genzyme Corp., 486 Mass. 713, 717 (2021). While the factual allegations in a complaint need not be detailed, they must set forth the basis for plaintiff's entitlement to relief with "more than labels and conclusions," Iannacchino v. Ford Motor Co., 451 Mass. 623, 636 (2008), quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007); and must "'be enough to raise a right to relief above the speculative level[,]' ... 'plausibly suggesting (not merely consistent with)' an entitlement to relief." Iannacchino, 451 Mass. at 636 (internal citations omitted), quoting Bell Atl., 550 U.S. at 555, 557. I address each count of the Complaint in turn.

### II. Massachusetts Wiretap Statute (Count I)

Count I asserts that defendant's use of SRC violates the Massachusetts Wiretap Statute, G.L. c. 272, § 99(Q), which provides a remedy for "[a]ny aggrieved person whose oral or wire communications were intercepted, disclosed or used ... or whose personal or property interests or privacy were violated by means of an interception," unless the interception was permitted under the Wiretap Statute. [4] See Commonwealth v. Ennis, 439 Mass. 64, 68 (2003) (Wiretap Statute "sought to curtail [ ] 'grave danger[ ]' of 'the uncontrolled development and unrestricted use of modern electronic surveillance devices,' which the Legislature termed a danger 'to the privacy of all citizens.'"), quoting G.L. c. 272, § 99(A). BJ's argues that plaintiff has failed plausibly to allege that its conduct concerned wire communications or amounted to an interception. [5] I disagree.

#### A. Wire Communication

The Wiretap Statute defines a "wire communication" as "any communication made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception." G.L. c. 272, § 99(B)(1). BJ's argues that plaintiff's Complaint does not implicate "wire communications" because the alleged Internet-based interactions (i) are not communications, and (ii) do not involve use of "a wire, cable, or other like connection." At this pleading stage, I am not persuaded this is correct.

*3 The Wiretap Statute does not define "communication" and no Massachusetts decision expounds on its meaning. Webster's Third New International Dictionary first defines "communication" as "the act or action of imparting or transmitting <the ~ of the common cold> <the ~ of power to the machine>." [6] Webster's Third New International Dictionary at 460 (2002). See Commonwealth v. Moody, 466 Mass. 196, 208-209 (2013) (because "record" not defined in Wiretap Statute, court looked to "common and approved usage," including Webster's Third New International Dictionary). Given this definition, the term as used in the Wiretap Statute may fairly be interpreted to encompass the website interactions captured by SRC. The mouse movements, clicks, keystrokes, and other browsing activity that SRC records plausibly constitute an exchange of information between the website's owner and the website user. See, e.g., Hammerling v. Google LLC, 615 F. Supp. 3d 1069, 1092 (N.D. Cal. 2022) ("Although there is some oddity in construing the collection of data related to app usage as involving 'communications,' it is at least plausible that it does."); Revitch v. New Moosejaw, LLC, No. 18-CV-06827-VC, 2019 WL 5485330 at *1 (N.D. Cal. Oct. 23, 2019) ("[A] customer who calls to inquire about a store's products undoubtedly communicates with the retailer. As

does an online patron. Revitch requested information from Moosejaw by clicking on items of interest; Moosejaw responded by supplying that information. This series of requests and responses - whether online or over the phone - is communication.").

Defendant's argument that an Internet-based interaction does not occur by using wire, cable, or another like connection, disregards plaintiff's allegations, see, e.g., Complaint ¶¶ 24 ("website delivers [SRC] to a user's browser"), 25 ("Events are typically accumulated and transmitted in blocks periodically throughout the user's website session"), 49 (SRC provides "instantaneous transmissions to the [SRP]"), 70, 76, and overlooks the fact that the mechanism for Internet interactions is the result of technology rooted in telephone infrastructure. Cf. United States v. Lyons, 740 F.3d 702, 716 (1st Cir. 2014) ("the internet is an 'instrumentalit[y] ... used or useful in the transmission of writings, signs, pictures, and sounds of all kinds by aid of wire, cable, or other like connection between the points of origin and reception of such transmission.'"), quoting 18 U.S.C. § 1081. Moreover, the Supreme Judicial Court has not narrowly construed the phrase "wire communication." See Moody, 466 Mass. at 208 (definition of "wire communication" in Wiretap Statute is "broad[ ]" and encompasses "non-oral electronic transmissions"). Thus, although there appears to be no Massachusetts authority directly on point, Internet-based interactions plausibly involve the use of cable or wire or, at the very least, a connection "like" cable or wire. [7] BJ's is not entitled to dismissal of Count I for failure plausibly to allege that the SRC affected a wire communication. [8]

## B. Interception

*4 In relevant part, under the Wiretap Statute, "'interception' means to secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire or oral communication through the use of any intercepting device by any person other than a person given prior authority by all parties to such communication." G.L. c. 272, § 99(B)(4) (emphasis added). BJ's contends that, even if plaintiff's interaction with its website constituted wire communications, plaintiff has failed to allege an "interception" because it has failed to allege (i) that the contents of any wire communication were recorded during his visits to its website, or (ii) that SRC is an intercepting device. These arguments are also unavailing.

### 1. Contents

The term "contents," as used in the definition of "interception," "means any information concerning the identity of the parties to [any wire or oral] communication or the existence, contents, substance, purport, or meaning of that communication." Id. at § 99(B)(5). Defendant argues that SRC does not capture "content," but simply records the actions of a website visitor. Given the breadth of the statutory definition, the Complaint plausibly suggests that keystrokes, clicks, mouse movements, URLs, and other data allegedly recorded by SRC constitute contents. See Commonwealth v. Mejia, 64 Mass. App. Ct. 238, 243 (2005) ("'Contents' ... is defined broadly"), quoting District Attorney for Plymouth Dist. v. New England Tel. & Tel. Co., 379 Mass. 586, 591-592 (1980).

The authorities that BJ's cites are not persuasive. To argue that its SRC did not record "contents," BJ's points to Commonwealth v. Hyde, 434 Mass. 594, 605 n. 11 (2001), and Commonwealth v. Camilli, 81 Mass. App. Ct. 1129, 2012 WL 1284387 at * 2 n.4 (Apr. 17, 2012) (Rule 1:28 decision). Both decisions held that silent video recordings did not implicate the Wiretap Statute because they did not intercept "oral communications" under the statute. Although BJ's argues that SRC is analogous to a surveillance camera that does not record audio, here we are dealing with "wire communications," which were not at issue in either case.

Defendant also cites several decisions from Florida and California that address whether SRC and other software violated Florida, California, and/or federal wiretap statutes. See, e.g., Jacome v. Spirit Airlines Inc., No. 2021-000947-CA-OI, 2021 WL 3087860 at * 4 (Fla. Cir. Ct. June 17, 2021) (no content intercepted under Florida statute); Brodsky v. Apple Inc., 445 F. Supp. 3d 110, 127 (N.D. Cal. 2020) (under federal and California statutes "user names, passwords, and geographic location information are not contents"). However, all three statutes define "contents" much more narrowly than G.L c. 272, § 99(B)(5), as any "information concerning the substance, purport, or meaning of [any wire, oral, or electronic] communication." 18 U.S.C. § 2510(8); Fla.

Stat. § 934.02(7); Brodsky, 445 F. Supp. 3d at 127 (Cal. Penal Code § 631(a) incorporates definition in 18 U.S.C. § 2510(8)). In contrast, the Massachusetts statute defines "contents" also to include "information concerning the identity of the parties" or "the existence ... of that communication."[9] Accordingly, the Florida and California cases have little persuasive value. See In re Zynga Privacy Litig., 750 F.3d 1098, 1106 (9th Cir. 2014) ("the term 'contents' under the federal wiretap statute refers to the communication's intended message and not record information regarding the characteristics of the message from the fact that the definition of contents was amended in 1986 to remove the phrase "identity of the parties to such communication").[10] Plaintiff has sufficiently alleged that the SRC on defendant's website recorded the "contents" of a wire communication under the Massachusetts Wiretap Statute.

**2. Intercepting Device**

*5 BJ's also argues that SRC is not an intercepting device. The Massachusetts Wiretap Statute defines an intercepting device, in relevant part, as:

> any device or apparatus which is capable of transmitting, receiving, amplifying, or recording a wire or oral communication ... other than any telephone or telegraph instrument, equipment, facility, or a component thereof, ... furnished to a subscriber or user by a communications common carrier in the ordinary course of its business under its tariff and being used by the subscriber or user in the ordinary course of its business ..."

G.L. c. 272, § 99(B)(3) (emphasis added). BJ's asserts that SRC is not a device or apparatus, or falls within the clause that begins "other than," which is referred to as the telephone equipment exception. Neither contention is availing.

In support of its first argument, defendant relies entirely on In re Facebook Internet Tracking Litig., a decision in which a federal district court in California dismissed a lawsuit alleging that Facebook violated the California wiretap statute by embedding cookies in plaintiffs' internet browsers. 140 F. Supp. 3d 922, 925, 937 (N.D. Cal. 2015). The court found the plaintiff's complaint failed to state a claim because it "only define[d] a cookie as a small text file containing a limited amount of information which sits idly on a user's computer until contacted by a server." Id. at 937. Because the facts here are different, the decision is inapposite. SRC is significantly different from the cookies at issue in that case; SRC allegedly captures an individual's data in a manner that is much more active and invasive. Several other decisions have suggested that SRC may be an intercepting device. See Rich v. Rich, No. BRCV200701538, 2011 WL 3672059 at *6 (Mass. Super. July 8, 2011) (McGuire, J.), quoting G.L. c. 272, § 99(B)(3) (key logger program was "an 'intercepting device' (at least when surreptitiously installed on a computer) because it 'is capable of... recording a wire ... communication"'); Makkinje v. Extra Space Storage, Inc., No. 8:21-CV-2234-WFJ-SPF, 2022 WL 80437 at *2 (M.D. Fla. Jan. 7, 2022) (software may constitute a device in wiretapping context); United States v. Hutchins, 361 F. Supp. 3d 779, 795 (E.D. Wis. 2019) ("The majority of courts to consider this issue have entertained the notion that software may be considered a device for the purposes of the [Federal] Wiretap Act.").

With regard to its second contention, BJ's cites Dillon v. Massachusetts Bay Transp. Auth., 49 Mass. App. Ct. 309 (2000), as suggesting the SRC that it deploys, which it obtained from third-party SRPs, falls under the telephone equipment exception, i.e. the equivalent of "telephone ... equipment ... furnished to a subscriber or user by a communications common carrier [i.e., a telephone company] in the ordinary course of its business." In Dillon, the court held that recording machines were covered by the exception even though they were furnished by non-telephone company sources. 49 Mass. App. Ct. at 314-316. In so ruling, it explained:

> We do not depart lightly from the express wording of a statute, but in the unusual circumstances appearing here ... a deviation is justified. The fact that there has been no amendment of the Massachusetts statute ... does not bar us from reading the exception so as to preserve it in its intrinsic intended scope and maintain its viability in the broad run of cases; the plaintiffs' proposal would in effect destroy the exception. Thus the decision below comports with the canons that interpretation should tend to preserve the substance of a statute rather than diminish it; should not override common sense; or produce absurd or unreasonable

results - in this case the absurdity of allowing the fortuity of the source of the equipment to entail serious material consequences.

*6 Id. at 315-316 (internal citations and footnote omitted). This analysis offers little guidance as to whether our appellate courts would depart even more dramatically from the language of G.L. c. 272, § 99(B)(3), and expand the exception to include software such as SRC, which has characteristics quite different from telephone equipment. Without such guidance, I decline to deviate so substantially from the statute's plain language. [11]

### III. Invasion of Privacy Claim

Plaintiff asserts that use of SRC is an invasion of privacy under G.L. c. 214, § 1B ("A person shall have a right against unreasonable, substantial or serious interference with his privacy. The superior court shall have jurisdiction in equity to enforce such right and in connection therewith to award damages."). A claim of violation of Section 1B may be either based on public disclosure of private facts or intrusion upon the plaintiff's solitude or seclusion, i.e., an infringement upon the right to be left alone. Polay v. McMahon, 468 Mass. 379, 382 (2014). In either case, the plaintiff must plausibly allege that the invasion was both unreasonable and substantial or serious. Id.

At the hearing, plaintiff clarified that his claim is based on an intrusion upon his solitude or seclusion, rather than the disclosure of private facts. See also Complaint ¶ 90. "Factors ... considered in assessing whether there has been an intrusion that is unreasonable, as well as substantial or serious, include the location of the intrusion, the means used, the frequency and duration of the intrusion, and the underlying purpose behind the intrusion." Polay, 468 Mass. at 383. The court must "balance the extent to which the defendant violated the plaintiff's privacy interests against any legitimate purpose the defendant may have had for the intrusion." Id. Typically, whether an intrusion is unreasonable, substantial, or serious is a fact question. Id. [12]

Plaintiff contends he has alleged an intrusion on his solitude or seclusion by alleging that each time he visited defendant's website on his smartphone or computer, the SRC secretly collected his personal data in real-time for defendant's monetary gain without his consent. I am somewhat skeptical that these allegations are sufficient to state a claim for invasion of privacy. Among other things, plaintiff has failed to allege clearly that BJ's was able to connect his identity to the data collected or that the data collected was particularly personal or sensitive. The Complaint merely alleges that plaintiff went to defendant's website to shop for tires, an activity unlikely to reveal information that is either particularly personal or of durational relevance. Cf. In re Facebook, Inc. Internet Tracking Litig., 956 F.3d 589, 604 n.7 (9th Cir. 2020) ("individuals have a reasonable expectation of privacy in collections of information that reveal familiar, political, professional, religious, and sexual associations") (internal quotes omitted), cert. denied, 141 S Ct. 1684 (2021); McLaughlin v. Meehan, No. 1681CV00866, 2018 WL 1041371 at *10 (Mass. Super. Jan. 19, 2018) (Tuttman, J.) (plaintiff stated claim where defendants searched his computer files, including email accounts, containing his "thoughts, ideas, and communications").

*7 Nevertheless, for three reasons I am hesitant at this early stage to conclude as a matter of law that the SRC on defendant's website did not cause the type of intrusion covered by the statute. First, the question of whether an intrusion transgresses the privacy statute is a fact question. Second, as suggested by some of the statistics cited in the Complaint, what constitutes acceptable data collection on the Internet appears to be evolving. See, e.g., Polay, 468 Mass. at 383 ("[T]he Legislature appears to have framed the statute in broad terms so that the courts can develop the law thereunder on a case-by-case basis, by balancing relevant factors ... and by considering prevailing societal values and the ability to enter orders which are practical and capable of reasonable enforcement."), quoting Schlesinger v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 409 Mass. 514, 519 (1991). Third, plaintiff's claim under the Wiretap Statute will proceed to discovery and the scope of discovery will not differ if plaintiff's claim under G.L. c. 214, § 1B remains. [13]

BJ's also argues with limited analysis that plaintiff may only look to the Wiretap Statute for relief because G.L. c. 272, § 99(Q), provides an exclusive civil remedy for those "whose personal or property interests or privacy were violated by means of an interception" and the invasion of privacy claim is based on the same facts. [14] In support, defendant cites two trial court decisions: Christensen v. Cox, No. SUCV201701635BLS1, 2017 WL 7053911 at * 7 (Mass. Super. Nov. 21, 2017) (Leibensperger, J.), and Tedeschi v. Reardon, 5 F. Supp. 2d 40, 46 (D. Mass. 1998) (Stearns, J.). In both cases, the trial court concluded that the Wiretap Statute is the exclusive remedy when conversations are illegally intercepted. Neither decision, however, offers much reasoning to support its conclusion. Christensen merely cites to Tedeschi and Tedeschi merely cites to G.L. c. 272, § 99(Q) and Charland v. Muzi Motors, Inc., 417 Mass. 580, 585-586 (1994), which held that G.L. c. 151B provides the exclusive remedy for employment discrimination not based on pre-existing tort law or constitutional protections. Charland was based, at least in part, on the existence of an exclusivity provision in G.L. c. 151B. 417 Mass. at 584-585. The Wiretap Statute does not have a comparable exclusivity provision. Thus, it is unclear whether the Legislature intended the two remedies to co-exist in the situation before me. While defendant's argument may ultimately have merit, without more comprehensive analysis from the parties, I am reluctant to decide the issue on a motion to dismiss for the same reasons discussed above - dismissal will not change the overall scope of the case. [15]

## ORDER

Defendant's Motion to Dismiss (Docket #12) is **DENIED.**

***8** Dated: June 21, 2023

.....................................................................................................................................................................

Peter B. Krupp

Justice of the Superior Court

## Footnotes

1 On behalf of himself and all others similarly situated.

2 A quick search on the Internet reveals the existence of a number of SRC providers and considerable information about the many uses of session replay software. See, e.g., "The definitive guide to session reply" (Mar. 25, 2023) ("Session replay capabilities elevate traditional web analytics tools by showing a complete picture of the user on a website or app."), available at https://www.fullstory.com/session-replay/; "Top 7 session replay tools for analyzing user behavior," (Feb. 28, 2023) ("A session replay, also known as a session recording, is a rendering of a user's journey through your website. Session replays show you what individual users saw and how they experienced your site during their visit-including their clicks, page scrolls, and mouse movements."), available at https://www.hotjar.com/blog/session-replay-tools/; Matsakis, L., "Over 400 of the World's Most Popular Websites Record Your Every Keystroke, Princeton Researchers Find," (Nov. 20, 2017) ("third-party scripts that run on many of the world's most popular websites track your every keystroke and then send that information to a third-party server"), available at https://www.vice.com/en/article/59yexk/princeton-study-session-replay-scripts-tracking-you. The Internet also reflects growing legal interest in litigation surrounding the use of SRC. See, e.g., Stegmaier, G, Quist, M., & Bart, A., "Lawsuits Accusing Online Session Replay of Criminal 'Wiretapping' Implicate Serious Constitutional Concerns," Washington Legal Foundation (Apr. 28, 2023), available at https://www.wlf.org/2023/04/28/ in the complaint and

draw "all reasonable inferences" from those allegations in favor of plaintiff. publishing/lawsuits-accusing-online-session-replay-of-criminal-wiretapping-implicate-serious-constitutional-concerns/; "Litigation Minute: Pennsylvania and Florida Emerge as Fertile Ground for Session Replay Litigation," The National Law Review (Apr. 18, 2023), available at https://www.natlawreview.com/article/litigation-minute-pennsylvania-and-florida-emerge-fertile-ground-session-replay; Bilus, A, Lipchitz, J. & Burdette, A., "Tips for Protecting Your Business from Wiretap Lawsuits Targeting Companies with Consumer-Facing Websites," American Bar Association (Feb. 22, 2023), available at https://www.americanbar.org/groups/litigation/committees/privacy-data-security/practice/2023/tips-protecting-business-wiretap-lawsuits/; Coyer, C., "Session Replay Software Again Faces Legal Challenges, But Likely Not for Long," Law.com (Sept. 16, 2022), available at https://www.law.com/legaltechnews/2022/09/16/session-replay-software-again-faces-legal-challenges-but-likely-not-for-long/. All links were last viewed June 21, 2023.

3 The SRC provided by Microsoft Corporation, one of BJ's SRPs, generates basic information about website user sessions, interactions, and engagement, and breaks down users by device type, country, and other criteria.

4 Plaintiff does not claim that defendant's SRC intercepted oral communications.

5 Although Section 99(Q) also prohibits use or disclosure of wire communications (not simply interception), plaintiff's claim primarily focuses on defendant's interception of his data. Defendant's argument likewise focuses on whether its purported use of SRC resulted in an interception. BJ's argues that plaintiff failed to plead use or disclosure with sufficient particularity, a position plaintiff contests. Because I conclude that plaintiff has plausibly alleged that an interception occurred, I need not address defendant's additional argument.

6 Accord State v. Ozuna, 184 Wash. 2d 238, 247 (2015) ("communication" is "the act or action of imparting or transmitting" or the "interchange of thoughts or opinions: a process by which meanings are exchanged between individuals through a common system of symbols (as language, signs, or gestures)"), quoting Webster's Third New International Dictionary 460 (2002); Regents of Univ. of Minnesota v. AGA Med. Corp., No. 07-CV-4732 PJS/LIB, 2011 WL 13943 at * 3 n.4 (D. Minn. Jan. 4, 2011); Rafferty v. NYNEX Corp., No. CIV.A.87-1521HHG/PJA, 1989 WL 38946 at * 1 (D.D.C. Apr. 4, 1989).

7 BJ's relies on Mastel v. Miniclip SA, 549 F. Supp. 3d 1129, 1134-1136 (E.D. Cal. 2021), which analyzed a claim brought under the first clause of Cal. Penal Code § 631(a). Unlike the Massachusetts Wiretap Statute, § 631 (a) applies only to the tapping of a "telegraph or telephone wire, line, cable, or instrument." (Emphasis added). Mastel, 549 F. Supp. 3d at 1134-1136. The case is inapposite in the context of the Massachusetts Wiretap Statute's broader language.

8 Citing to "the point of origin and the point of reception" language in the definition of "wire communication" and Ninth Circuit case law, BJ's also argues that plaintiff has not alleged an actionable wire communication because he admits that SRC intercepts contents only after it is received. See Konop v. Hawaiian Airlines, Inc., 302 F.3d 868, 876-879 (9th Cir. 2002) (for website to be "intercepted" in violation of the federal wiretap act it must be acquired during transmission, not while it is in electronic storage). Even assuming the Massachusetts Wiretap Statute contains a real-time interception requirement, I do not read the Complaint as making such an admission. See Complaint, ¶¶ 1, 24, 78. See also In re Pharmatrak, Inc., 329 F.3d 9, 21 (1st Cir. 2003) (declining to adopt or reject real time requirement, but stating "the storage-transit dichotomy adopted by earlier courts may be less than apt to address current problems").

9 The Massachusetts statute also circularly defines "contents" to include "any information concerning ... the ... contents ... of that [wire] communication." G.L. c. 272, § 99(B)(4).

10 Both Florida and California courts look to In re Zynga Privacy Litigation to determine if "contents" have been intercepted. See, e.g., Jacome, 2021 WL 3087860 at * 3; Brodsky, 445 F. Supp. 3d at 127.

11 BJ's contends that it used SRC in the ordinary course of business, a phrase which "translates as legitimate business purpose." Dillon, 49 Mass. App. Ct. at 319 (internal quotes omitted). Even assuming SRC could be considered telephone equipment, whether this is true would be a question of fact not properly resolved on a motion to dismiss. Cf Marquis v.

Google, Inc., No. 11-2808, 2012 WL 12929513 at * 4 (Mass. Super. Jan. 17, 2012) (Lauriat, J.) ("At this preliminary stage, the court cannot conclude as a matter of law that intercepting and scanning emails for purposes of 'interest-based advertising' is 'in the ordinary course of [Google's] business' under the Massachusetts wiretap statute.").

12 In Polay, the Court explained that "[m]ost of our jurisprudence under th[e] statute has involved public disclosure of private facts[.]" 468 Mass. at 382, citing Ayash v. Dana-Farber Cancer Inst., 443 Mass. 367, 382 n. 16, cert. denied sub nom Globe Newspaper Co., Inc. v. Ayash, 546 U.S. 927 (2005). In such cases, "[t]he statute, essentially, proscribes 'disclosure of facts about an individual that are of a highly personal or intimate nature when there exists no legitimate countervailing interest.'" Ayash, 443 Mass. at 383, quoting Bratt v. International Business Mach. Corp., 392 Mass. 508, 518 (1984).

13 BJ's also argues plaintiff's privacy claim fails because its interest in collecting plaintiff's data does not outweigh his privacy interest. This is a question of fact not appropriate for resolution on a motion to dismiss. See Polay, 468 Mass. at 384 ("Whether McMahon acted for the legitimate purpose ... that outweighs any incidental intrusion on the plaintiffs' privacy ... is ... a question of fact not suitable for resolution on a motion to dismiss.").

14 The Wiretap Statute was enacted in substantially its present form in 1968, before the enactment of G.L. c. 214, § 1B.

15 At the hearing, plaintiff suggested that his privacy claim was based not on an interception occasioned by the SRC but on BJ's "embedding" code on his browser. Even setting aside that this was not clearly pled in the Complaint or argued in plaintiff's opposition, such a claim would necessarily fail. It is difficult to understand how merely installing SRC, as opposed to (or without) its active use, results in any invasion of privacy. Cf Polay, 468 Mass. at 381-385 (plaintiff stated claim for invasion of privacy where plaintiff alleged defendant's cameras *recorded* plaintiffs' house).

End of Document

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 4

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN DOE, et al., Plaintiffs, v. META PLATFORMS, INC., et al., Defendants. | Case No. 22-cv-03580-WHO **ORDER ON MOTION TO DISMISS** |

United States District Court
Northern District of California

Plaintiffs challenge defendant Meta Platform, Inc.'s alleged use of proprietary computer code to obtain certain healthcare-related information of Facebook users: according to plaintiffs, the Meta Pixel allows Meta to intercept personally identifiable medical information and the content of patient communications from Facebook users, which Meta then monetizes for its own financial gain. Plaintiffs have brought several federal and state law claims, some of which they have plausibly alleged and others which need more specificity. As explained below, Meta's motion is GRANTED in part and DENIED in part.

**BACKGROUND**

Plaintiffs are five Facebook users who are proceeding anonymously due to the sensitive nature of this litigation. Consolidated Class Action Complaint ("CCAC," Dkt. 185) ¶¶ 24-28. They allege that Meta improperly acquires their confidential health information in violation of state and federal law and in contravention of Meta's own policies regarding use and collection of Facebook users' data. *Id.* ¶¶ 1–2, 5, 7.

Each of plaintiffs' healthcare providers—MedStar Health System, Rush University System for Health, WakeMed Health & Hospitals, Ohio State University Wexner Medical Center, and North Kansas City Hospital—allegedly installed the Meta Pixel on its patient portals. *See id.* ¶¶ 24-28. Plaintiffs claim that when they logged into their patient portal on their medical provider's

website, the Pixel transmitted information to Meta. *Id.* ¶¶ 6, 8-13, 22. They contend that this information, contemporaneously redirected to Meta, revealed their status as patients and was monetized by Meta for use in targeted advertising. *Id.* ¶¶ 9, 13.

Plaintiffs initially moved for a preliminary injunction. Dkt. No. 46. I denied that motion, finding that while plaintiffs presented sufficient evidence of a "weighty injury," the scope of their injury and technical feasibility of plaintiffs' proposed solutions were not clear and the balance of equities and public interest factors did not support injunctive relief based on the record at that juncture. Dkt. No. 159 ("PI Order").

In February 2023, Interim Class Counsel filed their Consolidated Class Action Complaint. Dkt. No. 185. In the CCAC, plaintiffs expand the scope of their suit and bring 13 claims: (1) breach of contract; (2) breach of the duty of good faith and fair dealing; (3) violation of the Electronic Communications Privacy Act ("ECPA" or "Wiretap Act"); (4) violation of the California Invasion of Privacy Act ("CIPA"); (5) intrusion upon seclusion; (6) California constitutional invasion of privacy; (7) negligence per se; (8) trespass to chattels; (9) violation of California's Unfair Competition Law ("UCL"); (10) violation of California's Consumer Legal Remedies Act ("CAFA"); (11) larceny; (12) violation of California's Comprehensive Computer Data Access and Fraud Act ("CDAFA"); and (13) unjust enrichment.

Defendant has moved to dismiss each of the claims asserted in the CCAC.[1]

United States District Court
Northern District of California

## LEGAL STANDARD

Under FRCP 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when the plaintiff pleads facts that "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). There must be "more than a sheer possibility that a defendant has acted unlawfully." *Id.* While courts do not

[1] In moving for a preliminary injunction, plaintiffs relied on their claims under the ECPA, CIPA, and California tort law. Dkt. No. 46.

require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 570.

In deciding whether the plaintiff has stated a claim upon which relief can be granted, the Court accepts the plaintiff's allegations as true and draws all reasonable inferences in favor of the plaintiff. *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). However, the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008). If the court dismisses the complaint, it "should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000). In making this determination, the court should consider factors such as "the presence or absence of undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party and futility of the proposed amendment." *Moore v. Kayport Package Express*, 885 F.2d 531, 538 (9th Cir. 1989).

## DISCUSSION

### I. ELECTRONIC COMMUNICATIONS PRIVACY ACT – CLAIM 3

"The Wiretap Act prohibits the unauthorized 'interception' of an 'electronic communication.'" *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 606–07 (9th Cir. 2020), cert. denied sub nom. *Facebook, Inc. v. Davis*, 141 S. Ct. 1684 (2021) (quoting 18 U.S.C. § 2511(1)(a)–(e)). To state this claim, plaintiffs must plausibly allege that Meta (1) intentionally (2) intercepted (3) the contents of (4) plaintiffs' electronic communications (5) using a device. *See In re Pharmatrak, Inc.*, 329 F.3d 9, 18 (1st Cir. 2003) (listing ECPA elements).

#### A. Intent

Addressing the intent and intercept elements of the ECPA claim in the PI Order, I wrote:

> "Intercept" is defined under the Wiretap Act as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4). Although the statute does not define "acquisition," the Ninth Circuit has construed the term according to its ordinary meaning as the "act of acquiring, or coming into possession of [.]" *United States v. Smith*, 155 F.3d 1051, 1055



United States District Court
Northern District of California

> n.7 (9th Cir. 1998). "Such acquisition occurs when the contents of a wire communication are captured or redirected in any way." *Noel v. Hall*, 568 F.3d 743, 749 (9th Cir. 2009) (internal citation and quotation marks omitted).
>
> According to plaintiffs, the Pixel is "designed for the very purpose of intercepting communications on third-party websites by surreptitiously and contemporaneously redirecting these communications to Meta." Mot. at 11 (citing Smith Decl. ¶¶ 7–14). Plaintiffs have put forward evidence that Meta receives information through the Pixel. *See, e.g.*, Smith Decl. ¶¶ 4–5, 32–33. Meta does not dispute that the intentional or interception elements are met. See Opp. at 20–21. Plaintiffs appear likely to succeed on these two elements of their claim.

PI Order at 18.

Meta points out that it did not dispute the intent element at the preliminary injunction stage. It disputes it now, arguing that plaintiffs have failed to plausibly allege that Meta intentionally – meaning "purposefully and deliberately and not as a result of accident or mistake," *United States v. Christensen*, 828 F.3d 763, 790 (9th Cir. 2015) – intended to intercept their sensitive health information. It asserts that plaintiffs cannot meet this burden because the CCAC acknowledges that third-party web developers, not Meta, choose whether to install Pixel and also set parameters on what information to send to Meta. It also argues that intent cannot be alleged because, as plaintiffs acknowledge, Meta seeks to avoid receiving sensitive information by contractually forbidding developers from sending it and filtering out any potentially sensitive data it detects on the back end. Mot at 5-6 (citing CCAC ¶¶ 39, 44-46 (Pixel is customizable per instructions provided by Meta), 118, 125, 148-149 (Meta has systems in place to filter sensitive information and, has publicly stated it does not want sensitive health information)).

While plaintiffs acknowledge that Meta may tell third parties and Facebook users that it intends to prevent receipt of sensitive health information, plaintiffs contend that is not what Meta *really* intends. *See, e.g.*, CCAC ¶¶ 122-123, 144-146, 150, 161 (plaintiffs allege Meta's tools and filters are not effective, not fully implemented, and call into question Meta's true intent). What Meta's true intent is, what steps it actually took to prevent receipt of health information, the efficacy of its filtering tools, and the technological feasibility of implementing other measures to prevent the transfer of health information, all turn on disputed questions of fact that need development on a full evidentiary record. *See, e.g.*, *Lopez v. Apple, Inc.*, 519 F. Supp. 3d 672, 684

United States District Court
Northern District of California

(N.D. Cal. 2021) ("At the pleading stage, however, interception may be considered intentional 'where a defendant is aware of the defect causing the interception but takes no remedial action.'") (quoting *In re Google Assistant Priv. Litig.*, 457 F. Supp. 3d 797, 815 (N.D. Cal. 2020)). At this stage, intent has been adequately alleged.

**B. Content**

Meta also argues that plaintiffs have not and cannot plausibly plead interception of covered "content." The statute broadly defines "content" to include "any information concerning the substance, purport, or meaning of [a] communication." 18 U.S.C. § 2510(8). "Contents" refers to the "intended message conveyed by the communication"—it does not include record information regarding the characteristics of the message that is generated in the course of the communication. *See In re Zynga Priv. Litig.*, 750 F.3d 1098, 1106 (9th Cir. 2014). For instance, contact information provided as part of a sign-up process constitutes "content" because this information is the subject of the communication. *Id.* at 1107 ("Because the users had communicated with the website by entering their personal medical information into a form provided by the website, the First Circuit correctly concluded that the defendant was disclosing the contents of a communication."). And while a URL that includes "basic identification and address information" is not "content," a URL disclosing a "search term or similar communication made by the user" "could constitute a communication" under the statute. *Id.* at 1108–09.

In the PI Order, I found that plaintiffs had made a strong showing on this element:

> In my view, the log-in buttons and the kinds of descriptive URLs identified in the Smith Decl. are "contents" within the meaning of the statute. Unlike in *Zynga*, the URLs at issue here would not merely reveal the name of a Facebook user or group—as Smith explained, the transmitted URLs include both the "path" and the "query string." Smith Decl. ¶¶ 50–51; see also id. ¶ 189 (showing hardfordhospital.org/services/digestive-health/conditions-we-treat/colorectal-small-bowel-disorders/ulcerative-colitis URL).
>
> These items are content because they concern the substance of a communication. *See Zynga*, 750 F.3d at 1107; *In re Google Inc. Cookie Placement Consumer Priv. Litig.*, 806 F.3d 125, 137 (3d Cir. 2015) ("If an address, phone number, or URL is . . . part of the substantive information conveyed to the recipient, then by definition it is 'content.'"); *see also In re Google RTB Consumer Priv. Litig.*, No. 21-cv-2155-YGR, 2022 WL 2165489, at *10 (N.D. Cal. June 13, 2022) (finding that categories of the website, categories that describe the current section of the website, and referrer URL that caused



United States District Court
Northern District of California

navigation to the current page constituted "content").

PI Order at 19. Meta acknowledges this prior conclusion, but argues that unspecified "remaining items" that are transferred "mostly" do not qualify as content and claims based on "those communications" should be dismissed. Mot. at 9-10; Reply at 4.

At this juncture, plaintiffs have adequately alleged covered content is transferred. The boundaries of what transferred information is content under the Act is better determined on a full evidentiary record.

### C. Consent

Finally, Meta argues that the ECPA's one-party consent exemption (exempting liability for intercepted information resulting from one party's consent) bars the claim as a matter of law. Meta points out, again, that it is the third-party web developers who make their Pixel-enhanced websites available to plaintiffs and their other healthcare customers, and by doing so those healthcare entities have necessarily consented to the transmission of data to Meta.

In the PI Order, I explained:

> [T]he Wiretap Act exempts liability in certain circumstances. The statute provides that:
>
> > It shall not be unlawful under this chapter for a person not acting under color of law to intercept a wire, oral, or electronic communication where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception unless such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State.
>
> 18 U.S.C. § 2511(2)(d). In other words, the Wiretap Act allows interception where the interception is made by a "party" to the communication or where a "party" has consented to the interception. *Id.* This exception does not apply, however, where the interceptor acts "for the purpose of" committing any crime or tort in violation of state or federal law. *Id.*

PI Order at 20.[2]

[2] In the PI Order, I "put aside" the issue of consent and considered whether the "crime or tort" "exception to the exception" applied. I concluded there was a "not-insignificant chance, then, that plaintiffs may be able to show that the crime-tort exception applies," but "in light of the authority in this district finding that liability does not lie where a defendant's primary motivator was to make money, I am not convinced that plaintiffs have met their burden to show that the law and facts 'clearly favor' their position." *Id.* at 20-22. However, I noted "this claim will present

On this motion to dismiss, the issue of consent is front and center and the burden of proof to show this exemption applies is on Meta. *See In re Google RTB Consumer Priv. Litig.*, 606 F. Supp. 3d 935, 949 (N.D. Cal. 2022). In support of dismissal, Meta relies on *Katz-Lacabe v. Oracle Am., Inc.*, No. 22-CV-04792-RS, 2023 WL 2838118, at *10 (N.D. Cal. Apr. 6, 2023). There, plaintiffs challenged Oracle's collection of "personal information from internet users" by "synchroniz[ing] that data to create individual profiles, and ultimately sell[ing] that data—bolstered by data made available by its partners—on its Data Marketplace." The court dismissed the ECPA claim because, "[a]s Defendant's customers must have chosen to deploy Oracle's tools on their websites, it necessarily follows that 'one of the parties to the communication'—the websites themselves—gave 'prior consent to such interception.'" *Id.* at *210 (relying on *Rodriguez v. Google LLC*, No. 20-cv-04688-RS, 2021 WL 2026726, at *6 (N.D. Cal. May 21, 2021).

Plaintiffs counter with *Brown v. Google LLC*, No. 4:20-CV-3664-YGR, 2023 WL 5029899, at *9 (N.D. Cal. Aug. 7, 2023). There, the court rejected summary judgment on the consent issue under the ECPA claim, despite the defendant having "generally disclosed" its data tracking practices, because it also "promote[d] the privacy afforded by Incognito" as a browsing mode. *Id.* In that situation, Google "itself created a situation where there is a dispute as to whether users' consent of Google's data collection generally is 'substantially the same' as their consent to the collection of their private browsing data in particular." *Id.*

The facts alleged here – that while Meta disclosed its purported attempts to prevent third-party developers who incorporated the Pixel from sending sensitive data to Meta, Meta in fact intended to receive and did receive that sensitive data – bring this case closer to *Brown*. *Id.*, 2023 WL 5029899 *7 ("For consent to be actual, the disclosures must 'explicitly notify' users of the practice at issue."). Meta has not pointed to anything I can judicially notice on this motion to dismiss to show as a matter of law that the healthcare providers did not just presumably but

---

differently in a motion to dismiss context," and recognized that the "parties will have the opportunity to refine their arguments regarding Meta's purpose in intercepting the information at issue here later in the litigation." PI Order at 20-22.

*actually* consented to the sending of sensitive healthcare information of its customers. Determination of whether actual consent was given depends on what Meta disclosed to healthcare providers, how it described and trained healthcare providers on the Pixel, and how the healthcare providers understood the Pixel worked and the information that then could or would be collected by Meta. These evidence-bound determinations are inappropriate to reach on this motion.

Meta's motion to dismiss the ECPA claim is DENIED.

## II. CALIFORNIA INVASION OF PRIVACY ACT – CLAIM 4

In the PI Order, I concluded that plaintiffs had adequately alleged and supported their CIPA claim under both sections 631(a) and 632, based on Meta's challenges to "content" under 631(a) and "confidential communications" under 632. PI Order at 23-24. Meta now moves to dismiss the California state law analog to the ECPA, raising arguments not addressed in my PI Order.

### A. Extraterritoriality

Meta initially argues that CIPA does not apply "extraterritorially," because CIPA's intent is "to protect the right of privacy of the people of this state." Cal. Penal Code § 630. As none of the named plaintiffs are California residents, Meta contends the CIPA claim must be dismissed.

I disagree for three reasons. First, this contention is arguably premature. *Kellman v. Spokeo, Inc.*, 599 F. Supp. 3d 877, 894 (N.D. Cal. 2022), *motion to certify appeal denied*, No. 3:21-CV-08976-WHO, 2022 WL 2965399 (N.D. Cal. July 8, 2022) (deferring choice of law analyses until class certification, after discovery shed light on whether defendants' acts had a substantial nexus to California).

Second, plaintiffs have plausibly alleged that the conduct at issue, in terms of the design and marketing of the Pixel technology and development and implementation of its Terms of Service, occurred in California;. *See, e.g., Schmitt v. SN Servicing Corp.*, No. 21-CV-03355-WHO, 2021 WL 3493754, at *3 (N.D. Cal. Aug. 9, 2021) (data breach allegations regarding defendant who operated out of California "sufficient to allow out-of-state plaintiffs to seek recovery under California law"); *Valentine v. NebuAd, Inc.*, 804 F. Supp. 2d 1022, 1028 (N.D. Cal. 2011) ("A legislative purpose that articulates an interest in protecting those within California



United States District Court
Northern District of California

is not inconsistent with also allowing non-Californians to pursue claims against California residents."); *see also Oman v. Delta Air Lines, Inc.*, 889 F.3d 1075, 1079 (9th Cir. 2018), *certified question accepted sub nom. Oman v. Delta Air Lines*, No. S248726, 2018 WL 10809386 (Cal. July 11, 2018), *and certified question answered*, 9 Cal. 5th 762 (2020) ("If the conduct that 'creates liability' occurs in California, California law properly governs that conduct.").

Third, Facebook's Terms of Service specify that California law applies to disputes between Facebook and its users. CCAC ¶ 292. That alone may not be dispositive, but it supports allowing these non-resident plaintiffs to assert a claim against a California resident under CIPA. *See Maldonado v. Apple, Inc*, No. 3:16-CV-04067-WHO, 2021 WL 1947512, at *6 (N.D. Cal. May 14, 2021) ("California Supreme Court held that choice-of-law clauses in contracts are generally enforceable and laid out a multipart test to determine whether to follow the contracted-for jurisdiction's law or disregard it.").

I am not determining or foreclosing any choice-of-law issues. Choice-of-law has not been squarely raised. I am denying the motion to dismiss the CIPA claim based on Meta's exterritoriality argument.

### B. Intent

Meta also argues plaintiffs fail to allege plausible facts to support the intent element of CIPA, which requires a showing of Meta's "affirmative desire" to intercept communications. Intent under CIPA is determined consistently with intent under ECPA, and for the same reasons as discussed above, intent has been adequately alleged. Whether Meta's affirmative disclosures and back-end filtering process sufficiently negate intent depends on Meta's knowledge as well as its implementation and the efficacy of its alleged contractual efforts and back-end filtering. Those will be tested on an evidentiary record. Similarly, Meta's point that Pixel captures some data that healthcare entities may permissibly share with Meta might provide a defense to some portion of plaintiffs' CIPA claim, but it does not negate the plausible allegations that sensitive healthcare information is intentionally captured and transmitted to Meta.

### C. Sent or Received

Meta points out that CIPA only covers interception of a communication while "it is being

United States District Court
Northern District of California

sent from, or received at any place within this state," Cal. Penal Code § 631(a), and argues plaintiffs have not plausibly alleged that plaintiffs' information was being sent to or received from a place in this state. Plaintiffs plead that Meta is headquartered in California and Meta "designed and *effectuated* its scheme to track the patient communications at issue here from California." CCAC ¶ 369 (emphasis added). That is sufficient at this stage.

**D. Device**

The last CIPA challenge is whether the Pixel is a "device" under Section 632(a) because it is a piece of software. Meta points out that two judges in this District, when considering "electronic tracking devices" under Penal Code section 637.7(d), have rejected the argument that tracking software are "devices." *See In re Google Location Hist. Litig.*, 428 F. Supp. 3d 185, 193 (N.D. Cal. 2019) (Davila, E.) (Google maps software and related "services are not a 'device' within the meaning of Section 637.7(d)."); *In Moreno v. San Francisco Bay Area Rapid Transit Dist.*, 2017 WL 6387764, at *5 (N.D. Cal. Dec. 14, 2017) (Corley, J.) (an "electronic tracking device" does not include "software installed in mobile devices").

Plaintiffs respond that the section 637.7 cases so not apply to this section 632(a) case. They instead discuss decisions construing and interpreting CIPA consistently with the ECPA which hold that servers or software qualify as "devices" under the ECPA. Oppo. at 10 n.2.[3] Most on point is *In re Carrier IQ, Inc.*, 78 F. Supp. 3d 1051, 1084 (N.D. Cal. 2015). There, plaintiffs alleged that a software application, once installed on users' phones, "surreptitiously intercepted personal data and communications and transmitted this data to Carrier IQ and its customers." *Id.* The Honorable Edward M. Chen held that "plaintiffs have sufficiently alleged that the Carrier IQ Software is a 'device' for purposes of the Wiretap Act." *Id.* at 1084. The section 637.7 cases are

[3] A few of the cases plaintiffs rely on are not truly in support. For example, in *United States v. Szymuszkiewicz*, 622 F.3d 701, 707 (7th Cir. 2010), as amended (Nov. 29, 2010), the court held that the defendant "acquired the emails by using at least three devices: Infusino's computer (where the rule was set up), the Kansas City server (where the rule caused each message to be duplicated and sent his way), and his own computer (where the messages were received, read, and sometimes stored)." In *Lopez v. Apple, Inc.*, 519 F. Supp. 3d 672, 690 (N.D. Cal. 2021), the court simply found that "Apple used the devices [iPhone] by programming Siri software to intercept communications when no hot word was spoken"). In both cases, devices were used. Here the use allegations concern only software.



United States District Court
Northern District of California

United States District Court
Northern District of California

distinguishable, and absent contrary authority under section 632(a), I agree that the Pixel software is a device under section 632(a).

Meta's motion to dismiss the CIPA claim is DENIED.

## III. CONSTITUTIONAL PRIVACY (CLAIM 6) AND INTRUSION ON SECLUSION (CLAIM 5)

Addressing the invasion of privacy and intrusion on seclusion claim in the PI Order, I explained that plaintiffs had shown enough to demonstrate a reasonable expectation of privacy in their medical communications (despite Meta's policies generally disclosing its collection of data from users and its disclosures that it would require partners to obtain lawful rights to share protected user data) and that Meta's conduct was highly offensive. PI Order at 24-27. Meta argues here that the California's constitutional privacy protections do not apply extraterritorially and plaintiffs have failed to adequately allege their sensitive information was received by Meta.

As with CIPA, plaintiffs have plausibly alleged that the conduct causing them harm occurred in and emanated from California. That is sufficient at this juncture.

Concerning the protected interest, Meta argues that plaintiffs have failed to plausibly allege a violation of their constitutionally protected privacy interests because the named plaintiffs fail to identify with specificity what, if any, private or particularly sensitive information about them Meta allegedly received. Meta is correct that these named plaintiffs do not identify in the CCAC what specific, personal or private information they conveyed to their healthcare providers that they reasonably believe Meta received.

In opposition, plaintiffs do not dispute this or identify any particular categories of information that they shared with their healthcare providers that they reasonably believe was captured by Meta. Instead, they rely on *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589 (9th Cir. 2020) to argue they do not need to disclose the specific information they contend Meta received. But in that case, there was no dispute that Facebook collected "a full-string detailed URL, which contains the name of a website, folder and sub-folders on the web-server, and the name of the precise file requested," when it operated. *Id.* at 605. Here, as Meta repeatedly points out and plaintiffs admit, there is information collected by the Pixel software that does not

United States District Court
Northern District of California

constitute sensitive, personal information.

Given the nature of this case – where plaintiffs allege that both unprotected and constitutionally protected information was captured by Meta's Pixel – plaintiffs are required to amend to describe the types or categories of sensitive health information that they provided through their devices to their healthcare providers. That basic amendment (which can be general enough to protect plaintiffs' specific privacy interests) will allow these privacy claims to go forward.[4]

Plaintiffs' invasion of privacy claims are DISMISSED with leave to amend.

## IV. CALIFORNIA'S COMPREHENSIVE COMPUTER DATA ACCESS AND FRAUD ACT – CLAIM 12

CDAFA provides that only an individual who has "suffer[ed] damage or loss by reason of a violation" of the statute may bring a civil action "for compensatory damages and injunctive relief or other equitable relief." Cal. Penal Code § 502(e)(1). CDAFA permits recovery of "[c]ompensatory damages [that] include any expenditure reasonably and necessarily incurred by the owner or lessee to verify that a computer system, computer network, computer program, or data was or was not altered, damaged, or deleted by the access." *Id.*

### A. Loss or Damage

Meta initially seeks dismissal of plaintiffs' CDAFA claim because plaintiffs have not alleged and cannot allege "damage or loss" in an action like this that is based on privacy violations as opposed to an intrusion that impacts the performance or operation of computer devices. Meta relies on a recent decision from Chief Magistrate Judge Donna M. Ryu, *Cottle v. Plaid Inc.*, 536 F. Supp. 3d 461 (N.D. Cal. 2021), where Judge Ryu rejected a theory of loss or damage under CDAFA based on the "loss of the right to control their own data, the loss of the value of their data,

[4] Related to the "legally protected interest" argument, Meta also contends that the privacy claims fail because plaintiffs have not alleged a "sufficiently serious" invasion of their privacy rights. Once plaintiffs amend to identify the types of protected information they shared with their healthcare providers and was likely captured by Meta, they will have plausibly alleged a sufficiently serious impact on their privacy rights. *See* PI Order at 26-27. Meta's remaining arguments, that its filtering efforts and purported use of any received healthcare information are highly relevant to whether its conduct is "highly offensive," have merit. Mot. at 14-15. But the balancing of the various factors required by *Hill v. Nat'l Collegiate Athletic Assn.*, 7 Cal. 4th 1, 37 (1994), must be done on a full evidentiary record.

and the loss of the right to protection of the data," as that type of loss was not covered by the statute. *Id.* at 488 (citing *Nowak v. Xapo, Inc.*, No. 5:20-cv-03643-BLF, 2020 WL 6822888, at *4-5 (N.D. Cal. Nov. 20, 2020) (dismissing CDAFA claim based on loss of value of stolen cryptocurrency in part because the nature of the loss was not cognizable under CDAFA)).

Plaintiffs respond that they adequately allege actionable "loss or damage" under CDAFA by alleging: (1) the Pixel "has precluded" them from being able to communicate with their healthcare providers through their computers or otherwise and (2) their protected information is diminished in value. Plaintiffs cite a number of cases from this District that they claim support these types of damages under CDAFA. However, each of the cases plaintiffs rely on dealt with different sections of CDAFA or allegations of impaired device performance. Oppo. at 13.[5]

Plaintiffs provide no support for their argument that an "inability" to use their computer devices to communicate with their healthcare providers in the future is a cognizable form of loss or damage actionable under the CDAFA. Their diminished value of information claim is foreclosed by the reasoning in *Cottle.*

Plaintiffs indicated at the hearing that they might be able to plead a different theory of impairment of their computing devices. They may do so. The CDAFA claim is DISMISSED, with leave to amend.

### B. Other CDAFA Elements

Meta also attacks the substance of the CDAFA claim. The CCAC relies on various substantive sections of CDAFA: sections 502(c)(1), (c)(2), (c)(3), (c)(6), (c)(7), and (c)(8). In opposition plaintiffs address only (1) and (8).[6] In their further amended CCAC, plaintiffs shall

---

[5] *See In re Apple Inc. Device Performance Litig.*, 347 F. Supp. 3d 434, 454 (N.D. Cal. 2018), on reconsideration in part, 386 F. Supp. 3d 1155 (N.D. Cal. 2019) (addressing (c)(4) and (c)(5) and allegations of device impairment); *Ubisoft, Inc. v. Kruk*, No. CV 20-478-DMG (ASX), 2021 WL 3472833, at *4 (C.D. Cal. July 9, 2021) ((c)(5) claim alleging DDoS attacks); In re Carrier IQ, Inc., 78 F. Supp. 3d 1051, 1067 (N.D. Cal. 2015) (alleging impact on battery life and performance); *see also In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 599 (9th Cir. 2020) (finding Article III standing to allege CDAFA claim, but not addressing standing under the "loss or damage" requirement of the statute).

[6] These provisions hold persons liable for "(1) Knowingly accesses and without permission alters, damages, deletes, destroys, or otherwise uses any data, computer, computer system, or computer network in order to either (A) devise or execute any scheme or artifice to defraud, deceive, or



United States District Court
Northern District of California

limit the CDAFA claim to these two subsections only.

Meta argues that plaintiffs have not alleged a claim under (1) because intent has not been sufficiently alleged. Consistent with the ECPA and CIPA discussions above, however, plaintiffs have adequately alleged intent. Meta next contends that plaintiffs cannot plausibly allege a claim under (8), as it was the healthcare entities' web developers who introduced Pixel onto their own websites, not Meta. Plaintiffs' allegations regarding how Meta induced or encouraged those entities to adopt and install the Pixel suffice at this juncture.

Meta also asserts that even if it could be vicariously liable, plaintiffs have not alleged and cannot plausibly allege that the Pixel is a prohibited "contaminant."[7] In *In re iPhone Application Litig.*, No. 11-MD-02250-LHK, 2011 WL 4403963 (N.D. Cal. Sept. 20, 2011) the court explained:

> Section 502(c)(1[2]) defines "computer contaminant" as "any set of computer instructions that are designed to modify, damage, destroy, record, or transmit information within a computer, computer system, or computer network without the intent or permission of the owner of the information. They include, but are not limited to, a group of computer instructions commonly called viruses or worms. . . to contaminate other computer programs or computer data, consume computer resources, modify, destroy, record, or transmit data, or in some other fashion usurp the normal operation of the computer, computer system, or computer network." *See* Cal.Penal Code § 502(b)(10) (emphasis added). Thus, the very definition of a "computer contaminant" limits liability to conduct that occurs "without the intent or permission of the owner of the information." Moreover, the section on "computer contaminants" appears to be aimed at "viruses or worms," and other malware that usurps the normal operation of the computer or computer system. Although Plaintiffs[] are given leave to amend to clarify their allegations in an amended complaint, it is not clear to the Court how Section 502(c)(8) applies to the case at hand."

Id. at *13.

United States District Court
Northern District of California

---

extort, or (B) wrongfully control or obtain money, property, or data" and (8) "Knowingly introduces any computer contaminant into any computer, computer system, or computer network." Cal. Penal Code § 502(c).

[7] Cal. Penal Code § 502(12) "'Computer contaminant' means any set of computer instructions that are designed to modify, damage, destroy, record, or transmit information within a computer, computer system, or computer network without the intent or permission of the owner of the information. They include, but are not limited to, a group of computer instructions commonly called viruses or worms, that are self-replicating or self-propagating and are designed to contaminate other computer programs or computer data, consume computer resources, modify, destroy, record, or transmit data, or in some other fashion usurp the normal operation of the computer, computer system, or computer network."

Whether plaintiffs can, on amendment, plausibly allege facts establishing recognized "loss or damage" sufficient to state a claim under CDAFA will also inform whether the Pixel is a contaminant that "usurps" the normal operation of plaintiffs' devices. *See also Flextronics Int'l, Ltd. v. Parametric Tech. Corp.*, No. 5:13-CV-00034-PSG, 2014 WL 2213910, at *5 (N.D. Cal. May 28, 2014) ("a plaintiff need only allege that the actions of the contaminant (modify/damage/destroy/record/ transmit) were undertaken by overcoming a technical barrier without the permission of the owner; the introduction of the contaminant to the system need not surmount the same hurdle.").

The motion to dismiss the CDAFA claim is GRANTED with leave to amend.

## V. BREACH OF CONTRACT – CLAIMS 1 & 2

### A. Limitation of Liability in Meta's Terms of Service

Meta argues initially that a "limitation of liability" clause in its TOS bars the breach of contract claims. That clause provides: "[Meta]'s liability shall be limited to the fullest extent permitted by applicable law, and under no circumstance will we be liable to you for any lost profits, revenues, information, or data, or consequential, special, indirect, exemplary, punitive, or incidental damages arising out of or related to these Terms or the Meta Products." Meta RJN Ex. 1 at 7.[8]

Meta notes that at least one court in this District has applied Meta's limitation provision to defeat express and implied contract claims, rejecting the argument that the limitation provision was unconscionable. *See Bass v. Facebook, Inc.*, 394 F. Supp. 3d 1024, 1037 (N.D. Cal. 2019) ("Perhaps regrettably, '[w]ith respect to claims for breach of contract, limitation of liability clauses are enforceable unless they are unconscionable, that is, the improper result of unequal bargaining power or contrary to public policy.' *Food Safety Net Servs. v. Eco Safe Sys. USA, Inc.*, 209 Cal. App. 4th 1118, 1126, 147 Cal.Rptr.3d 634 (2012)."). The *Bass* court then determined that the limitations provision was not unconscionable as applied to the contract and quasi-contract

[8] Meta seeks judicial notice of various documents, including its TOS, Business Tools Terms, Commercial Terms, Privacy Policy and Cookies Policy. *See* Dkt. No. 232-1. Plaintiffs do not oppose the request. The request is GRANTED.

causes of action. *Id.* at 1038; *see also Darnaa, LLC v. Google LLC*, 756 F. App'x 674, 676–77 (9th Cir. 2018) (rejecting unconscionability argument, "[a]s interpreted by California courts, Section 1668 generally does not prohibit parties from limiting liability for breach of contract, including breach of the implied covenant. [citations omitted]. We see no reason to depart from this principle here.").

Plaintiffs respond that Meta's attempt to limit its liability for the breach claim runs afoul of California Civil Code section 1668. It provides: "All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law." Here, because defendants acted intentionally by refusing to stop the data transfer or employ a stronger filter mechanism, plaintiffs assert that section 1668 comes into play even for a breach of contract claim. On that basis, they distinguish *Bass* from this case as *Bass* concerned a negligent data breach case caused by an obscure flaw in Meta's code and Meta took immediate action to fix it.

In addition to the substantive differences between the allegations in *Bass* and this case, plaintiffs also note that other courts in this district have allowed breach of contract claims to continue against Facebook despite the limitation of liability clause. *See, e.g., Lundy v. Facebook Inc.*, No. 18-CV-06793-JD, 2021 WL 4503071, at *2 (N.D. Cal. Sept. 30, 2021) ("For the damages element of plaintiffs' contract and quasi-contract claims, plaintiffs have adequately pleaded claims for disgorgement and nominal damages. [] These types of damages are not covered by the limitation of liability provision Facebook points to in its motion to dismiss. [] Nominal damages may be recovered for a breach of contract under California law." (internal citations omitted)); *Shared.com v. Meta Platforms, Inc.*, No. 22-CV-02366-RS, 2022 WL 4372349, at *4 (N.D. Cal. Sept. 21, 2022) (allowing breach of contract and other claims to proceed past motion to dismiss stage despite limitation of liability clause because the "discovery process would aid in determining more concretely whether each claim avers direct or indirect damages. The limitations provision will therefore not mandate dismissal of any of Plaintiff's claims, though Defendant can always reassert the limitations provision in, for example, a motion

for summary judgment").

Here, plaintiffs have pleaded entitlement to nominal damages and restitution. CCAC ¶ 317. Given the differences between the damages sought as well as the intentional conduct alleged (distinguishing this case from *Bass*), the breach of contract claims will not be dismissed based on the limitation of liability clause. Meta may, however, move to limit the types of damages available (*e.g.*, anything beyond nominal damages) on summary judgment or at another appropriate juncture.

**B. Sufficiently Definite Promises and Breach**

Next Meta argues that the contractual provisions on which plaintiffs based their breach of contract claim are not "sufficiently definite." The specific contractual promises made in Meta's Privacy Policy and TOS and plaintiffs' allegations regarding breach are identified at paragraph 312 in the CCAC:

- "We require Partners to have the right to … share your information before giving it to us."

  > Plaintiffs allege: "Meta does not require Partners to have the right to share health information with Meta before giving it to Meta."

- "We employ dedicated teams around the world … to detect potential misuse of our Products, harmful conduct towards others, and situations where we may be able to help support or protect our community."

  > Plaintiffs allege: "Meta does not employ dedicated teams to prevent its unauthorized acquisition of health information. To the contrary, Meta employs dedicated teams to encourage health entities to share health information with Meta that the health entities lack rights to share."

- "We … develop advanced technical systems to detect potential misuse of our Products, harmful conduct towards others, and situations where we may be able to help support or protect our community. If we learn of content or conduct like this, we will take appropriate action – for example … removing content, blocking access to certain features, disabling an account, or contacting law enforcement."

  > Plaintiffs allege: "Meta has developed advanced technical systems to detect potential misuse of certain products and is fully capable of using those systems to detect Pixel Partners from which it is acquiring health information without authorization. However, Meta has not used those systems to stop acquiring such information and has not taken appropriate action to prevent health entities from sharing health information with Meta in the absence of the right to do so."

United States District Court
Northern District of California

- "We work with external service providers, partners, and other relevant entities … to detect potential misuse of our Products, harmful conduct towards others, and situations where we may be able to help support or protect our community, including to respond to user reports of potentially violating content."

> Plaintiffs allege: "Meta does not work with external service providers, Partners, or other relevant entities to detect potential misuse of sending health information to Meta through the Pixel without the right to do so. To the contrary, Meta works with Partners to help those Partners avoid the meaningless restrictions Meta places on ads that are targeted to health. As shown above, Meta teaches health entities how to avoid its "restrictions" on personalized health targeted ads by removing certain words that would give users the idea that the ad was specifically targeted to them, all the while continuing to target ads to specific users based on personal attributes, including health."

CCAC ¶ 312; *see also* ¶¶ 96-97 (noting Meta "requires" some information including sensitive and protected information from users for services to work), 117 (same).[9] Plaintiffs' specific references to identified provisions in Meta's TOS and Privacy Policy are sufficiently definite to "determine the scope of the duty and the limits of performance must be sufficiently defined to provide a rational basis for the assessment of damages." *Ladas v. California State Auto. Assn.*, 19 Cal. App. 4th 761, 770 (1993).

Plaintiffs have also plausibly alleged that Meta breached the promises. Meta overreads the impact of plaintiffs' "admissions" that Meta may have "discouraged" partners from sending sensitive or protected information and Meta employed a filter to reduce the transfer of sensitive or protected information. Meta ignores plaintiffs' detailed and plausible allegations regarding how and why the transfer of sensitive or protected information is necessary for Meta's advertising services to function in the way Meta advertised those services, as well as allegations that Meta knew its filter was not effective and could have improved its filter or taken other steps to block the transfer of the sensitive or protected information. That is sufficient at this juncture.

The motion to dismiss the breach of contract and related breach of the duty of good faith and fair dealing claims is DENIED.[10]

---

[9]9 In addressing consent at the preliminary injunction stage, as both sides here note, I expressed that Meta's use of the term "require" was susceptible to multiple meanings. PI Order at 16.

[10] Plaintiffs' covenant of good faith and fair dealing claim is based on allegations that Meta abused its power in interpreting "require" in a way that does not actually require anything. CCAC ¶ 323;



United States District Court
Northern District of California

## VI. UNJUST ENRICHMENT – CLAIM 13

Meta moves to dismiss the unjust enrichment claim, which California law construes as a quasi-contract claim, in light of plaintiffs' express contract claim. But plaintiffs may plead this claim as an alternative at this juncture, even if the contract claim can be read to cover plaintiffs' allegation that Meta sold their data without consent and unjustly retained the proceeds. *See Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015). Meta also argues that the claim cannot stand as plaintiffs have failed to plead that they lack adequate remedies at law under *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020). But plaintiffs do allege that their remedies at law are inadequate. *See* CCAC ¶¶ 448, 489.

The motion to dismiss the unjust enrichment claim is DENIED.

## VII. NEGLIGENCE PER SE – CLAIM 7

Under California law, negligence per se is not a separate cause of action, but a negligence claim analyzed under the per se doctrine. *See Dent v. Nat'l Football League*, 902 F.3d 1109, 1118 (9th Cir. 2018). Under that doctrine, the standard of care can be established by a statute, and a defendant's violation of that statue can "give rise to a presumption that it failed to exercise due care" where that violation "proximately caused an injury," the injury resulted from something the statute was designed to prevent, and the person who was injured was "one of the class of persons for whose protection the statute, ordinance, or regulation was adopted." *Id.* (internal citations omitted). However, the basic elements of a negligence claim, including duty of care and causation, must still be alleged. *See Quiroz v. Seventh Ave. Ctr.*, 140 Cal. App. 4th 1256, 1285 (2006).

Meta attacks plaintiffs' attempt to plead a breach of the duty of care required to state a negligence-based claim. Plaintiffs' only identified source of duty is HIPAA, and at least one court this District and another within the Ninth Circuit have rejected HIPAA as a basis of a negligence per se claim. *See, e.g., Austin v. Atlina*, No. 20-CV-6363-YGR, 2021 WL 6200679, at *3 (N.D.

---

Oppo. at 17. As construed, the claim is not merely duplicative of or exceeding the obligations imposed by the contractual provisions plaintiffs rely on for their express breach claim. Plaintiffs have also adequately Meta's intent – conscious and deliberative acts – given the breach allegations discussed above. *See Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*, 222 Cal. App. 3d 1371, 1395 (Cal. Ct. App. 1990).



United States District Court
Northern District of California

Cal. Dec. 22, 2021) ("Because there is no private right of action under HIPAA, plaintiff's HIPAA claim is not cognizable under common law"); *Teeter v. Easterseals-Goodwill N. Rocky Mountain, Inc.*, No. CV-22-96-GF-BMM, 2023 WL 2330241, at *4 (D. Mont. Mar. 2, 2023) (dismissing negligence per se cause of action based on HIPAA); *see also Delta Sav. Bank v. United States*, 265 F.3d 1017, 1026 (9th Cir. 2001) ("[t]o bring suit under the FTCA based on negligence per se, a duty must be identified, and this duty cannot spring from a federal law. The duty must arise from state statutory or decisional law, and must impose on the defendants a duty to refrain from committing the sort of wrong alleged here," and citing authority explaining "[t]he pertinent inquiry is whether the duties set forth in the federal law are analogous to those imposed under local tort law") (quotations omitted); *In re: Netgain Tech., LLC*, No. 21-CV-1210 (SRN/LIB), 2022 WL 1810606, at *16 (D. Minn. June 2, 2022) ("Here, Plaintiffs have not cited any precedent in California, Minnesota, Nevada, South Carolina, or Wisconsin that permits a state-law negligence per se claim to proceed based on the theory that there is a violation of Section 5 of the FTC Act."); *but see In re Ambry Genetics Data Breach Litig.*, 567 F. Supp. 3d 1130, 1143 (C.D. Cal. 2021) (allowing negligence/negligence per se claim based on violations of FTCA and HIPAA to proceed).[11]

Following the majority of the cases that have considered the issue, the negligence per se claim based on a duty created by HIPAA is DISMISSED with leave to amend so that plaintiffs may attempt to identify a state law source of the duty of care.

## VIII. TRESPASS TO CHATTELS – CLAIM 8

Under California law, trespass to chattels "lies where an intentional interference with the possession of personal property has proximately caused injury." *Intel Corp. v. Hamidi*, 30 Cal.4th 1342, 1350–51, 1 Cal.Rptr.3d 32, 71 P.3d 296 (2003). This claim does not lie where injuries are to privacy and confidentiality. *See Casillas v. Berkshire Hathaway Homestate Ins. Co.*, 79 Cal.

[11] Meta also challenges plaintiffs' ability to plausibly please causation for a negligence claim, given plaintiffs' admission that the healthcare providers' web developers, not Meta, choose what information the Pixel sends to Meta. Mot. at 21. Given plaintiffs' plausible allegations that Meta induced or encourages web developers to send protected or sensitive private information, causation is sufficiently alleged at this juncture.

United States District Court
Northern District of California

App. 5th 755, 765 (2022). In cases of interference with possession of personal property not amounting to conversion "'the owner has a cause of action for trespass or case, *and may recover only the actual damages suffered by reason of the impairment of the property or the loss of its use.*'" *Hamidi*, at 1351 (emphasis in original, quoting *Zaslow v. Kroenert*, 29 Cal. 2d 541, 551 (1946)); *see also id.* 1353 (where there was "no actual or threatened damage to [plaintiff's] computer hardware or software and no interference with its ordinary and intended operation," the defendant's trespass was not actionable); *In re iPhone Application Litig.*, No. 11-MD-02250-LHK, 2011 WL 4403963, at *13–14 (N.D. Cal. Sept. 20, 2011 (following *Hamidi* and dismissing a privacy-based action where plaintiffs failed to connect the trespass to a harm in the functioning of the phone).

Plaintiffs' trespass claim is based on their assertions that Meta places the _fbp cookie on their devices via their health-care providers' websites. They do not allege that the presence of that cookie "impairs" the operation of their devices in terms of diminished storage, decreased battery life, or otherwise. Instead, they assert that Meta's tracking diminishes the value of plaintiffs' computing devices because plaintiffs no longer want to use their devices to communicate with their healthcare providers. CCAC ¶¶ 415-28, 423-25. They analogize their inability to use their phones and computers to communicate with their healthcare providers (lest they disclose personal healthcare information) to the situation in *Grace v. Apple Inc.*, No. 17-CV-00551, 2017 WL 3232464, at *11 (N.D. Cal. July 28, 2017). There, based on allegations that Apple heavily advertised the presence and ability to use Facetime in its iPhones and allegations that use of Facetime was integral to the plaintiffs' use of their iPhones, the court allowed the trespass claim to continue because the removal of Facetime from plaintiffs' phones due to Apple's software update significantly impaired the value of plaintiffs' phones.

Here, unlike in *Grace*, there are no allegations that any functionality inherent in their computing devices has been impacted by Meta's conduct. Nor are there allegations that plaintiffs purchased any specific computing device with the purpose in whole or part of using that device to communicate with their healthcare providers. That these plaintiffs may have valued using their personal devices to communicate with their healthcare providers does not sufficiently impair the

United States District Court
Northern District of California

value of those devices to allow the plaintiffs to state a trespass to chattels claim.

The trespass claim is DISMISSED with leave to amend.

## IX. LARCENY – CLAIM 11

Plaintiffs' larceny claim is brought under California Penal Code sections 484 and 496(a),[12] based on the theory that Meta "knowingly obtained" plaintiffs' information "by false pretenses." CCAC ¶¶ 455-464; Oppo. at 20-21; *see also Bell v. Feibush*, 212 Cal. App. 4th 1041, 1047-48 (2013) (discussing theft by false pretenses). To plausibly state a theft by false pretenses claim, plaintiffs must allege not only that Meta made specific false representations to them, but also that plaintiffs transferred their property to Meta "in reliance on the representation." *See People v. Miller*, 81 Cal. App. 4th 1427, 1440 (2000), as modified on denial of reh'g (July 6, 2000). Plaintiffs have not clearly identified the specific representations that Meta made to them that support their larceny claim or the facts showing that their reliance on those representations issufficient to state this claim.

The larceny claim is DISMISSED with leave to amend.

## X. UNFAIR COMPETITION LAW (CLAIM 9) AND CONSUMERS LEGAL RREMEDIES ACT (CLAIM 10)

A UCL claim may only be brought by "a person who has suffered injury in fact and has lost money or property as a result of the unfair competition." Cal. Bus. & Prof. Code § 17204. Plaintiffs, therefore, must "demonstrate some form of economic injury," such as surrendering more or acquiring less in a transaction, having a present or future property interest diminished, being deprived of money or property, or entering into a transaction costing money or property that would otherwise have been unnecessary. *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 323 (2011).

Courts in this district have dismissed cases where, like here, the injury is based on "the loss of the inherent value of their personal data," *see Cottle v. Plaid Inc.*, 536 F. Supp. 3d 461, 484 (N.D. Cal. 2021), as well as where it was undisputed that plaintiffs paid no money to the

---

[12] California Penal Code section 484 forbids theft, which includes obtaining property "by ... false ... representation or pretense." Cal. Penal Code § 484. California Penal Code section 496(a) prohibits the obtaining of property "in any manner constituting theft." Cal. Penal Code § 496(a).

defendant. *See In re Facebook, Inc., Consumer Privacy*, 402 F. Supp. 3d at 804 (noting "the plaintiffs here do not allege that they paid any premiums (or any money at all) to Facebook to potentially give rise to standing under California law" for purposes of UCL claim and dismissing claim for failure to allege "lost money or property"); *Wesch v. Yodlee, Inc.*, No. 20-cv-05991-SK, 2021 WL 1399291, at *6 (N.D. Cal. Feb. 16, 2021) (holding that the plaintiffs had not alleged that they "surrender[ed] more or acquir[ed] less in a transaction than they otherwise would have" for purposes of UCL standing where they had not paid money to the defendant).

Plaintiffs rely on *In re Solara Med. Supplies, LLC Customer Data Sec. Breach Litig.*, 613 F. Supp. 3d 1284, 1301 (S.D. Cal. 2020). But the injury in that case was based on a "benefit-of-the-bargain" theory that plaintiffs "acquired less" in their transactions with the defendant (who sold medical devices to plaintiffs). *See also Cappello v. Walmart Inc.*, 394 F. Supp. 3d 1015, 1019 (N.D. Cal. 2019) (benefit-of-the-bargain theory asserted by customers of defendant). There is no benefit of the bargain basis alleged in the CCAC with respect to the UCL claim, although benefit of the bargain allegations are made in support of the contract claim. *See* CCAC ¶ 316 (seeking benefit of the bargain contract damages). Given the different requirements to state a plausible remedy under a breach of contract claim and "loss of money or property" under the UCL, a cognizable "benefit of the bargain" theory has not adequately been alleged as a remedy for the UCL claim.[13]

With respect to diminished value of their data, in the most recent Northern District case to address the issue the Hon. Richard S. Seeborg reviewed recent cases and held:

> Plaintiffs fail to show they have an economic injury. Plaintiffs do identify some support for the idea that personal information without consent constitutes economic injury. *See Calhoun v. Google LLC*, 526 F. Supp. 3d 605, 636 (N.D. Cal. 2021) ("[T]he Ninth Circuit and a number of district courts, including this Court, have concluded that plaintiffs who suffered a loss of their personal information suffered economic injury and had standing.") (citing cases, including *In re Facebook Privacy Litig.* ("*Facebook Privacy*"), 572 F. App'x 494, 494 (9th Cir. 2014); and *In re Yahoo! Inc. Cust. Data Sec. Breach*

---

[13] Plaintiffs also rely on *Callahan v. PeopleConnect, Inc.*, No. 20-CV-09203-EMC, 2021 WL 5050079, at *19 (N.D. Cal. Nov. 1, 2021), motion to certify appeal denied, No. 20-CV-09203-EMC, 2022 WL 2132912 (N.D. Cal. June 14, 2022), but that case dealt with the misuse of names and likenesses as intellectual property.



United States District Court
Northern District of California

> *Litig.*, No. 16-MD-02752-LHK, 2017 WL 3727318, at *13 (N.D. Cal. Aug. 30, 2017)). The weight of the authority in the district and the state, however, point in the opposite direction: that "the 'mere misappropriation of personal information' does not establish compensable damages." *Pruchnicki v. Envision Healthcare Corp.*, 845 F. App'x 613, 615 (9th Cir. 2021) [citations omitted]. Because Plaintiffs have not alleged a specific monetary or economic loss, Plaintiffs lack standing to maintain their UCL claims.

*Katz-Lacabe v. Oracle Am., Inc.*, No. 22-CV-04792-RS, 2023 WL 2838118, at *8 (N.D. Cal. Apr. 6, 2023).

Judge Seeborg relied in part on *Moore v. Centrelake Med. Grp., Inc.*, 83 Cal. App. 5th 515, 538 (2022), *review denied* (Dec. 14, 2022). There, the California Court of Appeal held that plaintiffs' "lost-value-of-PII theory, as pled, is insufficient to support UCL standing," because "[a]ppellants properly pled only that their PII was stolen and disseminated, and that a market for it existed. They did not allege they ever attempted or intended to participate in this market, or otherwise to derive economic value from their PII. Nor did they allege that any prospective purchaser of their PII might learn that their PII had been stolen in this data breach and, as a result, refuse to enter into a transaction with them, or insist on less favorable terms. In the absence of any such allegation, appellants failed to adequately plead that they lost money or property in the form of the value of their PII." *Id.* at 538.

Plaintiffs rely on *Brown v. Google LLC*, No. 20-CV-03664-LHK, 2021 WL 6064009 (N.D. Cal. Dec. 22, 2021). There, the Honorable Lucy H. Koh found that plaintiffs adequately alleged lost money or property sufficient to state their UCL claim where they alleged that "because Google previously has paid individuals for browsing histories, it is plausible that, had Plaintiffs been aware of Google's data collection, they would have demanded payment for their data. Thus, by inducing Plaintiffs to give Google their data without payment, Google caused Plaintiffs to 'acquire in a transaction less[ ] than [they] otherwise would have.' [] Second, because there are several browsers and platforms willing to pay individuals for data, it is plausible that Plaintiffs will decide to sell their data at some point. Indeed, each named Plaintiff has alleged that he or she is aware of these browsers and platforms. [] Accordingly, by obtaining Plaintiffs' data and selling it to advertisers, Google 'diminished' Plaintiffs' 'future property interest.' *Kwikset*, 51 Cal. 4th at 324.")." *Brown*, at *15.



United States District Court
Northern District of California

Here, plaintiffs contend their allegations bring them closer to *Brown* and satisfy the deficiencies identified in *Moore*. *See* CCAC ¶¶ 22 (alleging Meta "takes patients' property and property rights without compensation and ignores their right to control the dissemination of their health information to third parties"), 215 ("Meta itself has paid users for their digital information"). But the crux of *this* case concerns Meta's receipt of "individually identifiable health information," that plaintiffs apparently do not want Meta or anyone other than their healthcare providers to have. *Id.*, ¶¶ 1, 216 ("Americans typically do not want to see their individually identifiable health information for any purpose"). That brings it closer to *Moore* and *Katz-Lacabe*.

In light of the failure to separately allege a benefit of the bargain basis for "loss of money or property" under the UCL and in light of the inconsistent allegations regarding how plaintiffs could *and* would participate in a legitimate market for health care information, the UCL claim is DISMISSED with leave to amend.

There is a different deficiency with plaintiffs' claim under the CLRA. The CLRA claim is based on Meta's representation "that it required its Partners to have the right to collect, use and share Plaintiffs' and Class members' information but doing nothing to ensure their rights were protected." CCAC ¶¶ 451-453. As a result, plaintiffs allege that Meta violated section 1770(2) of the CLRA by "[m]isrepresenting the source, sponsorship, approval, or certification of goods or services"; section 1770(5) of the CLRA by "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have"; and section 1770(14) of the CLRA by "[r]epresenting that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law."

Meta moves to dismiss these misrepresentations claims under Rule 9(b) because none of the plaintiffs allege that they saw and relied on those alleged misrepresentations. *See, e.g.*, *In re Zoom Video Commc'ns Inc. Priv. Litig.*, 525 F. Supp. 3d 1017, 1046 (N.D. Cal. 2021) (dismissing CLRA claims where "[n]o Plaintiff alleges reading those allegedly misleading statements, let alone reading them at a specific time or place."). Plaintiffs did not address this issue in their opposition or during the hearing. In accordance with my tentative ruling, the CLRA claim is

United States District Court
Northern District of California

DISMISSED with leave to amend so that plaintiffs can plead facts regarding reliance on the alleged misrepresentations.[14]

## CONCLUSION

For the foregoing reasons Meta's motion is DENIED regarding the ECPA, CIPA, breach of contract, and unjust enrichment claims. The motion is GRANTED with leave to amend on the privacy, CDAFA, negligence per se, trespass, larceny, UCL, and CLRA claims. Plaintiffs shall file their amended complaint within twenty (20) days of the date of this Order.

Dated: September 7, 2023

William H. Orrick
United States District Judge

United States District Court
Northern District of California

[14] In my Tentative Order issued in advance of the hearing, I indicated I was inclined to follow Judge Koh's decision in *Calhoun v. Google LLC*, 526 F. Supp. 3d 605, 635 (N.D. Cal. 2021). Dkt. No. 298. However, the defendant in *Calhoun* moved to dismiss arguing only that there was no property interest in browsing data and that copying data did not amount theft. *Id.* Meta's argument here rests on plaintiffs' failure to satisfy the false statement and reliance elements of that claim.

# EXHIBIT 5

2023 WL 5519323
Only the Westlaw citation is currently available.
United States District Court, N.D. California.

PATRICK YOCKEY, et al., Plaintiffs,
v.
SALESFORCE, INC., Defendant.

Case No. 22-cv-09067-JST
|
Filed 08/25/2023

**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS**

JON S. TIGAR United States District Judge

***1** Before the Court is Defendant Salesforce, Inc.'s motion to dismiss. ECF No. 23. The Court will grant the motion in part and deny it in part.

## I. BACKGROUND

Salesforce is a software-as-a-service provider that offers a service called Chat. ECF No. 22 ¶¶ 6, 11. Chat is an application programming interface ("API"), *id.* ¶ 12, which is "a tool that 'allow[s] programmers to use ... prewritten code to build certain functions into their own programs, rather than write their own code to perform those functions from scratch," *Google LLC v. Oracle Am., Inc.*, 141 S. Ct. 1183, 1191 (2021) (quoting *Oracle Am., Inc. v. Google, Inc.*, 750 F.3d 1339, 1349 (2014)). "An API divides and organizes the world of computing tasks in a particular way." *Id.* at 1192. *Id.* Chat operates from Salesforce's web servers, but its functionality can be implemented on the website of a company that contracts with Salesforce to use the service, thereby allowing that company's customers to interact with the company directly on the website. ECF No. 22 ¶ 12–13. When a customer sends a chat message to a company's customer service agent, "it is first routed through a Salesforce server." *Id.* ¶ 13. Transcripts of communications over Chat are automatically created in real time and subsequently transmitted to the contracting company. *Id.* ¶ 15. Chat includes a "Sneak Peek" feature, which enables an agent to view the contents of a customer's message while the customer types the message, *i.e.*, before the customer sends the message to the agent. *Id.* ¶ 22–23.

Rite Aid and Kaiser Permanente utilize Chat on their websites. *Id.* ¶ 13. Plaintiff Pearl Magpayo is a California resident and used the chat function on the Kaiser Permanente website to discuss her insurance and medical information with Kaiser's customer service agents. *Id.* ¶ 4. Plaintiff Patrick Yockey is a Pennsylvania resident and used the chat function on the Rite Aid website to discuss his prescription history and customer rewards with Rite Aid's customer service agents. *Id.* ¶ 3. Plaintiffs subsequently brought suit, alleging that Chat's functions constitute wiretapping in violation of California and Pennsylvania law. As individuals and on behalf of a putative class, they bring claims for violations of the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code §§ 631 & 632; and violation of Pennsylvania's Wiretapping and Electronic Surveillance Control Act ("WESCA"), 18 Pa. Cons. Stat. § 5701, *et seq.* ECF No. 22 ¶¶ 48–80.

Salesforce moved to dismiss the complaint on April 24, 2023. ECF No. 23. The Court took the motion under submission without a hearing on July 17, 2023. ECF No. 33.

## II. JURISDICTION

The Court has jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A).

## III. LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Dismissal "is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Factual allegations need not be detailed, but facts must be "enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

***2** "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. While this standard is not "akin to a 'probability requirement,' ... it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). "Where a complaint

pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.' " *Id.* (quoting *Twombly*, 550 U.S. at 557). In determining whether a plaintiff has met the plausibility requirement, a court must "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable" to the plaintiff. *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005). A plaintiff may "plead[ ] facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible." *Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017) (quoting *Arista Records, LLC v. Doe 3*, 603 F.3d 110, 120 (2d Cir. 2010)).

## IV. DISCUSSION

Salesforce argues that Plaintiffs lack standing, that Plaintiffs fail to state a claim under either statute, and that Plaintiffs otherwise consented to Salesforce's collection of their information.

### A. Article III Standing

"Article III of the Constitution confines the federal judicial power to the resolution of 'Cases' and 'Controversies.' " *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021). "For there to be a case or controversy under Article III, the plaintiff must have a 'personal stake' in the case—in other words, standing." *Id.* (quoting *Raines v. Byrd*, 521 U.S. 811, 819 (1997)). "[T]o establish standing, a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant, and (iii) that the injury would likely be redressed by judicial relief." *Id.* at 2203. "The party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). "Where, as here, a case is at the pleading stage, the plaintiff must 'clearly ... allege facts demonstrating' each element." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)).

Salesforce argues that Plaintiffs have not suffered a concrete injury because they have not alleged that Salesforce "shared, disclosed, or sold chat transcripts to third parties." ECF No. 23 at 16. The Court is not persuaded. "[V]arious intangible harms can ... be concrete. Chief among them are injuries with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts." *TransUnion*, 141 S. Ct. at 2204. An "exact duplicate" is not required, and the Supreme Court has recognized that "intrusion upon seclusion" is included among those traditionally recognized harms. *Id.* at 2204; *see* Restatement (Second) of Torts § 652B cmt. *b.* (1977) (including "tapping ... telephone wires" as an example of intrusion upon seclusion). In that vein, the Ninth Circuit has written that "[v]iolations of the right to privacy have long been actionable at common law," and that "[a] right to privacy 'encompass[es] the individual's control of information concerning his or her person.' " *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589, 598 (9th Cir. 2020) (first quoting *Patel v. Facebook*, 932 F.3d 1264, 1272 (9th Cir. 2019); and then quoting *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 983 (9th Cir. 2017)); *see also* Restatement (Second) of Torts § 652B cmt. *a.* (explaining that intrusion upon seclusion "does not depend upon any publicity given to the person whose interest is invaded or to his affairs" but rather "consists solely of an intentional interference with his interest in solicitude or seclusion").

*3 Statutes such as CIPA and WESCA thus "codify a substantive right to privacy, the violation of which gives rise to a concrete injury sufficient to confer standing." *Id.*; *accord In re Google Inc. Cookie Placement Consumer Privacy Litig.*, 934 F.3d 316, 325 (3d Cir. 2019) ("History and tradition reinforce that a concrete injury for Article III standing purposes occurs when Google, or any other third party, *tracks* a person's internet browser activity without authorization." (emphasis added)). Both Plaintiffs allege that they disclosed personal health information over Chat and that Salesforce collected the communications containing that information. ECF No. 22 ¶¶ 3, 4. These allegations give rise to a concrete injury because Salesforce's collection of those communications necessarily deprived Plaintiffs of their control of their information contained therein. *See Mastel v. Miniclip SA*, 549 F. Supp. 3d 1129, 1138 (E.D. Cal. 2021); *see also Licea v. Cinmar, LLC*, --- F. Supp. 3d ----, No. CV 22-6454-MWF (JEM), 2023 WL 2415592, at *3 (C.D. Cal. Mar. 7, 2023). Accordingly, the Court concludes that Plaintiffs have standing to bring their claims.

### B. CIPA

#### 1. Section 631

Salesforce argues that Magpayo fails to state a Section 631 claim because Salesforce was "acting merely as an extension of ... Kaiser's communications" such that it was a party to those communications. ECF No. 23 at 22. Plaintiffs argue that

Salesforce's interpretation of Section 631 runs afoul of the statute's text and corresponding caselaw. ECF No. 28 at 11.

Section 631 creates four avenues for relief:

> (1) where a person "by means of any machine, instrument, or contrivance, or in any other manner, intentionally taps, or makes any unauthorized connection ... with any telegraph or telephone wire, line, cable, or instrument";
>
> (2) where a person "willfully and without consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit";
>
> (3) where a person "uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained"; and
>
> (4) where a person "aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above."

*Javier v. Assurance IQ, LLC*, --- F. Supp. 3d ----, No. 20-cv-02860-CRB, 2023 WL 114225, at *4 (N.D. Cal. Jan. 5, 2023) (quoting Cal. Penal Code § 631). Magpayo's Section 631 claim arises under the second prong.

Recent Section 631 jurisprudence stems from two seminal cases: *Ribas v. Clark*, 38 Cal. 3d 355 (1985), and *Rogers v. Ulrich*, 52 Cal. App. 3d 894 (1975). In *Ribas*, Ribas and his former wife had reached a settlement agreement during divorce proceedings. 38 Cal. 3d at 358. The wife used Clark's phone to call Ribas and asked Clark to listen to the conversation on an extension telephone. *Id.* Ribas relayed to the wife the details of a conversation with the spouse's lawyer while Clark listened. *Id.* Ribas subsequently sued Clark for eavesdropping under Section 631. The California Supreme Court held that Clark's conduct violated Section 631 because the statute draws a distinction between "the secondhand repetition of the contents of a conversation and its simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device." *Id.* at 361. The Court wrote that "such secret monitoring denies the speaker an important aspect of privacy of communication—the right to control the nature and extent of the firsthand dissemination of his statements." *Id.*

In *Rogers*, Ulrich used a tape recorder jack installed on his telephone to record a conversation with Rogers without Rogers' knowledge. 52 Cal. App. 3d at 897. The Court of Appeal held that Ulrich's conduct did not violate Section 631 because Ulrich was a party to the conversation and thus could not eavesdrop under the statute. *Id.* at 899. The Court wrote that "[i]t is never a secret to one party to a conversation that the other party is listening to the conversation; only a third party can listen secretly to a private conversation." *Id.*

*4 Thus, as the court observed in *Javier v. Assurance IQ, LLC*, the question for purposes of determining whether Salesforce was a party to the communications is whether Chat "is more akin to the tape recorder in *Rogers*, held by [Kaiser], or [to] the friend in *Ribas* (in which case, [Kaiser] is the wife who allowed [Salesforce] to listen in)." 2023 WL 114225, at *5; *accord Yoon v. Lululemon USA, Inc.*, 549 F. Supp. 3d 1073, 1081 (C.D. Cal. 2021). In analogous circumstances, courts have arrived at two different answers.

In the first set of cases, courts concluded that software providers are third parties. The Ninth Circuit in *In re Facebook, Inc. Internet Tracking Litigation* held that Facebook was not a party to communications between a user's browser and a third-party website. 956 F.3d 589, 608 (9th Cir. 2020). On websites with Facebook plug-ins, Facebook's code copied a header containing a user's personally identifiable URL information that was transmitted from the user's web browser to the website. *Id.* at 607. This enabled Facebook to compile users' browsing histories for its own purposes. *Id.* The Ninth Circuit concluded that "unknown duplication and communication of" information in this manner "do not exempt a defendant from liability under the party exception." *Id.* at 608. Similarly, in *Revitch v. New Moosejaw, Inc.*, the court held that NaviStone was not a party to the communications between a website visitor and Moosejaw.com because Revitch had adequately alleged that NaviStone "embedded" code "into the Moosejaw.com pages" that tracked interactions between users and the website. No. 18-cv-06827-VC, 2019 WL 5485330, at *1 (N.D. Cal. Oct. 2023). The court emphasized that "it cannot be that anyone who receives a direct signal escapes liability by becoming a party to the communication," *id.* at *2, and further wrote,

> Revitch began each communication by pressing a button on his mouse or a key on his keyboard, causing one signal to travel to his computer and then through

> his browser to Moosejaw's server. Even if the browser caused a parallel signal to be sent to NaviStone, that intervention happened while the signal was already in transit from Revitch's device. Section 631's protections extend explicitly to the beginnings and ends of communications, so there is no reason to consider the first part of an electronic communication beyond the statute's reach.

*Id.*

And in *Javier*, the court held that ActiveProspect was not a party to communications between Assurance IQ and users of its website. 2023 WL 114225, at *5. ActiveProspect implemented "a piece of code that can be pasted into a form page to record keystrokes, mouse clicks, data entry, and other electronic communications of visitors to websites." *Id.* at *1 (internal quotation marks omitted). The website owner would subsequently obtain "a record of a users' entire interaction with its website." *Id.* Because Javier alleged "that ActiveProspect monitors, analyzes, and stores information about visits to assurance's websites, and that ActiveProspect can use that information for other purposes," ActiveProspect was not a party to the communication. *Id.* at *6; *see also Yoon*, 549 F. Supp. 3d at 1081 ("Yoon's first claim for relief survives Quantum Metric's participant exception challenge because she alleges that QM captures, stores, and interprets her real-time data—which extends beyond the ordinary function of a tape recorder."); *cf. Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 521 (C.D. Cal. 2021) ("FullStory did not become a 'party' to the communication simply because it was providing recording and transmission services for Nike.").

*5 In the second set of cases, courts have held that software providers are "extension[s]" that "provide[ ] a tool" allowing a company "to record and analyze its own data in aid of [its] business." *Graham v. Noom, Inc.*, 533 F. Supp. 3d 823, 832 (N.D. Cal. 2021). In *Graham*, FullStory provided a "software service that captures its clients' data, hosts it on FullStory's servers, and allows the clients to analyze their data." *Id.* The court likened this software to the tape recorder in *Rogers* and held that the software did not constitute eavesdropping because the plaintiffs had not alleged that FullStory "intercepted and used the data itself." *Id.* In *Williams v. What If Holdings, LLC*, the court held that ActiveProspect's software—the same software at issue in *Javier*—did not constitute wiretapping because there "were no facts ... to suggest that ActiveProspect 'intercepted and used the data itself.' " No. C 22-03780 WHA, 2023 WL 114225, at *3 (N.D. Cal. Dec. 22, 2022) (quoting *Graham*, 533 F. Supp. 3d at 832); *see also Johnson v. Blue Nile, Inc.*, No. C 20-08183 LB, 2021 WL 1312771, at *3 (N.D. Cal. Apr. 8, 2021); *Yale v. Clicktale, Inc.*, No. C 20-07575 LB, 2021 WL 1428400, at *3 (N.D. Cal. Apr. 15, 2021).

The *Javier* court partially disagreed with the reading of Section 631 adopted by this second set of cases for two reasons. First, the reading "interprets the second prong of the statute ... based on the intentions and usage of the prospective third party," "[b]ut the third prong of the statute already penalizes 'use.' " *Javier*, 2023 WL 114225, at *6. As a result, "reading a use requirement into the second prong would add requirements that are not present (and swallow the third prong in the process)." *Id.*; *see Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 86 (2017) ("[W]hen we're engaged in the business of interpreting statutes we presume differences in language ... convey differences in meaning."); *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 185 (2011) ("[W]e are hesitant to adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law." (quoting *Mackey v. Lanier Collection Agency & Serv., Inc.*, 468 U.S. 825, 837 (1988)). Second, the California Supreme Court in *Ribas* did not consider the intention of the eavesdropper or the use of the obtained information, but rather "emphasized the privacy concerns at issue with having an 'unannounced second auditor' listening in on the call," which implicates an individual's "right to control the nature and extent of the firsthand dissemination of [their] statements." *Id.*

The Court agrees with the *Javier* court that *Graham* and its progeny are based on a misinterpretation of Section 631 and *Ribas*, both of which compel the conclusion that the third party's intentions with respect to the use of the collected information are irrelevant. Rather, the inquiry turns on the more granular question of whether the third party "ha[s] the *capability* to use its record of the interaction for any other purpose." *Javier*, 2023 WL 114225, at *6 (emphasis altered). If Salesforce can use its records of the communications for any purpose other than to furnish information relating to those communications to Kaiser, then it is more like the wife in *Ribas* who allowed Clark to eavesdrop. By contrast, if Salesforce "has no independent ability to divulge its recording for any other purpose but for that of" Kaiser, then it is more like the tape recorder in *Rogers*. *Id.*

Plaintiffs allege that Chat "is run from Salesforce web servers," ECF No. 22 ¶ 12, that communications over Chat are "routed through a Salesforce server," *id.* ¶ 13, that Salesforce "directly receives the electronic communications of visitors, *id.* ¶ 20, that Salesforce "analyzes the customer-support agent interactions in real time to create live transcripts of communications," *id.* ¶ 14, and that "supervisors can view transcripts in real time," *id.* ¶ 16. These allegations do not support a reasonable inference that Salesforce has the capability to use these communications for any purpose other than furnishing them to Kaiser. Chat, as alleged, is therefore more akin the tape recorder in *Rogers*, and Plaintiffs have thus failed to state a claim pursuant to Section 631.

### 2. Section 632

#### a. Confidentiality of Commnnication

***6** "Section 632 provides that '(a) every person who, intentionally and without the consent of all parties to a confidential communication, by means of any electronic amplifying or recording device, eavesdrops upon or records such confidential communication ... shall be punished by fine ... or by imprisonment.' " *Rattray v. City of National City*, 51 F.3d 793, 797 (9th Cir. 1994) (quoting Cal. Penal Code § 632). "A communication is confidential under Section 632 if a party 'has an objectively reasonable expectation that the conversation is not being overheard or recorded.' " *Brown v. Google LLC*, 525 F. Supp. 3d 1049, 1073 (N.D. Cal. 2021) (quoting *Flanagan v. Flanagan*, 27 Cal. 4th 766, 776–77 (2002)). "California appeals courts have generally found that Internet-based communications are not 'confidential' within the meaning of [S]ection 632, because such communications can easily be shared by, for instance, the recipient(s) of the communications." *Campbell v. Facebook Inc.*, 77 F. Supp. 3d 836, 849 (N.D. Cal. 2014) (collecting cases). As a result, courts "have developed a presumption" that such communications do not give rise to the requisite expectation. *Revitch*, 2019 WL 5485330, at *3.

Salesforce argues that Magpayo did not have a reasonable expectation of confidentiality because "chat communications are by their very nature non-confidential." ECF No. 23 at 27 (citing *Campbell*, 77 F. Supp. 3d at 849). Plaintiffs respond that Magpayo maintained a reasonable expectation of confidentiality because she communicated information related to her prescription history, medical conditions, and insurance information to the customer service agents in a healthcare context. ECF No. 28 at 23. The Court agrees with Plaintiffs that the context of these communications renders them confidential.

A recent case from this district is instructive. In *In re Meta Pixel Healthcare Litig.*, No. 22-CV-03580-WHO, 2022 WL 17869218 (N.D. Cal. Dec. 22, 2022), the plaintiffs alleged that a Meta software product called Pixel, when installed on the patient portal of the plaintiffs' healthcare providers, intercepted "data relating to patient portal logins and logouts alongside identifiers for each patient," which was then transmitted to Meta. *Id.*, 2022 WL 17869218, at *8. The plaintiffs further alleged that following login, "the Meta Pixel allegedly continue[d] to transmit information to Meta, including information about doctors, medical conditions, and appointments associated with a patient's session." *Id.*, 2022 WL 17869218, at *3. Meta allegedly then "monetize[d] the information that it receive[d] through the Meta Pixel by using it to generate highly-profitable targeted advertising on- and off-Facebook." *Id.* The plaintiffs brought several claims against Meta in connection with these practices, including claims under sections 631(a) and 632(a). *Id.*, 2022 WL 17869218, at *13.

As Salesforce does here, Meta argued that the plaintiffs had no reasonable expectation of privacy because the communications occurred over the internet, but the court rejected that argument:

> Communications made in the context of a patient-medical provider relationship are readily distinguishable from online communications in general for at least two reasons. First, patient-status and medical-related communications between patients and their medical providers are protected by federal law .... Second, unlike communications made while inquiring about items of clothing on a retail website, *Revitch*, 2019 WL 5485330, at *3, health-related communications with a medical provider are almost uniquely personal. "One can think of few subject areas more personal and more likely to implicate privacy interests than that of one's health or genetic make-up." *Norman-Bloodsaw v. Lawrence Berkeley Lab'y*, 135 F.3d 1260, 1269 (9th Cir. 1998).

*Id.*, 2022 WL 17869218, at *14–15 (additional citations omitted). The same is true of the communications at issue in the present case.

*7 Salesforce does not meaningfully engage with this authority. Instead, it suggests that the operative complaint can be read so as to suggest that Plaintiffs were "merely using publicly-available customer support chats [and therefore] they had no objectively reasonable expectation that their communications were 'confidential' under the facts alleged." ECF No. 31 at 18. Salesforce cites no authority for the proposition that communications with a health care provider must occur with only certain of its agents or employees to be confidential, or that such communications are not confidential if conducted with a customer support worker. The Court therefore rejects Salesforce's argument and concludes that Magpayo's communications were "confidential" within the meaning of Section 632.

**b. Consent**

Salesforce argues that Kaiser's privacy policies "put [Magpayo] on prior notice, disclosing that [Kaiser] (i) collect[s] Plaintiffs' PHI and (ii) use[s] service providers that aid in this collection and subsequent customer service functions," such that Magpayo consented to Salesforce's monitoring and recording. ECF No. 23 at 29. Plaintiffs respond that Magpayo accessed the chat function using a Kaiser web page that did not require Magpayo's consent. ECF No. 28 at 31. Salesforce then replies that Plaintiffs make inconsistent allegations about which web pages Magpayo actually viewed, and that the only page that did not require a user's consent before chatting "applies only to federal employees, which Magpayo does not allege she is or was." ECF No. 31 at 20 (citing ECF No. 22 ¶ 19).

Salesforce's arguments do not appear to be based on the operative complaint, which says nothing regarding whether the web page(s) Magpayo visited apply only to federal employees, or whether Magpayo is or was a federal employee. Nor need the Court resolve the parties' disagreements about how to construe the allegations that Plaintiffs actually do make. Because there was at least one chat portal that did not require consent before use, and it is possible that Magpayo used that portal, Salesforce has not established that Magpayo consented to the monitoring and recording of her communications. Salesforce's motion to dismiss Plaintiffs' section 632 claim is therefore denied.

**C. WESCA**

WESCA "operates in conjunction with and as a supplement to the Federal Wiretap Act, 18 U.S.C. § 2150 *et seq.*" *Popa v. Harriet Carter Gifts, Inc.*, 52 F.4th 121, 125–126 (3d Cir. 2022). The statute "offers a private civil cause of action to '[a]ny person whose wire, electronic or communication is intercepted, disclosed, or used' ... against 'any person who intercepts, discloses, or procures any other person to intercept, disclose or use, such communication." *Id.* at 125 (quoting 18 Pa. Cons. Stat. § 5725(a)). WESCA defines "intercept" as "[a]ural or other acquisition of the contents of any wire, electronic or oral communication through the use of any electronic, mechanical, or other device." 18 Pa. Const. Stat. § 5702. WESCA further defines "electronic, mechanical or other device" as "[a]ny apparatus ... that can be used to intercept a wire, electronic or oral communication." *Id.* That definition expressly excludes, in relevant part, "[a]ny telephone or telegraph instrument, equipment, or facility, or any component thereof furnished to the subscriber or user by a provider of wire or electronic communication service in the ordinary course of its business." *Id.*

Salesforce first argues that Yockey has failed to allege that Salesforce intercepted his chat communications. The Third Circuit has written that "WESCA"s use of 'intercept' ... reduces to acquiring certain communications using a device. And based on just that definition, anyone could 'intercept' communications, including people who 'acquire' a text message or chat sent to them." *Popa*, 52 F.4th at 126. Thus, even if the communications at issue were sent directly through the Chat interface, Salesforce has nonetheless intercepted those communications within the meaning of WESCA to the extent that Salesforce received and stored those communications on its servers.

*8 Salesforce next argues that WESCA exempts Chat from its definition of "electronic, mechanical or other device." However, the definition exempts only instruments, equipment, facilities, or components appropriately characterized as "telephon[ic] or telegraph[ic]." 18 Pa. Const. Stat. § 5702. That a device "can perform functions similar or identical to a modern telephone is" insufficient to bring that device within this "telephone exception." *Commonwealth v. Diego*, 119 A.3d 370, 375 (Pa. Super. Ct. 2015). One court held, for example, that "telephone" in Section 5702 did not include an iPad because such an interpretation would "radically expand the definition of 'telephone' under [WESCA]" and run contrary to the requirement that WESCA's provisions are to be "strictly construed." *Id.* (quoting *Commonwealth v. Spangler*, 809

A.2d 234, 237 (Pa. 2002)). Therefore, Chat does not qualify as a "telephone or telegraph" even though it may be said to share features with such devices.

Third, Salesforce argues that Yockey's allegations do not establish that his communications were rerouted contemporaneously with transmission. WESCA does not impose a rerouting requirement; rather, it requires that communications be intercepted. *See* 18 Pa. Cons. Stat. § 5725(a). Salesforce's argument relies on a case in which the Third Circuit wrote, "Electronic communications are ... 'intercepted' when software reroutes communications to an interceptor." *Popa*, 52 F.4th at 130. The Third Circuit did not articulate such rerouting as a requirement of interception, but rather described the act of rerouting according to the facts of the case for purposes of determining where an interception occurs geographically. And while Salesforce is correct that an intercept must occur "contemporaneously with transmission" under WESCA, *see Fraser v. Nationwide Mut. Ins. Co.*, 352 F.3d 107, 113 & n.6 (3d Cir. 2003), Yockey plausibly alleges that Salesforce, in real time, directly receives Chat communications, creates live transcripts of those communications, and permits Rite Aid supervisors to view those transcripts. ECF No. 22 ¶¶ 13, 14, 16, 20. Yockey also plausibly alleges that Salesforce begins to obtain the contents of a user's message before the user sends it via the Sneak Peek feature. *Id.* ¶ 23. Salesforce protests that the complaint is devoid of allegations that Salesforce personnel read or could read the messages before RiteAid, but Yockey alleges misconduct on the part of Salesforce as the provider, not on the part of its personnel.

Fourth, Salesforce argues that two of WESCA's exceptions to liability apply to Salesforce's conduct. The first exception provides that "[i]t shall not be unlawful ... for:"

> An officer, agent or employee of a provider of wire or electronic communication service, whose facilities are used in the transmission of a wire communication, to intercept, disclose or use that communication in the normal course of his employment while engaged in any activity which is a necessary incident to the rendition of his service or to the protection of the rights or property of the provider of wire or electronic communication service. However, no provider of wire or electronic communication service shall utilize service observing or random monitoring except for mechanical or service quality control checks.

18 Pa. Const. Stat. § 5704(1). Salesforce argues that any interception is a "necessary incident to its rendition of [its] service."

There are two problems with this argument. First, it is not clear that "provider" as that term is used in section 5704(1) refers to any entity other than Rite Aid, i.e., the only entity that is a "provider" of services to the Plaintiff. Thus, Salesforce has not established that it is entitled to invoke this protection. Next, the second sentence of the exception states that "no provider of wire or electronic communication service shall utilize service observing or random monitoring except for mechanical or service quality control checks." 18 Pa. Const. Stat. § 5704(1). Whatever Salesforce is doing, it goes well beyond "service observing or random monitoring ... for mechanical or service quality control checks." *See* ECF No. 22 ¶¶ 21-23 (describing Salesforce's "Sneak Peek" feature, which enables an agent to view the contents of a customer's message while the customer types the message, *i.e.*, before the customer sends the message to the agent. *Id.* ¶ 22–23. For these reasons, the Court concludes that the exception set forth in section 5704(1) does not apply.

***9** The second exception provides that "[i]t shall not be unlawful ... for ... [a] person or entity providing electronic communication service to the public to divulge the contents of any such communication ... with the lawful consent of the originator or intended recipient of the communication." 18 Pa. Const. Stat. § 5704(9). This provision "allows only one party [to] consent to the recording and disclosure involved in computer communications, electronic mail and voice mail." *Barash v. Penn. Public Utility Comm'n*, 575 A.2d 79, 95 n.6 (1990) (Pellegrini, J., concurring in partt and dissenting in part), *aff'd sub nom. Barash v. Bell Tel. Co. of Penn.*, 605 A.2d 1198 (Pa. 1992)). Salesforce does not directly provide Chat's services to the public. Rather, Salesforce provides Chat to companies that contract with it to use the service on their websites. Even if those websites are accessible to Rite Aid's customers, there is nonetheless a degree of separation between Salesforce and the public that is absent typical from

arrangements between service providers and members of the public, such as that of an e-mail service to an e-mail user. *Cf. Diego*, 119 A.3d at 376 (noting that "it is, at best, a dubious proposition that the authors of the 1978 [WESCA]" intended an exception to apply to technology "not invented until the late 1980's"). And because the Pennsylvania Supreme Court has instructed that the WESCA's provisions are to be "strictly construed," the Court cannot conclude, as a matter of law, that the exception applies. *Spangler*, 809 A.2d at 23. Salesforce identifies no authority to the contrary, and the Court is aware of none. Therefore, Yockey has stated a WESCA claim.

**D. Consent**

Salesforce argues that Yockey otherwise consented to Salesforce's conduct. *See* 18 Pa. Const. Stat. § 5704(1) (exempting from liability "[a] person ... intercept[ing] a wire, electronic or oral communication, where all parties to the communication have given prior consent to such interpretation"). Salesforce points to Ride Aid's privacy policy, which appears via a hyperlink when using the "Chat With a Healthcare Professional" option. ECF No. 24-5 at 2.[1] The privacy policy discloses that Rite Aid "may share information about you with our service providers who perform services on our behalf. In addition, we may also share your personal information ... with third parties who provide services that we offer through our Sites." ECF no. 24-1 at 3. Yockey argues that he used the "Chat With Customer Support" option, which did not feature the hyperlink.

Regardless of whether the hyperlink to the privacy policy appeared in the particular chat window accessed by Yockey, the policy's language does not encompass the conduct at issue. "[P]ersonal information" is not synonymous with a word-for-word transcript of all communications both as a matter of common sense and as defined by the policy. *See* ECF No. 24-1 at 2; *Calhoun v. Google LLC*, 526 F. Supp. 3d 605, 620 (N.D. Cal. 2021) ("In order for consent to be actual, the disclosures must 'explicitly notify' users of the practice at issue. (quoting *in re Google Inc.*, No. 13-MD-02430-LHK, 2013 WL 5423918, at *12 (N.D. Cal. Sept. 26, 2013))). And even if "personal information" encompassed a transcript of all communications, the policy does not disclose that Salesforce, via the Sneak Peek feature, obtains those communications while users type them.

**CONCLUSION**

For the foregoing reasons, Salesforce's motion is granted in part and denied in part. Dismissal of Magpayo's CIPA Section 631 claim is with leave to amend because Salesforce has not shown that amendment would prejudice Salesforce, is sought in bad faith, would produce an undue delay, or would be futile. *See AmerisourceBergen Corp v. Dialyst West, Inc.*, 465 F.3d 946, 951 (9th Cir. 2006). Plaintiffs may file an amended complaint within twenty-one days of this order solely to cure the deficiencies identified by this order. Failure to file a timely amended complaint will result in dismissal of Magpayo's CIPA Section 631 claim with prejudice.

***10 IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2023 WL 5519323

## Footnotes

1 Because Yockey alleges that he did not consent to the communications at issue, the Court considers the contents of the Rite Aid privacy policy under the incorporation by reference doctrine. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018). Salesforce's requests for judicial notice, ECF Nos. 24 & 32, are otherwise denied because the Court need not rely on these materials to resolve the instant motion. The Court notes that judicial notice and incorporation by reference are separate procedures that "permit district courts to consider materials outside of a complaint ... for different reasons and in different ways." *Id.* at 998. It is therefore improper, as Salesforce does, to request the Court to take judicial notice of materials on the ground that those materials are incorporated by reference into the complaint.

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 6

525 F.Supp.3d 1049
United States District Court, N.D. California,
San Jose Division.

Chasom BROWN, et al., Plaintiffs,
v.
GOOGLE LLC, Defendant.

Case No. 20-CV-03664-LHK
|
Signed 03/12/2021

**Synopsis**

**Background:** Users of internet browser brought putative class action against browser provider, bringing claims of unauthorized interception under Wiretap Act, violation of California Invasion of Privacy Act (CIPA), violation of California Computer Data Access and Fraud Act (CDAFA), invasion of privacy under California constitution, and intrusion upon seclusion under California common law, arising from provider's alleged collection of data regarding websites users visited while in private browsing mode. Provider moved to dismiss for failure to state claim.

**Holdings:** The District Court, Lucy H. Koh, J., held that:

provider did not establish consent defense to users' claims;

applicable statutes of limitations began to run with each separate interception of users' data;

users adequately alleged that statutes of limitations were tolled under fraudulent concealment doctrine;

users stated claim for unauthorized interception under Wiretap Act;

users stated claim for violation of CIPA;

users stated claim for violation of CDAFA; and

users stated claims for intrusion upon seclusion and invasion of privacy.

Motion denied.

**Procedural Posture(s):** Motion to Dismiss for Failure to State a Claim.

**Attorneys and Law Firms**

***1054** John A. Yanchunis, Jean Sutton Martin, Pro Hac Vice, Olusegun Amen, Ra, Pro Hac Vice, Ryan McGee, Morgan & Morgan Complex Litigation Group, Tampa, FL, Alexander Patrick Frawley, Pro Hac Vice, Steven M. Shepard, Pro Hac Vice, William Christopher Carmody, Shawn Jonathan Rabin, Susman Godfrey LLP, New York, NY, Alexander Justin Konik, Antonio LaValle Ingram, II, Beko Osiris Ra Reblitz-Richardson, Sean Phillips Rodriguez, Hsiao C. Mao, Boies Schiller Flexner LLP, Michael Francis Ram, Morgan & Morgan Complex Litigation Group, San Francisco, CA, Amanda K. Bonn, Susman Godfrey L.L.P., Los Angeles, CA, David Boies, Boies Schiller and Flexner, Armonk, NY, James W. Lee, Rossana Baeza, Boies Schiller Flexner, Miami, FL, for Plaintiff Chasom Brown.

John A. Yanchunis, Jean Sutton Martin, Pro Hac Vice, Olusegun Amen, Ra, Pro Hac Vice, Ryan McGee, Morgan & Morgan Complex Litigation Group, Tampa, FL, Alexander Patrick Frawley, Pro Hac Vice, Steven M. Shepard, Pro Hac Vice, William Christopher Carmody, Shawn Jonathan Rabin, Susman Godfrey LLP, New York, NY, Alexander Justin Konik, Antonio LaValle Ingram, II, Beko Osiris Ra Reblitz-Richardson, Sean Phillips Rodriguez, Hsiao C. Mao, Boies Schiller Flexner LLP, San Francisco, CA, Amanda K. Bonn, Susman Godfrey L.L.P., Los Angeles, CA, David Boies, Boies Schiller and Flexner, Armonk, NY, James W. Lee, Rossana Baeza, Boies Schiller Flexner, Miami, FL, for Plaintiffs Maria Nguyen, William Byatt.

Andrew H. Schapiro, Pro Hac Vice, Quinn Emanuel Urquhart and Sullivan, LLP, Chicago, IL, Diane M. Doolittle, Thao T. Thai, Quinn Emanuel Urquhart & Sullivan, LLP, Redwood Shores, CA, Jomaire Alicia Crawford, Pro Hac Vice, Josef Teboho Ansorge, Pro Hac Vice, Quinn Emanuel Urquhart and Sullivan, LLP, New York, NY, Jonathan Sze Ming Tse, Quinn Emanuel Urquhart and Sullivan LLP, San Francisco, CA, Stephen Andrew Broome, Viola Trebicka, Quinn Emanuel Urquhart & Sullivan LLP, Los Angeles, CA, William Anthony Burck, Pro Hac Vice, Quinn Emanuel Urquhart and Sullivan, LLP, Washington, DC, for Defendant.

**ORDER DENYING MOTION TO DISMISS**

Re: Dkt. No. 82

LUCY H. KOH, United States District Judge

***1055** Plaintiffs Chasom Brown, Maria Nguyen, William Byatt, Jeremy Davis, and Christopher Castillo (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, sue Defendant Google LLC ("Google"). Before the Court is Google's motion to dismiss Plaintiffs' first amended complaint. ECF No. 82. Having considered the parties' submissions and oral arguments, the relevant law, and the record in this case, the Court DENIES Google's motion to dismiss.

## I. BACKGROUND

### A. Factual Background

Plaintiffs are Google account holders who used their browser in "private browsing mode." ECF No. 68 ("FAC") ¶ 11. Plaintiffs challenge Google's alleged collection of their data while they were in private browsing mode. *Id.* ¶ 5.

#### 1. Plaintiffs' Use of Private Browsing Mode

Plaintiffs are Google account holders who used their browser in "private browsing mode." *Id.* ¶ 11. In Google's Chrome browser ("Chrome"), private browsing mode is referred to as "Incognito mode." All Plaintiffs used Google's Chrome browser in Incognito mode. *Id.* ¶¶ 168, 173, 178, 183, 188 (stating that Plaintiffs used Chrome in Incognito mode). However, one plaintiff also used a different browser, Apple's Safari browser, in private browsing mode. *Id.* ¶ 173 (stating that Plaintiff Nguyen used Safari in private browsing mode). Furthermore, Plaintiffs seek to represent a class of users of private browsing mode without regard to the specific browser used. *Id.* ¶ 192.

Plaintiffs allege that "users of the Internet enable 'private browsing mode' for the purpose of preventing others ... from finding out what the users are viewing on the Internet." *Id.* ¶ 162. For example, users often enable private browsing mode in order to visit especially sensitive websites. *Id.* Accordingly, "users' Internet activity, while in 'private browsing mode,' may reveal: a user's dating history, a user's sexual interests and/or orientation, a user's political or religious views, a user's travel plans, a user's private plans for the future (e.g., purchasing of an engagement ring)." *Id.*

#### 2. Google's Alleged Collection of Plaintiffs' Data

Plaintiffs allege that Google collects data from them while they are in private browsing mode "through means that include Google Analytics, Google 'fingerprinting' techniques, concurrent Google applications and processes on a consumer's device, and ***1056** Google's Ad Manager." *Id.* ¶ 8. According to Plaintiffs, "[m]ore than 70% of all online publishers (websites) use one or more of these Google services."

Specifically, Plaintiffs allege that, whenever a user, including a user in private browsing mode, visits a website that is running Google Analytics or Google Ad Manager, "Google's software scripts on the website surreptitiously direct the user's browser to send a secret, separate message to Google's servers in California." *Id.* ¶ 63. This message includes six elements, each of which is discussed below.

First, Plaintiffs allege that Google collects duplicate GET requests. Whenever a user visits a webpage, his or her browser sends a message to the webpage's server, called a GET request. *Id.* The GET request "tells the website what information is being requested and then instructs the website to send the information to the user." *Id.* Accordingly, when Google obtains a duplicate GET request, the duplicate GET request "enables Google to learn exactly what content the user's browsing software was asking the website to display." *Id.* The duplicate GET request "also transmits a ... header containing the URL information of what the user has been viewing and requesting from websites online." *Id.* [1]

Second, Plaintiffs allege that Google collects the IP address of the user's connection to the Internet, which is unique to the user's device. *Id.* When a device is connected to the Internet, the Internet Service Provider (ISP) that is providing the internet connection will assign the device a unique IP address. *Id.* at 18 n.16. Although IP addresses can change over time, the ISP often continues to assign the same IP address to the same device. *Id.*

Third, Plaintiffs allege that Google collects information identifying the browser software that the user is using, including "fingerprint" data. *Id.* Because every unique device and installed application has small differences, images, digital pixels, and fonts display slightly differently for every device and application. *Id.* ¶ 100. Plaintiffs allege that, "[b]y forcing

a consumer to display one of its images, pixels, or fonts, online companies such as Google are able to 'fingerprint' their users." *Id.*

Fourth, Plaintiffs allege that Google collects user IDs issued by the website to the user. *Id.* ¶ 63. According to Plaintiffs, "Google offers an upgraded feature called 'Google Analytics User-ID,' which allows Google to map and match the user ... to a specific unique identifier that Google can track across the web." *Id.* ¶ 69. Plaintiffs allege that "[b]ecause of Google's omnipresence on the web, the use of User-IDs can be so powerful that the IDs 'identify related actions and devices and connect these seemingly independent data points.' " *Id.*

Fifth, Plaintiffs allege that Google collects the geolocation of the user. *Id.* ¶ 63. According to Plaintiffs, Google collects "geolocation data from (1) the Android operating system running on users' phones or tablets and (b) Google applications running on phones (e.g. Chrome and Maps), Google Assistant, Google Home, and other Google applications and services. *Id.* ¶ 105.

***1057** Finally, Plaintiffs allege that Google collects information contained in Google cookies, which were saved by the user's browser. *Id.* ¶ 63.[2] According to Plaintiffs, "Google Analytics contains a script that causes the user's ... browser to transmit, to Google, information from each of the Google Cookies already existing on the browser's cache." *Id.* ¶ 70. These cookies "typically show, at a minimum, the prior websites the user has viewed." *Id.* Thus, Google can obtain a user's browsing history from the current browsing session.

In addition, Plaintiffs allege that, for users using Chrome without Incognito Mode, Chrome constantly transmits "a unique digital string of characters called Google's 'X-Client-Data Header,' such that Google uniquely identifies the device and user thereafter." *Id.* ¶ 95. However, Plaintiffs allege that the X-Client Data Header is not present when a Chrome user has enabled Incognito Mode. *Id.* ¶ 96. Accordingly, Plaintiffs allege that Google is able to tell when a Chrome user has enabled Incognito Mode. *Id.* ¶ 96.

### 3. Google's Representations to Plaintiffs

Plaintiffs allege that they "reasonably believed that their data would not be collected by Google and that Google would not intercept their communications when they were in 'private browsing mode' " because of Google's representations regarding private browsing mode. *Id.* ¶ 3. Conversely, Google contends that it disclosed the alleged data collection. ECF No. 82 ("Mot.") at 5–6. Five Google documents are of particular relevance regarding Google's representations to users:[3] (1) Google's Privacy Policy; (2) Chrome's Privacy Notice; (3) a Google webpage entitled "Search & browse privately"; (4) a Google webpage entitled "How private browsing works in Chrome"; and (5) the Incognito Splash Screen. The Court discusses each document in turn.

First, Google's Privacy Policy states: "As you use our services, we want you to be clear how we're using information and the ways in which you can protect your privacy." Schapiro Decl. Exh. 1. Google's Privacy Policy states:

> Our Privacy Policy explains:
>
> • What information we collect and why we collect it.
>
> • How we use that information.
>
> • The choices we offer, including how to access and update information.

*Id.*

Google's Privacy Policy in effect from March 25, 2016 to June 28, 2016 made the following disclosures regarding Google's collection of data from users:

> We collect information about the services that you use and how you use them, like when you ... visit a website that uses our advertising services, or view and interact with our ads and content.
>
> This information includes: ... device-specific information (such as your hardware model, operating system version, ***1058** unique device identifiers, and mobile network information including phone number).
>
> When you use our services or view content provided by Google, we automatically collect and store certain information in server logs, [including] details of how you used our service, such as your search queries ... Internet protocol address ... device event information such as ... the date and time of your request and referral URL [and] cookies that may uniquely identify your browser or your Google Account.

*Id.* Subsequent versions of Google's Privacy Policy made similar disclosures.

Starting on May 25, 2018, Google's Privacy Policy made statements regarding Chrome's Incognito Mode:

> You can use our services in a variety of ways to manage your privacy. For example, you can sign up for a Google Account if you want to create and manage content like email or photos, or see more relevant search results.... You can also choose to browse the web privately using Chrome in Incognito mode. And across our services, you can adjust your privacy settings to control what we collect and how your information is used.

Schapiro Decl. Exh. 8. Subsequent versions of Google's Privacy Policy made similar statements.

Second, Google's Chrome Privacy Notice dated June 21, 2016 also made statements regarding Chrome's Incognito Mode:

> You can limit the information Chrome stores on your system by using incognito mode or guest mode. In these modes, Chrome won't store certain information, such as:
>
> • Basic browsing history information like URLs, cached paged text, or IP addresses of pages linked from the websites you visit.
>
> • Snapshots of pages that you visit ....
>
> How Chrome handles your incognito or guest information
>
> Cookies. Chrome won't share existing cookies with sites you visit in incognito or guest mode. Sites may deposit new cookies on your system while you are in these modes, but they'll only be stored and transmitted until you close the incognito or guest window.

Schapiro Decl. Exh. 17.

Third, Google's webpage entitled "Search & browse privately" makes the following statements regarding private browsing:

> You're in control of what information you share with Google when you search. To browse the web privately, you can use private browsing, sign out of your account, change your custom results settings, or delete past activity.
>
> If you want to search the web without saving your search activity to your account, you can use private browsing mode in a browser (like Chrome or Safari).
>
> How private browsing works
>
> Private browsing works differently depending on which browser you use. Browsing in private usually means:
>
> • The searches you do or sites you visit won't be saved to your device or browsing history.
>
> • Files you download or bookmarks you create might be kept on your device.
>
> • Cookies are deleted after you close your private browsing window or tab.
>
> • You might see search results and suggestions based on your location or other searches you've done during your current browsing session.

Schapiro Decl. Exh. 18.

Fourth, Google's webpage entitled "How private browsing works in Chrome" makes ***1059** the following statements regarding private browsing:

> When you browse privately, other people who use the device won't see your history ... Cookies and site data are remembered while you're browsing, but deleted when you exit Incognito mode.
>
> Your activity might still be visible.
>
> Incognito mode stops Chrome from saving your browsing activity to your local history. Your activity ... might still be visible to:
>
> • Websites you visit, including the ads and resources used on those sites
>
> • Websites you sign in to
>
> • Your employer, school, or whoever runs the network you're using
>
> • Your internet service provider
>
> • Search engines

- Search engines may show search suggestions based on your location or activity in your current Incognito browsing session.

Some of your info might still be visible.

A web service, website, search engine, or provider may be able to see:

- Your IP address, which can be used to identify your general location

- Your activity when you use a web service ....

Schapiro Decl. Exh. 19.

Fifth, when a user enables Incognito Mode in the Chrome Browser, the following "Splash Screen" is displayed to the user with similar statements regarding private browsing mode:



FAC ¶ 52.

Finally, Plaintiffs' complaint alleges that Google and its officials made additional statements regarding private browsing. For instance, Plaintiffs allege that, on September 27, 2016, Google's Director of Product Management Unni Narayana published an article in which he explained that Google was giving users "more control with incognito mode." FAC ¶ 146. The article stated the following: "Your searches are your business ... When you have incognito mode turned on in your settings, your search and browsing history will not ***1060** be saved." *Id.* ¶¶ 42, 146. Moreover, Plaintiffs allege that, on May 7, 2019, the New York Times published an opinion article written by Google's CEO, Sudar Pichai, who explained that Google focuses on "features that make privacy a reality." *Id.* ¶ 146. The article stated: "For example, we recently brought Incognito mode, the popular feature in Chrome that lets you browse the web without linking any activity to you, to YouTube." *Id.*

**B. Procedural History**

On June 2, 2020, Plaintiffs filed the instant case against Alphabet, Inc. and Google LLC. ECF No. 1. Plaintiffs bring five claims: (1) unauthorized interception under the Wiretap Act, 18 U.S.C. § 2510 *et seq.*; (2) violation of the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code §§ 631 and 632; (3) violation of the California Computer Data Access and Fraud Act ("CDAFA"), Cal. Penal Code § 502; (4) invasion of privacy; and (5) intrusion upon seclusion. FAC ¶¶ 202–266.

Plaintiffs seek to represent two classes: (1) "All Android device owners who accessed a website containing Google Analytics or Ad Manager using such a device and who were (a) in "private browsing mode" on that device's browser and (b) were not logged into their Google account on that device's browser, but whose communications, including identifying information and online browsing history, Google nevertheless intercepted, received, or collected from June 1, 2016 through the present" and (2) "All individuals with a Google account who accessed a website containing Google Analytics or Ad Manager using any non-Android device and who were (a) in "private browsing mode" in that device's browser, and (b) were not logged into their Google account on that device's browser, but whose communications, including identifying information and online browsing history, Google nevertheless intercepted, received, or collected from June 1, 2016 through the present." *Id.* ¶ 192.

On August 20, 2020, Plaintiffs and Alphabet stipulated to voluntarily dismiss Alphabet from the case without prejudice. ECF No. 51. On August 24, 2020, the Court granted the stipulation and voluntarily dismissed Alphabet, leaving Google as the only defendant. ECF No. 57.

On August 20, 2020, Google filed a motion to dismiss the complaint. ECF No. 53. On September 21, 2020, Plaintiffs filed a first amended complaint in lieu of opposing the motion to dismiss. ECF No. 68. On October 6, 2020, the Court denied as moot the motion to dismiss. ECF No. 74.

On October 21, 2020, Google filed the instant motion to dismiss the first amended complaint, ECF No. 82 ("Mot.") and a request for judicial notice, ECF No. 84. On November 18, 2020, Plaintiffs filed an opposition to Google's motion, ECF No. 87 ("Opp'n"), a response to Google's request for

judicial notice, ECF No. 88, and their own request for judicial notice, ECF No. 89. On December 7, 2020, Google filed a reply in support of its motion to dismiss, ECF No. 92 ("Reply"), and a response to Plaintiffs' response regarding Google's request for judicial notice, ECF No. 93.

The Court may take judicial notice of matters that are either "generally known within the trial court's territorial jurisdiction" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). However, to the extent any facts in documents subject to judicial notice are subject to reasonable dispute, the Court will not take judicial notice of those facts. *See Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001), *overruled on other grounds by Galbraith v. County of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002).

***1061** Google requests that the Court take judicial notice of twenty-seven documents, which include Google's Terms of Service, fifteen versions of Google's Privacy Policy, two versions of Google's Chrome Privacy Notice, and nine publicly available Google webpages. ECF No. 84. Plaintiffs request that the Court take judicial notice of Google's Privacy Policy in effect between March 31, 2020 and July 1, 2020, which is one of the fifteen versions of Google's Privacy Policy of which Google requests the Court take judicial notice. ECF No. 89. These documents appear on publicly available websites and are thus proper subjects for judicial notice. *See, e.g., In re Google Assistant Privacy Litig.*, 457 F. Supp. 3d 797, 813–14 (N.D. Cal. 2020) (taking judicial notice of Google's Terms of Service, Privacy Policy, and a Google blog post); *Matera v. Google, Inc.*, 2016 WL 5339806, at *7 (N.D. Cal. Sept. 23, 2016) (taking judicial notice of Google's Terms of Service, "various versions of Google's Privacy Policy," and a Google webpage entitled "Updates: Privacy Policy").

Plaintiffs contend that, as to six of the webpages presented by Google (Exhibits 19, 20, 22, 23, 24, and 25 to the Schapiro Declaration), Google does not identify the dates on which they became publicly available, so the Court should take judicial notice of these webpages only as to their existence on the date the webpage was last accessed. ECF No. 88 at 1. However, Google demonstrates using the Internet Archive's "Wayback Machine" that Exhibits 19 and 20 have been publicly available since August 18, 2018, and substantively identical versions of Exhibits 22 to 25 have been publicly available since March 25, 2015 (Exhibit 22); June 13, 2014 (Exhibit 23); November 12, 2012 (Exhibit 24); and January 28, 2015 (Exhibit 25). ECF No. 93 at 3–4. "Courts have taken judicial notice of the contents of web pages available through the Wayback Machine as facts that can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *See, e.g., Erickson v. Nebraska Mach. Co.*, 2015 WL 4089849, at *1 n. 1 (N.D. Cal. July 6, 2015) (taking judicial notice of websites where "Plaintiffs provided copies of current versions of these websites ... but the Internet Archive's Wayback Machine shows that the websites were substantively identical during the relevant timeframe"). Accordingly, the Court takes judicial notices of these webpages as of these dates. Thus, the Court GRANTS Google's request for judicial notice and GRANTS Plaintiffs' request for judicial notice.

Finally, at the hearing on the instant motion, Google raised for the first time arguments regarding the Court's website. *See* Tr. of Feb. 25, 2021 Hearing at 47:13–16, ECF No. 104. In its decision on the instant motion, the Court will not consider Google's untimely arguments. *See In re Apple Inc. Securities Litigation*, 2011 WL 1877988, *5 n. 6 (N.D. Cal. May 17, 2011) ("The Court is not inclined to consider this argument given that it was not briefed but rather was raised for the first time at the end of the hearing"); *White v. FedEx Corp.*, 2006 WL 618591, *2 (N.D. Cal. Mar. 13, 2006) ("The Court will not consider any arguments or evidence raised for the first time at the hearing"). Accordingly, the Court DENIES Google's motion to file an additional reply regarding the Court's website, ECF No. 112.

## II. LEGAL STANDARD

### A. Dismissal Pursuant to Federal Rule of Civil Procedure 12(b)(6)

Rule 8(a) of the Federal Rules of Civil Procedure requires a complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). A complaint that fails to meet this standard may be dismissed pursuant to ***1062** Federal Rule of Civil Procedure 12(b)(6). Rule 8(a) requires a plaintiff to plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (internal quotation marks

omitted). For purposes of ruling on a Rule 12(b)(6) motion, the Court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

The Court, however, need not accept as true allegations contradicted by judicially noticeable facts, *see Shwarz v. United States*, 234 F.3d 428, 435 (9th Cir. 2000), and it "may look beyond the plaintiff's complaint to matters of public record" without converting the Rule 12(b)(6) motion into a motion for summary judgment, *Shaw v. Hahn*, 56 F.3d 1128, 1129 n.1 (9th Cir. 1995). Nor must the Court "assume the truth of legal conclusions merely because they are cast in the form of factual allegations." *Fayer v. Vaughn*, 649 F.3d 1061, 1064 (9th Cir. 2011) (per curiam) (quoting *W. Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981)). Mere "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss." *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004).

**B. Leave to Amend**

If the Court determines that a complaint should be dismissed, it must then decide whether to grant leave to amend. Under Rule 15(a) of the Federal Rules of Civil Procedure, leave to amend "shall be freely given when justice so requires," bearing in mind "the underlying purpose of Rule 15 to facilitate decisions on the merits, rather than on the pleadings or technicalities." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (alterations and internal quotation marks omitted). When dismissing a complaint for failure to state a claim, " 'a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Id.* at 1130 (internal quotation marks omitted). Accordingly, leave to amend generally shall be denied only if allowing amendment would unduly prejudice the opposing party, cause undue delay, or be futile, or if the moving party has acted in bad faith. *Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 532 (9th Cir. 2008).

**III. DISCUSSION**

In the instant motion, Google first contends that Plaintiffs' claims should be dismissed because Plaintiffs and the websites consented to Google's receipt of the data. Mot. at 9–13. Google later argues that Plaintiffs' claims should be dismissed under the statutes of limitations. *Id.* at 23–25. Google also argues that Plaintiffs have failed to state their claims for additional reasons. *Id.* at 13–23. The Court addresses in turn: (1) consent; (2) the statutes of limitations; and (3) Google's other arguments for dismissal.

**A. Consent**

Google contends that (1) all claims should be dismissed because Plaintiffs consented ***1063** to Google's receipt of the data, and (2) Plaintiffs' Wiretap Act claims should be dismissed because the websites consented to Google's receipt of the data. *Id.* at 9–13. The Court addresses each argument in turn.

**1. Google has not shown that Plaintiffs consented.**

Consent is a defense to Plaintiffs' claims. *See* 18 U.S.C. § 2511(2)(d) (Wiretap Act) (providing that it is not "unlawful ... for a person ... to intercept a[n] ... electronic communication ... where one of the parties to the communication has given prior consent to such interception"); Cal. Pen. Code §§ 631(a), 632(a) (CIPA) (prohibiting wiretapping and eavesdropping "without the consent of all parties to the communication"); Cal. Pen. Code § 502(c)(2) (CDAFA) (providing that a person who "knowingly accesses and without permission takes, copies, or makes use of any data" is guilty of a public offense); *Smith v. Facebook, Inc.*, 262 F. Supp. 3d 943, 955–56 (N.D. Cal. 2017), *aff'd*, 745 F. App'x 8 (9th Cir. 2018) ("Plaintiff's consent ... bars their common-law tort claims and their claim for invasion of privacy under the California Constitution."). Accordingly, Google contends that Plaintiffs consented to Google's alleged data collection while they were in private browsing mode. Mot. at 10–11.

"[A]s 'the party seeking the benefit of the exception,' it is Google's burden to prove consent." *Matera v. Google Inc.*, 2016 WL 5339806, at *17. Consent "can be explicit or implied, but any consent must be actual." *In re Google, Inc.*, 2013 WL 5423918, at *12 (N.D. Cal. Sept. 26, 2013). In order for consent to be actual, the disclosures must "explicitly notify" users of the practice at issue. *Id.* at *13; *see also Campbell v. Facebook, Inc.*, 77 F. Supp. 3d 836, 847–48 (N.D. Cal. 2014) (explaining that, for a finding of consent, the disclosures must have given users notice of the "specific practice" at issue). The disclosures must have only one plausible interpretation for a finding of consent. *In re Facebook, Inc., Consumer Privacy User Profile Litig.*, 402 F. Supp. 3d 767, 794 (N.D. Cal. 2019). "[I]f a reasonable ... user could have plausibly interpreted the contract language as

not disclosing that [the defendant] would engage in particular conduct, then [the defendant] cannot obtain dismissal of a claim about that conduct (at least not based on the issue of consent)." *Id.* at 789–90.

In the instant motion, Google contends that users expressly consented to Google's alleged data collection while they were in private browsing mode. Mot. at 10–11. In *In re Google, Inc.*, this Court rejected a similar argument made by Google. 2013 WL 5423918, at *12–*14. In that case, the plaintiffs alleged that Google had intercepted their email communications over Gmail, Google's email service, in order to create user profiles and provide targeted advertising. *Id.* at *1. In Google's motion to dismiss, Google contended that the plaintiffs expressly consented to the interception of their emails and pointed to its Terms of Service and Privacy Policies. *Id.* at *13. Analyzing these policies, the Court concluded that "[n]othing in the [p]olicies suggests that Google intercepts email communication in transit between users, and in fact, the policies obscure Google's intent to engage in such interceptions." *Id.* Accordingly, the Court found that "a reasonable Gmail user who read the Privacy Policies would not have necessarily understood that her emails were being intercepted to create user profiles or to provide targeted advertisements." *Id.*

The Court rejects Google's argument in the instant case for two reasons. First, Google cannot demonstrate that Plaintiffs expressly consented because Google did not notify users that it would be engaging in the alleged data collection ***1064** while Plaintiffs were in private browsing mode. Second, as to Plaintiffs' Wiretap Act claim, consent is not a defense because Google allegedly intercepted Plaintiffs' communications for the purpose of violating other laws. The Court discusses each reason in turn.

First, Google cannot demonstrate that Google notified Plaintiffs that Google would engage in the alleged data collection while Plaintiffs were in private browsing mode. Google argues that Plaintiffs expressly consented to Google's Terms of Service, which incorporated Google's Privacy Policy, and Google's Privacy Policy disclosed that Google would receive the data from its third-party services. Mot. at 10–11. However, Google's Privacy Policy does not disclose Google's alleged data collection while Plaintiffs were in private browsing mode. Google's Privacy Policy provides:

> We collect information about the services that you use and how you use them, like when you ... visit a website that uses our advertising services, or view and interact with our ads and content.
>
> This information includes: ... device-specific information (such as your hardware model, operating system version, unique device identifiers, and mobile network information including phone number.
>
> When you use our services or view content provided by Google, we automatically collect and store certain information in server logs, [including] details of how you used our service, such as your search queries ... Internet protocol address ... device event information such as ... the date and time of your request and referral URL [and] cookies that may uniquely identify your browser or your Google Account.

Schapiro Decl. Exh. 1. This general disclosure never mentions private browsing. Nor does it explain that Google collects this data from users in private browsing mode. Google's Privacy Policy states:

> Our Privacy Policy explains:
>
> • What information we collect and why we collect it.
>
> • How we use that information.
>
> • The choices we offer, including how to access and update information.

*Id.* Accordingly, a Google user reading the general disclosure above, which never mentions private browsing mode, might have reasonably concluded that Google does not collect this data from users in private browsing mode.

In addition to Google's failure to mention private browsing, Google's representations regarding private browsing present private browsing as a way that users can manage their privacy and omit Google as an entity that can view users' activity while in private browsing mode. The Court addresses in turn five documents that contain Google's representations regarding private browsing: (1) the Incognito Splash Screen; (2) the "How private browsing works in Chrome" webpage; (3) the "Search and browse privately" webpage; (4) the Chrome Privacy Notice; and (5) Google's Privacy Policy.

First, the Incognito Splash Screen appeared to every user each time they enabled Incognito mode, immediately before they began their private browsing session:

***1065**



The Incognito Splash Screen makes three relevant representations regarding private browsing mode. One, the Incognito Splash Screen omits Google from the list of entities that can view a user's activity in private browsing mode: "Your activity might still be visible to: Websites you visit[;] Your employer or school[;] Your internet service provider." FAC ¶ 52. Although the Splash Screen states that websites may be able to see a user's activity, the Splash Screen does not state that Google sees a user's activity. *Id.* Based on the omission of Google from the list of entities that can see a user's activity, a user might have reasonably concluded that Google would not see his or her activity. Moreover, the omission of Google from the list of entities "obscure[s] Google's intent to engage in such interceptions." 2013 WL 5423918, at *13.

Two, the Incognito Splash Screen states: "Now you can browse privately, and other people who use this device won't see your activity[.]" FAC ¶ 52. According to Google, this sentence clarifies that Incognito mode is about privacy from other users of the same device, not privacy from Google. Specifically, Google reads the second phrase of this sentence ("other people who use this device won't see your activity") to provide more specification to the first phrase ("Now you can browse privately."). FAC ¶ 52. However, the Court concludes that a reasonable user could have read the two phrases as being independent of each other: "Now you can browse privately, *and* other people who use this device won't see your activity[.]" *Id.* (emphasis added). Accordingly, a reasonable user could have read this sentence to state that Incognito mode provided privacy from Google and privacy from other people who use the same device.

Three, the Incognito Splash Screen states "Chrome won't save ... [y]our browsing history [or] [c]ookies and site data." *Id.* Google argues that this sentence is accurate because, when Google collects the alleged data, Chrome is not storing the data; rather, the user's browser is transmitting the data to Google's server. However, the Court concludes that a reasonable user could read this statement to mean that their browsing history and cookies and site data would not be saved. Moreover, the Court notes that a user might reasonably associate Chrome with ***1066** Google because Chrome is Google's browser.

Second, like the Incognito Splash Screen, the Google webpage entitled "How private browsing works in Chrome" omits Google from the entities to which a user's private browsing activity may be visible. That webpage discloses that a user's private browsing activity might be visible to "websites [she] visit[s], *including the ads and resources used on those sites.*" Schapiro Decl. Exh. 19 (emphasis added). However, this webpage never references Google.

Third, Google's webpage entitled "Search & browse privately" states: "You're in control of what information you share with Google when you search. To browse the web privately, you can use private browsing ...." Schapiro Decl. Exh. 18. However, Plaintiffs allege that, in reality, users are not in control of what information they share with Google when they use private browsing mode. Rather, Google engages in the alleged data collection regardless of whether users are in private browsing mode.

Fourth, Google's Chrome Privacy Notice dated June 21, 2016 similarly stated that: "You can limit the information Chrome stores on your system by using incognito mode or guest mode. In these modes, Chrome won't store certain information, such as: ... Basic browsing history information like URLs, cached paged text, or IP addresses of pages linked from the websites you visit [and] Snapshots of pages that you visit ...." Schapiro Decl. Exh. 17. As with the Incognito Splash Screen, a reasonable user could read this statement to mean that their browsing history and IP address would not be saved.

Fifth, since May 25, 2018, Google's Privacy Policy has presented Incognito mode as a way that users can control the information that Google collects: "You can use our services in a variety of ways to manage your privacy. For example, ... You can ... choose to browse the web privately using Chrome in Incognito mode. And across our services, you can adjust your privacy settings to control what we collect and how your information is used." Schapiro Decl. Exh. 8. Google's Privacy Policy makes clear that "Our services include ... Products that are integrated into third-party apps and sites, like ads ...." *Id.* However, Plaintiffs allege that, in reality, private browsing

does not permit them to manage their privacy or control what Google collects because Google collects this information even when they use private browsing mode.

In addition, Plaintiffs' complaint alleges that Google and its officials made additional statements regarding private browsing. For instance, Plaintiffs allege that, on September 27, 2016, Google's Director of Product Management Unni Narayana published an article in which he explained that Google was giving users "more control with incognito mode." FAC ¶ 146. The article stated the following: "Your searches are your business ... When you have incognito mode turned on in your settings, your search and browsing history will not be saved." *Id.* ¶¶ 42, 146. Moreover, Plaintiffs allege that, on May 7, 2019, the New York Times published an opinion article written by Google's CEO, Sudar Pichai, who explained that Google focuses on "features that make privacy a reality." *Id.* ¶ 146. The article stated: "For example, we recently brought Incognito mode, the popular feature in Chrome that lets you browse the web without linking any activity to you, to YouTube." *Id.* These statements suggest that a user's activity in private browsing mode is not saved or linked to the user.

Reviewing these disclosures, the Court concludes that Google did not notify users that Google engages in the alleged data collection while the user is in private ***1067** browsing mode. Accordingly, Google cannot show that Plaintiffs expressly consented to Google's collection of data while Plaintiffs were in private browsing mode. *See In re Google*, 2013 WL 5423918, at *13 (rejecting Google's argument that users expressly consented because Google did not notify users of the alleged interceptions).

Second, as to Plaintiffs' Wiretap Act claim, consent is not a defense where the "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C. § 2511(2)(d). Under this exception, Plaintiffs must allege that either the "primary motivation or a determining factor in [the interceptor's] actions has been to injure plaintiffs tortiously." *In re Google Inc., Gmail Litig.*, 2014 WL 1102660, at *18 n.13 (N.D. Cal. Mar. 18, 2014) (quoting *In re DoubleClick Inc. Privacy Litig.*, 154 F. Supp. 2d 497, 518 (S.D.N.Y. 2001)).

In the instant case, Plaintiffs have alleged that Google intercepted their communications for the purpose of associating their data with preexisting user profiles. FAC ¶¶ 91, 93, 115, 160–64. The association of Plaintiffs' data with preexisting user profiles is a further use of Plaintiffs' data that satisfies this exception. *See Planned Parenthood Fed'n of Am., Inc., v. Ctr. for Med. Progress*, 214 F. Supp. 3d 808, 828 (N.D. Cal. 2016) (holding that "defendants' subsequent disclosures of the contents of the intercepted conversations for the alleged purpose of further invading the privacy of plaintiffs' staff satisfies" the exception). Indeed, Plaintiffs have adequately alleged that Google's association of their data with preexisting user profiles violated state law, including CDAFA, intrusion upon seclusion, and invasion of privacy. *See* Sections III(C)(3), III(C)(4), *infra*. Accordingly, consent is not a defense to Plaintiffs' Wiretap Act claims. Thus, the Court rejects Google's argument that Plaintiffs consented to the alleged data collection.

**2. Google has not shown that the websites consented.**

Google next contends that Plaintiffs' Wiretap Act claims should be dismissed because the websites provided implied consent to Google's receipt of the data. Mot. at 11–13. The Wiretap Act provides an exception to liability where "one of the parties to the communication has given prior consent to such interception." 18 U.S.C. § 2511(2)(d). Accordingly, Google contends that the websites impliedly consented to Google's alleged data collection by embedding Google's code on their webpages. Mot. at 11–13.

"[A]s 'the party seeking the benefit of the exception,' it is Google's burden to prove consent." *Matera v. Google Inc.*, 2016 WL 5339806, at *17. "Courts have cautioned that implied consent applies only in a narrow set of cases." *In re Google*, 2013 WL 5423918, at *12 (rejecting Google's argument that users had given implied consent, immunizing Google from liability under the Wiretap Act). "The critical question with respect to implied consent is whether the parties whose communications were intercepted had adequate notice of the interception." *Id.* "Moreover, consent is not an all-or-nothing proposition." *Id.* "Rather, '[a] party may consent to the interception of only part of a communication or to the interception of only a subset of its communications.' " *Id.* (quoting *In re Pharmatrak, Inc.*, 329 F.3d 9, 19 (1st Cir. 2003)). "Thus, 'a reviewing court must inquire into the dimensions of the consent and then ascertain whether the interception exceeded those boundaries.' " *Pharmatrak*, 329 F.3d at 19 (quotation omitted).

***1068** Google argues that the websites provided implied consent to Google's interception. Mot at. 11. In making this

argument, Google cites two twenty-year-old district court cases regarding DoubleClick (now known as Google Ad Manager), a service which was purchased by websites to gather users' data for advertising purposes. *See Chance v. Avenue A*, 165 F. Supp. 2d 1153, 1160–62 (W.D. Wash. 2001); *In re DoubleClick Inc. Privacy Litig.*, 154 F. Supp. 2d 497, 509–11 (S.D.N.Y. 2001). Both district courts concluded that the websites impliedly consented to DoubleClick's interception of their communications with users by installing DoubleClick's code on their websites. *Id.* However, courts have distinguished these cases where "the circumstances permit no reasonable inference that the [entities] did consent." *See, e.g., Pharmatrak*, 329 F.3d at 20.

Google contends that, like the websites in *In re DoubleClick* and *Avenue A*, the websites in the instant case provided implied consent to Google's interception by installing Google's code on their website. Mot at. 11. According to Plaintiffs, the presence of Google's code on the website causes Plaintiffs' browsers to send a duplicate GET request to Google's servers. FAC ¶ 63.

However, the Court concludes that Google has not met its burden to establish consent because, even assuming that Google has established that websites generally consented to the interception of their communications with users, Google does not demonstrate that websites consented to, or even knew about, the interception of their communications with users who were in private browsing mode. Indeed, Google's own resources for "[s]ite or app owners using Google Analytics" state that "[t]he Google privacy policy & principles describes how we treat personal information when you use Google's products and services, including Google Analytics." Schapiro Decl. Exh. 21. Similarly, Google represents to consumers and websites that use Google Ad Manager that Google will adhere to Google's Privacy Policy. FAC ¶ 83.

As the Court explained above, neither Google's Privacy Policy nor any other disclosure to which Google points states that Google engages in the alleged data collection while users are in private browsing mode. *See* Section III(A)(1), *supra.* To the contrary, Google's disclosures present private browsing as a way users can manage their privacy and omits Google from the list of entities to which a user's private browsing activity may be visible. *Id.* Thus, Google has not provided evidence that websites consented to, or even knew about, the interception of the subset of their communications that are with users who were in a private browsing mode. *See Pharmatrak*, 329 F.3d at 19 (explaining that "[a] party may consent to ... the interception of only a subset of its communications"). Accordingly, Google cannot show implied consent on the part of the websites. [4]

Furthermore, as explained above, consent is not a defense to Plaintiffs' Wiretap Act claim because their communications were allegedly intercepted for the purpose of associating their data with user profiles, which is a criminal or tortious act in violation of the Constitution or laws of the United States or of any State. *See* Section III(A)(1), *supra.* The Court thus rejects Google's consent-based arguments.

***1069 B. Statutes of Limitations**

Google next argues that Plaintiffs' complaint should be dismissed because each of Plaintiffs' claims exceed the applicable statutes of limitations. Mot. at 23–25. "A claim may be dismissed under Rule 12(b)(6) on the ground that it is barred by the applicable statute of limitations only when 'the running of the statute is apparent on the face of the complaint.' " *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 969 (9th Cir. 2010) (quoting *Huynh v. Chase Manhattan Bank*, 465 F.3d 992, 997 (9th Cir. 2006)). "[A] complaint cannot be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts that would establish the timeliness of the claim." *Id.* (quoting *Supermail Cargo, Inc. v. United States*, 68 F.3d 1204, 1206 (9th Cir. 1995)).

Each of Plaintiffs' claims has a limitations period of between one and three years. Specifically, the statute of limitations for Plaintiffs' Wiretap Act claim is "two years after the date upon which the claimant first has a reasonable opportunity to discover the violation." 18 U.S.C. § 2520(e). "Under the CIPA, the applicable statute of limitations is one year." *Brodsky v. Apple, Inc.*, 445 F. Supp. 3d 110, 134 (N.D. Cal. 2020). The statute of limitations for Plaintiffs' CDAFA claim is "three years of the date of the act complained of, or the date of the discovery of the damage, whatever is later." Cal. Pen. Code § 502(e)(5). The statute of limitations for Plaintiffs' intrusion upon seclusion and invasion of privacy claims is two years. *See* Cal. Civ. Proc. Code § 335.1 (setting a two year limitations period); *Cain v. State Farm Mut. Auto. Ins. Co.*, 62 Cal. App. 3d 310, 313, 132 Cal.Rptr. 860 (1976) (providing that Section 335.1, formally codified as Section 340, contains the statute of limitations for invasion of privacy claims); *accord Quan v. Smithkline Beecham Corp.*, 149 F. App'x 668, 670 (9th Cir. 2005) (stating that, as of 2003, invasion of privacy is subject to a two year limitations period).

Google contends that Plaintiffs' claims are barred by the applicable statutes of limitations because Plaintiffs allege that Google has been intercepting their communications since June 1, 2016—over four years before Plaintiffs filed their complaint on June 2, 2020. Mot. at 23. The Court concludes that Plaintiffs' complaint is timely for two reasons. First, each interception is a separate violation, and Plaintiffs allege that Google intercepted their communications between February 28, 2020 and May 31, 2020, just months or weeks before Plaintiffs' complaint was filed. Second, the fraudulent concealment doctrine tolled the statutes of limitations. The Court addresses each issue in turn.

**1. Each interception is a separate violation.**

First, the Ninth Circuit and California Supreme Court have held that separate, recurring invasions of the same right each trigger their own separate statute of limitations. The Ninth Circuit has held that, for Wiretap Act claims, "each interception is a discrete violation" with its own statute of limitations. *Bliss v. CoreCivic, Inc.*, 978 F.3d 1144, 1148 (9th Cir. 2020). In coming to this conclusion, the Ninth Circuit relied on the Wiretap Act's "multiple references to 'communication' in the singular," which showed that there was "no textual basis for morphing what otherwise would be considered separate violations into a single violation because they flow from a common practice or scheme." *Id.* The Ninth Circuit's reasoning applies to Plaintiffs' other claims, which also refer to "communication" or "act" in the singular. *See* Cal. Penal Code §§ 631(a) (prohibiting the unauthorized interception of "any message, report or communication"); *id.* § 632(a) (prohibiting the interception of a ***1070** "confidential communication"); Cal. Penal Code § 502(e)(5) (stating that the statute of limitations is three years from "the date of the act complained of, or the date of the discovery of the damage, whichever is later"). Furthermore, the California Supreme Court "ha[s] long settled that separate, recurring invasions of the same right can each trigger their own statute of limitations." *Aryeh v. Canon Business Solutions, Inc.*, 55 Cal.4th 1185, 151 Cal.Rptr.3d 827, 292 P.3d 871, 880 (2013).

In the instant case, Plaintiffs allege that Google engaged in interceptions of their communications between February 28, 2020 and May 31, 2020. FAC ¶¶ 168, 173, 178, 183, 188. Plaintiffs filed their complaint on June 2, 2020. ECF No. 1. Because Google's alleged interceptions took place just months or days before Plaintiffs filed their complaint, Plaintiffs' claims are not barred by the statutes of limitations.

**2. The statutes of limitations were tolled by the fraudulent concealment doctrine.**

"The purpose of the fraudulent concealment doctrine is to prevent a defendant from 'concealing a fraud ... until such a time as the party committing the fraud could plead the statute of limitations to protect it.' " *In re Animation Workers Antitrust Litig.*, 123 F. Supp. 3d 1175, 1194 (N.D. Cal. 2015) (quoting *Bailey v. Glover*, 88 U.S. (21 Wall.) 342, 349, 22 L.Ed. 636 (1874)). "A statute of limitations may be tolled if the defendant fraudulently concealed the existence of a cause of action in such a way that the plaintiff, acting as a reasonable person, did not know of its existence." *Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1060 (9th Cir. 2012). The plaintiff bears the burden of pleading fraudulent concealment. *In re Animation Workers*, 123 F. Supp. 3d at 1194. Fraudulent concealment must be pled with particularity. *Id.* "However, 'it is generally inappropriate to resolve the fact-intensive allegations of fraudulent concealment at the motion to dismiss stage.' " *Id.* (quoting *In re Rubber Chemicals Antitrust Litig.*, 504 F. Supp. 2d 777, 789 (N.D. Cal. 2007)).

"To plead fraudulent concealment, the plaintiff must allege that: (1) the defendant took affirmative acts to mislead the plaintiff; (2) the plaintiff did not have 'actual or constructive knowledge of the facts giving rise to its claim'; and (3) the plaintiff acted diligently in trying to uncover the facts giving rise to its claim." *Id.* (quoting *Hexcel*, 681 F.3d at 1060). The Court addresses each requirement in turn.

First, Plaintiffs have alleged that Google took affirmative acts to mislead Plaintiffs. As explained above, Google's representations regarding private browsing specifically omitted Google from the entities that could see a user's private browsing activity and presented private browsing as a way that users could maintain their privacy and control what Google collects. *See* Section III(A)(1), *supra.* Accordingly, Google's representations regarding private browsing "obscure[d] Google's intent to engage in such interceptions." *In re Google*, 2013 WL 5423918, at *13. Furthermore, Google's representations were "misleading partial disclosure[s]," which support the application of the fraudulent concealment doctrine. *In re Animation Workers*, 123 F. Supp. 3d at 1203.

Second, Plaintiffs have alleged that they did not have adequate or constructive notice of their claims. "[T]he question of constructive knowledge and inquiry notice generally 'presents a question for the trier of fact.' " *In re Animation Workers*, 123 F. Supp. 3d at 1205. As explained above, Google's representations could have led a reasonable user to conclude that Google was not collecting this data. *See* Section III(A)(1), *supra*. Accordingly, "[a]t this ***1071** stage, the Court is not persuaded that [Plaintiffs] were on inquiry notice of their claims as a matter of law." *In re Animation Workers*, 123 F. Supp. 3d at 1205.

Finally, Plaintiffs have alleged that they acted diligently in trying to uncover the facts giving rise to their claim. "[C]ourts have 'been hesitant to dismiss an otherwise fraudulently concealed antitrust claim for failure to sufficiently allege due diligence.' " *In re Animation Workers*, 123 F. Supp. 3d at 1205 (quoting *In re Magnesium Oxide Antitrust Litig.*, 2011 WL 5008090, at *24 (D.N.J. Oct. 20, 2011)). Google contends that Plaintiffs were not diligent because they failed to "tak[e] Google up on its offer on page 1 of [Google's] Privacy Policy to 'contact us' 'if you have any questions' about Google's practices." Reply at 15 (quoting Schapiro Decl. Exh. 1). That argument "puts the cart before the horse, however, as Plaintiffs were not obligated to investigate their claims until Plaintiffs had reason to suspect the existence of their claims." *In re Animation Workers*, 123 F. Supp. 3d at 1204. Thus, the Court concludes that Plaintiffs have adequately alleged that Plaintiffs' claims were tolled under the fraudulent concealment doctrine.

Because each of Google's interception is a separate violation and because the statutes of limitations were tolled under the fraudulent concealment doctrine, the Court DENIES Google's motion to dismiss Plaintiffs' claims based on the statutes of limitations.

**C. Other Arguments for Dismissal**

Finally, Google makes additional arguments that Plaintiffs have failed to state each of their claims. Mot. at 13–23. The Court addresses the following claims in turn: (1) unauthorized interception under the Wiretap Act; (2) CIPA; (3) CDAFA; and (4) intrusion upon seclusion and invasion of privacy.

**1. Plaintiffs have stated a claim for unauthorized interception under the Wiretap Act.**

The Wiretap Act, as amended by the Electronic Communications Privacy Act ("ECPA"), generally prohibits the interception of "wire, oral, or electronic communications." 18 U.S.C. § 2511(1). Specifically, the Wiretap Act provides a private right of action against any person who "intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication." 18 U.S.C. § 2511(1)(a); *see id.* § 2520 (providing a private right of action for violations of § 2511). The Act defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." *Id.* § 2510(4).

Plaintiffs allege that Google violated the Wiretap Act by intercepting internet communications that Plaintiffs were sending and receiving while they were browsing the internet in private browsing mode. FAC ¶¶ 206, 207, 208. Google contends that Plaintiffs have not stated a Wiretap Act claim because its alleged interceptions fall within the Wiretap Act's ordinary course of business exception to liability. Mot. at 13–14. Under that exception, "any telephone or telegraph instrument, equipment or facility, or any component thereof ... being used by a provider of wire or electronic communication service in the ordinary course of its business" is not a "device," and the use of such an instrument accordingly falls outside of the definition of "intercept." 18 U.S.C. § 2510(5)(a)(ii).

However, Google's argument is unpersuasive for two reasons. First, Google has not shown that its interception facilitates or is incidental to the transmission of the ***1072** communication at issue. Second, Plaintiffs have alleged that Google violated its own internal policies. The Court addresses each reason in turn.

First, Google has not shown that its interception facilitates or is incidental to the transmission of the communication at issue. "[T]he ordinary course of business exception is narrow .... and offers protection from liability only where an electronic communication service provider's interception facilitates the transmission of *the communication at issue* or is incidental to the transmission of such communication." *In re Google*, 2013 WL 5423918, at *8 (emphasis added); *see also S.D. v. Hytto Ltd.*, 2019 Wl 8333519, at *9 (N.D. Cal. May 15, 2019) (holding that the ordinary course of business exception must be construed "narrowly" and rejecting the exception as to the defendant because the defendant "failed to

explain why it would be difficult or impossible to provide its service without the objected-to-interception").

In the instant case, Plaintiffs allege that, whenever a user visits a website, his or her browser sends a GET request to the website's server, which "tells the website what information is being requested and then instructs the website to send the information to the user." FAC ¶ 63. Plaintiffs further allege that Google's code causes the user's browser to send a duplicate GET request from the user's computer to Google's servers, which "enables Google to learn exactly what content the user's browsing software was asking the website to display" and "transmits a ... header containing the URL information of what the user has been viewing and requesting from websites online." *Id.* ¶¶ 63, 65. Sending a duplicate GET request to Google neither facilitates nor is incidental to the transmission of "the communication at issue," which is the communication that Plaintiffs allege was intercepted — in this case, the communication between the user's computer and the website. *In re Google*, 2013 WL 5423918, at *8.

In an attempt to refute this conclusion, Google contends that the ordinary course of business exception applies because there is a "nexus between the need to engage in the alleged interception and ... the ability to provide the underlying service or good." *In re Google*, 2013 WL 5423918, at *11. In making this argument, Google contends that the " 'underlying service or good' ... in this case is [Google's] analytics and ad services," not the communication between the user's computer and the website. Mot. at 13. However, "the communication at issue" is the allegedly intercepted communication, which, in this case, is the communication between the user's computer and the website. *In re Google*, 2013 WL 5423918, at *8. The communication between the user's computer and Google is an unrelated communication. Google's argument to the contrary would vastly expand the ordinary course of business exception by permitting electronic communication services to claim that an interception is in the ordinary course of business when it facilitates another, unrelated communication. This Court has already rejected a similar attempt by Google to expand the ordinary course of business exception beyond its narrow scope. *See In re Google*, 2013 WL 5423918, at *11 (rejecting Google's argument that its interceptions of users' Gmail communications to benefit its advertising business fell within the ordinary course of business exception).

Second, the ordinary course of business exception does not apply because Plaintiffs have alleged that Google violated its own internal policies. As this Court explained in *In re Google*, "Plaintiffs' allegations that Google violated Google's own agreements and internal policies with regard to privacy also preclude application of the ordinary course of business exception." ***1073** 2013 WL 5423918, at *8. In the instant case, Plaintiffs similarly allege that Google violated its own internal policies with regard to privacy. *See, e.g.*, FAC ¶¶ 42 (Google's statements regarding private browsing), 45 (Privacy Policy), 48 ("Search & browse privately" webpage), 52 (Incognito Splash Screen). Accordingly, the interceptions at issue here do not fall within the ordinary course of business exception, and Plaintiffs have stated a Wiretap Act claim. Thus, the Court DENIES Google's motion to dismiss Plaintiffs' Wiretap Act claim.

**2. Plaintiffs have stated a CIPA claim.**

Plaintiffs bring claims under Sections 631 and 632 of the CIPA. Section 631 prohibits the unauthorized interception of "any message, report or communication." *See* Cal. Penal Code § 631(a). Section 632 prohibits the interception of any "confidential communication." *Id.* § 632(a). Google does not argue that the Section 631 claim is subject to dismissal, except based on the consent arguments that the Court has addressed above. *See* Section III(A), *supra*.

Instead, Google contends that Plaintiffs cannot state a Section 632 claim because the communications at issue in this case were not confidential. Mot. at 14–15. A communication is confidential under Section 632 if a party "has an objectively reasonable expectation that the conversation is not being overheard or recorded." *Flanagan v. Flanagan*, 27 Cal.4th 766, 117 Cal.Rptr.2d 574, 41 P.3d 575, 582 (2002). The plaintiff need not show an "additional belief that the information would not be divulged at a later time to third parties." *Mirkarimi v. Nevada Prop. 1 LLC*, 2013 WL 3761530, at *2 (S.D. Cal. July 15, 2013). Rather, the plaintiff only needs to show a reasonable "expectation that the conversation was not being simultaneously disseminated to an unannounced second observer." *Id.*

In arguing that the communications in the instant case were not confidential, Google relies on authority stemming from California appellate courts. "California appeals courts have generally found that Internet-based communications are not 'confidential' within the meaning of [S]ection 632, because such communications can easily be shared by ... the recipient(s) of the communications." *Campbell v. Facebook,*

*Inc.*, 77 F. Supp. 3d 836, 849 (N.D. Cal. 2014). For example, in *People v. Nakai*, the California Court of Appeals held that a defendant's Yahoo instant messages with a decoy, who was posing as a 12-year-old girl, were not confidential. 183 Cal. App. 4th 499, 518–19, 107 Cal.Rptr.3d 402 (2010). The court concluded that, although the defendant intended for the communication between himself and the recipient to be kept confidential, he could not reasonably expect that the communications would not be recorded. *Id.* at 518, 107 Cal.Rptr.3d 402. The court came to this conclusion for four reasons. First, Yahoo's policies "indicated that chat dialogues may be shared for the purpose of investigating or preventing illegal activities." *Id.* Second, Yahoo "warn[ed] users that chat dialogues can be 'archive[d], print[ed], and save[d].' " *Id.* Third, "[c]omputers that are connected to the internet are capable of instantaneously sending writings and photographs to thousands of people." *Id.* Finally, the defendant expressed concern that the recipient's mother would view the messages. *Id.*

Relying on *Nakai*, some cases have held that other Internet messaging services or emails are not confidential under Section 632. For example, in *In re Google*, this Court concluded that email communications were not confidential under Section 632 because "email services are by their very nature recorded on the computer of at least the recipient, who may then easily transmit the communication to anyone else who has access to the internet or print the communications." 2013 WL 5423918 at *23. Similarly, in *Campbell v. Facebook, Inc.*, another court in this district held that ***1074** Facebook messenger messages were not confidential under Section 632 because they could be shared by the recipients of the communications. 77 F. Supp. 3d at 849. Subsequently, in *Cline v. Reetz-Laiolo*, another court in this district concluded that "emails and other electronic messages" were not confidential communications under Section 632. 329 F. Supp. 3d 1000, 1051–52 (N.D. Cal. 2018).

However, the instant case is distinguishable from this line of authority for two reasons. First, unlike *Nakai*, *In re Google*, or *Campbell*, the instant case does not involve messages going to another person, who could share the communication with others. Rather, the instant case involves a user's own private browsing session. According to Plaintiffs, "users of the Internet enable 'private browsing mode' for the purpose of preventing others ... from finding out what the users are viewing on the Internet." FAC ¶ 162. For example, users often enable private browsing mode in order to visit especially sensitive websites, which could reveal "a user's dating history, a user's sexual interests and/or orientation, a user's political or religious views, a user's travel plans, a user's private plans for the future (e.g., purchasing of an engagement ring)." *Id.* Accordingly, Plaintiffs in the instant case could have had a reasonable expectation that their private browsing communications were not being disseminated.

Second, unlike *Nakai*, where Yahoo's policies disclosed that the messages could be shared, Google's policies did not indicate that data would be collected from users in private browsing mode and shared with Google. *See* Section III(A)(1), *supra*. Because the Court concludes that *Nakai* and *In re Google* are distinguishable from the instant case, the Court concludes that the communications at issue in this case were confidential. [5] Accordingly, the Court DENIES Google's motion to dismiss Plaintiffs' CIPA claim.

### 3. Plaintiffs have stated a CDAFA claim.

CDAFA [6] imposes liability on any person who "[k]nowingly accesses and without permission takes, copies, or makes use of any data from a computer, computer system, or computer network, or takes or copies any supporting documentation, whether existing or residing internal or external to a computer, computer system, or computer network." Cal. Penal Code § 502(c)(2).

Plaintiffs allege that Google violated CDAFA "by knowingly accessing and without permission taking, copying, analyzing, and using Plaintiffs' and Class members' data." FAC ¶ 232. Google contends that this claim should be dismissed because Plaintiffs fail to plausibly allege that Google's Analytics and Ad Manager code circumvented any barrier for Google to receive the data. Mot. at 16. [7]

***1075** However, courts have held that plaintiffs can state a CDAFA claim where a software system "was designed in such a way to render ineffective any barriers that [the plaintiffs] must wish to use to prevent access to their information." *Brodsky v. Apple, Inc.*, 2019 WL 4141936, at *9 (N.D. Cal. Aug. 30, 2019); *see also In re Carrier IQ*, 78 F. Supp. 3d 1051, 1101 (N.D. Cal. 2015). Indeed, courts have concluded that there is "no reason to distinguish between methods of circumvention built into a software system to render barriers ineffective and those which respond to barriers after they have been imposed." *In re Carrier IQ*, 78 F. Supp. 3d at 1101 (quotation omitted).

For example, another court in this district concluded that the plaintiffs had stated a CDAFA claim about "hidden" software that transmitted data without notice and without providing an opportunity to opt out of its functionality. *See In re Carrier IQ*, 78 F. Supp. 3d 1051, 1101 (N.D. Cal. 2015). The court concluded that this software "would effectively render any 'technical or code based' barrier implemented by the Plaintiffs ineffective." *Id.* Accordingly, the court concluded that the plaintiffs had stated a CDAFA claim. *Id.*

Similarly, Plaintiffs have adequately alleged a CDAFA claim in the instant case because Plaintiffs allege that Google's Analytics and Ad Manager core would render ineffective any barrier that Plaintiffs implemented. Specifically, Plaintiffs allege that Google's hidden code, like the software at issue in *In re Carrier Q*, transmitted data without notice while they were in private browsing mode. FAC ¶ 63 (describing how Google's hidden code directs the user's browser to send a duplicate request to Google). Furthermore, Plaintiffs allege that there was no opportunity to opt out of Google's hidden code, as was the case in *In re Carrier Q*. Thus, like the software at issue in *In re Carrier Q*, Google's hidden code would render ineffective any barrier Plaintiffs wished to use to prevent the transmission of their data. Accordingly, Plaintiffs have adequately stated a CDAFA claim, and the Court DENIES Google's motion to dismiss this claim.

### 4. Plaintiffs have stated claims for intrusion upon seclusion and invasion of privacy.

"To state a claim for intrusion upon seclusion under California common law, a plaintiff must plead that (1) a defendant 'intentionally intrude[d] into a place, conversation, or matter as to which the plaintiff has a reasonable expectation of privacy[,]' and (2) the intrusion 'occur[red] in a manner highly offensive to a reasonable person." *Facebook Tracking*, 956 F.3d at 601 (quoting *Hernandez v. Hillsides, Inc.*, 47 Cal. 4th 272, 286, 97 Cal.Rptr.3d 274, 211 P.3d 1063 (2009)). "A claim for invasion of privacy under the California Constitution involves similar elements. Plaintiffs must show that (1) they possess a legally protected privacy interest, (2) they maintain a reasonable expectation of privacy, and (3) the intrusion is 'so serious ... as to constitute an egregious breach of the social norms' such that the breach is 'highly offensive.' " *Id.* (quoting ***1076** *Hernandez*, 47 Cal. 4th at 287, 97 Cal.Rptr.3d 274, 211 P.3d 1063). "Because of the similarity of the tests, courts consider the claims together and ask whether: (1) there exists a reasonable expectation of privacy, and (2) the intrusion was highly offensive." *Id.* The Court addresses each element in turn.

#### a. Plaintiffs have adequately alleged that they had a reasonable expectation of privacy.

To meet the first element, the plaintiff must have had an "objectively reasonable expectation of seclusion or solitude in the place, conversation, or data source." *Shulman v. Group W. Prods., Inc.*, 18 Cal. 4th 200, 231, 74 Cal.Rptr.2d 843, 955 P.2d 469 (1998). "[T]he relevant question here is whether a user would reasonably expect that [Google] would have access to the ... data." *Facebook Tracking*, 956 F.3d at 602.

In *Facebook Tracking*, the Ninth Circuit considered whether the plaintiffs, who were Facebook users, had adequately pleaded that they had a reasonable expectation of privacy. *Id.* at 602. Like the instant case, *Facebook Tracking* concerned GET requests that were sent from Facebook users' browsers to Facebook after they had logged out of Facebook. *Id.* at 601. Like Google, Facebook allegedly received copies of GET requests that users sent to third-party websites because Facebook's embedded code caused the users' browses to generate copies of the GET requests and transmit them to Facebook. *Compare id.* at 607 *with* FAC ¶ 63.

The Ninth Circuit concluded that the plaintiffs had adequately pleaded that they had a reasonable expectation of privacy based on: (1) the amount of the data collected, the sensitivity of the data collected, and the nature of the data collection, and (2) Facebook's representations to users. *Facebook Tracking*, 956 F.3d at 602. The Court discusses each issue in turn.

The Ninth Circuit assessed the amount of the data collected, the sensitivity of the data collected, and the nature of the data collection. *Id.* at 603. The Ninth Circuit concluded that "the amount of data allegedly collected was significant"; Plaintiffs alleged that "Facebook obtained a comprehensive browsing history of an individual" and "then correlated that history with the time of day and other user actions on the websites visited," resulting in "an enormous amount of individualized data." *Id.* Additionally, the Ninth Circuit emphasized that some of the alleged data collected was sensitive, such as information about a user's visits to sensitive websites. *Id.* Finally, the Ninth Circuit found it significant "[t]hat this amount of information can be easily collected without user knowledge." *Id.*

In addition, the Ninth Circuit examined Facebook's representations to users. *Id.* According to the Ninth Circuit, "Plaintiffs ... plausibly alleged that an individual reading Facebook's promise to 'make important privacy disclosures' could have reasonably concluded that the basics of Facebook's tracking—when, why, and how it tracks user information—would be provided." *Id.* However, "Facebook's privacy disclosures at the time allegedly failed to acknowledge its tracking of logged-out users, suggesting that users' information would not be tracked." *Id.* Accordingly, "Plaintiffs ... plausibly alleged that, upon reading Facebook's statements in the applicable Data Use Policy, a user might assume that only logged-in user data would be collected." *Id.*

Other cases have come to similar conclusions. For example, in *Google Cookie*, the Third Circuit considered whether the plaintiffs had stated intrusion upon seclusion and invasion of privacy claims under California law. 806 F.3d 125, 149 (3d. Cir. 2015). That case concerned Google's placement of cookies on the browsers of users who had enabled cookie blockers. ***1077** *Id.* at 132. The Third Circuit concluded that the plaintiffs had a reasonable expectation of privacy based on "how Google accomplished its tracking," which involved "overriding the plaintiffs' cookie blockers, while concurrently announcing in its Privacy Policy that internet users could 'reset your browser to refuse all cookies.' " *Id.* at 151.

Similarly, in *In re Nickelodeon Consumer Privacy Litigation*, the Third Circuit considered whether the plaintiffs had stated a claim for intrusion upon seclusion under New Jersey law. 827 F.3d 262, 293–94 (3d. Cir. 2016). The plaintiffs alleged that Nickelodeon had placed cookies on users' browsers despite promising that it would not collect information from the users of its website. *Id.* The Third Circuit held that users had a reasonable expectation of privacy when Nickelodeon promised that it would not collect information from users of its website, but then did. *Id.*

In the instant case, Court concludes that Plaintiffs have adequately alleged that they had a reasonable expectation of privacy in the data allegedly collected for two reasons. First, the amount of data collected, the sensitivity of the data collected, and the nature of the data collection demonstrate that Plaintiffs have a reasonable expectation of privacy. Second, based on Google's representations regarding private browsing, Plaintiffs could have reasonably assumed that Google would not receive their data while they were in private browsing mode. The Court discusses each reason in turn.

First, Plaintiffs have adequately alleged that they had a reasonable expectation of privacy based on the amount of data collected, the sensitivity of the data collected, and the nature of the data collection. Indeed, the instant case involves the same data and the same process by which the data was collected as *Facebook Tracking*. *Compare id.* at 607 (describing how Facebook's code directs the user's browser to copy the referrer header and sends a duplicate request to Facebook) *with* FAC ¶ 63 (describing how Google's code directs the user's browser to send a duplicate request to Google). Even Google acknowledges the similarities between the two cases. *See* Tr. of Feb. 25, 2021 Hearing at 9:16–21, ECF No. 104 (The Court: "Let me ask Google's counsel, do you agree that the data [at] issue in this case is the same as the data at issue in *Facebook Tracking* like Plaintiffs' counsel just said?" Counsel: "Yes, much of the -- I would say yes, most of the data, probably all of it, is the same if we take [Plaintiffs] at their word for what we've just heard from [Plaintiff's counsel].").

The amount of data collected, the sensitivity of the data collected, and the nature of the data collection demonstrate that Plaintiffs had a reasonable expectation of privacy. Like in *Facebook Tracking*, Plaintiffs allege that the amount of data collected was vast. *See* FAC ¶ 8 (alleging that "[m]ore than 70% of all online publishers (websites) use one or more of [the] Google services" that collect data); *id.* ¶ 93 (alleging that "Google has gained a complete, cradle-to-grave profile of users"). Moreover, Plaintiffs' allegations regarding the sensitivity of the data collected are arguably even stronger in the instant case than in *Facebook Tracking*. Indeed, the instant case concerns data collected by users in private browsing mode, which users often enable in order to visit especially sensitive websites. *Id.* ¶ 162 ("Users of the Internet enable 'private browsing mode' for the purpose of preventing others ... from finding out what the users are viewing on the Internet. For example, users' Internet activity, while in 'private browsing mode,' may reveal: a user's dating history, a user's sexual interests and/or orientation, a user's political or religious views, a user's travel plans, a user's private plans for the ***1078** future (e.g., purchasing of an engagement ring)."). Finally, like in *Facebook Tracking*, Plaintiffs allege that a vast amount of data was collected secretly, without any notice to users. *Id.* ¶¶ 63 (describing how "Google's software scripts on the website surreptitiously direct the user's browser to send a secret, separate message to Google's servers"); 87 (describing how "Google's secret Javascript code" causes duplicate GET requests to be sent).

Second, like the plaintiffs in *Facebook Tracking*, Plaintiffs in the instant case could have reasonably assumed that Google would not receive their data while they were in private browsing mode based on Google's representations. Since May 25, 2018, Google's Privacy Policy itself has presented private browsing as a way that users can manage their privacy: "You can use our services in a variety of ways to manage your privacy. For example, ... [y]ou can ... choose to browse the web privately using Chrome in Incognito mode. And across our services, you can adjust your privacy settings to control what we collect and how your information is used." Schapiro Decl. Exh. 8. Similarly, the Incognito Splash Screen states: "You've gone incognito[.] Now you can browse privately, and other people who use this device won't see your activity[.]" FAC ¶ 52. Furthermore, on the Incognito Splash Screen and in other webpages, Google discloses that a user's activity in private browsing might be visible to certain entities, but Google does not identify itself as an entity to which a user's activity might be visible. Schapiro Decl. Exh. 19; FAC ¶ 52.

Despite the similarities between *Facebook Tracking* and the instant case, Google attempts to distinguish *Facebook Tracking* on two grounds. First, Google contends that Plaintiffs in the instant case consented to the alleged data collection. Second, Google contends that Plaintiffs have not adequately alleged that Google is associating data with personal profiles. Both arguments are unpersuasive.

First, Google contends that, unlike the plaintiffs in *Facebook Tracking*, Plaintiffs in the instant case consented to the alleged data collection. However, as the Court explained above, Plaintiffs did not consent to the alleged data collection. *See* Section III(A)(1), *supra*. Rather than disclosing the alleged data collection to users, Google made representations that could suggest to a reasonable user that the data would not be shared with Google while the user was in private browsing mode. *Id.*

Second, Google argues that, unlike in *Facebook Tracking*, Plaintiffs here have not adequately alleged that Google is associating data with personal profiles. However, like the Plaintiffs in *Facebook Tracking*, Plaintiffs have alleged that Google "obtained a comprehensive browsing history of an individual, no matter how sensitive the websites visited." 956 F.3d at 603. Indeed, Plaintiffs' complaint includes a section titled "Google Creates a User Profile on Each Individual." *See* FAC ¶ 92. That section alleges that "Google has gained a complete, cradle-to-grave profile of users." *Id.* ¶ 93. As to data gathered from users in private browsing mode, Plaintiffs allege that "[i]n many cases, Google is able to associate the data collected from users in 'private browsing mode' with specific and unique user profiles through Google Analytics User-ID. Google does this by making use of a combination of the unique identifier of the user it collects from Websites, and Google Cookies that it collects across the internet on the same user." *Id.* Plaintiffs also allege that Google supplements its profiles with the X-Client Data Header, fingerprinting techniques, system data, and geolocation data. *Id.* ¶¶ 94–112. Accordingly, Google's arguments are unpersuasive. Thus, Plaintiffs have alleged that ***1079** they have a reasonable expectation of privacy in their data.

**b. Plaintiffs have adequately alleged that the alleged intrusion was highly offensive.**

"Determining whether a defendant's actions were 'highly offensive to a reasonable person' requires a holistic consideration of factors such as the likelihood of serious harm to the victim, the degree and setting of the intrusion, the intruder's motives and objectives, and whether countervailing interests or social norms render the intrusion inoffensive." *Facebook Tracking*, 956 F.3d at 606 (quoting *Hernandez*, 47 Cal. 4th at 287, 97 Cal.Rptr.3d 274, 211 P.3d 1063). "While analysis of a reasonable expectation of privacy primarily focuses on the nature of the intrusion, the highly offensive analysis focuses on the degree to which the intrusion is unacceptable as a matter of public policy." *Id.* (citing *Hernandez*, 47 Cal. 4th at 287, 97 Cal.Rptr.3d 274, 211 P.3d 1063).

In *Facebook Tracking*, the Ninth Circuit held that "[t]he ultimate question of whether Facebook's tracking and collection practices could highly offend a reasonable individual is an issue that cannot be resolved at the pleading stage." *Id.* Specifically, the Ninth Circuit concluded that "Plaintiffs' allegations of surreptitious data collection when individuals were not using Facebook are sufficient to survive a dismissal motion on the issue" of whether the alleged intrusion was highly offensive. *Id.* In coming to this conclusion, the Ninth Circuit emphasized that "Plaintiffs have alleged that internal Facebook communications reveal that the company's own officials recognized these practices as a problematic privacy issue." *Id.*

As explained above, Plaintiffs in this case allege that Google was surreptitiously collecting the same type of data through

the same process that was at issue in *Facebook Tracking*. *See* Section III(C)(4)(a), *supra*. Furthermore, Plaintiffs in the instant case have an even stronger argument that Google's intrusion was highly offensive because, at the time Google collected the data, they were using private browsing mode, which is often used to prevent others from learning the user's most private and personal interests. FAC ¶ 162 ("Users of the Internet enable 'private browsing mode' for the purpose of preventing others ... from finding out what the users are viewing on the Internet. For example, users' Internet activity, while in 'private browsing mode,' may reveal: a user's dating history, a user's sexual interests and/or orientation, a user's political or religious views, a user's travel plans, a user's private plans for the future (e.g., purchasing of an engagement ring).").

Moreover, as explained above, Google's representations regarding private browsing mode could have led users to assume that Google would not view their activity while in private browsing mode. *See* Section III(A)(1), *supra*. Furthermore, like the plaintiffs in *Facebook Tracking*, Plaintiffs also allege that internal Google communications show that the company's employees recognized that its privacy disclosures were problematic. FAC ¶ 36 (alleging that "Google's employees made numerous admissions in internal communications, recognizing that Google's privacy disclosures are a 'mess' with regards to obtaining 'consent' for its data collection practices and other issues relevant in this lawsuit").

Google argues that its conduct is not "highly offensive" because its interceptions "served a legitimate commercial purpose." Mot. at 22. However, whether an intrusion is highly offensive requires a holistic consideration of a multitude of factors, only one of which is the "countervailing interests ... [that] render the intrusion ***1080** inoffensive," such as the intrusion's commercial purpose. *See Facebook Tracking*, 956 F.3d at 606 (quoting *Hernandez*, 47 Cal. 4th at 287, 97 Cal.Rptr.3d 274, 211 P.3d 1063). Recognizing this, the Ninth and Third Circuits have concluded that plaintiffs had sufficiently alleged that similar intrusions to the one at issue in the instant case are highly offensive. *See id.* (holding that the plaintiffs had sufficiently alleged that Facebook's collection of duplicate copies of GET requests from users who were signed out was highly offensive); *Google Cookie*, 806 F.3d at 150 (concluding that the plaintiffs had sufficiently alleged that Google's practice of circumventing cookie blockers was highly offensive). Indeed, in *Google Cookie*, the Third Circuit rejected a similar argument by Google. 806 F.3d at 150. Although Google argued that "tracking cookies are routine," the court concluded that "[b]ased on the pled facts, a reasonable factfinder could indeed deem Google's conduct 'highly offensive.' " *Id.* at 150–51. The Court comes to the same conclusion in the instant case.

Thus, Plaintiffs have alleged sufficient facts to survive a motion to dismiss on the issue of whether the intrusion was highly offensive. Accordingly, Plaintiffs have stated intrusion upon seclusion and invasion of privacy claims. Therefore, the Court DENIES Google's motion to dismiss these claims.

## IV. CONCLUSION

For the foregoing reasons, the Court DENIES Google's motion to dismiss.

**IT IS SO ORDERED.**

**All Citations**

525 F.Supp.3d 1049

## Footnotes

1 Other courts have similarly described the process by which duplicate GET requests are sent to servers. *See In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589, 607 (9th Cir. 2020) (describing process by which Facebook's embedded code caused a user's browser to transmit a duplicate GET request to Facebook) [hereinafter "*Facebook Tracking*"]; *In re Google Cookie Placement Consumer Privacy Litigation*, 806 F.3d 125, 130 (3d. Cir. 2015) (describing process by which Google received duplicate GET requests) [hereinafter "*Google Cookie*"].

2 Cookies are "small text files stored on the user's device." *Facebook Tracking*, 956 F.3d at 596. Cookies allow third-party companies like Google "to keep track of and monitor an individual user's web activity over every website on which these companies inject ads." *Google Cookie*, 806 F.3d at 131.

3 At the hearing on Google's motion to dismiss, the Court asked the parties to identify the key documents for this motion. Tr. of Feb. 25, 2021 Hearing at 12:23–13:03, ECF No. 104. The parties directed the Court's attention to eight documents, five of which are relevant to the representations Google made to users regarding private browsing and data collection. *Id.* at 15:10–14. Accordingly, the Court focuses on these documents.

4 Plaintiffs allege that, after they filed the instant case, Google launched a "Consent Mode" for Google Analytics and Google Ad Manager, "which would help Websites identify whether a particular user ... knows and has consented to the use of Google Analytics and other Google services, in 'Beta' or testing mode." FAC ¶¶ 73, 140.

5 Google also cites *Revitch v. New Moosejaw, LLC*, where another court in this district held that "clicks" on clothing items were not confidential communications. 2019 WL 5485330, at *2 (N.D. Cal. Oct. 23, 2019). However, in coming to that conclusion, the court relied exclusively upon the same line of authority discussed above regarding messages and emails. *Id.* This Court finds that line of authority to be distinguishable from the private browsing sessions involved in the instant case for the reasons explained above.

6 The CDAFA is also sometimes referred to as the California Computer Crime Law (CCCL). *See Brodsky*, 445 F. Supp. 3d at 131 ("The CCCL is also sometimes referred as the California Comprehensive Computer Data Access and Fraud Act and abbreviated as 'CDAFA.' ").

7 In response to Google's argument, Plaintiffs argue that there is no circumvention requirement. In making this argument, Plaintiffs rely on the Ninth Circuit's decision in *United States v. Christensen*, which concluded that the "term 'access' as defined in the [CDAFA] includes logging into a database with a valid password and subsequently taking, copying, or using the information in the database improperly. Otherwise, the words 'without permission' would be redundant, since by definition hackers lack permission to access a database." 828 F.3d 763, 789 (9th Cir. 2015). However, *Christensen* did not conclude that a barrier need not be circumvented. Rather, *Christensen* held that CDAFA "does not require *unauthorized* access." *Id.* (emphasis in original). Accordingly, *Christensen* still required that a barrier be circumvented—the barrier in that case was a system of password protection.

End of Document © 2023 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 7

2023 WL 3316766
Only the Westlaw citation is currently available.
United States District Court, N.D. California.

Jane DOE, Plaintiff,
v.
REGENTS OF the UNIVERSITY OF CALIFORNIA, Defendant.

Case No. 23-cv-00598-WHO
|
Signed May 6, 2023
|
Filed May 8, 2023

**Synopsis**

**Background:** Patient at university medical center filed putative class action alleging that University of California's regents violated California Invasion of Privacy Act (CIPA), Confidentiality of Medical Information Act (CMIA), and right to privacy under California law, breached express or implied contract, and was liable for unjust enrichment because of its use of tracking technology on medical center's website and online patient portal. Regents moved to dismiss.

**Holdings:** The District Court, William H. Orrick, J., held that:

regents were immune from civil liability under CIPA;

center was not subject to CMIA provision governing businesses organized for purpose of maintaining medical information;

patient was not required to plead specific medical information that center allegedly disclosed in order to state CMIA claim;

patient pled plausible CMIA claims;

patient pled plausible common law intrusion upon seclusion claim;

center's "Notice of Privacy Practices" and patient bill of rights did not constitute express contract to safeguard patient's personal medical information; and

patient pled plausible claim for breach of implied contract.

Motion granted in part and denied in part.

**Procedural Posture(s):** Motion to Dismiss for Failure to State a Claim.

**Attorneys and Law Firms**

James Matthew Wagstaffe, Frank H. Busch, Wagstaffe, Von Loewenfeldt, Busch & Radwick LLP, San Francisco, CA, Amanda Grace Fiorilla, Pro Hac Vice, Christian Levis, Pro Hac Vice, Rachel Isabel Kesten, Pro Hac Vice, Lowey Dannenberg, P.C., White Plains, NY, for Plaintiff.

Teresa Carey Chow, Alexander Vitruk, Baker & Hostetler LLP, Los Angeles, CA, James Morrison, Pro Hac Vice, Baker & Hostetler LLP, Seattle, WA, Paul G. Karlsgodt, Pro Hac Vice, Baker Hostetler, LLP, Denver, CO, for Defendant.

## ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS

Re: Dkt. No. 3

WILLIAM H. ORRICK, United States District Judge

## INTRODUCTION

*1 Plaintiff Jane Doe alleges that the Regents of the University of California ("UC Regents") violated the California Invasion of Privacy Act ("CIPA"), Confidentiality of Medical Information Act ("CIMA"), and right to privacy under the California Constitution and the common law, breached an express or implied contract, and is liable for unjust enrichment because of its use of a tracking technology called the Meta Pixel. UC Regents moves to dismiss, asserting that as a public entity it is immune from liability for several of plaintiff's causes of action and contending that plaintiff failed to state claim for each of the remaining causes of action.

On some claims—CIPA, privacy under the California Constitution, and those based upon an implied-in-law or quasi-contract theory—UC Regents is immune as a public entity. It is also not liable under CMIA § 56.06 because it is not a business that maintains medical information. Those claims are dismissed with prejudice. Plaintiff has not sufficiently alleged the existence of an express contract, so I will give her the opportunity to amend that claim.

The remaining claims are sufficiently pleaded and will survive: plaintiff has stated a common law privacy claim and US Regents is a healthcare provider subject to §§ 56.10 and 56.101 of the CMIA. The motion to dismiss will be GRANTED in part and DENIED in part.

## BACKGROUND

Doe's Complaint makes the following allegations, which I accept as true for purposes of the motion to dismiss. The UC Regents university system is a corporation endowed by the California Constitution. Compl. ¶¶ 1, 18. It operates the nation's largest academic health system, including University of California San Francisco Medical Center ("UCSF"). *Id.* UC Regents provides UCSF patients with an online patient portal, MyChart, through which patients can message their health care providers, refill prescriptions, pay bills, and view appointment information. ¶ 24. UC Regents incorporates a tracking technology called the Meta Pixel, provided by Meta Platforms, Inc. ("Meta"), on both the UCSF website and the MyChart patient portal. Compl. ¶ 4.

The Meta Pixel is a snippet of code that, when embedded on a third-party website, tracks a user's activity as the user navigates the website. As soon as a user takes any action on a webpage that includes the Meta Pixel, the code embedded in the page re-directs the content of the user's communication to Meta while the exchange of the communication between the user and website provider is still occurring. Compl. ¶ 39. In this manner, the Meta Pixel intercepts the pages a user visits, the buttons they click, and some information they input or search and transmits that information, along with the user's IP address, to Meta. Compl. ¶ 30. Meta has multiple means of associating the data it collects through the Meta Pixel with a user's Facebook account. Compl. ¶¶ 41-43. Meta then uses this information to provide targeted advertisements to the Facebook user and to train its algorithms to more accurately identify and target users. Compl. ¶ 46.

***2** Plaintiff is a UCSF patient who used the same email address to sign up for both MyChart and Facebook accounts. Compl. ¶¶ 54-55. Plaintiff entered data relating to her heart issues and high blood pressure in MyChart and later received advertisements on Facebook, including at least one advertisement relating to high blood pressure medication. Compl. ¶¶ 55-56. Plaintiff alleges that UC Regents intentionally incorporated Meta Pixel on the UCSF website and password protected MyChart portal, disclosing and allowing Meta to intercept plaintiff's and class members' data, including highly sensitive medical information. Compl. ¶ 31.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). A claim is facially plausible when the plaintiff pleads facts that "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citation omitted). There must be "more than a sheer possibility that a defendant has acted unlawfully." *Id.* While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 570, 127 S.Ct. 1955.

In deciding whether a claim has been stated upon which relief can be granted, the court accepts all factual allegations as true and draws all reasonable inferences in favor of the plaintiff. *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). "[A]llegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences," however, need not he "accept[ed] as true." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (internal quotation omitted).

If the court dismisses a complaint, it "should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (quoting *Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995)). In making this determination, the court should consider factors such as "the presence or absence of undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party and futility of the proposed amendment." *Moore v. Kayport Package Express*, 885 F.2d 531, 538 (9th Cir. 1989) (citing *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)).

## DISCUSSION

### I. California Invasion of Privacy Act

Plaintiff alleges that UC Regents violated Cal. Pen Code § 631, the California Invasion of Privacy Act ("CIPA"), by aiding Meta in misappropriating her private medical information. "When interpreting state law, federal courts are bound by decisions of the state's highest court. In the absence of such a decision, a federal court must predict how the highest state court would decide the issue using intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements as guidance." *PSM Holding Corp. v. Nat'l Farm Fin. Corp.*, 884 F.3d 812, 820 (9th Cir. 2018) (internal quotation and citations omitted).

UC Regents raises two arguments concerning its liability under CIPA. First, it argues that it is immune from suit under CIPA because it is a public entity. Second, it contends that embedding Meta's technology on its website did not constitute aiding, agreeing with, employing, and conspiring with Meta to carry out the wrongful conduct alleged, which would preclude liability under Cal. Pen Code § 631(a)(4).

***3** By its text, CIPA applies to "[p]ersons." Cal. Pen Code § 631(a). "Persons" is further defined as "an individual, business association, partnership, corporation, limited liability company, or other legal entity" or "an individual acting or purporting to act for or on behalf of any government or subdivision thereof, whether federal, state, or local." Cal. Pen Code § 632(b). Plaintiff contends that UC Regents meets this definition because it is registered as a corporation under California law. Not so. As she recognizes in her complaint, UC Regents was endowed by the California Constitution and is therefore a public entity.

The California Supreme Court has not ruled whether public entities are immune from civil liability under CIPA. [1] Plaintiff argues that CIPA only expressly excludes public utilities from liability, and therefore applies to any other type of entity. But the California Supreme Court has endorsed the opposite assumption with respect to liability for public entities. "[A]bsent express words to the contrary, governmental agencies are not included within the general words of a statute." *Wells v. One2One Learning Foundation*, 39 Cal. 4th 1164, 1192, 48 Cal.Rptr.3d 108, 141 P.3d 225 (2006). [2] In *Wells*, the public entities at issue were school districts. *Id.* Because the text of CIPA does not expressly include liability for public entities, I find that UC Regents is immune from liability under CIPA. UC Regents also contends that plaintiff has not pleaded facts sufficient to show that UC Regents had the requisite intent for claim of aiding and abetting. Because I find that UC Regents is immune from liability under CIPA, I do not reach this question. Accordingly, the motion to dismiss the first claim for relief is GRANTED with prejudice.

### II. Confidentiality of Medical Information Act

Plaintiff alleges that UC Regents violated three separate sections of the California Confidentiality of Medical Information Act ("CMIA"): Cal. Civ. §§ 56.10, 56.06, and 56.101. I address each section below.

#### A. CMIA § 56.06

In a footnote, UC Regents contends it is immune from liability under § 56.06 because it is not a "business." Plaintiff counters, also in a footnote, that UCSF is a business because it provides services for money. The statute states, in pertinent part, that:

> [a]ny business organized for the purpose of maintaining medical information in order to make the information available to an individual or to a provider of health care at the request of the individual or a provider of health care, for purposes of allowing the individual to manage his or her information, or for the diagnosis and treatment of the individual, shall be deemed to be a provider of health care subject to the requirements of this part.

***4** Cal Civ. § 56.06 (emphasis added). The statute goes on to state that "[a]ny business described in this section shall maintain the same standards of confidentiality required of a provider of health care with respect to medical information disclosed to the business."

It is undisputed that UCSF is a provider of healthcare and is therefore subject to the requirements of CMIA §§ 56.10 and 56.101. But § 56.06 imposes liability on an additional category of entities: businesses that act as intermediaries, maintaining medical information for transmission between patients and providers. The section also applies to "[a]ny business that offers software or hardware to consumers,

including a mobile application or other related device that is designed to maintain medical information in order to make the information available to an individual or a provider of health care." Cal. Civ. Code § 56.06(b). It would be redundant for this subsection to apply to health care providers, who are already subject to the same liability in other subsections of the statute. The parties have not cited, nor have I located, any cases imposing liability on a healthcare provider for violation of § 56.06(b). Accordingly, the motion to dismiss the fourth claim for relief is GRANTED with prejudice.

**B. CMIA §§ 56.10 and 56.101**

UC Regents also challenges the sufficiency of Plaintiff's pleading as to each of her CMIA claims. While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 570, 127 S.Ct. 1955.

Section 56.10 states, in pertinent part, that "[n]o provider of health care ... shall disclose medical information regarding a patient of the provider of health care ... without first obtaining an authorization ...." Section 56.101 of the CMIA states, in pertinent part, that "[a]ny provider of health care ... who negligently creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall be subject to the remedies and penalties ..." Cal. Civ. Code §§ 56.10, 56.101. UC Regents claims that plaintiff should have pleaded "[f]acts showing what *specific* medical information was entered by Plaintiff .... [and] which of that alleged medical information actually was transmitted to Meta and in what form." Mot. at 7:7-13. It also contends that plaintiff must plead facts showing how data from the patient portal could be matched to her Facebook profile.

At the motion to dismiss stage, it is not necessary for plaintiff to provide more specific medical details. She pleaded that she entered medical information, including information relating to her heart issues and high blood pressure, into the patient portal. She alleges that UC Regents intentionally incorporated Meta Pixel on the UCSF website and password protected MyChart portal, disclosing and allowing Meta to intercept her and class members' data, including highly sensitive medical information. She stated that after she entered her information into UCSF's patient portal, she began receiving advertisements on Facebook for high blood pressure medication as well as targeted email advertisements relating to the same. She further alleged that she used the same email address to register for both her MyChart and her Facebook account, which provides a plausible means by which her information could be matched to her Facebook profile.

*5 UC Regents responds that even if plaintiff has alleged that the information was transferred to Meta, she has not sufficiently alleged that it was *viewed* by an authorized party. This challenge fails because plaintiff has alleged that Meta acted upon the information transmitted to it by tailoring advertisements to her based on her medical condition. This is sufficient to raise a plausible claim that her medical information was inappropriately accessed. To require more would place the burden on her to describe UC Regents' technical systems without the benefit of discovery. *See Reichman v. Poshmark, Inc.*, 267 F. Supp. 3d 1278, 1286 (S.D. Cal. 2017).

Finally, UC Regents argues that plaintiff's receipt of advertising related to her conditions does not plausibly show that anything she did on the UCSF Health website caused this. This is so, they claim, because the Meta Pixel is present on 6.7 million websites, and she may have received those advertisements due to having visited another website, such as WebMD, and entered her private medical information there. Plausibility pleading does not require a plaintiff to foreclose every other avenue by which she could have been harmed, much less when it would involve cataloging 6.7 million websites that she may or may not have visited. She simply must plead facts that raise more than a sheer possibility that the defendant has acted unlawfully. She has done so here. Accordingly, UC Regents' motion to dismiss the fifth and sixth claims for relief is DENIED.

**III. Constitutional and Common Law Privacy**

**A. Public entity liability under Article I, Section 1 of California Constitution**

UC Regents contends that public entities cannot be held liable for damages for an alleged privacy claim under the California Constitution and seeks that I dismiss plaintiff's entire constitutional privacy claim pursuant to Rule 12(b)(6) because her claim is not cognizable under California law. UC Regents contends that this is true because she does not seek an injunction, but only money damages. She counters that a motion to dismiss is not the proper vehicle for striking a prayer for relief. *See Castle v. Gomez*, No. 221CV06212JVSMAR, 2022 WL 4540523, at *8 (C.D. Cal. Aug. 9, 2022). She also cites analogous cases where public entities have been subject to claims for monetary relief under

the California Constitution where injunctive relief was not a sufficient remedy. *See Doe v. Beard*, 63 F. Supp. 3d 1159, 1171 (C.D. Cal. 2014).

Article 1, Section 1 of the California Constitution prohibits the government from violating a citizen's right to privacy. Citizens can seek to enjoin the government from violating that right but cannot seek damages. *See Clausing v. San Francisco Unified School District*, 221 Cal. App. 3d 1224, 1238, 271 Cal.Rptr. 72 (1990) (finding no error in the trial court's decision to sustain the demurrer to appellants' constitutional invasion of privacy claim, where appellants sought damages and injunctive relief). Because plaintiff lacks a cognizable claim for a privacy violation under the California Constitution, UC Regents' motion to dismiss the third claim for relief is GRANTED. But this analysis does not apply to plaintiff's claim for a common law violation of privacy.

**B. Common law privacy claim**

Claims for invasion of privacy under the California Constitution and common law intrusion both require that: "(1) there exists a reasonable expectation of privacy, and (2) the intrusion was highly offensive." *Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 601 (9th Cir. 2020). UC Regents contends that plaintiff's privacy claims should be dismissed because she fails to establish that her specific personal information was transmitted or intercepted by Meta, and therefore fails to allege that a highly offensive intrusion occurred.

*6 For the reasons discussed above, I find that plaintiff has sufficiently alleged that her information was transmitted to Meta through the Meta Pixel. UC Regents goes on to cite a case for the proposition that an intrusion upon seclusion claim should be dismissed where the information collected (physical tracking, the name of plaintiff's bank, and phone applications plaintiff used) was "not highly offensive." Mot. at 18:18-21 (citing *Hammerling v. Google LLC*, No. 21-cv-09004-CRB, 2022 WL 17365255, at **8-9 (N.D. Cal. Dec. 1, 2022)). That case is inapposite here. Personal medical information is understood to be among the most sensitive information that could be collected about a person, and I see no reason to deviate from that norm. *See, e.g., Doe v. Beard*, 63 F. Supp. 3d 1159, 1169-70 (C.D. Cal. 2014). Accordingly, the motion to dismiss the second claim for relief is DENIED.

**IV. Breach of Contract**

**A. Existence of a contract**

Plaintiff contends that UC Regents' Notice of Privacy, Privacy Statement, and other public representations constitute an express or implied contract. In support of her argument, plaintiff seeks judicial notice of the UCSF Health Notice of Privacy Practices. [Dkt. No. 4] Ex. A, and Website Privacy Statement *Id.* Ex. B. Both exhibits are available publicly on the UCSF Health website, UC Regents does not contest the request, and I will take notice of them.

UC Regents argues that no contract exists. It says that (1) there was no offer and acceptance, (2) UCSF's Notice of Privacy is mandated by HIPAA and is therefore not a bargained for exchange, and (3) plaintiff does not point to specific provisions in the contract that create the obligation she claims that UC Regents breached.

**1. Express Contract**

I agree with UC Regents that there is no express contract. Plaintiff relies on *In re Solara Medical Supplies, LLC Customer Data Security Breach Litigation*, 613 F. Supp. 3d 1284 (S.D. Cal. 2020) for the proposition that a "Notice of Privacy Practices" can be form the basis for a breach of express contract claim. True enough, but in that case plaintiffs had alleged that every patient received a copy of both the Notice of Privacy Practices and Patient Bill of Rights. *In re Solara*, 613 F. Supp. 3d at 1296-97. The same is true for *In re Yahoo! Inc. Customer Data Security Breach Litigation*, where all users were required to accept the Terms of Service, and the Privacy Policy was "incorporated by reference" into those Terms of Service. No. 16-MD-02752-LHK, 2017 WL 3727318, at *44 (N.D. Cal. Aug. 30, 2017).

Here, plaintiff does not allege that she was required to read or agree to either of the documents. Instead, she alleges that they were available on the website and that she understood them to include promises by UCSF to safeguard her data. This is not sufficient to form an express contract. The motion to dismiss the seventh claim for relief is GRANTED without prejudice.

**2. Implied contract**

A plaintiff "may alternatively plead both a breach of contract claim and a quasi-contract claim, so long as [Plaintiff] pleads facts suggesting that the contract may be unenforceable or

invalid." *Beluca Ventures LLC v. Einride Aktiebolag*, No. 21-CV-06992-WHO, 2022 WL 17252589, at *4 (N.D. Cal. Nov. 28, 2022). An implied contract requires that both parties agree to its terms and have a "meeting of the minds," but the creation of an implied contract can be manifested by conduct rather than words. *Castillo v. Seagate Tech., LLC*, No. 16-CV-01958-RS, 2016 WL 9280242, at *8 (N.D. Cal. Sept. 14, 2016) (citations omitted).

Plaintiff alleges that she and other class members paid money and provided their User Data to UC Regents in exchange for services, and that she and class members would not have entrusted UC Regents with their User Data in the absence of an implied contract obligating UC Regents to safeguard that data. She states that UC Regents breached this implied contract by disclosing that information to Meta, a third party. She contends that she would not have paid, or would have paid less, for these services had she known that UCSF would disclose her data.

*7 It is plausible that the parties entered into an implied contract by their actions. The agreed upon terms of this implied contract are those spelled out in the Notice of Privacy and Privacy Statement, providing assurances. But there is another problem with this claim

**B. Availability of damages**

As a public entity, UC Regents cannot be sued under a theory of quasi-contract. *See Pasadena Live v. City of Pasadena*, 114 Cal. App. 4th 1089, 1094, 8 Cal.Rptr.3d 233 (2004) ("A public entity cannot be held liable on an implied-in-law or quasi-contract theory"). Plaintiff argues that *Pasadena Live* incorrectly broadened this rule when interpreting *Miller v. McKinnon*, which states that:

> Undoubtedly a school board, like a municipal corporation, may, under some circumstances, be held liable upon an implied contract for benefits received by it, but this rule of implied liability is applied only in those cases where the board or municipality is given the general power to contract with reference to a subject-matter, and the express contract which it has assumed to enter into in pursuance of this general power is rendered invalid for some mere irregularity or some invalidity in the execution thereof, and where the form or manner of entering into a contract is not violative of any statutory restriction upon the general power of the governing body to contract nor violative of public policy.

*Miller v. McKinnon*, 20 Cal. 2d 83, 91, 124 P.2d 34, 39 (1942) (emphasis added). But *Miller* did not suggest that public entities could normally be held liable based upon an implied contract. Instead, it allows for the possibility that the public entity believed it had entered a valid express contract that was rendered invalid by a minor irregularity. That is not this case. The motion to dismiss the eighth claim for relief is GRANTED with prejudice.

**V. Unjust enrichment**

For the same reasons discussed above, plaintiff cannot sustain a claim against UC Regents for unjust enrichment. *See, e.g., Pasadena Live v. City of Pasadena*, 114 Cal. App. 4th 1089, 1094, 8 Cal.Rptr.3d 233 (2004) ("The court sustained the demurrer to this cause of action because it was based on an oral contract. This ruling was correct. A public entity cannot be held liable on an implied-in-law or quasi-contract theory."). Accordingly, the motion to dismiss the ninth claim for relief is GRANTED with prejudice.

**CONCLUSION**

For the foregoing reasons, UC Regents' Motion to Dismiss is GRANTED in part and DENIED in part. Plaintiff may amend its contract claim by May 30, 2023.

**IT IS SO ORDERED.**

**All Citations**

--- F.Supp.3d ----, 2023 WL 3316766

## Footnotes

1 I note that there is one unpublished decision in which the California Courts of Appeal held a public entity was immune from civil liability for invasion of privacy under this statute. Given the California rules for unpublished decisions, I do not consider this case in assessing how the California Supreme Court would decide this question. Cal. Rules of Court, rule 8.1115(a).

2 *Wells* also recognized that "government agencies are excluded from the operation of general statutory provisions only if their inclusion would result in an infringement upon sovereign governmental powers. Pursuant to this principle, governmental agencies have been held subject to legislation which, by its terms, applies simply to any 'person.' " *Wells*, 39 Cal.4th at 1192, 48 Cal.Rptr.3d 108, 141 P.3d 225. (citations omitted). The premise that public entities are statutory "persons" unless their sovereign powers would be infringed is simply a maxim of statutory construction. While the "sovereign powers" principle can help resolve an unclear legislative intent, it cannot override positive indicia of a contrary legislative intent. *Id.* at 1193, 48 Cal.Rptr.3d 108, 141 P.3d 225.

End of Document

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 8

IN THE CIRCUIT COURT OF COLE COUNTY, STATE OF MISSOURI
NINETEENTH JUDICIAL CIRCUIT

| | |
|---|---|
| JOHN DOE,<br>Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>BOONE HEALTH, INC., et al<br><br>Defendants. | CASE NO. 22AC-CC07646 |

**ORDER DENYING DEFENDANTS' MOTION TO DISMISS**

Now on this date the Court takes up for consideration Defendants' Motion to Dismiss, filed on April 12, 2023. Plaintiff filed his Suggestions in Opposition on June 8, 2023. Defendants filed their Reply in Support on June 19, 2023. The matter was argued before the Court on June 22, 2023, when Mr. Jay Barnes and Mr. Foster Johnson appeared on behalf of Plaintiff, and Mr. Jason Scott appeared on behalf of Defendants. The Defendants argue that Plaintiff lacks standing and have failed to state a claim for which relief may be granted. Plaintiff argues that they have adequately pled concrete injuries and all elements of each of their causes of action, and therefore the motion to dismiss should be denied. After reviewing the pleadings and relevant case law, and hearing argument from the parties on June 22, 2023, the Court finds that Defendants' motion should be **DENIED.**

**Discussion**

The Standard for review regarding a motion to dismiss on the pleadings is as follows:

> A motion to dismiss for failure to state a cause of action is solely a test of the adequacy of the plaintiff's petition. It assumes that all of plaintiff's averments are

> true, and liberally grants to plaintiff all reasonable inferences therefrom. No attempt is made to weigh any facts alleged as to whether they are credible or persuasive. Instead, the petition is reviewed in an almost academic manner, to determine if the facts alleged meet the elements of a recognized cause of action, or of a cause that might be adopted in that case.

*State ex rel. Henley v. Bickel*, 285 S.W.3d 327, 329 (Mo. 2009). Therefore, a ruling on a motion to dismiss is confined to the face of the petition, which must be given a liberal construction. *Solberg v. Graven*, 174 S.W.3d 695, 699 (Mo. App. S.D. 2005).

**Standing**

Standing requires that a plaintiff has suffered an injury in fact. Injury in fact means that a plaintiff suffered the invasion of a legally protected interest that is "concrete and particularized," not "conjectural or hypothetical." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340-41 (2016). A bare violation of a procedural right, divorced from any concrete harm, is insufficient. *Id.* at 341. However, a "concrete" injury is not "necessarily synonymous with 'tangible.'" *Id.* at 340. An intangible injury may confer standing when that injury "has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Id.* at 341. Under Missouri law, "informational injury" and "invasion of privacy injury" are sufficient harms to constitute standing. See *Campbell v. Adeco USA, Inc.*, 561 S.W.3d 116 (Mo. App. 2018).

Here, Plaintiff has adequately pled concrete intangible and tangible injuries in fact resulting from Defendants' conduct has alleged in the complaint. Plaintiff has alleged that his and the putative Class Members' personally identifiable, health information—in which they have a traditionally recognized common law right to privacy—was transmitted to third parties without their consent. First Am. Compl. at ¶¶ 3, 27-28, 32-36, 188, 190, 306, 389. These harms include the type of "informational injury" and "invasions of privacy injury" sufficient to confer standing under Missouri law. He has further alleged that Defendants' have deprived him and the putative

Class Members of "the economic value of their sensitive medical information," *Id.* at ¶ 242, and did not receive the full benefit of their bargain with Defendants, *see id.* at ¶¶ 317, 331, 358, 389.

Plaintiff's allegations are sufficient to overcome Defendants' motion to dismiss with respect to standing.

**Missouri Computer Tampering Act**

Plaintiff has adequately stated a claim under Mo. Rev. Stat. §§ 569.095, 537.525. *See* First Am. Compl. at ¶¶ 299–321.

Defendants' assertion that, as corporations, they are not "person[s]" who may be held liable under this statute is not well taken. Section 1.020 of Missouri Revised Statutes states:

> As used in the statutory laws of this state, unless otherwise specially provided or unless plainly repugnant to the intent of the legislature or to the context thereof:
> *    *    *
> (12) The word "person" may extend and be applied to bodies politic and corporate, and to partnerships and other unincorporated associations.

Mo. R. S. § 1.020(12). Extending the term "person" in Mo. Rev. Stat §§ 569.095, 537.525 would not be repugnant to the legislative intent reflected in those statutes. To the contrary, it would be anomalous for corporations to be permitted to engage in criminal tampering of computers and related data while natural person may not.

Defendants cite *First Club Marketing LLC v. KC BBQ Soc.*, 2021 WL 5413119 (Jackson Cty. Cir. Ct. Sept. 23, 2021), a non-binding decision from a different circuit court, for the proposition that it may not be held liable for this cause of action. Defendants, however, overlook that *First Club Marketing* addressed whether *an unincorporated LLC* could be liable under the Missouri Computer Tamper Act (MCTA). The Defendants here are *corporations* subject to a different standard for establishing liability pursuant to Mo. R. S § 562.056(2). Indeed, a federal court considering this same issue held that the MCTA provides a civil cause of action against

corporations. *See LifeScience Techs, LLC v. Mercy Health*, 2022 WL 4547002, at *6 (E.D. Mo. Sept. 29, 2022). The Court here agrees with *LifeScience Tech.*

More importantly, *First Club Marketing* conflicts with *David Ranken Jr. v. Boykins*, 816 S.W.2d 189, 190 (Mo. 1991), which held that, when the term "person" is undefined in a Missouri statute, section 1.020(12), RSMo mandates that the term "person" includes corporations unless plainly repugnant to the statutory scheme. As explained above, extending the term "person" in the MCTA to include corporations is congruent with (and certainly not repugnant to) the purpose of the statute, which is to protect Missouri citizens against the unauthorized access and disclosure of their computer data.

Defendants' further contention that Plaintiffs' have failed to plead recoverable damages under § 537.525 is similarly unavailing. Section 537.525 provides for "compensatory damages, *including* any expenditures reasonably and necessarily incurred by the owner or lessee to verify that a computer system, computer network, computer program, computer service, or data was not altered, damaged, or deleted by the access." Mo. Rev. Stat § 537.525. This Court agrees with *Advanced Physical Therapy, LLC v. Apex Physical Therapy, LLC*, 2022 WL 303345, at *5 (W.D. Mo. Feb. 1, 2022), which found that "compensatory damages" in the statute includes "full compensation for past or present injuries that the plaintiff has shown by a preponderance of the evidence were caused by the defendant." The legislature's use of the term "including"—and the subsequent delineation of a specific harm that might not otherwise be recoverable—does not limit the "compensatory damages" recoverable but instead makes clear that Plaintiffs can also recover amounts expended to mitigate other types of harms. Plaintiff seeks compensatory damages and specifically alleged the types of harms that he and the Class Members suffered and that Plaintiff alleges warrant compensation. First Am. Compl. at ¶¶ 317, 319, 320, 321.

Accordingly, Defendants' motion with respect to Count I is denied.

**Breach of Fiduciary Duty of Confidentiality**

Plaintiff has also adequately stated a claim for Breach of Duty of Confidentiality. *See* First Am. Compl. at ¶¶ 322–331. More specifically, he has alleged that he and the putative Class Members were patients of Defendants, *see id.* at ¶¶ 12, 188, that Defendants owed him and the putative Class Members a duty of confidentiality, *see id.* at ¶¶ 325–28, and that Defendants breached that duty by improperly disclosing their patients' personally identifiable medical information to third parties, *see id.* ¶¶ 75, 81, 103, 108, 115, 129, 140-144, 151, 163-72, 175-88

Defendants' assertion that they owed no duty of confidentiality to Plaintiff as a matter of law is based on asserted facts that are outside of the First Amended Complaint, and therefore not properly before this Court. *See Solberg*, 174 S.W.3d at 699. Similarly, Defendants' contention that it did not breach any such duty is grounded in factual assertions that are not pled in the First Amended Complaint. The Court therefore will not consider them.

Defendant also ignores its relationship with Plaintiff, i.e. that there is a provider-patient relationship. Defendant cites no case holding that a medical provider does not have a fiduciary duty to patients. To the contrary, a consistent line of Missouri cases has held that such a duty is inherent in the provider-patient relationship. See *Brandt v. Medical Defense Assoc.*, 856 S.W.2d 667 (Mo. 1993); *Y.G. v. Jewish Hosp. of St. Louis*, 795 S.W.2d 488, 500 (Mo. App. 1990).

Taking Plaintiff's allegations as true, Plaintiff has sufficiently alleged that Boone breached its fiduciary duty of confidentiality by disclosing to third parties personally identifiable, health information, which Boone received in the course of Plaintiff and Class Members receiving treatment as patients. Defendants' motion with respect to Count II is denied.

**Implied-in-Fact Contract**

Plaintiff has also adequately stated a claim for implied-in-fact contract. *See* First Am. Compl. at ¶¶ 332–365. Plaintiff alleges that Defendants manifested an implicit promise to provide medical services, to institute reasonable measures to protect the confidentiality of his medical information, and to institute reasonable policies, procedures, and training programs to educate its employees about protecting the confidentiality of patients' personal health information. *Id.* at ¶¶ 207, 334-335, 344, 357. Plaintiff further alleges that Defendants solicited and received consideration from Plaintiff for this implicit promise, including monies paid for medical services and confidential medical information, *id.* at ¶¶ 335, 339, 340, 342, 354, and that Defendants breached the parties implied in fact agreement by transmitting personally identifiable, health information to Facebook and Google via tracking tools on its website and failing to develop policies, procedures, processes, and notices to ensure that would not happen. *Id.* at ¶¶ 357–60. Defendants' contrary arguments, which are again largely based on facts outside of the First Amended Complaint, are not persuasive.

Nor may Defendants rely on their asserted status as a "municipal corporation" to negate Plaintiff's plausible allegations. The First Amended Complaint does not contain allegations that establish that Defendants are municipal corporations who may not enter into implied-in-fact contracts pursuant to Mo. Rev. Stat. § 432.070. "The term 'municipal corporation or municipality' can vary in meaning depending on the time, place, and circumstances under which it is used." *Rail Switching Servs., Inc. v. Marquis-Missouri Terminal, LLC*, 533 S.W.3d 245, 255 (Mo. Ct. App. 2017). However, even in its broadest sense, a municipal corporation is a "*public* local corporation, exercising some function of government." *Laret Inv. Co. v. Dickmann*, 345 Mo. 449, 454, 134

S.W.2d 65, 68 (1939) (emphasis added). Defendants cite to no allegations which establish that they are "public" corporations—i.e., corporations owned by a city or county—as a matter of law.

Based on the foregoing, Defendants' motion with respect to Count III is denied.

**Unjust Enrichment**

In the alternative, Plaintiff has plausibly pled a claim for unjust enrichment. *See* First Am. Compl. at ¶¶ 366–373. Plaintiff alleges (1) that he and the putative Class Members conferred a benefit on Defendants in the form of valuable and confidential medical information, *see id.* at ¶369, (2) that Defendants retained those benefits, which it monetized by obtaining significant advertising benefits from Facebook and Google, *see id.* at 370, and (3) that, in equity and good conscience, Defendants have unjustly retained those monetary benefits, which belong to Plaintiff and the putative Class Members in equity, because Defendants obtained those benefits through a series of misrepresentations and omissions, including Defendants' promise that they would never share patient health information for marketing purposes without express written consent from patients. *Id.* at ¶¶ 200-208; 369-73. Defendants' contrary assertion that any disclosures occurred voluntarily and without expectation that such disclosures would be kept confidential is contrary to the factual allegations in the complaint which this Court must accept as true.

Finally, Defendants' argument that Plaintiff's unjust enrichment claim is precluded by his alternative claim for an implied-in-fact contract is unpersuasive. Plaintiffs' unjust enrichment claim is properly pled in the alternative. *See Steelhead Townhomes, L.L.C. v. Clearwater 2008 Note Program, LLC*, 537 S.W.3d 855, 863 (Mo. Ct. App. 2017). At this stage, Plaintiff may proceed under both legal theories. *See Murray-Kaplan v. NEC Ins., Inc.*, 617 S.W.3d 485, 497 (Mo. Ct. App. E.D. Jan. 26, 2021).

Defendants' motion with respect to Count IV is denied as well.

**Intrnsion upon Seclusion**

Plaintiff has also plausibly pled a claim for intrusion upon seclusion. *See* First Am. Compl. at ¶¶ 374–390. To state such a claim, a plaintiff must allege (1) the existence of a secret and private subject matter; (2) a right in the plaintiff to keep that subject matter private; and (3) the obtaining by the defendant of that information through unreasonable means. *Corcoran v. Southwestern Bell Telephone Co.*, 572 S.W.2d 212, 215 (Mo. Ct. App. 1978). Plaintiff has pled each of these elements by alleging that Defendants' patients had a reasonable expectation of privacy in the information that they shared with Defendants and that Defendants' obtaining that information without disclosing that they would transmit the same to third parties was unreasonable. *See* First Am. Compl. at ¶¶ 200-208; 378-381.

Defendants' contrary assertions that Plaintiff and putative Class Members had no reasonable expectation of privacy and voluntarily disclosed their medical information to Defendants is contrary to the factual allegations of the First Amended Complaint and is therefore not well taken.

Defendants' motion with respect to Count V is therefore denied.

**Identity Theft**

Finally, Plaintiff has adequately stated a claim for identity theft in violation of Mo. R. S. § 570.223, *et seq.* First Am. Compl. at ¶¶ 392–404. "A person commits the offense of identity theft if he or she knowingly and with the intent to deceive or defraud obtains, possesses, transfers, uses, or attempts to obtain, transfer or use, one or more means of identification not lawfully issued for his or her use." *Id.* at § 570.223.1. Here, Plaintiff plausibly alleges that Defendants knowingly obtained, used, and disclosed their patients' means of identification, including their names and Facebook IDs. *See* First Am. Compl. at ¶¶ 112, 115, 140, 144, 148, 162-167, 260, 313, 397.

Plaintiff further claims that Defendants "deceived Plaintiff and Class Members into providing such personally identifiable data by making a series of false representations in its privacy policies," *see id.* at ¶¶ 400–01, and sought to obtain their personally identifiable data through that deception, *see id.* at ¶ 402. This is sufficient to state an entitlement to relief under Mo. R. S. § 570.223.4.

None of Defendants' contrary arguments support dismissal. While Defendants assert that they did not transfer a means of identification, this assertion is neither based on the allegations in the First Amended Complaint nor consistent with the broad applicable definition of "means of identification." *See* Mo. Rev. Stat. § 570.010 (defining "means of identification" as "anything used by a person as a means to uniquely distinguish himself or herself."). Plaintiff's name and unique Facebook ID meet the definition of "means of identification" set forth by the statute. Similarly, Defendants urge an unduly narrow interpretation of "deceive or defraud" which is unsupported by the language of Mo. R. S. § 570.223. Defendants' assertion that Plaintiff and class members' personal medical information was "lawfully issued" to Defendants is likewise based on an unsupportable reading of Mo. Rev. Stat. § 570.223(1).

Finally, Defendants' contention that corporations like themselves are not "persons" who may be held liable under Mo. Rev. Stat. § 570.223 is untenable. As noted, *supra*, the definition of "person" in a Missouri statue includes both natural persons and incorporated and unincorporated entities, so long as such a meaning is not repugnant to the statute. Mo. R. S. § 1.020(12). Here, it is not repugnant to include corporations among the persons who may not engage in identity theft. Quite the contrary. It is not plausible that the legislature intended to allow such entities to commit identity theft without consequence. Moreover, other sections of the identity theft statute purport to exclude certain types of corporations from its reach, *see* Mo. 570.135 (excluding corporations for credit fraud). If "persons" only included natural persons, that exclusion in Sections 570.135

would be meaningless surplusage. The Court will not adopt such an interpretation. *See Wollard v. City of Kansas City*, 831 S.W.2d 200, 203 (Mo. banc 1992) ("The provisions of a legislative act must be construed and considered together and, if possible, all provisions must be harmonized and every clause given some meaning.").

Defendants' motion with respect to Count VI is also denied.

## CONCLUSION

For the foregoing reasons, it is **ORDERED, ADJUDGED AND DECREED** that Defendant's Motion to Dismiss is **DENIED**.

**IT IS SO ORDERED.**

Date: July 20, 2023

Hon. S. Cotton Walker
Circuit Court Judge, Division III

# EXHIBIT 9

FILED
KNOX COUNTY
COURT OF COMMON PLEAS
2023 AUG 25 AM 11: 07
CHRISTY MILLIGAN STATON
CLERK OF COURTS

**IN THE COURT OF COMMON PLEAS**
**KNOX COUNTY, OHIO**

RON STAKE, ET AL. :

PLAINTIFFS, :

-vs- : Case No. 23OT01-0026

KNOX COMMUNITY HOSPITAL : Judge Richard D. Wetzel

DEFENDANTS. :

KNOX COUNTY COURT OF COMMON PLEAS, MOUNT VERNON, OHIO 43050

**DECISION AND ENTRY ON DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT**

This matter is before the Court upon the Defendant's motion to dismiss Plaintiffs' first amended complaint pursuant to Civ. R. 12(B)(1) and (6). Defendant argues that the first amended complaint fails to allege sufficient facts to establish that this Court has subject matter jurisdiction over Plaintiffs' claims, and that the first amended complaint fails to state a claim upon which relief can be granted. Plaintiffs have filed a brief in opposition, and Defendant has replied.

Because "Ohio is a notice-pleading state, Ohio law does not ordinarily require a plaintiff to plead operative facts with particularity." *Cincinnati v. Beretta U.S.A. Corp.*, 95 Ohio St.3d 416, 2002-Ohio-2480, 768 N.E.2d 1136, ¶ 29; *Ogle v. Ohio Power Co.*, 180 Ohio App.3d 44, 2008-Ohio-7042, 903 N.E.2d 1284, ¶ 5 (4th Dist). Under the Ohio Rules of Civil Procedure, a complaint need only contain "a short and plain statement of the claim showing that the party is entitled to relief." Civ.R. 8(A)(1); *Beretta* at ¶ 29. Consequently, "as long as there is a set of facts, consistent with the plaintiff's complaint, which would allow the plaintiff to recover, the court may not grant a defendant's motion

KNOX COUNTY COURT OF COMMON PLEAS, MOUNT VERNON, OHIO 43050

to dismiss." *York v. Ohio State Hwy. Patrol* (1991), 60 Ohio St.3d 143, 145, 573 N.E.2d 1063.

In the case before this Court, the Court must construe the facts and all reasonable inferences of their complaint in the Plaintiffs' favor. Plaintiffs have alleged six counts in their 75 page first amended complaint, including 1) breach of duty of confidentiality (referred to as a *Biddle* claim), 2) conversion, 3) a claim for bailment, 4) unlawful interception of electronic communications pursuant to R.C. 2933.52, et seq., 5) breach of implied contract, and 6) unjust enrichment.

Defendant has moved to dismiss the first amended complaint pursuant to Civ. R. 12(B)(1) and (6). Plaintiffs have opposed the motion to dismiss the counts alleging unlawful interception of electronic communications (the "wiretap claim") and the *Biddle* claim. Plaintiffs have elected not to oppose the motion to dismiss the claims for conversion, breach of implied contract, and unjust enrichment (Plaintiffs' Opposition, fn2, p.14). Plaintiffs did not brief in opposition to the motion to dismiss the claim for bailment.

**Civil Rule 12(B)(1)**

Defendant's motion to dismiss pursuant to Civ. R. 12(B)(1) argues that the Plaintiffs have failed to establish subject matter jurisdiction for two reasons: (1) Plaintiffs fail to state a concrete, actual harm suffered from any alleged conduct by Defendant and (2) at best, Plaintiffs attempt to allege the possibility of future injury, which is insufficient for this Court to invoke subject matter jurisdiction. (Def. Motion, at 4).

In *Menorah Park Ctr. for Senior Living v. Rolston*, 164 Ohio St. 3d 400, 2020-Ohio-6658, 173 N.E.3d 432, 2020 Ohio LEXIS 2719, 2020 WL 7346097, the Ohio

KNOX COUNTY COURT OF COMMON PLEAS, MOUNT VERNON, OHIO 43050

Supreme Court held: "We continue to recognize a common-law cause of action by a medical patient for the unauthorized, unprivileged disclosure by a medical provider to a third party of the patient's nonpublic medical information." See *Biddle*, 86 Ohio St.3d 395, 1999- Ohio 115, 715 N.E.2d 518.

R.C. 2933.65 provides for a private right of action for misuse of electronic communications:

> (A) A person whose wire, oral, or electronic communications are intercepted, disclosed, or intentionally used in violation of sections 2933.51 to 2933.66 of the Revised Code may bring a civil action to recover from the person or entity that engaged in the violation any relief that may be appropriate and that includes, but is not limited to, the following:
> (1) The preliminary and other equitable or declaratory relief that is appropriate;
> (2) Whichever of the following is greater:
> (a) Liquidated damages computed at a rate of two hundred dollars per day for each day of violation or liquidated damages of ten thousand dollars, whichever is greater;
> (b) The sum of actual damages suffered by the plaintiff and the profits, if any, made as a result of the violation by the person or entity that engaged in the violation.
> (3) Punitive damages, if appropriate;
> (4) Reasonable attorney's fees and other litigation expenses that are reasonably incurred in bringing the civil action.

Plaintiffs have alleged that they are each patients of the Defendant. First amended complaint at ¶¶ 8, 9, 12, 202. Plaintiffs allege that they used the Defendant's website to obtain medical services, and transmitted to Defendant via its website details related to their medical conditions, including but not limited to their treating physicians, searches for various kinds of doctors, and information related to their ongoing treatment. *Id.* at ¶¶ 98, 100, 101, 251. Plaintiffs relied upon the expectation that their information would be privileged, private and confidential. *Id.* at ¶¶ 14, 101. Any unauthorized disclosures of the Plaintiffs' protected information are prohibited by state and federal law and the Defendant's ethical obligations to its patients. *Id.* at ¶¶134, 251. Plaintiffs have standing

KNOX COUNTY COURT OF COMMON PLEAS, MOUNT VERNON, OHIO 43050

to bring this cause of action in this Court. Defendant's motion to dismiss on the basis of Civ.R. 12(B)(1) is hereby denied.

**Civil Rule 12(B)(6)**

Defendant further argues that Plaintiffs' amended complaint should be dismissed for failure to state a claim upon which relief can be granted.

The test for determining whether a dismissal pursuant to Civ.R. 12(B)(6) is warranted is set forth in the syllabus of *O'Brien v. University Community Tenants Union* (1975), 42 Ohio St.2d 242, 327 N.E.2d 753: "In order for a court to dismiss a complaint for failure to state a claim upon which relief can be granted (Civ.R. 12(B) (6)), it must appear beyond doubt from the complaint that the plaintiff can prove no set of facts entitling him to recovery. (*Conley v. Gibson*, 355 U.S. 41, 78 S. Ct. 99, 2 L. Ed. 2d 80, followed.) See also, *Kodish v. Public Employees Retirement Board* (1975), 45 Ohio App.2d 147, 341 N.E.2d 320.

When considering a motion to dismiss pursuant to Civ.R. 12(B)(6), a court must accept all the allegations of the plaintiff's complaint as true as a matter of law and dismiss the case only where there is absolutely no basis for any of the challenged causes of action. *Greeley v. Miami Valley Maintenance Contractors* (1990), 49 Ohio St. 3d 228, 229, 551 N.E.2d 981. To prevent dismissal, plaintiffs are not required to prove their case with evidence, but only to point to some set of facts consistent with the complaint that, if proved, would allow plaintiffs to recover. *York v. Ohio State Hwy Patrol* (1991), 60 Ohio St. 3d 143, 145, 573 N.E.2d 1063.

In *Biddle,* the Ohio Supreme Court cited to the Supreme Court of Washington case of *Smith v. Driscoll*:

KNOX COUNTY COURT OF COMMON PLEAS, MOUNT VERNON, OHIO 43050

""We shall not go into the question, suggested in respondents' brief, that the action is improperly designated as one for slander. If the facts set forth in the complaint entitle appellant to relief, it is wholly immaterial by what name the action is called. Neither is it necessary to pursue at length the inquiry of whether a cause of action lies in favor of a patient against a physician for wrongfully divulging confidential communications. For the purposes of what we shall say it will be assumed that, for so palpable a wrong, the law provides a remedy." *Smith v. Driscoll* (1917), 94 Wash. 441, 442, 162 P. 572, 572.

Since then, courts in Ohio and elsewhere have faced common metamorphic disturbances in attempting to provide a legal identity for an actionable breach of patient confidentiality. In their efforts to devise a civil remedy "for so palpable a wrong," many of these courts have endeavored to fit a breach of confidence into a number of traditional or accepted legal theories. In much the same way as trying to fit a round peg into a square hole, courts have utilized theories of invasion of privacy, defamation, implied breach of contract, intentional and negligent infliction of emotional distress, implied private statutory cause of action, breach of trust, detrimental reliance, negligence, and medical malpractice. Invariably, these theories prove ill-suited for the purpose, and their application contrived, as they are designed to protect diverse interests that only coincidentally overlap that of preserving patient confidentiality. These courts, therefore, often find themselves forced to stretch the traditional theories beyond their reasonable bounds, or ignore or circumvent otherwise sound doctrinal limitations, in order to achieve justice within the parameters they have set for themselves.

We hold that in Ohio, an independent tort exists for the unauthorized, unprivileged disclosure to a third party of nonpublic medical information that a physician or hospital has learned within a physician-patient relationship."

*Biddle v. Warren Gen. Hosp.*, 86 Ohio St. 3d 395, 715 N.E.2d 518, 1999 Ohio LEXIS 2925, 1999-Ohio-115.

In *Biddle*, and as affirmed in *Menorah Park*, the Ohio Supreme Court recognized an independent tort claim for the unauthorized, unprivileged disclosure to a third party of nonpublic medical information that a physician or hospital has learned within a physician-patient relationship.

Plaintiffs' first amended complaint alleges that Plaintiffs provided to Defendant, and Defendant disclosed Plaintiffs' medical information to third parties without their knowledge, authorization or consent. First amended complaint, ¶¶ 3, 4, 100, 102, 137, 203. Plaintiffs allege that they were patients of Defendant who used the Defendant's website and transmitted personal protected information to Defendant's website as part of the medical services they received; and that they would not have used the Defendant's

KNOX COUNTY COURT OF COMMON PLEAS, MOUNT VERNON, OHIO 43050

website but for their patient status. *Id.* at ¶¶ 8, 9, 12, 251, 258, 260. Plaintiffs allege that Defendant has disclosed personally identifiable information of Plaintiffs to third parties, including confidential medical information, IP addresses, internet "cookies", browser fingerprints, and Facebook identifiers. *Id.* at ¶¶ 3, 4, 22, 23, 36, 38, 41, 45, 86, 90.

The Court finds that the Plaintiffs' first amended complaint is sufficient to survive a Civ. R. 12(B)(6) motion to dismiss the *Biddle* claim. Likewise, the "wiretap" claim is a stand alone tort claim under R.C. 2933.52, et seq., and R.C. 2933.65(A) gives Plaintiffs a statutory private right of civil action for remedies specified in the statute. The "wiretap" claim is not subsumed in the *Biddle* claim. Plaintiffs' allegations in the first amended complaint are sufficient to state a "wiretap" claim under Ohio law. The Court denies the motion to dismiss counts I (*Biddle* claim) and IV ("wiretap" claim).

The Plaintiff has not opposed the motion to dismiss counts II (conversion), III (bailment), V (breach of implied contract), and VI (unjust enrichment). Plaintiff's Opp., fn 2 at p. 14. The Court finds that under the authority of *Biddle,* these separate claims are redundant and "ill-suited" for such a remedy. "In much the same way as trying to fit a round peg into a square hole, courts have utilized theories of invasion of privacy, defamation, implied breach of contract, intentional and negligent infliction of emotional distress, implied private statutory cause of action, breach of trust, detrimental reliance, negligence, and medical malpractice. Invariably, these theories prove ill-suited for the purpose, and their application contrived, as they are designed to protect diverse interests that only coincidentally overlap that of preserving patient confidentiality." *Biddle,* 86 Ohio St. 3d at 400. The Court grants Defendant's motion to dismiss the conversion, bailment, breach of implied contract and unjust enrichment claims.

**IT IS SO ORDERED.**

8-24-23

Richard D. Wetzel, JUDGE

cc:
All parties and/or counsel of record

KNOX COUNTY COURT OF COMMON PLEAS, MOUNT VERNON, OHIO 43050

# EXHIBIT 10

U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES
**Office for Civil Rights**

July 20, 2023

[Company]
[Address]
[City, State, Zip Code]
Attn: [Name of Recipient]

Re: Use of Online Tracking Technologies

Dear [Name of Recipient],

The Office for Civil Rights (OCR) at the U.S. Department of Health and Human Services (HHS) and the Federal Trade Commission (FTC) are writing to draw your attention to serious privacy and security risks related to the use of online tracking technologies that may be present on your website or mobile application (app) and impermissibly disclosing consumers' sensitive personal health information to third parties.

Recent research,[1] news reports,[2] FTC enforcement actions,[3] and an OCR bulletin[4] have highlighted risks and concerns about the use of technologies, such as the Meta/Facebook pixel and Google Analytics, that can track a user's online activities. These tracking technologies

[1] *See, e.g.*, Mingjia Huo, Maxwell Bland, and Kirill Levchenko, *All Eyes on Me: Inside Third Party Trackers' Exfiltration of PHI from Healthcare Providers' Online Systems*, Proceedings of the 21st Workshop on Privacy in the Electronic Society (Nov. 7, 2022), https://dl.acm.org/doi/10.1145/3559613.3563190.
[2] *See, e.g.*, Todd Feathers, Katie Palmer, and Simon Fondrie-Teitler, *Out of Control: Dozens of Telehealth Startups Sent Sensitive Health Information to Big Tech Companies*, THE MARKUP (Dec. 13, 2022), https://themarkup.org/pixel-hunt/2022/12/13/out-of-control-dozens-of-telehealth-startups-sent-sensitive-health-information-to-big-tech-companies.
[3] *U.S. v. Easy Healthcare Corp.*, Case No. 1:23-cv-3107 (N.D. Ill. 2023), https://www.ftc.gov/legal-library/browse/cases-proceedings/202-3186-easy-healthcare-corporation-us-v; *In the Matter of BetterHelp, Inc.*, FTC Dkt. No. C-4796 (July 14, 2023), https://www.ftc.gov/legal-library/browse/cases-proceedings/2023169-betterhelp-inc-matter; *U.S. v. GoodRx Holdings, Inc.*, Case No. 23-cv-460 (N.D. Cal. 2023), https://www.ftc.gov/legal-library/browse/cases-proceedings/2023090-goodrx-holdings-inc; *In the Matter of Flo Health Inc.*, FTC Dkt. No. C-4747 (June 22, 2021), https://www.ftc.gov/legal-library/browse/cases-proceedings/192-3133-flo-health-inc.
[4] U.S. Dept. of Health and Human Svcs. Office for Civil Rights, *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates* (Dec. 1, 2022), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.

gather identifiable information about users as they interact with a website or mobile app, often in ways which are not avoidable by and largely unknown to users.

Impermissible disclosures of an individual's personal health information to third parties may result in a wide range of harms to an individual or others. Such disclosures can reveal sensitive information including health conditions, diagnoses, medications, medical treatments, frequency of visits to health care professionals, where an individual seeks medical treatment, and more. In addition, impermissible disclosures of personal health information may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others.

**Health Insurance Portability and Accountability Act of 1996 (HIPAA)**

If you are a covered entity or business associate ("regulated entities") under HIPAA, you must comply with the HIPAA Privacy, Security, and Breach Notification Rules (HIPAA Rules), with regard to protected health information (PHI) that is transmitted or maintained in electronic or any other form or medium.

The HIPAA Rules apply when the information that a regulated entity collects through tracking technologies or discloses to third parties (*e.g.*, tracking technology vendors) includes PHI. HIPAA regulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to third parties or any other violations of the HIPAA Rules. OCR's December 2022 bulletin about the use of online tracking technologies by HIPAA regulated entities provides a general overview of how the HIPAA Rules apply.[5] This bulletin discusses what tracking technologies are and reminds regulated entities of their obligations to comply with the HIPAA Rules when using tracking technologies.

**FTC Act and FTC Health Breach Notification Rule**

Even if you are not covered by HIPAA, you still have an obligation to protect against impermissible disclosures of personal health information under the FTC Act and the FTC Health Breach Notification Rule. This is true even if you relied upon a third party to develop your website or mobile app and even if you do not use the information obtained through use of a tracking technology for any marketing purposes. As recent FTC enforcement actions demonstrate, it is essential to monitor data flows of health information to third parties via technologies you have integrated into your website or app.[6] The disclosure of such information without a consumer's authorization can, in some circumstances, violate the FTC Act as well as constitute a breach of security under the FTC's Health Breach Notification Rule.[7] Within the last

[5] *Id.*
[6] *See supra* note 3.
[7] *See* Federal Trade Comm'n, *Statement of the Commission on Breaches by Health Apps and Other Connected Devices* (Sept. 15, 2021), https://www.ftc.gov/system/files/documents/public_statements/1596364/statement_of_the_commission_on_breaches_by_health_apps_and_other_connected_devices.pdf.

few months, the FTC has issued a series of guidance pieces addressed to entities collecting, using, or disclosing sensitive health information.[8]

OCR and the FTC remain committed to ensuring that consumers' health privacy remains protected with respect to this critical issue. Both agencies are closely watching developments in this area. To the extent you are using the tracking technologies described in this letter on your website or app, we strongly encourage you to review the laws cited in this letter and take actions to protect the privacy and security of individuals' health information.[9]

Sincerely,

/s/

Melanie Fontes Rainer
Director
Office for Civil Rights
U.S. Department of Health and Human Services

/s/

Samuel Levine
Director
Bureau of Consumer Protection
Federal Trade Commission

[8] *See, e.g.*, FTC Office of Technology, *Lurking Beneath the Surface: Hidden Impacts of Pixel Tracking* (Mar. 16, 2023), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2023/03/lurking-beneath-surface-hidden-impacts-pixel-tracking; Lesley Fair, *First FTC Health Breach Notification Rule case addresses GoodRx's not-so-good privacy practices* (Feb. 1, 2023), https://www.ftc.gov/business-guidance/blog/2023/02/first-ftc-health-breach-notification-rule-case-addresses-goodrxs-not-so-good-privacy-practices; Federal Trade Comm'n and the U.S. Department of Health & Human Services' Office of the National Coordinator for Health Information Technology (ONC), Office for Civil Rights (OCR), and Food and Drug Administration (FDA), *Mobile Health App Interactive Tool* (Dec. 2022), https://www.ftc.gov/business-guidance/resources/mobile-health-apps-interactive-tool; Kristin Cohen, *Location, health, and other sensitive information: FTC Committed to fully enforcing the law against illegal use and sharing of highly sensitive data* (July 11, 2022), https://www.ftc.gov/business-guidance/blog/2022/07/location-health-and-other-sensitive-information-ftc-committed-fully-enforcing-law-against-illegal.

[9] In addition to the HIPAA Rules, the FTC Act, and the FTC Health Breach Notification Rule, you may also be subject to other state or federal statutes that prohibit the disclosure of personal health information.

| CLERK'S NOTICE | DOCKET NUMBER<br>2277CV01000 D | Trial Court of Massachusetts<br>The Superior Court |
|---|---|---|
| CASE NAME:<br>**John Doe Individually and on Behalf of All others similarly situated vs. Emerson Hospital** | | Thomas H. Driscoll, Jr., Clerk of Courts<br>Essex County |
| TO:<br>Jessica N. Wahl, Esq.<br>2049 Century Park East<br>#3000<br>Los Angeles, CA 90067 | | COURT NAME & ADDRESS<br>Essex County Superior Court - Lawrence<br>43 Appleton Way<br>Lawrence, MA 01841 |

You are hereby notified that on 09/03/2025 the following entry was made on the above referenced docket:

**ORDER: PROCEDURAL ORDER**
**As stated on the record this date, the plaintiff is granted leave to file an Amended Complaint, which Amended Complaint shall be filed on or before 11/3/25. Any motion to remove this case to federal court shall be filed on or before 12/3/25.**

**So Ordered.**

**/s/ Salim R. Tabit, J.**

**Judge: Tabit, Hon. Salim**

2025 SEP 18 A 11:00

| DATE ISSUED | ASSOCIATE JUSTICE/ ASSISTANT CLERK | SESSION PHONE# |
|---|---|---|
| **09/04/2025** | **Hon. Salim Tabit** | **(978)242-1900** |

Date/Time Printed: 09-04-2025 08:18:35 SCR016\ 02/2023

THOMAS H. DRISCOLL, JR., ESQUIRE
CLERK OF COURTS AND MAGISTRATE
J. MICHAEL RUANE JUDICIAL CENTER
56 FEDERAL STREET
SALEM, MASSACHUSETTS 01970

BOSTON MA 020
4 SEP 2025 PM 2 L

FIRST-CLASS

US POSTAGE PITNEY BOWES
ZIP 01840 $ 000.74⁰
02 7H
0006200075 SEP 04 2025

2025 SEP 10 A

NIXIE 911 FE 1 0009/10/25
RETURN TO SENDER
ATTEMPTED - NOT KNOWN
UNABLE TO FORWARD
BC: 01970668899 *1421-00805-04-42

90067-3204
01970>6688

COMMONWEALTH OF MASSACHUSETTS

ESSEX, S.S. SUPERIOR COURT

| | | |
|---|---|---|
| JOHN DOE, JAMES DOE, JOSEPH DOE, AND JANE DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | § § § § § | C.A. No. 2277CV01000 |
| Plaintiffs | § § § | |
| v. | § § | |
| EMERSON HOSPITAL, | § § § | A TRUE COPY, ATTEST<br>DEPUTY ASS'T. CLERK |
| Defendant. | § § | |

**SECOND AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs John Doe, James Doe, Joseph Doe, and Jane Doe, ("Plaintiffs"), individually and on behalf of all other persons similarly situated ("Class Members"), bring suit against Defendant Emerson Hospital ("Defendant" or "Emerson"), and upon personal knowledge as to Plaintiffs' own conduct and on information and belief as to all other matters based upon investigation by counsel, allege as follows:

## NATURE OF ACTION AND ALLEGATIONS

1. This case arises from Defendant's systematic violation of the medical privacy rights of its patients, exposing highly sensitive personal information to third parties without those patients' knowledge or consent.

2. Until recently, Defendant's "Notice of Privacy Practices" ("Privacy Notice") told patients that "[p]rotecting your medical information is an important priority for Emerson

Hospital."[1] Indeed, Defendant assured patients that Defendant would *never* use or share patients' "personal information for marketing purposes" without "specific authorization."[2]

3. Contrary to these assurances, however, Defendant did not follow these policies, nor the law prohibiting such disclosures.

4. At all relevant times, Defendant disclosed information about its patients—including their status as patients, their physicians, their medical treatments, the hospitals they visited, and their personal identities—to Facebook, Google, and other third parties without its patients' knowledge, authorization, or consent.

5. Defendant discloses this protected health information through the deployment of various digital marketing and automatic rerouting tools embedded on its websites, patient portal, and inside of its Epic mobile application that purposefully and intentionally redirect patients' personal health information to third parties who exploit that information for advertising purposes. Defendant's use of these rerouting tools caused its patients' personally identifiable information and the contents of its patients' communications exchanged with Defendant to be automatically redirected to third parties in violation of those patients' reasonable expectations of privacy, their rights as patients, and both the express and implied promises of Defendant.

6. Defendant's conduct in disclosing such protected health information about its patients to Facebook and other third parties violates both Massachusetts and Federal law.

## PARTIES TO THE ACTION

7. Defendant Emerson Hospital is a Massachusetts corporation with its principal office at Nine Acres Corner, Concord, Massachusetts, 01742. Defendant is a private health

---

[1] https://www.emersonhospital.org/patients-visitors/patient-rights-responsibilities/patient-privacy
[2] https://www.emersonhospital.org/patients-visitors/patient-rights-responsibilities/patient-privacy

system serving over 300,000 individuals in 25 towns in Massachusetts.[3] Defendant owns and manages numerous healthcare facilities in Massachusetts, including Emerson Hospital, health centers in Westford, Groton, and Sudbury, the Center for Specialty Care in Concord, the Clough Family Center for Rehabilitation and Sports Therapies, the Hermel Breast Health Center, the Steinberg Wellness Center for Mind and Body, urgent care centers in Hudson and Littleton, and numerous ancillary facilities, including Cantu Concussion Center.[4]

8. Plaintiff, John Doe, is an individual residing in Essex County, Massachusetts, has been treated by Defendant's physicians, and has been a patient at the Cantu Concussion Center,[5] and thus also a patient of Defendant.

9. Plaintiff, James Doe, is an individual residing in Middlesex County, Massachusetts, has been treated by Defendant's physicians, and has been a patient at the Emerson Hospital in Concord,[6] and thus also a patient of Defendant.

10. Plaintiff, Joseph Doe, is an individual residing in Middlesex County, Massachusetts, has been treated by Defendant's physicians, and has been a patient at the Emerson Hospital in Concord,[7] and Emerson Health Westford,[8] and thus also a patient of Defendant.

11. Plaintiff, Jane Doe, is an individual residing in Middlesex County, Massachusetts, has been treated by Defendant's physicians, and has been a patient at the Emerson Hospital in Concord,[9] and thus also a patient of Defendant.

---

[3] https://www.emersonhospital.org/about-emerson/from-our-president-ceo
[4] https://www.emersonhospital.org/about-emerson/from-our-president-ceo; *see also* https://www.emersonhospital.org/locations
[5] https://www.emersonhospital.org/locations/concussion-center
[6] https://emersonhealth.org/locations/emerson-hospital-main-campus/
[7] https://emersonhealth.org/locations/emerson-hospital-main-campus/
[8] https://emersonhealth.org/locations/emerson-health-westford/
[9] https://emersonhealth.org/locations/emerson-hospital-main-campus/

## JURISDICTION AND VENUE

12. This Court has personal jurisdiction over Defendant because it regularly conducts business throughout Massachusetts and has its principal place of business at Nine Acres Corner, Concord, Massachusetts, 01742. G.L. c. 223A, § 2; G.L. c. 223A, § 3.

13. Venue is appropriate in this Court because Plaintiff John Doe resides in Essex County and the acts or conduct giving rise to the cause of action took place in Essex County. G.L. c. 223, § 1.

## FACTUAL BACKGROUND

### A. Plaintiffs' experiences with Defendant.

14. Plaintiff John Doe is a patient of Defendant who receives treatment at Cantu Concussion Center.[10] Since at least 2022, Plaintiff John Doe has been using Defendant's website at www.emersonhospital.org and accessing Defendant's patient portals. Plaintiff John Doe has used Defendant's website and patient portal to enter data and complete forms, view details about his doctor, and search and view medical records about his medical conditions. Specifically, he has used the website and patient portal for a variety of medical conditions over the years, including queries about treatment for his concussion. This has resulted in the disclosure of his Personal Health Information to third parties without his consent.

15. Plaintiff James Doe is a patient of Defendant who receives treatment at Emerson Hospital in Concord.[11] Since at least when the portals were first implemented, Plaintiff has been using Defendant's website at www.emersonhospital.org and accessing Defendant's patient portals. James Doe also used Defendant's Epic mobile application from at least 2019 through 2022 to access its "Patient Gateway" patient portal. Plaintiff James Doe has used Defendant's

[10] https://www.emersonhospital.org/locations/concussion-center
[11] https://emersonhealth.org/locations/emerson-hospital-main-campus/

website and patient portals, including through the Epic application, to search for information about doctors, pay for medical services, search and view medical records and test results, and fill out forms related to his medical conditions. Specifically, he has used the website and patient portals to seek treatment and communicate with his physicians regarding a variety of medical conditions over the years, including gastrointestinal issues and his bicep tendon tear. This has resulted in the disclosure of his Personal Health Information to third parties without his consent.

16. Plaintiff Joseph Doe is a patient of Defendant who receives treatment at Emerson Hospital in Concord,[12] and Emerson Health Westford,[13] Since at least 2022, Plaintiff has been using Defendant's website at www.emersonhospital.org and accessing Defendant's patient portals. Plaintiff Joseph Doe has also used Defendant's Epic mobile application to access its "Patient Gateway" patient portal. Plaintiff Joseph Doe has used Defendant's website and patient portals, including through the Epic mobile application, to search for information about doctors, schedule appointments, pay for medical services, and fill out forms related to his medical conditions. Specifically, he has used the website for a variety of medical conditions over the years, including prostate cancer screening and heart health. This has resulted in the disclosure of his Personal Health Information to third parties without his consent.

17. Plaintiff Jane Doe is a patient of Defendant who receives treatment at Emerson Hospital in Concord.[14] Since at least when the portals were first implemented, Plaintiff has been using Defendant's website at www.emersonhospital.org and accessing Defendant's patient portals. Jane Doe also used Defendant's Epic mobile application since the time that application was released to access its "Patient Gateway" patient portal. Plaintiff Jane Doe has used Defendant's website and patient portals, including through its Epic mobile application, to search

[12] https://emersonhealth.org/locations/emerson-hospital-main-campus/
[13] https://emersonhealth.org/locations/emerson-health-westford/
[14] https://emersonhealth.org/locations/emerson-hospital-main-campus/

for information about doctors, pay for medical services, fill out forms and make appointments for her medical conditions. Specifically, she has used the website and portal for a variety of medical conditions over the years, including spine issues and neurological conditions. This has resulted in the disclosure of her Personal Health Information to third parties without her consent.

18. Unbeknownst to Plaintiffs, Defendant installed tracking technologies across its webpages and portal-related Epic mobile application that caused the medical information Plaintiffs entered on those webpages and the app-accessible portal, their personally identifiable information including their IP Addresses and Brower Fingerprints, and Plaintiffs' interactions with Defendant's webpages and app-accessible portal, to be transmitted to third party advertisers without their consent.

**B. Defendant routinely discloses the protected health information of its patients to third parties including Facebook and Google.**

19. Under G.L. c. 214, § 1B, all persons "have a right against unreasonable, substantial, or serious interference" with their privacy.

20. Medical patients such as John Doe, James Doe, Joseph Doe, and Jane Doe, have a legal interest in preserving the confidentiality of their communications with healthcare providers and have reasonable expectations of privacy that their personally identifiable information and communications will not be disclosed to third parties by Defendant without their express written consent and authorization.

21. Patients also have reasonable expectations of privacy that their personal identifiable information and protected health information (together "PII/PHI") and communications will not be disclosed to third parties without their express written consent and authorization.

22. As a health care provider, Defendant has ethical fiduciary, common law, and statutory duties to protect the confidentiality of patient information and communications.

23. Defendant expressly and impliedly promises patients that it will maintain and protect the confidentiality of PII/PHI and communications.

24. Defendant operates websites for patients, including www.emersonhospital.org.

25. Defendant's websites and portals are designed for interactive communication with patients, including scheduling appointments, searching for physicians, paying bills, requesting medical records, learning about medical issues treatment options, and joining support groups.

26. Defendant encourages patients to use digital tools on its website and mobile application to seek and receive health services.

27. The home page of Defendant's website is designed for use by patients. The homepage provides patients with tools to seek treatment, such as finding a doctor, researching services and treatments, paying bills, and learning about Defendant's services.

28. Defendant also maintains two patient portals, which allow patients to make appointments, access medical records, view lab results, and exchange communications with their health care providers. Collectively herein, Defendant's website and patient portals are defined as Defendant's "Web Properties."

29. Notwithstanding patients' reasonable expectations of privacy, Defendant's legal duties of confidentiality, and Defendant's express promises to the contrary, Defendant has disclosed disclose the contents of patients' communications and protected healthcare information via automatic re-routing mechanisms embedded in the websites and mobile application operated by Defendant without patients' knowledge, authorization, or consent.

**C. Defendant misuses sophisticated software to automatically collect and disclose patient PII/PHI to third-party advertising companies like Google and Facebook.**

30. Defendant's disclosures of patients' personal healthcare information occur because Defendant intentionally deploys source code on the websites it operates, including https://www.emersonhospital.org, that causes patients' personally identifiable information (as well as the exact contents of their communications) to be transmitted to third parties. Defendant deployed similar technology on its Epic mobile application from at least 2019 through 2022 to cause similar transmissions from the app-accessible Patient Gateway patient portal.

31. By design, third parties (including Facebook and Google) receive and record the exact contents of patient communications while the communication between Defendant and the patient remains ongoing. Defendant accomplishes this by first intercepting patient communications and then separately disclosing the intercepted communications to those third parties almost instantaneously.

32. For example, when Plaintiffs or a Class Member accessed Defendant's website pages hosting the Meta Pixel, the Meta Pixel software directed their browsers to send a message to Facebook's servers. The information that Defendant sent to Facebook included the private information that Plaintiffs and Class Members communicated to Defendant's website, such as the type of medical appointment the patient made, the date, and the specific doctor the patient was seeing. Such private information allows third-party advertising companies like Facebook to determine that a specific patient was seeking a specific type of confidential medical treatment. This kind of disclosure also allows Facebook to reasonably infer that a specific patient was being treated for specific types of medical conditions, such as cancer and pregnancy.

33. Websites like those maintained by Defendant are hosted by a computer server through which the business in charge of the website exchanges and communicates with internet users via their web browsers.

34. Web browsers are software applications that allow users to exchange electronic communications over the internet.

35. Each exchange of an electronic communication over the internet typically consists of an HTTP request from a client device and an HTTP response from a server. When a user types a URL into a web browser, for example, the URL is sent as an HTTP request to the server corresponding to the web address, and the server then returns an HTTP response that consists of a web page to display in the client device's web browser.

36. In addition to specifying the URL, HTTP requests can also send data to the host server, including users' cookies. Cookies are text files stored on client devices to record data, often containing sensitive, personally identifiable information.

37. In turn, HTTP responses may consist, among other things, of a web page, another kind of file, text information, or error codes. A web page consists primarily of "Markup" and "Source Code." The markup of a web page comprises the visible portion of that web page. Markup is displayed by a web browser in the form of words, paragraphs, images, and videos displayed on a users' device screen. A web page's source code is a set of instructions that commands browsers to take certain actions, either when the web page loads or when a specified event triggers the code.

38. For example, typing https://www.emersonhospital.org/ into a browser sends an HTTP request to Defendant's website, which returns a HTTP response in the form of the home page of Defendant's website:




39. Source code is not visible on the client device's screen, but it may change the markup of a webpage, thereby changing what is displayed on the client device's screen. Source code may also execute a host of other programmatic instructions, including commanding a web browser to send data transmissions in the form of HTTP requests to the website's server, or, as is the case with Defendant's website, to third parties via pixels.

40. For example, Emerson's website has included software code that transmits HTTP requests directly to Facebook, including patients' PII/PHI, every time a patient interacts with a page on its website.

41. The basic command that web browsers use to exchange data and user communications is called a GET request.[15] For example, when a patient types "heart failure treatment" into the search box on Defendant's website and hits 'Enter,' the patient's web browser makes a connection with the server for Defendant's website and sends the following request: "GET search/q=heart+failure+treatment."

[15] https://www.w3schools.com/tags/ref_httpmethods.asp

42. When a server receives a GET request, the information becomes appended to the next URL (or "Uniform Resource Locator") accessed by the user. For example, if a user enters "respiratory problems" into the query box of a website search engine, and the search engine transmits this information using a GET request method, then the words "respiratory" and "problems" will be appended to the query string at the end of the URL of the webpage showing the search results.

43. The other basic transmission command utilized by web browsers is POST, which is typically employed when a user enters data into a form on a website and clicks 'Enter' or some other form of submission button. POST sends the data entered in the form to the server hosting the website that the user is visiting.

44. In response to receiving a GET or POST command, the server for the website with which the user is exchanging information will send a set of instructions to the web browser and command the browser with source code that directs the browser to render the website's responsive communication.

45. Unbeknownst to users, however, the website's server may also redirect the user's communications to third parties, like Facebook and Google. Indeed, Google warns website developers and publishers that installing its ad tracking software on webpages employing GET requests will result in users' personally identifiable information being disclosed to Google.[16] Typically, users are provided no notice that these disclosures are being made.

46. Third parties (such as Facebook and Google) use the information they receive to track user data and communications for marketing purposes.

47. In many cases, third-party marketing companies acquire the content of user communications through a 1x1 pixel (the smallest dot on a user's screen) called a tracking pixel,

[16] https://support.google.com/platformspolicy/answer/6156630?hl=en

a web-bug, or a web beacon. These tracking pixels are tiny and are purposefully camouflaged to remain invisible to users.

48. These tracking pixels can collect dozens of data points about individual website users who interact with a website.

49. For example, one of the world's most prevalent tracking pixels, called the Meta Pixel, is provided by Facebook.

50. Tracking pixels such as the Meta Pixel tool allow Defendant and Facebook to secretly track, intercept, record, and transmit every patient communication made on Defendant's websites. When patients visit Defendant's websites, unbeknownst to them, the web page displayed on the patient's browser includes the Meta Pixel as embedded code, which is not visible to patients or other visitors to Defendant's websites. This code is triggered when a patient or visitor interacts with the web page. Each time the Meta Pixel is triggered, the software code is executed and sends patient's PII/PHI directly to Facebook.

51. The Meta Pixel and similar tracking pixels act like a physical wiretap on a phone. Like a physical wiretap, pixels do not appear to alter the function of the communication device on which they surreptitiously installed. Instead, these pixels lie in wait until they are triggered by an event, at which time they effectively open a channel through the website to funnel data about users and their actions to third parties via a hidden HTTP request that is never shown to or agreed to by the user.

52. For example, a patient can trigger an HTTP request by interacting with the search bar on Defendants' websites by typing a term such as "breast cancer" into the search bar and then hitting enter. Defendants' servers in turn send an HTTP response, which results in the search results being displayed.

53. This is not the only HTTP request, however, that is created by a patient's interaction with Defendant's website. In fact, when the web page is instructed to send an HTTP request to Defendant requesting search results, the embedded source code, acting as a tap, is triggered, intercepting the patient's communication. As a result, Defendant's websites are also instructed to disclose the intercepted communication through the HTTP request directly to Facebook, Google, and other third parties informing them of the patient's exact search and the patient's identifiable information.

54. In addition to employing the Meta Pixel to track patients, Defendant's web properties and patient portal login used Google Analytics, to track and disclose patient activity—including Plaintiffs'—without their consent. Unbeknownst, the installation of this code resulted in disclosures of patients' personal health information, including their search terms; scheduling of appointments; submission of weight loss support group sign up; weight loss info session sign up; and Parkinson's virtual education sign up.

55. In addition, through Google Analytics, Defendant disclosed Plaintiffs' activity by tracking and disclosing their IP addresses, cookies, geolocation, and other unique device identifiers. Defendant routinely disclosed patients' PII/PHI to Google using this technology.

56. Defendant similarly deployed Google Firebase code within the Epic mobile application that it offered to the public. The deployment of this tracking technology functioned similarly to the use of Google Analytics across Emerson's websites, except that it captured communications and interactions from inside of the password-protected Patient Gateway patient portal. This resulted in significant amounts of patients' medical information being shared with Google, including the specific pages visited and used within the portal, as well as the actions taken inside the portal, including communications with treating physicians, scheduling of

appointments, and review of medication. In addition, the use of Google Firebase code and IP addresses, device properties (such as brand, model, and operating system), app events (such as screen views and notifications), marketing identifiers specific to the device, and device information, including geo-location information.

57. A web site developer who chooses to deploy third-party source code, like a tracking pixel, on their website must enter the third-party source code directly onto their website for every third party they wish to send user data and communications.

58. Tracking pixels can be placed directly on a web page by a developer, or they can be funneled through a "tag manager" service to make the invisible tracking run more smoothly. A tag manager further obscures the third parties to whom user data is transmitted.

59. Tag managers are simple enough that non-programmers can use them to deploy and remove digital tracking tools from web-properties with just the click of a few buttons.

60. Defendant deployed Google Tag Manager on its websites through an "iframe," a nested "frame" that exists within the Defendant's website that is, in reality, an invisible window through which Defendant funneled tracking pixels for third parties to secretly acquire the content of patient communications without any knowledge, consent, authorization, or further action of patients.

61. By design, none of the tracking was visible to patients visiting Defendant's websites.

**D. Tracking pixels provide third parties with a trove of personally identifying data permitting them to uniquely identify the individuals browsing a website.**

62. Tracking pixels are especially pernicious because they result in the disclosure of a variety of data that permits third parties to determine the unique personal data of website visitors. While most users believe that the internet provides them with anonymity when, for example,

they browse a hospital website for treatment information about a medical condition, that is not the case when the hospital website has embedded third party tracking devices, as Defendant has.

63. For example, an IP address is a numerical identifier that identifies each computer connected to the internet. IP addresses are used to identify and route communications on the internet. IP addresses of individual users are used by internet service providers, websites, and tracking companies to facilitate and track internet communications and content. IP addresses also offer advertising companies like Facebook a unique and semi-persistent identifier across devices—one that has limited privacy controls.[17]

64. Because of their uniquely identifying characteristics, IP addresses are considered protected personally identifiable information by HIPAA. *See* 45 CFR § 164.514(b)(2)(i)(O). Tracking pixels can (and typically do) collect website visitors' IP addresses.

65. Likewise, internet cookies also provide personally identifiable information. Cookies are small text files that web servers can place on a user's browser and computer when a user's browser interacts with a website server. Cookies are typically designed to acquire and record an individual internet user's communications and activities on websites and were developed by programmers to aid with online advertising.

66. Cookies are designed to operate as a means of identification for internet users. Advertising companies like Facebook and Google have developed methods for monetizing and profiting from cookies. These companies use third-party tracking cookies to help them acquire and record user data and communications in order to sell targeted advertising that is customized to a user's personal communications and browsing history. To build individual profiles of internet users, third party advertising companies assign each user a unique (or a set of unique) identifiers to each user.

[17] https://adtechexplained.com/the-future-of-ip-address-as-an-advertising-identifier/

67. Cookies fall within the personal identifiers protected by HIPAA. *See* 45 CFR § 164.514(b)(2)(i)(H), (J), (M), and (R). Tracking pixels can collect cookies from website visitors.

68. In general, cookies are categorized by (1) duration and (2) party.

69. There are two types of cookies classified by duration.

70. "Session cookies" are placed on a user's computing device only while the user is navigating the website that placed and accesses the cookie. The user's web browser typically deletes session cookies when the user closes the browser.

71. "Persistent cookies" are designed to survive beyond a single internet-browsing session. The party creating the persistent cookie determines its lifespan. As a result, a persistent cookie can acquire and record a user's internet communications for years and over dozens or even hundreds of websites. Persistent cookies are also called "tracking cookies."

72. Cookies are also classified by the party that uses the collected data.

73. "First-party cookies" are set on a user's device by the website with which the user is exchanging communications. First-party cookies can be helpful to the user, server, and/or website to assist with security, login, and functionality.

74. "Third-party cookies" are set on a user's device by website servers other than the website or server with which the user is exchanging communications. For example, the same patient who visits Defendant's website will also have cookies on their device from third parties, such as Facebook and Google. Unlike first-party cookies, third-party cookies are not typically helpful to the user. Instead, third-party cookies are typically used for data collection, behavioral profiling, and targeted advertising.

75. Data companies like Facebook have developed methods for monetizing and profiting from cookies. These companies use third-party tracking cookies to help them acquire

and record user data and communications in order to sell advertising that is customized to a user's communications and habits. To build individual profiles of internet users, third party data companies assign each user a unique identifier or set of unique identifiers.

76. Traditionally, first-party and third-party cookies were kept separate. An internet security policy known as the same-origin policy required web browsers to prevent one web server from accessing the cookies of a separate web server. For example, although Defendant can deploy source code that uses Facebook third-party cookies to help Facebook acquire and record a patient's communications, Defendant is not permitted direct access to Facebook third-party cookie values. The reverse *was* also true: Facebook was not provided direct access to the values associated with first-party cookies set by companies like Defendant. But data companies have designed a way to hack around the same-origin policy so that third-party data companies like Facebook can gain access to first-party cookies.

77. JavaScript source code developed by third party data companies and placed on a webpage by a developer such as Defendant can bypass the same-origin policy to send a first-party cookie value in a tracking pixel to the third-party data company. This technique is known as "cookie synching," and it allows two cooperating websites to learn each other's cookie identification numbers for the same user. Once the cookie synching operation is completed, the two websites can exchange any information that they have collected and recorded about a user that is associated with a cookie identifier number. The technique can also be used to track an individual who has chosen to deploy third-party cookie blockers.

78. In effect, cookie synching is a method through which Facebook, Google, and other third-party marketing companies set and access third-party cookies that masquerade as first-party cookies. By designing these special third-party cookies that are set for first-party

websites, Facebook and Google hack their way around any cookie blockers that users set up to stop their tracking. On information and belief, the letters fbp are an acronym for Facebook Pixel.

79. The Facebook _fbp cookie is a Facebook identifier that is set by Facebook source code and associated with the health care provider using the Meta Pixel.

80. The _fbp cookie is also a third-party cookie in that it is also a cookie associated with Facebook that is used by Facebook to associate information about a person and their communications with non-Facebook entities while the person is on a non-Facebook website or app.

81. Defendant requires patients using its patient portals to have enabled first-party cookies to gain access to its patient portals.

82. The _fbp cookie is used as a unique identifier for patients by Facebook.

83. If a patient takes an action to delete or clear third-party cookies from their device, the _fbp cookie is not impacted—even though it is a Facebook cookie—because Facebook has disguised it as a first-party cookie. Facebook also uses IP addresses and user-agent information to match the health information it receives from Defendant with Facebook users.

84. Defendant engages in cookie synching with Facebook, Google, and other third parties.

85. Defendant's cookie disclosures include the deployment of cookie synching techniques that cause the disclosure of the first-party cookie values that Defendant assigns to patients to also be made to third parties.

86. Defendant uses and causes the disclosure of patient cookie identifiers with each re-directed communication described herein, including patient communications concerning individual providers, conditions, and treatments.

87. A third type of personally identifiable information is what data companies refer to as a "browser-fingerprint." A browser-fingerprint is information collected about a computing device that can be used to identify the specific device.

88. These browser-fingerprints can be used to uniquely identify individual users when a computing device's IP address is hidden or cookies are blocked and can provide a wide variety of data. As Google explained, "With fingerprinting, developers have found ways to use tiny bits of information that vary between users, such as what device they have or what fonts they have installed to generate a unique identifier which can then be used to match a user across websites."[18] The value of browser-fingerprinting to advertisers (and trackers who want to monetize aggregated data) is that they can be used to track website users just as cookies do, but it employs much more subtle techniques.[19] Additionally, unlike cookies, users cannot clear their fingerprint and therefore cannot control how their personal information is collected.[20]

89. In 2017, researchers demonstrated that browser fingerprinting techniques can successfully identify 99.24 percent of all users.[21]

90. Browser-fingerprints are considered protected personal identifiers under HIPAA (*see* 45 C.F.R. § 164.514(b)(2)(i)(M), (R)),and tracking pixels can collect browser-fingerprints from website visitors.

---

[18] https://www.blog.google/products/chrome/building-a-more-private-web/
[19] https://pixelprivacy.com/resources/browser-fingerprinting/
[20] https://www.blog.google/products/chrome/building-a-more-private-web/
[21] https://www.ndss-symposium.org/ndss2017/ndss-2017-programme/cross-browser-fingerprinting-os-and-hardware-level-features/

91. Defendant uses and causes the disclosure of data sufficient for third parties to create a browser-fingerprint identifier with each re-directed communication described herein, including patient communications concerning individual providers, conditions, and treatments.

92. A fourth kind of personally identifyiable information protected by law against disclosure are unique user identifiers (such as Facebook's "Facebook ID") that permit companies like Facebook to quickly and automatically identify the personal identity of its user across the internet whenever the identifier is encountered. A Facebook ID is a number string that is connected to a user's Facebook profile.[22] Anyone with access to a user's Facebook ID can locate a user's Facebook profile.[23]

93. Unique personally identifiable information such as a person's Facebook ID are protected by HIPAA (*see* 45 C.F.R. § 164.514(b)(2)(i)(M), (R)) and are likewise capable of collection through pixel trackers.

94. Each of the individual data elements described above is personally identifiable on their own. However, Defendant's disclosures of such personally identifiable data elements do not occur in a vacuum. The disclosures of the different data elements are tied together and, when taken together, these data elements are even more accurate in identifying individual patients, particularly when disclosed to data companies such as Facebook, Google, and other internet marketing companies that expressly state that they use such data elements to identify individuals.

**E. Facebook's Business Model: Exploiting Users' Personal Information for Profit.**

95. Facebook, a social media platform founded in 2004 and today operated by Meta Platforms, Inc., was originally designed as a social networking website for college students.

[22] https://www.facebook.com/help/211813265517027
[23] https://smallseotools.com/find-facebook-id/

96. Facebook describes itself as a "real identity" platform.[24] This means that users are permitted only one account and must share "the name they go by in everyday life."[25] To that end, Facebook requires users to provide their first and last name, along with their birthday, telephone number and/or email address, and gender, when creating an account.[26]

97. In 2007, realizing the value of having direct access to millions of consumers, Facebook began monetizing its platform by launching "Facebook Ads," proclaiming this service to be a "completely new way of advertising online," that would allow "advertisers to deliver more tailored and relevant ads."[27] Facebook has since evolved into one of the largest advertising companies in the world.[28] Facebook can target users so effectively because it surveils user activity both on and off its website through the use of tracking pixels.[29] This allows Facebook to make inferences about users based on their interests, behavior, and connections.[30]

98. Today, Facebook provides advertising on its own social media platforms, as well as other websites through its Facebook Audience Network. Facebook has more than 2.9 billion users.[31]

99. Facebook maintains profiles on users that include users' real names, locations, email addresses, friends, likes, and communications. These profiles are associated with personal identifiers, including IP addresses, cookies, and other device identifiers. Facebook also tracks non-users across the web through its internet marketing products and source code. Facebook employs algorithms, powered by machine learning tools, to determine what advertisements to

---

[24] https://www.wsj.com/articles/how-many-users-does-facebook-have-the-company-struggles-to-figure-it-out-11634846701#:~:text=Facebook%20said%20in%20its%20most,of%20them%20than%20developed%20ones.
[25] https://transparency.fb.com/policies/community-standards/account-integrity-and-authentic-identity/
[26] https://www.facebook.com/help/406644739431633
[27] https://about.fb.com/news/2007/11/facebook-unveils-facebook-ads/
[28] https://www.pewresearch.org/fact-tank/2021/06/01/facts-about-americans-and-facebook/
[29] https://www.facebook.com/business/help/742478679120153?id=1205376682832142
[30] https://www.facebook.com/business/ads/ad-targeting
[31] https://www.statista.com/statistics/264810/number-of-monthly-active-facebook-users-worldwide/

show users based on their habits and interests, and utilizes tracking software such as the Meta Pixel to monitor and exploit users' habits and interests.

100. Tracking information about users' habits and interests is a critical component of Facebook's business model because it is precisely this kind of information that allows Facebook to sell advertising to its customers. Facebook uses plug-ins and cookies to track users' browsing histories when they visit third-party websites. Facebook then compiles these browsing histories into personal profiles which are sold to advertisers to generate profits.

101. Facebook offers several advertising options based on the type of audience that an advertiser wants to target. Those options include targeting "Core Audiences," "Custom Audiences," "Look Alike Audiences," and even more granulated approaches within audiences called "Detailed Targeting." Each of Facebook's advertising tools allow an advertiser to target users based, among other things, on their personal data, including geographic location, demographics (e.g., age, gender, education, job title, etc.), interests, (e.g., preferred food, movies), connections (e.g., particular events or Facebook pages), and behaviors (e.g., purchases, device usage, and pages visited). This audience can be created by Facebook, the advertiser, or both working in conjunction.

102. Ad Targeting has been extremely successful due to Facebook's ability to target individuals at a granular level. For example, among many possible target audiences, "Facebook offers advertisers 1.5 million people 'whose activity on Facebook suggests that they're more likely to engage with/distribute liberal political content' and nearly seven million Facebook users who 'prefer high-value goods in Mexico.'"[32] Aided by highly granular data used to target specific users, Facebook's advertising segment quickly became Facebook's most successful business unit, with millions of companies and individuals utilizing Facebook's advertising

[32] https://www.nytimes.com/2018/04/11/technology/facebook-privacy-hearings.html

services.

103. Defendant knew or should have known that Facebook could not be trusted with its patients' sensitive medical information given its history of violating consumers' privacy through unauthorized use of their personal information in general, and for marketing purposes, specifically.

104. Despite knowing that the Meta Pixel code embedded in its websites was sending patients' PII/PHI to Facebook, Defendant did nothing to protect its patients from egregious intrusions into its patients' privacy, choosing instead to benefit at those patients' expense.

105. Additionally, there is widespread knowledge within the health care community that installation of the Meta Pixel tool on hospital websites results in the disclosure of patients' PII/PHI to Facebook, as evidenced by multiple data breaches experienced by hospitals where data gathered by the Meta Pixel code was stolen by cybercriminals. There is also widespread recognition that such disclosures are not only illegal but fundamentally unethical, given the privacy rights involved.

**F. Facebook's Meta Pixel tool allows Facebook to track the personal data of individuals across a broad range of third-party websites.**

106. To power its advertising business, Facebook uses a variety of tracking tools to collect data about individuals, which it can then share with advertisers. These tools include software development kits incorporated into third-party applications, its "Like" and "Share" buttons (known as "social plug-ins"), and other methodologies, which it then uses to power its advertising business.

107. One of Facebook's most powerful tools is called the "Meta Pixel." Once a third-party like Defendant installs the Meta Pixel on its website, by default it begins sending user

information to Facebook automatically.[33]

108. The Meta Pixel is a snippet of code embedded on a third-party website that tracks users' activities as users navigate through a website.[34] Once activated, the Meta Pixel "tracks the people and type of actions they take."[35] Meta Pixel can track and log each page a user visits, what buttons they click, as well as specific information that users input into a website.[36] The Meta Pixel code works by sending Facebook a detailed log of a user's interaction with a website such as clicking on a product or running a search via a query box. The Meta Pixel also captures information such as what content a user views on a website or how far down a web page they scrolled.[37]

109. When someone visits a third-party website page that includes the Meta Pixel code, the Meta Pixel code is able to replicate and send the user data to Facebook through a separate (but simultaneous) channel in a manner that is undetectable by the user.[38]

110. The transmission is instantaneous—indeed Facebook often receives the information before the health care provider does.

111. The transmission is invisible.

112. The transmission is made without any affirmative action taken by the patient.

113. The information Meta Pixel captures and discloses to Facebook includes a referrer header (or "URL"), which includes significant information regarding the user's browsing history, including the identity of the individual internet user and the web server, as well as the name of

---

[33] https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector
[34] https://developers.facebook.com/docs/meta-pixel/
[35] https://www.facebook.com/business/goals/retargeting
[36] https://www.facebook.com/business/help/742478679120153?id=1205376682832142
[37] https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector
[38] *See, e.g., In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589, 596 (9th Cir. 2020) (explaining functionality of Facebook software code on third-party websites).

the web page and the search terms used to find it.[39] When users enter a URL address into their web browser using the 'http' web address format, or click hyperlinks embedded on a web page, they are actually telling their web browsers (the client) which resources to request and where to find them. Thus, the URL provides significant information regarding a user's browsing history, including the identity of the individual internet user and the web server, as well as the name of the web page and the search terms that the user used to find it.

114. These search terms and the resulting URLs divulge a user's personal interests, queries, and habits on third-party websites operating outside of Facebook's own platform. In this manner, Facebook tracks users browsing histories on third-party websites, and compiles these browsing histories into personal profiles which are sold to advertisers to generate revenue.[40]

115. For example, if Meta Pixel is incorporated on a shopping website, it may log what searches a user performed, which items of clothing a user clicked on, whether they added an item to their cart, as well as what they purchased. Along with this data, Facebook also receives personally identifying information like IP addresses, Facebook IDs, and other data that allow Facebook to identify the user. All this personally identifying data is available each time the Meta Pixel forwards a user's interactions with a third-party website to Facebook's servers. Once Facebook receives this information, Facebook processes it, analyzes it, and assimilates it into datasets like its Core Audiences and Custom Audiences. Facebook can then sell this information to companies who wish to display advertising for products similar to what the user looked at on the original shopping website.

116. These communications with Facebook happen silently, without users' knowledge. By default, the transmission of information to Facebook's servers is invisible. Facebook's Meta

---

[39] *In re Facebook*, 956 F.3d at 596.
[40] *In re Facebook*, 956 F.3d at 596.

Pixel allows third-party websites to capture and send personal information a user provides to match them with Facebook or Instagram profiles, even if they are not logged into Facebook at the time.[41]

117. The Meta Pixel collects data on website visitors regardless of whether they have Facebook or Instagram accounts.[42]

118. In exchange for installing its Meta Pixel, Facebook provides website owners like Defendant with analytics about the ads they've placed on Facebook and Instagram and tools to target people who have visited their website.[43] The Meta Pixel collects data on website visitors regardless of whether they have Facebook or Instagram accounts.[44]

119. Facebook can then share analytic metrics with the website host, while at the same time sharing the information it collects with third-party advertisers who can then target users based on the information collected and shared by Facebook.

120. Facebook touted Meta Pixel (which it originally called "Facebook Pixel") as "a new way to report and optimize for conversions, build audiences and get rich insights about how people use your website."[45] According to Facebook, the Meta Pixel is an analytics tool that allows business to measure the effectiveness of their advertising by understanding the actions people take on their websites."[46]

121. Facebook warns web developers that its Pixel is a personal identifier because it enables Facebook "to match your website visitors to their respective Facebook User accounts."[47]

122. Facebook recommends that its Meta Pixel code be added to the base code on

[41] https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector
[42] https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector
[43] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites
[44] https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector
[45] https://developers.facebook.com/ads/blog/post/v2/2015/10/14/announcing-facebook-pixel/
[46] https://www.oviond.com/understanding-the-facebook-pixel
[47] https://developers.facebook.com/docs/meta-pixel/get-started

every website page (including the website's persistent header) to reduce the chance of browsers or code from blocking Pixel's execution and to ensure that visitors will be tracked.[48]

123. Once Meta Pixel is installed on a business's website, the Meta Pixel tracks users as they navigate through the website and logs which pages are visited, which buttons are clicked, the specific information entered in forms (including PII/PHI), as well as "optional values" set by the business website.[49] Facebook builds user profiles on users that include the user's real name, address, location, email addresses, friends, likes, and communications that Facebook associates with personal identifiers, such as IP addresses and the Facebook ID. Meta Pixel tracks this data regardless of whether a user is logged into Facebook.[50]

124. Facebook tracks non-Facebook users through its widespread internet marketing products and source code and Mark Zuckerberg has conceded that the company maintains "shadow profiles" on nonusers of Facebook.[51]

125. For Facebook, the Meta Pixel tool embedded on third-party websites acts as a conduit for information, sending the information it collects to Facebook through scripts running in a user's internet browser, similar to how a "bug" or wiretap can capture audio information.

126. For example, the Meta Pixel is configured to automatically collect "HTTP Headers" and "Pixel-specific data."[52] HTTP headers collect data including "IP addresses, information about the web browser, page location, document, referrer and person using the website."[53] Pixel-specific data includes such data as the "Pixel ID and the Facebook Cookie."[54]

127. Meta Pixel takes the information it harvests and sends it to Facebook with

[48] https://developers.facebook.com/docs/meta-pixel/get-started
[49] https://developers.facebook.com/docs/meta-pixel/
[50] https://themarkup.org/pixel-hunt/2022/06/15/facebook-and-anti-abortion-clinics-are-collecting-highly-sensitive-info-on-would-be-patients
[51] https://techcrunch.com/2018/04/11/facebook-shadow-profiles-hearing-lujan-zuckerberg/
[52] https://developers.facebook.com/docs/meta-pixel/
[53] https://developers.facebook.com/docs/meta-pixel/
[54] https://developers.facebook.com/docs/meta-pixel/

personally identifiable information, such as a user's IP address, name, email, phone number, and specific Facebook ID, which identifies an individual's Facebook user account. Anyone who has access to this Facebook ID can use this identifier to quickly and easily locate, access, and view a user's corresponding Facebook profile. Facebook stores this information on its servers, and, in some instances, maintains this information for years.[55]

128. Facebook also receives personally identifying information in the form of user's unique IP addresses that stay the same as users visit multiple websites. When browsing a third-party website that has embedded Facebook code, a user's unique IP address is forwarded to Facebook by GET requests, which are triggered by Facebook code snippets. The IP address enables Facebook to keep track of the website page visits associated with that address.

129. Facebook also places cookies on visitors' computers. It then uses these cookies to store information about each user. For example, the "c_user" cookie is a unique identifier that identifies a Facebook user's ID. The c_user cookie value is the Facebook equivalent of a user identification number. Each Facebook user has one—and only one—unique c_user cookie. Facebook uses the c_user cookie to record user activities and communications.

130. The data supplied by the c_user cookie allows Facebook to identify the Facebook account associated with the cookie. One simply needs to log into Facebook, and then type www.facebook.com/#, with the c_user identifier in place of the "#." For example, the c_user cookie for Mark Zuckerberg is 4. Logging into Facebook and typing www.facebook.com/4 in the web browser retrieves Mark Zuckerberg's Facebook page: www.facebook.com/zuck.

131. Similarly, the "lu" cookie identifies the last Facebook user who logged in using a specific browser. Like IP addresses, cookies are included with each request that a user's browser

[55] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites

makes to Facebook's servers. Facebook employs similar cookies such as "datr," "fr," "act," "presence," "spin," "wd," "xs," and "fbp" cookies to track users on websites across the internet.[56] These cookies allow Facebook to easily link the browsing activity of its users to their real-world identities, and such highly sensitive data as medical information, religion, and political preferences.[57]

132. Facebook also uses browser fingerprinting to uniquely identify individuals. Web browsers have several attributes that vary between users, like the browser software system, plugins that have been installed, fonts that are available on the system, the size of the screen, color depth, and more. Together, these attributes create a fingerprint that is highly distinctive. The likelihood that two browsers have the same fingerprint is at least as low as 1 in 286,777, and the accuracy of the fingerprint increases when combined with cookies and the user's IP address. Facebook recognizes a visitor's browser fingerprint each time a Facebook button is loaded on a third-party website page. Using these various methods, Facebook can identify individual users, watch as they browse third-party websites like www.emersonhospital.org and target users with advertising based on their web activity.

133. Facebook then sells advertising space by highlighting its ability to target users. Facebook can target users so effectively because it surveils user activity both on and off its official website. This allows Facebook to make inferences about users far beyond what they explicitly disclose, like their "interests," "behavior," and "connections."[58] Facebook compiles this information into a generalized dataset called "Core Audiences," which advertisers use to create highly specific targeted advertising. Indeed, Facebook utilizes precisely the type of

[56] https://techexpertise.medium.com/facebook-cookies-analysis-e1cf6ffbdf8a#:~:text=browser%20session%20ends.-,%E2%80%9Cdatr%E2%80%9D,security%20and%20site%20integrity%20features.
[57] https://securehomes.esat.kuleuven.be/~gacar/fb_tracking/fb_plugins.pdf
[58] https://www.facebook.com/business/ads/ad-targeting

PII/PHI that Defendant bartered to Facebook so that Facebook can identify, target, and market products and services to individuals.

**G. Defendant has discretely embedded the Meta Pixel tool on its website, capturing and disclosing patients' PII/PHI to Facebook.**

134. A third-party website that incorporates Meta Pixel benefits from the ability to analyze a user's experience and activity on the website to assess the website's functionality and traffic. The third-party website also gains information from its customers through Meta Pixel that can be used to target them with advertisements, as well as to measure the results of advertising efforts.

135. Facebook's intrusion into the personal data of visitors to third-party websites incorporating the Meta Pixel is both significant and unprecedented. When Meta Pixel is incorporated into a third-party website, unbeknownst to users and without their consent, Facebook gains the ability to surreptitiously gather every user interaction with the website ranging from what the user clicks on to the personal information entered on a website search bar. Facebook aggregates this data against all websites visited by a specific user.[59] Facebook benefits from obtaining this information because it improves its advertising network, including its machine-learning algorithms and its ability to identify and target users with ads.

136. Facebook provides websites using Meta Pixel with the data it captures in the "Meta Pixel page" in Events Manager, as well as tools and analytics to reach these individuals through future Facebook ads.[60] For example, websites can use this data to create "custom audiences" to target the specific Facebook user, as well as other Facebook users who match "custom audience's" criteria.[61] Businesses that use Meta Pixel can also search through Meta

[59] https://www.facebook.com/business/help/742478679120153?id=1205376682832142
[60] https://www.facebook.com/business/help/742478679120153?id=1205376682832142
[61] https://developers.facebook.com/docs/marketing-api/reference/custom-audience/

Pixel data to find specific types of users to target, such as men over a certain age.

137. Businesses install the Meta Pixel software code to help drive and decode key performance metrics from visitor traffic to their websites.[62] Businesses also use the Meta Pixel to build custom audiences on Facebook that can be used for advertising purposes.[63]

138. For example, when a user on many hospital websites clicks on a "Schedule Online" button next to a doctor's name, Meta Pixel sends the text of the button, the doctor's name, and the search term (such as "cardiology") used to find the doctor to Facebook. If the hospital's website has a drop-down menu to select a medical condition in connection with locating a doctor or making an appointment, that condition is also transmitted to Facebook through Meta Pixel.

139. Facebook has designed the Meta Pixel such that Facebook receives information about patient activities on hospital websites as they occur in real time. Indeed, the moment that a patient takes any action on a webpage that includes the Meta Pixel—such as clicking a button to register, login, logout, or to create an appointment—Facebook code embedded on that page redirects the content of the patient's communications to Facebook while the exchange of information between the patient and hospital is still occurring.

140. Defendant is among the hospital systems who have embedded Meta Pixel on their websites. As recently as May 2024, Defendant had incorporated the Meta Pixel on pages throughout its website, resulting in the substantial (and unauthorized) disclosure of its patients' communications to Facebook and other third parties.

141. When a patient entered their personal information through Defendant's websites that incorporate Meta Pixel, including to locate a doctor or make an appointment, this

---

[62] https://instapage.com/blog/meta-pixel
[63] https://instapage.com/blog/meta-pixel

information, including what the patient is being treated for, those communications are immediately and instantaneously routed to Facebook via the Meta Pixel. The acquisition and disclosure of these communications occurs contemporaneously with the transmission of these communications by patients.

142. This data, which can include health conditions (e.g., addiction, Alzheimer's, heart disease), diagnoses, procedures, test results, the treating physician, medications, and other PII/PHI is obtained and used by Facebook, as well as other parties, for the purpose of targeted advertising.

143. For example, a patient searching for a doctor on Defendant's website is asked to provide a variety of information to filter the various physicians available to treat various medical conditions, including the doctor's specialty, the patient's condition, the patient's hometown, the patient's language preference, and other information that the patient provides.




144. All this data is disclosed to Facebook simultaneously in real time via the Meta Pixel as patients transmit their information, along with other data, such as patient's unique

Facebook ID that is captured by the c_user cookie, which allows Facebook to link this information to patients' unique Facebook accounts. Defendant also discloses other personally identifying information to Facebook, such as patient IP addresses, cookie identifiers, browser-fingerprints, and device identifiers.

145. Defendant discloses such personally identifying information and sensitive medical information even when patients are searching for doctors to assist with them conditions such as substance abuse and addiction.




146. Likewise, a patient who desires an appointment with a specific doctor is asked to fill out an extensive online questionnaire, which includes information such as the doctor's name, the patient's name, telephone number, physical address, and email address. All this information

is acquired by Defendant and forwarded to Facebook via the Meta Pixel contemporaneously with its transmission by patients.


REQUEST AN APPOINTMENT

Fill out the below form to request an appointment with Dr. Roomi. A member of our staff will get back to you during normal business hours.

Privacy Policy

First name: John
Last name: Doe
Home address: 268 Summer St LL
City: Boston
State: MA
Zip code: 02210
Email: johndoe@yahoo.com
Phone number: 555.555.5555

I'm not a robot
reCAPTCHA
Privacy - Terms

SUBMIT

147. Defendant also discloses patient information from across its website including (but not limited to) communications that are captured by the website's search bar, communications that are captured when a patient searches for "Services" offered by Defendant, communications made by patients using the website's Bill Pay/Financials function, communications made when patients access Defendant's patient portal, and communications made when patients are researching specific medical conditions such as COVID-19.

148. Defendant made similar disclosures to Facebook, Google, and other third parties

when patients click on the "Log in" buttons of the password protected portions of its website, including its patient portal and bill pay functions, confirming to these companies that the website users are Emerson patients. For example, Defendant allows patients to search for information about "Specialties & Services" such as "Cardiology," "Obstetrics, Gynecology & Midwifery," "Neurology," and "Gastroenterology."[64] A patient searching for information about cancer treatment or pregnancy, however, not only shares their Personal Health Information with Defendant, but also unknowingly shares their Personal Health Information with Facebook and Google, such as the fact that the patient is pregnant:




149. Defendant has disclosed patient PII/PHI collected across their websites and mobile application including (but not limited to) the following communications:

- when patients search via Defendant's search bars for their required care (e.g., for "substance abuse");

[64] https://emersonhealth.org/specialties-services/?

- when patients search for a physician or provider—which reveal their location and required medical services and medical conditions (e.g., searching for "Gynecology");
- when patients search for, register for, and/or click on classes or events;
- when patients make or reschedule appointments with their physicians;
- when patients review their prescriptions;
- when patients receive and look over their test results;
- when patients research treatment information and medical services; and
- when patients select "Locations" and then enter their ZIP code, the medical service they are seeking (e.g., "Behavioral Health"), and required location type (e.g., "Hospital").

150. In other words, through the transmittal of captured URLs and related data, Facebook and Google learned not just that patients were seeking treatment, but where and typically when they were seeking treatment, along with other information that patients would reasonably assume that Defendant was not sharing with third party marketing companies.

151. The transmitted URLs contain both the "path" and the "query string" arising from patients' interactions with Defendant's websites and mobile application. The path identifies where a file can be found on a website. Likewise, a query string provides a list of parameters. The query string parameters in this search indicate that a search was done at Defendant's website for information about HIV. In other words, the Meta Pixel and other tracking technologies capture information that connects a particular user to a particular healthcare provider and that patient's specific healthcare issue. To illustrate, an example of a full-string URL that provides a query string is https://emersonhealth.org/search/?keyword=cancer. The query string parameters

in this search indicate that a search was done at Defendant's website for information about cancer. In other words, the Meta Pixel captures information that connects a particular user with a particular health condition to a particular healthcare provider.

152. Defendant also provides Facebook and Google with details about online forms that patients fill out in the form of POST requests, including forms such as when a patient utilizes the Emerson Hospital website's "Find A Doctor" function.[65] All the information that patients provide when filling out these forms are also disclosed to Facebook and Google.

153. As the above demonstrates, knowing what information a patient is reviewing on Defendant's website can reveal deeply personal and private information. For example, a simple search for "pregnancy" on Defendant's website allows Meta Pixel to capture that search term and tells Facebook that the patient is likely pregnant. Indeed, Facebook might know that the patient is pregnant before the patient's close family and friends. But there is nothing visible on Defendant's website that would indicate to patients that, when they use Defendant's search function, their personally identifiable data and the precise content of their communications with Defendant are being automatically captured and made available to Facebook, who can then use that information for advertising purposes even when patients search for treatment options for sensitive medical conditions such as cancer or substance abuse.

154. The amount of data collected is significant. Via the Meta Pixel, when patients interact with its website, Defendant discloses a full-string, detailed URL to Facebook, which contains the name of the website, folder and sub-folders on the webserver, and the name of the precise file requested. For example, when a patient types a search term into the search bar on Defendant's website, the website returns links to information relevant to the search term. When

---

[65] https://www.emersonhospital.org/find-a-doctor

patients then click these links, a communication is created that contains a GET request and a full-string detailed URL.

155. By compelling visitors to its websites to disclose personally identifying data and sensitive medical information to Facebook and other third parties, Defendant knowingly discloses information that allows Facebook and other advertisers to link its patients' Personal Health Information to their private identities and target them with advertising. Defendant intentionally shares the Personal Health Information of its patients with Facebook in order to gain access to the benefits of the Meta Pixel tool.

156. The contents of patients' search terms shared with Facebook plainly relate to (and disclose) the past, present, or future physical or mental health or condition of individual patients who interact with Defendant's website and the provision of health care to those patients. Worse, no matter how sensitive the area of the Defendant's website that a patient reviews, the full-string referral URL generated by patient searches is acquired by Facebook along with personally identifiable information.

157. The nature of the collected data is also important. Defendant's unauthorized disclosures result in Facebook obtaining a comprehensive browsing history of an individual patient, no matter how sensitive the patient's medical condition. Facebook is then able to correlate that history with the time of day and other user actions on Defendant's website. This process results in Facebook acquiring a vast repository of personal data about patients—all without their knowledge or consent.

158. Defendant also disclosed the same kind of patient data described above to other third parties, including Google, DoubleClick, StackAdapt, Quantcast, CallRail, and Youtube via tracking software that Defendant installed on its website and mobile application. As with the

Facebook Meta Pixel, Defendant provides patients and prospective patients with no notice that Defendant is disclosing the contents of their communications to these third parties. Likewise, Defendant does not obtain consent from patients and prospective patients before forwarding their communications to these companies.

159. These disclosures to third parties other than Facebook are equally disturbing. Google Analytics, for example, has been described by the Wall Street Journal as "far and away the web's most dominant analytics platform," which "tracks you whether or not you are logged in."[66] Like Facebook, Google tracks internet users with IP addresses, cookies, geolocation, and other unique device identifiers. Defendant routinely discloses patients' personal health information to such Google services as Google Analytics, Google DoubleClick, and Google AdWords.

160. Google cookies provide personally identifiable data about patients who visit Defendant's website to Google. Defendant transmits personally identifiable Google cookie data to Google.

161. Google warns web-developers that Google marketing tools are not appropriate for health-related webpages and websites. Indeed, Google warns web developers that "Health" is a prohibited category that should not be used by advertisers to target ads to users or promote advertisers' products or services.

162. Defendant deploys Google tracking tools on nearly every page of its websites, resulting in the disclosure of communications exchanged with patients to be transmitted to Google. These transmissions occur simultaneously with patients' communications with Defendant and include communications that Plaintiffs and Class Members made about specific medical providers, treatments, conditions, appointments, bill payments, and registrations and

[66] https://www.wsj.com/articles/who-has-more-of-your-personal-data-than-facebook-try-google-1524398401

logins to Defendant's patient portal. Incredibly, Defendant continues to deploy Google Analytics on its website as of April 2025.

163. By compelling visitors to its websites to disclose personally identifiable data and sensitive medical information to Facebook and other third parties, Defendant knowingly discloses information that allows Facebook and other advertisers to link its patients' PII/PHI to their private identities and target them with advertising (or do whatever else Facebook may choose to do with their information, including running "experiments" on its customers by manipulating the information they are shown on their Facebook pages).[67] Defendant intentionally shared the PII/PHI of its patients with Facebook in order to gain access to the benefits of the Meta Pixel tool.

164. The information Plaintiffs and Class Members provide to Emerson via its website (and then shared illegally with Facebook) can be combined with other information in Facebook's possession, like their names, dates of birth, and phone numbers, to more effectively target Plaintiffs with advertisements or sell Plaintiffs' data to third parties.

165. Because Defendant embedded the Meta Pixel on their websites, Defendant disclosed intimate details about Plaintiffs' interactions with the websites, including Plaintiffs' scrolling, typing, and selecting options from drop down menus. Each time the Meta Pixel was triggered, it caused Plaintiffs' information to be secretly transmitted to Facebook's servers, as well as additional information that captures and discloses the communications' content and Plaintiffs' identities. For example, when Plaintiffs and Class Members visited Defendant's websites, their PII/PHI was transmitted to Facebook, including such engagement as using the website's search bar, using the website's "Find a Doctor" function, and typing content into

[67] https://www.theatlantic.com/technology/archive/2014/06/everything-we-know-about-facebooks-secret-mood-manipulation-experiment/373648/

online forms. During these same transmissions, Defendant's websites would also provide Facebook with Plaintiffs' and Class Members' Facebook ID, IP addresses, device IDs, and other information that Plaintiffs and Class Members provided. This is precisely the type of information that state and federal law require healthcare providers to de-identify to protect the privacy of patients.

166. Defendant knew that by embedding Meta Pixel and Google Analytics on to its Web Properties, and by embedding Google Firebase code into its Epic mobile application, it was permitting Facebook and Google to collect, use, and share Plaintiffs' and the Class Members' PII/PHI, including sensitive medical information and personally identifiable data. Defendant was also aware that such information would be shared with Facebook and Google simultaneously with patients' interactions with its websites. Defendant made the decision to barter its patients' PII/PHI to Facebook and Google because it wanted access valuable analytics information and tools, including the Meta Pixel and Google Analytics. Indeed, Defendant could not gain access to those analytics or tools without first disclosing it's patients' information and data to Facebook and Google. While that bargain may have benefited Defendant, Google, and Facebook, it also betrayed the rights of Plaintiffs and Class Members.

**H. Plaintiffs and the Class Members did not consent to the interception and disclosure of their protected health information.**

167. Plaintiffs and Class Members had no idea when they interacted with Defendant's websites and mobile application that their personal data, including sensitive medical data, was being collected and transmitted to Facebook and Google. That is because, among other things, Meta Pixel and Google Analytics is seamlessly integrated into Defendant's websites and is invisible to patients visiting those websites. The same was true for the integration of Google Firebase code into the Epic mobile application.

168. For example, when Plaintiffs visited Defendant's website in 2022 at www.emersonhospital.org, there was no indication that Meta Pixel was embedded on that website or that it would collect and transmit their sensitive medical data to Facebook. Similarly, there was no warning that at least from 2019 to 2022, use of Defendant's Epic mobile application would result in the transmission of communications to Google from inside of the Patient Gateway patient portal.

169. Plaintiffs and their fellow Class Members could not consent to Defendant's conduct when there was no indication that their sensitive medical information would be collected and transmitted to Facebook or Google in the first place.

170. While Defendant purported to have "Privacy Practices," those Privacy Practices were effectively hidden from patients, buried inside a link labeled "Notice of Privacy Practices" that was concealed at the bottom of Defendant's homepage in type so small as to be unreadable to many visitors:




171. Defendant's "Notice of Privacy Practices" gave no indication to patients that Defendant routinely allowed Facebook to capture and exploit patients' Personal Health

Information. Indeed, Defendant expressly promised[68] in its "Notice of Privacy Practices" that it would never share patient's medical information with marketing companies without express authorization from patients:

> **USES OR DISCLOSURES OF INFORMATION THAT REQUIRE YOUR WRITTEN PERMISSION**
>
> Using and/or sharing health information for most purposes other than treatment, payment or health care operations requires your specific authorization. The following will occur only with authorization from the individual:
>
> - most uses and disclosures of psychotherapy notes
> - uses and sharing of personal health information for marketing purposes, including communications related to subsidized treatment
> - disclosures that constitute a sale of personal health information

172. Even if a patient stumbled upon Defendant's carefully hidden "Notice of Privacy Practices," nothing in that notice would be understood by any reasonable patient to mean that Defendant was routinely allowing Facebook and Google to capture and exploit patients' Personal Health Information.

173. Defendant's "Notice of Privacy Practices" stated that "using and/or sharing health information for most purposes other than treatment, payment or health care operations requires [the patient's] specific authorization" and assured patients that Defendant would only use or share patients' Personal Health Information for marketing purposes "with authorization from the individual."[69]

174. These statements were false, deceptive, and misleading. Defendant in fact tracked patients' and potential patients' IP addresses, cookies, browser-fingerprints, and device

[68] https://www.emersonhospital.org/patients-visitors/patient-rights-responsibilities/patient-privacy
[69] https://www.emersonhospital.org/patients-visitors/patient-rights-responsibilities/patient-privacy

identifiers, and caused the transmission of the same to third parties along with patients' and potential patients' sensitive medical information.

175. Defendant does not have a legal right to share Plaintiffs and Class Members' Protected Health Information with Facebook, Google, or similar third parties because this information is protected from such disclosure by law. *See* G.L. c. 214, §1B; 45 C.F.R. § 164.508. Moreover, Defendant is not permitted to disclose patients' Personal Health Information to an advertising and marketing company like Facebook without express written authorization from patients.

176. Defendant failed to obtain a valid written authorization from Plaintiffs or any of the Class Members to allow the capture and exploitation of their personally identifiable information and the contents of their communications by third parties for their own direct marketing purposes.

177. A patient's reasonable expectation that their health care provider will not share their information with third parties for marketing purposes is not subject to waiver via an inconspicuous privacy policy hidden away on a company's website. Such "Browser-Wrap" statements do not create an enforceable contract against consumers. Further, Defendant expressly promised its patients that it would never sell or use their Personal Health Information for marketing purposes without express authorization.

178. Accordingly, Defendant lacked authorization to intercept, collect, and disclose Plaintiffs and Class Members' PII/PHI to Facebook, Google, or similar third parties, or to aid in the same.

**I. Defendant's disclosures of personal patient data to Facebook, Google, and other third parties are unnecessary.**

179. There is no information anywhere on the websites operated by Defendant that

would alert patients that their most private information (such as their identifiers, their medical conditions, and their medical providers) is being automatically transmitted to Facebook or Google. Nor are any of the disclosures of patient PII/PHI to Facebook and Google necessary for Defendant to maintain its healthcare website or provide medical services to patients.

180. For example, it is possible for a healthcare website to provide a doctor search function without allowing disclosures to third-party advertising companies about patient sign ups or appointments. It is also possible for a website developer to utilize tracking tools without allowing disclosure of patients' Personal Healthcare Information to companies like Facebook. Likewise, it is possible for Defendant to provide medical services to patients without sharing their Personal Health Information with Facebook so that this information can be exploited for advertising purposes. Indeed, after Plaintiffs filed the original complaint, Defendant removed the Meta Pixel from its website, confirming that use of the Meta Pixel is unnecessary for Defendant to provide medical services to its patients.

181. Despite the wholly unnecessary nature of the Meta Pixel for Defendant to run its business, Defendant willfully chose to implement Meta Pixel on its websites and aid in the disclosure of personally identifiable information and sensitive medical information about its patients, as well as the contents of their communications with Defendant, to third-parties, including Facebook and Google.

**J. Plaintiffs and Class Members have a reasonable expectation of privacy in their PII/PHI, especially with respect to sensitive medical information.**

182. Patient confidentiality "is a cardinal rule of the medical profession, faithfully adhered to in most instances, and thus has come to be justifiably relied upon by patients seeking advice and treatment." *Alberts v. Devine*, 395 Mass. 59, 65 (1985).

183. As patients, Plaintiffs and Class Members have a reasonable expectation of

privacy that their healthcare provider would not disclose their PII/PHI to third parties without their express authorization. Defendant's surreptitious interception, collection, and disclosure of patients' Personal Health Information to Facebook and Google violated Plaintiffs and Class Member's privacy interests.

184. Patient personal health information is specifically protected by law. *E.g.* G.L. 111, §70E(b); G.L. 214, §1B (Right to Privacy). The prohibitions against disclosing patient Personal Health Information include prohibitions against disclosing personally identifying data such as patient names, IP addresses, and other unique characteristics or codes. *See* G.L. c. 111, § 70E (Patients' and Residents' Rights); 105 Mass. Code Regs. 300.120; 45 C.F.R. § 164.514(b)(2)(i). And both HIPAA and Massachusetts law subject medical providers who treat conditions such as substance abuse to heightened duties of confidentiality. 42 C.F.R. § 2.12(a)(1)(i); M.G.L. c. 111B, § 11.. This legal framework applies to health care providers, such as Defendant.

185. Moreover, the modern Hippocratic Oath provides, "I will respect the privacy of my patients, for their problems are not disclosed to me that the world may know."[70] Likewise, the American Medical Association's ("AMA") Code of Medical Ethics contains numerous rules protecting the privacy of patient data and communications. For example, the AMA has issued medical ethics opinions providing that "[p]rotecting information gathered in association with the care of a patient is a core value in health care. However, respecting patient privacy in other forms is also fundamental, as an expression of respect for patient autonomy and a prerequisite for trust .... Physicians must seek to protect patient privacy in all settings to the greatest extent possible and should ... [m]inimize intrusion on privacy when the patient's privacy must be balanced against other factors [and inform] the patient when there has been a significant infringement on

[70] https://www.pbs.org/wgbh/nova/doctors/oath_modern.html

privacy of which the patient would otherwise not be aware."[71]

186. The AMA's ethics opinions have further cautioned physicians and hospitals that "[d]isclosing information to third parties for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship." [72]

187. Several studies examining the collection and disclosure of consumers' sensitive medical information confirm that the disclosure of sensitive medical information violates expectations of privacy that have been established as general social norms.

188. Privacy polls and studies also uniformly show that the overwhelming majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its customers' data.

189. For example, a recent study by *Consumer Reports* showed that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumers' data, and the same percentage believed that internet companies and websites should be required to provide consumers with a complete list of the data that has been collected about them.[73]

190. Users act consistently with these preferences. For example, following a new rollout of the iPhone operating software—which asks users for clear, affirmative consent before allowing companies to track users—85 percent of worldwide users and 94 percent of U.S. users chose not to share data when prompted.[74]

---

[71] https://www.ama-assn.org/sites/ama-assn.org/files/corp/media-browser/code-of-medical-ethics-chapter-3.pdf (opinion 3.1.1).
[72] https://www.ama-assn.org/sites/ama-assn.org/files/corp/media-browser/code-of-medical-ethics-chapter-3.pdf (opinion 3.2.4).
[73] https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907/
[74] https://www.wired.co.uk/article/apple-ios14-facebook

191. The concern about sharing personal medical information is compounded by the reality that advertisers view this type of information as particularly valuable. Indeed, having access to the data women share with their healthcare providers allows advertisers to obtain data on children before they are even born. As one recent article noted, "What is particularly worrying about this process of datafication of children is that companies like [Facebook] are harnessing and collecting multiple typologies of children's data and have the potential to store a plurality of data traces under unique ID profiles."[75]

192. Many privacy law experts have expressed serious concerns about patients' sensitive medical information being disclosed to third-party companies like Facebook. As those critics have pointed out, having a patient's personal health information disseminated in ways the patient is unaware of could have serious repercussions, including affecting their ability to obtain life insurance, how much they might pay for such coverage, the rates they might be charged on loans, and the likelihood of their being discriminated against.

**K. Defendant harmed Plaintiffs when it illicitly collected, disclosed, and exploited Plaintiffs' PII/PHI—which, after all, is Plaintiff's property and has economic value.**

193. It is common knowledge that there is an economic market for consumers' personal data—including the kind of data that Defendant has collected and disclosed from Plaintiffs and Class Members.

194. In 2013, the *Financial Times* reported that the data-broker industry profits from the trade of thousands of details about individuals, and that within that context, "age, gender and location information" were being sold for approximately "$0.50 per 1,000 people."[76]

195. In 2015, *TechCrunch* reported that "to obtain a list containing the names of individuals suffering from a particular disease," a market participant would have to spend about

[75] https://thereader.mitpress.mit.edu/tech-companies-are-profiling-us-from-before-birth/
[76] https://ig.ft.com/how-much-is-your-personal-data-worth/

"$0.30" per name.[77] That same article noted that "Data has become a strategic asset that allows companies to acquire or maintain a competitive edge" and that the value of a single user's data can vary from $15 to more than $40 per user.[78]

196. In a 2021 Washington Post article, the legal scholar Dina Srinivasan said that consumers "should think of Facebook's cost as [their] data and scrutinize the power it has to set its own price."[79] This price is only increasing. According to Facebook's own financial statements, the value of the average American's data in advertising sales rose from $19 to $164 per year between 2013 and 2020.[80]

197. Despite the protections afforded by law, there is an active market for health information. Medical information obtained from health providers garners substantial value because of the fact that it is not generally available to third party data marketing companies because of the strict restrictions on disclosure of such information by state laws and provider standards, including the Hippocratic oath. Even with these restrictions, however, a multi-billion-dollar market exists for the sale and purchase of such private medical information.[81]

198. Further, individuals can sell or monetize their own data if they so choose. For example, Facebook has offered to pay individuals for their voice recordings,[82] and has paid teenagers and adults up to $20 a month plus referral fees to install an app that allows Facebook to collect data on how individuals use their smart phones.[83]

199. A myriad of other companies and apps such as DataCoup, Nielsen Computer,

[77] https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/
[78] https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/
[79] https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/
[80] https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/
[81] https://revealnews.org/blog/your-medical-data-is-for-sale-and-theres-nothing-you-can-do-about-it/; *see also https://slate.com/technology/2022/06/health-data-brokers-privacy.html*
[82] https://www.theverge.com/2020/2/20/21145584/facebook-pay-record-voice-speech-recognition-viewpoints-proun861ciations-app
[83] https://www.cnbc.com/2019/01/29/facebook-paying-users-to-install-app-to-collect-data-techcrunch.html

Killi, and UpVoice also offer consumers money in exchange for access to their personal data.[84]

200. Given the monetary value that data companies like Facebook have already paid for personal information in the past, Defendant has deprived Plaintiffs and the Class Members of the economic value of their sensitive medical information by collecting, using, and disclosing that information to Facebook and other third parties without consideration for Plaintiffs and the Class Member's property.

**L. Defendant is enriched by making unlawful, unauthorized, and unnecessary disclosures of its patients' PII/PHI.**

201. In exchange for disclosing PII/PHI about its patients, Defendant has been compensated by Facebook and Google with enhanced online analytics and advertising services, including (but not limited to) retargeting and enhanced analytics functions.

202. Retargeting is a form of online targeted advertising that targets users with ads based on their previous internet actions, which is facilitated through the use of cookies and tracking pixels. Once an individual's data is disclosed and shared with a third-party marketing company, the advertiser is able to show ads to the user elsewhere on the internet.

203. For example, retargeting could allow a web-developer to show advertisements on other websites to customers or potential customers based on the specific communications exchanged by a patient or their activities on a website. Using the Meta Pixel, a website could target ads on Facebook itself or on the Facebook advertising network. The same or similar advertising can be accomplished via disclosures to other third-party advertisers and marketers.

204. Once personally identifiable information relating to patient communications is disclosed to third parties like Facebook and Google, Defendant loses the ability to control how that information is subsequently disseminated and exploited.

---

[84] https://www.creditdonkey.com/best-apps-data-collection.html; *see also https://www.monetha.io/blog/rewards/earn-money-from-your-data/*

205. The monetization of the data being disclosed by Defendant demonstrates the inherent value of the information being collected.

## TOLLING, CONCEALMENT, AND ESTOPPEL

206. The applicable statutes of limitation have been tolled as a result of Defendant's knowing and active concealment and denial of the facts alleged herein.

207. Defendant seamlessly incorporated Meta Pixel, Google Analytics, and other tracking pixels into its websites, providing no indication to users that they were interacting with a website enabled by such tracking technologies. Defendant likewise deployed Google Firebase code on its mobile application, without providing any warning of the same. Defendant had knowledge that its websites and mobile application incorporated Meta Pixel, Google Analytics, and other trackers yet failed to disclose that by interacting with its websites and application that Plaintiffs and Class Members' sensitive medical information would be intercepted, collected, used by, and disclosed to Facebook.

208. Plaintiffs and Class Members could not with due diligence have discovered the full scope of Defendants' conduct, because there were no disclosures or other indication that they were interacting with websites or an application employing Meta Pixel and other trackers.

209. The earliest that Plaintiffs and Class Members, acting with due diligence, could have reasonably discovered this conduct would have been on June 15, 2022, following the release of the Markup's investigation.

210. All applicable statutes of limitation have also been tolled by operation of the discovery rule and the doctrine of continuing tort. Defendant's illegal interception and disclosure of patients' Personal Health Information has continued. What's more, Defendant was under a duty to disclose the nature and significance of their data collection practices but did not do so.

Defendant is therefore estopped from relying on any statute of limitations defenses.

## CLASS ACTION ALLEGATIONS

211. Defendant's conduct violates the law and breaches its express and implied privacy promises.

212. Defendant's unlawful conduct has injured Plaintiffs and Class Members.

213. Defendant's conduct is ongoing.

214. Plaintiffs bring this action individually and as a class action against Defendant.

215. Plaintiffs seek class certification for the following proposed Class:

> During the fullest period allowed by law, all current Massachusetts citizens who are, or were, patients of Emerson Hospital or any of its affiliates and who exchanged communications at Emerson Hospital's websites, including www.emersonhospital.org and any other Emerson Hospital affiliated website, or through Emerson Hospital's Epic mobile application.

216. Excluded from the proposed Class are: (1) any Judge or Magistrate presiding over this action and members of their families; (2) the Defendant, Defendant's subsidiaries, affiliates, parents, successors, predecessors, and any entity in which the Defendant or its parent has a controlling interest and their current or former employees, officers, and directors; and (3) Plaintiffs' counsel and Defendant's counsel.

217. Plaintiffs reserve the right to redefine the Class and/or add Subclasses at, or prior to, the class certification stage, in response to discovery or pursuant to instruction by the Court.

218. This action is properly maintainable as a class action as specifically defined in Massachusetts Rule of Civil Procedure 23.

219. **Numerosity:** While the exact number of Class Members is unknown to Plaintiffs at this time, the Class, based on information and belief, consist of thousands of people, such that joinder of all members is impracticable. The exact number of Class Members can be determined

by review of information maintained by Defendants.

220. **Commonality and Predominance:** There are questions of law and fact common to Class Members and which predominate over any questions affecting only individual members. A class action will generate common answers to the questions below, which are apt to drive resolution:

a. Whether Defendant's acts and practices violated Plaintiffs' and Class Members' privacy rights;

b. Whether Defendant's acts and practices violate 18 U.S.C. § 2510, et seq.;

c. Whether Defendant's acts and practices violate G.L. c. 214, § 1B;

d. Whether Defendant's acts and practices violate G.L. c. 111, § 70E;

e. Whether Defendant knowingly allowed the surreptitious collection and disclosure of Plaintiffs and Class Members' PII/PHI to Facebook and other third parties;

f. Whether Defendant's acts and practices constitute a breach of fiduciary duty;

g. Whether Defendant profited from disclosures of patient PII/PHI to third parties including Facebook;

h. Whether Defendant was unjustly enriched;

i. Whether Defendant's acts and practices harmed and continue to harm Plaintiffs and Class Members and, if so, the extent of that injury;

j. Whether Plaintiffs and Class Members are entitled to equitable relief including, but not limited to, injunctive relief, restitution, and disgorgement; and

k. Whether Plaintiffs and Class Members are entitled to actual, statutory, punitive or other forms of damages, and other monetary relief.

221. These common questions of law and fact predominate over any questions affecting only the individual Class Members.

222. Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs individually and on behalf of the other Class Members. Identical statutory and common law violations, business practices, and injuries are involved.

Individual questions, if any, pale by comparison, in both quantity and quality, to the numerous common questions that dominate this action.

223. **Typicality:** Plaintiffs' claims are typical of the claims of other Class Members and Plaintiffs have substantially the same interest in this matter as other Class Members. Plaintiffs have no interests that are antagonist to, or in conflict with, the interests of other members of the Class. Plaintiffs' claims arise out of the same set of facts and conduct as all other Class Members. Plaintiffs and all Class Members are patients of Defendant who used the websites set up by Defendant for patients and are victims of Defendant's respective unauthorized disclosures to third parties including Facebook. All claims of Plaintiffs and Class Members are based on Defendant's wrongful conduct and unauthorized disclosures.

224. **Adequacy of Representation:** Plaintiffs are committed to prosecuting this action and have retained competent counsel experienced in litigation of this nature. Plaintiffs' claims are coincident with, and not antagonistic to, those of other Class Members they seeks to represent. Plaintiffs have no disabling conflicts with Class Members. Accordingly, Plaintiffs are an adequate representative of the Class and, along with counsel, will fairly and adequately protect the interests of the Class and any Subclasses.

225. **Superiority:** A class action is the superior method for fair and efficient adjudication of the controversy. Although all Class Members have claims against Defendant, the likelihood that individual Class Members will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation. The damages, harm, and other detriment suffered individually by Plaintiffs and other Class Members are relatively small compared to the burden and expense that would be required to litigate their claims on an individual basis against Defendant, making it impractical for Class Members to individually seek redress for Defendant's

wrongful conduct. Moreover, serial adjudication in numerous venues is not efficient, timely, or proper. Judicial resources would be unnecessarily depleted by prosecution of individual claims. The prosecution of separate actions by individual Class Members could create a risk of inconsistent or varying adjudications with respect to individual members of the Cass, which could establish incompatible standards of conduct for Defendant or adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the members of the Class Members who are not parties to the adjudications. If a class action is not permitted, Class Members will continue to suffer losses and Defendant's misconduct will continue without proper remedy.

226. Plaintiffs anticipate no unusual difficulties in the management of this litigation as a class action. The Class is readily ascertainable and direct notice can be provided from the records maintained by Defendant, electronically or by publication, the cost of which is properly imposed on Defendant.

227. For the above reasons, among others, a class action is superior to other available methods for the fair and efficient adjudication of this action.

## CAUSES OF ACTION

### COUNT I
### Interception of Wire Communications in Violation of 18 U.S.C. § 2510, *et seq* (On Behalf of Plaintiffs and the Class)

228. Plaintiffs re-allege and incorporates by reference all paragraphs above as if fully set forth herein.

229. The Electronic Communications Privacy Act (the "ECPA"), 18 U.S.C. § 2510, protects individuals against eavesdropping committed with an improper purpose.

230. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119 of Title 18 of the United States Code.

231. A violation of Chapter 119 and the ECPA occurs where any person "intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any . . . electronic communication" or "intentionally discloses, or endeavors to disclose, to any other person the contents of any . . . electronic communication, knowing or having reason to know that the information was obtained through the [unlawful] interception of a[n] . . . electronic communication" or "intentionally uses, or endeavors to use, the contents of any . . . electronic communication, knowing or having reason to know that the information was obtained through the [unlawful] interception of a[n] . . . electronic communication." 18 U.S.C. §§ 2511(1)(a), (c)-(d).

232. Plaintiffs' communications with Defendant on its web properties and through its mobile application and patient portal are covered communications under 18 U.S.C. §§ 2510, 2511.

233. Plaintiffs' and Class Members' communications with Defendant constitute "electronic communications" because each communication was the transfer of data or intelligence, including, but not limited to:

a. the parties to the communications;

b. the precise text of patient search queries;

c. personally identifying information such as patients' IP addresses, Facebook IDs, browser fingerprints, and other unique identifiers;

d. the precise text of patient communications about specific doctors;

e. the precise text of patient communications about specific medical conditions;

f. the precise text of patient communications about specific treatments;

g. the precise text of patient communications about scheduling appointments with medical providers;

h. the precise text of patient communications about billing and payment;

i. the precise text of specific buttons on Defendant's website(s) that patients click to exchange communications, including Log-Ins, Registrations, Requests for Appointments, Search, and other buttons;

j. the precise dates and times when patients click to Log-In on Defendant's website(s);

k. The precise dates and times when patients visit Defendant's websites;

l. information that is a general summary or informs third parties of the general subject of communications that Defendant sent back to patients in response to search queries and requests for information about specific doctors, conditions, treatments, billing, payment, and other information; and

m.. any other content that Defendant has aided third parties in scraping from webpages, communication forms at web properties, or its mobile application.

234. Plaintiffs and Class Members's communications with Defendant constitute "electronic communications" because they were wholly or partially transmitted by wire, electromagnetic, and/or photoelectronic systems including but not limited to:

a. Plaintiffs and Class Members' personal computing devices;

b. Plaintiffs and Class Members' web browsers;

c. Plaintiffs and Class Members' browser-managed files;

d. Facebook's Meta Pixel;

e. Google Analytics;

f. Google Firebase;

g. the Epic mobile application;

h. Internet cookies;

i. Defendant's computer servers; and

j. Third-party source code used by Defendants.

235. Whenever Plaintiffs and Patient Class members interacted with Defendant's web properties, including its patient portal, or its mobile application, Defendant, through the source code it imbedded and ran on its web properties and Epic mobile application, contemporaneously and intentionally divulged the contents of Plaintiffs and Class members' electronic communications while those communications were in transmission, to persons or entities other than an addressee or intended recipient of such communication, including Facebook and Google.

236. Defendant's intercepted communications include, but are not limited to, the contents of communications to/from Plaintiffs' and Class Members' regarding PII and PHI, treatment, medication, and scheduling.

237. The ECPA provides that a "party to the communication" may be liable where a "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State."

238. Thus, although Defendant is a "part[y] to the communications" at issue, it still incurs liability under the ECPA because it captured and redirected Plaintiffs' information to third parties without consent and for criminal and tortious purposes, as alleged throughout this complaint.

239. Defendant's acquisition of patient communications that were used and disclosed to Facebook and Google was done for purposes of committing criminal and tortious acts in violation of the laws of the United States and Massachusetts including, among other things:

a. Criminal violation of HIPAA, 42 U.S.C. § 1320d-6;

b. Invasion of privacy in violation of G.L. c. 214, § 1B;

c. Breach of confidentiality of medical records in violation of G.L. c. 111, § 70E; and

d. Breach of the common law duty of confidentiality.

240. For example, under 42 U.S.C. § 1320d-6, it is a criminal violation for a person to "use[] or cause[] to be used a unique health identifier" or to "disclose[] individually identifiable health information to another person … without authorization" from the patient.

241. The penalty for violation is enhanced where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." 42 U.S.C. § 1320d-6.

242. Defendant's conduct violated 42 U.S.C. § 1320d-6 in that it:

a. Used and caused to be used cookie identifiers associated with specific patients without patient authorization; and
b. Disclosed individually identifiable health information to Facebook and Google without patient authorization.

243. Defendant accessed, obtained, and disclosed Plaintiffs' and Class Members' Personal Health Information for the purpose of committing the crimes and torts described herein because it would not have been able to obtain analytics and advertising tools from Facebook, Google, and others if it had complied with the law. Specifically, Defendant could not have obtained those tools and analytics unless it first disclosed patients' information and data in violation of 42 U.S.C. § 1320d-6. Defendant understood that its deployment of Meta Pixel,

Google Analytics, and similar technologies would necessarily result in such disclosures and acted with the intent to cause those disclosures to take place.

244. As such, Defendant cannot viably claim any exception to ECPA liability.

245. As a result, Defendant harmed Plaintiffs and the Class, breaching the confidentiality of their medical information, violating their privacy, breaching their contract with the hospital, depriving them the full benefit of their bargain with Defendant for care, and causing actual damages in an amount to be proven at trial.

246. The ECPA provides that persons whose electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119 may recover statutory damages of the greater of $100 a day for each day of violation or $10,000. 18 U.S.C. § 2520.

247. For these reasons, Plaintiffs, individually and on behalf of the Class members, seeks all monetary and non-monetary relief allowed by law, including actual damages, statutory damages, punitive damages, preliminary and other equitable or declaratory relief, and attorneys' fees and costs.

**COUNT II**
**Invasion of Privacy in Violation of G.L. c. 214, § 1B**
**(On Behalf of Plaintiffs and the Class)**

248. Plaintiffs re-allege and incorporates by reference all paragraphs above as if fully set forth herein.

249. Plaintiffs bring this claim on behalf of themselves and all members of the Class.

250. G.L. c. 214, § 1B provides that "a person shall have a right against unreasonable, substantial, or serious interference with his privacy. The superior court shall have jurisdiction in equity to enforce such right and in connection therewith to award damages."

251. All health care providers owe their patients a duty not to disclose medical information about a patient without a patient's informed consent.

252. G.L. c. 111, § 70E provides that every patient or resident of a Massachusetts health care facility shall have the right to "confidentiality of all records and communications to the extent provided by law."

253. Maintaining the confidentiality of the doctor-patient relationship is a cardinal rule of the medical profession which has come to be justifiably relied on by patients seeking advice and treatments.

254. Plaintiffs and Class Members are patients of Defendant.

255. Defendant owes Plaintiffs and Class Members a duty of confidentiality.

256. Despite its duty not to disclose Personal Health Information without informed consent and written authorization, Defendant disclosed information relating to Plaintiffs and Class Members' medical treatment to third parties without their knowledge, consent, or authorization.

257. The information disclosed included personally identifiable information, Plaintiffs and Class Members' statuses as patients of Defendant, and the exact contents of communications exchanged between Plaintiffs and/or Class Members with Defendant, including but not limited to information about treating doctors, potential doctors, conditions, treatments, appointments, search terms, bill payment, and logins to Defendant's website.

258. The disclosure of personally identifiable medical information constitutes an unreasonable, substantial, and serious interference with Plaintiffs and Class Members' rights to privacy.

259. Plaintiffs and Class Members did not consent to, authorize, or know about Defendant's disclosure of their Personal Health Information to Facebook, Google, and other third

parties at the time it occurred. Plaintiffs and Class Members never agreed that their sensitive medical information could be collected, used, and monetized by Facebook and Google.

260. Defendant's intentional disclosure of patients' Personal Health Information to a third-party advertising company like Facebook and Google without consent would be highly offensive to a reasonable person. Plaintiffs and Class Members reasonably expected that their Personal Health Information would not be collected, used, and monetized by third party advertising companies.

261. Defendant's disclosure of Personal Health Information from thousands of individuals was highly offensive because it violated expectations of privacy that have been established by social norms. Privacy polls and studies show that Americans believe that one of the most important privacy rights is the need for an individual's affirmative consent before their personal data is collected, shared, or used.

262. Given the nature of the Personal Health Information that Defendant disclosed to Facebook, such as patients' names, email addresses, phone numbers, information entered into forms, doctor's names, potential doctor's names, the search terms used to locate doctors (i.e. "Alzheimer's"), the condition selected from dropdown menus (i.e. "Heart Disease"), medications, and details about upcoming doctor's appointments, this kind of intrusion would be (and in fact is) highly offensive to a reasonable person.

263. Defendant's breach caused Plaintiffs and Class Members, at minimum, the following damages:

a. Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private;

b. Defendants eroded the essential confidential nature of the doctor-patient and provider-patient relationship;

c. Defendants took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs and Class Members' knowledge, consent, or authorization and without sharing the benefit of such value;

d. Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain the confidentiality of their Personal Health Information; and

e. Defendant's actions diminished the value of Plaintiffs and Class Members' personal information.

264. Plaintiffs and Class Members have suffered harm and injury, including but not limited to the invasion of their privacy rights.

265. Plaintiffs and Class Members have been damaged as a direct and proximate result of Defendant's invasion of their privacy and are entitled to seek just compensation, including monetary damages.

266. Plaintiffs and Class Members seek appropriate relief for their injuries, including but not limited to damages that will reasonably compensate Plaintiffs and Class Members for the harm to their privacy interests as well as a disgorgement of profits made by Defendant as a result of its intrusions on Plaintiffs and Class Members' privacy.

267. Plaintiffs and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's actions, which caused injury to Plaintiffs and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

268. Plaintiffs and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

**COUNT III**
**Breach of Fiduciary Duty and/or Common Law Duty of Confidentiality**
**(On Behalf of Plaintiffs and the Class)**

269. Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

270. Plaintiffs bring this claim on behalf of themselves and all members of the Class.

271. All conditions precedent to this action have been performed or occurred.

272. In *Alberts v. Devine*, 479 N.E.2d 113, 120 (1985), the Massachusetts Supreme Court held that a duty of confidentiality arises from the physician-patient relationship and that a violation of that duty gives rise to a cause of action sounding in tort.

273. As medical provider for Plaintiffs and Class Members, Defendant owes Plaintiffs and Class Members a fiduciary duty of confidentiality in the data and content of communications exchanged between Defendant and Plaintiffs or Class Members.

274. Defendant breached its duty of confidentiality by disclosing Personal Health Information about Plaintiffs and Class Members, including their status as patients, the content of their communications, and information about their doctors, potential doctors, conditions, treatments, appointments, search terms, and bill payment.

275. Defendant's breach caused Plaintiffs and Class Members the following damages:

a. Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private;

b. Defendants eroded the essential confidential nature of the doctor-patient and provider-patient relationship;

c. Defendants took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs and Class Members' knowledge, consent, or authorization and without sharing the benefit of such value;

d. Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain the confidentiality of their Personal Health Information; and

e. Defendant's actions diminished the value of Plaintiffs and Class Members' personal information.

**COUNT IV**
**Breach of Implied Contract**
**(On Behalf of Plaintiffs and the Class)**

276. Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

277. Plaintiffs bring this claim on behalf of themselves and all members of the Class.

278. Defendant's website promised patients that "[p]rotecting your medical information is an important priority for Emerson Hospital."[85] Indeed, Defendant assured patients that Defendant would *never* use or share patients' "personal information for marketing purposes" without "specific authorization."[86]

279. Defendant solicited and invited Plaintiffs and Class Members to provide their Personal Health Information on its website as part of Defendant's regular business practices. Plaintiffs and Class Members accepted Defendant's offers and provided their Personal Health Information, which included personally identifiable information such as their names, telephone numbers, IP addresses, Facebook IDs, browser fingerprints, and device identifiers, to Defendant

---

[85] https://www.emersonhospital.org/patients-visitors/patient-rights-responsibilities/patient-privacy
[86] https://www.emersonhospital.org/patients-visitors/patient-rights-responsibilities/patient-privacy

as part of acquiring Defendant's medical services and using its Web Properties. Per its contractual, legal, ethical, and fiduciary duties, Defendant was obligated to take adequate measures to protect Plaintiffs' and Class Members' Personal Health Information from unauthorized disclosure to third parties such as Facebook and Google. These facts give rise to the inference that Defendant took on obligations outside the plain terms of any express contracts that they may have had with Plaintiffs and Class Members.

280. Plaintiffs and the Class Members entered into valid and enforceable implied contracts with Defendant when they sought medical treatment from Defendant. Specifically, through their course of conduct, Defendant, Plaintiffs, and Class Members entered into implied contracts for the provision of medical care and treatment, which included an implied agreement for Defendant to retain and protect the privacy of Plaintiffs' and Class Members' Personal Health Information.

281. Defendant required and obtained Plaintiffs' and Class Members' Personal Health Information as part of the physician-patient relationship, evincing an implicit promise by Defendant to act reasonably to protect the confidentiality of Plaintiffs' and Class Members' Personal Health Information. Defendant, through its privacy policies, codes of conduct, company security practices, and other conduct, implicitly that it would safeguard Plaintiffs' and Class Members' Personal Health Information in exchange for access to that information and the opportunity to treat Plaintiffs and Class Members.

282. Implied in the exchange was a promise by Defendant to ensure that the Personal Health Information of Plaintiffs and Class Members in its possession would only be used for medical treatment purposes and would not be shared with third parties such as Facebook and Google without the knowledge or consent of Plaintiffs and Class Members. By asking for and

obtaining Plaintiffs' and Class Members' Personal Health Information, Defendant assented to protecting the confidentiality of that information. Defendant's implicit agreement to safeguard the confidentiality of Plaintiffs' and Class Members' Personal Health Information was necessary to effectuate the contract between the parties.

283. Plaintiffs and Class Members provided their Personal Health Information in reliance on Defendant's implied promise that this information would be safeguarded and not be shared with third parties without their consent.

284. These exchanges constituted an agreement and meeting of the minds between the parties: Plaintiffs and Class Members would provide their Personal Health Information in exchange for the medical treatment and other benefits provided by Defendant (including the protection of their confidential personal and medical information). A portion of the price of each payment that Plaintiffs and the Class Members made to Defendant for medical services was intended to ensure the confidentiality of their Personal Health Information.

285. In entering into such implied contracts, Plaintiffs and Class Members reasonably believed and expected that Defendant would comply with its promises to protect the confidentiality of their Personal Health Information as well as applicable laws and regulations governing the disclosure of such information and that Defendant would not allow third parties to collect or exploit their communications with Defendant without their consent.

286. It is clear by these exchanges that the parties intended to enter into an agreement and mutual assent occurred. Plaintiffs and Class Members would not have disclosed their Personal Health Information to Defendant but for the prospect of Defendant's promise of medical treatment and other benefits. Conversely, Defendant presumably would not have taken

Plaintiffs and Class Members' Personal Health Information if it did not intend to provide them with medical treatment and other benefits.

287. Defendant was therefore required to reasonably safeguard and protect the Personal Health Information of Plaintiffs and Class Members from unauthorized disclosure and/or use by third parties.

288. Plaintiffs and Class Members accepted Defendant's medical services offer and fully performed their obligations under the implied contract with Defendant by providing their Personal Health Information to Defendant among other obligations. Plaintiffs and Class Members would not have provided and entrusted their Personal Health Information to Defendant in the absence of their implied contracts with Defendant and would have instead retained the opportunity to control their Personal Health Information for uses other than the benefits offered by Defendant.

289. Plaintiffs and Class Members relied on Defendant's implied promises to safeguard their Personal Health Information to their detriment. Defendant breached the implied contracts with Plaintiffs and Class Members by failing to reasonably safeguard and protect Plaintiffs' and Class Members' Personal Health Information from disclosure to Facebook, Google, and other third parties.

290. Defendant's failure to implement adequate measures to protect the Personal Health Information of Plaintiffs and Class Members and Defendant's intentional disclosure of the same to Facebook and Google violated the purpose of the agreement between the parties: Plaintiffs' and Class Members' provision of money and Personal Health Information in exchange for medical services and other benefits.

291. Instead of safeguarding Plaintiffs' and Class Members' Personal Health Information, Defendant intentionally shared that information with Facebook and Google, thereby breaching the implied contracts it had with Plaintiffs and Class Members.

292. Plaintiffs and Class Members who paid money to Defendant reasonably believed and expected that Defendant would use part of those funds to operate its websites free of surreptitious collection and exploitation of communications between the parties. Defendant failed to do so. Plaintiffs and Class Members would not have purchased medical services from Defendant if they knew that Defendant would share their Personal Health Information with Facebook and Google without their knowledge or written consent.

293. Plaintiffs and Class Members who paid money to Defendant reasonably believed and expected that Defendant would use part of those funds to operate its websites free of surreptitious collection and exploitation of communications between the parties. Defendant failed to do so.

294. Under the implied contracts, Defendant and/or its affiliated healthcare providers promised and were obligated to: (a) provide healthcare to Plaintiffs and Class Members; and (b) protect Plaintiffs and the Class Members' Personal Health Information provided to obtain such healthcare. In exchange, Plaintiffs and Class Members agreed to pay money for these services, and to turn over their Personal Health Information through the use of Defendant's websites.

295. Both the provision of medical services healthcare and the protection of Plaintiffs and Class Members' Private Health Information were material aspects of these implied contracts.

296. The implied contracts for the provision of medical services—contracts that include the contractual obligations to maintain the privacy of Plaintiffs and Class Members'

Private Health Information unless they consent—were also acknowledged, memorialized, and embodied in multiple documents, including (among other documents) Defendant's published Notice of Privacy Practices.

297. Defendant's express representations, including, but not limited to the express representations found in its Notice of Privacy Practices, memorialized and embodied an implied contractual obligation requiring Defendant refrain from aiding or allowing third parties to collect or Plaintiffs and Class Members' Private Health Information without consent. By soliciting and acquiring Plaintiffs' and Class Members' Personal Health Information Defendant assumed an independent duty to handle Plaintiffs' and Class Members' Personal Health Information with due care and consistent with industry standards to prevent the foreseeable harm that arises from a breach of that duty.

298. Consumers of healthcare value their privacy, the privacy of their dependents, and the ability to keep their Private Health Information associated with obtaining healthcare private. To customers such as Plaintiffs and the Class Members, healthcare that allows third parties to secretly collect their Private Health Information without consent is fundamentally less useful and less valuable than healthcare that refrains from such practices. Plaintiffs and Class Members would not have entrusted their Private Health Information to Defendant and entered into these implied contracts with Defendant without an understanding that their Private Health Information would be safeguarded and protected or entrusted their Private Health Information to Defendant in the absence of its implied promise to do so.

299. A meeting of the minds occurred when Plaintiffs and the Class Members agreed to, and did, provide their Private Health Information to Defendant and/or its affiliated healthcare providers, and paid for the provided healthcare in exchange for, amongst other things, (a) the

provision of healthcare and medical services and (b) the protection of their Private Health Information.

300. Plaintiffs and the Class Members performed their obligations under the contract when they paid for their healthcare services and provided their Private Health Information.

301. Defendant materially breached its contractual obligation to protect the nonpublic Private Health Information Defendant gathered when it allowed third parties to collect and exploit that information without Plaintiffs' and Class Members' consent.

302. Defendant also materially breached its contractual obligation to protect Plaintiffs' and Class Members' non-public Personal Health Information when it failed to implement adequate security measures and policies to protect the confidentiality of that information. For example, on information and belief, Defendant (1) failed to implement internal policies and procedures prohibiting the disclosure of patients' Personal Health Information without consent to third-party advertising companies like Facebook and Google, (2) failed to implement adequate reviews of the software code and java script installed on its websites to ensure that patients' Personal Health Information was not being automatically routed without consent to third party advertising companies like Facebook and Google, (3) failed to provide adequate notice to the public that visitors to its websites risked having their Personal Health Information shared with third party advertising companies like Facebook and Google, (4) failed to take other industry standard privacy protection measures such as providing a "cookie" acceptance button on its website homepages, (5) failed to provide visitors to its websites with a means to opt out of the automatic transfer of data regarding their website interactions to third party advertising companies like Facebook and Google, (6) failed to implement internal policies and educational programs to ensure that Defendant's website managers and coders were familiar with the legal

regulations governing the disclosure patient Personal Health Information to third parties, and (7) failed to install adequate firewalls or take similar measures to prevent the automatic routing of patients' Personal Health Information to third party advertising companies like Facebook and Google.

303. As a result of Defendant's failure to fulfill the data privacy protections promised in these contracts, Plaintiffs and Class Members did not receive the full benefit of their bargains, and instead received healthcare and other services that were of a diminished value compared to those described in the contracts. Plaintiffs and Class Members were therefore damaged in an amount at least equal to the difference in the value of the healthcare services with data privacy they paid for and the healthcare services they received.

304. As a result of Defendant's material breaches, Plaintiffs and Class Members were deprived of the benefit of their bargain with Defendant because they spent more on medical services with Defendant than they would have if they had known that Defendant was not providing the reasonable data security and confidentiality of patient communications that Defendant represented that it was providing in its privacy policies. Defendant's failure to honor its promises that it would protect the confidentiality of patient communications thus resulted in Plaintiffs and Class Members overpaying Defendant for the services they received.

305. The services that Plaintiffs and Class Members ultimately received in exchange for the monies paid to Defendant were worth quantifiably less than the services that Defendant promised to provide, which included Defendant's promise that any patient communications with Defendant would be treated as confidential and would never be disclosed to third parties for marketing purposes without the express consent of patients.

306. The medical services that Defendant offers are available from many other health care systems who do protect the confidentiality of patient communications. Had Defendant disclosed that it would allow third parties to secretly collect Plaintiffs and Class Members' Private Health Information without consent, neither the Plaintiffs, the Class Members, nor any reasonable person would have purchased healthcare from Defendant and/or its affiliated healthcare providers.

307. Defendant's conduct in sharing Plaintiffs' and Class Members' Personal Health Information with third parties also diminished the sales value of that information. There is a robust market for the type of information that Plaintiffs and Class Members shared with Defendant (which Defendant then disclosed with third parties). Facebook itself has offered to pay the public to acquire similar information in the past so that Facebook could use such information for marketing purposes. Plaintiffs and Class Members were harmed both by the dissemination of their Personal Health Information and by losing the sales value of that information.

308. As a direct and proximate result of these failures, Plaintiffs and the Class Members have been harmed and have suffered, and will continue to suffer, actual damages and injuries, including, without limitation, the release and disclosure of their Personal Health Information, the loss of control of their Personal Health Information, the diminution in value of their Personal Health Information, and the loss of the benefit of the bargain they had struck with Defendant.

309. Plaintiffs and the Class Members are entitled to compensatory and consequential damages suffered as a result.

310. Plaintiffs and Class Members also face a real and immediate threat of future injury to the confidentiality of their Personal Health Information both because such information remains within Defendant's control and because anytime that Plaintiffs and/or Class Members interact with Defendant's websites to make appointments, such information about their medical conditions, search for a doctor, or otherwise seek assistance with their medical conditions they risk further disclosure of their Personal Health Information. Plaintiffs and the Class Members are therefore also entitled to injunctive relief requiring Defendant to cease all website operations that allow for the third-party capture of Personal Health Information.

**COUNT V**
**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Class)**

311. Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

312. Plaintiffs hereby plead this Count in the alternative to Count IV.

313. Plaintiffs bring this claim on behalf of themselves and all members of the Class.

314. Plaintiffs and Class Members conferred a benefit on Defendant in the form of valuable sensitive medical information that Defendant collected from Plaintiffs and Class Members under the guise of keeping this information private. Defendant collected, used, and disclosed this information for its own gain, including for sale, or trade for valuable services from third parties. Additionally, Plaintiffs and the Class Members conferred a benefit on Defendant in the form of monetary compensation.

315. Plaintiffs and the Class Members would not have used the Defendant's services, or would have paid less for those services, if they had known that Defendant would collect, use, and disclose this information to third parties.

316. Defendant unjustly retained those benefits at the expense of Plaintiffs and Class Members because Defendant's conduct damaged Plaintiffs and Class Members, all without providing any commensurate compensation to Plaintiffs and Class Members.

317. The benefits that Defendant derived from Plaintiffs and Class Members rightly belong to Plaintiffs and Class Members. It would be inequitable under unjust enrichment principles for Defendant to be permitted to retain any of the profit or other benefits it derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

318. Defendant should be compelled to disgorge in a common fund for the benefit of Plaintiffs and Class Members all unlawful or inequitable proceeds that Defendant received, and such other relief as the Court may deem just and proper.

**COUNT VI**
**Violation of M.G.L. c. 93A for Unfair and Deceptive Acts or Practices in the Commonwealth of Massachusetts**
**(On Behalf of Plaintiffs and the Class)**

319. Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

320. At all relevant times, Defendant was engaged in trade or commerce in Massachusetts.

321. Defendant's willful and knowing use of tracking technologies on its web properties and mobile application was unscrupulous in that it constituted and encouraged illegal conduct, including:

a. the secret interception of wire communications in violation of 18 U.S.C. § 2510, *et seq.*;

b. Criminal violation of HIPAA, 42 U.S.C. § 1320d-6;

c. Invasion of privacy in violation of G.L. c. 214, § 1B; and

d. Breach of confidentiality of medical records in violation of G.L. c. 111, § 70E.

322. Defendnats' actions were oppressive or otherwise unconscionable within the meaning of M.G.L. c. 93A § 2 and 9 and 940 C.M.R. § 3.16 et seq.

323. Defendant's willful and knowing use of tracking technologies on its web properties and Epic mobile application was also deceptive. Defendant promised its patients that it valued their privacy and would not use their Personal Health Information for marketing purposes without their authorization. This representation was false, because at all relevant times Defendant tracked and disclosed its patients' Personal Health Information to third parties in return for marketing benefits.

324. Plaintiffs and Class Members would not have provided and entrusted their Personal Health Information to Defendant in the absence of Defendant's promises to protect their Personal Health Information and privacy. Instead, they would have retained the opportunity to control their Personal Health Information for uses other than the benefits offered by Defendant. Plaintiffs and the Class Members also would not have used the Defendant's services, or would have paid less for those services, if they had known that Defendant would collect, use, and disclose their Personal Health Information to third parties.

325. As a result of Defendant's conduct, Plaintiffs and Class Members suffered both economic and noneconomic injuries, including:

a. Deprivation of their right to privacy;

b. The release and disclosure of their Personal Health Information;

c. The loss of control of their Personal Health Information;

d. The diminution in value of their Personal Health Information, and;

e. the loss of the benefit of the bargain they had struck with Defendant.

326. Plaintiffs, through their attorneys, sent Defendant a written demand for relief under M.G.L. c. 93A § 9, par. 3, identifying the claimants and reasonably describing the unlawful, unfair, and deceptive acts or practices relied upon, and the damages sustained as a result.

327. In response, Defendant has refused to grant reasonable relief upon demand. Its refusal was made in bad faith with knowledge or reason to know that its acts and practices violated M.G.L. c. 93A § 2.

328. WHEREFORE, Plaintiffs demand judgement against Defendant, damages, punitive damages, treble damages, attorneys' fees, pre-and-post judgment interest, other litigation disbursements, disgorgement of profits, injunctive relief, and such other further relief as is just and equitable.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury on all issues so triable.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, ask for judgment in their favor, and that the Court enter an order as follows:

a. Certifying the Class and appointing Plaintiffs as the Class's representatives;

b. Appoint the law firms of Sweeny Merrigan Law, Keller Postman LLC, and Ahmad, Zavitsanos, & Mensing P.C. as class counsel;

c. Finding that Defendant's conduct as alleged herein was unlawful;

d. Awarding such injunctive and other equitable relief as the Court deems just and proper, including enjoining Defendant from making any further disclosure of Plaintiffs or Class Members' communications to third parties without the Plaintiffs or Class Members' express, informed, and written consent;

e. Awarding statutory damages of $10,000 per Plaintiffs and Class Members pursuant to 18 U.S.C. § 2520;

f. Imposing a constructive trust against Defendant through which Plaintiffs and Class Members can be compensated for any unjust enrichment gained by Defendant;

g. Awarding damages for violations of Plaintiffs and Class Members' right to privacy;

h. Awarding Plaintiffs and Class Members statutory, actual, compensatory, consequential, punitive, and nominal damages, as well as restitution and/or disgorgement of profits unlawfully obtained;

i. Awarding Plaintiffs and Class Members pre-judgment and post-judgment interest as provided by law;

j. Awarding Plaintiffs and Class Members reasonable attorney's fees, costs, and expenses;

k. Awarding costs of suit; and

l. Such other and further relief to which Plaintiffs and Class Members may be entitled.

**RESPECTFULLY SUBMITTED,
COUNSEL FOR PLAINTIFFS JOHN DOE, JAMES DOES, JOSEPH DOES, AND JANE DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED**

*/s/ Jonathan T. Merrigan*
J. Tucker Merrigan, BBO# 681627
Ryan M. Hawkins BBO# 686289
Erin E. McHugh, BBO# 703701
Sweeney Merrigan Law
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com

rmh@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Foster C. Johnson (*pro hac vice forthcoming*)
David Warden (*pro hac vice forthcoming*)
Nathan Campbell (*pro hac vice forthcoming*)
AHMAD, ZAVITSANOS, & MENSING, P.C.
1221 McKinney Street, Suite 3460
Houston, Texas 77010
(713) 655-1101
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

Seth Meyer (*pro hac vice forthcoming*)
Alex Dravillas (*pro hac vice forthcoming*)
Keller Postman LLC
150 N. Riverside Plaza
Suite 4100
Chicago, Illinois 60606
(312) 741-5220
sam@kellerpostman.com
ajd@kellerpostman.com

Dated: November 3, 2025

## CERTIFICATE OF SERVICE

I hereby certify that on November 3, 2025, a true and correct copy of the foregoing was served electronically through electronic mail to all counsel of record in accordance with the Rules of Civil Procedure.

*/s/ Jonathan T. Merrigan*
J. Tucker Merrigan, BBO# 681627

34

COMMONWEALTH OF MASSACHUSETTS

**ESSEX, S.S.**

**TRIAL COURT DEPARMENT**
**SUPERIOR COURT**

| | | |
|---|---|---|
| **JOHN DOE, Individually and on behalf of herself and all others similarly situated,** | § | **DOCKET NO. 2277CV01000D** |
| **Plaintiff,** | § | |
| **v.** | § | |
| **EMERSON HOSPITAL,** | § | |
| **Defendant.** | § | |

A TRUE COPY, ATTEST
DEPUTY ASS'T. CLERK

**PLAINTIFF'S MOTION TO COMPEL AND TO REMOVE CERTAIN OBJECTIONS**

NOW COMES Plaintiff John Doe, and requests this Honorable Court order the Defendant to supplement its Answers to Plaintiff's Interrogatories and Request of Production of Documents; to remove specific objections; and to answer and provide requested documents to each of Plaintiff's Request for Production of Documents. Further, Defendant has failed to provide Plaintiff with a date for the 30(b)(6) deposition of a Corporate Representative. As further grounds, Plaintiff refers this Honorable Court to Plaintiff's Memorandum Supporting his Motion to Compel and to Remove Certain Objections.

WHEREFORE, Plaintiff John Doe requests this Honorable Court grant his Motion in its entirety.

Respectfully Submitted
By Plaintiff's Counsel:

*/s/ Foster Johnson*
J. Tucker Merrigan, BBO# 681627
Thomas T. Merrigan, BBO# 343480
Erin E. McHugh, BBO# 703701
SWEENEY MERRIGAN LAW

268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
tom@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Foster Johnson (*admitted pro hac vice*)
Texas Bar No. 24076463
David Warden (*admitted pro hac vice*)
Texas Bar No. 20856750
Carl J. Gustafson (*pro hac vice forthcoming*)
Texas Bar No. 24125261
**AHMAD, ZAVITSANOS & MENSING, PLLC**
1221 McKinney, Suite 2500
Houston, Texas 77010
(713) 655-1101 -Phone
(713) 655-0062 – Fax
fjohnson@azalaw.com
dwarden@azalaw.com
cgustafson@azalaw.com

Alex Dravillas (*pro hac vice forthcoming*)
**KELLER POSTMAN LLC**
150 N. Riverside Plaza, Suite 4100
Chicago, IL 60606
(312) 741-5226
adj@kellerpostman.com

Sara Aguiniga (*pro hac vice forthcoming*)
**KELLER POSTMAN LLC**
1100 Vermont Ave, 12th Floor
Washington, DC 20005
sara.aguiniga@kellerpostman.com

**COMMONWEALTH OF MASSACHUSETTS**

**ESSEX, S.S.**

**TRIAL COURT DEPARMENT**
**SUPERIOR COURT**

**JOHN DOE, Individually and on behalf of herself and all others similarly situated,**

**Plaintiff,**

**v.**

**EMERSON HOSPITAL,**

**Defendant.**

**DOCKET NO. 2277CV01000D**

A TRUE COPY, ATTEST
DEPUTY ASST. CLERK

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION TO COMPEL AND REMOVE CERTAIN OBJECTIONS**

The Plaintiff John Doe, by and through his counsel, hereby submits this Memorandum in Support of his Motion to Compel Documents and to Remove Certain Objections. As grounds therefore, the Plaintiff states:

**(1) Defendant Failed to Provide a Date for the 30(b)(6) Deposition for Defendant's Corporate Representative.**

**(2) Defendant Did Not Answer Plaintiff's Interrogatories and Requests for Production of Documents Pursuant to the Massachusetts Rules of Civil Procedure;**

**(3) Defendant Failed to Reasonably Remove Its Objections as Required by Mass. Sup. Crt. R. 30A; and**

On April 13, 2023, Plaintiff Served his First and Second Requests for Production of Documents and his First Set of Interrogatories to Defendant. *See* Exhibit A. Plaintiff subsequently

served his Third Request for Production of Documents to Defendant on May 22, 2023. *See* Exhibit B. Defendant served its responses to Plaintiff's First and Second Sets of Requests for Production of Documents on June 20, 2023. *See* Exhibit C. Defendant served its First Amended Responses to Plaintiff's First and Second Sets of Requests for Production of Documents on August 31, 2023; however, it did not remove its general objections. *See* Exhibit D. Further, Per the Scheduling Order entered by the Court on July 25, 2023, Defendant was required to complete its production by August 31, 2023. *See* Exhibit D. Yet, as of the date of this filing, the Defendants have only produced thirty-nine (39) documents. On September 8, 2023, Plaintiff served a 9C letter to Defendant, which outlined the deficiencies in Defendants' responses to both the Production of Documents and Interrogatories, and further discussed that Defendant failed to furnish Plaintiff with not only a date for its 30(b)(6) corporate representative deposition. *See* Exhibit E.

On September 21, 2023, Plaintiff and Defendant held a 9C Conference, and during this conference, Defendant maintained its position and refused to supplement or amend its responses. Defendant further refused to provide Plaintiff with a date for the 30(b)(6) Deposition. Instead, Defendant asserted that all discovery should be stayed pending the Court's ruling on its Motion to Dismiss, despite its obligations under the Massachusetts Rules of Civil Procedure. Therefore, Plaintiff now files this Motion to Compel.

## BACKGROUND

This action arises out of Defendant's invasion of privacy and disclosure of personal and protected health information without Plaintiff's consent. Defendant violated Plaintiff's privacy rights by selling and/or bartering his personal health information to Facebook and Google in exchange for access to Facebook's Meta Pixel tool and Google Analytics. Plaintiff alleges that Defendant installed the Meta Pixel tool and Google Analytics to run surreptitiously on its websites in order to intercept and disclose patient communications to Facebook and Google for marketing purposes.

## LEGAL STANDARD

"Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party, including the existence, description, nature, custody, condition, and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter. It is not grounds for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence." Mass. R. Civ. P. 26(b)(1).

Courts in the Commonwealth have wide latitude in the practice of Mass. R. Civ. P. 26. "Generally discovery is permissible of any nonprivileged material which is relevant to pending action and reasonably calculated to lead to discovery of admissible evidence." *Hull Mun. Lighting Plant v. Massachusetts Mun. Wholesale Electric Company*, 414 Mass. 609, 615 (1993). The conduct and scope of discovery is within the sound discretion of the trial judge. *Poteau v. Normandy Farms Family Campground, Inc.*, 2000 WL 1765424 (Sup. Ct. 2000) (Citations omitted). Mass. R. Civ. P. 33, which governs Interrogatories, is interpreted under this broad analysis.

## ARGUMENT

### I. Defendant Has Failed to Provide Plaintiff with a Date for a 30(b)(6) Deposition, as Noticed by Plaintiff

Defendant has failed to provide Plaintiff with any date for its 30(b)(6) deposition. Plaintiff sent Defendant a draft Notice of Taking Corporate Representative Deposition on June 16, 2023, via email. In Plaintiff's email, Plaintiff requested Defendant provide it with dates during August of 2023 when Defendant could present a corporate designee or designees for its deposition. On July 5, 2023, Plaintiff again requested that Defendant provide corporate deposition dates for August of 2023. Plaintiff made additional requests for proposed dates for Defendant's corporate deposition on July

10, 2023; August 18, 2023; and August 23, 2023. During the 9C conference held on September 21, 2023, Defendants refused to entertain dates for depositions until after the resolution of their Motion to Dismiss.

To date, Defendant has failed to provide Plaintiff with a single date for its corporate deposition. Due to Defendant's refusal provide a date for the corporate deposition, Plaintiff respectfully requests that the Court compel Defendant to provide a date for this deposition to take place.

## II. Defendant Failed to Reasonably Respond to Plaintiff's First and Second Request for Production of Documents

### A. Defendant's Failure to Provide Non-Custodial Sources

Section 5 of the ESI Protocol in this matter requires that a list of non-custodial data sources, such as shared drives, servers, internal messaging applications, or any other sources likely to contain discoverable ESI, shall be disclosed within a reasonable amount of time prior to conducting searches for ESI in response to discovery requests. Defendant has not provided Plaintiff with a list of non-custodial data sources. During the 9C conference held on September 21, 2023, Defendants again refused to provide any non-custodial sources to Plaintiff. Instead, Defendant asserted that it would continue to work on gathering that information, but only if Plaintiffs agreed not to move forward with the instant Motion to Compel. Therefore, Plaintiff respectfully requests that the Court compel Defendant to furnish Plaintiff with non-custodial data sources.

### B. Defendant's Improper General Objections

Defendant's Responses to Plaintiff's First and Second Sets of Requests for Production of Documents began with sixteen General Objections that are applied to each and every response made. Mass. Sup. Ct. R. 30A(3)(a) states, "where general objections are made, the responding party shall prepare and serve a supplemental response no later than 10 days after the completion of production." Mass. Sup. Ct. R. 30A(3)(b) states:

> "Once production is completed, general objections to requests for production of documents and things are prohibited. As to each request, the supplemental response shall state either: (i) notwithstanding prior general objections, all responsive documents or things in the possession, custody, or control of the responding party have been produced; (ii) after diligent search no responsive documents or things are in the possession, custody, or control of the responding party; or (iii) the specific objection made to the request."

Defendant served its responses to Plaintiff's First and Second Sets of Requests for Production of Documents on June 20, 2023. Defendant served its First Amended Responses to Plaintiff's First and Second Sets of Requests for Production of Documents on August 31, 2023; however, it did not remove its general objections. During the 9C conference held on September 21, 2023, Defendant would not agree to remove these objections and, instead, asserted their position that all discovery should be stayed.

Additionally, Defendant raised several boilerplate objections in its responses to each request. Mass. Sup. Ct. R. 30A(3)(b) requires "[w]hen a specific objection is made, the response shall scribe the nature of all responsive documents or things in the possession, custody, or control of esponding party that have not been produced because of the objection." Per Mass. R. Civ. P. 5)(A), such a requirement also applies to documents that are withheld by claiming claims of . Apart from its responses to Requests Nos. 3 and 13, Defendant has not identified what being withheld pursuant to the objections it raised. During the 9C conference held on Defendants would not agree to remove these objections and, instead, asserted very should be stayed. Therefore, Plaintiff respectfully requests that the e both the general and individual objections.

<u>on of Documents</u>

nt stipulated that it would begin a rolling production wing numbered requests: 1-3, 4, 12-16, 19-20, 40-42, Scheduling Order entered by the Court on July 25, 2023,

Defendant was required to complete its production by August 31, 2023. *See* Exhibit D. Defendant failed to complete its production of documents. Defendant produced a mere 38 pages of documents on July 14, 2023; these documents were only responsive to Request Nos. 19, 20, 60, and 61, and did not contain all responsive documents to such requests. On August 29, 2023, Defendant produced a single document in response to Request No. 1. Again, this document was not wholly responsive to the request as it failed to de-duplicate the number of unique patients each year. Defendant has not produced any other responsive and discoverable documents despite agreeing to do so by August 31, 2023. It is unfathomable that Defendant only has 39 pages of discoverable documents in response to 163 requests. Plaintiff requested that Defendant supplement its document production, but Defendant refused.

***Request No. 1:*** Request Number 1 asks for documents sufficient to identify the number of unique patients, by year, that were treated by Defendant during the class period. Defendant provided Plaintiff with a chart showing the number of unique patients by year from 2016 to 2023. However, Defendant specifically noted that these numbers were not de-duplicated across the class period, arguing that the number of unique patients treated by Emerson has "no connection" to Plaintiff's claims. The standard for discovery in Massachusetts is whether the information sought is reasonably calculated to lead to the discovery of admissible evidence. Mass. R. Civ. P. 26(b)(1). The number of unique patients per year may lead to admissible evidence regarding the class size. Plaintiff requested that Defendant de-duplicate the number of unique patients by year and supplement its production, but Defendant refused.

***Request Nos. 3, 12, and 13:*** Request Number 3 asks for the production of documents sufficient to show the number of individuals whose Personal Health Information was disclosed to third parties. Request Number 12 asks for documents sufficient to show the amount of web traffic to Emerson's web properties and any patient portal during the class period. Request Number 13 asks

for the production of documents sufficient to show the number of unique visitors to Emerson's web properties. Defendant stated in response to Requests Nos. 3 and 13 that it does not have responsive documents. Defendant failed to articulate the scope of its search for responsive documents as required by Mass. Sup. Ct. R. 30A(3)(b). Defendant undoubtedly has responsive, discoverable documents, including ESI, in its possession, custody, or control.

***Request Nos. 2, 14, 15, and 16:*** Request Numbers 2, 14, 15, and 16 ask for the production of documents related to Emerson's patient portal. More specifically, these requests ask for documents sufficient to identify the number of unique patients and visitors per year who used the portal; the number of patients who registered for the portal; and the number of patients who logged into the portal. Defendant objected to these requests, alleging that no advertising technology was installed on the patient portal and that attempting to collect such documentation would take significant resources. The documents, including ESI, requested are discoverable as the requests are reasonably calculated to lead to the discovery of admissible evidence. Plaintiff has reason to believe that the pixel was installed on Emerson's patient portal and has previously discussed this with Defendant. Documents and ESI responsive to this request are necessary to this litigation and are necessary for identifying the class size. Defendant's assertion that collecting responsive documentation would take significant resources is unsupported and is not a basis for eschewing its discovery responsibilities. Defendant has ample resources to search for and collect responsive documents. Defendant has not complied with its obligations pursuant Mass. R. Civ. P. 26(c).

***Request Nos. 19 and 20***: Requests Number 19 and 20 ask for the production of any and all insurance policies that may be applicable in the subject action. Defendant produced its declaration pages for two policies but did not produce complete copies of its insurance policies. In withholding such production, Defendant argued that its insurance policies are not applicable at this stage of litigation. Mass. R. Civ. P. 26(b)(1) provides the contrary and specifically states:

> "A party may obtain discovery of the existence and contents of any insurance agreement under which any person carrying on an insurance business may be liable to satisfy part or all of a judgement which may be entered in the action or to indemnify or reimburse for payments made to satisfy the judgment."

During the 9C conference, Defendant would not agree to supplement its responses to any of the above-identified Requests, and therefore the Parties are at an impasse as to these Requests. Therefore, Plaintiff respectfully requests that the Court compel Defendant to respond to these Requests.

### III. Defendant's Deficient Responses to Plaintiff's Third Request for Production of Documents

On May 22, 2023, Plaintiff served his Third Set of Requests for Production of Documents upon Defendant. Defendant has not provided any responses or produced any documents in response to these requests. Defendant's responses and production to the same are overdue. During the 9C conference, Defendant refused to provide any documents or responses to these Requests and, instead, asserted their position that all discovery should be stayed. Therefore, Plaintiff respectfully requests that the Court compel Defendant to respond to these Requests and produce responsive documents.

### IV. Defendant's Insufficient Responses to Plaintiff's Interrogatories

fendant's answers to specific Interrogatories served by Plaintiff were wholly insufficient. the various deficient Interrogatories below in turn:

*ory No. 3:* Interrogatory No. 3 asks Defendant to state its best estimate for the als whose interactions with Defendant's website(s) resulted in data transmission ebsite and a third party via tracking pixel or source code. Defendant raised a ections, asserting that this interrogatory seeks legal conclusions and his interrogatory does not call for a legal conclusion or an expert estimate. Defendant's answer states that it is impossible for it to

estimate the number of individuals who have interacted with its website, and it did not attempt to give any answer. Even assuming it is impossible for Defendant to give an estimate as to the total number of individuals impacted, Defendant is able to measure the number of individuals who made appointments on the website. Defendant admitted in its answer to Interrogatory Number 2 that the tracking pixels captured information about appointment requests and sign-ups on its website.

***Interrogatory No. 4***: Interrogatory Number 4 asks in part for the number of patients who logged into Defendant's patient portal one or more times during the Class Period. Similar to the above, Defendant objects on the basis that the Interrogatory calls for an expert opinion and seeks a legal conclusion. This interrogatory does not request for either but rather requests a statement of fact. In its answer, Defendant asserted again that tracking pixels were not installed on the patient portal and that collecting portal-specific information would take significant resources. Again, Plaintiff has reason to believe that the pixel was installed on Emerson's patient portal. Defendant's assertion that collecting portal-specific information would require resources is unsupported and is not a basis for eschewing its discovery responsibilities. Defendant has ample resources to collect and review responsive documents and ESI. Defendant has not moved for a protective order pursuant to Mass. R. Civ. P. 26(c), and thus must collect and produce responsive documents. Yet, as of this date, the Defendant has failed to do so.

***Interrogatory Nos. 7 and 10:*** Interrogatory Number 7 asks for the number of Defendant's patients who reside in Massachusetts whose interactions within Emerson's patient portal during the Class Period resulted in transmission of data to third parties via tracking pixel or embedded source code. Interrogatory Number 10 asks for the time period during which Emerson had the Meta Pixel embedded within any pages of its patient portal. Defendant answered, stating that no tracking pixel or similar technology was ever embedded in the patient portal. Plaintiff knows that tracking pixels and source code was embedded on the login screen of Defendant's patient portal, and has reason to

believe that tracking pixel(s) or other source code was embedded in Emerson's patient portal. Yet, Defendant refused to provide this information to the Plaintiff.

***Interrogatory No. 8:*** Interrogatory Number 8 asks for the number of individuals who had any of their personal health information disclosed to Facebook or Google in the data disclosure. Defendant responded by saying none. Defendant explicitly stated in its answer to Interrogatory Number 2 that Facebook Pixel, Google Analytics, DoubleClick, GoogleAds, and StackAdapt were installed on numerous pages throughout its website. Defendant's argument that not a single one of these tracking pixels transmitted a single piece of Personal Health Information, which includes personally identifiable information as defined in the interrogatory, is incredulous and contrary to the very purpose of the tracking pixels' installation on Defendant's website. Yet, Defendant refused to supplement or modify its response.

Despite Plaintiff's request for Defendant to supplement its responses to the above-identified interrogatories, the Defendant refused. The Defendants' refusal was further enforced during the 9C conference which took place on September 21, 2023. Therefore, Plaintiff respectfully requests that the Court compel Defendant to supplement the above-identified deficient responses.

## CONCLUSION

For the reasons stated within, the Plaintiff respectfully requests the Court grant his Motion to Compel.

Respectfully Submitted:

*/s/ Foster Johnson*
J. Tucker Merrigan, BBO# 681627
Thomas T. Merrigan, BBO# 343480
Erin E. McHugh, BBO# 703701
**SWEENEY MERRIGAN LAW**
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
tom@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Foster Johnson (*admitted pro hac vice*)
Texas Bar No. 24076463
David Warden (*admitted pro hac vice*)
Texas Bar No. 20856750
Carl J. Gustafson (*pro hac vice forthcoming*)
Texas Bar No. 24125261
**AHMAD, ZAVITSANOS & MENSING, PLLC**
1221 McKinney, Suite 2500
Houston, Texas 77010
(713) 655-1101 -Phone
(713) 655-0062 – Fax
fjohnson@azalaw.com
dwarden@azalaw.com
cgustafson@azalaw.com

Alex Dravillas (*pro hac vice forthcoming*)
**KELLER POSTMAN LLC**
150 N. Riverside Plaza, Suite 4100
Chicago, IL 60606
(312) 741-5226
adj@kellerpostman.com

Sara Aguiniga (*pro hac vice forthcoming*)
**KELLER POSTMAN LLC**
1100 Vermont Ave, 12th Floor
Washington, DC 20005
sara.aguiniga@kellerpostman.com

**CERTIFICATE OF SERVICE**

I, J. Tucker Merrigan, hereby certify that on October 6, 2023, in accordance with Superior Court Rule 9A, I served the following documents:

1. Rule 9A Notice of Filing and Listing of Documents; and
2. Request for Hearing.

on all counsel of record, via electronic mail to the following parties of interest:

Emyr Remy
SHOOK, HARDY & BACON L.L.P.
One Federal Street, Suite 2540
Boston, MA 02110
Tel: (617) 531-1411 | Fax: (617) 531-1602
remy@shb.com

Jessica N. Wahl *(pro hac vice)*
SHOOK, HARDY & BACON L.L.P.
2049 Century Park East, Suite 3000
Los Angeles, CA 90067
Tel: (424) 285-8330 | Fax: (424) 204-9093
jwahl@shb.com

Alfred J. Saikali *(pro hac vice)*
SHOOK, HARDY & BACON L.L.P.
201 South Biscayne Blvd., Suite 3200
Miami, Florida 33131
Tel: (305) 358-5171 | Fax: (305) 358-7470
asaikali@shb.com

Jenn O. Hatcher *(pro hac vice)*
SHOOK, HARDY & BACON L.L.P.
2555 Grand Blvd
Kansas City, MO 64108
Tel: (816) 474-6550 | Fax: (816) 421-5547
Jhatcher@shb.com

Tammy B. Webb *(pro hac vice)*
SHOOK, HARDY & BACON, L.L.P.
555 Mission Street, Suite 2300
San Fransicso, CA 94105
Tel: (415) 544-1900 | Fax: (415) 391-0281
Tbwebb@shb.com

Justin R. Donoho *(pro hac vice)*
SHOOK, HARDY & BACON, L.L.P.
111 South Wacker Drive
Chicago, IL 60606
Tel: (312) 704-7713 | Fax: (312) 558-1195
jdonoho@shb.com

*/s/ Johnathan T. Merrigan*
J. Tucker Merrigan

**CERTIFICATE OF SERVICE**

I, J. Tucker Merrigan, hereby certify that on September 22, 2023, in accordance with Superior Court Rule 9A, I served the within document(s):

- Plaintiff's Motion to Compel and to Remove Certain Objections; and
- Memorandum in Support of Plaintiff's Motion to Compel and Remove Certain Objections;

on all counsel of record, via electronic mail to the following parties of interest:

Alan Y. Wong
Emyr Remy
SHOOK, HARDY & BACON L.L.P.
One Federal Street, Suite 2540
Boston, MA 02110
Tel: (617) 531-1411 | Fax: (617) 531-1602
awong@shb.com
remy@shb.com

Alfred J. Saikali *(pro hac vice)*
SHOOK, HARDY & BACON L.L.P.
201 South Biscayne Blvd., Suite 3200
Miami, Florida 33131
Tel: (305) 358-5171 | Fax: (305) 358-7470
asaikali@shb.com

Tammy B. Webb *(pro hac vice)*
SHOOK, HARDY & BACON, L.L.P.
555 Mission Street, Suite 2300
San Fransicso, CA 94105
Tel: (415) 544-1900 | Fax: (415) 391-0281
Tbwebb@shb.com

Jessica N. Wahl *(pro hac vice)*
SHOOK, HARDY & BACON L.L.P.
2049 Century Park East, Suite 3000
Los Angeles, CA 90067
Tel: (424) 285-8330 | Fax: (424) 204-9093
jwahl@shb.com

Jenn O. Hatcher *(pro hac vice)*
SHOOK, HARDY & BACON L.L.P.
2555 Grand Blvd
Kansas City, MO 64108
Tel: (816) 474-6550 | Fax: (816) 421-5547

Jhatcher@shb.com

Justin R. Donoho *(pro hac vice)*
SHOOK, HARDY & BACON, L.L.P.
111 South Wacker Drive
Chicago, IL 60606
Tel: (312) 704-7713 | Fax: (312) 558-1195
jdonoho@shb.com

*/s/ Jonathan T. Merrigan*
J. Tucker Merrigan

34.2

COMMONWEALTH OF MASSACHUSETTS

| | |
|---|---|
| ESSEX, ss | TRIAL COURT DEPARTMENT SUPERIOR COURT |
| JOHN DOE, individually and on behalf of all others similarly situated, Plaintiff, | DOCKET NO. 2277CV01000D |
| v. | |
| EMERSON HOSPITAL, Defendant. | A TRUE COPY, ATTEST DEPUTY ASST. CLERK |

**EMERSON HOSPITAL'S OPPOSITION TO**
**PLAINTIFF'S MOTION TO COMPEL AND TO REMOVE CERTAIN OBJECTIONS**

**Introduction and Summary**

Plaintiff's Motion to Compel and to Remove Certain Objections requests that the Court compel Defendant Emerson Hospital to (1) accelerate production of information in accordance with an overly aggressive schedule; (2) produce irrelevant information about patients' visitation, usage, and registrations at Emerson' patient portal; and (3) make an impossible estimate of the number of unique visitors to its website. Those three requests should be denied, as follows.

First, Plaintiff's entire motion moves to accelerate production of information in accordance with an unreasonable schedule. Plaintiff's schedule is overly aggressive, and therefore Plaintiff's entire motion should be denied. Such is shown by Plaintiff's misrepresentation of the Court's scheduling order as supposedly providing for completion of document production on August 31, 2023. It does not, and it provides for completion of fact discovery on December 31. Moreover, even the current date of December 31 for completion of fact discovery is now too aggressive and likely needs to be moved back in light of the Court's moving back of the motion to dismiss hearing

three months. Further, a stay of all further discovery until 30 days after the close of the pleadings should be entered because it will promote the interests of justice and judicial efficiency, prevent undue burden, and halt expensive and time-consuming discovery that would be needlessly incurred if Emerson's Motion to Dismiss is granted, in full or even in part. Accordingly, Emerson served its Motion for Protective Order and to Stay Discovery on September 25, 2023. (Section I, below.)

Second, Plaintiff moves to compel production of information relating to patients who visited, used, and registered for Emerson's patient portal. As its only basis for seeking this information, Plaintiff baldly asserts that Emerson's patient portal had advertising technology ("adtech") installed on it. This assertion is incorrect, as shown by the sworn affidavit, attached herewith, of Renee Fosberg, Emerson's Chief Information Officer, which shows that no adtech has ever been installed on the patient portal, the login button to the patient portal, or the webpage containing that login button. In addition, Emerson previously served on Plaintiff sworn interrogatory answers stating no adtech has ever been installed on Emerson's patient portal. Moreover, Emerson's counsel previously explained in teleconferences that according to Emerson's prior investigation, no adtech has ever been installed on the patient portal, the login button to the patient portal, or the webpage containing that login button. Further, Plaintiff's counsel has long promised to schedule a demonstration that would supposedly show adtech installed in the portal and/or on the login button, and now reneges, showing there is nothing to demonstrate (and also violating Mass. Super. Ct. R. 9C(a) in advance of filing Plaintiff's motion). In short, portal visitation, usage, and registration information is not relevant or discoverable in this case. Plaintiff's request for it should be denied. (Section II.)

Third, Plaintiff moves to compel two interrogatory answers different from the answers Emerson already provided, which stated that is impossible for Emerson to estimate the number of

unique visitors to its website for the many detailed reasons set forth in Emerson's interrogatory answers showing that the information Emerson has related to its website is insufficient to perform any accurate estimation. Plaintiff's motion to compel different answers is, at best, a disguised motion for summary judgment that fails to address these detailed reasons, offer any evidence, and comply with the procedural requirements for filing a motion for summary judgment. Plaintiff's request for different answers to interrogatories should be denied. (Section III.)

## Argument

### I. Plaintiff's request to accelerate discovery should be rejected.

#### A. Emerson has been producing information pursuant to an already accelerated schedule.

On January 30, 2023, Plaintiff filed his First Amended Complaint. Emerson moved to dismiss on February 9, 2023. Emerson's Motion to Dismiss was fully briefed on April 24, 2023, and set for hearing on July 20, 2023.

On July 17, 2023, three days before the hearing, the Parties submitted an agreed motion for entry of an agreed scheduling order, setting initial discovery deadlines. Later that same day, on July 17, 2023, the Court removed the July 20 hearing from its calendar. On July 25, 2023, the Court reset the Motion to Dismiss hearing for October 12, 2023, and entered the previously submitted scheduling order (Ex. 1, discussed in Sections I.B & I.C, below).

Emerson has been complying with the scheduling order. For example, on August 31, 2023, Emerson served its amended answers to all 17 of Plaintiff's First Interrogatories and its amended responses to all 163 of Plaintiff's First and Second Requests for Production of Documents. In addition, Emerson has made an initial production of responsive privacy policies and insurance documents. Further, Emerson invested significant time negotiating search terms with Plaintiff, and has collected documents pursuant to the parties' agreement on search terms.

**B. Plaintiff's request for relief misrepresents the Court's scheduling order.**

The July 25, 2023 scheduling order clearly states, "Defendant will respond to the remainder of Plaintiff's First Requests for Interrogatories and First and Second Requests for Production by August 31, 2023." Ex. 1. Emerson complied with that order. *See* Ex. 2. The order does not state, as Plaintiff misrepresents, that "[Emerson] was required to complete its [document] production by August 31, 2023." Mem. at 5-6. Rather, the order provides that fact discovery is to be completed by December 31, 2023. In short, Plaintiff's urgency undergirding its entire motion is premised on a misrepresentation of the Court's order. There is no such urgency.

**C. The schedule set forth in the Court's scheduling order should be extended.**

When the parties submitted the agreed scheduling order that the Court subsequently entered, Emerson understood that the motion to dismiss hearing would be occurring only three days later, on July 20, 2023, not nearly three months later. In light of the motion to dismiss hearing being moved back nearly three months, Emerson believes it is likely that the dates in the scheduling order will need to be moved back accordingly, if any claims survive the motion to dismiss.

**D. Discovery should be stayed until 30 days after the close of the pleadings.**

When the parties submitted the agreed scheduling order that the Court subsequently entered, Emerson had also anticipated that the following time-consuming tasks covering the entire subject of Plaintiff's motion to compel would not need to occur before the Court had an opportunity to rule on Emerson's Motion to Dismiss:

- Review and production of additional documents;
- Identify, prepare, and produce witness(es) for corporate representative deposition(s), including in response to Plaintiff's notice of deposition to Emerson, as amended August 18, 2023;

- Respond to Plaintiff's First Requests for Admissions and Third Requests for Production of Documents;
- Supplement existing discovery responses.[1]

On September 25, 2023, Emerson served its Motion for Protective Order and to Stay Discovery on September 25, 2023. As the motion shows, good cause exists for the issuance of a protective order staying all discovery in this matter. This is reason alone to deny Plaintiff's motion in its entirety. Emerson has challenged the legal sufficiency of Plaintiff's claims, and given that the scope of relevant discovery hinges on Plaintiff's ability to proceed with one or more of these claims, judicial and financial resources will be saved if this Court stays discovery pending resolution of Emerson's dispositive motion. This is particularly so because while Emerson's Motion to Dismiss remains pending, the next steps in discovery are incredibly time-consuming and resource-intensive. They include document review, analysis, and production in response to nearly 200 requests for production of documents; depositions of corporate representative(s) on 17 topics (several include numerous sub-topics)[2]; and further responses to written discovery requests. These activities are irrelevant to the determination of Emerson's pending Motion to Dismiss and will be moot in the event the Court grants the Motion. In addition, it would be a waste of the parties' resources to pursue these activities—and of judicial resources to resolve any disputes arising out of them, such as the disputes set forth in Sections II & III below—because, as shown

---

[1] A portion of the supplemental written discovery responses sought by Plaintiff's motion is for Emerson to indicate whether any information or documents have been withheld and on what basis (Mem. at 4-5). Plaintiff concedes such amendment is not required under Mass. Sup. Ct. Rs. 30A(3)(a) & 30A(3)(b) until after all documents have been produced (Mem. at 4-5).

[2] These topics cover a broad range of subjects, including but not limited to Emerson's relationships and communications with third-party vendors, nuanced details of website use and visitor traffic, software code, use of marketing tags and cookies, Emerson's privacy policies and amendments to same, document retention protocols, all responses to Plaintiff's written discovery requests, insurance agreements, and Emerson's finances.

in Emerson's Motion to Dismiss and reply brief and as set forth in its Notice of Supplemental Authority, Plaintiff cannot prevail on any of his claims. At a minimum, a ruling on the Motion could significantly narrow the claims.

A stay of all discovery would also avoid the imposition of undue burden and expense on Emerson, a nonprofit healthcare organization. Emerson is not large and does not have in-house counsel. Accordingly, imposing burdensome and expensive discovery that might all be for naught is a massive and unnecessary drain on Emerson's limited resources. Conversely, a temporary stay of discovery in this case will not prejudice Plaintiff, regardless of how this Court rules on Emerson's Motion to Dismiss. Lack of any prejudice to Plaintiff is reinforced by the fact that the parties have already negotiated search terms and Emerson has taken necessary steps to collect and preserve responsive documents.

Under these circumstances, there is good cause to stay all discovery until the Court has ruled on Emerson's Motion to Dismiss, and the issuance of such a stay is well within the Court's discretion. *See* Motion for Protective Order and to Stay Discovery (served September 25, 2023), quoting, *e.g., Kramer v. Zoning Bd. of Appeals of Somerville*, 65 Mass. App. Ct. 186, 196 n.10 (2005); *Chesapeake Inv. Servs., Inc. v. Olive Grp. Corp.*, No. 022654BLS, 2002 WL 31379955, at *2 (Mass. Super. Ct. Sept. 13, 2002); *E.A. Miller, Inc. v. South Shore Bank*, 405 Mass. 95, 100 (1989); *Hilles v. Episcopal Diocese of Massachusetts*, 51 Mass. App. Ct. 220, 225–26 (2001); *Fenn v. Trans Nat. Travel, Inc.*, No. Civ.A. 01-00962, 2002 WL 1466481, at *1 (Mass. Sup. Ct. June 27, 2002).

## II. Plaintiff's request for patient portal visitation, usage, and registration information should be rejected.

A portion of Plaintiff's motion seeks information relating to numbers of patients who visited, used, and registered for Emerson's patient portal. Mem. at 7, 9-10. As his only basis for

seeking this information, Plaintiff baldly asserts that he "has reason to believe" and "knows" that adtech was installed on Emerson's patient portal. *Id.*

This portion of Plaintiff's motion should be denied for the additional reason that the requested portal information is not relevant or discoverable. Not only was adtech never installed on Emerson's patient portal, neither does Plaintiff have any "reason to believe" or "know[ledge]" of such (Mem. at 7, 9-10), as shown by the following:

- Sworn Affidavit by Emerson's CIO. Attached hereto is the sworn affidavit of Renee Fosberg, Emerson's Chief Information Officer. Ex. 3. This affidavit demonstrates, based on Ms. Fosberg's personal knowledge and investigation, that no adtech has ever been installed on Emerson's patient portal, the login button to the patient portal, or the public webpage containing that login button and serving as the entryway to the portal.
- Sworn interrogatory answers. Emerson served interrogatory answers informing Plaintiff that no adtech has ever been installed on Emerson's patient portal on June 20, 2023, with sworn verification on July 5, 2023, and again in an amendment sworn and served on August 31, 2023. *See* Ex. 2, Ans. to Interrog. Nos. 4, 7, 10.
- Plaintiff's flip-flop showing the lack of any contrary evidence. On August 18, 2023, during a teleconference, undersigned counsel explained to Plaintiff's counsel that based on Emerson's technical investigation, no adtech has ever been installed on Emerson's patient portal, the login button to the patient portal, or the webpage containing that login button. Undersigned counsel also explained that if Plaintiff has any technical information to the contrary, then Emerson is willing to listen and consider such information as part of Emerson's good faith effort to understand any areas of technical disagreement. Plaintiff's counsel responded orally that although he did not have any

personal knowledge of the technical details, he would schedule a technical demonstration purportedly showing that adtech was installed in Emerson's patient portal and/or the login button to the portal, and sent a follow-up email requesting Emerson's availability. Ex. 4. Emerson immediately offered a date for Plaintiff's purported demonstration. Ex. 5. Plaintiff's counsel received this offered date, Ex. 6, and never followed up with any dates of his own. During a teleconference on September 21, 2023, undersigned counsel again identified Plaintiff's month-long failure to engage in a good faith effort to understand areas of technical disagreement. Plaintiff's counsel did not deny this failure and said he would check with his team. On September 22, 2023, Plaintiff filed this motion.[3]

In sum, there has never been any adtech installed in Emerson's patient portal. Therefore, in this case about adtech, Plaintiff's requested information about patients' portal visits, uses, and registrations is neither relevant nor discoverable. Plaintiff's request to compel production of such information should be denied. *See, e.g., Fitzgerald v. Morrison,* 2002 WL 389872, at *2 (Mass. Super. Jan. 10, 2002) (denying motion to compel because the documents sought were "irrelevant"); *Doe v. Bechtel Corp.,* 1995 WL 389950, at *1 (Mass. Super. Ct. May 12, 1995) (denying plaintiff's motion to compel because "the requested documents are irrelevant to [plaintiff]'s claim").

**III. Plaintiff's request that Emerson make an impossible estimate of the number of unique website visitors should be rejected.**

Plaintiff's motion also asks the Court to compel Emerson to estimate the number of individuals or a portion thereof who have interacted with Emerson's website, in answer to interrogatories 3 & 8. Mem. at 8, 10. As Emerson stated in answer to both of these interrogatories,

[3] As the foregoing narrative also demonstrates, Plaintiff violated Rule 9C(a)'s requirement that in advance of filing his motion to compel, Plaintiff was required to "make a good faith effort to narrow areas of disagreement to the fullest extent."

it is impossible for Emerson to provide any such estimate. Ex. 2, Ans. to Pl.'s Interrog. Nos. 3, 8. That is because the information Emerson has related to its website:

> is not responsive to this request or to this request as limited to patients, relevant web pages, relevant Data, and Massachusetts citizens, including because it relates to unique device-browser combinations instead of unique individuals or patients; counts the same unique device-browser combination more than once including each and every time it accesses any web page, clears cookies, or changes IP address; counts robotic devices; counts based on approximate geographic location of device-browser combination not an individual's or patient's citizenship; and includes other significant counting errors precluding any accurate estimation of the number of unique individuals, patients, or Massachusetts individuals or patients who accessed certain of Defendants' web pages when certain technology was installed on those web pages.

*Id.* In essence, Plaintiff served contention interrogatories, received an answer, and now moves this Court in what is a disguised motion for summary judgment to make a factual finding that Emerson's answer is incorrect. Worse, Plaintiff moves the Court to compel Emerson to make something up. This is completely inappropriate, especially without Plaintiff (a) addressing any of the above-quoted reasons supporting Plaintiff's interrogatory answers; (b) offering any evidence; or (c) complying with Mass. Super. Ct. R. 9A(b)(5). Plaintiff's request should be denied.[4]

**Conclusion**

For the foregoing reasons, Emerson respectfully requests that Plaintiff's Motion to Compel and Remove Certain Objections be denied.

[4] Plaintiff also challenges Emerson's additional answer "none" in answer to interrogatory 8, which argumentatively frames the question in terms of disclosure of "Personal Health Information" ("PHI"). Emerson contends no PHI as defined in the interrogatory was disclosed. Plaintiff again asks the court to find otherwise in what is essentially a disguised motion for summary judgment, without providing any evidence or complying with Mass. Super. Ct. R. 9A(b)(5). Moreover, Plaintiff's use of its term PHI is overbroad in its definition and therefore argumentative. Emerson is not required to make unwarranted admissions in what could be used as trial exhibits due to Plaintiff's argumentative use of an improperly defined term which should be excluded under Mass. Guide to Evid. § 403. Plaintiff cites no case for this proposition, and Emerson is aware of none.

Dated: October 5, 2023

Respectfully submitted,

EMERSON HOSPITAL

By:

/s/Justin R. Donoho

Justin R. Donoho (IL # 6299667)
**SHOOK, HARDY & BACON L.L.P.**
111 South Wacker Drive, Suite 4700
Chicago, IL 60606
Tel: (312) 704-7713 | F: (312) 558-1195
jdonoho@shb.com

Emyr T. Remy, BBO# 704156
**SHOOK, HARDY & BACON L.L.P.**
One Federal Street, Suite 2540
Boston, MA 02110
Tel.: (617) 531-1411 | Fax: (617) 531-1602
remy@shb.com

Alfred J. Saikali (FL # 0178195)
**SHOOK, HARDY & BACON L.L.P.**
201 South Biscayne Blvd., Suite 3200
Miami, Florida 33131
Tel: (305) 358-5171 | Fax: (305) 358-7470
asaikali@shb.com

Tammy B. Webb (CA # 227593)
**SHOOK, HARDY & BACON L.L.P.**
555 Mission Street, Suite 2300
San Francisco, CA 94105
Tel: (415) 544-1900 | Fax: (415) 391-0281
twebb@shb.com

Jenn O. Hatcher (MO # 69742)
**SHOOK, HARDY & BACON L.L.P.**
2555 Grand Boulevard
Kansas City, MO 64108
Tel: (816) 474-6550 | F: (816) 421-5547
jhatcher@shb.com

Jessica N. Wahl (CA # 321887)
**SHOOK, HARDY & BACON L.L.P.**
2049 Century Park East, Suite 3000
Los Angeles, CA 90067
Tel: (424) 324-3477 | Fax: (424) 204-9093
jwahl@shb.com

## CERTIFICATE OF SERVICE

I, Emyr T. Remy, hereby certify that on October 5, 2023, a true copy of the above document was served by email upon:

J. Tucker Merrigan (BBO# 681627)
Victoria Santoro (BBO# 679120)
Erin E, McHugh (BBO# 703701)
**SWEENEY MERRIGAN LAW**
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Seth Meyer (*PHV5191283NY*)
Alex Dravillas (*PHV6299686IL*)
**KELLER POSTMAN LLC**
150 N. Riverside Plaza, Suite 4100
Chicago, IL 60606
Tel: (312) 741-5220
sam@kellerpostman.com
ajd@kellerpostman.com

Foster C. Johnson (*PHV24076463TX*)
David Warden (*PHV20856750TX*)
Nathan Campbell (*PHV24097455TX*)
**AHMAD, ZAVITSANOS & MENSING, P.C.**
1221 McKinney St., Suite 3460
Houston, TX 77010
Tel: (713) 655-1101
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

*/s/ Emyr T. Remy*
Emyr T. Remy

34.3

COMMONWEALTH OF MASSACHUSETTS

ESSEX, S.S. SUPERIOR COURT

| | | |
|---|---|---|
| JOHN DOE,<br>INDIVIDUALLY AND ON<br>BEHALF OF ALL OTHERS SIMILARLY<br>SITUATED,<br><br>Plaintiff<br><br>v.<br><br>EMERSON HOSPITAL,<br><br>Defendant. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | C.A. No. 2277CV01000 |

**REQUEST FOR HEARING**

The Plaintiff, John Doe, Individually and on Behalf of All Others Similarly Situated respectfully requests that this court grants a hearing as to PLAINTIFF'S MOTION TO COMPEL AND TO REMOVE CERTAIN OBJECTIONS.

Respectfully Submitted
The Plaintiff
By his Attorney,

*/s/ J. Tucker Merrigan*
J. Tucker Merrigan, BBO# 681627
**SWEENEY MERRIGAN LAW, LLP**
268 Summer Street, LL
Boston, MA 02210
Phone: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com

Dated: October 6, 2023

A TRUE COPY, ATTEST
DEPUTY ASS'T. CLERK

34.4

COMMONWEALTH OF MASSACHUSETTS

ESSEX, S.S. SUPERIOR COURT

| | | |
|---|---|---|
| JOHN DOE,<br>INDIVIDUALLY AND ON<br>BEHALF OF ALL OTHERS SIMILARLY<br>SITUATED,<br><br>Plaintiff<br><br>v.<br><br>EMERSON HOSPITAL,<br><br>Defendant. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | C.A. No. 2277CV01000 |

**RULE 9A NOTICE OF FILING AND LISTING OF DOCUMENTS**

I, J. Tucker Merrigan, one of the counsel for Plaintiff, John Doe, Individually and on Behalf of All Others Similarly Situated, hereby state that the following list of documents have been submitted for filing with the Court pursuant to Superior Court Rule 9A:

1. Plaintiff's Motion to Compel and to Remove Certain Objections;
2. Memorandum in Support of Plaintiff's Motion to Compel and Remove Certain Objections;
3. Request for Hearing;
4. Emerson Hospital's Opposition to Plaintiff's Motion to Compel and to Remove Certain Objections; and
5. Certificate of Service.

Respectfully Submitted
The Plaintiff
By his Attorney,

*/s/ J. Tucker Merrigan*
J. Tucker Merrigan, BBO# 681627
**SWEENEY MERRIGAN LAW, LLP**
268 Summer Street, LL
Boston, MA 02210
Phone: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com

Dated: October 6, 2023

A TRUE COPY, ATTEST
DEPUTY ASST. CLERK

# CERTIFICATE OF SERVICE

I, J. Tucker Merrigan, hereby certify that on October 6, 2023, in accordance with Superior Court Rule 9A, I served the following documents:

1. Rule 9A Notice of Filing and Listing of Documents; and
2. Request for Hearing.

on all counsel of record, via electronic mail to the following parties of interest:

Emyr Remy
SHOOK, HARDY & BACON L.L.P.
One Federal Street, Suite 2540
Boston, MA 02110
Tel: (617) 531-1411 | Fax: (617) 531-1602
remy@shb.com

Jessica N. Wahl *(pro hac vice)*
SHOOK, HARDY & BACON L.L.P.
2049 Century Park East, Suite 3000
Los Angeles, CA 90067
Tel: (424) 285-8330 | Fax: (424) 204-9093
jwahl@shb.com

Alfred J. Saikali *(pro hac vice)*
SHOOK, HARDY & BACON L.L.P.
201 South Biscayne Blvd., Suite 3200
Miami, Florida 33131
Tel: (305) 358-5171 | Fax: (305) 358-7470
asaikali@shb.com

Jenn O. Hatcher *(pro hac vice)*
SHOOK, HARDY & BACON L.L.P.
2555 Grand Blvd
Kansas City, MO 64108
Tel: (816) 474-6550 | Fax: (816) 421-5547
Jhatcher@shb.com

Tammy B. Webb *(pro hac vice)*
SHOOK, HARDY & BACON, L.L.P.
555 Mission Street, Suite 2300
San Fransicso, CA 94105
Tel: (415) 544-1900 | Fax: (415) 391-0281
Tbwebb@shb.com

Justin R. Donoho *(pro hac vice)*
SHOOK, HARDY & BACON, L.L.P.
111 South Wacker Drive
Chicago, IL 60606
Tel: (312) 704-7713 | Fax: (312) 558-1195
jdonoho@shb.com

*/s/ Johnathan T. Merrigan*
J. Tucker Merrigan

**CERTIFICATE OF SERVICE**

I, J. Tucker Merrigan, hereby certify that on October 6, 2023, in accordance with Superior Court Rule 9A, I served the following documents:

1. Rule 9A Notice of Filing and Listing of Documents; and
2. Request for Hearing.

on all counsel of record, via electronic mail to the following parties of interest:

Emyr Remy
SHOOK, HARDY & BACON L.L.P.
One Federal Street, Suite 2540
Boston, MA 02110
Tel: (617) 531-1411 | Fax: (617) 531-1602
remy@shb.com

Jessica N. Wahl *(pro hac vice)*
SHOOK, HARDY & BACON L.L.P.
2049 Century Park East, Suite 3000
Los Angeles, CA 90067
Tel: (424) 285-8330 | Fax: (424) 204-9093
jwahl@shb.com

Alfred J. Saikali *(pro hac vice)*
SHOOK, HARDY & BACON L.L.P.
201 South Biscayne Blvd., Suite 3200
Miami, Florida 33131
Tel: (305) 358-5171 | Fax: (305) 358-7470
asaikali@shb.com

Jenn O. Hatcher *(pro hac vice)*
SHOOK, HARDY & BACON L.L.P.
2555 Grand Blvd
Kansas City, MO 64108
Tel: (816) 474-6550 | Fax: (816) 421-5547
Jhatcher@shb.com

Tammy B. Webb *(pro hac vice)*
SHOOK, HARDY & BACON, L.L.P.
555 Mission Street, Suite 2300
San Fransicso, CA 94105
Tel: (415) 544-1900 | Fax: (415) 391-0281
Tbwebb@shb.com

Justin R. Donoho *(pro hac vice)*
SHOOK, HARDY & BACON, L.L.P.
111 South Wacker Drive
Chicago, IL 60606
Tel: (312) 704-7713 | Fax: (312) 558-1195
jdonoho@shb.com

*/s/ Johnathan T. Merrigan*
J. Tucker Merrigan

**COMMONWEALTH OF MASSACHUSETTS**

**ESSEX, S.S.**

**TRIAL COURT DEPARMENT**
**SUPERIOR COURT**

**JOHN DOE, Individually and on behalf of herself and all others similarly situated,**

**Plaintiff,**

**v.**

**EMERSON HOSPITAL,**

**Defendant.**

**DOCKET NO. 2277CV01000D**

A TRUE COPY, ATTEST
DEPUTY ASST. CLERK
FILED ESSEX SUPERIOR COURT

**PLAINTIFF'S MOTION TO COMPEL AND TO REMOVE CERTAIN OBJECTIONS**

NOW COMES Plaintiff John Doe, and requests this Honorable Court order the Defendant to supplement its Answers to Plaintiff's Interrogatories and Request of Production of Documents; to remove specific objections; and to answer and provide requested documents to each of Plaintiff's Request for Production of Documents. Further, Defendant has failed to provide Plaintiff with a date for the 30(b)(6) deposition of a Corporate Representative. As further grounds, Plaintiff refers this Honorable Court to Plaintiff's Memorandum Supporting his Motion to Compel and to Remove Certain Objections.

WHEREFORE, Plaintiff John Doe requests this Honorable Court grant his Motion in its entirety.

Respectfully Submitted
By Plaintiff's Counsel:

*/s/ Foster Johnson*
J. Tucker Merrigan, BBO# 681627
Thomas T. Merrigan, BBO# 343480
Erin E. McHugh, BBO# 703701
SWEENEY MERRIGAN LAW

268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
tom@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Foster Johnson (*admitted pro hac vice*)
Texas Bar No. 24076463
David Warden (*admitted pro hac vice*)
Texas Bar No. 20856750
Carl J. Gustafson (*pro hac vice forthcoming*)
Texas Bar No. 24125261
**AHMAD, ZAVITSANOS & MENSING, PLLC**
1221 McKinney, Suite 2500
Houston, Texas 77010
(713) 655-1101 -Phone
(713) 655-0062 – Fax
fjohnson@azalaw.com
dwarden@azalaw.com
cgustafson@azalaw.com

Alex Dravillas (*pro hac vice forthcoming*)
**KELLER POSTMAN LLC**
150 N. Riverside Plaza, Suite 4100
Chicago, IL 60606
(312) 741-5226
adj@kellerpostman.com

Sara Aguiniga (*pro hac vice forthcoming*)
**KELLER POSTMAN LLC**
1100 Vermont Ave, 12th Floor
Washington, DC 20005
sara.aguiniga@kellerpostman.com

COMMONWEALTH OF MASSACHUSETTS

**ESSEX, S.S.**

**TRIAL COURT DEPARMENT**
**SUPERIOR COURT**

**JOHN DOE, Individually and on behalf of herself and all others similarly situated,**

**Plaintiff,**

**v.**

**EMERSON HOSPITAL,**

**Defendant.**

§ § § § § § § § § § § § §

**DOCKET NO. 2277CV01000D**

A TRUE COPY, ATTEST
DEPUTY ASS'T CLERK

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION TO COMPEL AND REMOVE CERTAIN OBJECTIONS**

The Plaintiff John Doe, by and through his counsel, hereby submits this Memorandum in Support of his Motion to Compel Documents and to Remove Certain Objections. As grounds therefore, the Plaintiff states:

**(1) Defendant Failed to Provide a Date for the 30(b)(6) Deposition for Defendant's Corporate Representative.**

**(2) Defendant Did Not Answer Plaintiff's Interrogatories and Requests for Production of Documents Pursuant to the Massachusetts Rules of Civil Procedure;**

**(3) Defendant Failed to Reasonably Remove Its Objections as Required by Mass. Sup. Crt. R. 30A; and**

On April 13, 2023, Plaintiff Served his First and Second Requests for Production of Documents and his First Set of Interrogatories to Defendant. *See* Exhibit A. Plaintiff subsequently

served his Third Request for Production of Documents to Defendant on May 22, 2023. *See* Exhibit B. Defendant served its responses to Plaintiff's First and Second Sets of Requests for Production of Documents on June 20, 2023. *See* Exhibit C. Defendant served its First Amended Responses to Plaintiff's First and Second Sets of Requests for Production of Documents on August 31, 2023; however, it did not remove its general objections. *See* Exhibit D. Further, Per the Scheduling Order entered by the Court on July 25, 2023, Defendant was required to complete its production by August 31, 2023. *See* Exhibit D. Yet, as of the date of this filing, the Defendants have only produced thirty-nine (39) documents. On September 8, 2023, Plaintiff served a 9C letter to Defendant, which outlined the deficiencies in Defendants' responses to both the Production of Documents and Interrogatories, and further discussed that Defendant failed to furnish Plaintiff with not only a date for its 30(b)(6) corporate representative deposition. *See* Exhibit E.

On September 21, 2023, Plaintiff and Defendant held a 9C Conference, and during this conference, Defendant maintained its position and refused to supplement or amend its responses. Defendant further refused to provide Plaintiff with a date for the 30(b)(6) Deposition. Instead, Defendant asserted that all discovery should be stayed pending the Court's ruling on its Motion to Dismiss, despite its obligations under the Massachusetts Rules of Civil Procedure. Therefore, Plaintiff now files this Motion to Compel.

## BACKGROUND

This action arises out of Defendant's invasion of privacy and disclosure of personal and protected health information without Plaintiff's consent. Defendant violated Plaintiff's privacy rights by selling and/or bartering his personal health information to Facebook and Google in exchange for access to Facebook's Meta Pixel tool and Google Analytics. Plaintiff alleges that Defendant installed the Meta Pixel tool and Google Analytics to run surreptitiously on its websites in order to intercept and disclose patient communications to Facebook and Google for marketing purposes.

## LEGAL STANDARD

"Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party, including the existence, description, nature, custody, condition, and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter. It is not grounds for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence." Mass. R. Civ. P. 26(b)(1).

Courts in the Commonwealth have wide latitude in the practice of Mass. R. Civ. P. 26. "Generally discovery is permissible of any nonprivileged material which is relevant to pending action and reasonably calculated to lead to discovery of admissible evidence." *Hull Mun. Lighting Plant v. Massachusetts Mun. Wholesale Electric Company*, 414 Mass. 609, 615 (1993). The conduct and scope of discovery is within the sound discretion of the trial judge. *Poteau v. Normandy Farms Family Campground, Inc.*, 2000 WL 1765424 (Sup. Ct. 2000) (Citations omitted). Mass. R. Civ. P. 33, which governs Interrogatories, is interpreted under this broad analysis.

## ARGUMENT

### I. Defendant Has Failed to Provide Plaintiff with a Date for a 30(b)(6) Deposition, as Noticed by Plaintiff

Defendant has failed to provide Plaintiff with any date for its 30(b)(6) deposition. Plaintiff sent Defendant a draft Notice of Taking Corporate Representative Deposition on June 16, 2023, via email. In Plaintiff's email, Plaintiff requested Defendant provide it with dates during August of 2023 when Defendant could present a corporate designee or designees for its deposition. On July 5, 2023, Plaintiff again requested that Defendant provide corporate deposition dates for August of 2023. Plaintiff made additional requests for proposed dates for Defendant's corporate deposition on July

10, 2023; August 18, 2023; and August 23, 2023. During the 9C conference held on September 21, 2023, Defendants refused to entertain dates for depositions until after the resolution of their Motion to Dismiss.

To date, Defendant has failed to provide Plaintiff with a single date for its corporate deposition. Due to Defendant's refusal provide a date for the corporate deposition, Plaintiff respectfully requests that the Court compel Defendant to provide a date for this deposition to take place.

## II. Defendant Failed to Reasonably Respond to Plaintiff's First and Second Request for Production of Documents

### A. Defendant's Failure to Provide Non-Custodial Sources

Section 5 of the ESI Protocol in this matter requires that a list of non-custodial data sources, such as shared drives, servers, internal messaging applications, or any other sources likely to contain discoverable ESI, shall be disclosed within a reasonable amount of time prior to conducting searches for ESI in response to discovery requests. Defendant has not provided Plaintiff with a list of non-custodial data sources. During the 9C conference held on September 21, 2023, Defendants again refused to provide any non-custodial sources to Plaintiff. Instead, Defendant asserted that it would continue to work on gathering that information, but only if Plaintiffs agreed not to move forward with the instant Motion to Compel. Therefore, Plaintiff respectfully requests that the Court compel Defendant to furnish Plaintiff with non-custodial data sources.

### B. Defendant's Improper General Objections

Defendant's Responses to Plaintiff's First and Second Sets of Requests for Production of Documents began with sixteen General Objections that are applied to each and every response made. Mass. Sup. Ct. R. 30A(3)(a) states, "where general objections are made, the responding party shall prepare and serve a supplemental response no later than 10 days after the completion of production." Mass. Sup. Ct. R. 30A(3)(b) states:

> "Once production is completed, general objections to requests for production of documents and things are prohibited. As to each request, the supplemental response shall state either: (i) notwithstanding prior general objections, all responsive documents or things in the possession, custody, or control of the responding party have been produced; (ii) after diligent search no responsive documents or things are in the possession, custody, or control of the responding party; or (iii) the specific objection made to the request."

Defendant served its responses to Plaintiff's First and Second Sets of Requests for Production of Documents on June 20, 2023. Defendant served its First Amended Responses to Plaintiff's First and Second Sets of Requests for Production of Documents on August 31, 2023; however, it did not remove its general objections. During the 9C conference held on September 21, 2023, Defendant would not agree to remove these objections and, instead, asserted their position that all discovery should be stayed.

Additionally, Defendant raised several boilerplate objections in its responses to each request. Mass. Sup. Ct. R. 30A(3)(b) requires "[w]hen a specific objection is made, the response shall describe the nature of all responsive documents or things in the possession, custody, or control of the responding party that have not been produced because of the objection." Per Mass. R. Civ. P. 26(b)(5)(A), such a requirement also applies to documents that are withheld by claiming claims of privilege. Apart from its responses to Requests Nos. 3 and 13, Defendant has not identified what documents are being withheld pursuant to the objections it raised. During the 9C conference held on September 21, 2023, Defendants would not agree to remove these objections and, instead, asserted their position that all discovery should be stayed. Therefore, Plaintiff respectfully requests that the Court compel Defendant to remove both the general and individual objections.

C. Defendant's Incomplete Production of Documents

In the Scheduling Agreement, Defendant stipulated that it would begin a rolling production for documents in response to Plaintiff's following numbered requests: 1-3, 4, 12-16, 19-20, 40-42, 44, 46-47, 54-56, 58, 92, and 142. Per the Scheduling Order entered by the Court on July 25, 2023,

Defendant was required to complete its production by August 31, 2023. *See* Exhibit D. Defendant failed to complete its production of documents. Defendant produced a mere 38 pages of documents on July 14, 2023; these documents were only responsive to Request Nos. 19, 20, 60, and 61, and did not contain all responsive documents to such requests. On August 29, 2023, Defendant produced a single document in response to Request No. 1. Again, this document was not wholly responsive to the request as it failed to de-duplicate the number of unique patients each year. Defendant has not produced any other responsive and discoverable documents despite agreeing to do so by August 31, 2023. It is unfathomable that Defendant only has 39 pages of discoverable documents in response to 163 requests. Plaintiff requested that Defendant supplement its document production, but Defendant refused.

***Request No. 1:*** Request Number 1 asks for documents sufficient to identify the number of unique patients, by year, that were treated by Defendant during the class period. Defendant provided Plaintiff with a chart showing the number of unique patients by year from 2016 to 2023. However, Defendant specifically noted that these numbers were not de-duplicated across the class period, arguing that the number of unique patients treated by Emerson has "no connection" to Plaintiff's claims. The standard for discovery in Massachusetts is whether the information sought is reasonably calculated to lead to the discovery of admissible evidence. Mass. R. Civ. P. 26(b)(1). The number of unique patients per year may lead to admissible evidence regarding the class size. Plaintiff requested that Defendant de-duplicate the number of unique patients by year and supplement its production, but Defendant refused.

***Request Nos. 3, 12, and 13:*** Request Number 3 asks for the production of documents sufficient to show the number of individuals whose Personal Health Information was disclosed to third parties. Request Number 12 asks for documents sufficient to show the amount of web traffic to Emerson's web properties and any patient portal during the class period. Request Number 13 asks

for the production of documents sufficient to show the number of unique visitors to Emerson's web properties. Defendant stated in response to Requests Nos. 3 and 13 that it does not have responsive documents. Defendant failed to articulate the scope of its search for responsive documents as required by Mass. Sup. Ct. R. 30A(3)(b). Defendant undoubtedly has responsive, discoverable documents, including ESI, in its possession, custody, or control.

***Request Nos. 2, 14, 15, and 16:*** Request Numbers 2, 14, 15, and 16 ask for the production of documents related to Emerson's patient portal. More specifically, these requests ask for documents sufficient to identify the number of unique patients and visitors per year who used the portal; the number of patients who registered for the portal; and the number of patients who logged into the portal. Defendant objected to these requests, alleging that no advertising technology was installed on the patient portal and that attempting to collect such documentation would take significant resources. The documents, including ESI, requested are discoverable as the requests are reasonably calculated to lead to the discovery of admissible evidence. Plaintiff has reason to believe that the pixel was installed on Emerson's patient portal and has previously discussed this with Defendant. Documents and ESI responsive to this request are necessary to this litigation and are necessary for identifying the class size. Defendant's assertion that collecting responsive documentation would take significant resources is unsupported and is not a basis for eschewing its discovery responsibilities. Defendant has ample resources to search for and collect responsive documents. Defendant has not complied with its obligations pursuant Mass. R. Civ. P. 26(c).

***Request Nos. 19 and 20*:** Requests Number 19 and 20 ask for the production of any and all insurance policies that may be applicable in the subject action. Defendant produced its declaration pages for two policies but did not produce complete copies of its insurance policies. In withholding such production, Defendant argued that its insurance policies are not applicable at this stage of litigation. Mass. R. Civ. P. 26(b)(1) provides the contrary and specifically states:

> "A party may obtain discovery of the existence and contents of any insurance agreement under which any person carrying on an insurance business may be liable to satisfy part or all of a judgement which may be entered in the action or to indemnify or reimburse for payments made to satisfy the judgment."

During the 9C conference, Defendant would not agree to supplement its responses to any of the above-identified Requests, and therefore the Parties are at an impasse as to these Requests. Therefore, Plaintiff respectfully requests that the Court compel Defendant to respond to these Requests.

## III. Defendant's Deficient Responses to Plaintiff's Third Request for Production of Documents

On May 22, 2023, Plaintiff served his Third Set of Requests for Production of Documents upon Defendant. Defendant has not provided any responses or produced any documents in response to these requests. Defendant's responses and production to the same are overdue. During the 9C conference, Defendant refused to provide any documents or responses to these Requests and, instead, asserted their position that all discovery should be stayed. Therefore, Plaintiff respectfully requests that the Court compel Defendant to respond to these Requests and produce responsive documents.

## IV. Defendant's Insufficient Responses to Plaintiff's Interrogatories

Defendant's answers to specific Interrogatories served by Plaintiff were wholly insufficient. We address the various deficient Interrogatories below in turn:

***Interrogatory No. 3:*** Interrogatory No. 3 asks Defendant to state its best estimate for the number of individuals whose interactions with Defendant's website(s) resulted in data transmission between Defendant's website and a third party via tracking pixel or source code. Defendant raised a number of unfounded objections, asserting that this interrogatory seeks legal conclusions and requires an expert opinion. This interrogatory does not call for a legal conclusion or an expert opinion; it simply calls for a fact or estimate. Defendant's answer states that it is impossible for it to

estimate the number of individuals who have interacted with its website, and it did not attempt to give any answer. Even assuming it is impossible for Defendant to give an estimate as to the total number of individuals impacted, Defendant is able to measure the number of individuals who made appointments on the website. Defendant admitted in its answer to Interrogatory Number 2 that the tracking pixels captured information about appointment requests and sign-ups on its website.

***Interrogatory No. 4***: Interrogatory Number 4 asks in part for the number of patients who logged into Defendant's patient portal one or more times during the Class Period. Similar to the above, Defendant objects on the basis that the Interrogatory calls for an expert opinion and seeks a legal conclusion. This interrogatory does not request for either but rather requests a statement of fact. In its answer, Defendant asserted again that tracking pixels were not installed on the patient portal and that collecting portal-specific information would take significant resources. Again, Plaintiff has reason to believe that the pixel was installed on Emerson's patient portal. Defendant's assertion that collecting portal-specific information would require resources is unsupported and is not a basis for eschewing its discovery responsibilities. Defendant has ample resources to collect and review responsive documents and ESI. Defendant has not moved for a protective order pursuant to Mass. R. Civ. P. 26(c), and thus must collect and produce responsive documents. Yet, as of this date, the Defendant has failed to do so.

***Interrogatory Nos. 7 and 10:*** Interrogatory Number 7 asks for the number of Defendant's patients who reside in Massachusetts whose interactions within Emerson's patient portal during the Class Period resulted in transmission of data to third parties via tracking pixel or embedded source code. Interrogatory Number 10 asks for the time period during which Emerson had the Meta Pixel embedded within any pages of its patient portal. Defendant answered, stating that no tracking pixel or similar technology was ever embedded in the patient portal. Plaintiff knows that tracking pixels and source code was embedded on the login screen of Defendant's patient portal, and has reason to

believe that tracking pixel(s) or other source code was embedded in Emerson's patient portal. Yet, Defendant refused to provide this information to the Plaintiff.

***Interrogatory No. 8:*** Interrogatory Number 8 asks for the number of individuals who had any of their personal health information disclosed to Facebook or Google in the data disclosure. Defendant responded by saying none. Defendant explicitly stated in its answer to Interrogatory Number 2 that Facebook Pixel, Google Analytics, DoubleClick, GoogleAds, and StackAdapt were installed on numerous pages throughout its website. Defendant's argument that not a single one of these tracking pixels transmitted a single piece of Personal Health Information, which includes personally identifiable information as defined in the interrogatory, is incredulous and contrary to the very purpose of the tracking pixels' installation on Defendant's website. Yet, Defendant refused to supplement or modify its response.

Despite Plaintiff's request for Defendant to supplement its responses to the above-identified interrogatories, the Defendant refused. The Defendants' refusal was further enforced during the 9C conference which took place on September 21, 2023. Therefore, Plaintiff respectfully requests that the Court compel Defendant to supplement the above-identified deficient responses.

## CONCLUSION

For the reasons stated within, the Plaintiff respectfully requests the Court grant his Motion to Compel.

Respectfully Submitted:

*/s/ Foster Johnson*
J. Tucker Merrigan, BBO# 681627
Thomas T. Merrigan, BBO# 343480
Erin E. McHugh, BBO# 703701
**SWEENEY MERRIGAN LAW**
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
tom@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Foster Johnson (*admitted pro hac vice*)
Texas Bar No. 24076463
David Warden (*admitted pro hac vice*)
Texas Bar No. 20856750
Carl J. Gustafson (*pro hac vice forthcoming*)
Texas Bar No. 24125261
**AHMAD, ZAVITSANOS & MENSING, PLLC**
1221 McKinney, Suite 2500
Houston, Texas 77010
(713) 655-1101 -Phone
(713) 655-0062 – Fax
fjohnson@azalaw.com
dwarden@azalaw.com
cgustafson@azalaw.com

Alex Dravillas (*pro hac vice forthcoming*)
**KELLER POSTMAN LLC**
150 N. Riverside Plaza, Suite 4100
Chicago, IL 60606
(312) 741-5226
adj@kellerpostman.com

Sara Aguiniga (*pro hac vice forthcoming*)
**KELLER POSTMAN LLC**
1100 Vermont Ave, 12th Floor
Washington, DC 20005
sara.aguiniga@kellerpostman.com

## CERTIFICATE OF SERVICE

I, J. Tucker Merrigan, hereby certify that on September 22, 2023, in accordance with Superior Court Rule 9A, I served the within document(s):

- Plaintiff's Motion to Compel and to Remove Certain Objections; and
- Memorandum in Support of Plaintiff's Motion to Compel and Remove Certain Objections;

on all counsel of record, via electronic mail to the following parties of interest:

Alan Y. Wong
Emyr Remy
SHOOK, HARDY & BACON L.L.P.
One Federal Street, Suite 2540
Boston, MA 02110
Tel: (617) 531-1411 | Fax: (617) 531-1602
awong@shb.com
remy@shb.com

Alfred J. Saikali *(pro hac vice)*
SHOOK, HARDY & BACON L.L.P.
201 South Biscayne Blvd., Suite 3200
Miami, Florida 33131
Tel: (305) 358-5171 | Fax: (305) 358-7470
asaikali@shb.com

Tammy B. Webb *(pro hac vice)*
SHOOK, HARDY & BACON, L.L.P.
555 Mission Street, Suite 2300
San Fransicso, CA 94105
Tel: (415) 544-1900 | Fax: (415) 391-0281
Tbwebb@shb.com

Jessica N. Wahl *(pro hac vice)*
SHOOK, HARDY & BACON L.L.P.
2049 Century Park East, Suite 3000
Los Angeles, CA 90067
Tel: (424) 285-8330 | Fax: (424) 204-9093
jwahl@shb.com

Jenn O. Hatcher *(pro hac vice)*
SHOOK, HARDY & BACON L.L.P.
2555 Grand Blvd
Kansas City, MO 64108
Tel: (816) 474-6550 | Fax: (816) 421-5547

Jhatcher@shb.com

Justin R. Donoho *(pro hac vice)*
SHOOK, HARDY & BACON, L.L.P.
111 South Wacker Drive
Chicago, IL 60606
Tel: (312) 704-7713 | Fax: (312) 558-1195
jdonoho@shb.com

*/s/ Jonathan T. Merrigan*
J. Tucker Merrigan

# Exhibit A

EXHIBIT A

COMMONWEALTH OF MASSACHUSETTS

ESSEX, S.S. SUPERIOR COURT

| | | |
|---|---|---|
| JOHN DOE,<br>INDIVIDUALLY AND ON<br>BEHALF OF ALL OTHERS SIMILARLY<br>SITUATED,<br><br>Plaintiff<br><br>v.<br><br>EMERSON HOSPITAL,<br><br>Defendant. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | C.A. No. 2277CV01000 |

**PLAINTIFF JOHN DOE'S, ON BEHALF OF HIMSELF AND ALL OTHERS SIMILARLY SITUATED, FIRST REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANT EMERSON HOSPITAL**

Pursuant to Rule 34 of the Massachusetts Rules of Civil Procedure, the Plaintiff John Doe, Individually and on Behalf of All Others Similarly Situated, hereby propounds his First Requests for Production of Documents to Defendant Emerson Hospital ("Emerson"). Emerson shall respond to these requests in writing according to the Instructions and Definitions contained herein and produce all responsive documents in its possession, custody, or control to Sweeney Merrigan Law, LLP, counsel for the Plaintiff, at 268 Summer Street, LL, Boston, MA 02210, within 30 days of service of these requests.

**INSTRUCTIONS AND DEFINITIONS**

Massachusetts Superior Court Rule 30A ("Rule 30A") applies to these requests for production. For reference, Rule 30A states as follows:

1. **Uniform definitions in discovery requests**

*(a) Incorporation by Reference and Limitations.*

The full text of the definitions set forth in paragraph (1)(c) is deemed incorporated by reference into all discovery requests, but shall not preclude (i) the definition of other terms specific to the particular litigation; (ii) the use of abbreviations; or (iii) a narrower definition of a term defined in paragraph (1)(c).

*(b) Effect on Scope of Discovery.*

This rule is not intended to broaden or narrow the scope of discovery permitted by the Massachusetts Rules of Civil Procedure.

*(c) Definitions.*

The following definitions apply to all discovery requests, unless otherwise ordered by the court:

(1) Communication. The term "communication" means the transmittal of information (in the form of facts, opinions, ideas, inquiries, or otherwise).

(2) Document. The term "document" is defined to be synonymous in meaning and equal in scope to the usage of this term in Mass. R. Civ. P. 34 (a). An earlier draft is a separate document within the meaning of this term.

(3) Identify (With Respect to Persons). When referring to a natural person, to "identify" means to give, to the extent known, the person's (a) full name, (b) present or last known address, and (c) the present or last known place of employment. Once a person has been identified in accordance with this subparagraph, only the name of that person need be listed in response to subsequent discovery requesting the identification of that person.

(4) Identify (With Respect to Entities). When referring to an entity, to "identify" means to give, to the extent known, (a) the entity's full name, including (when not apparent from the name) the nature of the entity, e.g. corporation, limited liability corporation, partnership, or professional corporation, (b) present or last known address of its headquarters or principal place of business, and (c) the state in which the entity is incorporated or otherwise created. Once an entity has been identified in accordance with this subparagraph, only the name of that entity need be listed in response to subsequent discovery requesting the identification of that entity.

(5) Identify (With Respect to Documents). When referring to documents, to "identify" means to give, to the extent known: (a) the type of document; (b) the general subject matter; (c) the date of the document; (d) the author or authors, according to the document; and (e) the persons to whom, according to the document, the document (or a copy) was to have been sent.

(6) Parties. The term "plaintiff" or "defendant," as well as a party's full or abbreviated name or a pronoun referring to a party, means the party and, where applicable, its officers, directors, employees, partners, corporate parent, and subsidiaries. This definition is not intended to impose a discovery obligation on any person who is not a party to the litigation.

(7) Person. The term "person" means any natural person or any business, legal, or governmental entity.

(8) Concerning. The term "concerning" means referring to, describing, offering evidence of, or constituting.

(9) State the Basis or State all Facts. When an interrogatory calls upon a party to "state the basis" of or "state all facts" concerning a particular claim, allegation, or defense (or uses comparable language), the party shall provide a substantial summary of the factual basis supporting the claim, allegation, or defense at the time the interrogatory is answered. The summary shall: (a) identify the essential acts or failures to act forming the substance of the claim, allegation, or defense, (b) identify the persons and entities that, through firsthand information or possession of documents, are the sources of the party's information regarding the claim, allegation, or defense, and (c) when one or more documents is the basis of the claim, allegation, or defense, such as a written contract in a contractual claim or defense, or a written misrepresentation in a misrepresentation claim, identify (or provide as part of the interrogatory answer a copy of) each such document. In stating the basis, a party may not withhold information from the interrogatory answer because it derives from attorney work product or was obtained in anticipation of litigation if the party intends to offer this information at trial.

**2. Objections to Interrogatories**

General objections to interrogatories are prohibited. Each objection to an interrogatory shall be specific to that interrogatory and shall have a good faith basis. If a party refuses to answer an interrogatory, the party shall so state and identify each objection asserted to justify the refusal to answer. If a party, after having asserted an objection, answers the interrogatory, the answer shall state either: (a) notwithstanding the objection no information has been withheld from the answer, or (b) information has been withheld from the answer because of the objection. Where information has been withheld from the answer, the objecting party shall describe the nature of the information withheld and identify each objection asserted to justify the withholding.

**3. Objections to requests for the production of documents and things**

(a) Where a party serves a response to a request for production of documents and things under Mass. R. Civ. P. 34 before production is completed, the response may include general objections. However, where general objections are made, the responding party shall prepare and serve a supplemental response no later than 10 days after the completion of production.

(b) Once production is completed, general objections to requests for production of documents and things are prohibited. As to each request, the supplemental response shall state either: (i) notwithstanding prior general objections, all responsive documents or things in the possession, custody, or control of the responding party have been produced; (ii) after diligent search no responsive documents or things are in the possession, custody, or control of the responding party; or (iii) the specific objection made to the request. When specific objection is made, the response shall describe the nature of all responsive documents or things in the possession, custody, or control of the responding party that have not been produced because of the objection. Where a privilege log is required by Mass. R. Civ. P. 26(b)(5) or court order, the log shall be served with the supplemental response, unless the requesting party waives entitlement to the log or agrees to a later date for service.

(c) In the initial written response, the responding party shall articulate with clarity the scope of the search conducted or to be conducted. If the scope of the search changes (luring production, the responding party in the supplemental written response shall articulate with clarity the change in scope. If the scope of the search does not include all locations. including electronic storage locations, where responsive documents or things reasonably might be found, the responding party shall explain why these locations have been excluded from the scope of the search.

## ADDITIONAL DEFINITIONS

Consistent with Rule 30A, specifically Rule 30A(1)(a)(i), the following definitions shall also apply to the requests below and are deemed incorporated by reference into those requests:

1. "All" means "any and all," and the word "Any" means "any and all."

2. "Affected person" means any individual whose Personal Health Information has been disclosed to Facebook, Google, or other third parties via code such as the Meta Pixel installed on Your websites.

3. "Agreement" means any contract, arrangement, or understanding between two or more persons or entities, whether formal or informal, written or unwritten.

4. "Browser fingerprinting" means any practice utilizing device and browser attribute settings to identify a browser.

5. The "Class Period" begins on the first date on which Defendant placed third-party source code on its web properties that caused data arising from user communications with those web properties to be disclosed to third parties.

6. "Communicate" or "communications" means any oral, written or electronic transmission of information or intelligence of any nature including, but not limited to, meetings, discussions, conversations, and telephone calls, as well as documentation thereof, and telegrams, memoranda, letters, e-mails, telecopies, messages, or notes.

7. "Complaint" refers to the operative complaint in this action.

8. "Cookie synching" means any practice permitting cooperating web sites to share cookie identifiers for the same user.

9. "Cross-device tracking" refers to a practice permitting Defendant or any other company to track a user across various communications devices.

10. "Data" means information regarding the actions that individuals take on Your website, including searches, page views, and other activities, including (but not limited to) filling out electronic forms, paying bills, making online appointments, reviewing health information, and researching and selecting physicians and treatments.

11. "Data Disclosure" refers to Defendant's disclosure of the Personal Health Information of visitors to Defendant's website(s) to Facebook, Google, and other third parties via the Meta Pixel software code and other similar code embedded in Defendant's website(s) and patient portal(s), including www.emersonhospital.org.

12. "Defendant," "You", and "Your" shall mean the entity to which these Requests are directed, or any predecessor or successor companies in existence during the proposed class period, and all employees, agents, or other persons acting on Defendant's behalf.

13. "Deploy" shall mean to place, use, or inject source code at any of Defendant's properties either directly or indirectly (such as through a tag manager or other similar service).

14. "Document" or "documents" shall mean all documents, electronically stored information, and tangible things including, without limitation, all written and graphic matter and all other means of recording information, whether written, transcribed, taped, filmed, microfilmed, or in any other way produced, reproduced, or recorded, and including, but not limited to: originals, drafts, computer-sorted and computer-retrievable information, copies and duplicates that are marked with any notation or annotation or otherwise differ in any way from the original, correspondence, memoranda, reports, notes, minutes, contracts, agreements, books, records, checks, vouchers, invoices, purchase orders, ledgers, diaries, logs, calendars, computer printouts, computer disks, card files, lists of persons attending meetings or conferences, sketches, diagrams, calculations, evaluations, analyses, directions, work papers, press clippings, sworn or unsworn statements, requisitions, manuals or guidelines, audit work papers, financial analyses, tables of organizations, charts, graphs, indices, advertisements and promotional materials, audited and unaudited financial statements, trade letters, trade publications, newspapers and newsletters, photographs, emails, electronic or mechanical records, facsimiles, telegrams and telecopies, and audiotapes. Each draft, annotated, or otherwise non-identical copy is a separate document within the meaning of this term. Documents shall also include any removable sticky notes, flags, or other attachments affixed to any of the foregoing, as well as the files, folder tabs, and labels appended to or containing any documents. Documents expressly include all electronic records.

15. "Electronic records" shall mean the original (or identical duplicate when the original is not available) and any non-identical copies (whether non-identical because of notes made on

copies or attached comments, annotations, marks, transmission notations, or highlighting of any kind) of writings of every kind and description inscribed by mechanical, facsimile, electronic, magnetic, digital, or other means. Electronic records includes, by way of example and not by limitation, computer programs (whether private, commercial, or work-in-progress), programming notes and instructions, activity listings of email transmittals and receipts, output resulting from the use of any software program (including word processing documents, spreadsheets, database files, charts, graphs and outlines), electronic mail, and any and all miscellaneous files and file fragments, regardless of the media on which they reside and regardless of whether said electronic exists in an active file, deleted file, or file fragment. Electronic records includes without limitation any and all items stored on computer memories, hard disks, diskettes and cartridges, network drives, network memory storage, archived tapes and cartridges, backup tapes, floppy disks, CD-ROMs, removable media, magnetic tapes of all types, microfiche, and any other media used for digital data storage or transmittal. Electronic records also includes the file, folder tabs, and containers and labels appended to or associated with each original and non-identical copy.

16. "Facebook" shall mean Facebook, Inc. or Meta Platforms, Inc., or any of its subsidiaries and/or affiliates.

17. "Google" shall mean Alphabet Inc. or Google LLC. or any of its subsidiaries and/or affiliates (including but not limited to DoubleClick, Google Tag Manager, Google Ads, YouTube, or Google Analytics).

18. "Google Analytics" means the tracking source code, originating from Google (or Alphabet, Inc.) that is embedded on Your websites to track visitor activity on the website.

19. "Health Information System" or "HIS" refers to any system implemented by Defendant that enables it to collect, store, manage, analyze, optimize, and/or transmit patient treatment or other patient data.

20. "Including" means including, but not limited to.

21. "Meta Pixel" means source code or a tracking pixel, originating from Facebook (or Meta, Inc.) that is embedded on Your websites to track visitor activity on the website.

22. "Patient portal" means a type of Health Information System used by Defendant which allows patients to access their personal health data including but not limited to appointment information, medications, medical history, and results over an internet connection.

23. "Person" or "persons" includes any natural person, firm, association, organization, partnership, business, trust, corporation, governmental or public entity or any other form of legal entity.

24. "Personal Health Information" means Data about (1) patients' and potential patients' health conditions (e.g., addiction, Alzheimer's, heart disease), diagnoses, procedures, test results, the treating physician, medications or (2) personally identifiable information, including but not limited to, patients' and potential patients' names, addresses, email addresses,

telephone numbers, IP addresses, Facebook IDs, unique identifying codes, HTTP Headers, Pixel IDs, and/or any other sensitive information obtained and stored by Defendant.

25. "Plaintiffs" shall mean the named Plaintiff or Plaintiffs in this lawsuit.

26. "Policy" shall mean any rule, procedure, practice, or course of conduct, whether formal or informal, written or unwritten, recorded, or unrecorded.

27. "Proposed Class Period" means the class period proposed in Plaintiff's Class Action Complaint.

28. "Relating to," "related to," "relates to" means constituting, containing, concerning, embodying, reflecting, identifying, stating, mentioning, discussing, describing, evidencing, or in any other way being relevant to that given subject matter.

29. "Representatives" means Your employees, agents, representatives, or any other person acting on Your behalf.

30. "Server-side disclosures" means disclosures that occur directly between Your web-servers and any third party.

31. "Source code" means any computer software or any set of instructions or statements using any language, signs, signals, symbols or other means of human or machine communication and that are placed directly or indirectly within Defendant's web properties.

32. "Third party" refers to any entity other than Defendant and the patient/user with whom Defendant is communicating via its web properties.

33. "Third-party source code" refers to any source code derived in whole or in part from a third-party source or created by Defendant (or any of its agents, assigns, or employees) that instructs or commands the computing devices or web-browsers to patients/users exchanging communications at Defendant's web properties to transmit data of any nature to third parties.

34. "Web-log data" or "server-log data" means any information in any form that is stored by You relating to a record of data exchanges at www.emersonhospital.org or any of Your other web properties.

35. "Web property," "web properties," "website," or "websites" shall mean all websites operated by or affiliated with the entity or persons to whom these requests are directed, including www.emersonhospital.org and Your patient portal(s).

## ADDITIONAL INSTRUCTIONS

1. The discovery requests are continuing and You must provide, by way of supplementary answers and responses, such additional information and documents as You or any other person acting on Your behalf may hereafter obtain which will supplement or otherwise modify any responses hereto.

2. Please produce all of the specified documents and electronic records which are in Your possession, or available to You, or to which You may gain access through reasonable effort, including information in the possession of Your past and present attorneys, accountants, investigators, consultants, or other persons directly or indirectly employed or retained by You, or in connection with You, or anyone else otherwise subject to Your control who maintains records on Your behalf, in Your name or otherwise under Your control.

3. Any comments, notations or markings appearing on any documents or electronic records, and not a part of the original, are considered a separate document or electronic records, and any draft, preliminary form or superseded version of any document is also considered a separate document or electronic records.

4. All documents and electronic records requested herein should be produced in the same order as they are kept, or maintained, or stored, in the regular course of business.

5. All documents requested herein should be produced in the file, folder, envelope, or other container in which the documents are kept or maintained. If for any reason the container cannot be produced, please produce copies of all labels or other identifying markings.

6. Any document attached to another document must not be separated.

7. In the event that any document or electronic record called for by these requests has been destroyed, lost, discarded, otherwise disposed of, or is otherwise unavailable, such document or electronic record is to be identified as completely as possible, including, without limitation, the following information: date of disposal; manner of disposal; reason for disposal; person authorizing the disposal; and person disposing of the document or electronic record.

8. Whenever possible, verb tenses shall be interpreted to include past, present, and future tenses.

9. If an objection is made to part or all of any request, the part should be specified together with the reasons for the objection. If a claim of privilege is asserted with respect to part or all of any document on the grounds of attorney-client privilege, the attorney work product doctrine, or any other basis, describe the document with sufficient particularity to make it susceptible to identification by separately stating the following with respect to any such document: (1) the type of document; (2) its date; (3) the name, address, and position of its author(s); (4) the name, address, and position of each recipient of the document; (5) a general description of the subject matter of the document; (6) the basis of any claim of privilege; and (7) if work product immunity is asserted, the proceeding for which the document was prepared.

10. The use of the singular form of any word includes the plural and vice versa.

11. The masculine includes the feminine and neutral genders.

12. The connectives "and" and "or" shall be constructed either disjunctively or conjunctively as necessary to bring within the scope of the discovery requests all responses that might otherwise be constructed to be outside their scope.

13. To the extent that You have any objection to producing responsive documents on the basis that the responsive documents are privileged or otherwise protected by the attorney-client privilege or work-product immunity, You are required to provide a privilege log in accordance with the Massachusetts Rules of Civil Procedure.

14. If You object to providing certain information requested, state Your objection and answer any unobjectionable portion of the request for information and/or supply the unobjectionable information requested.

15. Please produce all electronically-stored documents, or e-documents, as electronically Bates-numbered single-page TIFF images with appropriate document breaks, corresponding load file for the images, and a generic delimited data file for the corresponding metadata. The following metadata or fielded information, to the extent applicable to a produced electronic document, will be included in the generic delimited data file:

a. Beginning Production Number
b. Ending Production Number
c. Parent ID (if applicable)
d. Attachment ID (if applicable)
e. File Type (e.g., Word, Excel, email, etc.)
f. Last Modified Date (if collected from source system or custodian, rather than image)
g. Last Modified Time (if collected from source system or custodian, rather than image)
h. Sent Date
i. Sent Time
j. Document Author or Form
k. To
l. CC
m. BCC
n. Subject Line (emails only)
o. Custodian or Source
p. Attachment Count
q. Native File Link
r. File Name
s. File path/folder
t. Received Date
u. Full Text
v. De-duplicated instances (by full path)
w. Redacted flag
x. Embedded content flag

Documents that should not be rendered to TIFF images (i.e., Excel files, multimedia files, voice mail, sound files, databases, etc.) will be placed as native in a separate folder. The files will be named by a pre-pending a Bates number to the original file name. A confidentiality designation can also be inserted into the file name. A slip sheet will be provided containing the Bates number, the native file name, along with the note "Document Provided in Native Format." A link to the relative path of the natively produced document will be included in the metadata load file (Field no. 17 in list above). All embedded content shall be provided, including tracked changes, hidden comments, speaker notes, etc.

Emails and their attachments will be referenced to each other in the generic delimited data file and will be numbered sequentially wherein the attachment Bates number follows the parent email Bates number. Emails and their attachments will be designated in the generic delimited data file by the beginning and ending Bates numbers of the email or individual attachments (Fields nos. 1 and 2 in list above), and those of the entire family (Fields no. 3 and 4 in list above).

Multipage OCR or extracted text (i.e., TXT files) will be named to the corresponding TIFF images and placed in a separate folder named TEXT.

The searchable content of electronically stored documents will be extracted from the source documents, e.g., emails and their attachments, and will not be generated through optical character recognition (OCR) of the corresponding TIFF images, with the exception of redacted documents, which may be OCR-ed. Redacted documents will contain the searchable endorsement "Redacted."

## REQUESTS FOR PRODUCTION OF DOCUMENTS

1. Documents sufficient to identify the number of unique patients, by year, treated by You during the Class Period.

**RESPONSE:**

2. Documents sufficient to identify the number of unique patients, by year, who used Your patient portal during the Class Period.

**RESPONSE:**

3. Documents sufficient to show the number of individuals whose Personal Health Information was disclosed to third parties including (but not limited to) Facebook during the Data Disclosure, including the residency of those individuals.

**RESPONSE:**

4. All documents concerning Your use of the Meta Pixel on Your websites, including Your patient portal(s).

**RESPONSE:**

5. Documents sufficient to identify each Affected Person whose Data and/or Personal Health Information was disclosed to Facebook via the Meta Pixel installed on Your websites, including Your patient portal(s).

**RESPONSE:**

6. Documents sufficient to identify each Affected Person whose Data and/or Personal Health Information was disclosed to Google via code installed on Your websites, including Your patient portal(s).

**RESPONSE:**

7. Documents sufficient to show each kind of Data being shared with Facebook when patients or potential patients use and/or interact with Your websites.

**RESPONSE:**

8. Documents sufficient to show each kind of Data being shared with Google when patients or potential patients use and/or interact with Your websites.

**RESPONSE:**

9. Documents sufficient to show each kind of Personal Health Information being shared with Facebook when patients or potential patients use and/or interact with Your websites, including Your patient portal(s).

**RESPONSE:**

10. Documents sufficient to show each kind of Personal Health Information being shared with Google when patients or potential patients use and/or interact with Your websites, including Your patient portal(s).

**RESPONSE:**

11. Documents sufficient to identify each and every employee, agent, or other persons acting on Your behalf who were wholly or partially responsible for:

a. The design of Your web properties;

b. The source code deployed on Your web properties;

c. website analytics and metrics for Your web properties

d. Internet marketing for You that utilized Your web properties in any way;

e. Other marketing for You that mentioned the web properties in any way.

**RESPONSE:**

12. Documents sufficient to show the amount of web traffic to Your web properties and any patient portal(s) on such web properties during the Class Period.

**RESPONSE:**

13. Documents sufficient to show the number of unique visitors to Your web properties during the Class Period.

**RESPONSE:**

14. Documents sufficient to show the number of unique visitors to Your patient portal(s) during the Class Period.

**RESPONSE:**

15. Documents sufficient to show the number of Your patients who registered for Your patient portal(s) during the Class Period.

**RESPONSE:**

16. Documents sufficient to show the number of times that patients logged-in to Your patient portal(s) during the Class Period.

**RESPONSE:**

17. For each and every first-party cookie at any of Your web properties, including any patient portal(s) on said web properties, for the five years preceding the filing of this action, documents sufficient to show:

a. The cookie name;

b. What information is stored by the cookie;

c. When the cookie is first created;

d. When it is first set on a user's computer;

e. The expiration date for each cookie;

f. To what domain the cookie is set;

g. Whether the cookie value is disclosed to third-parties via cookie synching; and

h. The purpose of the cookie.

**RESPONSE:**

18. Documents sufficient to show the first date on which You deployed third-party source code at any of Your web properties from any of the following third parties or its affiliates:

a. Facebook;

b. Google;

c. Signal;

d. The Trade Desk;

e. Twitter;

f. Crazy Egg;

g. YouTube;

h. Any other third party not identified herein from whom You have deployed third-party source code.

**RESPONSE:**

19. All insurance policies, agreements, or by-laws under which any person may be liable to satisfy all or part of a judgment which may be entered in this action or to indemnify or reimburse You for payments made to satisfy any judgment, settlement, or expenses in connection with this action.

**RESPONSE:**

20. Any and all insurance policies that apply or that might arguably apply in this matter.

**RESPONSE:**

21. Any correspondence with any insurance company related to Plaintiff's claims, including any correspondence accepting or declining coverage and any reservation of right letters You have received related to this matter.

**RESPONSE:**

22. All documents You referenced or relied upon to answer any Interrogatory or Requests for Admissions that Plaintiffs have served in this case.

**RESPONSE:**

23. All exhibits that You propose to introduce in opposition to class certification or at the class certification hearing.

**RESPONSE:**

24. All web-log or server-log data for the patient portal(s) page or section of any of Your web properties, including, but not limited to, https://www.emersonhospital.org/patients-visitors/patient-portals.

**RESPONSE:**

25. All web-log and server-log data containing information that a user or patient "Enrolled" in the patient portal of any of Your web properties.

**RESPONSE:**

26. All web-log or server-log data containing information that a user or patient clicked to "Sign In" to the patient portal of any of Your web properties, including, but not limited to, https://www.emersonhospital.org/patients-visitors/patient-portals.

**RESPONSE:**

27. All web-log or server-log data containing information that a user or patient clicked to log out of the patient portal of any of Your web properties.

**RESPONSE:**

28. Any and all communications relating to Your general deployment, and/or use of third-party source code at any of Your web properties.

**RESPONSE:**

29. All documents related to proposed and effectuated changes in third-party source code deployed at any of Your web properties in the five years preceding the filing of this action.

**RESPONSE:**

30. All communications relating to adding, changing, or removing third-party source code deployed at any of Your web properties in the five years preceding the filing of this action.

**RESPONSE:**

31. Documents sufficient to show each date on which any third-party source code was added, changed, or removed from any of Your web properties, including Your patient portal(s), in the five years preceding the filing of this action.

**RESPONSE:**

32. For each and every third-party cookie value disclosed to or available to be accessed by any third party when communications are exchanged at any of Your web properties for the five years preceding the filing of this action, documents sufficient to show:

a. The cookie name;

b. The third-party entity to whom the cookie relates;

c. All third-party entities to whom information related to the cookie is disclosed or available to be accessed by;

d. The domain to which the cookie is set;

e. What information is stored by the cookie;

f. The purpose of the cookie;

g. How the cookie is used in relation to Defendant and its websites; and

h. Whether the cookie value is disclosed to others through cookie synching.

**RESPONSE:**

33. All documents relating to disclosure of data to any third parties for marketing purposes via server-side disclosures, including but not limited to server-side disclosures to Facebook, Google, Signal, The Trade Desk, and Twitter.

**RESPONSE:**

34. All documents relating to the deployment of the Facebook Tracking Pixel, Facebook Pixel, or Meta Pixel at any of Your web-properties, including Your patient portal(s).

**RESPONSE:**

35. All documents relating to the deployment of any Facebook third-party source code other than the Facebook Tracking Pixel, Facebook Pixel, or Meta Pixel at any of Your web-properties.

**RESPONSE:**

36. All documents relating to cookies associated with Facebook, including how they are deployed, accessed, disclosed, or used by Facebook or You at any of Your web properties, including but not limited to:

a. c_user;

b. datr;

c. fr;

d. Any other Facebook cookie that You permit Facebook to set or access via any of Your web-properties.

**RESPONSE:**

37. All documents relating to Facebook's use of cookies, IP addresses, device identifiers, and other data caused to be transmitted, disclosed, or accessed through Your deployment of Facebook third-party source code on Your web-properties.

**RESPONSE:**

38. All documents relating to Facebook's receipt of cookies, IP addresses, device identifiers, and other data caused to be transmitted, disclosed, or accessed through Your deployment of Facebook third-party source code on Your web-properties.

**RESPONSE:**

39. All documents relating to Your use of Custom Audiences through Facebook.

**RESPONSE:**

40. All communications between You and Facebook or its employees, agents, or assigns.

**RESPONSE:**

41. All contracts, agreements, memoranda of understanding, or other documents relating to the relationship between You and Facebook.

**RESPONSE:**

42. All non-disclosure or confidentiality agreements relating to Facebook and its collection of data at any of Your web properties, including www.emersonhospital.org.

**RESPONSE:**

43. All documents relating to Facebook's use of data collected and/or derived from Your deployment of Facebook third-party source code at any of Your web properties, including www.emersonhospital.org.

**RESPONSE:**

44. All documents relating to Your use of Facebook advertising tools in relation to any of Your web-properties.

**RESPONSE:**

45. All documents sufficient to show, during the Class Period, the total amount of money paid, or to be paid, to You from any third-party, including Facebook and Google, for the third-party's receipt of information from Your website.

**RESPONSE:**

46. All documents relating to return on investment from marketing through Facebook.

**RESPONSE:**

47. All documents relating to return on investment from marketing through Google.

**RESPONSE:**

48. All documents relating to deployment and use of Google source code at any of Your web properties, including but not limited to Google DoubleClick, Google Analytics, and Google Ads.

**RESPONSE:**

49. All documents relating to Your passing of data to Google.

**RESPONSE:**

50. All source code deployed at any of Your web properties that causes the passing of data to Google.

**RESPONSE:**

51. All documents relating to Your deployment and use of Google third-party source code at any of Your web properties, including but not limited to:

a. Google Analytics;

b. Google Ads;

c. Adservice.Google.com;

d. Google.com;

e. Google Doubleclick; and

f. YouTube.

**RESPONSE:**

52. All documents relating to cookies associated with Google, Facebook, or other third-parties from whom You deploy tracking pixels (or embedded source code), including documents sufficient to show how those cookies are deployed, accessed, disclosed or used by any of Your web-properties, and documents sufficient to show the data such cookies enable, including but not limited to at least the following cookies:

a. _gads

b. _gadsID

c. _sonar

d. _dpm_id

e. _fbp

f. ajs_anonymous_id

g. ajs_group_id

h. ajs_user_id

i. cto_lwid

j. DSID

k. id

l. permutive-id

m. permutive-session

n. rbuid

o. sm_uuid

p. _utma

q. _utmb

r. _utmc

s. _utmz

t. SSID

u. SIDCC

v. SAPISID

w. OGPC

x. NID

y. HSID

z. DV

aa. APISID

bb. ANID

cc. 1P_JAR

dd. _Secure-SSID

ee. _Secure-HSID

ff. _Secure-APISID

gg. _Secure-3PAPISID

**RESPONSE:**

53. All documents relating to the passing of values of putative first-party cookies to Google Analytics, including but not limited to cookies with the following names:

a. _utma

b. _utmb

c. _utmc

d. _utmz

**RESPONSE:**

54. All communications between You and Google or its employees, agents, or assigns.

**RESPONSE:**

55. All contracts, agreements, memoranda of understanding, or other documents relating to the relationship between You and Google.

**RESPONSE:**

56. All non-disclosure or confidentiality agreements relating to Google and its collection of data at any of Your web-properties.

**RESPONSE:**

57. All documents relating to Google's use or receipt of data collected and/or derived from Your deployment of Google third-party source code at or any of Your web-properties.

**RESPONSE:**

58. All documents relating to Your use of Google advertising tools in relation to any of Your web-properties.

**RESPONSE:**

59. All documents relating to return on investment from marketing through Google or any of its affiliates.

**RESPONSE:**

60. All Your HIPAA notices and privacy policy notices in effect during the Class Period.

**RESPONSE:**

61. All purported Privacy Policies in effect at any of Your web properties (including www.emersonhospital.org) from the date You first deployed any third-party source code from Facebook, Google, or any other third party. If the Privacy Policy changed at any point in time from the date referenced to the present, produce all Privacy Policies used and the dates those policies were in effect. If the links to the Privacy Policy or presentation thereof have changed at any point in time from the date reference to the present, produce duplications of each such presentation.

**RESPONSE:**

62. Documents sufficient to show Your organizational and management structure including, but not limited to, organizational charts and employee directories for the Class Period.

**RESPONSE:**

63. All written authorizations from any Affected Person authorizing You to share their Personal Health Information with Facebook.

**RESPONSE:**

64. All written authorizations from any Affected Person authorizing You to share their Personal Health Information with Google.

**RESPONSE:**

65. All written authorizations from any Affected Person authorizing You to share their Personal Health Information with any third party for marketing purposes.

**RESPONSE:**

66. All exhibits that You propose to introduce in opposition to class certification or at the class certification hearing.

**RESPONSE:**

67. Any documents reviewed, consulted, used, or relied upon by any expert that You intend to use on any issue related to class certification.

**RESPONSE:**

68. All contracts between You and Plaintiff.

**RESPONSE:**

69. All documents relating or referring to Plaintiff.

**RESPONSE:**

70. All documents relating to data disclosures that You provided to Plaintiff.

**RESPONSE:**

71. Any and all documents that You contend show that You had prior express consent to disclose any of Plaintiff's personally identifiable information and communications exchanged with You to any third-party internet tracking companies including, but not limited to, Facebook, Google, Signal, Trade Desk, or Twitter.

**RESPONSE:**

72. All documents relating to the manner, method, and means by which You contend Plaintiff purportedly consented to the disclosure of their personally identifiable information and

communications exchanged with You to third-party internet tracking companies including, but not limited to Facebook, Google, Signal, Trade Desk, or Twitter.

**RESPONSE:**

73. All documents relating to Your disclosure to third parties of any data about the Plaintiff.

**RESPONSE:**

74. All documents relating to Plaintiff conveyed from You to Facebook, Google, Signal, Trade Desk, Twitter, or any other third-party marketing company, regardless of the form or method of the conveyance or disclosure.

**RESPONSE:**

75. For the following entities, all documents relating to the responsibilities of the entity as it relates to Your web properties and/or marketing, including but not limited to contracts, memorandums of understanding, indemnification agreements, and non-disclosure agreements:

a. Influence Health, Inc.;

b. Healthgrades;

c. Facebook;

d. Google;

e. Signal;

f. The Trade Desk

g. Any other person not identified but which has responsibilities relating to Your web properties or marketing.

**RESPONSE:**

76. For the following entities, all communications with the entity and any of its employees, agents, or assigns relating to the deployment or use of third-party source code at Defendant's web properties:

a. Influence Health, Inc.;

b. Healthgrades;

c. Facebook;

d. Google;

e. YouTube;

f. Signal;

g. The Trade Desk

h. Any other entity not identified but which has responsibilities relating to Your web properties or marketing.

**RESPONSE:**

77. All documents relating to any communication to enroll or log in to the patient portal from any page at any of Your web properties, including documents with aggregate information and documents with specific information about any individual or computing device, including but not limited to names, email addresses, IP addresses, cookie identifiers, or any other unique identifiers associated with the enrollment or login. This request encompasses any data available to You that is available to You in the possession of a related entity or parent organization, or contractor or agent.

**RESPONSE:**

78. All documents relating to any communication to log out of the patient portal, including documents with aggregate information and documents with specific information about any individual or computing device, including but not limited to names, email addresses, IP addresses, cookie identifiers, or any other unique identifiers associated with the logout. This request encompasses any data available to You that is available to You in the possession of a related entity or parent organization, or contractor or agent.

**RESPONSE:**

79. All documents relating to any telephone request to enroll in Your patient portal(s) on any of Your web properties, including but not limited to names, email addresses, IP addresses, cookie identifiers, or any other unique identifiers associated with Enrollment or Login arising from such request to enroll.

**RESPONSE:**

80. All documents relating to any in-person request to enroll in Your patient portal(s) on any of Your web properties, including but not limited to names, email addresses, IP addresses, cookie identifiers, or any other unique identifiers associated with Enrollment or Login arising from such request to enroll.

**RESPONSE:**

Dated: April 13, 2023

Respectfully submitted,

**COUNSEL FOR PLAINTIFF JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED**

*/s/ J. Tucker Merrigan*
J. Tucker Merrigan, BBO# 681627
Thomas T. Merrigan, BBO# 343480
Erin E. McHugh, BBO# 703701
Sweeney Merrigan Law
268 Summer St. LL
Boston, MA 02210
(413) 774-5300
tucker@sweeneymerrigan.com
tom@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Foster C. Johnson (*admitted pro hac vice*)
David Warden (*admitted pro hac vice*)
Nathan Campbell (*admitted pro hac vice*)
Ahmad Zavitsanos & Mensing PLLC
1221 McKinney Street, Suite 2500
Houston, Texas 77010
(713) 655-1101
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

Seth Meyer (*admitted pro hac vice*)
Alex Dravillas (*admitted pro hac vice*)
Keller Postman LLC
150 N. Riverside Plaza
Suite 4100
Chicago, Illinois 60606
(312) 741-5220
sam@kellerpostman.com
ajd@kellerpostman.com

COMMONWEALTH OF MASSACHUSETTS

ESSEX, S.S. SUPERIOR COURT

| | | |
|---|---|---|
| JOHN DOE,<br>INDIVIDUALLY AND ON<br>BEHALF OF ALL OTHERS SIMILARLY<br>SITUATED,<br><br>Plaintiff<br><br>v.<br><br>EMERSON HOSPITAL,<br><br>Defendant. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | C.A. No. 2277CV01000 |

**PLAINTIFF JOHN DOE'S, ON BEHALF OF HIMSELF AND ALL OTHERS SIMILARLY SITUATED, SECOND REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANT EMERSON HOSPITAL**

Pursuant to Rule 34 of the Massachusetts Rules of Civil Procedure, the Plaintiff John Doe, Individually and on Behalf of All Others Similarly Situated, hereby propounds his Second Requests for Production of Documents to Defendant Emerson Hospital ("Emerson"). Emerson shall respond to these requests in writing according to the Instructions and Definitions contained herein and produce all responsive documents in its possession, custody, or control to Sweeney Merrigan Law, LLP, counsel for the Plaintiff, at 268 Summer Street, LL, Boston, MA 02210, within 30 days of service of these requests.

**INSTRUCTIONS AND DEFINITIONS**

Massachusetts Superior Court Rule 30A ("Rule 30A") applies to these requests for production. For reference, Rule 30A states as follows:

1. **Uniform definitions in discovery requests**

*(a) Incorporation by Reference and Limitations.*

The full text of the definitions set forth in paragraph (1)(c) is deemed incorporated by reference into all discovery requests, but shall not preclude (i) the definition of other terms specific to the particular litigation; (ii) the use of abbreviations; or (iii) a narrower definition of a term defined in paragraph (1)(c).

*(b) Effect on Scope of Discovery.*

This rule is not intended to broaden or narrow the scope of discovery permitted by the Massachusetts Rules of Civil Procedure.

*(c) Definitions.*

The following definitions apply to all discovery requests, unless otherwise ordered by the court:

(1) Communication. The term "communication" means the transmittal of information (in the form of facts, opinions, ideas, inquiries, or otherwise).

(2) Document. The term "document" is defined to be synonymous in meaning and equal in scope to the usage of this term in Mass. R. Civ. P. 34 (a). An earlier draft is a separate document within the meaning of this term.

(3) Identify (With Respect to Persons). When referring to a natural person, to "identify" means to give, to the extent known, the person's (a) full name, (b) present or last known address, and (c) the present or last known place of employment. Once a person has been identified in accordance with this subparagraph, only the name of that person need be listed in response to subsequent discovery requesting the identification of that person.

(4) Identify (With Respect to Entities). When referring to an entity, to "identify" means to give, to the extent known, (a) the entity's full name, including (when not apparent from the name) the nature of the entity, e.g. corporation, limited liability corporation, partnership, or professional corporation, (b) present or last known address of its headquarters or principal place of business, and (c) the state in which the entity is incorporated or otherwise created. Once an entity has been identified in accordance with this subparagraph, only the name of that entity need be listed in response to subsequent discovery requesting the identification of that entity.

(5) Identify (With Respect to Documents). When referring to documents, to "identify" means to give, to the extent known: (a) the type of document; (b) the general subject matter; (c) the date of the document; (d) the author or authors, according to the document; and (e) the persons to whom, according to the document, the document (or a copy) was to have been sent.

(6) Parties. The term "plaintiff" or "defendant," as well as a party's full or abbreviated name or a pronoun referring to a party, means the party and, where applicable, its officers, directors, employees, partners, corporate parent, and subsidiaries. This definition is not intended to impose a discovery obligation on any person who is not a party to the litigation.

(7) Person. The term "person" means any natural person or any business, legal, or governmental entity.

(8) Concerning. The term "concerning" means referring to, describing, offering evidence of, or constituting.

(9) State the Basis or State all Facts. When an interrogatory calls upon a party to "state the basis" of or "state all facts" concerning a particular claim, allegation, or defense (or uses comparable language), the party shall provide a substantial summary of the factual basis supporting the claim, allegation, or defense at the time the interrogatory is answered. The summary shall: (a) identify the essential acts or failures to act forming the substance of the claim, allegation, or defense, (b) identify the persons and entities that, through firsthand information or possession of documents, are the sources of the party's information regarding the claim, allegation, or defense, and (c) when one or more documents is the basis of the claim, allegation, or defense, such as a written contract in a contractual claim or defense, or a written misrepresentation in a misrepresentation claim, identify (or provide as part of the interrogatory answer a copy of) each such document. In stating the basis, a party may not withhold information from the interrogatory answer because it derives from attorney work product or was obtained in anticipation of litigation if the party intends to offer this information at trial.

**2. Objections to Interrogatories**

General objections to interrogatories are prohibited. Each objection to an interrogatory shall be specific to that interrogatory and shall have a good faith basis. If a party refuses to answer an interrogatory, the party shall so state and identify each objection asserted to justify the refusal to answer. If a party, after having asserted an objection, answers the interrogatory, the answer shall state either: (a) notwithstanding the objection no information has been withheld from the answer, or (b) information has been withheld from the answer because of the objection. Where information has been withheld from the answer, the objecting party shall describe the nature of the information withheld and identify each objection asserted to justify the withholding.

**3. Objections to requests for the production of documents and things**

(a) Where a party serves a response to a request for production of documents and things under Mass. R. Civ. P. 34 before production is completed, the response may include general objections. However, where general objections are made, the responding party shall prepare and serve a supplemental response no later than 10 days after the completion of production.

(b) Once production is completed, general objections to requests for production of documents and things are prohibited. As to each request, the supplemental response shall state either: (i) notwithstanding prior general objections, all responsive documents or things in the possession, custody, or control of the responding party have been produced; (ii) after diligent search no responsive documents or things are in the possession, custody, or control of the responding party; or (iii) the specific objection made to the request. When specific objection is made, the response shall describe the nature of all responsive documents or things in the possession, custody, or control of the responding party that have not been produced because of the objection. Where a privilege log is required by Mass. R. Civ. P. 26(b)(5) or court order, the log shall be served with the supplemental response, unless the requesting party waives entitlement to the log or agrees to a later date for service.

(c) In the initial written response, the responding party shall articulate with clarity the scope of the search conducted or to be conducted. If the scope of the search changes (luring production, the responding party in the supplemental written response shall articulate with clarity the change in scope. If the scope of the search does not include all locations. including electronic storage locations, where responsive documents or things reasonably might be found, the responding party shall explain why these locations have been excluded from the scope of the search.

## ADDITIONAL DEFINITIONS

Consistent with Rule 30A, specifically Rule 30A(1)(a)(i), the following definitions shall also apply to the requests below and are deemed incorporated by reference into those requests:

1. "All" means "any and all," and the word "Any" means "any and all."

2. "Affected person" means any individual whose Personal Health Information has been disclosed to Facebook, Google, or other third parties via code such as the Meta Pixel installed on Your websites.

3. "Agreement" means any contract, arrangement, or understanding between two or more persons or entities, whether formal or informal, written or unwritten.

4. "Browser fingerprinting" means any practice utilizing device and browser attribute settings to identify a browser.

5. The "Class Period" begins on the first date on which Defendant placed third-party source code on its web properties that caused data arising from user communications with those web properties to be disclosed to third parties.

6. "Communicate" or "communications" means any oral, written or electronic transmission of information or intelligence of any nature including, but not limited to, meetings, discussions, conversations, and telephone calls, as well as documentation thereof, and telegrams, memoranda, letters, e-mails, telecopies, messages, or notes.

7. "Complaint" refers to the operative complaint in this action.

8. "Cookie synching" means any practice permitting cooperating web sites to share cookie identifiers for the same user.

9. "Cross-device tracking" refers to a practice permitting Defendant or any other company to track a user across various communications devices.

10. "Data" means information regarding the actions that individuals take on Your website, including searches, page views, and other activities, including (but not limited to) filling out electronic forms, paying bills, making online appointments, reviewing health information, and researching and selecting physicians and treatments.

11. "Data Disclosure" refers to Defendant's disclosure of the Personal Health Information of visitors to Defendant's website(s) to Facebook, Google, and other third parties via the Meta Pixel software code and other similar code embedded in Defendant's website(s) and patient portal(s), including www.emersonhospital.org.

12. "Defendant," "You", and "Your" shall mean the entity to which these Requests are directed, or any predecessor or successor companies in existence during the proposed class period, and all employees, agents, or other persons acting on Defendant's behalf.

13. "Deploy" shall mean to place, use, or inject source code at any of Defendant's properties either directly or indirectly (such as through a tag manager or other similar service).

14. "Document" or "documents" shall mean all documents, electronically stored information, and tangible things including, without limitation, all written and graphic matter and all other means of recording information, whether written, transcribed, taped, filmed, microfilmed, or in any other way produced, reproduced, or recorded, and including, but not limited to: originals, drafts, computer-sorted and computer-retrievable information, copies and duplicates that are marked with any notation or annotation or otherwise differ in any way from the original, correspondence, memoranda, reports, notes, minutes, contracts, agreements, books, records, checks, vouchers, invoices, purchase orders, ledgers, diaries, logs, calendars, computer printouts, computer disks, card files, lists of persons attending meetings or conferences, sketches, diagrams, calculations, evaluations, analyses, directions, work papers, press clippings, sworn or unsworn statements, requisitions, manuals or guidelines, audit work papers, financial analyses, tables of organizations, charts, graphs, indices, advertisements and promotional materials, audited and unaudited financial statements, trade letters, trade publications, newspapers and newsletters, photographs, emails, electronic or mechanical records, facsimiles, telegrams and telecopies, and audiotapes. Each draft, annotated, or otherwise non-identical copy is a separate document within the meaning of this term. Documents shall also include any removable sticky notes, flags, or other attachments affixed to any of the foregoing, as well as the files, folder tabs, and labels appended to or containing any documents. Documents expressly include all electronic records.

15. "Electronic records" shall mean the original (or identical duplicate when the original is not available) and any non-identical copies (whether non-identical because of notes made on

copies or attached comments, annotations, marks, transmission notations, or highlighting of any kind) of writings of every kind and description inscribed by mechanical, facsimile, electronic, magnetic, digital, or other means. Electronic records includes, by way of example and not by limitation, computer programs (whether private, commercial, or work-in-progress), programming notes and instructions, activity listings of email transmittals and receipts, output resulting from the use of any software program (including word processing documents, spreadsheets, database files, charts, graphs and outlines), electronic mail, and any and all miscellaneous files and file fragments, regardless of the media on which they reside and regardless of whether said electronic exists in an active file, deleted file, or file fragment. Electronic records includes without limitation any and all items stored on computer memories, hard disks, diskettes and cartridges, network drives, network memory storage, archived tapes and cartridges, backup tapes, floppy disks, CD-ROMs, removable media, magnetic tapes of all types, microfiche, and any other media used for digital data storage or transmittal. Electronic records also includes the file, folder tabs, and containers and labels appended to or associated with each original and non-identical copy.

16. "Facebook" shall mean Facebook, Inc. or Meta Platforms, Inc., or any of its subsidiaries and/or affiliates.

17. "Google" shall mean Alphabet Inc. or Google LLC. or any of its subsidiaries and/or affiliates (including but not limited to DoubleClick, Google Tag Manager, Google Ads, YouTube, or Google Analytics).

18. "Google Analytics" means the tracking source code, originating from Google (or Alphabet, Inc.) that is embedded on Your websites to track visitor activity on the website.

19. "Health Information System" or "HIS" refers to any system implemented by Defendant that enables it to collect, store, manage, analyze, optimize, and/or transmit patient treatment or other patient data.

20. "Including" means including, but not limited to.

21. "Meta Pixel" means source code or a tracking pixel, originating from Facebook (or Meta, Inc.) that is embedded on Your websites to track visitor activity on the website.

22. "Patient portal" means a type of Health Information System used by Defendant which allows patients to access their personal health data including but not limited to appointment information, medications, medical history, and results over an internet connection.

23. "Person" or "persons" includes any natural person, firm, association, organization, partnership, business, trust, corporation, governmental or public entity or any other form of legal entity.

24. "Personal Health Information" means Data about (1) patients' and potential patients' health conditions (e.g., addiction, Alzheimer's, heart disease), diagnoses, procedures, test results, the treating physician, medications or (2) personally identifiable information, including but not limited to, patients' and potential patients' names, addresses, email addresses,

telephone numbers, IP addresses, Facebook IDs, unique identifying codes, HTTP Headers, Pixel IDs, and/or any other sensitive information obtained and stored by Defendant.

25. "Plaintiffs" shall mean the named Plaintiff or Plaintiffs in this lawsuit.

26. "Policy" shall mean any rule, procedure, practice, or course of conduct, whether formal or informal, written or unwritten, recorded, or unrecorded.

27. "Proposed Class Period" means the class period proposed in Plaintiff's Class Action Complaint.

28. "Relating to," "related to," "relates to" means constituting, containing, concerning, embodying, reflecting, identifying, stating, mentioning, discussing, describing, evidencing, or in any other way being relevant to that given subject matter.

29. "Representatives" means Your employees, agents, representatives, or any other person acting on Your behalf.

30. "Server-side disclosures" means disclosures that occur directly between Your web-servers and any third party.

31. "Source code" means any computer software or any set of instructions or statements using any language, signs, signals, symbols or other means of human or machine communication and that are placed directly or indirectly within Defendant's web properties.

32. "Third party" refers to any entity other than Defendant and the patient/user with whom Defendant is communicating via its web properties.

33. "Third-party source code" refers to any source code derived in whole or in part from a third-party source or created by Defendant (or any of its agents, assigns, or employees) that instructs or commands the computing devices or web-browsers to patients/users exchanging communications at Defendant's web properties to transmit data of any nature to third parties.

34. "Web-log data" or "server-log data" means any information in any form that is stored by You relating to a record of data exchanges at www.emersonhospital.org or any of Your other web properties.

35. "Web property," "web properties," "website," or "websites" shall mean all websites operated by or affiliated with the entity or persons to whom these requests are directed, including www.emersonhospital.org and Your patient portal(s).

## ADDITIONAL INSTRUCTIONS

1. The discovery requests are continuing and You must provide, by way of supplementary answers and responses, such additional information and documents as You or any other person acting on Your behalf may hereafter obtain which will supplement or otherwise modify any responses hereto.

2. Please produce all of the specified documents and electronic records which are in Your possession, or available to You, or to which You may gain access through reasonable effort, including information in the possession of Your past and present attorneys, accountants, investigators, consultants, or other persons directly or indirectly employed or retained by You, or in connection with You, or anyone else otherwise subject to Your control who maintains records on Your behalf, in Your name or otherwise under Your control.

3. Any comments, notations or markings appearing on any documents or electronic records, and not a part of the original, are considered a separate document or electronic records, and any draft, preliminary form or superseded version of any document is also considered a separate document or electronic records.

4. All documents and electronic records requested herein should be produced in the same order as they are kept, or maintained, or stored, in the regular course of business.

5. All documents requested herein should be produced in the file, folder, envelope, or other container in which the documents are kept or maintained. If for any reason the container cannot be produced, please produce copies of all labels or other identifying markings.

6. Any document attached to another document must not be separated.

7. In the event that any document or electronic record called for by these requests has been destroyed, lost, discarded, otherwise disposed of, or is otherwise unavailable, such document or electronic record is to be identified as completely as possible, including, without limitation, the following information: date of disposal; manner of disposal; reason for disposal; person authorizing the disposal; and person disposing of the document or electronic record.

8. Whenever possible, verb tenses shall be interpreted to include past, present, and future tenses.

9. If an objection is made to part or all of any request, the part should be specified together with the reasons for the objection. If a claim of privilege is asserted with respect to part or all of any document on the grounds of attorney-client privilege, the attorney work product doctrine, or any other basis, describe the document with sufficient particularity to make it susceptible to identification by separately stating the following with respect to any such document: (1) the type of document; (2) its date; (3) the name, address, and position of its author(s); (4) the name, address, and position of each recipient of the document; (5) a general description of the subject matter of the document; (6) the basis of any claim of privilege; and (7) if work product immunity is asserted, the proceeding for which the document was prepared.

10. The use of the singular form of any word includes the plural and vice versa.

11. The masculine includes the feminine and neutral genders.

12. The connectives "and" and "or" shall be constructed either disjunctively or conjunctively as necessary to bring within the scope of the discovery requests all responses that might otherwise be constructed to be outside their scope.

13. To the extent that You have any objection to producing responsive documents on the basis that the responsive documents are privileged or otherwise protected by the attorney-client privilege or work-product immunity, You are required to provide a privilege log in accordance with the Massachusetts Rules of Civil Procedure.

14. If You object to providing certain information requested, state Your objection and answer any unobjectionable portion of the request for information and/or supply the unobjectionable information requested.

15. Please produce all electronically-stored documents, or e-documents, as electronically Bates-numbered single-page TIFF images with appropriate document breaks, corresponding load file for the images, and a generic delimited data file for the corresponding metadata. The following metadata or fielded information, to the extent applicable to a produced electronic document, will be included in the generic delimited data file:

a. Beginning Production Number
b. Ending Production Number
c. Parent ID (if applicable)
d. Attachment ID (if applicable)
e. File Type (e.g., Word, Excel, email, etc.)
f. Last Modified Date (if collected from source system or custodian, rather than image)
g. Last Modified Time (if collected from source system or custodian, rather than image)
h. Sent Date
i. Sent Time
j. Document Author or Form
k. To
l. CC
m. BCC
n. Subject Line (emails only)
o. Custodian or Source
p. Attachment Count
q. Native File Link
r. File Name
s. File path/folder
t. Received Date
u. Full Text
v. De-duplicated instances (by full path)
w. Redacted flag
x. Embedded content flag

Documents that should not be rendered to TIFF images (i.e., Excel files, multimedia files, voice mail, sound files, databases, etc.) will be placed as native in a separate folder. The files will be named by a pre-pending a Bates number to the original file name. A confidentiality designation can also be inserted into the file name. A slip sheet will be provided containing the Bates number, the native file name, along with the note "Document Provided in Native Format." A link to the relative path of the natively produced document will be included in the metadata load file (Field no. 17 in list above). All embedded content shall be provided, including tracked changes, hidden comments, speaker notes, etc.

Emails and their attachments will be referenced to each other in the generic delimited data file and will be numbered sequentially wherein the attachment Bates number follows the parent email Bates number. Emails and their attachments will be designated in the generic delimited data file by the beginning and ending Bates numbers of the email or individual attachments (Fields nos. 1 and 2 in list above), and those of the entire family (Fields no. 3 and 4 in list above).

Multipage OCR or extracted text (i.e., TXT files) will be named to the corresponding TIFF images and placed in a separate folder named TEXT.

The searchable content of electronically stored documents will be extracted from the source documents, e.g., emails and their attachments, and will not be generated through optical character recognition (OCR) of the corresponding TIFF images, with the exception of redacted documents, which may be OCR-ed. Redacted documents will contain the searchable endorsement "Redacted."

## REQUESTS FOR PRODUCTION OF DOCUMENTS

81. All third-party source code deployed at any of Your web properties during the Class Period.

**RESPONSE:**

82. All documents relating to any meeting(s) (including but not limited to agendas, minutes, summaries, and notes) relating to third-party source code or the disclosure of information about patients/user who exchange communications at any of Your web properties, including but not limited to meeting(s) with representatives or agents of:

a. Facebook;

b. Google;

c. Signal;

d. The Trade Desk;

e. Twitter;

f. Any other third party not identified herein from whom You have deployed third-party source code.

**RESPONSE:**

83. All documents relating to Your use of cookie synching with third parties at any of Your web properties.

**RESPONSE:**

84. All documents relating to the Meta Pixel parameter 'ev' or Meta Events Manager, including all event data associated with any of Your web-properties.

**RESPONSE:**

85. All documents relating to the Meta Event with the value of 'SubscribedButtonClick' including associated settings and how it is used at any of Your web properties.

**RESPONSE:**

86. All documents relating to the cookie '_fbp', including how it is deployed and used by Facebook or by You.

**RESPONSE:**

87. All documents relating to Your use of cookie synching with Facebook.

**RESPONSE:**

88. All documents relating to Your use of cross-device tracking by Facebook.

**RESPONSE:**

89. All documents relating to website scraping by Facebook.

**RESPONSE:**

90. All documents relating to POST requests from users to Facebook being triggered even when the user does not fill out a form or take an affirmative action to submit data to You or Facebook.

**RESPONSE:**

91. All documents relating to any Facebook Javascript file(s) deployed at any of Your web properties, including Your patient portal(s).

**RESPONSE:**

92. All documents relating to the value of the data disclosed to third parties including, but not limited to, documents relating to:

a. any compensation provided or received, monetary or otherwise, for conveying information to a third party, including but not limited to, Facebook, Google, Signal, The Trade Desk, and Twitter.

b. any internal analysis regarding the value of privacy;

c. any internal analysis regarding the value of patient data to You;

d. the privacy policy, privacy promises, and/or general privacy and impression by users and/or the general public;

e. any internal analysis of the value of Your use of any or all third-party source code for marketing or other purposes.

**RESPONSE:**

93. All documents relating to the value You place on data disclosed to Facebook.

**RESPONSE:**

94. All documents relating to the value You place on the use of the Facebook Tracking Pixel, Facebook Pixel, or Meta Pixel.

**RESPONSE:**

95. All documents relating to Your use of cookie synching with Google.

**RESPONSE:**

96. All documents relating to data sharing or transmissions between Google and Facebook facilitated in whole or in part via any of Your web properties, whether directly through Google or an affiliate such as DoubleClick.

**RESPONSE:**

97. All documents relating to the deployment and use of a Meta Pixel ID through any Google property.

**RESPONSE:**

98. All documents relating to Your use of cookie synching with Google or any of its affiliates.

**RESPONSE:**

99. All documents relating to Your use of cross-device tracking by Google or any of its affiliates.

**RESPONSE:**

100. All documents relating to website scraping by Google.

**RESPONSE:**

101. All documents relating to Google's use of cookies, IP addresses, device identifiers, and other data caused to be transmitted, disclosed, or accessed through Defendant's deployment of Google third-party source code.

**RESPONSE:**

102. All documents relating to Google's receipt of cookies, IP addresses, device identifiers, and other data caused to be transmitted, disclosed, or accessed through Defendant's deployment of Google third-party source code.

**RESPONSE:**

103. All documents relating to the value of the data disclosed or transmitted to Facebook relating to any of Your web-properties.

**RESPONSE:**

104. All documents relating to the value You place on use of Google marketing tools deployed at any of Your web-properties.

**RESPONSE:**

105. All documents relating to Your deployment and use of The Bright Tag or Signal third-party source code (hereafter "Signal") at any of Your web properties.

**RESPONSE:**

106. All documents relating to Your use of cookie synching with Signal.

**RESPONSE:**

107. All documents relating to Your use of cross-device tracking by Signal.

**RESPONSE:**

108. All documents relating to cookies associated with Signal, including how they are deployed, accessed, disclosed or used by Signal or by any of Your web properties, including but not limited to 'vcnid.'

**RESPONSE:**

109. All documents relating to website scraping by Signal.

**RESPONSE:**

110. All documents relating to Signals use of cookies, IP addresses, device identifiers, and other data caused to be transmitted, disclosed, or accessed through Your deployment of Signal third-party source code.

**RESPONSE:**

111. All communications between You and Signal or its employees, agents, or assigns.

**RESPONSE:**

112. All contracts, agreements, memoranda of understanding, or other documents relating to the relationship between You and Signal relating to any of Your web-properties.

**RESPONSE:**

113. All non-disclosure or confidentiality agreements relating to Signal and its collection of data at or any of Your web-properties.

**RESPONSE:**

114. All documents relating to Signal's use of data collected and/or derived from Your deployment of Signal third-party source code at any of Your web-properties.

**RESPONSE:**

115. All documents relating to Your use of Signal advertising tools in relation to any of Your web-properties.

**RESPONSE:**

116. All documents relating to the value of the data disclosed or transmitted to Signal relating to or any of Your web-properties.

**RESPONSE:**

117. All documents relating to the value You place on use of Signal marketing tools deployed at or any of Your web-properties.

**RESPONSE:**

118. All documents relating to return on investment from marketing through Signal or any of its affiliates.

**RESPONSE:**

119. All documents relating to Your deployment and use of Trade Desk third-party source code at any of Your web-properties.

**RESPONSE:**

120. All documents relating to Your use of cookie synching with Trade Desk.

**RESPONSE:**

121. All documents relating to Your use of cross-device tracking by Trade Desk.

**RESPONSE:**

122. All documents relating to cookies associated with Trade Desk, including how they are deployed, accessed, disclosed or used by Trade Desk or by You at any of Your web-properties.

**RESPONSE:**

123. All documents relating to website scraping by Trade Desk.

**RESPONSE:**

124. All documents relating to Trade Desk's use of cookies, IP addresses, device identifiers, and other data caused to be transmitted, disclosed, or accessed through Your deployment of Trade Desk third-party source code.

**RESPONSE:**

125. All communications between You and Trade Desk or its employees, agents, or assigns.

**RESPONSE:**

126. All contracts, agreements, memoranda of understanding, or other documents relating to the relationship between You and Trade Desk relating to any of Your web-properties.

**RESPONSE:**

127. All non-disclosure or confidentiality agreements relating to Trade Desk and its collection of data at or any of Your web-properties.

**RESPONSE:**

128. All documents relating to Trade Desk's use of data collected and/or derived from Your deployment of Trade Desk third-party source code at any of Your web-properties.

**RESPONSE:**

129. All documents relating to Your use of Trade Desk advertising tools in relation to any of Your web-properties.

**RESPONSE:**

130. All documents relating to the value of the data disclosed or transmitted to Trade Desk relating to any of Your web-properties.

**RESPONSE:**

131. All documents relating to the value You place on use of Trade Desk marketing tools deployed at or any of Your web-properties.

**RESPONSE:**

132. All documents relating to return on investment from marketing through use of Trade Desk or any of its affiliates.

**RESPONSE:**

133. All documents relating to Your policies for the destruction of records, documents, or files.

**RESPONSE:**

134. All documents relating to Your document backup policies or procedures.

**RESPONSE:**

135. All documents relating to Your backup of electronic data relevant to this matter including, but not limited to, lists or descriptions of all media formats utilized, software and hardware

versions, build numbers and other related information You used to backup any of the data stored on archive or backup media with respect to documents relating to this request.

**RESPONSE:**

136. All diagrams depicting Your email system architecture including, but not limited to, physical server locations and mail store configurations.

**RESPONSE:**

137. Documents sufficient to show for each and every previous instance of an alleged or reported HIPAA violation by You, the nature of the HIPAA violation, the number of patients impacted by the violation, and the notice sent to patients informing them of the violation.

**RESPONSE:**

138. Documents sufficient to show each and every individual medical provider profile displayed at any of Your web properties during the Class Period.

**RESPONSE:**

139. Documents sufficient to show each and every individual medical provider associated with the appointment scheduling functionality at any of Your web properties during the Class Period.

**RESPONSE:**

140. Documents sufficient to show the database schema, including but not limited to tables, fields, and indexes, of any database in which You obtain, return, store, maintain, access, view, or communicate records of visits to www.emersonhospital.org or Your patient portal(s).

**RESPONSE:**

141. Documents sufficient to show how any database in which You obtain, return, store, maintain, access, view, or communicate records of visits to www.emersonhospital.org or Your patient portal(s) may be queried.

**RESPONSE:**

142. All documents and communications concerning Your policies and procedures regarding the collection and retention of Personal Health Information from website visitors, patients, and potential patients, including, but not limited to, specific Data collected and retained, and length of time Personal Health Information is retained, as well as any procedures in place to ensure that these policies and procedures were and are being followed.

**RESPONSE:**

143. All documents and communications concerning or comprising Your policies and procedures regarding the safeguarding and protection of Personal Health Information and other Data provided by visitors to Your websites, including, but not limited to, Your costs associated therewith, as well as any procedures, practices, and training in place to ensure that these policies and procedures were and are being followed during the relevant period.

**RESPONSE:**

144. All documents and communications concerning or comprising any representations You made to Your current and former patients regarding the protection and security of Personal Health Information and other Data from visitors to Your websites, including, but not limited to, compliance with any state or federal privacy or information security laws or regulations.

**RESPONSE:**

145. All documents and communications concerning or comprising any remedial steps You took during or following Your discovery of the Data Disclosure.

**RESPONSE:**

146. All documents concerning or comprising communications between You and any governmental entities that relate to Your policies, procedures, protocols, or practices for safeguarding and protecting Personal Health Information, and/or regarding the Data Disclosure.

**RESPONSE:**

147. All documents regarding Your compliance or noncompliance with any applicable Data security guidelines or standards.

**RESPONSE:**

148. All documents related to Your policies and procedures to prevent, detect, contain, or remediate information security incidents, such as unauthorized access to or disclosure of Personal Health Information, as well as documents concerning compliance or non-compliance with those policies and procedures.

**RESPONSE:**

149. All documents concerning assessments or analyses regarding the potential risks or vulnerabilities to the confidentiality, integrity, and availability of Personal Health Information in Your Health Information Systems, as well as any decisions or efforts to address or remediate any identified risks.

**RESPONSE:**

150. Documents sufficient to identify all vendors or consultants You hired, or from whom You sought proposals for cybersecurity matters and/or safeguarding and protecting Personal Health Information provided by visitors to Your websites.

**RESPONSE:**

151. Documents sufficient to show your IT, cybersecurity, and overall operating budgets.
**RESPONSE:**

152. All documents related to Your data security awareness and training programs for members of Your workforce, including independent contractors, including, but not limited to, names and titles of individuals conducting trainings, training manuals, course materials, topics covered, agendas, notes, and presentations.

**RESPONSE:**

153. All documents related to enforcement of Your information security policies and procedures, including records of sanctions for noncompliance with those policies and procedures.

**RESPONSE:**

154. All documents concerning Your policies and procedures for encryption and decryption of Personal Health Information and documents reflecting that these policies and procedures were and are being followed.

**RESPONSE:**

155. Documents sufficient to show how You identified that the Data Disclosure occurred, including, but not limited to, how You determined that the security of former and current patients' Data was disclosed to third parties including but not limited to Facebook, what data was disclosed, the dates on which You became aware of the disclosure, why the disclosure occurred, and any cybersecurity measures or precautions You have implemented in response to the Data Disclosure.

**RESPONSE:**

156. All reports or other documents regarding Your investigation and documentation of the Data Disclosure and its consequences or Your response to the Data Disclosure, including, but not limited to, the cause of the Data Disclosure, the information compromised during the Data Disclosure, the number of Affected Persons, remedial measures taken, changes implemented and details regarding such measures and changes such as when the changes took place or will take place, and who implemented or will implement the changes.

**RESPONSE:**

157. All documents detailing any recommendations made or actions taken to notify Affected persons, government entities, or the public of the Data Disclosure before June 2022, including, but

not limited to, the date on which those recommendations were made or actions were taken and the reasons why notification to Affected persons, government entities, or the public was delayed.

**RESPONSE:**

158. All documents and communications concerning assessments of potential Health Information System vendors.

**RESPONSE:**

159. All documents and communications sufficient to identify all vendors or consultants You hired or from whom You sought proposals for Health Information Systems.

**RESPONSE:**

160. All documents and communications concerning how Personal Health Information is stored in Health Information Systems, including but not limited to patient portals.

**RESPONSE:**

161. All documents and communications concerning the encryption or safeguarding of Personal Health Information in Health Information Systems such as patient portals.

**RESPONSE:**

162. All documents concerning policies and procedures regarding the means of access to Your Health Information Systems (including but not limited patient portals) given by You to third parties.

**RESPONSE:**

163. All documents and communications showing analyses regarding whether Health Information Systems such as patient portals improve patient care.

**RESPONSE:**

Dated: April 13, 2023

Respectfully submitted,

**COUNSEL FOR PLAINTIFF JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED**

*/s/ J. Tucker Merrigan*

J. Tucker Merrigan, BBO# 681627
Thomas T. Merrigan, BBO# 343480
Erin E. McHugh, BBO# 703701
Sweeney Merrigan Law
268 Summer St. LL
Boston, MA 02210
(413) 774-5300
tucker@sweeneymerrigan.com
tom@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Foster C. Johnson (*admitted pro hac vice*)
David Warden (*admitted pro hac vice*)
Nathan Campbell (*admitted pro hac vice*)
Ahmad Zavitsanos & Mensing PLLC
1221 McKinney Street, Suite 2500
Houston, Texas 77010
(713) 655-1101
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

Seth Meyer (*admitted pro hac vice*)
Alex Dravillas (*admitted pro hac vice*)
Keller Postman LLC
150 N. Riverside Plaza
Suite 4100
Chicago, Illinois 60606
(312) 741-5220
sam@kellerpostman.com
ajd@kellerpostman.com

COMMONWEALTH OF MASSACHUSETTS

ESSEX, S.S. SUPERIOR COURT

| | | |
|---|---|---|
| JOHN DOE,<br>INDIVIDUALLY AND ON<br>BEHALF OF ALL OTHERS SIMILARLY<br>SITUATED,<br><br>Plaintiff<br><br>v.<br><br>EMERSON HOSPITAL,<br><br>Defendant. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | C.A. No. 2277CV01000 |

**PLAINTIFF JOHN DOE'S, ON BEHALF OF HIMSELF AND ALL OTHERS SIMILARLY SITUATED, FIRST SET OF INTERROGATORIES TO DEFENDANT EMERSON HOSPITAL**

Pursuant to Rule 33 of the Massachusetts Rules of Civil Procedure, the Plaintiff John Doe, Individually and on Behalf of All Others Similarly Situated, hereby propounds his First Set of Interrogatories to Defendant Emerson Hospital ("Emerson"). Emerson shall answer these interrogatories in writing and under oath according to the Instructions and Definitions contained herein and serve a copy of such answers upon Sweeney Merrigan Law, LLP, counsel for the Plaintiff, at 268 Summer Street, LL Boston, MA 02210, within forty-five (45) days of service of these interrogatories.

**INSTRUCTIONS AND DEFINITIONS**

Massachusetts Superior Court Rule 30A ("Rule 30A") applies to these requests for production. For reference, Rule 30A states as follows:

1. **Uniform definitions in discovery requests**

*(a) Incorporation by Reference and Limitations.*

The full text of the definitions set forth in paragraph (1)(c) is deemed incorporated by reference into all discovery requests, but shall not preclude (i) the definition of other terms specific to the particular litigation; (ii) the use of abbreviations; or (iii) a narrower definition of a term defined in paragraph (1)(c).

*(b) Effect on Scope of Discovery.*

This rule is not intended to broaden or narrow the scope of discovery permitted by the Massachusetts Rules of Civil Procedure.

*(c) Definitions.*

The following definitions apply to all discovery requests, unless otherwise ordered by the court:

(1) Communication. The term "communication" means the transmittal of information (in the form of facts, opinions, ideas, inquiries, or otherwise).

(2) Document. The term "document" is defined to be synonymous in meaning and equal in scope to the usage of this term in Mass. R. Civ. P. 34 (a). An earlier draft is a separate document within the meaning of this term.

(3) Identify (With Respect to Persons). When referring to a natural person, to "identify" means to give, to the extent known, the person's (a) full name, (b) present or last known address, and (c) the present or last known place of employment. Once a person has been identified in accordance with this subparagraph, only the name of that person need be listed in response to subsequent discovery requesting the identification of that person.

(4) Identify (With Respect to Entities). When referring to an entity, to "identify" means to give, to the extent known, (a) the entity's full name, including (when not apparent from the name) the nature of the entity, e.g. corporation, limited liability corporation, partnership, or professional corporation, (b) present or last known address of its headquarters or principal place of business, and (c) the state in which the entity is incorporated or otherwise created. Once an entity has been identified in accordance with this subparagraph, only the name of that entity need be listed in response to subsequent discovery requesting the identification of that entity.

(5) Identify (With Respect to Documents). When referring to documents, to "identify" means to give, to the extent known: (a) the type of document; (b) the general subject matter; (c) the date of the document; (d) the author or authors, according to the document; and (e) the persons to whom, according to the document, the document (or a copy) was to have been sent.

(6) Parties. The term "plaintiff" or "defendant," as well as a party's full or abbreviated name or a pronoun referring to a party, means the party and, where applicable, its officers, directors, employees, partners, corporate parent, and subsidiaries. This definition is not intended to impose a discovery obligation on any person who is not a party to the litigation.

(7) Person. The term "person" means any natural person or any business, legal, or governmental entity.

(8) Concerning. The term "concerning" means referring to, describing, offering evidence of, or constituting.

(9) State the Basis or State all Facts. When an interrogatory calls upon a party to "state the basis" of or "state all facts" concerning a particular claim, allegation, or defense (or uses comparable language), the party shall provide a substantial summary of the factual basis supporting the claim, allegation, or defense at the time the interrogatory is answered. The summary shall: (a) identify the essential acts or failures to act forming the substance of the claim, allegation, or defense, (b) identify the persons and entities that, through firsthand information or possession of documents, are the sources of the party's information regarding the claim, allegation, or defense, and (c) when one or more documents is the basis of the claim, allegation, or defense, such as a written contract in a contractual claim or defense, or a written misrepresentation in a misrepresentation claim, identify (or provide as part of the interrogatory answer a copy of) each such document. In stating the basis, a party may not withhold information from the interrogatory answer because it derives from attorney work product or was obtained in anticipation of litigation if the party intends to offer this information at trial.

**2. Objections to Interrogatories**

General objections to interrogatories are prohibited. Each objection to an interrogatory shall be specific to that interrogatory and shall have a good faith basis. If a party refuses to answer an interrogatory, the party shall so state and identify each objection asserted to justify the refusal to answer. If a party, after having asserted an objection, answers the interrogatory, the answer shall state either: (a) notwithstanding the objection no information has been withheld from the answer, or (b) information has been withheld from the answer because of the objection. Where information has been withheld from the answer, the objecting party shall describe the nature of the information withheld and identify each objection asserted to justify the withholding.

**3. Objections to requests for the production of documents and things**

(a) Where a party serves a response to a request for production of documents and things under Mass. R. Civ. P. 34 before production is completed, the response may include general objections. However, where general objections are made, the responding party shall prepare and serve a supplemental response no later than 10 days after the completion of production.

(b) Once production is completed, general objections to requests for production of documents and things are prohibited. As to each request, the supplemental response shall state either: (i) notwithstanding prior general objections, all responsive documents or things in the possession, custody, or control of the responding party have been produced; (ii) after diligent search no responsive documents or things are in the possession, custody, or control of the responding party; or (iii) the specific objection made to the request. When specific objection is made, the response shall describe the nature of all responsive documents or things in the possession, custody, or control of the responding party that have not been produced because of the objection. Where a privilege log is required by Mass. R. Civ. P. 26(b)(5) or court order, the log shall be served with the supplemental response, unless the requesting party waives entitlement to the log or agrees to a later date for service.

(c) In the initial written response, the responding party shall articulate with clarity the scope of the search conducted or to be conducted. If the scope of the search changes (luring production, the responding party in the supplemental written response shall articulate with clarity the change in scope. If the scope of the search does not include all locations. including electronic storage locations, where responsive documents or things reasonably might be found, the responding party shall explain why these locations have been excluded from the scope of the search.

## ADDITIONAL DEFINITIONS

Consistent with Rule 30A, specifically Rule 30A(1)(a)(i), the following definitions shall also apply to the requests below and are deemed incorporated by reference into those requests:

1. "All" means "any and all," and the word "Any" means "any and all."

2. "Affected person" means any individual whose Personal Health Information has been disclosed to Facebook, Google, or other third parties via code such as the Meta Pixel installed on Your websites.

3. "Agreement" means any contract, arrangement, or understanding between two or more persons or entities, whether formal or informal, written or unwritten.

4. "Browser fingerprinting" means any practice utilizing device and browser attribute settings to identify a browser.

5. The "Class Period" begins on the first date on which Defendant placed third-party source code on its web properties that caused data arising from user communications with those web properties to be disclosed to third parties.

6. "Communicate" or "communications" means any oral, written or electronic transmission of information or intelligence of any nature including, but not limited to, meetings, discussions, conversations, and telephone calls, as well as documentation thereof, and telegrams, memoranda, letters, e-mails, telecopies, messages, or notes.

7. "Complaint" refers to the operative complaint in this action.

8. "Cookie synching" means any practice permitting cooperating web sites to share cookie identifiers for the same user.

9. "Cross-device tracking" refers to a practice permitting Defendant or any other company to track a user across various communications devices.

10. "Data" means information regarding the actions that individuals take on Your website, including searches, page views, and other activities, including (but not limited to) filling out electronic forms, paying bills, making online appointments, reviewing health information, and researching and selecting physicians and treatments.

11. "Data Disclosure" refers to Defendant's disclosure of the Personal Health Information of visitors to Defendant's website(s) to Facebook, Google, and other third parties via the Meta Pixel software code and other similar code embedded in Defendant's website(s) and patient portal(s), including www.emersonhospital.org.

12. "Defendant," "You", and "Your" shall mean the entity to which these Requests are directed, or any predecessor or successor companies in existence during the proposed class period, and all employees, agents, or other persons acting on Defendant's behalf.

13. "Deploy" shall mean to place, use, or inject source code at any of Defendant's properties either directly or indirectly (such as through a tag manager or other similar service).

14. "Document" or "documents" shall mean all documents, electronically stored information, and tangible things including, without limitation, all written and graphic matter and all other means of recording information, whether written, transcribed, taped, filmed, microfilmed, or in any other way produced, reproduced, or recorded, and including, but not limited to: originals, drafts, computer-sorted and computer-retrievable information, copies and duplicates that are marked with any notation or annotation or otherwise differ in any way from the original, correspondence, memoranda, reports, notes, minutes, contracts, agreements, books, records, checks, vouchers, invoices, purchase orders, ledgers, diaries, logs, calendars, computer printouts, computer disks, card files, lists of persons attending meetings or conferences, sketches, diagrams, calculations, evaluations, analyses, directions, work papers, press clippings, sworn or unsworn statements, requisitions, manuals or guidelines, audit work papers, financial analyses, tables of organizations, charts, graphs, indices, advertisements and promotional materials, audited and unaudited financial statements, trade letters, trade publications, newspapers and newsletters, photographs, emails, electronic or mechanical records, facsimiles, telegrams and telecopies, and audiotapes. Each draft, annotated, or otherwise non-identical copy is a separate document within the meaning of this term. Documents shall also include any removable sticky notes, flags, or other attachments affixed to any of the foregoing, as well as the files, folder tabs, and labels appended to or containing any documents. Documents expressly include all electronic records.

15. "Electronic records" shall mean the original (or identical duplicate when the original is not available) and any non-identical copies (whether non-identical because of notes made on

copies or attached comments, annotations, marks, transmission notations, or highlighting of any kind) of writings of every kind and description inscribed by mechanical, facsimile, electronic, magnetic, digital, or other means. Electronic records includes, by way of example and not by limitation, computer programs (whether private, commercial, or work-in-progress), programming notes and instructions, activity listings of email transmittals and receipts, output resulting from the use of any software program (including word processing documents, spreadsheets, database files, charts, graphs and outlines), electronic mail, and any and all miscellaneous files and file fragments, regardless of the media on which they reside and regardless of whether said electronic exists in an active file, deleted file, or file fragment. Electronic records includes without limitation any and all items stored on computer memories, hard disks, diskettes and cartridges, network drives, network memory storage, archived tapes and cartridges, backup tapes, floppy disks, CD-ROMs, removable media, magnetic tapes of all types, microfiche, and any other media used for digital data storage or transmittal. Electronic records also includes the file, folder tabs, and containers and labels appended to or associated with each original and non-identical copy.

16. "Facebook" shall mean Facebook, Inc. or Meta Platforms, Inc., or any of its subsidiaries and/or affiliates.

17. "Google" shall mean Alphabet Inc. or Google LLC. or any of its subsidiaries and/or affiliates (including but not limited to DoubleClick, Google Tag Manager, Google Ads, YouTube, or Google Analytics).

18. "Google Analytics" means the tracking source code, originating from Google (or Alphabet, Inc.) that is embedded on Your websites to track visitor activity on the website.

19. "Health Information System" or "HIS" refers to any system implemented by Defendant that enables it to collect, store, manage, analyze, optimize, and/or transmit patient treatment or other patient data.

20. "Including" means including, but not limited to.

21. "Meta Pixel" means source code or a tracking pixel, originating from Facebook (or Meta, Inc.) that is embedded on Your websites to track visitor activity on the website.

22. "Patient portal" means a type of Health Information System used by Defendant which allows patients to access their personal health data including but not limited to appointment information, medications, medical history, and results over an internet connection.

23. "Person" or "persons" includes any natural person, firm, association, organization, partnership, business, trust, corporation, governmental or public entity or any other form of legal entity.

24. "Personal Health Information" means Data about (1) patients' and potential patients' health conditions (e.g., addiction, Alzheimer's, heart disease), diagnoses, procedures, test results, the treating physician, medications or (2) personally identifiable information, including but not limited to, patients' and potential patients' names, addresses, email addresses,

telephone numbers, IP addresses, Facebook IDs, unique identifying codes, HTTP Headers, Pixel IDs, and/or any other sensitive information obtained and stored by Defendant.

25. "Plaintiffs" shall mean the named Plaintiff or Plaintiffs in this lawsuit.

26. "Policy" shall mean any rule, procedure, practice, or course of conduct, whether formal or informal, written or unwritten, recorded, or unrecorded.

27. "Proposed Class Period" means the class period proposed in Plaintiff's Class Action Complaint.

28. "Relating to," "related to," "relates to" means constituting, containing, concerning, embodying, reflecting, identifying, stating, mentioning, discussing, describing, evidencing, or in any other way being relevant to that given subject matter.

29. "Representatives" means Your employees, agents, representatives, or any other person acting on Your behalf.

30. "Server-side disclosures" means disclosures that occur directly between Your web-servers and any third party.

31. "Source code" means any computer software or any set of instructions or statements using any language, signs, signals, symbols or other means of human or machine communication and that are placed directly or indirectly within Defendant's web properties.

32. "Third party" refers to any entity other than Defendant and the patient/user with whom Defendant is communicating via its web properties.

33. "Third-party source code" refers to any source code derived in whole or in part from a third-party source or created by Defendant (or any of its agents, assigns, or employees) that instructs or commands the computing devices or web-browsers to patients/users exchanging communications at Defendant's web properties to transmit data of any nature to third parties.

34. "Web-log data" or "server-log data" means any information in any form that is stored by You relating to a record of data exchanges at www.emersonhospital.org or any of Your other web properties.

35. "Web property," "web properties," "website," or "websites" shall mean all websites operated by or affiliated with the entity or persons to whom these requests are directed, including www.emersonhospital.org and Your patient portal(s).

## ADDITIONAL INSTRUCTIONS

1. These interrogatories shall be deemed to be continuing, and to require you to supplement your response based upon any Documents or other information of which you become aware after you serve your initial response to these interrogatories.

2. You are to answer each interrogatory by providing all responsive information. If you object to any interrogatory, specify the part to which you object, state your objections, state all factual and legal justifications that you believe support your objections, and respond to the remainder to which you do not object.

3. If you cannot respond fully and completely to any interrogatory or part thereof, then answer to the fullest extent possible and state the reason for your inability to provide a full and complete answer.

4. To the extent that any information called for by any interrogatory is unknown to you, please state and set forth such information as is known to you. If any estimate can reasonably be made in place of unknown information, set forth your best estimate, clearly designated as such, and describe the basis upon which the estimate is made.

5. Each interrogatory shall be construed to include information and Documents within your knowledge, possession, or control as of the date you answer to these interrogatories, and any supplemental information, knowledge, Data, Documents, or communications responsive to these interrogatories that is generated, obtained or discovered after the date of your answers.

6. If you withhold otherwise responsive information or Documents identified herein based on a claim the information is privileged, please provide a privilege log that includes: the nature of the material not disclosed; the date and time the material was created or sent; the identity of each author and recipient; the present location of the material; the number of pages, attachments, and exhibits; and all information on which you base your claim of privilege.

7. If you object to providing certain information requested, state your objection and answer any unobjectionable portion of the request for information and/or supply the unobjectionable information requested.

8. Whenever possible, verb tenses shall be interpreted to include past, present, and future tenses.

9. The use of the singular form of any word includes the plural and vice versa.

10. The masculine includes the feminine and neutral genders.

11. The connectives "and" and "or" shall be constructed either disjunctively or conjunctively as necessary to bring within the scope of the discovery requests all responses that might otherwise be constructed to be outside their scope.

## INTERROGATORIES

**INTERROGATORY NO 1:** For the Class Period, identify all third-party tracking pixels (or embedded source code), including but not limited to the Meta Pixel and Google Analytics, that You have embedded on Your website(s) that cause the transmission of Data between Your website(s) and a third-party entity during communications between a web user and Your website(s).

**ANSWER:**

**INTERROGATORY NO. 2:** For each third-party tracking pixel (or embedded source code) identified in response to Interrogatory No. 1, describe in detail the functionality of each such tracking pixel (or embedded source code), including:

a) identifying the sections or portions of Your website(s), including any password protected patient portals, where such tracking pixels (or embedded source code) has been active during the Class Period;

b) describing the type of Data that is transmitted from Your website(s) to third parties via the functionality of said third-party tracking pixels, including any personally identifying information (such as cookies, IP addresses, Facebook, IDs) and the contents of any user communications (such as search terms, selections, or contents of online forms); and

c) each page on Your websites and patient portals where the third-party tracking pixel (or embedded source code) was installed.

**ANSWER:**

**INTERROGATORY NO. 3:** State your current best estimate of the number of individuals whose interactions with Your website(s) have resulted in the transmission of Data between one of Your websites and a third-party entity (such as Facebook or Google), via a third-party tracking pixel or source code (such as the Meta Pixel or Google Analytics) that are embedded on Your websites, during the Class Period.

**ANSWER:**

**INTERROGATORY NO 4:** Among the number of individuals responsive to Interrogatory No. 3, further state how many of such individuals were:

a) Your patients;
b) Your patients who reside in the state of Massachusetts;
c) Your patients who logged into Your patient portal one or more times.

**ANSWER:**

**INTERROGATORY NO 5:** For each third-party tracking pixel (or embedded source code) identified in response to Interrogatory No. 1, describe any updates, revisions, or modifications to each said tracking pixel that resulted changes in the type of Data that was transmitted from Your website(s) to third parties during user interactions with Your website(s), including an identification of when any such updates, revisions, or modifications were made.

**ANSWER:**

**INTERROGATORY NO 6:** State the total number of instances where Data was transmitted to third parties via third-party tracking pixel (or embedded source code), such as the Meta Pixel or Google Analytics, that occurred during user interactions within the password-protected patient portal available through Your website(s) during the Class Period.

**ANSWER:**

**INTERROGATORY NO 7:** State the number of Your patients who reside in the state of Massachusetts whose interactions within the password-protected patient portal available through Your website(s) during the Class Period have resulted in the transmission of Data to third parties via the functionalities of third-party tracking pixel (or embedded source code), such as the Meta Pixel or Google Analytics, that You have embedded on Your website(s).

**ANSWER:**

**INTERROGATORY NO 8:** Identify the number of individuals whom You have reason to believe had any of their Personal Health Information disclosed to Facebook or Google in the Data Disclosure. For purpose of answering this interrogatory, "Personal Health Information" includes both (1) data about patients' and potential patients' health conditions (e.g., addiction, Alzheimer's, heart disease), diagnoses, procedures, test results, the treating physician, medications ***and*** (2) personally identifiable information, including but not limited to, patients' and potential patients' names, addresses, email addresses, telephone numbers, IP addresses, Facebook IDs, unique identifying codes, HTTP Headers, Pixel IDs, and/or any other sensitive information obtained and stored by Defendant. Your answer should include the total number of individuals who have had *either* category of their Data disclosed to Facebook or Google in the Data Disclosure.

**ANSWER:**

**INTERROGATORY NO 9:** Identify and describe in detail all notices You have provided to Your patients regarding actual or potential disclosure(s) of Data to third parties that resulted from those patients' interactions with Your website(s) via third-party tracking pixel (or embedded source code), such as the Meta Pixel or Google Analytics. Your Response should include, at minimum, the date(s) of such notice(s), the content of such notice(s), the names of patients to whom such notice(s) were given, and the Bates numbers of any document(s) related to such notice(s).

**ANSWER:**

**INTERROGATORY NO 10:** State the time period during which You had the Meta Pixel embedded within any pages of the Patient Portal associated with Your websites.

**ANSWER:**

**INTERROGATORY NO 11:** For everyone whose Personal Health Information was disclosed or potentially disclosed in the Data Disclosure from either Your websites or patient portals, identify the individual by a unique identifier (*e.g.* number, letter or combination thereof) and identify their state of residence and the categories of Personal Health Information that were disclosed to Facebook and other third parties in the Data Disclosure:

| Individual Identifier | State of Residence | Personal Health Information Potentially Compromised |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |

**ANSWER:**

**INTERROGATORY NO 12:** For the Data Disclosure, describe:

a. The date and time when Your patients' Personal Health Information provided by patient visitors to Your websites first became accessible to third parties, including, but not limited to, Facebook and Google;

b. The date and time when You first learned that Personal Health Information provided by visitors to Your websites had been disclosed to third parties including, but not limited to, Facebook and Google;

c. The date on which You first notified Your current and former patients, employees, government entities, and/or the public that Personal Health Information provided by visitors to your website had been disclosed to third parties including, but not limited to, Facebook and Google; and

d. The method through which You notified Your current and former patients, government entities, and/or the public that Personal Health Information provided by visitors to Your website had been disclosed to third parties, including, but not limited to, Facebook and Google.

**ANSWER:**

**INTERROGATORY NO 13:** Identify, by name and title, each employee, agent, or other person acting on Your behalf with responsibility for the following:

a. The design of Your web properties during the Class Period;

b. The source code deployed on your web properties during the Class Period;

c. The operation of website analytics and metrics for your web properties during the Class Period; and

d. The Internet marketing for You that utilized Your websites in any way during the Class Period;

**ANSWER:**

**INTERROGATORY NO 14:** Identify and describe any investigations and analyses conducted by You or on Your behalf regarding the Data Disclosure and its causes, including any investigative reports and the conclusions that You reached.

**ANSWER:**

**INTERROGATORY NO 15:** Identify and describe any changes to Your policies, procedures, and practices for security of Personal Health Information and Your communications and training regarding the same that were recommended to You before the Data Disclosure, including but not limited to the nature of those recommended changes, the identity of the individuals and/or entities that recommended the changes, whether the changes were actually made, the reasons You made or chose not to make the changes, and the individuals and/or entities involved in approving, denying, and implementing the recommended changes.

**ANSWER:**

**INTERROGATORY NO 16:** Identify and describe any and all remedial steps You took during or after receiving notice of the Data Disclosure. Your response should include whether You conducted any internal investigation, had any external communications with Facebook, Google, or Your website developers about the Data Disclosure, whether any investigative or forensic report was drafted, and identification of who was involved in any internal investigation, who conducted any external communications with Facebook, Google, or Your website developers, and who drafted and received the investigative or forensic report.

**ANSWER:**

**INTERROGATORY NO 17:** For the websites and patient portals that you maintained during the Class Period, identify all data sources you have configured in your Meta/Facebook Events Manager, including every Meta Pixel you have created. For each Meta Pixel identified, provide the date you created it and the websites and pages you installed it on. For each web page where you installed a Meta Pixel, provide the date you added the Meta Pixel code to the page and anytime

you modified the code, including any code you added to track standard or custom events. Further, for each web page where you installed the Meta Pixel, provide all parameters included in the fbq('init') function call and for each parameter identify if it was provided in a hashed or unhashed format. For each event you tracked, provide the name of the event and all parameters and object properties that were included with the event and whether the parameters were provided in a hashed or unhashed format.

**ANSWER:**

Dated: April 13, 2023

Respectfully submitted,

**COUNSEL FOR PLAINTIFF JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED**

*/s/ J. Tucker Merrigan*

J. Tucker Merrigan, BBO# 681627
Thomas T. Merrigan, BBO# 343480
Erin E. McHugh, BBO# 703701
Sweeney Merrigan Law
268 Summer St. LL
Boston, MA 02210
(413) 774-5300
tucker@sweeneymerrigan.com
tom@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Foster C. Johnson (*admitted pro hac vice*)
David Warden (*admitted pro hac vice*)
Nathan Campbell (*admitted pro hac vice*)
Ahmad Zavitsanos & Mensing PLLC
1221 McKinney Street, Suite 2500
Houston, Texas 77010
(713) 655-1101
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

Seth Meyer (*admitted pro hac vice*)
Alex Dravillas (*admitted pro hac vice*)
Keller Postman LLC
150 N. Riverside Plaza
Suite 4100
Chicago, Illinois 60606
(312) 741-5220
sam@kellerpostman.com
ajd@kellerpostman.com

# Exhibit B

EXHIBIT B

COMMONWEALTH OF MASSACHUSETTS

ESSEX, S.S. SUPERIOR COURT

| | | |
|---|---|---|
| JOHN DOE,<br>INDIVIDUALLY AND ON<br>BEHALF OF ALL OTHERS SIMILARLY<br>SITUATED,<br><br>Plaintiff<br><br>v.<br><br>EMERSON HOSPITAL,<br><br>Defendant. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | C.A. No. 2277CV01000 |

**PLAINTIFF JOHN DOE'S, ON BEHALF OF HIMSELF AND ALL OTHERS SIMILARLY SITUATED, THIRD REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANT EMERSON HOSPITAL**

Pursuant to Rule 34 of the Massachusetts Rules of Civil Procedure, the Plaintiff John Doe, Individually and on Behalf of All Others Similarly Situated, hereby propounds his Third Requests for Production of Documents to Defendant Emerson Hospital ("Emerson"). Emerson shall respond to these requests in writing according to the Instructions and Definitions contained herein and produce all responsive documents in its possession, custody, or control to Sweeney Merrigan Law, LLP, counsel for the Plaintiff, and 268 Summer Street, LL, Boston, MA 02210, within 30 days of service of these requests.

**INSTRUCTIONS AND DEFINITIONS**

Massachusetts Superior Court Rule 30A ("Rule 30A") applies to these requests for production. For reference, Rule 30A states as follows:

1. **Uniform definitions in discovery requests**

*(a) Incorporation by Reference and Limitations.*

The full text of the definitions set forth in paragraph (1)(c) is deemed incorporated by reference into all discovery requests, but shall not preclude (i) the definition of other terms specific to the particular litigation; (ii) the use of abbreviations; or (iii) a narrower definition of a term defined in paragraph (1)(c).

*(b) Effect on Scope of Discovery.*

This rule is not intended to broaden or narrow the scope of discovery permitted by the Massachusetts Rules of Civil Procedure.

*(c) Definitions.*

The following definitions apply to all discovery requests, unless otherwise ordered by the court:

(1) Communication. The term "communication" means the transmittal of information (in the form of facts, opinions, ideas, inquiries, or otherwise).

(2) Document. The term "document" is defined to be synonymous in meaning and equal in scope to the usage of this term in Mass. R. Civ. P. 34 (a). An earlier draft is a separate document within the meaning of this term.

(3) Identify (With Respect to Persons). When referring to a natural person, to "identify" means to give, to the extent known, the person's (a) full name, (b) present or last known address, and (c) the present or last known place of employment. Once a person has been identified in accordance with this subparagraph, only the name of that person need be listed in response to subsequent discovery requesting the identification of that person.

(4) Identify (With Respect to Entities). When referring to an entity, to "identify" means to give, to the extent known, (a) the entity's full name, including (when not apparent from the name) the nature of the entity, e.g. corporation, limited liability corporation, partnership, or professional corporation, (b) present or last known address of its headquarters or principal place of business, and (c) the state in which the entity is incorporated or otherwise created. Once an entity has been identified in accordance with this subparagraph, only the name of that entity need be listed in response to subsequent discovery requesting the identification of that entity.

(5) Identify (With Respect to Documents). When referring to documents, to "identify" means to give, to the extent known: (a) the type of document; (b) the general subject matter; (c) the date of the document; (d) the author or authors, according to the document; and (e) the persons to whom, according to the document, the document (or a copy) was to have been sent.

(6) Parties. The term "plaintiff" or "defendant," as well as a party's full or abbreviated name or a pronoun referring to a party, means the party and, where applicable, its officers, directors, employees, partners, corporate parent, and subsidiaries. This definition is not intended to impose a discovery obligation on any person who is not a party to the litigation.

(7) Person. The term "person" means any natural person or any business, legal, or governmental entity.

(8) Concerning. The term "concerning" means referring to, describing, offering evidence of, or constituting.

(9) State the Basis or State all Facts. When an interrogatory calls upon a party to "state the basis" of or "state all facts" concerning a particular claim, allegation, or defense (or uses comparable language), the party shall provide a substantial summary of the factual basis supporting the claim, allegation, or defense at the time the interrogatory is answered. The summary shall: (a) identify the essential acts or failures to act forming the substance of the claim, allegation, or defense, (b) identify the persons and entities that, through firsthand information or possession of documents, are the sources of the party's information regarding the claim, allegation, or defense, and (c) when one or more documents is the basis of the claim, allegation, or defense, such as a written contract in a contractual claim or defense, or a written misrepresentation in a misrepresentation claim, identify (or provide as part of the interrogatory answer a copy of) each such document. In stating the basis, a party may not withhold information from the interrogatory answer because it derives from attorney work product or was obtained in anticipation of litigation if the party intends to offer this information at trial.

**2. Objections to Interrogatories**

General objections to interrogatories are prohibited. Each objection to an interrogatory shall be specific to that interrogatory and shall have a good faith basis. If a party refuses to answer an interrogatory, the party shall so state and identify each objection asserted to justify the refusal to answer. If a party, after having asserted an objection, answers the interrogatory, the answer shall state either: (a) notwithstanding the objection no information has been withheld from the answer, or (b) information has been withheld from the answer because of the objection. Where information has been withheld from the answer, the objecting party shall describe the nature of the information withheld and identify each objection asserted to justify the withholding.

**3. Objections to requests for the production of documents and things**

(a) Where a party serves a response to a request for production of documents and things under Mass. R. Civ. P. 34 before production is completed, the response may include general objections. However, where general objections are made, the responding party shall prepare and serve a supplemental response no later than 10 days after the completion of production.

(b) Once production is completed, general objections to requests for production of documents and things are prohibited. As to each request, the supplemental response shall state either: (i) notwithstanding prior general objections, all responsive documents or things in the possession, custody, or control of the responding party have been produced; (ii) after diligent search no responsive documents or things are in the possession, custody, or control of the responding party; or (iii) the specific objection made to the request. When specific objection is made, the response shall describe the nature of all responsive documents or things in the possession, custody, or control of the responding party that have not been produced because of the objection. Where a privilege log is required by Mass. R. Civ. P. 26(b)(5) or court order, the log shall be served with the supplemental response, unless the requesting party waives entitlement to the log or agrees to a later date for service.

(c) In the initial written response, the responding party shall articulate with clarity the scope of the search conducted or to be conducted. If the scope of the search changes (luring production, the responding party in the supplemental written response shall articulate with clarity the change in scope. If the scope of the search does not include all locations. including electronic storage locations, where responsive documents or things reasonably might be found, the responding party shall explain why these locations have been excluded from the scope of the search.

## ADDITIONAL DEFINITIONS

Consistent with Rule 30A, specifically Rule 30A(1)(a)(i), the following definitions shall also apply to the requests below and are deemed incorporated by reference into those requests:

1. "All" means "any and all," and the word "ANY" means "any and all."

2. "Affected person" means any individual whose Personal Health Information has been disclosed to Facebook, Google, or other third parties via code such as the Meta Pixel installed on Your websites.

3. "Agreement" means any contract, arrangement, or understanding between two or more persons or entities, whether formal or informal, written or unwritten.

4. "Browser fingerprinting" means any practice utilizing device and browser attribute settings to identify a browser.

5. The "Class Period" begins on the first date on which Defendant placed third-party source code on its web properties that caused data arising from user communications with those web properties to be disclosed to third parties.

6. "Communicate" or "communications" means any oral, written or electronic transmission of information or intelligence of any nature including, but not limited to, meetings, discussions, conversations, and telephone calls, as well as documentation thereof, and telegrams, memoranda, letters, e-mails, telecopies, messages, or notes.

7. "Complaint" refers to the operative complaint in this action.

8. "Cookie synching" means any practice permitting cooperating web sites to share cookie identifiers for the same user.

9. "Cross-device tracking" refers to a practice permitting Defendant or any other company to track a user across various communications devices.

10. "Data" means information regarding the actions that individuals take on Your website, including searches, page views, and other activities, including (but not limited to) filling out electronic forms, paying bills, making online appointments, reviewing health information, and researching and selecting physicians and treatments.

11. "Data Disclosure" refers to Defendant's disclosure of the Personal Health Information of visitors to Defendant's website(s) to Facebook, Google, and other third parties via the Meta Pixel software code and other similar code embedded in Defendant's website(s) and patient portal(s), including www.emersonhospital.org.

12. "Defendant," "You", and "Your" shall mean the entity to which these Requests are directed, or any predecessor or successor companies in existence during the proposed class period, and all employees, agents, or other persons acting on Defendant's behalf.

13. "Deploy" shall mean to place, use, or inject source code at any of Defendant's properties either directly or indirectly (such as through a tag manager or other similar service).

14. "Document" or "documents" shall mean all documents, electronically stored information, and tangible things including, without limitation, all written and graphic matter and all other means of recording information, whether written, transcribed, taped, filmed, microfilmed, or in any other way produced, reproduced, or recorded, and including, but not limited to: originals, drafts, computer-sorted and computer-retrievable information, copies and duplicates that are marked with any notation or annotation or otherwise differ in any way from the original, correspondence, memoranda, reports, notes, minutes, contracts, agreements, books, records, checks, vouchers, invoices, purchase orders, ledgers, diaries, logs, calendars, computer printouts, computer disks, card files, lists of persons attending meetings or conferences, sketches, diagrams, calculations, evaluations, analyses, directions, work papers, press clippings, sworn or unsworn statements, requisitions, manuals or guidelines, audit work papers, financial analyses, tables of organizations, charts, graphs, indices, advertisements and promotional materials, audited and unaudited financial statements, trade letters, trade publications, newspapers and newsletters, photographs, emails, electronic or mechanical records, facsimiles, telegrams and telecopies, and audiotapes. Each draft, annotated, or otherwise non-identical copy is a separate document within the meaning of this term. Documents shall also include any removable sticky notes, flags, or other attachments affixed to any of the foregoing, as well as the files, folder tabs, and labels appended to or containing any documents. Documents expressly include all electronic records.

15. "Electronic records" shall mean the original (or identical duplicate when the original is not available) and any non-identical copies (whether non-identical because of notes made on

copies or attached comments, annotations, marks, transmission notations, or highlighting of any kind) of writings of every kind and description inscribed by mechanical, facsimile, electronic, magnetic, digital, or other means. Electronic records includes, by way of example and not by limitation, computer programs (whether private, commercial, or work-in-progress), programming notes and instructions, activity listings of email transmittals and receipts, output resulting from the use of any software program (including word processing documents, spreadsheets, database files, charts, graphs and outlines), electronic mail, and any and all miscellaneous files and file fragments, regardless of the media on which they reside and regardless of whether said electronic exists in an active file, deleted file, or file fragment. Electronic records includes without limitation any and all items stored on computer memories, hard disks, diskettes and cartridges, network drives, network memory storage, archived tapes and cartridges, backup tapes, floppy disks, CD-ROMs, removable media, magnetic tapes of all types, microfiche, and any other media used for digital data storage or transmittal. Electronic records also includes the file, folder tabs, and containers and labels appended to or associated with each original and non-identical copy.

16. "Facebook" shall mean Facebook, Inc. or Meta Platforms, Inc., or any of its subsidiaries and/or affiliates.

17. "Google" shall mean Alphabet Inc. or Google LLC. or any of its subsidiaries and/or affiliates (including but not limited to DoubleClick, Google Tag Manager, Google Ads, YouTube, or Google Analytics).

18. "Google Analytics" means the tracking source code, originating from Google (or Alphabet, Inc.) that is embedded on Your websites to track visitor activity on the website.

19. "Health Information System" or "HIS" refers to any system implemented by Defendant that enables it to collect, store, manage, analyze, optimize, and/or transmit patient treatment or other patient data.

20. "Including" means including, but not limited to.

21. "Meta Pixel" means source code or a tracking pixel, originating from Facebook (or Meta, Inc.) that is embedded on Your websites to track visitor activity on the website.

22. "Patient portal" means a type of Health Information System used by Defendant which allows patients to access their personal health data including but not limited to appointment information, medications, medical history, and results over an internet connection.

23. "Person" or "persons" includes any natural person, firm, association, organization, partnership, business, trust, corporation, governmental or public entity or any other form of legal entity.

24. "Personal Health Information" means Data about (1) patients' and potential patients' health conditions (e.g., addiction, Alzheimer's, heart disease), diagnoses, procedures, test results, the treating physician, medications or (2) personally identifiable information, including but not limited to, patients' and potential patients' names, addresses, email addresses,

telephone numbers, IP addresses, Facebook IDs, unique identifying codes, HTTP Headers, Pixel IDs, and/or any other sensitive information obtained and stored by Defendant.

25. "Plaintiffs" shall mean the named Plaintiff or Plaintiffs in this lawsuit.

26. "Policy" shall mean any rule, procedure, practice, or course of conduct, whether formal or informal, written or unwritten, recorded, or unrecorded.

27. "Proposed Class Period" means the class period proposed in Plaintiff's Class Action Complaint.

28. "Relating to," "related to," "relates to" means constituting, containing, concerning, embodying, reflecting, identifying, stating, mentioning, discussing, describing, evidencing, or in any other way being relevant to that given subject matter.

29. "Representatives" means Your employees, agents, representatives, or any other person acting on Your behalf.

30. "Server-side disclosures" means disclosures that occur directly between Your web-servers and any third party.

31. "Source code" means any computer software or any set of instructions or statements using any language, signs, signals, symbols or other means of human or machine communication and that are placed directly or indirectly within Defendant's web properties.

32. "Third party" refers to any entity other than Defendant and the patient/user with whom Defendant is communicating via its web properties.

33. "Third-party source code" refers to any source code derived in whole or in part from a third-party source or created by Defendant (or any of its agents, assigns, or employees) that instructs or commands the computing devices or web-browsers to patients/users exchanging communications at Defendant's web properties to transmit data of any nature to third parties.

34. "Web-log data" or "server-log data" means any information in any form that is stored by You relating to a record of data exchanges at www.emersonhospital.org or any of Your other web properties.

35. "Web property," "web properties," "website," or "websites" shall mean all websites operated by or affiliated with the entity or persons to whom these requests are directed, including www.emersonhospital.org and Your patient portal(s).

## ADDITIONAL INSTRUCTIONS

1. The discovery requests are continuing, and You must provide, by way of supplementary answers and responses, such additional information and documents as You or any other person acting on Your behalf may hereafter obtain which will supplement or otherwise modify any responses hereto.

2. Please produce all of the specified documents and electronic records which are in Your possession, or available to You, or to which You may gain access through reasonable effort, including information in the possession of Your past and present attorneys, accountants, investigators, consultants, or other persons directly or indirectly employed or retained by You, or in connection with You, or anyone else otherwise subject to Your control who maintains records on Your behalf, in Your name or otherwise under Your control.

3. Any comments, notations or markings appearing on any documents or electronic records, and not a part of the original, are considered a separate document or electronic records, and any draft, preliminary form or superseded version of any document is also considered a separate document or electronic records.

4. All documents and electronic records requested herein should be produced in the same order as they are kept, or maintained, or stored, in the regular course of business.

5. All documents requested herein should be produced in the file, folder, envelope, or other container in which the documents are kept or maintained. If for any reason the container cannot be produced, please produce copies of all labels or other identifying markings.

6. Any document attached to another document must not be separated.

7. In the event that any document or electronic record called for by these requests has been destroyed, lost, discarded, otherwise disposed of, or is otherwise unavailable, such document or electronic record is to be identified as completely as possible, including, without limitation, the following information: date of disposal; manner of disposal; reason for disposal; person authorizing the disposal; and person disposing of the document or electronic record.

8. Whenever possible, verb tenses shall be interpreted to include past, present, and future tenses.

9. If an objection is made to part or all of any request, the part should be specified together with the reasons for the objection. If a claim of privilege is asserted with respect to part or all of any document on the grounds of attorney-client privilege, the attorney work product doctrine, or any other basis, describe the document with sufficient particularity to make it susceptible to identification by separately stating the following with respect to any such document: (1) the type of document; (2) its date; (3) the name, address, and position of its author(s); (4) the name, address, and position of each recipient of the document; (5) a general description of the subject matter of the document; (6) the basis of any claim of privilege; and (7) if work product immunity is asserted, the proceeding for which the document was prepared.

10. The use of the singular form of any work includes the plural and vice versa.

11. The masculine includes the feminine and neutral genders.

12. The connectives "and" and "or" shall be constructed either disjunctively or conjunctively as necessary to bring within the scope of the discovery requests all responses that might otherwise be constructed to be outside their scope.

13. To the extent that You have any objection to producing responsive documents on the basis that the responsive documents are privileged or otherwise protected by the attorney-client privilege or work-product immunity, You are requested to provide a privilege log in accordance with the Massachusetts Rules of Civil Procedure.

14. If You object to providing certain information requested, state Your objection and answer any unobjectionable portion of the request for information and/or supply the unobjectionable information requested.

15. Please produce all electronically-stored documents, or e-documents, as electronically Bates-numbered single-page TIFF images with appropriate document breaks, corresponding load file for the images, and a generic delimited data file for the corresponding metadata. The following metadata or fielded information, to the extent applicable to a produced electronic document, will be included in the generic delimited data file:

a. Beginning Production Number
b. Ending Production Number
c. Parent ID (if applicable)
d. Attachment ID (if applicable)
e. File Type (e.g., Word, Excel, email, etc.)
f. Last Modified Date (if collected from source system or custodian, rather than image)
g. Last Modified Time (if collected from source system or custodian, rather than image)
h. Sent Date
i. Sent Time
j. Document Author or Form
k. To
l. CC
m. BCC
n. Subject Line (emails only)
o. Custodian or Source
p. Attachment Count
q. Native File Link
r. File Name
s. File path/folder
t. Received Date
u. Full Text
v. De-duplicated instances (by full path)
w. Redacted flag
x. Embedded content flag

Documents that should not be rendered to TIFF images (i.e., Excel files, multimedia files, voice mail, sound files, databases, etc.) will be placed as native in a separate folder. The files will be named by a pre-pending a Bates number to the original file name. A confidentiality designation can also be inserted into the file name. A slip sheet will be provided containing the Bates number, the native file name, along with the note "Document Provided in Native Format." A link to the relative path of the natively produced document will be included in the metadata load file (Field no. 17 in list above). All embedded content shall be provided, including tracked changes, hidden comments, speaker notes, etc.

Emails and their attachments will be referenced to each other in the generic delimited data file and will be numbered sequentially wherein the attachment Bates number follows the parent email Bates number. Emails and their attachments will be designated in the generic delimited data file by the beginning and ending Bates numbers of the email or individual attachments (Fields nos. 1 and 2 in list above), and those of the entire family (Fields no. 3 and 4 in list above).

Multipage OCR or extracted text (i.e., TXT files) will be named to the corresponding TIFF images and placed in a separate folder named TEXT.

The searchable content of electronically stored documents will be extracted from the source documents, e.g., emails and their attachments, and will not be generated through optical character recognition (OCR) of the corresponding TIFF images, with the exception of redacted documents, which may be OCR-ed. Redacted documents will contain the searchable endorsement "Redacted."

## REQUESTS FOR PRODUCTION OF DOCUMENTS

164. Documents sufficient to show the total number of unique IP addresses who visited Your website during the Class Period.

**RESPONSE:**

165. All Google analytics reports generated by You or provided to You by any third-party consultant or vendor during the Class Period.

**RESPONSE:**

166. All Key Performance Indicator (KPI) reports generated by You or provided to You by any third-party consultant or vendor during the Class Period.

**RESPONSE:**

167. All communications and documents exchanged with any third-party consultant or vendor during the Class Period who assisted with management or development of Your website and patient portal, including the management of any analytics functions for Your website and patient portal.

**RESPONSE:**

168. All communications (including internal presentations and memoranda) regarding your use of pixel tracking technologies, including but not limited to the Meta Pixel and the Google analytics pixel, on Your websites and patient portals.

**RESPONSE:**

Dated: May 22, 2023

Respectfully submitted,

**COUNSEL FOR PLAINTIFF JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED**

*/s/ Foster Johnson*
J. Tucker Merrigan, BBO# 681627
Thomas T. Merrigan, BBO# 343480
Erin E. McHugh, BBO# 703701
**SWEENEY MERRIGAN LAW**
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
tom@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Foster Johnson (*admitted pro hac vice*)
Texas Bar No. 24076463
David Warden (*admitted pro hac vice*)
Texas Bar No. 20856750
Nathan Campbell (*admitted pro hac vice*)
Texas Bar No. 24097455
**AHMAD, ZAVITSANOS & MENSING, PLLC**
1221 McKinney, Suite 2500
Houston, Texas 77010
(713) 655-1101 -Phone
(713) 655-0062 – Fax
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

Seth A. Meyer (*admitted pro hac vice*)
Alex Dravillas (*admitted pro hac vice*)
**KELLER POSTMAN LLC**
150 N. Riverside Plaza, Suite 4100
Chicago, IL 60606
(312) 741-5226
sam@kellerpostman.com
adj@kellerpostman.com

**CERTIFICATE OF SERVICE**

I, J. Tucker Merrigan, counsel of record for the Plaintiffs in this action, hereby certify that on May 22, 2023, a copy of the Plaintiff John Doe's, On Behalf of Himself and All Others Similarly Situated, Third Request for Production of Documents to Defendant, Emerson Hospital were served on all counsel of record, via electronic mail to the following parties of interest:

Alan Y. Wong
awong@shb.com
Emyr Remy
remy@shb.com
SHOOK, HARDY & BACON L.L.P.
One Federal Street, Suite 2540
Boston, MA 02110
Tel: (617) 531-1411 | Fax: (617) 531-1602

Alfred J. Saikali
asaikali@shb.com
SHOOK, HARDY & BACON L.L.P.
201 South Biscayne Blvd., Suite 3200
Miami, Florida 33131
Tel: (305) 358-5171 | Fax: (305) 358-7470

Josh Becker (pro hac vice forthcoming)
jbecker@shb.com
SHOOK, HARDY & BACON L.L.P.
1230 Peachtree St., Suite 1200
Atlanta, GA 30309
Tel: (470) 867-6000 | Fax: (470) 867-6001

Michael Rayfield (pro hac vice forthcoming)
mrayfield@shb.com
SHOOK, HARDY & BACON L.L.P.
1325 Avenue of the Americas, 28th Floor
New York, NY 10019
Tel: (212) 989-8844 | Fax: (929) 501-5455

Lindsey M. Knapton (pro hac vice forthcoming)
lknapton@shb.com
SHOOK, HARDY & BACON L.L.P.
1600 17th Street, Suite 450
Denver, CO 80202
Tel: (303) 285-5300 | Fax: (303) 285-5301

*<u>/s/ Jonathan T. Merrigan</u>*
J. Tucker Merrigan

# Exhibit C

EXHIBIT C

**COMMONWEALTH OF MASSACHUSETTS**

**ESSEX, S.S.**

**TRIAL COURT DEPARTMENT**
**SUPERIOR COURT**

JOHN DOE, individually and on behalf of all other similarly situated,

Plaintiff,

v.

EMERSON HOSPITAL,

Defendant.

DOCKET NO. 2277CV01000D

**DEFENDANT EMERSON HOSPITAL'S RESPONSES TO PLAINTIFF JOHN DOE'S FIRST AND SECOND SETS OF REQUESTS FOR PRODUCTION OF DOCUMENTS**

Defendant Emerson Hospital ("Emerson"), by and through its undersigned counsel, hereby serves its Responses to Plaintiff John Doe's ("Plaintiff") First and Second Sets of Requests for Production of Documents pursuant to Massachusetts Rules of Civil Procedure Rule 34 and Massachusetts Superior Court Rule 30(A), for purposes of this action only, reserving the right to supplement and amend, as follows:

**GENERAL OBJECTIONS**

Defendant incorporates the following general objections in response to each request for production of documents, in addition to the specifically stated objections:

1. Defendant objects to these requests to the extent that they are vague, overbroad, unduly burdensome, and impose obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

2. Defendant objects to these requests to the extent that they seek information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence.

3. Defendant objects to these requests to the extent that they seek documents that were prepared for or in anticipation of litigation, or that are protected from disclosure by the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege, protection, or immunity.

4. The inadvertent production or disclosure of any privileged documents or information shall not constitute or be deemed to be a waiver of any applicable privilege with respect to such document or information (or the contents or subject matter thereof) or with respect to any other such document or discovery now or hereafter requested or provided. Defendant reserves the right not to produce documents that are in part protected by privilege, except on a redacted basis, and to require the return of any document (and all copies thereof) inadvertently produced.

5. Defendant does not waive the right to object, on any and all grounds, to (i) the evidentiary use of documents produced in response to these requests, and (ii) discovery requests relating to those documents.

6. Defendant objects to these requests to the extent that they seek documents not in Defendant's possession, custody, or control.

7. Defendant objects to these requests to the extent they call for the creation of documents not already in existence.

8. Defendant objects to these requests to the extent they seek documents that are publicly available or otherwise already in Plaintiff's possessions, custody, or control or equally accessible to Plaintiffs.

9. Defendant objects to these requests to the extent they seek documents beyond those agreed to between the parties such as with the use of agreed search terms.

10. Defendant objects to the definition of terms to the extent that it conflicts with the uniform definitions contained in Superior Court Rule 30A(1)(C).

11. Defendant objects to Plaintiff's definition of the terms "Data" and 'Personal Health Information' as they are vague, ambiguous, and overbroad.

12. Defendant objects to Plaintiff's definition of the term 'Class Period' as the definition presumes Defendant's liability and an unlimited statute of limitations. Defendant treats the term 'Class Period' for purposes only of responding to these Interrogatories (*e.g.*, without admitting that any third-party source code was installed on Defendant's web properties at any particular time, without admitting liability, and without waiving any affirmative defenses), to mean the time period of October 19, 2016 through the filing of this Complaint because all of Plaintiff's claims arising before at least that date are barred by the statute of limitations.

13. Defendant objects to Plaintiff's definition of the term 'Data Disclosure" as the definition presumes a disclosure of Personal Health Information proximately caused by Defendant. Defendant treats the term 'Data Disclosure" for purposes of responding to these Interrogatories as defined except without regard to who was the proximate cause and without admitting that any disclosure contained Personal Health Information.

14. Defendant submits these responses and objections without conceding the relevancy or materiality of the subject matter of any request or of any document, or that any responsive materials exist.

15. Defendant's responses and objections are not intended to be, and shall not be construed as, agreement with Defendant's characterization of any facts, circumstances, or legal obligations. Defendant reserves the right to contest any such characterization as inaccurate. Defendant also objects to the requests to the extent they contain any express or implied assumptions of fact or law concerning matters at issue in this litigation.

16. Defendant objects to Plaintiff's definition of "Personal Health Information" ("PHI") as overbroad, unduly burdensome, and disproportionate to the needs of the case to the

extent it seeks discovery that is inconsistent with or seeks to impose requirements or obligations on Defendant beyond what is imposed by state and federal law, including the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and the Health Information Technology for Economic and Clinical Health Act ("HITECH"). Defendant further objects to Plaintiff's definition as overbroad and unduly burdensome because it purports to include Personally Identifiable Information ("PII") within the definition of PHI when the two are separate and distinct from one another. Defendant hereby incorporates these objections into each and every one of Plaintiff's definitions where the term "Personal Health Information" is included.

## RESPONSES TO REQUESTS FOR PRODUCTION

1. Documents sufficient to identify the number of unique patients, by year, treated by You during the Class Period.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson will produce non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

2. Documents sufficient to identify the number of unique patients, by year, who used Your patient portal during the Class Period.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects

that any request for portal-specific documents is overbroad and unduly burdensome because no advertising technology was installed on Defendant's patient portal, and attempting to collect and produce the requested information would take significant resources.

3. Documents sufficient to show the number of individuals whose Personal Health Information was disclosed to third parties including (but not limited to) Facebook during the Data Disclosure, including the residency of those individuals.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks documents that do not exist, is vague and ambiguous, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure, including because the requested information is not limited to patients and Massachusetts citizens. Defendant further objects because it contends that no Personal Health Information was disclosed to third parties.

Subject to and without waiving the foregoing objections, Defendant responds that it does not have possession, custody, or control of any documents that are responsive to this request.

Defendant further states that it is in possession of certain information relating to web traffic on its web pages but such information is not responsive to this request or to this request as limited to patients, relevant web pages, relevant Data, and Massachusetts citizens, including because it relates to unique device-browser combinations instead of unique individuals or patients; counts the same unique device-browser combination more than once including each and every time it accesses any web page, clears cookies, or changes IP address; counts robotic devices; counts based on approximate geographic location of device-browser combination not an individual's or patient's citizenship; and includes other significant counting errors precluding any accurate estimation of the number of unique individuals, patients, or Massachusetts individuals or patients who accessed certain of Defendants' web pages when certain technology was installed on those web pages.

Defendant is willing to meet and confer regarding the production of documents relating to web traffic.

4. All documents concerning Your use of the Meta Pixel on Your websites, including Your patient portal(s).

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson will produce all non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

5. Documents sufficient to identify each Affected Person whose Data and/or Personal Health Information was disclosed to Facebook via the Meta Pixel installed on Your websites, including Your patient portal(s).

**RESPONSE:** Deferred until amendment of this document, per agreement.

6. Documents sufficient to identify each Affected Person whose Data and/or Personal Health Information was disclosed to Google via code installed on Your websites, including Your patient portal(s).

**RESPONSE:** Deferred until amendment of this document, per agreement.

7. Documents sufficient to show each kind of Data being shared with Facebook when patients or potential patients use and/or interact with Your websites.

**RESPONSE:** Deferred until amendment of this document, per agreement.

8. Documents sufficient to show each kind of Data being shared with Google when patients or potential patients use and/or interact with Your websites.

**RESPONSE:** Deferred until amendment of this document, per agreement.

9. Documents sufficient to show each kind of Personal Health Information being shared with Facebook when patients or potential patients use and/or interact with Your websites, including Your patient portal(s).

**RESPONSE:** Deferred until amendment of this document, per agreement.

10. Documents sufficient to show each kind of Personal Health Information being shared with Google when patients or potential patients use and/or interact with Your websites, including Your patient portal(s).

**RESPONSE:** Deferred until amendment of this document, per agreement.

11. Documents sufficient to identify each and every employee, agent, or other persons acting on Your behalf who were wholly or partially responsible for:

a) The design of Your web properties;

b) The source code deployed on Your web properties;

c) website analytics and metrics for Your web properties

d) Internet marketing for You that utilized Your web properties in any way;

e) Other marketing for You that mentioned the web properties in any way.

**RESPONSE:** Deferred until amendment of this document, per agreement.

12. Documents sufficient to show the amount of web traffic to Your web properties and any patient portal(s) on such web properties during the Class Period.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects that any request for portal-specific documents is overbroad and unduly burdensome because no advertising technology was installed on Defendant's patient portal, and attempting to collect and produce the requested information would take significant resources.

Subject to and without waiving the foregoing objections, Defendant responds that that it is willing to meet and confer regarding the production of documents relating to web traffic.

13. Documents sufficient to show the number of unique visitors to Your web properties during the Class Period.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks documents that do not exist, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure, including because the requested information is not limited to patients, relevant web properties, relevant Data, and Massachusetts citizens.

Subject to and without waiving the foregoing objections, Defendant responds that it does not have possession, custody, or control of any documents that are responsive to this request.

Defendant further states that it is in possession of certain information relating to web traffic on its web pages but such information is not responsive to this request or to this request as limited to patients, relevant web pages, relevant Data, and Massachusetts citizens, including because it relates to unique device-browser combinations instead of unique individuals or patients; counts the same unique device-browser combination more than once including each and every time it accesses any web page, clears cookies, or changes IP address; counts robotic devices; counts based on approximate geographic location of device-browser combination not an individual's or patient's citizenship; and includes other significant counting errors precluding any accurate estimation of the number of unique individuals, patients, or Massachusetts individuals or patients who accessed certain of Defendants' web pages when certain technology was installed on those web pages. Defendant is willing to meet and confer regarding the production of documents relating to web traffic.

14. Documents sufficient to show the number of unique visitors to Your patient portal(s) during the Class Period.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to

lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects that any request for portal-specific documents is overbroad and unduly burdensome because no advertising technology was installed on Defendant's patient portal, and attempting to collect and produce the requested information would take significant resources.

15. Documents sufficient to show the number of Your patients who registered for Your patient portal(s) during the Class Period.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects that any request for portal-specific documents is overbroad and unduly burdensome because no advertising technology was installed on Defendant's patient portal, and attempting to collect and produce the requested information would take significant resources.

16. Documents sufficient to show the number of times that patients logged-in to Your patient portal(s) during the Class Period.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects that any request for portal-specific documents is overbroad and unduly burdensome because no advertising technology was installed on Defendant's patient portal, and attempting to collect and produce the requested information would take significant resources.

17. For each and every first-party cookie at any of Your web properties, including any patient portal(s) on said web properties, for the five years preceding the filing of this action, documents sufficient to show:

a) The cookie name;

b) What information is stored by the cookie;

c) When the cookie is first created;

d) When it is first set on a user's computer;

e) The expiration date for each cookie;

f) To what domain the cookie is set;

g) Whether the cookie value is disclosed to third-parties via cookie synching; and

h) The purpose of the cookie.

**RESPONSE:** Deferred until amendment of this document, per agreement.

18. Documents sufficient to show the first date on which You deployed third-party source code at any of Your web properties from any of the following third parties or its affiliates:

a) Face book;

b) Google;

c) Signal;

d) The Trade Desk;

e) Twitter;

f) Crazy Egg;

g) YouTube;

h) Any other third party not identified herein from whom You have deployed third party source code.

**RESPONSE:** Deferred until amendment of this document, per agreement.

19. All insurance policies, agreements, or by-laws under which any person may be liable to satisfy all or part of a judgment which may be entered in this action or to indemnify or reimburse You for payments made to satisfy any judgment, settlement, or expenses in connection with this action.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the

discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, in the event that insurance agreements may become applicable that may indemnify or reimburse Defendant for any payments made to satisfy any judgment in this action, and subject to the entry of a protective order and any objections and redactions, such agreements will be provided at the appropriate time in the litigation.

20. Any and all insurance policies that apply or that might arguably apply in this matter.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, in the event that insurance agreements may become applicable that may indemnify or reimburse Defendant for any payments made to satisfy any judgment in this action, and subject to the entry of a protective order and any objections and redactions, such agreements will be provided at the appropriate time in the litigation.

21. Any correspondence with any insurance company related to Plaintiff's claims, including any correspondence accepting or declining coverage and any reservation of right letters You have received related to this matter.

**RESPONSE:** Deferred until amendment of this document, per agreement.

22. All documents You referenced or relied upon to answer any Interrogatory or Requests for Admissions that Plaintiffs have served in this case.

**RESPONSE:** Deferred until amendment of this document, per agreement.

23. All exhibits that You propose to introduce in opposition to class certification or at the class certification hearing.

**RESPONSE:** Deferred until amendment of this document, per agreement.

24. All web-log or server-log data for the patient portal(s) page or section of any of Your web properties, including, but not limited to, https://www.emersonhospital.org/patientsvisitors/patient-portals.

**RESPONSE:** Deferred until amendment of this document, per agreement.

25. All web-log and server-log data containing information that a user or patient "Enrolled" in the patient portal of any of Your web properties.

**RESPONSE:** Deferred until amendment of this document, per agreement.

26. All web-log or server-log data containing information that a user or patient clicked to "Sign In" to the patient portal of any of Your web properties, including, but not limited to, https://www.emersonhospital.org/patients-visitors/patient-portals.

**RESPONSE:** Deferred until amendment of this document, per agreement.

27. All web-log or server-log data containing information that a user or patient clicked to log out of the patient portal of any of Your web properties.

**RESPONSE:** Deferred until amendment of this document, per agreement.

28. Any and all communications relating to Your general deployment, and/or use of third-party source code at any of Your web properties.

**RESPONSE:** Deferred until amendment of this document, per agreement.

29. All documents related to proposed and effectuated changes in third-party source code deployed at any of Your web properties in the five years preceding the filing of this action.

**RESPONSE:** Deferred until amendment of this document, per agreement.

30. All communications relating to adding, changing, or removing third-party source code deployed at any of Your web properties in the five years preceding the filing of this action.

**RESPONSE:** Deferred until amendment of this document, per agreement.

31. Documents sufficient to show each date on which any third-party source code was added, changed, or removed from any of Your web properties, including Your patient portal(s), in the five years preceding the filing of this action.

**RESPONSE:** Deferred until amendment of this document, per agreement.

32. For each and every third-party cookie value disclosed to or available to be accessed by any third party when communications are exchanged at any of Your web properties for the five years preceding the filing of this action, documents sufficient to show:

The cookie name;

The third-party entity to whom the cookie relates;

All third-party entities to whom information related to the cookie is disclosed or available to be accessed by;

a) The domain to which the cookie is set;

b) What information is stored by the cookie;

c) The purpose of the cookie;

d) How the cookie is used in relation to Defendant and its websites; and

e) Whether the cookie value is disclosed to others through cookie synching.

**RESPONSE:** Deferred until amendment of this document, per agreement.

33. All documents relating to disclosure of data to any third parties for marketing purposes via server-side disclosures, including but not limited to server-side disclosures to Facebook, Google, Signal, The Trade Desk, and Twitter.

**RESPONSE:** Deferred until amendment of this document, per agreement.

34. All documents relating to the deployment of the Facebook Tracking Pixel, Facebook Pixel, or Meta Pixel at any of Your web-properties, including Your patient portal(s).

**RESPONSE:** Deferred until amendment of this document, per agreement.

35. All documents relating to the deployment of any Facebook third-party source code other than the Face book Tracking Pixel, Face book Pixel, or Meta Pixel at any of Your web-properties.

**RESPONSE:** Deferred until amendment of this document, per agreement.

36. All documents relating to cookies associated with Facebook, including how they are deployed, accessed, disclosed, or used by Facebook or You at any of Your web properties, including but not limited to:

a) c_user;

b) datr;

c) fr;

d) Any other Facebook cookie that You permit Face book to set or access via any of Your web-properties.

**RESPONSE:** Deferred until amendment of this document, per agreement.

37. All documents relating to Facebook's use of cookies, IP addresses, device identifiers, and other data caused to be transmitted, disclosed, or accessed through Your deployment of Facebook third-party source code on Your web-properties.

**RESPONSE:** Deferred until amendment of this document, per agreement.

38. All documents relating to Facebook's receipt of cookies, IP addresses, device identifiers, and other data caused to be transmitted, disclosed, or accessed through Your deployment of Facebook third-party source code on Your web-properties.

**RESPONSE:** Deferred until amendment of this document, per agreement.

39. All documents relating to Your use of Custom Audiences through Face book.

**RESPONSE:** Deferred until amendment of this document, per agreement.

40. All communications between You and Facebook or its employees, agents, or assigns.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson will produce all non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

41. All contracts, agreements, memoranda of understanding, or other documents relating to the relationship between You and Facebook.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson will produce all non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

42. All non-disclosure or confidentiality agreements relating to Facebook and its collection of data at any of Your web properties, including www.emersonhospital.org.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson will produce all non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

43. All documents relating to Facebook's use of data collected and/or derived from Your deployment of Facebook third-party source code at any of Your web properties, including www.emersonhospital.org.

**RESPONSE:** Deferred until amendment of this document, per agreement.

44. All documents relating to Your use of Face book advertising tools in relation to any of Your web-properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson will produce all non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

45. All documents sufficient to show, during the Class Period, the total amount of money paid, or to be paid, to You from any third-party, including Facebook and Google, for the third-party's receipt of information from Your website.

**RESPONSE:** Deferred until amendment of this document, per agreement.

46. All documents relating to return on investment from marketing through Facebook.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson will produce all non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

47. All documents relating to return on investment from marketing through Google.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson will produce all non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

48. All documents relating to deployment and use of Google source code at any of Your web properties, including but not limited to Google DoubleClick, Google Analytics, and Google Ads.

**RESPONSE:** Deferred until amendment of this document, per agreement.

49. All documents relating to Your passing of data to Google.

**RESPONSE:** Deferred until amendment of this document, per agreement.

50. All source code deployed at any of Your web properties that causes the passing of data to Google.

**RESPONSE:** Deferred until amendment of this document, per agreement.

51. All documents relating to Your deployment and use of Google third-party source code at any of Your web properties, including but not limited to:

a) Google Analytics;

b) Google Ads;

c) Adservice. Google.com;

d) Google.com;

e) Google Doubleclick; and

f) YouTube.

**RESPONSE:** Deferred until amendment of this document, per agreement.

52. All documents relating to cookies associated with Google, Facebook, or other third-parties from whom You deploy tracking pixels ( or embedded source code), including documents sufficient to show how those cookies are deployed, accessed, disclosed or used by any of Your

web-properties, and documents sufficient to show the data such cookies enable, including but not limited to at least the following cookies:

a) _gads

b) _gadsID

c) sonar

d) _dpm_id

e) _fbp

f) aj s anonymous_ id

g) ajs_group_id

h) ajs_user_id

i) cto_lwid

j) DSID

k) id

l) permutive-id

m) permutive-session

n) rbuid

o) sm uuid

p) utma

q) utmb

r) utmc

s) utmz

t) SSID

u) SIDCC

v) SAPISID

w) OGPC

x) NID

y) HSID

z) DV

aa) APISID

bb) ANID

cc) IP JAR

dd) Secure-SSID

ee) Secure-HSID

ff) Secure-APISID

gg) _Secure-3P APISID

**RESPONSE:** Deferred until amendment of this document, per agreement.

53. All documents relating to the passing of values of putative first-party cookies to Google Analytics, including but not limited to cookies with the following names:

a) utma

b) utmb

c) utmc

d) utmz

**RESPONSE:** Deferred until amendment of this document, per agreement.

54. All communications between You and Google or its employees, agents, or assigns.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson will produce all non-privileged documents responsive to this request that are within its possession, custody or control

that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

55. All contracts, agreements, memoranda of understanding, or other documents relating to the relationship between You and Google.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson will produce all non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

56. All non-disclosure or confidentiality agreements relating to Google and its collection of data at any of Your web-properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson will produce all non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

57. All documents relating to Google's use or receipt of data collected and/or derived from Your deployment of Google third-party source code at or any of Your web-properties.

**RESPONSE:** Deferred until amendment of this document, per agreement.

58. All documents relating to Your use of Google advertising tools in relation to any of Your web-properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson will produce all non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

59. All documents relating to return on investment from marketing through Google or any of its affiliates.

**RESPONSE:** Deferred until amendment of this document, per agreement.

60. All Your HIP AA notices and privacy policy notices in effect during the Class Period.

**RESPONSE:** Deferred until amendment of this document, per agreement.

61. All purported Privacy Policies in effect at any of Your web properties (including www.emersonhospital.org) from the date You first deployed any third-party source code from Facebook, Google, or any other third party. If the Privacy Policy changed at any point in time from the date referenced to the present, produce all Privacy Policies used and the dates those policies were in effect. If the links to the Privacy Policy or presentation thereof have changed at any point in time from the date reference to the present, produce duplications of each such presentation.

**RESPONSE:** Deferred until amendment of this document, per agreement.

62. Documents sufficient to show Your organizational and management structure including, but not limited to, organizational charts and employee directories for the Class Period.

**RESPONSE:** Deferred until amendment of this document, per agreement.

63. All written authorizations from any Affected Person authorizing You to share their Personal Health Information with Facebook.

**RESPONSE:** Deferred until amendment of this document, per agreement.

64. All written authorizations from any Affected Person authorizing You to share their Personal Health Information with Google.

**RESPONSE:** Deferred until amendment of this document, per agreement.

65. All written authorizations from any Affected Person authorizing You to share their Personal Health Information with any third party for marketing purposes.

**RESPONSE:** Deferred until amendment of this document, per agreement.

66. All exhibits that You propose to introduce in opposition to class certification or at the class certification hearing.

**RESPONSE:** Deferred until amendment of this document, per agreement.

67. Any documents reviewed, consulted, used, or relied upon by any expert that You intend to use on any issue related to class certification.

**RESPONSE:** Deferred until amendment of this document, per agreement.

68. All contracts between You and Plaintiff.

**RESPONSE:** Deferred until amendment of this document, per agreement.

69. All documents relating or referring to Plaintiff.

**RESPONSE:** Deferred until amendment of this document, per agreement.

70. All documents relating to data disclosures that You provided to Plaintiff.

**RESPONSE:** Deferred until amendment of this document, per agreement.

71. Any and all documents that You contend show that You had prior express consent to disclose any of Plaintiff's personally identifiable information and communications exchanged with You to any third-party internet tracking companies including, but not limited to, Facebook, Google, Signal, Trade Desk, or Twitter.

**RESPONSE:** Deferred until amendment of this document, per agreement.

72. All documents relating to the manner, method, and means by which You contend Plaintiff purportedly consented to the disclosure of their personally identifiable information and communications exchanged with You to third-party internet tracking companies including, but not limited to Facebook, Google, Signal, Trade Desk, or Twitter.

**RESPONSE:** Deferred until amendment of this document, per agreement.

73. All documents relating to Your disclosure to third parties of any data about the Plaintiff.

**RESPONSE:** Deferred until amendment of this document, per agreement.

74. All documents relating to Plaintiff conveyed from You to Facebook, Google, Signal, Trade Desk, Twitter, or any other third-party marketing company, regardless of the form or method of the conveyance or disclosure.

**RESPONSE:** Deferred until amendment of this document, per agreement.

75. For the following entities, all documents relating to the responsibilities of the entity as it relates to Your web properties and/or marketing, including but not limited to contracts, memorandums of understanding, indemnification agreements, and non-disclosure agreements:

a) Influence Health, Inc.;

b) Healthgrades;

c) Face book;

d) Google;

e) Signal;

f) The Trade Desk

g) Any other person not identified but which has responsibilities relating to Your web properties or marketing.

**RESPONSE:** Deferred until amendment of this document, per agreement.

76. For the following entities, all communications with the entity and any of its employees, agents, or assigns relating to the deployment or use of third-party source code at Defendant's web properties:

a) Influence Health, Inc.;

b) Healthgrades;

c) Facebook;

d) Google;

e) YouTube;

f) Signal;

g) The Trade Desk

h) Any other entity not identified but which has responsibilities relating to Your web properties or marketing.

**RESPONSE:** Deferred until amendment of this document, per agreement.

77. All documents relating to any communication to enroll or log in to the patient portal from any page at any of Your web properties, including documents with aggregate information and documents with specific information about any individual or computing device, including but not limited to names, email addresses, IP addresses, cookie identifiers, or any other unique identifiers associated with the enrollment or login. This request encompasses any data available to You that is available to You in the possession of a related entity or parent organization, or contractor or agent.

**RESPONSE:** Deferred until amendment of this document, per agreement.

78. All documents relating to any communication to enroll or log in to the patient portal from any page at any of Your web properties, including documents with aggregate information and documents with specific information about any individual or computing device, including but not limited to names, email addresses, IP addresses, cookie identifiers, or any other unique identifiers associated with the enrollment or login. This request encompasses any data available to You that is available to You in the possession of a related entity or parent organization, or contractor or agent.

**RESPONSE:** Deferred until amendment of this document, per agreement.

79. All documents relating to any telephone request to enroll in Your patient portal(s) on any of Your web properties, including but not limited to names, email addresses, IP addresses, cookie identifiers, or any other unique identifiers associated with Enrollment or Login arising from such request to enroll.

**RESPONSE:** Deferred until amendment of this document, per agreement.

80. All documents relating to any in-person request to enroll in Your patient portal(s) on any of Your web properties, including but not limited to names, email addresses, IP addresses, cookie identifiers, or any other unique identifiers associated with Enrollment or Login arising from such request to enroll.

**RESPONSE:** Deferred until amendment of this document, per agreement.

81. All third-party source code deployed at any ofY our web properties during the Class Period.

**RESPONSE:** Deferred until amendment of this document, per agreement.

82. All documents relating to any meeting(s) (including but not limited to agendas, minutes, summaries, and notes) relating to third-party source code or the disclosure of information

about patients/user who exchange communications at any of Your web properties, including but not limited to meeting(s) with representatives or agents of:

a) Face book;

b) Google;

c) Signal;

d) The Trade Desk;

e) Twitter;

f) Any other third party not identified herein from whom You have deployed thirdparty source code.

**RESPONSE:** Deferred until amendment of this document, per agreement.

83. All documents relating to Your use of cookie synching with third parties at any of Your web properties.

**RESPONSE:** Deferred until amendment of this document, per agreement.

84. All documents relating to the Meta Pixel parameter 'ev' or Meta Events Manager, including all event data associated with any of Your web-properties.

**RESPONSE:** Deferred until amendment of this document, per agreement.

85. All documents relating to the Meta Event with the value of 'SubscribedButtonClick' including associated settings and how it is used at any of Your web properties.

**RESPONSE:** Deferred until amendment of this document, per agreement.

86. All documents relating to the cookie '_ fbp', including how it is deployed and used by Facebook or by You.

**RESPONSE:** Deferred until amendment of this document, per agreement.

87. All documents relating to Your use of cookie synching with Face book.

**RESPONSE:** Deferred until amendment of this document, per agreement.

88. All documents relating to Your use of cross-device tracking by Facebook.

**RESPONSE:** Deferred until amendment of this document, per agreement.

89. All documents relating to website scraping by Facebook.

**RESPONSE:** Deferred until amendment of this document, per agreement.

90. All documents relating to POST requests from users to Facebook being triggered even when the user does not fill out a form or take an affirmative action to submit data to You or Facebook.

**RESPONSE:** Deferred until amendment of this document, per agreement.

91. All documents relating to any Facebook Javascript file(s) deployed at any of Your web properties, including Your patient portal(s).

**RESPONSE:** Deferred until amendment of this document, per agreement.

92. All documents relating to the value of the data disclosed to third parties including, but not limited to, documents relating to:

a) any compensation provided or received, monetary or otherwise, for conveymg information to a third party, including but not limited to, Facebook, Google, Signal, The Trade Desk, and Twitter.

b) any internal analysis regarding the value of privacy;

c) any internal analysis regarding the value of patient data to You;

d) the privacy policy, privacy promises, and/or general privacy and impression by users and/or the general public;

e) any internal analysis of the value of Your use of any or all third-party source code for marketing or other purposes.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson will produce all non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

93. All documents relating to the value You place on data disclosed to Face book.

**RESPONSE:** Deferred until amendment of this document, per agreement.

94. All documents relating to the value You place on the use of the Facebook Tracking Pixel, Facebook Pixel, or Meta Pixel.

**RESPONSE:** Deferred until amendment of this document, per agreement.

95. All documents relating to Your use of cookie synching with Google.

**RESPONSE:** Deferred until amendment of this document, per agreement.

96. All documents relating to data sharing or transmissions between Google and Facebook facilitated in whole or in part via any of Your web properties, whether directly through Google or an affiliate such as DoubleClick.

**RESPONSE:** Deferred until amendment of this document, per agreement.

97. All documents relating to the deployment and use of a Meta Pixel ID through any Google property.

**RESPONSE:** Deferred until amendment of this document, per agreement.

98. All documents relating to Your use of cookie synching with Google or any of its affiliates.

**RESPONSE:** Deferred until amendment of this document, per agreement.

99. All documents relating to Your use of cross-device tracking by Google or any of its affiliates.

**RESPONSE:** Deferred until amendment of this document, per agreement.

100. All documents relating to website scraping by Google.

**RESPONSE:** Deferred until amendment of this document, per agreement.

101. All documents relating to Google's use of cookies, IP addresses, device identifiers, and other data caused to be transmitted, disclosed, or accessed through Defendant's deployment of Google third-party source code.

**RESPONSE:** Deferred until amendment of this document, per agreement.

102. All documents relating to Google's receipt of cookies, IP addresses, device identifiers, and other data caused to be transmitted, disclosed, or accessed through Defendant's deployment of Google third-party source code.

**RESPONSE:** Deferred until amendment of this document, per agreement.

103. All documents relating to the value of the data disclosed or transmitted to Face book relating to any of Your web-properties.

**RESPONSE:** Deferred until amendment of this document, per agreement.

104. All documents relating to the value You place on use of Google marketing tools deployed at any of Your web-properties.

**RESPONSE:** Deferred until amendment of this document, per agreement.

105. All documents relating to Your deployment and use of The Bright Tag or Signal third-party source code (hereafter "Signal") at any of Your web properties.

**RESPONSE:** Deferred until amendment of this document, per agreement.

106. All documents relating to Your use of cookie synching with Signal.

**RESPONSE:** Deferred until amendment of this document, per agreement.

107. All documents relating to Your use of cross-device tracking by Signal.

**RESPONSE:** Deferred until amendment of this document, per agreement.

108. All documents relating to cookies associated with Signal, including how they are deployed, accessed, disclosed or used by Signal or by any of Your web properties, including but not limited to 'vcnid.'

**RESPONSE:** Deferred until amendment of this document, per agreement.

109. All documents relating to website scraping by Signal.

**RESPONSE:** Deferred until amendment of this document, per agreement.

110. All documents relating to Signals use of cookies, IP addresses, device identifiers, and other data caused to be transmitted, disclosed, or accessed through Your deployment of Signal third party source code.

**RESPONSE:** Deferred until amendment of this document, per agreement.

111. All communications between You and Signal or its employees, agents, or assigns.

**RESPONSE:** Deferred until amendment of this document, per agreement.

112. All contracts, agreements, memoranda of understanding, or other documents relating to the relationship between You and Signal relating to any of Your web-properties.

**RESPONSE:** Deferred until amendment of this document, per agreement.

113. All non-disclosure or confidentiality agreements relating to Signal and its collection of data at or any of Your web-properties.

**RESPONSE:** Deferred until amendment of this document, per agreement.

114. All documents relating to Signal's use of data collected and/or derived from Your deployment of Signal third-party source code at any of Your web-properties.

**RESPONSE:** Deferred until amendment of this document, per agreement.

115. All documents relating to Your use of Signal advertising tools in relation to any of Your web-properties.

**RESPONSE:** Deferred until amendment of this document, per agreement.

116. All documents relating to the value of the data disclosed or transmitted to Signal relating to or any of Your web-properties.

**RESPONSE:** Deferred until amendment of this document, per agreement.

117. All documents relating to the value You place on use of Signal marketing tools deployed at or any of Your web-properties.

**RESPONSE:** Deferred until amendment of this document, per agreement.

118. All documents relating to return on investment from marketing through Signal or any of its affiliates.

**RESPONSE:** Deferred until amendment of this document, per agreement.

119. All documents relating to Your deployment and use of Trade Desk third-party source code at any of Your web-properties.

**RESPONSE:** Deferred until amendment of this document, per agreement.

120. All documents relating to Your use of cookie synching with Trade Desk.

**RESPONSE:** Deferred until amendment of this document, per agreement.

121. All documents relating to Your use of cross-device tracking by Trade Desk.

**RESPONSE:** Deferred until amendment of this document, per agreement.

122. All documents relating to cookies associated with Trade Desk, including how they are deployed, accessed, disclosed or used by Trade Desk or by You at any of Your web-properties.

**RESPONSE:** Deferred until amendment of this document, per agreement.

123. All documents relating to website scraping by Trade Desk.

**RESPONSE:** Deferred until amendment of this document, per agreement.

124. All documents relating to Trade Desk's use of cookies, IP addresses, device identifiers, and other data caused to be transmitted, disclosed, or accessed through Your deployment of Trade Desk third-party source code.

**RESPONSE:** Deferred until amendment of this document, per agreement.

125. All communications between You and Trade Desk or its employees, agents, or assigns.

**RESPONSE:** Deferred until amendment of this document, per agreement.

126. All contracts, agreements, memoranda of understanding, or other documents relating to the relationship between You and Trade Desk relating to any of Your web-properties.

**RESPONSE:** Deferred until amendment of this document, per agreement.

127. All non-disclosure or confidentiality agreements relating to Trade Desk and its collection of data at or any of Your web-properties.

**RESPONSE:** Deferred until amendment of this document, per agreement.

128. All documents relating to Trade Desk's use of data collected and/or derived from Your deployment of Trade Desk third-party source code at any of Your web-properties.

**RESPONSE:** Deferred until amendment of this document, per agreement.

129. All documents relating to Your use of Trade Desk advertising tools in relation to any of Your web-properties.

**RESPONSE:** Deferred until amendment of this document, per agreement.

130. All documents relating to the value of the data disclosed or transmitted to Trade Desk relating to any of Your web-properties.

**RESPONSE:** Deferred until amendment of this document, per agreement.

131. All documents relating to the value You place on use of Trade Desk marketing tools deployed at or any of Your web-properties.

**RESPONSE:** Deferred until amendment of this document, per agreement.

132. All documents relating to return on investment from marketing through use of Trade Desk or any of its affiliates.

**RESPONSE:** Deferred until amendment of this document, per agreement.

133. All documents relating to Your policies for the destruction of records, documents, or files.

**RESPONSE:** Deferred until amendment of this document, per agreement.

134. All documents relating to Your document backup policies or procedures.

**RESPONSE:** Deferred until amendment of this document, per agreement.

135. All documents relating to Your backup of electronic data relevant to this matter including, but not limited to, lists or descriptions of all media formats utilized, software and hardware versions, build numbers and other related information You used to backup any of the data stored on archive or backup media with respect to documents relating to this request.

**RESPONSE:** Deferred until amendment of this document, per agreement.

136. All diagrams depicting Your email system architecture including, but not limited to, physical server locations and mail store configurations.

**RESPONSE:** Deferred until amendment of this document, per agreement.

137. Documents sufficient to show for each and every previous instance of an alleged or reported HIP AA violation by You, the nature of the HIP AA violation, the number of patients impacted by the violation, and the notice sent to patients informing them of the violation.

**RESPONSE:** Deferred until amendment of this document, per agreement.

138. Documents sufficient to show each and every individual medical provider profile displayed at any of Your web properties during the Class Period.

**RESPONSE:** Deferred until amendment of this document, per agreement.

139. Documents sufficient to show each and every individual medical provider associated with the appointment scheduling functionality at any of Your web properties during the Class Period.

**RESPONSE:** Deferred until amendment of this document, per agreement.

140. Documents sufficient to show the database schema, including but not limited to tables, fields, and indexes, of any database in which You obtain, return, store, maintain, access, view, or communicate records of visits to www.emersonhospital.org or Your patient portal(s).

**RESPONSE:** Deferred until amendment of this document, per agreement.

141. Documents sufficient to show how any database in which You obtain, return, store, maintain, access, view, or communicate records of visits to www.emersonhospital.org or Your patient portal(s) may be queried.

**RESPONSE:** Deferred until amendment of this document, per agreement.

142. All documents and communications concerning Your policies and procedures regarding the collection and retention of Personal Health Information from website visitors, patients, and potential patients, including, but not limited to, specific Data collected and retained, and length of time Personal Health Information is retained, as well as any procedures in place to ensure that these policies and procedures were and are being followed.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects because it contends that no Personal Health Information was disclosed to third parties.

Subject to and without waiving the foregoing objections, Emerson will produce all non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

143. All documents and communications concerning or comprising Your policies and procedures regarding the safeguarding and protection of Personal Health Information and other Data provided by visitors to Your websites, including, but not limited to, Your costs associated therewith, as well as any procedures, practices, and training in place to ensure that these policies and procedures were and are being followed during the relevant period.

**RESPONSE:** Deferred until amendment of this document, per agreement.

144. All documents and communications concerning or comprising any representations You made to Your current and former patients regarding the protection and security of Personal Health Information and other Data from visitors to Your websites, including, but not limited to, compliance with any state or federal privacy or information security laws or regulations.

**RESPONSE:** Deferred until amendment of this document, per agreement.

145. All documents and communications concerning or comprising any remedial steps You took during or following Your discovery of the Data Disclosure.

**RESPONSE:** Deferred until amendment of this document, per agreement.

146. All documents concerning or comprising communications between You and any governmental entities that relate to Your policies, procedures, protocols, or practices for safeguarding and protecting Personal Health Information, and/or regarding the Data Disclosure.

**RESPONSE:** Deferred until amendment of this document, per agreement.

147. All documents regarding Your compliance or noncompliance with any applicable Data security guidelines or standards.

**RESPONSE:** Deferred until amendment of this document, per agreement.

148. All documents related to Your policies and procedures to prevent, detect, contain, or remediate information security incidents, such as unauthorized access to or disclosure of Personal Health Information, as well as documents concerning compliance or non-compliance with those policies and procedures.

**RESPONSE:** Deferred until amendment of this document, per agreement.

149. All documents concerning assessments or analyses regarding the potential risks or vulnerabilities to the confidentiality, integrity, and availability of Personal Health Information in Your Health Information Systems, as well as any decisions or efforts to address or remediate any identified risks.

**RESPONSE:** Deferred until amendment of this document, per agreement.

150. Documents sufficient to identify all vendors or consultants You hired, or from whom You sought proposals for cybersecurity matters and/or safeguarding and protecting Personal Health Information provided by visitors to Your websites.

**RESPONSE:** Deferred until amendment of this document, per agreement.

151. Documents sufficient to show your IT, cybersecurity, and overall operating budgets.

**RESPONSE:** Deferred until amendment of this document, per agreement.

152. All documents related to Your data security awareness and training programs for members of Your workforce, including independent contractors, including, but not limited to, names and titles of individuals conducting trainings, training manuals, course materials, topics covered, agendas, notes, and presentations.

**RESPONSE:** Deferred until amendment of this document, per agreement.

153. All documents related to enforcement of Your information security policies and procedures, including records of sanctions for noncompliance with those policies and procedures.

**RESPONSE:** Deferred until amendment of this document, per agreement.

154. All documents concerning Your policies and procedures for encryption and decryption of Personal Health Information and documents reflecting that these policies and procedures were and are being followed.

**RESPONSE:** Deferred until amendment of this document, per agreement.

155. Documents sufficient to show how You identified that the Data Disclosure occurred, including, but not limited to, how You determined that the security of former and current patients' Data was disclosed to third parties including but not limited to Facebook, what data was disclosed, the dates on which You became aware of the disclosure, why the disclosure occurred, and any cybersecurity measures or precautions You have implemented in response to the Data Disclosure.

**RESPONSE:** Deferred until amendment of this document, per agreement.

156. All reports or other documents regarding Your investigation and documentation of the Data Disclosure and its consequences or Your response to the Data Disclosure, including, but not limited to, the cause of the Data Disclosure, the information compromised during the Data Disclosure, the number of Affected Persons, remedial measures taken, changes implemented and details regarding such measures and changes such as when the changes took place or will take place, and who implemented or will implement the changes.

**RESPONSE:** Deferred until amendment of this document, per agreement.

157. All documents detailing any recommendations made or actions taken to notify Affected persons, government entities, or the public of the Data Disclosure before June 2022, including, but not limited to, the date on which those recommendations were made or actions were taken and the reasons why notification to Affected persons, government entities, or the public was delayed.

**RESPONSE:** Deferred until amendment of this document, per agreement.

158. All documents and communications concerning assessments of potential Health Information System vendors.

**RESPONSE:** Deferred until amendment of this document, per agreement.

159. All documents and communications sufficient to identify all vendors or consultants You hired or from whom You sought proposals for Health Information Systems.

**RESPONSE:** Deferred until amendment of this document, per agreement.

160. All documents and communications concerning how Personal Health Information is stored in Health Information Systems, including but not limited to patient portals.

**RESPONSE:** Deferred until amendment of this document, per agreement.

161. All documents and communications concerning the encryption or safeguarding of Personal Health Information in Health Information Systems such as patient portals.

**RESPONSE:** Deferred until amendment of this document, per agreement.

162. All documents concerning policies and procedures regarding the means of access to Your Health Information Systems (including but not limited patient portals) given by You to third parties.

**RESPONSE:** Deferred until amendment of this document, per agreement.

163. All documents and communications showing analyses regarding whether Health Information Systems such as patient portals improve patient care.

**RESPONSE:** Deferred until amendment of this document, per agreement.

Dated: June 20, 2023

**EMERSON HOSPITAL**


*/s/ Emyr T. Remy*
Tammy B. Webb (*pro hac vice* forthcoming)
tbwebb@shb.com
SHOOK, HARDY, & BACON L.L.P.
555 Mission Street, Suite 2300
San Francisco, CA 94105
Tel: (415) 544-1900 | Fax: (415) 391-0281

Emyr T. Remy (BBO # 704156)
remy@shb.com
SHOOK, HARDY & BACON L.L.P.
One Federal Street, Suite 2540
Boston, MA 02110
Tel: (617) 531-1411 | Fax: (617) 531-1602

Alfred J. Saikali (*pro hac vice* forthcoming)
asaikali@shb.com
SHOOK, HARDY & BACON L.L.P.
201 South Biscayne Blvd., Suite 3200
Miami, Florida 33131
Tel: (305) 358-5171 | Fax: (305) 358-7470

Justin R. Donoho (*pro hac vice* forthcoming)
jdonoho@shb.com
SHOOK, HARDY & BACON L.L.P.
111 South Wacker Drive
Chicago, IL 60606
Tel: (312) 704-7713 | F: (312) 558-1195

Jessica N. Wahl (*pro hac vice* forthcoming)
jwahl@shb.com
SHOOK, HARDY & BACON L.L.P.
2049 Century Park East, Suite 3000
Los Angeles, CA 90067
T: (424) 285-8330 | F: (424) 204-9093

Jenn O. Hatcher (*pro hac vice*)
jhatcher@shb.com
SHOOK, HARDY & BACON L.L.P.
2555 Grand Blvd.
Kansas City, MO 64108
T: (816) 474-6550 | F: (816) 421-5547

**CERTIFICATE OF SERVICE**

I hereby certify that on June 20, 2023, I served DEFENDANT EMERSON HOSPITAL'S RESPONSES TO PLAINTIFF JOHN DOE'S FIRST AND SECOND SETS OF REQUESTS FOR PRODUCTION OF DOCUMENTS, via electronic mail, to the following counsel of record:

J. Tucker Merrigan (BBO# 681627)
Victoria Santoro (BBO# 679120)
Erin E, McHugh (BBO# 703701)
**SWEENEY MERRIGAN LAW**
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com
*Attorneys for Plaintiff*

Foster C. Johnson (*pro hac vice forthcoming*)
David Warden (*pro hac vice forthcoming*)
Nathan Campbell (*pro hac vice forthcoming*)
**AHMAD, ZAVITSANOS & MENSING, P.C.**
1221 McKinney St., Suite 3460
Houston, TX 77010
Tel: (713) 655-1101
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com
*Attorneys for Plaintiff*

Seth Meyer (*pro hac vice forthcoming*)
Alex Dravillas (*pro hac vice forthcoming*)
**KELLER POSTMAN LLC**
150 N. Riverside Plaza, Suite 4100
Chicago, IL 60606
Tel: (312) 741-5220
sam@kellerpostman.com
adj@kellerpostman.com
*Attorney for Plaintiff*

*/s/ Emyr T. Remy*
Emyr T. Remy

# Exhibit D

EXHIBIT D

COMMONWEALTH OF MASSACHUSETTS

**ESSEX, S.S.**

**TRIAL COURT DEPARTMENT**
**SUPERIOR COURT**

JOHN DOE, individually and on behalf of all other similarly situated,

Plaintiff,

v.

EMERSON HOSPITAL,

Defendant.

DOCKET NO. 2277CV01000D

**DEFENDANT EMERSON HOSPITAL'S FIRST AMENDED RESPONSES TO PLAINTIFF JOHN DOE'S FIRST AND SECOND SETS OF REQUESTS FOR PRODUCTION OF DOCUMENTS**

Defendant Emerson Hospital ("Emerson"), by and through its undersigned counsel, hereby serves its First Amended Responses to Plaintiff John Doe's ("Plaintiff") First and Second Sets of Requests for Production of Documents pursuant to Massachusetts Rules of Civil Procedure Rule 34 and Massachusetts Superior Court Rule 30(A), for purposes of this action only, reserving the right to supplement and amend, as follows:

**GENERAL OBJECTIONS**

Defendant incorporates the following general objections in response to each request for production of documents, in addition to the specifically stated objections:

1. Defendant objects to these requests to the extent that they are vague, overbroad, unduly burdensome, and impose obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

2. Defendant objects to these requests to the extent that they seek information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence.

3. Defendant objects to these requests to the extent that they seek documents that were prepared for or in anticipation of litigation, or that are protected from disclosure by the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege, protection, or immunity.

4. The inadvertent production or disclosure of any privileged documents or information shall not constitute or be deemed to be a waiver of any applicable privilege with respect to such document or information (or the contents or subject matter thereof) or with respect to any other such document or discovery now or hereafter requested or provided. Defendant reserves the right not to produce documents that are in part protected by privilege, except on a redacted basis, and to require the return of any document (and all copies thereof) inadvertently produced.

5. Defendant does not waive the right to object, on any and all grounds, to (i) the evidentiary use of documents produced in response to these requests, and (ii) discovery requests relating to those documents.

6. Defendant objects to these requests to the extent that they seek documents not in Defendant's possession, custody, or control.

7. Defendant objects to these requests to the extent they call for the creation of documents not already in existence.

8. Defendant objects to these requests to the extent they seek documents that are publicly available or otherwise already in Plaintiff's possessions, custody, or control or equally accessible to Plaintiffs.

9. Defendant objects to these requests to the extent they seek documents beyond those agreed to between the parties such as with the use of agreed search terms.

10. Defendant objects to the definition of terms to the extent that it conflicts with the uniform definitions contained in Superior Court Rule 30A(1)(C).

11. Defendant objects to Plaintiff's definition of the terms "Data", "Health Information Systems", and 'Personal Health Information' as they are vague, ambiguous, and overbroad.

12. Defendant objects to Plaintiff's definition of the term 'Class Period' as the definition presumes Defendant's liability and an unlimited statute of limitations. Defendant treats the term 'Class Period' for purposes only of responding to these Interrogatories (*e.g.*, without admitting that any third-party source code was installed on Defendant's web properties at any particular time, without admitting liability, and without waiving any affirmative defenses), to mean the time period of October 19, 2016 through the filing of this Complaint because all of Plaintiff's claims arising before at least that date are barred by the statute of limitations.

13. Defendant objects to Plaintiff's definition of the term 'Data Disclosure" as the definition presumes a disclosure of Personal Health Information proximately caused by Defendant. Defendant treats the term 'Data Disclosure" for purposes of responding to these Interrogatories as defined except without regard to who was the proximate cause and without admitting that any disclosure contained Personal Health Information.

14. Defendant submits these responses and objections without conceding the relevancy or materiality of the subject matter of any request or of any document, or that any responsive materials exist.

15. Defendant's responses and objections are not intended to be, and shall not be construed as, agreement with Defendant's characterization of any facts, circumstances, or legal obligations. Defendant reserves the right to contest any such characterization as inaccurate. Defendant also objects to the requests to the extent they contain any express or implied assumptions of fact or law concerning matters at issue in this litigation.

16. Defendant objects to Plaintiff's definition of "Personal Health Information" ("PHI") as overbroad, unduly burdensome, and disproportionate to the needs of the case to the

extent it seeks discovery that is inconsistent with or seeks to impose requirements or obligations on Defendant beyond what is imposed by state and federal law, including the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and the Health Information Technology for Economic and Clinical Health Act ("HITECH"). Defendant further objects to Plaintiff's definition as overbroad and unduly burdensome because it purports to include Personally Identifiable Information ("PII") within the definition of PHI when the two are separate and distinct from one another. Defendant hereby incorporates these objections into each and every one of Plaintiff's definitions where the term "Personal Health Information" is included.

## RESPONSES TO REQUESTS FOR PRODUCTION

1. Documents sufficient to identify the number of unique patients, by year, treated by You during the Class Period.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson will produce non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

2. Documents sufficient to identify the number of unique patients, by year, who used Your patient portal during the Class Period.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects

that any request for portal-specific documents is overbroad and unduly burdensome because no advertising technology was installed on Defendant's patient portal, and attempting to collect and produce the requested information would take significant resources.

3. Documents sufficient to show the number of individuals whose Personal Health Information was disclosed to third parties including (but not limited to) Facebook during the Data Disclosure, including the residency of those individuals.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks documents that do not exist, is vague and ambiguous, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure, including because the requested information is not limited to patients and Massachusetts citizens. Defendant further objects because it contends that no Personal Health Information was disclosed to third parties.

Subject to and without waiving the foregoing objections, Defendant responds that it does not have possession, custody, or control of any documents that are responsive to this request.

Defendant further states that it is in possession of certain information relating to web traffic on its web pages but such information is not responsive to this request or to this request as limited to patients, relevant web pages, relevant Data, and Massachusetts citizens, including because it relates to unique device-browser combinations instead of unique individuals or patients; counts the same unique device-browser combination more than once including each and every time it accesses any web page, clears cookies, or changes IP address; counts robotic devices; counts based on approximate geographic location of device-browser combination not an individual's or patient's citizenship; and includes other significant counting errors precluding any accurate estimation of the number of unique individuals, patients, or Massachusetts individuals or patients who accessed certain of Defendants' web pages when certain technology was installed on those web pages.

Defendant is willing to meet and confer regarding the production of documents relating to web traffic.

4. All documents concerning Your use of the Meta Pixel on Your websites, including Your patient portal(s).

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson will produce all non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

5. Documents sufficient to identify each Affected Person whose Data and/or Personal Health Information was disclosed to Facebook via the Meta Pixel installed on Your websites, including Your patient portal(s).

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks documents that do not exist, is vague and ambiguous, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure, including because the requested information is not limited to Massachusetts citizens. Defendant further objects because it contends that no Personal Health Information was disclosed to Facebook. Defendant further objects that no advertising technology was installed on Defendant's patient portal.

6. Documents sufficient to identify each Affected Person whose Data and/or Personal Health Information was disclosed to Google via code installed on Your websites, including Your patient portal(s).

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks documents that do not exist, is vague and ambiguous, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure, including because the requested information is not limited to Massachusetts citizens. Defendant further objects because it contends that no Personal Health Information was disclosed to Google. Defendant further objects that no advertising technology was installed on Defendant's patient portal.

7. Documents sufficient to show each kind of Data being shared with Facebook when patients or potential patients use and/or interact with Your websites.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

8. Documents sufficient to show each kind of Data being shared with Google when patients or potential patients use and/or interact with Your websites.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession,

custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

9. Documents sufficient to show each kind of Personal Health Information being shared with Facebook when patients or potential patients use and/or interact with Your websites, including Your patient portal(s).

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects because it contends that no Personal Health Information was shared with Facebook. Defendant further objects that no advertising technology was installed on Defendant's patient portal.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

10. Documents sufficient to show each kind of Personal Health Information being shared with Google when patients or potential patients use and/or interact with Your websites, including Your patient portal(s).

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects because it contends that no Personal Health Information was shared with Google. Defendant further objects that no advertising technology was installed on Defendant's patient portal.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

11. Documents sufficient to identify each and every employee, agent, or other persons acting on Your behalf who were wholly or partially responsible for:

a) The design of Your web properties;

b) The source code deployed on Your web properties;

c) website analytics and metrics for Your web properties

d) Internet marketing for You that utilized Your web properties in any way;

e) Other marketing for You that mentioned the web properties in any way.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks documents that do not exist, is vague and ambiguous, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

12. Documents sufficient to show the amount of web traffic to Your web properties and any patient portal(s) on such web properties during the Class Period.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Defendant further objects that any request for portal-specific documents is overbroad and unduly burdensome because no advertising technology was installed on Defendant's patient portal, and attempting to collect and produce the requested information would take significant resources.

Subject to and without waiving the foregoing objections, Defendant responds that that it is willing to meet and confer regarding the production of documents relating to web traffic.

13. Documents sufficient to show the number of unique visitors to Your web properties during the Class Period.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks documents that do not exist, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure, including because the requested information is not limited to patients, relevant web properties, relevant Data, and Massachusetts citizens.

Subject to and without waiving the foregoing objections, Defendant responds that it does not have possession, custody, or control of any documents that are responsive to this request.

Defendant further states that it is in possession of certain information relating to web traffic on its web pages but such information is not responsive to this request or to this request as limited to patients, relevant web pages, relevant Data, and Massachusetts citizens, including because it relates to unique device-browser combinations instead of unique individuals or patients; counts the same unique device-browser combination more than once including each and every time it accesses any web page, clears cookies, or changes IP address; counts robotic devices; counts based on approximate geographic location of device-browser combination not an individual's or patient's citizenship; and includes other significant counting errors precluding any accurate estimation of the number of unique individuals, patients, or Massachusetts individuals or patients who accessed certain of Defendants' web pages when certain technology was installed on those web pages.

Defendant is willing to meet and confer regarding the production of documents relating to web traffic.

14. Documents sufficient to show the number of unique visitors to Your patient portal(s) during the Class Period.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects that any request for portal-specific documents is overbroad and unduly burdensome because no advertising technology was installed on Defendant's patient portal, and attempting to collect and produce the requested information would take significant resources.

15. Documents sufficient to show the number of Your patients who registered for Your patient portal(s) during the Class Period.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects that any request for portal-specific documents is overbroad and unduly burdensome because no advertising technology was installed on Defendant's patient portal, and attempting to collect and produce the requested information would take significant resources.

16. Documents sufficient to show the number of times that patients logged-in to Your patient portal(s) during the Class Period.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and

imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects that any request for portal-specific documents is overbroad and unduly burdensome because no advertising technology was installed on Defendant's patient portal, and attempting to collect and produce the requested information would take significant resources.

17. For each and every first-party cookie at any of Your web properties, including any patient portal(s) on said web properties, for the five years preceding the filing of this action, documents sufficient to show:

a) The cookie name;

b) What information is stored by the cookie;

c) When the cookie is first created;

d) When it is first set on a user's computer;

e) The expiration date for each cookie;

f) To what domain the cookie is set;

g) Whether the cookie value is disclosed to third-parties via cookie synching; and

h) The purpose of the cookie.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects that no advertising technology was installed on Defendant's patient portal.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

18. Documents sufficient to show the first date on which You deployed third-party source code at any of Your web properties from any of the following third parties or its affiliates:

a) Face book;

b) Google;

c) Signal;

d) The Trade Desk;

e) Twitter;

f) Crazy Egg;

g) YouTube;

h) Any other third party not identified herein from whom You have deployed third party source code.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

19. All insurance policies, agreements, or by-laws under which any person may be liable to satisfy all or part of a judgment which may be entered in this action or to indemnify or reimburse You for payments made to satisfy any judgment, settlement, or expenses in connection with this action.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, in the event that insurance agreements may become applicable that may indemnify or reimburse Defendant for any payments

made to satisfy any judgment in this action, and subject to the entry of a protective order and any objections and redactions, such agreements will be provided at the appropriate time in the litigation.

20. Any and all insurance policies that apply or that might arguably apply in this matter.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, in the event that insurance agreements may become applicable that may indemnify or reimburse Defendant for any payments made to satisfy any judgment in this action, and subject to the entry of a protective order and any objections and redactions, such agreements will be provided at the appropriate time in the litigation.

21. Any correspondence with any insurance company related to Plaintiff's claims, including any correspondence accepting or declining coverage and any reservation of right letters You have received related to this matter.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

22. All documents You referenced or relied upon to answer any Interrogatory or Requests for Admissions that Plaintiffs have served in this case.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to

lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

23. All exhibits that You propose to introduce in opposition to class certification or at the class certification hearing.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request is premature. Subject to and without waiving the foregoing objections, Emerson states that it will produce documents responsive to this request that are within its possession, custody or control and reserves the right to supplement this response as discovery continues

24. All web-log or server-log data for the patient portal(s) page or section of any of Your web properties, including, but not limited to, https://www.emersonhospital.org/patientsvisitors/patient-portals.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague and ambiguous, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects that any request for portal-specific documents is overbroad and unduly burdensome because no advertising technology was installed on Defendant's patient portal, and attempting to collect and produce the requested information would take significant resources.

25. All web-log and server-log data containing information that a user or patient "Enrolled" in the patient portal of any of Your web properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague and ambiguous, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects that any request for portal-specific documents is overbroad and unduly burdensome because no advertising technology was installed on Defendant's patient portal, and attempting to collect and produce the requested information would take significant resources.

26. All web-log or server-log data containing information that a user or patient clicked to "Sign In" to the patient portal of any of Your web properties, including, but not limited to, https://www.emersonhospital.org/patients-visitors/patient-portals.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague and ambiguous, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects that any request for portal-specific documents is overbroad and unduly burdensome because no advertising technology was installed on Defendant's patient portal, and attempting to collect and produce the requested information would take significant resources.

27. All web-log or server-log data containing information that a user or patient clicked to log out of the patient portal of any of Your web properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague and ambiguous, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of

Civil Procedure. Defendant further objects that any request for portal-specific documents is overbroad and unduly burdensome because no advertising technology was installed on Defendant's patient portal, and attempting to collect and produce the requested information would take significant resources.

28. Any and all communications relating to Your general deployment, and/or use of third-party source code at any of Your web properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

29. All documents related to proposed and effectuated changes in third-party source code deployed at any of Your web properties in the five years preceding the filing of this action.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues

30. All communications relating to adding, changing, or removing third-party source code deployed at any of Your web properties in the five years preceding the filing of this action.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

31. Documents sufficient to show each date on which any third-party source code was added, changed, or removed from any of Your web properties, including Your patient portal(s), in the five years preceding the filing of this action.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects that no advertising technology was installed on Defendant's patient portal.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

32. For each and every third-party cookie value disclosed to or available to be accessed by any third party when communications are exchanged at any of Your web properties for the five years preceding the filing of this action, documents sufficient to show:

The cookie name;

The third-party entity to whom the cookie relates;

All third-party entities to whom information related to the cookie is disclosed or available to be accessed by;

a) The domain to which the cookie is set;

b) What information is stored by the cookie;

c) The purpose of the cookie;

d) How the cookie is used in relation to Defendant and its websites; and

e) Whether the cookie value is disclosed to others through cookie synching.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

33. All documents relating to disclosure of data to any third parties for marketing purposes via server-side disclosures, including but not limited to server-side disclosures to Facebook, Google, Signal, The Trade Desk, and Twitter.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession,

custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

34. All documents relating to the deployment of the Facebook Tracking Pixel, Facebook Pixel, or Meta Pixel at any of Your web-properties, including Your patient portal(s).

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects that no advertising technology was installed on Defendant's patient portal.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

35. All documents relating to the deployment of any Facebook third-party source code other than the Face book Tracking Pixel, Face book Pixel, or Meta Pixel at any of Your web-properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

36. All documents relating to cookies associated with Facebook, including how they are deployed, accessed, disclosed, or used by Facebook or You at any of Your web properties, including but not limited to:

a) c_user;

b) datr;

c) fr;

d) Any other Facebook cookie that You permit Face book to set or access via any of Your web-properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects to this request to the extent it seeks information that is a matter of public record or is in the possession, custody, or control of Facebook, not Defendant.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

37. All documents relating to Facebook's use of cookies, IP addresses, device identifiers, and other data caused to be transmitted, disclosed, or accessed through Your deployment of Facebook third-party source code on Your web-properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Defendant further objects to this request to the extent it seeks information that is a matter of public record or is in the possession, custody, or control of Facebook, not Defendant.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

38. All documents relating to Facebook's receipt of cookies, IP addresses, device identifiers, and other data caused to be transmitted, disclosed, or accessed through Your deployment of Facebook third-party source code on Your web-properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects to this request to the extent it seeks information that is a matter of public record or is in the possession, custody, or control of Facebook, not Defendant.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

39. All documents relating to Your use of Custom Audiences through Face book.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

40. All communications between You and Facebook or its employees, agents, or assigns.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson will produce all non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

41. All contracts, agreements, memoranda of understanding, or other documents relating to the relationship between You and Facebook.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson will produce all non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

42. All non-disclosure or confidentiality agreements relating to Facebook and its collection of data at any of Your web properties, including www.emersonhospital.org.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson will produce all non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

43. All documents relating to Facebook's use of data collected and/or derived from Your deployment of Facebook third-party source code at any of Your web properties, including www.emersonhospital.org.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects to this request to the extent it seeks information that is a matter of public record or is in the possession, custody, or control of Facebook, not Defendant.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

44. All documents relating to Your use of Face book advertising tools in relation to any of Your web-properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson will produce all non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

45. All documents sufficient to show, during the Class Period, the total amount of money paid, or to be paid, to You from any third-party, including Facebook and Google, for the third-party's receipt of information from Your website.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

46. All documents relating to return on investment from marketing through Facebook.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson will produce all non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

47. All documents relating to return on investment from marketing through Google.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson will produce all non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

48. All documents relating to deployment and use of Google source code at any of Your web properties, including but not limited to Google DoubleClick, Google Analytics, and Google Ads.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

49. All documents relating to Your passing of data to Google.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

50. All source code deployed at any of Your web properties that causes the passing of data to Google.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it is willing to meet and confer regarding the production of source code.

51. All documents relating to Your deployment and use of Google third-party source code at any of Your web properties, including but not limited to:

a) Google Analytics;

b) Google Ads;

c) Adservice. Google.com;

d) Google.com;

e) Google Doubleclick; and

f) YouTube.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

52. All documents relating to cookies associated with Google, Facebook, or other third-parties from whom You deploy tracking pixels ( or embedded source code), including documents sufficient to show how those cookies are deployed, accessed, disclosed or used by any of Your web-properties, and documents sufficient to show the data such cookies enable, including but not limited to at least the following cookies:

a) _gads

b) _gadsID

c) sonar

d) _dpm_id

e) _fbp

f) aj s anonymous_ id

g) ajs_group_id

h) ajs_user_id

i) cto_lwid

j) DSID

k) id

l) permutive-id

m) permutive-session

n) rbuid

o) sm uuid

p) utma

q) utmb

r) utmc

s) utmz

t) SSID

u) SIDCC

v) SAPISID

w) OGPC

x) NID

y) HSID

z) DV

aa) APISID

bb) ANID

cc) IP JAR

dd) Secure-SSID

ee) Secure-HSID

ff) Secure-APISID

gg) _ Secure-3P APISID

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

53. All documents relating to the passing of values of putative first-party cookies to Google Analytics, including but not limited to cookies with the following names:

a) utma

b) utmb

c) utmc

d) utmz

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

54. All communications between You and Google or its employees, agents, or assigns.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson will produce all non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

55. All contracts, agreements, memoranda of understanding, or other documents relating to the relationship between You and Google.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson will produce all non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

56. All non-disclosure or confidentiality agreements relating to Google and its collection of data at any of Your web-properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson will produce all non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

57. All documents relating to Google's use or receipt of data collected and/or derived from Your deployment of Google third-party source code at or any of Your web-properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects to this request to the extent it seeks information that is a matter of public record or is in the possession, custody, or control of Google, not Defendant.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

58. All documents relating to Your use of Google advertising tools in relation to any of Your web-properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson will produce all non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

59. All documents relating to return on investment from marketing through Google or any of its affiliates.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

60. All Your HIP AA notices and privacy policy notices in effect during the Class Period.

**RESPONSE** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

61. All purported Privacy Policies in effect at any of Your web properties (including www.emersonhospital.org) from the date You first deployed any third-party source code from Facebook, Google, or any other third party. If the Privacy Policy changed at any point in time from the date referenced to the present, produce all Privacy Policies used and the dates those policies were in effect. If the links to the Privacy Policy or presentation thereof have changed at any point in time from the date reference to the present, produce duplications of each such presentation.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

64. All written authorizations from any Affected Person authorizing You to share their Personal Health Information with Google.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects because it contends that it did not share Personal Health Information with Google.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

65. All written authorizations from any Affected Person authorizing You to share their Personal Health Information with any third party for marketing purposes.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects because it contends that it did not share Personal Health Information with third parties.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

66. All exhibits that You propose to introduce in opposition to class certification or at the class certification hearing.

**RESPONSE:** Subject to its General Objections, Defendant objects to this request as it is a duplicate of Request 23 and incorporates its response herein.

67. Any documents reviewed, consulted, used, or relied upon by any expert that You intend to use on any issue related to class certification.

**RESPONSE:** Defendant objects to this request to the extent it seeks expert discovery beyond the permitted scope of Mass. R. Civ. P. Rule 26(b)(4). Defendant also objects that this request is premature.

68. All contracts between You and Plaintiff.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects to this request to the extent Plaintiff has equal access to responsive documents.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

69. All documents relating or referring to Plaintiff.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects to this request as Plaintiff has equal access to responsive documents.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

70. All documents relating to data disclosures that You provided to Plaintiff.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

71. Any and all documents that You contend show that You had prior express consent to disclose any of Plaintiff's personally identifiable information and communications exchanged with You to any third-party internet tracking companies including, but not limited to, Facebook, Google, Signal, Trade Desk, or Twitter.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to

lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

72. All documents relating to the manner, method, and means by which You contend Plaintiff purportedly consented to the disclosure of their personally identifiable information and communications exchanged with You to third-party internet tracking companies including, but not limited to Facebook, Google, Signal, Trade Desk, or Twitter.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

73. All documents relating to Your disclosure to third parties of any data about the Plaintiff.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession,

custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

74. All documents relating to Plaintiff conveyed from You to Facebook, Google, Signal, Trade Desk, Twitter, or any other third-party marketing company, regardless of the form or method of the conveyance or disclosure.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

75. For the following entities, all documents relating to the responsibilities of the entity as it relates to Your web properties and/or marketing, including but not limited to contracts, memorandums of understanding, indemnification agreements, and non-disclosure agreements:

a) Influence Health, Inc.;

b) Healthgrades;

c) Face book;

d) Google;

e) Signal;

f) The Trade Desk

g) Any other person not identified but which has responsibilities relating to Your web properties or marketing.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to

lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

76. For the following entities, all communications with the entity and any of its employees, agents, or assigns relating to the deployment or use of third-party source code at Defendant's web properties:

a) Influence Health, Inc.;

b) Healthgrades;

c) Facebook;

d) Google;

e) YouTube;

f) Signal;

g) The Trade Desk

h) Any other entity not identified but which has responsibilities relating to Your web properties or marketing.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

77. All documents relating to any communication to enroll or log in to the patient portal from any page at any of Your web properties, including documents with aggregate information and documents with specific information about any individual or computing device, including but not limited to names, email addresses, IP addresses, cookie identifiers, or any other unique identifiers associated with the enrollment or login. This request encompasses any data available to You that is available to You in the possession of a related entity or parent organization, or contractor or agent.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks documents that do not exist, is vague and ambiguous, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects that any request for portal-specific documents is overbroad and unduly burdensome because no advertising technology was installed on Defendant's patient portal, and attempting to collect and produce the requested information would take significant resources.

78. All documents relating to any communication to enroll or log in to the patient portal from any page at any of Your web properties, including documents with aggregate information and documents with specific information about any individual or computing device, including but not limited to names, email addresses, IP addresses, cookie identifiers, or any other unique identifiers associated with the enrollment or login. This request encompasses any data available to You that is available to You in the possession of a related entity or parent organization, or contractor or agent.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks documents that do not exist, is vague and ambiguous, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects that any request for portal-specific documents is overbroad and unduly burdensome because no advertising technology was installed on Defendant's patient portal, and attempting to collect and produce the requested information would take significant resources.

79. All documents relating to any telephone request to enroll in Your patient portal(s) on any of Your web properties, including but not limited to names, email addresses, IP addresses,

cookie identifiers, or any other unique identifiers associated with Enrollment or Login arising from such request to enroll.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks documents that do not exist, is vague and ambiguous, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects that any request for portal-specific documents is overbroad and unduly burdensome because no advertising technology was installed on Defendant's patient portal, and attempting to collect and produce the requested information would take significant resources.

80. All documents relating to any in-person request to enroll in Your patient portal(s) on any of Your web properties, including but not limited to names, email addresses, IP addresses, cookie identifiers, or any other unique identifiers associated with Enrollment or Login arising from such request to enroll.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks documents that do not exist, is vague and ambiguous, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects that any request for portal-specific documents is overbroad and unduly burdensome because no advertising technology was installed on Defendant's patient portal, and attempting to collect and produce the requested information would take significant resources.

81. All third-party source code deployed at any of Your web properties during the Class Period.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it is willing to meet and confer regarding the production of source code.

82. All documents relating to any meeting(s) (including but not limited to agendas, minutes, summaries, and notes) relating to third-party source code or the disclosure of information about patients/user who exchange communications at any of Your web properties, including but not limited to meeting(s) with representatives or agents of:

a) Face book;

b) Google;

c) Signal;

d) The Trade Desk;

e) Twitter;

f) Any other third party not identified herein from whom You have deployed thirdparty source code.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

83. All documents relating to Your use of cookie synching with third parties at any of Your web properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

84. All documents relating to the Meta Pixel parameter 'ev' or Meta Events Manager, including all event data associated with any of Your web-properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

85. All documents relating to the Meta Event with the value of 'SubscribedButtonClick' including associated settings and how it is used at any of Your web properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

86. All documents relating to the cookie '_ fbp', including how it is deployed and used by Facebook or by You.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

87. All documents relating to Your use of cookie synching with Facebook.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

88. All documents relating to Your use of cross-device tracking by Facebook.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

89. All documents relating to website scraping by Facebook.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects to this request to the extent it seeks information that is a matter of public record or is in the possession, custody, or control of Facebook, not Defendant.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

90. All documents relating to POST requests from users to Facebook being triggered even when the user does not fill out a form or take an affirmative action to submit data to You or Facebook.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession,

custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

91. All documents relating to any Facebook Javascript file(s) deployed at any of Your web properties, including Your patient portal(s).

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects that no advertising technology was installed on Defendant's patient portal.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

92. All documents relating to the value of the data disclosed to third parties including, but not limited to, documents relating to:

a) any compensation provided or received, monetary or otherwise, for conveymg information to a third party, including but not limited to, Facebook, Google, Signal, The Trade Desk, and Twitter.

b) any internal analysis regarding the value of privacy;

c) any internal analysis regarding the value of patient data to You;

d) the privacy policy, privacy promises, and/or general privacy and impression by users and/or the general public;

e) any internal analysis of the value of Your use of any or all third-party source code for marketing or other purposes.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the

discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson will produce all non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

93. All documents relating to the value You place on data disclosed to Face book.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

94. All documents relating to the value You place on the use of the Facebook Tracking Pixel, Facebook Pixel, or Meta Pixel.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession,

custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

95. All documents relating to Your use of cookie synching with Google.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

96. All documents relating to data sharing or transmissions between Google and Facebook facilitated in whole or in part via any of Your web properties, whether directly through Google or an affiliate such as DoubleClick.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects to this request to the extent it seeks information that is a matter of public record or is in the possession, custody, or control of Google or Facebook, not Defendant.

97. All documents relating to the deployment and use of a Meta Pixel ID through any Google property.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to

lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

98. All documents relating to Your use of cookie synching with Google or any of its affiliates.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

99. All documents relating to Your use of cross-device tracking by Google or any of its affiliates.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession,

custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

100. All documents relating to website scraping by Google.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues. Defendant further objects to this request to the extent it seeks information that is a matter of public record or is in the possession, custody, or control of Google, not Defendant.

101. All documents relating to Google's use of cookies, IP addresses, device identifiers, and other data caused to be transmitted, disclosed, or accessed through Defendant's deployment of Google third-party source code.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects to this request to the extent it seeks information that is a matter of public record or is in the possession, custody, or control of Google, not Defendant.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession,

custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

102. All documents relating to Google's receipt of cookies, IP addresses, device identifiers, and other data caused to be transmitted, disclosed, or accessed through Defendant's deployment of Google third-party source code.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects to this request to the extent it seeks information that is a matter of public record or is in the possession, custody, or control of Google, not Defendant.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

103. All documents relating to the value of the data disclosed or transmitted to Facebook relating to any of Your web-properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

104. All documents relating to the value You place on use of Google marketing tools deployed at any of Your web-properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

105. All documents relating to Your deployment and use of The Bright Tag or Signal third-party source code (hereafter "Signal") at any of Your web properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

106. All documents relating to Your use of cookie synching with Signal.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

107. All documents relating to Your use of cross-device tracking by Signal.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

108. All documents relating to cookies associated with Signal, including how they are deployed, accessed, disclosed or used by Signal or by any of Your web properties, including but not limited to 'vcnid.'

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects to this request to the extent it seeks information that is a matter of public record or is in the possession, custody, or control of Signal, not Defendant.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession,

custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

109. All documents relating to website scraping by Signal.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects to this request to the extent it seeks information that is a matter of public record or is in the possession, custody, or control of Signal, not Defendant.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

110. All documents relating to Signals use of cookies, IP addresses, device identifiers, and other data caused to be transmitted, disclosed, or accessed through Your deployment of Signal third party source code.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects to this request to the extent it seeks information that is a matter of public record or is in the possession, custody, or control of Signal, not Defendant.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession,

custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

111. All communications between You and Signal or its employees, agents, or assigns.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

112. All contracts, agreements, memoranda of understanding, or other documents relating to the relationship between You and Signal relating to any of Your web-properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

113. All non-disclosure or confidentiality agreements relating to Signal and its collection of data at or any of Your web-properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to

lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

114. All documents relating to Signal's use of data collected and/or derived from Your deployment of Signal third-party source code at any of Your web-properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects to this request to the extent it seeks information that is a matter of public record or is in the possession, custody, or control of Signal, not Defendant.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

115. All documents relating to Your use of Signal advertising tools in relation to any of Your web-properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

116. All documents relating to the value of the data disclosed or transmitted to Signal relating to or any of Your web-properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

117. All documents relating to the value You place on use of Signal marketing tools deployed at or any of Your web-properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

118. All documents relating to return on investment from marketing through Signal or any of its affiliates.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

119. All documents relating to Your deployment and use of Trade Desk third-party source code at any of Your web-properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

120. All documents relating to Your use of cookie synching with Trade Desk.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

121. All documents relating to Your use of cross-device tracking by Trade Desk.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

122. All documents relating to cookies associated with Trade Desk, including how they are deployed, accessed, disclosed or used by Trade Desk or by You at any of Your web-properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects to this request to the extent it seeks information that is a matter of public record or is in the possession, custody, or control of Trade Desk, not Defendant.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession,

custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

123. All documents relating to website scraping by Trade Desk.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects to this request to the extent it seeks information that is a matter of public record or is in the possession, custody, or control of Trade Desk, not Defendant.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

124. All documents relating to Trade Desk's use of cookies, IP addresses, device identifiers, and other data caused to be transmitted, disclosed, or accessed through Your deployment of Trade Desk third-party source code.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects to this request to the extent it seeks information that is a matter of public record or is in the possession, custody, or control of Trade Desk, not Defendant.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession,

custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

125. All communications between You and Trade Desk or its employees, agents, or assigns.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

126. All contracts, agreements, memoranda of understanding, or other documents relating to the relationship between You and Trade Desk relating to any of Your web-properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

127. All non-disclosure or confidentiality agreements relating to Trade Desk and its collection of data at or any of Your web-properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

128. All documents relating to Trade Desk's use of data collected and/or derived from Your deployment of Trade Desk third-party source code at any of Your web-properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects to this request to the extent it seeks information that is a matter of public record or is in the possession, custody, or control of Trade Desk, not Defendant.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

129. All documents relating to Your use of Trade Desk advertising tools in relation to any of Your web-properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to

lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

130. All documents relating to the value of the data disclosed or transmitted to Trade Desk relating to any of Your web-properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

131. All documents relating to the value You place on use of Trade Desk marketing tools deployed at or any of Your web-properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession,

custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

132. All documents relating to return on investment from marketing through use of Trade Desk or any of its affiliates.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

133. All documents relating to Your policies for the destruction of records, documents, or files.

**RESPONSE:** Subject to its General Objections, Defendant further objects to this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects to this request to the extent it seeks information that is protected by the attorney-client privilege and/or work product doctrine. This request represents an inappropriate request for discovery-on-discovery and is not tailored to the claims and defenses in this matter.

134. All documents relating to Your document backup policies or procedures.

**RESPONSE:** Subject to its General Objections, Defendant further objects to this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes

obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects to this request to the extent it seeks information that is protected by the attorney-client privilege and/or work product doctrine. This request represents an inappropriate request for discovery-on-discovery and is not tailored to the claims and defenses in this matter.

135. All documents relating to Your backup of electronic data relevant to this matter including, but not limited to, lists or descriptions of all media formats utilized, software and hardware versions, build numbers and other related information You used to backup any of the data stored on archive or backup media with respect to documents relating to this request.

**RESPONSE:** Subject to its General Objections, Defendant further objects to this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects to this request to the extent it seeks information that is protected by the attorney-client privilege and/or work product doctrine. This request represents an inappropriate request for discovery-on-discovery and is not tailored to the claims and defenses in this matter. The internal infrastructure of Emerson computer backup systems is not relevant to the claims propounded in this case.

136. All diagrams depicting Your email system architecture including, but not limited to, physical server locations and mail store configurations.

**RESPONSE:** Subject to its General Objections, Defendant further objects to this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects to this request to the extent it seeks information that is protected by the attorney-client privilege and/or work product doctrine. This request represents an inappropriate request for discovery-on-discovery and is not tailored to the claims and defenses in this matter. Emerson's

email system architecture and computer system infrastructure is not relevant to the claims propounded in this case.

Subject to and without waiving the foregoing objections, Defendant states that it is willing to meet and confer regarding the production of emails.

137. Documents sufficient to show for each and every previous instance of an alleged or reported HIP AA violation by You, the nature of the HIP AA violation, the number of patients impacted by the violation, and the notice sent to patients informing them of the violation.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

138. Documents sufficient to show each and every individual medical provider profile displayed at any of Your web properties during the Class Period.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

139. Documents sufficient to show each and every individual medical provider associated with the appointment scheduling functionality at any of Your web properties during the Class Period.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to

lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects that no advertising technology was installed on any web page with appointment scheduling technology.

140. Documents sufficient to show the database schema, including but not limited to tables, fields, and indexes, of any database in which You obtain, return, store, maintain, access, view, or communicate records of visits to www.emersonhospital.org or Your patient portal(s).

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects that no advertising technology was installed on Defendant's patient portal. Defendant further objects to this request to the extent it seeks information that is a matter of public record or is in the possession, custody, or control of Google, not Defendant.

141. Documents sufficient to show how any database in which You obtain, return, store, maintain, access, view, or communicate records of visits to www.emersonhospital.org or Your patient portal(s) may be queried.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects that no advertising technology was installed on Defendant's patient portal. Defendant further objects to this request to the extent it seeks information that is a matter of public record or is in the possession, custody, or control of Google, not Defendant.

142. All documents and communications concerning Your policies and procedures regarding the collection and retention of Personal Health Information from website visitors, patients, and potential patients, including, but not limited to, specific Data collected and retained, and length of time Personal Health Information is retained, as well as any procedures in place to ensure that these policies and procedures were and are being followed.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects because it contends that no Personal Health Information was disclosed to third parties.

Subject to and without waiving the foregoing objections, Emerson will produce all non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

143. All documents and communications concerning or comprising Your policies and procedures regarding the safeguarding and protection of Personal Health Information and other Data provided by visitors to Your websites, including, but not limited to, Your costs associated therewith, as well as any procedures, practices, and training in place to ensure that these policies and procedures were and are being followed during the relevant period.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects because it contends that no Personal Health Information was disclosed to third parties.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession,

custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

144. All documents and communications concerning or comprising any representations You made to Your current and former patients regarding the protection and security of Personal Health Information and other Data from visitors to Your websites, including, but not limited to, compliance with any state or federal privacy or information security laws or regulations.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects because it contends that no Personal Health Information was disclosed to third parties.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

145. All documents and communications concerning or comprising any remedial steps You took during or following Your discovery of the Data Disclosure.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects because it contends that no steps taken were remedial.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession,

custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

146. All documents concerning or comprising communications between You and any governmental entities that relate to Your policies, procedures, protocols, or practices for safeguarding and protecting Personal Health Information, and/or regarding the Data Disclosure.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects because it contends that no Personal Health Information was disclosed to third parties.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

147. All documents regarding Your compliance or noncompliance with any applicable Data security guidelines or standards.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects to this request as it asks for a legal conclusion.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession,

custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

148. All documents related to Your policies and procedures to prevent, detect, contain, or remediate information security incidents, such as unauthorized access to or disclosure of Personal Health Information, as well as documents concerning compliance or non-compliance with those policies and procedures.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects because it contends that no Personal Health Information was disclosed to third parties.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

149. All documents concerning assessments or analyses regarding the potential risks or vulnerabilities to the confidentiality, integrity, and availability of Personal Health Information in Your Health Information Systems, as well as any decisions or efforts to address or remediate any identified risks.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects because it contends that no Personal Health Information was disclosed to third parties. Defendant further objects that no advertising technology was installed on any Defendant Health Information System.

150. Documents sufficient to identify all vendors or consultants You hired, or from whom You sought proposals for cybersecurity matters and/or safeguarding and protecting Personal Health Information provided by visitors to Your websites.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects because it contends that no Personal Health Information was disclosed to third parties.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

151. Documents sufficient to show your IT, cybersecurity, and overall operating budgets.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

152. All documents related to Your data security awareness and training programs for members of Your workforce, including independent contractors, including, but not limited to, names and titles of individuals conducting trainings, training manuals, course materials, topics covered, agendas, notes, and presentations.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

153. All documents related to enforcement of Your information security policies and procedures, including records of sanctions for noncompliance with those policies and procedures.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

154. All documents concerning Your policies and procedures for encryption and decryption of Personal Health Information and documents reflecting that these policies and procedures were and are being followed.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects because it contends that no Personal Health Information was disclosed to third parties.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession,

custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

155. Documents sufficient to show how You identified that the Data Disclosure occurred, including, but not limited to, how You determined that the security of former and current patients' Data was disclosed to third parties including but not limited to Facebook, what data was disclosed, the dates on which You became aware of the disclosure, why the disclosure occurred, and any cybersecurity measures or precautions You have implemented in response to the Data Disclosure.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

156. All reports or other documents regarding Your investigation and documentation of the Data Disclosure and its consequences or Your response to the Data Disclosure, including, but not limited to, the cause of the Data Disclosure, the information compromised during the Data Disclosure, the number of Affected Persons, remedial measures taken, changes implemented and details regarding such measures and changes such as when the changes took place or will take place, and who implemented or will implement the changes.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects to this request to the extent it seeks information that is protected by the attorney-client privilege and/or work product doctrine.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

157. All documents detailing any recommendations made or actions taken to notify Affected persons, government entities, or the public of the Data Disclosure before June 2022, including, but not limited to, the date on which those recommendations were made or actions were taken and the reasons why notification to Affected persons, government entities, or the public was delayed.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

158. All documents and communications concerning assessments of potential Health Information System vendors.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects that no advertising technology was installed on any Defendant Health Information System.

159. All documents and communications sufficient to identify all vendors or consultants You hired or from whom You sought proposals for Health Information Systems.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects that no advertising technology was installed on any Defendant Health Information System.

160. All documents and communications concerning how Personal Health Information is stored in Health Information Systems, including but not limited to patient portals.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects because it contends that no Personal Health Information was disclosed to third parties. Defendant further objects that no advertising technology was installed on any Defendant Health Information System or Defendant's patient portal.

161. All documents and communications concerning the encryption or safeguarding of Personal Health Information in Health Information Systems such as patient portals.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects because it contends that no Personal Health Information was disclosed to third parties. Defendant further objects that no advertising technology was installed on any Defendant Health Information System or Defendant's patient portal.

162. All documents concerning policies and procedures regarding the means of access to Your Health Information Systems (including but not limited patient portals) given by You to third parties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects that no advertising technology was installed on any Defendant Health Information System or Defendant's patient portal.

163. All documents and communications showing analyses regarding whether Health Information Systems such as patient portals improve patient care.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects that no advertising technology was installed on any Defendant Health Information System.

Dated: August 31, 2023

**EMERSON HOSPITAL**

*/s/ Emyr T. Remy*
Tammy B. Webb (*pro hac vice*)
tbwebb@shb.com
SHOOK, HARDY, & BACON L.L.P.
555 Mission Street, Suite 2300
San Francisco, CA 94105
Tel: (415) 544-1900 | Fax: (415) 391-0281

Emyr T. Remy (BBO # 704156)
remy@shb.com
SHOOK, HARDY & BACON L.L.P.
One Federal Street, Suite 2540
Boston, MA 02110
Tel: (617) 531-1411 | Fax: (617) 531-1602

Alfred J. Saikali (*pro hac vice*)
asaikali@shb.com
SHOOK, HARDY & BACON L.L.P.
201 South Biscayne Blvd., Suite 3200
Miami, Florida 33131
Tel: (305) 358-5171 | Fax: (305) 358-7470

Justin R. Donoho (*pro hac vice*)
jdonoho@shb.com
SHOOK, HARDY & BACON L.L.P.
111 South Wacker Drive
Chicago, IL 60606
Tel: (312) 704-7713 | F: (312) 558-1195

Jessica N. Wahl (*pro hac vice*)
jwahl@shb.com
SHOOK, HARDY & BACON L.L.P.
2049 Century Park East, Suite 3000
Los Angeles, CA 90067
T: (424) 285-8330 | F: (424) 204-9093

Jenn O. Hatcher (*pro hac vice*)
jhatcher@shb.com
SHOOK, HARDY & BACON L.L.P.
2555 Grand Blvd.
Kansas City, MO 64108
T: (816) 474-6550 | F: (816) 421-5547

**CERTIFICATE OF SERVICE**

I hereby certify that on August 31, 2023, I served DEFENDANT EMERSON HOSPITAL'S FIRST AMENDED RESPONSES TO PLAINTIFF JOHN DOE'S FIRST AND SECOND SETS OF REQUESTS FOR PRODUCTION OF DOCUMENTS, via electronic mail, to the following counsel of record:

J. Tucker Merrigan (BBO# 681627)
Victoria Santoro (BBO# 679120)
Erin E, McHugh (BBO# 703701)
**SWEENEY MERRIGAN LAW**
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com
*Attorneys for Plaintiff*

Foster C. Johnson (*pro hac vice*)
David Warden (*pro hac vice*)
Nathan Campbell (*pro hac vice*)
**AHMAD, ZAVITSANOS & MENSING, P.C.**
1221 McKinney St., Suite 3460
Houston, TX 77010
Tel: (713) 655-1101
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com
*Attorneys for Plaintiff*

Seth Meyer (*pro hac vice*)
Alex Dravillas (*pro hac vice*)
**KELLER POSTMAN LLC**
150 N. Riverside Plaza, Suite 4100
Chicago, IL 60606
Tel: (312) 741-5220
sam@kellerpostman.com
adj@kellerpostman.com
*Attorney for Plaintiff*

*/s/ Emyr T. Remy*
Emyr T. Remy

# Exhibit E

EXHIBIT E

AZA

CARL GUSTAFSON
DIRECT 713.600.4924
MAIN 713.655.1101
FAX 713.655.0062
CGUSTAFSON@AZALAW.COM

September 8, 2023

*Via Email*

Tammy B. Webb
Shook, Hardy, & Bacon LLP
555 Mission Street, Suite 2300
San Francisco, CA 94105
tbwebb@shb.com

**Re: John Doe, Individually and on Behalf of All Others Similarly Situated v. Emerson Hospital**
**Essex Superior Court C.A. No.: 2277CV01000**

Dear Counsel:

Please consider this letter to be a request for a discovery conference pursuant to Superior Court Rule 9(C) regarding your client's discovery responses. Plaintiff seeks to discuss the following issues, including a specific timeline for the supplementation of all issues detailed in this communication.

**Background**

Plaintiff served his First and Second Requests for Production of Documents and his First Set of Interrogatories to Defendant on April 13, 2023. Plaintiff subsequently served his Third Request for Production of Documents to Defendant on May 22, 2023. On July 10, 2023, the Court allowed the parties' Motion for Entry of Stipulated Protective Order. The Stipulated Protective Order ("Protective Order") governs the parties' handling of materials and documents deemed "Confidential" or "Highly Confidential" in conjunction with state and local rules. On July 13, 2023, the Court allowed the parties' Motion for Entry of Stipulated ESI Protocol. The Stipulated ESI Protocol ("ESI Protocol") governs the parties' responsibilities with respect to the discovery of electronically stored information in conjunction with state and local rules. On July 25, 2023, the Court allowed the parties' Motion for Entry of Agreed Scheduling Order. The Agreed Scheduling Order ("Scheduling Order") provides specific timelines and deadlines for parties' discovery obligations. Defendant has not satisfied its discovery obligations per the Scheduling Order.

**Defendant's Deposition**

Defendant has failed to provide Plaintiff with any date for its 30(b)(6) deposition. Plaintiff sent Defendant a draft Notice of Taking Corporate Representative Deposition on June 16, 2023, via email. In Plaintiff's email, Plaintiff requested Defendant provide it with dates during August of 2023 when Defendant could present a corporate designee or designees for its deposition. On July 5, 2023, Plaintiff again requested that Defendant provide corporate deposition dates for August of 2023. Plaintiff made additional requests for proposed dates for Defendant's corporate deposition on July 10, 2023; August 18, 2023; and August 23, 2023. To date, Defendant has failed to provide Plaintiff with a single date for its corporate deposition. Plaintiff requests again that Defendant provide dates for its deposition.

**Defendant's Responses to Plaintiff's First and Second Sets of Requests for Production of Documents**

Non-Custodial Data Sources

Section 5 of the ESI Protocol requires that a list of non-custodial data sources, such as shared drives, servers, internal messaging applications, or any other sources likely to contain discoverable ESI, shall be disclosed within a reasonable amount of time prior to conducting searches for ESI in response to discovery requests. Emerson has not provided Plaintiff with a list of non-custodial data sources. Kindly provide a list of non-custodial data sources as required by the ESI Protocol.

Defendant's Improper General Objections

Defendant's Responses to Plaintiff's First and Second Sets of Requests for Production of Documents begins with 16 General Objections that are applied to each and every response made. Mass. Sup. Ct. R. 30A(3)(a) states, "where general objections are made, the responding party shall prepare and serve a supplemental response no later than 10 days after the completion of production." Mass. Sup. Ct. R. 30A(3)(b) states:

> "Once production is completed, general objections to requests for production of documents and things are prohibited. As to each request, the supplemental response shall state either: (i) notwithstanding prior general objections, all responsive documents or things in the possession, custody, or control of the responding party have been produced; (ii) after diligent search no responsive documents or things are in the possession, custody, or

> control of the responding party; or (iii) the specific objection made to the request."

Defendant served its responses to Plaintiff's First and Second Sets of Requests for Production of Documents on June 20, 2023. Defendant served its First Amended Responses to Plaintiff's First and Second Sets of Requests for Production of Documents on August 31, 2023; however, it did not remove its general objections. Kindly supplement your production and remove your general objections.

Defendant's Improper Objections

In addition to its General Objections, Defendant raises a number of boilerplate objections in its responses to each request. These objections largely mirror the general objections made. Mass. Sup. Ct. R. 30A(3)(b) requires "[w]hen a specific objection is made, the response shall describe the nature of all responsive documents or things in the possession, custody, or control of the responding party that have not been produced because of the objection." Per Mass. R. Civ. P. 26(b)(5)(A), such a requirement also applies to documents that are withheld by claiming claims of privilege. Apart from its responses to Requests Nos. 3 and 13, Defendant has not identified what documents are being withheld pursuant to the objections it raised. Kindly remove your objections or supplement your responses in accordance with Mass. Sup. Ct. R. 30A(3)(b) and supplement your production.

Defendant's Incomplete Production

In the Scheduling Agreement, Defendant stipulated that it would begin a rolling production for documents in response to Plaintiff's following numbered requests: 1-3, 4, 12-16, 19-20, 40-42, 44, 46-47, 54-56, 58, 92, and 142. Per the Scheduling Order, Defendant was required to complete its production by August 31, 2023. Defendant failed to complete its production of documents. Defendant produced a mere 38 pages of documents on July 14, 2023; these documents were only responsive to Request Nos. 19, 20, 60, and 61, and did not contain all responsive documents to such requests. On August 29, 2023, Defendant produced a single document in response to Request No. 1. Again, this document was not wholly responsive to the request as it failed to de-duplicate the number of unique patients each year. Emerson has not produced any other responsive and discoverable documents despite agreeing to do so by August 31, 2023. It is unfathomable that Defendant only has 39 pages of discoverable documents in response to 163 requests. Plaintiff requests that Emerson supplement its document production.

*Request No. 1:* Request Number 1 asks for documents sufficient to identify the number of unique patients, by year, that were treated by Emerson during the class period. Defendant provided Plaintiff with a chart showing the number of unique patients by year from 2016

to 2023. However, Defendant specifically noted that these numbers were not de-duplicated across the class period, arguing that the number of unique patients treated by Emerson has "no connection" to Plaintiff's claims. The standard for discovery in Massachusetts is whether the information sought is reasonably calculated to lead to the discovery of admissible evidence. Mass. R. Civ. P. 26(b)(1). The number of unique patients per year may lead to admissible evidence regarding the class size. Kindly de-duplicate the number of unique patients by year and supplement your production.

*Request Nos. 3, 12, and 13:* Request Number 3 asks for the production of documents sufficient to show the number of individuals whose Personal Health Information was disclosed to third parties. Request Number 12 asks for documents sufficient to show the amount of web traffic to Emerson's web properties and any patient portal during the class period. Request Number 13 asks for the production of documents sufficient to show the number of unique visitors to Emerson's web properties. Defendant stated in response to Requests Nos. 3 and 13 that it does not have responsive documents. Defendant failed to articulate the scope of its search for responsive documents as required by Mass. Sup. Ct. R. 30A(3)(b). Defendant undoubtedly has responsive, discoverable documents, including ESI, in its possession, custody, or control. Kindly supplement your response and production, or alternatively, articulate the scope and extent of your search for responsive documents.

*Request Nos. 2, 14, 15, and 16:* Request Numbers 2, 14, 15, and 16 ask for the production of documents related to Emerson's patient portal. More specifically, these requests ask for documents sufficient to identify the number of unique patients and visitors per year who used the portal; the number of patients who registered for the portal; and the number of patients who logged into the portal. Defendant objected to these requests, alleging that no advertising technology was installed on the patient portal and that attempting to collect such documentation would take significant resources. The documents, including ESI, requested are discoverable as the requests are reasonably calculated to lead to the discovery of admissible evidence. Plaintiff has reason to believe that the pixel was installed on Emerson's patient portal and has previously discussed this with Defendant. Documents and ESI responsive to this request are necessary to this litigation and are necessary for identifying the class size. Defendant's assertion that collecting responsive documentation would take significant resources is unsupported and is not a basis for eschewing its discovery responsibilities. Defendant has ample resources to search for and collect responsive documents. Defendant has not complied with its obligations pursuant Mass. R. Civ. P. 26(c). Kindly supplement your response and production.

*Request Nos. 19 and 20*: Requests Number 19 and 20 ask for the production of any and all insurance policies that may be applicable in the subject action. Defendant produced its declaration pages for two policies but did not produce complete copies of its insurance

policies. In withholding such production, Defendant argued that its insurance policies are not applicable at this stage of litigation. Mass. R. Civ. P. 26(b)(1) provides the contrary and specifically states:

> "A party may obtain discovery of the existence and contents of any insurance agreement under which any person carrying on an insurance business may be liable to satisfy part or all of a judgement which may be entered in the action or to indemnify or reimburse for payments made to satisfy the judgment."

Please supplement your response and produce any and all potentially applicable insurance policies.

**Defendant's Responses to Plaintiff's Third Set of Requests for Production of Documents**

On May 22, 2023, Plaintiff served his Third Set of Requests for Production of Documents. Defendant has not provided any responses or produced any documents in response to these requests. Defendant's responses and production to the same are overdue. Kindly provide us with your responses and production.

**Defendant's Answers to Plaintiff's Interrogatories**

*Interrogatory No. 3:* Interrogatory No. 3 asks Defendant to state its best estimate for the number of individuals whose interactions with Defendant's website(s) resulted in data transmission between Defendant's website and a third party via tracking pixel or source code. Defendant raised a number of unfounded objections, asserting that this interrogatory seeks legal conclusions and requires an expert opinion. This interrogatory does not call for a legal conclusion or an expert opinion; it simply calls for a fact or estimate. Defendant's answer states that it is impossible for it to estimate the number of individuals who have interacted with its website, and it did not attempt to give any answer. Even assuming it is impossible for Defendant to give an estimate as to the total number of individuals impacted, Defendant is able to measure the number of individuals who made appointments on the website. Defendant admitted in its answer to Interrogatory Number 2 that the tracking pixels captured information about appointment requests and sign-ups on its website. Kindly supplement your answer.

*Interrogatory No. 4*: Interrogatory Number 4 asks in part for the number of patients who logged into Defendant's patient portal one or more times during the Class Period. Similar to the above, Defendant objects on the basis that the Interrogatory calls for an expert

opinion and seeks a legal conclusion. This interrogatory does not request for either but rather requests a statement of fact. In its answer, Defendant asserted again that tracking pixels were not installed on the patient portal and that collecting portal-specific information would take significant resources. Again, Plaintiff has reason to believe that the pixel was installed on Emerson's patient portal. Defendant's assertion that collecting portal-specific information would require resources is unsupported and is not a basis for eschewing its discovery responsibilities. Defendant has ample resources to collect and review responsive documents and ESI. Defendant has not moved for a protective order pursuant to Mass. R. Civ. P. 26(c), and thus must collect and produce responsive documents. Kindly supplement your answer.

*Interrogatory Nos. 7 and 10:* Interrogatory Number 7 asks for the number of Emerson's patients who reside in Massachusetts whose interactions within Emerson's patient portal during the Class Period resulted in transmission of data to third parties via tracking pixel or embedded source code. Interrogatory Number 10 asks for the time period during which Emerson had the Meta Pixel embedded within any pages of its patient portal. Defendant answered, stating that no tracking pixel or similar technology was ever embedded in the patient portal. Plaintiff knows that tracking pixels and source code was embedded on the login screen of Defendant's patient portal, and has reason to believe that tracking pixel(s) or other source code was embedded in Emerson's patient portal. Kindly supplement your answer.

*Interrogatory No. 8:* Interrogatory Number 8 asks for the number of individuals who had any of their personal health information disclosed to Facebook or Google in the data disclosure. Defendant responded by saying none. Defendant explicitly stated in its answer to Interrogatory Number 2 that Facebook Pixel, Google Analytics, DoubleClick, GoogleAds, and StackAdapt were installed on numerous pages throughout its website. Defendant's argument that not a single one of these tracking pixels transmitted a single piece of Personal Health Information, which includes personally identifiable information as defined in the interrogatory, is incredulous and contrary to the very purpose of the tracking pixels' installation on Emerson's website.

I am available to conduct a 9C conference by telephone or video conference regarding these matters on Wednesday, September 13, at either 10 a.m. or 2 p.m. Eastern. Alternatively, I am available on Thursday, September 14, before 3 p.m. Eastern.

Very truly yours,

Carl J. Gustafson

cc: Alfred J. Saikali (asaikali@shb.com)
Joseph Becker (jbecker@shb.com)
Michael Rayfield (mrayfield@shb.com)
Lindsey Knapton (lknapton@shb.com)
Alan Y. Wong (awong@shb.com)
Emyr Remy (remy@shb.com)
J. Tucker Merrigan (tucker@sweeneymerrigan.com)
Erin E. McHugh (emchugh@sweeneymerrigan.com)
Alex Dravillas (adj@kellerpostman.com)
Sara Aguiniga (sara.aguiniga@kellerpostman.com)
David Warden (dwarden@azalaw.com)

COMMONWEALTH OF MASSACHUSETTS

| | | |
|---|---|---|
| ESSEX, ss | ) | TRIAL COURT DEPARTMENT |
| | ) | SUPERIOR COURT |
| JOHN DOE, individually and on behalf of all others similarly situated, | ) | |
| Plaintiff, | ) | DOCKET NO. 2277CV01000D |
| v. | ) | |
| EMERSON HOSPITAL, | ) | |
| Defendant. | ) | |

**EMERSON HOSPITAL'S OPPOSITION TO**
**PLAINTIFF'S MOTION TO COMPEL AND TO REMOVE CERTAIN OBJECTIONS**

**Introduction and Summary**

Plaintiff's Motion to Compel and to Remove Certain Objections requests that the Court compel Defendant Emerson Hospital to (1) accelerate production of information in accordance with an overly aggressive schedule; (2) produce irrelevant information about patients' visitation, usage, and registrations at Emerson' patient portal; and (3) make an impossible estimate of the number of unique visitors to its website. Those three requests should be denied, as follows.

First, Plaintiff's entire motion moves to accelerate production of information in accordance with an unreasonable schedule. Plaintiff's schedule is overly aggressive, and therefore Plaintiff's entire motion should be denied. Such is shown by Plaintiff's misrepresentation of the Court's scheduling order as supposedly providing for completion of document production on August 31, 2023. It does not, and it provides for completion of fact discovery on December 31. Moreover, even the current date of December 31 for completion of fact discovery is now too aggressive and likely needs to be moved back in light of the Court's moving back of the motion to dismiss hearing

three months. Further, a stay of all further discovery until 30 days after the close of the pleadings should be entered because it will promote the interests of justice and judicial efficiency, prevent undue burden, and halt expensive and time-consuming discovery that would be needlessly incurred if Emerson's Motion to Dismiss is granted, in full or even in part. Accordingly, Emerson served its Motion for Protective Order and to Stay Discovery on September 25, 2023. (Section I, below.)

Second, Plaintiff moves to compel production of information relating to patients who visited, used, and registered for Emerson's patient portal. As its only basis for seeking this information, Plaintiff baldly asserts that Emerson's patient portal had advertising technology ("adtech") installed on it. This assertion is incorrect, as shown by the sworn affidavit, attached herewith, of Renee Fosberg, Emerson's Chief Information Officer, which shows that no adtech has ever been installed on the patient portal, the login button to the patient portal, or the webpage containing that login button. In addition, Emerson previously served on Plaintiff sworn interrogatory answers stating no adtech has ever been installed on Emerson's patient portal. Moreover, Emerson's counsel previously explained in teleconferences that according to Emerson's prior investigation, no adtech has ever been installed on the patient portal, the login button to the patient portal, or the webpage containing that login button. Further, Plaintiff's counsel has long promised to schedule a demonstration that would supposedly show adtech installed in the portal and/or on the login button, and now reneges, showing there is nothing to demonstrate (and also violating Mass. Super. Ct. R. 9C(a) in advance of filing Plaintiff's motion). In short, portal visitation, usage, and registration information is not relevant or discoverable in this case. Plaintiff's request for it should be denied. (Section II.)

Third, Plaintiff moves to compel two interrogatory answers different from the answers Emerson already provided, which stated that is impossible for Emerson to estimate the number of

unique visitors to its website for the many detailed reasons set forth in Emerson's interrogatory answers showing that the information Emerson has related to its website is insufficient to perform any accurate estimation. Plaintiff's motion to compel different answers is, at best, a disguised motion for summary judgment that fails to address these detailed reasons, offer any evidence, and comply with the procedural requirements for filing a motion for summary judgment. Plaintiff's request for different answers to interrogatories should be denied. (Section III.)

## Argument

### I. Plaintiff's request to accelerate discovery should be rejected.

#### A. Emerson has been producing information pursuant to an already accelerated schedule.

On January 30, 2023, Plaintiff filed his First Amended Complaint. Emerson moved to dismiss on February 9, 2023. Emerson's Motion to Dismiss was fully briefed on April 24, 2023, and set for hearing on July 20, 2023.

On July 17, 2023, three days before the hearing, the Parties submitted an agreed motion for entry of an agreed scheduling order, setting initial discovery deadlines. Later that same day, on July 17, 2023, the Court removed the July 20 hearing from its calendar. On July 25, 2023, the Court reset the Motion to Dismiss hearing for October 12, 2023, and entered the previously submitted scheduling order (Ex. 1, discussed in Sections I.B & I.C, below).

Emerson has been complying with the scheduling order. For example, on August 31, 2023, Emerson served its amended answers to all 17 of Plaintiff's First Interrogatories and its amended responses to all 163 of Plaintiff's First and Second Requests for Production of Documents. In addition, Emerson has made an initial production of responsive privacy policies and insurance documents. Further, Emerson invested significant time negotiating search terms with Plaintiff, and has collected documents pursuant to the parties' agreement on search terms.

**B. Plaintiff's request for relief misrepresents the Court's scheduling order.**

The July 25, 2023 scheduling order clearly states, "Defendant will respond to the remainder of Plaintiff's First Requests for Interrogatories and First and Second Requests for Production by August 31, 2023." Ex. 1. Emerson complied with that order. *See* Ex. 2. The order does not state, as Plaintiff misrepresents, that "[Emerson] was required to complete its [document] production by August 31, 2023." Mem. at 5-6. Rather, the order provides that fact discovery is to be completed by December 31, 2023. In short, Plaintiff's urgency undergirding its entire motion is premised on a misrepresentation of the Court's order. There is no such urgency.

**C. The schedule set forth in the Court's scheduling order should be extended.**

When the parties submitted the agreed scheduling order that the Court subsequently entered, Emerson understood that the motion to dismiss hearing would be occurring only three days later, on July 20, 2023, not nearly three months later. In light of the motion to dismiss hearing being moved back nearly three months, Emerson believes it is likely that the dates in the scheduling order will need to be moved back accordingly, if any claims survive the motion to dismiss.

**D. Discovery should be stayed until 30 days after the close of the pleadings.**

When the parties submitted the agreed scheduling order that the Court subsequently entered, Emerson had also anticipated that the following time-consuming tasks covering the entire subject of Plaintiff's motion to compel would not need to occur before the Court had an opportunity to rule on Emerson's Motion to Dismiss:

- Review and production of additional documents;
- Identify, prepare, and produce witness(es) for corporate representative deposition(s), including in response to Plaintiff's notice of deposition to Emerson, as amended August 18, 2023;

- Respond to Plaintiff's First Requests for Admissions and Third Requests for Production of Documents;
- Supplement existing discovery responses.[1]

On September 25, 2023, Emerson served its Motion for Protective Order and to Stay Discovery on September 25, 2023. As the motion shows, good cause exists for the issuance of a protective order staying all discovery in this matter. This is reason alone to deny Plaintiff's motion in its entirety. Emerson has challenged the legal sufficiency of Plaintiff's claims, and given that the scope of relevant discovery hinges on Plaintiff's ability to proceed with one or more of these claims, judicial and financial resources will be saved if this Court stays discovery pending resolution of Emerson's dispositive motion. This is particularly so because while Emerson's Motion to Dismiss remains pending, the next steps in discovery are incredibly time-consuming and resource-intensive. They include document review, analysis, and production in response to nearly 200 requests for production of documents; depositions of corporate representative(s) on 17 topics (several include numerous sub-topics)[2]; and further responses to written discovery requests. These activities are irrelevant to the determination of Emerson's pending Motion to Dismiss and will be moot in the event the Court grants the Motion. In addition, it would be a waste of the parties' resources to pursue these activities—and of judicial resources to resolve any disputes arising out of them, such as the disputes set forth in Sections II & III below—because, as shown

[1] A portion of the supplemental written discovery responses sought by Plaintiff's motion is for Emerson to indicate whether any information or documents have been withheld and on what basis (Mem. at 4-5). Plaintiff concedes such amendment is not required under Mass. Sup. Ct. Rs. 30A(3)(a) & 30A(3)(b) until after all documents have been produced (Mem. at 4-5).

[2] These topics cover a broad range of subjects, including but not limited to Emerson's relationships and communications with third-party vendors, nuanced details of website use and visitor traffic, software code, use of marketing tags and cookies, Emerson's privacy policies and amendments to same, document retention protocols, all responses to Plaintiff's written discovery requests, insurance agreements, and Emerson's finances.

in Emerson's Motion to Dismiss and reply brief and as set forth in its Notice of Supplemental Authority, Plaintiff cannot prevail on any of his claims. At a minimum, a ruling on the Motion could significantly narrow the claims.

A stay of all discovery would also avoid the imposition of undue burden and expense on Emerson, a nonprofit healthcare organization. Emerson is not large and does not have in-house counsel. Accordingly, imposing burdensome and expensive discovery that might all be for naught is a massive and unnecessary drain on Emerson's limited resources. Conversely, a temporary stay of discovery in this case will not prejudice Plaintiff, regardless of how this Court rules on Emerson's Motion to Dismiss. Lack of any prejudice to Plaintiff is reinforced by the fact that the parties have already negotiated search terms and Emerson has taken necessary steps to collect and preserve responsive documents.

Under these circumstances, there is good cause to stay all discovery until the Court has ruled on Emerson's Motion to Dismiss, and the issuance of such a stay is well within the Court's discretion. *See* Motion for Protective Order and to Stay Discovery (served September 25, 2023), quoting, *e.g.*, *Kramer v. Zoning Bd. of Appeals of Somerville*, 65 Mass. App. Ct. 186, 196 n.10 (2005); *Chesapeake Inv. Servs., Inc. v. Olive Grp. Corp.*, No. 022654BLS, 2002 WL 31379955, at *2 (Mass. Super. Ct. Sept. 13, 2002); *E.A. Miller, Inc. v. South Shore Bank*, 405 Mass. 95, 100 (1989); *Hilles v. Episcopal Diocese of Massachusetts*, 51 Mass. App. Ct. 220, 225–26 (2001); *Fenn v. Trans Nat. Travel, Inc.*, No. Civ.A. 01-00962, 2002 WL 1466481, at *1 (Mass. Sup. Ct. June 27, 2002).

## II. Plaintiff's request for patient portal visitation, usage, and registration information should be rejected.

A portion of Plaintiff's motion seeks information relating to numbers of patients who visited, used, and registered for Emerson's patient portal. Mem. at 7, 9-10. As his only basis for

seeking this information, Plaintiff baldly asserts that he "has reason to believe" and "knows" that adtech was installed on Emerson's patient portal. *Id.*

This portion of Plaintiff's motion should be denied for the additional reason that the requested portal information is not relevant or discoverable. Not only was adtech never installed on Emerson's patient portal, neither does Plaintiff have any "reason to believe" or "know[ledge]" of such (Mem. at 7, 9-10), as shown by the following:

- Sworn Affidavit by Emerson's CIO. Attached hereto is the sworn affidavit of Renee Fosberg, Emerson's Chief Information Officer. Ex. 3. This affidavit demonstrates, based on Ms. Fosberg's personal knowledge and investigation, that no adtech has ever been installed on Emerson's patient portal, the login button to the patient portal, or the public webpage containing that login button and serving as the entryway to the portal.
- Sworn interrogatory answers. Emerson served interrogatory answers informing Plaintiff that no adtech has ever been installed on Emerson's patient portal on June 20, 2023, with sworn verification on July 5, 2023, and again in an amendment sworn and served on August 31, 2023. *See* Ex. 2, Ans. to Interrog. Nos. 4, 7, 10.
- Plaintiff's flip-flop showing the lack of any contrary evidence. On August 18, 2023, during a teleconference, undersigned counsel explained to Plaintiff's counsel that based on Emerson's technical investigation, no adtech has ever been installed on Emerson's patient portal, the login button to the patient portal, or the webpage containing that login button. Undersigned counsel also explained that if Plaintiff has any technical information to the contrary, then Emerson is willing to listen and consider such information as part of Emerson's good faith effort to understand any areas of technical disagreement. Plaintiff's counsel responded orally that although he did not have any

personal knowledge of the technical details, he would schedule a technical demonstration purportedly showing that adtech was installed in Emerson's patient portal and/or the login button to the portal, and sent a follow-up email requesting Emerson's availability. Ex. 4. Emerson immediately offered a date for Plaintiff's purported demonstration. Ex. 5. Plaintiff's counsel received this offered date, Ex. 6, and never followed up with any dates of his own. During a teleconference on September 21, 2023, undersigned counsel again identified Plaintiff's month-long failure to engage in a good faith effort to understand areas of technical disagreement. Plaintiff's counsel did not deny this failure and said he would check with his team. On September 22, 2023, Plaintiff filed this motion.[3]

In sum, there has never been any adtech installed in Emerson's patient portal. Therefore, in this case about adtech, Plaintiff's requested information about patients' portal visits, uses, and registrations is neither relevant nor discoverable. Plaintiff's request to compel production of such information should be denied. *See, e.g., Fitzgerald v. Morrison,* 2002 WL 389872, at *2 (Mass. Super. Jan. 10, 2002) (denying motion to compel because the documents sought were "irrelevant"); *Doe v. Bechtel Corp.,* 1995 WL 389950, at *1 (Mass. Super. Ct. May 12, 1995) (denying plaintiff's motion to compel because "the requested documents are irrelevant to [plaintiff]'s claim").

## III. Plaintiff's request that Emerson make an impossible estimate of the number of unique website visitors should be rejected.

Plaintiff's motion also asks the Court to compel Emerson to estimate the number of individuals or a portion thereof who have interacted with Emerson's website, in answer to interrogatories 3 & 8. Mem. at 8, 10. As Emerson stated in answer to both of these interrogatories,

---

[3] As the foregoing narrative also demonstrates, Plaintiff violated Rule 9C(a)'s requirement that in advance of filing his motion to compel, Plaintiff was required to "make a good faith effort to narrow areas of disagreement to the fullest extent."

it is impossible for Emerson to provide any such estimate. Ex. 2, Ans. to Pl.'s Interrog. Nos. 3, 8. That is because the information Emerson has related to its website:

> is not responsive to this request or to this request as limited to patients, relevant web pages, relevant Data, and Massachusetts citizens, including because it relates to unique device-browser combinations instead of unique individuals or patients; counts the same unique device-browser combination more than once including each and every time it accesses any web page, clears cookies, or changes IP address; counts robotic devices; counts based on approximate geographic location of device-browser combination not an individual's or patient's citizenship; and includes other significant counting errors precluding any accurate estimation of the number of unique individuals, patients, or Massachusetts individuals or patients who accessed certain of Defendants' web pages when certain technology was installed on those web pages.

*Id.* In essence, Plaintiff served contention interrogatories, received an answer, and now moves this Court in what is a disguised motion for summary judgment to make a factual finding that Emerson's answer is incorrect. Worse, Plaintiff moves the Court to compel Emerson to make something up. This is completely inappropriate, especially without Plaintiff (a) addressing any of the above-quoted reasons supporting Plaintiff's interrogatory answers; (b) offering any evidence; or (c) complying with Mass. Super. Ct. R. 9A(b)(5). Plaintiff's request should be denied.[4]

## Conclusion

For the foregoing reasons, Emerson respectfully requests that Plaintiff's Motion to Compel and Remove Certain Objections be denied.

---

[4] Plaintiff also challenges Emerson's additional answer "none" in answer to interrogatory 8, which argumentatively frames the question in terms of disclosure of "Personal Health Information" ("PHI"). Emerson contends no PHI as defined in the interrogatory was disclosed. Plaintiff again asks the court to find otherwise in what is essentially a disguised motion for summary judgment, without providing any evidence or complying with Mass. Super. Ct. R. 9A(b)(5). Moreover, Plaintiff's use of its term PHI is overbroad in its definition and therefore argumentative. Emerson is not required to make unwarranted admissions in what could be used as trial exhibits due to Plaintiff's argumentative use of an improperly defined term which should be excluded under Mass. Guide to Evid. § 403. Plaintiff cites no case for this proposition, and Emerson is aware of none.

Dated: October 5, 2023

Respectfully submitted,

EMERSON HOSPITAL

By: _/s/Justin R. Donoho_

Justin R. Donoho (IL # 6299667)
**SHOOK, HARDY & BACON L.L.P.**
111 South Wacker Drive, Suite 4700
Chicago, IL 60606
Tel: (312) 704-7713 | F: (312) 558-1195
jdonoho@shb.com

Emyr T. Remy, BBO# 704156
**SHOOK, HARDY & BACON L.L.P.**
One Federal Street, Suite 2540
Boston, MA 02110
Tel.: (617) 531-1411 | Fax: (617) 531-1602
remy@shb.com

Alfred J. Saikali (FL # 0178195)
**SHOOK, HARDY & BACON L.L.P.**
201 South Biscayne Blvd., Suite 3200
Miami, Florida 33131
Tel: (305) 358-5171 | Fax: (305) 358-7470
asaikali@shb.com

Tammy B. Webb (CA # 227593)
**SHOOK, HARDY & BACON L.L.P.**
555 Mission Street, Suite 2300
San Francisco, CA 94105
Tel: (415) 544-1900 | Fax: (415) 391-0281
twebb@shb.com

Jenn O. Hatcher (MO # 69742)
**SHOOK, HARDY & BACON L.L.P.**
2555 Grand Boulevard
Kansas City, MO 64108
Tel: (816) 474-6550 | F: (816) 421-5547
jhatcher@shb.com

Jessica N. Wahl (CA # 321887)
**SHOOK, HARDY & BACON L.L.P.**
2049 Century Park East, Suite 3000
Los Angeles, CA 90067
Tel: (424) 324-3477 | Fax: (424) 204-9093
jwahl@shb.com

**CERTIFICATE OF SERVICE**

I, Emyr T. Remy, hereby certify that on October 5, 2023, a true copy of the above document was served by email upon:

J. Tucker Merrigan (BBO# 681627)
Victoria Santoro (BBO# 679120)
Erin E, McHugh (BBO# 703701)
**SWEENEY MERRIGAN LAW**
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Seth Meyer (*PHV5191283NY*)
Alex Dravillas (*PHV6299686IL*)
**KELLER POSTMAN LLC**
150 N. Riverside Plaza, Suite 4100
Chicago, IL 60606
Tel: (312) 741-5220
sam@kellerpostman.com
ajd@kellerpostman.com

Foster C. Johnson (*PHV24076463TX*)
David Warden (*PHV20856750TX*)
Nathan Campbell (*PHV24097455TX*)
**AHMAD, ZAVITSANOS & MENSING, P.C.**
1221 McKinney St., Suite 3460
Houston, TX 77010
Tel: (713) 655-1101
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

*/s/ Emyr T. Remy*
Emyr T. Remy

**Index of Exhibits**


| Ex. | Description | Page |
|---|---|---|
| 1 | *John Doe v. Emerson Hospital.*, Agreed Scheduling Order, No. 2277-CV-01000D, July 25, 2023 | 1 |
| 2 | *John Doe v. Emerson Hospital.*, Defendant Emerson hospital's First Amended Answers to Plaintiff John Doe's First Set of Interrogatories, & Defendant Emerson Hospital's First Amended Responses to Plaintiff John Doe's First and Second Sets of Requests for Production of Documents, No. 2277-CV-01000D, August 31, 2023 | 5 |
| 3 | *John Doe v. Emerson Hospital.*, Declaration of Renee Fosberg, No. 2277-CV-01000D, October 5, 2023 | 109 |
| 4 | Correspondence between counsel re: zoom call, August 18, 2023 | 114 |
| 5 | Correspondence between counsel re: zoom call, August 18, 2023 | 116 |
| 6 | Correspondence between counsel re: zoom call, August 18, 2023 | 119 |

# EXHIBIT 1

30

**COMMONWEALTH OF MASSACHUSETTS**

**ESSEX, S.S.**

**TRIAL COURT DEPARTMENT**
**SUPERIOR COURT**

JOHN DOE, individually and on behalf of all other similarly situated,

Plaintiff,

v.

EMERSON HOSPITAL,

Defendant.

DOCKET NO. 2277CV01000D

**~~[PROPOSED]~~ AGREED SCHEDULING ORDER**

The parties hereby submit the below Agreed Scheduling Order, and the Court being duly advised now **FINDS** and **ORDERS** as follows:

**DISCOVERY**

1. **Amendment of Pleadings.** Any motion to amend the pleadings shall be filed on or before **January 8, 2024.**

2. **Fact Discovery.** Defendants responded to the First Requests for Interrogatories Nos. 1, 2, 3, 4, 7, 8, 10 and First and Second Requests for Production Nos. 1-3, 4, 12-16, 19-20, 40-42, 44, 46-47, 54-56, 58, 92, 142 on June 20, 2023. Defendant will begin a rolling production in response to Plaintiff's document requests by July 17, 2023. In response to the proposed search term list previously submitted by Plaintiff, Defendant will provide an organizational chart and an initial hit list for negotiation purposes by July 24, 2023. Defendant will respond to the remainder of Plaintiff's First Requests for Interrogatories and First and Second Requests for Production by August 31, 2023. All discovery (other than expert witness depositions and any motions to compel) shall be completed by December 31, 2023.

3. **Plaintiffs' Class Certification Expert Designation.** Plaintiffs shall identify the name of any class certification expert witness whom they may call to testify and provide expert report(s) no later than **January 29, 2024**. Plaintiffs shall make such expert(s) available for deposition within 30 days of providing expert reports.

4. **Defendant's Class Certification Expert Designation.** Defendant shall identify the name of any class certification expert witness whom it may call to testify and provide expert report(s) within 30 days of receiving Plaintiff's expert reports. Defendant shall make such expert(s) available for deposition within 60 days of receiving Plaintiff's expert reports.

5. **Close of Class Certification Expert Discovery.** Class certification expert discovery shall be completed by **March 29, 2024.**

<u>**PRE-TRIAL MOTIONS AND CLASS CERTIFICATION**</u>

6. **Class Certification Motion.** Plaintiffs' motion for class certification is to be filed on or before **June 21, 2024.**

7. **Class Certification Response.** Defendant's response in opposition to Plaintiffs' motion for class certification is to be filed no later than 30 days after Plaintiffs file their motion for class certification.

8. **Class Certification Reply.** Plaintiffs' reply brief to Defendant's response in opposition is to be filed no later than 15 days after Defendant files its response in opposition.

9. **Class Certification Hearing.** Plaintiffs' motion for class certification will be called and heard within 30 days after Plaintiffs file their reply.

10. **Status Conference.** Within 30 days of the Court's ruling on class certification, the parties will submit a joint case management order, addressing the remaining deadlines in the case. The parties request that the Court hold a status conference to discuss the remaining deadlines.

CIVIL ACTION NO. 2277CV01000D

**MEDIATION**

11. The parties will meet and confer about a mediation date within 30 days of the Court's ruling on class certification.

**AMENDMENT OF THIS ORDER**

12. Any party may move to amend a deadline in this Order upon a showing of good cause or agreement of all parties.

IT IS ORDERED this 25th day of July, 2023

Janice W. Howe

Dated: ______________________

# EXHIBIT 2

COMMONWEALTH OF MASSACHUSETTS

ESSEX, S.S.

TRIAL COURT DEPARTMENT
SUPERIOR COURT

JOHN DOE, individually and on behalf of all other similarly situated,

Plaintiff,

v.

EMERSON HOSPITAL,

Defendant.

DOCKET NO. 2277CV01000D

**DEFENDANT EMERSON HOSPITAL'S FIRST AMENDED ANSWERS TO PLAINTIFF JOHN DOE'S FIRST SET OF INTERROGATORIES**

Defendant Emerson Hospital ("Emerson" or "Defendant"), by and through its undersigned counsel, hereby serves its First Amended Answers to Plaintiff John Doe's ("Plaintiff") Interrogatories pursuant to and in accordance with Rule 33 of the Massachusetts Rules of Civil Procedure and Massachusetts Superior Court Rules 30 and 30(A), reserving the right to supplement and amend, as follows:

**OBJECTION TO DEFINITIONS**

Defendant objects to the Definitions in Plaintiff's Interrogatories to the extent they attempt to impose obligations upon Emerson other than those imposed or authorized by the Massachusetts Rules of Civil Procedure, including, but not limited to, the extent they exceed the permissible scope of discovery under the Massachusetts Rules of Civil Procedure, and/or seek to impose duties of responding and/or supplementation different from or in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects to the Definitions in Plaintiff's Interrogatories to the extent they conflict with Massachusetts Rule of Civil Procedure Rule 30A.

Defendant objects to Plaintiff's definition of the terms "Data" and 'Personal Health Information' as they are vague, ambiguous, and overbroad.

Defendant objects to Plaintiff's definition of the term 'Class Period' as the definition presumes Defendant's liability and an unlimited statute of limitations. Defendant treats the term 'Class Period' for purposes only of responding to these Interrogatories (*e.g.*, without admitting that any third-party source code was installed on Defendant's web properties at any particular time, without admitting liability, and without waiving any affirmative defenses), to mean the time period of October 19, 2016 through the filing of this Complaint because all of Plaintiff's claims arising before at least that date are barred by the statute of limitations.

Defendant objects to Plaintiff's definition of the term 'Data Disclosure" as the definition presumes a disclosure of Personal Health Information proximately caused by Defendant. Defendant treats the term 'Data Disclosure" for purposes of responding to these Interrogatories as defined except without regard to who was the proximate cause and without admitting that any disclosure contained Personal Health Information.

Defendant objects to Plaintiff's definition of "Personal Health Information" ("PHI") as overbroad, unduly burdensome, and disproportionate to the needs of the case to the extent it seeks discovery that is inconsistent with or seeks to impose requirements or obligations on Defendant beyond what is imposed by state and federal law, including the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and the Health Information Technology for Economic and Clinical Health Act ("HITECH"). Defendant further objects to Plaintiff's definition as overbroad and unduly burdensome because it purports to include Personally Identifiable Information ("PII") within the definition of PHI when the two are separate and distinct from one another. Defendant

hereby incorporates these objections into each and every one of Plaintiff's definitions where the term "Personal Health Information" is included.

**OBJECTION TO INSTRUCTIONS**

Defendant objects to the Instructions in Plaintiff's Interrogatories to the extent they attempt to impose obligations upon Emerson other than those imposed or authorized by the Massachusetts Rules of Civil Procedure, including, but not limited to, the extent they exceed the permissible scope of discovery under the Massachusetts Rules of Civil Procedure, and/or seek to impose duties of responding and/or supplementation different from or in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Defendant objects to Plaintiff's instruction to include a privilege log because an instruction requiring the responding party to produce a privilege log or specific information about the assertion of privilege or work product protection conflicts with the Massachusetts Rules of Civil Procedure, which do not require the responding party to provide this information in its response. Mass. R. Civ. P. 26(b)(5).

**ANSWERS TO INTERROGATORIES**

INTERROGATORY NO. 1: For the Class Period, identify all third-party tracking pixels (or embedded source code), including but not limited to the Meta Pixel and Google Analytics, that You have embedded on Your website(s) that cause the transmission of Data between Your website(s) and a third-party entity during communications between a web user and Your website(s).

**ANSWER:** Defendant objects to this Interrogatory because it seeks legal conclusions including about causation. Defendant objects to this Interrogatory as not reasonably calculated to lead to the discovery of admissible evidence, overbroad, and unduly burdensome. Defendant objects to this Interrogatory to the extent it calls for an expert opinion. *Commonwealth v. Brusgulis*, 41 Mass. App. Ct. 386, 390–391 (1996); Mass. R. Evid. 701. Defendant objects to this Interrogatory to the extent it requests that Defendant admit facts that Defendant specifically denies.

Defendant objects to this Interrogatory to the extent it seeks information about technologies or websites unrelated to any transmission of Data or relevant Data.

Subject to and without waiving these objections, Defendant answers as follows:

There are no third-party tracking pixels or any embedded source code that cause the transmission of Data between Defendant's website and a third party entity during communications between a web user and Defendant's website. Rather, the transmission of Data occurs as follows: (1) the user's browser makes a page request to the website server (i.e. Defendant's website); (2) the website server (i.e. Defendant's website) renders the Emerson webpage back to the user's browser; (3) as the page is being rendered back to the user's browser, any JavaScript and/or source code is loaded onto the user's browser; (4) as a function of the page loading, any JavaScript and/or source code will be transmitted to the applicable third parties. Moreover, Defendant denies that third-party tracking pixels (or embedded source code) on Emerson's website are the proximate cause of any transmission of Data.

Subject to the foregoing objections and answer, and without admitting that any of the following technologies or Emerson's website were related to the transmission of any Data or relevant Data, Defendant further states that the following technology was embedded on www.emersonhospital.org: Facebook Pixel, Google Analytics, DoubleClick, GoogleAds, StackAdapt, Quancast, CallRail, and Youtube.

Notwithstanding the objections, the Defendant states that no information has been withheld from the answer.

INTERROGATORY NO. 2: For each third-party tracking pixel (or embedded source code) identified in response to Interrogatory No. 1, describe in detail the functionality of each such tracking pixel (or embedded source code), including:

a) identifying the sections or portions of Your website(s), including any password protected patient portals, where such tracking pixels (or embedded source code) has been active during the Class Period;

b) describing the type of Data that is transmitted from Your website(s) to third parties via the functionality of said third-party tracking pixels, including any personally identifying information (such as cookies, IP addresses, Facebook, IDs) and the contents of any user communications (such as search terms, selections, or contents of online forms); and

c) each page on Your websites and patient portals where the third-party tracking pixel (or embedded source code) was installed.

**ANSWER:** Defendant objects to this Interrogatory to the extent it seeks a legal conclusion. Defendant objects to this Interrogatory as not reasonably calculated to lead to the discovery of admissible evidence, overbroad, and unduly burdensome. Defendant objects to this Interrogatory to the extent it calls for an expert opinion. *Commonwealth v. Brusgulis*, 41 Mass. App. Ct. 386, 390–391 (1996); Mass. R. Evid. 701. Defendant objects to this Interrogatory to the extent it requests that Defendant admit facts that Defendant specifically denies. Defendant objects to this Interrogatory to the extent it seeks information about technologies and web pages unrelated to any transmission of Data or relevant Data.

Subject to and without waiving these objections, without admitting that any of the following technologies or web pages were related to the transmission of any Data or relevant Data, and further stating that discovery is in early stages, Defendant is continuing to investigate, and may supplement, Defendant answers as follows:

(a) There has never been any third-party tracking pixel or similar technology embedded in patient portal. For the Emerson Hospital website (www.emersonhospital.org): (i) Facebook Pixel was installed on the home page, find a therapist page, find a doctor page, search for a primary care physician page, search for a specialist page, find a location page, pages with specific hospital locations, doctor profile pages, pages for specific specialties, weight loss info session page, risk assessment page, and risk assessment report page; (ii) Google Analytics, DoubleClick, GoogleAds, and StackAdapt were installed on the home page, find a therapist page, find a doctor page, search

for a primary care physician page, search for a specialist page, find a location page, pages with specific hospital locations, doctor profile pages, pages for specific specialties, weight loss support group page, weight loss info session page, Parkinson's virtual education page; and (iii) Quantcast and YouTube were installed on the home page.

(b) There are no third-party tracking pixels or any embedded source code that cause the transmission of Data between Defendant's website and a third party entity during communications between a web user and Defendant's website. Rather, the transmission of Data occurs as follows: (1) the user's browser makes a page request to the website server (i.e. Defendant's website); (2) the website server (i.e. Defendant's website) renders the Emerson webpage back to the user's browser; (3) as the page is being rendered back to the user's browser, any JavaScript and/or source code is loaded onto the user's browser; (4) as a function of the page loading, any JavaScript and/or source code will be transmitted to the applicable third parties. Moreover, Defendant denies that third-party tracking pixels (or embedded source code) on Emerson's website are the proximate cause of any transmission of Data.

Subject to the foregoing objections and answer, Defendant further states that, for the Emerson Hospital website (www.emersonhospital.org): (i) Facebook Pixel was related to the transmission of information about search terms; button clicks to search/go, find a doctor, learn more, and submit; visits to pages on which the technology was installed (*see* 2(a) above); and submission of weight loss info session sign up and request and appointment; (ii) Google Analytics was related to the transmission of information about search terms; button click to "chat now" to schedule an appointment; visits to pages on which the technology was installed (*see* 2(a) above); and submission of weight loss support group sign up, weight loss info session sign up, Parkinson's virtual education sign up, and request and appointment; (iii) DoubleClick, GoogleAds, and

StackAdapt were related to the transmission of information about search terms; visits to pages on which the technology was installed (*see* 2(a) above); and submission of weight loss support group sign up, weight loss info session sign up, Parkinson's virtual education sign up, and request and appointment; and (iv) Quantcast and YouTube were related to the transmission of information about visits to the home page.

(c) Same as answer to 2(a), above.

Notwithstanding the objections, the Defendant states that no information has been withheld from the answer.

INTERROGATORY NO. 3: State your current best estimate of the number of individuals whose interactions with Your website(s) have resulted in the transmission of Data between one of Your websites and a third-party entity (such as Facebook or Google), via a third-party tracking pixel or source code (such as the Meta Pixel or Google Analytics) that are embedded on Your websites, during the Class Period.

**ANSWER:** Defendant objects to this Interrogatory as not reasonably calculated to lead to the discovery of admissible evidence, overly broad, and unduly burdensome including because the requested number of website visitors is not limited to patients, relevant websites or web pages, relevant Data, and Massachusetts citizens. *Facey v. Gabriel*, 2006 WL 6339502 (Mass. Super. Oct. 31, 2006). Defendant objects to this Interrogatory because it seeks legal conclusions including about causation. Defendant objects to this Interrogatory to the extent it calls for an expert opinion. *Commonwealth v. Brusgulis*, 41 Mass. App. Ct. 386, 390–391 (1996); Mass. R. Evid. 701. Defendant objects to this Interrogatory to the extent it requests that Defendant admit facts that Defendant specifically denies.

Subject to and without waiving the objection, Defendant answers as follows:

There are no individuals whose interactions with Defendant's website resulted in the transmission of Data between Defendant's website and a third-party entity via a third-party tracking pixel or source code. Rather, the transmission of Data occurs as follows: (1) the user's

browser makes a page request to the website server (i.e. Defendant's website); (2) the website server (i.e. Defendant's website) renders the Emerson webpage back to the user's browser; (3) as the page is being rendered back to the user's browser, any JavaScript and/or source code is loaded onto the user's browser; (4) as a function of the page loading, any JavaScript and/or source code will be transmitted to the applicable third parties. Moreover, Defendant denies that third-party tracking pixels (or embedded source code) on Emerson's website are the proximate cause of any transmission of Data.

Subject to the foregoing objections and answer, Defendant further states that it is impossible for Defendant to estimate either the number of individuals who have interacted with Defendant's website, resulting in transmission of Data to a third-party entity, or such number as limited to patients, relevant website and web pages, relevant Data, and Massachusetts citizens. Defendant is in possession of certain information relating to web traffic on its web pages but such information is not responsive to this request or to this request as limited to patients, relevant web pages, relevant Data, and Massachusetts citizens, including because it relates to unique device-browser combinations instead of unique individuals or patients; counts the same unique device-browser combination more than once including each and every time it accesses any web page, clears cookies, or changes IP address; counts robotic devices; counts based on approximate geographic location of device-browser combination not an individual's or patient's citizenship; and includes other significant counting errors precluding any accurate estimation of the number of unique individuals, patients, or Massachusetts individuals or patients who accessed certain of Defendants' web pages when certain technology was installed on those web pages. Defendant is willing to meet and confer regarding the production of documents relating to web traffic.

Notwithstanding the objections, the Defendant states that no information has been withheld from the answer.

<u>INTERROGATORY NO. 4</u>: Among the number of individuals responsive to Interrogatory No. 3, further state how many of such individuals were:

a) Your patients;
b) Your patients who reside in the state of Massachusetts;
c) Your patients who logged into Your Patient portal one or more times.

**ANSWER:** Defendant objects to this Interrogatory as not reasonably calculated to lead to the discovery of admissible evidence, overbroad, and unduly burdensome, including because it is not limited to patients who visited relevant web pages. Defendant objects to this Interrogatory to the extent it seeks a legal conclusion. Defendant objects to this Interrogatory to the extent it calls for an expert opinion. *Commonwealth v. Brusgulis*, 41 Mass. App. Ct. 386, 390–391 (1996); Mass. R. Evid. 701. Defendant objects to this Interrogatory to the extent it requests that Defendant admit facts that Defendant specifically denies.

Subject to and without waiving these objections, Defendant answers as follows:

As the number of individuals responsive to Interrogatory No. 3 is impossible to estimate, likewise it is impossible to provide break downs such as (a)-(c) within such an inestimable number. In addition, providing estimates of (a)-(c) above is further impossible because information Defendant has relating to web traffic on its web pages cannot be filtered by patients, or by whether the same visitor logged into the portal.

Subject to the foregoing objections and answer, Defendant further states as follows:

(a) From November 1, 2016 to June 5, 2023, Emerson had approximately 303,618 total patients, including all patients who did not visit relevant web pages or any of Emerson's web pages;

(b) From November 1, 2016 to June 5, 2023, Emerson had approximately 269,464 total patients who resided in Massachusetts, including all Massachusetts patients who did not visit relevant web pages or any of Emerson's web pages;

(c) Defendant further objects that any request for portal-specific information is overbroad and unduly burdensome because no advertising technology was installed on Defendant's patient portal, and attempting to collect portal-specific information would take significant resources. Subject to these additional objections, Defendant further states that approximately 50,596 patients have an account to the patient portal.

Notwithstanding the objections, the Defendant states that no information has been withheld from the answer.

INTERROGATORY NO. 5: For each third-party tracking pixel (or embedded source code) identified in response to Interrogatory No. 1, describe any updates, revisions, or modifications to each said tracking pixel that resulted changes in the type of Data that was transmitted from Your website(s) to third parties during user interactions with Your website(s), including an identification of when any such updates, revisions, or modifications were made.

**ANSWER:** Defendant objects to this Interrogatory because it seeks legal conclusions including about causation. Defendant objects to this Interrogatory as not reasonably calculated to lead to the discovery of admissible evidence, overbroad, and unduly burdensome. Defendant objects to this Interrogatory to the extent it calls for an expert opinion. *Commonwealth v. Brusgulis*, 41 Mass. App. Ct. 386, 390–391 (1996); Mass. R. Evid. 701. Defendant objects to this Interrogatory to the extent it requests that Defendant admit facts that Defendant specifically denies.

Subject to and without waiving these objections, Defendant answers as follows:

There were no updates, revisions, or modifications to any tracking pixel or source code identified in response to Interrogatory No. 1 that resulted in either the transmission of Data between Defendant's website and a third-party entity during user interactions with Defendants' website, or

any changes in the type of such Data. Rather, the transmission of Data occurs as follows: (1) the user's browser makes a page request to the website server (i.e. Defendant's website); (2) the website server (i.e. Defendant's website) renders the Emerson webpage back to the user's browser; (3) as the page is being rendered back to the user's browser, any JavaScript and/or source code is loaded onto the user's browser; (4) as a function of the page loading, any JavaScript and/or source code will be transmitted to the applicable third parties. Moreover, Defendant denies that third-party tracking pixels (or embedded source code) on Emerson's website are the proximate cause of any transmission of Data.

Subject to and without waiving the foregoing objections and answer, Defendant further states as follows:

Pursuant to Mass. R. Civ. P. 33(c), Defendant refers Plaintiff to Defendant's documents produced or to be produced in response to Plaintiffs Requests for Production of Documents and reserves the right to supplement this answer.

Notwithstanding the objections, Defendant states that no information has been withheld from the answer.

INTERROGATORY NO. 6: State the total number of instances where Data was transmitted to third parties via third-party tracking pixel (or embedded source code), such as the Meta Pixel or Google Analytics, that occurred during user interactions within the password-protected patient portal available through Your website(s) during the Class Period.

**ANSWER:** Defendant objects to this Interrogatory as not reasonably calculated to lead to the discovery of admissible evidence, overbroad, and unduly burdensome, including because it is not limited to patients who visited relevant web pages. Defendant objects to this Interrogatory to the extent it seeks a legal conclusion. Defendant objects to this Interrogatory to the extent it calls for an expert opinion. *Commonwealth v. Brusgulis*, 41 Mass. App. Ct. 386, 390–391 (1996); Mass. R. Evid. 701.

Subject to and without waiving these objections, Defendant answers as follows:

None. There were no third-party tracking pixels or any embedded source code installed on Defendant's patient portal. Moreover, third-party tracking pixels and any embedded source code do not cause the transmission of Data between a website and a third party entity during communications between a web user and the website. Rather, the transmission of Data occurs as follows: (1) the user's browser makes a page request to the website server; (2) the website server renders the webpage back to the user's browser; (3) as the page is being rendered back to the user's browser, any JavaScript and/or source code is loaded onto the user's browser; (4) as a function of the page loading, any JavaScript and/or source code will be transmitted to the applicable third parties. Further, Defendant denies that third-party tracking pixels (or embedded source code) on a website are the proximate cause of any transmission of Data.

Notwithstanding the objections, Defendant states that no information has been withheld from the answer.

INTERROGATORY NO. 7: State the number of Your patients who reside in the state of Massachusetts whose interactions within the password-protected patient portal available through Your website(s) during the Class Period have resulted in the transmission of Data to third parties via the functionalities of third-party tracking pixel (or embedded source code), such as the Meta Pixel or Google Analytics, that You have embedded on Your website(s).

**ANSWER:** Defendant objects to this Interrogatory to the extent it seeks legal conclusions including about causation. Defendant objects to this Interrogatory as not reasonably calculated to lead to the discovery of admissible evidence, overbroad, and unduly burdensome. Defendant objects to this Interrogatory to the extent it calls for an expert opinion. *Commonwealth v. Brusgulis*, 41 Mass. App. Ct. 386, 390–391 (1996); Mass. R. Evid. 701. The Defendant objects to this Interrogatory to the extent it requests that the Defendant admit facts that the Defendant specifically denies.

Subject to and without waiving its objections, the Defendant answers as follows:

None. Third-party tracking pixel or similar technology has never been embedded in the patient portal.

Notwithstanding the objections, the Defendant states that no information has been withheld from the answer.

INTERROGATORY NO. 8: Identify the number of individuals whom You have reason to believe had any of their Personal Health Information disclosed to Facebook or Google in the Data Disclosure. For purpose of answering this interrogatory, "Personal Health Information" includes both (1) data about patients' and potential patients' health conditions (e.g., addiction, Alzheimer's, heart disease), diagnoses, procedures, test results, the treating physician, medications ***and*** (2) personally identifiable information, including but not limited to, patients' and potential patients' names, addresses, email addresses, telephone numbers, IP addresses, Facebook IDs, unique identifying codes, HTTP Headers, Pixel IDs, and/or any other sensitive information obtained and stored by Defendant. Your answer should include the total number of individuals who have had *either* category of their Data disclosed to Facebook or Google in the Data Disclosure.

**ANSWER:** Defendant objects to this Interrogatory as not reasonably calculated to lead to the discovery of admissible evidence, overbroad, and unduly burdensome. Defendant objects to this Interrogatory to the extent it seeks a legal conclusion. Defendant objects to this Interrogatory to the extent it calls for an expert opinion. *Commonwealth v. Brusgulis*, 41 Mass. App. Ct. 386, 390–391 (1996); Mass. R. Evid. 701. Defendant objects to this Interrogatory because it requests that Defendant admit facts that Defendant specifically denies.

Subject to and without waiving the objection, Defendant answers as follows: None, because Defendant contends that no "Personal Health Information" as defined in this interrogatory was disclosed to Facebook or Google.

Subject to the foregoing objections and answer, Defendant further states that it is impossible for Defendant to estimate either the number of individuals who have interacted with Defendant's web pages, resulting in transmission of Data to a third-party entity, or such number as limited to patients, relevant web pages, relevant Data, and Massachusetts citizens. Defendant is in possession of certain information relating to web traffic on its web pages but such information

is not responsive to this request or to this request as limited to patients, relevant web pages, relevant Data, and Massachusetts citizens, including because it relates to unique device-browser combinations instead of unique individuals or patients; counts the same unique device-browser combination more than once including each and every time it accesses any web page, clears cookies, or changes IP address; counts robotic devices; counts based on approximate geographic location of device-browser combination not an individual's or patient's citizenship; and includes other significant counting errors precluding any accurate estimation of the number of unique individuals, patients, or Massachusetts individuals or patients who accessed certain of Defendants' web pages when certain technology was installed on those web pages. Defendant is willing to meet and confer regarding the production of documents relating to web traffic.

Notwithstanding the objections, Defendant states that no information has been withheld from the answer.

INTERROGATORY NO. 9: Identify and describe in detail all notices You have provided to Your patients regarding actual or potential disclosure(s) of Data to third parties that resulted from those patients' interactions with Your website(s) via third-party tracking pixel (or embedded source code), such as the Meta Pixel or Google Analytics. Your Response should include, at minimum, the date(s) of such notice(s), the content of such notice(s), the names of patients to whom such notice(s) were given, and the Bates numbers of any document(s) related to such notice(s).

**ANSWER:** Defendant objects to this Interrogatory because it seeks legal conclusions including about causation. Defendant objects to this Interrogatory as not reasonably calculated to lead to the discovery of admissible evidence, overbroad, and unduly burdensome. Defendant objects to this Interrogatory to the extent it calls for an expert opinion. *Commonwealth v. Brusgulis*, 41 Mass. App. Ct. 386, 390–391 (1996); Mass. R. Evid. 701. Defendant objects to this Interrogatory to the extent it requests that Defendant admit facts that Defendant specifically denies. Defendant further objects that the Interrogatory seeks information that is not in its possession, custody, or control. Defendant objects that it is impossible for Defendant to provide the names of

patients who visited its website and when they visited, absent discovery, for example, from Plaintiff.

Subject to and without waiving the foregoing objections, Defendant answers as follows:

Pursuant to Mass. R. Civ. P. 33(c), Defendant refers Plaintiff to Defendant's documents produced or to be produced in response to Plaintiffs Requests for Production of Documents and reserves the right to supplement this answer.

Notwithstanding the objections, Defendant states that no information has been withheld from the answer.

INTERROGATORY NO. 10: State the time period during which You had the Meta Pixel embedded within any pages of the Patient Portal associated with Your websites.

**ANSWER:** Defendant objects to this Interrogatory to the extent it seeks a legal conclusion. Defendant objects to this Interrogatory to the extent it calls for an expert opinion. *Commonwealth v. Brusgulis*, 41 Mass. App. Ct. 386, 390–391 (1996); Mass. R. Evid. 701. Defendant objects to this Interrogatory to the extent it requests that Defendant admit facts that Defendant specifically denies.

Subject to and without waiving its objections, the Defendant answers as follows:

None.

Notwithstanding the objections, the Defendant states that no information has been withheld from the answer.

INTERROGATORY NO. 11: For everyone whose Personal Health Information was disclosed or potentially disclosed in the Data Disclosure from either Your websites or patient portals, identify the individual by a unique identifier ( e.g. number, letter or combination thereof) and identify their state of residence and the categories of Personal Health Information that were disclosed to Facebook and other third parties in the Data Disclosure:

| Individual Identifier | State of Residence | Personal Health Information Potentially Compromised |
|---|---|---|
| | | |
| | | |

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**ANSWER:** Defendant objects to this Interrogatory as not reasonably calculated to lead to the discovery of admissible evidence, vague, overbroad, and unduly burdensome. Defendant objects to Plaintiff's vague and argumentative column headers. Defendant objects to this Interrogatory because it seeks legal conclusions including about causation. Defendant objects to this Interrogatory to the extent it calls for an expert opinion. *Commonwealth v. Brusgulis*, 41 Mass. App. Ct. 386, 390–391 (1996); Mass. R. Evid. 701. Defendant objects to this Interrogatory to the extent it requests that Defendant admit facts that Defendant specifically denies. Defendant objects that no advertising technology was installed on Defendant's patient portal.

Subject to and without waiving the foregoing objections, Defendant answers as follows:

No Personal Health Information was transmitted between Defendant's website and a third party entity. Rather, the transmission of Data occurs as follows: (1) the user's browser makes a page request to the website server; (2) the website server renders the webpage back to the user's browser; (3) as the page is being rendered back to the user's browser, any JavaScript and/or source code is loaded onto the user's browser; (4) as a function of the page loading, any JavaScript and/or source code will be transmitted to the applicable third parties. Further, Defendant denies that third-party tracking pixels (or embedded source code) on a website are the proximate cause of any transmission of Data.

Subject to and without waiving the foregoing objections and answer, Defendant further states as follows

Pursuant to Mass. R. Civ. P. 33(c), Defendant refers Plaintiff to Defendant's documents produced or to be produced in response to Plaintiffs Requests for Production of Documents and reserves the right to supplement this answer.

Notwithstanding the objections, Defendant states that no information has been withheld from the answer.

INTERROGATORY NO. 12: For the Data Disclosure, describe:

a) The date and time when Your patients' Personal Health Information provided by patient visitors to Your websites first became accessible to third parties, including, but not limited to, Facebook and Google;

b) The date and time when You first learned that Personal Health Information provided by visitors to Your websites had been disclosed to third parties including, but not limited to, Facebook and Google;

c) The date on which You first notified Your current and former patients, employees, government entities, and/or the public that Personal Health Information provided by visitors to your website had been disclosed to third parties including, but not limited to, Facebook and Google; and

d) The method through which You notified Your current and former patients, government entities, and/or the public that Personal Health Information provided by visitors to Your website had been disclosed to third parties, including, but not limited to, Facebook and Google.

**ANSWER:** Defendant objects to this Interrogatory as not reasonably calculated to lead to the discovery of admissible evidence, overbroad, and unduly burdensome. Defendant objects to this Interrogatory because it seeks legal conclusions including about causation. Defendant objects to this Interrogatory to the extent it calls for an expert opinion. *Commonwealth v. Brusgulis*, 41 Mass. App. Ct. 386, 390–391 (1996); Mass. R. Evid. 701. Defendant objects to this Interrogatory to the extent it requests that Defendant admit facts that Defendant specifically denies.

Subject to and without waiving the foregoing objections, Defendant answers as follows:

Pursuant to Mass. R. Civ. P. 33(c), Defendant refers Plaintiff to Defendant's documents produced or to be produced in response to Plaintiffs Requests for Production of Documents and reserves the right to supplement this answer.

Notwithstanding the objections, Defendant states that no information has been withheld from the answer.

INTERROGATORY NO. 13: Identify, by name and title, each employee, agent, or other person acting on Your behalf with responsibility for the following:

a) The design of Your web properties during the Class Period;

b) The source code deployed on your web properties during the Class Period;

c) The operation of website analytics and metrics for your web properties during the Class Period; and

d) The Internet marketing for You that utilized Your websites in any way during the Class Period;

**ANSWER:** Defendant objects to this Interrogatory as not reasonably calculated to lead to the discovery of admissible evidence, overbroad, and unduly burdensome. Defendant objects to this Interrogatory to the extent it calls for an expert opinion. *Commonwealth v. Brusgulis*, 41 Mass. App. Ct. 386, 390–391 (1996); Mass. R. Evid. 701. Defendant objects to this Interrogatory to the extent it requests that Defendant admit facts that Defendant specifically denies.

Subject to and without waiving the foregoing objections, Defendant answers as follows:

Pursuant to Mass. R. Civ. P. 33(c), Defendant refers Plaintiff to Defendant's documents produced or to be produced in response to Plaintiffs Requests for Production of Documents and reserves the right to supplement this answer.

Notwithstanding the objections, Defendant states that no information has been withheld from the answer.

INTERROGATORY NO. 14: Identify and describe any investigations and analyses conducted by You or on Your behalf regarding the Data Disclosure and its causes, including any investigative reports and the conclusions that You reached.

**ANSWER:**

Defendant objects to this Interrogatory as not reasonably calculated to lead to the discovery of admissible evidence, overbroad, and unduly burdensome. Defendant objects to this Interrogatory to the extent it calls for an expert opinion. *Commonwealth v. Brusgulis*, 41 Mass. App. Ct. 386, 390–391 (1996); Mass. R. Evid. 701. Defendant objects to this Interrogatory to the extent it requests that Defendant admit facts that Defendant specifically denies. The Defendant objects to this Interrogatory to the extent it seeks information protected by the attorney-client and work-product privileges, Mass. R. Civ. P. 26(b)(3), (5), and expert discovery beyond the permitted scope of Mass. R. Civ. P. Rule 26(b)(4).

INTERROGATORY NO. 15: Identify and describe any changes to Your policies, procedures, and practices for security of Personal Health Information and Your communications and training regarding the same that were recommended to You before the Data Disclosure, including but not limited to the nature of those recommended changes, the identity of the individuals and/or entities that recommended the changes, whether the changes were actually made, the reasons You made or chose not to make the changes, and the individuals and/or entities involved in approving, denying, and implementing the recommended changes.

**ANSWER:** Defendant objects to this Interrogatory as not reasonably calculated to lead to the discovery of admissible evidence, overbroad, and unduly burdensome. Defendant objects to this Interrogatory to the extent it calls for an expert opinion. *Commonwealth v. Brusgulis*, 41 Mass. App. Ct. 386, 390–391 (1996); Mass. R. Evid. 701. Defendant objects to this Interrogatory to the extent it requests that Defendant admit facts that Defendant specifically denies.

Subject to and without waiving the foregoing objections, Defendant answers as follows:

Pursuant to Mass. R. Civ. P. 33(c), Defendant refers Plaintiff to Defendant's documents produced or to be produced in response to Plaintiffs Requests for Production of Documents and reserves the right to supplement this answer.

Notwithstanding the objections, Defendant states that no information has been withheld from the answer.

**VERIFICATION**

I, Christine Gallery, Senior Vice President, Planning and Chief Strategy Officer at Emerson Hospital, hereby depose and state under penalty of perjury that, on this 29th day of August, 2023, I have read the foregoing answers of Emerson Hospital First Amended Answers to Plaintiff's First Set of Interrogatories and subscribe to the same on behalf of Emerson Hospital that the foregoing answers are based in part on my own knowledge, in part on information communicated to me, and in part on information from documents held by Emerson Hospital and that I believe the foregoing responses to be true and correct to the best of my knowledge.

EMERSON HOSPITAL

By: ______________________ 8/29/2023
Christine Gallery, Senior Vice President, Planning and Chief Strategy Officer

Dated: August 31, 2023

As to objections,

**EMERSON HOSPITAL**

*/s/ Emyr T. Remy*
Tammy B. Webb (*pro hac vice*)
tbwebb@shb.com
SHOOK, HARDY, & BACON L.L.P.
555 Mission Street, Suite 2300
San Francisco, CA 94105
Tel: (415) 544-1900 | Fax: (415) 391-0281

Emyr T. Remy (BBO # 704156)
remy@shb.com
SHOOK, HARDY & BACON L.L.P.
One Federal Street, Suite 2540
Boston, MA 02110
Tel: (617) 531-1411 | Fax: (617) 531-1602

Alfred J. Saikali (*pro hac vice*)
asaikali@shb.com
SHOOK, HARDY & BACON L.L.P.
201 South Biscayne Blvd., Suite 3200
Miami, Florida 33131
Tel: (305) 358-5171 | Fax: (305) 358-7470

Justin R. Donoho (*pro hac vice*)
jdonoho@shb.com
SHOOK, HARDY & BACON L.L.P.
111 South Wacker Drive
Chicago, IL 60606
Tel: (312) 704-7713 | F: (312) 558-1195

Jessica N. Wahl (*pro hac vice*)
jwahl@shb.com
SHOOK, HARDY & BACON L.L.P.
2049 Century Park East, Suite 3000
Los Angeles, CA 90067
T: (424) 285-8330 | F: (424) 204-9093

Jenn O. Hatcher (*pro hac vice*)
jhatcher@shb.com
SHOOK, HARDY & BACON L.L.P.
2555 Grand Blvd.
Kansas City, MO 64108
T: (816) 474-6550 | F: (816) 421-5547

**CERTIFICATE OF SERVICE**

I hereby certify that on August 31, 2023, 1 served DEFENDANT EMERSON HOSPITAL'S FIRST AMENDED RESPONSES TO PLAINTIFF JOHN DOE'S FIRST SET OF INTERROGATORIES, via electronic mail, to the following counsel of record:

J. Tucker Merrigan (BBO# 681627)
Victoria Santoro (BBO# 679120)
Erin E, McHugh (BBO# 703701)
**SWEENEY MERRIGAN LAW**
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com
*Attorneys for Plaintiff*

Foster C. Johnson (*pro hac vice*)
David Warden (*pro hac vice*)
Nathan Campbell (*pro hac vice*)
**AHMAD, ZAVITSANOS & MENSING, P.C.**
1221 McKinney St., Suite 3460
Houston, TX 77010
Tel: (713) 655-1101
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com
*Attorneys for Plaintiff*

Seth Meyer (*pro hac vice*)
Alex Dravillas (*pro hac vice*)
**KELLER POSTMAN LLC**
150 N. Riverside Plaza, Suite 4100
Chicago, IL 60606
Tel: (312) 741-5220
sam@kellerpostman.com
adj@kellerpostman.com
*Attorney for Plaintiff*

*/s/ Emyr T. Remy*
Emyr T. Remy

COMMONWEALTH OF MASSACHUSETTS

**ESSEX, S.S.**

**TRIAL COURT DEPARTMENT**
**SUPERIOR COURT**

JOHN DOE, individually and on behalf of all other similarly situated,

Plaintiff,

v.

EMERSON HOSPITAL,

Defendant.

DOCKET NO. 2277CV01000D

**DEFENDANT EMERSON HOSPITAL'S FIRST AMENDED RESPONSES TO PLAINTIFF JOHN DOE'S FIRST AND SECOND SETS OF REQUESTS FOR PRODUCTION OF DOCUMENTS**

Defendant Emerson Hospital ("Emerson"), by and through its undersigned counsel, hereby serves its First Amended Responses to Plaintiff John Doe's ("Plaintiff") First and Second Sets of Requests for Production of Documents pursuant to Massachusetts Rules of Civil Procedure Rule 34 and Massachusetts Superior Court Rule 30(A), for purposes of this action only, reserving the right to supplement and amend, as follows:

**GENERAL OBJECTIONS**

Defendant incorporates the following general objections in response to each request for production of documents, in addition to the specifically stated objections:

1. Defendant objects to these requests to the extent that they are vague, overbroad, unduly burdensome, and impose obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

2. Defendant objects to these requests to the extent that they seek information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence.

3. Defendant objects to these requests to the extent that they seek documents that were prepared for or in anticipation of litigation, or that are protected from disclosure by the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege, protection, or immunity.

4. The inadvertent production or disclosure of any privileged documents or information shall not constitute or be deemed to be a waiver of any applicable privilege with respect to such document or information (or the contents or subject matter thereof) or with respect to any other such document or discovery now or hereafter requested or provided. Defendant reserves the right not to produce documents that are in part protected by privilege, except on a redacted basis, and to require the return of any document (and all copies thereof) inadvertently produced.

5. Defendant does not waive the right to object, on any and all grounds, to (i) the evidentiary use of documents produced in response to these requests, and (ii) discovery requests relating to those documents.

6. Defendant objects to these requests to the extent that they seek documents not in Defendant's possession, custody, or control.

7. Defendant objects to these requests to the extent they call for the creation of documents not already in existence.

8. Defendant objects to these requests to the extent they seek documents that are publicly available or otherwise already in Plaintiff's possessions, custody, or control or equally accessible to Plaintiffs.

9. Defendant objects to these requests to the extent they seek documents beyond those agreed to between the parties such as with the use of agreed search terms.

10. Defendant objects to the definition of terms to the extent that it conflicts with the uniform definitions contained in Superior Court Rule 30A(1)(C).

11. Defendant objects to Plaintiff's definition of the terms "Data", "Health Information Systems", and 'Personal Health Information' as they are vague, ambiguous, and overbroad.

12. Defendant objects to Plaintiff's definition of the term 'Class Period' as the definition presumes Defendant's liability and an unlimited statute of limitations. Defendant treats the term 'Class Period' for purposes only of responding to these Interrogatories (*e.g.*, without admitting that any third-party source code was installed on Defendant's web properties at any particular time, without admitting liability, and without waiving any affirmative defenses), to mean the time period of October 19, 2016 through the filing of this Complaint because all of Plaintiff's claims arising before at least that date are barred by the statute of limitations.

13. Defendant objects to Plaintiff's definition of the term 'Data Disclosure" as the definition presumes a disclosure of Personal Health Information proximately caused by Defendant. Defendant treats the term 'Data Disclosure" for purposes of responding to these Interrogatories as defined except without regard to who was the proximate cause and without admitting that any disclosure contained Personal Health Information.

14. Defendant submits these responses and objections without conceding the relevancy or materiality of the subject matter of any request or of any document, or that any responsive materials exist.

15. Defendant's responses and objections are not intended to be, and shall not be construed as, agreement with Defendant's characterization of any facts, circumstances, or legal obligations. Defendant reserves the right to contest any such characterization as inaccurate. Defendant also objects to the requests to the extent they contain any express or implied assumptions of fact or law concerning matters at issue in this litigation.

16. Defendant objects to Plaintiff's definition of "Personal Health Information" ("PHI") as overbroad, unduly burdensome, and disproportionate to the needs of the case to the

extent it seeks discovery that is inconsistent with or seeks to impose requirements or obligations on Defendant beyond what is imposed by state and federal law, including the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and the Health Information Technology for Economic and Clinical Health Act ("HITECH"). Defendant further objects to Plaintiff's definition as overbroad and unduly burdensome because it purports to include Personally Identifiable Information ("PII") within the definition of PHI when the two are separate and distinct from one another. Defendant hereby incorporates these objections into each and every one of Plaintiff's definitions where the term "Personal Health Information" is included.

## RESPONSES TO REQUESTS FOR PRODUCTION

1. Documents sufficient to identify the number of unique patients, by year, treated by You during the Class Period.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson will produce non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

2. Documents sufficient to identify the number of unique patients, by year, who used Your patient portal during the Class Period.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects

that any request for portal-specific documents is overbroad and unduly burdensome because no advertising technology was installed on Defendant's patient portal, and attempting to collect and produce the requested information would take significant resources.

3. Documents sufficient to show the number of individuals whose Personal Health Information was disclosed to third parties including (but not limited to) Facebook during the Data Disclosure, including the residency of those individuals.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks documents that do not exist, is vague and ambiguous, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure, including because the requested information is not limited to patients and Massachusetts citizens. Defendant further objects because it contends that no Personal Health Information was disclosed to third parties.

Subject to and without waiving the foregoing objections, Defendant responds that it does not have possession, custody, or control of any documents that are responsive to this request.

Defendant further states that it is in possession of certain information relating to web traffic on its web pages but such information is not responsive to this request or to this request as limited to patients, relevant web pages, relevant Data, and Massachusetts citizens, including because it relates to unique device-browser combinations instead of unique individuals or patients; counts the same unique device-browser combination more than once including each and every time it accesses any web page, clears cookies, or changes IP address; counts robotic devices; counts based on approximate geographic location of device-browser combination not an individual's or patient's citizenship; and includes other significant counting errors precluding any accurate estimation of the number of unique individuals, patients, or Massachusetts individuals or patients who accessed certain of Defendants' web pages when certain technology was installed on those web pages.

Defendant is willing to meet and confer regarding the production of documents relating to web traffic.

4. All documents concerning Your use of the Meta Pixel on Your websites, including Your patient portal(s).

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson will produce all non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

5. Documents sufficient to identify each Affected Person whose Data and/or Personal Health Information was disclosed to Facebook via the Meta Pixel installed on Your websites, including Your patient portal(s).

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks documents that do not exist, is vague and ambiguous, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure, including because the requested information is not limited to Massachusetts citizens. Defendant further objects because it contends that no Personal Health Information was disclosed to Facebook. Defendant further objects that no advertising technology was installed on Defendant's patient portal.

6. Documents sufficient to identify each Affected Person whose Data and/or Personal Health Information was disclosed to Google via code installed on Your websites, including Your patient portal(s).

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks documents that do not exist, is vague and ambiguous, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure, including because the requested information is not limited to Massachusetts citizens. Defendant further objects because it contends that no Personal Health Information was disclosed to Google. Defendant further objects that no advertising technology was installed on Defendant's patient portal.

7. Documents sufficient to show each kind of Data being shared with Facebook when patients or potential patients use and/or interact with Your websites.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

8. Documents sufficient to show each kind of Data being shared with Google when patients or potential patients use and/or interact with Your websites.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession,

custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

9. Documents sufficient to show each kind of Personal Health Information being shared with Facebook when patients or potential patients use and/or interact with Your websites, including Your patient portal(s).

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects because it contends that no Personal Health Information was shared with Facebook. Defendant further objects that no advertising technology was installed on Defendant's patient portal.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

10. Documents sufficient to show each kind of Personal Health Information being shared with Google when patients or potential patients use and/or interact with Your websites, including Your patient portal(s).

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects because it contends that no Personal Health Information was shared with Google. Defendant further objects that no advertising technology was installed on Defendant's patient portal.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

11. Documents sufficient to identify each and every employee, agent, or other persons acting on Your behalf who were wholly or partially responsible for:

a) The design of Your web properties;

b) The source code deployed on Your web properties;

c) website analytics and metrics for Your web properties

d) Internet marketing for You that utilized Your web properties in any way;

e) Other marketing for You that mentioned the web properties in any way.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks documents that do not exist, is vague and ambiguous, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

12. Documents sufficient to show the amount of web traffic to Your web properties and any patient portal(s) on such web properties during the Class Period.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Defendant further objects that any request for portal-specific documents is overbroad and unduly burdensome because no advertising technology was installed on Defendant's patient portal, and attempting to collect and produce the requested information would take significant resources.

Subject to and without waiving the foregoing objections, Defendant responds that that it is willing to meet and confer regarding the production of documents relating to web traffic.

13. Documents sufficient to show the number of unique visitors to Your web properties during the Class Period.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks documents that do not exist, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure, including because the requested information is not limited to patients, relevant web properties, relevant Data, and Massachusetts citizens.

Subject to and without waiving the foregoing objections, Defendant responds that it does not have possession, custody, or control of any documents that are responsive to this request.

Defendant further states that it is in possession of certain information relating to web traffic on its web pages but such information is not responsive to this request or to this request as limited to patients, relevant web pages, relevant Data, and Massachusetts citizens, including because it relates to unique device-browser combinations instead of unique individuals or patients; counts the same unique device-browser combination more than once including each and every time it accesses any web page, clears cookies, or changes IP address; counts robotic devices; counts based on approximate geographic location of device-browser combination not an individual's or patient's citizenship; and includes other significant counting errors precluding any accurate estimation of the number of unique individuals, patients, or Massachusetts individuals or patients who accessed certain of Defendants' web pages when certain technology was installed on those web pages.

Defendant is willing to meet and confer regarding the production of documents relating to web traffic.

14. Documents sufficient to show the number of unique visitors to Your patient portal(s) during the Class Period.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects that any request for portal-specific documents is overbroad and unduly burdensome because no advertising technology was installed on Defendant's patient portal, and attempting to collect and produce the requested information would take significant resources.

15. Documents sufficient to show the number of Your patients who registered for Your patient portal(s) during the Class Period.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects that any request for portal-specific documents is overbroad and unduly burdensome because no advertising technology was installed on Defendant's patient portal, and attempting to collect and produce the requested information would take significant resources.

16. Documents sufficient to show the number of times that patients logged-in to Your patient portal(s) during the Class Period.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and

imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects that any request for portal-specific documents is overbroad and unduly burdensome because no advertising technology was installed on Defendant's patient portal, and attempting to collect and produce the requested information would take significant resources.

17. For each and every first-party cookie at any of Your web properties, including any patient portal(s) on said web properties, for the five years preceding the filing of this action, documents sufficient to show:

a) The cookie name;

b) What information is stored by the cookie;

c) When the cookie is first created;

d) When it is first set on a user's computer;

e) The expiration date for each cookie;

f) To what domain the cookie is set;

g) Whether the cookie value is disclosed to third-parties via cookie synching; and

h) The purpose of the cookie.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects that no advertising technology was installed on Defendant's patient portal.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

18. Documents sufficient to show the first date on which You deployed third-party source code at any of Your web properties from any of the following third parties or its affiliates:

a) Face book;

b) Google;

c) Signal;

d) The Trade Desk;

e) Twitter;

f) Crazy Egg;

g) YouTube;

h) Any other third party not identified herein from whom You have deployed third party source code.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

19. All insurance policies, agreements, or by-laws under which any person may be liable to satisfy all or part of a judgment which may be entered in this action or to indemnify or reimburse You for payments made to satisfy any judgment, settlement, or expenses in connection with this action.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, in the event that insurance agreements may become applicable that may indemnify or reimburse Defendant for any payments

made to satisfy any judgment in this action, and subject to the entry of a protective order and any objections and redactions, such agreements will be provided at the appropriate time in the litigation.

20. Any and all insurance policies that apply or that might arguably apply in this matter.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, in the event that insurance agreements may become applicable that may indemnify or reimburse Defendant for any payments made to satisfy any judgment in this action, and subject to the entry of a protective order and any objections and redactions, such agreements will be provided at the appropriate time in the litigation.

21. Any correspondence with any insurance company related to Plaintiff's claims, including any correspondence accepting or declining coverage and any reservation of right letters You have received related to this matter.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

22. All documents You referenced or relied upon to answer any Interrogatory or Requests for Admissions that Plaintiffs have served in this case.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to

lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

23. All exhibits that You propose to introduce in opposition to class certification or at the class certification hearing.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request is premature. Subject to and without waiving the foregoing objections, Emerson states that it will produce documents responsive to this request that are within its possession, custody or control and reserves the right to supplement this response as discovery continues

24. All web-log or server-log data for the patient portal(s) page or section of any of Your web properties, including, but not limited to, https://www.emersonhospital.org/patientsvisitors/patient-portals.

**RESPONSE:** Subject to its General Objections; Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague and ambiguous, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects that any request for portal-specific documents is overbroad and unduly burdensome because no advertising technology was installed on Defendant's patient portal, and attempting to collect and produce the requested information would take significant resources.

25. All web-log and server-log data containing information that a user or patient "Enrolled" in the patient portal of any of Your web properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague and ambiguous, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects that any request for portal-specific documents is overbroad and unduly burdensome because no advertising technology was installed on Defendant's patient portal, and attempting to collect and produce the requested information would take significant resources.

26. All web-log or server-log data containing information that a user or patient clicked to "Sign In" to the patient portal of any of Your web properties, including, but not limited to, https://www.emersonhospital.org/patients-visitors/patient-portals.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague and ambiguous, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects that any request for portal-specific documents is overbroad and unduly burdensome because no advertising technology was installed on Defendant's patient portal, and attempting to collect and produce the requested information would take significant resources.

27. All web-log or server-log data containing information that a user or patient clicked to log out of the patient portal of any of Your web properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague and ambiguous, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of

Civil Procedure. Defendant further objects that any request for portal-specific documents is overbroad and unduly burdensome because no advertising technology was installed on Defendant's patient portal, and attempting to collect and produce the requested information would take significant resources.

28. Any and all communications relating to Your general deployment, and/or use of third-party source code at any of Your web properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

29. All documents related to proposed and effectuated changes in third-party source code deployed at any of Your web properties in the five years preceding the filing of this action.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues

30. All communications relating to adding, changing, or removing third-party source code deployed at any of Your web properties in the five years preceding the filing of this action.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

31. Documents sufficient to show each date on which any third-party source code was added, changed, or removed from any of Your web properties, including Your patient portal(s), in the five years preceding the filing of this action.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects that no advertising technology was installed on Defendant's patient portal.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

32. For each and every third-party cookie value disclosed to or available to be accessed by any third party when communications are exchanged at any of Your web properties for the five years preceding the filing of this action, documents sufficient to show:

The cookie name;

The third-party entity to whom the cookie relates;

All third-party entities to whom information related to the cookie is disclosed or available to be accessed by;

a) The domain to which the cookie is set;

b) What information is stored by the cookie;

c) The purpose of the cookie;

d) How the cookie is used in relation to Defendant and its websites; and

e) Whether the cookie value is disclosed to others through cookie synching.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

33. All documents relating to disclosure of data to any third parties for marketing purposes via server-side disclosures, including but not limited to server-side disclosures to Facebook, Google, Signal, The Trade Desk, and Twitter.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession,

custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

34. All documents relating to the deployment of the Facebook Tracking Pixel, Facebook Pixel, or Meta Pixel at any of Your web-properties, including Your patient portal(s).

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects that no advertising technology was installed on Defendant's patient portal.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

35. All documents relating to the deployment of any Facebook third-party source code other than the Face book Tracking Pixel, Face book Pixel, or Meta Pixel at any of Your web-properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

36. All documents relating to cookies associated with Facebook, including how they are deployed, accessed, disclosed, or used by Facebook or You at any of Your web properties, including but not limited to:

a) c_user;

b) datr;

c) fr;

d) Any other Facebook cookie that You permit Face book to set or access via any of Your web-properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects to this request to the extent it seeks information that is a matter of public record or is in the possession, custody, or control of Facebook, not Defendant.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

37. All documents relating to Facebook's use of cookies, IP addresses, device identifiers, and other data caused to be transmitted, disclosed, or accessed through Your deployment of Facebook third-party source code on Your web-properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Defendant further objects to this request to the extent it seeks information that is a matter of public record or is in the possession, custody, or control of Facebook, not Defendant.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

38. All documents relating to Facebook's receipt of cookies, IP addresses, device identifiers, and other data caused to be transmitted, disclosed, or accessed through Your deployment of Facebook third-party source code on Your web-properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects to this request to the extent it seeks information that is a matter of public record or is in the possession, custody, or control of Facebook, not Defendant.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

39. All documents relating to Your use of Custom Audiences through Face book.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

40. All communications between You and Facebook or its employees, agents, or assigns.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson will produce all non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

41. All contracts, agreements, memoranda of understanding, or other documents relating to the relationship between You and Facebook.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson will produce all non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

42. All non-disclosure or confidentiality agreements relating to Facebook and its collection of data at any of Your web properties, including www.emersonhospital.org.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson will produce all non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

43. All documents relating to Facebook's use of data collected and/or derived from Your deployment of Facebook third-party source code at any of Your web properties, including www.emersonhospital.org.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects to this request to the extent it seeks information that is a matter of public record or is in the possession, custody, or control of Facebook, not Defendant.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

44. All documents relating to Your use of Face book advertising tools in relation to any of Your web-properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson will produce all non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

45. All documents sufficient to show, during the Class Period, the total amount of money paid, or to be paid, to You from any third-party, including Facebook and Google, for the third-party's receipt of information from Your website.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

46. All documents relating to return on investment from marketing through Facebook.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson will produce all non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

47. All documents relating to return on investment from marketing through Google.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson will produce all non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

48. All documents relating to deployment and use of Google source code at any of Your web properties, including but not limited to Google DoubleClick, Google Analytics, and Google Ads.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

49. All documents relating to Your passing of data to Google.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

50. All source code deployed at any of Your web properties that causes the passing of data to Google.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it is willing to meet and confer regarding the production of source code.

51. All documents relating to Your deployment and use of Google third-party source code at any of Your web properties, including but not limited to:

a) Google Analytics;

b) Google Ads;

c) Adservice. Google.com;

d) Google.com;

e) Google Doubleclick; and

f) YouTube.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

52. All documents relating to cookies associated with Google, Facebook, or other third-parties from whom You deploy tracking pixels ( or embedded source code), including documents sufficient to show how those cookies are deployed, accessed, disclosed or used by any of Your web-properties, and documents sufficient to show the data such cookies enable, including but not limited to at least the following cookies:

a) _gads

b) _gadsID

c) sonar

d) _dpm_id

e) _fbp

f) aj s anonymous_ id

g) ajs_group_id

h) ajs_user_id

i) cto_lwid

j) DSID

k) id

l) permutive-id

m) permutive-session

n) rbuid

o) sm uuid

p) utma

q) utmb

r) utmc

s) utmz

t) SSID

u) SIDCC

v) SAPISID

w) OGPC

x) NID

y) HSID

z) DV

aa) APISID

bb) ANID

cc) IP JAR

dd) Secure-SSID

ee) Secure-HSID

ff) Secure-APISID

gg) _Secure-3P APISID

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

53. All documents relating to the passing of values of putative first-party cookies to Google Analytics, including but not limited to cookies with the following names:

a) utma

b) utmb

c) utmc

d) utmz

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

54. All communications between You and Google or its employees, agents, or assigns.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson will produce all non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

55. All contracts, agreements, memoranda of understanding, or other documents relating to the relationship between You and Google.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson will produce all non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

56. All non-disclosure or confidentiality agreements relating to Google and its collection of data at any of Your web-properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson will produce all non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

57. All documents relating to Google's use or receipt of data collected and/or derived from Your deployment of Google third-party source code at or any of Your web-properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects to this request to the extent it seeks information that is a matter of public record or is in the possession, custody, or control of Google, not Defendant.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

58. All documents relating to Your use of Google advertising tools in relation to any of Your web-properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson will produce all non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

59. All documents relating to return on investment from marketing through Google or any of its affiliates.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

60. All Your HIP AA notices and privacy policy notices in effect during the Class Period.

**RESPONSE** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

61. All purported Privacy Policies in effect at any of Your web properties (including www.emersonhospital.org) from the date You first deployed any third-party source code from Facebook, Google, or any other third party. If the Privacy Policy changed at any point in time from the date referenced to the present, produce all Privacy Policies used and the dates those policies were in effect. If the links to the Privacy Policy or presentation thereof have changed at any point in time from the date reference to the present, produce duplications of each such presentation.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to

lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

62. Documents sufficient to show Your organizational and management structure including, but not limited to, organizational charts and employee directories for the Class Period.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

63. All written authorizations from any Affected Person authorizing You to share their Personal Health Information with Facebook.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects because it contends that it did not share Personal Health Information with Facebook.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

64. All written authorizations from any Affected Person authorizing You to share their Personal Health Information with Google.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects because it contends that it did not share Personal Health Information with Google.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

65. All written authorizations from any Affected Person authorizing You to share their Personal Health Information with any third party for marketing purposes.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects because it contends that it did not share Personal Health Information with third parties.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

66. All exhibits that You propose to introduce in opposition to class certification or at the class certification hearing.

**RESPONSE:** Subject to its General Objections, Defendant objects to this request as it is a duplicate of Request 23 and incorporates its response herein.

67. Any documents reviewed, consulted, used, or relied upon by any expert that You intend to use on any issue related to class certification.

**RESPONSE:** Defendant objects to this request to the extent it seeks expert discovery beyond the permitted scope of Mass. R. Civ. P. Rule 26(b)(4). Defendant also objects that this request is premature.

68. All contracts between You and Plaintiff.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects to this request to the extent Plaintiff has equal access to responsive documents.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

69. All documents relating or referring to Plaintiff.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects to this request as Plaintiff has equal access to responsive documents.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

70. All documents relating to data disclosures that You provided to Plaintiff.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

71. Any and all documents that You contend show that You had prior express consent to disclose any of Plaintiff's personally identifiable information and communications exchanged with You to any third-party internet tracking companies including, but not limited to, Facebook, Google, Signal, Trade Desk, or Twitter.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to

lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

72. All documents relating to the manner, method, and means by which You contend Plaintiff purportedly consented to the disclosure of their personally identifiable information and communications exchanged with You to third-party internet tracking companies including, but not limited to Facebook, Google, Signal, Trade Desk, or Twitter.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

73. All documents relating to Your disclosure to third parties of any data about the Plaintiff.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession,

custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

74. All documents relating to Plaintiff conveyed from You to Facebook, Google, Signal, Trade Desk, Twitter, or any other third-party marketing company, regardless of the form or method of the conveyance or disclosure.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

75. For the following entities, all documents relating to the responsibilities of the entity as it relates to Your web properties and/or marketing, including but not limited to contracts, memorandums of understanding, indemnification agreements, and non-disclosure agreements:

a) Influence Health, Inc.;

b) Healthgrades;

c) Face book;

d) Google;

e) Signal;

f) The Trade Desk

g) Any other person not identified but which has responsibilities relating to Your web properties or marketing.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to

lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

76. For the following entities, all communications with the entity and any of its employees, agents, or assigns relating to the deployment or use of third-party source code at Defendant's web properties:

a) Influence Health, Inc.;

b) Healthgrades;

c) Facebook;

d) Google;

e) YouTube;

f) Signal;

g) The Trade Desk

h) Any other entity not identified but which has responsibilities relating to Your web properties or marketing.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

77. All documents relating to any communication to enroll or log in to the patient portal from any page at any of Your web properties, including documents with aggregate information and documents with specific information about any individual or computing device, including but not limited to names, email addresses, IP addresses, cookie identifiers, or any other unique identifiers associated with the enrollment or login. This request encompasses any data available to You that is available to You in the possession of a related entity or parent organization, or contractor or agent.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks documents that do not exist, is vague and ambiguous, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects that any request for portal-specific documents is overbroad and unduly burdensome because no advertising technology was installed on Defendant's patient portal, and attempting to collect and produce the requested information would take significant resources.

78. All documents relating to any communication to enroll or log in to the patient portal from any page at any of Your web properties, including documents with aggregate information and documents with specific information about any individual or computing device, including but not limited to names, email addresses, IP addresses, cookie identifiers, or any other unique identifiers associated with the enrollment or login. This request encompasses any data available to You that is available to You in the possession of a related entity or parent organization, or contractor or agent.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks documents that do not exist, is vague and ambiguous, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects that any request for portal-specific documents is overbroad and unduly burdensome because no advertising technology was installed on Defendant's patient portal, and attempting to collect and produce the requested information would take significant resources.

79. All documents relating to any telephone request to enroll in Your patient portal(s) on any of Your web properties, including but not limited to names, email addresses, IP addresses,

cookie identifiers, or any other unique identifiers associated with Enrollment or Login arising from such request to enroll.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks documents that do not exist, is vague and ambiguous, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects that any request for portal-specific documents is overbroad and unduly burdensome because no advertising technology was installed on Defendant's patient portal, and attempting to collect and produce the requested information would take significant resources.

80. All documents relating to any in-person request to enroll in Your patient portal(s) on any of Your web properties, including but not limited to names, email addresses, IP addresses, cookie identifiers, or any other unique identifiers associated with Enrollment or Login arising from such request to enroll.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks documents that do not exist, is vague and ambiguous, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects that any request for portal-specific documents is overbroad and unduly burdensome because no advertising technology was installed on Defendant's patient portal, and attempting to collect and produce the requested information would take significant resources.

81. All third-party source code deployed at any of Your web properties during the Class Period.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it is willing to meet and confer regarding the production of source code.

82. All documents relating to any meeting(s) (including but not limited to agendas, minutes, summaries, and notes) relating to third-party source code or the disclosure of information about patients/user who exchange communications at any of Your web properties, including but not limited to meeting(s) with representatives or agents of:

a) Face book;

b) Google;

c) Signal;

d) The Trade Desk;

e) Twitter;

f) Any other third party not identified herein from whom You have deployed thirdparty source code.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

83. All documents relating to Your use of cookie synching with third parties at any of Your web properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

84. All documents relating to the Meta Pixel parameter 'ev' or Meta Events Manager, including all event data associated with any of Your web-properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

85. All documents relating to the Meta Event with the value of 'SubscribedButtonClick' including associated settings and how it is used at any of Your web properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

86. All documents relating to the cookie '_ fbp', including how it is deployed and used by Facebook or by You.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

87. All documents relating to Your use of cookie synching with Facebook.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

88. All documents relating to Your use of cross-device tracking by Facebook.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

89. All documents relating to website scraping by Facebook.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects to this request to the extent it seeks information that is a matter of public record or is in the possession, custody, or control of Facebook, not Defendant.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

90. All documents relating to POST requests from users to Facebook being triggered even when the user does not fill out a form or take an affirmative action to submit data to You or Facebook.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession,

custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

91. All documents relating to any Facebook Javascript file(s) deployed at any of Your web properties, including Your patient portal(s).

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects that no advertising technology was installed on Defendant's patient portal.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

92. All documents relating to the value of the data disclosed to third parties including, but not limited to, documents relating to:

a) any compensation provided or received, monetary or otherwise, for conveymg information to a third party, including but not limited to, Facebook, Google, Signal, The Trade Desk, and Twitter.

b) any internal analysis regarding the value of privacy;

c) any internal analysis regarding the value of patient data to You;

d) the privacy policy, privacy promises, and/or general privacy and impression by users and/or the general public;

e) any internal analysis of the value of Your use of any or all third-party source code for marketing or other purposes.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the

discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson will produce all non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

93. All documents relating to the value You place on data disclosed to Face book.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

94. All documents relating to the value You place on the use of the Facebook Tracking Pixel, Facebook Pixel, or Meta Pixel.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession,

custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

95. All documents relating to Your use of cookie synching with Google.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

96. All documents relating to data sharing or transmissions between Google and Facebook facilitated in whole or in part via any of Your web properties, whether directly through Google or an affiliate such as DoubleClick.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects to this request to the extent it seeks information that is a matter of public record or is in the possession, custody, or control of Google or Facebook, not Defendant.

97. All documents relating to the deployment and use of a Meta Pixel ID through any Google property.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to

lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

98. All documents relating to Your use of cookie synching with Google or any of its affiliates.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

99. All documents relating to Your use of cross-device tracking by Google or any of its affiliates.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession,

custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

100. All documents relating to website scraping by Google.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues. Defendant further objects to this request to the extent it seeks information that is a matter of public record or is in the possession, custody, or control of Google, not Defendant.

101. All documents relating to Google's use of cookies, IP addresses, device identifiers, and other data caused to be transmitted, disclosed, or accessed through Defendant's deployment of Google third-party source code.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects to this request to the extent it seeks information that is a matter of public record or is in the possession, custody, or control of Google, not Defendant.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession,

custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

102. All documents relating to Google's receipt of cookies, IP addresses, device identifiers, and other data caused to be transmitted, disclosed, or accessed through Defendant's deployment of Google third-party source code.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects to this request to the extent it seeks information that is a matter of public record or is in the possession, custody, or control of Google, not Defendant.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

103. All documents relating to the value of the data disclosed or transmitted to Facebook relating to any of Your web-properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

104. All documents relating to the value You place on use of Google marketing tools deployed at any of Your web-properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

105. All documents relating to Your deployment and use of The Bright Tag or Signal third-party source code (hereafter "Signal") at any of Your web properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

106. All documents relating to Your use of cookie synching with Signal.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

107. All documents relating to Your use of cross-device tracking by Signal.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

108. All documents relating to cookies associated with Signal, including how they are deployed, accessed, disclosed or used by Signal or by any of Your web properties, including but not limited to 'vcnid.'

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects to this request to the extent it seeks information that is a matter of public record or is in the possession, custody, or control of Signal, not Defendant.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession,

custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

109. All documents relating to website scraping by Signal.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects to this request to the extent it seeks information that is a matter of public record or is in the possession, custody, or control of Signal, not Defendant.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

110. All documents relating to Signals use of cookies, IP addresses, device identifiers, and other data caused to be transmitted, disclosed, or accessed through Your deployment of Signal third party source code.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects to this request to the extent it seeks information that is a matter of public record or is in the possession, custody, or control of Signal, not Defendant.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession,

custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

111. All communications between You and Signal or its employees, agents, or assigns.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

112. All contracts, agreements, memoranda of understanding, or other documents relating to the relationship between You and Signal relating to any of Your web-properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

113. All non-disclosure or confidentiality agreements relating to Signal and its collection of data at or any of Your web-properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to

lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

114. All documents relating to Signal's use of data collected and/or derived from Your deployment of Signal third-party source code at any of Your web-properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects to this request to the extent it seeks information that is a matter of public record or is in the possession, custody, or control of Signal, not Defendant.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

115. All documents relating to Your use of Signal advertising tools in relation to any of Your web-properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

116. All documents relating to the value of the data disclosed or transmitted to Signal relating to or any of Your web-properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

117. All documents relating to the value You place on use of Signal marketing tools deployed at or any of Your web-properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

118. All documents relating to return on investment from marketing through Signal or any of its affiliates.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

119. All documents relating to Your deployment and use of Trade Desk third-party source code at any of Your web-properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

120. All documents relating to Your use of cookie synching with Trade Desk.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

121. All documents relating to Your use of cross-device tracking by Trade Desk.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

122. All documents relating to cookies associated with Trade Desk, including how they are deployed, accessed, disclosed or used by Trade Desk or by You at any of Your web-properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects to this request to the extent it seeks information that is a matter of public record or is in the possession, custody, or control of Trade Desk, not Defendant.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession,

custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

123. All documents relating to website scraping by Trade Desk.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects to this request to the extent it seeks information that is a matter of public record or is in the possession, custody, or control of Trade Desk, not Defendant.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

124. All documents relating to Trade Desk's use of cookies, IP addresses, device identifiers, and other data caused to be transmitted, disclosed, or accessed through Your deployment of Trade Desk third-party source code.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects to this request to the extent it seeks information that is a matter of public record or is in the possession, custody, or control of Trade Desk, not Defendant.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession,

custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

125. All communications between You and Trade Desk or its employees, agents, or assigns.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

126. All contracts, agreements, memoranda of understanding, or other documents relating to the relationship between You and Trade Desk relating to any of Your web-properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

127. All non-disclosure or confidentiality agreements relating to Trade Desk and its collection of data at or any of Your web-properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

128. All documents relating to Trade Desk's use of data collected and/or derived from Your deployment of Trade Desk third-party source code at any of Your web-properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects to this request to the extent it seeks information that is a matter of public record or is in the possession, custody, or control of Trade Desk, not Defendant.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

129. All documents relating to Your use of Trade Desk advertising tools in relation to any of Your web-properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to

lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

130. All documents relating to the value of the data disclosed or transmitted to Trade Desk relating to any of Your web-properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

131. All documents relating to the value You place on use of Trade Desk marketing tools deployed at or any of Your web-properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession,

custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

132. All documents relating to return on investment from marketing through use of Trade Desk or any of its affiliates.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

133. All documents relating to Your policies for the destruction of records, documents, or files.

**RESPONSE:** Subject to its General Objections, Defendant further objects to this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects to this request to the extent it seeks information that is protected by the attorney-client privilege and/or work product doctrine. This request represents an inappropriate request for discovery-on-discovery and is not tailored to the claims and defenses in this matter.

134. All documents relating to Your document backup policies or procedures.

**RESPONSE:** Subject to its General Objections, Defendant further objects to this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes

obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects to this request to the extent it seeks information that is protected by the attorney-client privilege and/or work product doctrine. This request represents an inappropriate request for discovery-on-discovery and is not tailored to the claims and defenses in this matter.

135. All documents relating to Your backup of electronic data relevant to this matter including, but not limited to, lists or descriptions of all media formats utilized, software and hardware versions, build numbers and other related information You used to backup any of the data stored on archive or backup media with respect to documents relating to this request.

**RESPONSE:** Subject to its General Objections, Defendant further objects to this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects to this request to the extent it seeks information that is protected by the attorney-client privilege and/or work product doctrine. This request represents an inappropriate request for discovery-on-discovery and is not tailored to the claims and defenses in this matter. The internal infrastructure of Emerson computer backup systems is not relevant to the claims propounded in this case.

136. All diagrams depicting Your email system architecture including, but not limited to, physical server locations and mail store configurations.

**RESPONSE:** Subject to its General Objections, Defendant further objects to this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects to this request to the extent it seeks information that is protected by the attorney-client privilege and/or work product doctrine. This request represents an inappropriate request for discovery-on-discovery and is not tailored to the claims and defenses in this matter. Emerson's

email system architecture and computer system infrastructure is not relevant to the claims propounded in this case.

Subject to and without waiving the foregoing objections, Defendant states that it is willing to meet and confer regarding the production of emails.

137. Documents sufficient to show for each and every previous instance of an alleged or reported HIP AA violation by You, the nature of the HIP AA violation, the number of patients impacted by the violation, and the notice sent to patients informing them of the violation.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

138. Documents sufficient to show each and every individual medical provider profile displayed at any of Your web properties during the Class Period.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

139. Documents sufficient to show each and every individual medical provider associated with the appointment scheduling functionality at any of Your web properties during the Class Period.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to

lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects that no advertising technology was installed on any web page with appointment scheduling technology.

140. Documents sufficient to show the database schema, including but not limited to tables, fields, and indexes, of any database in which You obtain, return, store, maintain, access, view, or communicate records of visits to www.emersonhospital.org or Your patient portal(s).

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects that no advertising technology was installed on Defendant's patient portal. Defendant further objects to this request to the extent it seeks information that is a matter of public record or is in the possession, custody, or control of Google, not Defendant.

141. Documents sufficient to show how any database in which You obtain, return, store, maintain, access, view, or communicate records of visits to www.emersonhospital.org or Your patient portal(s) may be queried.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects that no advertising technology was installed on Defendant's patient portal. Defendant further objects to this request to the extent it seeks information that is a matter of public record or is in the possession, custody, or control of Google, not Defendant.

142. All documents and communications concerning Your policies and procedures regarding the collection and retention of Personal Health Information from website visitors, patients, and potential patients, including, but not limited to, specific Data collected and retained, and length of time Personal Health Information is retained, as well as any procedures in place to ensure that these policies and procedures were and are being followed.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects because it contends that no Personal Health Information was disclosed to third parties.

Subject to and without waiving the foregoing objections, Emerson will produce all non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

143. All documents and communications concerning or comprising Your policies and procedures regarding the safeguarding and protection of Personal Health Information and other Data provided by visitors to Your websites, including, but not limited to, Your costs associated therewith, as well as any procedures, practices, and training in place to ensure that these policies and procedures were and are being followed during the relevant period.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects because it contends that no Personal Health Information was disclosed to third parties.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession,

custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

144. All documents and communications concerning or comprising any representations You made to Your current and former patients regarding the protection and security of Personal Health Information and other Data from visitors to Your websites, including, but not limited to, compliance with any state or federal privacy or information security laws or regulations.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects because it contends that no Personal Health Information was disclosed to third parties.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

145. All documents and communications concerning or comprising any remedial steps You took during or following Your discovery of the Data Disclosure.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects because it contends that no steps taken were remedial.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession,

custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

146. All documents concerning or comprising communications between You and any governmental entities that relate to Your policies, procedures, protocols, or practices for safeguarding and protecting Personal Health Information, and/or regarding the Data Disclosure.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects because it contends that no Personal Health Information was disclosed to third parties.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

147. All documents regarding Your compliance or noncompliance with any applicable Data security guidelines or standards.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects to this request as it asks for a legal conclusion.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession,

custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

148. All documents related to Your policies and procedures to prevent, detect, contain, or remediate information security incidents, such as unauthorized access to or disclosure of Personal Health Information, as well as documents concerning compliance or non-compliance with those policies and procedures.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects because it contends that no Personal Health Information was disclosed to third parties.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

149. All documents concerning assessments or analyses regarding the potential risks or vulnerabilities to the confidentiality, integrity, and availability of Personal Health Information in Your Health Information Systems, as well as any decisions or efforts to address or remediate any identified risks.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects because it contends that no Personal Health Information was disclosed to third parties. Defendant further objects that no advertising technology was installed on any Defendant Health Information System.

150. Documents sufficient to identify all vendors or consultants You hired, or from whom You sought proposals for cybersecurity matters and/or safeguarding and protecting Personal Health Information provided by visitors to Your websites.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects because it contends that no Personal Health Information was disclosed to third parties.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

151. Documents sufficient to show your IT, cybersecurity, and overall operating budgets.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

152. All documents related to Your data security awareness and training programs for members of Your workforce, including independent contractors, including, but not limited to, names and titles of individuals conducting trainings, training manuals, course materials, topics covered, agendas, notes, and presentations.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

153. All documents related to enforcement of Your information security policies and procedures, including records of sanctions for noncompliance with those policies and procedures.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

154. All documents concerning Your policies and procedures for encryption and decryption of Personal Health Information and documents reflecting that these policies and procedures were and are being followed.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects because it contends that no Personal Health Information was disclosed to third parties.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession,

custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

155. Documents sufficient to show how You identified that the Data Disclosure occurred, including, but not limited to, how You determined that the security of former and current patients' Data was disclosed to third parties including but not limited to Facebook, what data was disclosed, the dates on which You became aware of the disclosure, why the disclosure occurred, and any cybersecurity measures or precautions You have implemented in response to the Data Disclosure.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

156. All reports or other documents regarding Your investigation and documentation of the Data Disclosure and its consequences or Your response to the Data Disclosure, including, but not limited to, the cause of the Data Disclosure, the information compromised during the Data Disclosure, the number of Affected Persons, remedial measures taken, changes implemented and details regarding such measures and changes such as when the changes took place or will take place, and who implemented or will implement the changes.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects to this request to the extent it seeks information that is protected by the attorney-client privilege and/or work product doctrine.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

157. All documents detailing any recommendations made or actions taken to notify Affected persons, government entities, or the public of the Data Disclosure before June 2022, including, but not limited to, the date on which those recommendations were made or actions were taken and the reasons why notification to Affected persons, government entities, or the public was delayed.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

158. All documents and communications concerning assessments of potential Health Information System vendors.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects that no advertising technology was installed on any Defendant Health Information System.

159. All documents and communications sufficient to identify all vendors or consultants You hired or from whom You sought proposals for Health Information Systems.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects that no advertising technology was installed on any Defendant Health Information System.

160. All documents and communications concerning how Personal Health Information is stored in Health Information Systems, including but not limited to patient portals.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects because it contends that no Personal Health Information was disclosed to third parties. Defendant further objects that no advertising technology was installed on any Defendant Health Information System or Defendant's patient portal.

161. All documents and communications concerning the encryption or safeguarding of Personal Health Information in Health Information Systems such as patient portals.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects because it contends that no Personal Health Information was disclosed to third parties. Defendant further objects that no advertising technology was installed on any Defendant Health Information System or Defendant's patient portal.

162. All documents concerning policies and procedures regarding the means of access to Your Health Information Systems (including but not limited patient portals) given by You to third parties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects that no advertising technology was installed on any Defendant Health Information System or Defendant's patient portal.

163. All documents and communications showing analyses regarding whether Health Information Systems such as patient portals improve patient care.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects that no advertising technology was installed on any Defendant Health Information System.

Dated: August 31, 2023

**EMERSON HOSPITAL**

*/s/ Emyr T. Remy*
Tammy B. Webb (*pro hac vice*)
tbwebb@shb.com
SHOOK, HARDY, & BACON L.L.P.
555 Mission Street, Suite 2300
San Francisco, CA 94105
Tel: (415) 544-1900 | Fax: (415) 391-0281

Emyr T. Remy (BBO # 704156)
remy@shb.com
SHOOK, HARDY & BACON L.L.P.
One Federal Street, Suite 2540
Boston, MA 02110
Tel: (617) 531-1411 | Fax: (617) 531-1602

Alfred J. Saikali (*pro hac vice*)
asaikali@shb.com
SHOOK, HARDY & BACON L.L.P.
201 South Biscayne Blvd., Suite 3200
Miami, Florida 33131
Tel: (305) 358-5171 | Fax: (305) 358-7470

Justin R. Donoho (*pro hac vice*)
jdonoho@shb.com
SHOOK, HARDY & BACON L.L.P.
111 South Wacker Drive
Chicago, IL 60606
Tel: (312) 704-7713 | F: (312) 558-1195

Jessica N. Wahl (*pro hac vice*)
jwahl@shb.com
SHOOK, HARDY & BACON L.L.P.
2049 Century Park East, Suite 3000
Los Angeles, CA 90067
T: (424) 285-8330 | F: (424) 204-9093

Jenn O. Hatcher (*pro hac vice*)
jhatcher@shb.com
SHOOK, HARDY & BACON L.L.P.
2555 Grand Blvd.
Kansas City, MO 64108
T: (816) 474-6550 | F: (816) 421-5547

**CERTIFICATE OF SERVICE**

I hereby certify that on August 31, 2023, I served DEFENDANT EMERSON HOSPITAL'S FIRST AMENDED RESPONSES TO PLAINTIFF JOHN DOE'S FIRST AND SECOND SETS OF REQUESTS FOR PRODUCTION OF DOCUMENTS, via electronic mail, to the following counsel of record:

J. Tucker Merrigan (BBO# 681627)
Victoria Santoro (BBO# 679120)
Erin E, McHugh (BBO# 703701)
**SWEENEY MERRIGAN LAW**
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com
*Attorneys for Plaintiff*

Foster C. Johnson (*pro hac vice*)
David Warden (*pro hac vice*)
Nathan Campbell (*pro hac vice*)
**AHMAD, ZAVITSANOS & MENSING, P.C.**
1221 McKinney St., Suite 3460
Houston, TX 77010
Tel: (713) 655-1101
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com
*Attorneys for Plaintiff*

Seth Meyer (*pro hac vice*)
Alex Dravillas (*pro hac vice*)
**KELLER POSTMAN LLC**
150 N. Riverside Plaza, Suite 4100
Chicago, IL 60606
Tel: (312) 741-5220
sam@kellerpostman.com
adj@kellerpostman.com
*Attorney for Plaintiff*

*/s/ Emyr T. Remy*
Emyr T. Remy

# EXHIBIT 3

COMMONWEALTH OF MASSACHUSETTS

| | | |
|---|---|---|
| ESSEX, ss | ) | TRIAL COURT DEPARTMENT SUPERIOR COURT |
| JOHN DOE, individually and on behalf of all others similarly situated, | ) | |
| Plaintiff, | ) | DOCKET NO. 2277CV01000D |
| v. | ) | |
| EMERSON HOSPITAL, | ) | |
| Defendant. | ) | |

**DECLARATION OF RENEE FOSBERG**

I, **RENNE FOSBERG**, hereby certify and declare as follows:

1. I am Vice President and Chief Information Officer at Emerson Hospital ("Emerson"). I have worked at Emerson since 2006, serving in the roles of Vice President and Chief Information officer (2019-present), Senior Director of Information Systems (2012-2019), Senior Director of Applications (2009-2012), and Director of Outpatient Applications (2006-2009).

2. I have worked for nearly twenty (20) years as a leader in the health care information systems industry. Prior to my role at Emerson, I worked for Caritas Christi Health Care (now Steward Health Care) for ten (10) years.

3. I submit this Affidavit in support of Emerson's Opposition to Plaintiff's Motion to Compel and Remove Certain Objections. I have personal knowledge of the facts contained herein and could and would testify to them if called as a witness.

4. As Emerson's Vice President and Chief Information Officer, I have chief responsibility for managing and implementing Emerson's information systems, including (1) the public webpage located at https://ehconnect.emersonhosp.org/PTAccess, which serves as the

entryway to Emerson Health Connect, Emerson's patient portal for hospital services, including inpatient care, rehabilitation, lab, and imaging; (2) the login button on this public webpage; and (3) the private patient portal pages available to portal users beyond the entryway and login button once a user logs in (collectively, Emerson's "Patient Portal").

5. Emerson's Patient Portal is hosted on servers owned and operated by Emerson but developed and maintained with software programs by a third-party vendor named iatricSystems.

6. The Patient Portal has never contained any advertisements. Moreover, neither Emerson nor iatricSystems has ever captured any data with any software that would enable any analysis of the types of visitors to the website or overall website traffic for marketing or advertisement purposes.

7. On November 30, 2022, and again on October 3, 2023, a member of my team reached out to iatricSystems to make queries about whether the Patient Portal has ever had installed on it any advertising technologies such as Meta/Facebook Pixel, Google Analytics, DoubleClick, GoogleAds, StackAdapt, Quantcast and YouTube ("adtech"). In response, iatricSystems consulted its application development team and confirmed that no adtech has ever been installed on the Patient Portal.

8. A member of my team also performed an independent test to ensure that no Meta/Facebook Pixel code was installed on the Patient Portal by: (a) installing a Google Chrome browser extension provided by Facebook/Meta for developers to test whether Pixel is running on a specific web page; (b) loading the extension onto a computer that was not part of Emerson's network; (c) following Facebook/Meta's instructions to check the Emerson Portal Page located at https://ehconnect.emersonhosp.org/PTAccess; (d) receiving output from the extension confirming that no Pixel code was being used; and (e) confirming that the extension was working properly by testing the extension on other websites containing Facebook/Meta Pixel code.

*I declare under penalty of perjury under the laws of the Commonwealth of Massachusetts that the foregoing statements are true and correct.*

Dated this 5th day of October, 2023.

Renee Fosberg

# Emerson - Declaration of Renee Fosberg

Final Audit Report 2023-10-05

| | |
|---|---|
| Created: | 2023-10-05 |
| By: | Emyr Remy (remy@shb.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAtK3A3Rlo1Et-AKhFWDrjhqJbU8jR7UBh |

## "Emerson - Declaration of Renee Fosberg" History

Document created by Emyr Remy (remy@shb.com)
2023-10-05 - 4:35:53 PM GMT

Document emailed to rfosberg@emersonhosp.org for signature
2023-10-05 - 4:36:42 PM GMT

Email viewed by rfosberg@emersonhosp.org
2023-10-05 - 4:55:01 PM GMT

Signer rfosberg@emersonhosp.org entered name at signing as Renee Fosberg
2023-10-05 - 4:56:27 PM GMT

Document e-signed by Renee Fosberg (rfosberg@emersonhosp.org)
Signature Date: 2023-10-05 - 4:56:29 PM GMT - Time Source: server

Agreement completed.
2023-10-05 - 4:56:29 PM GMT

Adobe Acrobat Sign

# EXHIBIT 4

**From:** Foster Johnson <fjohnson@AZALAW.COM>
**Sent:** Friday, August 18, 2023 1:15 PM
**To:** Webb, Tammy (SHB)
**Cc:** Donoho, Justin R. (SHB); Ward, Jason (SHB); David Warden
**Subject:** Zoom call next week about Emerson patient portal use

**EXTERNAL**

Tammy,

Please let me know your team's availability for a call on Thursday-Friday next week to discuss Emerson's use of tracking pixels on its patient portal.

Thanks,
Foster

**Foster C. Johnson**
Partner
Ahmad, Zavitsanos & Mensing, PLLC
1221 McKinney, Suite 2500
Houston, Texas 77010
Direct 713.600.4915
Main 713.655.1101
Cell 713.724.6743
www.azalaw.com

**Disclaimer**

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by **Mimecast Ltd**, an innovator in Software as a Service (SaaS) for business. Providing a **safer** and **more useful** place for your human generated data. Specializing in; Security, archiving and compliance. To find out more Click Here.

# EXHIBIT 5

**From:** Webb, Tammy (SHB)
**Sent:** Friday, August 18, 2023 3:56 PM
**To:** Foster Johnson
**Cc:** Donoho, Justin R. (SHB); Ward, Jason (SHB); David Warden; Tanner, Arlen (SHB)
**Subject:** RE: Zoom call next week about Emerson patient portal use

Hi Foster. Next week is pretty bad for me as I have to travel and participate in an all-day mediation Wednesday- Friday and Jason is out of town on Friday too.

Would Monday, August 28 work for our Zoom? We can be available from 11-2 Central or after 3:30 Central.

Thanks so much,
Tammy

**Tammy B. Webb**
*Class Action and Complex Litigation Partner*
Shook, Hardy & Bacon L.L.P.

415.544.1904 | tbwebb@shb.com

**From:** Foster Johnson <fjohnson@AZALAW.COM>
**Sent:** Friday, August 18, 2023 11:15 AM
**To:** Webb, Tammy (SHB) <TBWEBB@shb.com>
**Cc:** Donoho, Justin R. (SHB) <jdonoho@shb.com>; Ward, Jason (SHB) <JWARD@shb.com>; David Warden <dwarden@AZALAW.COM>
**Subject:** Zoom call next week about Emerson patient portal use

**EXTERNAL**

Tammy,

Please let me know your team's availability for a call on Thursday-Friday next week to discuss Emerson's use of tracking pixels on its patient portal.

Thanks,
Foster

**Foster C. Johnson**
Partner
Ahmad, Zavitsanos & Mensing, PLLC
1221 McKinney, Suite 2500
Houston, Texas 77010

Direct 713.600.4915
Main 713.655.1101
Cell 713.724.6743
www.azalaw.com

**Disclaimer**

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by **Mimecast Ltd**, an innovator in Software as a Service (SaaS) for business. Providing a **safer** and **more useful** place for your human generated data. Specializing in; Security, archiving and compliance. To find out more Click Here.

# EXHIBIT 6

**From:** Foster Johnson <fjohnson@AZALAW.COM>
**Sent:** Friday, August 18, 2023 3:57 PM
**To:** Webb, Tammy (SHB)
**Cc:** Donoho, Justin R. (SHB); Ward, Jason (SHB); David Warden; Tanner, Arlen (SHB)
**Subject:** RE: Zoom call next week about Emerson patient portal use

**EXTERNAL**

That will probably work. Let me check on my end.

Thanks,
Foster

**Foster C. Johnson**
Partner
Ahmad, Zavitsanos & Mensing, PLLC
1221 McKinney, Suite 2500
Houston, Texas 77010
Direct 713.600.4915
Main 713.655.1101
Cell 713.724.6743
www.azalaw.com

**From:** Webb, Tammy (SHB) <TBWEBB@shb.com>
**Sent:** Friday, August 18, 2023 3:56 PM
**To:** Foster Johnson <fjohnson@AZALAW.COM>
**Cc:** Donoho, Justin R. (SHB) <jdonoho@shb.com>; Ward, Jason (SHB) <JWARD@shb.com>; David Warden <dwarden@AZALAW.COM>; Tanner, Arlen (SHB) <ATANNER@shb.com>
**Subject:** RE: Zoom call next week about Emerson patient portal use

Hi Foster. Next week is pretty bad for me as I have to travel and participate in an all-day mediation Wednesday- Friday and Jason is out of town on Friday too.

Would Monday, August 28 work for our Zoom? We can be available from 11-2 Central or after 3:30 Central.

Thanks so much,
Tammy

**Tammy B. Webb**
*Class Action and Complex Litigation Partner*
Shook, Hardy & Bacon L.L.P.

415.544.1904 | tbwebb@shb.com

**From:** Foster Johnson <fjohnson@AZALAW.COM>
**Sent:** Friday, August 18, 2023 11:15 AM
**To:** Webb, Tammy (SHB) <TBWEBB@shb.com>
**Cc:** Donoho, Justin R. (SHB) <jdonoho@shb.com>; Ward, Jason (SHB) <JWARD@shb.com>; David Warden <dwarden@AZALAW.COM>
**Subject:** Zoom call next week about Emerson patient portal use

**EXTERNAL**

Tammy,

Please let me know your team's availability for a call on Thursday-Friday next week to discuss Emerson's use of tracking pixels on its patient portal.

Thanks,
Foster

**Foster C. Johnson**
Partner
Ahmad, Zavitsanos & Mensing, PLLC
1221 McKinney, Suite 2S00
Houston, Texas 77010
Direct 713.600.4915
Main 713.655.1101
Cell 713.724.6743
www.azalaw.com

**Disclaimer**

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by **Mimecast Ltd**, an innovator in Software as a Service (SaaS) for business. Providing a **safer** and **more useful** place for your human generated data. Specializing in; Security, archiving and compliance. To find out more Click Here.

CONFIDENTIALITY NOTICE: This e-mail message including attachments, if any, is intended for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message. Thank you.

**Disclaimer**

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by **Mimecast Ltd**, an innovator in Software as a Service (SaaS) for business. Providing a **safer** and **more useful** place for your human generated data. Specializing in; Security, archiving and compliance. To find out more Click Here.

COMMONWEALTH OF MASSACHUSETTS

ESSEX, S.S. SUPERIOR COURT

| | | |
|---|---|---|
| JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | § | C.A. No. 2277CV01000 |
| Plaintiff | § | |
| v. | § | |
| EMERSON HOSPITAL, | § | |
| Defendant. | § | |

FILED ESSEX SUPERIOR COURT

**REQUEST FOR HEARING**

The Plaintiff, John Doe, Individually and on Behalf of All Others Similarly Situated respectfully requests that this court grants a hearing as to PLAINTIFF'S MOTION TO COMPEL AND TO REMOVE CERTAIN OBJECTIONS.

Respectfully Submitted
The Plaintiff
By his Attorney,

*/s/ J. Tucker Merrigan*

J. Tucker Merrigan, BBO# 681627
**SWEENEY MERRIGAN LAW, LLP**
268 Summer Street, LL
Boston, MA 02210
Phone: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com

Dated: October 6, 2023

COMMONWEALTH OF MASSACHUSETTS

ESSEX, S.S. SUPERIOR COURT

| | | |
|---|---|---|
| JOHN DOE,<br>INDIVIDUALLY AND ON<br>BEHALF OF ALL OTHERS SIMILARLY<br>SITUATED,<br><br>Plaintiff<br><br>v.<br><br>EMERSON HOSPITAL,<br><br>Defendant. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | C.A. No. 2277CV01000 |

**RULE 9A NOTICE OF FILING AND LISTING OF DOCUMENTS**

I, J. Tucker Merrigan, one of the counsel for Plaintiff, John Doe, Individually and on Behalf of All Others Similarly Situated, hereby state that the following list of documents have been submitted for filing with the Court pursuant to Superior Court Rule 9A:

1. Plaintiff's Motion to Compel and to Remove Certain Objections;
2. Memorandum in Support of Plaintiff's Motion to Compel and Remove Certain Objections;
3. Request for Hearing;
4. Emerson Hospital's Opposition to Plaintiff's Motion to Compel and to Remove Certain Objections; and
5. Certificate of Service.

Respectfully Submitted
The Plaintiff
By his Attorney,

*/s/ J. Tucker Merrigan*

J. Tucker Merrigan, BBO# 681627
**SWEENEY MERRIGAN LAW, LLP**
268 Summer Street, LL
Boston, MA 02210
Phone: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com

Dated: October 6, 2023

## CERTIFICATE OF SERVICE

I, J. Tucker Merrigan, hereby certify that on October 6, 2023, in accordance with Superior Court Rule 9A, I served the following documents:

1. Rule 9A Notice of Filing and Listing of Documents; and
2. Request for Hearing.

on all counsel of record, via electronic mail to the following parties of interest:

Emyr Remy
SHOOK, HARDY & BACON L.L.P.
One Federal Street, Suite 2540
Boston, MA 02110
Tel: (617) 531-1411 | Fax: (617) 531-1602
remy@shb.com

Alfred J. Saikali *(pro hac vice)*
SHOOK, HARDY & BACON L.L.P.
201 South Biscayne Blvd., Suite 3200
Miami, Florida 33131
Tel: (305) 358-5171 | Fax: (305) 358-7470
asaikali@shb.com

Tammy B. Webb *(pro hac vice)*
SHOOK, HARDY & BACON, L.L.P.
555 Mission Street, Suite 2300
San Fransicso, CA 94105
Tel: (415) 544-1900 | Fax: (415) 391-0281
Tbwebb@shb.com

Jessica N. Wahl *(pro hac vice)*
SHOOK, HARDY & BACON L.L.P.
2049 Century Park East, Suite 3000
Los Angeles, CA 90067
Tel: (424) 285-8330 | Fax: (424) 204-9093
jwahl@shb.com

Jenn O. Hatcher *(pro hac vice)*
SHOOK, HARDY & BACON L.L.P.
2555 Grand Blvd
Kansas City, MO 64108
Tel: (816) 474-6550 | Fax: (816) 421-5547
Jhatcher@shb.com

Justin R. Donoho *(pro hac vice)*
SHOOK, HARDY & BACON, L.L.P.
111 South Wacker Drive
Chicago, IL 60606
Tel: (312) 704-7713 | Fax: (312) 558-1195
jdonoho@shb.com

*/s/ Johnathan T. Merrigan*
J. Tucker Merrigan

# SWEENEY MERRIGAN LAW, LLP

PETER M. MERRIGAN *
J. TUCKER MERRIGAN
BRADLEY M. HENRY
VICTORIA M. SANTORO MAIR
MATTHIEU J. PARENTEAU **
JESSICA M. GRAY
ERIN E. MCHUGH ***
DYLAN T. HIXSON
KYLE A. CAMILLERI ****
MAGGIE K. O'DONNELL
HON. THOMAS T. MERRIGAN (RET.)

ATTORNEYS AT LAW

268 SUMMER STREET, LL
BOSTON, MA 02210

WWW.SWEENEYMERRIGAN.COM
PHONE: (617) 391-9001
FAX: (617) 357-9001

*IN ADDITION TO MASSACHUSETTS, LICENSED IN:*
*PENNSYLVANIA* *
*MAINE* **
*CONNECTICUT* ***
*NEW HAMPSHIRE* ****

ESSEX SUPERIOR COURT FILED
2023 OCT 10 PM 1:28

October 6, 2023

Civil Clerk's Office
Essex Superior Court
43 Appleton Way
Lawrence, MA 01840

**RE: John Doe, Individually and on Behalf of All Others, et al v. Emerson Hospital**
**<u>Essex Superior Court, Civil Action No: 2277CV01000</u>**

Dear Sir/Madam:

With regard to the above-referenced matter, and in accordance with Superior Court Rule 9A, enclosed please find a courtesy copy of the following:

- Plaintiff's Motion to Compel and to Remove Certain Objections;
- Memorandum in Support of Plaintiff's Motion to Compel and Remove Certain Objections;
- √ Request for Hearing;
- Emerson Hospital's Opposition to Plaintiff's Motion to Compel and to Remove Certain Objections;
- Rule 9A Notice of Filing and Listing of Documents; and
- Certificate of Service.

Thank you for your attention to this matter.

Very truly yours,

*/s/ J. Tucker Merrigan*

J. Tucker Merrigan

JTM/kdf
Enclosures

cc: Erin E. McHugh, Esq. *(emchugh@sweeneymerrigan.com)*
Foster C. Johnson, Esq. *(fjohnson@azalaw.com)*
David Warden, Esq. *(dwarden@azalaw.com)*
Nathan Campbell, Esq. *(ncampbell@azalaw.com)*
Warren Postman, Esq. *(wdp@kellerpostman.com)*
Alex Dravillas, Esq. *(adj@kellerpostman.com)*
Sara Aguiniga, Esq. *(sara.aguiniga@kellerpostman.com)*
Carl Gustafson, Esq. *(cgustafson@azalaw.com*
Emyr Remy, Esq. (remy@shb.com)
Tammy B. Webb, Esq. *(Tbwebb@shb.com)*
Alfred J. Saikali, Esq. *(asaikali@shb.com)*
Jessica N. Wahl, Esq. *(jwahl@shb.com)*
Jenn O. Hatcher, Esq. *(Jhatcher@shb.com)*
Justin R. Donoho, Esq. *(jdonoho@shb.com)*

# EXHIBIT 2

**COMMONWEALTH OF MASSACHUSETTS**

**ESSEX, S.S.**

**TRIAL COURT DEPARTMENT**
**SUPERIOR COURT**

JOHN DOE, individually and on behalf of all other similarly situated,

Plaintiff,

v.

EMERSON HOSPITAL,

Defendant.

DOCKET NO. 2277CV01000D

**DEFENDANT EMERSON HOSPITAL'S FIRST AMENDED ANSWERS**
**TO PLAINTIFF JOHN DOE'S FIRST SET OF INTERROGATORIES**

Defendant Emerson Hospital ("Emerson" or "Defendant"), by and through its undersigned counsel, hereby serves its First Amended Answers to Plaintiff John Doe's ("Plaintiff") Interrogatories pursuant to and in accordance with Rule 33 of the Massachusetts Rules of Civil Procedure and Massachusetts Superior Court Rules 30 and 30(A), reserving the right to supplement and amend, as follows:

**OBJECTION TO DEFINITIONS**

Defendant objects to the Definitions in Plaintiff's Interrogatories to the extent they attempt to impose obligations upon Emerson other than those imposed or authorized by the Massachusetts Rules of Civil Procedure, including, but not limited to, the extent they exceed the permissible scope of discovery under the Massachusetts Rules of Civil Procedure, and/or seek to impose duties of responding and/or supplementation different from or in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects to the Definitions in Plaintiff's Interrogatories to the extent they conflict with Massachusetts Rule of Civil Procedure Rule 30A.

Defendant objects to Plaintiff's definition of the terms "Data" and 'Personal Health Information' as they are vague, ambiguous, and overbroad.

Defendant objects to Plaintiff's definition of the term 'Class Period' as the definition presumes Defendant's liability and an unlimited statute of limitations. Defendant treats the term 'Class Period' for purposes only of responding to these Interrogatories (*e.g.*, without admitting that any third-party source code was installed on Defendant's web properties at any particular time, without admitting liability, and without waiving any affirmative defenses), to mean the time period of October 19, 2016 through the filing of this Complaint because all of Plaintiff's claims arising before at least that date are barred by the statute of limitations.

Defendant objects to Plaintiff's definition of the term 'Data Disclosure" as the definition presumes a disclosure of Personal Health Information proximately caused by Defendant. Defendant treats the term 'Data Disclosure" for purposes of responding to these Interrogatories as defined except without regard to who was the proximate cause and without admitting that any disclosure contained Personal Health Information.

Defendant objects to Plaintiff's definition of "Personal Health Information" ("PHI") as overbroad, unduly burdensome, and disproportionate to the needs of the case to the extent it seeks discovery that is inconsistent with or seeks to impose requirements or obligations on Defendant beyond what is imposed by state and federal law, including the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and the Health Information Technology for Economic and Clinical Health Act ("HITECH"). Defendant further objects to Plaintiff's definition as overbroad and unduly burdensome because it purports to include Personally Identifiable Information ("PII") within the definition of PHI when the two are separate and distinct from one another. Defendant

hereby incorporates these objections into each and every one of Plaintiff's definitions where the term "Personal Health Information" is included.

## OBJECTION TO INSTRUCTIONS

Defendant objects to the Instructions in Plaintiff's Interrogatories to the extent they attempt to impose obligations upon Emerson other than those imposed or authorized by the Massachusetts Rules of Civil Procedure, including, but not limited to, the extent they exceed the permissible scope of discovery under the Massachusetts Rules of Civil Procedure, and/or seek to impose duties of responding and/or supplementation different from or in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Defendant objects to Plaintiff's instruction to include a privilege log because an instruction requiring the responding party to produce a privilege log or specific information about the assertion of privilege or work product protection conflicts with the Massachusetts Rules of Civil Procedure, which do not require the responding party to provide this information in its response. Mass. R. Civ. P. 26(b)(5).

## ANSWERS TO INTERROGATORIES

INTERROGATORY NO. 1: For the Class Period, identify all third-party tracking pixels (or embedded source code), including but not limited to the Meta Pixel and Google Analytics, that You have embedded on Your website(s) that cause the transmission of Data between Your website(s) and a third-party entity during communications between a web user and Your website(s).

**ANSWER:** Defendant objects to this Interrogatory because it seeks legal conclusions including about causation. Defendant objects to this Interrogatory as not reasonably calculated to lead to the discovery of admissible evidence, overbroad, and unduly burdensome. Defendant objects to this Interrogatory to the extent it calls for an expert opinion. *Commonwealth v. Brusgulis*, 41 Mass. App. Ct. 386, 390–391 (1996); Mass. R. Evid. 701. Defendant objects to this Interrogatory to the extent it requests that Defendant admit facts that Defendant specifically denies.

Defendant objects to this Interrogatory to the extent it seeks information about technologies or websites unrelated to any transmission of Data or relevant Data.

Subject to and without waiving these objections, Defendant answers as follows:

There are no third-party tracking pixels or any embedded source code that cause the transmission of Data between Defendant's website and a third party entity during communications between a web user and Defendant's website. Rather, the transmission of Data occurs as follows: (1) the user's browser makes a page request to the website server (i.e. Defendant's website); (2) the website server (i.e. Defendant's website) renders the Emerson webpage back to the user's browser; (3) as the page is being rendered back to the user's browser, any JavaScript and/or source code is loaded onto the user's browser; (4) as a function of the page loading, any JavaScript and/or source code will be transmitted to the applicable third parties. Moreover, Defendant denies that third-party tracking pixels (or embedded source code) on Emerson's website are the proximate cause of any transmission of Data.

Subject to the foregoing objections and answer, and without admitting that any of the following technologies or Emerson's website were related to the transmission of any Data or relevant Data, Defendant further states that the following technology was embedded on www.emersonhospital.org: Facebook Pixel, Google Analytics, DoubleClick, GoogleAds, StackAdapt, Quancast, CallRail, and Youtube.

Notwithstanding the objections, the Defendant states that no information has been withheld from the answer.

INTERROGATORY NO. 2: For each third-party tracking pixel (or embedded source code) identified in response to Interrogatory No. 1, describe in detail the functionality of each such tracking pixel (or embedded source code), including:

a) identifying the sections or portions of Your website(s), including any password protected patient portals, where such tracking pixels (or embedded source code) has been active during the Class Period;

b) describing the type of Data that is transmitted from Your website(s) to third parties via the functionality of said third-party tracking pixels, including any personally identifying information (such as cookies, IP addresses, Facebook, IDs) and the contents of any user communications (such as search terms, selections, or contents of online forms); and

c) each page on Your websites and patient portals where the third-party tracking pixel (or embedded source code) was installed.

**ANSWER:** Defendant objects to this Interrogatory to the extent it seeks a legal conclusion. Defendant objects to this Interrogatory as not reasonably calculated to lead to the discovery of admissible evidence, overbroad, and unduly burdensome. Defendant objects to this Interrogatory to the extent it calls for an expert opinion. *Commonwealth v. Brusgulis*, 41 Mass. App. Ct. 386, 390–391 (1996); Mass. R. Evid. 701. Defendant objects to this Interrogatory to the extent it requests that Defendant admit facts that Defendant specifically denies. Defendant objects to this Interrogatory to the extent it seeks information about technologies and web pages unrelated to any transmission of Data or relevant Data.

Subject to and without waiving these objections, without admitting that any of the following technologies or web pages were related to the transmission of any Data or relevant Data, and further stating that discovery is in early stages, Defendant is continuing to investigate, and may supplement, Defendant answers as follows:

(a) There has never been any third-party tracking pixel or similar technology embedded in patient portal. For the Emerson Hospital website (www.emersonhospital.org): (i) Facebook Pixel was installed on the home page, find a therapist page, find a doctor page, search for a primary care physician page, search for a specialist page, find a location page, pages with specific hospital locations, doctor profile pages, pages for specific specialties, weight loss info session page, risk assessment page, and risk assessment report page; (ii) Google Analytics, DoubleClick, GoogleAds, and StackAdapt were installed on the home page, find a therapist page, find a doctor page, search

for a primary care physician page, search for a specialist page, find a location page, pages with specific hospital locations, doctor profile pages, pages for specific specialties, weight loss support group page, weight loss info session page, Parkinson's virtual education page; and (iii) Quantcast and YouTube were installed on the home page.

(b) There are no third-party tracking pixels or any embedded source code that cause the transmission of Data between Defendant's website and a third party entity during communications between a web user and Defendant's website. Rather, the transmission of Data occurs as follows: (1) the user's browser makes a page request to the website server (i.e. Defendant's website); (2) the website server (i.e. Defendant's website) renders the Emerson webpage back to the user's browser; (3) as the page is being rendered back to the user's browser, any JavaScript and/or source code is loaded onto the user's browser; (4) as a function of the page loading, any JavaScript and/or source code will be transmitted to the applicable third parties. Moreover, Defendant denies that third-party tracking pixels (or embedded source code) on Emerson's website are the proximate cause of any transmission of Data.

Subject to the foregoing objections and answer, Defendant further states that, for the Emerson Hospital website (www.emersonhospital.org): (i) Facebook Pixel was related to the transmission of information about search terms; button clicks to search/go, find a doctor, learn more, and submit; visits to pages on which the technology was installed (*see* 2(a) above); and submission of weight loss info session sign up and request and appointment; (ii) Google Analytics was related to the transmission of information about search terms; button click to "chat now" to schedule an appointment; visits to pages on which the technology was installed (*see* 2(a) above); and submission of weight loss support group sign up, weight loss info session sign up, Parkinson's virtual education sign up, and request and appointment; (iii) DoubleClick, GoogleAds, and

StackAdapt were related to the transmission of information about search terms; visits to pages on which the technology was installed (*see* 2(a) above); and submission of weight loss support group sign up, weight loss info session sign up, Parkinson's virtual education sign up, and request and appointment; and (iv) Quantcast and YouTube were related to the transmission of information about visits to the home page.

(c) Same as answer to 2(a), above.

Notwithstanding the objections, the Defendant states that no information has been withheld from the answer.

INTERROGATORY NO. 3: State your current best estimate of the number of individuals whose interactions with Your website(s) have resulted in the transmission of Data between one of Your websites and a third-party entity (such as Facebook or Google), via a third-party tracking pixel or source code (such as the Meta Pixel or Google Analytics) that are embedded on Your websites, during the Class Period.

**ANSWER:** Defendant objects to this Interrogatory as not reasonably calculated to lead to the discovery of admissible evidence, overly broad, and unduly burdensome including because the requested number of website visitors is not limited to patients, relevant websites or web pages, relevant Data, and Massachusetts citizens. *Facey v. Gabriel*, 2006 WL 6339502 (Mass. Super. Oct. 31, 2006). Defendant objects to this Interrogatory because it seeks legal conclusions including about causation. Defendant objects to this Interrogatory to the extent it calls for an expert opinion. *Commonwealth v. Brusgulis*, 41 Mass. App. Ct. 386, 390–391 (1996); Mass. R. Evid. 701. Defendant objects to this Interrogatory to the extent it requests that Defendant admit facts that Defendant specifically denies.

Subject to and without waiving the objection, Defendant answers as follows:

There are no individuals whose interactions with Defendant's website resulted in the transmission of Data between Defendant's website and a third-party entity via a third-party tracking pixel or source code. Rather, the transmission of Data occurs as follows: (1) the user's

browser makes a page request to the website server (i.e. Defendant's website); (2) the website server (i.e. Defendant's website) renders the Emerson webpage back to the user's browser; (3) as the page is being rendered back to the user's browser, any JavaScript and/or source code is loaded onto the user's browser; (4) as a function of the page loading, any JavaScript and/or source code will be transmitted to the applicable third parties. Moreover, Defendant denies that third-party tracking pixels (or embedded source code) on Emerson's website are the proximate cause of any transmission of Data.

Subject to the foregoing objections and answer, Defendant further states that it is impossible for Defendant to estimate either the number of individuals who have interacted with Defendant's website, resulting in transmission of Data to a third-party entity, or such number as limited to patients, relevant website and web pages, relevant Data, and Massachusetts citizens. Defendant is in possession of certain information relating to web traffic on its web pages but such information is not responsive to this request or to this request as limited to patients, relevant web pages, relevant Data, and Massachusetts citizens, including because it relates to unique device-browser combinations instead of unique individuals or patients; counts the same unique device-browser combination more than once including each and every time it accesses any web page, clears cookies, or changes IP address; counts robotic devices; counts based on approximate geographic location of device-browser combination not an individual's or patient's citizenship; and includes other significant counting errors precluding any accurate estimation of the number of unique individuals, patients, or Massachusetts individuals or patients who accessed certain of Defendants' web pages when certain technology was installed on those web pages. Defendant is willing to meet and confer regarding the production of documents relating to web traffic.

Notwithstanding the objections, the Defendant states that no information has been withheld from the answer.

INTERROGATORY NO. 4: Among the number of individuals responsive to Interrogatory No. 3, further state how many of such individuals were:

a) Your patients;
b) Your patients who reside in the state of Massachusetts;
c) Your patients who logged into Your Patient portal one or more times.

**ANSWER:** Defendant objects to this Interrogatory as not reasonably calculated to lead to the discovery of admissible evidence, overbroad, and unduly burdensome, including because it is not limited to patients who visited relevant web pages. Defendant objects to this Interrogatory to the extent it seeks a legal conclusion. Defendant objects to this Interrogatory to the extent it calls for an expert opinion. *Commonwealth v. Brusgulis*, 41 Mass. App. Ct. 386, 390–391 (1996); Mass. R. Evid. 701. Defendant objects to this Interrogatory to the extent it requests that Defendant admit facts that Defendant specifically denies.

Subject to and without waiving these objections, Defendant answers as follows:

As the number of individuals responsive to Interrogatory No. 3 is impossible to estimate, likewise it is impossible to provide break downs such as (a)-(c) within such an inestimable number. In addition, providing estimates of (a)-(c) above is further impossible because information Defendant has relating to web traffic on its web pages cannot be filtered by patients, or by whether the same visitor logged into the portal.

Subject to the foregoing objections and answer, Defendant further states as follows:

(a) From November 1, 2016 to June 5, 2023, Emerson had approximately 303,618 total patients, including all patients who did not visit relevant web pages or any of Emerson's web pages;

(b) From November 1, 2016 to June 5, 2023, Emerson had approximately 269,464 total patients who resided in Massachusetts, including all Massachusetts patients who did not visit relevant web pages or any of Emerson's web pages;

(c) Defendant further objects that any request for portal-specific information is overbroad and unduly burdensome because no advertising technology was installed on Defendant's patient portal, and attempting to collect portal-specific information would take significant resources. Subject to these additional objections, Defendant further states that approximately 50,596 patients have an account to the patient portal.

Notwithstanding the objections, the Defendant states that no information has been withheld from the answer.

INTERROGATORY NO. 5: For each third-party tracking pixel (or embedded source code) identified in response to Interrogatory No. 1, describe any updates, revisions, or modifications to each said tracking pixel that resulted changes in the type of Data that was transmitted from Your website(s) to third parties during user interactions with Your website(s), including an identification of when any such updates, revisions, or modifications were made.

**ANSWER:** Defendant objects to this Interrogatory because it seeks legal conclusions including about causation. Defendant objects to this Interrogatory as not reasonably calculated to lead to the discovery of admissible evidence, overbroad, and unduly burdensome. Defendant objects to this Interrogatory to the extent it calls for an expert opinion. *Commonwealth v. Brusgulis*, 41 Mass. App. Ct. 386, 390–391 (1996); Mass. R. Evid. 701. Defendant objects to this Interrogatory to the extent it requests that Defendant admit facts that Defendant specifically denies.

Subject to and without waiving these objections, Defendant answers as follows:

There were no updates, revisions, or modifications to any tracking pixel or source code identified in response to Interrogatory No. 1 that resulted in either the transmission of Data between Defendant's website and a third-party entity during user interactions with Defendants' website, or

any changes in the type of such Data. Rather, the transmission of Data occurs as follows: (1) the user's browser makes a page request to the website server (i.e. Defendant's website); (2) the website server (i.e. Defendant's website) renders the Emerson webpage back to the user's browser; (3) as the page is being rendered back to the user's browser, any JavaScript and/or source code is loaded onto the user's browser; (4) as a function of the page loading, any JavaScript and/or source code will be transmitted to the applicable third parties. Moreover, Defendant denies that third-party tracking pixels (or embedded source code) on Emerson's website are the proximate cause of any transmission of Data.

Subject to and without waiving the foregoing objections and answer, Defendant further states as follows:

Pursuant to Mass. R. Civ. P. 33(c), Defendant refers Plaintiff to Defendant's documents produced or to be produced in response to Plaintiffs Requests for Production of Documents and reserves the right to supplement this answer.

Notwithstanding the objections, Defendant states that no information has been withheld from the answer.

INTERROGATORY NO. 6: State the total number of instances where Data was transmitted to third parties via third-party tracking pixel (or embedded source code), such as the Meta Pixel or Google Analytics, that occurred during user interactions within the password-protected patient portal available through Your website(s) during the Class Period.

**ANSWER:** Defendant objects to this Interrogatory as not reasonably calculated to lead to the discovery of admissible evidence, overbroad, and unduly burdensome, including because it is not limited to patients who visited relevant web pages. Defendant objects to this Interrogatory to the extent it seeks a legal conclusion. Defendant objects to this Interrogatory to the extent it calls for an expert opinion. *Commonwealth v. Brusgulis*, 41 Mass. App. Ct. 386, 390–391 (1996); Mass. R. Evid. 701.

Subject to and without waiving these objections, Defendant answers as follows:

None. There were no third-party tracking pixels or any embedded source code installed on Defendant's patient portal. Moreover, third-party tracking pixels and any embedded source code do not cause the transmission of Data between a website and a third party entity during communications between a web user and the website. Rather, the transmission of Data occurs as follows: (1) the user's browser makes a page request to the website server; (2) the website server renders the webpage back to the user's browser; (3) as the page is being rendered back to the user's browser, any JavaScript and/or source code is loaded onto the user's browser; (4) as a function of the page loading, any JavaScript and/or source code will be transmitted to the applicable third parties. Further, Defendant denies that third-party tracking pixels (or embedded source code) on a website are the proximate cause of any transmission of Data.

Notwithstanding the objections, Defendant states that no information has been withheld from the answer.

INTERROGATORY NO. 7: State the number of Your patients who reside in the state of Massachusetts whose interactions within the password-protected patient portal available through Your website(s) during the Class Period have resulted in the transmission of Data to third parties via the functionalities of third-party tracking pixel (or embedded source code), such as the Meta Pixel or Google Analytics, that You have embedded on Your website(s).

**ANSWER:** Defendant objects to this Interrogatory to the extent it seeks legal conclusions including about causation. Defendant objects to this Interrogatory as not reasonably calculated to lead to the discovery of admissible evidence, overbroad, and unduly burdensome. Defendant objects to this Interrogatory to the extent it calls for an expert opinion. *Commonwealth v. Brusgulis*, 41 Mass. App. Ct. 386, 390–391 (1996); Mass. R. Evid. 701. The Defendant objects to this Interrogatory to the extent it requests that the Defendant admit facts that the Defendant specifically denies.

Subject to and without waiving its objections, the Defendant answers as follows:

None. Third-party tracking pixel or similar technology has never been embedded in the patient portal.

Notwithstanding the objections, the Defendant states that no information has been withheld from the answer.

INTERROGATORY NO. 8: Identify the number of individuals whom You have reason to believe had any of their Personal Health Information disclosed to Facebook or Google in the Data Disclosure. For purpose of answering this interrogatory, "Personal Health Information" includes both (1) data about patients' and potential patients' health conditions (e.g., addiction, Alzheimer's, heart disease), diagnoses, procedures, test results, the treating physician, medications ***and*** (2) personally identifiable information, including but not limited to, patients' and potential patients' names, addresses, email addresses, telephone numbers, IP addresses, Facebook IDs, unique identifying codes, HTTP Headers, Pixel IDs, and/or any other sensitive information obtained and stored by Defendant. Your answer should include the total number of individuals who have had *either* category of their Data disclosed to Facebook or Google in the Data Disclosure.

**ANSWER:** Defendant objects to this Interrogatory as not reasonably calculated to lead to the discovery of admissible evidence, overbroad, and unduly burdensome. Defendant objects to this Interrogatory to the extent it seeks a legal conclusion. Defendant objects to this Interrogatory to the extent it calls for an expert opinion. *Commonwealth v. Brusgulis*, 41 Mass. App. Ct. 386, 390–391 (1996); Mass. R. Evid. 701. Defendant objects to this Interrogatory because it requests that Defendant admit facts that Defendant specifically denies.

Subject to and without waiving the objection, Defendant answers as follows: None, because Defendant contends that no "Personal Health Information" as defined in this interrogatory was disclosed to Facebook or Google.

Subject to the foregoing objections and answer, Defendant further states that it is impossible for Defendant to estimate either the number of individuals who have interacted with Defendant's web pages, resulting in transmission of Data to a third-party entity, or such number as limited to patients, relevant web pages, relevant Data, and Massachusetts citizens. Defendant is in possession of certain information relating to web traffic on its web pages but such information

is not responsive to this request or to this request as limited to patients, relevant web pages, relevant Data, and Massachusetts citizens, including because it relates to unique device-browser combinations instead of unique individuals or patients; counts the same unique device-browser combination more than once including each and every time it accesses any web page, clears cookies, or changes IP address; counts robotic devices; counts based on approximate geographic location of device-browser combination not an individual's or patient's citizenship; and includes other significant counting errors precluding any accurate estimation of the number of unique individuals, patients, or Massachusetts individuals or patients who accessed certain of Defendants' web pages when certain technology was installed on those web pages. Defendant is willing to meet and confer regarding the production of documents relating to web traffic.

Notwithstanding the objections, Defendant states that no information has been withheld from the answer.

INTERROGATORY NO. 9: Identify and describe in detail all notices You have provided to Your patients regarding actual or potential disclosure(s) of Data to third parties that resulted from those patients' interactions with Your website(s) via third-party tracking pixel (or embedded source code), such as the Meta Pixel or Google Analytics. Your Response should include, at minimum, the date(s) of such notice(s), the content of such notice(s), the names of patients to whom such notice(s) were given, and the Bates numbers of any document(s) related to such notice(s).

**ANSWER:** Defendant objects to this Interrogatory because it seeks legal conclusions including about causation. Defendant objects to this Interrogatory as not reasonably calculated to lead to the discovery of admissible evidence, overbroad, and unduly burdensome. Defendant objects to this Interrogatory to the extent it calls for an expert opinion. *Commonwealth v. Brusgulis*, 41 Mass. App. Ct. 386, 390–391 (1996); Mass. R. Evid. 701. Defendant objects to this Interrogatory to the extent it requests that Defendant admit facts that Defendant specifically denies. Defendant further objects that the Interrogatory seeks information that is not in its possession, custody, or control. Defendant objects that it is impossible for Defendant to provide the names of

patients who visited its website and when they visited, absent discovery, for example, from Plaintiff.

Subject to and without waiving the foregoing objections, Defendant answers as follows:

Pursuant to Mass. R. Civ. P. 33(c), Defendant refers Plaintiff to Defendant's documents produced or to be produced in response to Plaintiffs Requests for Production of Documents and reserves the right to supplement this answer.

Notwithstanding the objections, Defendant states that no information has been withheld from the answer.

INTERROGATORY NO. 10: State the time period during which You had the Meta Pixel embedded within any pages of the Patient Portal associated with Your websites.

**ANSWER:** Defendant objects to this Interrogatory to the extent it seeks a legal conclusion. Defendant objects to this Interrogatory to the extent it calls for an expert opinion. *Commonwealth v. Brusgulis*, 41 Mass. App. Ct. 386, 390–391 (1996); Mass. R. Evid. 701. Defendant objects to this Interrogatory to the extent it requests that Defendant admit facts that Defendant specifically denies.

Subject to and without waiving its objections, the Defendant answers as follows:

None.

Notwithstanding the objections, the Defendant states that no information has been withheld from the answer.

INTERROGATORY NO. 11: For everyone whose Personal Health Information was disclosed or potentially disclosed in the Data Disclosure from either Your websites or patient portals, identify the individual by a unique identifier ( e.g. number, letter or combination thereof) and identify their state of residence and the categories of Personal Health Information that were disclosed to Facebook and other third parties in the Data Disclosure:

| Individual Identifier | State of Residence | Personal Health Information Potentially Compromised |
|---|---|---|
| | | |
| | | |

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**ANSWER:** Defendant objects to this Interrogatory as not reasonably calculated to lead to the discovery of admissible evidence, vague, overbroad, and unduly burdensome. Defendant objects to Plaintiff's vague and argumentative column headers. Defendant objects to this Interrogatory because it seeks legal conclusions including about causation. Defendant objects to this Interrogatory to the extent it calls for an expert opinion. *Commonwealth v. Brusgulis*, 41 Mass. App. Ct. 386, 390–391 (1996); Mass. R. Evid. 701. Defendant objects to this Interrogatory to the extent it requests that Defendant admit facts that Defendant specifically denies. Defendant objects that no advertising technology was installed on Defendant's patient portal.

Subject to and without waiving the foregoing objections, Defendant answers as follows:

No Personal Health Information was transmitted between Defendant's website and a third party entity. Rather, the transmission of Data occurs as follows: (1) the user's browser makes a page request to the website server; (2) the website server renders the webpage back to the user's browser; (3) as the page is being rendered back to the user's browser, any JavaScript and/or source code is loaded onto the user's browser; (4) as a function of the page loading, any JavaScript and/or source code will be transmitted to the applicable third parties. Further, Defendant denies that third-party tracking pixels (or embedded source code) on a website are the proximate cause of any transmission of Data.

Subject to and without waiving the foregoing objections and answer, Defendant further states as follows

Pursuant to Mass. R. Civ. P. 33(c), Defendant refers Plaintiff to Defendant's documents produced or to be produced in response to Plaintiffs Requests for Production of Documents and reserves the right to supplement this answer.

Notwithstanding the objections, Defendant states that no information has been withheld from the answer.

INTERROGATORY NO. 12: For the Data Disclosure, describe:

a) The date and time when Your patients' Personal Health Information provided by patient visitors to Your websites first became accessible to third parties, including, but not limited to, Facebook and Google;

b) The date and time when You first learned that Personal Health Information provided by visitors to Your websites had been disclosed to third parties including, but not limited to, Facebook and Google;

c) The date on which You first notified Your current and former patients, employees, government entities, and/or the public that Personal Health Information provided by visitors to your website had been disclosed to third parties including, but not limited to, Facebook and Google; and

d) The method through which You notified Your current and former patients, government entities, and/or the public that Personal Health Information provided by visitors to Your website had been disclosed to third parties, including, but not limited to, Facebook and Google.

**ANSWER:** Defendant objects to this Interrogatory as not reasonably calculated to lead to the discovery of admissible evidence, overbroad, and unduly burdensome. Defendant objects to this Interrogatory because it seeks legal conclusions including about causation. Defendant objects to this Interrogatory to the extent it calls for an expert opinion. *Commonwealth v. Brusgulis*, 41 Mass. App. Ct. 386, 390–391 (1996); Mass. R. Evid. 701. Defendant objects to this Interrogatory to the extent it requests that Defendant admit facts that Defendant specifically denies.

Subject to and without waiving the foregoing objections, Defendant answers as follows:

Pursuant to Mass. R. Civ. P. 33(c), Defendant refers Plaintiff to Defendant's documents produced or to be produced in response to Plaintiffs Requests for Production of Documents and reserves the right to supplement this answer.

Notwithstanding the objections, Defendant states that no information has been withheld from the answer.

INTERROGATORY NO. 13: Identify, by name and title, each employee, agent, or other person acting on Your behalf with responsibility for the following:

a) The design of Your web properties during the Class Period;

b) The source code deployed on your web properties during the Class Period;

c) The operation of website analytics and metrics for your web properties during the Class Period; and

d) The Internet marketing for You that utilized Your websites in any way during the Class Period;

**ANSWER:** Defendant objects to this Interrogatory as not reasonably calculated to lead to the discovery of admissible evidence, overbroad, and unduly burdensome. Defendant objects to this Interrogatory to the extent it calls for an expert opinion. *Commonwealth v. Brusgulis*, 41 Mass. App. Ct. 386, 390–391 (1996); Mass. R. Evid. 701. Defendant objects to this Interrogatory to the extent it requests that Defendant admit facts that Defendant specifically denies.

Subject to and without waiving the foregoing objections, Defendant answers as follows:

Pursuant to Mass. R. Civ. P. 33(c), Defendant refers Plaintiff to Defendant's documents produced or to be produced in response to Plaintiffs Requests for Production of Documents and reserves the right to supplement this answer.

Notwithstanding the objections, Defendant states that no information has been withheld from the answer.

INTERROGATORY NO. 14: Identify and describe any investigations and analyses conducted by You or on Your behalf regarding the Data Disclosure and its causes, including any investigative reports and the conclusions that You reached.

**ANSWER:**

Defendant objects to this Interrogatory as not reasonably calculated to lead to the discovery of admissible evidence, overbroad, and unduly burdensome. Defendant objects to this Interrogatory to the extent it calls for an expert opinion. *Commonwealth v. Brusgulis*, 41 Mass. App. Ct. 386, 390–391 (1996); Mass. R. Evid. 701. Defendant objects to this Interrogatory to the extent it requests that Defendant admit facts that Defendant specifically denies. The Defendant objects to this Interrogatory to the extent it seeks information protected by the attorney-client and work-product privileges, Mass. R. Civ. P. 26(b)(3), (5), and expert discovery beyond the permitted scope of Mass. R. Civ. P. Rule 26(b)(4).

INTERROGATORY NO. 15: Identify and describe any changes to Your policies, procedures, and practices for security of Personal Health Information and Your communications and training regarding the same that were recommended to You before the Data Disclosure, including but not limited to the nature of those recommended changes, the identity of the individuals and/or entities that recommended the changes, whether the changes were actually made, the reasons You made or chose not to make the changes, and the individuals and/or entities involved in approving, denying, and implementing the recommended changes.

**ANSWER:** Defendant objects to this Interrogatory as not reasonably calculated to lead to the discovery of admissible evidence, overbroad, and unduly burdensome. Defendant objects to this Interrogatory to the extent it calls for an expert opinion. *Commonwealth v. Brusgulis*, 41 Mass. App. Ct. 386, 390–391 (1996); Mass. R. Evid. 701. Defendant objects to this Interrogatory to the extent it requests that Defendant admit facts that Defendant specifically denies.

Subject to and without waiving the foregoing objections, Defendant answers as follows:

Pursuant to Mass. R. Civ. P. 33(c), Defendant refers Plaintiff to Defendant's documents produced or to be produced in response to Plaintiffs Requests for Production of Documents and reserves the right to supplement this answer.

Notwithstanding the objections, Defendant states that no information has been withheld from the answer.

DocuSign Envelope ID: F40D6810-FCC3-4861-AC64-9DCECC4DABC9

# VERIFICATION

I, Christine Gallery, Senior Vice President, Planning and Chief Strategy Officer at Emerson Hospital, hereby depose and state under penalty of perjury that, on this 29th day of August, 2023, I have read the foregoing answers of Emerson Hospital First Amended Answers to Plaintiff's First Set of Interrogatories and subscribe to the same on behalf of Emerson Hospital that the foregoing answers are based in part on my own knowledge, in part on information communicated to me, and in part on information from documents held by Emerson Hospital and that I believe the foregoing responses to be true and correct to the best of my knowledge.

EMERSON HOSPITAL

By: ______________________________ 8/29/2023
Christine Gallery, Senior Vice President, Planning and Chief Strategy Officer

Dated: August 31, 2023

As to objections,

**EMERSON HOSPITAL**

*/s/ Emyr T. Remy*
Tammy B. Webb (*pro hac vice*)
tbwebb@shb.com
SHOOK, HARDY, & BACON L.L.P.
555 Mission Street, Suite 2300
San Francisco, CA 94105
Tel: (415) 544-1900 | Fax: (415) 391-0281

Emyr T. Remy (BBO # 704156)
remy@shb.com
SHOOK, HARDY & BACON L.L.P.
One Federal Street, Suite 2540
Boston, MA 02110
Tel: (617) 531-1411 | Fax: (617) 531-1602

Alfred J. Saikali (*pro hac vice*)
asaikali@shb.com
SHOOK, HARDY & BACON L.L.P.
201 South Biscayne Blvd., Suite 3200
Miami, Florida 33131
Tel: (305) 358-5171 | Fax: (305) 358-7470

Justin R. Donoho (*pro hac vice*)
jdonoho@shb.com
SHOOK, HARDY & BACON L.L.P.
111 South Wacker Drive
Chicago, IL 60606
Tel: (312) 704-7713 | F: (312) 558-1195

Jessica N. Wahl (*pro hac vice*)
jwahl@shb.com
SHOOK, HARDY & BACON L.L.P.
2049 Century Park East, Suite 3000
Los Angeles, CA 90067
T: (424) 285-8330 | F: (424) 204-9093

Jenn O. Hatcher (*pro hac vice*)
jhatcher@shb.com
SHOOK, HARDY & BACON L.L.P.
2555 Grand Blvd.
Kansas City, MO 64108
T: (816) 474-6550 | F: (816) 421-5547

## CERTIFICATE OF SERVICE

I hereby certify that on August 31, 2023, I served DEFENDANT EMERSON HOSPITAL'S FIRST AMENDED RESPONSES TO PLAINTIFF JOHN DOE'S FIRST SET OF INTERROGATORIES, via electronic mail, to the following counsel of record:

J. Tucker Merrigan (BBO# 681627)
Victoria Santoro (BBO# 679120)
Erin E, McHugh (BBO# 703701)
**SWEENEY MERRIGAN LAW**
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com
*Attorneys for Plaintiff*

Foster C. Johnson (*pro hac vice*)
David Warden (*pro hac vice*)
Nathan Campbell (*pro hac vice*)
**AHMAD, ZAVITSANOS & MENSING, P.C.**
1221 McKinney St., Suite 3460
Houston, TX 77010
Tel: (713) 655-1101
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com
*Attorneys for Plaintiff*

Seth Meyer (*pro hac vice*)
Alex Dravillas (*pro hac vice*)
**KELLER POSTMAN LLC**
150 N. Riverside Plaza, Suite 4100
Chicago, IL 60606
Tel: (312) 741-5220
sam@kellerpostman.com
adj@kellerpostman.com
*Attorney for Plaintiff*

*/s/ Emyr T. Remy*
Emyr T. Remy

**COMMONWEALTH OF MASSACHUSETTS**

**ESSEX, S.S.**

**TRIAL COURT DEPARTMENT**
**SUPERIOR COURT**

JOHN DOE, individually and on behalf of all other similarly situated,

Plaintiff,

v.

EMERSON HOSPITAL,

Defendant.

DOCKET NO. 2277CV01000D

**DEFENDANT EMERSON HOSPITAL'S FIRST AMENDED RESPONSES TO PLAINTIFF JOHN DOE'S FIRST AND SECOND SETS OF REQUESTS FOR PRODUCTION OF DOCUMENTS**

Defendant Emerson Hospital ("Emerson"), by and through its undersigned counsel, hereby serves its First Amended Responses to Plaintiff John Doe's ("Plaintiff") First and Second Sets of Requests for Production of Documents pursuant to Massachusetts Rules of Civil Procedure Rule 34 and Massachusetts Superior Court Rule 30(A), for purposes of this action only, reserving the right to supplement and amend, as follows:

## GENERAL OBJECTIONS

Defendant incorporates the following general objections in response to each request for production of documents, in addition to the specifically stated objections:

1. Defendant objects to these requests to the extent that they are vague, overbroad, unduly burdensome, and impose obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

2. Defendant objects to these requests to the extent that they seek information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence.

3. Defendant objects to these requests to the extent that they seek documents that were prepared for or in anticipation of litigation, or that are protected from disclosure by the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege, protection, or immunity.

4. The inadvertent production or disclosure of any privileged documents or information shall not constitute or be deemed to be a waiver of any applicable privilege with respect to such document or information (or the contents or subject matter thereof) or with respect to any other such document or discovery now or hereafter requested or provided. Defendant reserves the right not to produce documents that are in part protected by privilege, except on a redacted basis, and to require the return of any document (and all copies thereof) inadvertently produced.

5. Defendant does not waive the right to object, on any and all grounds, to (i) the evidentiary use of documents produced in response to these requests, and (ii) discovery requests relating to those documents.

6. Defendant objects to these requests to the extent that they seek documents not in Defendant's possession, custody, or control.

7. Defendant objects to these requests to the extent they call for the creation of documents not already in existence.

8. Defendant objects to these requests to the extent they seek documents that are publicly available or otherwise already in Plaintiff's possessions, custody, or control or equally accessible to Plaintiffs.

9. Defendant objects to these requests to the extent they seek documents beyond those agreed to between the parties such as with the use of agreed search terms.

10. Defendant objects to the definition of terms to the extent that it conflicts with the uniform definitions contained in Superior Court Rule 30A(1)(C).

11. Defendant objects to Plaintiff's definition of the terms "Data", "Health Information Systems", and 'Personal Health Information' as they are vague, ambiguous, and overbroad.

12. Defendant objects to Plaintiff's definition of the term 'Class Period' as the definition presumes Defendant's liability and an unlimited statute of limitations. Defendant treats the term 'Class Period' for purposes only of responding to these Interrogatories (*e.g.*, without admitting that any third-party source code was installed on Defendant's web properties at any particular time, without admitting liability, and without waiving any affirmative defenses), to mean the time period of October 19, 2016 through the filing of this Complaint because all of Plaintiff's claims arising before at least that date are barred by the statute of limitations.

13. Defendant objects to Plaintiff's definition of the term 'Data Disclosure" as the definition presumes a disclosure of Personal Health Information proximately caused by Defendant. Defendant treats the term 'Data Disclosure" for purposes of responding to these Interrogatories as defined except without regard to who was the proximate cause and without admitting that any disclosure contained Personal Health Information.

14. Defendant submits these responses and objections without conceding the relevancy or materiality of the subject matter of any request or of any document, or that any responsive materials exist.

15. Defendant's responses and objections are not intended to be, and shall not be construed as, agreement with Defendant's characterization of any facts, circumstances, or legal obligations. Defendant reserves the right to contest any such characterization as inaccurate. Defendant also objects to the requests to the extent they contain any express or implied assumptions of fact or law concerning matters at issue in this litigation.

16. Defendant objects to Plaintiff's definition of "Personal Health Information" ("PHI") as overbroad, unduly burdensome, and disproportionate to the needs of the case to the

extent it seeks discovery that is inconsistent with or seeks to impose requirements or obligations on Defendant beyond what is imposed by state and federal law, including the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and the Health Information Technology for Economic and Clinical Health Act ("HITECH"). Defendant further objects to Plaintiff's definition as overbroad and unduly burdensome because it purports to include Personally Identifiable Information ("PII") within the definition of PHI when the two are separate and distinct from one another. Defendant hereby incorporates these objections into each and every one of Plaintiff's definitions where the term "Personal Health Information" is included.

## RESPONSES TO REQUESTS FOR PRODUCTION

1. Documents sufficient to identify the number of unique patients, by year, treated by You during the Class Period.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson will produce non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

2. Documents sufficient to identify the number of unique patients, by year, who used Your patient portal during the Class Period.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects

that any request for portal-specific documents is overbroad and unduly burdensome because no advertising technology was installed on Defendant's patient portal, and attempting to collect and produce the requested information would take significant resources.

3. Documents sufficient to show the number of individuals whose Personal Health Information was disclosed to third parties including (but not limited to) Facebook during the Data Disclosure, including the residency of those individuals.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks documents that do not exist, is vague and ambiguous, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure, including because the requested information is not limited to patients and Massachusetts citizens. Defendant further objects because it contends that no Personal Health Information was disclosed to third parties.

Subject to and without waiving the foregoing objections, Defendant responds that it does not have possession, custody, or control of any documents that are responsive to this request.

Defendant further states that it is in possession of certain information relating to web traffic on its web pages but such information is not responsive to this request or to this request as limited to patients, relevant web pages, relevant Data, and Massachusetts citizens, including because it relates to unique device-browser combinations instead of unique individuals or patients; counts the same unique device-browser combination more than once including each and every time it accesses any web page, clears cookies, or changes IP address; counts robotic devices; counts based on approximate geographic location of device-browser combination not an individual's or patient's citizenship; and includes other significant counting errors precluding any accurate estimation of the number of unique individuals, patients, or Massachusetts individuals or patients who accessed certain of Defendants' web pages when certain technology was installed on those web pages.

Defendant is willing to meet and confer regarding the production of documents relating to web traffic.

4. All documents concerning Your use of the Meta Pixel on Your websites, including Your patient portal(s).

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson will produce all non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

5. Documents sufficient to identify each Affected Person whose Data and/or Personal Health Information was disclosed to Facebook via the Meta Pixel installed on Your websites, including Your patient portal(s).

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks documents that do not exist, is vague and ambiguous, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure, including because the requested information is not limited to Massachusetts citizens. Defendant further objects because it contends that no Personal Health Information was disclosed to Facebook. Defendant further objects that no advertising technology was installed on Defendant's patient portal.

6. Documents sufficient to identify each Affected Person whose Data and/or Personal Health Information was disclosed to Google via code installed on Your websites, including Your patient portal(s).

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks documents that do not exist, is vague and ambiguous, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure, including because the requested information is not limited to Massachusetts citizens. Defendant further objects because it contends that no Personal Health Information was disclosed to Google. Defendant further objects that no advertising technology was installed on Defendant's patient portal.

7. Documents sufficient to show each kind of Data being shared with Facebook when patients or potential patients use and/or interact with Your websites.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

8. Documents sufficient to show each kind of Data being shared with Google when patients or potential patients use and/or interact with Your websites.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession,

custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

9. Documents sufficient to show each kind of Personal Health Information being shared with Facebook when patients or potential patients use and/or interact with Your websites, including Your patient portal(s).

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects because it contends that no Personal Health Information was shared with Facebook. Defendant further objects that no advertising technology was installed on Defendant's patient portal.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

10. Documents sufficient to show each kind of Personal Health Information being shared with Google when patients or potential patients use and/or interact with Your websites, including Your patient portal(s).

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects because it contends that no Personal Health Information was shared with Google. Defendant further objects that no advertising technology was installed on Defendant's patient portal.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

11. Documents sufficient to identify each and every employee, agent, or other persons acting on Your behalf who were wholly or partially responsible for:

a) The design of Your web properties;

b) The source code deployed on Your web properties;

c) website analytics and metrics for Your web properties

d) Internet marketing for You that utilized Your web properties in any way;

e) Other marketing for You that mentioned the web properties in any way.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks documents that do not exist, is vague and ambiguous, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

12. Documents sufficient to show the amount of web traffic to Your web properties and any patient portal(s) on such web properties during the Class Period.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Defendant further objects that any request for portal-specific documents is overbroad and unduly burdensome because no advertising technology was installed on Defendant's patient portal, and attempting to collect and produce the requested information would take significant resources.

Subject to and without waiving the foregoing objections, Defendant responds that that it is willing to meet and confer regarding the production of documents relating to web traffic.

13. Documents sufficient to show the number of unique visitors to Your web properties during the Class Period.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks documents that do not exist, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure, including because the requested information is not limited to patients, relevant web properties, relevant Data, and Massachusetts citizens.

Subject to and without waiving the foregoing objections, Defendant responds that it does not have possession, custody, or control of any documents that are responsive to this request.

Defendant further states that it is in possession of certain information relating to web traffic on its web pages but such information is not responsive to this request or to this request as limited to patients, relevant web pages, relevant Data, and Massachusetts citizens, including because it relates to unique device-browser combinations instead of unique individuals or patients; counts the same unique device-browser combination more than once including each and every time it accesses any web page, clears cookies, or changes IP address; counts robotic devices; counts based on approximate geographic location of device-browser combination not an individual's or patient's citizenship; and includes other significant counting errors precluding any accurate estimation of the number of unique individuals, patients, or Massachusetts individuals or patients who accessed certain of Defendants' web pages when certain technology was installed on those web pages.

Defendant is willing to meet and confer regarding the production of documents relating to web traffic.

14. Documents sufficient to show the number of unique visitors to Your patient portal(s) during the Class Period.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects that any request for portal-specific documents is overbroad and unduly burdensome because no advertising technology was installed on Defendant's patient portal, and attempting to collect and produce the requested information would take significant resources.

15. Documents sufficient to show the number of Your patients who registered for Your patient portal(s) during the Class Period.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects that any request for portal-specific documents is overbroad and unduly burdensome because no advertising technology was installed on Defendant's patient portal, and attempting to collect and produce the requested information would take significant resources.

16. Documents sufficient to show the number of times that patients logged-in to Your patient portal(s) during the Class Period.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and

imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects that any request for portal-specific documents is overbroad and unduly burdensome because no advertising technology was installed on Defendant's patient portal, and attempting to collect and produce the requested information would take significant resources.

17. For each and every first-party cookie at any of Your web properties, including any patient portal(s) on said web properties, for the five years preceding the filing of this action, documents sufficient to show:

a) The cookie name;

b) What information is stored by the cookie;

c) When the cookie is first created;

d) When it is first set on a user's computer;

e) The expiration date for each cookie;

f) To what domain the cookie is set;

g) Whether the cookie value is disclosed to third-parties via cookie synching; and

h) The purpose of the cookie.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects that no advertising technology was installed on Defendant's patient portal.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

18. Documents sufficient to show the first date on which You deployed third-party source code at any of Your web properties from any of the following third parties or its affiliates:

a) Face book;

b) Google;

c) Signal;

d) The Trade Desk;

e) Twitter;

f) Crazy Egg;

g) YouTube;

h) Any other third party not identified herein from whom You have deployed third party source code.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

19. All insurance policies, agreements, or by-laws under which any person may be liable to satisfy all or part of a judgment which may be entered in this action or to indemnify or reimburse You for payments made to satisfy any judgment, settlement, or expenses in connection with this action.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, in the event that insurance agreements may become applicable that may indemnify or reimburse Defendant for any payments

made to satisfy any judgment in this action, and subject to the entry of a protective order and any objections and redactions, such agreements will be provided at the appropriate time in the litigation.

20. Any and all insurance policies that apply or that might arguably apply in this matter.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, in the event that insurance agreements may become applicable that may indemnify or reimburse Defendant for any payments made to satisfy any judgment in this action, and subject to the entry of a protective order and any objections and redactions, such agreements will be provided at the appropriate time in the litigation.

21. Any correspondence with any insurance company related to Plaintiffs claims, including any correspondence accepting or declining coverage and any reservation of right letters You have received related to this matter.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

22. All documents You referenced or relied upon to answer any Interrogatory or Requests for Admissions that Plaintiffs have served in this case.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to

lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

23. All exhibits that You propose to introduce in opposition to class certification or at the class certification hearing.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request is premature. Subject to and without waiving the foregoing objections, Emerson states that it will produce documents responsive to this request that are within its possession, custody or control and reserves the right to supplement this response as discovery continues

24. All web-log or server-log data for the patient portal(s) page or section of any of Your web properties, including, but not limited to, https://www.emersonhospital.org/patientsvisitors/patient-portals.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague and ambiguous, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects that any request for portal-specific documents is overbroad and unduly burdensome because no advertising technology was installed on Defendant's patient portal, and attempting to collect and produce the requested information would take significant resources.

25. All web-log and server-log data containing information that a user or patient "Enrolled" in the patient portal of any of Your web properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague and ambiguous, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects that any request for portal-specific documents is overbroad and unduly burdensome because no advertising technology was installed on Defendant's patient portal, and attempting to collect and produce the requested information would take significant resources.

26. All web-log or server-log data containing information that a user or patient clicked to "Sign In" to the patient portal of any of Your web properties, including, but not limited to, https://www.emersonhospital.org/patients-visitors/patient-portals.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague and ambiguous, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects that any request for portal-specific documents is overbroad and unduly burdensome because no advertising technology was installed on Defendant's patient portal, and attempting to collect and produce the requested information would take significant resources.

27. All web-log or server-log data containing information that a user or patient clicked to log out of the patient portal of any of Your web properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague and ambiguous, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of

Civil Procedure. Defendant further objects that any request for portal-specific documents is overbroad and unduly burdensome because no advertising technology was installed on Defendant's patient portal, and attempting to collect and produce the requested information would take significant resources.

28. Any and all communications relating to Your general deployment, and/or use of third-party source code at any of Your web properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

29. All documents related to proposed and effectuated changes in third-party source code deployed at any of Your web properties in the five years preceding the filing of this action.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues

30. All communications relating to adding, changing, or removing third-party source code deployed at any of Your web properties in the five years preceding the filing of this action.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

31. Documents sufficient to show each date on which any third-party source code was added, changed, or removed from any of Your web properties, including Your patient portal(s), in the five years preceding the filing of this action.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects that no advertising technology was installed on Defendant's patient portal.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

32. For each and every third-party cookie value disclosed to or available to be accessed by any third party when communications are exchanged at any of Your web properties for the five years preceding the filing of this action, documents sufficient to show:

The cookie name;

The third-party entity to whom the cookie relates;

All third-party entities to whom information related to the cookie is disclosed or available to be accessed by;

a) The domain to which the cookie is set;

b) What information is stored by the cookie;

c) The purpose of the cookie;

d) How the cookie is used in relation to Defendant and its websites; and

e) Whether the cookie value is disclosed to others through cookie synching.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

33. All documents relating to disclosure of data to any third parties for marketing purposes via server-side disclosures, including but not limited to server-side disclosures to Facebook, Google, Signal, The Trade Desk, and Twitter.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession,

custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

34. All documents relating to the deployment of the Facebook Tracking Pixel, Facebook Pixel, or Meta Pixel at any of Your web-properties, including Your patient portal(s).

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects that no advertising technology was installed on Defendant's patient portal.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

35. All documents relating to the deployment of any Facebook third-party source code other than the Face book Tracking Pixel, Face book Pixel, or Meta Pixel at any of Your web-properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

36. All documents relating to cookies associated with Facebook, including how they are deployed, accessed, disclosed, or used by Facebook or You at any of Your web properties, including but not limited to:

a) c_user;

b) datr;

c) fr;

d) Any other Facebook cookie that You permit Face book to set or access via any of Your web-properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects to this request to the extent it seeks information that is a matter of public record or is in the possession, custody, or control of Facebook, not Defendant.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

37. All documents relating to Facebook's use of cookies, IP addresses, device identifiers, and other data caused to be transmitted, disclosed, or accessed through Your deployment of Facebook third-party source code on Your web-properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Defendant further objects to this request to the extent it seeks information that is a matter of public record or is in the possession, custody, or control of Facebook, not Defendant.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

38. All documents relating to Facebook's receipt of cookies, IP addresses, device identifiers, and other data caused to be transmitted, disclosed, or accessed through Your deployment of Facebook third-party source code on Your web-properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects to this request to the extent it seeks information that is a matter of public record or is in the possession, custody, or control of Facebook, not Defendant.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

39. All documents relating to Your use of Custom Audiences through Face book.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

40. All communications between You and Facebook or its employees, agents, or assigns.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson will produce all non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

41. All contracts, agreements, memoranda of understanding, or other documents relating to the relationship between You and Facebook.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson will produce all non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

42. All non-disclosure or confidentiality agreements relating to Facebook and its collection of data at any of Your web properties, including www.emersonhospital.org.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson will produce all non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

43. All documents relating to Facebook's use of data collected and/or derived from Your deployment of Facebook third-party source code at any of Your web properties, including www.emersonhospital.org.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects to this request to the extent it seeks information that is a matter of public record or is in the possession, custody, or control of Facebook, not Defendant.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

44. All documents relating to Your use of Face book advertising tools in relation to any of Your web-properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson will produce all non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

45. All documents sufficient to show, during the Class Period, the total amount of money paid, or to be paid, to You from any third-party, including Facebook and Google, for the third-party's receipt of information from Your website.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

46. All documents relating to return on investment from marketing through Facebook.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson will produce all non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

47. All documents relating to return on investment from marketing through Google.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson will produce all non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

48. All documents relating to deployment and use of Google source code at any of Your web properties, including but not limited to Google DoubleClick, Google Analytics, and Google Ads.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

49. All documents relating to Your passing of data to Google.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

50. All source code deployed at any of Your web properties that causes the passing of data to Google.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it is willing to meet and confer regarding the production of source code.

51. All documents relating to Your deployment and use of Google third-party source code at any of Your web properties, including but not limited to:

a) Google Analytics;

b) Google Ads;

c) Adservice. Google.com;

d) Google.com;

e) Google Doubleclick; and

f) YouTube.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

52. All documents relating to cookies associated with Google, Facebook, or other third-parties from whom You deploy tracking pixels ( or embedded source code), including documents sufficient to show how those cookies are deployed, accessed, disclosed or used by any of Your web-properties, and documents sufficient to show the data such cookies enable, including but not limited to at least the following cookies:

a) _gads

b) _gadsID

c) sonar

d) _dpm_id

e) _fbp

f) aj s anonymous_ id

g) ajs_group_id

h) ajs_user_id

i) cto_lwid

j) DSID

k) id

l) permutive-id

m) permutive-session

n) rbuid

o) sm uuid

p) utma

q) utmb

r) utmc

s) utmz

t) SSID

u) SIDCC

v) SAPISID

w) OGPC

x) NID

y) HSID

z) DV

aa) APISID

bb) ANID

cc) IP JAR

dd) Secure-SSID

ee) Secure-HSID

ff) Secure-APISID

gg) _ Secure-3P APISID

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

53. All documents relating to the passing of values of putative first-party cookies to Google Analytics, including but not limited to cookies with the following names:

a) utma

b) utmb

c) utmc

d) utmz

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

54. All communications between You and Google or its employees, agents, or assigns.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson will produce all non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

55. All contracts, agreements, memoranda of understanding, or other documents relating to the relationship between You and Google.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson will produce all non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

56. All non-disclosure or confidentiality agreements relating to Google and its collection of data at any of Your web-properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson will produce all non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

57. All documents relating to Google's use or receipt of data collected and/or derived from Your deployment of Google third-party source code at or any of Your web-properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects to this request to the extent it seeks information that is a matter of public record or is in the possession, custody, or control of Google, not Defendant.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

58. All documents relating to Your use of Google advertising tools in relation to any of Your web-properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson will produce all non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

59. All documents relating to return on investment from marketing through Google or any of its affiliates.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

60. All Your HIP AA notices and privacy policy notices in effect during the Class Period.

**RESPONSE** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

61. All purported Privacy Policies in effect at any of Your web properties (including www.emersonhospital.org) from the date You first deployed any third-party source code from Facebook, Google, or any other third party. If the Privacy Policy changed at any point in time from the date referenced to the present, produce all Privacy Policies used and the dates those policies were in effect. If the links to the Privacy Policy or presentation thereof have changed at any point in time from the date reference to the present, produce duplications of each such presentation.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to

lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

62. Documents sufficient to show Your organizational and management structure including, but not limited to, organizational charts and employee directories for the Class Period.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

63. All written authorizations from any Affected Person authorizing You to share their Personal Health Information with Facebook.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects because it contends that it did not share Personal Health Information with Facebook.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

64. All written authorizations from any Affected Person authorizing You to share their Personal Health Information with Google.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects because it contends that it did not share Personal Health Information with Google.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

65. All written authorizations from any Affected Person authorizing You to share their Personal Health Information with any third party for marketing purposes.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects because it contends that it did not share Personal Health Information with third parties.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

66. All exhibits that You propose to introduce in opposition to class certification or at the class certification hearing.

**RESPONSE:** Subject to its General Objections, Defendant objects to this request as it is a duplicate of Request 23 and incorporates its response herein.

67. Any documents reviewed, consulted, used, or relied upon by any expert that You intend to use on any issue related to class certification.

**RESPONSE:** Defendant objects to this request to the extent it seeks expert discovery beyond the permitted scope of Mass. R. Civ. P. Rule 26(b)(4). Defendant also objects that this request is premature.

68. All contracts between You and Plaintiff.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects to this request to the extent Plaintiff has equal access to responsive documents.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

69. All documents relating or referring to Plaintiff.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects to this request as Plaintiff has equal access to responsive documents.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

70. All documents relating to data disclosures that You provided to Plaintiff.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

71. Any and all documents that You contend show that You had prior express consent to disclose any of Plaintiff's personally identifiable information and communications exchanged with You to any third-party internet tracking companies including, but not limited to, Facebook, Google, Signal, Trade Desk, or Twitter.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to

lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

72. All documents relating to the manner, method, and means by which You contend Plaintiff purportedly consented to the disclosure of their personally identifiable information and communications exchanged with You to third-party internet tracking companies including, but not limited to Facebook, Google, Signal, Trade Desk, or Twitter.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

73. All documents relating to Your disclosure to third parties of any data about the Plaintiff.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession,

custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

74. All documents relating to Plaintiff conveyed from You to Facebook, Google, Signal, Trade Desk, Twitter, or any other third-party marketing company, regardless of the form or method of the conveyance or disclosure.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

75. For the following entities, all documents relating to the responsibilities of the entity as it relates to Your web properties and/or marketing, including but not limited to contracts, memorandums of understanding, indemnification agreements, and non-disclosure agreements:

a) Influence Health, Inc.;

b) Healthgrades;

c) Face book;

d) Google;

e) Signal;

f) The Trade Desk

g) Any other person not identified but which has responsibilities relating to Your web properties or marketing.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to

lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

76. For the following entities, all communications with the entity and any of its employees, agents, or assigns relating to the deployment or use of third-party source code at Defendant's web properties:

a) Influence Health, Inc.;

b) Healthgrades;

c) Facebook;

d) Google;

e) YouTube;

f) Signal;

g) The Trade Desk

h) Any other entity not identified but which has responsibilities relating to Your web properties or marketing.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

77. All documents relating to any communication to enroll or log in to the patient portal from any page at any of Your web properties, including documents with aggregate information and documents with specific information about any individual or computing device, including but not limited to names, email addresses, IP addresses, cookie identifiers, or any other unique identifiers associated with the enrollment or login. This request encompasses any data available to You that is available to You in the possession of a related entity or parent organization, or contractor or agent.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks documents that do not exist, is vague and ambiguous, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects that any request for portal-specific documents is overbroad and unduly burdensome because no advertising technology was installed on Defendant's patient portal, and attempting to collect and produce the requested information would take significant resources.

78. All documents relating to any communication to enroll or log in to the patient portal from any page at any of Your web properties, including documents with aggregate information and documents with specific information about any individual or computing device, including but not limited to names, email addresses, IP addresses, cookie identifiers, or any other unique identifiers associated with the enrollment or login. This request encompasses any data available to You that is available to You in the possession of a related entity or parent organization, or contractor or agent.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks documents that do not exist, is vague and ambiguous, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects that any request for portal-specific documents is overbroad and unduly burdensome because no advertising technology was installed on Defendant's patient portal, and attempting to collect and produce the requested information would take significant resources.

79. All documents relating to any telephone request to enroll in Your patient portal(s) on any of Your web properties, including but not limited to names, email addresses, IP addresses,

cookie identifiers, or any other unique identifiers associated with Enrollment or Login arising from such request to enroll.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks documents that do not exist, is vague and ambiguous, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects that any request for portal-specific documents is overbroad and unduly burdensome because no advertising technology was installed on Defendant's patient portal, and attempting to collect and produce the requested information would take significant resources.

80. All documents relating to any in-person request to enroll in Your patient portal(s) on any of Your web properties, including but not limited to names, email addresses, IP addresses, cookie identifiers, or any other unique identifiers associated with Enrollment or Login arising from such request to enroll.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks documents that do not exist, is vague and ambiguous, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects that any request for portal-specific documents is overbroad and unduly burdensome because no advertising technology was installed on Defendant's patient portal, and attempting to collect and produce the requested information would take significant resources.

81. All third-party source code deployed at any of Your web properties during the Class Period.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it is willing to meet and confer regarding the production of source code.

82. All documents relating to any meeting(s) (including but not limited to agendas, minutes, summaries, and notes) relating to third-party source code or the disclosure of information about patients/user who exchange communications at any of Your web properties, including but not limited to meeting(s) with representatives or agents of:

a) Face book;

b) Google;

c) Signal;

d) The Trade Desk;

e) Twitter;

f) Any other third party not identified herein from whom You have deployed thirdparty source code.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

83. All documents relating to Your use of cookie synching with third parties at any of Your web properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

84. All documents relating to the Meta Pixel parameter 'ev' or Meta Events Manager, including all event data associated with any of Your web-properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

85. All documents relating to the Meta Event with the value of 'SubscribedButtonClick' including associated settings and how it is used at any of Your web properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

86. All documents relating to the cookie '_ fbp', including how it is deployed and used by Facebook or by You.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

87. All documents relating to Your use of cookie synching with Facebook.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

88. All documents relating to Your use of cross-device tracking by Facebook.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

89. All documents relating to website scraping by Facebook.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects to this request to the extent it seeks information that is a matter of public record or is in the possession, custody, or control of Facebook, not Defendant.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

90. All documents relating to POST requests from users to Facebook being triggered even when the user does not fill out a form or take an affirmative action to submit data to You or Facebook.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession,

custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

91. All documents relating to any Facebook Javascript file(s) deployed at any of Your web properties, including Your patient portal(s).

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects that no advertising technology was installed on Defendant's patient portal.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

92. All documents relating to the value of the data disclosed to third parties including, but not limited to, documents relating to:

a) any compensation provided or received, monetary or otherwise, for conveymg information to a third party, including but not limited to, Facebook, Google, Signal, The Trade Desk, and Twitter.

b) any internal analysis regarding the value of privacy;

c) any internal analysis regarding the value of patient data to You;

d) the privacy policy, privacy promises, and/or general privacy and impression by users and/or the general public;

e) any internal analysis of the value of Your use of any or all third-party source code for marketing or other purposes.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the

discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson will produce all non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

93. All documents relating to the value You place on data disclosed to Face book.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

94. All documents relating to the value You place on the use of the Facebook Tracking Pixel, Facebook Pixel, or Meta Pixel.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession,

custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

95. All documents relating to Your use of cookie synching with Google.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

96. All documents relating to data sharing or transmissions between Google and Facebook facilitated in whole or in part via any of Your web properties, whether directly through Google or an affiliate such as DoubleClick.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects to this request to the extent it seeks information that is a matter of public record or is in the possession, custody, or control of Google or Facebook, not Defendant.

97. All documents relating to the deployment and use of a Meta Pixel ID through any Google property.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to

lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

98. All documents relating to Your use of cookie synching with Google or any of its affiliates.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

99. All documents relating to Your use of cross-device tracking by Google or any of its affiliates.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession,

custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

100. All documents relating to website scraping by Google.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues. Defendant further objects to this request to the extent it seeks information that is a matter of public record or is in the possession, custody, or control of Google, not Defendant.

101. All documents relating to Google's use of cookies, IP addresses, device identifiers, and other data caused to be transmitted, disclosed, or accessed through Defendant's deployment of Google third-party source code.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects to this request to the extent it seeks information that is a matter of public record or is in the possession, custody, or control of Google, not Defendant.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession,

custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

102. All documents relating to Google's receipt of cookies, IP addresses, device identifiers, and other data caused to be transmitted, disclosed, or accessed through Defendant's deployment of Google third-party source code.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects to this request to the extent it seeks information that is a matter of public record or is in the possession, custody, or control of Google, not Defendant.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

103. All documents relating to the value of the data disclosed or transmitted to Facebook relating to any of Your web-properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

104. All documents relating to the value You place on use of Google marketing tools deployed at any of Your web-properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

105. All documents relating to Your deployment and use of The Bright Tag or Signal third-party source code (hereafter "Signal") at any of Your web properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

106. All documents relating to Your use of cookie synching with Signal.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

107. All documents relating to Your use of cross-device tracking by Signal.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

108. All documents relating to cookies associated with Signal, including how they are deployed, accessed, disclosed or used by Signal or by any of Your web properties, including but not limited to 'vcnid.'

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects to this request to the extent it seeks information that is a matter of public record or is in the possession, custody, or control of Signal, not Defendant.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession,

custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

109. All documents relating to website scraping by Signal.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects to this request to the extent it seeks information that is a matter of public record or is in the possession, custody, or control of Signal, not Defendant.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

110. All documents relating to Signals use of cookies, IP addresses, device identifiers, and other data caused to be transmitted, disclosed, or accessed through Your deployment of Signal third party source code.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects to this request to the extent it seeks information that is a matter of public record or is in the possession, custody, or control of Signal, not Defendant.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession,

custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

111. All communications between You and Signal or its employees, agents, or assigns.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

112. All contracts, agreements, memoranda of understanding, or other documents relating to the relationship between You and Signal relating to any of Your web-properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

113. All non-disclosure or confidentiality agreements relating to Signal and its collection of data at or any of Your web-properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to

lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

114. All documents relating to Signal's use of data collected and/or derived from Your deployment of Signal third-party source code at any of Your web-properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects to this request to the extent it seeks information that is a matter of public record or is in the possession, custody, or control of Signal, not Defendant.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

115. All documents relating to Your use of Signal advertising tools in relation to any of Your web-properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

116. All documents relating to the value of the data disclosed or transmitted to Signal relating to or any of Your web-properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

117. All documents relating to the value You place on use of Signal marketing tools deployed at or any of Your web-properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

118. All documents relating to return on investment from marketing through Signal or any of its affiliates.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

119. All documents relating to Your deployment and use of Trade Desk third-party source code at any of Your web-properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

120. All documents relating to Your use of cookie synching with Trade Desk.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

121. All documents relating to Your use of cross-device tracking by Trade Desk.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

122. All documents relating to cookies associated with Trade Desk, including how they are deployed, accessed, disclosed or used by Trade Desk or by You at any of Your web-properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects to this request to the extent it seeks information that is a matter of public record or is in the possession, custody, or control of Trade Desk, not Defendant.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession,

custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

123. All documents relating to website scraping by Trade Desk.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects to this request to the extent it seeks information that is a matter of public record or is in the possession, custody, or control of Trade Desk, not Defendant.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

124. All documents relating to Trade Desk's use of cookies, IP addresses, device identifiers, and other data caused to be transmitted, disclosed, or accessed through Your deployment of Trade Desk third-party source code.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects to this request to the extent it seeks information that is a matter of public record or is in the possession, custody, or control of Trade Desk, not Defendant.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession,

custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

125. All communications between You and Trade Desk or its employees, agents, or assigns.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

126. All contracts, agreements, memoranda of understanding, or other documents relating to the relationship between You and Trade Desk relating to any of Your web-properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

127. All non-disclosure or confidentiality agreements relating to Trade Desk and its collection of data at or any of Your web-properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

128. All documents relating to Trade Desk's use of data collected and/or derived from Your deployment of Trade Desk third-party source code at any of Your web-properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects to this request to the extent it seeks information that is a matter of public record or is in the possession, custody, or control of Trade Desk, not Defendant.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

129. All documents relating to Your use of Trade Desk advertising tools in relation to any of Your web-properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to

lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

130. All documents relating to the value of the data disclosed or transmitted to Trade Desk relating to any of Your web-properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

131. All documents relating to the value You place on use of Trade Desk marketing tools deployed at or any of Your web-properties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession,

custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

132. All documents relating to return on investment from marketing through use of Trade Desk or any of its affiliates.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

133. All documents relating to Your policies for the destruction of records, documents, or files.

**RESPONSE:** Subject to its General Objections, Defendant further objects to this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects to this request to the extent it seeks information that is protected by the attorney-client privilege and/or work product doctrine. This request represents an inappropriate request for discovery-on-discovery and is not tailored to the claims and defenses in this matter.

134. All documents relating to Your document backup policies or procedures.

**RESPONSE:** Subject to its General Objections, Defendant further objects to this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes

obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects to this request to the extent it seeks information that is protected by the attorney-client privilege and/or work product doctrine. This request represents an inappropriate request for discovery-on-discovery and is not tailored to the claims and defenses in this matter.

135. All documents relating to Your backup of electronic data relevant to this matter including, but not limited to, lists or descriptions of all media formats utilized, software and hardware versions, build numbers and other related information You used to backup any of the data stored on archive or backup media with respect to documents relating to this request.

**RESPONSE:** Subject to its General Objections, Defendant further objects to this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects to this request to the extent it seeks information that is protected by the attorney-client privilege and/or work product doctrine. This request represents an inappropriate request for discovery-on-discovery and is not tailored to the claims and defenses in this matter. The internal infrastructure of Emerson computer backup systems is not relevant to the claims propounded in this case.

136. All diagrams depicting Your email system architecture including, but not limited to, physical server locations and mail store configurations.

**RESPONSE:** Subject to its General Objections, Defendant further objects to this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects to this request to the extent it seeks information that is protected by the attorney-client privilege and/or work product doctrine. This request represents an inappropriate request for discovery-on-discovery and is not tailored to the claims and defenses in this matter. Emerson's

email system architecture and computer system infrastructure is not relevant to the claims propounded in this case.

Subject to and without waiving the foregoing objections, Defendant states that it is willing to meet and confer regarding the production of emails.

137. Documents sufficient to show for each and every previous instance of an alleged or reported HIP AA violation by You, the nature of the HIP AA violation, the number of patients impacted by the violation, and the notice sent to patients informing them of the violation.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

138. Documents sufficient to show each and every individual medical provider profile displayed at any of Your web properties during the Class Period.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

139. Documents sufficient to show each and every individual medical provider associated with the appointment scheduling functionality at any of Your web properties during the Class Period.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to

lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects that no advertising technology was installed on any web page with appointment scheduling technology.

140. Documents sufficient to show the database schema, including but not limited to tables, fields, and indexes, of any database in which You obtain, return, store, maintain, access, view, or communicate records of visits to www.emersonhospital.org or Your patient portal(s).

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects that no advertising technology was installed on Defendant's patient portal. Defendant further objects to this request to the extent it seeks information that is a matter of public record or is in the possession, custody, or control of Google, not Defendant.

141. Documents sufficient to show how any database in which You obtain, return, store, maintain, access, view, or communicate records of visits to www.emersonhospital.org or Your patient portal(s) may be queried.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects that no advertising technology was installed on Defendant's patient portal. Defendant further objects to this request to the extent it seeks information that is a matter of public record or is in the possession, custody, or control of Google, not Defendant.

142. All documents and communications concerning Your policies and procedures regarding the collection and retention of Personal Health Information from website visitors, patients, and potential patients, including, but not limited to, specific Data collected and retained, and length of time Personal Health Information is retained, as well as any procedures in place to ensure that these policies and procedures were and are being followed.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects because it contends that no Personal Health Information was disclosed to third parties.

Subject to and without waiving the foregoing objections, Emerson will produce all non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

143. All documents and communications concerning or comprising Your policies and procedures regarding the safeguarding and protection of Personal Health Information and other Data provided by visitors to Your websites, including, but not limited to, Your costs associated therewith, as well as any procedures, practices, and training in place to ensure that these policies and procedures were and are being followed during the relevant period.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects because it contends that no Personal Health Information was disclosed to third parties.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession,

custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

144. All documents and communications concerning or comprising any representations You made to Your current and former patients regarding the protection and security of Personal Health Information and other Data from visitors to Your websites, including, but not limited to, compliance with any state or federal privacy or information security laws or regulations.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects because it contends that no Personal Health Information was disclosed to third parties.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

145. All documents and communications concerning or comprising any remedial steps You took during or following Your discovery of the Data Disclosure.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects because it contends that no steps taken were remedial.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession,

custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

146. All documents concerning or comprising communications between You and any governmental entities that relate to Your policies, procedures, protocols, or practices for safeguarding and protecting Personal Health Information, and/or regarding the Data Disclosure.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects because it contends that no Personal Health Information was disclosed to third parties.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

147. All documents regarding Your compliance or noncompliance with any applicable Data security guidelines or standards.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects to this request as it asks for a legal conclusion.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession,

custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

148. All documents related to Your policies and procedures to prevent, detect, contain, or remediate information security incidents, such as unauthorized access to or disclosure of Personal Health Information, as well as documents concerning compliance or non-compliance with those policies and procedures.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects because it contends that no Personal Health Information was disclosed to third parties.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

149. All documents concerning assessments or analyses regarding the potential risks or vulnerabilities to the confidentiality, integrity, and availability of Personal Health Information in Your Health Information Systems, as well as any decisions or efforts to address or remediate any identified risks.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects because it contends that no Personal Health Information was disclosed to third parties. Defendant further objects that no advertising technology was installed on any Defendant Health Information System.

150. Documents sufficient to identify all vendors or consultants You hired, or from whom You sought proposals for cybersecurity matters and/or safeguarding and protecting Personal Health Information provided by visitors to Your websites.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects because it contends that no Personal Health Information was disclosed to third parties.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

151. Documents sufficient to show your IT, cybersecurity, and overall operating budgets.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

152. All documents related to Your data security awareness and training programs for members of Your workforce, including independent contractors, including, but not limited to, names and titles of individuals conducting trainings, training manuals, course materials, topics covered, agendas, notes, and presentations.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

153. All documents related to enforcement of Your information security policies and procedures, including records of sanctions for noncompliance with those policies and procedures.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

154. All documents concerning Your policies and procedures for encryption and decryption of Personal Health Information and documents reflecting that these policies and procedures were and are being followed.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects because it contends that no Personal Health Information was disclosed to third parties.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession,

custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

155. Documents sufficient to show how You identified that the Data Disclosure occurred, including, but not limited to, how You determined that the security of former and current patients' Data was disclosed to third parties including but not limited to Facebook, what data was disclosed, the dates on which You became aware of the disclosure, why the disclosure occurred, and any cybersecurity measures or precautions You have implemented in response to the Data Disclosure.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

156. All reports or other documents regarding Your investigation and documentation of the Data Disclosure and its consequences or Your response to the Data Disclosure, including, but not limited to, the cause of the Data Disclosure, the information compromised during the Data Disclosure, the number of Affected Persons, remedial measures taken, changes implemented and details regarding such measures and changes such as when the changes took place or will take place, and who implemented or will implement the changes.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects to this request to the extent it seeks information that is protected by the attorney-client privilege and/or work product doctrine.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

157. All documents detailing any recommendations made or actions taken to notify Affected persons, government entities, or the public of the Data Disclosure before June 2022, including, but not limited to, the date on which those recommendations were made or actions were taken and the reasons why notification to Affected persons, government entities, or the public was delayed.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure.

Subject to and without waiving the foregoing objections, Emerson states that it will produce any non-privileged documents responsive to this request that are within its possession, custody or control that can be located following a reasonable search and reserves the right to supplement this response as discovery continues.

158. All documents and communications concerning assessments of potential Health Information System vendors.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects that no advertising technology was installed on any Defendant Health Information System.

159. All documents and communications sufficient to identify all vendors or consultants You hired or from whom You sought proposals for Health Information Systems.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects that no advertising technology was installed on any Defendant Health Information System.

160. All documents and communications concerning how Personal Health Information is stored in Health Information Systems, including but not limited to patient portals.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects because it contends that no Personal Health Information was disclosed to third parties. Defendant further objects that no advertising technology was installed on any Defendant Health Information System or Defendant's patient portal.

161. All documents and communications concerning the encryption or safeguarding of Personal Health Information in Health Information Systems such as patient portals.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects because it contends that no Personal Health Information was disclosed to third parties. Defendant further objects that no advertising technology was installed on any Defendant Health Information System or Defendant's patient portal.

162. All documents concerning policies and procedures regarding the means of access to Your Health Information Systems (including but not limited patient portals) given by You to third parties.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects that no advertising technology was installed on any Defendant Health Information System or Defendant's patient portal.

163. All documents and communications showing analyses regarding whether Health Information Systems such as patient portals improve patient care.

**RESPONSE:** Subject to its General Objections, Defendant further objects that this request seeks information that is neither relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence, is vague, overbroad, unduly burdensome, and imposes obligations in excess of those imposed by the Massachusetts Rules of Civil Procedure. Defendant further objects that no advertising technology was installed on any Defendant Health Information System.

Dated: August 31, 2023

**EMERSON HOSPITAL**

*/s/ Emyr T. Remy*

Tammy B. Webb (*pro hac vice*)
tbwebb@shb.com
SHOOK, HARDY, & BACON L.L.P.
555 Mission Street, Suite 2300
San Francisco, CA 94105
Tel: (415) 544-1900 | Fax: (415) 391-0281

Emyr T. Remy (BBO # 704156)
remy@shb.com
SHOOK, HARDY & BACON L.L.P.
One Federal Street, Suite 2540
Boston, MA 02110
Tel: (617) 531-1411 | Fax: (617) 531-1602

Alfred J. Saikali (*pro hac vice*)
asaikali@shb.com
SHOOK, HARDY & BACON L.L.P.
201 South Biscayne Blvd., Suite 3200
Miami, Florida 33131
Tel: (305) 358-5171 | Fax: (305) 358-7470

Justin R. Donoho (*pro hac vice*)
jdonoho@shb.com
SHOOK, HARDY & BACON L.L.P.
111 South Wacker Drive
Chicago, IL 60606
Tel: (312) 704-7713 | F: (312) 558-1195

Jessica N. Wahl (*pro hac vice*)
jwahl@shb.com
SHOOK, HARDY & BACON L.L.P.
2049 Century Park East, Suite 3000
Los Angeles, CA 90067
T: (424) 285-8330 | F: (424) 204-9093

Jenn O. Hatcher (*pro hac vice*)
jhatcher@shb.com
SHOOK, HARDY & BACON L.L.P.
2555 Grand Blvd.
Kansas City, MO 64108
T: (816) 474-6550 | F: (816) 421-5547

**CERTIFICATE OF SERVICE**

I hereby certify that on August 31, 2023, I served DEFENDANT EMERSON HOSPITAL'S FIRST AMENDED RESPONSES TO PLAINTIFF JOHN DOE'S FIRST AND SECOND SETS OF REQUESTS FOR PRODUCTION OF DOCUMENTS, via electronic mail, to the following counsel of record:

J. Tucker Merrigan (BBO# 681627)
Victoria Santoro (BBO# 679120)
Erin E, McHugh (BBO# 703701)
**SWEENEY MERRIGAN LAW**
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com
*Attorneys for Plaintiff*

Foster C. Johnson (*pro hac vice*)
David Warden (*pro hac vice*)
Nathan Campbell (*pro hac vice*)
**AHMAD, ZAVITSANOS & MENSING, P.C.**
1221 McKinney St., Suite 3460
Houston, TX 77010
Tel: (713) 655-1101
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com
*Attorneys for Plaintiff*

Seth Meyer (*pro hac vice*)
Alex Dravillas (*pro hac vice*)
**KELLER POSTMAN LLC**
150 N. Riverside Plaza, Suite 4100
Chicago, IL 60606
Tel: (312) 741-5220
sam@kellerpostman.com
adj@kellerpostman.com
*Attorney for Plaintiff*

/s/ *Emyr T. Remy*
Emyr T. Remy

# EXHIBIT 3

COMMONWEALTH OF MASSACHUSETTS

| | | |
|---|---|---|
| ESSEX, ss | ) | TRIAL COURT DEPARTMENT |
| | ) | SUPERIOR COURT |
| JOHN DOE, individually and on behalf of all others similarly situated, | ) | |
| Plaintiff, | ) | DOCKET NO. 2277CV01000D |
| v. | ) | |
| EMERSON HOSPITAL, | ) | |
| Defendant. | ) | |

**DECLARATION OF RENEE FOSBERG**

I, **RENNE FOSBERG**, hereby certify and declare as follows:

1. I am Vice President and Chief Information Officer at Emerson Hospital ("Emerson"). I have worked at Emerson since 2006, serving in the roles of Vice President and Chief Information officer (2019-present), Senior Director of Information Systems (2012-2019), Senior Director of Applications (2009-2012), and Director of Outpatient Applications (2006-2009).

2. I have worked for nearly twenty (20) years as a leader in the health care information systems industry. Prior to my role at Emerson, I worked for Caritas Christi Health Care (now Steward Health Care) for ten (10) years.

3. I submit this Affidavit in support of Emerson's Opposition to Plaintiff's Motion to Compel and Remove Certain Objections. I have personal knowledge of the facts contained herein and could and would testify to them if called as a witness.

4. As Emerson's Vice President and Chief Information Officer, I have chief responsibility for managing and implementing Emerson's information systems, including (1) the public webpage located at https://ehconnect.emersonhosp.org/PTAccess, which serves as the

entryway to Emerson Health Connect, Emerson's patient portal for hospital services, including inpatient care, rehabilitation, lab, and imaging; (2) the login button on this public webpage; and (3) the private patient portal pages available to portal users beyond the entryway and login button once a user logs in (collectively, Emerson's "Patient Portal").

5. Emerson's Patient Portal is hosted on servers owned and operated by Emerson but developed and maintained with software programs by a third-party vendor named iatricSystems.

6. The Patient Portal has never contained any advertisements. Moreover, neither Emerson nor iatricSystems has ever captured any data with any software that would enable any analysis of the types of visitors to the website or overall website traffic for marketing or advertisement purposes.

7. On November 30, 2022, and again on October 3, 2023, a member of my team reached out to iatricSystems to make queries about whether the Patient Portal has ever had installed on it any advertising technologies such as Meta/Facebook Pixel, Google Analytics, DoubleClick, GoogleAds, StackAdapt, Quantcast and YouTube ("adtech"). In response, iatricSystems consulted its application development team and confirmed that no adtech has ever been installed on the Patient Portal.

8. A member of my team also performed an independent test to ensure that no Meta/Facebook Pixel code was installed on the Patient Portal by: (a) installing a Google Chrome browser extension provided by Facebook/Meta for developers to test whether Pixel is running on a specific web page; (b) loading the extension onto a computer that was not part of Emerson's network; (c) following Facebook/Meta's instructions to check the Emerson Portal Page located at https://ehconnect.emersonhosp.org/PTAccess; (d) receiving output from the extension confirming that no Pixel code was being used; and (e) confirming that the extension was working properly by testing the extension on other websites containing Facebook/Meta Pixel code.

*I declare under penalty of perjury under the laws of the Commonwealth of Massachusetts that the foregoing statements are true and correct.*

Dated this 5th day of October, 2023.

Renee Fosberg

# Emerson - Declaration of Renee Fosberg

Final Audit Report 2023-10-05

| | |
|---|---|
| Created: | 2023-10-05 |
| By: | Emyr Remy (remy@shb.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAtK3A3Rlo1Et-AKhFWDrjhqJbU8jR7UBh |

## "Emerson - Declaration of Renee Fosberg" History

Document created by Emyr Remy (remy@shb.com)
2023-10-05 - 4:35:53 PM GMT

Document emailed to rfosberg@emersonhosp.org for signature
2023-10-05 - 4:36:42 PM GMT

Email viewed by rfosberg@emersonhosp.org
2023-10-05 - 4:55:01 PM GMT

Signer rfosberg@emersonhosp.org entered name at signing as Renee Fosberg
2023-10-05 - 4:56:27 PM GMT

Document e-signed by Renee Fosberg (rfosberg@emersonhosp.org)
Signature Date: 2023-10-05 - 4:56:29 PM GMT - Time Source: server

Agreement completed.
2023-10-05 - 4:56:29 PM GMT

# EXHIBIT 4

**From:** Foster Johnson <fjohnson@AZALAW.COM>
**Sent:** Friday, August 18, 2023 1:15 PM
**To:** Webb, Tammy (SHB)
**Cc:** Donoho, Justin R. (SHB); Ward, Jason (SHB); David Warden
**Subject:** Zoom call next week about Emerson patient portal use

**EXTERNAL**

Tammy,

Please let me know your team's availability for a call on Thursday-Friday next week to discuss Emerson's use of tracking pixels on its patient portal.

Thanks,
Foster

**Foster C. Johnson**
Partner
Ahmad, Zavitsanos & Mensing, PLLC
1221 McKinney, Suite 2500
Houston, Texas 77010
Direct 713.600.4915
Main 713.655.1101
Cell 713.724.6743
www.azalaw.com

**Disclaimer**

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by **Mimecast Ltd**, an innovator in Software as a Service (SaaS) for business. Providing a **safer** and **more useful** place for your human generated data. Specializing in; Security, archiving and compliance. To find out more Click Here.

# EXHIBIT 5

**From:** Webb, Tammy (SHB)
**Sent:** Friday, August 18, 2023 3:56 PM
**To:** Foster Johnson
**Cc:** Donoho, Justin R. (SHB); Ward, Jason (SHB); David Warden; Tanner, Arlen (SHB)
**Subject:** RE: Zoom call next week about Emerson patient portal use

Hi Foster. Next week is pretty bad for me as I have to travel and participate in an all-day mediation Wednesday- Friday and Jason is out of town on Friday too.

Would Monday, August 28 work for our Zoom? We can be available from 11-2 Central or after 3:30 Central.

Thanks so much,
Tammy

**Tammy B. Webb**
*Class Action and Complex Litigation Partner*
Shook, Hardy & Bacon L.L.P.

415.544.1904 | tbwebb@shb.com

**From:** Foster Johnson <fjohnson@AZALAW.COM>
**Sent:** Friday, August 18, 2023 11:15 AM
**To:** Webb, Tammy (SHB) <TBWEBB@shb.com>
**Cc:** Donoho, Justin R. (SHB) <jdonoho@shb.com>; Ward, Jason (SHB) <JWARD@shb.com>; David Warden <dwarden@AZALAW.COM>
**Subject:** Zoom call next week about Emerson patient portal use

**EXTERNAL**

Tammy,

Please let me know your team's availability for a call on Thursday-Friday next week to discuss Emerson's use of tracking pixels on its patient portal.

Thanks,
Foster

**Foster C. Johnson**
Partner
Ahmad, Zavitsanos & Mensing, PLLC
1221 McKinney, Suite 2500
Houston, Texas 77010

Direct 713.600.4915
Main 713.655.1101
Cell 713.724.6743
www.azalaw.com

**Disclaimer**

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by **Mimecast Ltd**, an innovator in Software as a Service (SaaS) for business. Providing a **safer** and **more useful** place for your human generated data. Specializing in; Security, archiving and compliance. To find out more Click Here.

# EXHIBIT 6

**From:** Foster Johnson <fjohnson@AZALAW.COM>
**Sent:** Friday, August 18, 2023 3:57 PM
**To:** Webb, Tammy (SHB)
**Cc:** Donoho, Justin R. (SHB); Ward, Jason (SHB); David Warden; Tanner, Arlen (SHB)
**Subject:** RE: Zoom call next week about Emerson patient portal use

**EXTERNAL**

That will probably work. Let me check on my end.

Thanks,
Foster

**Foster C. Johnson**
Partner
Ahmad, Zavitsanos & Mensing, PLLC
1221 McKinney, Suite 2500
Houston, Texas 77010
Direct 713.600.4915
Main 713.655.1101
Cell 713.724.6743
www.azalaw.com

**From:** Webb, Tammy (SHB) <TBWEBB@shb.com>
**Sent:** Friday, August 18, 2023 3:56 PM
**To:** Foster Johnson <fjohnson@AZALAW.COM>
**Cc:** Donoho, Justin R. (SHB) <jdonoho@shb.com>; Ward, Jason (SHB) <JWARD@shb.com>; David Warden <dwarden@AZALAW.COM>; Tanner, Arlen (SHB) <ATANNER@shb.com>
**Subject:** RE: Zoom call next week about Emerson patient portal use

Hi Foster. Next week is pretty bad for me as I have to travel and participate in an all-day mediation Wednesday- Friday and Jason is out of town on Friday too.

Would Monday, August 28 work for our Zoom? We can be available from 11-2 Central or after 3:30 Central.

Thanks so much,
Tammy

**Tammy B. Webb**
*Class Action and Complex Litigation Partner*
Shook, Hardy & Bacon L.L.P.

415.544.1904 | tbwebb@shb.com

**From:** Foster Johnson <fjohnson@AZALAW.COM>
**Sent:** Friday, August 18, 2023 11:15 AM
**To:** Webb, Tammy (SHB) <TBWEBB@shb.com>
**Cc:** Donoho, Justin R. (SHB) <jdonoho@shb.com>; Ward, Jason (SHB) <JWARD@shb.com>; David Warden <dwarden@AZALAW.COM>
**Subject:** Zoom call next week about Emerson patient portal use

**EXTERNAL**

Tammy,

Please let me know your team's availability for a call on Thursday-Friday next week to discuss Emerson's use of tracking pixels on its patient portal.

Thanks,
Foster

**Foster C. Johnson**
Partner
Ahmad, Zavitsanos & Mensing, PLLC
1221 McKinney, Suite 2500
Houston, Texas 77010
Direct 713.600.4915
Main 713.655.1101
Cell 713.724.6743
www.azalaw.com

**Disclaimer**

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by **Mimecast Ltd**, an innovator in Software as a Service (SaaS) for business. Providing a **safer** and **more useful** place for your human generated data. Specializing in; Security, archiving and compliance. To find out more Click Here.

CONFIDENTIALITY NOTICE: This e-mail message including attachments, if any, is intended for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message. Thank you.

**Disclaimer**

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by **Mimecast Ltd**, an innovator in Software as a Service (SaaS) for business. Providing a **safer** and **more useful** place for your human generated data. Specializing in; Security, archiving and compliance. To find out more Click Here.

COMMONWEALTH OF MASSACHUSETTS

ESSEX, S.S. SUPERIOR COURT

| | | |
|---|---|---|
| JOHN DOE,<br>INDIVIDUALLY AND ON<br>BEHALF OF ALL OTHERS SIMILARLY<br>SITUATED,<br><br>Plaintiff<br><br>v.<br><br>EMERSON HOSPITAL,<br><br>Defendant. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | C.A. No. 2277CV01000 |

FILED
ESSEX SUPERIOR COURT

**REQUEST FOR HEARING**

The Plaintiff, John Doe, Individually and on Behalf of All Others Similarly Situated respectfully requests that this court grants a hearing as to PLAINTIFF'S MOTION TO COMPEL AND TO REMOVE CERTAIN OBJECTIONS.

Respectfully Submitted
The Plaintiff
By his Attorney,

*/s/ J. Tucker Merrigan*
J. Tucker Merrigan, BBO# 681627
**SWEENEY MERRIGAN LAW, LLP**
268 Summer Street, LL
Boston, MA 02210
Phone: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com

Dated: October 6, 2023

COMMONWEALTH OF MASSACHUSETTS

ESSEX, S.S. SUPERIOR COURT

JOHN DOE,
INDIVIDUALLY AND ON
BEHALF OF ALL OTHERS SIMILARLY
SITUATED,

Plaintiff

v.

EMERSON HOSPITAL,

Defendant.

C.A. No. 2277CV01000

**RULE 9A NOTICE OF FILING AND LISTING OF DOCUMENTS**

I, J. Tucker Merrigan, one of the counsel for Plaintiff, John Doe, Individually and on Behalf of All Others Similarly Situated, hereby state that the following list of documents have been submitted for filing with the Court pursuant to Superior Court Rule 9A:

1. Plaintiff's Motion to Compel and to Remove Certain Objections;
2. Memorandum in Support of Plaintiff's Motion to Compel and Remove Certain Objections;
3. Request for Hearing;
4. Emerson Hospital's Opposition to Plaintiff's Motion to Compel and to Remove Certain Objections; and
5. Certificate of Service.

Respectfully Submitted
The Plaintiff
By his Attorney,

*/s/ J. Tucker Merrigan*

J. Tucker Merrigan, BBO# 681627
**SWEENEY MERRIGAN LAW, LLP**
268 Summer Street, LL
Boston, MA 02210
Phone: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com

Dated: October 6, 2023

**CERTIFICATE OF SERVICE**

I, J. Tucker Merrigan, hereby certify that on October 6, 2023, in accordance with Superior Court Rule 9A, I served the following documents:

1. Rule 9A Notice of Filing and Listing of Documents; and
2. Request for Hearing.

on all counsel of record, via electronic mail to the following parties of interest:

Emyr Remy
SHOOK, HARDY & BACON L.L.P.
One Federal Street, Suite 2540
Boston, MA 02110
Tel: (617) 531-1411 | Fax: (617) 531-1602
remy@shb.com

Alfred J. Saikali *(pro hac vice)*
SHOOK, HARDY & BACON L.L.P.
201 South Biscayne Blvd., Suite 3200
Miami, Florida 33131
Tel: (305) 358-5171 | Fax: (305) 358-7470
asaikali@shb.com

Tammy B. Webb *(pro hac vice)*
SHOOK, HARDY & BACON, L.L.P.
555 Mission Street, Suite 2300
San Fransicso, CA 94105
Tel: (415) 544-1900 | Fax: (415) 391-0281
Tbwebb@shb.com

Jessica N. Wahl *(pro hac vice)*
SHOOK, HARDY & BACON L.L.P.
2049 Century Park East, Suite 3000
Los Angeles, CA 90067
Tel: (424) 285-8330 | Fax: (424) 204-9093
jwahl@shb.com

Jenn O. Hatcher *(pro hac vice)*
SHOOK, HARDY & BACON L.L.P.
2555 Grand Blvd
Kansas City, MO 64108
Tel: (816) 474-6550 | Fax: (816) 421-5547
Jhatcher@shb.com

Justin R. Donoho *(pro hac vice)*
SHOOK, HARDY & BACON, L.L.P.
111 South Wacker Drive
Chicago, IL 60606
Tel: (312) 704-7713 | Fax: (312) 558-1195
jdonoho@shb.com

*/s/ Johnathan T. Merrigan*
J. Tucker Merrigan

2277CV01000

Please take note that, with respect to the ,

43

on January 2, 2024, the following order was entered on the docket of the above-referenced case:

ORDER: Appellate proceedings stayed to 2/2/2024, pending a decision on the motion to report to be filed in the trial court. Status report due 2/2/2024, or within 7 days of a decision on the motion, whichever date is sooner. *Notice/Attest

REGISTRATION FOR ELECTRONIC FILING. Every attorney with an appeal pending in the Appeals Court must have an account with eFileMA.com. Registration with eFileMA.com constitutes consent to receive electronic notification from the Appeals Court and e-service of documents. Self-represented litigants are encouraged, but not required, to register for electronic filing.

ELECTRONIC FILING. Attorneys must e-file all non-impounded documents. Impounded documents and submissions by self-represented litigants may be e-filed. No paper original or copy of any e-filed document is required. Additional information is located on our Electronic Filing page: http://www.mass.gov/courts/court-info/appealscourt/efiling-appeals-faq-gen.html

FILING OF CONFIDENTIAL OR IMPOUNDED INFORMATION. Any document containing confidential or impounded material must be filed in compliance with Mass. R. App. P. 16(d), 16(m), 18(a)(1)(A)(iv), 18(d), and 21.

Very truly yours,

The Clerk's Office

Dated: January 2, 2024

-----Original Message-----
From: Appeals Court Clerk's Office <AppealsCtClerk@appct.state.ma.us>
Sent: Tuesday, January 2, 2024 1:00 PM
To: Essex Clerks Office <Essex.clerksoffice@jud.state.ma.us>
Subject: 2023-J-0750 - Notice of Order

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT CLERK'S OFFICE
John Adams Courthouse
One Pemberton Square, Suite 1200
Boston, Massachusetts 02108-1705
617-921-4443

A TRUE COPY, ATTEST
DEPUTY ASS'T. CLERK

January 2, 2024

RE: No. 2023-J-0750
Lower Ct. No.: 2277CV01000

JOHN DOE
vs.
EMERSON HOSPITAL

NOTICE OF DOCKET ENTRY

Date Filed 1/22/2024 6:34 PM
Superior Court - Essex
Docket Number 2277CV01000



COMMONWEALTH OF MASSACHUSETTS

ESSEX, ss

| | |
|---|---|
| JOHN DOE, individually and on behalf of all others similarly situated, Plaintiff, v. EMERSON HOSPITAL, Defendant. | TRIAL COURT DEPARTMENT SUPERIOR COURT<br><br>DOCKET NO. 2277CV01000D |

A TRUE COPY, ATTEST
DEPUTY ASS'T. CLERK

## EMERSON HOSPITAL'S MOTION TO REPORT

Defendant Emerson Hospital ("Emerson") respectfully moves, pursuant to Massachusetts Rule of Civil Procedure 64(a) and M.G.L. c. 231, § 111, for this Court to report its November 22, 2023 Memorandum of Decision and Order on Defendant's Motion to Dismiss to the Massachusetts Appeals Court for interlocutory review. As set forth in further detail in Emerson's memorandum in support, reporting the court's Order is appropriate here because it "so affects the merits of the controversy that the matter ought to be determined by the appeals court before any further proceedings in the trial court." Mass. R. Civ. P. 64. Further, reporting the Order will ensure "the just, speedy, and inexpensive determination" of this action and others. Mass. R. Civ. P. 1. Accordingly, Emerson respectfully requests that this Court report its Order to the Appeals Court for interlocutory review and determination and stay any further proceedings in this Court pending appellate review.

## REQUEST FOR HEARING

Pursuant to Superior Court Rule 9A(c), Emerson respectfully requests a hearing on its Motion to Report.

Case is stayed pending SJC decision on 2 Vita Cases (See Paper #45). The issue of the Writ...

... unreasonable delay / Dinigans'

e Filed 1/22/2024 6:34 PM
ɔerior Court - Essex
ɔket Number 2277CV01000

Dated: December 20, 2023

Respectfully submitted,

EMERSON HOSPITAL

By: */s/Emyr T. Remy*

Emyr T. Remy (BBO# 704156)
**SHOOK, HARDY & BACON L.L.P.**
One Federal Street, Suite 2540
Boston, MA 02110
Tel.: (617) 531-1411 | Fax: (617) 531-1602
remy@shb.com

Alfred J. Saikali (FL # 0178195)
**SHOOK, HARDY & BACON L.L.P.**
201 South Biscayne Blvd., Suite 3200
Miami, Florida 33131
Tel: (305) 358-5171 | Fax: (305) 358-7470
asaikali@shb.com

Tammy B. Webb (CA # 227593)
**SHOOK, HARDY & BACON L.L.P.**
555 Mission Street, Suite 2300
San Francisco, CA 94105
Tel: (415) 544-1900 | Fax: (415) 391-0281
twebb@shb.com

Justin R. Donoho (IL # 6299667)
Tara D. Kennedy (IL # 6320909)
**SHOOK, HARDY & BACON L.L.P.**
111 South Wacker Drive, Suite 4700
Chicago, IL 60606
Tel: (312) 704-7713 | F: (312) 558-1195
jdonoho@shb.com
tkennedy@shb.com

Jessica N. Wahl (CA # 321887)
**SHOOK, HARDY & BACON L.L.P.**
2049 Century Park East, Suite 3000
Los Angeles, CA 90067
Tel: (424) 324-3477 | Fax: (424) 204-9093
jwahl@shb.com

iled 1/22/2024 6:34 PM
or Court - Essex
t Number 2277CV01000

**RULE 9C CERTIFICATION**

Pursuant to Superior Court Rule 9C(a), Defendant's counsel conferred with Plaintiff's counsel by phone on December 20, 2023 regarding the relief requested in this motion. Despite good faith efforts the parties were unable to reach an agreement regarding the relief requested herein.

/s/ Emyr T. Remy
Emyr T. Remy

**CERTIFICATE OF SERVICE**

I, Emyr T. Remy, hereby certify that on December 20, 2023 a true copy of the above document was served by email upon:

J. Tucker Merrigan (BBO# 681627)
Victoria Santoro (BBO# 679120)
Erin E, McHugh (BBO# 703701)
**SWEENEY MERRIGAN LAW**
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Seth Meyer (*PHV5191283NY*)
Alex Dravillas (*PHV6299686IL*)
**KELLER POSTMAN LLC**
150 N. Riverside Plaza, Suite 4100
Chicago, IL 60606
Tel: (312) 741-5220
sam@kellerpostman.com
ajd@kellerpostman.com

Foster C. Johnson (*PHV24076463TX*)
David Warden (*PHV20856750TX*)
Nathan Campbell (*PHV24097455TX*)
**AHMAD, ZAVITSANOS & MENSING, P.C.**
1221 McKinney St., Suite 3460
Houston, TX 77010
Tel: (713) 655-1101
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

/s/ Emyr T. Remy
Emyr T. Remy

Date Filed 1/22/2024 6:34 PM
Superior Court - Essex
Docket Number 2277CV01000

44.1

COMMONWEALTH OF MASSACHUSETTS

| | | |
|---|---|---|
| ESSEX, ss | ) | TRIAL COURT DEPARTMENT |
| | ) | SUPERIOR COURT |
| JOHN DOE, individually and on behalf of all others similarly situated, | ) | |
| Plaintiff, | ) | DOCKET NO. 2277CV01000D |
| v. | ) | |
| EMERSON HOSPITAL, | ) | |
| Defendant. | ) | |

A TRUE COPY, ATTEST
DEPUTY ASS'T. CLERK

**EMERSON HOSPITAL'S MEMORANDUM IN SUPPORT OF ITS MOTION TO REPORT**

Defendant, Emerson Hospital ("Emerson"), respectfully moves, pursuant to Massachusetts Rule of Civil Procedure 64(a) and M.G.L. c. 231, § 111, for this Court to report to the Appeals Court for interlocutory review, its finding, in its November 22, 2023 Memorandum of Decision and Order on Defendant's Motion to Dismiss, that advertising technology software is an "intercepting device" under Massachusetts' Wiretap Act, and stay any further proceedings in this Court pending appellate review.[1] A Rule 64 report is warranted here because this finding "so affects the merits of the controversy that the matter ought to be determined by the appeals court before any further proceedings in the trial court." Mass. R. Civ. P. 64(a). Granting this request will also increase judicial efficiency by expediting appellate review of an important, potentially catastrophic, threshold, genuine legal issue that is central to this case and threatens the existence

[1] Emerson has also petitioned the Single Justice of the Appeals Court to allow leave for an interlocutory appeal under M.G.L. c. 231, § 118, ¶ 1, to preserve its right to do so in light of the thirty-day jurisdictional limitation on seeking such an order. Emerson has advised the Single Justice that it is also requesting that this Court report its finding.

of Emerson, many other Massachusetts businesses, and the entire economy of the Commonwealth. *See* Mass. R. Civ. P. 1.

## I. BACKGROUND

This is a putative class action brought by Plaintiff John Doe against Emerson Hospital, alleging violation of the Massachusetts Wiretap Act, M.G.L. c. 272, § 99, asserting additional claims, and seeking tens or hundreds of millions of dollars in statutory damages under the Wiretap Act. First Amended Complaint ("FAC") ¶ 193; Ex. 1, 10/12/23 Hr'g Tr. at 34:8-13. Emerson is a small non-profit hospital. Emerson's Mem. in Supp. of Mot. to Dismiss ("Mem.") at 3. If the Massachusetts court system determines with finality that the FAC's allegations meet the requirements of the Wiretap Act, it would be catastrophic to Emerson and the Commonwealth's economy. FAC ¶ 193; Ex. 1 at 28:8-12; 34:8-22.

The lawsuit is not based on any allegation that any private information was disclosed publicly or to any cybercriminal. Instead, Plaintiff alleges that the word "concussion" he anonymously clicked on or entered on Emerson's public-facing website was sent by Emerson to Facebook and Google causing Facebook and Google to adjust the nature of the advertisements they already sent him to be "targeted." FAC ¶¶ 36, 102, 103; Mem. at 3-5; Ex. 1 at 11:16-14:1. According to Plaintiff, Emerson did this with something called the Meta Pixel or similar Google software technologies ("advertising technology software" or "adtech software"). As Plaintiff alleges, this software is "wildly popular and embedded on millions of websites." FAC ¶ 82; Ex. 1 at 12:3-7.

Emerson filed a motion to dismiss under Rule 12(b)(6), on the ground, among others, that adtech software is not an "intercepting device" within the meaning of the Wiretap Act. Mem. at

Date Filed 1/22/2024 6:34 PM
Superior Court - Essex
Docket Number 2277CV01000

14-16; Reply at 4; Ex. 1 at 28:7-34:25. The Court denied Emerson's motion on this ground, as follows (the "Finding"):

> Emerson argues that the [wiretap] claim fails because the FAC ... fails to allege that it used an intercepting device ... Th[is] argument has been rejected in other recent Superior Court decisions analyzing similar allegations and the court sees no reason to diverge from those rulings. See, e.g., Doe[ v. BMC], 2023 WL 7105628, at *4 [(Mass. Super. Ct. Sep. 14, 2023) (finding that Meta Pixel and Google Analytics "software code" is an "intercepting device")].

11/22/23 Order at 11.

The following adtech software healthcare cases have already been reported for interlocutory appellate review and are currently on appeal. These cases address **different** issues under the Wiretap Act from the Finding, quoted above, that Emerson requests that the Court report for appellate review here. Ex. 2, 11/31/23 Order Reporting for Appellate Review in *Vita v. Beth Israel Deaconess Medical Center, Inc.*, No. 2384CV00480-BLS1; Ex. 3, 10/3123 Order Reporting for Appellate Review in *Vita v. New England Baptist Hospital*, No. 2384CV00857-BLS1 ("*Vita* cases"). In the *Vita* cases, the issues being appealed are whether, under the Wiretap Act, alleged disclosures via adtech software (1) are "wire communications"; (2) were "secret[]"; and (3) fall under the "ordinary course of its business" exception. Ex. 4, Application for Direct Appellate Review of Both Cases at 11 (setting forth the issues in full). The *Vita* cases did not argue in the trial court nor are they appealing the issue presented by the Finding: Whether advertising technology software is "intercepting device" within the meaning of the Wiretap Act.

## II. LEGAL STANDARD

This Court may report an interlocutory finding if it "so affects the merits of the controversy that the matter ought to be determined by the appeals court before any further proceedings in the trial court." Mass. R. Civ. P. Rule 64(a); M.G.L. c. 231, § 111; *Patel v. Martin*, 481 Mass. 29, 31-

32 (2018). An interlocutory order "should be reported" under Rule 64 where (A) it presents a "serious" question; (B) the question is "likely to be material in the ultimate decision"; (C) "subsequent proceedings in the trial court will be substantially facilitated"; and (D) the question has "significant public repercussions." *Armstrong v. Theoharides*, No. 1884CV02132BLS1, 2021 WL 4515360, at *2 (Mass. Super. June 23, 2021) (citations omitted). All four of these factors favor reporting the Finding under Rule 64, as discussed in the next section.

## III. ARGUMENT

### A. The Finding presents a serious question.

The issue presented by the Finding—whether advertising technology software is an "intercepting device" within the meaning of the Wiretap Act—is a serious question worthy of appellate review for multiple reasons. First, it is a question of law that has not been addressed by any Massachusetts appellate court, nor is it being addressed by the *Vita* consolidated interlocutory appeal. *See Acevedo v. Musterfield Place, LLC*, No. 1581CV00308, 2017 WL 7313406, at *3 (Mass. Super. May 31, 2017) (granting motion to report question of law where no Massachusetts court besides the Superior Court had addressed the issue); *Brown v. Office of the Com'r of Probation*, No. SUCV2007-03552-A, 2011 WL 13383961, at **1-2 (Mass. Super. Nov. 22, 2011) (granting request to report under Rule 64 an order presenting questions of law that were "perhaps novel"); Ex. 2 at 10-11 (reporting questions of law that are "unresolved at the appellate level in Massachusetts"); Ex. 3 at 10-11 (same).

Moreover, there is substantial ground for a difference of opinion on whether advertising technology software is an "intercepting device" under the Wiretap Act. *See Brown*, 2011 WL 13383961, at **1-2 (granting request to report questions that were "complex and perhaps novel"); Ex. 2 at 11 (reporting issue under the Wiretap Act because this statute "was enacted in 1968—long

before the internet, let alone internet tracking, became available. The Legislature did not, therefore, contemplate internet tracking as a form of secretly intercepting communications"); Ex. 3 at 11 (same). A Massachusetts appellate court may find that advertising technology software is not an "intercepting device," for at least the following reasons:

- Plain meaning. The Wiretap Act defines an "intercepting device" as "any device or apparatus which is capable of transmitting, receiving, amplifying, or recording a wire or oral communication..." Mem. at 14-15, quoting, M.G.L. c. 272 § 99(B)(3). Software is not a "device" or "apparatus," both of which terms are most commonly understood as hardware, not software. *See* Mem. at 14-15, quoting Black's Law Dictionary (11th ed. 2019) (defining "device" as "[a] mechanical invention that may be "an apparatus or an article of manufacture"); *id.* (defining "apparatus" with reference to "machine," which is defined as "[a] device or apparatus consisting of fixed and moving parts"); *accord* Oxford English Dictionary (defining "device" as "a thing made or adapted for a particular purpose, especially a piece of mechanical or electronic equipment"); *id.* (defining "apparatus" as "technical equipment or machinery"); Webster's (defining "device" as "a piece of equipment or mechanism"); *id.* (defining "apparatus" as an "instrument or appliance"). *See Hovagimian v. Concert Blue Hill, LLC*, 488 Mass. 237, 245 (2021) (interpreting statutory term according to its "plain meaning" as set forth in a dictionary definition, stating, "Ascribing its plain meaning to the term 'service charge' settles expectations"); *Dunn v. Comm'r of Civ. Serv.*, 281 Mass. 376, 382, (1933) ("A new meaning cannot be given to the words of an old statute in consequence of the changed conditions of a time later than the enactment of that statute"); *Com. v. Dykens*, 473 Mass. 635, 646 (2016) ("We ... look to the ordinary meaning of the word as of ... the year the statute was enacted").

- Legislative history. Not only did the legislature not intend to include *any* software within the meaning of "intercepting device" (see prior bullet), the legislative history shows it also did not intend to include adtech software. The Wiretap Act was drafted in 1968. Ex. 1 at 28:13-16. In enacting it, "the Legislature was concerned principally with the investigative use of surveillance devices by law enforcement officials to eavesdrop surreptitiously on conversations." *Id.* at 28:17-28:23, quoting *Commonwealth v. Rainey*, 491 Mass. 632, 645, 205 N.E.3d 1090, 1103 (2023). The same legislature faced with adtech software would not have intended to include it within the meaning of an "intercepting device." Ex. 1 at 30:21-31:9. Adtech software is not used for "surveillance" or to "eavesdrop surreptitiously on conversations." *Rainey*, 491 Mass. at 645. Rather, it is used to (i) encrypt information like the word "concussion" Plaintiff clicked on or entered on Emerson's public-facing website, (ii) send the encrypted information to an adtech company like Facebook or Google, and (iii) thereby enable Facebook and Google to adjust the nature of the advertisements they already send him to be "targeted." FAC ¶¶ 36, 73, 102, 103; Mem. at 3-5; Ex. 1 at 11:16-14:1. Plaintiff does not allege that any other entity besides Facebook or any actual person has an encrypted version of the word "concussion" and can link it with what he calls his "real-world identity." FAC ¶ 77; Ex. 1 at 27:1-12. He does not allege that even Facebook, or any other entity, or any person, has the word "concussion" in a decrypted (readable) format. In short, adtech software functionality is not the type of functionality the legislature considered when drafting the meaning of "intercepting device." *See Kobrin v. Gastfriend*, 443 Mass. 327, 335, 821 N.E.2d 60, 66 (2005) (construing statute to be consistent with legislative history)

- Statute as a whole. Like the Wiretap Act's legislative history, other parts of the Wiretap Act besides its definition also show that the Legislature did not intend to include adtech software within the meaning of "intercepting device." The term "aggrieved person" is defined as "any individual who was a party to an intercepted wire or oral communication ... or who would otherwise have standing to complain that his personal or property interest or privacy was invaded in the course of an interception." Ex. 1 at 33:25-34:2, citing M.G.L. c. 272 § 99(B)(6). In other words, the legislature's intent was to prohibit invasions of privacy. Ex. 1 at 33:25-34:7. Adtech software's encryption of web-browsing information and sending of the encrypted information to adtech companies is not an invasion of privacy, and not the functionality intended by the legislature of an "intercepting device." *Id. See Commissioners of Bristol Cnty. Mosquito Control Dist. v. State Reclamation & Mosquito Control Bd.*, 466 Mass. 523, 529, 997 N.E.2d 1188, 1192 (2013) (construing statutory text in light of "other sections" of the statute).
- Absurd results. The term "intercepting device" should also not be construed to include adtech software because of the absurd results that would produce, namely, unprecedented and catastrophic consequences for the Commonwealth's economy. FAC ¶ 193; Ex. 1 at 28:8-12; 34:8-22; *Rainey*, 491 Mass. at 642-43 ("Because we assume generally that the Legislature intends to act reasonably, we will not adopt a literal construction of a statute if the consequences of such a construction are absurd or unreasonable") (punctuation omitted).
- Rule of lenity. The Wiretap Act is primarily criminal—defining multiple offenses punishable by incarceration. Those criminal offenses and Plaintiff's civil cause of action turns on the same definition of "intercepting device." The rule of lenity thus requires that

any ambiguities in that term be resolved in Emerson's favor. Ex. 1 at 34:2-3; *see Velazquez v. Commonwealth*, 491 Mass. 279, 283 n.5 (2023) ("where the language of a criminal statute plausibly can be found ambiguous, the rule of lenity requires that the defendant receive the benefit of the ambiguity"); *see also Leocal v. Ashcroft*, 543 U.S. 1, 11 n.8 (2004) ("Because we must interpret the statute consistently, whether we encounter its application in a criminal or noncriminal context, the rule of lenity applies"); *Cook v. Patient Edu, LLC*, 465 Mass. 548, 555-56 (2013) (assuming, without deciding, that *Leocal*'s holding applies under Massachusetts law); *DiFiore v. Am. Airlines, Inc.*, 454 Mass. 486, 497 n.12 (2009) (same).

- Other courts' decisions. Other courts have found that software is not a "device or apparatus" under other states' wiretap acts. *See* Mem. at 15 & Ex. 1 at 32:8-33:21, citing, *e.g., Potter v. Havlicek*, 2008 WL 2556723, at *1 (S.D. Ohio June 23, 2008) (dismissing claim under 18 U.S.C.A. § 2512, holding that spy software did not constitute a "device or apparatus"); *Jacome v. Spirit Airlines Inc.*, 2021 WL 3087860, at *5 (Fla. Cir. Ct. June 17, 2021) (dismissing Florida wiretap act claim, holding that session replay software did not constitute a "device or apparatus"); *Connor v. Whirlpool Corp.*, 2021 WL 3076477, at *2 (S.D. Fla. July 6, 2021) (same); *Cardoso v. Whirlpool Corp.*, 2021 WL 2820822, at *2 (S.D. Fla. July 6, 2021) (same); *accord Goldstein v. Luxottica of Am., Inc.*, 2021 WL 4093295, at *2 (S.D. Fla. Aug. 23, 2021) (same); *In re Google Location Hist. Litig.*, 428 F. Supp. 3d 185, 193 (N.D. Cal. 2019) (finding that "[s]oftware like Google Maps, Chrome, etc. are not 'devices' within the meaning of CIPA [California's wiretap act]"); *Moreno v. San Francisco Bay Area Rapid Transit Dist.*, 2017 WL 6387764, at *5 (N.D. Cal. Dec. 14,

2017) ("Plaintiff has not plausibly alleged that the [software] App is a 'device'") (citing dictionary definitions of "device").

**B. The Finding presents a question that is likely to be material in the ultimate decision.**

The Finding is likely to be material to the outcome of this litigation because whether Plaintiff can prove his claim under the Wiretap Act depends on resolution of the legal issue of whether adtech software is an "intercepting device." If adtech software is not an "intercepting device," then Plaintiff cannot prove an essential element of the wiretap claim. If it is, then Plaintiff's ability to prove Emerson's alleged violation of the Wiretap Act will not face the same insurmountable hurdle as to that requirement.

The Finding is also material because Plaintiff's claim under the Wiretap Act seeks tens or hundreds of millions of dollars in statutory damages. FAC ¶ 193; Ex. 1, 10/12/23 Hr'g Tr. at 34:8-13. That is material. It is so material, in fact, that Plaintiff's remaining claims evaporate by comparison, because they do not involve any statutory damages and seek damages only for any alleged actual injury. Plaintiff alleges that he suffered economic injury based only on his allegations that (i) Emerson diminished the alleged value of his entered or clicked-on term "concussion," resulting in benefits to Emerson in the form of access to marketing and analytics tools, FAC ¶ 194(a)-(c) & (e), 210(a)-(c) & (e), 222(a)-(c) & (e), 254 (*i.e.*, that Emerson allegedly underpaid Plaintiff); and (ii) Plaintiff paid Emerson money for data privacy and did not receive that data privacy in return. *Id.* ¶ 194(d), 210(d), 222(d), 254 (*i.e.*, that Plaintiff allegedly overpaid Emerson). Other courts have found such allegations so implausible that they have dismissed them on the pleadings. *Dinerstein v. Google, LLC*, 73 F.4th 502, 516-18 (7th Cir. 2023) ("[Plaintiff] contends that he *overpaid* the University for his medical treatment or, alternatively, that the University *underpaid* him for the interest in his medical records. . . . While [plaintiff] alleges both

an overpayment and underpayment theory of financial harm, neither is plausible"); *Provost v. Aptos, Inc.*, 2018 WL 1465766, at *4 (N.D. Ga. Mar. 12, 2018) (finding overpayment and underpayment damages implausible, stating "Plaintiff's allegations of overpayment and lost benefit of the bargain are insufficient" and "The Court is not persuaded by the hypothetical diminution of value propounded by Plaintiff").

### C. Subsequent proceedings in this Court will be substantially facilitated by interlocutory appellate review of the Finding.

A definitive appellate answer to whether adtech software is an "intercepting device" within the meaning of the Wiretap Act could potentially save the parties to this case collectively thousands of hours, and hundreds of thousands (or even millions) of dollars, in effort and costs related to discovery, class certification, and summary judgment, to say nothing of trial. This is true for a number of reasons. For one, rulings on class certification may need to be redone if the wiretap claim is eliminated only by an appeal after final judgment. The wiretap claim, if applicable, presents its own individualized issues precluding a finding of commonality and predominance, including, for example, regarding the following statutory terms:

- "Interception." M.G.L. c. 272 § 99(B)(4). An interception, by definition, must be "secret." *Id.* Whether alleged disclosures via adtech software were secret may turn on factual questions specific to each individual. For example, was the individual aware of widespread adtech software? Did he notice the same purported "targeted" advertisements occurring before he visited Emerson's website? Did he participate in a prior settlement regarding adtech software in Massachusetts (*Doe v. Partners Healthcare Sys., Inc.*, No. 1984CV01651-BLS-1 (Mass. Super. Ct.)), or was he aware of it before visiting Emerson's website? An answer of "yes" to any of these questions may be evidence of lack of secrecy.

- "Aggrieved person." M.G.L. c. 272 § 99(B)(6). Whether an alleged class member is an "aggrieved person" capable of obtaining civil relief under the Wiretap Act depends on whether that person's "privacy was invaded in the course of an interception." *Id.* This question, too, may turn on factual questions specific to each individual. For example, what allegedly private information did the individual transmit on Emerson's website? Did the individual transmit that same information to anyone else? Even if not, is that information private by nature? Did the individual read and understand Facebook's privacy policies? All of these questions bear on the question of whether Plaintiff is an "aggrieved person."
- "Wire communication." M.G.L. c. 272 § 99(B)(1). It ought to be determined in the *Vita* appeals (Exs. 2-3) that all alleged disclosures via adtech software are not "wire communications" under the Wiretap Act. In the alternative, alleged disclosures via adtech software are not "wire communications" in at least some circumstances, raising individualized issues for each class member. For example, did the individual identify himself when visiting the hospital's website—like one would ordinarily do in a telephone conversation, which is the type of communication the legislature envisioned in 1968 when it enacted the statute? Or, instead, did the individual visit the website anonymously? Did the individual merely click on links or tabs as opposed to entering conversation-like information into a form? These factual questions specific to each individual and others may determine whether a "wire communication" occurred.

Litigation of all of these issues in the discovery, class certification, and summary judgment phases of this case could be avoided, if adtech software is finally determined in the first place not to be an "intercepting device." *See* Ex. 2 at 11 (granting motion to report, stating, "If ... the Massachusetts Wiretap Statute does not apply to business-related internet tracking, significant

judicial and party resources will be saved by quick resolution of these cases before discovery and other stages of litigation"); Ex. 3 at 11 (same).

Moreover, the wiretap claim is the main money claim in this litigation by tens or hundreds of millions of dollars and will therefore be the focus and main driver of hotly contested complex litigation in this Court. If the wiretap claim were resolved first by interlocutory appeal, then many arguments would not need to be made and briefs filed in this Court and, indeed, the rest of the case would have the potential to settle. As one court explained in similar circumstances: "If the appeal is not allowed, and the suit proceeds in the [trial] court on both the [main and other] claims, the completion of the litigation will take longer than if the [main] claim is out of the case, especially since that claim appears to be the plaintiffs' main one, with the [other claims] perhaps just a life jacket. Moreover, uncertainty about the status of the [main] claim may delay settlement (almost all class actions are settled rather than tried), and by doing so further protract the litigation. That is enough to satisfy the 'may materially advance' clause of section 1292(b) [similar to the 'so affects the merits of the controversy...' clause of M.G.L. c. 231, § 111]; neither the statutory language nor the case law requires that if the interlocutory appeal should be decided in favor of the appellant the litigation will end then and there, with no further proceedings in the [trial] court." *Sterk v. Redbox Automated Retail, LLC*, 672 F.3d 535, 536 (7th Cir. 2012).

Other Massachusetts adtech healthcare cases with both a wiretap claim and additional claim(s) have stayed trial-court proceedings while the *Vita* appeals remain pending. *See* Ex. 5, 12/8/23 Stay Order in *Doe v. Cape Cod Healthcare, Inc.*, No. 2384CV01236-BLS1 (wiretap claim and five other claims); Ex. 6, 11/9/23 Stay Order in *Doe v. Boston Medical Center Corp.*, No. 2384CV00326-BLS1 (wiretap claim and one other claim); Ex. 7, 12/14/23 Stay Order in *Alves v. BJ's Wholesale Club, Inc.*, No. 2284CV02509 (wiretap claim and one other claim). These stays

Filed 1/22/2024 6:34 PM
ior Court - Essex
et Number 2277CV01000

are consistent with the fact that early resolution of the wiretap claim would substantially facilitate resolution of trial-court proceedings in this case, which also has both wiretap and non-wiretap claims.

**D. The Finding presents a question with significant public repercussions.**

So far at least the following Massachusetts companies, mostly Massachusetts healthcare providers, face bet-the-company or otherwise potentially catastrophic wiretap claims based on alleged disclosures via adtech software like Emerson faces here: Atrius Health, Inc.; Baystate Health System, Inc.; Beth Israel Deaconess Medical Center, Inc.; BJ's Wholesale Club, Inc.; Blue Cross & Blue Shield of Massachusetts, Inc.; Blue Cross & Blue Shield of Massachusetts HMO Blue, Inc.; Boston IVF, LLC; Boston Medical Center Corp.; Cabela's, Inc.; Cape Cod Healthcare, Inc.; Dynatrace, Inc.; Lawrence General Hospital; New England Baptist Hospital; Southcoast Hospitals Group, Inc.; Steward Health Care System LLC; The Children's Hospital Corp. (Boston Children's Hospital); Tufts Medical Center, Inc.; UMass Memorial Health Care, Inc. *See* Ex. 4 at Ex. C.

Moreover, as Plaintiff alleges, this software is "wildly popular and embedded on millions of websites." FAC ¶ 82; Ex. 1 at 12:3-7. Not only the many Massachusetts companies above, but also potentially many more, face repercussions if adtech software is finally decided to be an "intercepting device," to such a degree that the entire economy of Massachusetts is at serious risk.

In sum, many Massachusetts companies have their entire existence riding on the final outcome of the Finding. This is reason to report. *See Armstrong*, 2021 WL 4515360, at *2 (granting motion to report, stating, "The litigants and numerous interested third-parties—including the City of Boston and various other shorefront municipalities—have a great deal (literally and figuratively) riding on that outcome"); *Acevedo v. Musterfield Place, LLC*, 2017 WL 7313406, at

*3 (Mass. Super. May 31, 2017) (granting motion to report, stating, "the matter has a potentially broad impact throughout the Commonwealth").

## IV. CONCLUSION

Emerson respectfully requests that this Court report to the Appeals Court for interlocutory review its finding, in its November 22, 2023 Memorandum of Decision and Order on Defendant's Motion to Dismiss, that advertising technology software is an "intercepting device" under Massachusetts' Wiretap Act, and stay any further proceedings in this Court pending appellate review.

:iled 1/22/2024 6:34 PM
ior Court - Essex
:t Number 2277CV01000

Dated: December 20, 2023

Respectfully submitted,

EMERSON HOSPITAL

By: /s/Emyr T. Remy

Emyr T. Remy (BBO# 704156)
**SHOOK, HARDY & BACON L.L.P.**
One Federal Street, Suite 2540
Boston, MA 02110
Tel.: (617) 531-1411 | Fax: (617) 531-1602
remy@shb.com

Alfred J. Saikali (FL # 0178195)
**SHOOK, HARDY & BACON L.L.P.**
201 South Biscayne Blvd., Suite 3200
Miami, Florida 33131
Tel: (305) 358-5171 | Fax: (305) 358-7470
asaikali@shb.com

Tammy B. Webb (CA # 227593)
**SHOOK, HARDY & BACON L.L.P.**
555 Mission Street, Suite 2300
San Francisco, CA 94105
Tel: (415) 544-1900 | Fax: (415) 391-0281
twebb@shb.com

Justin R. Donoho (IL # 6299667)
Tara D. Kennedy (IL # 6320909)
**SHOOK, HARDY & BACON L.L.P.**
111 South Wacker Drive, Suite 4700
Chicago, IL 60606
Tel: (312) 704-7713 | F: (312) 558-1195
jdonoho@shb.com
tkennedy@shb.com

Jessica N. Wahl (CA # 321887)
**SHOOK, HARDY & BACON L.L.P.**
2049 Century Park East, Suite 3000
Los Angeles, CA 90067
Tel: (424) 324-3477 | Fax: (424) 204-9093
jwahl@shb.com

1/22/2024 6:34 PM
Court - Essex
umber 2277CV01000

## CERTIFICATE OF SERVICE

I, Emyr T. Remy, hereby certify that on December 20, 2023, a true copy of the above document was served by email upon:

J. Tucker Merrigan (BBO# 681627)
Victoria Santoro (BBO# 679120)
Erin E, McHugh (BBO# 703701)
**SWEENEY MERRIGAN LAW**
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Seth Meyer (*PHV5191283NY*)
Alex Dravillas (*PHV6299686IL*)
**KELLER POSTMAN LLC**
150 N. Riverside Plaza, Suite 4100
Chicago, IL 60606
Tel: (312) 741-5220
sam@kellerpostman.com
ajd@kellerpostman.com

Foster C. Johnson (*PHV24076463TX*)
David Warden (*PHV20856750TX*)
Nathan Campbell (*PHV24097455TX*)
**AHMAD, ZAVITSANOS & MENSING, P.C.**
1221 McKinney St., Suite 3460
Houston, TX 77010
Tel: (713) 655-1101
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

*/s/ Emyr T. Remy*
Emyr T. Remy

Date Filed 1/22/2024 6:34 PM
Superior Court - Essex
Docket Number 2277CV01000

44.2

**COMMONWEALTH OF MASSACHUSETTS**

| | | |
|---|---|---|
| **ESSEX, S.S.** | | **SUPERIOR COURT** |
| **JOHN DOE, Individually and on Behalf of All Others Similarly Situated,** | § § | **C.A. No. 2277CV010000** |
| ***Plaintiffs,*** | § § § | |
| **v.** | § | |
| **EMERSON HOSPITAL.** | § § | |
| ***Defendant.*** | § § | |

---

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO REPORT**

---

Defendant asks this Court to undertake the extraordinary step of making an interlocutory report of a widely rejected matter to the Appeals Court: "Whether advertising technology software is [an] 'intercepting device' within the meaning of the Wiretap Act." Emerson Hospital's Memorandum in Support of Its Motion to Report ("Mem.") at 3. Specifically, Defendant contends that an intercepting device under the Massachusetts Wiretap Statute "must be tangible" and that "it does not encompass intangible software code on a website." Defendant's Memorandum of Law in Support of Its Motion to Dismiss the First Amended Complaint at 15 (April 24, 2023). This Court, and many others, have long moved past this argument. Plaintiffs respectfully submit that this Court should again decline to report the matter to the Appeals Court and maintain this case's trial track.

## BACKGROUND

Contrary to its promises to protect personal and patient privacy, without notice and unbeknownst to Plaintiffs, Defendant installed Facebook's Metal Pixel and Google Analytics on its hospital web properties in order to surreptitiously gather their information and provide it to Facebook and other third parties. These third parties used the Plaintiffs' personal and health information to target them with advertisements, including through social media. In exchange, those third parties gave Defendant access to valuable marketing tools, including Google Analytics and Facebook Meta Pixel. Plaintiffs received no benefits from this secret tracking and disclosure of their information.

On January 30, 2023, Plaintiffs filed an amended complaint against Defendant and alleged two Massachusetts statutory claims and three common law claims: (1) violation of the wiretap statute, G.L. c. 272, § 99; (2) invasion of privacy, G.L. c. 214, § 1B; (3) breach of fiduciary duty; (4) breach of implied contract; and (5) unjust enrichment. Compl. at ¶¶ 176-264. On April 24, 2023, Defendant filed a motion to dismiss the amended complaint. On November 23, 2023, Judge Janice W. Howe issued a 12-page Memorandum of Decision and Order on Defendant's Motion to Dismiss ("Order").

First, this Court held that the Plaintiff asserts cognizable injuries and have standing to bring common law claims as "Plaintiff alleges he was injured because his private medical information was disclosed to Facebook without his consent" and "because Emerson and Facebook monetized his personal health information without compensating him" (Order at 5). Second, this Court held that Plaintiff adequately alleges breach of fiduciary duty because Defendant disclosed his status as a patient and the contents of his treatments to third parties (Order at 5-6). Third, this Court rejected Defendant's assertion that Plaintiff ineffectively alleged breach of implied contract because:

> A portion of the price of each payment that Plaintiff made to Emerson for medical services was intended to ensure the confidentiality of his health information. The implied promise was evidenced by Emerson's privacy policies, codes of conduct, company security practices, and other conduct, including the statement on its website that it would not share health information for advertising purposes without consent.
>
> Order at 7.

Fourth, this Court held that Plaintiff sufficiently alleged unjust enrichment because (a) confidential health information has significant marketplace value, (b) Plaintiff supplied Defendant with this information on the basis that Defendant promised to protect it, and (c) part of Plaintiff's payments for medical services were intended to compensate Defendant for protecting this information (Order at 9). Fifth, this Court rejected Defendant's contention that it did not invade Plaintiff's privacy in violation of G.L. c. 214, § 1B because Plaintiff alleged that Defendant disclosed to third parties his status as a patient, his treatments, and the exact contents of his communications with the Defendant (Order at 10).

Finally, this Court turned to Defendant's two arguments that Plaintiff did not adequately allege a violation of the wiretap statute, G.L. c. 272, § 99; namely that (1) Plaintiff consented to Facebook's tracking activities and (2) an intercepting device must be a tangible object and cannot be a computer program (Order at 11). Regarding the former, this Court rightly rejected Defendant's argument that simply consenting to Facebook's policies somehow imparted implied consent for Plaintiff to allow Emerson to share his personal and health information with Facebook (Order at 11). Regarding the latter, this Court recognized that it is well-understood that an intercepting device is not limited to a tangible object and summarily dismissed it:

> [This] argument has been rejected in other recent Superior Court decisions analyzing similar allegations and the court sees no reason to diverge from those rulings. See, e.g., Doe, 2023 WL 7105628, at *4.

This Court knew of Judge Hélène Kazanjian's two reported cases pursuant to Mass. R. Civ. P. 64

involving similar wiretap claims "seeking clarification on a motion to dismiss as to whether the Wiretap Statute applies to the internet tracking alleged" (Order at 12). Nevertheless, Judge Howe determined not to report her rulings on the Defendant's wiretap arguments to the Appeals Court and, instead, resolved to revisit them depending upon the outcome of appellate review and to maintain the trial track of this case (Order at 12).

Now, despite no new information, Defendant seeks to relitigate its motion to dismiss and asks this Court to revisit its decision to not report its finding that an intercepting device can be an intangible object.

## STANDARD OF REVIEW

"The decision whether to report an interlocutory ruling in accordance with Mass. R. Civ. P. 64(a) is highly discretionary." *McMenimen v. Passatempo*, 452 Mass. 178, 189 (2008). "Such a report should be reserved for novel and difficult issues…" *Morrison v. Lennett*, 415 Mass. 857, 859 (1993). ("[Appellate courts] should not be flooded with cases in their early stages. The questions reported may become immaterial when the issues and facts are fully developed. Interlocutory matters should be reported only where it appears that they present serious questions likely to be material in the ultimate decision, and that subsequent proceedings in the trial court will be substantially facilitated by so doing." *John Gilbert Jr., Co. v. C.M. Fauci Co.*, 309 Mass. 271, 273 (1941).

Rule 64(a) of Massachusetts Civil Procedure provides:

> If the trial court is of opinion that an interlocutory finding or order made by it so affects the merits of the controversy that the matter ought to be determined by the appeals court before any further proceedings in the trial court, it may report such matter, and may stay all further proceedings except such as are necessary to preserve the rights of the parties.

Similarly, G.L. c. 231, § 111, provides:

> If a justice of the superior court is of the opinion that an interlocutory finding or order made by him so affects the merits of the controversy that the matter ought to be determined by the appeals court before any further proceedings in the trial court, he may report such matter to the appeals court, and may stay all further proceedings except such as are necessary to preserve the rights of the parties.

"[T]he power to report arises only if the judge who makes the decree or order 'is of opinion that *it* [the decree or order] so affects the merits of the controversy that the *matter* [the decree or order] ought to be determined by the full court.'" *Benselv v. Commissioner of Public Safety*, 328 Mass. 443, 444 (1952) (emphasis in the original). "Although a judge may report specific questions of law in connection with an interlocutory finding or order, the basic issue to be reported is the correctness of his finding or order." *McStowe v. Bornstein*, 377 Mass. 804, 805 n. 2 (1979). Under Mass. R. Civ. P. 64(a), the trial court should only report a case to an appellate court if it (1) presents a serious question that is (2) likely to be material to the ultimate decision and (3) resolution on appeal will substantially facilitate subsequent proceedings in the trial court. *Angoff v. Angoff*, 1 Mass. App. Ct. 112, 115 (1973).

## ARGUMENT

### 1. Defendant Assumes a Finding that is Not Present in the Order

Defendant erroneously contends that Judge Howe made a specific "finding" that "Meta Pixel and Google Analytics 'software code' is an 'intercepting device'" (Mem. at 2). Here, Defendant seeks to transform Judge Howe's determination that "the court sees no reason to diver from those rulings" (Order at 11) into an explicit finding that "Meta Pixel and Google Analytics 'software code' is an 'intercepting device'" (Mem. at 2). Simply put, Judge Howe did not make any such "finding." Instead, Judge Howe determined that Defendant's argument did not present an issue that needed to be discussed, given that so many other courts had already done so (Order at 11). Accordingly, this Court should reject Defendant's argument that Judge Howe issued a finding that is

reportable to an appellate court. *See Globe Newspaper Co. v. Massachusetts Bay Transp. Authority Retirement Bd.*, 412 Mass. 770, 773 (1992) ("The report must be accompanied by a record that gives an appellate court a basis to exercise its independent judgment of the validity of the judge's determination of that central issue.").

**2. Defendant's Outdated Argument Does Not Present a Serious Question**

Contrary to the Defendant's assertion, it is not a "serious question" whether an intercepting device must be a tangible object (Mem. at 4). Massachusetts courts analyzing the wiretap statute have consistently held otherwise. *See Commonwealth v. Moody*, 466 Mass. 196, 207-209 (2013) (wiretap statute applied to text messages); *Rich v. Rich,* 2011 WL 3672059, at *6 (Mass. Super. July 8, 2011) (key logger software program deemed to be intercepting device under wiretap statute). Moreover, several Massachusetts courts have recently debunked Defendant's specific contention that an intercepting device cannot be active and invasive software tracking programs. *See Doe v. BMC,* 2023 WL 7105628, at *3-5 (Mass. Super. Sep. 14, 2023) (argument that intercepting device is limited to tangible objects only and does not encompass Meta Pixel and Google Analytics software is unavailing); *Alves v. BJ's Wholesale Club, Inc,* 2023 WL 4456956, at *10 (Mass. Super. June 21, 2023), citing *United States v. Hutchins,* 361 F. Supp. 3d 779, 795 (E.D. Wis. 2019) ("The majority of courts to consider this issue have entertained the notion that software may be considered a device for the purposes of the [Federal] Wiretap Act").

"In construing the wiretap statute, in particular, we have turned repeatedly to the statute's preamble to inform our analysis." *Commonwealth v. Rainey*, 491 Mass. 632, 642 (2023). The preamble provides that the statute was intended to protect Massachusetts citizens against grave dangers posed by the "uncontrolled development and unrestricted use of <u>modern</u>

electronic surveillance devices..." G.L. c. 272, § 99(A) (emphasis added). In so doing, the statute broadly defines an intercepting device as "any device or apparatus which is capable of transmitting, receiving, amplifying, or recording a wire or oral communication." G.L. c. 272, § 99(B)(4) (emphasis added). Nothing in this definition restricts it to tangible objects only, as Defendant suggests. Indeed, "to restrict software code from being considered an intercepting device as [Defendant] suggests would essentially nullify the statute's application." *Doe*, 2023 WL 7105628, at *4. "[W]here cellphone, tablet, and computer applications and programs, and their interfacing with the internet, all rely on software for their operation, its use is practically implicit in any modern electronic communication." *Id.* (emphasis added).

Defendant further contends that "there is substantial ground for a difference of opinion on whether advertising software is an 'intercepting device' under the Wiretap Act" (Mem. at 4). Defendant, however, does not produce a single Massachusetts decision that aligns with its position. As noted above, Massachusetts courts have consistently reached the opposite conclusion. *See FAMM Inc., v. Peabody Const. Co.*, 2002 WL 31379951, at *2 (Mass. Super. Sept. 9, 2022) (declining to report finding where motion was supported primarily by inapplicable out-of-state decisions and did not demonstrate that a Massachusetts appellate court would rule differently than the trial court).

Additionally, Defendant opines that the Legislature did not intend for active and invasive software tracking technology to be considered an intercepting device (Mem. at 6). This argument ignores the statute's plain language that it be applied to "modern" electronic surveillance devices. G.L. c. 272, § 99(A). It also ignores the Legislature's anticipation that electronic surveillance will develop and be wielded more broadly with negative effects on important

privacy rights. Special Commission on Electronic Eavesdropping, 1968 Senate Doc. No. 1132.[1] Thus, "[v]ast changes in technology have occurred since 1968, but they have not prompted the Legislature to amend the statute." *Commonwealth v. Du*, 103 Mass. App. Ct. 469, 474 n.9 (2023). As the Legislature intended, since 1968, courts have consistently applied contemporary understandings of modern electronic surveillance devices to the wiretap statute. *See Rich,* 2011 WL 3672059, at *6; *Marquis v. Google, Inc.*, 2012 WL 12929513, at *2 (Mass. Super. Jan. 17, 2012) ("This court declines to accept Google's contention that the Massachusetts wiretap statute does not prohibit the secret interception of emails."); *Moody*, 466 Mass. at 207-209 (2013) (intercepting electronic messages); *BJ's Wholesale Club, Inc.*, 2023 WL 4456956, at *10 (software may constitute an intercepting device); *Doe*, 2023 WL 7105628, at *4.

Lastly, Defendant asserts that its argument is entitled to deference through the doctrine of lenity (Mem. at 7-8). That doctrine applies to criminal statutes or quasi-criminal statutes (e.g., G.L. c. 90) that, due to their ambiguity, would, in application, unconstitutionally deprive a defendant of due process. Even in that context, however, the doctrine of lenity is a guide for resolving ambiguity and "[i]n criminal cases no less than in civil, '[w]here the draftsmanship of a statute is faulty or lacks precision, it is our duty to give the statute a reasonable construction.'" *Commonwealth v. Maloney*, 447 Mass. 577, 585 (2006). Here, Defendant does cite a single case in which that doctrine was applied in the context of the wiretap statute. Moreover, Defendant does not identify its perceived ambiguity. The statute is clear that an intercepting device can be any device, and Defendant's suggestion that it must only be a tangible, physical device is

[1] Quoting Professor Alan Westin in his treaties *Privacy and Freedom*, the Special Commission noted: "From a public policy standpoint, we must consider what would be the impact in the coming decade, when electronic monitoring devices spread even more widely in the population, of each citizen having to know that the person to whom he is talking in the office, at home, in his car, on the street, in a store, etc., may be recording the conservation with full legal authority and without having to have such clandestine recording authorized in advance by any judicial agency."

Date Filed 1/22/2024 6:34 PM
Superior Court - Essex
Docket Number 2277CV01000

patently unreasonable. "Where the legislative purpose is expressed in clear statutory language, we must construe the statute in accordance with its terms and need not apply the rule of lenity on which the defendant relies." *Commonwealth v. Chavis*, 415 Mass. 703, 708 (1993).

**3. The Issue is Not Material to the Matter**

"[T]he power to report arises only if the judge who makes the decree or order 'is of opinion that *it* [the decree or order] so affects the merits of the controversy that the *matter* [the decree or order] ought to be determined by the full court.'" *Benselv v. Commissioner of Public Safety*, 328 Mass. 443, 444 (1952) (emphasis in the original). Here, Judge Howe's conclusion that an intangible object can be a modern electronic surveillance device is immaterial to the merits of the matter. The Order denying the Defendant's motion to dismiss spanned 12 pages and discussed in detail the Plaintiff's three common law claims and two statutory claims. The overwhelming majority of the Order did not pertain to Defendant's assertion that a modern intercepting device is a tangible object. Instead, it discussed the other four claims that Defendant moved to dismiss. Judge Howe recognized that the wiretap claim is simply a part of Plaintiff's overall case. As such, Judge Howe resolved to review the ruling, if warranted, pending the outcome of the cases reported by Judge Kazanjian (Order at 12).

Further, Defendant's assertion that the alleged "finding" is material to the outcome of this case (Mem. at 9) is incompatible with the fact that Judge Howe dispensed with it in two sentences (Order at 11). The Massachusetts Superior Court has repeatedly addressed this issue, and Judge Howe was well within her authority to summarily rule that there was "no reason to diverge from those rulings" (Order at 11). Those rulings reflected several respectable decisions and demonstrated the unavailing nature of Defendant's argument. The Order was thoughtful, deliberate, and proportional to the issues raised. *See Genova v. Cornell*, 101 Mass. App. Ct.

1116, 2022 WL 3692865, at *2 (Aug. 26, 2022) (unpublished decision) (no error where "judge declined [defendant's] motion to report questions because she found them neither novel nor difficult nor material to the ultimate question").

**4. Subsequent Trial Court Proceedings are Not Substantially Facilitated by Appellate Review**

If this Court determines that its ruling (1) presents a serious question that is (2) likely to be material to the ultimate decision, it must (3) determine whether reporting its ruling for appellate review will substantially facilitate subsequent proceedings in the trial court. *Angoff v. Angoff*, 1 Mass. App. Ct. 112, 115 (1973). Here, Defendant puts forward speculative, commonplace arguments and assumptions.

At the outset, Defendant seeks to establish only two possible outcomes regarding this Court's ruling: either an appellate court reverses it on (a) interlocutory review or (b) after final judgment (Mem. at 10). On this incline, Defendant asserts that time and money are saved in reporting the ruling because, otherwise, "rulings on class certification may need to be redone if the wiretap claim is eliminated only by an appeal after final judgment" (Mem. at 10). Defendant likewise declares that "[l]itigation on all of these issues in the discovery, class certification, and summary judgment phases of this case could be avoided" if an appellate court reverses sooner rather than later (Mem. at 11). From here, Defendant postulates that if an appellate court reverses this Court's ruling on interlocutory review, the rest of the case may settle because only nominally valued claims would remain (Mem. at 12). These are attenuated assumptions at best.

There is no evidence, facts, or Massachusetts law cited by Defendant to demonstrate that a Massachusetts appellate court would support its underlying premise and reverse this Court's reasonable interpretation of the wiretap statute. As previously demonstrated, Massachusetts case law proves the opposite conclusion. Further, Plaintiffs allege five (5) separate causes of action,

of which the wiretap claim is one claim. In the cases reported by Judge Kazanjian, the wiretap claim was either the sole or single secondary claim. While the facts underlying Plaintiff's claims may overlap, none of Plaintiff'' four other claims require them to prove their wiretapping claim in order to proceed. Defendant's core contention – that a stay will maximize judicial economy because Plaintiff's case rises and falls with their wiretap claim – is incorrect.

Moreover, these arguments are expected with class action cases involving multiple claims, and acceptance of them would diminish a judicial policy of avoiding piecemeal litigation. *See McMenimen v. Passatempo*, 452 Mass. 178, 193 (2008) (broadly construing right to appeal pursuant G.L. c. 231, § 118 "would thereby undercut in a significant way the principle that piecemeal appellate review is strongly disfavored."). It would also undercut the Superior Court's general supervision and control of its cases. *See Angoff*, 1 Mass. App. Ct. at 115 ("statutes permitting [the report of a case] were not intended 'to relieve the (trial court) of the responsibility of deciding upon all questions incident to the trial of issues in that court'"). As correctly determined by Judge Howe, the Plaintiff's case will proceed regardless of what happens in the other wiretap cases on appeal. *See Hennessy v. Brookdale Senior Living Communities, Inc.*, 2018 WL 4427020, at *7 (Mass. Super. Aug. 1, 2018) ("Defendants have not made any showing that an interlocutory appeal would be appropriate as to overcharging claims."); *Harrison v. Massachusetts Bay Transportation Authority*, 2020 WL 5993063, at 3* (Mass. Super. Aug. 20, 2020) ("Plaintiffs have not shown that interlocutory review of the Court's dismissal of some claims would somehow facilitate resolution of the two remaining claims. The mere fact that the Court's prior order disposes of the more substantial claims in this case is not a good reason to allow an interlocutory appeal concerning part of the case.").

Defendant also suggests that because other courts, particularly Judge Kazanjian, reported rulings regarding the wiretap statute's applicability to pixel technology, so too should this Court (Mem. at 12-13). Defendant asserts that "early resolution of the wiretap claim would substantially facilitate resolution of trial-court proceedings in this case" (Mem. at 13). However, Judge Howe was keenly aware of these cases when she held:

> In so ruling, the Court notes that two recent Superior Court cases involving similar claims were reported to the Appeals Court under Mass. R. Civ. P. 64, seeking clarification on a motion to dismiss as to whether the Wiretap Statute applies to the internet tracking alleged. See Vita v. New England Baptist Hosp., 2384CV00857 (Kazanjian, J.); Vita v. Beth Israel Deaconess Med. Ctr., Inc., 2384CV00480 (Kazanjian, J.). Depending on the outcome of appellate review, the court's ruling here may have to be revisited.
>
> Order at 12.

Moreover, the general issue that Defendant wants to be heard on appeal – the applicability of advertising technology to the wiretap statute – is already on appeal. *See Hennessy,* 2018 WL 4427020, at *7 ("Finally, since the legal issue that Defendants wish to have reported is already on appeal in another case, there is no apparent need to report this decision on an interlocutory basis, as the issue will be decided on appeal in that other matter."). It was within Judge Howe's substantial discretion and in alignment with judicial policies to maintain this case's fast trial track.[2] Even an important issue should not be reported unless it is material to the ultimate decision in the case and directly connected to the Court's order. *Benselv v. Commissioner of Public Safety*, 328 Mass. 443, 444-445 (1952).

**5. Defendant's Public Policy Argument is Unavailing**

Defendant suggests that virtually all Massachusetts hospitals are at risk of operation due to various claims of wiretap violations (Mem. at 13). More ominously, Defendant asserts that

[2] This case is designated at "DCM Track F – Fast Track."

"the entire economy of Massachusetts is at risk" and that "many Massachusetts companies have their entire existence on riding on the final outcome of this Finding" (Mem. at 13). Defendant grossly exaggerates the scope and impact of this Court's finding.

The finding is limited to whether modern electronic surveillance devices can be intangible objects, such as active and invasive computer programs that track a user's every movement on their electronic device. Since its inception, the Massachusetts wiretap statute has been designed to impose stringent restrictions on the use of electronic surveillance devices. Special Commission on Electronic Eavesdropping, 1968 Senate Doc. No. 1132. Further, the statute is to be broadly construed. *See Commonwealth v. Moody*, 466 Mass. 196, 208 (2013) ("broad enough to cover non-oral electronic transmissions"); *Rich v. Rich,* 2011 WL 3672059, at *6 (Mass. Super. July 8, 2011) (broad enough to include key logger software program). Defendant's contention that the Massachusetts economy is at risk because software tracking technology constitutes a modern electronic surveillance device disregards Massachusetts case law and modern understandings of the term. It is a contention without merit. As Judge Kazanjian aptly summed up in *Doe v. BMC,* 2023 WL 7105628, at *4 (Mass. Super. Sept. 14, 2023)

> "[W]here cellphone, tablet, and computer applications and programs, and their interfacing with the internet, all rely on software for their operation, its use is practically implicit in any modern electronic communication. Thus, to restrict software code from being considered an intercepting device as [Emerson] suggests would essentially nullify the statute's application."

## CONCLUSION

This Court did not make a specific finding that is ripe for reporting to an appellate court. But, even if the Court did find that modern electronic surveillance devices are not limited to tangible objects only and encompass the active and invasive computer program that Defendant employed to intercept Plaintiff's personal and health information surreptitiously, that is

consistent with how Massachusetts courts have interpreted the wiretap statute for years. And it is not a new or novel interpretation. It is reasonable and widely accepted. At the time of her ruling, Judge Howe was acutely aware of the other wiretap claims reported for appeal by Judge Kazanjian. It was well within Judge Howe's authority to manage the case by resolving to revisit the wiretap ruling pending the outcome of other claims on appeal. Accordingly, this Court should deny Defendant's motion to report.

January 12, 2024

Respectfully submitted,

**COUNSEL FOR PLAINTIFFS JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED**

*/s/ Ryan M. Hawkins*
J. Tucker Merrigan, BBO# 681627
Thomas T. Merrigan, BBO# 343480
Ryan M. Hawkins, BBO# 686289
Erin E. McHugh, BBO# 703701
**SWEENEY MERRIGAN LAW**
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
tom@sweeneymerrigan.com
rmh@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Foster Johnson (*admitted pro hac vice)*
Texas Bar No. 24076463
David Warden (*admitted pro hac vice)*
Texas Bar No. 20856750
Nathan Campbell (*admitted pro hac vice)*
Texas Bar No. 24097455
Carl J. Gustafson (*admitted pro hac vice*)
Texas Bar No. 24125261
Justin Kenney, BBO# 706672
**AHMAD, ZAVITSANOS & MENSING, PLLC**

Date Filed 1/22/2024 6:34 PM
Superior Court - Essex
Docket Number 2277CV01000

1221 McKinney, Suite 2500
Houston, Texas 77010
(713) 655-1101 -Phone
(713) 655-0062 – Fax
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com
cgustafson@azalaw.com
jkenney@azalaw.com

Alex Dravillas (*admitted pro hac vice*)
**KELLER POSTMAN LLC**
150 N. Riverside Plaza, Suite 4100
Chicago, IL 60606
(312) 741-5226
ajd@kellerpostman.com

Sara Aguiniga (*admitted pro hac vice*)
**KELLER POSTMAN LLC**
1100 Vermont Ave, 12th Floor
Washington, DC 20005
sara.aguiniga@kellerpostman.com

## CERTIFICATE OF SERVICE

I, Ryan M. Hawkins, counsel of record for the Plaintiffs in this action, hereby certify that on January 12, 2024, a copy of the foregoing document was electronically served on counsel of record for Defendant Emerson Hospital.

Emyr T. Remy, BBO# 704156
**SHOOK, HARDY & BACON L.L.P.**
One Federal Street, Suite 2540
Boston, MA 02110
Tel.: (617) 531-1411 | Fax: (617) 531-1602
remy@shb.com

Alfred J. Saikali *(pro hac vice)*
SHOOK, HARDY & BACON L.L.P.
201 South Biscayne Blvd., Suite 3200
Miami, Florida 33131
Tel: (305) 358-5171 | Fax: (305) 358-7470
asaikali@shb.com

Tammy B. Webb *(pro hac vice)*
SHOOK, HARDY & BACON, L.L.P.
555 Mission Street, Suite 2300
San Fransicso, CA 94105
Tel: (415) 544-1900 | Fax: (415) 391-0281
Tbwebb@shb.com

Jessica N. Wahl *(pro hac vice)*
SHOOK, HARDY & BACON L.L.P.
2049 Century Park East, Suite 3000
Los Angeles, CA 90067
Tel: (424) 285-8330 | Fax: (424) 204-9093
jwahl@shb.com

Jenn O. Hatcher *(pro hac vice)*
SHOOK, HARDY & BACON L.L.P.
2555 Grand Blvd
Kansas City, MO 64108
Tel: (816) 474-6550 | Fax: (816) 421-5547
Jhatcher@shb.com

Justin R. Donoho *(pro hac vice)*
SHOOK, HARDY & BACON, L.L.P.
111 South Wacker Drive
Chicago, IL 60606
Tel: (312) 704-7713 | Fax: (312) 558-1195
jdonoho@shb.com

*/s/ Ryan M .Hawkins*

Ryan M. Hawkins, BBO# 686289
SWEENEY MERRIGAN LAW
268 Summer St. LL
Boston, MA 02210
rmh@sweeneymerrigan.com

Date Filed 1/22/2024 6:34 PM
Superior Court - Essex
Docket Number 2277CV01000

44.3

COMMONWEALTH OF MASSACHUSETTS

ESSEX, ss

TRIAL COURT DEPARTMENT
SUPERIOR COURT

JOHN DOE, individually and on behalf of all other similarly situated,

Plaintiff,

v.

EMERSON HOSPITAL,

Defendant.

DOCKET NO. 2277CV01000D

**EMERSON HOSPITAL'S REPLY**
**IN SUPPORT OF ITS MOTION TO REPORT**

Date Filed 1/22/2024 6:34 PM
Superior Court - Essex
Docket Number 2277CV01000

Emerson submits this Reply in support of its Motion to Report, pursuant to Mass. Super. Ct. R. 9A(a)(3), to show, as described below:

- Plaintiff cites a June 1968 legislative report. It shows the legislature's lack of intent to include adtech software within the meaning of "intercepting device." So do the interim reports leading up to it. (Section I, below)
- Plaintiff cites 19 cases. This Court should follow 2 of them but not the remaining 17, for multiple reasons (Section II).[1]

## I. Three Reports of the Special Commission on Electronic Eavesdropping (1967-1968) Show that the Legislature Did Not Intend to Include Adtech Software Within the Meaning of "Intercepting Device."

Plaintiff cites the Report of the Special Commission on Electronic Eavesdropping, Senate Doc 1132 (June 1968), and concedes it shows the Wiretap Act was intended to apply to "surveillance" devices. Opp. at 7–8 & n.1, 13. This concession is also supported by two interim reports. All three reports show that the Wiretap Act was intended to apply to a device (A) typically consisting of hardware (*e.g.*, transmitters, microphones, amplifiers); (B) used primarily for surveillance, (C) used primarily to record telephone conversations, (D) used primarily with respect to discrete transmissions; (E) placed surreptitiously such that one looking for it could not find it or the identity of the eavesdropper, (F) easily used by criminals for criminal uses, and (G) functioning as an invasion of privacy. *See* Exs. 9–11 (attached with underlines/highlights added).

Accordingly, these legislative reports further support the following arguments Emerson made in support of dismissal, that adtech software was not intended by the 1968 legislature to be

[1] Emerson also notes that on January 17, 2024, the Supreme Judicial Court accepted direct appellate review of the *Vita* appeals, bypassing the Court of Appeals. Ex. 8. This development supports reporting the Court's Finding here. The Finding is a different issue than the ones at issue in the *Vita* appeals (*See* Emerson's Mem. in Support of Its Motion to Report ("Mot.") at 3) and just as serious, material, facilitative, and publicly significant (Mot. at 4–14).

included in the meaning of "intercepting device":

(A) Adtech software is not hardware. Mem. in support Mot. to Report ("Mot.") at 5 (citing Mem. at 14–15; M.G.L. c 272 § 99(B)(3); Black's, Oxford, and Webster's dictionaries).

(B) Adtech software is not used primarily for surveillance. Mot. at 6 (citing Mem. at 3–5; Ex. 1 at 11:16–14:1, 28:13–23, 27:1–2; FAC ¶¶ 36, 73, 77, 102, 103; *Commonwealth v. Rainey*, 491 Mass. 632, 645 (2023)).

(C) Adtech software is not used primarily to record telephone conversations or anything analogous to them (*e.g.*, this case involves anonymously entered search terms). Mot. at 6 (citing Ex. 1 at 28:17–23, 27:1–2; FAC ¶¶ 36, 73, 77, 102, 103; *Rainey*, 491 Mass. at 645); Mot. at 11; Ex. 1 at 28:24–29:9, 31:2–9, 33:8–21, 54:16–55:8.

(D) Adtech software is not used primarily with respect to discrete transmissions, but rather massive conglomerated numbers of transmissions which if counted would produce absurd results. Mot. at 7 (citing FAC ¶ 193; Ex. 1 at 28:8–12, 34:8–22; *Rainey*, 491 Mass. at 642–43); Mot. at 2 (citing FAC ¶ 82; Ex. 1 at 12:3–7); Ex. 1 at 28:24–29:9.

(E) Adtech software is not placed surreptitiously such that one looking for it could not find it or the identity of the eavesdropper. Rather, it is available as public website code that identifies the website owner and the adtech company. Mot. at 2 (citing FAC ¶¶ 36, 102, 103; Mem. at 3–5; Ex. 1 at 11:16–14:1); Ex. 1 at 23:11–13.

(F) Adtech software is not used by cybercriminals for criminal uses but by large public companies for business purposes. Mot. at 2; Mot. at 7–8 (citing Ex. 1 at 34:2–3).

(G) Adtech software's encryption of web-browsing information and sending of the encrypted information to adtech companies is not an invasion of privacy. Mot. at 7, (citing Ex. 1 at 33:25–34:7; M.G.L. c 272 § 99(B)(6)).

## III. This Court Should Follow Only 2 of Plaintiff's 19 Cases, for Multiple Reasons.

In *McStowe v. Bornstein* (cited in Opp. at 5), although the Superior Court issued an interlocutory order based on "prior decisions of [the Supreme Judicial Court]," it reported the matter under Rule 64 because "the judge believed it time for 'a fresh look at the issues presented by this case.'" 377 Mass. 804, 804 (1979). The Supreme Judicial Court took a direct appeal, vacated the interlocutory ruling, and found support for its vacatur in prior precedent of the Supreme Judicial Court, in other jurisdictions, and consistent with a statute. *Id.* at 804–09. The Finding should be reported for similar reasons here. *See* Mot. at 1–14.

The only 1 of Emerson's 29 cases addressed by Plaintiff's opposition is *Rainey*, 491 Mass. 632, which shows the legislature intended to focus on "surveillance" devices (Mot. at 6) and did not intend absurd results (*id.* at 7). Plaintiff argues only that *Rainey* supports referencing the Wiretap Act's preamble. Opp. at 6–7. The preamble shows a focus on "surveillance" devices. *Id.*

The remaining 17 cases cited in Plaintiff's opposition should not be followed (all besides *McStowe* and *Rainey*). *First*, the only cases Plaintiff cites supposedly addressing whether adtech software is an "intercepting device" under the Wiretap Act did not actually address that issue,[2] or was a single non-binding Superior Court opinion and did not address many arguments Emerson makes here or any cases it cites here, including from the Supreme Judicial Court (Mot. at 4–9).[3]

---

[2] *Commonwealth v. Moody*, 466 Mass. 196 (2013) (involving device used for surveillance of criminals, not adtech; moreover, not addressing meaning of statutory term "intercepting device"); *Commonwealth v. Du*, 103 Mass. App. Ct. 469 (2023) (same); *United States v. Hutchins*, 361 F. Supp. 3d 779 (E.D. Wis. 2019) (involving "malware" used by criminals, not adtech; also not involving the same statute at issue here); *Rich v. Rich*, 2011 WL 3672059 (Mass. Super. July 8, 2011) (involving "key logger" software installed on a computer by ex-husband to spy on ex-wife, not adtech; also not addressing any of Emerson's arguments made here regarding the meaning of "intercepting device," Mot. at 4–9); *Marquis v. Google, Inc.*, 2012 WL 12929513, at *1 (Mass. Super. Jan. 17, 2012) (not addressing the meaning of statutory term "intercepting device").

[3] *Doe v. Boston Medical Center Corp.*, 2023 WL 7105628 (Mass. Super. Sep. 14, 2023) (not addressing any arguments like Emerson makes here regarding, *e.g.*, legislative history, consistency

*Second,* Plaintiff's only cases involving a Rule 64 report or a request for one turned on the report being of: (A) a decision not attached to the appellate record and therefore not reviewable by the appellate court[4] (not the relief sought here, *see* Mot. at 2–3, 14); (B) a question not ruled on[5] (not the relief sought here, *see* Mot. at 2–3, 14); (C) factual questions[6] (not true here, as Emerson seeks to report a question of law, *see* Mot. at 4–9); (D) a question seeking to overturn Supreme Judicial Court precedent[7] (not the case here; Supreme Judicial Court precedent instead supports Emerson's position, *see* Mot. at 4–9; and if any applicable Supreme Judicial Court precedent also favored Plaintiff (none cited by either party), a Rule 64 report would still be warranted, *see* *McStowe*, 377 Mass. at 804–09); (E) an issue already on appeal in another case and, moreover, not

---

with other portions of the Wiretap Act, the canon against a construction that would produce absurd results, and the rule of lenity).

[4] *Globe Newspaper Co. v. Mass. Bay Transp. Auth. Ret. Bd.*, 412 Mass. 770, 773 (1992) ("The report must be accompanied by a record that gives an appellate court a basis to exercise its independent judgment of the validity of the judge's determination of that central issue. The record before us contains no such basis"); *John Gilbert, Jr., Co. v. C.M. Fauci Co.*, 309 Mass. 271, 272 (1941) ("no order or decree upon it by any judge appears in the record, so that we do not even know what order or decree was entered by the judge").

[5] *Benslev v. Comm'r of Pub. Safety*, 328 Mass. 443, 444 (1952) ("The authority of a judge of the Superior Court to report interlocutory matters ... does not mean that a judge by reason of having made an interlocutory decree or order is thereby empowered to report to this court questions of Law not involved in such order").

[6] *Angoff v. Angoff*, 1 Mass. App. Ct. 112, 112 (1973) (involving reporting of 87 objections to master's report on "accounting with respect to the partnership assets and profits"); *Morrison v. Lennett*, 415 Mass. 857, 859 (1993) ("The ruling reported in this case concerns only a possible cap on the measure of damages recoverable by the plaintiff. It does not concern the defendants' liability on the various claims. Further, the stipulation of facts filed by the parties is sketchy at best. The entire record is insufficient to permit a complete decision of the limits of liability of all defendants."); *Genova v. Cornell*, 101 Mass. App. Ct. 1116 (2022), *aff'g* 2021 WL 218041 (Mass. Land Ct. Jan. 21, 2021) (involving reporting of ownership of the bed of a pond and easement rights; moreover, declining to report because moot, stating, "there will be no further proceedings in this court for which guidance from an appellate court would be of use. [Defendant] will be free to immediately appeal the judgment to be issued with this memorandum of decision and to bring his arguments to the appellate courts without the invocation of Rule 64").

[7] *FAMM, Inc. v. Peabody Const. Co.*, 2002 WL 31379951, at *2 (Mass. Super. Sept. 9, 2002) (denying motion for interlocutory appellate review "based on the contention that [*Swinton v. Whitinsville Savings Bank*, 311 Mass. 677 (1942)] is no longer good law").

reported because "[plaintiff] is more than sixty-five years old and therefore is entitled by statute to a 'speedy trial' [under G.L.c. 231, § 59F]"[8] (the issue presented by the Finding is *not* on appeal in another case, *see* Mot. at 3, and Plaintiff does not argue that he is over 65); (F) an issue the judge "might have reported" if the case did not involve an elderly widow seeking contested death benefits her late husband thought he was providing for her[9] (plaintiff makes no similar contention here); and (G) an issue regarding a statute not addressed in underlying briefing (unlike here, where Emerson challenges the same statute as it did in moving to dismiss) and, moreover, requested in an alleged class action by a plaintiff, as opposed to a defendant, with the Court stating: "That [dismissing class claims] is very different than allowing [class] claims to proceed"[10] (as Emerson argued at Mot. at 10–12).

*Finally*, Plaintiff's only cases involving the rule of lenity declined to apply it only because the Court found no ambiguity,[11] whereas a Massachusetts appellate court may find an ambiguity as to whether the term "intercepting device" was intended by the legislature to encompass website advertising technology software. *See* Mot. at 4–7, 8–9; Section I, above.

## CONCLUSION

For the foregoing reasons, and those stated in its opening brief, Emerson respectfully requests that this Court report to the Appeals Court for interlocutory review its finding, in its November 22, 2023 Memorandum of Decision and Order on Defendant's Motion to Dismiss, that website advertising technology software is an "intercepting device" under Massachusetts' Wiretap Act, and stay any further proceedings in this Court pending appellate review.

---

[8] *Hennessy v. Brookdale Senior Living Communities, Inc.*, 2018 WL 4427020, at **6–7 (Mass. Super. Aug. 1, 2018).

[9] *McMenimen v. Passatempo*, 452 Mass. 178, 181 (2008).

[10] *Harrison v. Mass. Bay Transp. Auth.*, 2020 WL 5993063, at **1-3 (Mass. Super. Aug. 20, 2020).

[11] *Com. v. Maloney*, 447 Mass. 577, 585 (2006); *Com. v. Chavis*, 415 Mass. 703, 708 (1993).

Date Filed 1/22/2024 6:34 PM
Superior Court - Essex
Docket Number 2277CV01000

Dated: January 22, 2024

Respectfully submitted,

EMERSON HOSPITAL

By: */s/Emyr T. Remy*

Emyr T. Remy, BBO# 704156
**SHOOK, HARDY & BACON L.L.P.**
One Federal Street, Suite 2540
Boston, MA 02110
Tel.: (617) 531-1411 | Fax: (617) 531-1602
remy@shb.com

Alfred J. Saikali (FL # 0178195)
**SHOOK, HARDY & BACON L.L.P.**
201 South Biscayne Blvd., Suite 3200
Miami, Florida 33131
Tel: (305) 358-5171 | Fax: (305) 358-7470
asaikali@shb.com

Tammy B. Webb (CA # 227593)
**SHOOK, HARDY & BACON L.L.P.**
555 Mission Street, Suite 2300
San Francisco, CA 94105
Tel: (415) 544-1900 | Fax: (415) 391-0281
twebb@shb.com

Justin R. Donoho (IL # 6299667)
Tara D. Kennedy (IL # 6320909)
**SHOOK, HARDY & BACON L.L.P.**
111 South Wacker Drive, Suite 4700
Chicago, IL 60606
Tel: (312) 704-7713 | F: (312) 558-1195
jdonoho@shb.com
tkennedy@shb.com

Jessica N. Wahl (CA # 321887)
**SHOOK, HARDY & BACON L.L.P.**
2049 Century Park East, Suite 3000
Los Angeles, CA 90067
Tel: (424) 324-3477 | Fax: (424) 204-9093
jwahl@shb.com

## CERTIFICATE OF SERVICE

I, Emyr T. Remy, hereby certify that on January 22, 2024, a true copy of the above document was served by email upon:

J. Tucker Merrigan (BBO# 681627)
Victoria Santoro (BBO# 679120)
Erin E, McHugh (BBO# 703701)
Ryan M. Hawkins (BBO# 686289)
Thomas T. Merrigan (BBO# 343480)
**SWEENEY MERRIGAN LAW**
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com
rmh@sweeneymerrigan.com
tom@sweeneymerrigan.com

Alex Dravillas (*PHV6299686IL*)
**KELLER POSTMAN LLC**
150 N. Riverside Plaza, Suite 4100
Chicago, IL 60606
Tel: (312) 741-5220
adj@kellerpostman.com

Foster C. Johnson (*PHV24076463TX*)
David Warden (*PHV20856750TX*)
Nathan Campbell (*PHV24097455TX*)
Carl J. Gustafson (*PHV24125261TX*)
Justin C. Kenney (BBO# 706672)
**AHMAD, ZAVITSANOS & MENSING, P.C.**
1221 McKinney St., Suite 3460
Houston, TX 77010
Tel: (713) 655-1101
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com
cgustafson@azlaw.com
jkenney@azalaw.com

Sara Aguiniga (*PHV1029692DC*)
**KELLER POSTMAN LLC**
1100 Vermont Ave., 12th Flr
Washington, DC 20005
Sara.aguiniga@kellerpostman.com

*/s/ Emyr T. Remy*
Emyr T. Remy

Date Filed 1/22/2024 6:34 PM
Superior Court - Essex
Docket Number 2277CV01000

**COMMONWEALTH OF MASSACHUSETTS**

**ESSEX, ss** **TRIAL COURT DEPARTMENT SUPERIOR COURT**

JOHN DOE, individually and on behalf of all others similarly situated,

Plaintiff,

v.

EMERSON HOSPITAL,

Defendant.

DOCKET NO. 2277CV01000D

**EXHIBIT INDEX TO EMERSON HOSPITAL'S REPLY IN SUPPORT OF ITS MOTION TO REPORT**

| Ex. | Description |
|---|---|
| 8 | Order allowing Application for Direct Appellate Review in *Vita v. New England Baptist Hospital & another*, No. DAR-29590 (Supreme Judicial Court), January 17, 2024 |
| 9 | Commonwealth of Massachusetts Interim Report of the Special Commission on Electronic Eavesdropping, April, 1967 |
| 10 | Commonwealth of Massachusetts Interim Report of the Special Commission on Electronic Eavesdropping, October 26, 1967 |
| 11 | Commonwealth of Massachusetts Report of the Special Commission on Electronic Eavesdropping, June, 1968 |

Dated: January 22, 2024

Respectfully submitted,

EMERSON HOSPITAL

By:

*/s/ Emyr T. Remy*

Emyr T. Remy, BBO# 704156
**SHOOK, HARDY & BACON L.L.P.**
One Federal Street, Suite 2540
Boston, MA 02110
Tel.: (617) 531-1411 | Fax: (617) 531-1602
remy@shb.com

Justin R. Donoho (IL # 6299667)
Tara D. Kennedy (IL # 6320909)
**SHOOK, HARDY & BACON L.L.P.**
111 South Wacker Drive, Suite 4700
Chicago, IL 60606
Tel: (312) 704-7713 | F: (312) 558-1195
jdonoho@shb.com
tkennedy@shb.com

Alfred J. Saikali (FL # 0178195)
**SHOOK, HARDY & BACON L.L.P.**
201 South Biscayne Blvd., Suite 3200
Miami, Florida 33131
Tel: (305) 358-5171 | Fax: (305) 358-7470
asaikali@shb.com

Tammy B. Webb (CA # 227593)
**SHOOK, HARDY & BACON L.L.P.**
555 Mission Street, Suite 2300
San Francisco, CA 94105
Tel: (415) 544-1900 | Fax: (415) 391-0281
twebb@shb.com

Jessica N. Wahl (CA # 321887)
**SHOOK, HARDY & BACON L.L.P.**
2049 Century Park East, Suite 3000
Los Angeles, CA 90067
Tel: (424) 324-3477 | Fax: (424) 204-9093
jwahl@shb.com

**CERTIFICATE OF SERVICE**

I, Emyr T. Remy, hereby certify that on January 22, 2024, a true copy of the above document was served by email upon:

J. Tucker Merrigan (BBO# 681627)
Victoria Santoro (BBO# 679120)
Erin E, McHugh (BBO# 703701)
Ryan M. Hawkins (BBO# 686289)
Thomas T. Merrigan (BBO# 343480)
**SWEENEY MERRIGAN LAW**
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com
rmh@sweeneymerrigan.com
tom@sweeneymerrigan.com

Alex Dravillas (*PHV6299686IL*)
**KELLER POSTMAN LLC**
150 N. Riverside Plaza, Suite 4100
Chicago, IL 60606
Tel: (312) 741-5220
adj@kellerpostman.com

Foster C. Johnson (*PHV24076463TX*)
David Warden (*PHV20856750TX*)
Nathan Campbell (*PHV24097455TX*)
Carl J. Gustafson (*PHV24125261TX*)
Justin C. Kenney (BBO# 706672)
**AHMAD, ZAVITSANOS & MENSING, P.C.**
1221 McKinney St., Suite 3460
Houston, TX 77010
Tel: (713) 655-1101
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com
cgustafson@azlaw.com
jkenney@azalaw.com

Sara Aguiniga (*PHV1029692DC*)
**KELLER POSTMAN LLC**
1100 Vermont Ave., 12th Flr
Washington, DC 20005
Sara.aguiniga@kellerpostman.com

*/s/ Emyr T. Remy*
Emyr T. Remy

Date Filed 1/22/2024 6:34 PM
Superior Court - Essex
Docket Number 2277CV01000

# EXHIBIT 8

Date Filed 1/22/2024 6:34 PM
Superior Court - Essex
Docket Number 2277CV01000

COMMONWEALTH OF MASSACHUSETTS
**SUPREME JUDICIAL COURT FOR THE COMMONWEALTH**

**ORDER**

It is hereby Ordered, that the following Application for Direct Appellate Review be allowed:

DAR-29590

**KATHLEEN VITA**
**vs.**
**NEW ENGLAND BAPTIST HOSPITAL & another**

Suffolk Superior Court No. 2384CV000857
A.C. No. 2023-P-1308 & 2023-P-1310

By the Court,
[signature]
Maura A. Looney
Assistant Clerk

ENTERED: January 17, 2024

Date Filed 1/22/2024 6:34 PM
Superior Court - Essex
Docket Number 2277CV01000

# EXHIBIT 9

Date Filed 1/22/2024 6:34 PM
Superior Court - Essex
Docket Number 2277CV01000

SENATE No. 1198

The Commonwealth of Massachusetts

# INTERIM REPORT

# OF THE SPECIAL COMMISSION ON ELECTRONIC EAVESDROPPING

APRIL, 1967

Date Filed 1/22/2024 6:34 PM
Superior Court - Essex
Docket Number 2277CV01000

The Commonwealth of Massachusetts

SEN. MARIO UMANA
*Chairman*

SEN. WILLIAM X. WALL
*Vice Chairman*

REP. PHILIP K. KIMBALL

REP. ANDRE R. SIGOURNEY

WILLIAM P. HOMANS, JR.

ELLIOT B. COLE

NORMAN S. WEINBERG

Senator Wall has signed the above report in order that a majority of signatures appear hereon—so that said report may properly be filed for consideration by the General Court. Senator Wall reserves his right on future action concerning the report. Representative Weinberg of Boston also reserves his right

Date Filed 1/22/2024 6:34 PM
Superior Court - Essex
Docket Number 2277CV01000



The Special Commission on Electronic Eavesdropping was created to study and investigate "the manner by which communications by wire, radio and word-of-mouth may be overheard or otherwise intercepted without the knowledge, consent, or authorization of either or all parties to a communication."

During the past year, the Commission held three public hearings and a number of executive sessions. The commission has heard testimony on the capabilities of present eavesdropping devices and the prospects of research and development. Also, the commission has conducted an extensive study of service observation and monitoring of the New England Telephone and Telegraph Company.

Part I. Eavesdropping Devices

The Commission heard testimony from Emanuel Mittleman of New York City and Bernard B. Spindel of Holmes, New York.

Mr. Mittleman, president of the Wireless Guitar Company, manufactures devices of a commercial nature primarily for private investigators and private parties. He sells his goods on a cash-and-carry, no-names-no-questions-asked basis. Mittleman told the commission that in the spirit of American capitalism (as he sees it), his only concern "is making a buck." The devices which he demonstrated consisted of a "parasite bug" and a "room bug."

The "parasite bug" is a subminiature transmitter, less than half the size of a pack of cigarettes, which broadcasts *both* sides of a telephone conversation, and derives its power from the telephone itself. Ordinarily these transmitters can last for years, and properly constructed and installed are detectable only by physical inspection of the telephone.

The "room bug" is also a subminiature transmitter but requires a battery as a power-source which lasts up to two weeks. Either device can transmit a very clear signal at least 7 blocks in downtown Boston and can pick up a whisper at 20 feet. The advantage of using a transmitter is that even if detected, which is highly unlikely, one can never learn the identity of the eavesdropper.

Conversations may be monitored by using micro-miniature micro-phones, some of which can pick up a whisper at 50 feet. Hearing-aid microphones may be as small as 3/8" on a side. Under

Date Filed 1/22/2024 6:34 PM
Superior Court - Essex
Docket Number 2277CV01000



development are microphones the diameter of a pin-head and less than 1/8" long. If a telephone line is used, amplifiers less than a third of the size of a dime, and just as thin, can amplify the signal as far as 20 miles by using telephone wire. The telephone wires used are called vacant pairs, telephone lines not being used by subscriber. (For technical reasons, it is necessary for the Telephone Company to have "vacant pairs".) Another alternative is to utilize power lines, by using the principal of the wireless intercom, technically called a carrier-transmitter, or transmitting RF signals, i.e., radio waves, down the power line. Also in use is the device hidden in an eagle found in our Moscow Embassy in 1958, activated by ultrasonic waves. In the future, one can expect lasers to be utilized.

Clearly the future is frightening, and beyond the layman's comprehension. Science has a double-edge sword, which can work for the betterment of mankind or for its destruction, depending on how the scientific tools developed are used. Clearly in our age the basic components of eavesdropping devices have many legitimate uses in electronics, communications, aerospace, and medical applications. Even the strictest enforcement of the most all-encompassing statute will not put a stop to electronic eavesdropping. We can only hope to lessen the incidence of eavesdropping by co-operative federalism. (See below.)

## Part II. Service observation procedures of the New England Telephone and Telegraph Company

On Sunday, June 12, 1966 the Boston *Herald* in a copyrighted story by Ronald Kessler disclosed to the public the existence of the Bell system's service observation practices. This is believed to be the first public disclosure of the telephone company's practices since its inception. Service observation, according to the representatives of the telephone company, is part of the company's quality control system; specifically, service observation checks the performance of the company's equipment and employees. In so doing, the company intercepts customer-to-customer calls and customer-to-company calls.

Service observation was first instituted in February, 1903. At that time, the operation of the company's equipment could only

Date Filed 1/22/2024 6:34 PM
Superior Court - Essex
Docket Number 2277CV01000



be evaluated by listening to phone calls. The company, by its own admission continued to listen in to customer-to-customer calls for periods up to ten minutes up to June 1, 1966. Company employees listened in to conversations in order to hear subscriber comments about company service. Current service observation procedures are contained in the two-volume *Traffic Service Observing Practices Manual*. A summary of the practices is contained below.

During the course of the investigation, members of the commission met frequently with three company executives: William Hogan, vice-president; Jay H. Whatley, assistant vice-president-operations; George R. Clark, Traffic Supervisor, all of whom gave their full cooperation. However, other officials refused entry to the Commission's Chairman when he accompanied the Boston press corps for a tour of the Company's service observation facilities. Fortunately other officials prevailed and the Chairman accompanied the press.

The three above-mentioned executives spent many hours describing to Commission members the company's service observation practices, which are uniform throughout the Bell System.

The following summary of these practices and objectives is taken from a report prepared by the Telephone Staff Committee of the New England conference of public utility commissioners:

## TRAFFIC DEPARTMENT SERVICE OBSERVING

*Private*

Service Observing on the handling of traffic by the Traffic Department is done as described in the material which follows:

Service Observing is done by trained Service Observers who follow standard System methods and procedures as specified in the Traffic Service Observing Practice.

The observing procedures are contained in eleven measurement plans which have been issued by the Traffic Measurement Group at "195". A brief description of each of these plans is as follows:

*Dial Line*

This practice measures the effectiveness of the dial system on

Date Filed 1/22/2024 6:34 PM
Superior Court - Essex
Docket Number 2277CV01000



local calls and the customer's use of the dial equipment by observing on the customer's lines while he dials the number and the connection is established. The dialed number is recorded on a tape. The observer notes customer dialing errors and equipment malfunctions staying on each connection only long enough to establish that the desired station has been reached. The customer's lines to be observed are picked at random "except for some concentration on heavy DDD users" and the list is completely changed each week. In general, about 30 or 40 lines in a given dial entity are being observed at any one time, although the observer can observe only one call at a time from the group. Presently, about 2,500 dial entities are being observed with the usual number of observations, 300 per month.

*DDD Outgoing Trunk*

Measurements are made on the effectiveness of customer dialed DDD calls by observing on the trunks outgoing to the tandem toll switching machine from the local office. Items measured are ineffective attempts due to overflows, reorder, and equipment failures. When a trunk is seized, the called number is displayed before the observer who stays on the connection only long enough to determine whether or not the desired station is reached. The calling station is not identified. If a CAMA operator is brought into the connection for calling number identification, the observer checks her handling of the call and the accuracy of keying. Observed trunks are a representative sample of all tandem trunks and are not changed unless a need is apparent. About 500 AMA and CAMA installations are now being observed in accordance with this practice.

*DDD Incoming Trunk*

Incoming Trunk Observations measure the ability of the dial equipment within a certain area to complete toll calls coming into that area from other areas. The only items measured relate to the disposition of the call: completed, busy, don't answer, reached intercept correctly, or ineffective. Ineffective attempts are separated by cause — reorder, no circuit, or equipment failure.

The observer is connected to trunks incoming to the toll switch-

Date Filed 1/22/2024 6:34 PM
Superior Court - Essex
Docket Number 2277CV01000



ing machine from another area. She receives a display of the called number and remains on the connection only long enough to determine the disposition. She has no record of the calling number.

The number of Incoming Trunk Observing locations in the System is about 100. The monthly quota for each installation is 5,000 — 7,000 observations.

*Manually Handled Outward Toll and Assistance*

Measurements on cord switchboards handling toll and assist traffic are designed to measure operator and equipment performance. Speed of answer is measured mechanically. Both operator accuracy speed and manner are measured by the observer. Most of this observing is done by connecting the observer to a cord pair on the operator's position. This procedure insures a completely random selection of calls to be observed.

The observer stays on the cord pair through the setting up of the connection, recording the order, timing the operator's actions and noting any operator failures, until conversation starts. The observer then cuts out of the connection until conversation is completed as indicated by signals on her position. The observer requisitions the operator's ticket and checks it for accuracy of recording, timing, and the collection of changes on coin calls.

In a minority of locations, the observer is not connected to a cord pair but instead has a duplicate of the operator's switchboard multiple before her. In these cases she selects a recording trunk on which a call is waiting and follows the subsequent action in a manner similar to cord observing.

There are just over 1,000 Outward Toll Chief Operator Units now being observed in the Bell System. The quota is 900 observations obtained in one, two, or three months.

*Outward Toll — Traffic Service Position*

Traffic Service Position observing is a relatively new measurement. The practice was issued in July, 1965 and at present ten or twelve units are being observed. The observer in this instance is measuring the effectiveness of the TSP operator and the dial switching network.

The observer is connected to a trunk which has been selected by a customer call. She receives a display of the calling number plus the code or number dialed by the customer and any keying by an operator in connection with the call. Similarly as for observing on manually handled toll, the observer observes the initial operator contact and any subsequent contact, cutting out of the connection when conversation takes place. The observer measures the operator's accuracy, speed and manner and the effectiveness of the dial network in completing and timing the customer's call.

Speed of operator answer is obtained mechanically.

*Information*

Observing on Information service is strictly a measurement of the operator's effectiveness in providing accurate, complete, and pleasing service. The observer is connected to an information trunk which has been selected by an incoming call from a local or distant customer or operator. The observer records the request and checks the details given by the operator for accuracy. The observer has no knowledge of the calling number and there is no conversation other than that between the customer and the operator.

*Intercept*

Observing on Intercept service is very similar to Information observing. The observer is connected to a trunk incoming to the intercept board and listens to the exchange between the operator and the customer. She measures the operator's accuracy, speed, and manner.

*PBX*

The PBX measurement plan does not involve separate observing. Instead the observations used in this plan are Dial Line and Outward Toll observations which originate or terminate at PBX's.

*CCSA*

Common Control Switching Arrangement is the name of the service which provides switching systems furnished customers such as FTS and G.E. to inter-connect their PBX's. Observing is done

Date Filed 1/22/2024 6:34 PM
Superior Court - Essex
Docket Number 2277CV01000



on these systems either with dial line observing circuits or by the use of portable observing sets. In either case, the observing circuits are connected to the access lines between the PBX's and the toll switching machines. The observer receives a record of the dialed number to determine whether or not the attempt is effective. If the attempt is ineffective, she records the reason for the failure. She does not stay on the connection after the desired called number is reached.

*Dial TWX*

A modified dial line circuit is used for dial TWX observing. The observing circuit is attached to dial TWX lines which are selected at random and are completely changed each week. When the TWX customer dials a number, it is recorded on tape for the observer. The observer had a "receive only" TWX machine associated with her position which will duplicate the initial exchange between the calling and called stations. The observer stays on the connection only until the desired station answers. The observer measures the instances of customer dialing irregularities and equipment failures, as in dial line observing.

*TWX Outward and Assistance*

Observations are made on operator performance at 15 TWX assistance centers in the System. These observations are made from monitoring positions in the central office. The observer is on the connection only during the period the operator is on the connection. The observer receives the same print-out as the operator and records the calls in various classifications. She also makes note of any keypulsing or operating irregularities by the operator or any incorrect reports given to customers. Speed of answer is obtained by mechanical means.

The company also provides service observing equipment for its subscribers pursuant to New England Telephone and Telegraph Tariff DPU Number 10, Part III, Section 15, page 13. "This equipment is provided solely for the purpose of determining the need for training, improving the quality of service rendered by customers' employees in their operation of private branch exchange attendant positions, or in the handling of telephone calls of an

impersonal nature concerning the customers' business." (The word, customers, here refers to the company's subscribers.)

The complexity of today's telephone equipment, taken as an integrated unit defies human comprehension. The commission believes that the company is sincere in its statement that service observation is essential to the proper functioning of the telephone system.

This commission lacks the technical competence to judge the value of service observation with respect to the maintenance and repair of the company's equipment. We therefore accept the conclusions of the Telephone Staff Committee's report, infra. The Telephone Staff Committee is composed of one representative from each public utility commission in New England who is familiar with the telephone system's requirements.

The Report on page 6 states "It is our conclusion that, as in industry generally, random sampling of a company's product — *in this case installation and maintenance of communications equipment and the transmission of voice and data* — is vital in maintaining control of quality and performance.

*"The magnitude of the data collected and the analysis and summarization thereof seems to indicate beyond reasonable doubt that a high standard of service is the purpose for which this program is maintained.* Company regulations pertaining to secrecy of communications as set forth in its booklet entitled 'Protection of Telephone Plant and Service,' . . . . seem to further support this contention."

The Telephone Staff Committee's recommendations are the following:

*RECOMMENDATIONS*

1) The company should institute and pursue a program designed to fully acquaint its customers by means of bill inserts and other media with the type of observations being made in its quality control program.

2) In order to remove any aura of secrecy and to bring the service observing and monitoring practices directly under regulatory scrutiny we recommend that reference be made

to this matter in the General Regulations of the filed tariffs along the following lines:

a) *Privacy of Conversation.* It is the policy and practice of the Company not to listen in on any calls between its customers.

b) *Service Observing and Monitoring of Calls.* It is the policy and practice of the Company to observe service to its customers by monitoring a random sample of the handling of the calls by its operators and equipment, and to monitor a random sample of conversations involving Information Service, Intercept Service, Repair Service and Business Office contacts. Monitoring and service observing will be done in accordance with stated company practices, available for inspection by appropriate regulatory authorities.

3) In order to maintain the privacy of calls between customers and to further insure that there will be no invasion of privacy at any time, we recommend that the service observer's cut-off key be automated by relay or other appropriate means so that the observer will be cut out of the call at the time the calling party reaches the called number.

The Commonwealth's Department of Public Utilities called for an investigation (DPU #15298) of observation practices one week after this commission held its public hearing. The following are the orders of the DPU:

*D. ORDERS*

After due notice, public hearing and consideration, it is hereby

*ORDERED:* That the telephone company pursue a program on a continuing basis that will keep its customers informed by means of bill inserts and other media with its present types and any changes in types of service observing and monitoring made in its quality-control programs, and it is further

*ORDERED:* That to bring the service observing and monitoring practices directly under regulatory scrutiny, reference be made to these practices in the General Regulations of the Company's filed tariffs along the following lines:

A. *Privacy of Conversation.* The Company shall not listen in on the conversation of any customer-to-customer calls.

B. *Service Observing and Monitoring of Calls.*

(1) The Company may observe service to its customers by monitoring a random sample of the handling of calls by its operators and equipment, but only until the calling customer reaches the called customer.

(2) The Company may monitor a random sample of conversations involving Information Service, Intercept Service, Repair Service, and Business Office contacts.

(3) Monitoring and service observing will be done in accordance with stated company practices, a current copy of which shall be on file in the Rates and Research Division of the Department, and it is further

*ORDERED:* That within fourteen days of this order a current copy of the service observing and monitoring practices of the Company be filed with the Rates and Research Division of the Department, and it is further

*ORDERED*: That there shall be no changes made in service observing and monitoring practices of the Company unless they are made in accordance with statutory provisions and the rules and regulations of the Department governing changes in filed tariffs, and it is further

*ORDERED:* That the Company make the studies referred to herein and file with the Secretary of the Department within six months of the date of this order a written report summarizing their studies and stating the conclusions of the Company concerning the proposed changes in Company practices as suggested in our findings herein, and it is further

*ORDERED*: That the following requests for rulings of law by the respondent are denied: Nos. 1, 2, 3, 4, 5, 6, 11, 12, 13. We do not grant requests for rulings of law on the aforementioned Nos. 1. 2, 3, 4 and 5, because they are beyond the scope of our investigation. We do not grant requests for rulings of law Nos. 11, 12 and 13 for the reason that they are inapplicable to this order, and it is further

*ORDERED:* That the investigation herein be and is hereby continued until further order of the Department.

By order of the Department,

ROY C. PAPALIA, *Chairman*
LUCY M. CARRA, *Commissioner*
DAVID M. BRACKMAN, *Commissioner*
NORMAN MASON, *Commissioner*
JOSEPH F. CLEARY, *Commissioner*
HELEN P. ROSS, *Commissioner*

(Commissioner Andrew Benson dissented.)

## CONCLUSIONS

The commission believes that the service observation practices of the telephone company as we understand them are necessary to the rendition of service and that the telephone company is cognizant of its duty to preserve the customer's privacy. The telephone company therefore since June 1, 1966, has ordered its service observers to discontinue their observations as soon as a connection has been made and a conversation between two customers is established. However, as telephone company officials conceded during hearings conducted by the Massachusetts Department of Public Utilities, there is no way for the telephone company to insure that its service observers will discontinue their observations when a conversation ensues.

Therefore, in the interests of the public, we believe an automatic, voice-actuated cut-off device should be installed in all telephone company service observing equipment throughout the Commonwealth to insure that no part of any conversation will be heard by a service observer. The device referred to would automatically disconnect a call from the service observer's equipment as soon

Date Filed 1/22/2024 6:34 PM
Superior Court - Essex
Docket Number 2277CV01000



as the first word is spoken after a connection has been made, and this would be accomplished with a voice-actuated cut-off switch.

The DPU has ordered the telephone company to report by June, 1967, what measures can be taken to prevent invasion of privacy in service observance practices. We assume the report will describe the automatic cut-off proposal mentioned above, a recommendation also made by the Telephone Study Committee.

The commission believes that the requirement of a voice-actuated automatic cut-off device should properly be required by the DPU under its regulatory powers. If the DPU fails to exercise its powers, this commission shall report to the General Court with appropriate recommendations.

There are many questions that are raised in relation to the Department of Public Utilities which we think should be aired. We cannot understand why the DPU commission has never studied service observation practices in the past 50 years. We cannot understand why apparently no one in the DPU thought it outrageous that the company would monitor customer-to-customer calls *to gain customer comments on service.* Nor can we understand why the DPU commission took 5 weeks to call for an investigation when this commission and the U.S. Senate's subcommittee on Administrative Practices and Procedures (the Long Committee) were able to determine in but a few days that an investigation was in the public interest. New England Telephone and Telegraph Company is exempted by c. 272. sec. 102 (G.L. Ter. ed.) from the eavesdropping statutes of the Commonwealth. This section was enacted in recognition of the specialized problems of the telephone industry. The same does not hold true for the company's subscribers.

Part III. The Massachusetts Statutes

In *Commonwealth v. Spindel,* recently decided by the Supreme Judicial Court, the court said "the eavesdropping statute is not a paragon of clarity." Chapter 272, Sections 99, 99A, 100, 101 and 102 (G.L. Ter., ed.) deal with eavesdropping. These sections, when taken singly are difficult to construe. Taken together one is hard pressed to find another with the same interpretation.

We therefore think it necessary to enact new legislation this session even though this commission cannot yet advise the general court on the policy issues involved. A number of bills relative to eavesdropping have been filed this session. H. 1435 was filed by then Attorney General Edward Brooke, and is supported by Attorney General Elliot Richardson. As a stop-gap measure this commission recommends enactment of H. 1435. We realize that certain sections of the bill are poorly drafted; we also realize that in all probability a later report by this commission will seek changes in the bill, if it is enacted, in both form and substance. Notwithstanding these considerations, we feel the existing statutes necessitate enactment.

Part IV. Legislative Recommendations

The Public Utilities Commission is authorized to grant tariffs to exempt common carriers of electrical intelligence from the prohibitions of C

Section 1: Chapter 272, section 102, as most recently amended by chapter 48, section 2 of the acts of 1956, is hereby repealed.

Section 2: The following section is inserted following chapter 166, section :
Section : The public utilities commission is authorized to grant tariffs to exempt common carriers of electrical intelligence from the prohibitions of chapter 272, sections 99, 100, and 101 for the purpose of maintenance, repair and development of transmission equipment. Said tariff may be promulgated by the public utilities commission upon a finding that it is necessary for the maintenance, repair, and development of the carrier's transmission equipment. The commission shall take care that a carrier does not intercept substantive portions of communications.

Date Filed 1/22/2024 6:34 PM
Superior Court - Essex
Docket Number 2277CV01000

Date Filed 1/22/2024 6:34 PM
Superior Court - Essex
Docket Number 2277CV01000

# EXHIBIT 10

Date Filed 1/22/2024 6:34 PM
Superior Court - Essex
Docket Number 2277CV01000

SENATE No. 1469

The Commonwealth of Massachusetts

# INTERIM REPORT

## OF THE

## SPECIAL COMMISSION

## ON ELECTRONIC EAVESDROPPING

(Established under Chapter 82 of the Resolves of 1964 and time most recently extended under Chapter 107 of the Resolves of 1966)

October 26, 1967.

The Commonwealth of Massachusetts

# INTERIM REPORT OF THE SPECIAL COMMISSION ON ELECTRONIC EAVESDROPPING

As a result of our investigation into "the manner by which communications by wire, radio, and word of mouth may be overheard or otherwise intercepted without the knowledge, consent or authorization of either or all parties to a communication," the Commission has great concern over the inability of private citizens to receive proper compensation and damages of any kind as a result of the invasion of their personal privacy.

As reported previously, the availability of instruments for overhearing secretly private conversations is immense. The devices are available at low cost and do not have to be specially manufactured and can be used by ordinary people without special training or there are devices available of a very sophisticated nature requiring more skillful operation.

The result is a problem of immense dimensions in terms of control with which the Commission is continuing to deal and concerning which it hopes to offer concrete recommendations in the very near future.

However, at the present time the problem raised by the motion picture produced at the Bridgewater State hospital brings to immediate attention the need for protective legislation in the area of invasion of privacy.

Your Commission staff has prepared a study concerning the present state of the law of invasion of privacy in Massachusetts and in other states. A copy of this study is attached hereto as an appendix.

In summary, the study indicates that compensation for invasion of privacy has been handled by the states by statute or some courts of higher jurisdiction have recognized invasion of privacy as a tort within the meaning of the common law. The Supreme Judicial Court of the Commonwealth of Massachusetts in its latest decision on the subject namely *Frick V. Boyd* 214 N.E. 2d 460, (1966,) has failed to state until this time whether or not a cause of action for

invasion of privacy exists at common law. It is the opinion of this Commission that there should be the right to compensation for invasion of privacy.

Although we recognize that a civil action to allow persons to be compensated for an invasion of their privacy is not a completely effective control of the use of devices to overhear conversations we do feel it is a minimum remedy which should be available to all citizens of Massachusetts due to the tremendous expansion of the problem created by the new technology. In addition, our studies of the laws of Massachusetts make it clear that there are other areas such as those which were raised by the current investigation over the production of the new "Titicut Follies" which cry out for statutory treatment for protection. It is our hope that the development of the law of invasion of privacy will be some aid in compensating persons in the situation of the inmates of Bridgewater State Hospital to some degree for the intrusions made to their privacy. We also see the need for detailed study to produce legislation to more clearly define the areas of confidentiality & invasion of privacy.

Our survey of the present state of the law of invasion of privacy is not meant to imply that it is our intention to limit by our bill, an action of invasion of privacy to the current state of the law. It is our desire that the Supreme Judicial Court shall develop the action of invasion of privacy in the tradition of the Common Law to meet the needs and dangers of the technological society in which we live. Yet, we feel this should be done on a case by case basis rather than to attempt to spell out all the possible situations in legislation.

MEMBERS OF COMMISSION

*Senators*

MARIO UMANA

WILLIAM X. WALL

WILLIAM I. RANDALL

*Representatives*

GEORGE L. SACCO, JR.

ANDRE R. SIGOURNEY

NORMAN S. WEINBERG

DANIEL W. CARNEY

PHILIP K. KIMBALL

*Governor*

HON. WILLIAM P. HOMANS, JR.

ELLIOT B. COLE

[APPENDIX A]

Subject: Invasion of Privacy: The Nature of the Tort and Its Development as a Cause of Action.

I

Nature of the Tort

The law of privacy as it exists today comprises four distinct types of invasion of four different interests of the plaintiff. All four are designated by the term "invasion of privacy," but in fact they have nothing in common other than that each represents an interference with the right of the plaintiff to be let alone.

One of these torts consists of a trespassory intrusion into a private area as by an illegal search and seizure[1], an illegal search of a shopping bag in a store[2], an invasion of his home[3], and illegal eavesdropping.[4]

The key to this tort is that there must be something in the nature of prying or intrusion. It is clear also that the intrusion or prying must be something which would be offensive or objectionable to a reasonable man.[5] Also for a cause of action to lie it must be established that the intrusion or prying was into a private area.[6]

A second group of cases allow recovery in tort where there has been publicity of a highly objectionable kind to private information, even though it is true and so no action for defamation would lie. A writing is not required for publicity.[7] Once again the mat-

[1] *Griswald* v. *Connecticut*, 381 U.S. 479 (1964)

[2] *Sutherland* v. *Kroger Co.*. 144 W. Va. 673, 110 S.E. 2d 716 (1959).

[3] *Walker* v. *Whittle*, 83 Ga. App. 445, 64 S.E. 2d 87 (1951); *Ford Motor Co.* v. *Williams*, 108 Ga. App. 21. 132 S.E. 2d (1963).

[4] *La Crone* v. *Ohio Bell Tel. Co.*, 114 Ohio App. 299, 182 N.E. 2d 15 (1961); *Roach* v. *Harper*, 143 W. Va. 869, 105 S.E. 2d 564 (1958).

[5] *Horstman* v. *Newman*, Ky., 291 S.W. 2d 567 (1956); *Harms* v. *Miami News, Inc.*, Fla., 127 So. 2d 715 (1961).

[6] *Gotthelf* v. *Hillcrest Lumber Co.*, 280 App. Div. 668, 116 N.Y.S. 2d 873 (1952); *Voelker* v. *Tyndall*, 226 Ind. 43, 75 N.E. 2d 548 (1947).

[7] *Linehan* v. *Linehan*, 134 Cal. App. 2d 250 P. 2d 326 (1955).

ter made public must be offensive or objectionable to a man of ordinary sensibilities.[8]

The third form of invasion or privacy consists of publicity which places the plaintiff in a false light in the public eye. Examples are wrongfully attributing to the plaintiff authorship of books or articles.[9] Other instances are false testimonials in advertising, and a picture of an honest man in a newspaper expose of gangsters. Again the published matter must be offensive or objectionable to a reasonable man of ordinary sensibilities.[10]

The final defined area where a cause of action will lie for invasion of privacy consists of the appropriation for the benefit of the defendant of the name or picture of the plaintiff. This most frequently occurs where the plaintiff is falsely portrayed in an advertisement as approving of a product.[11] Other examples include posing as plaintiff's wife and using plaintiff's identity to obtain credit. The key to recovery under this tort theory is that the defendant must gain some benefit from the appropriation and this usually consists of some economic return.

## II

### Its Development as a Cause of Action

In many jurisdictions[12] a cause of action lies for invasion of privacy based on common law decisions. Four states[13] have statutes

8 *Samuel v. Curtis Pub. Co.*, 122 F. Supp. 327 (N.D. Cal., 1954); *Meetze v. Associated Press*. 230 S.C. 330, 95 S.E. 2d (606 (1956).

9 *D'Altomante v. New York Herald Co.*, 154 App. Div. 453, 139 N.Y. S. 200 (1913); *Kerby v. Hal Roach Studios*, 53 Cal. App. 2d 207, 127 P. 2d (557) (1942).

10 *Carlisle v. Fawcett Publications, Inc.*, 201 Cal. App. 2d 733, 20 Cal. Reptr. 405 (1962).

11 *Lane v. F. W. Woolworth Co.*, 174 Misc. 66, 11 N. Y. S. 2d 199 (1939); *Selsman v. Universal Books, Inc.*, 18 App. Div. 2d 151, 238 N.Y. S. 2d 686 (1963).

12 Alabama, Alaska, Arizona, Arkansas, California, Connecticut, Delaware, the District of Columbia, Florida, Georgia, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maryland. Michigan, Mississippi, Missouri, Montana, Nevada, New Hampshire, New Jersey, North Carolina, Ohio, Oregon, Pennsylvania, South Carolina, South Dakota, Tennessee and West Virginia.

13 New York, N. Y. Civil Rights Law SS 50-51; Oklahoma, Okla. Stat. Ann., Title 21, SS 839-40; Utah Code Ann. 1953, S 76-4-8 and S 76-4-9; Virginia, Va. Code Ann. 1957, S 8-650.

expressly dealing with invasion of privacy. These laws are all quite similar; each providing for a civil cause of action where there has been wrongful use of a plaintiff's name or picture.

Massachusetts has been slow in developing any common-law tort for invasion of privacy. The first case in the area, *Thayer* v. *Worcester Post Co.*, 284 Mass. 160, 187 N.E. 292 (1933) mentions the fact that the right to be free from such invasion existed under the common law in various other jurisdictions but felt it unnecessary to decide the question as to Massachusetts, since the plaintiff there had given consent to any invasion. In the next case dealing with the law of privacy, *Marek* v. *Zanal Products*, 298 Mass. 1, 9 N.E. 2d 393 (1937) consent was again presumed so that the court again declined to decide the issue. In *Themo* v. *New England Newspaper Pub. Co.*, 306 Mass. 54, 27 N.E. 2d 753 (1940) the court still again refused to come to grips with the problem by holding there that certain material published in a newspaper was not private matter and so that even if a right to privacy existed, there could be no recovery under the facts presented. A Federal case, *Wright* v. *R.K.O. Radio Pictures*, 55 F. Supp. (D. Mass., 1944) seizing on dicta in *Themo, supra*, construed the state of the law in Massachusetts to be that an actionable invasion of privacy existed but only such an invasion that would amount to libel. The Massachusetts court rejected this interpretation of its decisions in *Kelly* v. *Post Publishing Co.*, 327 Mass. 275, 98 N.E. 2d 286 (1951) holding that *Themo*, *supra* left open the question whether there exists a legally protected right of privacy in Massachusetts. *Kelly* held that even if a right to privacy exists, to publish the gory picture of a dead child is not an invasion of the privacy of the parents. The latest Massachusetts decision on the subject is *Frick* v. *Boyd*, — Mass. — , 214 N.E. 2d 460 (1966) also declines to answer the issue.

Massachusetts, then, has failed to take a position on the matter, since the courts have felt that no fact pattern before it has shown any invasion of privacy.

Date Filed 1/22/2024 6:34 PM
Superior Court - Essex
Docket Number 2277CV01000

SENATE — No. 1469. [Oct. 1967.

[APPENDIX B]

# The Commonwealth of Massachusetts

In the Year One Thousand Nine Hundred and Sixty-Seven.

AN ACT CREATING A CIVIL ACTION FOR INVASION OF PRIVACY

*Be it enacted by the Senate and House of Representatives in General Court assembled, and by the authority of the same, as follows:*

CHAPTER 231 OF THE GENERAL LAWS OF THE COMMONWEALTH SHALL BE AMENDED BY INSERTING THEREIN THE FOLLOWING AS SECTION 90A:

There is a cause of action for invasion of privacy. Compensatory damages, punitive damages, reasonable attorney's fees and other litigation costs reasonably incurred may be awarded. Notwithstanding any provisional law relating to limitations of action, an action for invasion of privacy may commence within two (2) years after the plaintiff learns of the facts upon which the action is grounded.

Date Filed 1/22/2024 6:34 PM
Superior Court - Essex
Docket Number 2277CV01000

# EXHIBIT 11

Date Filed 1/22/2024 6:34 PM
Superior Court - Essex
Docket Number 2277CV01000

**SENATE** **No. 1132**

The Commonwealth of Massachusetts

# REPORT

OF THE

# SPECIAL COMMISSION ON ELECTRONIC EAVESDROPPING

June, 1968

Date Filed 1/22/2024 6:34 PM
Superior Court - Essex
Docket Number 2277CV01000

# The Commonwealth of Massachusetts

---

## THE COMMISSION'S MEMBERS

---

SEN. MARIO UMANA, *Chairman*

SEN. WILLIAM X. WALL, *Vice-Chairman*

SEN. WILLIAM I. RANDALL

REP. GEORGE SACCO

REP. DANIEL CARNEY

REP. NORMAN WEINBERG

REP. PHILIP KIMBALL

REP. ANDRE SIGOURNEY

WILLIAM P. HOMANS, JR.

ELLIOT B. COLE

SANFORD A. KOWAL, *Chief Counsel*

Date Filed 1/22/2024 6:34 PM
Superior Court - Essex
Docket Number 2277CV01000

## TABLE OF CONTENTS

| | Page |
|---|---|
| The commission's Report | 5 |
| Mr. Cole and Mr. Homans, concurring | 10 |
| Appendix 'A' | 14 |
| Appendix 'B' | 33 |
| Appendix 'C' | 34 |

Date Filed 1/22/2024 6:34 PM
Superior Court - Essex
Docket Number 2277CV01000

Date Filed 1/22/2024 6:34 PM
Superior Court - Essex
Docket Number 2277CV01000

# INTERIM REPORT OF THE SPECIAL COMMISSION TO INVESTIGATE ELECTRONIC EAVESDROPPING AND WIRETAPPING.

## *INTRODUCTION*

A special commission to investigate electronic eavesdropping was created by the Legislature in 1964. During this period the Commission has held numerous public hearings, executive sessions and has directed its counsel to pursue research and investigation into the laws involving privacy, wiretapping and eavesdropping by law enforcement agencies, and problem of wiretapping and eavesdropping as it is committed by members of the general public.

Public hearings have been held by the Commission to demonstrate the type of eavesdropping devices presently available to members of the general public, and those used at the present time for covert wiretapping and eavesdropping. Public hearings were held to determine the extent and need for service observing as carried on by the New England Telephone and Telegraph Company.

## *RECENT UNITED STATES SUPREME COURT DECISIONS*

Two recent cases decided by the United States Supreme Court clearly indicate that Sections 99, 100, 101, and 102 of Chapter 272 of the General Laws are unconstitutional insofar as they describe the methods by which law enforcement officers may be permitted to commit judicially authorized eavesdropping and wiretapping. In the case of *Berger v. State of New York* a statute very similar to the sections described above was held unconstitutional on its face. The Court found the provisions for obtaining a warrant were too broad and that the statute permitted a "continuous search". The United States Supreme Court for the first time made it clear in that case, that a judicially authorized eavesdrop or wiretap must conform to the Fourth Amendment of the United States Constitution.

This requirement means that an application for such a wiretap or eavesdrop order, to be valid under the Fourth Amendment, must conform to the same test of "probable cause" as is required for a search warrant. In addition the Court makes it clear that it desires close judicial supervision over all aspects of the process of

eavesdropping and wiretapping as it is performed by law enforcement officers.

The impact of these decisions is that the Massachusetts statute must be revised if police and law enforcement officials are to be able to lawfully intercept or wiretap any wire or oral conversations by members of the public under any circumstances.

## *DEVICES FOR WIRETAPPING AND EAVESDROPPING BY MEMBERS OF THE PUBLIC.*

Our hearings and studies have made it clear that eavesdropping devices are readily available to members of the public from commercially available stores. A person with a minimal education in electronics can easily install these commercially available devices for purposes of illegally intercepting wire or oral communications. In addition to devices which are easily available on the commercial market, other devices of much greater sophistication are manufactured by persons specializing in covert wiretapping and eavesdropping.

Due to the ease with which these devices may be obtained and manufactured, and the great proliferation of these devices, it is the Commission's conclusion that there is no way to effectively prohibit their sale or manufacture.

As a result, the Commission has revised the present Massachusetts statute to strictly forbid electronic eavesdropping or wiretapping by members of the public. This has been made necessary due to the fact that only two convictions have been obtained in Massachusetts for wiretapping or eavesdropping to the Commission's knowledge.

## *SERVICE OBSERVING*

As a result of an investigation conducted by this Commission, at a public hearing held pursuant to that investigation the first admission by any telephone and telegraph company was made, that for a long period of time, these companies have operated a service by which the telephone company has overheard the conversations of subscribers without their knowledge. Long distance calls were monitored by the telephone company up until 1956. Local calls were monitored up until 15 days prior to the investigation conducted by the Commission in 1966.

"Service observing" was justified by the telephone company in order for it to check the quality of transmission of conversations over its lines, to supervise its operators, to check on the response of its repair personnel to the calls made by subscribers. The testimony further indicated that at the present time there is no necessity to listen to any conversation by a subscriber. In addition, service observing of the operators was said not to be necessary beyond the point that the operator heard the connection made between the parties for the call. This is due to the fact that improved electronic devices enable the same checks to be made without the necessity for overhearing the conversation of the parties.

To this end the Commission recommends the amendment of the Act governing the regulation of telephone companies by the Department of Public Utilities to insure that the privacy of the subscribers' telephone conversations will be protected. In the system of regulation described by the proposed statute, the Department of Public Utilities is specifically designated to enforce these requirements. The standard of service observing as set forth by the Telephone Company in its testimony before the Commission are incorporated into the provisions of the proposed bill. The scheme of regulation requires an annual report to the Department of Public Utilities of all service observing activities by the Telephone Company, reporting of all rules and regulations of the Telephone Company concerning observing, a report of the amount of money expended for such service, and requires a semi-annual investigation of such service by the Department of Public Utilities.

This Commission feels that past conduct by the Telephone Company indicates that the Telephone Company has clearly favored its business interest against right of the public to have privacy in their telephone conservations. In addition, we take a dim view of a method of supervision which allows an employer to act as "big brother" towards its employees. As a result the Commission feels that a scheme of regulation by a public body with detailed statutory standards is required.

## *LAW ENFORCEMENT EAVESDROPPING AND WIRETAPPING*

The Commission feels that eavesdropping and wiretapping by

law enforcement officials should be permitted in order to effectively combat the menace of organized crime but only if such wiretapping and eavesdropping is limited by the standards set forth by the United States Supreme Court. This means that law enforcement eavesdropping and wiretapping should be strictly supervised by the judicial branch of the government and applications for eavesdropping and wiretapping must conform to the provisions of the Fourth Amendment.

The statute proposed by the Commission has revised the Massachusetts law to require strict compliance with the probable cause provisions of the Fourth Amendment. Wiretapping and eavesdropping by police officials will be limited to specified conversations and "continuous searches" will be prohibited. Applications for warrants must be made to a Justice of the Superior Court. The time limit of searches and warrants are strictly defined and are limited as required by the directions given in the decided cases.

In addition, the Commission's statute has centralized administration of police and law enforcement wiretapping in the Superior Court. As this is the chief trial court of the Commonwealth, and the tribunal which hears the most serious cases, it is hoped that there will be a better uniformity in the application of the law.

In addition, it is required that the original recording or tape or a sworn statement of the complete contents of the intercepted communication if there is no tape, be returned to the judge who issued the warrant so that he may determine whether or not the warrant has been executed in a manner in which he authorized it. This additional judicial supervision, it is hoped, will eliminate the possibility of abuse and add to the public's confidence in the manner in which this statute is employed by law enforcement officials.

The original tapes and statements are to be kept in the custody of the Chief Justice of the Superior Court. This provision has been added to eliminate the possibility of any editing between the time the tapes are obtained and the time they must be made available for trial. We feel this also aids the prosecutor in that the procedure eliminates false charges by a defendant that the tape had been edited or changed. It was felt by the Commission that this added control over the fruits of an interception will be a means of insuring the competence of the public in the system of judicially au-

Date Filed 1/22/2024 6:34 PM
Superior Court - Essex
Docket Number 2277CV01000



thorized eavesdropping and wiretapping and a means of promoting confidence in the fairness of a trial in which such evidence is used.

The right of a defendant to be confronted with the evidence against him is protected in that any wiretap information to be used against the defendant must be shown to him prior to the trial.

Provisions are made for annual reports to the legislature describing the extent of wiretapping and eavesdropping conducted during the previous year by the judicial officers of the Commonwealth authorized to seek warrants for wiretapping under this bill.

*PROHIBITION OF WIRETAPPING AND EAVESDROPPING BY THE PUBLIC*

The Commission is of the opinion that wiretapping and eavesdropping other than by law enforcement officers should be strictly prohibited. The present Massachusetts laws have been revised in our proposed act to strictly prohibit electronic eavesdropping and wiretapping of other persons' conversations without permission. Penalties have been increased and the crimes have been more strictly defined. Possession of illegal wiretapping devices has been made a crime under circumstances evincing an intent to illegally use those devices.

*PRIVATE INVESTIGATORS*

It is the Commission's view that private investigators should not be permitted to make use of eavesdropping and wiretapping devices. To this end, the Commission recommends the amendment of the Act regulating private investigators in order that their licenses may be revoked in the event they are convicted of any violation of the new wiretapping and eavesdropping statutes.

Respectfully submitted,

MARIO UMANA, *Chairman*
ELLIOT B. COLE
WILLIAM P. HOMANS, JR.
ANDRE R. SIGOURNEY
NORMAN S. WEINBERG
PHILLIP K. KIMBAL

Date Filed 1/22/2024 6:34 PM
Superior Court - Essex
Docket Number 2277CV01000



*Commission Member Elliot B. Cole concurrs in the Commission's legislative recommendations.*
*Commission Member William P. Homans, Jr., joins Mr. Cole.*

I join the majority of the Commission in their legislative recommendations, but I must add some comments on those provisions dealing with law enforcement eavesdropping and with "all-party consent".

In the past I have been a vigorous opponent of provisions which would permit law enforcement eavesdropping and wiretapping. This opposition has been based on both Constitutional considerations and the lack of information available on law enforcement eavesdropping practices.

Today I know no more than I did when I was appointed to this Commission about the practices and effectiveness of law enforcement eavesdropping. Indeed these two elements — practices and effectiveness — appear to be the most secret of all law enforcement secrets. As Prof. Alan Westin states in his treaties *Privacy and Freedom.*

> 'There has never been a detailed presentation by any law-enforcement agency, in terms that the educated public could judge, to prove this view (the need for wiretapping and eavesdropping in criminal investigations) on a crime-by-crime analysis.'

This Commission and Attorney General Richardson agree on the necessity of an annual report by the Commonwealth's prosecuting attorneys stating their activities in this area on a crime-by-crime basis. The secrecy of the past I believe is both destructive and alien to a democracy. It is the inclusion of the reporting provision, which was first put forth by the Attorney General, that has caused me to re-evaluate my previous opposition to law enforcement eavesdropping. It is to be hoped that the information contained in the prosecutor's annual report will provide a basis for the General Court to better evaluate its policy on law enforcement eavesdropping.

The other basis of my opposition to law enforcement eavesdropping has been its constitutionality. This controversy has raged within and without the United States Supreme Court since 1927 when that Court first decided the constitutionality of wiretapping.

In 1961, in *Silverman v. United States,* the Court indicated that eavesdropping under certain circumstances was violative of the Constitution. But recently, in *Berger v. New York,* the Court stated its tolerance for law enforcement eavesdropping given specific standards for judicial regulation. This Commission's Bill, as our Report explains, would implement those standards. If the Bill is not Constitutional and is enacted, I am sure that the Court will have an opportunity to so state.

The Commission have decided to recommend to the General Court a provision which would require the consent of all parties to a conversation before that conversation could be recorded or otherwise electronically 'intercepted'. It is the 'all-party consent' provision which is the essence of any protection which the law can afford the public.

But this view has not gained universal acceptance, and is opposed by those who see the possibility — what some of their number describe as the necessity — to secretly record the words of another. These advocates would maintain 'one-party consent', the present statutory standard. Their argument is based on the assumption that any participant in a conversation has the authority to divulge or publish the words and thoughts of his conversational partner. This assumption is ludicrous. If those participating in the conversation were mute and could only communicate via the written word, each participant would himself determine who had access to his thoughts. Furthermore, he could legally enforce his right by enjoining unauthorized publication of those thoughts.

The proponents of 'one-party consent' frequently justify their position by stating that every persons runs the risk that his confidence in the person to whom he is talking may be betrayed. This of course is true. But instead of protecting the individual from being betrayed, these proponents would legitimatize the betrayal. At the very least the individual should himself be able to determine who should have authority to mechanically reproduce his words.

Again I should like to rely on Prof. Westin. The first of the following passages is taken from that section of his book dealing with legislative provisions which would further protect the individual's right of privacy.

'(I) would *not* include an exception to allow wiretapping or eavesdropping with the consent of one party. This has been the basic charter for private-detective taps and bugs, for "owner" eavesdropping on facilities that are used by members of the public, and for much free-lance police eavesdropping. Allowing eavesdropping with the consent of one party would destroy the statutory plan of limiting the offenses for which eavesdropping by device can be used and insisting on a court-order process. And as technology enables every man to carry his micro-miniaturized recorder everywhere he goes and allows every room to be monitored surreptitiously by built-in equipment, permitting eavesdropping with the consent of one party would be to sanction a means of reproducing conversation that could choke off much vital social exchange.' (Emphasis in the original.)

The following passage is excerpted, with permission, from a letter to me from Prof. Westin on the advisability of incorporating the 'one-party consent' provision into a new Massachusetts statute.

'Based on the studies I have made on wiretapping and eavesdropping practices throught the United States, as reflected in my recently published book, *Privacy and Freedom* (New York: Atheneum, 1967), I believe such a provision is unwise. From a public policy standpoint, we must consider what would be the impact in the coming decade, when electronic monitoring devices spread even more widely in the population, of each citizen having to know that the person to whom he is talking in the office, at home, in his car, on the street, in a store, etc., may be recording the conservation with full legal authority and without having to have such clandestine recording authorized in advance by any judicial agency. I think this creates a serious inhibition on freedom of communication, especially because the person who chooses to speak frankly and freely in personal conversation runs the risk, under such a situation, that what he says in jest, with a wink, for its shock value on his conversational partner, or to test some belief held by the other party, can now be produced in evidence against him, with all the impact on the grand or petit jury, that we know such a tape recording exerts. In my book, I call this type of physical surveillance "surveillance by reproducibility." I quote from a 1958 opinion of the Bundesgerechtshof, West Germany's highest civil court, the dangers of this type of surveillance. The court states that "freedom and self-determination" are "essential to the development of [the individual's] personality." This freedom includes the right to decide for himself "whether his words shall be accessible solely to his conversation partner, to a particular group, or to the public, and, *a fortiori*, whether his voice shall be fixed on a record." The opinion notes further that the individual expresses his personality in private conversation, and has a right to do so freely, without distrust and suspicion. This expression of personality would disappear if individuals feared that their conversations, even their tone of voice, were secretly being recorded. Men would no longer be able to engage in natural, free discussion.'

Date Filed 1/22/2024 6:34 PM
Superior Court - Essex
Docket Number 2277CV01000



It is clear to me that the passage of the Commissions Bill will protect the privacy of the individual while providing law enforcement agencies with the tools they feel are necessary in this technological era.

ELLIOT B. COLE
WILLIAM P. HOMANS, JR.

Date Filed 1/22/2024 6:34 PM
Superior Court - Essex
Docket Number 2277CV01000



The Commonwealth of Massachusetts

## APPENDIX A

AN ACT REPEALING THE PRESENT WIRETAPPING AND EAVESDROPPING STATUTES AND PROVIDING A NEW STATUTE IN RELATION THERETO.

*Be it enacted by the Senate and House of Representatives in General Court assembled, and by the authority of the same, as follows:*

Sections 99, 100, 101 and 102 of Chapter 272 of the General Laws are hereby repealed and the following section substituted in place thereof.

*Section 99.* Interception of wire and oral communications.

A. *Definitions.* As used in this section —

1. The term "wire communication" means any communication made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception.

2. The term "oral communications" means speech, except such speech as is transmitted over the public air waves by radio or other similar device.

3. The term "intercepting device" means any device or apparatus which is capable of transmitting, receiving, amplifying, or recording a wire or oral communication other than a hearing aid or similar device which is being used to correct subnormal hearing to normal.

4. The term "interception" means to secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire or oral communication through the use of any intercepting device by any person other than a person given prior authority by all parties to such communication.

5. The term "contents," when used with respect to any wire or oral communication, means any information concerning the identity of the parties to such communication or the existence, contents, substance, purport, or meaning of that communication.

Date Filed 1/22/2024 6:34 PM
Superior Court - Essex
Docket Number 2277CV01000



6. The term "aggrieved person" means any individual who was a party to an intercepted wire or oral communication or who was named in the warrant authorizing the interception or whose personal or property interest or privacy were invaded in the course of an interception.

7. The term "designated offense" shall include the offenses of murder, armed robbery, prostitution, kidnapping, extortion, suborning perjury, jury tampering, aggravated assault, arson, bribery, gambling, larceny from the commonwealth, lending of money or thing of value in violation of the laws of the commonwealth, any offense involving commercial dealings in narcotics and any violation of the provisions of this section, being an accessory to any of the foregoing offenses, and conspiracy or attempt to commit any of the foregoing offenses.

8. The term "investigative or law enforcement officer" means any officer of the United States, a state or a political subdivision of a state, who is empowered by law to conduct investigations of, or to make arrests for the designated offenses, any attorney authorized by law to participate in the prosecution of such offenses.

9. The term "judge of competent jurisdiction" means any justice of the superior court of the commonwealth.

10. The term "chief justice" means the chief justice of the superior court of the commonwealth.

11. The term "issuing judge" means any justice of the superior court who shall issue a warrant as provided herein or in the event of his disability or unavailablity any other judge of competent jurisdiction designated by the chief justice.

12. The term "communication common carrier" means any person engaged as a common carrier in providing or operating wire communication facilities.

13. The term "person" means any individual, partnership, association, joint stock company, trust, or corporation, whether or not any of the foregoing is an officer, agent or employee of the United States, a state, or a political subdivision of a state.

14. The terms "sworn" or "under oath" as they appear in this section shall mean an oath or by affirmation or a state-

Date Filed 1/22/2024 6:34 PM
Superior Court - Essex
Docket Number 2277CV01000



ment subscribed to under the pains and penalties of perjury.

15. The terms "applicant attorney general" or "applicant district attorney" shall mean the attorney general of the Commonwealth or a district attorney of the Commonwealth who has made application for a warrant pursuant to this section.

16. The term "exigent circumstances" shall mean the showing of special facts to the issuing judge as to the nature of the investigation for which a warrant is sought pursuant to this section which require secrecy in order to obtain the information desired from the interception sought to be authorized.

B. *Offenses*

1. *Interception, oral communications prohibited.*

Except as otherwise specifically provided in this section any person who —

willfully commits an interception, endeavors to commit an interception, or procures any other person to commit an interception or endeavor to commit an interception of any wire or oral communication shall be fined not more than ten thousand dollars, or imprisoned in the state prison not more than five years, or imprisoned in a jail or house of correction not more than two and one half years, or both so fined any given one such imprisonment.

Proof of the installation of any intercepting device by any person under circumstances evincing an intent to commit an interception which is not authorized or permitted by this section, shall be prima facie evidence of a violation of this subparagraph.

2. *Editing of tape recordings in judicial proceeding prohibited*

Except as otherwise specifically provided in this section any person who —

willfully edits, alters or tampers with any tape, transcription or recording of oral or wire communication by any means, or endeavors to edit, alter or tamper with any tape, transcription or recording of oral or wire communication by any means with the intent to present in any judicial proceeding or proceeding under oath, or who presents such recording or permits such recording to be presented in any

judicial proceeding or proceeding under oath, without fully indicating the nature of the changes made in the original state of the recording, shall be fined not more than ten thousand dollars ($10,000.00) or imprisoned in the state prison not more than five years or imprisoned in a jail or house of correction not more than two years or both so fined and given one such imprisonment.

3. *Disclosure, or use of wire or oral communications prohibited.*

Except as otherwise specifically provided in this section any person who —

a. willfully discloses or endeavors to disclose to any person the contents of any wire or oral communication, knowing that the information was obtained through interception; or

b. willfully uses or endeavors to use the contents of any wire or oral communication, knowing that the information was obtained through interception shall be guilty of a misdemeanor punishable by imprisonment in a jail or a house of correction for not more than two years or by a fine of not more than five thousand dollars or both.

4. *Disclosure of contents of applications, warrants, renewals, and returns prohibited.*

Except as otherwise specifically provided in this section any person who —

willfully discloses to any person, any information concerning or contained in, the application for, the granting or denial of orders for interception, renewals, notice or return on an ex parte order granted pursuant to this section, or the contents of any document, tape, or recording kept in accordance with paragraph M, shall be guilty of a misdemeanor punishable by imprisonment in a jail or a house of correction for not more than two years or by a fine of not more than five thousand dollars or both.

5. *Duty to report to law enforcement officers.*

An employee of any communication common carrier who has knowledge obtained during the course of such employment of any violation of this section and willfully fails to

Date Filed 1/22/2024 6:34 PM
Superior Court - Essex
Docket Number 2277CV01000



report such knowledge within seven days to a district attorney general shall be guilty of a misdemeanor punishable by imprisonment in a jail or a house of correction for not more than two years or by a fine of not more than five thousand dollars or both.

6. *Possession of Interception Devices Prohibited.*

A person who possesses any intercepting device under circumstances evincing an intent to commit an interception not permitted or authorized by this Section, or a person who permits an intercepting device to be used or employed for an interception not permitted or authorized by this Section, or a person who possesses an intercepting device knowing that the same is intended to be used to commit an interception not permitted or authorized by this Section, shall be guilty of a misdemeanor punishable by imprisonment in a jail or house of correction for not more than two years or by a fine or not more than five thousand dollars or both.

The installation of any such intercepting device by such person or with his permission or at his direction shall be prima facie evidence of possession as required by this subparagraph.

7. Any person who permits or on behalf of any other person commits or endeavors to commit, or any person who participates in a conspiracy to commit or to endeavor to commit, or any accessory to a person who commits a violation of subparagraphs 1 through 6 of paragraph B of this section shall be punished in the same manner as is provided for the respective offenses as described in subparagraph 1 through 6 of paragraph B.

C. *Exemptions.*

1. *Permitted interception of wire or oral communications.*
It shall not be a violation of this section —

a. for an operator of a switchboard, officer, agent or employee of any communication common carrier, whose facilities are used in the transmission of a wire communication, to intercept, to disclose to officers, agents or employees of a communication common carrier, or use that communication in the normal course of his employment

Date Filed 1/22/2024 6:34 PM
Superior Court - Essex
Docket Number 2277CV01000



if such interception shall be made necessary in order to repair or test equipment and lines of such communication common carrier, or

b. for persons to possess an office intercommunication system which is used in the ordinary course of their business or to use such office intercommunication system in the ordinary course of their business.

c. for investigative and law enforcement officers of the United States of America to violate the provisions of this section if acting pursuant to authority of the laws of the United States and within the scope of their authority.

d. for any person duly authorized to make specified interceptions by a warrant issued pursuant to paragraph E of this section.

2. *Permitted disclosure and use of intercepted wire or oral communications.*

a. Any investigative or law enforcement officer, who, by any means authorized by this section, has obtained knowledge of the contents of any wire or oral communication, or evidence derived therefrom may disclose such contents or evidence in the proper performance of his official duties.

b. Any investigative or law enforcement officer, who, by any means authorized by this section has obtained knowledge of the contents of any wire or oral communication, or evidence derived therefrom, may use such contents or evidence in the proper performance of his official duties.

c. Any person who has obtained, by any means authorized by this section, knowledge of the contents of any wire or oral communication, or evidence derived therefrom, may disclose such contents while giving testimony under oath or affirmation in any criminal proceeding in any court of the United States or of any state or in any Federal or state grand jury proceeding.

d. The contents of any wire or oral communication intercepted pursuant to a warrant in accordance with the provisions of this section, or evidence derived therefrom,

Date Filed 1/22/2024 6:34 PM
Superior Court - Essex
Docket Number 2277CV01000



may otherwise be disclosed only upon a showing of good cause before a judge of competent jurisdiction.

D. *Warrants: when issuable.*

A warrant may issue only upon sworn application in conformity with this section and upon a showing by the applicant that there is probable cause to believe that the designated offense has been, is being, or is about to be committed and that evidence of the commission of such an offense may thus be obtained or that information which will aid in the apprehension of a person who the applicant has probable cause to believe has committed, is committing, or is about to commit a designated offense may thus be obtained.

E. *Warrants: application.*

1. Application. The attorney general, any assistant attorney general specially designated by the attorney general, any district attorney, or any assistant district attorney specially designated by the district attorney may apply ex parte to a judge of competent jurisdiction for a warrant to intercept wire or oral communications. Each application ex parte for a warrant must be in writing, subscribed and sworn to by the applicant authorized by this subparagraph.

2. The application must contain the following:

a. A statement of facts establishing probable cause to believe that a particularly described designated offense has been, is being, or is about to be committed; and

b. A statement of facts establishing probable cause to believe that oral or wire communications of a particularly described person will constitute evidence of such designated offense or will aid in the apprehension of a person who the applicant has probable cause to believe has committed, is committing, or is about to commit a designated offense; and

c. That the oral or wire communication of the particularly described person or persons will occur in a particularly described place and premises or over particularly described telephone or telegraph lines; and

d. A particular description of the nature of the conversation sought to be overheard; and

e. A statement that the conversation sought is material to a particularly described investigation or prosecution and that such conversation is not legally privileged; and

f. a statement of the period of time for which the interception is required to be maintained. If practicable, the application should designate hours of the day or night during which the conversation may be reasonably expected to occur. If the nature of the investigation is such that the authorization for the interception should not automatically terminate when the described conversation has been first obtained, the application must specifically state facts establishing probable cause to believe that additional conversation of the same nature will occur thereafter; and

g. If it is reasonably necessary to make a secret entry upon a private place and premises in order to install an intercept device to effectuate the purposes of the application, a statement to such effect; and

h. If a prior application has been submitted or a warrant previously obtained for eavesdropping, a statement fully disclosing the date, court, applicant, execution, results, and present status thereof; and

8. If there is good cause for requiring the postponement of service pursuant to paragraph K, subparagraph 2, a description of such circumstances, including reasons for the applicant's belief that secrecy is essential to obtaining the evidence or information sought.

3. Allegations of fact in the application may be based either upon the personal knowledge of the applicant or upon information and belief. If the applicant personally knows the fact alleged, it must be so stated. If the facts establishing such probable cause are derived in whole or part from the statements of persons other than the applicant, the sources of such information and belief must be either disclosed or described, and the application must contain facts establishing the existence and reliability of any informant and, the reliability of the information supplied by

Date Filed 1/22/2024 6:34 PM
Superior Court - Essex
Docket Number 2277CV01000



him. The application must also state, so far as possible, the basis of the informant's knowledge or belief. If the applicant's information and belief is derived from tangible evidence or recorded oral evidence, a copy or detailed description thereof should be annexed to or included in the application. Affidavits of persons other than the applicant may be submitted in conjunction with the application if they tend to support any fact or conclusion alleged therein. Such accompanying affidavits may be based either on personal knowledge of the affiant or information and belief, with the source thereof, and reason therefor, specified.

F. *Warrants; application to whom made.*

Application for a warrant authorized by this section must be made to a judge of competent jurisdiction in the county where the interception is to occur, or the county where the office of the applicant is located, or in the event that there is no judge of competent jurisdiction sitting in said county at such time, to a judge of competent jurisdiction sitting in Suffolk County; except that for these purposes the office of the attorney general shall be deemed to be located in Suffolk County.

G. *Warrants; application how determined.*

1. If the application conforms to paragraph E, the issuing judge may examine under oath any person for the purpose of determining whether probable cause exists for the issuance of the warrant pursuant to paragraph D. A verbatim transcript of every such interrogation or examination must be taken and a transcription of the same sworn to by the stenographer shall be attached to the application and be deemed a part thereof.

2. If satisfied that probable cause exists for the issuance of a warrant the judge may grant the application and issue a warrant in accordance with paragraph H. The application and an attested copy of the warrant shall be retained by the issuing judge and transported to the chief justice of the superior court in accordance with the provisions of paragraph M of this section.

3. If the application does not conform to paragraph E,

Date Filed 1/22/2024 6:34 PM
Superior Court - Essex
Docket Number 2277CV01000



or if the judge is not satisfied that probable cause has been shown sufficient for the issuance of a warrant, the application must be denied.

H. *Warrants; form and content.*

A warrant must contain the following:

1. The subscription and title of the issuing judge; and

2. The date of issuance, the date of effect, and termination date which in no event shall exceed thirty days from the date of effect. The warrant shall permit interception for a period not to exceed fifteen days. If physical installation of a device is necessary, the thirty day period shall begin upon the date of installation. If the effective period of the warrant is to terminate upon the acquisition of particular evidence or information, the warrant shall so provide; and

3. A particular description of the person and the place, premises or telephone or telegraph line upon which interception may be conducted; and

4. A particular description of the nature of the conversation to be obtained by the interception including a statement of the designated offense to which it relates; and

5. An express authorization to make secret entry upon a private place or premises to install a specified intercepting device, if such entry is necessary to execute the warrant; and

6. A statement providing for service of the warrant pursuant to Paragraph K, except that if there has been a finding of good cause shown requiring the postponement of such service, a statement of such finding together with the basis therefor must be included and an alternative direction for deferred service pursuant to Paragraph K, Subparagraph 2.

I. *Warrants; renewals.*

1. Any time prior to the expiration of a warrant or a renewal thereof, the applicant may apply to the issuing judge for a renewal thereof with respect to the same person, place, premises or telephone or telegraph line. An application for renewal must incorporate the warrant sought

to be renewed together with the application therefor and any accompanying papers upon which it was issued. The application for renewal must set forth the results of the interceptions thus far conducted. In addition it must set forth present grounds for extension in conformity with paragraph E.

2. Upon such application, the judge may issue an order renewing the warrant and extending the authorization for a period not exceeding fifteen (15) days from the entry thereof. Such an order shall specify the grounds for the issuance thereof. An attested copy of the order shall be retained by the issuing judge to be transported to the chief justice in attendance with the provisions of sub-paragraph M of this section.

J. *Warrants; manner and time of execution.*

1. A warrant may be executed pursuant to its terms anywhere in the Commonwealth.

2. Such warrant may be executed by the authorized applicant personally or by any investigative or law enforcement officer of the Commonwealth designated by him for the purpose.

3. The warrant may be executed according to its terms during the hours specified therein, and for the period therein authorized, or a part thereof. The authorization shall terminate upon the acquisition of the conversations described in the warrant. Upon termination of the authorization in the warrant and any renewals thereof, the interception must cease at once, and any device installed for the purpose of the interception must be removed as soon thereafter as practicable. Entry upon private premises for the removal of such device is deemed to be authorized by the warrant.

K. *Warrants; service thereof.*

1. Prior to the execution of a warrant authorized by this section or any renewal thereof, an attested copy of the warrant or the renewal, must, except as otherwise provided in subparagraph 2 of paragraph K, be served upon a person whose conversation is to be obtained, and if an inter-

Date Filed 1/22/2024 6:34 PM
Superior Court - Essex
Docket Number 2277CV01000



cepting device is to be installed upon the owner, lessee, or occupant of the place or premises, or upon the subscriber to the telephone or owner or lessee of the telegraph line described in the warrant.

2. If the application specially alleges exigent circumstances requiring the postponement of service and the issuing judge finds that such circumstances exist, the warrant may provide that an attested copy thereof may be served within thirty days after the expiration of the warrant or, in case of any renewals thereof, within thirty days after the expiration of the last renewal; except that upon a showing of important special facts which set forth the need for continued secrecy to the satisfaction of the issuing judge, said judge may direct that the attested copy of the warrant be served on such parties as are required by this section at such time as may be appropriate in the circumstances but in no event may he order it to be served later than two (2) years from the time of expiration of the warrant or the last renewal thereof. In the event that the service required herein is postponed in accordance with this paragraph, in addition to the requirements of any other paragraph of this section, service of an attested copy of the warrant shall be made upon any aggrieved person who should reasonably be known to the person who executed or obtained the warrant as a result of the information obtained from the interception authorized thereby.

3. The attested copy of the warrant shall be served on persons required by this section by any investigative or law enforcement officer of the commonwealth authorized to serve criminal process by leaving the same at his usual place of abode, or in hand, or if this is not possible by mailing the same by certified or registered mail to his last known place of abode. A return of service shall be made to the issuing judge, except, that if such service is postponed as provided in sub-paragraph 2 of paragraph K, and in such event to the chief justice. The return of service

shall be deemed a part of the return of the warrant and attached thereto.

L. *Warrant; return.*

Within twenty-one days after termination of the warrant or the last renewal thereof, a return must be made thereon to the judge issuing the warrant by the applicant therefor, containing the following:

a. a statement of the nature and location of the communications facilities, if any, and premises or places where the interceptions were made; and

b. The periods of time during which such interceptions were made; and

c. the names of the parties to the communications intercepted if known; and

d. the original recording of the oral or wire communications intercepted, if any; and,

e. a verbatim transcript of any recording made pursuant to the warrant attested under the pains and penalties of perjury as a true transcript of the oral or wire communications contained in the recording to the best ability of the person who so transcribed it and a statement attested under the pains and penalties of perjury by each person who heard oral or wire communications as a result of the interception authorized by the warrant which was not recorded stating everything that was overheard to the best of their recollection at the time of the execution of the statement.

M. *Custody and Secrecy of papers and recordings made pursuant to a warrant.*

1. The contents of any wire or oral communication intercepted pursuant to a warrant issued pursuant to this section shall, if possible be recorded on tape or wire or other similar device. Duplicate recordings may be made for use pursuant to subparagraphs 2(a) and (b) of paragraph C for investigations. Upon examination of the return and a determination that it complies with this section, the issuing judge shall forthwith order that the application, warrant, all renewal orders and the return thereof

be transmitted to the chief justice by such persons as he shall designate. Their contents shall not be disclosed except as provided in this section. The application, warrant, the renewal order and the return or any one of them or any part of them may be transferred to any trial court, grand jury proceeding of any jurisdiction by any law enforcement or investigative officer designated by the chief justice upon application made as provided herein and a trial justice may allow them to be disclosed in accordance with paragraph C, subparagraph 2, or paragraph N or any other applicable provision of this section.

The application, warrant, all renewal orders and the return, shall be stored in a secure place which shall be designated by the chief justice, to which access shall be denied to all persons except the chief justice or such court officers or administrative personnel of the court as he shall designate.

2. Upon application to the chief justice,

a. ex parte by the applicant district attorney or his successor or the applicant attorney general or his successor, the application, warrant, renewal orders, or return, shall be made available for their use under such conditions as will comply with the provisions of this section.

b. ex parte by any person or his attorney who is named in the application, warrant, any renewal orders or the return or who can offer evidence sufficient to show that his oral or wire communications have been intercepted pursuant to a warrant, an attested copy of the application, and statement, which are a part of the return as required pursuant to a warrant, an attested copy of the application, and statement, which are a part of the return as required by this section shall be made available without charge upon oath or affirmation by the person or his attorney that the items described herein or any one of them, or information contained therein is to be used in any criminal proceeding in any jurisdiction where the person is a defendant.

c. to any other person who shall have need in the interest of justice and in accordance with the purposes of this act,

Date Filed 1/22/2024 6:34 PM
Superior Court - Essex
Docket Number 2277CV01000



the original or copies of the application, warrant, renewal orders, and return, or all of them under such terms or conditions as the chief justice shall determine. Such application shall be upon oath or affirmation by the person and shall state sufficient reliable facts to enable the chief justice to determine from its face the interception sought. In the event the application does not so state such facts the chief justice shall deny it. In the event the application shall state such sufficient facts the chief justice shall cause the applicant district attorney or attorney general or their their respective successors to be notified of the application pursuant to this sub-paragraph. If the district attorney or attorney general submit to the chief justice a statement in writing upon oath or affirmation within thirty (30) days following notification stating that the information sought must remain secret for investigative purposes, the chief justice must refuse to grant an application pursuant to this sub-paragraph. In such event he may require the district attorney or attorney general to designate a date at which time the information may be made available to the person making the application in the event the chief justice shall determine that the person has need in the interests of justice and in accordance with the purposes of this act. Such a date may not exceed three (3) years from the date of an application pursuant to the sub-paragraph nor may it exceed thirty (30) days prior to the date of destruction of the respective document or items as required by this section whichever is sooner. Determination of the need of the person applying pursuant to this sub-paragraph shall be in the discretion of the chief justice.

d. Except as provided by other provisions of this section, in no event until an application is granted pursuant to sub-paragraphs a, b, c of paragraph M by the chief justice or upon order granted by the Supreme Judicial Court after appeal, shall the person applying pursuant to sub-paragraphs a, b or c of Paragraph M or any person on his behalf at any time or for any reason have any right

Date Filed 1/22/2024 6:34 PM
Superior Court - Essex
Docket Number 2277CV01000



nor be granted permission to examine any of the applications, warrants, renewals orders, or returns in the custody of the chief justice.

e. In addition to any other appeal provided by law, failure by the chief justice to grant an application pursuant to sub-paragraph a, b, or c of Paragraph M may be appealed within twenty (20) days to the Supreme Judicial Court in Suffolk County by the applicant or his attorney. The granting of an application pursuant to sub-paragraph c of section M may be appealed by the applicant district attorney or attorney general or their respective successors within twenty (20) days to the supreme judicial court in Suffolk County. The supreme judicial court may take additional testimony, may order the production for its use of any of the applications, renewal orders, warrants or returns or copies thereof as it may require for determination of the issues by it.

f. Any violation of the terms and conditions of the chief justice or any order of the supreme judicial court pursuant to the authority granted in Paragraph M or the conditions set forth in Paragraph M shall be punished as a criminal contempt of court in addition to any other punishment authorized by law.

g. The application, warrant, renewal and return shall be kept for a period of five (5) years from the date of the issuance of the warrant or the last renewal thereof at which time they shall be destroyed by a person designated by the chief justice. Notice of the destruction shall be given to the applicant attorney general or his successor or the applicant district attorney or his successor and upon a showing of good cause to the chief justice, the application, warrant, renewal, and return may be kept for such additional period as the chief justice shall determine but in no event longer than the longest period of limitation for any designated offense specified in the warrant, after which time they must be destroyed by a person designated by the chief justice.

N. *Introduction of evidence.*

Notwithstanding any other provisions of this section or any order issued pursuant thereto, in any criminal trial where the Commonwealth intends to offer in evidence any portions of the contents of any interception or any evidence derived therefrom, the defendant shall be served with a complete copy of each document and item which make up each application, warrant, renewal orders, and return pursuant to which the information was obtained, except that he shall be furnished a copy of any recording instead of the original. The service must be made at the arraignment of the defendant or, if a period in excess of thirty (30) days shall elapse prior to the commencement of the trial of the defendant, the service may be made at least thirty (30) days before the commencement of the criminal trial. Service shall be made in hand upon the defendant or his attorney by any investigative or law enforcement officer of the Commonwealth authorized to serve criminal process. Return of the service required by this sub-paragraph including the date of service shall be entered into the record of trial of the defendant by the Commonwealth and such return shall be deemed prima facie evidence of the service described therein. Failure by the Commonwealth to make such service at the arraignment or if delayed at least thirty (30) days before the commencement of the criminal trial shall render such evidence illegally obtained for purposes of the trial against the defendant and such evidence shall not be offered nor received at the trial notwithstanding the provisions of any other law or Rules of Court.

P. *Suppression of evidence.*

Any aggrieved person who is a defendant in a criminal trial in a court of the commonwealth may move to suppress the contents of any intercepted wire or oral communication or evidence derived therefrom, for the following reasons:

1. That the communication was unlawfully intercepted.

Date Filed 1/22/2024 6:34 PM
Superior Court - Essex
Docket Number 2277CV01000



2. That the communication was not intercepted in accordance with the terms of this section.

3. That the application or renewal application fails to set forth facts sufficient to establish probable cause for the issuance of a warrant.

4. That the interception was not made in conformity with the warrant.

5. That the evidence sought to be introduced was illegally obtained.

6. That the warrant does not conform to the provisions of this section.

Q. *Civil Remedy.*

Any aggrieved person whose oral or wire communications were intercepted, disclosed or used except as permitted or authorized by this section or whose personal or property interests or privacy were violated by means of an interception except as permitted or authorized by this section shall have a civil cause of action against any person who so intercepts, discloses or uses such communications or who so violates personal, property or privacy interest and shall be entitled to recover from any such person —

1. actual damages but not less than liquidated damages computed at the rate of $100 per day for each day of violation or $1000, whichever is higher;

2. punitive damages; and

3. a reasonable attorney's fee and other litigation disbursements reasonably incurred. Good faith reliance on a warrant issued under this section shall constitute a complete defense to an action brought under this paragraph.

R. *Annual Report of Interceptions of the General Court.*

On the second Friday of January, each year, the attorney general and each district attorney shall submit a report to the general court stating (1) the number of applications made for warrants during the previous year, (2) the name of the applicant, (3) the number of warrants issued, (4) the effective period for the warrants, (5) the number and designation of the offenses for which those applications

Date Filed 1/22/2024 6:34 PM
Superior Court - Essex
Docket Number 2277CV01000


were sought, and for each of the designated offenses the following: (a) the number of renewals, (b) the number of intercepts made during the previous year, (c) the number of indictments believed to be obtained as a result of those intercepts, (d) the number of criminal convictions obtained in trials where interception evidence was introduced. This report shall be a public document and be made available to the public at the offices of the attorney general and district attorneys. In the event of failure to comply with the provisions of this paragraph any person may compel compliance by means of an action of mandamus.

S. *Severability.*

If any provision of this section or application thereof to any person or circumstances is held invalid, such invalidity shall not affect other provisions of applications of the section which can be given effect without the invalid provision or aplication, and to this end the provisions of this section are declared to be severable.

Date Filed 1/22/2024 6:34 PM
Superior Court - Essex
Docket Number 2277CV01000



## The Commonwealth of Massachusetts

### APPENDIX B

CHAPTER 166 OF THE GENERAL LAWS IS HEREBY AMENDED BY ADDING THE FOLLOWING AFTER SECTION 43:

*Section 44. Service Observing, Interception.* — Service observing of telephone lines conducted by telephone companies for the purpose of determining the quality of transmission or for any other purpose shall cease as soon as a connection is established between the users of the telephone line. In the event of any interception or any recording of the conversation of users by any telephone company to repair or test the equipment and lines of the company, the telephone company shall cause to be emitted a "beep" tone or other identifying signal in order to inform the users of the interception or recording. The Department of Public Utilities shall require that each telephone company file annually with it a complete report of all service observing activity carried on by any telephone company to indicate the number of calls monitored during the previous calendar year, all rules and regulations of the telephone companies for such service observing, a complete description of the location of each service observing facility, the number of employees engaged in service observing and a statement of the expenses incurred for such service observing to include salaries, cost of capital equipment and maintenance and replacement costs of such equipment, and administrative expenses incurred. The Department shall also conduct periodic inspections at least semi-annually of such service observing to determine whether or not it complies with this section and the accuracy of the reports filed. In the event of the failure of any telephone company to comply with this section the Department of Public Utilities must order that the activity cease until compliance is obtained and may seek an enforcement order in the Superior Court of Suffolk County.

Date Filed 1/22/2024 6:34 PM
Superior Court - Essex
Docket Number 2277CV01000



SENATE — No. 1132. [June 1968.

The Commonwealth of Massachusetts

APPENDIX "C"

AMENDMENT TO THE PRIVATE DETECTIVE BUSINESS ACT

Chapter 147, Section 25 of the General Laws is amended by adding the following sentences after the last sentence of the first paragraph:

"No person convicted of a violation of Section 99 or 99A of Chapter 272 of the General Laws shall be granted a license and any license previously granted to such person shall be revoked."

Date Filed 1/22/2024 6:34 PM
Superior Court - Essex
Docket Number 2277CV01000

Date Filed 1/22/2024 6:34 PM
Superior Court - Essex
Docket Number 2277CV01000

Date Filed 1/22/2024 6:34 PM
Superior Court - Essex
Docket Number 2277CV01000

44.4

COMMONWEALTH OF MASSACHUSETTS

ESSEX, ss

TRIAL COURT DEPARTMENT
SUPERIOR COURT

JOHN DOE, individually and on behalf of all other similarly situated,

Plaintiff,

v.

EMERSON HOSPITAL,

Defendant.

DOCKET NO. 2277CV01000D

**NOTICE OF FILING AND SUPERIOR COURT RULE 9A LIST OF DOCUMENTS FILED**

In accordance with Superior Court Rule 9A, the following documents, together with this Notice, have been filed with the Civil Clerk's Office:

1. Defendant Emerson Hospital's Notice of Filing and Superior Court Rule 9A List of Documents Filed;
2. Emerson Hospital's Motion to Report;
3. Emerson Hospital's Memorandum in Support of Its Motion to Report;
4. Plaintiff's Opposition to Defendant's Motion to Report; and
5. Emerson Hospital's Reply in Support of Its Motion to Report.

Filed 1/22/2024 6:34 PM
rior Court - Essex
et Number 2277CV01000



Dated: January 22, 2024

Respectfully submitted,

EMERSON HOSPITAL

By: */s/ Emyr T. Remy*

Emyr T. Remy, BBO# 704156
**SHOOK, HARDY & BACON L.L.P.**
One Federal Street, Suite 2540
Boston, MA 02110
Tel.: (617) 531-1411 | Fax: (617) 531-1602
remy@shb.com

Justin R. Donoho (IL # 6299667)
Tara D. Kennedy (IL # 6320909)
**SHOOK, HARDY & BACON L.L.P.**
111 South Wacker Drive, Suite 4700
Chicago, IL 60606
Tel: (312) 704-7713 | F: (312) 558-1195
jdonoho@shb.com
tkennedy@shb.com

Alfred J. Saikali (FL # 0178195)
**SHOOK, HARDY & BACON L.L.P.**
201 South Biscayne Blvd., Suite 3200
Miami, Florida 33131
Tel: (305) 358-5171 | Fax: (305) 358-7470
asaikali@shb.com

Tammy B. Webb (CA # 227593)
**SHOOK, HARDY & BACON L.L.P.**
555 Mission Street, Suite 2300
San Francisco, CA 94105
Tel: (415) 544-1900 | Fax: (415) 391-0281
twebb@shb.com

Jessica N. Wahl (CA # 321887)
**SHOOK, HARDY & BACON L.L.P.**
2049 Century Park East, Suite 3000
Los Angeles, CA 90067
Tel: (424) 324-3477 | Fax: (424) 204-9093
jwahl@shb.com

1/22/2024 6:34 PM
ourt - Essex
mber 2277CV01000

## CERTIFICATE OF SERVICE

I, Emyr T. Remy, hereby certify that on January 22, 2024, a true copy of the above document was served by email upon:

J. Tucker Merrigan (BBO# 681627)
Victoria Santoro (BBO# 679120)
Erin E, McHugh (BBO# 703701)
Ryan M. Hawkins (BBO# 686289)
Thomas T. Merrigan (BBO# 343480)
**SWEENEY MERRIGAN LAW**
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com
rmh@sweeneymerrigan.com
tom@sweeneymerrigan.com

Alex Dravillas (*PHV6299686IL*)
**KELLER POSTMAN LLC**
150 N. Riverside Plaza, Suite 4100
Chicago, IL 60606
Tel: (312) 741-5220
adj@kellerpostman.com

Foster C. Johnson (*PHV24076463TX*)
David Warden (*PHV20856750TX*)
Nathan Campbell (*PHV24097455TX*)
Carl J. Gustafson (*PHV24125261TX*)
Justin C. Kenney (BBO# 706672)
**AHMAD, ZAVITSANOS & MENSING, P.C.**
1221 McKinney St., Suite 3460
Houston, TX 77010
Tel: (713) 655-1101
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com
cgustafson@azlaw.com
jkenney@azalaw.com

Sara Aguiniga (*PHV1029692DC*)
**KELLER POSTMAN LLC**
1100 Vermont Ave., 12th Flr
Washington, DC 20005
Sara.aguiniga@kellerpostman.com

*/s/ Emyr T. Remy*
Emyr T. Remy

Date Filed 1/22/2024 6:48 PM
Superior Court - Essex
Docket Number 2277CV01000

44.2

**COMMONWEALTH OF MASSACHUSETTS**

**ESSEX, S.S.** **SUPERIOR COURT**

| | | |
|---|---|---|
| **JOHN DOE, Individually and on Behalf of All Others Similarly Situated,** | § | **C.A. No. 2277CV01000** |
| | § | |
| ***Plaintiffs,*** | § | |
| | § | A TRUE COPY, ATTEST |
| **v.** | § | |
| | § | DEPUTY ASS'T. CLERK |
| **EMERSON HOSPITAL** | § | |
| | § | |
| ***Defendant.*** | § | |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO STAY**

Defendant's Motion to Stay is the latest in a series of maneuvers Defendant has pursued to evade its discovery obligations in this case. Only a few weeks after this Court denied Defendant's motion to dismiss in a thoroughly reasoned Memorandum, Defendant asks the Court to use its inherent powers to halt this case based on appeals of different cases involving different parties in a different court. Defendant asserts that these appeals of the *Vita v. Beth Israel Deaconess Medical Center*, No. 2384CV00480-BLS1, and *Vita v. New England Baptist Hospital*, No. 2384CV00857-BLS1 cases (the "Wiretap Appeals"), which have already been addressed by this Court, "*may*" require the Court to revisit its ruling on *one* of Plaintiff's five claims and staying the proceedings "*could potentially*" save Defendant money. But Defendant's suggested approach ignores that the Court's inherent power to stay a case is meant to achieve the orderly and expeditious disposition of cases, not provide a lifeline to prevent discovery in the hopes of decreased expenses and a better settlement position.

Beyond conjecture of what *might* happen in the Wiretap Appeals, which could not resolve the entirety of Plaintiff's case in any event, Defendant fails to show how a stay in this case

preserves judicial economy. Indeed, Defendant wastes judicial resources by relitigating issues the Court *just decided* in its ruling on Defendant's motion to dismiss. Defendant's purported burden with continuing the proceedings—needing to complete relevant discovery—is no different than the burden of any party in any lawsuit after denial of a motion to dismiss. Meanwhile, a stay would delay Plaintiff's ultimate relief on their claims even though all of their claims have survived a motion to dismiss and only one of them is implicated in the Wiretap Appeals. No matter the outcome in the Wiretap Appeals, most of Plaintiff's claims will go forward—the proceedings should as well. As such, Defendant's motion to stay should be denied.

**BACKGROUND**

Plaintiff and the putative class members are Defendant's patients who used the hospital's websites to obtain healthcare, including searching for care specific to their own medical conditions and locating their healthcare providers. While Plaintiff reasonably believed that his sensitive medical information would be protected by Defendant, his communications turned out to have been anything but confidential. Hidden from Plaintiff's view, Defendant had installed software throughout its websites that collected Plaintiff's personal health care and private information and shared it with Facebook, Google, and other third parties. These third parties used Plaintiff's health information to target them with advertisements, including through social media. In return, those third parties gave Defendants' access to valuable marketing tools, including Google Analytics and Facebook Meta Pixel.

Plaintiffs' claims in this lawsuit, which all flow from these common facts, are (1) Wiretapping in violation of G.L. c. 272, § 99; (2) Invasion of Privacy in Violation of G.L. c. 214, § 1B; (3) Breach of Fiduciary Duty and/or Common Law Duty of Confidentiality; (4) Breach of Implied Contract, and (5) Unjust Enrichment. On November 22, 2023, this Court denied

Defendant's motion to dismiss all of these claims. Ex. M, Order on Motion to Dismiss at 3-12. In denying Defendant's motion related to the Wiretap Act claim only, the Court acknowledged that both *Vita* cases were reported to the Appeals Court to clarify whether, on a motion to dismiss, "the Wiretap Statute applies to the internet tracking alleged" in that suit. *Id.* at 12.[1] Unlike Plaintiffs' suit, both *Vita* cases state a single claim for violations of the Massachusetts Wiretap Act. Mot. Ex. A at 1, Mot. Ex. B at 1.

On December 20, 2023, less than thirty days after the court ruled on Emerson's motion to dismiss, and *just one day* before a scheduled hearing on Plaintiff's motion to compel Emerson to resolve its significant discovery deficiencies, Emerson served the present motion to stay the proceedings. Curiously, counsel for Plaintiff who had conferred with Emerson and informed Emerson's counsel that they would be attending that hearing, were not sent the email containing Defendant's motion papers, and thus—in violation of Rule 9A(b)—were not properly served with the motion before it was discussed in court. And notably, Emerson also filed a "notice" of its impending motion with the Court, thereby evading its obligation to provide Plaintiff with an opportunity to respond in writing before the stay issue was raised. *See* Mass. R. Civ. Pro. 9(c). Emerson proceeded to advocate for a stay at the hearing, December 21, 2023 hearing, which resulted in Plaintiff's pending discovery motion not being taken up at that time. Discovery and all other proceedings in this case have since remained in limbo.

---

[1] Defendant's motion erroneously states that *Vita v. Beth Israel Deaconess Medical Center* was reported for appeal on November 31, 2023. Mot. at 2. Both decisions were reported for appeal on October 31, 2023, three weeks before the motion to dismiss in this case was denied. Mot. Ex. A, Ex. B., Opinion.

## ARGUMENT

"[A] motion to stay proceedings is ordinally a matter addressed to the sound discretion of the trial judge." *Travenol Lab'ys, Inc. v. Zotal, Ltd.*, 394 Mass.95, 100 (1985). In exercising discretion, the burden of demonstrating that a stay is warranted in the case on the movant. *See, e.g., Landis v. North American Co.*, 57 S.Ct. 163, 166-167, 299 U.S. 248, 256-257 (1936) (noting that **even if** in "all likelihood" another case would resolve or simplify all questions of fact and law, still "the burden of making out the justice and wisdom of a departure from the beaten track lay heavily on the petitioners, suppliants for relief"). When deciding whether Defendants have met their burden, "the Court must balance the hardship of a stay to all the parties." *Havan-Oroomieh v. Massachusetts State Lottery Com'n,* 1998 WL 1285611, at *1 (Mass. Super. 1998) (denying motion to stay trial court action in favor of administrative proceedings).

Contrary to Defendant's contentions, stays are ***not*** "commonly granted when a pending decision could clarify the parties' liability." Mot. at 7. Indeed, *not one published case* Defendant cites in its motion involves staying an action in favor of waiting for a decision in an action with unrelated parties over one party's opposition. *See Sommer v. Maharaj*, 451 Mass. 615, 616 (2008) (examining grant of interim relief that did not involve a stay); *Director of Div. of Employment Sec. v. Town of Mattapoisett*, 392 Mass. 858, 861 (1984) (denying appellate relief where town brought a collateral attack regarding a teacher's unemployment benefits while the teacher's entitlement to benefits was the subject of a pending appeal); *Town of Danvers v. Wexler Const. Co., Inc.*, 12 Mass.App.Ct. 160, 166 (Mass. App. Ct. 1981) (staying third-party complaint in deference to the arbitration agreement between the counter-plaintiff and the third-party defendant where issues in complaint were "peripheral to, and [could] be handled separately from" main litigation); *Town of Rockland v. Massachusetts Civil Service Com'n*, No. 2084-CV0-1354, 2021 WL 46246586, at *1

(Mass. Super. Oct. 1, 2021) (discussing the parties jointly moving to stay proceedings); *Van Emden Management Corp. v. Marsh & McLennan Companies*, 2005 WL 2456737, at **2–3 (Mass.Super. 2005) (staying state court action in light of pending Federal Multidistrict Litigation with same defendant and similar claims); *Williams v. Fedex Ground Package Sys. Inc.*, No. 062344C, 2007 WL 3013266, at *1 (Mass. Super. Sept. 20, 2007) (same); *Landis v. North American Co.*, 57 S.Ct. 163, 166, 299 U.S. 248, 255 (U.S. 1936) (affirming stay of two actions against the then-Chairman of the Securities and Exchange Commission where four dozen others were already pending against the Chairman, all challenging the constitutionality of the same statute); *Sterk v. Redbox Automated Retail, LLC*, 672 F.3d 535, 536-37 (7th Cir. 2012) (certifying interlocutory appeal and deciding issue in same matter).

Indeed, the only *unpublished* case Defendant cites involves an opposed stay, *Alves v. BJ's Wholesale Club, Inc.*, Case No. 2284CV02509, a case in a very different posture than this case. Mot. at Ex. F. The *Alves* case was one of a number of actions pending in the BLS that was specifically identified in the *Vita* decision as raising the same Wiretapping issues and being an appropriate subject of a stay pending appeal. The same is not true of this case, which raises additional and materially different claims.[2]

A motion to stay is considered pending interlocutory review in the case itself, a trial court's "discretionary decisionmaking" traditionally looks to the specific facts and circumstances of the case in front of it and, in doing so, "allows for a balancing of all relevant interests" to determine whether a stay is proper. *Coinbase, Inc. v. Bielski*, 599 U.S. 736, 747-48, 143 S.Ct. 1915, 1923-24

[2] Plaintiff's counsel did not oppose a stay only in the pending *Cape Cod* case only light of the BLS's clearly expressed intent to pause that case as well pending resolution of the Wiretap Appeals. This is a far cry from what Defendants are asking this Court to do here: impose a stay over the objection of a party due to the pending appeal of a different and unrelated case.

(2023) (Jackson, J., dissenting). In those instances, a Court's determination of whether a case should be stayed has been "distilled into consideration of four factors: (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434, 129 S. Ct. 1749, 1761 (2009) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776, 107 S.Ct. 2113, 2119 (1987)). Given that Defendant's motion asks this Court to stay the entire case pending an appeal with unrelated parties, these factors—at a minimum—demonstrate that the Defendant fails to meet its heavy burden in requesting a complete stay of this action. *Cf. Landis* 57 S. Ct. at 255 (noting that "the suppliant for a stay must make out a clear case of hardship or inequity in being required to go forward," as "only in rare circumstances will a litigant in one cause be compelled to stand aside while a litigant in another settles the rule of law that will define the rights of both.").[3]

**A. This Court has already considered the pending Wiretap Appeals and opted not to stay this case.**

As a preliminary matter, this Court already commented on the pending Wiretap Appeals in its Order denying Defendant's Motion to Dismiss, stating that "depending on the outcome of the appellate review, the court's ruling here may have to be revisited." Op. at 12 (specifying potential revision of ruling pending appeal only with regards to Plaintiff's Wiretap Act claim). This Court did not, however, opt to stay this case at time.

Without meeting criteria for reconsideration, Defendant is essentially asking this court to reconsider its Order and finding that it may have to revisit just one part of the Court's opinion on

---

[3] *Holder* postdates all Massachusetts state court decisions Defendant cites related to considerations of judicial economy in opposed motions to stay proceedings.

the Motion to Dismiss and instead impose a mandatory stay of the entire action. Typically, such relief would need to be considered on a motion for reconsideration under Superior Court Rule 9D. ("A Motion for Reconsideration shall be based on (1) newly discovered evidence that could not be discovered through the exercise of due diligence before the original motion was filed; (2) a change of relevant law; or (3) a particular and demonstrable error in the original ruling or decision."). Defendant may not appeal to have the Court's "inherent powers" do an end run around the requirements of that rule. *See Caisey v. Hewitt*, No. 15-P-1749, 2017 WL 318965 (Mass. App. Ct. Jan. 23, 2017) (finding that "since the defendant made no claim of any change in circumstances" after the court's prior orders, "the judge could not have found any change to justify vacating the orders at that time"). Moreover, nothing has changed that justifies this Court revisiting its prior decision. No briefs have been submitted in the Wiretap Appeals matters, and the Supreme Judicial Court has not decided whether to grant a pending application for Direct Appellate Review in the Wiretap Appeals. In the absence of any significant developments in the law and facts underlying the Court's prior decision, and without even a suggestion by Defendant that the decision not to impose a stay was in error, there is no basis for undoing though Defendant's motion. *Cf.* Super. Ct. R. 9D.[4]

**B. Defendant's rehashing of legal arguments from its motion to dismiss do not make a strong showing that Defendant is likely to succeed on the merits.**

"The United States Supreme Court has ruled that the moving party's likelihood of success on the merits is one of the most important parts" of a determination of whether a proceeding should be stayed. *Rouleau v. Dep't of Developmental Servs.*, No. 14-CV-5385-F, 2014 WL 6697229, at

[4] Further, as the notice of intent to file the motion to stay came almost a month after the Court's opinion and order, Defendant would have missed the ten day deadline specified in Rule 9D for motions to reconsider.

*4 (Mass. Super. Aug. 10, 2014) (citing *Holder*, 556 U.S. at 434). This factor requires the movant to make a "strong showing" of its likelihood to succeed on the merits; a "mere possibility of relief" is not enough. *Holder*, 556 U.S. at 434. Further, "the existence of a single meritorious claim does not satisfy the standard for the issuance of a stay. It is the combination of likelihood of success and degree of irreparable injury that matters." *Tretheway v. Tretheway*, No. 21-P-839, 2022 WL 1275403, at *2 (Mass. App. Ct. Apr. 29, 2022).

Defendant argues that the Wiretap Appeals "ought" to determine several interpretative questions about the Massachusetts Wiretap Act. Mot. at 4-5. But Defendant cites little to no authority as to *why* these are likely to be decided in its favor. Perhaps this is because every Superior Court to consider similar issues to those in the Wiretap Appeals has determined that Defendant's actions fall within the scope of the Wiretap Act. *See* Mot. Ex. C at Ex. C (listing all known cases involving adtech software such as the tracking technologies Defendant used—none of the cases were dismissed on Defendant's proposed interpretation of the Wiretap Act).

This point is illustrated by comparing Defendant's questions surrounding statutory terms in its motion with the Court's recent opinion and order denying Defendant's motion to dismiss. For example, this Court has already examined (and rejected) Defendant's arguments that the interceptions of patient information in this case were not "secret" under the facts alleged in Plaintiffs' complaint. *Compare* Mot. at 5 *with* Op. on Mot. to Dismiss at 11-12. Indeed, Defendant's motion to stay asks *separate questions* than those pending in the Wiretap Appeals. *See* Mot. at 5 (arguing that Plaintiffs are not "aggrieved persons" under the Wiretap Act despite no question to that effect in the Wiretap Appeals). Further, Defendant's contentions that its use of tracking technologies to monetize patients' interactions with Defendant is a "legitimate business purpose" is without merit. And, while covered in the Wiretap Appeals, the legitimate business

purpose issue in this case is unlikely to be resolved by (1) an examination of *another* party's business conduct; (2) without discovery in Defendant's own actions. *See* Mot. at 6. Given the particular facts of this case and the Court's recent determinations that—barring a major shift in Massachusetts privacy law—those allegations plausibly state a claim for relief point indicate that Defendant (by proxy) is not likely to succeed on the merits of its Wiretap Act interpretation arguments made here.

**C. The normal costs of discovery and litigation are not irreparable injuries that warrant staying this action.**

Next, courts consider whether the moving party will suffer irreparable harm should the court decline to stay the case. *Holder*, 556 U.S. at 434. A movant must also make a "strong showing" that such irreparable harm will be suffered for this balancing factor to be in favor of staying the action. Ordinarily, motions to stay "must be denied" when a movant does not make a strong showing of either factor. *Arkansas Teacher Retirement Sys v. State Street Bank & Trust Co.*, 527 F.Supp.3d 40, 46 (D. Mass. 2021).

Defendant does not identify any irreparable injury it will suffer should the court fail to stay this case. Although Defendant claims it will be "prejudiced" by burdensome discovery should the stay be denied, courts have rejected "lengthy and costly discovery" as a reason to issue a stay pending an appeal in an unrelated matter, especially when that appeal will "simply prolong the inevitable that will need to occur" for other claims not covered in the other suit. *Hennessy v. Brookdale Senior Living Comms., Inc.*, 1784CV0421BLS2, at *6 (Aug. 1, 2018); *see also Sourcing Unlimited, Inc. v. Elektroteks, LLC*, No. 20-CV-11955-ADB, 2022 WL 504022, at *2 (D. Mass. Feb. 18, 2022) ("The Court is sympathetic to Elektroteks and Guler's reasonable position that costly discovery should not be undertaken if an action will ultimately be dismissed, but it is unlikely that all claims will be resolved by the verdict in the State Action and a stay would, at

minimum, simply prolong the inevitable discovery that will need to occur for those claims."). Defendant's similar assertions that will be harmed because it "is not large and does not have in-house counsel" and that discovery might "need to be redone" depending on the outcome of the Wiretap Appeals are not bases to find irreparable harm, nor are they meaningfully connected to any of the relatively standard discovery that Plaintiffs intend to conduct in the matter. Mot. at 8.

Here, the "time-consuming and resource-intensive" discovery Defendant complains of in its motion is not limited to the Wiretap Claim, which is the *only* claim that has a possibility of being impacted by the specific questions proposed for review in the Wiretap Appeals. And Defendant's argument that any alleged harm caused by hypothetical future motions for summary judgment and class certification that may need to have certain portions of the analysis informed by the results of the Wiretap Appeals ignore that in order to reach the stage of litigation when those motions are typically filed, discovery is necessary. Allowing a stay in this matter would necessarily halt discovery and the entire case progress, whereas denying the stay will allow discovery to proceed on all of Plaintiffs' claims while the Wiretap Appeals address specific legal questions related to only one of Plaintiffs' claims. Thus, Defendant has failed to establish *any* irreparable harm that will result from failing to stay the present case.

**D. Defendant's attempt to litigate class certification before discovery does not support's its request for a stay.**

Likewise, Defendant's arguments regarding class certification are speculative, premature, and irrelevant for this Court's analysis of whether this case should be stayed. Defendant appears to assert that because it projects (without support) there will be individualized issues related only to Plaintiff's Wiretapping claim, this Court should not reach class certification before the Wiretapping Appeals are resolved. This argument is illogical. If Defendant is correct, Plaintiff would face a *higher burden* to obtain class certification with the Wiretapping claim still in this

case than without it. This is because the "individualized issues" Defendant contends are present in the Wiretap Act claim would not have to be factored into a predominance analysis in the hypothetical scenario where the Wiretap claim is no longer viable. So, even if all of Defendant's predictions came to pass, there is no scenario where this Court would have to walk back a decision granting class certification. Rather, the proper way to address any decision from the Appeals Court would be on a motion for summary judgment *after* class certification.

Moreover, at this stage of the litigation, there is no basis to think that *any* of Defendant's unsupported assertions will prove correct. The most that Defendant can do is offer a list of *hypothetical* fact issues that may or may not present in this case and may or may not have legal significance at class certification. *See* Mot. at 4-5 (listing strings of hypothetical fact questions that may, but not necessarily will, need to be resolved on future summary judgment or class certification motions). The reason why this list of hypothetical questions is so extensive is simple—Defendant continues to refuse to provide any meaningful discovery to Plaintiff, leaving these questions – among more relevant factual issues related –unanswered.

If Defendant wants to actually litigate these issues, the proper way to do so is by engaging in discovery so the parties and this Court may address them on a fuller record. Staying all proceedings prevents this from happening in the foreseeable future.

**E. A stay that indefinitely cuts off discovery on all five of Plaintiffs' claims will substantially injure Plaintiffs.**

"The third requirement essentially asks the [movant] to establish convincingly that the stay is not likely to damage any other party *or* that if injury results, it will be trivial." James W. Smith & H.B. Zobel, Mass. Rules Practice § 62.3, at 409 (2d ed. 2007).

It is important to recognize the extent of the stay that Defendants seek. No briefs have been filed in the Wiretap Appeals currently pending before the Appeals Court. Nor has the Supreme

Judicial Court issued a decision on the pending application for Direct Appellate Review. Review of decisions in civil matters published by the Supreme Judicial Court and Appeals Court in December 2023 suggests that any final decision in the Wiretap Appeals is likely to be a year or more away. *See In the Matter of the Estate of Frances R. Mason,* SJC-13439 (December 13, 2023); (timely appeal from March 4, 2022 decision allowing motion to strike lien and claim on estate); *Conrad Murphy v. Commissioner of Correction & Others*, SJC-13437 (December 14, 2023) (timely appeal from November 2022 order granting motion for judgment on the pleadings); *DaSilva Enterprises LLC v. Gina Wright,* No. 22-P-799 (December 5, 2023) (appeal from May 26, 2022 order of single justice striking appeal). Granting a stay to wait on progress in an unrelated case with unrelated parties substantially delays the Plaintiff's ability to achieve adjudication of their claims, and thus substantially injures Plaintiff.

The substantial stay that Defendants seek will prejudice Plaintiff by denying them access to this discovery and witness testimony. It is well recognized that delay of a civil proceeding carries with it the "risk of irremediable loss of witness memories, and perhaps a lesser, but still concerning, risk of witness unavailability for deposition or trial, whether through death, disability, or other circumstance." *Del Valle v. Bechtel Corp.*, 2008 WL 4107472, at *1 (Mass. Super. 2008). That is certainly true in this case, where the class that Plaintiff seeks to represent is made up of patients; a particularly vulnerable group. To make up for the gaps in witnesses' memories that will inevitably open over the course of the requested stay, Plaintiff will have to seek additional and alternative sources of evidence from the Defendants. This will only increase the discovery burden on *all* parties, and Plaintiff in particular, while hindering the ability of Plaintiff and the putative Class to prove their case. *See id.* at **1, 5 (Denying motion to stay where "[t]he resulting prejudice to the plaintiffs' ability to prove their claims would be substantial.").

Defendant also relies on the argument that "Plaintiff has not suffered any actual injury in this case"—which the Court rejected in its opinion on Defendant's motion to dismiss and expressly found would be better addressed on a "fuller record"—to assert that Plaintiff will not be injured by the imposition of a stay. Op. at 5. This stay seeks to prevent that "fuller record" from being developed for as long as possible, thus causing Plaintiff to sit without definitive resolution of *any* of its claims for the longest time possible. And, indeed, one thing that "fuller record "will reflect is the total patient population whose data was monetized and otherwise used by Defendant, including likely revealing that many of the putative class members in this class are senior citizens or individuals facing severe health issues for whom time is of the essence to have their privacy rights vindicated.

Finally, Defendant's laser focus on what actions Plaintiff may take in the *future* to minimize the ability of entities like Defendant from using tracking technologies to mine their health information for monetization and other uses that are solely for Defendant's benefit ignores that those solutions are no remedy for the violations that have *already happened*. Delaying resolution of these claims through stayed proceedings will materially delay justice for past injuries, causing substantial injury to Plaintiff.

**F. Because the extent of Defendant's privacy violations across a large number of Massachusetts residents, the public interest is best served by denying Defendant's motion to stay the proceedings.**

The final factor looks to whether a stay in this case would disserve the public interest. *Holder*, 556 U.S. at 434. It would. Defendant has monetized and used its patients' sensitive information for years all for its own gain (with few repercussions). Allowing Defendant even more time to hide the full extent of its actions fails the members of the public that put their trust in Emerson as their healthcare provider.

Defendant's assertions that discovery and case progress for these claims should essentially be ignored because the Wiretap Act claim is the "main money claim" rings hollow for the countless Massachusettsans whose patient information was monetized and otherwise used for Defendant's gain without their knowledge and the substantial justice that will come from enjoining Defendant from placing these tracking technologies on their healthcare websites again. Further, that the Court and the Parties have yet to consider what monetary damages are available on any of Plaintiffs' claims, and likely will not be able to do so until discovery is conducted in his matter. In essence, Defendant relies on the assumption that the Wiretap Act will be the "main claim" or "main money claim" in the litigation without proceeding to discovery to reveal what specific facts influence the importance of all claims in Plaintiffs' First Amended Complaint.

Finally, the delays caused by Defendant's requested stay will likely deprive many class members of their ability to *ever* receive relief. The sobering reality is that with a class made up of many thousands of people, it is likely that some of those class members will pass away before this litigation can be resolved. Many more will never live to see relief if this case is unnecessarily delayed by a year or more pending the Wiretap Appeals. Although this risk would be present in any class action facing a potential stay, it is heightened here where the class members are patients of a medical provider.

## CONCLUSION

For all of these reasons, Plaintiffs request that the Court deny Defendants' Motion.

Filed 1/22/2024 6:48 PM
rior Court - Essex
:et Number 2277CV01000

January 12, 2024

Respectfully submitted,

**COUNSEL FOR PLAINTIFFS JOHN DOE, JAMES DOE, AND JANE DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED**

/s/ Justin Kenney
J. Tucker Merrigan, BBO# 681627
Thomas T. Merrigan, BBO# 343480
Erin E. McHugh, BBO# 703701
Ryan Hawkins, BBO# 686289
SWEENEY MERRIGAN LAW
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
tom@sweeneymerrigan.com
emchugh@sweeneymerrigan.com
rmh@sweeneymerrigan.com

Foster Johnson (*admitted pro hac vice)*
Texas Bar No. 24076463
David Warden (*admitted pro hac vice)*
Texas Bar No. 20856750
Nathan Campbell (*admitted pro hac vice)*
Texas Bar No. 24097455
Carl J. Gustafson (*admitted pro hac vice*)
Texas Bar No. 24125261
Justin Kenney, BBO# 706672
AHMAD, ZAVITSANOS & MENSING, PLLC
1221 McKinney, Suite 2500
Houston, Texas 77010
(713) 655-1101 -Phone
(713) 655-0062 – Fax
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com
cgustafson@azalaw.com

ed 1/22/2024 6:48 PM
Court - Essex
Number 2277CV01000

jkenney@azalaw.com

Alex Dravillas (*admitted pro hac vice*)
**KELLER POSTMAN LLC**
150 N. Riverside Plaza, Suite 4100
Chicago, IL 60606
(312) 741-5226
ajd@kellerpostman.com

Sara Aguiniga (*admitted pro hac vice*)
**KELLER POSTMAN LLC**
1100 Vermont Ave, 12th Floor
Washington, DC 20005
sara.aguiniga@kellerpostman.com

**CERTIFICATE OF SERVICE**

I, Foster C. Johnson, hereby certify that on January 12, 2024, in accordance with Superior Court Rule 9A, served the Plaintiffs' Opposition to Defendants' Motion to Stay on all counsel of record, via electronic mail to the following parties of interest:

Emyr Remy
SHOOK, HARDY & BACON L.L.P.
One Federal Street, Suite 2540
Boston, MA 02110
Tel: (617) 531-1411 | Fax: (617) 531-1602
remy@shb.com

Alfred J. Saikali (*pro hac vice*)
SHOOK, HARDY & BACON L.L.P.
201 South Biscayne Blvd., Suite 3200
Miami, Florida 33131
Tel: (305) 358-5171 | Fax: (305) 358-7470
asaikali@shb.com

Tammy B. Webb (*pro hac vice*)
SHOOK, HARDY & BACON, L.L.P.
555 Mission Street, Suite 2300
San Fransicso, CA 94105
Tel: (415) 544-1900 | Fax: (415) 391-0281
Tbwebb@shb.com

led 1/22/2024 6:48 PM
or Court - Essex
: Number 2277CV01000

Jessica N. Wahl *(pro hac vice)*
SHOOK, HARDY & BACON L.L.P.
2049 Century Park East, Suite 3000
Los Angeles, CA 90067
Tel: (424) 285-8330 | Fax: (424) 204-9093
jwahl@shb.com

Jenn O. Hatcher *(pro hac vice)*
SHOOK, HARDY & BACON L.L.P.
2555 Grand Blvd
Kansas City, MO 64108
Tel: (816) 474-6550 | Fax: (816) 421-5547
Jhatcher@shb.com

Justin R. Donoho *(pro hac vice)*
SHOOK, HARDY & BACON, L.L.P.
111 South Wacker Drive
Chicago, IL 60606
Tel: (312) 704-7713 | Fax: (312) 558-1195
jdonoho@shb.com

*/s/ Foster C. Johnson*
AHMAD, ZAVITSANOS & MENSING, PLLC
1221 McKinney, Suite 2500
Houston, Texas 77010
(713) 655-1101 -Phone
fjohnson@azalaw.com

Date Filed 1/22/2024 6:48 PM
Superior Court - Essex
Docket Number 2277CV01000

44.3

COMMONWEALTH OF MASSACHUSETTS

| | | |
|---|---|---|
| ESSEX, ss | ) | TRIAL COURT DEPARTMENT SUPERIOR COURT |
| JOHN DOE, individually and on behalf of all others similarly situated, | ) | |
| Plaintiff, | ) | DOCKET NO. 2277CV01000D |
| v. | ) | |
| EMERSON HOSPITAL, | ) | |
| Defendant. | ) | |

**EMERSON HOSPITAL'S REPLY**
**<u>IN SUPPORT OF ITS MOTION TO STAY</u>**

A TRUE COPY, ATTEST

DEPUTY ASS'T. CLERK

Date Filed 1/22/2024 6:48 PM
Superior Court - Essex
Docket Number 2277CV01000

Emerson respectfully submits this Reply in further support of its Motion to Stay, pursuant to Mass. Super. Ct. R. 9A(a)(3), to show, as described below:

- Plaintiff argues that Emerson's Motion to Stay is a motion for reconsideration and is governed by Superior Court Rule 9D. Neither is true. This is the first time Emerson has moved to stay pending appeal or has raised the arguments in its motion. (Section I, below.)
- On January 17, 2023, the Supreme Judicial Court accepted direct appellate review of the *Vita* appeals. Any requested stay will be significantly shorter than initially anticipated. (Section II.)
- Plaintiff argues that this Court should apply a severe legal standard that applies to stays of executions of judgments, not stays of legal proceedings. No case cited by Plaintiff supports such. Instead, a stay is warranted under both of the following two standards: (1) the standard applicable to stays of legal proceedings, which requires considerations of judicial efficiency and balancing competing interests; and (2) the precedent set by all ten other cases to consider whether to order a stay pending the *Vita* appeals. (Section III.)

## I. This Court's November 22, 2023 Order Did Not Consider Whether to Stay This Matter Pending the *Vita* Appeals.

Plaintiff argues that Emerson's Motion to Stay seeks "reconsideration" of the Court's statement in its November 22, 2023 Order denying Emerson's motion to dismiss that "depending on the outcome of appellate review [in the *Vita* appeals], the court's ruling here [on the motion to dismiss] may need to be revisited." Opp. at 6–7. Not so. Emerson does not seek "reconsideration" of the Court's denial of its motion to dismiss, or of any ruling on any other Emerson motion. Instead, Emerson moves to stay pending the *Vita* appeals for the first time. This Court neither considered such a motion nor ruled on one previously, at any time. Nor does the Court's November 22, 2023 Order reflect that the Court *sua sponte* considered and refused to stay this case pending

the *Vita* appeals. In addition, even if this Court had considered the issue *sua sponte* at any time, this Court should not apply Superior Court Rule 9D, as Plaintiff argues. Opp. at 7. That rule limits arguments to certain ones beyond those "raised in the original motion." There was no prior motion to stay any proceedings pending appeal in the *Vita* cases before the original one being briefed here.

## II. A Stay Is Supported by Recent Court Orders, Including From the Supreme Judicial Court.

On January 17, 2024, the Supreme Judicial Court accepted direct appellate review of the *Vita* appeals, bypassing the Court of Appeals. Exhibit M. This important recent development means appellate briefing in Massachusetts' highest court will conclude by approximately the end of March 2024. Thus, any stay would likely be much shorter than "a year or more" (Opp. at 12) as Plaintiff argued before the direct appeal was allowed.

Other recent orders also support a stay, including orders staying similar Massachusetts cases pending the *Vita* appeals in all ten cases that have decided this issue. *See* Section III, bulleted list, below. Four of these ten stay orders post-date the Court's November 22, 2023 Order, as does the Supreme Judicial Court's allowance of direct appeal, such that all of the foregoing should be considered even if Rule 9D applied (it does not, *see* Section I, above). And, notably, all ten stay orders pre-date the Supreme Judicial Court allowing direct appellate review. Now, with the length of any stay shortened significantly, the prior ten stay orders have even more force and provide even stronger reason to order a stay here.

## III. The Legal Standard Plaintiff Asks the Court to Apply Is Incorrect. Under the Applicable Standards, a Stay Is Warranted.

Plaintiff argues that Emerson has the burden to show: (1) the *Vita* appeals are "likely to succeed"; (2) Emerson will be "irreparably injured" absent a stay; (3) a stay will not "substantially injure" Plaintiff; and (4) the "public interest" favors a stay. Opp. at 6–14. This legal standard and these factors address whether to stay execution of a judgment, not whether to stay legal

proceedings. The only cases Plaintiff cites in favor of using this standard and these factors are cases that did not involve any stay of legal proceedings, and instead involved staying execution of a judgment. *See Nken v. Holder*, 556 U.S. 418, 436 (2009) (staying order to remove alien from United States); *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987) (staying order directing release of habeas petitioner); *Rouleau v. Dep't of Dev. Servs.*, 2014 WL 6697229, at *1 (Mass. Super. Aug. 10, 2014) (denying stay of order to transfer patient to different facility); *Trethewey v. Trethewey*, 101 Mass. App. Ct. 1103, 2022 WL 1275403, at *1 (2022) (denying stay of order dividing marital property); *Arkansas Tchr. Ret. Sys. v. State St. Bank & Tr. Co.*, 527 F. Supp. 3d 40, 45–47 (D. Mass. 2021) (denying stay of distribution of funds pursuant to award of attorneys' fees).[1]

Instead, this Court should employ the following two standards, both of which support a stay. First, the Court should follow the standard employed for <u>whether to stay legal proceedings</u>, which is to (A) consider the "economy and time and effort for [the Court], for counsel, and for the litigants"; and (B) "weigh competing interests and maintain an even balance." *Williams v. Fedex*

---

[1] Plaintiff also relies on three cases that applied other inapplicable standards and which otherwise do not apply because they presented circumstances not applicable here. *See Hennessy v. Brookdale Senior Living Communities, Inc.*, 2018 WL 4427020, at **6–7 (Mass. Super. Aug. 1, 2018) (not involving a motion to stay; denying a motion to report under Rule 64 because "[plaintiff] is more than sixty-five years old and therefore is entitled by statute to a 'speedy trial'" under G.L.c. 231, § 59F); *Sourcing Unlimited, Inc. v. Elektroteks, LLC*, 2022 WL 504022, at *1 (D. Mass. Feb. 18, 2022) (applying the "prior-pending-action doctrine," stating: "When analyzing whether to stay an action under the doctrine, courts consider two factors: '(1) [whether] there exists an identity of issues between the two actions and (2) [whether] the controlling issues in the later-filed action will be determined in the earlier-filed action'"); *Del Valle v. Bechtel Corp.*, 2008 WL 4107472, at *1 (Mass. Super. July 29, 2008) (addressing whether to stay civil proceedings that "threaten the integrity of criminal proceedings," applying the following test agreed to by the parties in that case: "The Court must weigh five competing interests: (1) The interest of the plaintiffs in proceeding expeditiously with this litigation or any particular aspect of it, and the potential prejudice to plaintiffs of a delay; (2) The burden which any particular aspect of the proceedings may impose on defendants; (3) The convenience of the court in the management of its cases, and the efficient use of judicial resources; (4) The interests of persons not parties to the civil litigation; and (5) The interest of the public in pending civil and criminal litigation").

*Ground Package Sys., Inc.*, 2007 WL 3013266, at *1 (Mass. Super. Sept. 20, 2007) (quoting *Landis v. North American Co.*, 299 U.S. 248, 254–55 (1936)).[2] Those factors are supported here, for the reasons stated in Emerson's Memorandum in support ("Mem.") at 3–8, and further supported by the Supreme Judicial Court's allowance of direct appellate review (Ex. M). *See* Mass. R. App. P. 11(a) (applications for direct review granted only for "questions of first impression or novel questions of law[;]" constitutional questions; or "questions of such public interest that justice requires a final determination by the full Supreme Judicial Court").

In addition, this Court should follow the precedent set by all cases which have considered whether to stay similar cases pending the *Vita* appeals, including cases, like this one, that have claims in addition to the Wiretap Act claim. Some of those stay orders were addressed in Emerson's Mem. at 9–10. Others have issued since then. Every single Court to have determined whether to stay a case like this one pending the *Vita* appeals has determined that it should. Here is the full known list, as of this filing:

- *Doe v. Boston Med. Ctr. Corp.*, No. 2384CV00326 (Suffolk Super. Nov. 10, 2023) (staying case alleging wiretap and invasion of privacy claims, finding it "substantially similar" to *Vita* cases on appeal);
- *Doe v. The Children's Hosp. Corp.*, No. 2384CV00411 (Suffolk Super. Nov. 10, 2023) (staying case alleging wiretap claim, finding it "substantially similar" to *Vita* cases);
- *Alves v. BJ's Wholesale Club, Inc.*, No. 2284CV02509 (Suffolk Super. Dec. 14, 2023 (staying case alleging wiretap and invasion of privacy claims, over plaintiff's opposition);

[2] *Coinbase, Inc. v. Bielski*, 599 U.S. 736 (2023) (cited in Opp. at 5–6) is consistent with this standard. *See id.* at 743 (ordering stay of legal proceedings pending arbitration, including based on the interests of "efficiency, less expense, less intrusive discovery, and the like").

- *Doe. v. Cape Cod Healthcare, Inc.*, No. 2384CV01236 (Suffolk Super. Dec. 14, 2023) (staying case alleging same five claims as alleged against Emerson, plus another claim, unopposed by same opposing counsel in this case);
- *Nova v. Boston Med. Ctr. Corp.*, No. 2384CV01086 (Suffolk Super. Nov. 10, 2023) (staying case alleging wiretap claim);
- *Doe v. Baystate Health Sys.*, No. 2384CV01949 (Suffolk Super. Jan. 2, 2024) (staying case alleging wiretap claim, invasion of privacy, and breach of contract claims, unopposed);
- *Doe v. Atrius Health, Inc.*, No. 2384CV00597 (Suffolk Super. Nov. 20, 2023) (staying case alleging wiretap claim, unopposed);
- *Vita v. Blue Cross & Blue Shield of Mass., Inc.*, No. 2384CV00542 (Suffolk Super. Dec. 11, 2023) (same);
- *Vita v. Beth Israel Deaconess Med. Ctr., Inc.*, No. 2384CV00480 (Suffolk Super. Nov. 9, 2023) (staying case alleging wiretap claim upon reporting wiretap ruling); and
- *Vita v. New Engl. Bapt. Hosp.*, No. 2384CV00857 (Suffolk Super. Nov. 9, 2023) (same).[3]

## CONCLUSION

For the foregoing reasons, and those stated in its opening brief, Emerson respectfully requests that this Court stay this matter pending resolution of the *Vita* appeals.

---

[3] Plaintiff argues that Emerson failed to comply with Superior Court Rule 9A in serving its motion. Opp. at 3. Incorrect. Plaintiff was properly served. *See* Exhibit N. Plaintiff also mischaracterizes oral argument at the December 20, 2023 hearing, stating that "Emerson proceeded to advocate for a stay at the hearing." Opp. at 3. This neglects to mention that Plaintiff's counsel had received the motion to stay and began advocating against it first. Emerson began advocating only in response. A full copy of the transcript is attached as Exhibit O. In any event, argument at the prior hearing is irrelevant, insofar as the Court ruled at the hearing that this motion would be briefed and then heard on January 30, 2024, and Plaintiff does not challenge that ruling here.

Dated: January 22, 2024

Respectfully submitted,

EMERSON HOSPITAL

By: /s/Emyr T. Remy

Emyr T. Remy, BBO# 704156
**SHOOK, HARDY & BACON L.L.P.**
One Federal Street, Suite 2540
Boston, MA 02110
Tel.: (617) 531-1411 | Fax: (617) 531-1602
remy@shb.com

Alfred J. Saikali (FL # 0178195)
**SHOOK, HARDY & BACON L.L.P.**
201 South Biscayne Blvd., Suite 3200
Miami, Florida 33131
Tel: (305) 358-5171 | Fax: (305) 358-7470
asaikali@shb.com

Tammy B. Webb (CA # 227593)
**SHOOK, HARDY & BACON L.L.P.**
555 Mission Street, Suite 2300
San Francisco, CA 94105
Tel: (415) 544-1900 | Fax: (415) 391-0281
twebb@shb.com

Justin R. Donoho (IL # 6299667)
Tara D. Kennedy (IL # 6320909)
**SHOOK, HARDY & BACON L.L.P.**
111 South Wacker Drive, Suite 4700
Chicago, IL 60606
Tel: (312) 704-7713 | F: (312) 558-1195
jdonoho@shb.com
tkennedy@shb.com

Jessica N. Wahl (CA # 321887)
**SHOOK, HARDY & BACON L.L.P.**
2049 Century Park East, Suite 3000
Los Angeles, CA 90067
Tel: (424) 324-3477 | Fax: (424) 204-9093
jwahl@shb.com

Filed 1/22/2024 6:48 PM
ior Court - Essex
et Number 2277CV01000

## CERTIFICATE OF SERVICE

I, Emyr T. Remy, hereby certify that on January 22, 2024, a true copy of the above document was served by email upon:

J. Tucker Merrigan (BBO# 681627)
Victoria Santoro (BBO# 679120)
Erin E, McHugh (BBO# 703701)
Ryan M. Hawkins (BBO# 686289)
Thomas T. Merrigan (BBO# 343480)
**SWEENEY MERRIGAN LAW**
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com
rmh@sweeneymerrigan.com
tom@sweeneymerrigan.com

Alex Dravillas (*PHV6299686IL*)
**KELLER POSTMAN LLC**
150 N. Riverside Plaza, Suite 4100
Chicago, IL 60606
Tel: (312) 741-5220
adj@kellerpostman.com

Foster C. Johnson (*PHV24076463TX*)
David Warden (*PHV20856750TX*)
Nathan Campbell (*PHV24097455TX*)
Carl J. Gustafson (*PHV24125261TX*)
Justin C. Kenney (BBO# 706672)
**AHMAD, ZAVITSANOS & MENSING, P.C.**
1221 McKinney St., Suite 3460
Houston, TX 77010
Tel: (713) 655-1101
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com
cgustafson@azlaw.com
jkenney@azalaw.com

Sara Aguiniga (*PHV1029692DC*)
**KELLER POSTMAN LLC**
1100 Vermont Ave., 12th Flr
Washington, DC 20005
Sara.aguiniga@kellerpostman.com

*/s/ Emyr T. Remy*
Emyr T. Remy

Date Filed 1/22/2024 6:48 PM
Superior Court - Essex
Docket Number 2277CV01000

44.4

COMMONWEALTH OF MASSACHUSETTS

ESSEX, ss

TRIAL COURT DEPARTMENT
SUPERIOR COURT

JOHN DOE, individually and on behalf of all other similarly situated,

Plaintiff,

v.

EMERSON HOSPITAL,

Defendant.

DOCKET NO. 2277CV01000D

**NOTICE OF FILING AND SUPERIOR COURT RULE 9A LIST OF DOCUMENTS FILED**

In accordance with Superior Court Rule 9A, the following documents, together with this Notice, have been filed with the Civil Clerk's Office:

1. Defendant Emerson Hospital's Notice of Filing and Superior Court Rule 9A List of Documents Filed;
2. Emerson Hospital's Motion to Stay;
3. Emerson Hospital's Memorandum in Support of Its Motion to Stay;
4. Plaintiff's Opposition to Defendant's Motion to Stay; and
5. Emerson Hospital's Reply in Support of Its Motion to Stay.

A TRUE COPY, ATTEST
DEPUTY ASS'T. CLERK

Dated: January 22, 2024

Respectfully submitted,

EMERSON HOSPITAL

By:

*/s/ Emyr T. Remy*

Emyr T. Remy, BBO# 704156
**SHOOK, HARDY & BACON L.L.P.**
One Federal Street, Suite 2540
Boston, MA 02110
Tel.: (617) 531-1411 | Fax: (617) 531-1602
remy@shb.com

Justin R. Donoho (IL # 6299667)
Tara D. Kennedy (IL # 6320909)
**SHOOK, HARDY & BACON L.L.P.**
111 South Wacker Drive, Suite 4700
Chicago, IL 60606
Tel: (312) 704-7713 | F: (312) 558-1195
jdonoho@shb.com
tkennedy@shb.com

Alfred J. Saikali (FL # 0178195)
**SHOOK, HARDY & BACON L.L.P.**
201 South Biscayne Blvd., Suite 3200
Miami, Florida 33131
Tel: (305) 358-5171 | Fax: (305) 358-7470
asaikali@shb.com

Tammy B. Webb (CA # 227593)
**SHOOK, HARDY & BACON L.L.P.**
555 Mission Street, Suite 2300
San Francisco, CA 94105
Tel: (415) 544-1900 | Fax: (415) 391-0281
twebb@shb.com

Jessica N. Wahl (CA # 321887)
**SHOOK, HARDY & BACON L.L.P.**
2049 Century Park East, Suite 3000
Los Angeles, CA 90067
Tel: (424) 324-3477 | Fax: (424) 204-9093
jwahl@shb.com

Date Filed 1/22/2024 6:48 PM
Superior Court - Essex
Docket Number 2277CV01000

DOCKET NO. 2277CV01000D

## CERTIFICATE OF SERVICE

I, Emyr T. Remy, hereby certify that on January 22, 2024, a true copy of the above document was served by email upon:

J. Tucker Merrigan (BBO# 681627)
Victoria Santoro (BBO# 679120)
Erin E, McHugh (BBO# 703701)
Ryan M. Hawkins (BBO# 686289)
Thomas T. Merrigan (BBO# 343480)
**SWEENEY MERRIGAN LAW**
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com
rmh@sweeneymerrigan.com
tom@sweeneymerrigan.com

Alex Dravillas (*PHV6299686IL*)
**KELLER POSTMAN LLC**
150 N. Riverside Plaza, Suite 4100
Chicago, IL 60606
Tel: (312) 741-5220
adj@kellerpostman.com

Foster C. Johnson (*PHV24076463TX*)
David Warden (*PHV20856750TX*)
Nathan Campbell (*PHV24097455TX*)
Carl J. Gustafson (*PHV24125261TX)*
Justin C. Kenney (BBO# 706672)
**AHMAD, ZAVITSANOS & MENSING, P.C.**
1221 McKinney St., Suite 3460
Houston, TX 77010
Tel: (713) 655-1101
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com
cgustafson@azlaw.com
jkenney@azalaw.com

Sara Aguiniga (*PHV1029692DC*)
**KELLER POSTMAN LLC**
1100 Vermont Ave., 12th Flr
Washington, DC 20005
Sara.aguiniga@kellerpostman.com

*/s/ Emyr T. Remy*
Emyr T. Remy

Date Filed 2/2/2024 3:47 PM
Superior Court - Essex
Docket Number 2277CV01000



**COMMONWEALTH OF MASSACHUSETTS**
**APPEALS COURT**

**2023-J-0750**
**(Essex Superior Court**
**C.A. No. 2277CV01000D)**

---

**JOHN DOE, FOR HIMSELF AND THE CLASS,**
Plaintiff/Respondent,

**V.**

**EMERSON HOSPITAL,**
Defendant/Petitioner.

A TRUE COPY, ATTEST
DEPUTY ASS'T. CLERK

---

**EMERSON'S STATUS REPORT IN SUPPORT OF SINGLE JUSTICE INTERLOCUTORY REVIEW**

---

Defendant/Petitioner Emerson Hospital ("Emerson") respectfully submits this Status Report pursuant to this Court's Order dated January 2, 2024.

On January 30, 2024, the Superior Court denied Emerson's Motion to Report the Superior Court's 11/22/23 ruling that advertising technology software is an "intercepting device" under the Massachusetts' Wiretap Act, with the rationale being that this issue is already "before the SJC" in *Vita v. New England Baptist Hosp.*, No. SJC-13542. *See* Ex. 1. The Superior Court also issued a stay pending resolution of the *Vita* appeal.

Emerson contends that the "intercepting device" issue it petitions to appeal is different from the issues being litigated in the *Vita* appeal. The *Vita* appellate issues are whether, under the Wiretap Act, alleged disclosures via adtech (1) are "wire communications"; (2) were "secret[]"; and (3) fall under the "ordinary course of its business" exception. *See* Emerson's Petition for Single Justice Interlocutory Review at 4, and supporting Memorandum at 3-4.

Because the "intercepting device" issue is different from the issues in the *Vita* appeal, and for the reasons set forth in its Petition for Single Justice Interlocutory Review, Emerson continues to request that its Petition for Single Justice Interlocutory Review be granted.

**DEFENDANT/PETITIONER,**
**EMERSON HOSPITAL**

By its attorneys,

Emyr Remy (BBO # 704156)
remy@shb.com
SHOOK, HARDY & BACON L.L.P.
One Federal Street, Suite 2540
Boston, MA 02110
Tel: 617.531.1411 | Fax: 617 531.1602

Tammy B. Webb (*pro hac vice*)
tbwebb@shb.com
SHOOK, HARDY & BACON L.L.P.

555 Mission Street, Suite 2300
San Francisco, CA 94105
Tel: 415.544.1900 | Fax: 415.391.0281

Justin R. Donoho (*pro hac vice*)
Tara D. Kennedy (*pro hac vice*)
jdonoho@shb.com
tkennedy@shb.com
SHOOK, HARDY & BACON L.L.P.
111 South Wacker Drive, Suite 4700
Chicago, IL 60606
Tel: (312) 704-7713 | F: (312) 558-1195

Jessica N. Wahl (*pro hac vice*)
jwahl@shb.com
SHOOK, HARDY & BACON L.L.P.
2049 Century Park East, Suite 3000
Los Angeles, CA 90067
Tel: 424.324.3477 | Fax: 424.204.9093

Date Filed 2/2/2024 3:47 PM
Superior Court - Essex
Docket Number 2277CV01000

## CERTIFICATE OF SERVICE

I hereby certify that on February 2, 2024, I served Emerson's Status Report in Support of Single Justice Interlocutory Review as follows:

A copy of the foregoing was emailed to the following counsel of record:

J. Tucker Merrigan (BBO# 681627)
Victoria Santoro (BBO# 679120)
Erin E, McHugh (BBO# 703701)
**SWEENEY MERRIGAN LAW**
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Foster C. Johnson (*PHV24076463TX*)
David Warden (*PHV20856750TX*)
Nathan Campbell (*PHV24097455TX*)
**AHMAD, ZAVITSANOS & MENSING, P.C.**
1221 McKinney St., Suite 3460
Houston, TX 77010
Tel: (713) 655-1101
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

Seth Meyer (*PHV5191283NY*)
Alex Dravillas (*PHV6299686IL*)
**KELLER POSTMAN LLC**
150 N. Riverside Plaza, Suite 4100
Chicago, IL 60606
Tel: (312) 741-5220
sam@kellerpostman.com
ajd@kellerpostman.com

A copy was also filed with the trial court pursuant to Appeals Court Rule 20.0(d).

[signature]

Emyr Remy

Dated: February 2, 2024

Date Filed 2/2/2024 3:47 PM
Superior Court - Essex
Docket Number 2277CV01000

# EXHIBIT 1

Date Filed 2/2/2024 3:47 PM
Superior Court - Essex
Docket Number 2277CV01000

| **CLERK'S NOTICE** | DOCKET NUMBER<br>**2277CV01000** | **Trial Court of Massachusetts**<br>**The Superior Court** |
|---|---|---|
| CASE NAME:<br>**John Doe In his/her capacity Individually and on befalf of all others similarly situated vs. Emerson Hospital** | | Thomas H. Driscoll, Jr., Clerk of Courts<br>Essex County |
| TO:<br>Emyr Remy, Esq.<br>Shook, Hardy and Bacon L.L.P.<br>One Federal St Suite 2540<br>Boston, MA 02110 | | COURT NAME & ADDRESS<br>Essex County Superior Court - Lawrence<br>43 Appleton Way<br>Lawrence, MA 01841 |

You are hereby notified that on 01/31/2024 the following entry was made on the above referenced docket:

**Endorsement on Motion to report (#44.0): DENIED**
**After hearing, motion Denied. Case is stayed pending SJC decision on 2 Vita cases (see Paper #45). The issue of the wire tap statute as it applies to internet tracking is squarely before the SJC. This issue-section F.of Howe,J. memo and order on defendant's motion to dismiss (Paper#37) if before the SJC and reporting the decision would cause additional unreasonable delay. Dated 1/30/24.**

**Judge: Dunigan, Hon. Elizabeth**

| DATE ISSUED | ASSOCIATE JUSTICE/ ASSISTANT CLERK | SESSION PHONE# |
|---|---|---|
| **01/31/2024** | **Hon. Elizabeth Dunigan** | **(978)242-1900** |

Date/Time Printed: 01-31-2024 08:38:45 SCR016\ 02/2023

Date Filed 2/2/2024 3:47 PM
Superior Court - Essex
Docket Number 2277CV01000
Filed 1/22/2024 6:34 PM
Superior Court - Essex
Docket Number 2277CV01000



COMMONWEALTH OF MASSACHUSETTS

| | |
|---|---|
| ESSEX, ss | TRIAL COURT DEPARTMENT<br>SUPERIOR COURT |
| JOHN DOE, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>EMERSON HOSPITAL,<br><br>Defendant. | DOCKET NO. 2277CV01000D |

**EMERSON HOSPITAL'S MOTION TO REPORT**

Defendant Emerson Hospital ("Emerson") respectfully moves, pursuant to Massachusetts Rule of Civil Procedure 64(a) and M.G.L. c. 231, § 111, for this Court to report its November 22, 2023 Memorandum of Decision and Order on Defendant's Motion to Dismiss to the Massachusetts Appeals Court for interlocutory review. As set forth in further detail in Emerson's memorandum in support, reporting the court's Order is appropriate here because it "so affects the merits of the controversy that the matter ought to be determined by the appeals court before any further proceedings in the trial court." Mass. R. Civ. P. 64. Further, reporting the Order will ensure "the just, speedy, and inexpensive determination" of this action and others. Mass. R. Civ. P. 1. Accordingly, Emerson respectfully requests that this Court report its Order to the Appeals Court for interlocutory review and determination and stay any further proceedings in this Court pending appellate review.

**REQUEST FOR HEARING**

Pursuant to Superior Court Rule 9A(c), Emerson respectfully requests a hearing on its Motion to Report.

1-30-2024 - After hearing, motion DENIED. Case is stayed pending SJC decision on 2 Vita Cases (See Paper #45). The issue of the wiretap statute as it applies to internet tracking is squarely before the SJC. This issue - section F. of Howe's memo + order on Defendant's motion to dismiss (Paper #37) - will be before the SJC and reporting this would cause unreasonable additional delay. Dungan, J.

Date Filed 1/22/2024 6:48 PM
Superior Court - Essex
Docket Number 2277CV01000



COMMONWEALTH OF MASSACHUSETTS

ESSEX, ss

| | |
|---|---|
| JOHN DOE, individually and on behalf of all others similarly situated, Plaintiff, v. EMERSON HOSPITAL, Defendant. | TRIAL COURT DEPARTMENT SUPERIOR COURT DOCKET NO. 2277CV01000D |

**EMERSON HOSPITAL'S MOTION TO STAY**

Defendant Emerson Hospital ("Emerson") hereby moves to stay this action pending issuance of an appellate decision by the Massachusetts Appeals Court interpreting the application of the Wiretap Act in two parallel cases consolidated for interlocutory appeal, *Vita v. Beth Israel Deaconess Medical Center, Inc.*, No. 2384CV00480-BLS1, and *Vita v. New England Baptist Hospital*, No. 2384CV00857-BLS1. In further support of this motion, Emerson refers this Honorable Court to Emerson's Memorandum in Support of Its Motion to Stay, submitted herewith.

WHEREFORE, Emerson respectfully requests that the Court stay this action.

**REQUEST FOR HEARING**

Pursuant to Superior Court Rule 9A(c), Emerson respectfully requests a hearing on its Motion to Stay.

After hearing, motion ALLOWED. Case stayed pending SJC decision on "wiretap" issues. Dunigan J

DAR allowed by SJC on 1/17/2024 in Vita cases, regarding ... Dunigan J

Dated: December 20, 2023

Respectfully submitted,

EMERSON HOSPITAL

By: */s/Emyr T. Remy*

Emyr T. Remy (BBO# 704156)
**SHOOK, HARDY & BACON L.L.P.**
One Federal Street, Suite 2540
Boston, MA 02110
Tel.: (617) 531-1411 | Fax: (617) 531-1602
remy@shb.com

Alfred J. Saikali (FL # 0178195)
**SHOOK, HARDY & BACON L.L.P.**
201 South Biscayne Blvd., Suite 3200
Miami, Florida 33131
Tel: (305) 358-5171 | Fax: (305) 358-7470
asaikali@shb.com

Tammy B. Webb (CA # 227593)
**SHOOK, HARDY & BACON L.L.P.**
555 Mission Street, Suite 2300
San Francisco, CA 94105
Tel: (415) 544-1900 | Fax: (415) 391-0281
twebb@shb.com

Justin R. Donoho (IL # 6299667)
Tara D. Kennedy (IL # 6320909)
**SHOOK, HARDY & BACON L.L.P.**
111 South Wacker Drive, Suite 4700
Chicago, IL 60606
Tel: (312) 704-7713 | F: (312) 558-1195
jdonoho@shb.com
tkennedy@shb.com

Jessica N. Wahl (CA # 321887)
**SHOOK, HARDY & BACON L.L.P.**
2049 Century Park East, Suite 3000
Los Angeles, CA 90067
Tel: (424) 324-3477 | Fax: (424) 204-9093
jwahl@shb.com

iled 1/22/2024 6:48 PM
ior Court - Essex
t Number 2277CV01000

## RULE 9C CERTIFICATION

Pursuant to Superior Court Rule 9C(a), Defendant's counsel conferred with Plaintiff's counsel by phone on December 20, 2023 regarding the relief requested in this motion. Despite good faith efforts the parties were unable to reach an agreement regarding the relief requested herein.

*/s/ Emyr T. Remy*
Emyr T. Remy

## CERTIFICATE OF SERVICE

I, Emyr T. Remy, hereby certify that on December 20, 2023 a true copy of the above document was served by email upon:

J. Tucker Merrigan (BBO# 681627)
Victoria Santoro (BBO# 679120)
Erin E, McHugh (BBO# 703701)
**SWEENEY MERRIGAN LAW**
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Seth Meyer (*PHV5191283NY*)
Alex Dravillas (*PHV6299686IL*)
**KELLER POSTMAN LLC**
150 N. Riverside Plaza, Suite 4100
Chicago, IL 60606
Tel: (312) 741-5220
sam@kellerpostman.com
ajd@kellerpostman.com

Foster C. Johnson (*PHV24076463TX*)
David Warden (*PHV20856750TX*)
Nathan Campbell (*PHV24097455TX*)
**AHMAD, ZAVITSANOS & MENSING, P.C.**
1221 McKinney St., Suite 3460
Houston, TX 77010
Tel: (713) 655-1101
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

*/s/ Emyr T. Remy*
Emyr T. Remy

Date Filed 1/22/2024 6:48 PM
Superior Court - Essex
Docket Number 2277CV01000

45.1

COMMONWEALTH OF MASSACHUSETTS

| | | |
|---|---|---|
| ESSEX, ss | ) | TRIAL COURT DEPARTMENT |
| | ) | SUPERIOR COURT |
| JOHN DOE, individually and on behalf of all others | ) | |
| similarly situated, | ) | |
| | ) | |
| Plaintiff, | ) | DOCKET NO. 2277CV01000D |
| | ) | |
| v. | ) | A TRUE COPY, ATTEST |
| | ) | |
| EMERSON HOSPITAL, | ) | |
| | ) | DEPUTY ASS'T. CLERK |
| Defendant. | ) | |
| | ) | |

**EMERSON HOSPITAL'S MEMORANDUM**
**<u>IN SUPPORT OF ITS MOTION TO STAY</u>**

Pursuant to this Court's inherent discretion to manage its docket, Defendant Emerson Hospital ("Emerson"), respectfully submits this Memorandum of Law in support of its motion to stay this action pending interlocutory appellate decisions in two cases consolidated for interlocutory appeal, *Vita v. Beth Israel Deaconess Medical Center, Inc.*, No. 2384CV00480-BLS1, and *Vita v. New England Baptist Hospital*, No. 2384CV00857-BLS1. The appeal of those matters has the potential to eliminate the wiretap claim from this case or, alternatively, to narrow or clarify its scope. A stay will promote the interests of judicial economy and prevent undue burden and waste of the parties' resources by eliminating the potential need to expend and/or re-expend thousands of hours, and hundreds of thousands (or even millions) of dollars, in effort and costs related to discovery, class certification, and summary judgment.[1]

[1] Emerson has also simultaneously moved this Court pursuant to Rule 64(a) to report for interlocutory review a separate issue that could also eliminate the wiretap claim from this case, and to stay further proceedings pending interlocutory appeal of that issue. *See* Notice of Motion to Report for Interlocutory Appeal the Court's Finding that Adtech Software Is an "Intercepting Device" Under Massachusetts' Wiretap Act.

## I. BACKGROUND

This is a putative class action brought by Plaintiff John Doe against Emerson Hospital, alleging violation of the Massachusetts Wiretap Act, M.G.L. c. 272, § 99, asserting additional claims, and seeking tens or hundreds of millions of dollars in statutory damages under the Wiretap Act. First Amended Complaint ("FAC") ¶ 193.

The following adtech software healthcare cases have been reported for interlocutory appellate review and are currently on appeal. **Exhibit A**, Nov. 31, 2023 Order Reporting for Appellate Review in *Vita v. Beth Israel Deaconess Medical Center, Inc.*, No. 2384CV00480-BLS1; **Exhibit B**, Oct. 31, 2023 Order Reporting for Appellate Review in *Vita v. New England Baptist Hospital*, No. 2384CV00857-BLS1 ("*Vita* cases"). In the *Vita* cases, the issues being appealed are whether, under the Wiretap Act, alleged disclosures via adtech software (1) are "wire communications"; (2) were "secret[]"; and (3) fall under the "ordinary course of its business" exception. **Exhibit C**, Application for Direct Appellate Review of Both Cases, at 11 (setting forth the issues in full).

A final appellate ruling in the *Vita* appeals may result in a holding that eliminates, narrows, or clarifies the scope of the wiretap act as applied to this case.

## II. LEGAL STANDARD

This Court has inherent power over its courtroom, including broad discretion to issue a stay so as to effectively manage its docket. *See Landis v. North Am. Co.*, 299 U.S. 248, 254 (1936) ("The power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants"); *Sommer v. Maharaj*, 451 Mass. 615, 621 (2008) (court has "inherent power ... to manage [its] own affairs so as to achieve the orderly and expeditious disposition of cases").

In deciding whether to exercise discretion to enter a stay, courts should consider the interest of judicial economy and orderly adjudication, as well as the potential detriment or burden to the parties of a stay. *See Dir. Of Div. of Employment Sec. v. Town of Mattapoisett*, 392 Mass. 858, 861 (1984) (court should balance possible prejudice to litigants with the "benefits of judicial economy and orderly adjudication"); *Town of Danvers v. Wexler Const. Co.*, 12 Mass. App. Ct. 160, 164 (1981) (factors considered in deciding whether to enter stay included "judicial economy" and the interests and potential harm to parties of stay).

A pending appeal in a related or similar matter that is potentially determinative of the same legal or factual issues is a proper basis for entering a stay. *Town of Mattapoisett*, 392 Mass. at 861 ("determination of a cause of action entirely contingent on the validity of an appealed judgment in a separate proceeding should be stayed pending resolution of the appellate process unless the detriment to the litigants of delay outweighs the benefits of judicial economy and orderly adjudication").

## III. ARGUMENT

This Court should exercise its inherent discretion to stay all proceedings in this case pending resolution of the *Vita* appeals because (A) a stay will promote judicial economy; (B) a stay will not prejudice plaintiff, and any prejudice is far outweighed by the prejudice to Emerson absent a stay; and (C) a stay is supported by precedent in other Pixel healthcare cases including those with non-wiretap claims that have been stayed pending the *Vita* appeals.

### A. A Stay Will Promote Judicial Economy.

As noted above, stays are commonly granted when a pending appeal could resolve or clarify a key legal issue in the case or the parties' liability. *See Town of Mattapoisett*, 392 Mass. at 861; *Town of Rockland v. Massachusetts Civil Service Com'n*, No. 2084-CV0-1354, 2021 WL

6246586, at *1 (Mass. Super. Oct. 1, 2021) (noting with approval that matter had been stayed pending a decision by the appeals court in a related matter); *Williams v. Fedex Ground Package Sys., Inc.*, No. 062344C, 2007 WL 3013266, at *1 (Mass. Super. Sept. 20, 2007) (granting stay of case pending resolution of federal MDL that would resolve key issue of plaintiff's employment status in context of related class actions).

Definitive appellate answers to whether alleged disclosures via adtech software (1) are "wire communications"; (2) were "secret[]"; and (3) fall under the "ordinary course of its business" exception could potentially save the parties to this case collectively thousands of hours, and hundreds of thousands (or even millions) of dollars, in effort and costs related to discovery, class certification, and summary judgment, to say nothing of trial. This is true for a number of reasons. For one, rulings on class certification may need to be redone if the wiretap claim is eliminated only by an appeal after final judgment. The wiretap claim, if applicable, presents its own individualized issues precluding a finding of commonality and predominance, including, for example, regarding the following statutory terms:

- "Wire communication." M.G.L. c. 272 § 99(B)(1). It ought to be determined in the *Vita* appeals (Ex. C) that all alleged disclosures via adtech software are not "wire communications" under the Wiretap Act. In the alternative, alleged disclosures via adtech software are not "wire communications" in at least some circumstances, raising individualized issues for each class member. For example, did the individual identify himself when visiting the hospital's website—like one would ordinarily do in a telephone conversation, which is the type of communication the legislature envisioned in 1968 when it enacted the statute? Or, instead, did the individual visit the website anonymously? Did the individual merely click on links or tabs as opposed to entering conversation-like

information into a form? These factual questions specific to each individual and others may determine whether a "wire communication" occurred.

- "Interception." M.G.L. c. 272 § 99(B)(4). An interception, by definition, must be "secret." *Id.* Whether alleged disclosures via adtech software were secret may turn on factual questions specific to each individual. For example, was the individual aware of widespread adtech software? Did he notice the same purported "targeted" advertisements occurring before he visited Emerson's website? Did he participate in a prior settlement regarding adtech software in Massachusetts (*Doe v. Partners Healthcare Sys., Inc.*, No. 1984CV01651-BLS-1 (Mass. Super. Ct.)), or was he aware of it before visiting Emerson's website? An answer of "yes" to any of these questions may be evidence of lack of secrecy.
- "Aggrieved person." M.G.L. c. 272 § 99(B)(6). Whether an alleged class member is an "aggrieved person" capable of obtaining civil relief under the Wiretap Act depends on whether that person's "privacy was invaded in the course of an interception." *Id.* This question, too, may turn on factual questions specific to each individual. For example, what allegedly private information did the individual transmit on Emerson's website? Did the individual transmit that same information to anyone else? Even if not, is that information private by nature? Did the individual read and understand Facebook's privacy policies? All of these questions bear on the question of whether the individual is an "aggrieved person."

Litigation of all of these issues in the discovery, class certification, and summary judgment phases of this case could be avoided, if it is finally determined in the first place that the Massachusetts Wiretap Act does not apply to adtech software cases for any of the reasons being litigated in the *Vita* appeal.

Moreover, the wiretap claim is the main money claim in this litigation by tens or hundreds of millions of dollars and will therefore be the focus and main driver of hotly contested complex litigation in this Court. If the wiretap claim were resolved first by interlocutory appeal, then many arguments would not need to be made and briefs filed in this Court and, indeed, the rest of the case could potentially settle. As one court explained in similar circumstances: "If ... the suit proceeds in the [trial] court on both the [main and other] claims, the completion of the litigation will take longer than if the [main] claim is out of the case, especially since that claim appears to be the plaintiffs' main one, with the [other claims] perhaps just a life jacket. Moreover, uncertainty about the status of the [main] claim may delay settlement (almost all class actions are settled rather than tried), and by doing so further protract the litigation." *Sterk v. Redbox Automated Retail, LLC*, 672 F.3d 535, 536 (7th Cir. 2012).

Furthermore, the interpretation of the Wiretap Act by the Appeals Court in the *Vita* appeals will resolve (or, at a minimum, affect) Plaintiff's remaining claims. For example, one of the issues to be considered on appeal is whether the ubiquitous commercial use of adtech software falls within the ordinary course of business exception set forth in the Wiretap Act. *See* M.G.L. c. 272 § 99(B)(3). To use software within the "ordinary course of business" means that it is utilized for a "legitimate business purpose." *Dillon v. Mass. Bay Transp. Auth.*, 49 Mass. App. Ct. 309, 319 (2000). To support his claim under the Privacy Act, Plaintiff will need to prove Emerson did not have a countervailing legitimate interest in the alleged invasion of privacy. *O'Connor v. Police Com'r of Bos.*, 408 Mass. 324, 330 (1990). If the Appeals Court finds that the Wiretap Act's ordinary course of business exception applies to the technology at issue here, it will be difficult (if not impossible) for Plaintiff to credibly argue that ubiquitous website software used for a legitimate business purpose is outweighed by any reasonable expectation of privacy Plaintiff claims to have

Date Filed 1/22/2024 6:48 PM
Superior Court - Essex
Docket Number 2277CV01000

in mouse clicks on Emerson's website. *Wilson v. Transworld Systems, Inc.*, No. ESCV2011-00400, 2013 WL 9932964, at *15 (Mass. Super. May 21, 2013) (holding "[n]o reasonable jury could find that these two calls amounted to an unreasonable, substantial, and serious intrusion upon [plaintiff]'s seclusion"). Further, if the Appeals Court determines that the alleged disclosures via adtech software does not capture "contents" of a communication within the Wiretap Act, this Court could conclude that the collection of mouse clicks was not an unreasonable, substantial or serious intrusion, as many courts have already done. *See, e.g., Popa v. Harriet Carter Gifts, Inc.*, 426 F. Supp. 3d 108, 122 (W.D. Pa. 2019) ("The act of collecting [plaintiff]'s keystrokes, mouse clicks, and PII is simply not the type of highly offensive act to which liability can attach"). The Appeals Court's determinations of the foregoing issues could likewise affect elements of Plaintiff's other non-wiretap claims, such whether any fiduciary or contractual duty existed and was breached, and whether any purported enrichment was unjust.

In sum, a stay will preserve the Parties' from having to expend resources on potentially unnecessary discovery, in addition to serving judicial economy by avoiding any potential need for the court to re-decide class certification or summary judgment issues. *See e.g., Van Emden Mgmt. Corp. v. Marsh & McLennan Companies*, No. CIV.A. 05-0066-A, 2005 WL 2456737, at *3 (Mass. Super. Sept. 21, 2005) ("Furthermore, if the Court were to deny the stay, inconsistent rulings on issues of discovery, class certification and other substantive matters would be likely. That circumstance would disrupt the orderly disposition of the national litigation and generate substantial economic costs for all the parties involved.")

### B. A Stay Will Not Prejudice Plaintiff, While A Denied Stay Will Prejudice Emerson.

Plaintiff will not be burdened by a stay of this matter. A temporary stay of this case will not materially prejudice Plaintiff because the parties have already negotiated search terms and

Emerson has taken all necessary steps to collect and preserve all potentially responsive documents. Further, Plaintiff has not suffered any actual injury in this case. Moreover, he is and always has been free to change his Facebook settings to prevent the only events he complains of here— that the word "concussion" he anonymously clicked on or entered on Emerson's public-facing website was sent by Emerson to Facebook and Google causing Facebook and Google to adjust the nature of the advertisements they already sent him to be "targeted." FAC ¶¶ 36, 102, 103. Nor is there any pressing need to resolve Plaintiff's claims for statutory damages as soon as possible.

Conversely, Emerson will be prejudiced if a stay is not entered. A stay would avoid the imposition of undue burden and expense on Emerson, a nonprofit healthcare organization. Emerson is not large and does not have in-house counsel. Accordingly, imposing burdensome and expensive discovery that might be for naught and need to be redone is a massive and unnecessary drain on Emerson's limited resources. This is particularly so because the next steps in discovery are incredibly time-consuming and resource-intensive. They include document review, analysis, and production in response to nearly 200 requests for production of documents; depositions of corporate representatives on 17 topics (several include numerous sub-topics); and further responses to written discovery requests. Emerson estimates tens or hundreds of thousands in remaining costs to complete document discovery alone. Emerson should not be forced into this burdensome and expensive discovery, nor deposition and other fact discovery, expert discovery, opposition to class certification, or seeking summary judgment, when each of those phases is dependent on open questions of catastrophic liability, or none, relating to the Wiretap Act, while that issue is pending before the Appeals Court. A stay of this action pending the related *Vita* appeal would protect Emerson from such unnecessary burden and expense while promoting the interests of judicial economy.

### C. Multiple Parallel Actions Have Been Stayed While Awaiting Appellate Review of Plaintiff's Novel Wiretap Act Theory.

As noted above, Plaintiff's claims are premised on the theory that Emerson embedded adtech on its public website in violation of the Wiretap Act, Privacy Statute, and various common law causes of action. Other Massachusetts adtech healthcare cases with both a wiretap claim and additional claim(s) have been stayed by the trial-courts while the *Vita* appeals remain pending. *See* **Exhibit D**, *Doe v. Cape Cod Healthcare, Inc.*, No. 2384CV01236-BLS1, Dec. 8, 2023 Stay Order (Wiretap Act claim and five other claims); **Exhibit E**, *Doe v. Boston Medical Center Corp.*, No. 2384CV00326-BLS1, Nov. 9, 2023 Stay Order (Wiretap Act and Privacy Act claim) ("the court has reported its decision in two substantially similar cases … Further proceedings in this case are stayed pending the outcome of the reported cases"); *see also* **Exhibit F**, *Alves v. BJ's Wholesale Club, Inc.*, Case No. 2284CV02509 (granting opposed stay of case with Wiretap Act and Privacy Act claims).[2] These stays are consistent with the fact that early resolution of the Wiretap Act claim would substantially facilitate resolution of trial-court proceedings and serve judicial economy.[3]

Most recently, in *Doe v. Cape Cod Healthcare, Inc.*, Case No. 2384CV018086-BLS1, the defendant filed an unopposed motion to stay proceedings pending completion of the *Vita* interlocutory appeals. A copy of the unopposed motion is attached as **Exhibit K**. Plaintiffs' counsel in the *Cape Cod Healthcare* action – the same counsel that represents the Plaintiff in this

---

[2] Defendant has also moved for a stay in *Doe v. Southcoast Hospitals Grp., Inc.*, Case No. 2273CV00673, which has claims identical to those here as well as the same plaintiff's counsel. *See* **Exhibit G**.

[3] Trial Courts have also stayed adtech healthcare cases that have only a Wiretap Act claim. *See* **Exhibit H**, *Doe v. The Children's Hospital*, Case No. 2384CV00411-BLS1 (Wiretap only); **Exhibit I**, *Doe v. Lawrence General Hospital*, Case No. 2831-CV-00728-BLS1 (Wiretap only) (pending joint stipulation and proposed order to stay); **Exhibit J**, *Nova v. Boston Medical Center Corp.*, Case No. 2384-cv-018086-BLS1, Nov. 9, 2023 Stay Order (Wiretap Act and Privacy Act claim).

case – did not oppose the motion. *See* **Ex. K** at 1; **Exhibit L**, Order allowing stay. Although this action involves essentially the same causes of action and factual allegations as in *Cape Cod Healthcare,* Plaintiff's counsel has, without further explanation, not yet consented to a similar stay of this action.

## IV. CONCLUSION

For the foregoing reasons, Emerson respectfully requests that the Court enter a stay of this matter until 30 days after all appellate decisions in the *Vita* interlocutory appeals.

Dated: December 20, 2023

Respectfully submitted,

EMERSON HOSPITAL

By: */s/Emyr T. Remy*

Emyr T. Remy (BBO# 704156)
**SHOOK, HARDY & BACON L.L.P.**
One Federal Street, Suite 2540
Boston, MA 02110
Tel.: (617) 531-1411 | Fax: (617) 531-1602
remy@shb.com

Alfred J. Saikali (FL # 0178195)
**SHOOK, HARDY & BACON L.L.P.**
201 South Biscayne Blvd., Suite 3200
Miami, Florida 33131
Tel: (305) 358-5171 | Fax: (305) 358-7470
asaikali@shb.com

Tammy B. Webb (CA # 227593)
**SHOOK, HARDY & BACON L.L.P.**
555 Mission Street, Suite 2300
San Francisco, CA 94105
Tel: (415) 544-1900 | Fax: (415) 391-0281
twebb@shb.com

Justin R. Donoho (IL # 6299667)
Tara D. Kennedy (IL # 6320909)
**SHOOK, HARDY & BACON L.L.P.**
111 South Wacker Drive, Suite 4700
Chicago, IL 60606
Tel: (312) 704-7713 | F: (312) 558-1195
jdonoho@shb.com
tkennedy@shb.com

Jessica N. Wahl (CA # 321887)
**SHOOK, HARDY & BACON L.L.P.**
2049 Century Park East, Suite 3000
Los Angeles, CA 90067
Tel: (424) 324-3477 | Fax: (424) 204-9093
jwahl@shb.com

## CERTIFICATE OF SERVICE

I, Emyr T. Remy, hereby certify that on December 20, 2023, a true copy of the above document was served by email upon:

J. Tucker Merrigan (BBO# 681627)
Victoria Santoro (BBO# 679120)
Erin E, McHugh (BBO# 703701)
**SWEENEY MERRIGAN LAW**
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Seth Meyer (*PHV5191283NY*)
Alex Dravillas (*PHV6299686IL*)
**KELLER POSTMAN LLC**
150 N. Riverside Plaza, Suite 4100
Chicago, IL 60606
Tel: (312) 741-5220
sam@kellerpostman.com
ajd@kellerpostman.com

Foster C. Johnson (*PHV24076463TX*)
David Warden (*PHV20856750TX*)
Nathan Campbell (*PHV24097455TX*)
**AHMAD, ZAVITSANOS & MENSING, P.C.**
1221 McKinney St., Suite 3460
Houston, TX 77010
Tel: (713) 655-1101
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

*/s/ Emyr T. Remy*
Emyr T. Remy

Date Filed 1/22/2024 6:48 PM
Superior Court - Essex
Docket Number 2277CV01000

**COMMONWEALTH OF MASSACHUSETTS**

**ESSEX, ss**

**TRIAL COURT DEPARTMENT**
**SUPERIOR COURT**

JOHN DOE, individually and on behalf of all others similarly situated,

Plaintiff,

v.

EMERSON HOSPITAL,

Defendant.

DOCKET NO. 2277CV01000D

**EXHIBIT INDEX TO EMERSON HOSPITAL'S**
**REPLY IN SUPPORT OF ITS MOTION TO STAY**

| Ex. | Description |
|---|---|
| M | Order allowing Application for Direct Appellate Review in *Vita v. New England Baptist Hospital & another*, No. DAR-29590 (Supreme Judicial Court), January 17, 2024 |
| N | December 20, 2023 Email to Plaintiff's Counsel Serving Motion to Report and Motion to Stay |
| O | Transcript of December 21, 2023 Motion Hearing in *Doe v. Emerson* |

Dated: January 22, 2024

Respectfully submitted,

EMERSON HOSPITAL

By:

/s/ Emyr T. Remy

Emyr T. Remy, BBO# 704156
**SHOOK, HARDY & BACON L.L.P.**
One Federal Street, Suite 2540
Boston, MA 02110
Tel.: (617) 531-1411 | Fax: (617) 531-1602
remy@shb.com

Justin R. Donoho (IL # 6299667)
Tara D. Kennedy (IL # 6320909)
**SHOOK, HARDY & BACON L.L.P.**
111 South Wacker Drive, Suite 4700
Chicago, IL 60606
Tel: (312) 704-7713 | F: (312) 558-1195
jdonoho@shb.com
tkennedy@shb.com

Alfred J. Saikali (FL # 0178195)
**SHOOK, HARDY & BACON L.L.P.**
201 South Biscayne Blvd., Suite 3200
Miami, Florida 33131
Tel: (305) 358-5171 | Fax: (305) 358-7470
asaikali@shb.com

Tammy B. Webb (CA # 227593)
**SHOOK, HARDY & BACON L.L.P.**
555 Mission Street, Suite 2300
San Francisco, CA 94105
Tel: (415) 544-1900 | Fax: (415) 391-0281
twebb@shb.com

Jessica N. Wahl (CA # 321887)
**SHOOK, HARDY & BACON L.L.P.**
2049 Century Park East, Suite 3000
Los Angeles, CA 90067
Tel: (424) 324-3477 | Fax: (424) 204-9093
jwahl@shb.com

**CERTIFICATE OF SERVICE**

I, Emyr T. Remy, hereby certify that on January 22, 2024, a true copy of the above document was served by email upon:

J. Tucker Merrigan (BBO# 681627)
Victoria Santoro (BBO# 679120)
Erin E, McHugh (BBO# 703701)
Ryan M. Hawkins (BBO# 686289)
Thomas T. Merrigan (BBO# 343480)
**SWEENEY MERRIGAN LAW**
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com
rmh@sweeneymerrigan.com
tom@sweeneymerrigan.com

Alex Dravillas (*PHV6299686IL*)
**KELLER POSTMAN LLC**
150 N. Riverside Plaza, Suite 4100
Chicago, IL 60606
Tel: (312) 741-5220
adj@kellerpostman.com

Foster C. Johnson (*PHV24076463TX*)
David Warden (*PHV20856750TX*)
Nathan Campbell (*PHV24097455TX*)
Carl J. Gustafson (*PHV24125261TX*)
Justin C. Kenney (BBO# 706672)
**AHMAD, ZAVITSANOS & MENSING, P.C.**
1221 McKinney St., Suite 3460
Houston, TX 77010
Tel: (713) 655-1101
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com
cgustafson@azlaw.com
jkenney@azalaw.com

Sara Aguiniga (*PHV1029692DC*)
**KELLER POSTMAN LLC**
1100 Vermont Ave., 12th Flr
Washington, DC 20005
Sara.aguiniga@kellerpostman.com

*/s/ Emyr T. Remy*
Emyr T. Remy

Date Filed 1/22/2024 6:48 PM
Superior Court - Essex
Docket Number 2277CV01000

# EXHIBIT M

Date Filed 1/22/2024 6:48 PM
Superior Court - Essex
Docket Number 2277CV01000

COMMONWEALTH OF MASSACHUSETTS
**SUPREME JUDICIAL COURT FOR THE COMMONWEALTH**

**ORDER**

It is hereby Ordered, that the following Application for Direct Appellate Review be allowed:

DAR-29590

**KATHLEEN VITA**
**vs.**
**NEW ENGLAND BAPTIST HOSPITAL & another**

Suffolk Superior Court No. 2384CV000857
A.C. No. 2023-P-1308 & 2023-P-1310

By the Court,
Maura A. Looney

Maura A. Looney
Assistant Clerk

ENTERED: January 17, 2024

# EXHIBIT N

| | |
|---|---|
| **From:** | Ferrer-Sosa, Valeria (SHB) |
| **Sent:** | Wednesday, December 20, 2023 6:15 PM |
| **To:** | tucker@sweeneymerrigan.com; victoria@sweeneymerrigan.com; emchugh@sweeneymerrigan.com; sam@kellerpostman.com; ajd@kellerpostman.com; Foster Johnson; David Warden; Nathan Campbell |
| **Cc:** | Remy, Emyr T. (SHB); Saikali, Al (SHB); Webb, Tammy (SHB); Donoho, Justin R. (SHB); Kennedy, Tara D. (SHB); Wahl, Jessica N. (SHB) |
| **Subject:** | DOCKET NO. 2277CV01000D - John Doe, individually and on behalf of all other similarly situated, vs. Emerson Hospital |
| **Attachments:** | 2023.12.20 - Emerson - Motion to Stay.pdf; 2023.12.20 - Emerson - Memo ISO Motion to Stay [with exhibits].pdf; 2023.12.20 - Emerson - Motion to Report.pdf; 2023.12.20 - Emerson - Memo ISO Motion to Report[with exhibits] .pdf; Emerson - Notice of Motion to Report [to file].pdf; Emerson - Notice of Motion to Stay (file).pdf |

Counsel, attached for service please find the following document(s);

- Emerson Hospital's Motion To Stay,
- Emerson Hospital's Memorandum In Support Of Its Motion To Stay,
- Notice Of Motion To Stay,
- Emerson Hospital's Motion To Report,
- Emerson Hospital's Memorandum In Support Of Its Motion To Report, and
- Notice Of Motion To Report.

**Valeria Ferrer**
*Legal Administrative Assistant*
*1 Federal St., Suite 2540*
*Boston, MA 02110*
*(617)531-1411*
vferrer@shb.com

SHOOK
HARDY & BACON

Date Filed 1/22/2024 6:48 PM
Superior Court - Essex
Docket Number 2277CV01000

# EXHIBIT O

Date Filed 1/22/2024 6:48 PM
Superior Court - Essex
Docket Number 2277CV01000



Volume 1 of 1
Page: 1 of 16
Exhibits: None

COMMONWEALTH OF MASSACHUSETTS

Essex SS, ESSEX SUPERIOR COURT

* * * * * * * * * * * * *
JOHN DOE *
*
V * Docket No. 2277CV01000
*
EMERSON HOSPITAL *
*
* * * * * * * * * * * * *

BEFORE THE HONORABLE LYNN C. ROONEY

Appearances:

For the Plaintiff:
Sweeney Merrigan Law
393 Main Street
Greenfield, MA 01301
Work Phone: 413-774-5300
By: Thomas Tucker Merrigan, David Warden, Ryan Hawkins

Sweeney Merrigan Law
268 Summer Street LL
Boston, MA 02210
Work Phone: 617-391-9001
By: Victoria M. Santoro, Jonathan Tucker Merrigan, Erin E. McHugh

Ahmad, Zavitsanos & Mensing, P.C.
1221 McKinney
Suite 2500
Houston, TX 77010
By: Nathan B. Campbell, Foster C. Johnson, David E. Warden,
Justin C. Kenney, Carl J. Gustafson

Appearances (continued)

Keller Postman LLC
150 N. Riverside Plaza
Suite 4100
Chicago, IL 60606
Work Phone: 312-741-5220
By: Alex J. Dravillas

Keller Postman LLC
1100 Vermon Avenue, N.W. 12th Floor
Washington, DC 20005
Work Phone: 209-918-1123
By: Sara Aguiniga

For the Defendant:
Shook Hardy and Bacon LLP
111 S. Wacker Drive
Suite 4700
Chicago, IL 60606
By: Justin R. Donoho

Shook, Hardy and Bacon L.L.P.
One Federal Street, Suite 2540
Boston, MA 02110
Work Phone: 617-531-1411
By: Emyr Remy

Shook, Hardy & Bacon, LLP
201 S. Biscayne Boulevard, Suite 3200
Miami, FL 33131
Work Phone: 305-960-6923
By: Alfred J. Saikali

Shook, Hardy & Bacon, LLP
2555 Grand Boulevard
Kansas City, MO 64108
Work Phone: 816-559-0306
By: Jenn O. Hatcher

Appearances (continued)

Shook, Hardy & Bacon, LLP
2049 Century Park East #3000
Los Angeles, CA 90067
Work Phone: 424-324-3477
By: Jessica N. Wahl

Shook, Hardy & Bacon, LLP
555 Mission Street
Suite 2300
San Francisco, CA 94105
Work Phone: 415-544-1904
By: Tammy B. Webb

Essex Superior Court, Lawrence
Courtroom 1 (SC)
December 21, 2023

# I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|

| EXHIBITS | PAGE |
|---|---|

Date Filed 1/22/2024 6:48 PM
Superior Court - Essex
Docket Number 2277CV01000



PROCEEDINGS

(Case called at 10:59 a.m.)

COURT OFFICER: Court is in session. Please be seated.

THE CLERK: Good afternoon, again, Your Honor. Your Honor, calling Number 3 and 4 on our list today, Docket Number 2277CV01000, John Doe in his capacity individually and on behalf of all others similarly situated versus Emerson Hospital.

Can I please have counsel identify yourselves for the record, starting with plaintiff's counsel?

MR. HAWKINS: Your Honor, Ryan Hawkins for the plaintiff.

THE COURT: Good afternoon.

MR. KENNEY: Good afternoon, Your Honor. Justin Kenney, also for the plaintiff.

THE COURT: Good afternoon.

MR. DONOHO: Hello, Your Honor. Justin Donoho for defendant Emerson Hospital.

THE COURT: Good afternoon.

I just -- I did just get a notice. Is your client appealing -- was -- the motion to dismiss was denied I take it and you're appealing that?

MR. DONOHO: We are going to ask Your Honor to report one of the legal findings in that ruling for interlocutory appeal. That's one of the motions that you (indiscernible)

notice yesterday.

THE COURT: The Appeals Court hates that.

MR. DONOHO: Well, it's all -- the Appeals Court's already got two of them so far, it needs Pixel Healthcare cases.

THE COURT: And did they accept it?

MR. DONOHO: It's been reported by Judge Kazanjian in two of her cases.

THE COURT: And do you know what they've done with it?

MR. DONOHO: Currently it's on the Appeals Court's docket. I believe the first brief is due Tuesday.

THE COURT: Okay. All right. So I've read through the papers. I do have a question. It seems that Judge Howe issued -- issued an order that was actually agreed to back in July.

MR. KENNEY: That is correct, Your Honor.

THE COURT: Does not appear to have been complied with.

MR. KENNEY: That is also correct, Your Honor.

THE COURT: And I'm curious as to why.

MR. KENNEY: Your Honor, if I can lay a little bit of the background of the back and forth between the parties, I think that will very clearly answer your question.

THE COURT: Well, let me tell you this. I'm happy to issue a discovery order, and I will. And I'm pretty sure no one's going to like it. So if you want to go out in the

hall and see if you can come to an agreement, you might arrive at something that you'll be much happier with. If you don't want to do that, I'm happy to hear from you and I'll issue a decision.

MR. KENNEY: Your Honor, here is the concern of plaintiffs. Is that between April of this year and now, we have reached multiple agreements with the defendant. Various deadlines, ways to phase discovery, ways to try to minimize the burden. Unfortunately, all of the deadlines that had been agreed to informally were not met, and now the order was also not met.

So from plaintiff's perspective, we do not have confidence that an informal agreement on discovery is going to move the ball forward in this case.

THE COURT: Okay.

MR. KENNEY: So I appreciate where Your Honor is coming from --

THE COURT: Okay.

MR. KENNEY: -- we just don't think that's going to be a productive way to proceed.

THE COURT: Counsel?

MR. DONOHO: I agree on non-productiveness. And just to set the stage on where we are today, if I could have just moment, just some background. This is one of dozens of cases against hospitals in the Commonwealth alleging -- the

allegations here are that the plaintiff clicked on the word concussion on a website or entered the word concussion. That term was encrypted, sent to Facebook and Google, and so Facebook and Google then adjusted the nature of the advertisements sent to plaintiff.

And so plaintiff is now suing for hundreds of millions of dollars under the Wiretap Act against our hospital, against all the hospitals in Massachusetts. The entire Commonwealth is threatened. That's why the Appeals Court's taking this up. Most of these cases have been stayed. So one of the --

THE COURT: And can I just -- I don't mean to interrupt you, but I am. As they -- so has everything been stayed once the motion to dismiss, I'm assuming was denied; is that what happened?

MR. DONOHO: So now that these -- since we filed our prior motion to stay, these interlocutory appeals have been taken up. And so now, pending that appeal, which decides whether we're going to bankrupt the economy or not and the Appeals Court, whether this case is actually going to go forward on the wiretap claim that's driving this whole case, most cases including cases like this one that have other claims in them, including against plaintiff's same law firm who agreed to a stay in other cases, most cases have been stayed and discovery's not happening, and there's good

reasons for that. One of the motions we filed yesterday is also motions to stay pending those appeals.

THE COURT: And then until I got this notice of the motion to stay, it sounded as if all the discovery disputes which were scheduled for a hearing today, you still haven't gotten a decision on the motion to suppress, and somewhere in between you got it; am I right about that?

MR. KENNEY: So, Your Honor, there is not a motion to suppress that was filed --

THE COURT: Dismiss, I mean.

MR. KENNEY: So the motion to dismiss was decided towards the end of November --

THE COURT: Of 2023?

MR. KENNEY: 2023.

THE COURT: So all of this was filed while you were awaiting that decision?

MR. KENNEY: No, Your Honor. The motion for protective order and the motion to compel had all been filed before the motion to dismiss was even heard and then before it was decided. They've been pending since about the end of September.

THE COURT: Because some of the arguments that I was reading was essentially asking that it wait until the motion to dismiss was decided.

MR. DONOHO: That's right.

MR. KENNEY: That's correct.

THE COURT: Okay. Okay.

MR. KENNEY: But we would -- we think that those arguments are probably now moot given the posture of the case.

THE COURT: And so something Counsel just said struck me. You've agreed to a stay in other cases?

MR. KENNEY: There was an agreement to a stay in one case that was pending in the BLS because the BLS had been staying other cases, including those in front of Judge Kazanjian. There have been no decisions that we are aware of, and certainly not in our cases where a motion to stay has been granted over the opposition of the plaintiffs. It had only been either agreed or had been a stay because the case had been reported, so Rule 64A, interlocutory appeal and related stay.

Not in a case like this where until yesterday there had not even been a notice of an intent to bring any assortment of appeal and where there has been no appeal. So this is a meaningfully different case than any of the ones that have been stayed for that and other reasons, which plaintiffs will respond to in writing within ten days as they're permitted to under the rule.

And we think that's how this should be taken up consistent with Rule 9A and 9C, not a motion that was

brought to our attention yesterday and which the Counsel at this table did not even receive until about 11:00 a.m. this morning.

MR. HAWKINS: In the case that is on appeal with Judge Kazanjian, that's being opposed too. It's not an uncontested, you know case that's up there.

THE COURT: Oh, no. Well, I would assume that.

MR. HAWKINS: Right.

MR. KENNEY: One other important difference between this case and the Kazanjian case is -- I hope we would be able to focus on the discovery disputes that are ripe. There are five causes of action in this case. Only one of them is the wiretap. Defendants characterize that as being the driving claim in this case. That's not how plaintiffs see it.

Frankly, this case is going to go forward regardless of what happens in the Appeals Court. And so this is not a situation where it's 100 percent up or 100 percent down, depending on what happens there. But, again, I'd just urge that we focus on the motions that are ripe and that have been pending since September, and the significant discovery issues that I think Your Honor alluded to a little while ago.

THE COURT: All of which could potentially become moot depending upon what the Appeals Court does.

UNIDENTIFIED SPEAKER: No.

MR. HAWKINS: That was also an argument that was made (inaudible) motion to dismiss. Like let's -- let's stay (inaudible) motion to dismiss. Now let's stay it because there's this. Now let's stay it because there's the next thing. It's -- are we going to have to go up to the SJC in continuing to stay it (inaudible)? I mean there's a scheduling order that should be abided to, that we're here because it's not.

And, you know, if you play this out -- you know, the defendant's operating on their own schedule. And, you know, no court (inaudible) say discovery pending, you know, the outcome of a motion to dismiss. And even in the filing, you know, defense has -- let's wait to see what happens to the motion to dismiss and 30 days later, which is, you know, in December, we'll start to comply with it in discovery. And now it's well, we're going to file this next thing and we'll see where that goes and then we'll comply.

MR. KENNEY: And, Your Honor, just to make one thing very clear, you asked wouldn't this be moot. Again, no. The discovery that we are seeking is discovery that's going to apply to all of these claims. To one example, the invasion of privacy claim that's in this case is based on the same conduct as a wiretap act but it does not require us to prove a violation of the wiretap act.

Filed 1/22/2024 6:48 PM
erior Court - Essex
ket Number 2277CV01000


So all the discovery that we are asking for today is still going to be relevant and should be produced whether it's now or a year or more down the road once we have some direction from the Court of Appeals.

The only question is, are we going to keep discovery in this case moving forward in the meantime to where it ultimately needs to go or are we going to pause it for an indefinite period of time for an opinion that's maybe not going to change anything and certainly is not going to wipe out this case?

MR. DONOHO: May I respond to that, Your Honor?

THE COURT: Sure.

MR. DONOHO: So, Counsel is starting to argue against the merits of our motion to stay pending interlocutory review in the cases. I think there are many reasons why discovery would need to be redone depending on the way those issues are being decided in the Appeals Court. There's a lot that has to happen in here, and it is -- right now it's a hundred-million-dollar case.

Without the Wiretap Act, it's going to be -- well, they allege no actual injury at all for the remaining claims. So how are those cases going to be differently litigated? That's one thing. But the claims themselves, the nature of the claim, the privacy claim, depends on for example how the ordinary course of its business exception is decided in the

Appeals Court.

We've laid out a lot of this in our -- in our motion, and I don't want to argue now. But I do think that on the timing issue, it would make sense to have the ten days to brief the motion to stay. We'll reply promptly, and we'll be right back before Your Honor to argue these issues then.

MR. KENNEY: And, Your Honor, none of that prevents us from dealing with the discovery issue today. I think we should take this one step at a time, figure out what discovery is going to look like going forward, and then Your Honor can consider the motions that are going to be in front of you based on a full papered up record as opposing Counsel just described.

THE COURT: It's the cart before the horse. I think the Court needs to hear on the motion to stay and make a decision on the motion to stay before it dives into this. Because if a decision is made that it's stayed, the picture as it pertains to all the discovery requests could change significantly.

So I can give you a date for that hearing.

Do you have the calendar?

MR. KENNEY: Your Honor, we can take a date. I will say again, plaintiff's position, and I think this will be borne out, is discovery will not change based on what happens in the appeal. Obviously if the case is stayed,

1/22/2024 6:48 PM
Court - Essex
umber 2277CV01000



that -- the case is stayed. That's one thing. But we will be back in the same position in a year regardless of what happens if this case is stayed.

MR. DONOHO: Disagree.

THE COURT: So Tuesdays and Thursdays are the days for motions.

THE CLERK: If you want to throw out a date I can look and see what it looks --

THE COURT: I don't know --

THE CLERK: Do you want me to pick a date (inaudible) --

THE COURT: Like the third, fourth week in -- last week in January?

THE CLERK: That would be January 30th. Let me just take a quick peek at that.

Yeah, I think we can squeeze that in there. Things can -- so, yeah. January 30th would work.

THE COURT: That works for you. Does that work for you?

MR. KENNEY: We will be here.

THE COURT: Okay. All right. So --

MR. KENNEY: And just to be clear, will that be a continued hearing on these motions and a hearing on the motion to stay or --

THE COURT: So why don't we do this. Why don't we put

iled 1/22/2024 6:48 PM
or Court - Essex
t Number 2277CV01000



the motion to stay on for argument if that's something -- be prepared on the discovery ones. Because if the court -- it's not going to be me leading the session, but if the court, you know, is able to move on the discovery, rather do the -- rather than have you come back again you could do them both on that day.

MR. DONOHO: Thank you, Your Honor.

THE COURT: Okay.

MR. DONOHO: And one further question too, there's also the motion to report the separate interlocutory issue that's different from the other ones on appeal. We also filed the SJ. Will that be also up for hearing on the 30th as well?

THE COURT: We'll put those all on for hearing.

MR. DONOHO: Okay. Thank you.

THE COURT: Okay.

MR. KENNEY: Understood.

THE COURT: All right. Thank you so much.

(Matter concluded at 3:13 p.m.)

d 1/22/2024 6:48 PM
Court - Essex
Number 2277CV01000



The Commonwealth of Massachusetts
ADMINISTRATIVE OFFICE OF THE TRIAL COURT
Office of Transcription Services (OTS)
Two Center Plaza
Boston, Massachusetts 02108

## AUDIO ASSESSMENT FORM (AAF)

***Approved Court Transcriber:*** *Complete one (1) Audio Assessment Form (AAF) for each volume of transcript, attach the original AAF to the next to last page of each volume of transcript, and FAX a copy of the AAF to OTS at 617-878-0762.*

TODAY'S DATE: 1/4/24 TRANSCRIBER NAME: Benjamin Gold

CASE NAME: John Doe v Emerson DOCKET NO.: 2277CV01000

JUDGE: Lynn C. Rooney RECORDING DATE: 12/21/23

TRANSCRIPT VOLUME: 1 OF 1

QUALITY OF AUDIO:
(check one)
- [x] excellent
- [ ] good
- [ ] fair
- [ ] poor

TYPE OF AUDIO:
(check one)
- [ ] CD
- [ ] TAPE

(check all that apply)
- [ ] background noise
- [x] low audio
- [ ] low audio at sidebar
- [ ] simultaneous speech
- [ ] speaking away from microphone

TIME STAMP or INDEX NUMBER

3:00:39, 3:07:43, 3:08:09, 3:11:54

COMMENTS:

C E R T I F I C A T E

I, Benjamin K. Gold, a Professional Verbatim Reporter, do hereby certify that the foregoing is a true and accurate transcript prepared to the best of my ability, from the audio recording produced by Court Personnel of the District Court Department court proceedings in the above entitled matter.

I, Benjamin K. Gold, further certify that the foregoing is in compliance with the Administrative Office of the Trial Court Directive on Transcript Format.

I, Benjamin K. Gold, further certify that I neither am counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken, and further that I am not financially nor otherwise interested in the outcome of the action.

(The proper name spellings herein, unless otherwise indicated, are phonetically spelled.)

//Benjamin K. Gold// 1/24/23

PLEASE NOTE: THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION OF THE SAME UNDER THE DIRECT CONTROL AND\OR DIRECTION OF THE CERTIFYING TRANSCRIBER.

Benjamin Gold, Professional Verbatim Reporter
Benjamingold731@gmail.com

d 1/22/2024 6:48 PM
Court - Essex
Number 2277CV01000

# Keyword Index


## #

**#3000** [1] 3:18

## *

* [32] 1:6,6,6,6,6,6,6,6,6,6,6,6,6,7,8,9,10,11,12,13,13,13,13,13,13,13,13,13,13,13,13,13,13

## 0

**01301** [1] 1:19
**02110** [1] 3:3
**02210** [1] 1:24

## 1

**1** [4] 1:1,1,2 4:4
**10:59** [1] 4:10
**100** [2] 11:1,1
**11:00** [1] 10:10
**1100** [1] 2:16
**111** [1] 2:22
**1221** [1] 2:3
**12th** [1] 2:16
**150** [1] 2:10
**16** [1] 1:2

## 2

**20005** [1] 2:17
**201** [1] 3:7
**2023** [3] 4:5 8:21,22
**2049** [1] 3:18
**209-918-1123** [1] 2:18
**21** [1] 4:5
**2277cv01000** [2] 1:9 4:14
**2300** [1] 3:24
**2500** [1] 2:4
**2540** [1] 3:2
**2555** [1] 3:12
**268** [1] 1:23

## 3

**3** [1] 4:13
**3:13** [1] 16:1
**30** [1] 11:23
**305-960-6923** [1] 3:9
**30th** [3] 14:22,25 15:20
**312-741-5220** [1] 2:13
**3200** [1] 3:7
**33131** [1] 3:8
**393** [1] 1:18

## 4

**4** [1] 4:13
**4100** [1] 2:11
**413-774-5300** [1] 1:20
**415-544-1904** [1] 4:1
**424-324-3477** [1] 3:20
**4700** [1] 2:23

## 5

**555** [1] 3:23

## 6

**60606** [2] 2:12,24
**617-391-9001** [1] 1:25
**617-531-1411** [1] 3:4
**64108** [1] 3:13
**64a** [1] 9:23

## 7

**77010** [1] 2:5

## 8

**816-559-0306** [1] 3:14

## 9

**90067** [1] 3:19
**94105** [1] 3:25
**9a** [1] 10:8
**9c** [1] 10:8

## A

**a** [41] 5:3,21 6:3,7,12 7:3,10 8:7,13,14,16 9:15,16,20,22,25 10:1,2,8,25 11:5,15,21 12:7,8,11,25 13:2,10,17,20,23,25 14:3,5,10,15,18,23 15:5,6
**a.m** [2] 4:10 10:10
**abided** [1] 11:16
**able** [2] 10:19 15:12
**about** [3] 8:15 9:3 10:10
**accept** [1] 5:14
**act** [4] 7:15 12:7,8 13:3
**action** [1] 10:20
**actual** [1] 13:4
**actually** [2] 5:22 8:3
**adjusted** [1] 7:12
**advertisements** [1] 7:13
**afternoon** [5] 4:12,21,22,24 5:2
**again** [5] 4:12 11:2 12:3 14:6 15:13
**against** [5] 7:8,15,16 8:6 12:21
**ago** [1] 11:6
**agree** [1] 7:5
**agreed** [5] 5:22 6:18 8:7 9:15,22
**agreement** [3] 6:9,21 9:16
**agreements** [1] 6:15
**aguiniga** [1] 2:19
**ahmad** [1] 2:2
**alex** [1] 2:14
**alfred** [1] 3:10
**all** [16] 4:15 5:11,20 6:17 7:16 8:12,23 9:1 11:7 12:5,9 13:4 14:1 15:4,21,25
**allegations** [1] 7:9
**allege** [1] 13:4
**alleging** [1] 7:8
**alluded** [1] 11:5
**already** [1] 5:12
**also** [8] 4:23 6:1,19 8:10 11:10 15:17,19,20
**am** [2] 7:21 8:15
**an** [9] 5:22 6:9,21 9:16 10:1,13 11:10 12:15,16
**and** [63] 2:21 3:1 4:13,15 5:5,14,17 6:2,4,7,7,9,11,14,18 7:5,11,11,12,14,20 8:1,2,8,8,11,14 9:1,2,14,20,24 10:2,4,7,8,9,18,25 11:3,4,18,19,21,23,24,25 12:1,2,10,17 13:1,11,13,15,18,23 14:6,13,16 15:5,6,17
**angeles** [1] 3:19
**answer** [1] 6:5
**any** [2] 10:1,3
**anything** [1] 12:17
**appeal** [8] 5:8 8:1 9:24 10:2,2,12 14:8 15:19
**appealing** [2] 5:4,5
**appeals** [12] 5:10,11,18 7:17,25 8:3,10 10:25 11:8 12:12,25 13:9
**appear** [1] 5:25
**appearances** [3] 1:15 2:8 3:16
**apply** [1] 12:5
**appreciate** [1] 6:24
**april** [1] 6:14
**are** [18] 5:6 7:6,9 9:12,19 10:19,20 11:3,14 12:4,9,13,15,23,25 13:5,19 14:13
**argue** [3] 12:21 13:11,14
**argument** [2] 11:10 15:9
**arguments** [2] 9:5,12
**arrive** [1] 6:10
**as** [9] 6:2 7:21 8:12 10:5,21 12:7 13:20 14:1 15:20
**ask** [1] 5:6
**asked** [1] 12:3
**asking** [2] 9:6 12:9
**assortment** [1] 10:1
**assume** [1] 10:15
**assuming** [1] 7:22
**at** [7] 4:10 6:10 10:9 13:4,17 14:23 16:1
**attention** [1] 10:9
**avenue** [1] 2:16
**awaiting** [1] 8:24
**aware** [1] 9:20

## B

**b** [2] 2:6 4:2
**back** [5] 5:22 6:4 13:14 14:10 15:13
**background** [2] 6:4 7:7
**bacon** [6] 2:21 3:1,6,11,17,22
**ball** [1] 6:22
**bankrupt** [1] 8:2
**based** [3] 12:6 13:20 14:7
**be** [23] 4:11 6:10 7:2 10:7,18 11:16 12:3,10,10,24 13:3,5,14,19 14:6,10,22 15:3,5,5,9,11,20
**because** [8] 9:5,17,22 11:12,13,17 13:25 15:10
**become** [1] 11:7
**been** [19] 5:15,25 6:18 7:

Filed 1/22/2024 6:48 PM
Superior Court - Essex
Docket Number 2277CV01000

# Keyword Index

18,21,25 8:7 9:1,3,17,19, 21,22,22,23 10:1,2,4 11:4
**before** [6] 1:14 9:1,2 13:14, 22,24
**behalf** [1] 4:15
**being** [3] 10:13,21 12:25
**believe** [1] 5:19
**between** [4] 6:4,14 8:15 10:17
**biscayne** [1] 3:7
**bit** [1] 6:3
**bls** [2] 9:17,17
**borne** [1] 14:7
**boston** [2] 1:24 3:3
**both** [1] 15:14
**boulevard** [2] 3:7,12
**brief** [2] 5:19 13:13
**bring** [1] 10:1
**brought** [1] 10:9
**burden** [1] 6:17
**business** [1] 13:8
**but** [8] 7:21 9:11 11:2 12:7 13:6,11 14:9 15:11
**by** [12] 1:21 2:1,6,14,19,25 3:5,10,15,21 4:2 5:15

## C

**c** [3] 1:14 2:6,7
**ca** [2] 3:19,25
**calendar** [1] 14:4
**called** [1] 4:10
**calling** [1] 4:13
**campbell** [1] 2:6
**can** [10] 4:17 6:3,9 7:20 13:19 14:3,5,15,24,24
**capacity** [1] 4:14
**carl** [1] 2:7
**cart** [1] 13:22
**case** [23] 4:10 6:22 8:3,4 9:13,17,23,25 10:3,12,14,18, 18,20,22,24 12:6,14,18 13:2 14:8,9,11
**cases** [13] 5:13,16 7:8,18 8:5,5,7,7 9:15,18,20 12:23 13:5
**causes** [1] 10:20
**century** [1] 3:18
**certainly** [2] 9:20 12:17
**change** [3] 12:17 14:1,7
**characterize** [1] 10:21
**chicago** [2] 2:12,24
**city** [1] 3:13
**claim** [5] 8:4 10:22 12:6 13:7,7
**claims** [4] 8:6 12:5 13:4,6
**clear** [2] 12:3 15:5
**clearly** [1] 6:5
**clerk** [4] 4:12 14:15,18,22
**clicked** [1] 7:9
**client** [1] 5:3
**come** [2] 6:9 15:13
**coming** [1] 6:24
**commonwealth** [3] 1:4 7:8,17
**compel** [1] 9:1
**complied** [1] 5:25
**comply** [2] 11:24 12:1
**concern** [1] 6:13
**concluded** [1] 16:1
**concussion** [2] 7:10,10
**conduct** [1] 12:7
**confidence** [1] 6:21
**consider** [1] 13:19
**consistent** [1] 10:8
**continued** [3] 2:8 3:16 15:6
**continuing** [1] 11:15
**correct** [3] 5:24 6:1 9:9
**could** [4] 7:6 11:7 14:1 15:13
**counsel** [7] 4:17,18 7:4 9:14 10:9 12:21 13:20
**course** [1] 13:8
**court** [50] 1:5 4:3,11,11,21, 24 5:2,10,10,14,17,20,25 6:2,6,23 7:1,4,20 8:3,11,18, 21,23 9:5,10,14 10:15,25 11:7,8,20 12:12,20,25 13:9, 22,23 14:13,17,20 15:1,4,8, 10,12,16,21,23,25
**court's** [3] 5:11,18 7:17
**courtroom** [1] 4:4
**cross** [1] 4:7
**curious** [1] 6:2
**currently** [1] 5:18

## D

**d** [1] 4:6
**date** [4] 14:3,5,15,18
**david** [2] 1:21 2:6
**day** [1] 15:14
**days** [4] 10:5 11:23 13:12 14:13
**dc** [1] 2:17
**deadlines** [2] 6:16,17
**dealing** [1] 13:16
**december** [2] 4:5 11:24
**decided** [5] 8:19 9:3,7 12:25 13:8
**decides** [1] 8:1
**decision** [5] 6:12 8:14,24 13:24,25
**decisions** [1] 9:19
**defendant** [3] 2:20 5:1 6:15
**defendant's** [1] 11:19
**defendants** [1] 10:21
**defense** [1] 11:22
**denied** [2] 5:4 7:22
**depending** [3] 11:2,8 12:24
**depends** [1] 13:7
**described** [1] 13:21
**did** [3] 5:3,14 10:10
**difference** [1] 10:17
**different** [2] 10:3 15:19
**differently** [1] 13:5
**direct** [1] 4:7
**direction** [1] 12:12
**disagree** [1] 14:12
**discovery** [19] 6:7,16,21 8:12 10:19 11:4,20,24 12:4,4, 9,13,24 13:16,18 14:1,7 15:10,12
**discovery's** [1] 8:8
**dismiss** [10] 5:4 7:22 8:18, 19 9:2,7 11:11,12,21,23
**disputes** [2] 8:12 10:19
**dives** [1] 13:24
**do** [10] 5:17,21 6:11,20 13:11 14:4,18 15:8,12,13
**docket** [3] 1:9 4:13 5:19
**doe** [2] 1:7 4:14
**does** [4] 5:25 11:8 12:7 15:1
**dollars** [1] 7:15
**don't** [7] 6:11 7:2,20 13:11 14:17 15:8,8
**done** [1] 5:17
**donoho** [16] 2:25 4:25,25 5:6,11,15,18 7:5,24 9:8 12:19,21 14:12 15:15,17,22
**down** [2] 11:1 12:11
**dozens** [1] 7:7
**dravillas** [1] 2:14
**drive** [1] 2:22
**driving** [2] 8:4 10:22
**due** [1] 5:19

## E

**e** [3] 2:1,6 4:6
**east** [1] 3:18
**economy** [1] 8:2
**either** [1] 9:22
**emerson** [3] 1:11 4:16 5:1
**emyr** [1] 3:5
**encrypted** [1] 7:11
**end** [2] 8:20 9:3
**entered** [1] 7:10
**entire** [1] 7:16
**erin** [1] 2:1
**essentially** [1] 9:6
**essex** [3] 1:5,5 4:3
**even** [4] 9:2 10:1,10 11:21
**everything** [1] 7:21
**example** [2] 12:5 13:7
**exception** [1] 13:8
**exhibits** [2] 1:3 4:8

## F

**facebook** [2] 7:11,12
**far** [1] 5:12
**federal** [1] 3:2
**figure** [1] 13:17
**file** [1] 11:25
**filed** [6] 7:24 8:9,17,23 9:1 15:19
**filing** [1] 11:21
**findings** [1] 5:7
**firm** [1] 8:6
**first** [1] 5:19

Date Filed 1/22/2024 6:48 PM
Superior Court - Essex
Docket Number 2277CV01000

# Keyword Index


**five** [1] 10:20
**fl** [1] 3:8
**floor** [1] 2:16
**focus** [2] 10:19 11:3
**for** [24] 1:16 2:20 4:17,19, 23,25 5:7 7:14 8:9,13,25 10:4 12:9,15,16 13:4,7 14: 3,13 15:1,1,9,20,21
**forth** [1] 6:4
**forward** [5] 6:22 8:4 10:24 12:14 13:18
**foster** [1] 2:6
**fourth** [1] 14:20
**francisco** [1] 3:25
**frankly** [1] 10:24
**from** [6] 6:11,20,25 12:12 13:16 15:19
**front** [2] 9:18 13:19
**full** [1] 13:20
**further** [1] 15:17

## G

**get** [1] 5:3
**give** [1] 14:3
**given** [1] 9:12
**go** [5] 6:8 8:3 10:24 11:14 12:15
**goes** [1] 12:1
**going** [21] 5:6 6:8,21 7:2 8: 2,3 10:24 11:14,25 12:4,10, 13,15,17,17 13:3,5,18,18, 19 15:11
**good** [6] 4:12,21,22,24 5:2 8:8
**google** [2] 7:11,12
**got** [3] 5:12 8:11,15
**gotten** [1] 8:14
**grand** [1] 3:12
**granted** [1] 9:21
**greenfield** [1] 1:19
**gustafson** [1] 2:7

## H

**had** [7] 6:18 9:1,17,22,22, 23,25
**hall** [1] 6:9
**happen** [1] 13:1
**happened** [1] 7:23
**happening** [1] 8:8
**happens** [5] 10:25 11:2,22 14:8,11
**happier** [1] 6:10
**happy** [2] 6:6,11
**hardy** [6] 2:21 3:1,6,11,17, 22
**has** [5] 7:21 9:21 10:2 11: 22 13:1
**hatcher** [1] 3:15
**hates** [1] 5:10
**have** [18] 4:17 5:21,25 6:15, 20 7:6,18,25 8:5,7 9:19 10: 3 11:3,14 12:11 13:12 14:4 15:13
**haven't** [1] 8:13
**hawkins** [6] 1:21 4:19,19 10:12,16 11:10
**healthcare** [1] 5:12
**hear** [2] 6:11 13:23
**heard** [1] 9:2
**hearing** [6] 8:13 14:3 15:6, 6,20,21
**hello** [1] 4:25
**her** [1] 5:16
**here** [5] 6:13 7:9 11:16 13: 1 15:3
**his** [1] 4:14
**honor** [21] 4:12,13,19,22, 25 5:6,24 6:1,3,13,24 8:16, 25 11:5 12:2,19 13:14,15, 19 14:5 15:15
**honorable** [1] 1:14
**hope** [1] 10:18
**horse** [1] 13:22
**hospital** [4] 1:11 4:16 5:1 7:15
**hospitals** [2] 7:8,16
**houston** [1] 2:5
**how** [4] 10:7,22 13:5,7
**howe** [1] 5:21
**hundred-million-dollar** [1] 13:2
**hundreds** [1] 7:14

## I

**i** [36] 4:6,17 5:3,3,4,19,21 6: 3,4,7,24 7:5,6,20,20,21 8: 11,15,18 9:5 10:15,18 11:5, 15 12:19,23 13:11,11,16, 22 14:3,5,6,15,17,24
**i'd** [1] 11:2
**i'll** [1] 6:12
**i'm** [5] 6:2,6,7,11 7:22
**i've** [1] 5:20
**identify** [1] 4:17
**if** [14] 6:3,8,9,10 7:6 8:12 11: 18 13:25 14:8,11,15 15:9, 10,11
**il** [2] 2:12,24
**important** [1] 10:17
**in** [43] 4:11,14 5:7,15,23 6:8, 22 7:8,16 8:6,7,15 9:15,16, 17,18,20,25 10:5,12,20,22, 25 11:14,21,23,24 12:6,13, 14,23,25 13:1,8,10,10,19 14:8,10,10,20,21,24
**inaudible** [5] 11:11,12,15, 20 14:19
**including** [3] 8:5,6 9:18
**indefinite** [1] 12:16
**indiscernible** [1] 5:8
**individually** [1] 4:14
**informal** [1] 6:21
**informally** [1] 6:18
**injury** [1] 13:4
**intent** [1] 10:1
**interlocutory** [5] 5:7 7:25 9:23 12:22 15:18
**interrupt** [1] 7:20
**into** [1] 13:24
**invasion** [1] 12:6
**is** [38] 4:11 5:3,19,24 6:1,13, 14,21,24 7:7,14,17,22 8:3, 9,16 10:2,12,18,21,24,25 11:23 12:4,6,9,13,17,21 13: 1,8,18,25 14:7,8,9,11 15: 12
**issue** [5] 6:7,12 13:12,16 15:18
**issued** [2] 5:22,22
**issues** [3] 11:5 12:25 13: 14
**it** [24] 5:5,12,14,17,21 6:8 8: 12,15 9:2,6,22 10:23 11:12, 13,15,24 12:7,14,15 13:1, 12,24 14:1,16
**it's** [14] 5:11,15,18 10:13 11:1,14,17,25 12:11 13:1,3, 22,25 15:11
**its** [1] 13:8

## J

**j** [3] 2:7,14 3:10
**january** [3] 14:21,22,25
**jenn** [1] 3:15
**jessica** [1] 3:21
**john** [2] 1:7 4:14
**johnson** [1] 2:6
**jonathan** [1] 2:1
**judge** [4] 5:15,21 9:19 10: 12
**july** [1] 5:23
**just** [13] 5:3,3 7:2,5,6,7,20 9:14 11:2 12:2 13:21 14:22 15:5
**justin** [4] 2:7,25 4:22,25

## K

**kansas** [1] 3:13
**kazanjian** [4] 5:15 9:19 10: 13,18
**keep** [1] 12:13
**keller** [2] 2:9,15
**kenney** [23] 2:7 4:22,23 5: 24 6:1,3,13,24 7:2 8:16,19, 22,25 9:9,11,16 10:17 12:2 13:15 14:5 15:3,5,24
**know** [10] 5:17 10:14 11: 18,18,19,20,22,23 14:17 15:12

## L

**l.l.p** [1] 3:1
**laid** [1] 13:10
**last** [1] 14:20
**later** [1] 11:23
**law** [3] 1:17,22 8:6
**lawrence** [1] 4:3
**lay** [1] 6:3
**leading** [1] 15:11
**legal** [1] 5:7
**let** [2] 6:6 14:22
**let's** [5] 11:11,11,12,13,22

# Keyword Index


**like** [6] 6:8 8:5 9:25 11:11 13:18 14:20
**list** [1] 4:13
**litigated** [1] 13:5
**little** [2] 6:3 11:5
**ll** [1] 1:23
**llc** [2] 2:9,15
**llp** [5] 2:21 3:6,11,17,22
**look** [2] 13:18 14:15
**looks** [1] 14:16
**los** [1] 3:19
**lot** [2] 13:1,10
**lynn** [1] 1:14

## M

**m** [1] 2:1
**ma** [3] 1:19,24 3:3
**made** [2] 11:10 13:25
**main** [1] 1:18
**make** [3] 12:2 13:12,23
**many** [1] 12:23
**massachusetts** [2] 1:4 7:16
**matter** [1] 16:1
**may** [1] 12:19
**maybe** [1] 12:16
**mchugh** [1] 2:1
**mckinney** [1] 2:3
**me** [5] 6:6 9:15 14:18,22 15:11
**mean** [3] 7:20 8:18 11:15
**meaningfully** [1] 10:3
**meantime** [1] 12:14
**mensing** [1] 2:2
**merits** [1] 12:22
**merrigan** [4] 1:17,21,22 2:1
**met** [2] 6:18,19
**miami** [1] 3:8
**might** [1] 6:9
**millions** [1] 7:14
**minimize** [1] 6:17
**mission** [1] 3:23
**mo** [1] 3:13
**moment** [1] 7:7
**moot** [3] 9:12 11:7 12:3
**more** [1] 12:11
**morning** [1] 10:11
**most** [3] 7:18 8:5,7
**motion** [25] 5:4 7:22,25 8:12,14,16,19,25 9:1,2,6,20 10:8 11:11,12,21,23 12:22 13:10,13,23,24 15:7,9,18
**motions** [7] 5:8 8:9,10 11:3 13:19 14:14 15:6
**move** [2] 6:22 15:12
**moving** [1] 12:14
**mr** [39] 4:19,22,25 5:6,11,15,18,24 6:1,3,13,24 7:2,5,24 8:16,19,22,25 9:8,9,11,16 10:12,16,17 11:10 12:2,19,21 13:15 14:5,12 15:3,5,15,17,22,24
**much** [2] 6:10 15:25
**multiple** [1] 6:15

## N

**n** [3] 2:10 3:21 4:6
**n.w** [1] 2:16
**nathan** [1] 2:6
**nature** [2] 7:12 13:6
**need** [1] 12:24
**needs** [3] 5:12 12:15 13:23
**next** [2] 11:13,25
**no** [10] 1:9 6:7 8:25 9:19 10:2,15 11:9,20 12:3 13:4
**none** [2] 1:3 13:15
**non-productiveness** [1] 7:5
**not** [21] 5:25 6:18,19,20 8:2,8,16 9:20,25 10:1,8,10,13,22,25 11:17 12:7,16,17 14:7 15:11
**notice** [4] 5:3,9 8:11 10:1
**november** [1] 8:20
**now** [12] 6:14,18 7:14,24 8:1 9:12 11:12,13,25 12:11 13:1,11
**number** [2] 4:13,14

## O

**o** [1] 3:15
**obviously** [1] 14:8
**of** [51] 1:1,2,4 4:15 5:7,8,12,16 6:3,4,13,14,17 7:7,7,12,14,15,18,19 8:9,11,20,21,23 9:3,5,12,18,20,21 10:1,2,3,20,20,24 11:7,21 12:5,6,8,12,16,22 13:6,8,10,15,20 14:10
**officer** [1] 4:11
**oh** [1] 10:15
**okay** [9] 5:20 6:23 7:1 9:10,10 15:4,16,22,23
**on** [32] 4:13,15 5:18 6:21 7:5,6,9,10 8:4,14 10:12,19 11:2,3,19 12:6,24 13:7,11,20,23,24 14:7 15:6,6,9,10,12,14,19,20,21
**once** [2] 7:22 12:11
**one** [16] 3:2 5:7,8 7:7,19 8:5,9 9:16 10:17,20 12:2,5 13:6,17 14:9 15:17
**one's** [1] 6:8
**ones** [3] 10:3 15:10,19
**only** [3] 9:22 10:20 12:13
**operating** [1] 11:19
**opinion** [1] 12:16
**opposed** [1] 10:13
**opposing** [1] 13:20
**opposition** [1] 9:21
**or** [8] 7:10 8:2 9:22 11:1 12:11,11,15 15:7
**order** [5] 5:22 6:7,19 9:1 11:16
**ordinary** [1] 13:8
**other** [7] 8:5,7 9:15,18 10:4,17 15:19
**others** [1] 4:15
**our** [8] 4:13 7:15,24 9:20 10:9 12:22 13:10,10
**out** [7] 6:8 11:18 12:18 13:10,17 14:7,15
**outcome** [1] 11:21
**over** [1] 9:21
**own** [1] 11:19

## P

**p.c** [1] 2:2
**p.m** [1] 16:1
**page** [2] 1:2 4:8
**papered** [1] 13:20
**papers** [1] 5:21
**park** [1] 3:18
**parties** [1] 6:4
**pause** [1] 12:15
**peek** [1] 14:23
**pending** [7] 8:1,10 9:3,17 11:4,20 12:22
**percent** [2] 11:1,1
**period** [1] 12:16
**permitted** [1] 10:6
**perspective** [1] 6:20
**pertains** [1] 14:1
**phase** [1] 6:16
**phone** [9] 1:20,25 2:13,18 3:4,9,14,20 4:1
**pick** [1] 14:18
**picture** [1] 13:25
**pixel** [1] 5:12
**plaintiff** [6] 1:16 4:20,23 7:9,13,14
**plaintiff's** [4] 4:18 6:20 8:6 14:6
**plaintiffs** [4] 6:14 9:21 10:4,22
**play** [1] 11:18
**plaza** [1] 2:10
**please** [2] 4:11,17
**position** [2] 14:6,10
**postman** [2] 2:9,15
**posture** [1] 9:12
**potentially** [1] 11:7
**prepared** [1] 15:10
**pretty** [1] 6:7
**prevents** [1] 13:15
**prior** [1] 7:25
**privacy** [2] 12:6 13:7
**probably** [1] 9:12
**proceed** [1] 7:3
**proceedings** [1] 4:9
**produced** [1] 12:10
**productive** [1] 7:3
**promptly** [1] 13:13
**protective** [1] 8:25
**prove** [1] 12:8
**put** [2] 15:8,21

## Q

**question** [4] 5:21 6:5 12:13 15:17
**quick** [1] 14:23

Date Filed 1/22/2024 6:48 PM
Superior Court - Essex
Docket Number 2277CV01000

# Keyword Index


## R

r [1] 2:25
rather [2] 15:12,13
reached [1] 6:15
read [1] 5:20
reading [1] 9:6
reasons [3] 8:9 10:4 12:23
receive [1] 10:10
record [2] 4:18 13:20
recross [1] 4:7
redirect [1] 4:7
redone [1] 12:24
regardless [2] 10:24 14:10
related [1] 9:24
relevant [1] 12:10
remaining [1] 13:4
remy [1] 3:5
reply [1] 13:13
report [2] 5:6 15:18
reported [2] 5:15 9:23
requests [1] 14:1
require [1] 12:7
respond [2] 10:5 12:19
review [1] 12:23
right [8] 5:20 8:15 9:8 10:16 13:1,14 15:4,25
ripe [2] 10:19 11:3
riverside [1] 2:10
road [1] 12:11
rooney [1] 1:14
rule [3] 9:23 10:6,8
ruling [1] 5:7
ryan [2] 1:21 4:19

## S

s [2] 2:22 3:7
said [1] 9:14
saikali [1] 3:10
same [3] 8:6 12:7 14:10
san [1] 3:25
santoro [1] 2:1
sara [1] 2:19
say [2] 11:20 14:6
sc [1] 4:4
schedule [1] 11:19
scheduled [1] 8:13
scheduling [1] 11:16
seated [1] 4:11
see [5] 6:9 10:23 11:22 12:1 14:16
seeking [1] 12:4
seems [1] 5:21
sense [1] 13:12
sent [2] 7:11,13
separate [1] 15:18
september [2] 9:4 11:4
session [2] 4:11 15:11
set [1] 7:6
shook [6] 2:21 3:1,6,11,17,22
should [4] 10:7 11:16 12:10 13:17
significant [1] 11:4
significantly [1] 14:2
similarly [1] 4:15
since [3] 7:24 9:3 11:4
situated [1] 4:15
situation [1] 11:1
sj [1] 15:20
sjc [1] 11:14
so [27] 5:12,20 6:8,20,24 7:11,14,18,21,24 8:1,16,19,23 9:14,23 10:2,25 12:9,21 13:4 14:3,13,25 15:4,8,25
some [3] 7:7 9:5 12:11
something [3] 6:10 9:14 15:9
somewhere [1] 8:14
sounded [1] 8:12
speaker [1] 11:9
squeeze [1] 14:24
ss [1] 1:5
stage [1] 7:6
start [1] 11:24
starting [2] 4:18 12:21
stay [19] 7:25 8:7,10,12 9:15,16,21,22,24 11:11,12,13,15 12:22 13:13,23,24 15:7,9
stayed [8] 7:18,21 8:8 10:4 13:25 14:8,9,11
staying [1] 9:18
step [1] 13:17
still [2] 8:13 12:10
street [4] 1:18,23 3:2,23
struck [1] 9:14
suing [1] 7:14
suite [6] 2:4,11,23 3:2,7,24
summer [1] 1:23
superior [2] 1:5 4:3
suppress [2] 8:14,17
sure [2] 6:7 12:20
sweeney [2] 1:17,22

## T

table [1] 10:10
take [4] 5:4 13:17 14:5,23
taken [2] 8:1 10:7
taking [1] 7:18
tammy [1] 4:2
tell [1] 6:6
ten [2] 10:5 13:12
term [1] 7:11
than [2] 10:3 15:13
thank [3] 15:15,22,25
that [63] 5:5,7,8,10,21,22,24 6:1,5,10,11,14,18,21 7:9,11,22,24 8:1,5,9,15,17,24 9:5,6,11,17,19 10:3,4,8,12,15,19,21 11:3,3,3,5,10,10,16,16 12:1,4,9,19 13:1,11,15,19,25 14:3,9,22,23,24 15:1,1,5,14,20
that's [17] 5:8 7:2,17 8:4 9:8,9 10:7,13,14,22 12:4,6,16 13:6 14:9 15:9,18
their [1] 11:19
them [4] 5:12 8:6 10:21 15:14
themselves [1] 13:6
then [6] 7:12 8:11 9:2 12:1 13:14,18
there [10] 8:16 9:16,19,25 10:2,14,20 11:2 12:23 14:24
there's [6] 8:8 11:13,13,15 12:25 15:17
these [6] 7:18,24,25 12:5 13:14 15:6
they [3] 5:14 7:21 13:3
they're [1] 10:5
they've [2] 5:17 9:3
thing [5] 11:14,25 12:2 13:6 14:9
things [1] 14:24
think [11] 6:5 7:2 9:11 10:7 11:5 12:23 13:11,16,22 14:6,24
third [1] 14:20
this [33] 6:6,14,22 7:7,18 8:3,4,5,11,23 9:25 10:2,7,10,10,18,20,22,24,25 11:13,18,25 12:3,6,14,18 13:10,17,24 14:6,11 15:8
thomas [1] 1:21
those [6] 8:10 9:11,18 12:24 13:5 15:21
threatened [1] 7:17
through [1] 5:20
throw [1] 14:15
thursdays [1] 14:13
time [2] 12:16 13:17
timing [1] 13:12
to [97] 5:4,6,6,22,25 6:2,6,8,8,9,11,11,16,16,16,18,22 7:2,3,6,11,13,20,22,25 8:2,3,7,10,12,14,16,19 9:1,2,7,15,16,20 10:1,5,6,9,19,24 11:5,11,12,14,14,14,15,16,21,22,22,23,24,25 12:2,5,5,5,8,10,13,14,15,15,17,17,19,21,22,24 13:1,3,5,11,12,12,13,14,18,19,23,23,24 14:1,15,18 15:5,7,9,11,12,18
today [5] 4:13 7:6 8:13 12:9 13:16
too [2] 10:13 15:17
towards [1] 8:20
try [1] 6:16
tucker [2] 1:21 2:1
tuesday [1] 5:19
tuesdays [1] 14:13
two [2] 5:12,16
tx [1] 2:5

## U

ultimately [1] 12:15
uncontested [1] 10:14
under [2] 7:15 10:6
understood [1] 15:24

2/2024 6:48 PM
...rt - Essex
Date ... ber 2277CV01000
Su...
D...

# Keyword Index

unfortunately [1] 6:17
unidentified [1] 11:9
until [4] 8:11 9:6,25 10:10
up [8] 7:18 8:1 10:7,14 11:1,14 13:20 15:20
upon [1] 11:8
urge [1] 11:2
us [2] 12:7 13:15

V

v [1] 1:9
various [1] 6:16
vermon [1] 2:16
versus [1] 4:15
very [2] 6:5 12:3
victoria [1] 2:1
violation [1] 12:8
volume [1] 1:1

W

wacker [1] 2:22
wahl [1] 3:21
wait [2] 9:6 11:22
want [5] 6:8,11 13:11 14:15,18
warden [2] 1:21 2:6
was [19] 5:4,4,22 6:19 7:11,22 8:17,19,23 9:2,2,5,6,7,16,17 10:8 11:10,10
washington [1] 2:17
way [2] 7:3 12:24
ways [2] 6:16,16
we [27] 5:6 6:14,20 7:2,6,24 8:9 9:11,11,19 10:7,18 11:3,14 12:4,9,11,13,15 13:16 14:5,9,24 15:3,8,8,19
we'll [6] 11:24,25 12:1 13:13,13 15:21
we're [3] 8:2 11:16,25
we've [1] 13:10
webb [1] 4:2
website [1] 7:10
week [2] 14:20,20
well [6] 5:11 6:6 10:15 11:25 13:3 15:20
were [3] 6:18 8:13,23
what [10] 5:17 7:23 10:25 11:2,8,22 13:17 14:7,10,16
where [8] 6:24 7:6 9:20,25 10:2 11:1 12:1,14
whether [3] 8:2,3 12:10
which [6] 8:1,13 10:4,9 11:7,23
while [2] 8:23 11:5
who [1] 8:7
whole [1] 8:4
why [5] 6:2 7:17 12:23 15:8,8
will [10] 6:5,7 10:5 14:5,6,7,9 15:3,5,20
wipe [1] 12:17
wiretap [6] 7:15 8:4 10:21 12:7,8 13:3
with [9] 4:18 5:17,25 6:10,15 10:8,12 11:24 13:16
within [1] 10:5
without [1] 13:3
witness [1] 4:7
word [2] 7:9,10
work [11] 1:20,25 2:13,18 3:4,9,14,20 4:1 14:25 15:1
works [1] 15:1
would [7] 9:11 10:15,18 12:24 13:12 14:22,25
wouldn't [1] 12:3
writing [1] 10:5

X

x [1] 4:6

Y

yeah [2] 14:24,25
year [3] 6:14 12:11 14:10
yesterday [4] 5:9 8:9 9:25 10:9
you [34] 5:8,17 6:6,8,9,9,11,11 7:21 8:13,15,23 10:14 11:18,18,18,19,20,21,23 12:3 13:20 14:3,4,15,18 15:1,2,12,13,13,15,22,25
you'll [1] 6:10
you're [1] 5:5
you've [1] 9:15
your [23] 4:12,12,19,22,25 5:3,6,24 6:1,3,5,13,24 8:16,25 11:5 12:2,19 13:14,15,18 14:5 15:15
yourselves [1] 4:17

Z

zavitsanos [1] 2:2

COMMONWEALTH OF MASSACHUSETTS

| | | |
|---|---|---|
| ESSEX, ss | ) | TRIAL COURT DEPARTMENT |
| | ) | SUPERIOR COURT |
| JOHN DOE, individually and on behalf of all others similarly situated, | ) | |
| | ) | |
| Plaintiff, | ) | DOCKET NO. 2277CV01000D |
| v. | ) | |
| EMERSON HOSPITAL, | ) | |
| Defendant. | ) | |

**EMERSON HOSPITAL'S MEMORANDUM**
**IN SUPPORT OF ITS MOTION TO STAY**

Pursuant to this Court's inherent discretion to manage its docket, Defendant Emerson Hospital ("Emerson"), respectfully submits this Memorandum of Law in support of its motion to stay this action pending interlocutory appellate decisions in two cases consolidated for interlocutory appeal, *Vita v. Beth Israel Deaconess Medical Center, Inc.*, No. 2384CV00480-BLS1, and *Vita v. New England Baptist Hospital*, No. 2384CV00857-BLS1. The appeal of those matters has the potential to eliminate the wiretap claim from this case or, alternatively, to narrow or clarify its scope. A stay will promote the interests of judicial economy and prevent undue burden and waste of the parties' resources by eliminating the potential need to expend and/or re-expend thousands of hours, and hundreds of thousands (or even millions) of dollars, in effort and costs related to discovery, class certification, and summary judgment.[1]

[1] Emerson has also simultaneously moved this Court pursuant to Rule 64(a) to report for interlocutory review a separate issue that could also eliminate the wiretap claim from this case, and to stay further proceedings pending interlocutory appeal of that issue. *See* Notice of Motion to Report for Interlocutory Appeal the Court's Finding that Adtech Software Is an "Intercepting Device" Under Massachusetts' Wiretap Act.

## I. BACKGROUND

This is a putative class action brought by Plaintiff John Doe against Emerson Hospital, alleging violation of the Massachusetts Wiretap Act, M.G.L. c. 272, § 99, asserting additional claims, and seeking tens or hundreds of millions of dollars in statutory damages under the Wiretap Act. First Amended Complaint ("FAC") ¶ 193.

The following adtech software healthcare cases have been reported for interlocutory appellate review and are currently on appeal. **Exhibit A**, Nov. 31, 2023 Order Reporting for Appellate Review in *Vita v. Beth Israel Deaconess Medical Center, Inc.*, No. 2384CV00480-BLS1; **Exhibit B**, Oct. 31, 2023 Order Reporting for Appellate Review in *Vita v. New England Baptist Hospital*, No. 2384CV00857-BLS1 ("*Vita* cases"). In the *Vita* cases, the issues being appealed are whether, under the Wiretap Act, alleged disclosures via adtech software (1) are "wire communications"; (2) were "secret[]"; and (3) fall under the "ordinary course of its business" exception. **Exhibit C**, Application for Direct Appellate Review of Both Cases, at 11 (setting forth the issues in full).

A final appellate ruling in the *Vita* appeals may result in a holding that eliminates, narrows, or clarifies the scope of the wiretap act as applied to this case.

## II. LEGAL STANDARD

This Court has inherent power over its courtroom, including broad discretion to issue a stay so as to effectively manage its docket. *See Landis v. North Am. Co.*, 299 U.S. 248, 254 (1936) ("The power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants"); *Sommer v. Maharaj*, 451 Mass. 615, 621 (2008) (court has "inherent power ... to manage [its] own affairs so as to achieve the orderly and expeditious disposition of cases").

In deciding whether to exercise discretion to enter a stay, courts should consider the interest of judicial economy and orderly adjudication, as well as the potential detriment or burden to the parties of a stay. *See Dir. Of Div. of Employment Sec. v. Town of Mattapoisett*, 392 Mass. 858, 861 (1984) (court should balance possible prejudice to litigants with the "benefits of judicial economy and orderly adjudication"); *Town of Danvers v. Wexler Const. Co.*, 12 Mass. App. Ct. 160, 164 (1981) (factors considered in deciding whether to enter stay included "judicial economy" and the interests and potential harm to parties of stay).

A pending appeal in a related or similar matter that is potentially determinative of the same legal or factual issues is a proper basis for entering a stay. *Town of Mattapoisett*, 392 Mass. at 861 ("determination of a cause of action entirely contingent on the validity of an appealed judgment in a separate proceeding should be stayed pending resolution of the appellate process unless the detriment to the litigants of delay outweighs the benefits of judicial economy and orderly adjudication").

## III. ARGUMENT

This Court should exercise its inherent discretion to stay all proceedings in this case pending resolution of the *Vita* appeals because (A) a stay will promote judicial economy; (B) a stay will not prejudice plaintiff, and any prejudice is far outweighed by the prejudice to Emerson absent a stay; and (C) a stay is supported by precedent in other Pixel healthcare cases including those with non-wiretap claims that have been stayed pending the *Vita* appeals.

### A. A Stay Will Promote Judicial Economy.

As noted above, stays are commonly granted when a pending appeal could resolve or clarify a key legal issue in the case or the parties' liability. *See Town of Mattapoisett*, 392 Mass. at 861; *Town of Rockland v. Massachusetts Civil Service Com'n*, No. 2084-CV0-1354, 2021 WL

6246586, at *1 (Mass. Super. Oct. 1, 2021) (noting with approval that matter had been stayed pending a decision by the appeals court in a related matter); *Williams v. Fedex Ground Package Sys., Inc.*, No. 062344C, 2007 WL 3013266, at *1 (Mass. Super. Sept. 20, 2007) (granting stay of case pending resolution of federal MDL that would resolve key issue of plaintiff's employment status in context of related class actions).

Definitive appellate answers to whether alleged disclosures via adtech software (1) are "wire communications"; (2) were "secret[]"; and (3) fall under the "ordinary course of its business" exception could potentially save the parties to this case collectively thousands of hours, and hundreds of thousands (or even millions) of dollars, in effort and costs related to discovery, class certification, and summary judgment, to say nothing of trial. This is true for a number of reasons. For one, rulings on class certification may need to be redone if the wiretap claim is eliminated only by an appeal after final judgment. The wiretap claim, if applicable, presents its own individualized issues precluding a finding of commonality and predominance, including, for example, regarding the following statutory terms:

- "Wire communication." M.G.L. c. 272 § 99(B)(1). It ought to be determined in the *Vita* appeals (Ex. C) that all alleged disclosures via adtech software are not "wire communications" under the Wiretap Act. In the alternative, alleged disclosures via adtech software are not "wire communications" in at least some circumstances, raising individualized issues for each class member. For example, did the individual identify himself when visiting the hospital's website—like one would ordinarily do in a telephone conversation, which is the type of communication the legislature envisioned in 1968 when it enacted the statute? Or, instead, did the individual visit the website anonymously? Did the individual merely click on links or tabs as opposed to entering conversation-like

information into a form? These factual questions specific to each individual and others may determine whether a "wire communication" occurred.

- "Interception." M.G.L. c. 272 § 99(B)(4). An interception, by definition, must be "secret." *Id.* Whether alleged disclosures via adtech software were secret may turn on factual questions specific to each individual. For example, was the individual aware of widespread adtech software? Did he notice the same purported "targeted" advertisements occurring before he visited Emerson's website? Did he participate in a prior settlement regarding adtech software in Massachusetts (*Doe v. Partners Healthcare Sys., Inc.*, No. 1984CV01651-BLS-1 (Mass. Super. Ct.)), or was he aware of it before visiting Emerson's website? An answer of "yes" to any of these questions may be evidence of lack of secrecy.
- "Aggrieved person." M.G.L. c. 272 § 99(B)(6). Whether an alleged class member is an "aggrieved person" capable of obtaining civil relief under the Wiretap Act depends on whether that person's "privacy was invaded in the course of an interception." *Id.* This question, too, may turn on factual questions specific to each individual. For example, what allegedly private information did the individual transmit on Emerson's website? Did the individual transmit that same information to anyone else? Even if not, is that information private by nature? Did the individual read and understand Facebook's privacy policies? All of these questions bear on the question of whether the individual is an "aggrieved person."

Litigation of all of these issues in the discovery, class certification, and summary judgment phases of this case could be avoided, if it is finally determined in the first place that the Massachusetts Wiretap Act does not apply to adtech software cases for any of the reasons being litigated in the *Vita* appeal.

Moreover, the wiretap claim is the main money claim in this litigation by tens or hundreds of millions of dollars and will therefore be the focus and main driver of hotly contested complex litigation in this Court. If the wiretap claim were resolved first by interlocutory appeal, then many arguments would not need to be made and briefs filed in this Court and, indeed, the rest of the case could potentially settle. As one court explained in similar circumstances: "If ... the suit proceeds in the [trial] court on both the [main and other] claims, the completion of the litigation will take longer than if the [main] claim is out of the case, especially since that claim appears to be the plaintiffs' main one, with the [other claims] perhaps just a life jacket. Moreover, uncertainty about the status of the [main] claim may delay settlement (almost all class actions are settled rather than tried), and by doing so further protract the litigation." *Sterk v. Redbox Automated Retail, LLC*, 672 F.3d 535, 536 (7th Cir. 2012).

Furthermore, the interpretation of the Wiretap Act by the Appeals Court in the *Vita* appeals will resolve (or, at a minimum, affect) Plaintiff's remaining claims. For example, one of the issues to be considered on appeal is whether the ubiquitous commercial use of adtech software falls within the ordinary course of business exception set forth in the Wiretap Act. *See* M.G.L. c. 272 § 99(B)(3). To use software within the "ordinary course of business" means that it is utilized for a "legitimate business purpose." *Dillon v. Mass. Bay Transp. Auth.*, 49 Mass. App. Ct. 309, 319 (2000). To support his claim under the Privacy Act, Plaintiff will need to prove Emerson did not have a countervailing legitimate interest in the alleged invasion of privacy. *O'Connor v. Police Com'r of Bos.*, 408 Mass. 324, 330 (1990). If the Appeals Court finds that the Wiretap Act's ordinary course of business exception applies to the technology at issue here, it will be difficult (if not impossible) for Plaintiff to credibly argue that ubiquitous website software used for a legitimate business purpose is outweighed by any reasonable expectation of privacy Plaintiff claims to have

in mouse clicks on Emerson's website. *Wilson v. Transworld Systems, Inc.*, No. ESCV2011-00400, 2013 WL 9932964, at *15 (Mass. Super. May 21, 2013) (holding "[n]o reasonable jury could find that these two calls amounted to an unreasonable, substantial, and serious intrusion upon [plaintiff]'s seclusion"). Further, if the Appeals Court determines that the alleged disclosures via adtech software does not capture "contents" of a communication within the Wiretap Act, this Court could conclude that the collection of mouse clicks was not an unreasonable, substantial or serious intrusion, as many courts have already done. *See, e.g., Popa v. Harriet Carter Gifts, Inc.*, 426 F. Supp. 3d 108, 122 (W.D. Pa. 2019) ("The act of collecting [plaintiff]'s keystrokes, mouse clicks, and PII is simply not the type of highly offensive act to which liability can attach"). The Appeals Court's determinations of the foregoing issues could likewise affect elements of Plaintiff's other non-wiretap claims, such whether any fiduciary or contractual duty existed and was breached, and whether any purported enrichment was unjust.

In sum, a stay will preserve the Parties' from having to expend resources on potentially unnecessary discovery, in addition to serving judicial economy by avoiding any potential need for the court to re-decide class certification or summary judgment issues. *See e.g., Van Emden Mgmt. Corp. v. Marsh & McLennan Companies*, No. CIV.A. 05-0066-A, 2005 WL 2456737, at *3 (Mass. Super. Sept. 21, 2005) ("Furthermore, if the Court were to deny the stay, inconsistent rulings on issues of discovery, class certification and other substantive matters would be likely. That circumstance would disrupt the orderly disposition of the national litigation and generate substantial economic costs for all the parties involved.")

**B. A Stay Will Not Prejudice Plaintiff, While A Denied Stay Will Prejudice Emerson.**

Plaintiff will not be burdened by a stay of this matter. A temporary stay of this case will not materially prejudice Plaintiff because the parties have already negotiated search terms and

Emerson has taken all necessary steps to collect and preserve all potentially responsive documents. Further, Plaintiff has not suffered any actual injury in this case. Moreover, he is and always has been free to change his Facebook settings to prevent the only events he complains of here— that the word "concussion" he anonymously clicked on or entered on Emerson's public-facing website was sent by Emerson to Facebook and Google causing Facebook and Google to adjust the nature of the advertisements they already sent him to be "targeted." FAC ¶¶ 36, 102, 103. Nor is there any pressing need to resolve Plaintiff's claims for statutory damages as soon as possible.

Conversely, Emerson will be prejudiced if a stay is not entered. A stay would avoid the imposition of undue burden and expense on Emerson, a nonprofit healthcare organization. Emerson is not large and does not have in-house counsel. Accordingly, imposing burdensome and expensive discovery that might be for naught and need to be redone is a massive and unnecessary drain on Emerson's limited resources. This is particularly so because the next steps in discovery are incredibly time-consuming and resource-intensive. They include document review, analysis, and production in response to nearly 200 requests for production of documents; depositions of corporate representatives on 17 topics (several include numerous sub-topics); and further responses to written discovery requests. Emerson estimates tens or hundreds of thousands in remaining costs to complete document discovery alone. Emerson should not be forced into this burdensome and expensive discovery, nor deposition and other fact discovery, expert discovery, opposition to class certification, or seeking summary judgment, when each of those phases is dependent on open questions of catastrophic liability, or none, relating to the Wiretap Act, while that issue is pending before the Appeals Court. A stay of this action pending the related *Vita* appeal would protect Emerson from such unnecessary burden and expense while promoting the interests of judicial economy.

### C. Multiple Parallel Actions Have Been Stayed While Awaiting Appellate Review of Plaintiff's Novel Wiretap Act Theory.

As noted above, Plaintiff's claims are premised on the theory that Emerson embedded adtech on its public website in violation of the Wiretap Act, Privacy Statute, and various common law causes of action. Other Massachusetts adtech healthcare cases with both a wiretap claim and additional claim(s) have been stayed by the trial-courts while the *Vita* appeals remain pending. *See* **Exhibit D**, *Doe v. Cape Cod Healthcare, Inc.*, No. 2384CV01236-BLS1, Dec. 8, 2023 Stay Order (Wiretap Act claim and five other claims); **Exhibit E**, *Doe v. Boston Medical Center Corp.*, No. 2384CV00326-BLS1, Nov. 9, 2023 Stay Order (Wiretap Act and Privacy Act claim) ("the court has reported its decision in two substantially similar cases … Further proceedings in this case are stayed pending the outcome of the reported cases"); *see also* **Exhibit F**, *Alves v. BJ's Wholesale Club, Inc.*, Case No. 2284CV02509 (granting opposed stay of case with Wiretap Act and Privacy Act claims).[2] These stays are consistent with the fact that early resolution of the Wiretap Act claim would substantially facilitate resolution of trial-court proceedings and serve judicial economy.[3]

Most recently, in *Doe v. Cape Cod Healthcare, Inc.*, Case No. 2384CV018086-BLS1, the defendant filed an unopposed motion to stay proceedings pending completion of the *Vita* interlocutory appeals. A copy of the unopposed motion is attached as **Exhibit K**. Plaintiffs' counsel in the *Cape Cod Healthcare* action – the same counsel that represents the Plaintiff in this

---

[2] Defendant has also moved for a stay in *Doe v. Southcoast Hospitals Grp., Inc.*, Case No. 2273CV00673, which has claims identical to those here as well as the same plaintiff's counsel. *See* **Exhibit G**.

[3] Trial Courts have also stayed adtech healthcare cases that have only a Wiretap Act claim. *See* **Exhibit H**, *Doe v. The Children's Hospital*, Case No. 2384CV00411-BLS1 (Wiretap only); **Exhibit I**, *Doe v. Lawrence General Hospital*, Case No. 2831-CV-00728-BLS1 (Wiretap only) (pending joint stipulation and proposed order to stay); **Exhibit J**, *Nova v. Boston Medical Center Corp.*, Case No. 2384-cv-018086-BLS1, Nov. 9, 2023 Stay Order (Wiretap Act and Privacy Act claim).

case – did not oppose the motion. *See* **Ex. K** at 1; **Exhibit L**, Order allowing stay. Although this action involves essentially the same causes of action and factual allegations as in *Cape Cod Healthcare*, Plaintiff's counsel has, without further explanation, not yet consented to a similar stay of this action.

## IV. CONCLUSION

For the foregoing reasons, Emerson respectfully requests that the Court enter a stay of this matter until 30 days after all appellate decisions in the *Vita* interlocutory appeals.

Dated: December 20, 2023

Respectfully submitted,

EMERSON HOSPITAL

By: */s/Emyr T. Remy*

Emyr T. Remy (BBO# 704156)
**SHOOK, HARDY & BACON L.L.P.**
One Federal Street, Suite 2540
Boston, MA 02110
Tel.: (617) 531-1411 | Fax: (617) 531-1602
remy@shb.com

Alfred J. Saikali (FL # 0178195)
**SHOOK, HARDY & BACON L.L.P.**
201 South Biscayne Blvd., Suite 3200
Miami, Florida 33131
Tel: (305) 358-5171 | Fax: (305) 358-7470
asaikali@shb.com

Tammy B. Webb (CA # 227593)
**SHOOK, HARDY & BACON L.L.P.**
555 Mission Street, Suite 2300
San Francisco, CA 94105
Tel: (415) 544-1900 | Fax: (415) 391-0281
twebb@shb.com

Justin R. Donoho (IL # 6299667)
Tara D. Kennedy (IL # 6320909)
**SHOOK, HARDY & BACON L.L.P.**
111 South Wacker Drive, Suite 4700
Chicago, IL 60606
Tel: (312) 704-7713 | F: (312) 558-1195
jdonoho@shb.com
tkennedy@shb.com

Jessica N. Wahl (CA # 321887)
**SHOOK, HARDY & BACON L.L.P.**
2049 Century Park East, Suite 3000
Los Angeles, CA 90067
Tel: (424) 324-3477 | Fax: (424) 204-9093
jwahl@shb.com

## CERTIFICATE OF SERVICE

I, Emyr T. Remy, hereby certify that on December 20, 2023, a true copy of the above document was served by email upon:

J. Tucker Merrigan (BBO# 681627)
Victoria Santoro (BBO# 679120)
Erin E, McHugh (BBO# 703701)
**SWEENEY MERRIGAN LAW**
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Seth Meyer (*PHV5191283NY*)
Alex Dravillas (*PHV6299686IL*)
**KELLER POSTMAN LLC**
150 N. Riverside Plaza, Suite 4100
Chicago, IL 60606
Tel: (312) 741-5220
sam@kellerpostman.com
ajd@kellerpostman.com

Foster C. Johnson (*PHV24076463TX*)
David Warden (*PHV20856750TX*)
Nathan Campbell (*PHV24097455TX*)
**AHMAD, ZAVITSANOS & MENSING, P.C.**
1221 McKinney St., Suite 3460
Houston, TX 77010
Tel: (713) 655-1101
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

*/s/ Emyr T. Remy*
Emyr T. Remy

COMMONWEALTH OF MASSACHUSETTS

| | | |
|---|---|---|
| ESSEX, ss | ) | TRIAL COURT DEPARTMENT |
| | ) | SUPERIOR COURT |
| JOHN DOE, individually and on behalf of all others similarly situated, | ) | |
| | ) | DOCKET NO. 2277CV01000D |
| Plaintiff, | ) | |
| v. | ) | |
| EMERSON HOSPITAL, | ) | |
| Defendant. | ) | |

**EXHIBIT INDEX FOR EMERSON HOSPITAL'S MEMORANDUM IN SUPPORT OF ITS MOTION TO STAY**

| Ex. | Description | Page No. |
|---|---|---|
| A | Memorandum of Decision and Order on Defendant's Motion to Dismiss and Report to the Appeals Court, *Kathleen Vita v. Beth Israel Deaconess Medical Center, Inc.,* Docket No. 2384CV00480-BLS1 | 1 |
| B | Memorandum of Decision and Order on Defendant's Motion to Dismiss and Report to the Appeals Court, *Kathleen Vita v. New England Baptist Hospital,* Docket No. 2384CV00857-BLS1 | 12 |
| C | Defendants-Appellants' Application For Direct Appellate Review Of Both Cases - *Kathleen Vita v. New England Baptist Hospital,* and *Kathleen Vita v. Beth Israel Deaconess Medical Center, Inc.,* | 27 |
| D | Defendant's Unopposed Motion to Stay Proceedings Until Completion of Interlocutory Appeals in Parallel Wiretap Act Cases – *Jane Doe v. Cape Cod Healthcare, Inc.,* Docket No. 2384CV01236-BLS1 | 106 |
| E | Defendant Boston Medical Center Corporation's Mass. R. Civ.P.64 and M.G.L.c.231 § 111 Motion to Report the Court's Order on Defendants' Motion to Dismiss for Interlocutory Appeal – *Jane Doe v. Boston Medical Center Corporation,* Docket No. 2384CV00326-BLS1 | 108 |
| F | Defendant's Motion to Stay – *Joe Alves v. BJ's Wholesale Club, Inc.,* Docket No. 2284CV02509 | 110 |
| G | Defendant Southcoast Hospitals Group, Inc.'s Memorandum Of Law In Support Of Its Motion To Stay – *John Doe, James Doe, and Jane Doe v. Southcoast Hospitals Group, Inc. d/b/a St. Luke's Hospital, Tobey Hospital, And Charlton Memorial Hospital,* Docket No. 2273CV00673 | 112 |
| H | Defendant's Motion to Report the Court's Order Denying Motion to Dismiss to the Appeals Court for Interlocutory Review – *Jane Doe v. The* | 123 |

| | | |
|---|---|---|
| | *Children's Hospital Corporation*, Docket No. 2382CV00411-B:S1 | |
| I | Joint Stipulation and Proposed Order to Stay All Proceedings Pending Interlocutory Appeal in Related Cases – *Jane Doe v. Lawrence General Hospital*, Docket No. 2384CV00728-BLS1 | 125 |
| J | Defendant Boston Medical Center Corporation's Motion to Dismiss the Complaint Under Mass. R. Civ. P. 12(b)(1) And (6) – *Elizabeth Nova v. Boston Medical Center Corporation*, Docket No. 2384CV01086-BLS1 | 128 |
| K | Defendant's Unopposed Motion To Stay Proceedings Until Completion Of Interlocutory Appeals In Parallel Wiretap Act Cases – *Jane Doe v. Cape Cod Healthcare, Inc.*, Docket No. 2384CV01236-BLS1 | 130 |
| L | Defendant's Unopposed Motion to Stay Proceedings Until Completion of Interlocutory Appeals in Parallel Wiretap Act Cases – *Jane Doe v. Cape Cod Healthcare, Inc.*, Docket No. 2384CV01236-BLS1 | 134 |

# EXHIBIT A

NOTIFY

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT
CIVIL ACTION
No. 2384CV00480-BLS1

KATHLEEN VITA[1]

vs.

BETH ISRAEL DEACONESS MEDICAL CENTER, INC.

**MEMORANDUM OF DECISION AND ORDER ON DEFENDANT'S MOTION TO DISMISS AND REPORT TO THE APPEALS COURT**

Plaintiff Kathleen Vita ("Plaintiff") commenced this putative class action against defendant Beth Israel Deaconess Medical Center ("BIDMC"), alleging that it used internet tracking tools on its website that illegally redirected website users' personal information, and the contents of users' communications with BIDMC's website, to third parties Google and Meta. On the basis of these allegations, the Complaint asserts a single claim for violation of the Massachusetts Wiretap Statute, G.L. c. 272, § 99. Presently before the court is BIDMC's motion to dismiss. After a hearing on September 19, 2023, and consideration of the parties' submissions, the motion is **DENIED**, and, consistent with the parties' request, the matter is **REPORTED** to the Appeals Court.

## BACKGROUND

The Complaint and relevant documents attached to the motion to dismiss set forth the following facts.[2] BIDMC operates a hospital in Boston that offers inpatient and outpatient care

[1] For herself and the class.
[2] BIDMC's complete website Privacy Policy, which Plaintiff relies on in framing her Complaint, was attached to the motion to dismiss. *Marram v. Kobrick Offshore Fund, Ltd.*, 442 Mass. 43, 45 n.4 (2004).

to residents in the greater Boston area. Plaintiff is an individual residing in Revere, Massachusetts.

BIDMC maintains and controls a website for its hospital. The website allows users to obtain information about the services BIDMC provides, including information about doctors, services, and treatments provided for particular medical conditions. Website users also can book appointments, access and pay bills, and access private medical information through the website's patient portal. The website contains search bars that aid users in finding specific information on the site, and forms that users may submit to BIDMC, such as the "Request an Appointment" form.

As relevant here, BIDMC's website privacy policy ("Privacy Policy") states:

> Beth Israel Deaconess Medical Center (BIDMC) is committed to protecting your privacy. The BIDMC website allows you to visit most areas without identifying yourself or providing personal information. For those areas where you elect to provide identifiable information, we assure you that we make every effort to protect your privacy. . . .
>
> Beth Israel Deaconess Medical Center routinely gathers data on website activity, such as how many people visit the site, the pages they visit, where they come from, how long they stay, etc. The data is collected on an aggregate, anonymous basis, which means no personally identifiable information is associated with the data. This data helps us improve site content and overall usage. This information is not shared with other organizations. Except for authorized law enforcement investigations or other facially valid legal processes, we will not share any information we receive with outside parties. . . .
>
> We and our Third Party Service Provider collect and save the default information customarily logged by worldwide web server software. Our logs contain the following information for each request: date and time, originating IP address and domain name (the unique address assigned to your Internet service provider's computer that connects to the Internet), object requested, and completion status of the request. These logs may be kept for an indefinite amount of time, used at any time and in any way necessary to prevent security breaches and to ensure the integrity of the data on our servers.

(Formatting altered). Since 2021, BIDMC's website also has included a pop-up notice that references the use of "cookies and other tools to enhance your experience on the website," with a link to the Privacy Policy "for more information about these cookies and the data collected."

Notwithstanding this Privacy Policy, BIDMC has implemented multiple software-based internet tracking technologies on its website that contemporaneously record and transmit data about users' interactions with BIDMC's website to multiple unidentified third parties. The software is unrelated to the website's functionality and is invisible to users. Two such tracking technologies are Meta Pixel, which transmits data to Meta (the parent company of Facebook), and Google Analytics, which transmits data to Google.

Meta Pixel and Google Analytics operate through the automatic execution of pieces of JavaScript code, embedded in the BIDMC website, which cause a website user's internet browser to record and send information to those third parties when a user visits and interacts with the site. The transmitted information can include: the website address (URL); the title of webpages visited; information about the content of the website; search terms or any other information inputted into a form; selections on drop-down menus and the contents thereof; scrolls down a webpage; and button clicks. A website user's internet protocol ("IP") address and web browser configurations are also revealed, which permits Google and Meta to associate the data it receives from the website visit to the identity of a particular individual known to them. The content of the user's communications with BIDMC's website is added to Google's and Meta's collection of information already known about the individual, which can be used to target advertising to that individual. Google, Meta, and BIDMC may also use the information collected for other commercial purposes. After a media exposé about the use of Meta Pixel on hospital

websites, BIDMC removed it from its website in September 2022. As of the date the Complaint was filed, Google Analytics software remained on the BIDMC website.

In addition to Meta Pixel and Google Analytics, BIDMC also employs other software-based internet tracking technologies that work in a similar fashion. Those include Doubleclick, Siteimprove Analytics, and Marchex.io.

Plaintiff's husband is a BIDMC patient. Plaintiff regularly uses the BIDMC website to obtain information about BIDMC doctors (including their credentials and backgrounds); search for information on particular symptoms, conditions, and medical procedures, both for herself and her husband; and obtain and review her husband's medical records through the BIDMC website patient portal.

## STANDARD OF REVIEW

Rule 12(b)(6) allows for dismissal of a complaint when the factual allegations contained within it do not suggest a plausible entitlement to relief. *Iannacchino v. Ford Motor Co.*, 451 Mass. 623, 635-636 (2008); *Fraelick v. PerkettPR, Inc.*, 83 Mass. App. Ct. 698, 699-700 (2013). In ruling on the motions, the court accepts the factual allegations as true and draws all reasonable inferences in the non-moving party's favor. *Fraelick*, 83 Mass. App. Ct. at 699-700.

## DISCUSSION

BIDMC argues that Plaintiff's claims must be dismissed due to lack of standing and failure to meet the requirements of the Massachusetts Wiretap Statute. As discussed below, however, under this court's reading of the relevant caselaw and the plain language of the statute, the Complaint states a claim sufficient to survive dismissal under Rule 12(b)(6). Nevertheless, because of the novelty of the issue raised, which also has arisen in several analogous cases

before this court, and for the further reasons discussed below, a report to the Appeals Court is appropriate.[3]

1. **Standing**[4]

This court recently addressed standing in an analogous wiretap cases — *Doe v. Boston Medical Center*, 2384CV00326-BLS1, slip op. at 4-5 (Mass. Super. Ct. Sept. 15, 2023) ("*Boston Medical Center*"). There, the court denied the defendant's motion to dismiss on standing grounds, concluding that "a properly alleged violation of the [Massachusetts Wiretap Statute], alone, constitute[s] injury sufficient to confer standing." *Id.* (citing *Pine v. Rust*, 404 Mass. 411, 418 (1989); *In re Lubanski*, 186 B.R. 160, 166-67 (Bankr. D. Mass. 1995)). For the same reasons enunciated in that decision, Plaintiff has standing to sue here, as well.

2. **Massachusetts Wiretap Statute**

General Laws c. 272, § 99(Q) provides a cause of action for "any aggrieved person whose oral or wire communications were intercepted, disclosed or used . . . or whose personal or property interests or privacy were violated by means of an interception," except as permitted or authorized by the Wiretap Statute. "Interception" is defined to mean "to secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire or oral communication through the use of any intercepting device by any person other than a person given prior authority by all parties to such communication." G.L. c. 272, § 99(B)(4).

BIDMC argues that the action should be dismissed because, according to it: 1) the statute applies only to "conversations," not internet tracking; 2) BIDMC's recording of website user

[3] On this same date the court also decides a similar motion to dismiss and reports the correctness of its ruling to the Appeals Court in *Kathleen Vita v. New England Baptist Hospital*, 2384CV00857-BLS1.
[4] The standard of review for challenging standing in a motion to dismiss under Rule 12(b)(1) is functionally the same as under Rule 12(b)(6). *Abate v. Fremont Inv. & Loan*, 470 Mass. 821, 828 (2015).

activity was not secret; 3) the statutory "ordinary course of business" exception applies; and 4) application of the statute to the facts here would lead to absurd results the Legislature could not have intended. The court addresses each, in turn.

*A. Limitation of the statute to human-to-human conversation*. In prior analogous cases, this court concluded that the plain language of the statute encompasses the electronic activity alleged here. *See Boston Medical Center*, 2384CV00326-BLS1, slip op. at 6-7; *Doe v. Boston Children's Hospital*, 2384CV00411-BLS1, slip op. at 4-6 (Mass. Super. Ct. Sept. 15. 2023) ("*Boston Children's*"). Accordingly, for the same reasons already articulated in those cases, the argument fails here, as well.

*B. Secrecy requirement*. As noted, an interception under the Massachusetts Wiretap Statute must be "secret." G.L. c. 272, § 99(B)(4). A "secret" recording is one that is "concealed," and "kept hidden or unexplained." *Curtatone v. Barstool Sports, Inc.*, 487 Mass. 655, 658 (2021) (dictionary citations omitted). An interception is not secret for purposes of the Massachusetts Wiretap Statute if the individual communicating has "actual [or constructive] knowledge of the recording," which is proved through "'clear and unequivocal objective manifestations of knowledge' in the [users'] statements or conduct." *Commonwealth v. Morris*, 492 Mass. 498, 515 (2023) (Budd., J., concurring) (quoting *Commonwealth v. Jackson*, 370 Mass. 502, 507 (1976)). *See Commonwealth v. Du*, No. 22-P-870, 2023 WL 652243, at *6 (Mass. App. Ct. Oct. 6, 2023).

BIDMC argues that its Privacy Policy and related website pop-up disclose BIDMC's collection of data, and its sharing of that data with a third party, such that the internet tracking activity alleged here is not secret. There are two problems with that argument. First, the Privacy Policy is unclear about the exact nature of the website data BIDMC shares. The Privacy Policy

informs users that BIDMC collects certain user data that is kept anonymous and which "is not shared with other organizations," but then notes the existence of an external "Third Party Service Provider" that also collects data, but defines that collected data in a different way. The Privacy Policy language is technical and obscures whether the BIDMC data and the Third Party Service Provider data are related or overlap in some ways, and thus whether some of the purportedly private, unshared, "anonymous" data BIDMC collects is nevertheless shared with the Third Party Service Provider.[5] Second, the Privacy Policy discloses the existence of only a *single* "Third Party Service Provider," while the Complaint alleges that the data BIDMC collects is contemporaneously shared with *multiple* external organizations (Google, Meta, and others). The existence of these additional third-party "eavesdroppers" are thus kept hidden from BIDMC's website users.

In sum, the Privacy Policy and website pop-up, while disclosing some amount of data sharing, do not establish users' actual or constructive knowledge of the totality of the internet tracking alleged here.[6] Accordingly, on the facts as pleaded and taken as true, the Complaint sufficiently alleges a secret interception, i.e. that BIDMC "aid[ed] another to secretly hear or secretly record the contents of any wire or oral communication." G.L. c. 272, § 99(B)(4).[7]

*C. "Ordinary course of business" exception.* The Massachusetts Wiretap Statute excepts from the definition of "intercepting device":

[5] Indeed, as a lay reader of the Privacy Policy, the court is unable to determine whether BIDMC's collected data about "how many people visit the site, the pages they visit, where they come from, how long they stay, etc." includes some of the same information as it and the Third Party Service Provider's collection of "default information customarily logged by worldwide web server software."
[6] That a website user can reveal the internet tracking software code by employing "Developer Mode" also does not establish actual or constructive knowledge of the software code at issue.
[7] Because this case alleges third-party eavesdropping on website communications by undisclosed, contemporaneous third-parties, this case differs from *Curtatone v. Barstool Sports, Inc.*, 487 Mass. 655 (2023), which involved a consented-to recorded conversation between two people only. *See id.* at 657, 660.

> any telephone or telegraph instrument, equipment, facility, or a component thereof, (a) furnished to a subscriber or user by a communications common carrier in the ordinary course of its business under its tariff and being used by the subscriber or user in the ordinary course of its business . . .

G.L. c. 272, § 99(B)(3). Thus, for the exception to apply, the intercepting device at issue must consist of or include "telephone or telegraph" equipment, instruments, etc. *Id.*

Setting aside whether internet tracking occurs in the ordinary course of BIDMC's business, the electronic software-based internet tracking technology at issue here plainly is not telephone or telegraph equipment. For that reason, in the absence of an appellate decision extending the exception beyond the realm of telephones and telegraphs, under the plain language of the statute, the court declines to apply the exception here. *See Alves v. BJ's Wholesale Club, Inc.*, 2284CV02509-BLS1, slip op. at 10 (Super. Ct. June 21, 2023) ("*Alves*") (declining to extend exception to software-based session replay code technology).

*D.* *Legislative Intent.* Finally, BIDMC argues that interpreting the Massachusetts Wiretap Statute to encompass the ubiquitous internet tracking that practically all businesses presently employ would lead to absurd results the Legislature could not have intended when it enacted the statute in 1968. Reading the criminal caselaw that BIDMC cites for this proposition does not compel the denial it seeks, however.

*Commonwealth v. Morris*, 492 Mass. 498 (2023), and *Commonwealth v. Rainey*, 491 Mass. 632 (2023), upon which BIDMC relies, each involve statements made to police wherein the speakers necessarily understood that their statements were being memorialized for future use or presentation in court, despite the lack of explicit disclosure about electronic recording. *Morris*, 492 Mass. at 503-04; *Rainey*, 491 Mass. at 635, 640-41. In that narrow context, the

court determined that literal application of the Massachusetts Wiretap Statute would result in absurd and unintended consequences, at odds with the Legislature's intent in enacting the statute. *See Morris*, 492 Mass. at 506 ("nothing in the statute as a whole, including its codified preamble, supports the conclusion that the Legislature intended to criminalize the police officers' recording of the defendant's voluntary statement, which the defendant understood was being preserved for future use in connection with the investigation of the crime about which the defendant was speaking voluntarily"); *Rainey*, 491 Mass. at 643 (same as to victim's voluntarily-provided statement to police).

Here, unlike the criminal defendant and victim in *Morris* and *Rainey*, Plaintiff and BIDMC's other website users are not alleged to be proceeding with the implicit understanding that their communications are to be preserved and memorialized, electronically or by handwritten notes, by a government body, for important public safety reasons. Rather, the entire gist of the Complaint is that Plaintiff interacted with the BIDMC website with no concept that the data she inputted would be simultaneously and automatically intercepted and externally shared with multiple external parties. These facts alone distinguish this case from *Morris* and *Rainey*.

In further contrast to those cases, the statute's preamble arguably supports the right to freedom from private electronic surveillance at issue here. Its broad language provides:

> The general court . . . finds that the uncontrolled development and unrestricted use of modern electronic surveillance devices pose grave dangers to the privacy of all citizens of the commonwealth. Therefore, the secret use of such devices by private individuals must be prohibited.

G.L. c. 272, § 99. In fact, a broad interpretation of the statute's language is endorsed in *Commonwealth v. Moody*, 466 Mass. 196 (2013), a Supreme Judicial Court decision that

extended the Massachusetts Wiretap Statute's application to electronic text messages. *See id.* at 209 ("[i]n light of the broad statutory definitions of the terms 'wire communication' and 'interception,' we conclude that the Massachusetts wiretap statute provides protection for the electronic transmission of text messages").[8]

For the reasons explained above, and absent an appellate decision interpreting the Massachusetts Wiretap Statute in the narrow way that BIDMC suggests, this court concludes that the facts as alleged in the Complaint state a claim for a violation of the statute.

3. Report to Appeals Court

Under Mass. R. Civ. P. 64, a Superior Court judge may report an interlocutory decision "where he or she concludes that the finding or order 'so affects the merits of the controversy that the matter ought to be determined by the [A]ppeals [C]ourt before any further proceedings in the trial court.'" *Patel v. Martin*, 481 Mass. 29, 32 (2018) (quoting Mass. R. Civ. P. 64(a)). The Supreme Judicial Court has cautioned that "[i]nterlocutory matters should be reported only where it appears that they present serious questions likely to be material in the ultimate decision, and that subsequent proceedings in the trial court will be substantially facilitated by so doing." *Globe Newspaper Co. v. Massachusetts Bay Transp. Auth. Ret. Bd.*, 412 Mass. 770, 772 (1992) (quoting *John Gilbert Jr. Co. v. C.M. Fauci Co.*, 309 Mass. 271, 273 (1941)). Such is the case here. The parties here also have requested that the court report the matter to the Appeals Court.

Whether the Massachusetts Wiretap Statute applies to the internet tracking alleged here is a novel question unresolved at the appellate level in Massachusetts, and is the central and

[8] The most recent published case interpreting the Massachusetts Wiretap Statute is consistent with this view. *See Commonwealth v. Du*, No. 22-P-870, 2023 WL 6522435, at *6-*7 (Mass. App. Ct. Oct. 6, 2023) (court interpreted statute to prohibit surreptitious audio-visual video recording of drug transaction made by police using cell phone application).

dispositive issue in this case. Although the Massachusetts Wiretap Statute is broadly drafted, and states the Legislature's explicit intention to protect citizens from the grave danger of electronic surveillance by private individuals poses, it was enacted in 1968 — long before the internet, let alone internet tracking, became available. The Legislature did not, therefore, contemplate internet tracking as a form of secretly intercepting communications. BIDMC argues that internet tracking is practically ubiquitous across all businesses and organizations with websites, and that BIDMC's use of such tracking is a legitimate, ordinary part of its business. Had the Legislature been aware of internet tracking and its possible business uses in 1968, it might have written the statute to allow the type of tracking alleged in this case.

The novel question here has arisen in several other cases. As noted, this court already has denied motions to dismiss in two other internet-tracking wiretap cases. *See Boston Medical Center*, 2384CV00326-BLS1; *Boston Children's*, 2384CV00411-BLS1. Other Superior Court judges have issued similar decisions. *See Alves*, 2284CV02509-BLS1; *Doe v. Partners Healthcare System, Inc.*, 1984CV01651-BLS1, endorsement denying motion to dismiss (Super. Ct. Dec. 7, 2020). There are many other analogous cases presently pending in the Superior Court, including in this session.[9] If, as BIDMC argues, the Massachusetts Wiretap Statute does not apply to business-related internet tracking, significant judicial and party resources will be saved by the quick resolution of these cases before discovery and other stages of litigation.

---

[9] Other analogous cases pending in BLS1 include: *Progin, Janice v. UMass Memorial Health Care, Inc.*, 2284CV2889; *John Doe v. Boston Medical Center Corp.*, 2384CV326; *Jane Doe v. The Children's Hospital Corp.*, 2384CV411; *Kathleen Vita v. New England Baptist Hospital*, 2384CV00857; *Karen McManus v. Tufts Medical Center, Inc.*, 2384CV930; *Elizabeth Nova v. Boston Medical Center Corporation*, 2384CV1086; *Jane Doe v. Cape Cod Healthcare, Inc.*, 2384CV1236; *Jane Doe v Baystate Health Systems*, 2384CV1949; *John Doe v. UMass Memorial Health Care Inc.*, 2384CV2448; *Lisa Colleton v. UMass Memorial Health Care Inc.*, 2384CV2450

For all of these reasons, this matter should be determined by the Appeals Court before any proceedings continue in this court.

**ORDER**

For the foregoing reasons, it is hereby **ORDERED** that:

1. BIDMC's motion to dismiss is **DENIED**; and
2. The Court **REPORTS** the correctness of its ruling to the Appeals Court.

Dated: October 31, 2023

Hélène Kazanjian
Justice of the Superior Court

# EXHIBIT B

16

NOTIFY

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT
CIVIL ACTION
No. 2384CV00857-BLS1

11/1/23
notice sent
BH (2)

KATHLEEN VITA[1]

vs.

NEW ENGLAND BAPTIST HOSPITAL

**MEMORANDUM OF DECISION AND ORDER ON DEFENDANT'S MOTION TO DISMISS AND REPORT TO THE APPEALS COURT**

Plaintiff Kathleen Vita ("Plaintiff") commenced this putative class action against defendant New England Baptist Hospital ("NEBH"), alleging that it used internet tracking tools on its website that illegally redirected website users' personal information, and the contents of users' communications with NEBH's website, to third parties Google and Meta. On the basis of these allegations, the Complaint asserts a single claim for violation of the Massachusetts Wiretap Statute, G.L. c. 272, § 99. Presently before the court is NEBH's motion to dismiss. After a hearing on September 19, 2023, and consideration of the parties' submissions, the motion is **DENIED**, and, consistent with the parties' request, the matter is **REPORTED** to the Appeals Court.

**BACKGROUND**

The Complaint and relevant documents attached to the motion to dismiss set forth the following facts.[2] NEBH operates a hospital with a main campus in Boston, and several other

[1] For herself and the class.

[2] NEBH's complete website Privacy Policy, which Plaintiff relies on in framing her Complaint, was attached to the motion to dismiss. *Marram v. Kobrick Offshore Fund, Ltd.*, 442 Mass. 43, 45 n.4 (2004).

locations in the Boston area, focusing on orthopedic care and complex orthopedic procedures. Plaintiff is an individual residing in Revere, Massachusetts.

NEBH maintains and controls a website for its hospital. The website allows users to obtain information about the services NEBH provides, including information about doctors, services, and treatments provided for particular medical conditions. Website users also can access and pay bills, and access private medical information through the website's patient portal. The website contains search bars that aid users in finding specific information on the site, and forms that users may submit to NEBH, such as the "Find a Doctor" form.

As relevant here, NEBH's website privacy policy ("Privacy Policy") states:

> New England Baptist Hospital (NEBH) is committed to protecting your privacy. The NEBH website allows you to visit most areas without identifying yourself or providing personal information. For those areas where you elect to provide identifiable information, we assure you that we make every effort to protect your privacy. . . .
>
> New England Baptist Hospital routinely gathers data on website activity, such as how many people visit the site, the pages they visit, where they come from, how long they stay, etc. The data is collected on an aggregate, anonymous basis, which means no personally identifiable information is associated with the data. This data helps us improve site content and overall usage. This information is not shared with other organizations. Except for authorized law enforcement investigations or other facially valid legal processes, we will not share any information we receive with outside parties. . . .
>
> We and our Third Party Service Provider collect and save the default information customarily logged by worldwide web server software. Our logs contain the following information for each request: date and time, originating IP address and domain name (the unique address assigned to your Internet service provider's computer that connects to the Internet), object requested, and completion status of the request. These logs may be kept for an indefinite amount of time, used at any time and in any way necessary to prevent security breaches and to ensure the integrity of the data on our servers.

(Formatting altered). Since 2021, NEBH's website also has included a pop-up notice that references the use of "cookies and other tools to enhance your experience on the

website," with a link to the Privacy Policy "for more information about these cookies and the data collected."

Notwithstanding this Privacy Policy, NEBH has implemented multiple software-based internet tracking technologies on its website that contemporaneously record and transmit data about users' interactions with NEBH's website to multiple unidentified third parties. The software is unrelated to the website's functionality and is invisible to users. Two such tracking technologies are Meta Pixel, which transmits data to Meta (the parent company of Facebook), and Google Analytics, which transmits data to Google.

Meta Pixel and Google Analytics operate through the automatic execution of pieces of JavaScript code, embedded in the NEBH website, which cause a website user's internet browser to record and send information to those third parties when a user visits and interacts with the site. The transmitted information can include: the website address (URL); the title of webpages visited; information about the content of the website; search terms or any other information inputted into a form; selections on drop-down menus and the contents thereof; scrolls down a webpage; and button clicks. A website user's internet protocol ("IP") address and web browser configurations are also revealed, which permits Google and Meta to associate the data it receives from the website visit to the identity of a particular individual known to them. The content of the user's communications with NEBH's website is added to Google's and Meta's collection of information already known about the individual, which can be used to target advertising to that individual. Google, Meta, and NEBH may also use the information collected for other commercial purposes. After a media exposé about the use of Meta Pixel on hospital websites in June 2022, NEBH removed it from its website at some unidentified point in time. As of the date the Complaint was filed, Google Analytics software remained on the NEBH website.

Plaintiff is a NEBH patient. Plaintiff regularly uses the NEBH website to obtain information about NEBH doctors (including their credentials and backgrounds) and to search for information on particular medical procedures.

**STANDARD OF REVIEW**

Rule 12(b)(6) allows for dismissal of a complaint when the factual allegations contained within it do not suggest a plausible entitlement to relief. *Iannacchino v. Ford Motor Co.*, 451 Mass. 623, 635-636 (2008); *Fraelick v. PerkettPR, Inc.*, 83 Mass. App. Ct. 698, 699-700 (2013). In ruling on the motions, the court accepts the factual allegations as true and draws all reasonable inferences in the non-moving party's favor. *Fraelick*, 83 Mass. App. Ct. at 699-700.

**DISCUSSION**

NEBH argues that Plaintiff's claims must be dismissed due to lack of standing and failure to meet the requirements of the Massachusetts Wiretap Statute. As discussed below, however, under this court's reading of the relevant caselaw and the plain language of the statute, the Complaint states a claim sufficient to survive dismissal under Rule 12(b)(6). Nevertheless, because of the novelty of the issue raised, which also has arisen in several analogous cases before this court, and for the further reasons discussed below, a report to the Appeals Court is appropriate.[3]

[3] On this same date the court also decides a similar motion to dismiss and reports the correctness of its ruling to the Appeals Court in *Kathleen Vita v. Beth Israel Deaconess Medical Center, Inc.*, 2384CV00480-BLS1.

1. **Standing**[4]

This court recently addressed standing in an analogous wiretap case — *Doe v. Boston Medical Center*, 2384CV00326-BLS1, slip op. at 4-5 (Mass. Super. Ct. Sept. 15, 2023) ("*Boston Medical Center*"). There, the court denied the defendant's motion to dismiss on standing grounds, concluding that "a properly alleged violation of the [Massachusetts Wiretap Statute], alone, constitute[s] injury sufficient to confer standing." *Id.* (citing *Pine v. Rust,* 404 Mass. 411, 418 (1989); *In re Lubanski,* 186 B.R. 160, 166-67 (Bankr. D. Mass. 1995)). For the same reasons enunciated in that decision, Plaintiff has standing to sue here, as well.

2. **Massachusetts Wiretap Statute**

General Laws c. 272, § 99(Q) provides a cause of action for "any aggrieved person whose oral or wire communications were intercepted, disclosed or used . . . or whose personal or property interests or privacy were violated by means of an interception," except as permitted or authorized by the Wiretap Statute. "Interception" is defined to mean "to secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire or oral communication through the use of any intercepting device by any person other than a person given prior authority by all parties to such communication." G.L. c. 272, § 99(B)(4).

NEBH argues that the action should be dismissed because, according to it: 1) the statute applies only to "conversations," not internet tracking; 2) NEBH's recording of website user activity was not secret; 3) the statutory "ordinary course of business" exception applies; and 4) application of the statute to the facts here would lead to absurd results the Legislature could not have intended. The court addresses each, in turn.

[4] The standard of review for challenging standing in a motion to dismiss under Rule 12(b)(1) is functionally the same as under Rule 12(b)(6). *Abate v. Fremont Inv. & Loan*, 470 Mass. 821, 828 (2015).

*A. Limitation of the statute to human-to-human conversation.* In prior analogous cases, this court concluded that the plain language of the statute encompasses the electronic activity alleged here. *See Boston Medical Center*, 2384CV00326-BLS1, slip op. at 6-7; *Doe v. Boston Children's Hospital*, 2384CV00411-BLS1, slip op. at 4-6 (Mass. Super. Ct. Sept. 15. 2023) ("*Boston Children's*"). Accordingly, for the same reasons articulated in those cases, the argument fails here, as well.

*B. Secrecy requirement.* As noted, an interception under the Massachusetts Wiretap Statute must be "secret." G.L. c. 272, § 99(B)(4). A "secret" recording is one that is "concealed," and "kept hidden or unexplained." *Curtatone v. Barstool Sports, Inc.*, 487 Mass. 655, 658 (2021) (dictionary citations omitted). An interception is not secret for purposes of the Massachusetts Wiretap Statute if the individual communicating has "actual [or constructive] knowledge of the recording," which is proved through "'clear and unequivocal objective manifestations of knowledge' in the [users'] statements or conduct." *Commonwealth v. Morris*, 492 Mass. 498, 515 (2023) (Budd., J., concurring) (quoting *Commonwealth v. Jackson*, 370 Mass. 502, 507 (1976)). *See Commonwealth v. Du*, No. 22-P-870, 2023 WL 652243, at *6 (Mass. App. Ct. Oct. 6, 2023).

NEBH argues that its Privacy Policy and related website pop-up disclose NEBH's collection of data, and its sharing of that data with a third party, such that the internet tracking activity alleged here is not secret. There are two problems with that argument. First, the Privacy Policy is unclear about the exact nature of the website data NEBH shares. The Privacy Policy informs users that NEBH collects certain user data that is kept anonymous and which "is not shared with other organizations," but then notes the existence of an external "Third Party Service Provider" that also collects data, but defines that collected data in a different way. The Privacy

Policy language is technical and obscures whether the NEBH data and the Third Party Service Provider data are related or overlap in some ways, and thus whether some of the purportedly private, unshared, "anonymous" data NEBH collects is nevertheless also shared with the Third Party Service Provider.[5] Second, the Privacy Policy discloses the existence of only a *single* "Third Party Service Provider," while the Complaint alleges that the data NEBH collects is contemporaneously shared with *multiple* external organizations (Google, Meta, and others). The existence of these additional third-party "eavesdroppers" are thus kept hidden from NEBH's website users.

In sum, the Privacy Policy and website pop-up, while disclosing some amount of data sharing, do not establish users' actual or constructive knowledge of the totality of the internet tracking alleged here.[6] Accordingly, on the facts as pleaded and taken as true, the Complaint sufficiently alleges a secret interception, i.e. that NEBH "aid[ed] another to secretly hear or secretly record the contents of any wire or oral communication." G.L. c. 272, § 99(B)(4).[7]

*C. "Ordinary course of business" exception.* The Massachusetts Wiretap Statute excepts from the definition of "intercepting device":

> any telephone or telegraph instrument, equipment, facility, or a component thereof, (a) furnished to a subscriber or user by a communications common carrier in the ordinary course of its business under its tariff and being used by the subscriber or user in the ordinary course of its business . . .

[5] Indeed, as a lay reader of the Privacy Policy, the court is unable to determine whether NEBH's collected data about "how many people visit the site, the pages they visit, where they come from, how long they stay, etc." includes some of the same information as it and the Third Party Service Provider's collection of "default information customarily logged by worldwide web server software."

[6] That a website user can reveal the internet tracking software code by employing "Developer Mode" also does not establish actual or constructive knowledge of the software code at issue.

[7] Because this case alleges third-party eavesdropping on website communications by undisclosed, contemporaneous third-parties, this case differs from *Curtatone v. Barstool Sports, Inc.*, 487 Mass. 655 (2023), which involved a consented-to recorded conversation between two people only. *See id.* at 657, 660.

G.L. c. 272, § 99(B)(3). Thus, for the exception to apply, the intercepting device at issue must consist of or include "telephone or telegraph" equipment, instruments, etc. *Id.*

Setting aside whether internet tracking occurs in the ordinary course of NEBH's business, the electronic software-based internet tracking technology at issue here plainly is not telephone or telegraph equipment. For that reason, in the absence of an appellate decision extending the exception beyond telephones and telegraphs, under the plain language of the statute, the court declines to apply the exception here. *See Alves v. BJ's Wholesale Club, Inc.*, 2284CV02509-BLS1, slip op. at 10 (Super. Ct. June 21, 2023) ("*Alves*") (declining to extend exception to software-based session replay code technology).

*D.* *Legislative Intent*. Finally, NEBH argues that interpreting the Massachusetts Wiretap Statute to encompass the ubiquitous internet tracking that practically all businesses presently employ would lead to absurd results the Legislature could not have intended when it enacted the statute in 1968. Reading the criminal caselaw that NEBH cites for this proposition does not compel the denial it seeks, however.

*Commonwealth v. Morris*, 492 Mass. 498 (2023), and *Commonwealth v. Rainey*, 491 Mass. 632 (2023), upon which NEBH relies, each involve statements made to police where the speakers necessarily understood that their statements were being memorialized for future use or presentation in court, despite the lack of explicit disclosure about electronic recording. *Morris*, 492 Mass. at 503-04; *Rainey*, 491 Mass. at 635, 640-41. In that narrow context, the court determined that literal application of the Massachusetts Wiretap Statute would result in absurd and unintended consequences, at odds with the Legislature's intent in enacting the statute. *See Morris*, 492 Mass. at 506 ("nothing in the statute as a whole, including its codified preamble, supports the conclusion that the Legislature intended to criminalize the police officers' recording

of the defendant's voluntary statement, which the defendant understood was being preserved for future use in connection with the investigation of the crime about which the defendant was speaking voluntarily"); *Rainey*, 491 Mass. at 643 (same as to victim's voluntarily-provided statement to police).

Here, unlike the criminal defendant and victim in *Morris* and *Rainey*, Plaintiff and NEBH's other website users are not alleged to be proceeding with the implicit understanding that their communications are to be preserved and memorialized, electronically or by handwritten notes, by a government body, for important public safety reasons. Rather, the entire gist of the Complaint is that Plaintiff interacted with the NEBH website with no concept that the data she inputted would be simultaneously and automatically intercepted and externally shared with multiple external parties. These facts alone distinguish this case from *Morris* and *Rainey*.

In further contrast to those cases, the statute's preamble arguably supports the right to freedom from private electronic surveillance at issue here. Its broad language provides:

> The general court . . . finds that the uncontrolled development and unrestricted use of modern electronic surveillance devices pose grave dangers to the privacy of all citizens of the commonwealth. Therefore, the secret use of such devices by private individuals must be prohibited.

G.L. c. 272, § 99. In fact, a broad interpretation of the statute's language is endorsed in *Commonwealth v. Moody*, 466 Mass. 196 (2013), a Supreme Judicial Court decision that extended the Massachusetts Wiretap Statute's application to electronic text messages. *See id.* at 209 ("[i]n light of the broad statutory definitions of the terms 'wire communication' and

'interception,' we conclude that the Massachusetts wiretap statute provides protection for the electronic transmission of text messages").[8]

For the reasons explained above, and absent an appellate decision interpreting the Massachusetts Wiretap Statute in the narrow way that NEBH suggests, this court concludes that the facts as alleged in the Complaint state a claim for a violation of the statute.

3. <u>Report to Appeals Court</u>

Under Mass. R. Civ. P. 64, a Superior Court judge may report an interlocutory decision "where he or she concludes that the finding or order 'so affects the merits of the controversy that the matter ought to be determined by the [A]ppeals [C]ourt before any further proceedings in the trial court.'" *Patel v. Martin*, 481 Mass. 29, 32 (2018) (quoting Mass. R. Civ. P. 64(a)). The Supreme Judicial Court has cautioned that "[i]nterlocutory matters should be reported only where it appears that they present serious questions likely to be material in the ultimate decision, and that subsequent proceedings in the trial court will be substantially facilitated by so doing." *Globe Newspaper Co. v. Massachusetts Bay Transp. Auth. Ret. Bd.*, 412 Mass. 770, 772 (1992) (quoting *John Gilbert Jr. Co. v. C.M. Fauci Co.*, 309 Mass. 271, 273 (1941)). Such is the case here. The parties here also have requested that the court report the matter to the Appeals Court.

Whether the Massachusetts Wiretap Statute applies to the internet tracking alleged here is a novel question unresolved at the appellate level in Massachusetts, and is the central and dispositive issue in this case. Although the Massachusetts Wiretap Statute is broadly drafted, and states the Legislature's explicit intention to protect citizens from the grave danger of

---

[8] The most recent published case interpreting the Massachusetts Wiretap Statute is consistent with this view. *See Commonwealth v. Du*, No. 22-P-870, 2023 WL 6522435, at *6-*7 (Mass. App. Ct. Oct. 6, 2023) (court interpreted statute to prohibit surreptitious audio-visual video recording of drug transaction made by police using cell phone application).

electronic surveillance by private individuals, it was enacted in 1968 — long before the internet, let alone internet tracking, became available. The Legislature did not, therefore, contemplate internet tracking as a form of secretly intercepting communications. NEBH argues that internet tracking is practically ubiquitous across all businesses and organizations with websites, and that NEBH's use of such tracking is a legitimate, ordinary part of its business. Had the Legislature been aware of internet tracking and its possible business uses in 1968, it might have written the statute to allow the type of tracking alleged in this case.

The novel question here has arisen in several other cases. As noted, this court already has denied motions to dismiss in two other internet-tracking wiretap cases. *See Boston Medical Center*, 2384CV00326-BLS1; *Boston Children's*, 2384CV00411-BLS1. Other Superior Court judges have issued similar decisions recently. *See Alves*, 2284CV02509-BLS1; *Doe v. Partners Healthcare System, Inc.*, 1984CV01651-BLS1, endorsement denying motion to dismiss (Super. Ct. Dec. 7, 2020). There are many other analogous cases presently pending in the Superior Court, including in this session.[9] If, as NEBH argues, the Massachusetts Wiretap Statute does not apply to business-related internet tracking, significant judicial and party resources will be saved by the quick resolution of these cases before discovery and other stages of litigation.

For all of these reasons, this matter should be determined by the Appeals Court before any proceedings continue in this court.

---

[9] Other analogous cases pending in BLS1 include: *Progin, Janice v. UMass Memorial Health Care, Inc.*, 2284CV2889; *John Doe v. Boston Medical Center Corp.*, 2384CV326; *Jane Doe v. The Children's Hospital Corp.*, 2384CV411; *Kathleen Vita v. Beth Israel Deaconess Medical Center, Inc.*, 2384CV00480; *Karen McManus v. Tufts Medical Center, Inc.*, 2384CV930; *Elizabeth Nova v. Boston Medical Center Corporation*, 2384CV1086; *Jane Doe v. Cape Cod Healthcare, Inc.*, 2384CV1236; *Jane Doe v Baystate Health Systems*, 2384CV1949; *John Doe v. UMass Memorial Health Care Inc.*, 2384CV2448; *Lisa Colleton v. UMass Memorial Health Care Inc.*, 2384CV2450

**ORDER**

For the foregoing reasons, it is hereby **ORDERED** that:

1. NEBH's motion to dismiss is **DENIED**; and

2. The Court **REPORTS** the correctness of its ruling to the Appeals Court.

Dated: October 31, 2023

Hélène Kazanjian
Justice of the Superior Court

# EXHIBIT C

COMMONWEALTH OF MASSACHUSETTS
SUPREME JUDICIAL COURT
FOR THE COMMONWEALTH

APPEALS COURT NOS.
2023-P-1308, 2023-P-1310

SUFFOLK COUNTY

---

KATHLEEN VITA
Plaintiff - Appellee

v.

NEW ENGLAND BAPTIST HOSPITAL
Defendant - Appellant

---

KATHLEEN VITA
Plaintiff - Appellee

v.

BETH ISRAEL DEACONESS MEDICAL CENTER, INC.
Defendant - Appellant

---

# DEFENDANTS-APPELLANTS' APPLICATION FOR DIRECT APPELLATE REVIEW OF BOTH CASES

---

David Quinn Gacioch, BBO No. 660784
Annabel Rodriguez, BBO No. 696001
McDERMOTT WILL & EMERY LLP
200 Clarendon Street, Floor 58
Boston, MA 02116
(617) 535-4000
dgacioch@mwe.com
anrodriguez@mwe.com

## I. REQUEST FOR DIRECT APPELLATE REVIEW

Defendants-Appellants New England Baptist Hospital ("NEBH") and Beth Israel Deaconess Medical Center, Inc. ("BIDMC") (together, the "Hospitals") request direct appellate review of these two parallel cases by the Supreme Judicial Court, pursuant to Mass. R. App. P. 11.[1] As explained below, these are two of at least two dozen putative class action lawsuits that plaintiffs' lawyers have recently commenced against Massachusetts hospitals and other organizations, relying on a novel and overbroad application of the Massachusetts Wiretap Act, G.L. c. 272, § 99 (the "Wiretap Act" or just the "Act"). Judicial acceptance of plaintiffs' attempted weaponization of the Act to cover advertising and analytics technologies that are ubiquitous on public websites in 2023 would expose thousands of Massachusetts businesses and public charities to potentially crippling civil liability, given the Act's severe liquidated damages and fee-shifting provisions, as well as to possible criminal prosecution. The Act's potential applicability to this website technology context is an appellate question of first impression. Accordingly, at least two of the independently-sufficient criteria in Mass. R. App. P. 11(a) support direct appellate review of these cases.

---

[1] The two cases are nearly identical. Plaintiff Kathleen Vita, represented by Shapiro Haber & Urmy LLP, brought both. NEBH and BIDMC are part of the same health system and are both represented by McDermott Will & Emery LLP.

## II. STATEMENT OF PRIOR AND PARALLEL PROCEEDINGS

Plaintiff Kathleen Vita commenced a putative class action against BIDMC in Suffolk Superior Court's Business Litigation Session on February 24, 2023 (Docket No. 2384CV00480-BLS1). She filed a nearly-identical complaint against NEBH in the same court on April 7, 2023 (Docket No. 2384CV00857-BLS1). Each lawsuit alleges a single claim: violations of the Wiretap Act.

BIDMC timely moved to dismiss Plaintiff's complaint on June 9, 2023, and NEBH did the same on June 22, 2023. Plaintiff opposed both motions. After hearing oral argument in a joint Rule 12 proceeding, the Superior Court (Kazanjian, J.), on October 31, 2023, issued two Opinions and Orders, denying each Hospital's motion to dismiss and simultaneously reporting her decisions for interlocutory appellate review, pursuant to Mass. R. Civ. P. 64(a).[2] The two resulting appeals were docketed in the Appeals Court on November 13, 2023. (Docket Nos. 2023-P-1308 and 2023-P-1310 for the cases against NEBH and BIDMC, respectively).

Hundreds of similar lawsuits have recently been filed by plaintiffs' lawyers around the country against website and mobile application owners, targeting ubiquitous website analytics and advertising technologies such as Google Analytics and Meta/Facebook Pixel (collectively "AdTech"). The first such lawsuit here in

---

[2] Copies of Justice Kazanjian's two Opinions and Orders are attached as Appendices A and B.

Massachusetts, brought against Partners Healthcare (now called Mass General Brigham) and Dana-Farber Cancer Institute, resulted in an $18.4 million settlement finalized in early 2022, after the Superior Court denied the defendants' motion to dismiss in late 2020.[3] At least twenty-four more such Wiretap Act lawsuits then sprung up in quick succession, including these two.[4] The Superior Court has now denied motions to dismiss in a total of seven such cases,[5] but these parallel appeals mark the first time this novel (and, in the Hospitals' view, unsupportable) attempt to

---

[3] See Doe v. Partners Healthcare Sys., Inc., No. 1984CV01651-BLS-1 (Mass. Super. Ct.) (Tr. of Rule 12 Hearing Nov. 20, 2020; Endorsed Order Allowing in Part and Denying in Part Motion to Dismiss, dated Dec. 7, 2020; Judgment, Dkt. No. 76, dated Jan. 24, 2022).

[4] A list of all known cases alleging Massachusetts Wiretap Act violations based on public website AdTech is attached as Appendix C.

[5] In addition to the cases against BIDMC and NEBH presently on appeal, and Doe v. Partners, supra n.3, see Alves v. BJ's Wholesale Club, Inc., No. 2284CV02509-BLS1 (Suffolk Super. Ct.) (Mem. & Order, Dkt. No. 16, dated June 22, 2023); Doe v. Boston Med. Ctr. Corp., No. 2384CV00326-BLS1 (Suffolk Super. Ct.) (Mem. & Order, Dkt. No. 18, dated Sept. 15, 2023); Doe v. The Children's Hosp. Corp., No. 2384CV00411-BLS1 (Suffolk Super. Ct.) (Mem. & Order, Dkt. No. 18, dated Sept. 15, 2023); Doe v. Emerson Hosp., No. 2277CV01000 (Essex Super. Ct.) (Mem. & Order, Dkt. No. 37, dated Nov. 22, 2023).

extend the Act has come before a Massachusetts appellate court.[6] Justice Kazanjian has stayed all further Superior Court proceedings in these two cases, and in several others, pending the outcome of these two appeals. (See App. C.) Copies of all Superior Court docket entries to date are attached hereto as Appendices D and E.

## III. SHORT STATEMENT OF RELEVANT FACTS[7]

In a nutshell, Plaintiff alleges that each Hospital violated the Act by "secretly" installing on its public website certain AdTech software provided by Google, Meta/Facebook, and other third party vendors. (BIDMC & NEBH Compls. ¶¶ 1-2.) The Hospitals allegedly deployed that AdTech software for website optimization and marketing purposes. (BIDMC Compl. ¶¶ 30, 107; NEBH Compl.

---

[6] Boston Medical Center and Boston Children's Hospital also sought interlocutory review of the Superior Court's denials of their respective motions to dismiss. Justice Kazanjian declined to report those two decisions under Mass. R. Civ. P. 64(a) and G.L. c. 231 § 111 (2nd par.). See Doe v. Boston Med. Ctr., No. 2384CV00326-BLS1 (Endorsed Order dated Nov. 10, 2023); Doe v. Children's Hosp., No. 2384CV00411-BLS1 (Endorsed Order dated Nov. 10, 2023). Appeals Court Justice Englander denied single justice petitions for discretionary interlocutory review pursuant to G.L. c. 231, s. 118 (1st par.) (Appeals Court Dkt. Nos. 2023-J-0603 and 2023-J-0609, respectively.) In so ruling, both Justice Englander and Justice Kazanjian cited, *inter alia*, the fact that interlocutory appeals were proceeding in these two cases against NEBH and BIDMC, as vehicles for appellate review of dispositive issues common to the multiple, parallel cases pending in the Superior Court.

[7] Because these interlocutory appeals arose from the Superior Court's denial of the Hospitals' motions to dismiss, the factual record consists primarily of the plausibly-pled factual allegations in Plaintiff's two complaints. By recounting such allegations here, the Hospitals do not concede their accuracy.

¶¶ 30, 97.) That software allegedly caused website visitors' web browsers (e.g., Google Chrome, Microsoft Edge, iOS Safari, etc.) to share certain information with those vendors while those users browsed the Hospitals' public websites. (BIDMC & NEBH Compls. ¶¶ 38-39.) Plaintiff generally alleges that AdTech software typically logs and shares the IP addresses and various settings associated with users' computers, along with information about which pages are visited, which links or buttons are clicked, which menu selections are made, and also any words that are typed into search boxes or form fields. (BIDMC & NEBH Compls. ¶¶ 22, 39, 49-50, 61-68.) In some cases, the AdTech software also allegedly logs and shares how far down a webpage a user scrolls. (BIDMC Compl. ¶ 71.)

Plaintiff does ***not*** allege that either Hospital, or any other party, unlawfully obtained or shared any information about, including the content of, any email, text message, instant message, chat message, or the like that Plaintiff (or any other person) may have sent or received. Plaintiff also does not allege that any "interceptions" occurred within any user-authenticated/access-restricted portion of any website, such as either Hospital's patient portal, where a patient can access

medical records and other information specific to them.[8] Her "interception" allegations are limited to the publicly-available portions of each Hospital's website, and limited to basic website browsing data (button/link clicks, URLs visited, information typed into form fields, etc.). Plaintiff asserts, however, that the sensitivity (or lack thereof) of the specific content or setting has no bearing on whether a Wiretap Act violation has occurred:

> *6. Although this case concerns the interception of communications that disclose healthcare consumers' private health information, Plaintiff's claim under the Massachusetts Wiretap Act does not depend on whether the intercepted communications reveal an individual's private health information or any other sensitive information.* ***The Massachusetts Wiretap Act applies to all interceptions, regardless of the communication's substance.***
>
> *7. Moreover, although this case concerns communications between healthcare consumers and healthcare providers, ... [Plaintiff's Wiretap Act claim] ... does not depend on the nature of the relationship between Plaintiff and the Members of the Class and [the Hospital].* ***The Massachusetts Wiretap Act applies to all interceptions, regardless of relationship, if any, among the parties to the communication.***[9]

---

[8] Plaintiff's complaints allege that AdTech operated on the publicly-accessible pages of www.bidmc.org and www.nebh.org that contained links through which users could connect to the login pages of various secure patient portal, medical records, and/or bill payment sites. (See BIDMC Compl. ¶¶ 96-103; NEBH Compl. ¶¶ 83-94.) But Plaintiff does not allege that any AdTech operated on any of the actual login pages to which those links pointed or on any pages within the secure, non-public, user-authenticated environments protected by those login pages.

[9] (See BIDMC and NEBH Compls. ¶¶ 6-7 (emphases added).)

Plaintiff repeatedly alleges that the presence of AdTech on the websites was "secret," but it is undisputed that each website included the following pop-up notice:[10]

> We use cookies and other tools to enhance your experience on our website and to analyze our web traffic. For more information about these cookies and the data collected, please refer to our web privacy statement.

That notice included a link to a page on the website featuring a broader privacy policy. That policy included passages such as "[BIDMC/NEBH] routinely gathers data on website activity…" and: "We and our Third Party Service Provider collect and save the default information customarily logged by worldwide web server software. Our logs contain the following information for each request: date and time, originating IP address and domain name (the unique address assigned to your

[10] (See BIDMC Compl. ¶ 24 and NEBH Compl. ¶ 24. The Hospitals provided complete copies of the pop-up disclosure text as Exhibit B to their respective memoranda in support of their motions to dismiss.) Plaintiff's conclusory allegations of "secrecy"—or that "wire communications" or "interceptions" occurred, etc.—are, of course, not regarded as true even in the posture of a Rule 12 motion. See Sudbury v. Mass. Bay Transp. Auth., 485 Mass. 774, 778-79 (2020) (quoting Leavitt v. Brockton Hosp., Inc., 454 Mass. 37, 39 n.6 (2009)).

Internet service provider's computer that connects to the Internet), object requested…." (BIDMC & NEBH Compls. ¶¶ 22-23.)[11]

Plaintiff herself makes almost no appearance in the factual allegations of her complaint. She alleges that she lives in Revere, that she is a patient of NEBH, that her husband is a BIDMC patient, and that she "regularly uses" each Hospital's website to "obtain information about [NEBH's/BIDMC's] doctors (including their credentials and backgrounds)"; to "search for information on particular medical procedures" (with respect to NEBH) or to "search for information on particular symptoms, conditions, and medical procedures, both for herself and her husband" (with respect to BIDMC). (BIDMC & NEBH Compls. ¶ 10.) She additionally alleges that she uses BIDMC's website to "obtain and review her husband's medical records through the website's patient portal." (BIDMC Compl. ¶ 10.)

The complaints repeat various phrasings of the following conclusory allegation (from ¶ 1 of each): "[NEBH/BIDMC] aided in the interception of communications between Plaintiff and other Class Members (defined below) and …

---

[11] The privacy policy also included statements such as that the website "allows you to visit most areas without identifying yourself or providing personal information" and that at least some of the data gathered "is not shared with other organizations." (BIDMC & NEBH Compls. ¶¶ 22-23.) Plaintiff argues that those statements were false and/or misleading in light of the presence of AdTech, so as to render the disclosures completely ineffective. (See id.) Especially given that G.L. c. 93H, § 1 specifically defines "Personal Information" in a manner not implicated by Plaintiff's allegations here (requiring the presence of name plus, e.g., Social Security number, etc.), the Hospitals disagree.

a website maintained by [NEBH/BIDMC]." Neither complaint alleges that any actual harm or injury befell Plaintiff. The complaints allege nothing about the results of such claimed "interceptions" other than generally alleging that companies such as Google and Meta "can and do identify users on the website and associate their identities to the website users' communications with the website ... [and] then use the communications to serve personalized advertising to those individuals." (BIDMC & NEBH Compls. ¶ 22.) The complaints do not allege that Plaintiff herself saw any such targeted advertising, nor do they allege that anything else actually happened to Plaintiff as a result of the purported "interceptions." Indeed, both complaints include one or more iterations of the following (or a similar) disclaimer about many of their allegations: "The further examples presented below do not [necessarily] reflect webpages Plaintiff personally visited but are presented for illustrative purposes." (BIDMC Compl. ¶ 72; NEBH Compl. ¶ 70.[12])

[12] Plaintiff's complaint against BIDMC also repeatedly states: "This is an example and does ***not*** reflect Plaintiff's personal activity on the website." (¶¶ 80 n.6, 84 n.7, and 88 n.8 (emphasis added).) By the time she filed her complaint against NEBH six weeks later, Plaintiff had removed those repeated disclaimers about specific allegations from her template but still included the same general disclaimer quoted above.

## IV. ISSUES OF LAW RAISED BY THIS APPEAL

The Hospitals will raise at least the following issues for appeal, all of which undersigned counsel believes to be appellate questions of first impression:

a. Whether an individual's browsing of a publicly-available website generates one or more "wire communications" for purposes of the Act, see G.L. c. 272, § 99(B)(1), when such browsing activity does ***not*** include the sending or receipt of any email/text/chat/instant message or equivalent.

b. If so, whether such a "wire communication" can be "intercepted" for purposes of the Act (*i.e.* secretly heard or secretly recorded), see G.L. c. 272, § 99(B)(4), when the user had actual or constructive knowledge that her browsing actions on the website were being logged by one or more parties (such as the website owner, host, and/or operator), but she allegedly lacked knowledge that additional parties might also receive data about those same browsing actions.

c. If the Act is broad enough to cover technology that logs or shares data regarding users' browsing actions on public websites, as Plaintiff claims, whether the Act's exceptions for activities conducted in the ordinary course of business, see, e.g., G.L. c. 272, § 99(B)(3), must be construed similarly broadly, rather than strictly limited to activities employing "any telephone or telegraph instrument, equipment, facility, or a component

thereof" (narrowly defined), in order to preserve the careful balance the General Court struck when it drafted the Act in 1968—when all wire communications traveled over telephone/telegraph wires and website technology did not yet exist—and to avoid absurd, unreasonable results.

All of these issues were properly raised and preserved at the Superior Court through the Hospitals' motions to dismiss, their briefing in support of those motions, and the oral argument that the Superior Court heard on September 19, 2023.

## V. BRIEF ARGUMENT ON THE ISSUES RAISED

The Wiretap Act generally prohibits the warrantless "interception" (i.e., secret hearing or secret recording) of oral or wire communications using an "intercepting device." The General Court passed it in 1968 with interpersonal telephone calls and telegrams in mind, as there were no other types of wire communications then in widespread use. These lawsuits attempt to stretch the Act far beyond the bounds of what the General Court intended (or could possibly have imagined): to create massive, widespread liability for ubiquitous advertising and analytics technology on public websites. This Court should reject that attempt.

### A. The General Court Never Intended the Act to Be Wielded in This Manner.

The severe penalties triggered by any Wiretap Act violation make it clear that the General Court could not possibly have intended it to be used in this way. For

example, a consumer claiming an unfair or deceptive business practice can bring a G.L. 93A, § 9 claim—entitling her to damages of at least $25 per violation if she can prove ***both*** a violation of the statute ***and*** an actual injury that resulted. See G.L. c. 93A, § 9(1),(3). The contemporaneously-enacted Wiretap Act, in stark contrast, provides for damages of ***at least $1,000 per violation***—40x the Chapter 93A, Section 9 minimum. See G.L. c. 272, § 99(Q). And while Chapter 93A's liquidated damages require proof of injury, Plaintiff argues that the Wiretap Act requires only proof of a bare statutory violation.[13] In still starker contrast, a willful Chapter 93A violation can trigger treble damages (minimum $75). A willful Wiretap Act violation, however, is a ***felony*** carrying up to a five-year prison sentence and $10,000 fine.[14] Under Plaintiff's theory, the Wiretap Act is a far more potent litigation weapon than Chapter 93A, but that power somehow lay dormant and unrealized for its first fifty years of existence.

Given that contrast, the General Court in 1968 obviously intended the Wiretap Act's severe penalties to target only a limited range of criminal acts that were both serious and unambiguously wrongful. The Act clearly was ***not*** intended as a tool for policing ordinary business or non-profit practices. The Act's lack of reference to class actions, unlike Chapter 93A, Section 9(2), further confirms this.

[13] The Hospitals dispute Plaintiff's contention.

[14] Compare G.L. c. 93A, § 9(3), with G.L. c. 272, § 99(C).

In the Act's 50+-year history, courts have rejected the very few attempts made to wield it broadly[15]—until the Superior Court's denial of Partners Healthcare's motion to dismiss yielded the $18.4 million settlement last year.

### B. Plaintiff's Interpretation of the Wiretap Act Violates the Rule of Lenity and Would Lead to Absurd, Unjustifiable Results.

If judicially accepted, Plaintiff's attempt to overstretch the Act risks calamitous consequences across all for-profit and non-profit sectors of the Massachusetts economy. Plaintiff readily admits that her theory depends neither on the nature of any relationship between website owner and user nor on the sensitivity of any content allegedly "intercepted."[16] Plaintiff's theory applies no differently to non-profit hospital websites than it does to, e.g., the menu page at dunkindonuts.com, the game schedule page at redsox.com, the "Exhibits" page on the Museum of Science's website, the "Get Involved" page on the Greater Boston Food Bank's website, or the "Mass Times" page on the Roman Catholic Cathedral's website, to name just a few examples.

---

[15] See, e.g., O'Sullivan v. NYNEX Corp., 426 Mass. 261, 263, 266-67 (1997) (affirming summary judgment for NYNEX against customer claims); Dillon v. Mass. Bay Transp. Auth., 49 Mass. App. Ct. 309, 319 (2000) (affirming summary judgment for the MBTA in putative employee class action).

[16] (See BIDMC and NEBH Compls. ¶¶ 6-7.) ("The [Act] applies to all interceptions, regardless of the communication's substance. … The [Act] applies to all interceptions, regardless of relationship, if any, among the parties to the communication.").) These paragraphs are reproduced in full on page 7.

As the $18.4 million Partners settlement shows, public websites in 2023 are also ***very*** different from 1968 telephone calls and telegrams regarding the magnitude of potential liability. Plaintiff argues that each website visitor whose browsing information is logged by AdTech generates another (minimum $1,000) Wiretap Act violation. Even for a small public website that gets just 1,000 unique visitors on an average day of light traffic, Plaintiff's theory demands ***at least $36 million in damages per year***, over a three-year limitations period. And that's just for ***one*** lightly-used website—among many thousands across Massachusetts.[17]

Finally, the Act is primarily criminal—defining multiple offenses punishable by incarceration. Those criminal offenses and Plaintiff's civil causes of action here turn on the same elements and definitions. If the "secret" use of AdTech software on a public website can constitute the "interception" of "wire communications" here, the same is true regarding the felony offenses of "willfully commit[ting] an interception, attempt[ing] to commit an interception, or procur[ing] any other person to commit an interception or to attempt to commit an interception" under § 99(C)(1). If AdTech constitutes an "intercepting device" (a conclusion on which Plaintiff's claims depend), any person who possesses such software "under circumstances evincing an intent to commit an interception not permitted or

[17] The Hospitals do not concede any aspect of Plaintiff's damages theory, including the applicable statute of limitations.

authorized by [§ 99]" commits a misdemeanor punishable by incarceration in a house of corrections and a $5,000 fine under § 99(C)(5). Plaintiff's theory leads to both massive civil and possible criminal liability exposure for thousands of Massachusetts organizations and their marketing, IT, and other professionals. The rule of lenity thus ***requires*** that the many statutory ambiguities fundamental to Plaintiff's claims (e.g., whether basic browsing actions on a public website can constitute "wire communications" at all, etc.) be resolved in the Hospitals' favor.[18]

It is also black letter law that Massachusetts courts do not follow literal statutory language beyond the bounds of common sense and into the realm of absurdity.[19] Yet that is exactly what Plaintiff's position requires: reading the language of this pre-internet age statute in a way that creates unintended, absurd, and calamitous internet age consequences and then following it blindly.

---

[18] See Velazquez v. Commonwealth, 491 Mass. 279, 283 n.5 (2023) ("where the language of a criminal statute plausibly can be found ambiguous, the rule of lenity ***requires*** that the defendant receive the benefit of the ambiguity") (citation omitted; emphasis added); see also Leocal v. Ashcroft, 543 U.S. 1, 11 n.8 (2004) (for a mixed criminal-civil statute, "[b]ecause we must interpret the statute consistently, whether we encounter its application in a criminal or noncriminal context, the rule of lenity applies"); Cook v. Patient Edu, LLC, 465 Mass. 548, 555-56 (2013) (assuming, without deciding, that Leocal's holding applies under Massachusetts law); DiFiore v. American Airlines, Inc., 454 Mass. 486, 497 n.12 (2009) (same).

[19] See, e.g, Commonwealth v. Rainey, 491 Mass. 632, 642-43 (2023) (declining to apply the Act as broadly as its text might strictly suggest, noting "[b]ecause we assume generally that the Legislature intends to act reasonably, we will not adopt a literal construction of a statute if the consequences of such a construction are absurd or unreasonable.") (citations omitted).

### C. Plaintiff Has Not Plausibly Alleged Multiple Required Elements of Her Claims.

To prevail on her claims, Plaintiff must prove unlawful "interceptions," which the Act defines as "to secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire or oral communication through the use of any intercepting device."[20] Plaintiff fails to plausibly allege multiple required elements.

***First***, basic website browsing actions are not "wire communications." The Act clearly was intended to restrict eavesdropping on ***interpersonal conversations or messages***. It does not apply to technology that simply monitors movements, such as a video-only surveillance camera or GPS device.[21] Here, the vast majority of Plaintiff's alleged "wire communications" are simply digital movements, such as mouse scrolling, link/button clicks, and entering URLs, to navigate a website. The rest involve entering limited text into search or form fields. No interpersonal messages are alleged.

***Second***, Plaintiff has not plausibly alleged secrecy—for at least two reasons. This Court has made clear that an "interception" requires ***the act of hearing or***

---

[20] G.L. c. 272 §§ 99(B)(4),(6), 99(Q).

[21] See, e.g., Martin v. Gross, 340 F. Supp. 3d 87, 92-93 (D. Mass. 2018), aff'd in part, Project Veritas Action Fund v. Rollins, 982 F.3d 813 (1st Cir. 2020); Commonwealth v. Connolly, 454 Mass. 808, 825 (2009).

***recording itself*** to be secret.[22] Moreover, the specific means of recording and the identity of the eventual audience need not be apparent, as long as the speaker has general notice that her speech is being recorded somehow.[23]

It is common knowledge that websites cannot follow users' browsing commands without logging (*i.e.*, "recording") them. Thus, Plaintiff not only knew but ***intended*** that her "communications" with the Hospitals' websites would be "recorded"—because the websites could not otherwise have displayed the content she sought. That is how the internet works, as multiple courts in Massachusetts and elsewhere have recognized.[24]

Moreover, each website displayed a pop-up notice to users, with a link to a detailed privacy policy, that collectively disclosed the collection of browsing data

[22] See Curtatone v. Barstool Sports, Inc., 487 Mass. 655, 658-59 (2021) (no violation where party falsified his identity in order to secure phone interview, but was open about recording once on the call).

[23] See, e.g., Commonwealth v. Morris, 492 Mass. 498, 501-03 (July 25, 2023) (officers' visible note-taking and verbal references to the audience for defendant's story provided sufficient notice of audio-visual recording).

[24] See, e.g., Commonwealth. v. Maccini, No. 060873 2007 WL 1203560, at *3 (Mass. Super. Ct. Apr. 23, 2007) (Fabricant, J.) ("One who uses [email or instant messaging] … is on notice of the inherent recording, and implicitly consents to it."); accord, e.g., Commonwealth. v. Byrd, 235 A.3d 311, 319 (Pa. 2020) ("by the very act of sending a communication over the Internet, the party expressly consents to the recording of the message"); State v. Lott, 152 N.H. 436, 439-42 (2005).

by the website owner and at least one "Third Party Service Provider." Such warnings were sufficient to eliminate any secrecy.[25]

***Third***, if the Act applies to public websites at all, its "ordinary course of business" exception must also apply.[26] The General Court struck a careful balance in 1968. While prohibiting most interceptions, it specifically excluded from liability any secret hearing or recording done in the ordinary course of an organization's business, using standard equipment. As technology and markets evolved after 1968, this Court and the Appeals Court interpreted that exception flexibly, to avoid absurd results.[27] Plaintiff contends that the exception applies only where "a telephone or telegraph instrument, equipment, facility, or a component thereof" (narrowly defined) is used, not AdTech. But Dillon rejected such a narrow, literalist approach

---

[25] See, e.g., Morris, 492 Mass. at 501-03 (officers' note-taking and general references to an audience were sufficient notice); Curtatone, 487 Mass. at 659 (merely "hold[ing] tape recorder in plain sight" would be sufficient notice).

[26] See G.L. c. 272, § 99(B)(3) (excluding from the definition of "intercepting device" any "telephone or telegraph instrument, equipment, facility, or a component thereof, (a) furnished to a subscriber or user by a communications common carrier in the ordinary course of its business under its tariff and being used by the subscriber or user in the ordinary course of its business; or (b) being used by a communications common carrier in the ordinary course of its business.")

[27] See, e.g., O'Sullivan, 426 Mass. at 263, 266-67; Dillon, 49 Mass. App. Ct. at 319.

that would "destroy the exception," "override common sense," and "produce absurd or unreasonable results."[28]

At bottom, Plaintiff argues that the Act's prohibitions should be applied broadly to 21st Century website technology, while its exceptions must be limited strictly to a 1968 understanding of their text. That is exactly the type of absurd result, and destruction of the intended legislative balance, that courts consistently reject. This Court should do so again.

## VI. REASONS WHY DIRECT APPELLATE REVIEW IS WARRANTED

These cases merit direct appellate review for at least two of the three independently-sufficient reasons set forth in Rule 11(a): (i) because they present multiple "questions of first impression or novel questions of law which should be submitted for final determination to the [SJC]" and (ii) because they present "questions of such public interest that justice requires a final determination by the full [SJC]."

As Justice Kazanjian wrote in each of her two opinions that are on appeal, "[w]hether the Massachusetts Wiretap Statute applies to the internet tracking alleged here is a novel question unresolved at the appellate level in Massachusetts, and is the central and dispositive issue in this case." (See Apps. A & B at 10-11.) Undersigned counsel is similarly aware of no prior appellate decision that considers

[28] 49 Mass. App. Ct. at 315-16 (citations omitted).

the Wiretap Act's possible application to website browsing and/or AdTech software.

Indeed, there have been very few appellate decisions substantively addressing ***any*** aspect of the Wiretap Act in the context of its private civil cause of action for damages (§ 99(Q)). Undersigned counsel is aware of only six decisions meeting that description over the Act's 55-year existence:

- In Curtatone v. Barstool Sports, Inc., after granting direct appellate review on its own motion, this Court affirmed the Superior Court's dismissal of Somerville Mayor Curtatone's claim for unlawful wiretapping when a representative of Barstool Sports posed as a *Boston Globe* reporter in order to secure a telephone interview with the mayor (after having been denied when attempted without subterfuge), recorded the interview (which the mayor permitted, thinking he was speaking with a *Globe* reporter), and then posted the recording on Barstool's website. 487 Mass. 655 (2021).
- In O'Sullivan v. NYNEX Corporation, after granting direct appellate review on its own motion, this Court affirmed the Superior Court's grant of summary judgment to NYNEX, based upon the Act's ordinary course of business exception, on claims brought by 37 customers

concerning secret recording of telemarketing calls between them and NYNEX representatives. 426 Mass. 261 (1997).

- In Birbiglia v. Saint Vincent Hospital, Inc., after granting the parties' direct appellate review applications, this Court affirmed a Superior Court judgment (upon a jury verdict) in favor of a physician against a hospital and certain other physicians on a Wiretap Act claim premised on secret audio recordings of specific in-person conversations between the parties that resulted in the plaintiff not being reappointed to the hospital's medical staff. 427 Mass. 80 (1998).

- In ____ Pine v., After granting direct appellate review on its own motion, this Court affirmed in part and reversed in part a City of Boston Housing Court judgment (after a non-jury trial) awarding damages and attorneys' fees for a conceded Wiretap Act violation—where the defendant landlord's spouse gained access to a confidential meeting of tenants with an attorney (by falsely claiming to be a tenant) and then secretly audio recorded portions of that meeting for use by the landlord against whom the tenants were seeking legal advice. 404 Mass. 411 (1989).

- In Dillon v. Massachusetts Bay Transportation Authority, the Appeals Court affirmed the Superior Court's grant of summary judgment to the MBTA, due to the Act's ordinary course of business exception, in a putative employee class action concerning the MBTA's allegedly-secret recording of telephone calls into and out of its operations centers. In so doing, the Appeals Court disregarded the ordinary course of business exception's text about equipment sourced from a common carrier, in order to preserve legislative intent and avoid absurd results. 49 Mass. App. Ct. 309 (2000).[29]
- Finally, in Johnson v. Frei, the Appeals Court summarily affirmed a jury verdict in favor of an individual plaintiff against an individual defendant over the latter's cell phone audio-visual recording of an in-person encounter between them. No. 17-P-218 (Mass. App. Ct. May 16, 2018) (Rule 1:28 Order).

Of these decisions, only O'Sullivan and Dillon concerned attempts by plaintiffs to use the Wiretap Act to create liability for widespread business practices (in both cases, routine recording of phone calls), as opposed to secret recordings of specific,

[29] This Court cited Dillon approvingly in, e.g., Commonwealth v. Moody, 466 Mass. 196 (2013).

one-off conversations that took place in person or by telephone. As noted, this Court and the Appeals Court rejected both of those attempts.[30]

The novel issues raised in the two present appeals are also of widespread public interest. Justice Kazanjian noted in each opinion that "[t]he novel question here has arisen in several other cases . . . . If, as [the Hospital] argues, the Massachusetts Wiretap Statute does not apply to business-related internet tracking, significant judicial and party resources will be saved by the quick resolution of these cases …." (See Apps. A & B at 11.) Indeed, Justice Kazanjian reported her decisions denying motions to dismiss in these two cases specifically as vehicles for early, definitive appellate resolution of novel questions of law on which more than two dozen pending cases turn in whole or part (in the Suffolk Superior Court's BLS, in other Superior Court sessions, and in federal courts here and elsewhere). Justice Kazanjian is in the process of staying all Superior Court proceedings in the remaining cases before her until these appeals are resolved. The Hospitals have attached, as Appendix F, a brief joint statement by defendants involved in many of

---

[30] A third such case, in which this Court had granted direct appellate review on its own motion, was voluntarily dismissed immediately prior to oral argument. See Marquis v. Google, Inc., No. SJC-12103 (appeal of Superior Court's grant of summary judgment to defendant Google on Wiretap Act claims based on scanning of Gmail messages—because plaintiff's claims would require extra-territorial application of the Act to conduct outside of Massachusetts).

those parallel Wiretap Act lawsuits conveying the widespread importance of definitive appellate resolution of these core legal issues by this Court.

Beyond the presently pending group of cases, it is no exaggeration to say that potentially ***billions*** of dollars in liquidated statutory damages and attorneys' fees, across many thousands of potential Massachusetts defendants, including these two non-profit hospitals, ultimately hang on such resolution. The AdTech about which Plaintiff complains in these two cases is truly ubiquitous in 2023. While Plaintiff may argue that her complaints are ultimately about sufficiency of disclosure, not about the presence of AdTech itself, the fact that ***basically every major hospital or health system in the Commonwealth has now been sued*** in one of these putative Wiretap Act class actions underscores that the statewide impacts of judicial adoption of Plaintiff's legal theory would be immense.

In short, this is precisely the type of case for which the direct appellate review mechanism was created.

## VII. CONCLUSION AND APPENDED DOCUMENTS

For the reasons stated above, the Hospitals respectfully request that this Court grant their application and accept these two cases for direct appellate review. In accordance with Mass. R. App. P. 11(b), the Hospitals have appended:

A. a copy of the Superior Court's Opinion and Order denying NEBH's motion to dismiss the complaint;

B. a copy of the Superior Court's Opinion and Order denying BIDMC's motion to dismiss the complaint;

C. a list of all known putative class actions alleging Wiretap Act violations based on website-based AdTech;

D. the Superior Court docket entries in the case against NEBH;

E. the Superior Court docket entries in the case against BIDMC; and

F. a joint statement in support of this application signed by defendants in other pending cases.

Dated: December 1, 2023

Respectfully submitted,

BETH ISRAEL DEACONESS MEDICAL CENTER, INC. and NEW ENGLAND BAPTIST HOSPITAL, Defendants-Appellants

By their attorneys,

/s/ David Quinn Gacioch

David Quinn Gacioch, BBO No. 660784
Annabel Rodriguez, BBO No. 696001
McDERMOTT WILL & EMERY LLP
200 Clarendon Street, Floor 58
Boston, MA 02116
(617) 535-4000
dgacioch@mwe.com
anrodriguez@mwe.com

## CERTIFICATE OF COMPLIANCE

I hereby certify, under the pains and penalties of perjury, that this Application complies with the Massachusetts Rules of Appellate Procedure that pertain to this filing, including, but not limited to:

Rule 11(b) (contents and form of direct appellate review application); and

Rule 20(a)(1),(4) (type size, margins, and form of briefs and appendices).

I further certify that the foregoing application complies with the applicable length limitation in Mass. R. A. P. 11(b) because it is produced in the proportionally spaced font Times New Roman at size 14 point, and Section V (brief argument) contains fewer than two thousand (2,000) words, as counted with the Word Count feature of Microsoft Word (Microsoft Office 2016 edition).

/s/ David Quinn Gacioch
David Quinn Gacioch

## CERTIFICATE OF SERVICE

Pursuant to Mass.R.A.P. 13(d), I hereby certify, under the penalties of perjury, that on December 1, 2023 I have made service of this Application upon the attorney of record for each party, by email and the Electronic Filing System on:

Edward F. Haber
Michelle H. Blauner
Patrick J. Vallely
SHAPIRO HABER & URMY LLP
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

/s/ David Quinn Gacioch
David Quinn Gacioch

# TABLE OF AUTHORITIES

Page(s)

**Cases**

Alves v. BJ's Wholesale Club, Inc.,
No. 2284CV02509-BLS1 (Suffolk Super. Ct.) (Mem. & Order, Dkt. No. 16, dated June 22, 2023) .................................. 4

Birbiglia v. Saint Vincent Hospital, Inc.,
427 Mass. 80 (1998) ............................................................. 22

Commonwealth. v. Byrd,
235 A.3d 311 (Pa. 2020) ............................................................ 18

Commonwealth v. Connolly,
454 Mass. 808 (2009) ............................................................. 17

Commonwealth. v. Maccini,
No. 060873 2007 WL 1203560 (Mass. Super. Ct. Apr. 23, 2007) (Fabricant, J.) ............................................................ 18

Commonwealth v. Moody,
466 Mass. 196 (2013) ............................................................ 23

Commonwealth v. Morris,
492 Mass. 498 (July 25, 2023) ............................................ 18, 19

Commonwealth v. Rainey,
491 Mass. 632 (2023) ............................................................ 16

Cook v. Patient Edu, LLC,
465 Mass. 548 (2013) ............................................................ 16

Curtatone v. Barstool Sports, Inc.,
487 Mass. 655 (2021) ................................................... 18, 19, 21

DiFiore v. American Airlines, Inc.,
454 Mass. 486 (2009) ............................................................ 16

Dillon v. Mass. Bay Transp. Auth.,
49 Mass. App. Ct. 309 (2000) ................................ 14, 19-20, 23-24

Doe v. Boston Med. Ctr. Corp.,
No. 2384CV00326-BLS1 (Suffolk Super. Ct.) (Mem. & Order, Dkt. No. 18, dated Sept. 15, 2023) .................................. 4

Doe v. Boston Med. Ctr. Corp.,
No. 2384CV00326-BLS1 (Suffolk Super. Ct.) (Endorsed Order dated Nov. 10, 2023) .......................................... 5

Doe v. The Children's Hosp. Corp.,
No. 2384CV00411-BLS1 (Suffolk Super. Ct.) (Mem. & Order, Dkt. No. 18, dated Sept. 15, 2023) .................................. 4

Doe v. The Children's Hosp. Corp.,
No. 2384CV00411-BLS1 (Suffolk Super. Ct.) (Endorsed Order dated Nov. 10, 2023) .......................................... 5

Doe v. Emerson Hosp.,
No. 2277CV01000 (Essex Super. Ct.) (Mem. & Order, Dkt. No. 37, dated Nov. 22, 2023) ...................................... 4

Doe v. Partners Healthcare Sys., Inc.,
No. 1984CV01651-BLS-1 (Mass. Super. Ct.) ............................... 4

Johnson v. Frei,
No. 17-P-218 (Mass. App. Ct. May 16, 2018) ............................ 23

Leavitt v. Brockton Hosp., Inc.,
454 Mass. 37 (2009) ............................................................... 8

Leocal v. Ashcroft,
543 U.S. 1 (2004) ................................................................... 16

Marquis v. Google, Inc.,
No. SJC-12103 ........................................................................ 24

Martin v. Gross,
340 F. Supp. 3d 87 (D. Mass. 2018), aff'd in part, Project Veritas Action Fund v. Rollins, 982 F.3d 813 (1st Cir. 2020) .............................................................................. 17

O'Sullivan v. NYNEX Corp.,
426 Mass. 261 (1997) ................................................ 14, 19, 21-24

Pine v. Rust,
404 Mass. 411 (1989) ........................................................ 22

State v. Lott,
152 N.H. 436 (2005) ........................................................ 18

Sudbury v. Mass. Bay Transp. Auth.,
485 Mass. 774 (2020) ........................................................ 8

Velazquez v. Commonwealth,
491 Mass. 279 (2023) ........................................................ 16

**Statutes**

G.L. c. 93A, § 9 ........................................................ 13

G.L. c. 93H, § 1 ........................................................ 9

G.L. c. 231, § 118 ........................................................ 5

G.L. c. 231, § 111 ........................................................ 5

Massachusetts Wiretap Act, G.L. c. 272, § 99(B),(C),(Q) .......... *passim*

**Other Authorities**

Mass. R. App. P. 11 ........................................................ 2, 20, 24

Mass. R. Civ. P. 64(a) ........................................................ 3, 4

Rule 12 ........................................................ 2, 7

DM_US 202333501-5.056777.0081

# ADDENDUM

## TABLE OF CONTENTS

Opinion and Order in *Vita v. Beth Israel Deaconess Medical Center, Inc.* (2384CV00480-BLS1) (Ex. A). . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Opinion and Order in *Vita v. New England Baptist Hospital* (2384CV00857-BLS1) (Ex. B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

List of all MA Wiretap Act Cases (Ex. C) . . . . . . . . . . . . . . . . . . . . .27

Superior Court Docket in *Vita v. Beth Israel Deaconess Medical Center, Inc.* (2384CV00480-BLS1) (Ex. D) . . . . . . . . . . . . . . . . . . . 32

Superior Court Docket in *Vita v. New England Baptist Hospital* (2384CV00857-BLS1) (Ex. E). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .36

Statement of Support for Direct Appellate Review (Ex. F). . . . . . . . 41

# EXHIBIT A

NOTIFY

17

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT
CIVIL ACTION
No. 2384CV00480-BLS1

KATHLEEN VITA[1]

vs.

BETH ISRAEL DEACONESS MEDICAL CENTER, INC.

**MEMORANDUM OF DECISION AND ORDER ON DEFENDANT'S MOTION TO DISMISS AND REPORT TO THE APPEALS COURT**

Plaintiff Kathleen Vita ("Plaintiff") commenced this putative class action against defendant Beth Israel Deaconess Medical Center ("BIDMC"), alleging that it used internet tracking tools on its website that illegally redirected website users' personal information, and the contents of users' communications with BIDMC's website, to third parties Google and Meta. On the basis of these allegations, the Complaint asserts a single claim for violation of the Massachusetts Wiretap Statute, G.L. c. 272, § 99. Presently before the court is BIDMC's motion to dismiss. After a hearing on September 19, 2023, and consideration of the parties' submissions, the motion is **DENIED**, and, consistent with the parties' request, the matter is **REPORTED** to the Appeals Court.

**BACKGROUND**

The Complaint and relevant documents attached to the motion to dismiss set forth the following facts.[2] BIDMC operates a hospital in Boston that offers inpatient and outpatient care

[1] For herself and the class.
[2] BIDMC's complete website Privacy Policy, which Plaintiff relies on in framing her Complaint, was attached to the motion to dismiss. *Marram v. Kobrick Offshore Fund, Ltd.*, 442 Mass. 43, 45 n.4 (2004).

to residents in the greater Boston area. Plaintiff is an individual residing in Revere, Massachusetts.

BIDMC maintains and controls a website for its hospital. The website allows users to obtain information about the services BIDMC provides, including information about doctors, services, and treatments provided for particular medical conditions. Website users also can book appointments, access and pay bills, and access private medical information through the website's patient portal. The website contains search bars that aid users in finding specific information on the site, and forms that users may submit to BIDMC, such as the "Request an Appointment" form.

As relevant here, BIDMC's website privacy policy ("Privacy Policy") states:

> Beth Israel Deaconess Medical Center (BIDMC) is committed to protecting your privacy. The BIDMC website allows you to visit most areas without identifying yourself or providing personal information. For those areas where you elect to provide identifiable information, we assure you that we make every effort to protect your privacy. . . .
>
> Beth Israel Deaconess Medical Center routinely gathers data on website activity, such as how many people visit the site, the pages they visit, where they come from, how long they stay, etc. The data is collected on an aggregate, anonymous basis, which means no personally identifiable information is associated with the data. This data helps us improve site content and overall usage. This information is not shared with other organizations. Except for authorized law enforcement investigations or other facially valid legal processes, we will not share any information we receive with outside parties. . . .
>
> We and our Third Party Service Provider collect and save the default information customarily logged by worldwide web server software. Our logs contain the following information for each request: date and time, originating IP address and domain name (the unique address assigned to your Internet service provider's computer that connects to the Internet), object requested, and completion status of the request. These logs may be kept for an indefinite amount of time, used at any time and in any way necessary to prevent security breaches and to ensure the integrity of the data on our servers.

(Formatting altered). Since 2021, BIDMC's website also has included a pop-up notice that references the use of "cookies and other tools to enhance your experience on the website," with a link to the Privacy Policy "for more information about these cookies and the data collected."

Notwithstanding this Privacy Policy, BIDMC has implemented multiple software-based internet tracking technologies on its website that contemporaneously record and transmit data about users' interactions with BIDMC's website to multiple unidentified third parties. The software is unrelated to the website's functionality and is invisible to users. Two such tracking technologies are Meta Pixel, which transmits data to Meta (the parent company of Facebook), and Google Analytics, which transmits data to Google.

Meta Pixel and Google Analytics operate through the automatic execution of pieces of JavaScript code, embedded in the BIDMC website, which cause a website user's internet browser to record and send information to those third parties when a user visits and interacts with the site. The transmitted information can include: the website address (URL); the title of webpages visited; information about the content of the website; search terms or any other information inputted into a form; selections on drop-down menus and the contents thereof; scrolls down a webpage; and button clicks. A website user's internet protocol ("IP") address and web browser configurations are also revealed, which permits Google and Meta to associate the data it receives from the website visit to the identity of a particular individual known to them. The content of the user's communications with BIDMC's website is added to Google's and Meta's collection of information already known about the individual, which can be used to target advertising to that individual. Google, Meta, and BIDMC may also use the information collected for other commercial purposes. After a media exposé about the use of Meta Pixel on hospital

websites, BIDMC removed it from its website in September 2022. As of the date the Complaint was filed, Google Analytics software remained on the BIDMC website.

In addition to Meta Pixel and Google Analytics, BIDMC also employs other software-based internet tracking technologies that work in a similar fashion. Those include Doubleclick, Siteimprove Analytics, and Marchex.io.

Plaintiff's husband is a BIDMC patient. Plaintiff regularly uses the BIDMC website to obtain information about BIDMC doctors (including their credentials and backgrounds); search for information on particular symptoms, conditions, and medical procedures, both for herself and her husband; and obtain and review her husband's medical records through the BIDMC website patient portal.

**STANDARD OF REVIEW**

Rule 12(b)(6) allows for dismissal of a complaint when the factual allegations contained within it do not suggest a plausible entitlement to relief. *Iannacchino v. Ford Motor Co.*, 451 Mass. 623, 635-636 (2008); *Fraelick v. PerkettPR, Inc.*, 83 Mass. App. Ct. 698, 699-700 (2013). In ruling on the motions, the court accepts the factual allegations as true and draws all reasonable inferences in the non-moving party's favor. *Fraelick*, 83 Mass. App. Ct. at 699-700.

**DISCUSSION**

BIDMC argues that Plaintiff's claims must be dismissed due to lack of standing and failure to meet the requirements of the Massachusetts Wiretap Statute. As discussed below, however, under this court's reading of the relevant caselaw and the plain language of the statute, the Complaint states a claim sufficient to survive dismissal under Rule 12(b)(6). Nevertheless, because of the novelty of the issue raised, which also has arisen in several analogous cases

before this court, and for the further reasons discussed below, a report to the Appeals Court is appropriate.[3]

**1. Standing**[4]

This court recently addressed standing in an analogous wiretap cases — *Doe v. Boston Medical Center*, 2384CV00326-BLS1, slip op. at 4-5 (Mass. Super. Ct. Sept. 15, 2023) ("*Boston Medical Center*"). There, the court denied the defendant's motion to dismiss on standing grounds, concluding that "a properly alleged violation of the [Massachusetts Wiretap Statute], alone, constitute[s] injury sufficient to confer standing." *Id.* (citing *Pine v. Rust*, 404 Mass. 411, 418 (1989); *In re Lubanski*, 186 B.R. 160, 166-67 (Bankr. D. Mass. 1995)). For the same reasons enunciated in that decision, Plaintiff has standing to sue here, as well.

**2. Massachusetts Wiretap Statute**

General Laws c. 272, § 99(Q) provides a cause of action for "any aggrieved person whose oral or wire communications were intercepted, disclosed or used . . . or whose personal or property interests or privacy were violated by means of an interception," except as permitted or authorized by the Wiretap Statute. "Interception" is defined to mean "to secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire or oral communication through the use of any intercepting device by any person other than a person given prior authority by all parties to such communication." G.L. c. 272, § 99(B)(4).

BIDMC argues that the action should be dismissed because, according to it: 1) the statute applies only to "conversations," not internet tracking; 2) BIDMC's recording of website user

[3] On this same date the court also decides a similar motion to dismiss and reports the correctness of its ruling to the Appeals Court in *Kathleen Vita v. New England Baptist Hospital*, 2384CV00857-BLS1.
[4] The standard of review for challenging standing in a motion to dismiss under Rule 12(b)(1) is functionally the same as under Rule 12(b)(6). *Abate v. Fremont Inv. & Loan*, 470 Mass. 821, 828 (2015).

activity was not secret; 3) the statutory "ordinary course of business" exception applies; and 4) application of the statute to the facts here would lead to absurd results the Legislature could not have intended. The court addresses each, in turn.

*A.* Limitation of the statute to human-to-human conversation. In prior analogous cases, this court concluded that the plain language of the statute encompasses the electronic activity alleged here. *See Boston Medical Center*, 2384CV00326-BLS1, slip op. at 6-7; *Doe v. Boston Children's Hospital,* 2384CV00411-BLS1, slip op. at 4-6 (Mass. Super. Ct. Sept. 15. 2023) ("*Boston Children's*"). Accordingly, for the same reasons already articulated in those cases, the argument fails here, as well.

*B.* Secrecy requirement. As noted, an interception under the Massachusetts Wiretap Statute must be "secret." G.L. c. 272, § 99(B)(4). A "secret" recording is one that is "concealed," and "kept hidden or unexplained." *Curtatone v. Barstool Sports, Inc.*, 487 Mass. 655, 658 (2021) (dictionary citations omitted). An interception is not secret for purposes of the Massachusetts Wiretap Statute if the individual communicating has "actual [or constructive] knowledge of the recording," which is proved through "'clear and unequivocal objective manifestations of knowledge' in the [users'] statements or conduct." *Commonwealth v. Morris*, 492 Mass. 498, 515 (2023) (Budd., J., concurring) (quoting *Commonwealth v. Jackson*, 370 Mass. 502, 507 (1976)). *See Commonwealth v. Du*, No. 22-P-870, 2023 WL 652243, at *6 (Mass. App. Ct. Oct. 6, 2023).

BIDMC argues that its Privacy Policy and related website pop-up disclose BIDMC's collection of data, and its sharing of that data with a third party, such that the internet tracking activity alleged here is not secret. There are two problems with that argument. First, the Privacy Policy is unclear about the exact nature of the website data BIDMC shares. The Privacy Policy

informs users that BIDMC collects certain user data that is kept anonymous and which "is not shared with other organizations," but then notes the existence of an external "Third Party Service Provider" that also collects data, but defines that collected data in a different way. The Privacy Policy language is technical and obscures whether the BIDMC data and the Third Party Service Provider data are related or overlap in some ways, and thus whether some of the purportedly private, unshared, "anonymous" data BIDMC collects is nevertheless shared with the Third Party Service Provider.[5] Second, the Privacy Policy discloses the existence of only a *single* "Third Party Service Provider," while the Complaint alleges that the data BIDMC collects is contemporaneously shared with *multiple* external organizations (Google, Meta, and others). The existence of these additional third-party "eavesdroppers" are thus kept hidden from BIDMC's website users.

In sum, the Privacy Policy and website pop-up, while disclosing some amount of data sharing, do not establish users' actual or constructive knowledge of the totality of the internet tracking alleged here.[6] Accordingly, on the facts as pleaded and taken as true, the Complaint sufficiently alleges a secret interception, i.e. that BIDMC "aid[ed] another to secretly hear or secretly record the contents of any wire or oral communication." G.L. c. 272, § 99(B)(4).[7]

*C. "Ordinary course of business" exception.* The Massachusetts Wiretap Statute excepts from the definition of "intercepting device":

[5] Indeed, as a lay reader of the Privacy Policy, the court is unable to determine whether BIDMC's collected data about "how many people visit the site, the pages they visit, where they come from, how long they stay, etc." includes some of the same information as it and the Third Party Service Provider's collection of "default information customarily logged by worldwide web server software."

[6] That a website user can reveal the internet tracking software code by employing "Developer Mode" also does not establish actual or constructive knowledge of the software code at issue.

[7] Because this case alleges third-party eavesdropping on website communications by undisclosed, contemporaneous third-parties, this case differs from *Curtatone v. Barstool Sports, Inc.*, 487 Mass. 655 (2023), which involved a consented-to recorded conversation between two people only. *See id.* at 657, 660.

> any telephone or telegraph instrument, equipment, facility, or a component thereof, (a) furnished to a subscriber or user by a communications common carrier in the ordinary course of its business under its tariff and being used by the subscriber or user in the ordinary course of its business . . .

G.L. c. 272, § 99(B)(3). Thus, for the exception to apply, the intercepting device at issue must consist of or include "telephone or telegraph" equipment, instruments, etc. *Id.*

Setting aside whether internet tracking occurs in the ordinary course of BIDMC's business, the electronic software-based internet tracking technology at issue here plainly is not telephone or telegraph equipment. For that reason, in the absence of an appellate decision extending the exception beyond the realm of telephones and telegraphs, under the plain language of the statute, the court declines to apply the exception here. *See Alves v. BJ's Wholesale Club, Inc.*, 2284CV02509-BLS1, slip op. at 10 (Super. Ct. June 21, 2023) ("*Alves*") (declining to extend exception to software-based session replay code technology).

*D. <u>Legislative Intent</u>.* Finally, BIDMC argues that interpreting the Massachusetts Wiretap Statute to encompass the ubiquitous internet tracking that practically all businesses presently employ would lead to absurd results the Legislature could not have intended when it enacted the statute in 1968. Reading the criminal caselaw that BIDMC cites for this proposition does not compel the denial it seeks, however.

*Commonwealth v. Morris*, 492 Mass. 498 (2023), and *Commonwealth v. Rainey*, 491 Mass. 632 (2023), upon which BIDMC relies, each involve statements made to police wherein the speakers necessarily understood that their statements were being memorialized for future use or presentation in court, despite the lack of explicit disclosure about electronic recording. *Morris*, 492 Mass. at 503-04; *Rainey*, 491 Mass. at 635, 640-41. In that narrow context, the

court determined that literal application of the Massachusetts Wiretap Statute would result in absurd and unintended consequences, at odds with the Legislature's intent in enacting the statute. *See Morris*, 492 Mass. at 506 ("nothing in the statute as a whole, including its codified preamble, supports the conclusion that the Legislature intended to criminalize the police officers' recording of the defendant's voluntary statement, which the defendant understood was being preserved for future use in connection with the investigation of the crime about which the defendant was speaking voluntarily"); *Rainey*, 491 Mass. at 643 (same as to victim's voluntarily-provided statement to police).

Here, unlike the criminal defendant and victim in *Morris* and *Rainey*, Plaintiff and BIDMC's other website users are not alleged to be proceeding with the implicit understanding that their communications are to be preserved and memorialized, electronically or by handwritten notes, by a government body, for important public safety reasons. Rather, the entire gist of the Complaint is that Plaintiff interacted with the BIDMC website with no concept that the data she inputted would be simultaneously and automatically intercepted and externally shared with multiple external parties. These facts alone distinguish this case from *Morris* and *Rainey*.

In further contrast to those cases, the statute's preamble arguably supports the right to freedom from private electronic surveillance at issue here. Its broad language provides:

> The general court . . . finds that the uncontrolled development and unrestricted use of modern electronic surveillance devices pose grave dangers to the privacy of all citizens of the commonwealth. Therefore, the secret use of such devices by private individuals must be prohibited.

G.L. c. 272, § 99. In fact, a broad interpretation of the statute's language is endorsed in *Commonwealth v. Moody*, 466 Mass. 196 (2013), a Supreme Judicial Court decision that

extended the Massachusetts Wiretap Statute's application to electronic text messages. *See id.* at 209 ("[i]n light of the broad statutory definitions of the terms 'wire communication' and 'interception,' we conclude that the Massachusetts wiretap statute provides protection for the electronic transmission of text messages").[8]

For the reasons explained above, and absent an appellate decision interpreting the Massachusetts Wiretap Statute in the narrow way that BIDMC suggests, this court concludes that the facts as alleged in the Complaint state a claim for a violation of the statute.

3. **Report to Appeals Court**

Under Mass. R. Civ. P. 64, a Superior Court judge may report an interlocutory decision "where he or she concludes that the finding or order 'so affects the merits of the controversy that the matter ought to be determined by the [A]ppeals [C]ourt before any further proceedings in the trial court.'" *Patel v. Martin*, 481 Mass. 29, 32 (2018) (quoting Mass. R. Civ. P. 64(a)). The Supreme Judicial Court has cautioned that "[i]nterlocutory matters should be reported only where it appears that they present serious questions likely to be material in the ultimate decision, and that subsequent proceedings in the trial court will be substantially facilitated by so doing." *Globe Newspaper Co. v. Massachusetts Bay Transp. Auth. Ret. Bd.*, 412 Mass. 770, 772 (1992) (quoting *John Gilbert Jr. Co. v. C.M. Fauci Co.*, 309 Mass. 271, 273 (1941)). Such is the case here. The parties here also have requested that the court report the matter to the Appeals Court.

Whether the Massachusetts Wiretap Statute applies to the internet tracking alleged here is a novel question unresolved at the appellate level in Massachusetts, and is the central and

[8] The most recent published case interpreting the Massachusetts Wiretap Statute is consistent with this view. *See Commonwealth v. Du*, No. 22-P-870, 2023 WL 6522435, at *6-*7 (Mass. App. Ct. Oct. 6, 2023) (court interpreted statute to prohibit surreptitious audio-visual video recording of drug transaction made by police using cell phone application).

dispositive issue in this case. Although the Massachusetts Wiretap Statute is broadly drafted, and states the Legislature's explicit intention to protect citizens from the grave danger of electronic surveillance by private individuals poses, it was enacted in 1968 — long before the internet, let alone internet tracking, became available. The Legislature did not, therefore, contemplate internet tracking as a form of secretly intercepting communications. BIDMC argues that internet tracking is practically ubiquitous across all businesses and organizations with websites, and that BIDMC's use of such tracking is a legitimate, ordinary part of its business. Had the Legislature been aware of internet tracking and its possible business uses in 1968, it might have written the statute to allow the type of tracking alleged in this case.

The novel question here has arisen in several other cases. As noted, this court already has denied motions to dismiss in two other internet-tracking wiretap cases. *See Boston Medical Center*, 2384CV00326-BLS1; *Boston Children's*, 2384CV00411-BLS1. Other Superior Court judges have issued similar decisions. *See Alves*, 2284CV02509-BLS1; *Doe v. Partners Healthcare System, Inc.*, 1984CV01651-BLS1, endorsement denying motion to dismiss (Super. Ct. Dec. 7, 2020). There are many other analogous cases presently pending in the Superior Court, including in this session.[9] If, as BIDMC argues, the Massachusetts Wiretap Statute does not apply to business-related internet tracking, significant judicial and party resources will be saved by the quick resolution of these cases before discovery and other stages of litigation.

[9] Other analogous cases pending in BLS1 include: *Progin, Janice v. UMass Memorial Health Care, Inc.*, 2284CV2889; *John Doe v. Boston Medical Center Corp.*, 2384CV326; *Jane Doe v. The Children's Hospital Corp.*, 2384CV411; *Kathleen Vita v. New England Baptist Hospital*, 2384CV00857; *Karen McManus v. Tufts Medical Center, Inc.*, 2384CV930; *Elizabeth Nova v. Boston Medical Center Corporation*, 2384CV1086; *Jane Doe v. Cape Cod Healthcare, Inc.*, 2384CV1236; *Jane Doe v Baystate Health Systems*, 2384CV1949; *John Doe v. UMass Memorial Health Care Inc.*, 2384CV2448; *Lisa Colleton v. UMass Memorial Health Care Inc.*, 2384CV2450

For all of these reasons, this matter should be determined by the Appeals Court before any proceedings continue in this court.

**ORDER**

For the foregoing reasons, it is hereby **ORDERED** that:

1. BIDMC's motion to dismiss is **DENIED**; and
2. The Court **REPORTS** the correctness of its ruling to the Appeals Court.

Dated: October 31, 2023

Hélène Kazanjian
Justice of the Superior Court

# EXHIBIT B

NOTIFY

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT
CIVIL ACTION
No. 2384CV00857-BLS1

11/1/23 notice sent BH (2)

KATHLEEN VITA[1]

vs.

NEW ENGLAND BAPTIST HOSPITAL

**MEMORANDUM OF DECISION AND ORDER ON DEFENDANT'S MOTION TO DISMISS AND REPORT TO THE APPEALS COURT**

Plaintiff Kathleen Vita ("Plaintiff") commenced this putative class action against defendant New England Baptist Hospital ("NEBH"), alleging that it used internet tracking tools on its website that illegally redirected website users' personal information, and the contents of users' communications with NEBH's website, to third parties Google and Meta. On the basis of these allegations, the Complaint asserts a single claim for violation of the Massachusetts Wiretap Statute, G.L. c. 272, § 99. Presently before the court is NEBH's motion to dismiss. After a hearing on September 19, 2023, and consideration of the parties' submissions, the motion is **DENIED**, and, consistent with the parties' request, the matter is **REPORTED** to the Appeals Court.

## BACKGROUND

The Complaint and relevant documents attached to the motion to dismiss set forth the following facts.[2] NEBH operates a hospital with a main campus in Boston, and several other

[1] For herself and the class.
[2] NEBH's complete website Privacy Policy, which Plaintiff relies on in framing her Complaint, was attached to the motion to dismiss. *Marram v. Kobrick Offshore Fund, Ltd.*, 442 Mass. 43, 45 n.4 (2004).

locations in the Boston area, focusing on orthopedic care and complex orthopedic procedures. Plaintiff is an individual residing in Revere, Massachusetts.

NEBH maintains and controls a website for its hospital. The website allows users to obtain information about the services NEBH provides, including information about doctors, services, and treatments provided for particular medical conditions. Website users also can access and pay bills, and access private medical information through the website's patient portal. The website contains search bars that aid users in finding specific information on the site, and forms that users may submit to NEBH, such as the "Find a Doctor" form.

As relevant here, NEBH's website privacy policy ("Privacy Policy") states:

> New England Baptist Hospital (NEBH) is committed to protecting your privacy. The NEBH website allows you to visit most areas without identifying yourself or providing personal information. For those areas where you elect to provide identifiable information, we assure you that we make every effort to protect your privacy. . . .
>
> New England Baptist Hospital routinely gathers data on website activity, such as how many people visit the site, the pages they visit, where they come from, how long they stay, etc. The data is collected on an aggregate, anonymous basis, which means no personally identifiable information is associated with the data. This data helps us improve site content and overall usage. This information is not shared with other organizations. Except for authorized law enforcement investigations or other facially valid legal processes, we will not share any information we receive with outside parties. . . .
>
> We and our Third Party Service Provider collect and save the default information customarily logged by worldwide web server software. Our logs contain the following information for each request: date and time, originating IP address and domain name (the unique address assigned to your Internet service provider's computer that connects to the Internet), object requested, and completion status of the request. These logs may be kept for an indefinite amount of time, used at any time and in any way necessary to prevent security breaches and to ensure the integrity of the data on our servers.

(Formatting altered). Since 2021, NEBH's website also has included a pop-up notice that references the use of "cookies and other tools to enhance your experience on the

website," with a link to the Privacy Policy "for more information about these cookies and the data collected."

Notwithstanding this Privacy Policy, NEBH has implemented multiple software-based internet tracking technologies on its website that contemporaneously record and transmit data about users' interactions with NEBH's website to multiple unidentified third parties. The software is unrelated to the website's functionality and is invisible to users. Two such tracking technologies are Meta Pixel, which transmits data to Meta (the parent company of Facebook), and Google Analytics, which transmits data to Google.

Meta Pixel and Google Analytics operate through the automatic execution of pieces of JavaScript code, embedded in the NEBH website, which cause a website user's internet browser to record and send information to those third parties when a user visits and interacts with the site. The transmitted information can include: the website address (URL); the title of webpages visited; information about the content of the website; search terms or any other information inputted into a form; selections on drop-down menus and the contents thereof; scrolls down a webpage; and button clicks. A website user's internet protocol ("IP") address and web browser configurations are also revealed, which permits Google and Meta to associate the data it receives from the website visit to the identity of a particular individual known to them. The content of the user's communications with NEBH's website is added to Google's and Meta's collection of information already known about the individual, which can be used to target advertising to that individual. Google, Meta, and NEBH may also use the information collected for other commercial purposes. After a media exposé about the use of Meta Pixel on hospital websites in June 2022, NEBH removed it from its website at some unidentified point in time. As of the date the Complaint was filed, Google Analytics software remained on the NEBH website.

Plaintiff is a NEBH patient. Plaintiff regularly uses the NEBH website to obtain information about NEBH doctors (including their credentials and backgrounds) and to search for information on particular medical procedures.

## STANDARD OF REVIEW

Rule 12(b)(6) allows for dismissal of a complaint when the factual allegations contained within it do not suggest a plausible entitlement to relief. *Iannacchino v. Ford Motor Co.*, 451 Mass. 623, 635-636 (2008); *Fraelick v. PerkettPR, Inc.*, 83 Mass. App. Ct. 698, 699-700 (2013). In ruling on the motions, the court accepts the factual allegations as true and draws all reasonable inferences in the non-moving party's favor. *Fraelick*, 83 Mass. App. Ct. at 699-700.

## DISCUSSION

NEBH argues that Plaintiff's claims must be dismissed due to lack of standing and failure to meet the requirements of the Massachusetts Wiretap Statute. As discussed below, however, under this court's reading of the relevant caselaw and the plain language of the statute, the Complaint states a claim sufficient to survive dismissal under Rule 12(b)(6). Nevertheless, because of the novelty of the issue raised, which also has arisen in several analogous cases before this court, and for the further reasons discussed below, a report to the Appeals Court is appropriate.[3]

[3] On this same date the court also decides a similar motion to dismiss and reports the correctness of its ruling to the Appeals Court in *Kathleen Vita v. Beth Israel Deaconess Medical Center, Inc.*, 2384CV00480-BLS1.

1. **Standing**[4]

This court recently addressed standing in an analogous wiretap case — *Doe v. Boston Medical Center*, 2384CV00326-BLS1, slip op. at 4-5 (Mass. Super. Ct. Sept. 15, 2023) ("*Boston Medical Center*"). There, the court denied the defendant's motion to dismiss on standing grounds, concluding that "a properly alleged violation of the [Massachusetts Wiretap Statute], alone, constitute[s] injury sufficient to confer standing." *Id.* (citing *Pine v. Rust*, 404 Mass. 411, 418 (1989); *In re Lubanski*, 186 B.R. 160, 166-67 (Bankr. D. Mass. 1995)). For the same reasons enunciated in that decision, Plaintiff has standing to sue here, as well.

2. **Massachusetts Wiretap Statute**

General Laws c. 272, § 99(Q) provides a cause of action for "any aggrieved person whose oral or wire communications were intercepted, disclosed or used . . . or whose personal or property interests or privacy were violated by means of an interception," except as permitted or authorized by the Wiretap Statute. "Interception" is defined to mean "to secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire or oral communication through the use of any intercepting device by any person other than a person given prior authority by all parties to such communication." G.L. c. 272, § 99(B)(4).

NEBH argues that the action should be dismissed because, according to it: 1) the statute applies only to "conversations," not internet tracking; 2) NEBH's recording of website user activity was not secret; 3) the statutory "ordinary course of business" exception applies; and 4) application of the statute to the facts here would lead to absurd results the Legislature could not have intended. The court addresses each, in turn.

[4] The standard of review for challenging standing in a motion to dismiss under Rule 12(b)(1) is functionally the same as under Rule 12(b)(6). *Abate v. Fremont Inv. & Loan*, 470 Mass. 821, 828 (2015).

*A. Limitation of the statute to human-to-human conversation.* In prior analogous cases, this court concluded that the plain language of the statute encompasses the electronic activity alleged here. *See Boston Medical Center*, 2384CV00326-BLS1, slip op. at 6-7; *Doe v. Boston Children's Hospital*, 2384CV00411-BLS1, slip op. at 4-6 (Mass. Super. Ct. Sept. 15. 2023) ("*Boston Children's*"). Accordingly, for the same reasons articulated in those cases, the argument fails here, as well.

*B. Secrecy requirement.* As noted, an interception under the Massachusetts Wiretap Statute must be "secret." G.L. c. 272, § 99(B)(4). A "secret" recording is one that is "concealed," and "kept hidden or unexplained." *Curtatone v. Barstool Sports, Inc.*, 487 Mass. 655, 658 (2021) (dictionary citations omitted). An interception is not secret for purposes of the Massachusetts Wiretap Statute if the individual communicating has "actual [or constructive] knowledge of the recording," which is proved through "'clear and unequivocal objective manifestations of knowledge' in the [users'] statements or conduct." *Commonwealth v. Morris*, 492 Mass. 498, 515 (2023) (Budd., J., concurring) (quoting *Commonwealth v. Jackson*, 370 Mass. 502, 507 (1976)). *See Commonwealth v. Du*, No. 22-P-870, 2023 WL 652243, at *6 (Mass. App. Ct. Oct. 6, 2023).

NEBH argues that its Privacy Policy and related website pop-up disclose NEBH's collection of data, and its sharing of that data with a third party, such that the internet tracking activity alleged here is not secret. There are two problems with that argument. First, the Privacy Policy is unclear about the exact nature of the website data NEBH shares. The Privacy Policy informs users that NEBH collects certain user data that is kept anonymous and which "is not shared with other organizations," but then notes the existence of an external "Third Party Service Provider" that also collects data, but defines that collected data in a different way. The Privacy

Policy language is technical and obscures whether the NEBH data and the Third Party Service Provider data are related or overlap in some ways, and thus whether some of the purportedly private, unshared, "anonymous" data NEBH collects is nevertheless also shared with the Third Party Service Provider.[5] Second, the Privacy Policy discloses the existence of only a *single* "Third Party Service Provider," while the Complaint alleges that the data NEBH collects is contemporaneously shared with *multiple* external organizations (Google, Meta, and others). The existence of these additional third-party "eavesdroppers" are thus kept hidden from NEBH's website users.

In sum, the Privacy Policy and website pop-up, while disclosing some amount of data sharing, do not establish users' actual or constructive knowledge of the totality of the internet tracking alleged here.[6] Accordingly, on the facts as pleaded and taken as true, the Complaint sufficiently alleges a secret interception, i.e. that NEBH "aid[ed] another to secretly hear or secretly record the contents of any wire or oral communication." G.L. c. 272, § 99(B)(4).[7]

*C. "Ordinary course of business" exception.* The Massachusetts Wiretap Statute excepts from the definition of "intercepting device":

> any telephone or telegraph instrument, equipment, facility, or a component thereof, (a) furnished to a subscriber or user by a communications common carrier in the ordinary course of its business under its tariff and being used by the subscriber or user in the ordinary course of its business . . .

---

[5] Indeed, as a lay reader of the Privacy Policy, the court is unable to determine whether NEBH's collected data about "how many people visit the site, the pages they visit, where they come from, how long they stay, etc." includes some of the same information as it and the Third Party Service Provider's collection of "default information customarily logged by worldwide web server software."

[6] That a website user can reveal the internet tracking software code by employing "Developer Mode" also does not establish actual or constructive knowledge of the software code at issue.

[7] Because this case alleges third-party eavesdropping on website communications by undisclosed, contemporaneous third-parties, this case differs from *Curtatone v. Barstool Sports, Inc.*, 487 Mass. 655 (2023), which involved a consented-to recorded conversation between two people only. *See id.* at 657, 660.

G.L. c. 272, § 99(B)(3). Thus, for the exception to apply, the intercepting device at issue must consist of or include "telephone or telegraph" equipment, instruments, etc. *Id.*

Setting aside whether internet tracking occurs in the ordinary course of NEBH's business, the electronic software-based internet tracking technology at issue here plainly is not telephone or telegraph equipment. For that reason, in the absence of an appellate decision extending the exception beyond telephones and telegraphs, under the plain language of the statute, the court declines to apply the exception here. *See Alves v. BJ's Wholesale Club, Inc.*, 2284CV02509-BLS1, slip op. at 10 (Super. Ct. June 21, 2023) ("*Alves*") (declining to extend exception to software-based session replay code technology).

*D.* *Legislative Intent*. Finally, NEBH argues that interpreting the Massachusetts Wiretap Statute to encompass the ubiquitous internet tracking that practically all businesses presently employ would lead to absurd results the Legislature could not have intended when it enacted the statute in 1968. Reading the criminal caselaw that NEBH cites for this proposition does not compel the denial it seeks, however.

*Commonwealth v. Morris*, 492 Mass. 498 (2023), and *Commonwealth v. Rainey*, 491 Mass. 632 (2023), upon which NEBH relies, each involve statements made to police where the speakers necessarily understood that their statements were being memorialized for future use or presentation in court, despite the lack of explicit disclosure about electronic recording. *Morris*, 492 Mass. at 503-04; *Rainey*, 491 Mass. at 635, 640-41. In that narrow context, the court determined that literal application of the Massachusetts Wiretap Statute would result in absurd and unintended consequences, at odds with the Legislature's intent in enacting the statute. *See Morris*, 492 Mass. at 506 ("nothing in the statute as a whole, including its codified preamble, supports the conclusion that the Legislature intended to criminalize the police officers' recording

of the defendant's voluntary statement, which the defendant understood was being preserved for future use in connection with the investigation of the crime about which the defendant was speaking voluntarily"); *Rainey*, 491 Mass. at 643 (same as to victim's voluntarily-provided statement to police).

Here, unlike the criminal defendant and victim in *Morris* and *Rainey*, Plaintiff and NEBH's other website users are not alleged to be proceeding with the implicit understanding that their communications are to be preserved and memorialized, electronically or by handwritten notes, by a government body, for important public safety reasons. Rather, the entire gist of the Complaint is that Plaintiff interacted with the NEBH website with no concept that the data she inputted would be simultaneously and automatically intercepted and externally shared with multiple external parties. These facts alone distinguish this case from *Morris* and *Rainey*.

In further contrast to those cases, the statute's preamble arguably supports the right to freedom from private electronic surveillance at issue here. Its broad language provides:

> The general court . . . finds that the uncontrolled development and unrestricted use of modern electronic surveillance devices pose grave dangers to the privacy of all citizens of the commonwealth. Therefore, the secret use of such devices by private individuals must be prohibited.

G.L. c. 272, § 99. In fact, a broad interpretation of the statute's language is endorsed in *Commonwealth v. Moody*, 466 Mass. 196 (2013), a Supreme Judicial Court decision that extended the Massachusetts Wiretap Statute's application to electronic text messages. *See id.* at 209 ("[i]n light of the broad statutory definitions of the terms 'wire communication' and

'interception,' we conclude that the Massachusetts wiretap statute provides protection for the electronic transmission of text messages").[8]

For the reasons explained above, and absent an appellate decision interpreting the Massachusetts Wiretap Statute in the narrow way that NEBH suggests, this court concludes that the facts as alleged in the Complaint state a claim for a violation of the statute.

### 3. Report to Appeals Court

Under Mass. R. Civ. P. 64, a Superior Court judge may report an interlocutory decision "where he or she concludes that the finding or order 'so affects the merits of the controversy that the matter ought to be determined by the [A]ppeals [C]ourt before any further proceedings in the trial court.'" *Patel v. Martin*, 481 Mass. 29, 32 (2018) (quoting Mass. R. Civ. P. 64(a)). The Supreme Judicial Court has cautioned that "[i]nterlocutory matters should be reported only where it appears that they present serious questions likely to be material in the ultimate decision, and that subsequent proceedings in the trial court will be substantially facilitated by so doing." *Globe Newspaper Co. v. Massachusetts Bay Transp. Auth. Ret. Bd.*, 412 Mass. 770, 772 (1992) (quoting *John Gilbert Jr. Co. v. C.M. Fauci Co.*, 309 Mass. 271, 273 (1941)). Such is the case here. The parties here also have requested that the court report the matter to the Appeals Court.

Whether the Massachusetts Wiretap Statute applies to the internet tracking alleged here is a novel question unresolved at the appellate level in Massachusetts, and is the central and dispositive issue in this case. Although the Massachusetts Wiretap Statute is broadly drafted, and states the Legislature's explicit intention to protect citizens from the grave danger of

---

[8] The most recent published case interpreting the Massachusetts Wiretap Statute is consistent with this view. *See Commonwealth v. Du*, No. 22-P-870, 2023 WL 6522435, at *6-*7 (Mass. App. Ct. Oct. 6, 2023) (court interpreted statute to prohibit surreptitious audio-visual video recording of drug transaction made by police using cell phone application).

electronic surveillance by private individuals, it was enacted in 1968 — long before the internet, let alone internet tracking, became available. The Legislature did not, therefore, contemplate internet tracking as a form of secretly intercepting communications. NEBH argues that internet tracking is practically ubiquitous across all businesses and organizations with websites, and that NEBH's use of such tracking is a legitimate, ordinary part of its business. Had the Legislature been aware of internet tracking and its possible business uses in 1968, it might have written the statute to allow the type of tracking alleged in this case.

The novel question here has arisen in several other cases. As noted, this court already has denied motions to dismiss in two other internet-tracking wiretap cases. *See Boston Medical Center*, 2384CV00326-BLS1; *Boston Children's*, 2384CV00411-BLS1. Other Superior Court judges have issued similar decisions recently. *See Alves*, 2284CV02509-BLS1; *Doe v. Partners Healthcare System, Inc.*, 1984CV01651-BLS1, endorsement denying motion to dismiss (Super. Ct. Dec. 7, 2020). There are many other analogous cases presently pending in the Superior Court, including in this session.[9] If, as NEBH argues, the Massachusetts Wiretap Statute does not apply to business-related internet tracking, significant judicial and party resources will be saved by the quick resolution of these cases before discovery and other stages of litigation.

For all of these reasons, this matter should be determined by the Appeals Court before any proceedings continue in this court.

[9] Other analogous cases pending in BLS1 include: *Progin, Janice v. UMass Memorial Health Care, Inc.*, 2284CV2889; *John Doe v. Boston Medical Center Corp.*, 2384CV326; *Jane Doe v. The Children's Hospital Corp.*, 2384CV411; *Kathleen Vita v. Beth Israel Deaconess Medical Center, Inc.*, 2384CV00480; *Karen McManus v. Tufts Medical Center, Inc.*, 2384CV930; *Elizabeth Nova v. Boston Medical Center Corporation*, 2384CV1086; *Jane Doe v. Cape Cod Healthcare, Inc.*, 2384CV1236; *Jane Doe v Baystate Health Systems*, 2384CV1949; *John Doe v. UMass Memorial Health Care Inc.*, 2384CV2448; *Lisa Colleton v. UMass Memorial Health Care Inc.*, 2384CV2450

**ORDER**

For the foregoing reasons, it is hereby **ORDERED** that:

1. NEBH's motion to dismiss is **DENIED**; and

2. The Court **REPORTS** the correctness of its ruling to the Appeals Court.

Dated: October 31, 2023

Hélène Kazanjian
Justice of the Superior Court

# EXHIBIT C

**Known Putative Class Actions Alleging Massachusetts Wiretap Act Violations Based on Public Website/Mobile Application Advertising/Analytics Software**
As of December 1, 2023

| Filed | Caption | Court/Case No. | Plaintiffs' Counsel |
|---|---|---|---|
| 5/23/2019 | Doe v. Partners Healthcare Sys., Inc.; Dana-Farber Cancer Inst., Inc.; et al. *(settled for $18.4M in 2022)* | Suffolk Superior BLS1 1984CV01651 | Simmons Hanly Conroy Kenney & Conley, P.C. |
| 5/23/2019 | Doe v. Tufts Medical Center, Inc., et al. *(voluntarily dismissed)* | Suffolk Superior BLS1 1984CV01648 | Simmons Hanly Conroy Kenney & Conley, P.C. |
| 10/11/2022 | Doe v. Southcoast Hospitals Group, Inc. | Bristol Superior 2273CV00673 | Sweeney Merrigan Law, LLP<br>Ahmad, Zavitsanos & Mensing, P.C.<br>Keller Postman LLC |
| 10/18/2022 | Doe, et al v. Atrius Health, Inc. | Suffolk Superior BLS1 2384CV02704[1] | Sweeney Merrigan Law, LLP<br>Ahmad, Zavitsanos & Mensing, P.C.<br>Keller Postman LLC |
| 10/19/2022 | Doe v. Emerson Hospital | Essex Superior 2277CV01000 | Sweeney Merrigan Law, LLP<br>Ahmad, Zavitsanos & Mensing, P.C.<br>Keller Postman LLC |
| 10/24/2022 | Doe v. UMass Memorial Health Care Inc. | Suffolk Superior BLS1 2384CV02448[2] | Sweeney Merrigan Law, LLP<br>Ahmad, Zavitsanos & Mensing, P.C.<br>Keller Postman LLC |
| 10/24/2022 | Alves v. Goodyear Tire and Rubber Co. *(dismissed for lack of personal jurisdiction – on appeal at 1st Cir.)* | U.S.D.C., D.Mass. 22-cv-11820<br>1st Cir. 23-1682 | Zimmerman Reed LLP<br>Scott+Scott Attys at Law LLP |

[1] Originally filed in Norfolk Superior Court, No. 2282CV00982.
[2] Originally filed in Worcester Superior Court, No. 2285CV01205.

| Filed | Caption | Court/Case No. | Plaintiffs' Counsel |
|---|---|---|---|
| 10/27/2022 | Montecalvo v. Cabela's, Inc. | U.S.D.C., E.D. Pa. 23-cv-02282 and 23-md-03074[3] | Zimmerman Reed LLP Scott+Scott Attys at Law LLP |
| 11/3/2022 | Alves v. BJ's Wholesale Club, Inc. | Suffolk Super. BLS1 2284CV02509 | Zimmerman Reed LLP Scott+Scott Attys at Law LLP |
| 11/14/2022 | Colleton v. UMass Memorial Health Care, Inc. | Suffolk Superior BLS1 2384CV02450[4] | Colonna & Associates Liddle Sheets Coulson P.C. |
| 11/15/2022 | Rosenthal v. Bloomingdale's Inc. *(dismissed for lack of personal jurisdiction – on appeal at 1st Cir.)* | U.S.D.C., D.Mass. 22-cv-11944<br>1st Cir. 23-1683 | Zimmerman Reed LLP Scott+Scott Attys at Law LLP |
| 12/8/2022 | Doe v. Cape Cod Healthcare, Inc. | Suffolk Super. BLS1 2384CV01236[5] | Sweeney Merrigan Law, LLP |
| 12/20/2022 | Progin v. UMass Memorial Health Care Inc. et al | Suffolk Super. BLS1 2284CV02889 | Shapiro Haber & Urmy LLP |
| 1/23/2023 | Doe v. Steward Health Care System LLC | Suffolk Super. BLS1 2384CV00174 | Bailey and Glasser LLP |
| 2/6/2023 | Doe v. Boston Medical Center Corporation ***(stayed pending these appeals)*** | Suffolk Super. BLS1 2384CV00326 | Shapiro & Teitelbaum LLP Berger Montague PC |

[3] Originally filed in the U.S. District Court, D. Mass., No. 22-cv-11837.
[4] Originally filed in Worcester Superior Court, No. 2285CV01293.
[5] Originally filed in Barnstable Superior Court, No. 2272CV00493.

| Filed | Caption | Court/Case No. | Plaintiffs' Counsel |
|---|---|---|---|
| 2/8/2023 | Price v. Carnival Corp. | U.S.D.C., S.D. Cal. 23-cv-00236 | Lynch Carpenter LLP<br>Freed Kanner London & Millen LLC<br>Hausfeld LLP<br>The Murray Law Firm<br>Scott + Scott Attys at Law LLP<br>Zimmerman Reed LLP |
| 2/9/2023 | Rubridge v. Carnival Corp. | U.S.D.C., S.D. Cal. 23-cv-01072 | Zimmerman Reed LLP<br>Scott+Scott Attys at Law LLP |
| 2/10/2023 | Doe v. Emerson Health System, Inc. *(voluntarily dismissed)* | Middlesex Superior 2381CV00443 | Bailey and Glasser LLP |
| 2/15/2023 | Doe v. The Children's Hosp. Corp. (Boston Children's Hospital) ***(stayed pending these appeals)*** | Suffolk Super. BLS1 2384CV00411 | Shapiro Haber & Urmy LLP |
| **2/24/2023** | **Vita v. Beth Israel Deaconess Medical Center, Inc.** ***(stayed pending appeal)*** | **Suffolk Super. BLS1 2384CV00480**<br>**Appeals Court 2023-P-1310** | Shapiro Haber & Urmy LLP |
| 3/3/2023 | Vita v. Blue Cross and Blue Shield of Mass., Inc., et al. | Suffolk Super. BLS1 2384CV00542 | Shapiro Haber & Urmy LLP |
| 3/10/2023 | Doe v. Atrius Health, Inc. | Suffolk Super. BLS1 2384CV00597 | Shapiro Haber & Urmy LLP |
| 3/27/2023 | Doe v. Lawrence General Hospital | Suffolk Super. BLS1 2384CV00728 | Shapiro Haber & Urmy LLP |

| Filed | Caption | Court/Case No. | Plaintiffs' Counsel |
|---|---|---|---|
| 4/7/2023 | Vita v. New England Baptist Hospital *(stayed pending appeal)* | Suffolk Super. BLS1 2384CV00857<br>Appeals Court 2023-P-1308 | Shapiro Haber & Urmy LLP |
| 4/19/2023 | McManus v. Tufts Medical Center, Inc. | Suffolk Super. BLS1 2384CV00930 | Shapiro Haber & Urmy LLP |
| 5/10/2023 | Nova v. Boston Medical Center Corporation *(stayed pending these appeals)* | Suffolk Super. BLS1 2384CV01086 | Shapiro Haber & Urmy LLP |
| 7/26/2023 | Gary v. Dynatrace, Inc. | U.S.D.C., D.Mass. 23-cv-11673 | Bursor & Fisher, P.A. |
| 8/23/2023 | Marden v. LifeMD Inc. | U.S.D.C., S.D.N.Y. 23-cv-7469 | Almeida Law Group LLC; Migliaccio Rathod |
| 8/29/2023 | Doe v. Baystate Health System, Inc. | Suffolk Super. BLS1 2384CV01949 | Shapiro & Teitelbaum LLP<br>Berger Montague PC |
| 10/23/2023 | Doe v. Boston IVF, LLC | Middlesex Super. 2381CV02951 | Ketterer, Browne & Assoc., LLC<br>Cohen & Malad, LLP<br>Stranch, Jennings & Garvey, PLLC<br>Turke & Strauss, LLP |

DM_US 202380993-1.056777.0081

# EXHIBIT D

# 2384CV00480 Vita, For Herself And The Class, Kathleen vs. Beth Israel Deaconess Medical Center, Inc.

- Case Type:
- Business Litigation
- Case Status:
- Open
- File Date
- 02/24/2023
- DCM Track:
- B - Special Track (BLS)
- Initiating Action:
- Fraud, Business Torts, etc.
- Status Date:
- 02/24/2023
- Case Judge:
-
- Next Event:
-

All Information | Party | Event | Docket | Disposition

## Party Information

**Vita, For Herself And The Class, Kathleen**
**- Plaintiff**

Alias

**Party Attorney**

- Attorney
- Blauner, Esq., Michelle H
- Bar Code
- 549049
- Address
- Shapiro Haber and Urmy LLP
One Boston Place
Boston, MA 02108
- Phone Number
- (617)208-4713

More Party Information

**Beth Israel Deaconess Medical Center, Inc.**
**- Defendant**

Alias

**Party Attorney**

- Attorney
- Gacioch, Esq., David Quinn
- Bar Code
- 660784
- Address
- McDermott Will and Emery LLP
200 Clarendon St
Floor 58
Boston, MA 02116
- Phone Number
- (617)535-4000
- Attorney
- Rodriguez, Esq., Annabel
- Bar Code
- 696001
- Address
- McDermott Will and Emery LLP
200 Clarendon St
Floor 58
Boston, MA 02116
- Phone Number
- (617)535-4063

More Party Information

## Events

| Date | Session | Location | Type | Event Judge | Result |
|---|---|---|---|---|---|
| 09/19/2023 02:00 PM | Business Litigation 1 | BOS-13th FL, CR 1309 (SC) | Rule 12 Hearing | Kazanjian, Hon. Helene | |

## Docket Information

| Docket Date | Docket Text | File Ref Nbr. | Image Avail. |
|---|---|---|---|
| 02/24/2023 | Complaint electronically filed. | 1 | Image |
| 02/24/2023 | Civil action cover sheet filed. | 2 | Image |
| 03/02/2023 | General correspondence regarding NOTICE OF ACCEPTANCE INTO THE BUSINESS LITIGATION SESSION "BLS1"<br>This matter has been accepted into the Suffolk Business Litigation Session. It has been assigned to BLS1. Dated: February 24, 2023 Notice sent 3/1/23 (See P#3 for complete notice) | 3 | Image |
| 03/29/2023 | Defendant Beth Israel Deaconess Medical Center, Inc.'s Assented to Motion to Extend Time to Answer or Otherwise Respond to the Complaint | 4 | Image |
| 03/29/2023 | Attorney appearance electronically filed.<br>On this date Annabel Rodriguez, Esq. added for Defendant Beth Israel Deaconess Medical Center, Inc. | | Image |
| 03/29/2023 | Attorney appearance electronically filed.<br>On this date David Quinn Gacioch, Esq. added for Defendant Beth Israel Deaconess Medical Center, Inc. | | Image |
| 04/01/2023 | Service Returned for<br><br>Applies To: Beth Israel Deaconess Medical Center, Inc. (Defendant) | 5 | Image |
| 04/05/2023 | Endorsement on Motion to Extend Time to Answer or Otherwise Respond to the Complaint (#4.0): ALLOWED<br>defendant shall answer or otherwise respond to the complaint by 6/09/23.<br><br>(dated 4/03/23) notice sent 4/05/23 | | Image |
| 06/12/2023 | Defendant Beth Israel Deaconess Medical Center, Inc.'s Notice of Motion to Dismiss | | Image |
| 06/16/2023 | Plaintiff, Defendant Kathleen Vita, For Herself And The Class, Beth Israel Deaconess Medical Center, Inc.'s Joint Motion to<br>set Briefing Schedule on Motion to Dismiss | 6 | Image |
| 06/23/2023 | Endorsement on Motion to set Briefing Schedule on Motion to Dismiss (#6.0): ALLOWED<br>dated (6/21/23) Notice Sent 06/26/23 | | Image |
| 06/29/2023 | Plaintiff Kathleen Vita, For Herself And The Class's Assented to Motion to Exceed Page Limit For Opposition To Motion To Dismiss<br>(Jury Trial Demanded) | 7 | Image |
| 07/12/2023 | Endorsement on Motion to Exceed Page Limit for Opposition to Motion to Dismiss (#7.0): ALLOWED<br>The Court will allow the motion but discourages filing anything over 20 pages. Dated 7/10/23<br>Notice sent 7/12/23 | | Image |
| 08/04/2023 | Defendant Beth Israel Deaconess Medical Center, Inc.'s Notice of Filing | | Image |
| 08/04/2023 | Defendant Beth Israel Deaconess Medical Center, Inc.'s Motion to dismiss under some, not all counts for failure to state a claim | 8 | Image |
| 08/04/2023 | Beth Israel Deaconess Medical Center, Inc.'s Memorandum in support of the defendant's motion to dismiss for failure to state a claim | 9 | Image |
| 08/04/2023 | Declaration of David Quinn Gacioch in support of defendant's motion to dismiss for failure to state a claim | 10 | Image |
| 08/04/2023 | Exhibits/Appendix<br><br>A-D | | Image |
| 08/04/2023 | Reply/Sur-reply<br><br>Memorandum in support of defendant Beth Israel Deaconess Medical Center Inc.'s motion to dismiss the complaint | 11 | Image |

| Docket Date | Docket Text | File Ref Nbr. | Image Avail. |
|---|---|---|---|
| 08/04/2023 | Exhibits/Appendix<br><br>ADENDM | | Image |
| 08/04/2023 | Opposition to Defendant's Motion to Dismiss filed by Kathleen Vita, For Herself And The Class | 12 | Image |
| 09/13/2023 | Defendants Beth Israel Deaconess Medical Center, Inc.'s Submission of Letter to the Court | 13 | Image |
| 10/06/2023 | Defendant Beth Israel Deaconess Medical Center, Inc.'s Supplemental, Submission of of Defendants Regarding Their Pending Motions to Dismiss | 14 | Image |
| 10/16/2023 | Opposition to Defendant's Beth Israel Deaconess Medical Center INC. and New England Baptist Hospital's Request that the Court report issues for Interlocutory review filed by Kathleen Vita, For Herself And The Class | 15 | Image |
| 10/18/2023 | Reply/Sur-reply<br><br>To Plaintiff's Opposition To Interlocutory Appellate Review (Joint)<br><br>Applies To: Beth Israel Deaconess Medical Center, Inc. (Defendant) | 16 | Image |
| 10/31/2023 | MEMORANDUM & ORDER:<br><br>Memorandum of Decision and Order on Defendant's Motion to dismiss and report to the Appeals Court<br>See page #17<br><br>For the foregoing reasons, it is hereby ORDERED that:<br>1. BIDMC's Motion to dismiss is DENIED; and<br>2. The Court REPORTS the correctness of its ruling to the Appeals Court.<br>(Dated 10/31/2023)<br><br>Judge: Kazanjian, Hon. Helene<br><br>Notice sent 11/1/23 | 17 | Image |
| 11/06/2023 | Defendant Beth Israel Deaconess Medical Center, Inc.'s Notice of Filing of Transcript<br><br>Transcript of 9/19/23 received | 18 | Image |
| 11/06/2023 | Docket Note: Notice of Assembly of Record on Report to the Appeals Court sent to Counsel | | |
| 11/06/2023 | Notice to Clerk of the Appeals Court of Assembly of Record | | |
| 11/07/2023 | Plaintiff, Defendant Kathleen Vita, For Herself And The Class, Beth Israel Deaconess Medical Center, Inc.'s Joint Stipulation and<br>Proposed Order to Stay all Proceedings Pending Interlocutory Appeal | 19 | Image |
| 11/13/2023 | Endorsement on Stipulation and Proposed Order to Stay all Proceedings Pending Interlocutory Appeal (#19.0): ALLOWED<br>(Dated: 11/9/23) | | Image |
| 11/13/2023 | Notice of docket entry received from Appeals Court<br>n accordance with Massachusetts Rule of Appellate Procedure 10(a)(3), please note that the above-referenced case (2023-P-1310) was entered in this Court on November 13, 2023. | 20 | Image |

## Case Disposition

| Disposition | Date | Case Judge |
|---|---|---|
| Pending | | |

# EXHIBIT E

# 2384CV00857 Kathleen Vita For Herself And The Class vs. New England Baptist Hospital

- Case Type:
- Business Litigation
- Case Status:
- Open
- File Date
- 04/07/2023
- DCM Track:
- 
- Initiating Action:
- Fraud, Business Torts, etc.
- Status Date:
- 04/07/2023
- Case Judge:
- 
- Next Event:
- 

All Information | Party | Event | Docket | Disposition

## Party Information

**Kathleen Vita For Herself And The Class**
**- Plaintiff**

Alias

**Party Attorney**
- Attorney
- Blauner, Esq., Michelle H
- Bar Code
- 549049
- Address
- Shapiro Haber and Urmy LLP
  One Boston Place
  Boston, MA 02108
- Phone Number
- (617)208-4713
- Attorney
- Haber, Esq., Edward F
- Bar Code
- 215620
- Address
- Shapiro Haber and Urmy LLP
  One Boston Place
  Suite 2600
  Boston, MA 02108
- Phone Number
- (617)439-3939
- Attorney
- Vallely, Esq., Patrick
- Bar Code
- 663866
- Address
- Shapiro Haber and Urmy LLP
  One Boston Place
  Suite 2600
  Boston, MA 02108
- Phone Number
- (617)439-3939

More Party Information

**New England Baptist Hospital**
**- Defendant**

Alias

**Party Attorney**
- Attorney
- Gacioch, Esq., David Quinn
- Bar Code
- 660784
- Address
- McDermott Will and Emery LLP

200 Clarendon St
Floor 58
Boston, MA 02116
- Phone Number
- (617)535-4000
- Attorney
- Rodriguez, Esq., Annabel
- Bar Code
- 696001
- Address
- McDermott Will and Emery LLP
200 Clarendon St
Floor 58
Boston, MA 02116
- Phone Number
- (617)535-4063

More Party Information

## Events

| Date | Session | Location | Type | Event Judge | Result |
|---|---|---|---|---|---|
| 09/19/2023 02:00 PM | Business Litigation 1 | BOS-13th FL, CR 1309 (SC) | Rule 12 Hearing | Kazanjian, Hon. Helene | |

## Docket Information

| Docket Date | *Docket Text* | File Ref Nbr. | *Image Avail.* |
|---|---|---|---|
| 04/07/2023 | Complaint electronically filed. | 1 | Image |
| 04/07/2023 | Civil action cover sheet filed. | 2 | Image |
| 04/07/2023 | Plaintiff Kathleen Vita For Herself And The Class's Motion to Appoint special process server | 3 | Image |
| 04/07/2023 | Attorney appearance<br>On this date Edward F Haber, Esq. added for Plaintiff Kathleen Vita For Herself And The Class | | |
| 04/07/2023 | Attorney appearance<br>On this date Patrick Vallely, Esq. added for Plaintiff Kathleen Vita For Herself And The Class | | |
| 04/10/2023 | Docket Note: One summon send by mail | | |
| 04/19/2023 | General correspondence regarding NOTICE OF ACCEPTANCE INTO BUSINESS LITIGATION SESSION "BLS1"<br>This matter has been accepted into the Suffolk Business Litigation Session. It has been assigned to BLS1. Dated: April 11, 2023 Notice sent 4/19/23 (See P#4 for complete notice)<br><br>Judge: Salinger, Hon. Kenneth W | 4 | Image |
| 04/19/2023 | Endorsement on Motion to Appoint Special Process Server (#3.0): ALLOWED<br>(dated 4/14/2023) Notice sent 4/19/23 | | Image |
| 04/25/2023 | Attorney appearance electronically filed.<br>On this date David Quinn Gacioch, Esq. added for Defendant New England Baptist Hospital | | Image |
| 04/25/2023 | Attorney appearance electronically filed.<br>On this date Annabel Rodriguez, Esq. added for Defendant New England Baptist Hospital | | Image |
| 04/25/2023 | Defendant, Plaintiff New England Baptist Hospital, Kathleen Vita For Herself And The Class's Joint Motion to Extend time to answer or otherwise respond to the complaint | 5 | Image |
| 05/03/2023 | Endorsement on Motion to Extend time to answer or otherwise respond to the complaint (#5.0): ALLOWED<br>defendant shall answer or otherwise respond to the complaint by 7/10/23.<br><br>(dated 4/26/23) notice sent 5/03/23 | | Image |
| 06/23/2023 | Defendant New England Baptist Hospital's Notice of Motion to Dismiss | 6 | Image |
| 06/29/2023 | Plaintiff Kathleen Vita For Herself And The Class's Assented to Motion to Exceed Page Limit For Opposition To Motion To dismiss | 7 | Image |
| 07/28/2023 | Endorsement on Motion to exceed page limit for opposition to Motion to dismiss (#7.0): DENIED<br>(Dated 7/26/2023)<br>Notice sent 7/28/23 | | Image |

| Docket Date | *Docket Text* | File Ref Nbr. | *Image Avail.* |
|---|---|---|---|
| 08/04/2023 | Notice of Filing | | Image |
| 08/04/2023 | Defendant New England Baptist Hospital's Motion to dismiss the complaint | 8 | Image |
| 08/04/2023 | New England Baptist Hospital's Memorandum in support of Defendant's motion to dismiss the complaint | 9 | Image |
| 08/04/2023 | Declaration of David Quinn Gacioch in support of Defendant's motion to dismiss for failure to state a claim | 10 | Image |
| 08/04/2023 | Exhibits/Appendix | | Image |
| 08/04/2023 | New England Baptist Hospital's Reply Memorandum in support of Motion to dismiss the complaint | 11 | Image |
| 08/04/2023 | Exhibits/Appendix<br><br>Addendum | | Image |
| 08/04/2023 | Opposition to Motion to dismiss filed by Kathleen Vita For Herself And The Class | 12 | Image |
| 10/06/2023 | Defendant New England Baptist Hospital's Supplemental, Submission of of Defendants Regarding Their Pending Motions to Dismiss | 13 | Image |
| 10/16/2023 | Opposition to Defendant's Beth Israel Deaconess Medical Center INC. and New England Baptist Hospital's Request that the Court report issues for Interlocutory review filed by Kathleen Vita, For Herself And The Class filed by Kathleen Vita For Herself And The Class | 14 | Image |
| 10/18/2023 | Reply/Sur-reply<br><br>To Plaintiff's Opposition To Interlocutory Appellate Review (Joint)<br><br>Applies To: New England Baptist Hospital (Defendant) | 15 | Image |
| 10/31/2023 | MEMORANDUM & ORDER:<br><br>Memorandum of Decision and Order on Defendant's Motion to Dismiss and Report to the Appeals Court<br>See page #16<br><br>For the foregoing reasons, it is hereby ORDERED that:<br>1. NEBH's Motion to dismiss is DENIED; and<br>2. The Court REPORTS the correctness of its ruling to the appeals Court.<br>(Dated 10/31/2023)<br><br>Judge: Kazanjian, Hon. Helene<br><br>Notice sent 11/1/23 | 16 | Image |
| 11/06/2023 | Defendant New England Baptist Hospital's Notice of Filing of Transcript<br><br>Transcript of 9/19/23 received | 17 | Image |
| 11/06/2023 | Docket Note: Notice of Assembly of Record on Report to the Appeals Court sent to Counsel | | |
| 11/06/2023 | Notice to Clerk of the Appeals Court of Assembly of Record | | |
| 11/07/2023 | Plaintiff, Defendant Kathleen Vita For Herself And The Class, New England Baptist Hospital's Joint Stipulation and<br>Proposed Order to Stay all Proceedings Pending Interlocutory Appeal | 18 | Image |
| 11/13/2023 | Endorsement on Stipulation and Proposed Order to Stay all Proceedings Pending Interlocutory Appeal (#18.0): ALLOWED<br>(Dated: 11/9/23)<br>Notice sent 11/14/23 | | Image |
| 11/13/2023 | Notice of Entry of appeal received from the Appeals Court<br>In accordance with Massachusetts Rule of Appellate Procedure 10(a)(3), please note that the above-referenced case (2023-P-1308) was entered in this Court on November 13, 2023. | 19 | Image |

## Case Disposition

| Disposition | Date | Case Judge |
|---|---|---|
| Pending | | |

| Disposition | Date | Case Judge |
|---|---|---|
| | | |

# EXHIBIT F

## STATEMENT OF SUPPORT FOR DIRECT APPELLATE REVIEW

A series of largely parallel actions, alleging violations of the Massachusetts Wiretap Act, M.G.L. c. 272 §99, have been filed, to date, against more than a dozen Massachusetts hospitals and healthcare providers, a Massachusetts healthcare insurer, and at least two retailers. In each of those actions, plaintiffs claim that the defendants' use of common data analytics tools on public websites constitutes an illegal wiretap under Massachusetts law.

The undersigned hospitals, healthcare institutions, and other defendants in those putative class action lawsuits (listed in Attachment A and referred to as the "Wiretap Act Suits"), ask the Court to grant the application for direct appellate review filed by defendants Beth Israel Deaconess Medical Center, Inc. ("BIDMC") and New England Baptist Hospital ("NEBH"). The Superior Court noted, in its orders denying the BIDMC and NEBH motions to dismiss and reporting its decisions to the Appeals Court, that "[w]hether the Massachusetts Wiretap Statute applies to the internet tracking alleged here is a novel question unresolved at the appellate level in Massachusetts." Memorandum of Decision & Ord. on Defendant's Motion to Dismiss & Rep. to the Appeals Ct. at 10, *Vita v. New England Baptist Hosp.*, No. 2384CV00857-BLS1 (Suffolk Super. Ct. Oct. 31, 2023). As in the BIDMC and NEBH cases, that unresolved question is a central, and in some cases dispositive issue, in each of the Wiretap Act Suits.[1]

Whether the Wiretap Act imposes liability for the widespread business use of website analytics and internet tracking technology alleged in the BIDMC and NEBH cases has significant financial and public policy implications for the Massachusetts healthcare sector, in particular, and to businesses and other institutions in the Commonwealth more broadly. As it currently stands,

[1] With respect to the defendants signing this statement, Attachment A identifies the Wiretap Act Suits that include only Wiretap Act claims and those that include other causes of action as well.

most of the large healthcare institutions in the Commonwealth are defendants in the Wiretap Act Suits. With potential statutory damages of at least $1,000 per website visitor, under the plaintiffs' theory, these putative class actions threaten to impose catastrophic liability on Massachusetts' essential healthcare system, including nonprofit entities serving low-income communities. Under plaintiffs' reading of the Wiretap Act, other organizations and institutions also face potentially crippling liability for their use of ubiquitous website marketing and analytics tools, as liability under the Wiretap Act is not limited to the healthcare sector.

Because the question of whether the Wiretap Act applies to the internet tracking alleged in the BIDMC and NEBH complaints has profound implications, not just for these 18 Wiretap Act Suits, but for the entire Massachusetts healthcare and business communities, the undersigned ask the Court to grant the application for direct appellate review.

| **ATRIUS HEALTH, INC.** | **BAYSTATE HEALTH, INC.** |
| --- | --- |
| by its attorneys,<br><br>/s/ Anthony E. Fuller<br>Anthony E. Fuller (BBO #633246)<br>Kayla H. Ghantous (BBO #709197)<br>HOGAN LOVELLS US LLP<br>125 High Street, Suite 2010<br>Boston, MA 02110<br>Tel: (617) 371-1000<br>anthony.fuller@hoganlovells.com<br>kayla.ghantous@hoganlovells.com<br><br>Allison Holt Ryan (*admitted pro hac vice*)<br>Adam A. Cooke (BBO #679637)<br>HOGAN LOVELLS US LLP<br>Columbia Square<br>555 Thirteenth Street, NW<br>Washington, DC 20004<br>Tel: (202) 637-5600<br>allison.holt-ryan@hoganlovells.com<br>adam.a.cooke@hoganlovells.com | by its attorneys,<br><br>/s/ Frederick S. Rudesheim<br>Frederick S. Rudesheim<br>Stephen I. Hansen (BBO #679134)<br>SHOOK, HARDY & BACON LLP<br>One Federal Street, Suite 2540<br>Boston, MA 02110<br>Tel: (617) 531-1411<br>Fax: (617) 531-1602<br>frudesheim@shb.com<br>sjhansen@shb.com |

| | |
|---|---|
| **BJ'S WHOLESALE CLUB, INC.**<br><br>by its attorneys,<br><br><u>/s/ Geoffrey M. Raux</u><br>Geoffrey M. Raux (BBO #674788)<br>Miranda D. Curtis (BBO #709084)<br>FOLEY & LARDNER LLP<br>111 Huntington Avenue<br>Boston, MA 02199<br>Tel: (617) 342-4000<br>Fax: (617) 342-4001<br>graux@foley.com<br>mcurtis@foley.com<br><br>Kevin A. Reck *(admitted pro hac vice)*<br>Emily J. Lang *(admitted pro hac vice)*<br>FOLEY & LARDNER LLP<br>301 East Pine Street, Suite 1200<br>Orlando, FL 32801<br>Tel: (407) 244-3269<br>Fax: (407) 648-1743<br>kreck@foley.com<br>elang@foley.com | **BLUE CROSS AND BLUE SHIELD OF MASSACHUSETTS, INC. and BLUE CROSS AND BLUE SHIELD OF MASSACHUSETTS HMO BLUE, INC.**<br><br>by their attorneys,<br><br><u>/s/ Daniel S. Savrin</u><br>Daniel S. Savrin (BBO #555434)<br>Wayne E. George (BBO #656286)<br>MORGAN, LEWIS & BOCKIUS LLP<br>One Federal Street<br>Boston, MA 02110<br>Tel: (617) 341-7700<br>Fax: (617) 341-7701<br>daniel.saverin@morganlewis.com<br>wayne.george@morganlewis.com<br><br>Kathryn E. Deal *(admitted pro hac vice)*<br>Ezra D. Church *(admitted pro hac vice)*<br>MORGAN, LEWIS & BOCKIUS LLP<br>2222 Market Street<br>Philadelphia, PA 19103<br>Tel: (215) 963-5000<br>Fax: (215) 963-5001<br>ezra.church@morganlewis.com<br>kathryn.deal@morganlewis.com |
| **BOSTON IVF, LLC**<br><br>by its attorneys,<br><br><u>/s/ Christopher M. Iaquinto</u><br>Christopher M. Iaquinto (BBO No. 685718)<br>Holland & Knight LLP<br>10 St. James Avenue, 11th Floor<br>Boston, Massachusetts 02116<br>t: 617.305.2092<br>christopher.iaquinto@hklaw.com<br><br>Mark S. Melodia<br>Holland & Knight LLP<br>31 West 52nd Street, 12th floor<br>New York, New York 10019<br>mark.melodia@hklaw.com | **BOSTON MEDICAL CENTER CORPORATION**<br><br>by its attorneys,<br><br><u>/s/ Linn F. Freedman</u><br>Linn F. Freedman (BBO #639564<br>Wystan M. Ackerman (BBO #651086)<br>Wm Maxwell Daley (BBO #694729)<br>ROBINSON & COLE LLP<br>One Boston Place, 26th Floor<br>Boston, MA 02108<br>Tel: (800) 762-2678<br>Fax: (617) 557-5999<br>lfreedman@rc.com<br>wackerman@rc.com<br>wdaley@rc.com |

| | |
|---|---|
| **CAPE COD HEALTHCARE, INC.**<br><br>by its attorneys,<br><br>/s/ Adam Bookbinder<br>Adam J. Bookbinder (BBO #657593)<br>Samuel Rudman (BBO #698018)<br>CHOATE, HALL & STEWART LLP<br>Two International Place<br>Boston, MA 02110<br>Tel.: (617) 248-5000<br>Fax: (617) 248-4000<br>abookbinder@choate.com<br>srudman@choate.com<br><br>Timothy J. Lowe (*admitted pro hac vice*)<br>MCDONALD HOPKINS<br>39533 Woodward Ave, Suite 318<br>Bloomfield Hills, MI 48304<br>Tel.: (248) 220-1359<br>tlowe@mcdonaldhopkins.com | **THE CHILDREN'S HOSPITAL CORPORATION**<br><br>by its attorneys,<br><br>/s/ Frederick S. Rudesheim<br>Frederick S. Rudesheim<br>Emyr T. Remy (BBO #704156)<br>SHOOK, HARDY & BACON LLP<br>One Federal Street, Suite 2540<br>Boston, MA 02110<br>Tel: (617) 531-1411<br>Fax: (617) 531-1602<br>frudesheim@shb.com<br>remy@shb.com |
| **EMERSON HOSPITAL**<br><br>by its attorneys,<br><br>/s/ Justin R. Donoho<br>Justin R. Donoho<br>Emyr T. Remy (BBO #704156)<br>SHOOK, HARDY & BACON LLP<br>One Federal Street, Suite 2540<br>Boston, MA 02110<br>Tel: (617) 531-1411<br>Fax: (617) 531-1602<br>jdonoho@shb.com<br>remy@shb.com | **LAWRENCE GENERAL HOSPITAL**<br><br>by its attorneys,<br><br>/s/ Frederick S. Rudesheim<br>Frederick S. Rudesheim<br>Emyr T. Remy (BBO #704156)<br>SHOOK, HARDY & BACON LLP<br>One Federal Street, Suite 2540<br>Boston, MA 02110<br>Tel: (617) 531-1411<br>Fax: (617) 531-1602<br>frudesheim@shb.com<br>remy@shb.com |
| **SOUTHCOAST HOSPITALS GROUP, INC.**<br><br>by its attorneys,<br><br>/s/ William J. Egan<br>William J. Egan (BBO #636128)<br>Julianna M. Charpentier (BBO #703286)<br>ROBINSON & COLE LLP | **STEWARD HEALTH CARE SYSTEM LLC**<br><br>by its attorneys,<br><br>/s/ Howard M. Cooper<br>Howard M. Cooper (BBO #543842)<br>Ingrid S. Martin (BBO #653632)<br>Ian J. Pinta (BBO #667812) |

| | |
|---|---|
| One Boston Place, 25th Floor<br>Boston, MA 02108<br>Tel: (617) 557-5900<br>wegan@rc.com<br>jcharpentier@rc.com<br><br>Jordan O'Donnell (BBO #684001)<br>James F. Monagle (*admitted pro hac vice*)<br>MULLEN COUGHLIN LLC<br>3 Allied Drive, Suite 303<br>Dedham, MA 02026<br>jsodonnell@mullen.law<br>jmonagle@mullen.law | TODD & WELD LLP<br>One Federal Street, 27th Floor<br>Boston, MA 02110<br>Tel: (617) 720-2626<br>hcooper@toddweld.com<br>jmartin@toddweld.com<br>ipinta@toddweld.com |
| **TUFTS MEDICAL CENTER, INC.**<br><br>by its attorneys,<br><br>/s/ James H. Rollinson<br>James H. Rollinson (BBO #649407)<br>BAKER & HOSTETLER LLP<br>127 Public Street, Suite 2000<br>Cleveland, OH 44116<br>Tel: (216) 621-0200<br>Fax: (216) 626-0740<br>jrollinson@bakerlaw.com<br><br>Elizabeth A. Scully<br>BAKER & HOSTETLER LLP<br>1050 Connecticut Ave., N.W., Suite 1100<br>Washington, D.C. 20036<br>Tel: (202) 861-1500<br>Fax: (202) 861-1783<br>escully@bakerlaw.com | **UMASS MEMORIAL HEALTH CARE, INC.**<br><br>by its attorneys,<br><br>/s/ Stephen T. Paterniti<br>Stephen T. Paterniti (BBO #564860)<br>JACKSON LEWIS P.C.<br>75 Park Plaza, 4th Floor<br>Boston, MA 02116<br>Tel: (617) 305-1221<br>Stephen.Paterniti@jacksonlewis.com<br><br>James H. Rollinson (BBO #649407)<br>BAKER & HOSTETLER LLP<br>127 Public Street, Suite 2000<br>Cleveland, OH 44116<br>Tel: (216) 621-0200<br>Fax: (216) 626-0740<br>jrollinson@bakerlaw.com<br><br>Elizabeth A. Scully<br>BAKER & HOSTETLER LLP<br>1050 Connecticut Ave., N.W., Suite 1100<br>Washington, D.C. 20036<br>Tel: (202) 861-1500<br>Fax: (202) 861-1783<br>escully@bakerlaw.com |

## ATTACHMENT A

**Wiretap Act-Only Suits**

- Colleton v. UMass Mem. Health Care, Inc., No. 2384CV02450-BLS1 (Suffolk Super. Ct.)
- Progin v. UMass Mem. Health Care Inc., No. 2284CV02889-BLS1 (Suffolk Super. Ct.)
- Doe v. The Children's Hospital Corp., No. 2384CV00411-BLS1 (Suffolk Super. Ct.)
- Vita v. Blue Cross & Blue Shield of Mass., Inc., No. 2384CV00542-BLS1 (Suffolk Super. Ct.)
- Doe v. Atrius Health, Inc., No. 2384CV00597-BLS1 (Suffolk Super. Ct.)
- Doe v. Lawrence General Hospital, No. 2384CV00728-BLS1 (Suffolk Super. Ct.)
- McManus v. Tufts Medical Center, Inc., No. 2384CV00930-BLS1 (Suffolk Super. Ct.)
- Nova v. Boston Medical Center Corp., No. 2384CV01086-BLS1 (Suffolk Super. Ct.)

**Wiretap Act Suits with Additional Claims**

- Doe v. Boston IVF, LLC, No. 2381CV02951 (Middlesex Super. Ct.)
- Doe v. Southcoast Hospitals Group, Inc., No. 2273CV00673 (Bristol Super. Ct.)
- Doe, et al v. Atrius Health, Inc., No. 2384CV02704-BLS1 (Suffolk Super. Ct.)
- Doe v. Emerson Hospital, No. 2277CV01000 (Essex Super. Ct.)
- Doe v. UMass Mem. Health Care Inc., No. 2384CV02448-BLS1 (Suffolk Super. Ct.)
- Alves v. BJ's Wholesale Club, Inc., No. 2284CV02509-BLS1 (Suffolk Super. Ct.)
- Doe v. Cape Cod Healthcare, Inc., No. 2384CV01236-BLS1 (Suffolk Super. Ct.)
- Doe v. Steward Health Care System LLC, No. 2384CV00174-BLS1 (Suffolk Super. Ct.)
- Doe v. Boston Medical Center Corp., No. 2384CV00326-BLS1 (Suffolk Super. Ct.)
- Doe v. Baystate Health System, Inc., No. 2384CV01949-BLS1 (Suffolk Super. Ct.)

# EXHIBIT D

Date Filed 12/8/2023 2:15 PM
Superior Court - Suffolk
Docket Number 2384CV01236

BC

12.12
NOTIFY

COMMONWEALTH OF MASSACHUSETTS

32

SUFFOLK, ss

SUPERIOR COURT
BUSINESS LITIGATION SESSION

JANE DOE, individually and on behalf of all others similarly situated,

Plaintiff,

v.

CAPE COD HEALTHCARE, INC.

Defendant,

C.A. NO. 2384-CV-01236-BLS1

**DEFENDANT'S UNOPPOSED MOTION TO STAY PROCEEDINGS UNTIL COMPLETION OF INTERLOCUTORY APPEALS IN PARALLEL WIRETAP ACT CASES**

Defendant Cape Cod HealthCare, Inc. ("CCHC") asks the Court to stay all proceedings in this case pending the completion of the interlocutory appeals in *Vita v. New England Baptist Hosp.*, No. 2384CV00857-BLS1 and *Vita v. Beth Israel Deaconess Medical Center, Inc.*, No. 2384CV00480-BLS1 (the "NEBH and BIDMC Cases"). Plaintiff has stated, through counsel, that she does not oppose this motion.

Plaintiff Jane Doe filed this putative class action on December 8, 2022 against Defendant CCHC, a non-profit healthcare system based in Hyannis, Massachusetts. Plaintiff brought the case on her own behalf, and on behalf of a putative class consisting of all Massachusetts residents who were CCHC patients and used its public website. Compl. ¶ 148. She alleges that CCHC used digital marketing tools on that public website that redirected website users' information to third parties, such as Facebook, without the users' knowledge or consent. Id. ¶¶ 3–8. The Complaint

12-13-23 ALLOWED. H. Kazanjian, J.

# EXHIBIT E

Date Filed 11/3/2023 1:07 PM
Superior Court - Suffolk
Docket Number 2384CV00326

BC

11·07

NOTIFY

24

11-9-23 Denied. The court has reported this decision in two substantially similar cases. Dockets 2384CV00480-BLS1 and 2384CV00957-BLS1). Further proceedings in this case are stayed pending the outcome of the reported cases. Kazanjian, J.

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT
BUSINESS LITIGATION SECTION
CIVIL ACTION NO. 2384CV00326 BLS1

JOHN DOE 1 AND JOHN DOE 2, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,

*Plaintiffs*,

v.

BOSTON MEDICAL CENTER CORPORATION,

*Defendant*.

**DEFENDANT BOSTON MEDICAL CENTER CORPORATION'S MASS. R. CIV. P. 64 AND M.G.L. c. 231, § 111 MOTION TO REPORT THE COURT'S ORDER ON DEFENDANTS'S MOTION TO DISMISS FOR INTERLOCUTORY APPEAL**

Pursuant to Mass. R. Civ. P. 64 and M.G.L. c. 231, § 111, Defendant Boston Medical Center Corporation ("BMC") respectfully requests that the Court report its September 14, 2023, Memorandum and Order (the "Order") denying BMC's Motion to Dismiss under Mass. R. Civ. P. 12(b)(1) and (6) for interlocutory appeal to the Appeals Court. In short and as set forth in further detail in the contemporaneously filed memorandum of law, reporting the Order is appropriate here because it "so affects the merits of the controversy that the matter ought to be determined by the appeals court before any further proceedings in the trial court." Mass. R. Civ. P. 64(a); *see also Transamerica Ins. Group v. Turner Constr. Co.*, 33 Mass. App. Ct. 446, 447, n. 2 (1992). Moreover, reporting the Order will help "to secure the just, speedy, and inexpensive determination" of this action and others. Mass. R. Civ. P. 1. Accordingly, BMC respectfully requests that this Court report its Order to the Massachusetts Appeals Court for review and determination.

# Exhibit F

Date Filed 12/11/2023 2:25 PM
Superior Court - Suffolk
Docket Number 2284CV02509

SL

12.14 NOT1f9

32

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
BUSINESS LITIGATION SESSION 1

| | |
|---|---|
| JOE ALVES, individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>BJ'S WHOLESALE CLUB, INC.,<br><br>Defendant. | CIVIL ACTION NO. 2284CV02509 |

**DEFENDANT'S MOTION TO STAY**

Defendant BJ's Wholesale Club, Inc. ("Defendant") hereby moves to stay all discovery and class certification proceedings in the above-referenced action pending issuance of a decision by the Massachusetts Appeals Court interpreting the application of the Wiretap Act. The grounds for this Motion are more fully set forth in the Memorandum of Law filed herewith.

WHEREFORE, Defendant requests that this Court stay this action.

12-14-23 ALLOWED. H. Karanjian, J.

Respectfully Submitted,

FOLEY & LARDNER LLP

*/s/ Geoffrey M. Raux*

Geoffrey M. Raux (BBO # 674788)
Miranda D. Curtis (BBO # 709084)
FOLEY & LARDNER LLP
111 Huntington Avenue
Boston, MA 02199
Phone: 617-342-4000
Fax: 617-342-4001

# EXHIBIT G

**THE COMMONWEALTH OF MASSACHUSETTS**

**BRISTOL, ss.** **SUPERIOR COURT DEPT.**

JOHN DOE, JAMES DOE, AND JANE DOE, Individually and on Behalf of All Others Similarly Situated,

Plaintiffs,

v.

SOUTHCOAST HOSPITALS GROUP, INC. d/b/a ST. LUKE'S HOSPITAL, TOBEY HOSPITAL, AND CHARLTON MEMORIAL HOSPITAL

Defendant.

**CIVIL ACTION NO. 2273CV00673**

**DEFENDANT SOUTHCOAST HOSPITALS GROUP, INC.'S**
**MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO STAY**

Pursuant to the Court's inherent discretion to manage its cases, Defendant Southcoast Hospitals Group, Inc. d/b/a St. Luke's Hospital, Tobey Hospital, and Charlton Memorial Hospital ("Southcoast" or "Defendant"), respectfully submits this Memorandum of Law in support of its Motion for a Stay of this action pending a decision by the Massachusetts Appeals Court or Supreme Judicial Court that will impact the claims in this case.[1] There are at least two appealed decisions poised to have the Appeals Court or Supreme Judicial Court interpret the novel application of the Massachusetts Wiretap Act to this case and similar putative class actions – a decision that could also substantially affect the remainder of Plaintiffs' claims in this action as well.

---

[1] An application for direct appellate review is attached hereto as ***Exhibit A***.

## I. INTRODUCTION

As with the more than two dozen putative class action lawsuits that plaintiffs' lawyers have recently commenced in multiple Massachusetts Superior Courts against Massachusetts hospitals and other organizations[2], the primary claim at issue in the instant putative class action is the alleged violation of the Massachusetts' Wiretap Act, G.L. c. 272, § 99 (the "Wiretap Act"), which portends minimum statutory liability of $1,000 per putative class member. While the First Amended Class Action Complaint also includes causes of action premised on an alleged violation of the Massachusetts Invasion of Privacy Statute, G.L. c. 214, § 1B (the "Privacy Statute"), and common law causes of action for breach of fiduciary duty, breach of implied contract, and unjust enrichment, the Wiretap Act claim is central to the action. Plaintiffs' only cognizable damages in these cases – based on allegedly improper internet tracking and advertising – are statutory damages under the Wiretap Act, thus an Appellate Court or Supreme Judicial Court decision regarding the applicability of the Wiretap Act to other similar matters will significantly impact this case.

Plaintiffs allege that Southcoast employed tracking technology ("Webtech") to send information regarding its website visitors to third parties, including Google and Meta (Facebook). Recently, multiple actions with substantially similar allegations have been stayed while the application of the Wiretap Act to such alleged conduct is set to be decided by the Massachusetts Appeals Court or Supreme Judicial Court as more fully discussed below.

The Wiretap Act authorizes statutory damages of "not less than liquidated damages computed at the rate of $100 per day for each day of violation or $1000, whichever is higher."

---

[2] A cogent summary of the history of this recent spate of related Massachusetts litigation (part of a nationwide epidemic of hundreds of such class actions driven by plaintiffs' lawyers and seeking statutory damages nationwide) is contained at the outset of the recently-filed Application for Direct Appellate Review. *See* Exhibit A, p. 2-4.

Mass. G.L. c. 272, § 99(Q). If aggregated across a class, these damages could equate to hundreds of millions or billions of dollars in damages for normal volumes of visits to websites employing commonplace website technologies. A decision from the appellate court regarding whether the Wiretap Act applies to the internet tracking alleged here is not only a central issue in this case legally, but also practically, as the potential liability based on the Wiretap Act claim is driving this litigation (including the likelihood of whether it can be resolved through settlement) entirely.

## II. ARGUMENT

### A. Legal Standard

Judges also have broad discretion to issue stays to effectively manage their cases. *See McCarthy v. Daurie*, 102 Mass. App. Ct. 1117 (2023) (Unpublished Decision) (citing *Landis v. North Am. Co.*, 299 U.S. 248, 254 (1936) ("the power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants"); *Sommer v. Maharaj*, 451 Mass. 615, 621 (2008) (courts have "inherent power ... to manage [its] own affairs so as to achieve the orderly and expeditious disposition of cases"); *see also Travenol Lab'ys, Inc. v. Zotal, Ltd.*, 394 Mass. 95, 97, 474 N.E.2d 1070, 1072 (1985) ("[A] motion to stay proceedings is ordinarily a matter addressed to the sound discretion of the trial judge.").

More specifically, "[a] trial judge has broad discretion to grant or deny a stay of proceedings pending resolution of the same or similar claims in another forum." *In re Rewalk Robotics Ltd. S'holder Litig.*, No. 1684CV03336BLS2, 2017 WL 2427329, at *1 (Mass. Super., Apr. 4, 2017); *see also Ross v. Health & Ret. Properties Tr.*, 46 Mass. App. Ct. 82, 88 (1998) ("[I]t is always open to a party to seek a stay of proceedings pending a decision in another case."). Thus, "determination of a cause of action entirely contingent on the validity of an appealed judgment in

a separate proceeding should be stayed pending resolution of the appellate process …" *See Dir. of Div. of Emp. Sec. v. Town of Mattapoisett*, 392 Mass. 858, 861 (1984).

"In making its discretionary determination, the Court must balance the hardship of a stay to all the parties." *Havan-Oroomieh v. Massachusetts State Lottery Comm'n*, No. 9800912G, 1998 WL 1285611, at *1 (Mass. Super., May 14, 1998); *see also Town of Mattapoisett*, 392 Mass. at 861 (The Court should balance any possible prejudice to the litigants with the "benefits of judicial economy and orderly adjudication.").

**B. Multiple Courts Have Stayed Actions While Awaiting Appellate Review of Plaintiffs' Novel Legal Theory**

Plaintiffs' claims are premised on the theory that Southcoast deploys Webtech on its website in violation of the Wiretap Act, Privacy Statute, and various common law causes of action. *See* Am. Compl., ¶ 23. A number of similar lawsuits have been filed in Massachusetts courts. Motions to dismiss Wiretap Act claims in several of those cases have recently been decided as discussed below. Thereafter, trial courts have determined that stays are appropriate in many such cases during the pendency of the appeals of this issue, and for the same reasons a stay is appropriate here.

For instance, in *Kathleen Vita v. New England Baptist Hospital*, Case No. 2384CV00857-BLS1 ("NEBH"), the Business Litigation Section for the Superior Court Department of Suffolk County issued an Order denying a motion to dismiss a Complaint premised upon the defendant hospital's alleged violation of the Wiretap Act. A copy of that Order is attached hereto as ***Exhibit B***. In the Order, the court reported the decision for interlocutory appeal pursuant to Mass. R. Civ. P. 64 because this appeal will "present serious questions likely to be material in the ultimate decision, and that subsequent proceedings in the trial court will be substantially facilitated by so doing." *See **Exhibit B*** at p. 10 (citations omitted).

The *NEBH* court stated that "***[w]hether the Massachusetts Wiretap Statute applies to the internet tracking alleged here is a novel question unresolved at the appellate level in Massachusetts, and is the central and dispositive issue in this case.***" *Id.* (emphasis added). After explaining that the same novel question has arisen in a number of cases, the court stated that "[i]f, as [the defendant] argues, the Massachusetts Wiretap Statute does not apply to business-related internet tracking, significant judicial and party resources will be saved by the quick resolution of these cases before discovery and other stages of litigation." *Id.* at 11. Thus, the court held that "this matter should be determined by the Appeals Court before any proceedings continue in this court." *Id.*

The trial court in in *Kathleen Vita v. Beth Israel Deaconess Medical Center, Inc.*, Case No. 2384CV00480-BLS1 ("BIDMC"), issued a nearly identical Order in a nearly identical case, also reporting the case for appeal and staying any proceedings in the interim. A copy of the *BIDC* Order is attached hereto as ***Exhibit C***. The NEBH and BIDC cases are the subjects of the application for direct appellate review set forth in ***Exhibit A***.

Similarly, in *Doe v. Boston Medical Center Corporation*, Case No. 2384CV00326-BLS1 ("BMCC"), which involves Wiretap Act and Privacy Statute causes of action, the trial court denied a motion to dismiss, but noted that "the court has reported its decision in two substantially similar cases ... Further proceedings in this case are stayed pending the outcome of the reported cases." A copy of the *BMCC* Order is attached as ***Exhibit D***. On November 9, 2023, the same date *BMCC* was stayed, a trial court also stayed yet another case involving alleged website tracking technologies. *See Nova v. Boston Medical Center Corporation*, Case No. 2384CV018086-BLS1, a copy of which is attached as ***Exhibit E***. In *Nova*, the court denied a motion to dismiss without prejudice to be renewed following a decision from the Appeals Court in *NEBH* and *BIDMC*.

Most recently, in *Doe v. Cape Cod Healthcare, Inc.*, Case No. 2384CV018086-BLS1, the Defendant filed an unopposed motion to stay proceedings pending completion of the *NEBH* and *BIDMC* interlocutory appeals. A copy of the unopposed motion is attached as ***Exhibit F***. Plaintiffs' counsel in the *Cape Cod Healthcare* action – the same counsel that represents the Plaintiffs in this case – did not oppose the motion. *See* ***Exhibit F*** at 1. Although this action involves essentially the same causes of action and factual allegations as in *Cape Cod Healthcare*, Plaintiffs' counsel has, without further explanation, not yet consented to a similar stay of this action.

**C. A Stay Will Not Prejudice the Plaintiffs, and Will Promote Judicial Economy, While A Denied Stay Will Prejudice Defendant**

This Court should issue a discretionary stay of all proceedings, pending appellate decisions regarding Plaintiffs' counsel's[3] novel attempt to apply the provisions of the Wiretap Act to seek potentially billions of dollars of aggregated statutory damages for the near-ubiquitous use of internet tracking technologies.

Plaintiffs will not be materially prejudiced if a stay of these proceedings because Plaintiffs' counsel knows that Southcoast temporarily halted use of the complained of Webtech shortly after the litigation commenced, all related evidence has been preserved, and there is no pressing our mounting need to resolve Plaintiffs' claims for statutory damages prior to a ruling from the Appellate Court on the applicability of the Wiretap Act to situations such as those in this case.

The parties have exchanged initial discovery responses, although Plaintiffs' initial responses were formulaic and Plaintiffs produced no responsive documents. By contrast,

[3] As noted in Exhibit C to the recently-filed Application for Direct Appellate Review, attached hereto as ***Exhibit A***, Plaintiffs' counsel involved in this matter have at least five pending cases against Massachusetts healthcare organizations based on similar claims, including Southcoast, Atrius Heath, Emerson Hospital, UMass Memorial Healthcare, and Cape Cod Healthcare.

Southcoast has already expended substantial resources to produce nearly 1,500 pages of documents, as well as a forensic copy of its website, and logs denoting all significant changes to its Webtech. *See* the attached Declaration of James Monagle, ***Exhibit G***, ¶ 3. Southcoast has also commenced an e-discovery project including culling all relevant data sources from its systems and document custodians for review for potential production. *Id.* at ¶ 4. Southcoast estimates tens to hundreds of thousands of dollars will be incurred in remaining costs to complete e-discovery, which could be significantly affected or avoided altogether based on a ruling in the pending appeals. The current discovery cutoff date is February 29, 2024, almost three months away. Once the Appeals Court renders a decision, this action can continue to the extent consistent with the outcome of the appeals.

As noted above, stays are commonly granted when a pending decision could clarify the parties' liability. *See Town of Mattapoisett*, 392 Mass. at 861. That is certainly the case here, as it was in *NEBH, BIDMC, BMCC*, and *Nova*. While Plaintiffs have alleged causes of action in addition to their Wiretap Act claim (none of which provide for statutory damages), the case could be greatly shaped by an appellate decision related to the Wiretap Act. The most efficient use of the parties' and the Court's resources would be to stay all proceedings in this action pending a decision by the Appeals Court or Supreme Judicial Court regarding the application of the Wiretap Act.

Likewise, the scope of discovery may also significantly change as a result of the appellate decision regarding the Wiretap Act. *See, e.g., Henry v. Bozzuto Mgmt. Co.*, 98 Mass. App. Ct. 690, 704 (2020) (A judge ruling on discovery requests may "take into account considerations of efficiency and economy") (citation omitted).

Perhaps more importantly, Southcoast should not be forced into costly preparation to oppose class certification or seek summary judgment based on open questions of liability relating to the Wiretap Act now pending before the Appeals Court. A stay of this action pending the related appeals would protect Southcoast from such unnecessary burden and expense while promoting the interests of judicial economy. *See Van Emden Mgmt. Corp. v. Marsh & McLennan Companies*, No. CIV.A. 05-0066-A, 2005 WL 2456737, at *3 (Mass. Super., Sept. 21, 2005) ("[I]f the Court were to deny the stay, inconsistent rulings on issues of discovery, class certification and other substantive matters would be likely. That circumstance would disrupt the orderly disposition of the national litigation and generate substantial economic costs for all the parties involved.").

## III. CONCLUSION

For all the foregoing reasons, Defendant Southcoast Hospitals Group, Inc. d/b/a St. Luke's Hospital, Tobey Hospital, and Charlton Memorial Hospital respectfully requests that the Court stay all proceedings, including deadlines related to discovery, class certification, and motions for summary judgment, during the pendency of the appeals resulting from the trial court's reporting of the October 31, 2023 decisions in *Vita v. New England Baptist Hospital* and *Kathleen Vita v. Beth Israel Deaconess Medical Center, Inc.*

Dated: December 14, 2023

**DEFENDANT, SOUTHCOAST HOSPITALS GROUP, INC.**

By its attorneys,

/s/ William J. Egan
William J. Egan (BBO #636128)
wegan@rc.com
Julianna M. Charpentier (BBO #703286)
jcharpentier@rc.com
ROBINSON & COLE LLP
One Boston Place, 25th Floor
Boston, MA 02108
(617) 557-5900

James F. Monagle (pro hac vice)
jmonagle@mullen.law
Mullen Coughlin LLC
309 Fellowship Rd., Suite 200
Mt. Laurel, New Jersey 08054
(267) 930-1529

## CERTIFICATE OF SERVICE

I, William J. Egan, certify that on this 14th day of December, 2023, I caused a copy of the foregoing to be served by email and first class U.S. Mail upon the following:

Victoria Santoro Mair, Esq.
J. Tucker Merrigan
Ryan Hawkins
Erin McHugh
Sweeney Merrigan Law
268 Summer Street LL
Boston, MA 02210
EMcHugh@sweeneymerrigan.com
victoria@sweeneymerrigan.com
tucker@sweeneymerrigan.com
rmh@sweeneymerrigan.com

Foster C. Johnson, Esq.
David Warden, Esq.
Nathan Campbell, Esq.
Justin Kenney, Esq.
Ahmad, Zavitsanos, & Mensing P.C.
1221 McKinney Street, Suite 3460
Houston, TX 77010
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com
jkenney@azalaw.com

Seth Meyer, Esq.
Alex Dravillas, Esq.
Keller Postman LLC
150 N. Riverside Plaza
Suite 4100
Chicago, IL 60606
sam@kellerpostman.com
adj@kellerpostman.com

*/s/ William J. Egan*
William J. Egan

# EXHIBIT H

11-10

25

**NOTIFY**

Date Filed 11/6/2023 4:28 PM
Superior Court - Suffolk
Docket Number 2384CV00411

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss

TRIAL COURT DEPARTMENT
SUPERIOR COURT
DOCKET NO. 2384CV00411 BLS-1

JANE DOE, for herself and the class,

Plaintiff,

v.

THE CHILDREN'S HOSPITAL CORPORATION,

Defendant.

**DEFENDANT'S MOTION TO REPORT THE COURT'S ORDER DENYING MOTION TO DISMISS TO THE APPEALS COURT FOR INTERLOCUTORY REVIEW**

Defendant The Children's Hospital Corporation d/b/a Boston Children's Hospital ("Boston Children's" or "BCH") respectfully moves, pursuant to Massachusetts Rule of Civil Procedure 64(a) and M.G.L. c. 231, § 111, for this Court to report its September 14, 2023 Memorandum of Decision and Order on Defendant's Motion to Dismiss to the Appeals Court for interlocutory review. As set forth in further detail in BCH's memorandum in support, reporting the Court's Order is appropriate here because it "so affects the merits of the controversy that the matter ought to be determined by the appeals court before any further proceedings in the trial court." Mass. R. Civ. P. 64. Further, reporting the Order will ensure "the just, speedy, and inexpensive determination" of this action and others. Mass. R. Civ. P. 1. Accordingly, BCH respectfully requests that this Court report its Order to the Appeals Court for interlocutory review and determination and stay any further proceedings in this Court pending appellate review.

11-9-23 DENIED. The court has reported its decision in two substantially similar cases (Dockets 2384CV01480-BLS1 and 2384CV0857-BLS1) for the proceedings in this case are stayed pending the outcome of the reported cases. H. Kazanjian, J.

# EXHIBIT I

iled 11/9/2023 4:27 PM
ior Court - Suffolk
et Number 2384CV00728

BC

COMMONWEALTH OF MASSACHUSETTS

| | |
|---|---|
| Suffolk, ss. | SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT BUSINESS LITIGATION SESSION |
| JANE DOE, For herself and the Class, v. LAWRENCE GENERAL HOSPITAL, Defendant. | CIVIL ACTION NO. 2834-CV-00728-BLS1 |

# JOINT STIPULATION AND PROPOSED ORDER TO STAY ALL PROCEEDINGS PENDING INTERLOCUTORY APPEAL IN RELATED CASES

Plaintiff Jane Doe ("Plaintiff") and Defendant Lawrence General Hospital ("Defendant," and with Plaintiff, the "Parties") move to stay this case pending completion of the appeals in *Vita v. Beth Israel Deaconess Medical Center, Inc.* (No. 2384CV00480-BLS1) and *Vita v. New England Baptist Hospital* (No. 2384CV00857-BLS1). In support of this joint motion, the Parties state as follows:

Plaintiff filed her Complaint on March 27, 2023. Defendant served a motion to dismiss on June 12, 2023; Plaintiff opposed the motion, and Defendant filed the Rule 9A package for the motion on August 15, 2023. The Court has not yet held a hearing on Defendant's motion.

On October 31, 2023, the Court denied the motions to dismiss in *Beth Israel* and *New England Baptist*. The Court also decided to report its decisions denying the motions to dismiss in those cases to the Massachusetts Appeals Court for interlocutory appellate review, pursuant to Mass. R. Civ. P. 64(a). The issues raised in the *Beth Isreal* and *New England Baptist* appeals overlap with the issues in this case, including those presented through Defendant's pending motion to dismiss.

The Parties have conferred and agreed to stay all Superior Court proceedings in this matter pending completion of the appeals in *Beth Israel* and *New England Baptist* and that the stay should remain in place and be lifted only after the completion of those appeals.

Accordingly, the Parties stipulate and agree, subject to the Court's approval, that:

1. All Superior Court proceedings, time standards, and deadlines in this matter should be stayed during the pendency of the appeals in *Beth Isreal* and *New England Baptist*.

2. No discovery requests or responses will be exchanged between the Parties during the pendency of the stay, including (without limitation) interrogatories, requests for the production of documents/data, or deposition notices.

3. Fourteen days after the completion of the appeals in the *Beth Isreal* and *New England Baptist* (including the exhaustion or expiration of any rights to rehearing, reconsideration, or further appellate review), this stay shall be automatically lifted, and the Parties may then proceed with further litigating the case in this Court, to the extent consistent with the outcome of the appeal.

Respectfully submitted,

/s/ Patrick J. Vallely
SHAPIRO HABER & URMY LLP
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

*Counsel for Plaintiff*

/s/ Emyr T. Remy
SHOOK, HARDY & BACON L.L.P.
Emyr T. Remy (BBO# 704156)
One Federal Street, Suite 2540
Boston, MA 02110
Tel.: (617) 531-1411
remy@shb.com

*Counsel for Defendant*

Dated: November 9, 2023

The Court hereby approves the Parties' Joint Stipulation above and so orders.

_______________________
Associate Justice, Superior Court
Commonwealth of Massachusetts

Entered: ______________, 2023

# EXHIBIT J

VM

08.17

NOTIFY

…erior Court - Suffolk
…ket Number 2384CV01086

1-9-23 The motion to dismiss is Denied without prejudice to be renewed following the decision from the Appeals Court on Dockets 2384CV1480-BLS1 and 2384CV0057-BLS1, which cases have been reported pursuant to Mass. R. Civ. P. 64. All further proceedings in this case are stayed pending the outcome of the reported cases. (Kazanjian, J.)

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT
BUSINESS LITIGATION SECTION
CIVIL ACTION NO. 2384CV01086 BLS1

ELIZABETH NOVA, for herself and the Class,

*Plaintiff,*

v.

BOSTON MEDICAL CENTER CORPORATION,

*Defendant.*

**DEFENDANT BOSTON MEDICAL CENTER CORPORATION'S MOTION TO DISMISS THE COMPLAINT UNDER MASS. R. CIV. P. 12(b)(1) AND (6)**

Defendant Boston Medical Center Corporation ("BMC") respectfully moves, under Mass. R. Civ. P. 12(b)(1) and (6), to dismiss Plaintiff Elizabeth Nova's ("Plaintiff") May 10, 2023 Complaint (the "Complaint") in its entirety and with prejudice. Plaintiff failed to establish standing, and, substantively, her state law claim, under the Massachusetts Wiretap Act, G.L. c. 272, § 99 (the "Wiretap Act"), fails for a variety of reasons. *First*, for the reasons articulated by the Massachusetts Supreme Judicial Court in *Pugsley v. Police Dep't of Bos.*, 472 Mass. 367, 373, 34 N.E.3d 1235, 1240 (2015), which controls, Plaintiff cannot establish standing because her claim does not allege any "nonspeculative, direct injury" that is "sufficiently concrete and imminent"—an essential requirement of standing in the Commonwealth. This deficiency alone warrants dismissal in full. *See Pishev v. City of Somerville*, 95 Mass. App. Ct. 678, 683, 131 N.E.3d 852, 859 (2019) (affirming dismissal for lack of standing pursuant to Rule 12(b)(1)). Moreover, Plaintiff's claim under the Wiretap Act fails to state a claim because she has not pled a plausible, *prima facie* entitlement to relief under that Act as a matter of law. The grounds for dismissal are

# EXHIBIT K

d 12/8/2023 2:15 PM
Court - Suffolk
Number 2384CV01236

BC

32

COMMONWEALTH OF MASSACHUSETTS

SUPERIOR COURT
BUSINESS LITIGATION SESSION

SUFFOLK, ss

JANE DOE, individually and on behalf of all others similarly situated,

Plaintiff,

v.

CAPE COD HEALTHCARE, INC.

Defendant,

C.A. NO. 2384-CV-01236-BLS1

**DEFENDANT'S UNOPPOSED MOTION TO STAY PROCEEDINGS UNTIL COMPLETION OF INTERLOCUTORY APPEALS IN PARALLEL WIRETAP ACT CASES**

Defendant Cape Cod HealthCare, Inc. ("CCHC") asks the Court to stay all proceedings in this case pending the completion of the interlocutory appeals in *Vita v. New England Baptist Hosp.*, No. 2384CV00857-BLS1 and *Vita v. Beth Israel Deaconess Medical Center, Inc.*, No. 2384CV00480-BLS1 (the "NEBH and BIDMC Cases"). Plaintiff has stated, through counsel, that she does not oppose this motion.

Plaintiff Jane Doe filed this putative class action on December 8, 2022 against Defendant CCHC, a non-profit healthcare system based in Hyannis, Massachusetts. Plaintiff brought the case on her own behalf, and on behalf of a putative class consisting of all Massachusetts residents who were CCHC patients and used its public website. Compl. ¶ 148. She alleges that CCHC used digital marketing tools on that public website that redirected website users' information to third parties, such as Facebook, without the users' knowledge or consent. Id. ¶¶ 3–8. The Complaint

Filed 12/8/2023 2:15 PM
rior Court - Suffolk
:et Number 2384CV01236

includes six counts, one of which alleges violations of the Massachusetts Wiretap Act, G.L. c.272 § 99, which provides for damages of $1000 per violation. Compl. ¶¶ 161–254.

This is one of at least 16 similar cases currently pending in Massachusetts against healthcare institutions, all alleging violations of the Wiretap Act (and, in some cases, like this one, asserting other claims as well). In two of these parallel cases, the BIDMC and NEBH Cases, this Court denied the defendants' motions to dismiss but reported its decision to the Massachusetts Appeals Court for interlocutory appellate review, pursuant to Mass. R. Civ. P. 64(a). Memorandum of Decision & Ord. on Defendant's Motion to Dismiss & Rep. to the Appeals Ct. at 10, *Vita v. New England Baptist Hosp.*, No. 2384CV00857-BLS1 (Suffolk Super. Ct. Oct. 31, 2023). The Court concluded that the applicability of the Wiretap Act to these cases "should be determined by the Appeals Court before any proceedings continue in this court." *Id.* At 11. On November 9, 2023, the Court granted the Joint Stipulation and Proposed Order to Stay All Proceedings Pending Interlocutory Appeal in the BIDMC and NEBH cases. On the same date, the Court also stayed proceedings in parallel cases *Doe v. Boston Medical Center Corp.*, No. 2384CV00326-BLS1, and *Doe v. The Children's Hospital Corp.*, No. 2384CV00411-BLS1, even though it declined to report to the Appeals Court its denials of the motions to dismiss in those case.

In light of the pending interlocutory appeals in the BIDMC and NEBH Cases, the Parties have conferred, and the Plaintiff has stated, through counsel, that she does not oppose this motion. Accordingly, the Defendant asks the Court to order that:

1. All Superior Court proceedings, time standards, and deadlines in this matter be stayed during the pendency of the interlocutory appeals in the BIDMC and NEBH Cases.

Date Filed 12/8/2023 2:
Superior Court - Suffolk
Docket Number 2384CV

is

tio

3

BIDMC

onsideratio

e case in this

December 8, 2

I, Adam Bookbi
December 8, 2023, this

Jonathan
Foster Joh
David War
Nathan Car
Seth Meyer
Alex Dravil

2. No discovery requests or responses be exchanged between the Parties while the stay is in place, including (without limitation) interrogatories, requests for production of documents, or deposition notices.

3. The stay will be automatically lifted 14 days after the completion of the appeals in the BIDMC and NEBH Cases (including the exhaustion or expiration of any rights to rehearing, reconsideration, or further appellate review). The Parties may then proceed with further litigating the case in this Court, consistent with the outcome of the appeal.

December 8, 2023

Respectfully Submitted,

CAPE COD HEALTHCARE, INC.,

*By its attorneys,*

*/s/ Adam Bookbinder*
Adam Bookbinder (BBO No. 566590)
Samuel Rudman (BBO No. 698018)
CHOATE, HALL & STEWART LLP
Two International Place
Boston, MA 02110
Telephone: 617-248-5000
srudman@choate.com
abookbinder@choate.com

**CERTIFICATE OF SERVICE**

I, Adam Bookbinder, Attorney for Defendant Cape Cod HealthCare, Inc., certify that on December 8, 2023, this document is being served by e-mail to:

Jonathan Merrigan (tucker@sweeneymerrigan.com)
Foster Johnson (fjohnson@azalaw.com)
David Warden (dwarden@azalaw.com)
Nathan Campbell (ncampbell@azalaw.com)
Seth Meyer (sam@kellerpostman.com)
Alex Dravillas (ajd@kellerpostman.com)

*/s/ Adam Bookbinder*
Adam Bookbinder

# EXHIBIT L

Date Filed 12/8/2023 2:15 PM
Superior Court - Suffolk
Docket Number 2384CV01236

BC

12.12
NOTIFY

COMMONWEALTH OF MASSACHUSETTS

32

SUFFOLK, ss

SUPERIOR COURT
BUSINESS LITIGATION SESSION

JANE DOE, individually and on behalf of all others similarly situated,

Plaintiff,

v.

CAPE COD HEALTHCARE, INC.

Defendant,

C.A. NO. 2384-CV-01236-BLS1

**DEFENDANT'S UNOPPOSED MOTION TO STAY PROCEEDINGS UNTIL COMPLETION OF INTERLOCUTORY APPEALS IN PARALLEL WIRETAP ACT CASES**

Defendant Cape Cod HealthCare, Inc. ("CCHC") asks the Court to stay all proceedings in this case pending the completion of the interlocutory appeals in *Vita v. New England Baptist Hosp.*, No. 2384CV00857-BLS1 and *Vita v. Beth Israel Deaconess Medical Center, Inc.*, No. 2384CV00480-BLS1 (the "NEBH and BIDMC Cases"). Plaintiff has stated, through counsel, that she does not oppose this motion.

Plaintiff Jane Doe filed this putative class action on December 8, 2022 against Defendant CCHC, a non-profit healthcare system based in Hyannis, Massachusetts. Plaintiff brought the case on her own behalf, and on behalf of a putative class consisting of all Massachusetts residents who were CCHC patients and used its public website. Compl. ¶ 148. She alleges that CCHC used digital marketing tools on that public website that redirected website users' information to third parties, such as Facebook, without the users' knowledge or consent. Id. ¶¶ 3–8. The Complaint

12-13-23 ALLOWED. H. Kazanjian J.

COMMONWEALTH OF MASSACHUSETTS

| | |
|---|---|
| ESSEX, ss | TRIAL COURT DEPARTMENT<br>SUPERIOR COURT |
| JOHN DOE, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>EMERSON HOSPITAL,<br><br>Defendant. | DOCKET NO. 2277CV01000D |

## EMERSON HOSPITAL'S MEMORANDUM IN SUPPORT OF ITS MOTION TO REPORT

Defendant, Emerson Hospital ("Emerson") respectfully moves, pursuant to Massachusetts

Court to report to the Appeals

23 Memorandum of Decision

44.1

g technology software is an

any further proceedings in this

here because this finding "so

termined by the appeals court

. 64(a). Granting this request

v of an important, potentially

catastrophic, threshold, genuine legal issue that is central to this case and threatens the existence

---

[1] Emerson has also petitioned the Single Justice of the Appeals Court to allow leave for an interlocutory appeal under M.G.L. c. 231, § 118, ¶ 1, to preserve its right to do so in light of the thirty-day jurisdictional limitation on seeking such an order. Emerson has advised the Single Justice that it is also requesting that this Court report its finding.

of Emerson, many other Massachusetts businesses, and the entire economy of the Commonwealth. *See* Mass. R. Civ. P. 1.

## I. BACKGROUND

This is a putative class action brought by Plaintiff John Doe against Emerson Hospital, alleging violation of the Massachusetts Wiretap Act, M.G.L. c. 272, § 99, asserting additional claims, and seeking tens or hundreds of millions of dollars in statutory damages under the Wiretap Act. First Amended Complaint ("FAC") ¶ 193; Ex. 1, 10/12/23 Hr'g Tr. at 34:8-13. Emerson is a small non-profit hospital. Emerson's Mem. in Supp. of Mot. to Dismiss ("Mem.") at 3. If the Massachusetts court system determines with finality that the FAC's allegations meet the requirements of the Wiretap Act, it would be catastrophic to Emerson and the Commonwealth's economy. FAC ¶ 193; Ex. 1 at 28:8-12; 34:8-22.

The lawsuit is not based on any allegation that any private information was disclosed publicly or to any cybercriminal. Instead, Plaintiff alleges that the word "concussion" he anonymously clicked on or entered on Emerson's public-facing website was sent by Emerson to Facebook and Google causing Facebook and Google to adjust the nature of the advertisements they already sent him to be "targeted." FAC ¶¶ 36, 102, 103; Mem. at 3-5; Ex. 1 at 11:16-14:1. According to Plaintiff, Emerson did this with something called the Meta Pixel or similar Google software technologies ("advertising technology software" or "adtech software"). As Plaintiff alleges, this software is "wildly popular and embedded on millions of websites." FAC ¶ 82; Ex. 1 at 12:3-7.

Emerson filed a motion to dismiss under Rule 12(b)(6), on the ground, among others, that adtech software is not an "intercepting device" within the meaning of the Wiretap Act. Mem. at

14-16; Reply at 4; Ex. 1 at 28:7-34:25. The Court denied Emerson's motion on this ground, as follows (the "Finding"):

> Emerson argues that the [wiretap] claim fails because the FAC ... fails to allege that it used an intercepting device ... Th[is] argument has been rejected in other recent Superior Court decisions analyzing similar allegations and the court sees no reason to diverge from those rulings. See, e.g., Doe[ v. BMC], 2023 WL 7105628, at *4 [(Mass. Super. Ct. Sep. 14, 2023) (finding that Meta Pixel and Google Analytics "software code" is an "intercepting device")].

11/22/23 Order at 11.

The following adtech software healthcare cases have already been reported for interlocutory appellate review and are currently on appeal. These cases address **different** issues under the Wiretap Act from the Finding, quoted above, that Emerson requests that the Court report for appellate review here. Ex. 2, 11/31/23 Order Reporting for Appellate Review in *Vita v. Beth Israel Deaconess Medical Center, Inc.*, No. 2384CV00480-BLS1; Ex. 3, 10/3123 Order Reporting for Appellate Review in *Vita v. New England Baptist Hospital*, No. 2384CV00857-BLS1 ("*Vita* cases"). In the *Vita* cases, the issues being appealed are whether, under the Wiretap Act, alleged disclosures via adtech software (1) are "wire communications"; (2) were "secret[]"; and (3) fall under the "ordinary course of its business" exception. Ex. 4, Application for Direct Appellate Review of Both Cases at 11 (setting forth the issues in full). The *Vita* cases did not argue in the trial court nor are they appealing the issue presented by the Finding: Whether advertising technology software is "intercepting device" within the meaning of the Wiretap Act.

## II. LEGAL STANDARD

This Court may report an interlocutory finding if it "so affects the merits of the controversy that the matter ought to be determined by the appeals court before any further proceedings in the trial court." Mass. R. Civ. P. Rule 64(a); M.G.L. c. 231, § 111; *Patel v. Martin*, 481 Mass. 29, 31-

32 (2018). An interlocutory order "should be reported" under Rule 64 where (A) it presents a "serious" question; (B) the question is "likely to be material in the ultimate decision"; (C) "subsequent proceedings in the trial court will be substantially facilitated"; and (D) the question has "significant public repercussions." *Armstrong v. Theoharides*, No. 1884CV02132BLS1, 2021 WL 4515360, at *2 (Mass. Super. June 23, 2021) (citations omitted). All four of these factors favor reporting the Finding under Rule 64, as discussed in the next section.

## III. ARGUMENT

### A. The Finding presents a serious question.

The issue presented by the Finding—whether advertising technology software is an "intercepting device" within the meaning of the Wiretap Act—is a serious question worthy of appellate review for multiple reasons. First, it is a question of law that has not been addressed by any Massachusetts appellate court, nor is it being addressed by the *Vita* consolidated interlocutory appeal. *See Acevedo v. Musterfield Place, LLC*, No. 1581CV00308, 2017 WL 7313406, at *3 (Mass. Super. May 31, 2017) (granting motion to report question of law where no Massachusetts court besides the Superior Court had addressed the issue); *Brown v. Office of the Com'r of Probation*, No. SUCV2007-03552-A, 2011 WL 13383961, at **1-2 (Mass. Super. Nov. 22, 2011) (granting request to report under Rule 64 an order presenting questions of law that were "perhaps novel"); Ex. 2 at 10-11 (reporting questions of law that are "unresolved at the appellate level in Massachusetts"); Ex. 3 at 10-11 (same).

Moreover, there is substantial ground for a difference of opinion on whether advertising technology software is an "intercepting device" under the Wiretap Act. *See Brown*, 2011 WL 13383961, at **1-2 (granting request to report questions that were "complex and perhaps novel"); Ex. 2 at 11 (reporting issue under the Wiretap Act because this statute "was enacted in 1968—long

before the internet, let alone internet tracking, became available. The Legislature did not, therefore, contemplate internet tracking as a form of secretly intercepting communications"); Ex. 3 at 11 (same). A Massachusetts appellate court may find that advertising technology software is not an "intercepting device," for at least the following reasons:

- Plain meaning. The Wiretap Act defines an "intercepting device" as "any device or apparatus which is capable of transmitting, receiving, amplifying, or recording a wire or oral communication..." Mem. at 14-15, quoting, M.G.L. c. 272 § 99(B)(3). Software is not a "device" or "apparatus," both of which terms are most commonly understood as hardware, not software. *See* Mem. at 14-15, quoting Black's Law Dictionary (11th ed. 2019) (defining "device" as "[a] mechanical invention that may be "an apparatus or an article of manufacture"); *id.* (defining "apparatus" with reference to "machine," which is defined as "[a] device or apparatus consisting of fixed and moving parts"); *accord* Oxford English Dictionary (defining "device" as "a thing made or adapted for a particular purpose, especially a piece of mechanical or electronic equipment"); *id.* (defining "apparatus" as "technical equipment or machinery"); Webster's (defining "device" as "a piece of equipment or mechanism"); *id.* (defining "apparatus" as an "instrument or appliance"). *See* *Hovagimian v. Concert Blue Hill, LLC*, 488 Mass. 237, 245 (2021) (interpreting statutory term according to its "plain meaning" as set forth in a dictionary definition, stating, "Ascribing its plain meaning to the term 'service charge' settles expectations"); *Dunn v. Comm'r of Civ. Serv.*, 281 Mass. 376, 382, (1933) ("A new meaning cannot be given to the words of an old statute in consequence of the changed conditions of a time later than the enactment of that statute"); *Com. v. Dykens*, 473 Mass. 635, 646 (2016) ("We ... look to the ordinary meaning of the word as of ... the year the statute was enacted").

- Legislative history. Not only did the legislature not intend to include *any* software within the meaning of "intercepting device" (see prior bullet), the legislative history shows it also did not intend to include adtech software. The Wiretap Act was drafted in 1968. Ex. 1 at 28:13-16. In enacting it, "the Legislature was concerned principally with the investigative use of surveillance devices by law enforcement officials to eavesdrop surreptitiously on conversations." *Id.* at 28:17-28:23, quoting *Commonwealth v. Rainey*, 491 Mass. 632, 645, 205 N.E.3d 1090, 1103 (2023). The same legislature faced with adtech software would not have intended to include it within the meaning of an "intercepting device." Ex. 1 at 30:21-31:9. Adtech software is not used for "surveillance" or to "eavesdrop surreptitiously on conversations." *Rainey*, 491 Mass. at 645. Rather, it is used to (i) encrypt information like the word "concussion" Plaintiff clicked on or entered on Emerson's public-facing website, (ii) send the encrypted information to an adtech company like Facebook or Google, and (iii) thereby enable Facebook and Google to adjust the nature of the advertisements they already send him to be "targeted." FAC ¶¶ 36, 73, 102, 103; Mem. at 3-5; Ex. 1 at 11:16-14:1. Plaintiff does not allege that any other entity besides Facebook or any actual person has an encrypted version of the word "concussion" and can link it with what he calls his "real-world identity." FAC ¶ 77; Ex. 1 at 27:1-12. He does not allege that even Facebook, or any other entity, or any person, has the word "concussion" in a decrypted (readable) format. In short, adtech software functionality is not the type of functionality the legislature considered when drafting the meaning of "intercepting device." *See Kobrin v. Gastfriend*, 443 Mass. 327, 335, 821 N.E.2d 60, 66 (2005) (construing statute to be consistent with legislative history)

- Statute as a whole. Like the Wiretap Act's legislative history, other parts of the Wiretap Act besides its definition also show that the Legislature did not intend to include adtech software within the meaning of "intercepting device." The term "aggrieved person" is defined as "any individual who was a party to an intercepted wire or oral communication ... or who would otherwise have standing to complain that his personal or property interest or privacy was invaded in the course of an interception." Ex. 1 at 33:25-34:2, citing M.G.L. c. 272 § 99(B)(6). In other words, the legislature's intent was to prohibit invasions of privacy. Ex. 1 at 33:25-34:7. Adtech software's encryption of web-browsing information and sending of the encrypted information to adtech companies is not an invasion of privacy, and not the functionality intended by the legislature of an "intercepting device." *Id. See Commissioners of Bristol Cnty. Mosquito Control Dist. v. State Reclamation & Mosquito Control Bd.*, 466 Mass. 523, 529, 997 N.E.2d 1188, 1192 (2013) (construing statutory text in light of "other sections" of the statute).
- Absurd results. The term "intercepting device" should also not be construed to include adtech software because of the absurd results that would produce, namely, unprecedented and catastrophic consequences for the Commonwealth's economy. FAC ¶ 193; Ex. 1 at 28:8-12; 34:8-22; *Rainey*, 491 Mass. at 642-43 ("Because we assume generally that the Legislature intends to act reasonably, we will not adopt a literal construction of a statute if the consequences of such a construction are absurd or unreasonable") (punctuation omitted).
- Rule of lenity. The Wiretap Act is primarily criminal—defining multiple offenses punishable by incarceration. Those criminal offenses and Plaintiff's civil cause of action turns on the same definition of "intercepting device." The rule of lenity thus requires that

any ambiguities in that term be resolved in Emerson's favor. Ex. 1 at 34:2-3; *see Velazquez v. Commonwealth*, 491 Mass. 279, 283 n.5 (2023) ("where the language of a criminal statute plausibly can be found ambiguous, the rule of lenity requires that the defendant receive the benefit of the ambiguity"); *see also Leocal v. Ashcroft*, 543 U.S. 1, 11 n.8 (2004) ("Because we must interpret the statute consistently, whether we encounter its application in a criminal or noncriminal context, the rule of lenity applies"); *Cook v. Patient Edu, LLC*, 465 Mass. 548, 555-56 (2013) (assuming, without deciding, that *Leocal*'s holding applies under Massachusetts law); *DiFiore v. Am. Airlines, Inc.*, 454 Mass. 486, 497 n.12 (2009) (same).

- Other courts' decisions. Other courts have found that software is not a "device or apparatus" under other states' wiretap acts. *See* Mem. at 15 & Ex. 1 at 32:8-33:21, citing, *e.g.*, *Potter v. Havlicek*, 2008 WL 2556723, at *1 (S.D. Ohio June 23, 2008) (dismissing claim under 18 U.S.C.A. § 2512, holding that spy software did not constitute a "device or apparatus"); *Jacome v. Spirit Airlines Inc.*, 2021 WL 3087860, at *5 (Fla. Cir. Ct. June 17, 2021) (dismissing Florida wiretap act claim, holding that session replay software did not constitute a "device or apparatus"); *Connor v. Whirlpool Corp.*, 2021 WL 3076477, at *2 (S.D. Fla. July 6, 2021) (same); *Cardoso v. Whirlpool Corp.*, 2021 WL 2820822, at *2 (S.D. Fla. July 6, 2021) (same); *accord Goldstein v. Luxottica of Am., Inc.*, 2021 WL 4093295, at *2 (S.D. Fla. Aug. 23, 2021) (same); *In re Google Location Hist. Litig.*, 428 F. Supp. 3d 185, 193 (N.D. Cal. 2019) (finding that "[s]oftware like Google Maps, Chrome, etc. are not 'devices' within the meaning of CIPA [California's wiretap act]"); *Moreno v. San Francisco Bay Area Rapid Transit Dist.*, 2017 WL 6387764, at *5 (N.D. Cal. Dec. 14,

2017) ("Plaintiff has not plausibly alleged that the [software] App is a 'device'") (citing dictionary definitions of "device").

**B. The Finding presents a question that is likely to be material in the ultimate decision.**

The Finding is likely to be material to the outcome of this litigation because whether Plaintiff can prove his claim under the Wiretap Act depends on resolution of the legal issue of whether adtech software is an "intercepting device." If adtech software is not an "intercepting device," then Plaintiff cannot prove an essential element of the wiretap claim. If it is, then Plaintiff's ability to prove Emerson's alleged violation of the Wiretap Act will not face the same insurmountable hurdle as to that requirement.

The Finding is also material because Plaintiff's claim under the Wiretap Act seeks tens or hundreds of millions of dollars in statutory damages. FAC ¶ 193; Ex. 1, 10/12/23 Hr'g Tr. at 34:8-13. That is material. It is so material, in fact, that Plaintiff's remaining claims evaporate by comparison, because they do not involve any statutory damages and seek damages only for any alleged actual injury. Plaintiff alleges that he suffered economic injury based only on his allegations that (i) Emerson diminished the alleged value of his entered or clicked-on term "concussion," resulting in benefits to Emerson in the form of access to marketing and analytics tools, FAC ¶ 194(a)-(c) & (e), 210(a)-(c) & (e), 222(a)-(c) & (e), 254 (*i.e.*, that Emerson allegedly underpaid Plaintiff); and (ii) Plaintiff paid Emerson money for data privacy and did not receive that data privacy in return. *Id.* ¶ 194(d), 210(d), 222(d), 254 (*i.e.*, that Plaintiff allegedly overpaid Emerson). Other courts have found such allegations so implausible that they have dismissed them on the pleadings. *Dinerstein v. Google, LLC*, 73 F.4th 502, 516-18 (7th Cir. 2023) ("[Plaintiff] contends that he *overpaid* the University for his medical treatment or, alternatively, that the University *underpaid* him for the interest in his medical records. . . . While [plaintiff] alleges both

an overpayment and underpayment theory of financial harm, neither is plausible"); *Provost v. Aptos, Inc.*, 2018 WL 1465766, at *4 (N.D. Ga. Mar. 12, 2018) (finding overpayment and underpayment damages implausible, stating "Plaintiff's allegations of overpayment and lost benefit of the bargain are insufficient" and "The Court is not persuaded by the hypothetical diminution of value propounded by Plaintiff").

**C. Subsequent proceedings in this Court will be substantially facilitated by interlocutory appellate review of the Finding.**

A definitive appellate answer to whether adtech software is an "intercepting device" within the meaning of the Wiretap Act could potentially save the parties to this case collectively thousands of hours, and hundreds of thousands (or even millions) of dollars, in effort and costs related to discovery, class certification, and summary judgment, to say nothing of trial. This is true for a number of reasons. For one, rulings on class certification may need to be redone if the wiretap claim is eliminated only by an appeal after final judgment. The wiretap claim, if applicable, presents its own individualized issues precluding a finding of commonality and predominance, including, for example, regarding the following statutory terms:

- "Interception." M.G.L. c. 272 § 99(B)(4). An interception, by definition, must be "secret." *Id.* Whether alleged disclosures via adtech software were secret may turn on factual questions specific to each individual. For example, was the individual aware of widespread adtech software? Did he notice the same purported "targeted" advertisements occurring before he visited Emerson's website? Did he participate in a prior settlement regarding adtech software in Massachusetts (*Doe v. Partners Healthcare Sys., Inc.*, No. 1984CV01651-BLS-1 (Mass. Super. Ct.)), or was he aware of it before visiting Emerson's website? An answer of "yes" to any of these questions may be evidence of lack of secrecy.

- "Aggrieved person." M.G.L. c. 272 § 99(B)(6). Whether an alleged class member is an "aggrieved person" capable of obtaining civil relief under the Wiretap Act depends on whether that person's "privacy was invaded in the course of an interception." *Id.* This question, too, may turn on factual questions specific to each individual. For example, what allegedly private information did the individual transmit on Emerson's website? Did the individual transmit that same information to anyone else? Even if not, is that information private by nature? Did the individual read and understand Facebook's privacy policies? All of these questions bear on the question of whether Plaintiff is an "aggrieved person."
- "Wire communication." M.G.L. c. 272 § 99(B)(1). It ought to be determined in the *Vita* appeals (Exs. 2-3) that all alleged disclosures via adtech software are not "wire communications" under the Wiretap Act. In the alternative, alleged disclosures via adtech software are not "wire communications" in at least some circumstances, raising individualized issues for each class member. For example, did the individual identify himself when visiting the hospital's website—like one would ordinarily do in a telephone conversation, which is the type of communication the legislature envisioned in 1968 when it enacted the statute? Or, instead, did the individual visit the website anonymously? Did the individual merely click on links or tabs as opposed to entering conversation-like information into a form? These factual questions specific to each individual and others may determine whether a "wire communication" occurred.

Litigation of all of these issues in the discovery, class certification, and summary judgment phases of this case could be avoided, if adtech software is finally determined in the first place not to be an "intercepting device." *See* Ex. 2 at 11 (granting motion to report, stating, "If ... the Massachusetts Wiretap Statute does not apply to business-related internet tracking, significant

judicial and party resources will be saved by quick resolution of these cases before discovery and other stages of litigation"); Ex. 3 at 11 (same).

Moreover, the wiretap claim is the main money claim in this litigation by tens or hundreds of millions of dollars and will therefore be the focus and main driver of hotly contested complex litigation in this Court. If the wiretap claim were resolved first by interlocutory appeal, then many arguments would not need to be made and briefs filed in this Court and, indeed, the rest of the case would have the potential to settle. As one court explained in similar circumstances: "If the appeal is not allowed, and the suit proceeds in the [trial] court on both the [main and other] claims, the completion of the litigation will take longer than if the [main] claim is out of the case, especially since that claim appears to be the plaintiffs' main one, with the [other claims] perhaps just a life jacket. Moreover, uncertainty about the status of the [main] claim may delay settlement (almost all class actions are settled rather than tried), and by doing so further protract the litigation. That is enough to satisfy the 'may materially advance' clause of section 1292(b) [similar to the 'so affects the merits of the controversy...' clause of M.G.L. c. 231, § 111]; neither the statutory language nor the case law requires that if the interlocutory appeal should be decided in favor of the appellant the litigation will end then and there, with no further proceedings in the [trial] court." *Sterk v. Redbox Automated Retail, LLC*, 672 F.3d 535, 536 (7th Cir. 2012).

Other Massachusetts adtech healthcare cases with both a wiretap claim and additional claim(s) have stayed trial-court proceedings while the *Vita* appeals remain pending. *See* Ex. 5, 12/8/23 Stay Order in *Doe v. Cape Cod Healthcare, Inc.*, No. 2384CV01236-BLS1 (wiretap claim and five other claims); Ex. 6, 11/9/23 Stay Order in *Doe v. Boston Medical Center Corp.*, No. 2384CV00326-BLS1 (wiretap claim and one other claim); Ex. 7, 12/14/23 Stay Order in *Alves v. BJ's Wholesale Club, Inc.*, No. 2284CV02509 (wiretap claim and one other claim). These stays

are consistent with the fact that early resolution of the wiretap claim would substantially facilitate resolution of trial-court proceedings in this case, which also has both wiretap and non-wiretap claims.

**D. The Finding presents a question with significant public repercussions.**

So far at least the following Massachusetts companies, mostly Massachusetts healthcare providers, face bet-the-company or otherwise potentially catastrophic wiretap claims based on alleged disclosures via adtech software like Emerson faces here: Atrius Health, Inc.; Baystate Health System, Inc.; Beth Israel Deaconess Medical Center, Inc.; BJ's Wholesale Club, Inc.; Blue Cross & Blue Shield of Massachusetts, Inc.; Blue Cross & Blue Shield of Massachusetts HMO Blue, Inc.; Boston IVF, LLC; Boston Medical Center Corp.; Cabela's, Inc.; Cape Cod Healthcare, Inc.; Dynatrace, Inc.; Lawrence General Hospital; New England Baptist Hospital; Southcoast Hospitals Group, Inc.; Steward Health Care System LLC; The Children's Hospital Corp. (Boston Children's Hospital); Tufts Medical Center, Inc.; UMass Memorial Health Care, Inc. *See* Ex. 4 at Ex. C.

Moreover, as Plaintiff alleges, this software is "wildly popular and embedded on millions of websites." FAC ¶ 82; Ex. 1 at 12:3-7. Not only the many Massachusetts companies above, but also potentially many more, face repercussions if adtech software is finally decided to be an "intercepting device," to such a degree that the entire economy of Massachusetts is at serious risk.

In sum, many Massachusetts companies have their entire existence riding on the final outcome of the Finding. This is reason to report. *See Armstrong*, 2021 WL 4515360, at *2 (granting motion to report, stating, "The litigants and numerous interested third-parties—including the City of Boston and various other shorefront municipalities—have a great deal (literally and figuratively) riding on that outcome"); *Acevedo v. Musterfield Place, LLC*, 2017 WL 7313406, at

*3 (Mass. Super. May 31, 2017) (granting motion to report, stating, "the matter has a potentially broad impact throughout the Commonwealth").

## IV. CONCLUSION

Emerson respectfully requests that this Court report to the Appeals Court for interlocutory review its finding, in its November 22, 2023 Memorandum of Decision and Order on Defendant's Motion to Dismiss, that advertising technology software is an "intercepting device" under Massachusetts' Wiretap Act, and stay any further proceedings in this Court pending appellate review.

Dated: December 20, 2023

Respectfully submitted,

EMERSON HOSPITAL

By: */s/Emyr T. Remy*

Emyr T. Remy (BBO# 704156)
**SHOOK, HARDY & BACON L.L.P.**
One Federal Street, Suite 2540
Boston, MA 02110
Tel.: (617) 531-1411 | Fax: (617) 531-1602
remy@shb.com

Alfred J. Saikali (FL # 0178195)
**SHOOK, HARDY & BACON L.L.P.**
201 South Biscayne Blvd., Suite 3200
Miami, Florida 33131
Tel: (305) 358-5171 | Fax: (305) 358-7470
asaikali@shb.com

Tammy B. Webb (CA # 227593)
**SHOOK, HARDY & BACON L.L.P.**
555 Mission Street, Suite 2300
San Francisco, CA 94105
Tel: (415) 544-1900 | Fax: (415) 391-0281
twebb@shb.com

Justin R. Donoho (IL # 6299667)
Tara D. Kennedy (IL # 6320909)
**SHOOK, HARDY & BACON L.L.P.**
111 South Wacker Drive, Suite 4700
Chicago, IL 60606
Tel: (312) 704-7713 | F: (312) 558-1195
jdonoho@shb.com
tkennedy@shb.com

Jessica N. Wahl (CA # 321887)
**SHOOK, HARDY & BACON L.L.P.**
2049 Century Park East, Suite 3000
Los Angeles, CA 90067
Tel: (424) 324-3477 | Fax: (424) 204-9093
jwahl@shb.com

**CERTIFICATE OF SERVICE**

I, Emyr T. Remy, hereby certify that on December 20, 2023, a true copy of the above document was served by email upon:

J. Tucker Merrigan (BBO# 681627)
Victoria Santoro (BBO# 679120)
Erin E, McHugh (BBO# 703701)
**SWEENEY MERRIGAN LAW**
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Foster C. Johnson (*PHV24076463TX*)
David Warden (*PHV20856750TX*)
Nathan Campbell (*PHV24097455TX*)
**AHMAD, ZAVITSANOS & MENSING, P.C.**
1221 McKinney St., Suite 3460
Houston, TX 77010
Tel: (713) 655-1101
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

Seth Meyer (*PHV5191283NY*)
Alex Dravillas (*PHV6299686IL*)
**KELLER POSTMAN LLC**
150 N. Riverside Plaza, Suite 4100
Chicago, IL 60606
Tel: (312) 741-5220
sam@kellerpostman.com
ajd@kellerpostman.com

*/s/ Emyr T. Remy*
Emyr T. Remy

COMMONWEALTH OF MASSACHUSETTS

ESSEX, ss ) TRIAL COURT DEPARTMENT
) SUPERIOR COURT

JOHN DOE, individually and on behalf of all others similarly situated,

Plaintiff,

v.

EMERSON HOSPITAL,

Defendant.

DOCKET NO. 2277CV01000D

A TRUE COPY, ATTEST
[signature]
DEPUTY ASST. CLERK

**EXHIBIT INDEX FOR EMERSON HOSPITAL'S MEMORANDUM IN SUPPORT OF ITS MOTION TO REPORT**

| Ex. | Description | Page No. |
|---|---|---|
| 1 | Transcript for Hearing on October 12, 2023 relating to Defendant's Motion to Dismiss First Amended Complaint – *John Doe v. Emerson Hospital*, Docket No. 2277CV01000 | 1 |
| 2 | Memorandum of Decision and Order on Defendant's Motion to Dismiss and Report to the Appeals Court, *Kathleen Vita v. Beth Israel Deaconess Medical Center, Inc.*, Docket No. 2384CV00480-BLS1 | 74 |
| 3 | Memorandum of Decision and Order on Defendant's Motion to Dismiss and Report to the Appeals Court, *Kathleen Vita v. New England Baptist Hospital*, Docket No. 2384CV00857-BLS1 | 87 |
| 4 | Defendants-Appellants' Application For Direct Appellate Review Of Both Cases - *Kathleen Vita v. New England Baptist Hospital*, and *Kathleen Vita v. Beth Israel Deaconess Medical Center, Inc.*, | 100 |
| 5 | Defendant's Unopposed Motion to Stay Proceedings Until Completion of Interlocutory Appeals in Parallel Wiretap Act Cases – *Jane Doe v. Cape Cod Healthcare, Inc.*, Docket No. 2384CV01236-BLS1 | 179 |
| 6 | Defendant Boston Medical Center Corporation's Mass. R. Civ.P.64 and M.G.L.c.231 § 111 Motion to Report the Court's Order on Defendants' Motion to Dismiss for Interlocutory Appeal – *Jane Doe v. Boston Medical Center Corporation*, Docket No. 2384CV00326-BLS1 | 181 |
| 7 | Defendant's Motion to Stay – *Joe Alves v. BJ's Wholesale Club, Inc.*, Docket No. 2284CV02509 | 183 |

# EXHIBIT 1

Volume 1 of 1
Page: 1 of 55
Exhibits: None

COMMONWEALTH OF MASSACHUSETTS

Essex SS, ESSEX SUPERIOR COURT

```
* * * * * * * * * * * * *
JOHN DOE                *
                        *
V                       * Docket No. 2277CV01000
                        *
EMERSON HOSPITAL        *
                        *
* * * * * * * * * * * * *
```

BEFORE THE HONORABLE JANICE W. HOWE

Appearances:

For the Plaintiff:
Sweeney Merrigan Law
393 Main Street
Greenfield, MA 01301
Work Phone: 413-774-5300
By: Thomas Tucker Merrigan, David Warden

Sweeney Merrigan Law
268 Summer Street LL
Boston, MA 02210
Work Phone: 617-391-9001
By: Victoria M Santoro, Jonathan Tucker Merrigan, Erin E McHugh

Ahmad, Zavitsanos & Mensing, P.C.
1221 McKinney
Suite 2500
Houston, TX 77010
By: Nathan B Campbell, Foster C Johnson, David E Warden,
Carl J. Gustafson

Appearances (continued)

Keller Postman LLC
150 N. Riverside Plaza
Suite 4100
Chicago, IL 60606
Work Phone: 312-741-5220
By: Alex J Dravillas

Keller Postman LLC
1100 Vermon Avenue, N.W. 12th Floor
Washington, DC 20005
Work Phone: 209-918-1123
By: Sara Aguiniga

For the Defendant:
Shook Hardy and Bacon LLP
111 S. Wacker Drive
Suite 4700
Chicago, IL 60606
By: Justin R. Donoho

Shook, Hardy and Bacon L.L.P.
One Federal Street, Suite 2540
Boston, MA 02110
Work Phone: 617-531-1411
By: Emyr Remy

Shook, Hardy & Bacon, LLP
201 S. Biscayne Boulevard, Suite 3200
Miami, FL 33131
Work Phone: 305-960-6923
By: Alfred J. Saikali

Shook, Hardy & Bacon, LLP
2555 Grand Boulevard
Kansas City, MO 64108
Work Phone: 816-559-0306
By: Jenn O. Hatcher

Appearances (continued)

Shook, Hardy & Bacon, LLP
2049 Century Park East #3000
Los Angeles, CA 90067
Work Phone: 424-324-3477
By: Jessica N. Wahl

Shook, Hardy & Bacon, LLP
555 Mission Street
Suite 2300
San Francisco, CA 94105
Work Phone: 415-544-1904
By: Tammy B. Webb

Essex Superior Court, Lawrence
Courtroom 3 (SC)
October 12, 2023

I N D E X

WITNESS DIRECT CROSS REDIRECT RECROSS

EXHIBITS PAGE

PROCEEDINGS

(Case called at 2:56 p.m.)

THE CLERK: Now calling the John Doe-Emerson Hospital matter. If the parties could kindly approach as I'm now calling Civil Action 2277CV1000. John Doe in his/her capacity individually on behalf of all others similarly situated versus Emerson Hospital. This is scheduled for defendant's motion to dismiss first amended complaint, Paper 18.

If I could have counsel identify themselves, please, starting with plaintiff?

MR. MERRIGAN: Jonathan Tucker Merrigan on behalf of the plaintiff.

THE COURT: Mr. Merrigan.

MR. WARDEN: Along with David Warden on behalf of the plaintiff.

THE COURT: Good afternoon.

THE CLERK: And counsel for defense, sorry.

MR. DONOHO: Hi. This is Justin Donoho on behalf Emerson Hospital. With me here also, I have a corporate representative from Emerson, this is Mike McAuliffe, Compliance Officer.

THE COURT: Okay. I'm going to ask everyone to speak up. All right? It's a broken record, or I'm the broken record here, but the acoustics are terrible, and if I think

that the recording may not be picking up people, or if I find it a little difficult to hear, I'm going to keep repeating that. So, I apologize in advance for that. All right.

MR. MERRIGAN: And, Judge, also I just also put on the record that we have a number of individuals observing by Zoom video conferencing. Thank you, Judge.

THE COURT: Okay. All right. So, let's take the plaintiff's motion to strike first. So, that's Paper Number 18.

MR. DONOHO: Your Honor, you ruled on that motion denying it previously.

THE COURT: Mm-hmm. Okay.

MR. DONOHO: But I was prepared to reiterate our position on it.

THE COURT: You want to revisit that? Is that reflected?

MR. MERRIGAN: It was Paper 15, Judge?

THE COURT: Mm-hmm.

MR. MERRIGAN: Let me take a look, I'm sorry.

THE COURT: May have gotten me on a different day.

MR. MERRIGAN: Defense motion to strike, Paper 16, is listed as denied on the docket. Let me continue looking for 15, Judge.

THE COURT: Defendant's?

MR. MERRIGAN: Yes.

THE COURT: But I have --

MR. MERRIGAN: Plaintiff's motion to strike seems to be unendorsed, Judge, on the docket, Paper 15.

THE COURT: Plaintiff's motion to strike relates to the exhibits attached and you think I've already ruled on that?

MR. DONOHO: There was a ruling on it, I believe, yes. But --

THE COURT: I don't --

MR. DONOHO: -- I thought it was on the docket.

THE COURT: All right. Hold on one -- we're going to clarify this because I don't believe that it's been ruled on.

MR. MERRIGAN: Judge, I've scanned the docket. Paper 15, there is no endorsement on the docket on that motion strike, which is plaintiff's motion to strike.

Paper 16, which is defendant's motion to strike -- I'm sorry, Paper 16 is defendant's request for leave to exceed the page limit. That was addressed, but Page 15 was not -- Paper 15 was not addressed.

THE COURT: Okay. All right. Then I don't know what you received.

MR. DONOHO: The -- I'm prepared to discuss it with the Court.

THE COURT: Okay. I don't know what you received in the way of --

MR. MERRIGAN: Judge, if I may, --

THE COURT: -- notice.

MR. MERRIGAN: -- it seems that the motion was docketed twice. The motion to strike is listed solely as Paper 15, but then again as 17 and 17.1 all the way up to 17.5. That motion, Paper 17, was denied for failure to comply with 9C. Then it was denied outright once again on April 27th, presumably after 9C notice was filed.

MR. DONOHO: And I can provide clarity on that.

THE COURT: Okay. Because I don't -- I want this to be cleared up today. I don't want --

MR. DONOHO: Sure. So, the motion was initially denied by Your Honor for --

THE COURT: Right.

MR. DONOHO: -- failure to comply.

THE COURT: For procedural?

MR. DONOHO: Yes.

THE COURT: Right.

MR. DONOHO: We had filed a 9C certificate with our motion. So, I actually had contacted the clerk to see if that had been brought to Your Honor's attention. The 9C part of your denial was then subsequently crossed out, I believe, on your subsequent ruling. And then that's what

brings us at least up to date with the history of it.

THE COURT: Clerk's bringing up an image.

THE CLERK: So, Judge, the original endorsement on 4/25/23, plaintiff's motion to strike is denied for failure to comply with Superior Court Rule 9C. A further endorsement on April 27th, after further review, the motion is denied.

THE COURT: Okay. And that paper is duplicative of the motion that I have before me that -- Mr. Clerk?

THE CLERK: Sorry, Judge. (Inaudible) docket.

THE COURT: All right. So, the motion that I have --

THE CLERK: Eighteen is the motion to dismiss.

THE COURT: And I have --

THE CLERK: (Inaudible).

THE COURT: Okay. I think for the sake of sanity, logic, and clarity, at the moment, I'm going to vacate my denial on the previous motion because there seems to be some confusion, and I'm going to let you argue this.

So, this is the plaintiff's motion to strike the extrinsic documents attached to the motion to dismiss. Are we all on the same page?

MR. DONOHO: We are, Your Honor. I'm not prepared to argue that, but I will tell you that in arguing --

THE COURT: I need you to speak up, I'm sorry.

MR. DONOHO: Sorry, Your Honor. I'm not prepared to

argue that motion, but I'm also -- I'm here to argue the motion to dismiss. But I'll also tell you that none of my arguments today will rely on the extrinsic documents attached.

THE COURT: Okay. All right. So, you want to come back and argue that? Is that what you're saying?

MR. MERRIGAN: I would propose --

THE COURT: Well, hold on one second. Is that what you're saying?

MR. DONOHO: If necessary, Your Honor. I don't think that they're necessary to rule in favor of our motion. If the Court --

THE COURT: Well, if you're not prepared to argue it today, then we can proceed in one of two ways. You can waive argument, and the plaintiff can argue, and I can make a decision based on that, or if you want to come back and argue the motion to strike, I'll allow you to do that. Which would you prefer?

MR. DONOHO: On the motion to strike, so long as that does not dismiss -- does not delay today's motion to dismiss hearing?

THE COURT: No. No. The motion to dismiss hearing is going to be heard today.

MR. MERRIGAN: Great. In that case, I would defer, Your Honor, if we could be heard on the motion to strike

hearing. I'm not prepared for that, I apologize.

THE COURT: Okay. There obviously is some confusion in this docket, so no one's at fault. All right.

Okay. Now, are we ready to proceed in the motion to dismiss?

MR. DONOHO: Thank you, Your Honor. I'm Justin Donoho. I'm here on behalf of Emerson Hospital, here on Emerson's motion to dismiss.

I'm happy to proceed in whichever way Your Honor would prefer. If Your Honor does not have a preference, I would suggest that one way I might start is just to give a nutshell of what the allegations are in the complaint, what has been alleged and what has not, before proceeding then to the claims.

THE COURT: Okay.

MR. DONOHO: Okay. Here's the nutshell of allegations, of what happened, what information was disclosed, to whom, and why.

First, plaintiff visited Emerson's public-facing website. Then he clicked a button to navigate to a public page that said "Concussion", so he could see what concussion-related services Emerson provides, or he entered the word "concussion" in a search field, so he could search for a doctor. That's all Plaintiff did.

Then Emerson told private servers located at Facebook

and Google that some individual, Emerson didn't know who, could not identify, clicked a button related to concussions or entered the word "concussion". Well, Emerson did this because with something called the Meta Pixel or similar Google software because, as plaintiff himself alleges, these advertising technologies are "wildly popular and embedded on millions of websites."

Finally, just Facebook's private server, not Google's or anyone else's, was able to take that information from Google and combine it with Facebook's own information that plaintiff himself had voluntarily given to Facebook, his name and e-mail address when building his user profile, and the Facebook server was able to do that with a cryptographic "hash" function that only Facebook's server knew how to do.

And so, Facebook's server, with its hash function, figured out that John Doe had -- it was John Doe who had clicked a few buttons about concussions. And so, it could serve up some advertisements to plaintiff.

THE COURT: And so, what?

MR. DONOHO: So, it could serve up some advertisements to plaintiff in the Facebook feed. Those are the facts alleged here. And I would just like to pause to ask the Court -- to see if the Court has any questions about that what I just submitted.

THE COURT: No, I've read your papers.

MR. DONOHO: Okay. Is it --

THE COURT: And I've read the complaint.

MR. DONOHO: Okay. It's really important that we get the facts straight here, because this case is really unlike all of the cases that plaintiff is citing in his briefs, in a couple respects.

First of all, this is not a data breach case. This is not a case where malicious hackers have hacked in and stolen money, or payment card info, or social security numbers, have caused worries about identity theft where someone has actually had some mitigation costs to secure against it, and any identity theft. None of that. It's not a data breach case.

Also, this is not a patient portal case like a lot of these Meta Pixel healthcare cases that are being brought today. It does not involve any interaction with a user actually entering his name and password, identifying himself, and then having interactions after he's been identified such as within that private space with a doctor or a nurse. None of that.

In addition, it's also not like some of the other disclosure cases that plaintiff cites, but are even further than portal cases, where actual medical records are being disclosed. That doesn't happen in portal cases either, but

it doesn't happen here either.

So, I just want to make sure we get those facts straight, and I'm ready to proceed with the claims, unless the Court has any questions about that.

THE COURT: No. Go ahead.

MR. DONOHO: Okay. So, there have been five claims that have been brought here. The first is for breach of fiduciary duty. That claim should be dismissed for two reasons. Number one, there's no fiduciary duty in Massachusetts or anywhere else that I'm aware of to refrain from disclosing the kind of anonymized public website activity or concussion that's occurring here. Again, there are no patient portal interactions here.

THE COURT: And is there nothing in what the -- a John Doe did to access the Emerson Hospital website that ultimately identified his IP address or anything that tied the access to the portal to John Doe?

MR. DONOHO: The only thing that tied what the plaintiff refers to as his real identity, like his name, IP address can't do it. It says so right in the complaint. The -- it says so right in the complaint, not about IP address, but whether it can do it or not, it can't. That's contested. But the Court doesn't need to figure out that about IP address, because what is alleged in the complaint is that whether it was IP address, it wasn't, or whether it

was actually the Facebook cookie, or -- which is based upon browser device fingerprint, all those three things are alleged as only Facebook figured that out with its cryptographic hash function.

Emerson didn't know who was accessing its website. There's no allegation that it did.

THE COURT: Okay. Go ahead.

MR. DONOHO: So, in the breach of fiduciary duty claim, there is no duty in Massachusetts to refrain from disclosing the kind of anonymized public website activity here. One -- this is -- there's a lot of Pixel healthcare cases in Massachusetts right now.

THE COURT: So I've seen.

MR. DONOHO: Yes. There were up to at least a couple dozen. This is one of the only cases in Massachusetts raising a breach of fiduciary duty claim. I don't think there's been any ruling on any.

THE COURT: I thought there was another one in the supplemental --

MR. DONOHO: Yes. I think the --

THE COURT: -- authorities that I read. There were -- I don't know what, there were a few decisions by Judge Kazanjian and I can't remember whether they were all Massachusetts cases after -- I remember the Judge Kazanjian decisions, but --

MR. MERRIGAN: Your Honor, if I may, it's Partners Health --

THE COURT: Right.

MR. MERRIGAN: -- in 2020 that actually addressed the fiduciary duty claim --

THE COURT: Yeah. Okay.

MR. MERRIGAN: -- and upheld it at this stage.

MR. DONOHO: Judge Davis.

THE COURT: Joe versus Partners Health?

MR. DONOHO: And that was Judge Davis. And --

THE COURT: Right. That was -- yeah, 11/20/2020.

MR. MERRIGAN: Yes.

THE COURT: Okay.

MR. DONOHO: And I'm glad counsel raised that. This -- that case also was not like this case. It did not involve just anonymized health information, as was argued at that case on Page 51 of the transcript. What was argued was that these are portal interactions. We have interactions with doctors and nurses that have identified the plaintiff and that have disclosed the interactions with the doctors and plaintiff. That is not what is at issue here. We have not had any kind of a fiduciary duty ruling in a case like this.

THE COURT: Because there was no direct interaction with the healthcare provider?

MR. DONOHO: And no identification of the patient. It's completely anonymized. It's just the word "concussion" that somebody typed in or clicked on.

THE COURT: Okay.

MR. DONOHO: And so, our case is cited in our brief, Petro and Van Gorder (phonetic), stand for the proposition that when there's no precedent for a fiduciary duty that goes this far, courts do not go ahead and create them.

We've also, in our notice of additional authority, cited two cases that are on point here. One is the Cousin case that addressed the breach of fiduciary duty case in a Pixel healthcare case and found there's no duty in this state that goes that far. Same with the Dinerstein case, which has analogous facts, not the Meta Pixel, but we'll discuss that one later.

THE COURT: Are these in your -- I don't remember some of the names of the cases. I've read most of the cases that I was handed today. Are these in cases -- are these in what you provided? I just want to make sure I have cites.

MR. DONOHO: Yes. There have been a lot of filings, so they're all in one of them. So, the Petro and Van Gorder are in one of our briefs.

THE COURT: Right.

MR. DONOHO: And then Dinerstein and Cousin are in our

notice of additional authorities.

THE COURT: Okay. Go ahead.

MR. DONOHO: The cases that they rely on are not like this. They all involve, in their brief, identification of the patient. It hasn't happened here. Also involve medical records, like in Alberts-Devine, when the doctor told his patient's employer, "Hey, in my medical opinion, Mr. Alberts identifying the patient, he's mentally ill." We have neither of those things. Neither -- not an identification, not anything about a medical condition that is linked to that identification. Nothing like that. That's one reason to dismiss the breach of fiduciary duty claim.

Another one is that there has not been any plausibly alleged damages in this case. And this is important not only to the breach of fiduciary duty claim, but this applies also to the breach of implied contract claim and the unjust enrichment claim.

The plaintiffs have made lots of allegations about economic loss that they've suffered. And they all boil down to one or two things, either an overpayment theory or an underpayment theory. And I want to kind of just explain what those are.

The overpayment theory is that the plaintiff says that he paid extra. He overpaid a separate amount for data

privacy to prevent the events that are alleged in this complaint. That was separate from the money that he paid for his healthcare services. And then Emerson received this separate payment and then did not exchange the data privacy in return for that payment.

The other theory, the underpayment theory, is that Emerson underpaid him for the value of his button clicks on the website, that he had -- the value of his button clicks has thereby been diminished, and whereas -- and in return, Emerson got this marketing benefit from the button clicks, which Emerson did not earn by providing the patient anything in return. There have been no other economic losses pled here besides those.

THE COURT: I'm sorry, I didn't hear you.

MR. DONOHO: There have been no economic losses pled here in the complaint besides either that, that amount to either an overpayment theory or an underpayment theory. And I think that's important because this case that we cited in our notice of supplemental authority, the Dinerstein v. Google case, this case is out of the 7th Circuit and it had quite an extensive analysis in a similar factual scenario here. It involved overpayment and underpayment theories.

There, a patient alleged that a hospital, like Emerson, breached its contract by paying -- by sharing

anonymized medical information to Google. So, that's even more of a disclosure here. There's no anonymized medical information here. We just have anonymized "queries" on a website, the word "concussion".

THE COURT: With no response?

MR. DONOHO: Well, there is a response. They could serve up the public webpage that says concussion -- that it offers concussion services or, you know, the --

THE COURT: What I mean, no response tailored to or about the specifics of John Doe?

MR. DONOHO: Correct. It's just specific to the public. Here are the doctors we offer that have concussions -- sorry, here the services that we provide about concussions. That's it.

THE COURT: Okay.

MR. DONOHO: And so, the 7th Circuit, similarly anonymous, but again, this was even more disclosure in the 7th Circuit, because these were medical records. These had to have medical conditions and more than just the word "concussion".

Consider both of these overpayment and underpayment theories, and the analysis in that case should be followed here. The Court rejected the overpayment theory for a couple of reasons. One, because it is, "It is wholly implausible," and the plaintiff here doesn't allege

anything to the contrary.

THE COURT: And the plaintiff doesn't allege what?

MR. DONOHO: Anything to the contrary, that the hospital charged this discrete patient's website confidentiality fee. It didn't. There's no allegations that that happened. There's no allegations that this web browsing patients paid different from non-web browsing patients.

Moreover, the Court said, "Plaintiff has not alleged a defect in his medical care." Also not alleged here. Further, said the Court, "Plaintiff's 'argument' that he would not have paid for the hospital's medical services had he known otherwise is similarly implausible." This all relates to the overpayment theory. Other courts have also rejected these overpayment theories as well. The Dinerstein case cites some of them.

The underpayment theory should also be rejected for multiple reasons. First of all, I've looked and I've not found any law in Massachusetts that says that a web user has a property interest in his button clicks on the website which are at issue here. Plaintiff has not cited any. Even hospital records are typically the property of the hospital, not the plaintiff. That was one reason that the Dinerstein case found no plausibly alleged underpayment damages as well.

But in addition, said the Court, "Even if the plaintiff has a property interest, his allegations do not support an inference that the value of that property has been diminished." So, here the only suggestion the plaintiffs makes in his complaint is that, you know, sometimes Facebook has paid money for some things. So, like Facebook was going to give him a reasonable royalty for the amount of whatever it was worth that he was supposedly offering to -- whatever the value of this information he was offering to Emerson was. The Court rejected that, too.

The district court in that case, faced with a similar allegation, said Google or the hospital would not have -- rejected the argument that, "Google or the hospital would have agreed to pay him the royalty that they had negotiated in good faith for his medical records." Come on, this is web browsing activities. That is basically the ruling there.

Now, other courts have also rejected as implausible, similar allegations for underpayment theories, also cited in the Dinerstein case. So, I've given you two reasons to dismiss the breach of fiduciary claim.

That lack of damages is a reason also to dismiss the implied contract claim, which I'll discuss next. But there are two further reasons on the implied contract claim.

First, there's been no implied consent here from Emerson to refrain from the disclosures to Facebook and Google of anonymized queries at issue here. That's not covered by the privacy policies that plaintiff cites in his complaint. I'm not referring to anything cited in our, Your Honor, in our papers. Plaintiff cites his own privacy policies. It's not covered by those. But even if it was, that would be an express contract claim, not an implied contract claim, anyway. So, that would be another reason that implied consent claim would fail.

But also, there's nothing about the conduct here of the parties of accepting anonymized browsing activity on a public website that implies consent that we can't forward that information. It's anonymized and it's just clicking on the word "concussion".

A third reason I'll give you, Your Honor, for why this breach of contract claim should be dismissed. And plaintiff did not even respond to this one in his response brief. What he said in response, actually, was at Page 8, he says, "HIPAA prohibits healthcare providers like Emerson from disclosing their patients' personal health information to third-parties for marketing purposes."

In other words, argues the plaintiff, HIPAA prohibits the very conduct that, plaintiff argues, was in breach of a contract. But in Massachusetts and everywhere else,

there's -- that does not amount to any bargain for consideration. There's no consideration for agreeing to refrain from doing something that the law already prohibits you to do, as plaintiff argues, prohibits. And lots of cases have found that where plaintiffs allege promises that amount only to promises to refrain from violating HIPAA, like a plaintiff argues he alleges here, then courts have dismissed those claims.

We cited the Brush case in our opening brief, the plaintiff himself cited a case that dismissed on that same ground, In re Anthem. That's -- there were a couple of those. That was the one with the Westlaw site on May 27th, 2016. There are other cases, too. The plaintiff did not even respond to that argument. So, that's three reasons to dismiss the breach of implied contract claim.

Moving on to the -- I'll pause there for a moment before I move on to the unjust enrichment claim. Okay. So, the unjust enrichment also has not been plausibly alleged for two reasons.

One, there's been no plausibly alleged benefit or enrichment. Again, this is only the underpayment or overpayment theories that have been alleged here. Anything else that's been alleged is not an economic benefit and therefore cannot support an unjust enrichment.

In addition, if the Court were to find some plausibly

alleged benefit to Emerson, which we submit it should not, any -- there are no plausible allegations that any such enrichment was unjust for three reasons. One, if so, it would be only de minimis, but the same de minimis benefit also inured to plaintiff's benefit. You received advertisements being directed for his benefit in return. That's what those advertisements do. It's a win-win. This is how Facebook works.

In addition, he agreed to receive those advertisements. And the Court need --

THE COURT: In addition, he agreed what?

MR. DONOHO: He agreed with Facebook to receive those advertisements. And the Court does not need to look at any papers attached to our motion to see that. The Court need only look at, for example, Smith v. Facebook, 745 F. App'x 8, in the 9th Circuit, 2018, where the 9th Circuit held -- well, that's basically how Facebook works. Plaintiffs, in general, do -- that's what they are deemed as consenting to when they sign up to Facebook.

The Court could also look at plaintiffs' own case, cited in their response at a In re Facebook, Inc., Consumer Privacy User Profile Litigation. That case granted a motion to dismiss on plaintiff's consent for users who established Facebook accounts after 2009. There was a difference before 2009, but after 2009, because the court

found that in 2009 is when Facebook started to disclose its data sharing practices. This has been around for a long time. Here the events occurred in 2022. But consent is just one factor. They did receive these advertisements.

Another reason there's no plausible allegations of any enrichment being unjust is that Emerson didn't understand that a side order of an additional payment for data privacy to prevent the data clicks, the overpayment. Any payment by plaintiff, Emerson only understood that to be for healthcare services. There's no allegations that Emerson understood it to be anything else. Just because plaintiff might have subjectively, in his head, thought that part of what he was paying for was to not share those button clicks. There's no allegation that Emerson understood that, and that is another reason for finding no plausible allegations that any enrichment was unjust.

Two more claims. Next one, invasion of privacy. Under the statute, the standard there is whether gathering or disseminating of private facts resulted in an unreasonable, substantial, or serious interference with privacy. We submit that that standard has not been met here. The facts allegedly gathered here are not private. They're "queries". That's a quote from the plaintiff's complaint. The plaintiff made on a public website. This is not highly personal information. It is anonymized.

The fact that someone made these queries and was allegedly disseminated only to Facebook and Google on their secure servers, there's no publicity here. At most, what the plaintiff alleges here is that his anonymized information was sent amidst lines of computer code to Facebook and Google with no allegation that this information was seen by anyone or that anyone could do the -- any correlation to match that with plaintiff's real identity, that's his word, real identity, other than a cryptographic hash function on a Facebook server that he signed up to. This is not highly offensive, it's routine commercial behavior.

The plaintiff himself says this happens on millions of websites. It's just queries about concussions. It only went to Facebook's server because he asked it to. He still has a Facebook account, too. Paragraph 103 of the complaint says that, even though these same types of disclosures for his ordinary website activities are being served up to him every day on his Facebook feed.

This case is just like the In re iPhone Application Litigation case we cited in our brief. That case involved information allegedly disclosed to third-parties that included unique device identifier numbers, personal data, and geolocation information from plaintiff's iPhones and other iDevices. And the Court held, even assuming this

information was transmitted without plaintiff's knowledge and consent, a fact disputed by plaintiffs, even assuming that, "Such disclosure does not constitute an egregious breach of social norms." Neither does this. As the plaintiff himself says, "Happens on millions of websites." This is normal action.

Finally, the Wiretap Act. And I saved the most important for last. This case seeks damages here on a scale that's catastrophic and unprecedented. It's the reason many people are on Zoom here today and the others are in the courtroom, too. This threatens the Commonwealth's economy. If in a case like this, the Court finds there's a wiretap claim. Give some background on this wiretap claim -- the statute. It was enacted in 1968, just like the Federal Wiretap Act also that enacted in 1968.

In enacting it, the legislature was concerned principally with "The investigative use of surveillance devices by law enforcement officials to eavesdrop surreptitiously on conversations." That's Commonwealth v. Rainey, 493 Massachusetts 632. If you've seen that supplemental submission to Judge Kazanjian, it's -- you'll be familiar with that.

What the legislature had in mind with this statute was discrete acts of using a surveillance device eavesdropping

on a telephone conversation. And so, what the court needs to ask itself here with today's modern technology is, are the events at issue here moving forward with today's technology analogous to discrete acts of intercept -- of using an intercepting device to intercept a telephone conversation? We submit no, because there has been neither an intercepting device used here, nor an interception that occurred here, as both of those terms are defined in statute. And I'd like to address each of those portions.

There's my statute. Intercepting device, under the statute means "Any device or apparatus which is capable of transmitting, receiving, amplifying, or recording a wire or oral communication other than," and then it lists some exceptions. We submit there's been no intercepting device here because what was used was the Meta Pixel and that's software and it's not a "device or apparatus".

THE COURT: What about the cases that the plaintiff cites for the proposition that software equals intercepting device?

MR. DONOHO: Well, I'd like to --

THE COURT: Or code equals intercepting device?

MR. DONOHO: Yes. They do cite three cases in their response, and none of them involves that issue, whereas all three of the cases in our brief does involve this issue. I would love to talk about those cases.

So, in our opening brief, we cite three cases that found that what was really at use was software. And it's important to -- if I could just back up a second before I get to these cases and explain, and why I keep emphasizing the word "use", because that's within the language of the statute. I'm relying on the language of the statute here.

THE COURT: Mm-hmm.

MR. DONOHO: Interception device -- interception means to secretly share contents of communications "through the use of any intercepting device." Okay. So, what is being used to make the alleged interception? Here, it's the Meta Pixel that's being used to intercept these anonymized button clicks.

THE COURT: And your contention is that the Meta Pixel is not an intercepting device?

MR. DONOHO: That's correct, because it's software for -- and that -- because it's being used -- for what it's being used for to allegedly intercept, it's software. It's only the Meta Pixel and that Meta Pixel is software. That's correct. And so, cases have --

THE COURT: And should I take into account the enormous advances in electronic communications and computer science and data?

MR. DONOHO: Yes, Your Honor. Sure. Your Honor should also pay attention to the language of the statute,

which I'd like to address some more.

But in addition, as I said at the beginning, what the question that this court needs to ask is, when looking at those -- looking at today's technology, is that analogous? Not is it actually telephone equipment, but is what's happening on the fax, in this case, analogous to a conversation? And it is not. There's no conversation occurring here. What's occurring here is the word "concussion". The speaker has an identity.

THE COURT: Isn't that communication? And I realize that the word says conversation -- the statute says conversation. The concept you read broadly as some oral communication, I mean, if you -- this is a two-party consent state. If you just do a -- take a video of somebody without the audio component, without consent, that's very different than a video with an audio and visual component, right?

MR. DONOHO: Correct. And --

THE COURT: So, if there is communication of some form by way of access to the website and what the Meta Pixel does after access to pick up that communication, does that not fit within the statute?

MR. DONOHO: It doesn't because it's not a device or apparatus, Your Honor. It's --

THE COURT: Well, that goes back to that component,

but I thought you were arguing that it isn't conversation.

Go ahead, Mr. Donoho. You're going to have to -- I'm going to give you a few more minutes, and then I have to turn to the plaintiffs. Okay?

MR. DONOHO: Thank you, Your Honor. I'll wrap up quickly here.

THE COURT: Good. Thank you.

MR. DONOHO: The cases in our brief, they involve session replay software, which is software code on a website, that's Connor v. Whirlpool, Jacome v. Spirit Airlines, Whirlpool and Spirit Airlines used software on their website. The courts found that that software -- what was being used for an interception was software, and that software was not a device or apparatus, and it was for no intercepting device.

Also, Potter v. Havlicek found that using single-spy software, putting it on a plaintiff's computer, what was being used was the software. Here there's no plausible allegations that Emerson was using anything else than the Meta Pixel. Plaintiff was using his hardware devices. I urge you to follow our cases. And their cases just do not address whether software was a device or was at use.

I will say, there's a notice of additional authority that they've cited, Doe vs. Boston Medical Center. And this is where Judge Kazanjian has found, in a short

paragraph, that the Meta Pixel in that case was acting like a device. Just to be upfront about that, but I -- we would respectfully request that you do not follow Judge Kazanjian's opinion for two reasons.

One, we think that the reasoning in Connor, Jacome, and Havlicek, the three cases we've cited, is more persuasive.

In addition, we don't think that the Boston Medical Center case and the cases that Judge Kazanjian cites are applicable on the facts in this case. Part of what Judge Kazanjian said in her opinion was that the communications at issue in that case were "the modern equivalent of telephone inquiries and conversations". Basically, just what Your Honor was suggesting, what we've asked you to do is to figure out what's analogous in modern technology with old tech moving back to 1968.

That case was a portal case. There, a user logged in, identified himself, could have some interactions like a cop phone conversation, that didn't happen here. And so, there's nothing like a surveillance device of the type that was envisioned by the legislature in 1968.

Finally, there's been no interception. There's several reasons for this.

THE COURT: Okay. One minute, Mr. Donoho.

MR. DONOHO: Thank you. The interception should be

interpreted to be only if there's an invasion of privacy. It says so in aggrieved person's definition. The rule of lenity applies. This is a criminal statute. There was consent. It was not secret that what was happening here was an interaction with Emerson. That's the Curtatone v. Barstool Sports case cited in the supplemental authority Your Honor mentioned.

Finally, it would be -- Your Honor needs to consider the effects of what today's ruling would mean. This occurs on millions of websites. Plaintiff has alleged that. We're talking tens, hundreds of million dollars, not just for Emerson. It's a non-profit, small hospital, already struggling. It's not just -- this would devastate it. This is not just for Emerson. This is for all the other companies that this would affect. There's at least two dozen Pixel cases in the state. If the case -- if this court were to make a new ruling, this is one test case, though. This is a non-portal test -- non-portal case. This is just generalized web activity. There's been no ruling in a Wiretap Act claim in a case like this.

If this Court rules like this, the results would be absolutely catastrophic for the Commonwealth. There's been no intercepting device, no interception under the meanings of those words in the statute. We ask that the Court dismiss the plaintiff's complaint. Thank you.

THE COURT: All right. Thank you, Mr. Donoho.

Mr. Merrigan?

MR. MERRIGAN: Thank you, Your Honor.

I will try to talk about the concepts at play here, which, I think, fit into each of the claims, rather than go in detail on each. Much of the -- but I'm going to begin with the fact that every case cited is less persuasive than the four cases that are on point that are rendered by state court judges here in Massachusetts, addressing the exact subject matter that we're here to talk about today.

I do not understand quite where the argument that -- of what was limited by what was taken from the plaintiff in this case as to just be the fact that he entered in a concussion. It's alleged in the complaint, the information disclosed includes the exact content of communications exchange between plaintiff with defendant, including but not limited to information about treating doctors, potential doctors, conditions, treatments, appointments, search terms, and goes on.

How does this happen in just practical way of the way any user would be? When we use the Internet and we see advertisements about, let's say, hypothetically, a knee brace. And I have a bad knee. And I was on the website looking at an orthopedic surgeon, and all of a sudden, I'm getting an advertiser. That information is taken from the

mosaic of data that was captured by a Pixel and recorded and then provided to a third-party. That's how I'm getting that at. And then that data is used in billions of data points to create like audiences such that if Your Honor had a bad knee, you'll now start -- because of the similar search patterns and interactions with the defendant's website, you'll start to get it.

So, the effects of my data in that hypothetical fact pattern are actually being used to market the defendant in this case. They're using it for marketing purposes.

THE COURT: Okay. Let me ask you a question. Your hypothetical doesn't include the allegation that the person conducting the search on a public website was identified in any way, or that the nature of the search or the content of the search was tied to a particular person.

MR. MERRIGAN: But it does when it's being regurgitated to every electronic device and television, and every single place that I can possibly go, the Internet and a third-party is now in possession of my data.

THE COURT: So, are you saying that it doesn't matter if all of this is anonymous and none of it ever gets tied to John Doe?

MR. MERRIGAN: Yes. Absolutely. If you can visit a website about any -- I mean, we're using a pretty bland version of private medical information with a bad knee,

sexual private information, HIV information, all of that is now free to be dispersed to advertisers back to me?

THE COURT: Well, is it information or is it a query on the topic?

MR. MERRIGAN: It's the constellation of the data that has been recorded without my consent or knowledge while interacting with the defendant's website for the defendant's marketing benefit, for Facebook's marketing benefit, and then others that are now monetizing and creating a marketplace for that data.

THE COURT: So --

MR. MERRIGAN: There's a marketplace for my private health information.

THE COURT: Well, what if Jane Doe conducted a search about some medical topic or medical issue that just biologically didn't even relate to Jane Doe, would -- and the same occurred?

MR. MERRIGAN: She's not interacting with a licensed professional that practices medicine, just like if someone asked for legal advice from me or talk to shared private information.

THE COURT: No. I'm talking about in your hypothetical, if you -- if Jane Doe conducted the search of a particular medical issue that clearly was not relevant to Jane Doe, but she was doing it for somebody else, but it

was on the Emerson Hospital or some other healthcare provider's website. Does that --

MR. WARDEN: I can answer that.

MR. MERRIGAN: Well, I --

THE COURT: -- is that consistent with your --

MR. MERRIGAN: No.

THE COURT: -- I mean, would that --

MR. MERRIGAN: Because I think now we have like totem pole data sharing. So, no, I don't think so, unless my bro --

THE COURT: But I guess what I'm saying, the reason I ask that is, if somebody isn't identified by name or something more than an IP address, how is that person injured?

MR. WARDEN: May I address that, --

THE COURT: Go ahead.

MR. WARDEN: -- Your Honor?

THE COURT: Sure.

MR. WARDEN: I hate to butt in.

MR. MERRIGAN: No.

MR. WARDEN: But well, we have it.

THE COURT: Well, you have --

MR. WARDEN: Yeah, counsel for the defense said it's important to get the facts straight here.

THE COURT: It what?

MR. WARDEN: It's important to get the facts straight here, and we don't disagree with that. But at this stage, it's what we alleged.

THE COURT: Right.

MR. WARDEN: And what we have alleged is that the person is identified. So, every time --

THE COURT: And where is that specifically in the complaint?

MR. WARDEN: Okay. I was afraid you were going to ask that as soon as I opened my mouth. But it's in there. In our brief, we, you know, I'll find it in a minute when I turn it back over to Mr. Merrigan and give the Court the exact paragraphs, but if you will allow me to explain how the Meta Pixel works, I think it will -- and how we've alleged it works, I think it will take care of the person identification problem and the device problem, all at the same time.

THE COURT: Okay. Go ahead.

MR. WARDEN: So, when Your Honor, for example, types in the Internet address for Emerson Hospital, that signal is received by Emerson Hospital's server.

THE COURT: Mm-hmm.

MR. WARDEN: They send back to you sufficient information to open up the homepage. In that homepage, and every succeeding page that you might look at, is embedded

where the -- you can't see it, the Meta Pixel code.

THE COURT: Okay.

MR. WARDEN: That -- so now, you've got the Meta Pixel code on your machine. That Meta Pixel code directs your computer and your browser to do this for every key stroke and every page you view and every piece of information you enter to do two things.

One, it sends it back to Emerson so that you can get to the next page that you want. Two, it makes a copy of it, attaches to that copy, if it's the Meta Pixel, the Facebook cookie that you have already installed on your computer by Facebook, and sends that --

THE COURT: By being voluntarily enrolled in --

MR. WARDEN: Right.

THE COURT: -- whatever Facebook --

MR. WARDEN: Right.

THE COURT: -- license.

MR. WARDEN: When you voluntarily enroll in Facebook, it stores a cookie with your --

THE COURT: Mm-hmm.

MR. WARDEN: -- name, address, telephone number, a bunch of other stuff. So, it attaches that cookie to your query to Emerson and sends that to Facebook. So, that's the interception and that's how Meta Pixel works with --

THE COURT: Okay.

MR. WARDEN: -- with the devices.

THE COURT: All right. I understand that concept.

MR. WARDEN: And that's why it's not anonymized. Now, for Google --

THE COURT: Well, how does it identify and where do you allege, and I realize that I put you on the spot and asked you for the specific paragraphs, and frankly, I thought I had tabbed as --

MR. WARDEN: I've probably got it tabbed here, and I'll get that to your clerk before we leave. But so, the idea that it's anonymized is wrong. And for the Google --

THE COURT: So, how does it identify John Doe?

MR. WARDEN: Because you have, or John Doe, has on his computer a cookie that has all his information in it, data. It's attached to his query about Emerson Hospital, and that packet of information is then sent to Facebook. So, it's not anonymized at all. If it's Google --

THE COURT: Because it links to Facebook?

MR. WARDEN: Because you have a Facebook account.

THE COURT: Right.

MR. WARDEN: And Meta Pixel is given out to web browser developers free of charge for all the reasons we've alleged, so that they can do their advertising program. But it is definitely not anonymized and that changes the whole landscape.

And Google works in a slightly different way, but does essentially the same thing, because Google has all your -- it has cookies on your computer as well. And if you didn't even -- if you went and said, I don't want any cookies on my machine, because I'm worried about my privacy, these companies have enough data that they can do what they call a fingerprint -- a browser fingerprint, which with 99, it's in our brief, 99 point something plus percent accuracy, they can identify the person, name, address, telephone number, whatever. So --

THE COURT: And does Emerson Hospital have the identity of John Doe, as you call it, the real identity?

MR. WARDEN: They have the real identity, of course. Now --

THE COURT: By means of the Meta Pixel?

MR. WARDEN: Well, no, they have the identity because Emerson Hospital have the identity of John Doe, I can't sit here and tell you with certainty that Emerson then has it, but they have, you know, do they get that packet of material that Facebook gets? Do they get another copy of it on their server? I don't know. I'm sorry. But they release that information because they've chosen to put the Meta Pixel on their website.

THE COURT: They release what information?

MR. WARDEN: They release every keystroke that this

patient does on their website, plus if that patient is a Facebook subscriber, they release his personal identity.

MR. MERRIGAN: If I can make something clear, and it's -- we're talking about a pretty sophisticated interaction with software that takes the data and technology, and as he referenced, from a Facebook fingerprint or from the ability -- these companies, from a 99 plus percentage ability to identify somebody, it's all happening because Emerson is taking that data and sharing it with them. That's how those companies, the third-parties are able to identify. They're providing the connective information.

THE COURT: But then my question is, does that identifying information go back to Emerson?

MR. WARDEN: It doesn't have to. I mean, they are already communicating with the plaintiff.

MR. MERRIGAN: They've already disclosed it to a third-party, which is the essence that --

THE COURT: So, the dots that you're alleging have been connected or connect -- that you're saying have been connected in your allegations are that the identity of John Doe arises, or occurs, or the identification occurs once it goes to Facebook, right?

MR. MERRIGAN: Yes. And --

THE COURT: Okay. So, let me ask you this. Let's move on for a second. What was disclosed to Facebook? The

searches, and the searches were, as I understand it from the complaint, the search for -- about his concussions -- about concussions, in general, correct?

MR. MERRIGAN: Yeah. And Your Honor's question leads me to this kind of issue as to what the setting is for this hearing today, which is, we haven't got to do a discovery yet.

THE COURT: No. I --

MR. MERRIGAN: We're at a plausibility hearing, so --

THE COURT: I understand. That's why I'm asking --

MR. MERRIGAN: So --

THE COURT: -- what's alleged in, I mean, so --

MR. MERRIGAN: What's alleged in the complaint is information about treating doctors, potential doctors, conditions, treatments, appointments, search terms, bill payment, logins. Obviously, there aren't logins according to the defendant's representation.

THE COURT: So, Paragraph 85 of your complaint says, for example, plaintiff John Doe visited defendant's website in 2022 at with the website for Emerson and entered data including sensitive medical information such as details about his medical condition and doctor. The information that plaintiff John Doe transmitted included queries about treatment for his concussion. And so, it wasn't simply a query, how do you treat, you know, for example, how do you

treat concussions, or who do you have who treats concussions? The allegation is that John Doe included personal data, private health information about himself?

MR. MERRIGAN: Whether that's in -- John Doe communicated about light sensitivity and metallic taste in his smells, and dizziness, anything that John Doe communicated to the website to --

THE COURT: But what are the details? I mean, the --

MR. MERRIGAN: What are the details? The --

THE COURT: -- defendant in his motion says the what and how are not alleged in the complaint with any particularity?

MR. MERRIGAN: But because you're talking about every single thing, the details of somebody interacting with a website is their interactions with that website. So, on Paragraph 204 of the complaint, --

THE COURT: Okay. Hold on.

MR. MERRIGAN: -- that's where the details are listed.

THE COURT: Paragraph 204 of the complaint?

MR. MERRIGAN: Yes, Your Honor.

THE COURT: Maybe I have the wrong complaint. What does yours say?

MR. MERRIGAN: That's the highlighted section, I'll continued to read, "Information about treating doctors, potential doctors, conditions, treatments, appointments,

search terms, bill payment." I mean, those are pretty particular.

THE COURT: Okay. We digressed from what you were arguing. So, go ahead, you can go back to what you were arguing.

MR. MERRIGAN: In terms of some of the common law claims, the breach of fiduciary duty, unjust enrichment, this is a hospital that is taking pieces of information that it is using for marketing purposes. That's a benefit. It's a lot cheaper to do that and to generate lots of thousands of visits to a website for marketing purposes is a benefit, and they're leveraging the visitors' data for that reason. And they're retaining it. And they're putting it there with intention. They didn't put it there by mistake. When I was -- and to draw a connection when I said mosaic, and I'm talking about why we have search warrants to connect somebody's cellphone.

THE COURT: Yeah, I understand.

MR. MERRIGAN: So, yeah, that is what this data is doing when it's being triangulated, if it isn't a good enough term, to be able to track, identify who the person is and what their treatment is. I make the argument, irrespective of whether that identity does or doesn't exist, it still matters.

But as Mr. Warden confirmed, which is discussed in

extensive detail in the complaint, the accuracy in which they can identify a visitor. Not necessarily Emerson, but these third-parties.

So, let's say somebody walked up to a doctor, didn't introduce themselves, and they said, a bunch of private medical information, never introduced themselves. And that doctor walks away and says, that guy over there has X, Y, Z for medical condition. It's just somebody who can identify him. He has now disclosed private health information to another party that can identify that person. I know him. That's what's going on here in a very complex, sophisticated world. And why put it there? If it's so innocent, why put it there?

And I want to make one comment just because I know we have a lot of time eating up and I know Mr. Warden wants to talk about some of the wiretapping and I'm going to hand it over to him. The argument about software, if I hold my phone out and press record while you're talking without your permission, it's software that's recording you. It's not a tape recorder. It's software that's recording you. So, the idea that the technology is not a recording device, the software is not a recording device, isn't practical.

And lastly, this underpayment, overpayment, that was the point I wanted to make about -- and I chuckled because I'm probably exhausting Your Honor with argument, but the

underpayment, overpayment --

THE COURT: I'm not exhausted yet.

MR. MERRIGAN: All right. Good. The underpayment, overpayment, I don't -- like, that's -- and it's not a central discussion in any of these briefs, but to say it's not a benefit and doesn't have a marketing purpose is totally conflating the issue.

With that, Mr. Warden.

MR. WARDEN: Your Honor --

THE COURT: So, let me just ask one question before Mr. Warden takes over. The injury, the damages to John Doe and to the class, what are they?

MR. MERRIGAN: You want to handle that one?

THE COURT: I mean, what's alleged for injuries?

MR. WARDEN: Well, all sorts of things were alleged.

THE COURT: And that's --

MR. WARDEN: We don't have any discovery yet. So, that's --

THE COURT: No. No. I understand.

MR. WARDEN: Yeah.

THE COURT: And that's -- this is all in the context of the four corners of the class action complaint and the agreed document, the policy of Emerson Hospital --

MR. MERRIGAN: Yes.

THE COURT: -- at the moment?

MR. MERRIGAN: Yes. And to answer your question, the same injury that's alleged in many data breach and data privacy cases, this is private medical data that is specific to the user and is not to be spread. It's the same reason we have confidentiality. It's the same reason we have fiduciary duty. It is that person's private medical information which is not to be made public or leveraged for marketplace.

THE COURT: Okay. All right. Go ahead, Mr. Warden.

MR. WARDEN: So, you're good on the damages? You don't -- I can't really have --

THE COURT: Unless you want to --

MR. WARDEN: No. Let me --

THE COURT: -- succinctly say something else.

MR. WARDEN: -- take from the top of the page and then you cut me off when you're tired or when I'm not making any sense.

I've already talked about the fact that we've alleged that the patient actually is identified and, you know, and how that works. Of course, we don't have access to the portals. And while we haven't made any allegations about what's behind the portal, whether they have tracking devices there, we simply don't know yet. We'll find out in discovery, you know, hopefully.

But on the wiretap claim, secretly intercepted, and

they claim that we, because we signed up with Facebook, have agreed to, and have consented to actually have our medical data from Emerson collected by Facebook or -- by the Facebook Meta Pixel when sent out, it simply doesn't comport with your law here in Massachusetts that consent has to be actual knowledge and not this two-step affair.

There is nothing, by the way, and we have alleged this in our complaint, in the terms of service of Facebook that would notify anybody that their private medical data is going to be collected. And, in fact, we also point out, and this is pointed out in the cases cited in our brief, that the terms of service for Facebook expressly say to users of the Meta Pixel, like Emerson, don't give us anything you don't have a legal right to give us. Okay. And this kind of data is the kind of data that they do not have the legal right to give you under HIPAA and, you know, all kinds of other state laws. So, we're comfortable that we didn't consent and that it is secret. Plaintiff had no idea that Emerson had installed these tracking devices on their website.

Intercepting device, I think we're clear on that already. The Meta Pixel -- software doesn't do anything without, you know, a machine to control. The machine to control, like your computer, doesn't do anything without software. They are together the device and we've alleged

that in the complaint. And on top of that, if you want to get granular and say, is software itself a device, there, we've given you cases on that, and I think your judge, I'm going to say it wrong, Kazanjian?

THE COURT: Kazanjian.

MR. WARDEN: Kazanjian cited a bunch of cases in that opinion, in both of those opinions, specifically about software being a device under the Massachusetts Wiretap Act. So, we're comfortable there.

Finally, if you want to really get granular on that language, device -- any device or apparatus has to be read as device and apparatus meaning two different things, right? And there is no -- first, the judge in that other case rejected the black law's interpretation of device and went with a more common dictionary definition because it's not defined in the statute. And the more common definition of device is much broader.

THE COURT: Of apparatus.

MR. WARDEN: Of device, yes. Now, of apparatus, there's no definition in the statute, but that has to mean something. The judge in that case, Judge Kazanjian, did not address this argument, but it's in our brief that those two words have to mean something different. And we suggest that apparatus is much broader and includes software. But there's four different ways to get at that.

On the invasion of privacy --

THE COURT: And is that disclosure of the facts or the intrusion upon solitude and --

MR. WARDEN: Pardon me.

THE COURT: -- seclusion? I think. I said, is -- the theory alleged the invasion of privacy claim is based on disclosure of private information or the intrusion upon the plaintiff's seclusion or solitude?

MR. WARDEN: Well, I think we've probably rolled in both. But it's the disclosure -- the fundamental is the disclosure of private information, which one could argue also invades their solitude, depending on what the information is. But all we have to, in Judge Kazanjian's opinion in the Boston Medical Center case, addressed the invasion of privacy claim clearly on Pages 8 and 9. And it's just sufficient to allege the disclosure of private information. That's all you have to do. And you have to say by what means, but you don't have to say what was it used for. And we allege by what means. So, I think on the allegations, the invasion of privacy claim is pretty solid. The --

THE COURT: Mr. Warden, I'm going to ask you to wrap up in a minute or two. Okay?

MR. WARDEN: How about 30 seconds?

THE COURT: Because I have two other matters. What is

that?

MR. WARDEN: How about 30 seconds?

THE COURT: Oh, good. Perfect.

MR. WARDEN: So, for the invasion of privacy claim, if you want to look at a Massachusetts case, look at Doe versus Boston Medical Center by Judge Kazanjian. And if you want to see how that court in Partners Health and the BJ's Wholesale case addressed the --

THE COURT: Okay. Those cases are cited in your papers.

MR. WARDEN: Right.

THE COURT: Yeah.

MR. WARDEN: Look at the Doe versus the Children's Hospital.

THE COURT: Okay.

MR. MERRIGAN: Your Honor, --

THE COURT: All right. Yeah.

MR. MERRIGAN: -- I have a proposed order, if Your Honor wishes to review it, or I'm happy to offer it to the Court. But --

THE COURT: Proposed order for the motion to dismiss?

MR. MERRIGAN: Denying defendant's motion to dismiss.

THE COURT: I'll take it.

MR. MERRIGAN: Okay. And a --

THE COURT: You can give it to the clerk.

MR. MERRIGAN: -- final point, Your Honor, in response to the policy argument made by a defendant about the implications of this, there needs to be a line with artificial intelligence and data and where that line is drawn. This is a well-insured defendant, and so the epic fear of damages needs to be taken into consideration with that.

THE COURT: Okay.

MR. MERRIGAN: Thank you, Your Honor.

THE COURT: All right. Thank you very much.

MR. WARDEN: Thank you, Your Honor.

MR. DONOHO: Your Honor, if I have just a few minutes to correct the record on a few points.

THE COURT: I will give you one minute, Mr. Donoho.

MR. DONOHO: Thank you, Your Honor.

Paragraph 204 does not plausibly allege that the patient has identified himself. It says bill payment and logins.

THE COURT: It says what?

MR. DONOHO: Counsel referred to bill payment and logins. First of all, there's no detail on what that means. But it also conflicts with Plaintiff's own allegations where he said, visited emersonhospital.org website. That is the public website. That is a different website from the patient portal website. There's been no

portal allegations here. There's been no identification of the portal.

Paragraph 91, which is what I thought it was going to say, was where it has a picture of an example of someone identifying himself. But that also does not apply to the plaintiff. It's a different plaintiff with a different address, Essex County versus Boston. There's just no identification here.

And if the Court is inclined to dismiss and let the plaintiff amend, I would like to know if any amendment would be futile to, not only do they not have any information about the portal, as counsel admitted, Your Honor also has a sworn affidavit by the Chief Information Officer in response to the motion of compel that says there was no advertising technology on the portal, on the login page to the portal, on the gateway to the portal. There's been no identification. It's all anonymized information. The only identification, 97 percent accuracy, is being able to serve ads. It's not knowing it's John Doe. And it's with that hash function.

THE COURT: Okay. All right. I'll take this under advisement. Thank you very much.

MR. MERRIGAN: Thank you.

MR. WARDEN: Thank you, Your Honor.

(Matter concluded at 4:11 p.m.)

John Doe v Emerson Hospital, 10/12/23, 2277CV01000

The Commonwealth of Massachusetts
ADMINISTRATIVE OFFICE OF THE TRIAL COURT
Office of Transcription Services (OTS)
Two Center Plaza
Boston, Massachusetts 02108

# AUDIO ASSESSMENT FORM (AAF)

***Approved Court Transcriber:*** *Complete one (1) Audio Assessment Form (AAF) for each volume of transcript, attach the original AAF to the next to last page of each volume of transcript, and FAX a copy of the AAF to OTS at 617-878-0762.*

TODAY'S DATE: 11/3/23 TRANSCRIBER NAME: Benjamin Gold

CASE NAME: John Doe v Emerson Hospital DOCKET NO.: 2277CV01000

JUDGE: Janice W. Howe RECORDING DATE: 10/12/23

TRANSCRIPT VOLUME: 1 OF 1

**QUALITY OF AUDIO:**
**(check one)**
☑ excellent ☐ good ☐ fair ☐ poor

**TYPE OF AUDIO:**
**(check one)**
☐ CD ☐ TAPE

**(check all that apply)** — **TIME STAMP or INDEX NUMBER**

☐ background noise ______
☑ low audio — 3:02:12, 3:02:24
☐ low audio at sidebar ______
☐ simultaneous speech ______
☐ speaking away from microphone ______
☐ ______
☐ ______
☐ ______
☐ ______

COMMENTS: ______

C E R T I F I C A T E

I, Benjamin K. Gold, a Professional Verbatim Reporter, do hereby certify that the foregoing is a true and accurate transcript prepared to the best of my ability, from the audio recording produced by Court Personnel of the District Court Department court proceedings in the above entitled matter.

I, Benjamin K. Gold, further certify that the foregoing is in compliance with the Administrative Office of the Trial Court Directive on Transcript Format.

I, Benjamin K. Gold, further certify that I neither am counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken, and further that I am not financially nor otherwise interested in the outcome of the action.

(The proper name spellings herein, unless otherwise indicated, are phonetically spelled.)

//Benjamin K. Gold // 11/3/23

PLEASE NOTE: THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION OF THE SAME UNDER THE DIRECT CONTROL AND\OR DIRECTION OF THE CERTIFYING TRANSCRIBER.

Benjamin Gold, Professional Verbatim Reporter
Benjamingold731@gmail.com

# Keyword Index


**#**

**#3000** [1] 3:18

*****

***** [32] 1:6,6,6,6,6,6,6,6,6,6,6,6,7,8,9,10,11,12,13,13,13,13,13,13,13,13,13,13,13,13,13

**0**

**01301** [1] 1:19
**02110** [1] 3:3
**02210** [1] 1:24

**1**

**1** [3] 1:1,1,2
**103** [1] 26:17
**11/20/2020** [1] 15:17
**1100** [1] 2:16
**111** [1] 2:22
**12** [1] 4:5
**1221** [1] 2:3
**12th** [1] 2:16
**15** [7] 6:1,7,12,23 7:2,3,13
**150** [1] 2:10
**16** [3] 6:5,25 7:1
**17** [2] 7:14,15
**17.1** [1] 7:14
**17.5** [1] 7:14
**18** [2] 4:17 5:18
**1968** [4] 27:15,16 32:14,19

**2**

**2:56** [1] 4:10
**20005** [1] 2:17
**2009** [4] 24:25 25:1,1,1
**201** [1] 3:7
**2016** [1] 23:14
**2018** [1] 24:17
**2020** [1] 15:10
**2022** [2] 25:4 43:18
**2023** [1] 4:5
**204** [3] 44:14,17 53:14
**2049** [1] 3:18
**209-918-1123** [1] 2:18
**2277cv01000** [1] 1:9
**2277cv1000** [1] 4:13
**2300** [1] 3:24
**2500** [1] 2:4
**2540** [1] 3:2
**2555** [1] 3:12
**268** [1] 1:23
**27th** [3] 7:16 8:13 23:13

**3**

**3** [1] 4:4
**30** [2] 51:22,25
**305-960-6923** [1] 3:9
**312-741-5220** [1] 2:13
**3200** [1] 3:7
**33131** [1] 3:8
**393** [1] 1:18

**4**

**4/25/23** [1] 8:11
**4:11** [1] 54:22
**4100** [1] 2:11
**413-774-5300** [1] 1:20
**415-544-1904** [1] 4:1
**424-324-3477** [1] 3:20
**4700** [1] 2:23
**493** [1] 27:21

**5**

**51** [1] 15:23
**55** [1] 1:2
**555** [1] 3:23

**6**

**60606** [2] 2:12,24
**617-391-9001** [1] 1:25
**617-531-1411** [1] 3:4
**632** [1] 27:21
**64108** [1] 3:13

**7**

**745** [1] 24:16
**77010** [1] 2:5
**7th** [3] 18:23 19:18,20

**8**

**8** [3] 22:20 24:17 51:13
**816-559-0306** [1] 3:14
**85** [1] 43:16

**9**

**9** [1] 51:13
**90067** [1] 3:19
**91** [1] 53:25
**94105** [1] 3:25
**97** [1] 54:15
**99** [3] 41:5,6 42:5
**9c** [5] 7:15,17 8:3,5,12
**9th** [2] 24:17,17

**‘**

**‘argument’** [1] 20:13

**“**

**“any** [1] 28:11
**“concussion”** [8] 11:3,5,10 16:7 19:6,22 22:16 30:9
**“device** [1] 28:16
**“even** [1] 21:3
**“google** [1] 21:15
**“happens** [1] 27:6
**“hash”** [1] 11:21
**“hey** [1] 17:11
**“hipaa** [1] 22:21
**“information** [1] 44:22
**“it** [1] 20:1
**“plaintiff** [1] 20:11
**“plaintiff’s** [1] 20:13
**“queries”** [2] 19:5 25:23
**“such** [1] 27:4
**“the** [2] 27:18 32:10
**“through** [1] 29:9
**“use”** [1] 29:5
**“wildly** [1] 11:13

**A**

**ability** [2] 42:4,5
**able** [5] 11:16,20 42:8 45:19 54:15
**about** [45] 11:24 12:5,17 13:10 14:2,5 17:14,22 19:12,15 22:12 26:15 28:17,25 32:1 34:2,8,15,20 35:22 36:13,20 40:13 41:3 42:2,25,25 43:12,20,21 44:1,3,11,22 45:14 46:14,15,22 48:16,19 50:5 51:22,25 52:25 54:9
**absolutely** [2] 33:20 35:21
**accepting** [1] 22:13
**access** [5] 13:21,23 30:19,20 48:18
**accessing** [1] 14:11
**according** [1] 43:14
**account** [3] 26:17 29:21 40:17
**accounts** [1] 24:25
**accuracy** [3] 41:6 45:24 54:15
**acoustics** [1] 5:8
**act** [4] 27:8,16 33:18 50:6
**acting** [1] 31:25
**action** [3] 4:13 27:7 47:20
**activities** [2] 21:18 26:19
**activity** [4] 13:18 14:16 22:13 33:17
**acts** [2] 27:25 28:4
**actual** [2] 13:5 49:4
**actually** [10] 8:4 12:18,24 14:7 15:10 22:20 30:5 35:7 48:17,25
**addition** [7] 13:3 21:3 24:1,10,12 30:2 32:6
**additional** [4] 16:14 17:5 25:8 31:22
**address** [16] 11:19 13:22 14:1,3,5,6 28:9 30:1 31:21 37:10,12 38:18 39:19 41:7 50:20 54:4
**addressed** [6] 7:2,3 15:10 16:16 51:12 52:6
**addressing** [1] 34:7
**admitted** [1] 54:9
**ads** [1] 54:16
**advance** [1] 5:11
**advances** [1] 29:22
**advertisements** [8] 11:25 12:2 24:7,8,10,14 25:5 34:20
**advertiser** [1] 34:23
**advertisers** [1] 35:25
**advertising** [3] 11:13 40:21 54:11
**advice** [1] 36:18
**advisement** [1] 54:19
**affair** [1] 49:4
**affect** [1] 33:13

# Keyword Index


affidavit [1] 54:10
afraid [1] 38:7
after [7] 7:17 8:13 12:25 15:5 24:25 25:1 30:20
afternoon [1] 4:25
again [5] 7:14,16 13:18 19:19 23:22
against [1] 12:18
aggrieved [1] 32:25
agreed [6] 21:16 24:10,12,13 47:21 48:25
agreeing [1] 23:3
aguiniga [1] 2:19
ahead [9] 13:11 14:13 16:13 17:6 31:1 37:13 38:16 45:2 48:7
ahmad [1] 2:2
airlines [2] 31:10,10
alberts [1] 17:11
alberts-devine [1] 17:10
alex [1] 2:14
alfred [1] 3:10
all [46] 4:14 5:7,11,16 6:19 7:4,14 8:18 9:3,12 10:10 11:6 12:12,14 14:8 15:4 17:1,8,23 20:15,20 28:23 33:12,24 34:22 35:19,24 38:14 39:25 40:12,15,20,25 42:6 47:1,13,19 48:7 49:14 51:11,15 52:15 53:8,19 54:14,18
allegation [6] 14:12 21:14 25:15 26:7 35:10 43:25
allegations [17] 10:19,23 17:22 20:7,8 21:4,21 24:3 25:6,11,16 31:18 42:18 48:19 51:18 53:20,23
allege [7] 20:2,4 23:6 40:4 51:14,17 53:14
alleged [32] 10:20 12:4 14:5,9 17:18 18:4 19:1 20:11,12 21:1 23:19,21,23,24 24:2 29:11 33:8 34:12 38:1,3,13 40:20 43:10,11 44:9 47:12,13,25 48:16 49:5,23 51:4
allegedly [4] 25:23 26:3,23 29:18
alleges [3] 11:12 23:8 26:5
alleging [1] 42:16
allow [2] 9:24 38:11
along [1] 4:23
already [8] 6:14 23:4 33:10 39:9 42:13,14 48:16 49:20
also [29] 5:3,13,13 9:8,9 12:21 13:3 15:21 16:14 17:9,20 20:12,16,19 21:20,21,24 22:12 23:19 24:6,21 27:16 29:25 31:15 49:8 51:10 53:20 54:2,9
amend [1] 54:7
amended [1] 4:16
amendment [1] 54:7
amidst [1] 26:6
amount [5] 18:3,19 21:9 23:2,6
amplifying [1] 28:12
an [28] 8:9 17:13,24,24 18:20,20,24 21:4 22:9,9 23:24,25 25:8,20 27:4 28:5,7,7 29:15 30:9,16 31:12 32:24 33:3 34:22,23 37:10 54:1
analogous [5] 16:19 28:4 30:4,6 32:13
analysis [2] 18:24 19:24
angeles [1] 3:19
anonymized [18] 13:17 14:16 15:22 16:7 19:2,4,5 22:4,13,15 26:1,5 29:12 40:1,9,15,22 54:14
anonymous [2] 19:19 35:19
another [7] 14:24 17:17 22:10 25:6,15 41:18 46:8
answer [2] 37:1 47:24
anthem [1] 23:12
any [31] 12:5,19,23 13:10 14:23,23 16:3 17:17 20:21,23 23:2 24:3,3,14 25:6,9,16 26:8 29:10 34:19 35:12,22 41:2 44:9 47:3,15 48:14,19 50:9 54:7,8
anybody [1] 49:7
anyone [3] 11:16 26:8,8
anything [13] 13:22 17:14 18:14 20:2,5 22:6 23:23 25:12 31:18 44:4 49:11,20,22
anyway [1] 22:10
anywhere [1] 13:16
apologize [2] 5:11 10:8
app'x [1] 24:16
apparatus [8] 28:11 30:23 31:13 50:9,10,16,17,22
apparatus" [1] 28:16
appearances [3] 1:15 2:8 3:16
applicable [1] 32:8
application [1] 26:21
applies [2] 17:19 33:1
apply [1] 54:2
appointments [3] 34:16 43:13 44:23
approach [1] 4:12
april [2] 7:16 8:13
are [52] 5:8 9:2,4 10:11,19 11:13 12:3,22 13:4,5,19 14:8 15:24 16:15,21,23,23 17:2,4,7 18:1,4 19:14 20:23,24 22:1 23:14 24:3,19 25:23 26:19 27:11,11 28:2,8 32:7 34:6,6 35:7,18 36:7 42:8,12,18 44:6,7,9,16,24 47:10 49:23 52:7
aren't [1] 43:14
argue [9] 8:25 9:5,8,8,13,20,22,24 51:9
argued [2] 15:22,23
argues [4] 22:24,25 23:5,8
arguing [4] 9:5 30:25 45:2,3
argument [9] 9:22 21:15 23:15 34:9 45:20 46:15,23 50:20 52:25
arguments [1] 9:10
arises [1] 42:19
around [1] 25:3
artificial [1] 53:2
as [32] 4:12 6:6 7:13,14 10:1 11:12 13:1,25 14:9 15:22 20:17 21:1,20 23:4 24:19 27:5 28:8 30:2,12 34:11 38:8,8 40:6 41:1,10 42:3,24 43:3,19 45:23 50:10 54:9
ask [11] 5:6 12:4 28:2 30:3 33:22 35:9 37:9 38:7 42:22 47:8 51:20
asked [4] 26:16 32:12 36:18 40:4
asking [1] 43:8
assuming [2] 27:1,3
at [40] 4:10 8:8,23 10:10 11:7 14:20 15:13,22 16:2 20:23 22:4,20 24:14,16,21,22 26:4 28:3 29:2 30:2,3,4 31:21 32:9 33:13 34:2,22 35:1 37:24 38:14,23 40:15 43:7,18 47:23 50:23 52:3,3,11 54:22
attached [5] 6:14 9:2,11 24:15 40:13
attaches [2] 39:8,20
attention [2] 8:5 29:25
audiences [1] 35:2
audio [2] 30:15,16
authorities [2] 15:2 17:5
authority [4] 16:14 18:22 31:22 33:4
avenue [1] 2:16
aware [1] 13:16
away [1] 46:5


## B


b [2] 2:6 4:2
back [11] 9:13,23 29:3 30:24 32:14 35:25 38:10,21 39:6 42:11 45:2
background [1] 27:14
bacon [6] 2:21 3:1,6,11,17,22
bad [3] 34:21 35:2,23
bargain [1] 23:2
barstool [1] 33:4
based [3] 9:23 14:7 51:4
basically [3] 21:18 24:18 32:11
be [33] 5:9 6:11 7:19 8:24 10:5,7 13:14 19:24 20:19 22:9,10,18 24:5 25:10,12 27:23 32:1,23,24 33:6,19 34:11,19 35:25 45:19 48:2,

# Keyword Index


5 **49**:3,8 **50**:9 **53**:1,4 **54**:8
**because** [36] **6**:20 **7**:19 **8**:24 **11**:11,12 **12**:11 **14**:5 **16**:4 **18**:21 **19**:20 **20**:1 **25**:1,12 **26**:16 **28**:6,15 **29**:5,16,17 **30**:22 **35**:3 **37**:6 **40**:11,16,17,25 **41**:3,14,20 **42**:6 **44**:11 **46**:12,22 **48**:24 **50**:13 **51**:23
**been** [31] **6**:20 **8**:5 **10**:20 **12**:25 **13**:12,13 **14**:23 **16**:25 **17**:17 **18**:12,15,18 **21**:5 **22**:2 **23**:19,21,23,24 **25**:3,22 **28**:6,14 **32**:20 **33**:17,20 **36**:4 **42**:16,17 **53**:23,24 **54**:13
**before** [8] **1**:14 **8**:16 **10**:20 **23**:18 **24**:25 **29**:3 **40**:8 **47**:8
**begin** [1] **34**:4
**beginning** [1] **30**:2
**behalf** [5] **4**:14,20,23 **5**:2 **10**:14
**behavior** [1] **26**:13
**behind** [1] **48**:20
**being** [17] **12**:22 **13**:5 **24**:7 **25**:7 **26**:19 **29**:10,12,17,18 **31**:12,17 **35**:7,14 **39**:11 **45**:18 **50**:6 **54**:15
**believe** [3] **6**:15,20 **8**:7
**benefit** [12] **18**:13 **23**:21,24 **24**:2,5,6,7 **36**:6,6 **45**:7,9 **47**:4
**besides** [2] **18**:16,19
**between** [1] **34**:14
**bill** [4] **43**:13 **44**:24 **53**:15,18
**billions** [1] **35**:1
**biologically** [1] **36**:14
**biscayne** [1] **3**:7
**bj's** [1] **52**:5
**black** [1] **50**:12
**bland** [1] **35**:22
**boil** [1] **17**:23
**boston** [7] **1**:24 **3**:3 **31**:23 **32**:6 **51**:12 **52**:4 **54**:4
**both** [4] **19**:23 **28**:8 **50**:5 **51**:8
**boulevard** [2] **3**:7,12
**brace** [1] **34**:21
**breach** [16] **12**:14,19 **13**:13 **14**:14,22 **16**:16 **17**:16,19,20 **21**:23 **22**:18,25 **23**:16 **27**:5 **45**:5 **47**:25
**breached** [1] **19**:2
**brief** [12] **16**:10 **17**:8 **22**:19 **23**:10 **26**:22 **28**:24 **29**:1 **31**:7 **38**:9 **41**:6 **49**:9 **50**:20
**briefs** [3] **12**:12 **17**:2 **47**:3
**bringing** [1] **8**:9
**brings** [1] **8**:8
**bro** [1] **37**:7
**broader** [2] **50**:15,22
**broadly** [1] **30**:12
**broken** [2] **5**:7,7
**brought** [3] **8**:5 **12**:22 **13**:13
**browser** [4] **14**:8 **39**:3 **40**:19 **41**:5
**browsing** [4] **20**:9,9 **21**:18 **22**:13
**brush** [1] **23**:10
**building** [1] **11**:19
**bunch** [3] **39**:20 **46**:3 **50**:4
**but** [61] **5**:8,22 **6**:10,16 **7**:2,14 **9**:5,8,9 **13**:4,6 **14**:3,4 **15**:6 **16**:19 **17**:19 **19**:19 **21**:3,25 **22**:8,12 **23**:1 **24**:5 **25**:1,4 **30**:2,5,24 **32**:1 **34**:4,14 **35**:14 **36**:23,23 **37**:8,18,24 **38**:8,11 **40**:8,21,24 **41**:17,19 **42**:10 **44**:6,11 **45**:23,25 **46**:23 **47**:3 **48**:23 **50**:18,20,22 **51**:8,11,16 **52**:18 **53**:20 **54**:2
**butt** [1] **37**:16
**button** [8] **11**:2,9 **18**:10,11,13 **20**:22 **25**:14 **29**:12
**buttons** [1] **11**:24
**by** [42] **1**:21 **2**:1,6,14,19,25 **3**:5,10,15,21 **4**:2 **5**:14 **7**:22 **15**:3 **18**:14 **19**:2,2 **22**:5,8 **25**:9 **26**:8 **27**:3,19 **30**:19 **32**:19 **34**:6,10,24 **37**:9 **38**:19 **39**:9,11 **41**:13 **45**:12 **49**:1,1,5 **51**:16,17 **52**:4,25 **54**:10

## C

**c** [1] **2**:6
**ca** [2] **3**:19,25
**call** [2] **41**:4,10
**called** [2] **4**:10 **11**:11
**calling** [2] **4**:11,13
**campbell** [1] **2**:6
**can** [19] **7**:18 **9**:21,21,22,22 **14**:3 **35**:16,21 **37**:1 **39**:6 **40**:21 **41**:4,7 **42**:1 **45**:2,25 **46**:6,8 **52**:23
**can't** [7] **14**:1,3 **15**:4 **22**:14 **38**:24 **41**:15 **48**:9
**cannot** [1] **23**:25
**capable** [1] **28**:11
**capacity** [1] **4**:14
**captured** [1] **34**:24
**card** [1] **12**:16
**care** [1] **38**:13
**care."** [1] **20**:12
**carl** [1] **2**:7
**case** [54] **4**:10 **10**:6 **12**:11,14,15,20,21 **15**:21,21,23 **16**:3,10,16,16,17,18 **17**:18 **18**:21,23,23 **19**:24 **20**:18 **21**:1,13,22 **23**:10,11 **24**:21,23 **26**:21,22,22 **27**:9,13 **30**:6 **31**:25 **32**:7,8,10,15,15 **33**:4,14,15,16,18 **34**:5,11 **35**:8 **50**:11,19 **51**:12 **52**:3,6
**cases** [34] **12**:12,22 **13**:4,5,6 **14**:17,21 **15**:5 **16**:15,22,22,23 **17**:7 **23**:5,14 **28**:17,22,24,25 **29**:1,4,20 **31**:7,20,20 **32**:5,7 **33**:14 **34**:6 **48**:1 **49**:9 **50**:1,4 **52**:7
**catastrophic** [2] **27**:10 **33**:20
**caused** [1] **12**:17
**cellphone** [1] **45**:15
**center** [4] **31**:23 **32**:7 **51**:12 **52**:4
**central** [1] **47**:3
**century** [1] **3**:18
**certainty** [1] **41**:16
**certificate** [1] **8**:3
**changes** [1] **40**:22
**charge** [1] **40**:20
**charged** [1] **20**:6
**cheaper** [1] **45**:8
**chicago** [2] **2**:12,24
**chief** [1] **54**:10
**children's** [1] **52**:11
**chosen** [1] **41**:20
**chuckled** [1] **46**:22
**circuit** [5] **18**:23 **19**:18,20 **24**:17,17
**cite** [2] **28**:22 **29**:1
**cited** [17] **16**:10,15 **18**:21 **20**:23 **21**:21 **22**:6 **23**:10,11 **24**:22 **26**:22 **31**:23 **32**:5 **33**:4 **34**:5 **49**:9 **50**:4 **52**:7
**cites** [7] **13**:4 **16**:24 **20**:18 **22**:5,7 **28**:18 **32**:7
**citing** [1] **12**:12
**city** [1] **3**:13
**civil** [1] **4**:13
**claim** [26] **13**:14 **14**:14,22 **15**:11 **17**:16,19,20,21 **21**:23,25 **22**:1,9,10,11,18 **23**:16,18 **27**:14,14 **33**:18 **48**:23,24 **51**:4,13,18 **52**:2
**claims** [7] **10**:21 **13**:9,12 **23**:9 **25**:18 **34**:3 **45**:5
**clarify** [1] **6**:20
**clarity** [2] **7**:18 **8**:23
**class** [2] **47**:10,20
**clear** [2] **42**:1 **49**:19
**cleared** [1] **7**:20
**clearly** [2] **36**:22 **51**:13
**clerk** [10] **4**:11 **5**:1 **8**:4,10,16,17,19,21 **40**:8 **52**:23
**clerk's** [1] **8**:9
**clicked** [4] **11**:2,9,24 **16**:8
**clicking** [1] **22**:15
**clicks** [7] **18**:10,11,13 **20**:22 **25**:9,14 **29**:13
**code** [6] **26**:6 **28**:21 **31**:8 **38**:24 **39**:2,2
**collected** [2] **49**:1,8
**combine** [1] **11**:17
**come** [3] **9**:12,23 **21**:17
**comfortable** [2] **49**:15 **50**:7
**comment** [1] **46**:12

# Keyword Index


**commercial** [1] 26:12
**common** [3] 45:4 50:13, 14
**commonwealth** [3] 1:4 27:20 33:20
**commonwealth's** [1] 27:12
**communicated** [2] 44:3, 5
**communicating** [1] 42:13
**communication** [5] 28:13 30:10,13,18,20
**communications** [4] 29:9,22 32:9 34:13
**companies** [4] 33:13 41:4 42:5,8
**compel** [1] 54:11
**complaint** [26] 4:16 10:19 12:9 14:1,2,5 18:5,19 21:7 22:6 25:24 26:17 33:23 34:12 38:6 42:25 43:11,16 44:9,14,17,19 45:24 47:20 49:6,24
**completely** [1] 16:7
**complex** [1] 46:9
**compliance** [1] 5:5
**comply** [3] 7:15,24 8:12
**component** [3] 30:15,16, 24
**comport** [1] 49:2
**computer** [8] 26:6 29:22 31:16 39:3,9 40:12 41:1 49:22
**concept** [2] 30:12 39:25
**concepts** [1] 34:2
**concerned** [1] 27:17
**concluded** [1] 54:22
**concussion** [5] 13:18 19:9,10 34:12 43:22
**concussion-related** [1] 11:4
**concussions** [9] 11:9,24 19:14,16 26:15 42:25 43:1, 24,25
**condition** [3] 17:14 43:20 46:6
**conditions** [4] 19:21 34:16 43:13 44:23
**conduct** [2] 22:12,25
**conducted** [2] 36:12,21
**conducting** [1] 35:11
**conferencing** [1] 5:15
**confidentiality** [2] 20:7 48:3
**confirmed** [1] 45:23
**conflating** [1] 47:5
**conflicts** [1] 53:20
**confusion** [2] 8:25 10:9
**connect** [2] 42:17 45:14
**connected** [2] 42:17,18
**connection** [1] 45:13
**connective** [1] 42:9
**connor** [2] 31:9 32:4
**consent** [12] 22:2,11,14 24:24 25:4 27:3 30:13,15 33:2 36:4 49:3,16
**consented** [1] 48:25
**consenting** [1] 24:19
**consider** [2] 19:23 33:6
**consideration** [3] 23:2,3 53:4
**consistent** [1] 37:3
**constellation** [1] 36:3
**constitute** [1] 27:4
**consumer** [1] 24:22
**contacted** [1] 8:4
**content** [2] 34:13 35:12
**contention** [1] 29:14
**contents** [1] 29:9
**contested** [1] 14:4
**context** [1] 47:19
**continue** [1] 6:6
**continued** [3] 2:8 3:16 44:22
**contract** [9] 17:20 19:2 21:25 22:1,9,10,18 23:1,16
**contrary** [2] 20:3,5
**control** [2] 49:21,22
**conversation** [8] 28:1,6 30:7,7,11,12,25 32:17
**conversations."** [1] 27:20
**conversations"** [1] 32:11
**cookie** [5] 14:7 39:9,17,20 40:12
**cookies** [2] 41:1,2
**cop** [1] 32:16
**copy** [3] 39:7,8 41:18
**corners** [1] 47:20
**corporate** [1] 5:3
**correct** [6] 19:13 29:16,20 30:17 43:1 53:11
**correlation** [1] 26:9
**costs** [1] 12:18
**could** [14] 4:12,18 10:7 11:3,5,9,24 12:2 19:8 24:21 26:8 29:3 32:16 51:9
**counsel** [6] 4:18 5:1 15:20 37:20 53:18 54:9
**county** [1] 54:4
**couple** [4] 12:13 14:20 20:1 23:12
**course** [2] 41:11 48:18
**courtroom** [2] 4:4 27:12
**courts** [5] 16:13 20:16 21:20 23:8 31:11
**cousin** [2] 16:15 17:4
**covered** [2] 22:5,8
**create** [2] 16:13 35:2
**creating** [1] 36:7
**criminal** [1] 33:1
**cross** [1] 4:7
**crossed** [1] 8:6
**cryptographic** [3] 11:20 14:10 26:10
**curtatone** [1] 33:3
**cut** [1] 48:14

## D

**d** [1] 4:6
**damages** [7] 17:18 21:1, 24 27:9 47:9 48:8 53:4
**data** [33] 12:14,19 18:3,7 25:2,8,9 26:24 29:23 34:24 35:1,1,6,17 36:3,8 37:7 40:12 41:4 42:3,7 43:18 44:1 45:10,17 47:25,25 48:1 49:1,7,13,13 53:2
**date** [1] 8:8
**david** [3] 1:21 2:6 4:23
**davis** [2] 15:14,16
**day** [2] 6:4 26:20
**dc** [1] 2:17
**de** [2] 24:5,5
**decision** [1] 9:23
**decisions** [2] 15:3,6
**deemed** [1] 24:19
**defect** [1] 20:12
**defendant** [6] 2:20 34:14 35:7 44:8 52:25 53:3
**defendant's** [10] 4:16 6:8, 25 7:1 35:4 36:5,5 43:15, 17 52:20
**defense** [3] 5:1 6:5 37:20
**defer** [1] 10:6
**defined** [2] 28:8 50:14
**definitely** [1] 40:22
**definition** [4] 32:25 50:13, 14,18
**delay** [1] 10:2
**denial** [2] 8:6,24
**denied** [6] 6:6 7:15,16,21 8:11,14
**denying** [2] 5:20 52:20
**depending** [1] 51:10
**detail** [3] 34:4 45:24 53:19
**details** [5] 43:19 44:6,7,12, 16
**devastate** [1] 33:11
**developers** [1] 40:20
**device** [33] 14:8 26:24 27:25 28:5,7,10,11,14,19,21 29:8,15 30:22 31:13,14,21, 25 32:18 33:21 35:15 38:14 46:19,20 49:19,23,25 50:6,9,9,10,12,15,17
**device."** [1] 29:10
**devices** [5] 27:19 31:19 39:24 48:20 49:17
**dictionary** [1] 50:13
**did** [11] 11:6,10 13:21 14:12 15:21 18:7,14 22:19 23:14 25:5 50:19
**didn't** [11] 11:8 14:11 18:17 20:7 25:7 32:17 36:14 41:1 45:12 46:2 49:15
**difference** [1] 24:25
**different** [10] 6:4 20:9 30:15 40:24 50:10,21,23 53:22 54:3,3

# Keyword Index


difficult [1] 5:10
digressed [1] 45:1
diminished [1] 18:12
diminished." [1] 21:6
dinerstein [6] 16:18 17:4 18:22 20:17,25 21:22
direct [2] 4:7 16:4
directed [1] 24:7
directs [1] 39:2
disagree [1] 37:24
disclose [1] 25:2
disclosed [8] 10:24 13:6 16:1 26:23 34:13 42:14,23 46:7
disclosing [3] 13:17 14:15 22:22
disclosure [9] 13:4 19:4,19 27:4 50:25 51:5,8,9,14
disclosures [2] 22:3 26:18
discovery [3] 43:4 47:15 48:22
discrete [3] 20:6 27:25 28:4
discuss [3] 7:6 16:20 21:25
discussed [1] 45:23
discussion [1] 47:3
dismiss [18] 4:16 8:19 9:2,9 10:2,2,4,12,15 17:16 21:23,24 23:16 24:24 33:23 52:19,20 54:6
dismissed [4] 13:14 22:18 23:8,11
dispersed [1] 35:25
disputed [1] 27:3
disseminated [1] 26:3
disseminating [1] 25:20
district [1] 21:13
dizziness [1] 44:4
do [34] 9:24 11:20,21 14:1,3 16:13 21:4 23:4 24:8,19 26:8 28:22 30:14 31:20 32:2,12 34:9 39:3,5 40:3,21 41:4,17,18 43:4,23,23,24 45:8 49:13,20,22 51:15 54:8
docket [8] 1:9 6:6,12,18,22,23 8:17 10:10
docketed [1] 7:12
doctor [6] 11:6 13:1 17:10 43:20 46:2,5
doctors [9] 15:25 16:1 19:14 34:15,16 43:12,12 44:22,23
document [1] 47:21
documents [2] 9:2,10
doe [27] 1:7 4:13 11:23,23 13:21,23 19:12 31:23 35:20 36:12,14,21,23 40:10,11 41:10,15 42:19 43:17,21,25 44:2,4 47:9 52:3,11 54:16
doe-emerson [1] 4:11
does [24] 10:2,2,17 12:23 23:2 24:14 27:4,5 28:24 30:19,20 34:18 35:14 36:25 40:3,10,24 41:9,24 42:10 44:20 45:21 53:14 54:2
doesn't [14] 13:6,7 14:4 20:2,4 30:22 35:10,18 42:12 45:21 47:4 49:2,20,22
doing [3] 23:3 36:23 45:18
dollars [1] 33:9
don't [23] 6:17,20 7:4,8,19,20 9:17 14:22 15:3 16:21 32:6 37:7,24 41:2,19 47:2,15 48:8,18,21 49:11,12 51:16
donoho [59] 2:25 5:2,2,19,22 6:15,18 7:6,18,21,24 8:1,3 9:4,7,17 10:1,13,13,23 12:2,8,10 13:12,24 14:14,20 15:1,14,16,20 16:6,10,25 17:4,7 18:18 19:8,13,18 20:5 24:13 28:20,22 29:8,16,24 30:17,22 31:1,4,7 32:22,23 33:24 53:10,12,13,18
dots [1] 42:16
down [1] 17:23
dozen [2] 14:21 33:14
dravillas [1] 2:14
draw [1] 45:13
drawn [1] 53:3
drive [1] 2:22
duplicative [1] 8:15
duty [14] 13:14,15 14:14,15,22 15:11 16:3,12,16,17 17:16,19 45:5 48:4

E

e [3] 2:1,6 4:6
each [3] 28:9 34:3,4
earn [1] 18:14
east [1] 3:18
eating [1] 46:13
eavesdrop [1] 27:19
eavesdropping [1] 27:25
economic [4] 17:23 18:15,18 23:24
economy [1] 27:12
effects [2] 33:7 35:6
egregious [1] 27:4
eighteen [1] 8:19
either [5] 13:6,7 17:24 18:19,20
electronic [2] 29:22 35:15
else [7] 13:16 23:1,24 25:12 31:18 36:23 48:12
else's [1] 11:16
e-mail [1] 11:19
embedded [2] 11:13 38:23
emerson [45] 1:11 4:15 5:3,4 10:14 11:4,7,8,10 13:21 14:11 18:6,10,13,14 19:1 21:11 22:3,21 24:2 25:7,10,11,15 31:18 33:3,10,12 36:24 38:18,19 39:6,21 40:13 41:9,15,16 42:6,11 43:18 45:25 47:21 49:1,11,17
emerson's [2] 10:14 11:1
emersonhospital.org [1] 53:21
emphasizing [1] 29:4
employer [1] 17:11
emyr [1] 3:5
enacted [2] 27:15,16
enacting [1] 27:17
endorsement [3] 6:23 8:10,13
enforcement [1] 27:19
enormous [1] 29:21
enough [2] 41:4 45:19
enrichment [9] 17:21 23:18,19,22,25 24:4 25:7,17 45:5
enroll [1] 39:16
enrolled [1] 39:11
enter [1] 39:5
entered [4] 11:4,10 34:11 43:18
entering [1] 12:24
envisioned [1] 32:19
epic [1] 53:3
equals [2] 28:18,21
equipment [1] 30:5
equivalent [1] 32:10
erin [1] 2:1
essence [1] 42:15
essentially [1] 40:25
essex [4] 1:5,5 4:3 54:4
established [1] 24:24
even [12] 13:4 19:3,19 20:23 22:8,19 23:15 26:18 27:1,3 36:14 41:2
events [3] 18:4 25:4 28:3
ever [1] 35:19
every [11] 26:20 34:5 35:15,15 38:4,23 39:3,4,4 41:23 44:11
everyone [1] 5:6
everywhere [1] 23:1
exact [3] 34:7,13 38:11
example [5] 24:16 38:17 43:17,23 54:1
exceed [1] 7:1
exceptions [1] 28:14
exchange [2] 18:7 34:14
exhausted [1] 46:25
exhausting [1] 46:23
exhibits [3] 1:3 4:8 6:14
exist [1] 45:21
explain [3] 17:25 29:4 38:11
express [1] 22:9
expressly [1] 49:10
extensive [2] 18:24 45:24
extra [1] 18:3
extrinsic [2] 9:2,10

# Keyword Index


## F

**f** [1] 24:16
**facebook** [40] 11:7,18,20 12:3 14:7,9 21:7,8 22:3 24:9,13,16,18,20,22,25 25:2 26:3,7,11,17,20 39:8,10,13,16,21 40:14,16,17 41:18,25 42:4,20,23 48:24 49:1,2,6,10
**facebook's** [6] 11:15,17,21,22 26:16 36:6
**faced** [1] 21:13
**fact** [7] 26:2 27:3 34:5,11 35:6 48:16 49:8
**factor** [1] 25:4
**facts** [10] 12:3,11 13:8 16:19 25:20,22 32:8 37:21,23 50:25
**factual** [1] 18:24
**fail** [1] 22:11
**failure** [3] 7:15,24 8:11
**faith** [1] 21:17
**familiar** [1] 27:23
**far** [2] 16:13,18
**fault** [1] 10:10
**favor** [1] 9:18
**fax** [1] 30:6
**fear** [1] 53:4
**federal** [2] 3:2 27:15
**fee** [1] 20:7
**feed** [2] 12:3 26:20
**few** [5] 11:24 15:3 31:2 53:10,11
**fiduciary** [13] 13:14,15 14:14,22 15:11 16:3,12,16 17:16,19 21:23 45:5 48:4
**field** [1] 11:5
**figure** [2] 14:4 32:13
**figured** [2] 11:23 14:9
**filed** [2] 7:17 8:3
**filings** [1] 16:25
**final** [1] 52:24
**finally** [5] 11:15 27:8 32:20 33:6 50:8
**find** [4] 5:10 24:1 38:9 48:21
**finding** [1] 25:16
**finds** [1] 27:13
**fingerprint** [4] 14:8 41:5,5 42:4
**first** [9] 4:16 5:17 11:1 12:14 13:13 20:20 22:2 50:11 53:19
**fit** [2] 30:21 34:3
**five** [1] 13:12
**fl** [1] 3:8
**floor** [1] 2:16
**follow** [2] 31:20 32:2
**followed** [1] 19:24
**for** [90] 1:16 2:20 4:15 5:1,11 6:6 7:1,15,22,25 8:11,22 10:8 11:6 13:13,14 16:11,12 18:3,6,8,10 19:25 20:14,19 21:8,9,17,21 22:17,23 23:2,3,17,20 24:4,7,16,24 25:3,8,10,14,16 26:18 27:9 28:18 29:16,17,18 31:12,13 32:3,21 33:9,12,12,20 35:8 36:5,6,8,10,18,23 37:20 38:17,18 39:3 40:2,5,9,20 42:23,25 43:3,17,18,22,23 45:7,9,10 46:6 47:12 48:5 49:10 51:17 52:2,19
**form** [1] 30:18
**forward** [2] 22:14 28:3
**foster** [1] 2:6
**found** [9] 16:17 20:21 21:1 23:5 25:1 29:2 31:11,15,24
**four** [3] 34:6 47:20 50:23
**francisco** [1] 3:25
**frankly** [1] 40:5
**free** [2] 35:25 40:20
**from** [25] 5:4 11:16 13:17 14:15 18:5,13 20:9 22:2,3,21 23:3,7 25:24 26:25 34:10,23 36:18 42:4,4,5,24 45:1 48:13 49:1 53:22
**function** [5] 11:21,22 14:10 26:11 54:17
**fundamental** [1] 51:8
**further** [5] 8:12,13 13:4 20:13 22:1
**futile** [1] 54:8

## G

**gateway** [1] 54:13
**gathered** [1] 25:23
**gathering** [1] 25:19
**general** [2] 24:19 43:1
**generalized** [1] 33:17
**generate** [1] 45:8
**geolocation** [1] 26:25
**get** [13] 12:10 13:8 29:4 35:5 37:21,23 39:6 40:8 41:17,18 49:25 50:8,23
**gets** [2] 35:19 41:18
**getting** [2] 34:23,25
**give** [11] 10:18 21:9 22:17 27:14 31:2 38:10 49:11,12,14 52:23 53:12
**given** [4] 11:18 21:22 40:19 50:1
**glad** [1] 15:20
**go** [13] 13:11 14:13 16:13 17:6 31:1 34:3 35:16 37:13 38:16 42:11 45:2,2 48:7
**goes** [5] 16:13,18 30:24 34:17 42:20
**going** [17] 5:6,10 6:19 8:23,25 10:5 21:8 31:1,2 34:4 38:7 46:9,14 49:8 50:2 51:20 53:25
**good** [7] 4:25 21:17 31:6 45:18 47:1 48:8 52:1
**google** [14] 11:8,12,17 18:23 19:3 21:14 22:4 26:3,7 40:2,9,15,24,25
**google's** [1] 11:15
**gorder** [2] 16:11 17:1
**got** [4] 18:13 39:1 40:7 43:4
**gotten** [1] 6:4
**grand** [1] 3:12
**granted** [1] 24:23
**granular** [2] 49:25 50:8
**great** [1] 10:6
**greenfield** [1] 1:19
**ground** [1] 23:12
**guess** [1] 37:8
**gustafson** [1] 2:7
**guy** [1] 46:5

## H

**hacked** [1] 12:15
**hackers** [1] 12:15
**had** [18] 8:3,4,5 11:18,23,23 12:18 16:3 18:11,23 19:20 20:14 21:16 27:24 35:2 40:6 49:16,17
**hand** [1] 46:14
**handed** [1] 16:23
**handle** [1] 47:11
**happen** [4] 13:6,7 32:17 34:18
**happened** [3] 10:24 17:9 20:8
**happening** [3] 30:6 33:2 42:6
**happens** [1] 26:14
**happy** [2] 10:16 52:17
**hardware** [1] 31:19
**hardy** [6] 2:21 3:1,6,11,17,22
**has** [36] 10:20,20 12:5,17 13:10 16:19 17:17 18:12 20:11,21,23 21:4,5,8 23:19 25:3,22 26:17 28:6 30:9 31:24 33:8 36:4 40:11,12,25 41:1,16 46:5,7 49:3 50:9,18 53:15 54:1,9
**hash** [4] 11:22 14:10 26:11 54:17
**hasn't** [1] 17:9
**hatcher** [1] 3:15
**hate** [1] 37:16
**have** [82] 4:18 5:3,14 6:4,10 8:16,18,20 10:17 12:15,17 13:12,13 15:24,25 16:1,2,24,25 17:12,22 18:15,18 19:5,14,21 20:14,16 21:14,16,20 23:5,8,23 25:12 29:20 31:1,2 32:16 34:21 37:6,18,19 38:3 39:9 40:11,17 41:4,9,11,14,15,17 42:12,16,17 43:24 44:19 45:14 46:13 47:4,15 48:3,3,9,18,20,24,25,25 49:5,12,13 50:21 51:11,15,15,16,23 52:16 53:10 54:8
**haven't** [2] 43:4 48:19
**having** [1] 12:25

# Keyword Index


**havlicek** [2] 31:15 32:5
**he** [26] 11:2,3,4,5 18:3,3,5, 11 20:13,15 21:10,11 22: 20,20 23:8 24:10,12,13 25: 13 26:11,16,16 34:11 42:3 46:7 53:21
**he's** [2] 12:25 17:12
**head** [1] 25:13
**health** [8] 15:8,15,22 22:22 36:11 44:1 46:7 52:5
**healthcare** [8] 12:22 14: 17 16:5,17 18:6 22:21 25: 10 36:24
**hear** [2] 5:10 18:17
**heard** [2] 10:5,7
**hearing** [5] 10:3,4,8 43:4,7
**held** [2] 24:17 27:1
**her** [1] 32:9
**here** [63] 5:3,8 9:8 10:14, 14 12:4,11 13:7,13,18,19 14:16 16:2,15 17:9 18:16, 19,25 19:4,5,14,15,25 20:2, 12,23 21:6 22:2,4,12 23:8, 23 25:3,22,23 26:4,5 27:9, 11 28:2,3,7,8,15 29:6,11 30:8,8 31:5,17 32:17 33:2 34:2,7,8 37:21,24 40:7 41: 16 46:9 49:3 53:24 54:5
**here's** [1] 10:23
**hi** [1] 5:2
**highlighted** [1] 44:21
**highly** [2] 25:25 26:12
**him** [7] 18:10 21:9,16 26: 19 46:7,8,15
**himself** [10] 11:12,18 12: 25 23:11 26:14 27:6 32:16 44:1 53:15 54:2
**hipaa** [3] 22:24 23:7 49:14
**his** [35] 11:18,19 12:12,24 13:22,25,25 17:10 18:6,10, 11 20:12,22 21:4,7,17 22:5, 7,19 24:7 25:13 26:5,10,19, 20 31:19 40:11,12,13 41: 25 42:25 43:20,22 44:4,8
**his/her** [1] 4:13
**history** [1] 8:8
**hiv** [1] 35:24
**hold** [4] 6:19 9:15 44:15 46: 15
**homepage** [2] 38:22,22
**honor** [35] 5:19 7:22 9:4,7, 17 10:7,13,16,17 15:7 22:7, 17 29:24,24 30:23 31:4 32: 12 33:5,6 34:1 35:2 37:14 38:17 44:18 46:23 47:7 52: 14,17,24 53:7,9,10,13 54:9, 21
**honor's** [2] 8:5 43:2
**honorable** [1] 1:14
**hopefully** [1] 48:22
**hospital** [21] 1:11 4:11,15 5:3 10:14 13:21 19:1 20:6, 24,24 21:14,15 33:10 36: 24 38:18 40:13 41:9,15 45: 6 47:21 52:12
**hospital's** [2] 20:14 38:19
**houston** [1] 2:5
**how** [19] 11:21 24:9,18 34: 18,25 37:10 38:11,12 39: 22 40:3,10 42:7 43:23,23 44:9 48:18 51:22,25 52:5
**howe** [1] 1:14
**hundreds** [1] 33:9
**hypothetical** [3] 35:6,10 36:21
**hypothetically** [1] 34:20

**I**

**i'd** [3] 28:9,20 29:25
**i'll** [11] 9:9,24 21:25 22:17 23:17 31:4 38:9 40:7 44:21 52:21 54:18
**i'm** [41] 4:12 5:6,7,10 6:3, 25 7:6 8:23,25 9:4,6,7,8,8 10:8,13,14,16 13:9,16 15: 20 18:17 22:6 29:6 31:1 34: 4,22,25 36:20 37:8 41:3,19 43:8 45:13 46:14,23,25 48: 14 50:1 51:20 52:17
**i've** [11] 6:14,22 12:7,9 14: 19 16:22 20:20,20 21:22 40:7 48:16
**idea** [3] 40:8 46:19 49:16
**identification** [10] 16:6 17:8,13,15 38:14 42:19 53: 24 54:5,14,15
**identified** [9] 13:1,22 15: 25 32:16 35:11 37:9 38:4 48:17 53:15
**identifier** [1] 26:24
**identify** [11] 4:18 11:9 40: 3,10 41:7 42:6,8 45:19,25 46:6,8
**identifying** [4] 12:24 17: 12 42:11 54:2
**identity** [14] 12:17,19 13: 25 26:9,10 30:9 41:9,10,11, 14,15,25 42:18 45:21
**idevices** [1] 27:1
**if** [54] 4:12,18 5:8,9 7:10 8:4 9:17,18,20,23 10:7,17 12:5 15:7 21:3 22:8 24:1,4 27: 13,21 29:3 30:13,14,18 32: 24 33:14,14,19 35:2,19,21 36:12,17,21,21 37:9 38:11 39:8 40:15 41:1,2,24 42:1 45:18 46:10,15 49:24 50:8 52:2,4,16 53:10 54:6,7
**il** [2] 2:12,24
**ill."** [1] 17:12
**image** [1] 8:9
**implausible** [1] 21:20
**implausible,"** [1] 20:2
**implausible."** [1] 20:15
**implications** [1] 53:1
**implied** [7] 17:20 21:25 22: 1,2,9,11 23:16
**implies** [1] 22:14
**important** [7] 12:10 17:18 18:21 27:9 29:3 37:21,23
**inaudible** [2] 8:17,21
**inc** [1] 24:22
**inclined** [1] 54:6
**include** [1] 35:10
**included** [3] 26:24 43:21, 25
**includes** [2] 34:13 50:22
**including** [2] 34:14 43:19
**individual** [1] 11:8
**individually** [1] 4:14
**individuals** [1] 5:14
**inference** [1] 21:5
**info** [1] 12:16
**information** [47] 10:24 11: 16,17 15:22 19:3,4 21:11 22:15,22 26:1,6,7,23,25 27: 2 34:12,15,23 35:23,24,24 36:1,11,19 38:22 39:4 40: 12,14 41:20,22 42:9,11 43: 12,19,20 44:1 45:6 46:4,7 48:5 51:5,9,11,15 54:8,10, 14
**initially** [1] 7:21
**injured** [1] 37:11
**injuries** [1] 47:12
**injury** [2] 47:9,25
**innocent** [1] 46:10
**inquiries** [1] 32:11
**installed** [2] 39:9 49:17
**intelligence** [1] 53:2
**intention** [1] 45:12
**interacting** [3] 36:5,16 44: 12
**interaction** [4] 12:23 16:4 33:3 42:2
**interactions** [8] 12:25 13: 19 15:24,24 16:1 32:16 35: 4 44:13
**intercept** [4] 28:4,5 29:12, 18
**intercepted** [1] 48:23
**intercepting** [11] 28:5,7, 10,14,18,21 29:10,15 31: 14 33:21 49:19
**interception** [9] 28:7 29:8, 8,11 31:12 32:20,23 33:21 39:22
**interest** [2] 20:22 21:4
**interference** [1] 25:21
**internet** [3] 34:19 35:16 38:18
**interpretation** [1] 50:12
**interpreted** [1] 32:24
**into** [3] 29:21 34:3 53:4
**introduce** [1] 46:3
**introduced** [1] 46:4
**intrusion** [2] 51:1,5
**inured** [1] 24:6
**invades** [1] 51:10
**invasion** [7] 25:18 32:24 50:24 51:4,13,18 52:2
**investigative** [1] 27:18

# Keyword Index


involve [6] 12:23 15:21 17:8,9 28:24 31:7
involved [2] 18:25 26:22
involves [1] 28:23
ip [6] 13:22,25 14:2,5,6 37:10
iphone [1] 26:21
iphones [1] 26:25
irrespective [1] 45:21
isn't [5] 30:10,25 37:9 45:18 46:20
issue [11] 16:2 20:23 22:4 28:3,23,24 32:10 36:13,22 43:3 47:5
it's [65] 5:7 6:20 12:10,19 13:3 15:7 16:7,7 19:13 22:8,15,15 24:8 26:12,15 27:10,22 28:16 29:2,11,16,17,17,18,18 30:22,23 33:10,11 34:12 35:14 36:3 37:20,23 38:1,8 39:8 40:1,9,13,14,15 41:5 42:1,6 45:7,18 46:6,10,17,17,18 47:2,3 48:2,3 50:13,20 51:8,14 54:3,14,16,16,16
its [5] 11:22 14:9,11 19:2 25:2
itself [2] 28:2 49:25

J

j [3] 2:7,14 3:10
jacome [2] 31:9 32:4
jane [4] 36:12,14,21,23
janice [1] 1:14
jenn [1] 3:15
jessica [1] 3:21
joe [1] 15:15
john [21] 1:7 4:11,13 11:23,23 13:20,23 19:12 35:20 40:10,11 41:10,15 42:18 43:17,21,25 44:2,4 47:9 54:16
johnson [1] 2:6
jonathan [2] 2:1 4:20
judge [24] 5:13,15 6:1,7,12,22 7:10 8:10,17 15:3,5,14,16 27:22 31:24 32:2,7,8 50:1,11,19,19 51:11 52:4
judges [1] 34:7
just [38] 5:13 10:18 11:15 12:4,6 13:8 15:22 16:7,24 17:25 19:5,13,21 22:15 25:4,12 26:15,21 27:15 29:3 30:14 31:20 32:1,11 33:9,11,12,17 34:11,18 36:13,17 46:6,12 47:8 51:14 53:10 54:4
justin [3] 2:25 5:2 10:13

K

kansas [1] 3:13
kazanjian [11] 15:4,5 27:22 31:24 32:7,9 50:2,3,4,19 52:4
kazanjian's [2] 32:3 51:11
keep [2] 5:10 29:4
keller [2] 2:9,15
key [1] 39:3
keystroke [1] 41:23
kind [7] 13:17 14:16 16:3 17:25 43:3 49:12,13
kindly [1] 4:12
kinds [1] 49:14
knee [4] 34:20,21 35:3,23
knew [1] 11:21
know [20] 7:4,8 11:8 14:11 15:3 19:10 21:7 38:9 41:17,19 43:23 46:8,12,13 48:17,21,22 49:14,21 54:7
knowing [1] 54:16
knowledge [3] 27:2 36:4 49:4
known [1] 20:15

L

l.l.p [1] 3:1
lack [1] 21:24
landscape [1] 40:23
language [4] 29:5,6,25 50:9
last [1] 27:9
lastly [1] 46:21
later [1] 16:20
law [7] 1:17,22 20:21 23:4 27:19 45:4 49:3
law's [1] 50:12
lawrence [1] 4:3
laws [1] 49:15
leads [1] 43:2
least [3] 8:8 14:20 33:13
leave [2] 7:1 40:8
legal [3] 36:18 49:12,13
legislature [3] 27:17,24 32:19
lenity [1] 33:1
less [1] 34:5
let [8] 6:3,6 8:25 35:9 42:22 47:8 48:11 54:6
let's [4] 5:16 34:20 42:22 46:2
leveraged [1] 48:5
leveraging [1] 45:10
license [1] 39:15
licensed [1] 36:16
light [1] 44:3
like [31] 12:4,21 13:3,25 15:21 16:3 17:7,10,15 19:1 21:8 22:21 23:7 26:21 27:13,15 28:9,20 30:1 31:25 32:16,18 33:18,19 35:2 36:17 37:6 47:2 49:11,22 54:7
limit [1] 7:2
limited [2] 34:10,15
line [2] 53:1,2
lines [1] 26:6
linked [1] 17:14
links [1] 40:16
listed [3] 6:6 7:13 44:16
lists [1] 28:13
litigation [2] 24:23 26:22
little [1] 5:10
ll [1] 1:23
llc [2] 2:9,15
llp [5] 2:21 3:6,11,17,22
located [1] 11:7
logged [1] 32:15
logic [1] 8:23
login [1] 54:12
logins [4] 43:14,14 53:16,19
long [2] 10:1 25:3
look [8] 6:3 24:14,16,21 38:23 52:3,3,11
looked [1] 20:20
looking [4] 6:6 30:3,4 34:22
los [1] 3:19
loss [1] 17:23
losses [2] 18:15,18
lot [5] 12:21 14:17 16:25 45:8 46:13
lots [3] 17:22 23:5 45:8
love [1] 28:25

M

m [1] 2:1
ma [3] 1:19,24 3:3
machine [4] 39:2 41:3 49:21,21
made [6] 17:22 25:25 26:2 48:5,19 52:25
main [1] 1:18
make [9] 9:22 13:8 16:24 29:11 33:15 42:1 45:20 46:12,22
makes [2] 21:7 39:7
making [1] 48:14
malicious [1] 12:15
many [2] 27:10 47:25
market [1] 35:7
marketing [8] 18:13 22:23 35:8 36:6,6 45:7,9 47:4
marketplace [3] 36:8,10 48:6
massachusetts [13] 1:4 13:16 14:15,18,21 15:5 20:21 23:1 27:21 34:7 49:3 50:6 52:3
match [1] 26:9
material [1] 41:17
matter [4] 4:12 34:8 35:18 54:22
matters [2] 45:22 51:23
may [6] 5:9 6:4 7:10 15:7 23:13 37:12
maybe [1] 44:19
mcauliffe [1] 5:4
mchugh [1] 2:1
mckinney [1] 2:3
me [15] 5:3 6:3,4,6 8:16 35:9,25 36:18 38:11 42:22 43:

# Keyword Index

3 47:8 48:11,14 51:2
mean [12] 19:11 30:13 33:7 35:22 37:5 42:12 43:10 44:6,24 47:12 50:18,21
meaning [1] 50:10
meanings [1] 33:21
means [6] 28:11 29:8 41:13 51:16,17 53:19
medical [27] 13:5 17:9,11,14 19:3,4,20,21 20:12,14 21:17 31:23 32:6 35:23 36:13,13,22 43:19,20 46:4,6 48:1,4,25 49:7 51:12 52:4
medicine [1] 36:17
mensing [1] 2:2
mentally [1] 17:12
mentioned [1] 33:5
merrigan [60] 1:17,21,22 2:1 4:20,20,22 5:13 6:1,3,5,9,11,22 7:10,12 9:14 10:6 15:7,10,13,18 33:25 34:1 35:14,21 36:3,10,16 37:2,4,6,17 38:10 42:1,14,21 43:2,7,9,11 44:2,7,11,16,18,21 45:4,17 47:1,11,22,24 52:14,16,20,22,24 53:7 54:20
met [1] 25:22
meta [23] 11:11 12:22 16:19 28:15 29:11,14,19,19 30:19 31:19,25 38:12,24 39:1,2,8,22 40:19 41:13,20 49:2,11,20
metallic [1] 44:3
miami [1] 3:8
might [3] 10:18 25:12 38:23
mike [1] 5:4
million [1] 33:9
millions [4] 11:14 26:14 27:6 33:8
mind [1] 27:24
minimis [2] 24:5,5
minute [4] 32:22 38:9 51:21 53:12
minutes [2] 31:2 53:10
mission [1] 3:23
mistake [1] 45:12
mitigation [1] 12:18
mm-hmm [5] 5:21 6:2 29:7 38:20 39:18
mo [1] 3:13
modern [3] 28:2 32:10,13
moment [3] 8:23 23:17 47:23
monetizing [1] 36:7
money [3] 12:16 18:5 21:8
more [10] 19:3,19,21 25:18 30:1 31:2 32:5 37:10 50:13,14
moreover [1] 20:11
mosaic [2] 34:24 45:13
most [3] 16:22 26:4 27:8
motion [38] 4:16 5:17,19 6:5,11,13,23,24,25 7:12,13,15,21 8:4,11,13,16,18,19,24 9:1,2,8,9,18,24 10:1,2,4,7,11,15 24:15,23 44:8 52:19,20 54:11
mouth [1] 38:8
move [2] 23:18 42:22
moving [3] 23:17 28:3 32:14
much [5] 34:4 50:15,22 53:8 54:19
multiple [1] 20:20
my [14] 8:23 9:9 17:11 28:10 35:6,17 36:4,10 37:7 38:8 41:2,3 42:10 46:15

## N

n [3] 2:10 3:21 4:6
n.w [1] 2:16
name [6] 11:19 12:24 13:25 37:9 39:19 41:7
names [1] 16:22
nathan [1] 2:6
nature [1] 35:12
navigate [1] 11:2
necessarily [1] 45:25
necessary [2] 9:17,18
need [5] 9:6 14:4 24:11,14,15
needs [5] 28:1 30:3 33:6 53:1,4
negotiated [1] 21:16
neither [4] 17:13,13 27:5 28:6
never [1] 46:4
new [1] 33:15
next [3] 21:25 25:18 39:7
no [60] 1:9 6:23 10:4,4,10 12:7 13:11,15,19 14:12,15 16:4,6,12,17 18:15,18 19:4,7,11 20:7,8 21:1 22:2 23:3,21 24:3 25:6,11,14,16 26:4,7 28:6,14 30:7 31:13,17 32:20 33:17,21,21 36:20 37:4,7,17 41:14 43:6 47:17,17 48:11 49:16 50:11,18 53:19,23,24 54:4,11,13
none [6] 1:3 9:9 12:19 13:2 28:23 35:19
non-portal [2] 33:16,16
non-profit [1] 33:10
non-web [1] 20:9
nor [1] 28:7
normal [1] 27:7
norms." [1] 27:5
not [99] 5:9 7:2,3 9:4,7,20 10:2,2,8,17,20 11:9,15 12:14,15,19,21,23 13:3 14:2,3 15:21,21 16:2,2,13,19 17:7,13,14,17,18 18:7,14 20:11,12,14,20,23,25 21:4,14 22:4,6,8,9,19 23:2,14,19,24 24:2,14 25:14,22,23,25 26:12 27:4 28:16 29:15 30:5,7,20,22 31:13,20 32:2 33:2,9,11,12 34:9,14 36:16,22 40:1,15,22 44:9 45:25 46:17,19,20,25 47:2,4 48:2,5,14 49:4,13 50:13,19 53:14 54:2,8,8,16
nothing [5] 13:20 17:15 22:12 32:18 49:5
notice [6] 7:11,17 16:14 17:5 18:22 31:22
notify [1] 49:7
now [15] 4:11,12 10:11 14:18 21:20 35:3,17,25 36:7 37:6 39:1 40:1 41:12 46:7 50:17
number [5] 5:14,17 13:15 39:19 41:7
numbers [2] 12:16 26:24
nurse [1] 13:2
nurses [1] 15:25
nutshell [2] 10:19,23

## O

o [1] 3:15
observing [1] 5:14
obviously [2] 10:9 43:14
occurred [3] 25:4 28:8 36:15
occurring [3] 13:18 30:8,8
occurs [3] 33:7 42:19,19
october [1] 4:5
off [1] 48:14
offensive [1] 26:12
offer [2] 19:14 52:17
offering [2] 21:10,11
offers [1] 19:10
officer [2] 5:5 54:10
officials [1] 27:19
oh [1] 52:1
okay [42] 5:6,16,21 7:4,8,19 8:15,22 9:12 10:9,11,22,23 12:8,10 13:12 14:13 15:12,19 16:9 17:6 19:17 23:18 29:10 31:3 32:22 35:9 38:7,16,25 39:23 42:22 44:15 45:1 48:7 49:12 51:21 52:7,13,22 53:6 54:18
old [1] 32:13
once [2] 7:16 42:19
one [33] 3:2 6:19 9:15,21 10:18 13:15 14:16,21,24 16:15,20 17:1,2,15,17,24 20:1,25 22:19 23:13,21 24:4 25:4,18 32:4,22 33:15 39:6 46:12 47:8,11 51:9 53:12
one's [1] 10:10
only [17] 11:21 13:24 14:9,21 17:19 21:6 23:6,22 24:5,16 25:10 26:3,15 29:19 32:24 54:8,14
open [1] 38:22
opened [1] 38:8
opening [2] 23:10 29:1
opinion [5] 17:11 32:3,9

# Keyword Index


50:5 51:12
**opinions** [1] 50:5
**or** [61] 5:7,9 9:23 11:4,10, 11,16 12:16,16 13:2,16,18, 22 14:3,6,7 16:8 17:24,24 18:20 19:10,11 21:14,15 23:21,22 25:19,21 26:8 28: 11,12,12,16,21 30:22 31: 13,21 35:12,12 36:1,4,13, 18,24 37:9 40:11 42:4,17, 19,19 43:24 45:21 48:5,14 49:1 50:9,25 51:5,6,21 52: 17
**oral** [2] 28:13 30:12
**order** [3] 25:8 52:16,19
**ordinary** [1] 26:19
**original** [1] 8:10
**orthopedic** [1] 34:22
**other** [16] 13:3 18:9,15 20: 16 21:20 22:24 23:14 26: 10 27:1 28:13 33:12 36:24 39:20 49:15 50:11 51:23
**others** [3] 4:14 27:11 36:7
**otherwise** [1] 20:15
**our** [24] 5:22 8:3 9:18 16: 10,10,14 17:2,4 18:22 22:6, 7 23:10 24:15 26:22 28:24 29:1 31:7,20 38:9 41:6 48: 25 49:6,9 50:20
**out** [12] 8:6 11:23 14:4,9 18: 23 32:13 40:19 46:16 48: 21 49:2,8,9
**outright** [1] 7:16
**over** [4] 38:10 46:5,15 47:9
**overpaid** [1] 18:3
**overpayment** [13] 17:24 18:2,20,25 19:23,25 20:16, 17 23:23 25:9 46:21,24 47: 2
**own** [4] 11:17 22:7 24:21 53:20

**P**

**p.c** [1] 2:2
**p.m** [2] 4:10 54:22
**packet** [2] 40:14 41:17
**page** [13] 1:2 4:8 7:2,2 9:3 11:3 15:23 22:20 38:23 39: 4,7 48:13 54:12
**pages** [1] 51:13
**paid** [5] 18:3,5 20:9,14 21: 8
**paper** [12] 4:16 5:17 6:1,5, 12,22,25 7:1,3,13,15 8:15
**papers** [4] 12:7 22:7 24:15 52:8
**paragraph** [7] 26:17 31: 24 43:16 44:14,17 53:14, 25
**paragraphs** [2] 38:11 40: 5
**pardon** [1] 51:2
**park** [1] 3:18
**part** [3] 8:6 25:13 32:8
**particular** [3] 35:13 36:22 44:25
**particularity** [1] 44:10
**parties** [2] 4:12 22:13
**partners** [3] 15:7,15 52:5
**party** [2] 42:15 46:8
**password** [1] 12:24
**patient** [12] 12:21 13:19 16:6 17:9,12 18:14 19:1 41: 24,24 48:17 53:15,23
**patient's** [2] 17:11 20:6
**patients** [2] 20:9,10
**patients'** [1] 22:22
**pattern** [1] 35:7
**patterns** [1] 35:4
**pause** [2] 12:4 23:17
**pay** [2] 21:16 29:25
**paying** [2] 19:2 25:14
**payment** [8] 12:16 18:7,8 25:8,9 43:14 53:15,18
**payment."** [1] 44:24
**people** [2] 5:9 27:11
**percent** [2] 41:6 54:15
**percentage** [1] 42:5
**perfect** [1] 52:1
**permission** [1] 46:17
**person** [8] 35:10,13 37:10 38:4,13 41:7 45:19 46:8
**person's** [2] 32:25 48:4
**personal** [5] 22:22 26:1, 24 41:25 44:1
**persuasive** [2] 32:5 34:5
**petro** [2] 16:11 17:1
**phone** [11] 1:20,25 2:13,18 3:4,9,14,20 4:1 32:17 46: 16
**phonetic** [1] 16:11
**pick** [1] 30:20
**picking** [1] 5:9
**picture** [1] 54:1
**piece** [1] 39:4
**pieces** [1] 45:6
**pixel** [27] 11:11 12:22 14: 17 16:17,19 28:15 29:12, 14,19,19 30:19 31:19,25 33:14 34:24 38:12,24 39:1, 2,8,22 40:19 41:13,20 49:2, 11,20
**place** [1] 35:16
**plaintiff** [49] 1:16 4:19,21, 24 9:22 11:1,6,12,18,25 12: 3,12 13:4,25 15:25 16:2 18: 2 20:2,4,23,25 21:3 22:5,7, 18,24,25 23:5,7,11,14 25: 10,12,25 26:5,14 27:6 28: 17 31:19 33:8 34:10,14 42: 13 43:17,21 49:16 54:3,3,7
**plaintiff's** [16] 5:17 6:11, 13,24 8:11 9:1 24:6,24 25: 24 26:9,25 27:2 31:16 33: 23 51:6 53:20
**plaintiffs** [6] 17:22 21:6 23:6 24:18 27:3 31:3
**plaintiffs'** [1] 24:21
**plausibility** [1] 43:7
**plausible** [4] 24:3 25:6,16 31:17
**plausibly** [6] 17:17 21:1 23:19,21 24:1 53:14
**play** [1] 34:2
**plaza** [1] 2:10
**please** [1] 4:18
**pled** [2] 18:15,18
**plus** [3] 41:6,24 42:5
**point** [6] 16:15 34:6 41:6 46:22 49:8 52:24
**pointed** [1] 49:9
**points** [2] 35:1 53:11
**pole** [1] 37:7
**policies** [2] 22:5,8
**policy** [2] 47:21 52:25
**popular** [1] 11:13
**portal** [15] 12:21 13:5,6,19, 23 15:24 32:15 48:20 53: 23,23,24 54:9,12,12,13
**portals** [1] 48:19
**portions** [1] 28:9
**position** [1] 5:23
**possession** [1] 35:17
**possibly** [1] 35:16
**postman** [2] 2:9,15
**potential** [3] 34:15 43:12 44:23
**potter** [1] 31:15
**practical** [2] 34:18 46:20
**practices** [2] 25:3 36:17
**precedent** [1] 16:12
**prefer** [2] 9:25 10:17
**preference** [1] 10:17
**prepared** [6] 5:22 7:6 9:4, 7,20 10:8
**press** [1] 46:16
**presumably** [1] 7:17
**pretty** [4] 35:22 42:2 44:24 51:18
**prevent** [2] 18:4 25:9
**previous** [1] 8:24
**previously** [1] 5:20
**principally** [1] 27:18
**privacy** [16] 18:4,7 22:5,7 24:23 25:8,18,21 32:24 41: 3 48:1 50:24 51:4,13,18 52: 2
**private** [18] 11:7,15 13:1 25:20,23 35:23,24 36:10, 18 44:1 46:3,7 48:1,4 49:7 51:5,9,14
**probably** [3] 40:7 46:23 51:7
**problem** [2] 38:14,14
**procedural** [1] 7:25
**proceed** [4] 9:21 10:11,16 13:9
**proceeding** [1] 10:20
**proceedings** [1] 4:9
**professional** [1] 36:17
**profile** [2] 11:19 24:23
**program** [1] 40:21

# Keyword Index


**prohibits** [4] 22:21,24 23:4,5
**promises** [2] 23:6,7
**property** [4] 20:22,24 21:4,5
**propose** [1] 9:14
**proposed** [2] 52:16,19
**proposition** [2] 16:11 28:18
**provide** [2] 7:18 19:15
**provided** [2] 16:24 34:25
**provider** [1] 16:5
**provider's** [1] 36:24
**providers** [1] 22:21
**provides** [1] 11:4
**providing** [2] 18:14 42:9
**public** [10] 11:2 13:17 14:16 19:9,14 22:14 25:25 35:11 48:5 53:22
**public-facing** [1] 11:1
**publicity** [1] 26:4
**purpose** [1] 47:4
**purposes** [3] 35:8 45:7,9
**purposes."** [1] 22:23
**put** [6] 5:13 40:4 41:20 45:12 46:10,10
**putting** [2] 31:16 45:11

**Q**

**queries** [4] 22:4 26:2,15 43:21
**query** [4] 36:1 39:21 40:13 43:23
**question** [6] 30:3 35:9 42:10 43:2 47:8,24
**questions** [2] 12:5 13:10
**quickly** [1] 31:5
**quite** [2] 18:24 34:9
**quote** [1] 25:24

**R**

**r** [1] 2:25
**rainey** [1] 27:21
**raised** [1] 15:20
**raising** [1] 14:22
**rather** [1] 34:3
**re** [3] 23:12 24:22 26:21
**read** [7] 12:7,9 15:2 16:22 30:12 44:22 50:9
**ready** [2] 10:11 13:9
**real** [5] 13:25 26:9,10 41:10,11
**realize** [2] 30:10 40:4
**really** [5] 12:10,11 29:2 48:9 50:8
**reason** [12] 17:15 20:25 21:24 22:10,17 25:6,16 27:10 37:8 45:10 48:2,3
**reasonable** [1] 21:9
**reasoning** [1] 32:4
**reasons** [11] 13:15 20:1,20 21:22 22:1 23:15,20 24:4 32:3,21 40:20
**receive** [3] 24:10,13 25:5
**received** [5] 7:5,8 18:6 24:6 38:19
**receiving** [1] 28:12
**record** [5] 5:7,8,14 46:16 53:11
**recorded** [2] 34:24 36:4
**recorder** [1] 46:18
**recording** [6] 5:9 28:12 46:17,18,19,20
**records** [4] 13:5 17:10 19:20 20:24
**records."** [1] 21:17
**recross** [1] 4:7
**redirect** [1] 4:7
**referenced** [1] 42:4
**referred** [1] 53:18
**referring** [1] 22:6
**refers** [1] 13:25
**reflected** [1] 5:25
**refrain** [5] 13:16 14:15 22:3 23:3,7
**regurgitated** [1] 35:14
**reiterate** [1] 5:22
**rejected** [7] 19:25 20:17,19 21:12,15,20 50:12
**relate** [1] 36:14
**related** [1] 11:9
**relates** [2] 6:13 20:16
**release** [4] 41:19,22,23,25
**relevant** [1] 36:22
**rely** [2] 9:10 17:7
**relying** [1] 29:6
**remember** [3] 15:4,5 16:21
**remy** [1] 3:5
**rendered** [1] 34:6
**repeating** [1] 5:11
**replay** [1] 31:8
**representation** [1] 43:15
**representative** [1] 5:4
**request** [2] 7:1 32:2
**respectfully** [1] 32:2
**respects** [1] 12:13
**respond** [2] 22:19 23:15
**response** [9] 19:7,8,11 22:19,20 24:22 28:23 52:24 54:10
**resulted** [1] 25:20
**results** [1] 33:19
**retaining** [1] 45:11
**return** [4] 18:8,12,15 24:7
**review** [2] 8:13 52:17
**revisit** [1] 5:24
**right** [33] 5:7,12,16 6:19 7:4,23 8:2,18 9:12 10:10 14:1,2,18 15:9,17 17:3 30:16 33:24 38:2 39:12,14,25 40:18 42:20 47:1 48:7 49:12,14 50:10 52:9,15 53:8 54:18
**riverside** [1] 2:10
**rolled** [1] 51:7
**routine** [1] 26:12
**royalty** [2] 21:9,16
**rule** [3] 8:12 9:18 32:25
**ruled** [3] 5:19 6:14,20
**rules** [1] 33:19
**ruling** [8] 6:15 8:7 14:23 16:3 21:18 33:7,15,17

**S**

**s** [2] 2:22 3:7
**said** [14] 11:3 20:11,13 21:3,14 22:20 30:2 32:9 37:20 41:2 45:13 46:3 51:3 53:21
**saikali** [1] 3:10
**sake** [1] 8:22
**same** [11] 9:3 16:18 23:11 24:5 26:18 36:15 38:15 40:25 47:25 48:2,3
**san** [1] 3:25
**sanity** [1] 8:22
**santoro** [1] 2:1
**sara** [1] 2:19
**saved** [1] 27:8
**say** [12] 31:22 34:20 44:20 46:2 47:3 48:12 49:10,25 50:2 51:16,16 54:1
**saying** [5] 9:13,16 35:18 37:8 42:17
**says** [18] 14:1,2 18:2 19:9 20:21 22:20 26:14,18 27:6 30:11,11 32:25 43:16 44:8 46:5 53:15,17 54:11
**sc** [1] 4:4
**scale** [1] 27:9
**scanned** [1] 6:22
**scenario** [1] 18:24
**scheduled** [1] 4:15
**science** [1] 29:22
**search** [13] 11:5,5 34:16 35:3,11,12,13 36:12,21 42:25 43:13 44:24 45:14
**searches** [2] 42:24,24
**seclusion** [2] 51:3,6
**second** [3] 9:15 29:3 42:23
**seconds** [2] 51:22,25
**secret** [2] 33:2 49:16
**secretly** [2] 29:9 48:23
**section** [1] 44:21
**secure** [2] 12:18 26:4
**security** [1] 12:16
**see** [7] 8:4 11:3 12:5 24:15 34:19 38:24 52:5
**seeks** [1] 27:9
**seems** [3] 6:11 7:12 8:24
**seen** [3] 14:19 26:8 27:21
**send** [1] 38:21
**sends** [3] 39:6,10,21
**sense** [1] 48:15
**sensitive** [1] 43:19
**sensitivity** [1] 44:3
**sent** [3] 26:6 40:14 49:2
**separate** [3] 18:3,5,7
**serious** [1] 25:21
**serve** [4] 11:25 12:2 19:9 54:15

# Keyword Index


**served** [1] 26:19
**server** [8] 11:15,20,21,22 26:11,16 38:19 41:19
**servers** [2] 11:7 26:4
**service** [2] 49:6,10
**services** [6] 11:4 18:6 19:10,15 20:14 25:11
**session** [1] 31:8
**setting** [1] 43:3
**several** [1] 32:20
**sexual** [1] 35:24
**share** [2] 25:14 29:9
**shared** [1] 36:18
**sharing** [4] 19:2 25:2 37:7 42:7
**she** [1] 36:23
**she's** [1] 36:16
**shook** [6] 2:21 3:1,6,11,17,22
**short** [1] 31:24
**should** [8] 13:14 19:24 20:19 22:18 24:2 29:21,24 32:23
**side** [1] 25:8
**sign** [1] 24:20
**signal** [1] 38:18
**signed** [2] 26:11 48:24
**similar** [5] 11:11 18:24 21:13,21 35:3
**similarly** [3] 4:14 19:18 20:15
**simply** [3] 43:22 48:21 49:2
**single** [2] 35:15 44:12
**single-spy** [1] 31:15
**sit** [1] 41:15
**site** [1] 23:13
**situated** [1] 4:15
**slightly** [1] 40:24
**small** [1] 33:10
**smells** [1] 44:4
**smith** [1] 24:16
**so** [79] 5:11,16,17 7:21 8:4,10,18 9:1,12 10:1,10 11:3,5,22,24 12:1,2 13:8,12 14:1,2,14,19 16:10,25 17:1 19:3,18 21:6,8,22 22:10 23:15,18 24:4 28:1 29:1,10,20 30:18 32:17,25 35:6,18 36:9 37:7,7 38:4,17 39:1,6,20,21 40:8,10,14,21 41:8 42:16,22 43:7,9,10,16,22 44:13 45:2,17 46:2,10,18 47:8,15 48:8 49:15 50:7 51:17 52:2 53:3
**social** [2] 12:16 27:5
**software** [26] 11:12 28:16,18 29:2,16,18,19 31:8,8,10,11,12,13,16,17,21 42:3 46:15,17,18,20 49:20,23,25 50:6,22
**solely** [1] 7:13
**solid** [1] 51:18
**solitude** [3] 51:1,6,10
**some** [21] 8:24 10:9 11:8,25 12:2,18 13:3 16:21 20:18 21:8 24:1 27:14 28:13 30:1,12,18 32:16 36:13,24 45:4 46:14
**somebody** [8] 16:8 30:14 36:23 37:9 42:6 44:12 46:2,6
**somebody's** [1] 45:15
**someone** [4] 12:17 26:2 36:17 54:1
**something** [8] 11:11 23:4 37:10 41:6 42:1 48:12 50:19,21
**sometimes** [1] 21:7
**soon** [1] 38:8
**sophisticated** [2] 42:2 46:9
**sorry** [9] 5:1 6:3 7:1 8:17 9:6,7 18:17 19:15 41:19
**sorts** [1] 47:13
**space** [1] 13:1
**speak** [2] 5:6 9:6
**speaker** [1] 30:9
**specific** [3] 19:13 40:5 48:1
**specifically** [2] 38:5 50:5
**specifics** [1] 19:12
**spirit** [2] 31:9,10
**sports** [1] 33:4
**spot** [1] 40:4
**spread** [1] 48:2
**ss** [1] 1:5
**stage** [2] 15:13 37:24
**stand** [1] 16:11
**standard** [2] 25:19,22
**start** [3] 10:18 35:3,5
**started** [1] 25:2
**starting** [1] 4:19
**state** [5] 16:18 30:14 33:14 34:6 49:15
**statute** [15] 25:19 27:15,24 28:9,10,11 29:6,6,25 30:11,21 33:1,22 50:14,18
**still** [2] 26:16 45:22
**stolen** [1] 12:15
**stores** [1] 39:17
**straight** [4] 12:11 13:9 37:21,23
**street** [4] 1:18,23 3:2,23
**strike** [13] 5:17 6:5,11,13,24,24,25 7:13 8:11 9:1,24 10:1,7
**stroke** [1] 39:3
**struggling** [1] 33:11
**stuff** [1] 39:20
**subject** [1] 34:8
**subjectively** [1] 25:13
**submission** [1] 27:22
**submit** [4] 24:2 25:22 28:6,14
**submitted** [1] 12:6
**subscriber** [1] 41:25
**subsequent** [1] 8:7
**subsequently** [1] 8:6
**substantial** [1] 25:21
**succeeding** [1] 38:23
**succinctly** [1] 48:12
**such** [4] 13:1 24:3 35:2 43:19
**sudden** [1] 34:22
**suffered** [1] 17:23
**sufficient** [2] 38:21 51:14
**suggest** [2] 10:18 50:21
**suggesting** [1] 32:12
**suggestion** [1] 21:6
**suite** [6] 2:4,11,23 3:2,7,24
**summer** [1] 1:23
**superior** [3] 1:5 4:3 8:12
**supplemental** [4] 14:25 18:22 27:22 33:4
**support** [2] 21:4 23:25
**supposedly** [1] 21:10
**sure** [5] 7:21 13:8 16:24 29:24 37:15
**surgeon** [1] 34:22
**surreptitiously** [1] 27:20
**surveillance** [3] 27:18,25 32:18
**sweeney** [2] 1:17,22
**sworn** [1] 54:10

**T**

**tabbed** [2] 40:6,7
**tailored** [1] 19:11
**take** [9] 5:16 6:3 11:16 29:21 30:14 38:13 48:13 52:21 54:18
**taken** [3] 34:10,23 53:4
**takes** [2] 42:3 47:9
**taking** [2] 42:7 45:6
**talk** [5] 28:25 34:2,8 36:18 46:14
**talked** [1] 48:16
**talking** [6] 33:9 36:20 42:2 44:11 45:14 46:16
**tammy** [1] 4:2
**tape** [1] 46:18
**taste** [1] 44:3
**tech** [1] 32:14
**technologies** [1] 11:13
**technology** [7] 28:2,4 30:4 32:13 42:3 46:19 54:12
**telephone** [6] 28:1,5 30:5 32:10 39:19 41:7
**television** [1] 35:15
**tell** [3] 9:5,9 41:16
**tens** [1] 33:9
**term** [1] 45:19
**terms** [7] 28:8 34:16 43:13 44:24 45:4 49:6,10
**terrible** [1] 5:8
**test** [2] 33:15,16
**than** [8] 13:5 19:21 26:10 30:16 31:18 34:3,5 37:10
**than,"** [1] 28:13
**thank** [15] 5:15 10:13 31:4,6 32:23 33:23,24 34:1 53:7,

# Keyword Index

8,9,13 54:19,20,21
that's [47] 5:17 8:7 11:6 13:18 14:3 17:15 18:21 19:3,16 22:4 23:12,15,24 24:8,18,19 25:24 26:10 27:10,20 28:15 29:5,12,16,19 30:15 31:9 33:3 34:25 39:21,22 40:1 42:7 43:8 44:2,16,21 45:7 46:9,17,18 47:2,14,16,19,25 51:15
theft [2] 12:17,19
their [16] 17:8 22:22 24:22 26:3 28:22 31:11,20 40:21 41:18,21,24 44:13 45:20 49:7,17 51:10
them [5] 16:13 17:1 20:18 28:23 42:7
themselves [3] 4:18 46:3,4
then [23] 7:4,14,16 8:6,7 9:21 10:20 11:2,7 12:25 17:4 18:6,7 23:8 28:13 31:2 34:25 35:1 36:7 40:14 41:16 42:10 48:13
theories [5] 18:25 19:24 20:17 21:21 23:23
theory [11] 17:24,25 18:2,9,9,20,20 19:25 20:16,19 51:4
there [45] 6:15,23 8:24 10:9 13:12,18,20 14:15,20,24 15:2,3 16:4,25 17:17 18:15,18 19:1,8 21:19,25 23:12,14,17 24:3,25 25:19 28:6 30:18 32:15 33:1 38:8 43:14 45:11,12 46:5,10,11 48:21 49:5,25 50:7,11 53:1 54:11
there's [39] 13:15 14:12,17,23 16:12,17 19:4 20:7,8 22:2,12 23:1,3,21 25:6,11,14 26:4 27:13 28:10,14 30:7 31:17,22 32:18,20,20,24 33:13,17,20 36:10 50:18,23 53:19,23,24 54:4,13
thereby [1] 18:12
therefore [1] 23:25
these [20] 11:12 12:22 15:24 16:21,23,23 19:20,20,23 20:17 25:5 26:2,18 29:4,12 41:3 42:5 46:1 47:3 49:17
they [35] 15:4 17:7,8,23 19:8 21:16 24:19,20 25:5 28:22 31:7 38:21 40:21 41:4,4,6,11,14,17,17,18,19,22,23,25 42:12 45:12,25 46:3 47:10 48:20,24 49:13,23 54:8
they're [8] 9:18 17:1 25:23 35:8 42:8 45:10,11,11
they've [4] 17:23 31:23 41:20 42:14
thing [3] 13:24 40:25 44:12
things [7] 14:8 17:13,24 21:8 39:5 47:13 50:10
think [19] 5:8 6:14 8:22 9:17 14:22 15:1 18:21 32:4,6 34:3 37:6,7 38:12,13 49:19 50:1 51:3,7,17
third [2] 22:17 42:14
third-parties [4] 22:23 26:23 42:8 46:1
third-party [2] 34:25 35:16
this [97] 4:15 5:2,4 6:20 7:19 8:25 9:1 10:10 11:10 12:11,14,14,21 14:17,21 15:13,20,21 16:3,13,17 17:8,18,18,19 18:4,6,13,21,23 19:19 20:6,8,15 21:11,17 22:17,19 23:22 24:8 25:3,25 26:7,12,14,21 27:1,5,7,9,12,13,14,24 28:24 30:3,6,13 31:23 32:8,21 33:1,7,11,11,12,13,14,15,16,16,18,19,19 34:11,18 35:8,19 37:24 39:3 41:23 42:22 43:3,3 45:6,17 46:21 47:19 48:1 49:4,5,9,12 50:20 53:1,3 54:18
thomas [1] 1:21
those [23] 12:3 13:8 14:8 17:13 18:1,16 22:8 23:8,13 24:8,10,13 25:14 28:8,9,25 30:4 33:22 42:7 44:24 50:5,20 52:7
though [2] 26:18 33:16
thought [6] 6:18 14:24 25:13 30:25 40:5 53:25
thousands [1] 45:8
threatens [1] 27:12
three [7] 14:8 23:15 24:4 28:22,24 29:1 32:5
tied [4] 13:22,24 35:13,19
time [4] 25:3 38:4,15 46:13
tired [1] 48:14
today [9] 7:20 9:10,21 10:5 12:23 16:23 27:11 34:8 43:4
today's [5] 10:2 28:2,3 30:4 33:7
together [1] 49:23
told [2] 11:7 17:10
too [4] 21:12 23:14 26:17 27:12
top [2] 48:13 49:24
topic [2] 36:2,13
totally [1] 47:5
totem [1] 37:6
track [1] 45:19
tracking [2] 48:20 49:17
transcript [1] 15:23
transmitted [2] 27:2 43:21
transmitting [1] 28:12
treat [2] 43:23,24
treating [3] 34:15 43:12 44:22
treatment [2] 43:22 45:20
treatments [3] 34:16 43:13 44:23
treats [1] 43:24
triangulated [1] 45:18
try [1] 34:2
tucker [3] 1:21 2:1 4:20
turn [2] 31:3 38:10
twice [1] 7:13
two [16] 9:21 13:14 16:15 17:24 21:22 22:1 23:20 25:18 32:3 33:13 39:5,7 50:10,20 51:21,23
two-party [1] 30:13
two-step [1] 49:4
tx [1] 2:5
type [1] 32:18
typed [1] 16:8
types [2] 26:18 38:17
typically [1] 20:24

## U

ultimately [1] 13:22
under [6] 25:18 28:10 33:21 49:14 50:6 54:18
underpaid [1] 18:10
underpayment [12] 17:25 18:9,20,25 19:23 20:19 21:1,21 23:22 46:21,24 47:1
understand [7] 25:7 34:9 39:25 42:24 43:8 45:16 47:17
understood [3] 25:10,11,15
unendorsed [1] 6:12
unique [1] 26:24
unjust [8] 17:20 23:18,19,25 24:4 25:7,17 45:5
unless [3] 13:9 37:7 48:10
unlike [1] 12:11
unprecedented [1] 27:10
unreasonable [1] 25:20
up [22] 5:7,9 7:14,20 8:8,9 9:6 11:25 12:2 14:20 19:9 24:20 26:11,19 29:3 30:20 31:4 38:22 46:2,13 48:24 51:20
upfront [1] 32:1
upheld [1] 15:13
upon [3] 14:7 51:1,5
urge [1] 31:20
us [3] 8:8 49:11,12
use [5] 27:18 29:2,10 31:21 34:19
used [12] 28:7,15 29:11,12,17,18 31:10,12,17 35:1,7 51:17
user [7] 11:19 12:23 20:21 24:23 32:15 34:19 48:2
users [2] 24:24 49:10
using [8] 27:25 28:5 31:15,18,19 35:8,22 45:7

## V

# Keyword Index


v [8] 1:9 18:22 24:16 27:20 31:9,9,15 33:3
vacate [1] 8:23
value [4] 18:10,11 21:5,11
van [2] 16:11 17:1
vermon [1] 2:16
version [1] 35:23
versus [5] 4:15 15:15 52:3, 11 54:4
very [5] 22:25 30:15 46:9 53:8 54:19
victoria [1] 2:1
video [3] 5:15 30:14,16
view [1] 39:4
violating [1] 23:7
visit [1] 35:21
visited [3] 11:1 43:17 53: 21
visitor [1] 45:25
visitors' [1] 45:10
visits [1] 45:9
visual [1] 30:16
volume [1] 1:1
voluntarily [3] 11:18 39: 11,16
vs [1] 31:23

W

w [1] 1:14
wacker [1] 2:22
wahl [1] 3:21
waive [1] 9:22
walked [1] 46:2
walks [1] 46:5
want [17] 5:24 7:19,20 9:12, 23 13:8 16:24 17:25 39:7 41:2 46:12 47:11 48:10 49: 24 50:8 52:3,4
wanted [1] 46:22
wants [1] 46:13
warden [54] 1:21 2:6 4:23, 23 37:1,12,14,16,18,20,23 38:3,7,17,21 39:1,12,14,16, 19,24 40:1,7,11,17,19 41: 11,14,23 42:12 45:23 46: 13 47:6,7,9,13,15,18 48:7, 8,11,13 50:4,17 51:2,7,20, 22,25 52:2,9,11 53:9 54:21
warrants [1] 45:14
was [93] 5:22 6:1,15,18 7:2, 2,3,12,15,16,17,21 8:6 10: 24 11:16,20,23 14:6,7,11, 24 15:16,17,21,22,23,23 16:4,23 18:5 19:19 20:25 21:8,10,10,11,12 22:8,20, 25 23:13 24:4,25 25:13,14, 17 26:2,6,8 27:2,15,17,24 28:15,15 29:2,2 31:12,12, 13,13,16,17,18,19,21,21,25 32:9,12,15,19 33:1,2,2,2 34:10,10,21,24 35:11,13 36:22,23,23 38:7 42:23 45: 12 46:21 51:16 53:25 54:1, 11
washington [1] 2:17
wasn't [2] 14:6 43:22
way [10] 7:9,14 10:16,18 30:19 34:18,18 35:12 40: 24 49:5
ways [2] 9:21 50:23
we [55] 5:14 8:3 9:3,4,21 10:7,11 12:10 13:8 15:24 16:2 17:12 18:21 19:5,14, 15 22:14 23:10 24:2 25:21 26:22 28:6,14 29:1 32:1,4, 6 33:22 34:19,19 37:6,18, 24 38:1,3,9 40:8 43:4 45:1, 14 46:12 47:15 48:3,3,18, 19,21,24,24 49:5,8,15 50: 21 51:11,17
we'll [2] 16:19 48:21
we're [9] 6:19 33:8 34:8 35: 22 42:2 43:7 49:15,19 50:7
we've [9] 16:14 32:5,12 38: 12 40:20 48:16 49:23 50:1 51:7
web [5] 20:8,21 21:18 33: 17 40:19
webb [1] 4:2
webpage [1] 19:9
website [34] 11:2 13:17,21 14:11,16 18:11 19:5 20:6, 22 22:14 25:25 26:19 30: 19 31:9,11 34:21 35:4,11, 22 36:5,25 41:21,24 43:17, 18 44:5,13,13 45:9 49:18
53:21,22,22,23
websites [2] 26:15 33:8
websites." [2] 11:14 27:6
well [19] 9:15,20 11:10 19: 8 20:17 21:2 24:18 28:20 30:24 36:1,12 37:2,18,19 40:3 41:1,14 47:13 51:7
well-insured [1] 53:3
went [3] 26:16 41:2 50:12
were [15] 14:20 15:2,3,4 19: 20 23:12 24:1 30:25 32:10 33:15 38:7 42:24 45:1,2 47: 13
westlaw [1] 23:13
what [73] 7:4,8 8:7 9:13,15 10:19,19,20,24,24 11:3 12: 1,6 13:20,24 14:5 15:3,23 16:2,23 18:1 19:11 20:4 22: 20 24:8,12,19 25:13 26:4 27:24 28:1,15,17 29:2,10, 17 30:2,19 31:11,16 32:8, 11,12 33:2,7 34:10,10 36: 12 37:8,22 38:1,3 41:4,22 42:23 43:3 44:6,7,8,19 45: 1,2,17,20 47:10 51:10,16, 16,17,23 53:17,19,25
what's [8] 30:5,8 32:13 43: 10,11 46:9 47:12 48:20
whatever [4] 21:9,10 39: 13 41:8
when [17] 11:19 16:12 17: 10 24:20 25:2 30:3 34:19 35:14 38:9,17 39:16 45:12, 13,18 48:14,14 49:2
where [14] 12:15,17 13:5 23:6 24:17 31:24 34:9 38:5, 24 40:3 44:16 53:2,20 54:1
whereas [2] 18:12 28:23
whether [9] 14:3,6,6 15:4 25:19 31:21 44:2 45:21 48: 20
which [21] 6:24,25 9:25 14: 7 16:19 18:14 20:23 21:25 24:2 28:11 29:25 31:8 34:3 41:5 42:15 43:4 45:23,24 48:5 51:9 53:25
whichever [1] 10:16
while [3] 36:4 46:16 48:19
whirlpool [2] 31:9,10
who [8] 11:8,23 14:11 24: 24 43:24,24 45:19 46:6
whole [1] 40:22
wholesale [1] 52:6
wholly [1] 20:1
whom [1] 10:24
why [8] 10:25 22:17 29:4 40:1 43:8 45:14 46:10,10
will [8] 9:5,10 31:22 34:2 38:11,12,13 53:12
win-win [1] 24:8
wire [1] 28:12
wiretap [7] 27:8,13,14,16 33:18 48:23 50:6
wiretapping [1] 46:14
wishes [1] 52:17
with [66] 4:19,23 5:3 7:6,15 8:3,8,12 11:11,17,20,22 12: 23 13:1,9 14:9 15:24 16:1, 5,18 19:7 21:13 23:13 24: 13 25:21 26:7,9 27:18,23, 24 28:2,3 30:16 32:13 33:3 34:5,14 35:4,23 36:5,16 37: 3,24 39:17,22,24 41:5,16 42:3,7,13 43:18 44:9,12,13 45:11 46:23 47:6 48:24 49: 3 50:13 53:1,4,20 54:3,16
within [3] 13:1 29:5 30:21
without [7] 27:2 30:14,15 36:4 46:16 49:21,22
witness [1] 4:7
word [10] 11:5,10 16:7 19: 6,21 22:16 26:10 29:5 30:8, 11
words [3] 22:24 33:22 50: 21
work [9] 1:20,25 2:13,18 3: 4,9,14,20 4:1
works [7] 24:9,18 38:12,13 39:22 40:24 48:18
world [1] 46:10
worried [1] 41:3
worries [1] 12:17
worth [1] 21:10
would [26] 9:14,25 10:6,16, 17 12:4 20:14 21:14,15 22: 9,10,11 24:5 28:25 32:1 33:

# Keyword Index


6,7,11,13,19 **34**:19 **36**:14 **37**:5 **49**:7 **54**:7,7
**wrap** [2] **31**:4 **51**:20
**wrong** [3] **40**:9 **44**:19 **50**:2

**X**

**x** [2] **4**:6 **46**:5

**Y**

**y** [1] **46**:5
**yeah** [9] **15**:12,17 **37**:20 **43**:2 **45**:16,17 **47**:18 **52**:10,15
**yes** [15] **6**:9,15 **8**:1 **14**:20 **15**:1,18 **16**:25 **28**:22 **29**:24 **35**:21 **42**:21 **44**:18 **47**:22,24 **50**:17
**yet** [4] **43**:5 **46**:25 **47**:15 **48**:21
**you'll** [3] **27**:22 **35**:3,5
**you're** [10] **9**:13,16,20 **31**:1 **42**:16,17 **44**:11 **46**:16 **48**:8,14
**you've** [2] **27**:21 **39**:1
**your** [62] **5**:19 **7**:22 **8**:5,6,7 **9**:4,7,17 **10**:7,13,16,17 **12**:7 **15**:7 **16**:21 **22**:6,17 **29**:14,24,24 **30**:23 **31**:4 **32**:11 **33**:5,6 **34**:1 **35**:2,9 **36**:20 **37**:3,14 **38**:17 **39**:2,2,3,9,17,20 **40**:8,25 **41**:1 **42**:18 **43**:2,16 **44**:18 **46**:16,23 **47**:7,24 **49**:3,22 **50**:1 **52**:7,14,16,24 **53**:7,9,10,13 **54**:9,21
**yours** [1] **44**:20

**Z**

**z** [1] **46**:5
**zavitsanos** [1] **2**:2
**zoom** [2] **5**:15 **27**:11

# EXHIBIT 2

NOTIFY

17

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT
CIVIL ACTION
No. 2384CV00480-BLS1

KATHLEEN VITA[1]

vs.

BETH ISRAEL DEACONESS MEDICAL CENTER, INC.

**MEMORANDUM OF DECISION AND ORDER ON DEFENDANT'S MOTION TO DISMISS AND REPORT TO THE APPEALS COURT**

Plaintiff Kathleen Vita ("Plaintiff") commenced this putative class action against defendant Beth Israel Deaconess Medical Center ("BIDMC"), alleging that it used internet tracking tools on its website that illegally redirected website users' personal information, and the contents of users' communications with BIDMC's website, to third parties Google and Meta. On the basis of these allegations, the Complaint asserts a single claim for violation of the Massachusetts Wiretap Statute, G.L. c. 272, § 99. Presently before the court is BIDMC's motion to dismiss. After a hearing on September 19, 2023, and consideration of the parties' submissions, the motion is **DENIED**, and, consistent with the parties' request, the matter is **REPORTED** to the Appeals Court.

## BACKGROUND

The Complaint and relevant documents attached to the motion to dismiss set forth the following facts.[2] BIDMC operates a hospital in Boston that offers inpatient and outpatient care

[1] For herself and the class.
[2] BIDMC's complete website Privacy Policy, which Plaintiff relies on in framing her Complaint, was attached to the motion to dismiss. *Marram v. Kobrick Offshore Fund, Ltd.*, 442 Mass. 43, 45 n.4 (2004).

to residents in the greater Boston area. Plaintiff is an individual residing in Revere, Massachusetts.

BIDMC maintains and controls a website for its hospital. The website allows users to obtain information about the services BIDMC provides, including information about doctors, services, and treatments provided for particular medical conditions. Website users also can book appointments, access and pay bills, and access private medical information through the website's patient portal. The website contains search bars that aid users in finding specific information on the site, and forms that users may submit to BIDMC, such as the "Request an Appointment" form.

As relevant here, BIDMC's website privacy policy ("Privacy Policy") states:

> Beth Israel Deaconess Medical Center (BIDMC) is committed to protecting your privacy. The BIDMC website allows you to visit most areas without identifying yourself or providing personal information. For those areas where you elect to provide identifiable information, we assure you that we make every effort to protect your privacy. . . .
>
> Beth Israel Deaconess Medical Center routinely gathers data on website activity, such as how many people visit the site, the pages they visit, where they come from, how long they stay, etc. The data is collected on an aggregate, anonymous basis, which means no personally identifiable information is associated with the data. This data helps us improve site content and overall usage. This information is not shared with other organizations. Except for authorized law enforcement investigations or other facially valid legal processes, we will not share any information we receive with outside parties. . . .
>
> We and our Third Party Service Provider collect and save the default information customarily logged by worldwide web server software. Our logs contain the following information for each request: date and time, originating IP address and domain name (the unique address assigned to your Internet service provider's computer that connects to the Internet), object requested, and completion status of the request. These logs may be kept for an indefinite amount of time, used at any time and in any way necessary to prevent security breaches and to ensure the integrity of the data on our servers.

(Formatting altered). Since 2021, BIDMC's website also has included a pop-up notice that references the use of "cookies and other tools to enhance your experience on the website," with a link to the Privacy Policy "for more information about these cookies and the data collected."

Notwithstanding this Privacy Policy, BIDMC has implemented multiple software-based internet tracking technologies on its website that contemporaneously record and transmit data about users' interactions with BIDMC's website to multiple unidentified third parties. The software is unrelated to the website's functionality and is invisible to users. Two such tracking technologies are Meta Pixel, which transmits data to Meta (the parent company of Facebook), and Google Analytics, which transmits data to Google.

Meta Pixel and Google Analytics operate through the automatic execution of pieces of JavaScript code, embedded in the BIDMC website, which cause a website user's internet browser to record and send information to those third parties when a user visits and interacts with the site. The transmitted information can include: the website address (URL); the title of webpages visited; information about the content of the website; search terms or any other information inputted into a form; selections on drop-down menus and the contents thereof; scrolls down a webpage; and button clicks. A website user's internet protocol ("IP") address and web browser configurations are also revealed, which permits Google and Meta to associate the data it receives from the website visit to the identity of a particular individual known to them. The content of the user's communications with BIDMC's website is added to Google's and Meta's collection of information already known about the individual, which can be used to target advertising to that individual. Google, Meta, and BIDMC may also use the information collected for other commercial purposes. After a media exposé about the use of Meta Pixel on hospital

websites, BIDMC removed it from its website in September 2022. As of the date the Complaint was filed, Google Analytics software remained on the BIDMC website.

In addition to Meta Pixel and Google Analytics, BIDMC also employs other software-based internet tracking technologies that work in a similar fashion. Those include Doubleclick, Siteimprove Analytics, and Marchex.io.

Plaintiff's husband is a BIDMC patient. Plaintiff regularly uses the BIDMC website to obtain information about BIDMC doctors (including their credentials and backgrounds); search for information on particular symptoms, conditions, and medical procedures, both for herself and her husband; and obtain and review her husband's medical records through the BIDMC website patient portal.

## STANDARD OF REVIEW

Rule 12(b)(6) allows for dismissal of a complaint when the factual allegations contained within it do not suggest a plausible entitlement to relief. *Iannacchino v. Ford Motor Co.*, 451 Mass. 623, 635-636 (2008); *Fraelick v. PerkettPR, Inc.*, 83 Mass. App. Ct. 698, 699-700 (2013). In ruling on the motions, the court accepts the factual allegations as true and draws all reasonable inferences in the non-moving party's favor. *Fraelick*, 83 Mass. App. Ct. at 699-700.

## DISCUSSION

BIDMC argues that Plaintiff's claims must be dismissed due to lack of standing and failure to meet the requirements of the Massachusetts Wiretap Statute. As discussed below, however, under this court's reading of the relevant caselaw and the plain language of the statute, the Complaint states a claim sufficient to survive dismissal under Rule 12(b)(6). Nevertheless, because of the novelty of the issue raised, which also has arisen in several analogous cases

before this court, and for the further reasons discussed below, a report to the Appeals Court is appropriate.[3]

1. <u>Standing</u>[4]

This court recently addressed standing in an analogous wiretap cases — *Doe v. Boston Medical Center*, 2384CV00326-BLS1, slip op. at 4-5 (Mass. Super. Ct. Sept. 15, 2023) ("*Boston Medical Center*"). There, the court denied the defendant's motion to dismiss on standing grounds, concluding that "a properly alleged violation of the [Massachusetts Wiretap Statute], alone, constitute[s] injury sufficient to confer standing." *Id.* (citing *Pine v. Rust*, 404 Mass. 411, 418 (1989); *In re Lubanski*, 186 B.R. 160, 166-67 (Bankr. D. Mass. 1995)). For the same reasons enunciated in that decision, Plaintiff has standing to sue here, as well.

2. <u>Massachusetts Wiretap Statute</u>

General Laws c. 272, § 99(Q) provides a cause of action for "any aggrieved person whose oral or wire communications were intercepted, disclosed or used . . . or whose personal or property interests or privacy were violated by means of an interception," except as permitted or authorized by the Wiretap Statute. "Interception" is defined to mean "to secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire or oral communication through the use of any intercepting device by any person other than a person given prior authority by all parties to such communication." G.L. c. 272, § 99(B)(4).

BIDMC argues that the action should be dismissed because, according to it: 1) the statute applies only to "conversations," not internet tracking; 2) BIDMC's recording of website user

[3] On this same date the court also decides a similar motion to dismiss and reports the correctness of its ruling to the Appeals Court in *Kathleen Vita v. New England Baptist Hospital*, 2384CV00857-BLS1.
[4] The standard of review for challenging standing in a motion to dismiss under Rule 12(b)(1) is functionally the same as under Rule 12(b)(6). *Abate v. Fremont Inv. & Loan*, 470 Mass. 821, 828 (2015).

activity was not secret; 3) the statutory "ordinary course of business" exception applies; and 4) application of the statute to the facts here would lead to absurd results the Legislature could not have intended. The court addresses each, in turn.

*A.* *Limitation of the statute to human-to-human conversation*. In prior analogous cases, this court concluded that the plain language of the statute encompasses the electronic activity alleged here. *See Boston Medical Center*, 2384CV00326-BLS1, slip op. at 6-7; *Doe v. Boston Children's Hospital*, 2384CV00411-BLS1, slip op. at 4-6 (Mass. Super. Ct. Sept. 15. 2023) ("*Boston Children's*"). Accordingly, for the same reasons already articulated in those cases, the argument fails here, as well.

*B.* *Secrecy requirement*. As noted, an interception under the Massachusetts Wiretap Statute must be "secret." G.L. c. 272, § 99(B)(4). A "secret" recording is one that is "concealed," and "kept hidden or unexplained." *Curtatone v. Barstool Sports, Inc.*, 487 Mass. 655, 658 (2021) (dictionary citations omitted). An interception is not secret for purposes of the Massachusetts Wiretap Statute if the individual communicating has "actual [or constructive] knowledge of the recording," which is proved through "'clear and unequivocal objective manifestations of knowledge' in the [users'] statements or conduct." *Commonwealth v. Morris*, 492 Mass. 498, 515 (2023) (Budd., J., concurring) (quoting *Commonwealth v. Jackson*, 370 Mass. 502, 507 (1976)). *See Commonwealth v. Du*, No. 22-P-870, 2023 WL 652243, at *6 (Mass. App. Ct. Oct. 6, 2023).

BIDMC argues that its Privacy Policy and related website pop-up disclose BIDMC's collection of data, and its sharing of that data with a third party, such that the internet tracking activity alleged here is not secret. There are two problems with that argument. First, the Privacy Policy is unclear about the exact nature of the website data BIDMC shares. The Privacy Policy

informs users that BIDMC collects certain user data that is kept anonymous and which "is not shared with other organizations," but then notes the existence of an external "Third Party Service Provider" that also collects data, but defines that collected data in a different way. The Privacy Policy language is technical and obscures whether the BIDMC data and the Third Party Service Provider data are related or overlap in some ways, and thus whether some of the purportedly private, unshared, "anonymous" data BIDMC collects is nevertheless shared with the Third Party Service Provider.[5] Second, the Privacy Policy discloses the existence of only a *single* "Third Party Service Provider," while the Complaint alleges that the data BIDMC collects is contemporaneously shared with *multiple* external organizations (Google, Meta, and others). The existence of these additional third-party "eavesdroppers" are thus kept hidden from BIDMC's website users.

In sum, the Privacy Policy and website pop-up, while disclosing some amount of data sharing, do not establish users' actual or constructive knowledge of the totality of the internet tracking alleged here.[6] Accordingly, on the facts as pleaded and taken as true, the Complaint sufficiently alleges a secret interception, i.e. that BIDMC "aid[ed] another to secretly hear or secretly record the contents of any wire or oral communication." G.L. c. 272, § 99(B)(4).[7]

*C. "Ordinary course of business" exception.* The Massachusetts Wiretap Statute excepts from the definition of "intercepting device":

---

[5] Indeed, as a lay reader of the Privacy Policy, the court is unable to determine whether BIDMC's collected data about "how many people visit the site, the pages they visit, where they come from, how long they stay, etc." includes some of the same information as it and the Third Party Service Provider's collection of "default information customarily logged by worldwide web server software."

[6] That a website user can reveal the internet tracking software code by employing "Developer Mode" also does not establish actual or constructive knowledge of the software code at issue.

[7] Because this case alleges third-party eavesdropping on website communications by undisclosed, contemporaneous third-parties, this case differs from *Curtatone v. Barstool Sports, Inc.*, 487 Mass. 655 (2023), which involved a consented-to recorded conversation between two people only. *See id.* at 657, 660.

> any telephone or telegraph instrument, equipment, facility, or a component thereof, (a) furnished to a subscriber or user by a communications common carrier in the ordinary course of its business under its tariff and being used by the subscriber or user in the ordinary course of its business . . .

G.L. c. 272, § 99(B)(3). Thus, for the exception to apply, the intercepting device at issue must consist of or include "telephone or telegraph" equipment, instruments, etc. *Id.*

Setting aside whether internet tracking occurs in the ordinary course of BIDMC's business, the electronic software-based internet tracking technology at issue here plainly is not telephone or telegraph equipment. For that reason, in the absence of an appellate decision extending the exception beyond the realm of telephones and telegraphs, under the plain language of the statute, the court declines to apply the exception here. *See Alves v. BJ's Wholesale Club, Inc.*, 2284CV02509-BLS1, slip op. at 10 (Super. Ct. June 21, 2023) ("*Alves*") (declining to extend exception to software-based session replay code technology).

*D. Legislative Intent.* Finally, BIDMC argues that interpreting the Massachusetts Wiretap Statute to encompass the ubiquitous internet tracking that practically all businesses presently employ would lead to absurd results the Legislature could not have intended when it enacted the statute in 1968. Reading the criminal caselaw that BIDMC cites for this proposition does not compel the denial it seeks, however.

*Commonwealth v. Morris*, 492 Mass. 498 (2023), and *Commonwealth v. Rainey*, 491 Mass. 632 (2023), upon which BIDMC relies, each involve statements made to police wherein the speakers necessarily understood that their statements were being memorialized for future use or presentation in court, despite the lack of explicit disclosure about electronic recording. *Morris*, 492 Mass. at 503-04; *Rainey*, 491 Mass. at 635, 640-41. In that narrow context, the

court determined that literal application of the Massachusetts Wiretap Statute would result in absurd and unintended consequences, at odds with the Legislature's intent in enacting the statute. *See Morris*, 492 Mass. at 506 ("nothing in the statute as a whole, including its codified preamble, supports the conclusion that the Legislature intended to criminalize the police officers' recording of the defendant's voluntary statement, which the defendant understood was being preserved for future use in connection with the investigation of the crime about which the defendant was speaking voluntarily"); *Rainey*, 491 Mass. at 643 (same as to victim's voluntarily-provided statement to police).

Here, unlike the criminal defendant and victim in *Morris* and *Rainey*, Plaintiff and BIDMC's other website users are not alleged to be proceeding with the implicit understanding that their communications are to be preserved and memorialized, electronically or by handwritten notes, by a government body, for important public safety reasons. Rather, the entire gist of the Complaint is that Plaintiff interacted with the BIDMC website with no concept that the data she inputted would be simultaneously and automatically intercepted and externally shared with multiple external parties. These facts alone distinguish this case from *Morris* and *Rainey*.

In further contrast to those cases, the statute's preamble arguably supports the right to freedom from private electronic surveillance at issue here. Its broad language provides:

> The general court . . . finds that the uncontrolled development and unrestricted use of modern electronic surveillance devices pose grave dangers to the privacy of all citizens of the commonwealth. Therefore, the secret use of such devices by private individuals must be prohibited.

G.L. c. 272, § 99. In fact, a broad interpretation of the statute's language is endorsed in *Commonwealth v. Moody*, 466 Mass. 196 (2013), a Supreme Judicial Court decision that

extended the Massachusetts Wiretap Statute's application to electronic text messages. *See id.* at 209 ("[i]n light of the broad statutory definitions of the terms 'wire communication' and 'interception,' we conclude that the Massachusetts wiretap statute provides protection for the electronic transmission of text messages").[8]

For the reasons explained above, and absent an appellate decision interpreting the Massachusetts Wiretap Statute in the narrow way that BIDMC suggests, this court concludes that the facts as alleged in the Complaint state a claim for a violation of the statute.

3. <u>Report to Appeals Court</u>

Under Mass. R. Civ. P. 64, a Superior Court judge may report an interlocutory decision "where he or she concludes that the finding or order 'so affects the merits of the controversy that the matter ought to be determined by the [A]ppeals [C]ourt before any further proceedings in the trial court.'" *Patel v. Martin*, 481 Mass. 29, 32 (2018) (quoting Mass. R. Civ. P. 64(a)). The Supreme Judicial Court has cautioned that "[i]nterlocutory matters should be reported only where it appears that they present serious questions likely to be material in the ultimate decision, and that subsequent proceedings in the trial court will be substantially facilitated by so doing." *Globe Newspaper Co. v. Massachusetts Bay Transp. Auth. Ret. Bd.*, 412 Mass. 770, 772 (1992) (quoting *John Gilbert Jr. Co. v. C.M. Fauci Co.*, 309 Mass. 271, 273 (1941)). Such is the case here. The parties here also have requested that the court report the matter to the Appeals Court.

Whether the Massachusetts Wiretap Statute applies to the internet tracking alleged here is a novel question unresolved at the appellate level in Massachusetts, and is the central and

---

[8] The most recent published case interpreting the Massachusetts Wiretap Statute is consistent with this view. *See Commonwealth v. Du*, No. 22-P-870, 2023 WL 6522435, at *6-*7 (Mass. App. Ct. Oct. 6, 2023) (court interpreted statute to prohibit surreptitious audio-visual video recording of drug transaction made by police using cell phone application).

dispositive issue in this case. Although the Massachusetts Wiretap Statute is broadly drafted, and states the Legislature's explicit intention to protect citizens from the grave danger of electronic surveillance by private individuals poses, it was enacted in 1968 — long before the internet, let alone internet tracking, became available. The Legislature did not, therefore, contemplate internet tracking as a form of secretly intercepting communications. BIDMC argues that internet tracking is practically ubiquitous across all businesses and organizations with websites, and that BIDMC's use of such tracking is a legitimate, ordinary part of its business. Had the Legislature been aware of internet tracking and its possible business uses in 1968, it might have written the statute to allow the type of tracking alleged in this case.

The novel question here has arisen in several other cases. As noted, this court already has denied motions to dismiss in two other internet-tracking wiretap cases. *See Boston Medical Center*, 2384CV00326-BLS1; *Boston Children's*, 2384CV00411-BLS1. Other Superior Court judges have issued similar decisions. *See Alves*, 2284CV02509-BLS1; *Doe v. Partners Healthcare System, Inc.*, 1984CV01651-BLS1, endorsement denying motion to dismiss (Super. Ct. Dec. 7, 2020). There are many other analogous cases presently pending in the Superior Court, including in this session.[9] If, as BIDMC argues, the Massachusetts Wiretap Statute does not apply to business-related internet tracking, significant judicial and party resources will be saved by the quick resolution of these cases before discovery and other stages of litigation.

---

[9] Other analogous cases pending in BLS1 include: *Progin, Janice v. UMass Memorial Health Care, Inc.*, 2284CV2889; *John Doe v. Boston Medical Center Corp.*, 2384CV326; *Jane Doe v. The Children's Hospital Corp.*, 2384CV411; *Kathleen Vita v. New England Baptist Hospital*, 2384CV00857; *Karen McManus v. Tufts Medical Center, Inc.*, 2384CV930; *Elizabeth Nova v. Boston Medical Center Corporation*, 2384CV1086; *Jane Doe v. Cape Cod Healthcare, Inc.*, 2384CV1236; *Jane Doe v Baystate Health Systems*, 2384CV1949; *John Doe v. UMass Memorial Health Care Inc.*, 2384CV2448; *Lisa Colleton v. UMass Memorial Health Care Inc.*, 2384CV2450

For all of these reasons, this matter should be determined by the Appeals Court before any proceedings continue in this court.

**ORDER**

For the foregoing reasons, it is hereby **ORDERED** that:

1. BIDMC's motion to dismiss is **DENIED**; and
2. The Court **REPORTS** the correctness of its ruling to the Appeals Court.

Dated: October 31, 2023

Hélène Kazanjian
Justice of the Superior Court

# EXHIBIT 3

16

NOTIFY

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT
CIVIL ACTION
No. 2384CV00857-BLS1

KATHLEEN VITA[1]

11/1/23
notice sent
BH (2)

vs.

NEW ENGLAND BAPTIST HOSPITAL

**MEMORANDUM OF DECISION AND ORDER ON DEFENDANT'S MOTION TO DISMISS AND REPORT TO THE APPEALS COURT**

Plaintiff Kathleen Vita ("Plaintiff") commenced this putative class action against defendant New England Baptist Hospital ("NEBH"), alleging that it used internet tracking tools on its website that illegally redirected website users' personal information, and the contents of users' communications with NEBH's website, to third parties Google and Meta. On the basis of these allegations, the Complaint asserts a single claim for violation of the Massachusetts Wiretap Statute, G.L. c. 272, § 99. Presently before the court is NEBH's motion to dismiss. After a hearing on September 19, 2023, and consideration of the parties' submissions, the motion is **DENIED**, and, consistent with the parties' request, the matter is **REPORTED** to the Appeals Court.

## BACKGROUND

The Complaint and relevant documents attached to the motion to dismiss set forth the following facts.[2] NEBH operates a hospital with a main campus in Boston, and several other

[1] For herself and the class.
[2] NEBH's complete website Privacy Policy, which Plaintiff relies on in framing her Complaint, was attached to the motion to dismiss. *Marram v. Kobrick Offshore Fund, Ltd.*, 442 Mass. 43, 45 n.4 (2004).

locations in the Boston area, focusing on orthopedic care and complex orthopedic procedures. Plaintiff is an individual residing in Revere, Massachusetts.

NEBH maintains and controls a website for its hospital. The website allows users to obtain information about the services NEBH provides, including information about doctors, services, and treatments provided for particular medical conditions. Website users also can access and pay bills, and access private medical information through the website's patient portal. The website contains search bars that aid users in finding specific information on the site, and forms that users may submit to NEBH, such as the "Find a Doctor" form.

As relevant here, NEBH's website privacy policy ("Privacy Policy") states:

> New England Baptist Hospital (NEBH) is committed to protecting your privacy. The NEBH website allows you to visit most areas without identifying yourself or providing personal information. For those areas where you elect to provide identifiable information, we assure you that we make every effort to protect your privacy. . . .
>
> New England Baptist Hospital routinely gathers data on website activity, such as how many people visit the site, the pages they visit, where they come from, how long they stay, etc. The data is collected on an aggregate, anonymous basis, which means no personally identifiable information is associated with the data. This data helps us improve site content and overall usage. This information is not shared with other organizations. Except for authorized law enforcement investigations or other facially valid legal processes, we will not share any information we receive with outside parties. . . .
>
> We and our Third Party Service Provider collect and save the default information customarily logged by worldwide web server software. Our logs contain the following information for each request: date and time, originating IP address and domain name (the unique address assigned to your Internet service provider's computer that connects to the Internet), object requested, and completion status of the request. These logs may be kept for an indefinite amount of time, used at any time and in any way necessary to prevent security breaches and to ensure the integrity of the data on our servers.

(Formatting altered). Since 2021, NEBH's website also has included a pop-up notice that references the use of "cookies and other tools to enhance your experience on the

website," with a link to the Privacy Policy "for more information about these cookies and the data collected."

Notwithstanding this Privacy Policy, NEBH has implemented multiple software-based internet tracking technologies on its website that contemporaneously record and transmit data about users' interactions with NEBH's website to multiple unidentified third parties. The software is unrelated to the website's functionality and is invisible to users. Two such tracking technologies are Meta Pixel, which transmits data to Meta (the parent company of Facebook), and Google Analytics, which transmits data to Google.

Meta Pixel and Google Analytics operate through the automatic execution of pieces of JavaScript code, embedded in the NEBH website, which cause a website user's internet browser to record and send information to those third parties when a user visits and interacts with the site. The transmitted information can include: the website address (URL); the title of webpages visited; information about the content of the website; search terms or any other information inputted into a form; selections on drop-down menus and the contents thereof; scrolls down a webpage; and button clicks. A website user's internet protocol ("IP") address and web browser configurations are also revealed, which permits Google and Meta to associate the data it receives from the website visit to the identity of a particular individual known to them. The content of the user's communications with NEBH's website is added to Google's and Meta's collection of information already known about the individual, which can be used to target advertising to that individual. Google, Meta, and NEBH may also use the information collected for other commercial purposes. After a media exposé about the use of Meta Pixel on hospital websites in June 2022, NEBH removed it from its website at some unidentified point in time. As of the date the Complaint was filed, Google Analytics software remained on the NEBH website.

Plaintiff is a NEBH patient. Plaintiff regularly uses the NEBH website to obtain information about NEBH doctors (including their credentials and backgrounds) and to search for information on particular medical procedures.

## STANDARD OF REVIEW

Rule 12(b)(6) allows for dismissal of a complaint when the factual allegations contained within it do not suggest a plausible entitlement to relief. *Iannacchino v. Ford Motor Co.*, 451 Mass. 623, 635-636 (2008); *Fraelick v. PerkettPR, Inc.*, 83 Mass. App. Ct. 698, 699-700 (2013). In ruling on the motions, the court accepts the factual allegations as true and draws all reasonable inferences in the non-moving party's favor. *Fraelick*, 83 Mass. App. Ct. at 699-700.

## DISCUSSION

NEBH argues that Plaintiff's claims must be dismissed due to lack of standing and failure to meet the requirements of the Massachusetts Wiretap Statute. As discussed below, however, under this court's reading of the relevant caselaw and the plain language of the statute, the Complaint states a claim sufficient to survive dismissal under Rule 12(b)(6). Nevertheless, because of the novelty of the issue raised, which also has arisen in several analogous cases before this court, and for the further reasons discussed below, a report to the Appeals Court is appropriate.[3]

---

[3] On this same date the court also decides a similar motion to dismiss and reports the correctness of its ruling to the Appeals Court in *Kathleen Vita v. Beth Israel Deaconess Medical Center, Inc.*, 2384CV00480-BLS1.

1. **Standing**[4]

This court recently addressed standing in an analogous wiretap case — *Doe v. Boston Medical Center*, 2384CV00326-BLS1, slip op. at 4-5 (Mass. Super. Ct. Sept. 15, 2023) ("*Boston Medical Center*"). There, the court denied the defendant's motion to dismiss on standing grounds, concluding that "a properly alleged violation of the [Massachusetts Wiretap Statute], alone, constitute[s] injury sufficient to confer standing." *Id.* (citing *Pine v. Rust*, 404 Mass. 411, 418 (1989); *In re Lubanski*, 186 B.R. 160, 166-67 (Bankr. D. Mass. 1995)). For the same reasons enunciated in that decision, Plaintiff has standing to sue here, as well.

2. **Massachusetts Wiretap Statute**

General Laws c. 272, § 99(Q) provides a cause of action for "any aggrieved person whose oral or wire communications were intercepted, disclosed or used . . . or whose personal or property interests or privacy were violated by means of an interception," except as permitted or authorized by the Wiretap Statute. "Interception" is defined to mean "to secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire or oral communication through the use of any intercepting device by any person other than a person given prior authority by all parties to such communication." G.L. c. 272, § 99(B)(4).

NEBH argues that the action should be dismissed because, according to it: 1) the statute applies only to "conversations," not internet tracking; 2) NEBH's recording of website user activity was not secret; 3) the statutory "ordinary course of business" exception applies; and 4) application of the statute to the facts here would lead to absurd results the Legislature could not have intended. The court addresses each, in turn.

[4] The standard of review for challenging standing in a motion to dismiss under Rule 12(b)(1) is functionally the same as under Rule 12(b)(6). *Abate v. Fremont Inv. & Loan*, 470 Mass. 821, 828 (2015).

*A. Limitation of the statute to human-to-human conversation.* In prior analogous cases, this court concluded that the plain language of the statute encompasses the electronic activity alleged here. *See Boston Medical Center*, 2384CV00326-BLS1, slip op. at 6-7; *Doe v. Boston Children's Hospital*, 2384CV00411-BLS1, slip op. at 4-6 (Mass. Super. Ct. Sept. 15. 2023) ("*Boston Children's*"). Accordingly, for the same reasons articulated in those cases, the argument fails here, as well.

*B. Secrecy requirement.* As noted, an interception under the Massachusetts Wiretap Statute must be "secret." G.L. c. 272, § 99(B)(4). A "secret" recording is one that is "concealed," and "kept hidden or unexplained." *Curtatone v. Barstool Sports, Inc.*, 487 Mass. 655, 658 (2021) (dictionary citations omitted). An interception is not secret for purposes of the Massachusetts Wiretap Statute if the individual communicating has "actual [or constructive] knowledge of the recording," which is proved through "'clear and unequivocal objective manifestations of knowledge' in the [users'] statements or conduct." *Commonwealth v. Morris*, 492 Mass. 498, 515 (2023) (Budd., J., concurring) (quoting *Commonwealth v. Jackson*, 370 Mass. 502, 507 (1976)). *See Commonwealth v. Du*, No. 22-P-870, 2023 WL 652243, at *6 (Mass. App. Ct. Oct. 6, 2023).

NEBH argues that its Privacy Policy and related website pop-up disclose NEBH's collection of data, and its sharing of that data with a third party, such that the internet tracking activity alleged here is not secret. There are two problems with that argument. First, the Privacy Policy is unclear about the exact nature of the website data NEBH shares. The Privacy Policy informs users that NEBH collects certain user data that is kept anonymous and which "is not shared with other organizations," but then notes the existence of an external "Third Party Service Provider" that also collects data, but defines that collected data in a different way. The Privacy

Policy language is technical and obscures whether the NEBH data and the Third Party Service Provider data are related or overlap in some ways, and thus whether some of the purportedly private, unshared, "anonymous" data NEBH collects is nevertheless also shared with the Third Party Service Provider.[5] Second, the Privacy Policy discloses the existence of only a *single* "Third Party Service Provider," while the Complaint alleges that the data NEBH collects is contemporaneously shared with *multiple* external organizations (Google, Meta, and others). The existence of these additional third-party "eavesdroppers" are thus kept hidden from NEBH's website users.

In sum, the Privacy Policy and website pop-up, while disclosing some amount of data sharing, do not establish users' actual or constructive knowledge of the totality of the internet tracking alleged here.[6] Accordingly, on the facts as pleaded and taken as true, the Complaint sufficiently alleges a secret interception, i.e. that NEBH "aid[ed] another to secretly hear or secretly record the contents of any wire or oral communication." G.L. c. 272, § 99(B)(4).[7]

C. "<u>Ordinary course of business" exception</u>. The Massachusetts Wiretap Statute excepts from the definition of "intercepting device":

> any telephone or telegraph instrument, equipment, facility, or a component thereof, (a) furnished to a subscriber or user by a communications common carrier in the ordinary course of its business under its tariff and being used by the subscriber or user in the ordinary course of its business . . .

[5] Indeed, as a lay reader of the Privacy Policy, the court is unable to determine whether NEBH's collected data about "how many people visit the site, the pages they visit, where they come from, how long they stay, etc." includes some of the same information as it and the Third Party Service Provider's collection of "default information customarily logged by worldwide web server software."

[6] That a website user can reveal the internet tracking software code by employing "Developer Mode" also does not establish actual or constructive knowledge of the software code at issue.

[7] Because this case alleges third-party eavesdropping on website communications by undisclosed, contemporaneous third-parties, this case differs from *Curtatone v. Barstool Sports, Inc.*, 487 Mass. 655 (2023), which involved a consented-to recorded conversation between two people only. *See id.* at 657, 660.

G.L. c. 272, § 99(B)(3). Thus, for the exception to apply, the intercepting device at issue must consist of or include "telephone or telegraph" equipment, instruments, etc. *Id.*

Setting aside whether internet tracking occurs in the ordinary course of NEBH's business, the electronic software-based internet tracking technology at issue here plainly is not telephone or telegraph equipment. For that reason, in the absence of an appellate decision extending the exception beyond telephones and telegraphs, under the plain language of the statute, the court declines to apply the exception here. *See Alves v. BJ's Wholesale Club, Inc.*, 2284CV02509-BLS1, slip op. at 10 (Super. Ct. June 21, 2023) ("*Alves*") (declining to extend exception to software-based session replay code technology).

*D.* *Legislative Intent*. Finally, NEBH argues that interpreting the Massachusetts Wiretap Statute to encompass the ubiquitous internet tracking that practically all businesses presently employ would lead to absurd results the Legislature could not have intended when it enacted the statute in 1968. Reading the criminal caselaw that NEBH cites for this proposition does not compel the denial it seeks, however.

*Commonwealth v. Morris*, 492 Mass. 498 (2023), and *Commonwealth v. Rainey*, 491 Mass. 632 (2023), upon which NEBH relies, each involve statements made to police where the speakers necessarily understood that their statements were being memorialized for future use or presentation in court, despite the lack of explicit disclosure about electronic recording. *Morris*, 492 Mass. at 503-04; *Rainey*, 491 Mass. at 635, 640-41. In that narrow context, the court determined that literal application of the Massachusetts Wiretap Statute would result in absurd and unintended consequences, at odds with the Legislature's intent in enacting the statute. *See Morris*, 492 Mass. at 506 ("nothing in the statute as a whole, including its codified preamble, supports the conclusion that the Legislature intended to criminalize the police officers' recording

of the defendant's voluntary statement, which the defendant understood was being preserved for future use in connection with the investigation of the crime about which the defendant was speaking voluntarily"); *Rainey*, 491 Mass. at 643 (same as to victim's voluntarily-provided statement to police).

Here, unlike the criminal defendant and victim in *Morris* and *Rainey*, Plaintiff and NEBH's other website users are not alleged to be proceeding with the implicit understanding that their communications are to be preserved and memorialized, electronically or by handwritten notes, by a government body, for important public safety reasons. Rather, the entire gist of the Complaint is that Plaintiff interacted with the NEBH website with no concept that the data she inputted would be simultaneously and automatically intercepted and externally shared with multiple external parties. These facts alone distinguish this case from *Morris* and *Rainey*.

In further contrast to those cases, the statute's preamble arguably supports the right to freedom from private electronic surveillance at issue here. Its broad language provides:

> The general court . . . finds that the uncontrolled development and unrestricted use of modern electronic surveillance devices pose grave dangers to the privacy of all citizens of the commonwealth. Therefore, the secret use of such devices by private individuals must be prohibited.

G.L. c. 272, § 99. In fact, a broad interpretation of the statute's language is endorsed in *Commonwealth v. Moody*, 466 Mass. 196 (2013), a Supreme Judicial Court decision that extended the Massachusetts Wiretap Statute's application to electronic text messages. *See id.* at 209 ("[i]n light of the broad statutory definitions of the terms 'wire communication' and

'interception,' we conclude that the Massachusetts wiretap statute provides protection for the electronic transmission of text messages").[8]

For the reasons explained above, and absent an appellate decision interpreting the Massachusetts Wiretap Statute in the narrow way that NEBH suggests, this court concludes that the facts as alleged in the Complaint state a claim for a violation of the statute.

3. **Report to Appeals Court**

Under Mass. R. Civ. P. 64, a Superior Court judge may report an interlocutory decision "where he or she concludes that the finding or order 'so affects the merits of the controversy that the matter ought to be determined by the [A]ppeals [C]ourt before any further proceedings in the trial court.'" *Patel v. Martin*, 481 Mass. 29, 32 (2018) (quoting Mass. R. Civ. P. 64(a)). The Supreme Judicial Court has cautioned that "[i]nterlocutory matters should be reported only where it appears that they present serious questions likely to be material in the ultimate decision, and that subsequent proceedings in the trial court will be substantially facilitated by so doing." *Globe Newspaper Co. v. Massachusetts Bay Transp. Auth. Ret. Bd.*, 412 Mass. 770, 772 (1992) (quoting *John Gilbert Jr. Co. v. C.M. Fauci Co.*, 309 Mass. 271, 273 (1941)). Such is the case here. The parties here also have requested that the court report the matter to the Appeals Court.

Whether the Massachusetts Wiretap Statute applies to the internet tracking alleged here is a novel question unresolved at the appellate level in Massachusetts, and is the central and dispositive issue in this case. Although the Massachusetts Wiretap Statute is broadly drafted, and states the Legislature's explicit intention to protect citizens from the grave danger of

[8] The most recent published case interpreting the Massachusetts Wiretap Statute is consistent with this view. *See Commonwealth v. Du*, No. 22-P-870, 2023 WL 6522435, at *6-*7 (Mass. App. Ct. Oct. 6, 2023) (court interpreted statute to prohibit surreptitious audio-visual video recording of drug transaction made by police using cell phone application).

electronic surveillance by private individuals, it was enacted in 1968 — long before the internet, let alone internet tracking, became available. The Legislature did not, therefore, contemplate internet tracking as a form of secretly intercepting communications. NEBH argues that internet tracking is practically ubiquitous across all businesses and organizations with websites, and that NEBH's use of such tracking is a legitimate, ordinary part of its business. Had the Legislature been aware of internet tracking and its possible business uses in 1968, it might have written the statute to allow the type of tracking alleged in this case.

The novel question here has arisen in several other cases. As noted, this court already has denied motions to dismiss in two other internet-tracking wiretap cases. *See Boston Medical Center*, 2384CV00326-BLS1; *Boston Children's*, 2384CV00411-BLS1. Other Superior Court judges have issued similar decisions recently. *See Alves*, 2284CV02509-BLS1; *Doe v. Partners Healthcare System, Inc.*, 1984CV01651-BLS1, endorsement denying motion to dismiss (Super. Ct. Dec. 7, 2020). There are many other analogous cases presently pending in the Superior Court, including in this session.[9] If, as NEBH argues, the Massachusetts Wiretap Statute does not apply to business-related internet tracking, significant judicial and party resources will be saved by the quick resolution of these cases before discovery and other stages of litigation.

For all of these reasons, this matter should be determined by the Appeals Court before any proceedings continue in this court.

---

[9] Other analogous cases pending in BLS1 include: *Progin, Janice v. UMass Memorial Health Care, Inc.*, 2284CV2889; *John Doe v. Boston Medical Center Corp.*, 2384CV326; *Jane Doe v. The Children's Hospital Corp.*, 2384CV411; *Kathleen Vita v. Beth Israel Deaconess Medical Center, Inc.*, 2384CV00480; *Karen McManus v. Tufts Medical Center, Inc.*, 2384CV930; *Elizabeth Nova v. Boston Medical Center Corporation*, 2384CV1086; *Jane Doe v. Cape Cod Healthcare, Inc.*, 2384CV1236; *Jane Doe v Baystate Health Systems*, 2384CV1949; *John Doe v. UMass Memorial Health Care Inc.*, 2384CV2448; *Lisa Colleton v. UMass Memorial Health Care Inc.*, 2384CV2450

**ORDER**

For the foregoing reasons, it is hereby **ORDERED** that:

1. NEBH's motion to dismiss is **DENIED**; and

2. The Court **REPORTS** the correctness of its ruling to the Appeals Court.

Dated: October 31, 2023

Hélène Kazanjian
Justice of the Superior Court

# EXHIBIT 4

COMMONWEALTH OF MASSACHUSETTS
SUPREME JUDICIAL COURT
FOR THE COMMONWEALTH

APPEALS COURT NOS.
2023-P-1308, 2023-P-1310

SUFFOLK COUNTY

---

KATHLEEN VITA
Plaintiff - Appellee

v.

NEW ENGLAND BAPTIST HOSPITAL
Defendant - Appellant

---

KATHLEEN VITA
Plaintiff - Appellee

v.

BETH ISRAEL DEACONESS MEDICAL CENTER, INC.
Defendant - Appellant

---

# DEFENDANTS-APPELLANTS' APPLICATION FOR DIRECT APPELLATE REVIEW OF BOTH CASES

---

David Quinn Gacioch, BBO No. 660784
Annabel Rodriguez, BBO No. 696001
McDERMOTT WILL & EMERY LLP
200 Clarendon Street, Floor 58
Boston, MA 02116
(617) 535-4000
dgacioch@mwe.com
anrodriguez@mwe.com

## I. REQUEST FOR DIRECT APPELLATE REVIEW

Defendants-Appellants New England Baptist Hospital ("NEBH") and Beth Israel Deaconess Medical Center, Inc. ("BIDMC") (together, the "Hospitals") request direct appellate review of these two parallel cases by the Supreme Judicial Court, pursuant to Mass. R. App. P. 11.[1] As explained below, these are two of at least two dozen putative class action lawsuits that plaintiffs' lawyers have recently commenced against Massachusetts hospitals and other organizations, relying on a novel and overbroad application of the Massachusetts Wiretap Act, G.L. c. 272, § 99 (the "Wiretap Act" or just the "Act"). Judicial acceptance of plaintiffs' attempted weaponization of the Act to cover advertising and analytics technologies that are ubiquitous on public websites in 2023 would expose thousands of Massachusetts businesses and public charities to potentially crippling civil liability, given the Act's severe liquidated damages and fee-shifting provisions, as well as to possible criminal prosecution. The Act's potential applicability to this website technology context is an appellate question of first impression. Accordingly, at least two of the independently-sufficient criteria in Mass. R. App. P. 11(a) support direct appellate review of these cases.

---

[1] The two cases are nearly identical. Plaintiff Kathleen Vita, represented by Shapiro Haber & Urmy LLP, brought both. NEBH and BIDMC are part of the same health system and are both represented by McDermott Will & Emery LLP.

## II. STATEMENT OF PRIOR AND PARALLEL PROCEEDINGS

Plaintiff Kathleen Vita commenced a putative class action against BIDMC in Suffolk Superior Court's Business Litigation Session on February 24, 2023 (Docket No. 2384CV00480-BLS1). She filed a nearly-identical complaint against NEBH in the same court on April 7, 2023 (Docket No. 2384CV00857-BLS1). Each lawsuit alleges a single claim: violations of the Wiretap Act.

BIDMC timely moved to dismiss Plaintiff's complaint on June 9, 2023, and NEBH did the same on June 22, 2023. Plaintiff opposed both motions. After hearing oral argument in a joint Rule 12 proceeding, the Superior Court (Kazanjian, J.), on October 31, 2023, issued two Opinions and Orders, denying each Hospital's motion to dismiss and simultaneously reporting her decisions for interlocutory appellate review, pursuant to Mass. R. Civ. P. 64(a).[2] The two resulting appeals were docketed in the Appeals Court on November 13, 2023. (Docket Nos. 2023-P-1308 and 2023-P-1310 for the cases against NEBH and BIDMC, respectively).

Hundreds of similar lawsuits have recently been filed by plaintiffs' lawyers around the country against website and mobile application owners, targeting ubiquitous website analytics and advertising technologies such as Google Analytics and Meta/Facebook Pixel (collectively "AdTech"). The first such lawsuit here in

---

[2] Copies of Justice Kazanjian's two Opinions and Orders are attached as Appendices A and B.

Massachusetts, brought against Partners Healthcare (now called Mass General Brigham) and Dana-Farber Cancer Institute, resulted in an $18.4 million settlement finalized in early 2022, after the Superior Court denied the defendants' motion to dismiss in late 2020.[3] At least twenty-four more such Wiretap Act lawsuits then sprung up in quick succession, including these two.[4] The Superior Court has now denied motions to dismiss in a total of seven such cases,[5] but these parallel appeals mark the first time this novel (and, in the Hospitals' view, unsupportable) attempt to

---

[3] See Doe v. Partners Healthcare Sys., Inc., No. 1984CV01651-BLS-1 (Mass. Super. Ct.) (Tr. of Rule 12 Hearing Nov. 20, 2020; Endorsed Order Allowing in Part and Denying in Part Motion to Dismiss, dated Dec. 7, 2020; Judgment, Dkt. No. 76, dated Jan. 24, 2022).

[4] A list of all known cases alleging Massachusetts Wiretap Act violations based on public website AdTech is attached as Appendix C.

[5] In addition to the cases against BIDMC and NEBH presently on appeal, and Doe v. Partners, supra n.3, see Alves v. BJ's Wholesale Club, Inc., No. 2284CV02509-BLS1 (Suffolk Super. Ct.) (Mem. & Order, Dkt. No. 16, dated June 22, 2023); Doe v. Boston Med. Ctr. Corp., No. 2384CV00326-BLS1 (Suffolk Super. Ct.) (Mem. & Order, Dkt. No. 18, dated Sept. 15, 2023); Doe v. The Children's Hosp. Corp., No. 2384CV00411-BLS1 (Suffolk Super. Ct.) (Mem. & Order, Dkt. No. 18, dated Sept. 15, 2023); Doe v. Emerson Hosp., No. 2277CV01000 (Essex Super. Ct.) (Mem. & Order, Dkt. No. 37, dated Nov. 22, 2023).

extend the Act has come before a Massachusetts appellate court.[6] Justice Kazanjian has stayed all further Superior Court proceedings in these two cases, and in several others, pending the outcome of these two appeals. (See App. C.) Copies of all Superior Court docket entries to date are attached hereto as Appendices D and E.

## III. SHORT STATEMENT OF RELEVANT FACTS[7]

In a nutshell, Plaintiff alleges that each Hospital violated the Act by "secretly" installing on its public website certain AdTech software provided by Google, Meta/Facebook, and other third party vendors. (BIDMC & NEBH Compls. ¶¶ 1-2.) The Hospitals allegedly deployed that AdTech software for website optimization and marketing purposes. (BIDMC Compl. ¶¶ 30, 107; NEBH Compl.

---

[6] Boston Medical Center and Boston Children's Hospital also sought interlocutory review of the Superior Court's denials of their respective motions to dismiss. Justice Kazanjian declined to report those two decisions under Mass. R. Civ. P. 64(a) and G.L. c. 231 § 111 (2nd par.). See Doe v. Boston Med. Ctr., No. 2384CV00326-BLS1 (Endorsed Order dated Nov. 10, 2023); Doe v. Children's Hosp., No. 2384CV00411-BLS1 (Endorsed Order dated Nov. 10, 2023). Appeals Court Justice Englander denied single justice petitions for discretionary interlocutory review pursuant to G.L. c. 231, s. 118 (1st par.) (Appeals Court Dkt. Nos. 2023-J-0603 and 2023-J-0609, respectively.) In so ruling, both Justice Englander and Justice Kazanjian cited, *inter alia*, the fact that interlocutory appeals were proceeding in these two cases against NEBH and BIDMC, as vehicles for appellate review of dispositive issues common to the multiple, parallel cases pending in the Superior Court.

[7] Because these interlocutory appeals arose from the Superior Court's denial of the Hospitals' motions to dismiss, the factual record consists primarily of the plausibly-pled factual allegations in Plaintiff's two complaints. By recounting such allegations here, the Hospitals do not concede their accuracy.

¶¶ 30, 97.) That software allegedly caused website visitors' web browsers (e.g., Google Chrome, Microsoft Edge, iOS Safari, etc.) to share certain information with those vendors while those users browsed the Hospitals' public websites. (BIDMC & NEBH Compls. ¶¶ 38-39.) Plaintiff generally alleges that AdTech software typically logs and shares the IP addresses and various settings associated with users' computers, along with information about which pages are visited, which links or buttons are clicked, which menu selections are made, and also any words that are typed into search boxes or form fields. (BIDMC & NEBH Compls. ¶¶ 22, 39, 49-50, 61-68.) In some cases, the AdTech software also allegedly logs and shares how far down a webpage a user scrolls. (BIDMC Compl. ¶ 71.)

Plaintiff does ***not*** allege that either Hospital, or any other party, unlawfully obtained or shared any information about, including the content of, any email, text message, instant message, chat message, or the like that Plaintiff (or any other person) may have sent or received. Plaintiff also does not allege that any "interceptions" occurred within any user-authenticated/access-restricted portion of any website, such as either Hospital's patient portal, where a patient can access

medical records and other information specific to them.[8] Her "interception" allegations are limited to the publicly-available portions of each Hospital's website, and limited to basic website browsing data (button/link clicks, URLs visited, information typed into form fields, etc.). Plaintiff asserts, however, that the sensitivity (or lack thereof) of the specific content or setting has no bearing on whether a Wiretap Act violation has occurred:

> *6. Although this case concerns the interception of communications that disclose healthcare consumers' private health information, Plaintiff's claim under the Massachusetts Wiretap Act does not depend on whether the intercepted communications reveal an individual's private health information or any other sensitive information.* ***The Massachusetts Wiretap Act applies to all interceptions, regardless of the communication's substance.***
>
> *7. Moreover, although this case concerns communications between healthcare consumers and healthcare providers, ... [Plaintiff's Wiretap Act claim] ... does not depend on the nature of the relationship between Plaintiff and the Members of the Class and [the Hospital].* ***The Massachusetts Wiretap Act applies to all interceptions, regardless of relationship, if any, among the parties to the communication.***[9]

---

[8] Plaintiff's complaints allege that AdTech operated on the publicly-accessible pages of www.bidmc.org and www.nebh.org that contained links through which users could connect to the login pages of various secure patient portal, medical records, and/or bill payment sites. (See BIDMC Compl. ¶¶ 96-103; NEBH Compl. ¶¶ 83-94.) But Plaintiff does not allege that any AdTech operated on any of the actual login pages to which those links pointed or on any pages within the secure, non-public, user-authenticated environments protected by those login pages.

[9] (See BIDMC and NEBH Compls. ¶¶ 6-7 (emphases added).)

Plaintiff repeatedly alleges that the presence of AdTech on the websites was "secret," but it is undisputed that each website included the following pop-up notice:[10]

> We use cookies and other tools to enhance your experience on our website and to analyze our web traffic. For more information about these cookies and the data collected, please refer to our web privacy statement.

That notice included a link to a page on the website featuring a broader privacy policy. That policy included passages such as "[BIDMC/NEBH] routinely gathers data on website activity…" and: "We and our Third Party Service Provider collect and save the default information customarily logged by worldwide web server software. Our logs contain the following information for each request: date and time, originating IP address and domain name (the unique address assigned to your

---

[10] (<u>See</u> BIDMC Compl. ¶ 24 and NEBH Compl. ¶ 24. The Hospitals provided complete copies of the pop-up disclosure text as Exhibit B to their respective memoranda in support of their motions to dismiss.) Plaintiff's conclusory allegations of "secrecy"—or that "wire communications" or "interceptions" occurred, etc.—are, of course, not regarded as true even in the posture of a Rule 12 motion. <u>See</u> <u>Sudbury v. Mass. Bay Transp. Auth.</u>, 485 Mass. 774, 778-79 (2020) (quoting <u>Leavitt v. Brockton Hosp., Inc.</u>, 454 Mass. 37, 39 n.6 (2009)).

Internet service provider's computer that connects to the Internet), object requested…." (BIDMC & NEBH Compls. ¶¶ 22-23.)[11]

Plaintiff herself makes almost no appearance in the factual allegations of her complaint. She alleges that she lives in Revere, that she is a patient of NEBH, that her husband is a BIDMC patient, and that she "regularly uses" each Hospital's website to "obtain information about [NEBH's/BIDMC's] doctors (including their credentials and backgrounds)"; to "search for information on particular medical procedures" (with respect to NEBH) or to "search for information on particular symptoms, conditions, and medical procedures, both for herself and her husband" (with respect to BIDMC). (BIDMC & NEBH Compls. ¶ 10.) She additionally alleges that she uses BIDMC's website to "obtain and review her husband's medical records through the website's patient portal." (BIDMC Compl. ¶ 10.)

The complaints repeat various phrasings of the following conclusory allegation (from ¶ 1 of each): "[NEBH/BIDMC] aided in the interception of communications between Plaintiff and other Class Members (defined below) and …

[11] The privacy policy also included statements such as that the website "allows you to visit most areas without identifying yourself or providing personal information" and that at least some of the data gathered "is not shared with other organizations." (BIDMC & NEBH Compls. ¶¶ 22-23.) Plaintiff argues that those statements were false and/or misleading in light of the presence of AdTech, so as to render the disclosures completely ineffective. (See id.) Especially given that G.L. c. 93H, § 1 specifically defines "Personal Information" in a manner not implicated by Plaintiff's allegations here (requiring the presence of name plus, e.g., Social Security number, etc.), the Hospitals disagree.

a website maintained by [NEBH/BIDMC]." Neither complaint alleges that any actual harm or injury befell Plaintiff. The complaints allege nothing about the results of such claimed "interceptions" other than generally alleging that companies such as Google and Meta "can and do identify users on the website and associate their identities to the website users' communications with the website ... [and] then use the communications to serve personalized advertising to those individuals." (BIDMC & NEBH Compls. ¶ 22.) The complaints do not allege that Plaintiff herself saw any such targeted advertising, nor do they allege that anything else actually happened to Plaintiff as a result of the purported "interceptions." Indeed, both complaints include one or more iterations of the following (or a similar) disclaimer about many of their allegations: "The further examples presented below do not [necessarily] reflect webpages Plaintiff personally visited but are presented for illustrative purposes." (BIDMC Compl. ¶ 72; NEBH Compl. ¶ 70.[12])

---

[12] Plaintiff's complaint against BIDMC also repeatedly states: "This is an example and does ***not*** reflect Plaintiff's personal activity on the website." (¶¶ 80 n.6, 84 n.7, and 88 n.8 (emphasis added).) By the time she filed her complaint against NEBH six weeks later, Plaintiff had removed those repeated disclaimers about specific allegations from her template but still included the same general disclaimer quoted above.

## IV. ISSUES OF LAW RAISED BY THIS APPEAL

The Hospitals will raise at least the following issues for appeal, all of which undersigned counsel believes to be appellate questions of first impression:

a. Whether an individual's browsing of a publicly-available website generates one or more "wire communications" for purposes of the Act, see G.L. c. 272, § 99(B)(1), when such browsing activity does ***not*** include the sending or receipt of any email/text/chat/instant message or equivalent.

b. If so, whether such a "wire communication" can be "intercepted" for purposes of the Act (*i.e.* secretly heard or secretly recorded), see G.L. c. 272, § 99(B)(4), when the user had actual or constructive knowledge that her browsing actions on the website were being logged by one or more parties (such as the website owner, host, and/or operator), but she allegedly lacked knowledge that additional parties might also receive data about those same browsing actions.

c. If the Act is broad enough to cover technology that logs or shares data regarding users' browsing actions on public websites, as Plaintiff claims, whether the Act's exceptions for activities conducted in the ordinary course of business, see, e.g., G.L. c. 272, § 99(B)(3), must be construed similarly broadly, rather than strictly limited to activities employing "any telephone or telegraph instrument, equipment, facility, or a component

thereof" (narrowly defined), in order to preserve the careful balance the General Court struck when it drafted the Act in 1968—when all wire communications traveled over telephone/telegraph wires and website technology did not yet exist—and to avoid absurd, unreasonable results.

All of these issues were properly raised and preserved at the Superior Court through the Hospitals' motions to dismiss, their briefing in support of those motions, and the oral argument that the Superior Court heard on September 19, 2023.

## V. BRIEF ARGUMENT ON THE ISSUES RAISED

The Wiretap Act generally prohibits the warrantless "interception" (i.e., secret hearing or secret recording) of oral or wire communications using an "intercepting device." The General Court passed it in 1968 with interpersonal telephone calls and telegrams in mind, as there were no other types of wire communications then in widespread use. These lawsuits attempt to stretch the Act far beyond the bounds of what the General Court intended (or could possibly have imagined): to create massive, widespread liability for ubiquitous advertising and analytics technology on public websites. This Court should reject that attempt.

### A. The General Court Never Intended the Act to Be Wielded in This Manner.

The severe penalties triggered by any Wiretap Act violation make it clear that the General Court could not possibly have intended it to be used in this way. For

example, a consumer claiming an unfair or deceptive business practice can bring a G.L. 93A, § 9 claim—entitling her to damages of at least $25 per violation if she can prove ***both*** a violation of the statute ***and*** an actual injury that resulted. See G.L. c. 93A, § 9(1),(3). The contemporaneously-enacted Wiretap Act, in stark contrast, provides for damages of ***at least $1,000 per violation***—40x the Chapter 93A, Section 9 minimum. See G.L. c. 272, § 99(Q). And while Chapter 93A's liquidated damages require proof of injury, Plaintiff argues that the Wiretap Act requires only proof of a bare statutory violation.[13] In still starker contrast, a willful Chapter 93A violation can trigger treble damages (minimum $75). A willful Wiretap Act violation, however, is a ***felony*** carrying up to a five-year prison sentence and $10,000 fine.[14] Under Plaintiff's theory, the Wiretap Act is a far more potent litigation weapon than Chapter 93A, but that power somehow lay dormant and unrealized for its first fifty years of existence.

Given that contrast, the General Court in 1968 obviously intended the Wiretap Act's severe penalties to target only a limited range of criminal acts that were both serious and unambiguously wrongful. The Act clearly was ***not*** intended as a tool for policing ordinary business or non-profit practices. The Act's lack of reference to class actions, unlike Chapter 93A, Section 9(2), further confirms this.

---

[13] The Hospitals dispute Plaintiff's contention.

[14] Compare G.L. c. 93A, § 9(3), with G.L. c. 272, § 99(C).

In the Act's 50+-year history, courts have rejected the very few attempts made to wield it broadly[15]—until the Superior Court's denial of Partners Healthcare's motion to dismiss yielded the $18.4 million settlement last year.

### B. Plaintiff's Interpretation of the Wiretap Act Violates the Rule of Lenity and Would Lead to Absurd, Unjustifiable Results.

If judicially accepted, Plaintiff's attempt to overstretch the Act risks calamitous consequences across all for-profit and non-profit sectors of the Massachusetts economy. Plaintiff readily admits that her theory depends neither on the nature of any relationship between website owner and user nor on the sensitivity of any content allegedly "intercepted."[16] Plaintiff's theory applies no differently to non-profit hospital websites than it does to, e.g., the menu page at dunkindonuts.com, the game schedule page at redsox.com, the "Exhibits" page on the Museum of Science's website, the "Get Involved" page on the Greater Boston Food Bank's website, or the "Mass Times" page on the Roman Catholic Cathedral's website, to name just a few examples.

---

[15] See, e.g., O'Sullivan v. NYNEX Corp., 426 Mass. 261, 263, 266-67 (1997) (affirming summary judgment for NYNEX against customer claims); Dillon v. Mass. Bay Transp. Auth., 49 Mass. App. Ct. 309, 319 (2000) (affirming summary judgment for the MBTA in putative employee class action).

[16] (See BIDMC and NEBH Compls. ¶¶ 6-7.) ("The [Act] applies to all interceptions, regardless of the communication's substance. … The [Act] applies to all interceptions, regardless of relationship, if any, among the parties to the communication.").) These paragraphs are reproduced in full on page 7.

As the $18.4 million Partners settlement shows, public websites in 2023 are also ***very*** different from 1968 telephone calls and telegrams regarding the magnitude of potential liability. Plaintiff argues that each website visitor whose browsing information is logged by AdTech generates another (minimum $1,000) Wiretap Act violation. Even for a small public website that gets just 1,000 unique visitors on an average day of light traffic, Plaintiff's theory demands ***at least $36 million in damages per year***, over a three-year limitations period. And that's just for ***one*** lightly-used website—among many thousands across Massachusetts.[17]

Finally, the Act is primarily criminal—defining multiple offenses punishable by incarceration. Those criminal offenses and Plaintiff's civil causes of action here turn on the same elements and definitions. If the "secret" use of AdTech software on a public website can constitute the "interception" of "wire communications" here, the same is true regarding the felony offenses of "willfully commit[ting] an interception, attempt[ing] to commit an interception, or procur[ing] any other person to commit an interception or to attempt to commit an interception" under § 99(C)(1). If AdTech constitutes an "intercepting device" (a conclusion on which Plaintiff's claims depend), any person who possesses such software "under circumstances evincing an intent to commit an interception not permitted or

---

[17] The Hospitals do not concede any aspect of Plaintiff's damages theory, including the applicable statute of limitations.

authorized by [§ 99]" commits a misdemeanor punishable by incarceration in a house of corrections and a $5,000 fine under § 99(C)(5). Plaintiff's theory leads to both massive civil and possible criminal liability exposure for thousands of Massachusetts organizations and their marketing, IT, and other professionals. The rule of lenity thus ***requires*** that the many statutory ambiguities fundamental to Plaintiff's claims (e.g., whether basic browsing actions on a public website can constitute "wire communications" at all, etc.) be resolved in the Hospitals' favor.[18]

It is also black letter law that Massachusetts courts do not follow literal statutory language beyond the bounds of common sense and into the realm of absurdity.[19] Yet that is exactly what Plaintiff's position requires: reading the language of this pre-internet age statute in a way that creates unintended, absurd, and calamitous internet age consequences and then following it blindly.

---

[18] See Velazquez v. Commonwealth, 491 Mass. 279, 283 n.5 (2023) ("where the language of a criminal statute plausibly can be found ambiguous, the rule of lenity ***requires*** that the defendant receive the benefit of the ambiguity") (citation omitted; emphasis added); see also Leocal v. Ashcroft, 543 U.S. 1, 11 n.8 (2004) (for a mixed criminal-civil statute, "[b]ecause we must interpret the statute consistently, whether we encounter its application in a criminal or noncriminal context, the rule of lenity applies"); Cook v. Patient Edu, LLC, 465 Mass. 548, 555-56 (2013) (assuming, without deciding, that Leocal's holding applies under Massachusetts law); DiFiore v. American Airlines, Inc., 454 Mass. 486, 497 n.12 (2009) (same).

[19] See, e.g. Commonwealth v. Rainey, 491 Mass. 632, 642-43 (2023) (declining to apply the Act as broadly as its text might strictly suggest, noting "[b]ecause we assume generally that the Legislature intends to act reasonably, we will not adopt a literal construction of a statute if the consequences of such a construction are absurd or unreasonable.") (citations omitted).

### C. Plaintiff Has Not Plausibly Alleged Multiple Required Elements of Her Claims.

To prevail on her claims, Plaintiff must prove unlawful "interceptions," which the Act defines as "to secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire or oral communication through the use of any intercepting device."[20] Plaintiff fails to plausibly allege multiple required elements.

***First***, basic website browsing actions are not "wire communications." The Act clearly was intended to restrict eavesdropping on ***interpersonal conversations or messages***. It does not apply to technology that simply monitors movements, such as a video-only surveillance camera or GPS device.[21] Here, the vast majority of Plaintiff's alleged "wire communications" are simply digital movements, such as mouse scrolling, link/button clicks, and entering URLs, to navigate a website. The rest involve entering limited text into search or form fields. No interpersonal messages are alleged.

***Second***, Plaintiff has not plausibly alleged secrecy—for at least two reasons. This Court has made clear that an "interception" requires ***the act of hearing or***

---

[20] G.L. c. 272 §§ 99(B)(4),(6), 99(Q).

[21] See, e.g., Martin v. Gross, 340 F. Supp. 3d 87, 92-93 (D. Mass. 2018), aff'd in part, Project Veritas Action Fund v. Rollins, 982 F.3d 813 (1st Cir. 2020); Commonwealth v. Connolly, 454 Mass. 808, 825 (2009).

***recording itself*** to be secret.[22] Moreover, the specific means of recording and the identity of the eventual audience need not be apparent, as long as the speaker has general notice that her speech is being recorded somehow.[23]

It is common knowledge that websites cannot follow users' browsing commands without logging (*i.e.*, "recording") them. Thus, Plaintiff not only knew but ***intended*** that her "communications" with the Hospitals' websites would be "recorded"—because the websites could not otherwise have displayed the content she sought. That is how the internet works, as multiple courts in Massachusetts and elsewhere have recognized.[24]

Moreover, each website displayed a pop-up notice to users, with a link to a detailed privacy policy, that collectively disclosed the collection of browsing data

---

[22] See Curtatone v. Barstool Sports, Inc., 487 Mass. 655, 658-59 (2021) (no violation where party falsified his identity in order to secure phone interview, but was open about recording once on the call).

[23] See, e.g., Commonwealth v. Morris, 492 Mass. 498, 501-03 (July 25, 2023) (officers' visible note-taking and verbal references to the audience for defendant's story provided sufficient notice of audio-visual recording).

[24] See, e.g., Commonwealth. v. Maccini, No. 060873 2007 WL 1203560, at *3 (Mass. Super. Ct. Apr. 23, 2007) (Fabricant, J.) ("One who uses [email or instant messaging] … is on notice of the inherent recording, and implicitly consents to it."); accord, e.g., Commonwealth. v. Byrd, 235 A.3d 311, 319 (Pa. 2020) ("by the very act of sending a communication over the Internet, the party expressly consents to the recording of the message"); State v. Lott, 152 N.H. 436, 439-42 (2005).

by the website owner and at least one "Third Party Service Provider." Such warnings were sufficient to eliminate any secrecy.[25]

***Third***, if the Act applies to public websites at all, its "ordinary course of business" exception must also apply.[26] The General Court struck a careful balance in 1968. While prohibiting most interceptions, it specifically excluded from liability any secret hearing or recording done in the ordinary course of an organization's business, using standard equipment. As technology and markets evolved after 1968, this Court and the Appeals Court interpreted that exception flexibly, to avoid absurd results.[27] Plaintiff contends that the exception applies only where "a telephone or telegraph instrument, equipment, facility, or a component thereof" (narrowly defined) is used, not AdTech. But Dillon rejected such a narrow, literalist approach

---

[25] See, e.g., Morris, 492 Mass. at 501-03 (officers' note-taking and general references to an audience were sufficient notice); Curtatone, 487 Mass. at 659 (merely "hold[ing] tape recorder in plain sight" would be sufficient notice).

[26] See G.L. c. 272, § 99(B)(3) (excluding from the definition of "intercepting device" any "telephone or telegraph instrument, equipment, facility, or a component thereof, (a) furnished to a subscriber or user by a communications common carrier in the ordinary course of its business under its tariff and being used by the subscriber or user in the ordinary course of its business; or (b) being used by a communications common carrier in the ordinary course of its business.")

[27] See, e.g., O'Sullivan, 426 Mass. at 263, 266-67; Dillon, 49 Mass. App. Ct. at 319.

that would "destroy the exception," "override common sense," and "produce absurd or unreasonable results."[28]

At bottom, Plaintiff argues that the Act's prohibitions should be applied broadly to 21st Century website technology, while its exceptions must be limited strictly to a 1968 understanding of their text. That is exactly the type of absurd result, and destruction of the intended legislative balance, that courts consistently reject. This Court should do so again.

## VI. REASONS WHY DIRECT APPELLATE REVIEW IS WARRANTED

These cases merit direct appellate review for at least two of the three independently-sufficient reasons set forth in Rule 11(a): (i) because they present multiple "questions of first impression or novel questions of law which should be submitted for final determination to the [SJC]" and (ii) because they present "questions of such public interest that justice requires a final determination by the full [SJC]."

As Justice Kazanjian wrote in each of her two opinions that are on appeal, "[w]hether the Massachusetts Wiretap Statute applies to the internet tracking alleged here is a novel question unresolved at the appellate level in Massachusetts, and is the central and dispositive issue in this case." (See Apps. A & B at 10-11.) Undersigned counsel is similarly aware of no prior appellate decision that considers

[28] 49 Mass. App. Ct. at 315-16 (citations omitted).

the Wiretap Act's possible application to website browsing and/or AdTech software.

Indeed, there have been very few appellate decisions substantively addressing ***any*** aspect of the Wiretap Act in the context of its private civil cause of action for damages (§ 99(Q)). Undersigned counsel is aware of only six decisions meeting that description over the Act's 55-year existence:

- In Curtatone v. Barstool Sports, Inc., after granting direct appellate review on its own motion, this Court affirmed the Superior Court's dismissal of Somerville Mayor Curtatone's claim for unlawful wiretapping when a representative of Barstool Sports posed as a *Boston Globe* reporter in order to secure a telephone interview with the mayor (after having been denied when attempted without subterfuge), recorded the interview (which the mayor permitted, thinking he was speaking with a *Globe* reporter), and then posted the recording on Barstool's website. 487 Mass. 655 (2021).
- In O'Sullivan v. NYNEX Corporation, after granting direct appellate review on its own motion, this Court affirmed the Superior Court's grant of summary judgment to NYNEX, based upon the Act's ordinary course of business exception, on claims brought by 37 customers

concerning secret recording of telemarketing calls between them and NYNEX representatives. 426 Mass. 261 (1997).

- In Birbiglia v. Saint Vincent Hospital, Inc., after granting the parties' direct appellate review applications, this Court affirmed a Superior Court judgment (upon a jury verdict) in favor of a physician against a hospital and certain other physicians on a Wiretap Act claim premised on secret audio recordings of specific in-person conversations between the parties that resulted in the plaintiff not being reappointed to the hospital's medical staff. 427 Mass. 80 (1998).
- In Pine v., Rafter granting direct appellate review on its own motion, this Court affirmed in part and reversed in part a City of Boston Housing Court judgment (after a non-jury trial) awarding damages and attorneys' fees for a conceded Wiretap Act violation—where the defendant landlord's spouse gained access to a confidential meeting of tenants with an attorney (by falsely claiming to be a tenant) and then secretly audio recorded portions of that meeting for use by the landlord against whom the tenants were seeking legal advice. 404 Mass. 411 (1989).

- In Dillon v. Massachusetts Bay Transportation Authority, the Appeals Court affirmed the Superior Court's grant of summary judgment to the MBTA, due to the Act's ordinary course of business exception, in a putative employee class action concerning the MBTA's allegedly-secret recording of telephone calls into and out of its operations centers. In so doing, the Appeals Court disregarded the ordinary course of business exception's text about equipment sourced from a common carrier, in order to preserve legislative intent and avoid absurd results. 49 Mass. App. Ct. 309 (2000).[29]
- Finally, in Johnson v. Frei, the Appeals Court summarily affirmed a jury verdict in favor of an individual plaintiff against an individual defendant over the latter's cell phone audio-visual recording of an in-person encounter between them. No. 17-P-218 (Mass. App. Ct. May 16, 2018) (Rule 1:28 Order).

Of these decisions, only O'Sullivan and Dillon concerned attempts by plaintiffs to use the Wiretap Act to create liability for widespread business practices (in both cases, routine recording of phone calls), as opposed to secret recordings of specific,

---

[29] This Court cited Dillon approvingly in, e.g., Commonwealth v. Moody, 466 Mass. 196 (2013).

one-off conversations that took place in person or by telephone. As noted, this Court and the Appeals Court rejected both of those attempts.[30]

The novel issues raised in the two present appeals are also of widespread public interest. Justice Kazanjian noted in each opinion that "[t]he novel question here has arisen in several other cases . . . . If, as [the Hospital] argues, the Massachusetts Wiretap Statute does not apply to business-related internet tracking, significant judicial and party resources will be saved by the quick resolution of these cases ...." (See Apps. A & B at 11.) Indeed, Justice Kazanjian reported her decisions denying motions to dismiss in these two cases specifically as vehicles for early, definitive appellate resolution of novel questions of law on which more than two dozen pending cases turn in whole or part (in the Suffolk Superior Court's BLS, in other Superior Court sessions, and in federal courts here and elsewhere). Justice Kazanjian is in the process of staying all Superior Court proceedings in the remaining cases before her until these appeals are resolved. The Hospitals have attached, as Appendix F, a brief joint statement by defendants involved in many of

[30] A third such case, in which this Court had granted direct appellate review on its own motion, was voluntarily dismissed immediately prior to oral argument. See Marquis v. Google, Inc., No. SJC-12103 (appeal of Superior Court's grant of summary judgment to defendant Google on Wiretap Act claims based on scanning of Gmail messages—because plaintiff's claims would require extra-territorial application of the Act to conduct outside of Massachusetts).

those parallel Wiretap Act lawsuits conveying the widespread importance of definitive appellate resolution of these core legal issues by this Court.

Beyond the presently pending group of cases, it is no exaggeration to say that potentially ***billions*** of dollars in liquidated statutory damages and attorneys' fees, across many thousands of potential Massachusetts defendants, including these two non-profit hospitals, ultimately hang on such resolution. The AdTech about which Plaintiff complains in these two cases is truly ubiquitous in 2023. While Plaintiff may argue that her complaints are ultimately about sufficiency of disclosure, not about the presence of AdTech itself, the fact that ***basically every major hospital or health system in the Commonwealth has now been sued*** in one of these putative Wiretap Act class actions underscores that the statewide impacts of judicial adoption of Plaintiff's legal theory would be immense.

In short, this is precisely the type of case for which the direct appellate review mechanism was created.

## VII. CONCLUSION AND APPENDED DOCUMENTS

For the reasons stated above, the Hospitals respectfully request that this Court grant their application and accept these two cases for direct appellate review. In accordance with Mass. R. App. P. 11(b), the Hospitals have appended:

A. a copy of the Superior Court's Opinion and Order denying NEBH's motion to dismiss the complaint;

B. a copy of the Superior Court's Opinion and Order denying BIDMC's motion to dismiss the complaint;

C. a list of all known putative class actions alleging Wiretap Act violations based on website-based AdTech;

D. the Superior Court docket entries in the case against NEBH;

E. the Superior Court docket entries in the case against BIDMC; and

F. a joint statement in support of this application signed by defendants in other pending cases.

Dated: December 1, 2023

Respectfully submitted,

BETH ISRAEL DEACONESS MEDICAL CENTER, INC. and NEW ENGLAND BAPTIST HOSPITAL, Defendants-Appellants

By their attorneys,

/s/ David Quinn Gacioch

David Quinn Gacioch, BBO No. 660784
Annabel Rodriguez, BBO No. 696001
McDermott Will & Emery LLP
200 Clarendon Street, Floor 58
Boston, MA 02116
(617) 535-4000
dgacioch@mwe.com
anrodriguez@mwe.com

## CERTIFICATE OF COMPLIANCE

I hereby certify, under the pains and penalties of perjury, that this Application complies with the Massachusetts Rules of Appellate Procedure that pertain to this filing, including, but not limited to:

Rule 11(b) (contents and form of direct appellate review application); and

Rule 20(a)(1),(4) (type size, margins, and form of briefs and appendices).

I further certify that the foregoing application complies with the applicable length limitation in Mass. R. A. P. 11(b) because it is produced in the proportionally spaced font Times New Roman at size 14 point, and Section V (brief argument) contains fewer than two thousand (2,000) words, as counted with the Word Count feature of Microsoft Word (Microsoft Office 2016 edition).

/s/ David Quinn Gacioch
David Quinn Gacioch

## CERTIFICATE OF SERVICE

Pursuant to Mass.R.A.P. 13(d), I hereby certify, under the penalties of perjury, that on December 1, 2023 I have made service of this Application upon the attorney of record for each party, by email and the Electronic Filing System on:

Edward F. Haber
Michelle H. Blauner
Patrick J. Vallely
SHAPIRO HABER & URMY LLP
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

/s/ David Quinn Gacioch
David Quinn Gacioch

# TABLE OF AUTHORITIES

Page(s)

**Cases**

Alves v. BJ's Wholesale Club, Inc.,
No. 2284CV02509-BLS1 (Suffolk Super. Ct.) (Mem. & Order, Dkt. No. 16, dated June 22, 2023) .... 4

Birbiglia v. Saint Vincent Hospital, Inc.,
427 Mass. 80 (1998) .... 22

Commonwealth. v. Byrd,
235 A.3d 311 (Pa. 2020) .... 18

Commonwealth v. Connolly,
454 Mass. 808 (2009) .... 17

Commonwealth. v. Maccini,
No. 060873 2007 WL 1203560 (Mass. Super. Ct. Apr. 23, 2007) (Fabricant, J.) .... 18

Commonwealth v. Moody,
466 Mass. 196 (2013) .... 23

Commonwealth v. Morris,
492 Mass. 498 (July 25, 2023) .... 18, 19

Commonwealth v. Rainey,
491 Mass. 632 (2023) .... 16

Cook v. Patient Edu, LLC,
465 Mass. 548 (2013) .... 16

Curtatone v. Barstool Sports, Inc.,
487 Mass. 655 (2021) .... 18, 19, 21

DiFiore v. American Airlines, Inc.,
454 Mass. 486 (2009) .... 16

Dillon v. Mass. Bay Transp. Auth.,
49 Mass. App. Ct. 309 (2000) .... 14, 19-20, 23-24

Doe v. Boston Med. Ctr. Corp.,
No. 2384CV00326-BLS1 (Suffolk Super. Ct.) (Mem. & Order, Dkt. No. 18, dated Sept. 15, 2023) .................................. 4

Doe v. Boston Med. Ctr. Corp.,
No. 2384CV00326-BLS1 (Suffolk Super. Ct.) (Endorsed Order dated Nov. 10, 2023) .......................................... 5

Doe v. The Children's Hosp. Corp.,
No. 2384CV00411-BLS1 (Suffolk Super. Ct.) (Mem. & Order, Dkt. No. 18, dated Sept. 15, 2023) .................................. 4

Doe v. The Children's Hosp. Corp.,
No. 2384CV00411-BLS1 (Suffolk Super. Ct.) (Endorsed Order dated Nov. 10, 2023) .......................................... 5

Doe v. Emerson Hosp.,
No. 2277CV01000 (Essex Super. Ct.) (Mem. & Order, Dkt. No. 37, dated Nov. 22, 2023)...................................... 4

Doe v. Partners Healthcare Sys., Inc.,
No. 1984CV01651-BLS-1 (Mass. Super. Ct.) ............................... 4

Johnson v. Frei,
No. 17-P-218 (Mass. App. Ct. May 16, 2018)............................. 23

Leavitt v. Brockton Hosp., Inc.,
454 Mass. 37 (2009)................................................................ 8

Leocal v. Ashcroft,
543 U.S. 1 (2004) ................................................................... 16

Marquis v. Google, Inc.,
No. SJC-12103 ........................................................................ 24

Martin v. Gross,
340 F. Supp. 3d 87 (D. Mass. 2018), aff'd in part, Project Veritas Action Fund v. Rollins, 982 F.3d 813 (1st Cir. 2020).............................................................................. 17

O'Sullivan v. NYNEX Corp.,
426 Mass. 261 (1997)...........................................14, 19, 21-24

Pine v. Rust,
404 Mass. 411 (1989) ........................................................ 22

State v. Lott,
152 N.H. 436 (2005)........................................................ 18

Sudbury v. Mass. Bay Transp. Auth.,
485 Mass. 774 (2020) ........................................................ 8

Velazquez v. Commonwealth,
491 Mass. 279 (2023) ........................................................ 16

**Statutes**

G.L. c. 93A, § 9 ........................................................ 13

G.L. c. 93H, § 1 ........................................................ 9

G.L. c. 231, § 118 ........................................................ 5

G.L. c. 231, § 111 ........................................................ 5

Massachusetts Wiretap Act, G.L. c. 272, § 99(B),(C),(Q)..........*passim*

**Other Authorities**

Mass. R. App. P. 11 ........................................................ 2, 20, 24

Mass. R. Civ. P. 64(a)........................................................ 3, 4

Rule 12........................................................ 2, 7

DM_US 202333501-5.056777.0081

ADDENDUM

TABLE OF CONTENTS

Opinion and Order in *Vita v. Beth Israel Deaconess Medical Center, Inc.* (2384CV00480-BLS1) (Ex. A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Opinion and Order in *Vita v. New England Baptist Hospital* (2384CV00857-BLS1) (Ex. B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

List of all MA Wiretap Act Cases (Ex. C) . . . . . . . . . . . . . . . . . . . . .27

Superior Court Docket in *Vita v. Beth Israel Deaconess Medical Center, Inc.* (2384CV00480-BLS1) (Ex. D) . . . . . . . . . . . . . . . . . . . 32

Superior Court Docket in *Vita v. New England Baptist Hospital* (2384CV00857-BLS1) (Ex. E). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .36

Statement of Support for Direct Appellate Review (Ex. F). . . . . . . . 41

# EXHIBIT A

NOTIFY

17

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT
CIVIL ACTION
No. 2384CV00480-BLS1

KATHLEEN VITA[1]

vs.

BETH ISRAEL DEACONESS MEDICAL CENTER, INC.

**MEMORANDUM OF DECISION AND ORDER ON DEFENDANT'S MOTION TO DISMISS AND REPORT TO THE APPEALS COURT**

Plaintiff Kathleen Vita ("Plaintiff") commenced this putative class action against defendant Beth Israel Deaconess Medical Center ("BIDMC"), alleging that it used internet tracking tools on its website that illegally redirected website users' personal information, and the contents of users' communications with BIDMC's website, to third parties Google and Meta. On the basis of these allegations, the Complaint asserts a single claim for violation of the Massachusetts Wiretap Statute, G.L. c. 272, § 99. Presently before the court is BIDMC's motion to dismiss. After a hearing on September 19, 2023, and consideration of the parties' submissions, the motion is **DENIED**, and, consistent with the parties' request, the matter is **REPORTED** to the Appeals Court.

## BACKGROUND

The Complaint and relevant documents attached to the motion to dismiss set forth the following facts.[2] BIDMC operates a hospital in Boston that offers inpatient and outpatient care

[1] For herself and the class.

[2] BIDMC's complete website Privacy Policy, which Plaintiff relies on in framing her Complaint, was attached to the motion to dismiss. *Marram v. Kobrick Offshore Fund, Ltd.*, 442 Mass. 43, 45 n.4 (2004).

to residents in the greater Boston area. Plaintiff is an individual residing in Revere, Massachusetts.

BIDMC maintains and controls a website for its hospital. The website allows users to obtain information about the services BIDMC provides, including information about doctors, services, and treatments provided for particular medical conditions. Website users also can book appointments, access and pay bills, and access private medical information through the website's patient portal. The website contains search bars that aid users in finding specific information on the site, and forms that users may submit to BIDMC, such as the "Request an Appointment" form.

As relevant here, BIDMC's website privacy policy ("Privacy Policy") states:

> Beth Israel Deaconess Medical Center (BIDMC) is committed to protecting your privacy. The BIDMC website allows you to visit most areas without identifying yourself or providing personal information. For those areas where you elect to provide identifiable information, we assure you that we make every effort to protect your privacy. . . .
>
> Beth Israel Deaconess Medical Center routinely gathers data on website activity, such as how many people visit the site, the pages they visit, where they come from, how long they stay, etc. The data is collected on an aggregate, anonymous basis, which means no personally identifiable information is associated with the data. This data helps us improve site content and overall usage. This information is not shared with other organizations. Except for authorized law enforcement investigations or other facially valid legal processes, we will not share any information we receive with outside parties. . . .
>
> We and our Third Party Service Provider collect and save the default information customarily logged by worldwide web server software. Our logs contain the following information for each request: date and time, originating IP address and domain name (the unique address assigned to your Internet service provider's computer that connects to the Internet), object requested, and completion status of the request. These logs may be kept for an indefinite amount of time, used at any time and in any way necessary to prevent security breaches and to ensure the integrity of the data on our servers.

(Formatting altered). Since 2021, BIDMC's website also has included a pop-up notice that references the use of "cookies and other tools to enhance your experience on the website," with a link to the Privacy Policy "for more information about these cookies and the data collected."

Notwithstanding this Privacy Policy, BIDMC has implemented multiple software-based internet tracking technologies on its website that contemporaneously record and transmit data about users' interactions with BIDMC's website to multiple unidentified third parties. The software is unrelated to the website's functionality and is invisible to users. Two such tracking technologies are Meta Pixel, which transmits data to Meta (the parent company of Facebook), and Google Analytics, which transmits data to Google.

Meta Pixel and Google Analytics operate through the automatic execution of pieces of JavaScript code, embedded in the BIDMC website, which cause a website user's internet browser to record and send information to those third parties when a user visits and interacts with the site. The transmitted information can include: the website address (URL); the title of webpages visited; information about the content of the website; search terms or any other information inputted into a form; selections on drop-down menus and the contents thereof; scrolls down a webpage; and button clicks. A website user's internet protocol ("IP") address and web browser configurations are also revealed, which permits Google and Meta to associate the data it receives from the website visit to the identity of a particular individual known to them. The content of the user's communications with BIDMC's website is added to Google's and Meta's collection of information already known about the individual, which can be used to target advertising to that individual. Google, Meta, and BIDMC may also use the information collected for other commercial purposes. After a media exposé about the use of Meta Pixel on hospital

websites, BIDMC removed it from its website in September 2022. As of the date the Complaint was filed, Google Analytics software remained on the BIDMC website.

In addition to Meta Pixel and Google Analytics, BIDMC also employs other software-based internet tracking technologies that work in a similar fashion. Those include Doubleclick, Siteimprove Analytics, and Marchex.io.

Plaintiff's husband is a BIDMC patient. Plaintiff regularly uses the BIDMC website to obtain information about BIDMC doctors (including their credentials and backgrounds); search for information on particular symptoms, conditions, and medical procedures, both for herself and her husband; and obtain and review her husband's medical records through the BIDMC website patient portal.

## STANDARD OF REVIEW

Rule 12(b)(6) allows for dismissal of a complaint when the factual allegations contained within it do not suggest a plausible entitlement to relief. *Iannacchino v. Ford Motor Co.*, 451 Mass. 623, 635-636 (2008); *Fraelick v. PerkettPR, Inc.*, 83 Mass. App. Ct. 698, 699-700 (2013). In ruling on the motions, the court accepts the factual allegations as true and draws all reasonable inferences in the non-moving party's favor. *Fraelick*, 83 Mass. App. Ct. at 699-700.

## DISCUSSION

BIDMC argues that Plaintiff's claims must be dismissed due to lack of standing and failure to meet the requirements of the Massachusetts Wiretap Statute. As discussed below, however, under this court's reading of the relevant caselaw and the plain language of the statute, the Complaint states a claim sufficient to survive dismissal under Rule 12(b)(6). Nevertheless, because of the novelty of the issue raised, which also has arisen in several analogous cases

before this court, and for the further reasons discussed below, a report to the Appeals Court is appropriate.[3]

1. **Standing**[4]

This court recently addressed standing in an analogous wiretap cases — *Doe v. Boston Medical Center*, 2384CV00326-BLS1, slip op. at 4-5 (Mass. Super. Ct. Sept. 15, 2023) ("*Boston Medical Center*"). There, the court denied the defendant's motion to dismiss on standing grounds, concluding that "a properly alleged violation of the [Massachusetts Wiretap Statute], alone, constitute[s] injury sufficient to confer standing." *Id.* (citing *Pine v. Rust*, 404 Mass. 411, 418 (1989); *In re Lubanski*, 186 B.R. 160, 166-67 (Bankr. D. Mass. 1995)). For the same reasons enunciated in that decision, Plaintiff has standing to sue here, as well.

2. **Massachusetts Wiretap Statute**

General Laws c. 272, § 99(Q) provides a cause of action for "any aggrieved person whose oral or wire communications were intercepted, disclosed or used . . . or whose personal or property interests or privacy were violated by means of an interception," except as permitted or authorized by the Wiretap Statute. "Interception" is defined to mean "to secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire or oral communication through the use of any intercepting device by any person other than a person given prior authority by all parties to such communication." G.L. c. 272, § 99(B)(4).

BIDMC argues that the action should be dismissed because, according to it: 1) the statute applies only to "conversations," not internet tracking; 2) BIDMC's recording of website user

[3] On this same date the court also decides a similar motion to dismiss and reports the correctness of its ruling to the Appeals Court in *Kathleen Vita v. New England Baptist Hospital*, 2384CV00857-BLS1.
[4] The standard of review for challenging standing in a motion to dismiss under Rule 12(b)(1) is functionally the same as under Rule 12(b)(6). *Abate v. Fremont Inv. & Loan*, 470 Mass. 821, 828 (2015).

activity was not secret; 3) the statutory "ordinary course of business" exception applies; and 4) application of the statute to the facts here would lead to absurd results the Legislature could not have intended. The court addresses each, in turn.

*A. Limitation of the statute to human-to-human conversation.* In prior analogous cases, this court concluded that the plain language of the statute encompasses the electronic activity alleged here. *See Boston Medical Center*, 2384CV00326-BLS1, slip op. at 6-7; *Doe v. Boston Children's Hospital*, 2384CV00411-BLS1, slip op. at 4-6 (Mass. Super. Ct. Sept. 15. 2023) ("*Boston Children's*"). Accordingly, for the same reasons already articulated in those cases, the argument fails here, as well.

*B. Secrecy requirement.* As noted, an interception under the Massachusetts Wiretap Statute must be "secret." G.L. c. 272, § 99(B)(4). A "secret" recording is one that is "concealed," and "kept hidden or unexplained." *Curtatone v. Barstool Sports, Inc.*, 487 Mass. 655, 658 (2021) (dictionary citations omitted). An interception is not secret for purposes of the Massachusetts Wiretap Statute if the individual communicating has "actual [or constructive] knowledge of the recording," which is proved through "'clear and unequivocal objective manifestations of knowledge' in the [users'] statements or conduct." *Commonwealth v. Morris*, 492 Mass. 498, 515 (2023) (Budd., J., concurring) (quoting *Commonwealth v. Jackson*, 370 Mass. 502, 507 (1976)). *See Commonwealth v. Du*, No. 22-P-870, 2023 WL 652243, at *6 (Mass. App. Ct. Oct. 6, 2023).

BIDMC argues that its Privacy Policy and related website pop-up disclose BIDMC's collection of data, and its sharing of that data with a third party, such that the internet tracking activity alleged here is not secret. There are two problems with that argument. First, the Privacy Policy is unclear about the exact nature of the website data BIDMC shares. The Privacy Policy

informs users that BIDMC collects certain user data that is kept anonymous and which "is not shared with other organizations," but then notes the existence of an external "Third Party Service Provider" that also collects data, but defines that collected data in a different way. The Privacy Policy language is technical and obscures whether the BIDMC data and the Third Party Service Provider data are related or overlap in some ways, and thus whether some of the purportedly private, unshared, "anonymous" data BIDMC collects is nevertheless shared with the Third Party Service Provider.[5] Second, the Privacy Policy discloses the existence of only a *single* "Third Party Service Provider," while the Complaint alleges that the data BIDMC collects is contemporaneously shared with *multiple* external organizations (Google, Meta, and others). The existence of these additional third-party "eavesdroppers" are thus kept hidden from BIDMC's website users.

In sum, the Privacy Policy and website pop-up, while disclosing some amount of data sharing, do not establish users' actual or constructive knowledge of the totality of the internet tracking alleged here.[6] Accordingly, on the facts as pleaded and taken as true, the Complaint sufficiently alleges a secret interception, i.e. that BIDMC "aid[ed] another to secretly hear or secretly record the contents of any wire or oral communication." G.L. c. 272, § 99(B)(4).[7]

*C. "Ordinary course of business" exception.* The Massachusetts Wiretap Statute excepts from the definition of "intercepting device":

---

[5] Indeed, as a lay reader of the Privacy Policy, the court is unable to determine whether BIDMC's collected data about "how many people visit the site, the pages they visit, where they come from, how long they stay, etc." includes some of the same information as it and the Third Party Service Provider's collection of "default information customarily logged by worldwide web server software."

[6] That a website user can reveal the internet tracking software code by employing "Developer Mode" also does not establish actual or constructive knowledge of the software code at issue.

[7] Because this case alleges third-party eavesdropping on website communications by undisclosed, contemporaneous third-parties, this case differs from *Curtatone v. Barstool Sports, Inc.*, 487 Mass. 655 (2023), which involved a consented-to recorded conversation between two people only. *See id.* at 657, 660.

> any telephone or telegraph instrument, equipment, facility, or a component thereof, (a) furnished to a subscriber or user by a communications common carrier in the ordinary course of its business under its tariff and being used by the subscriber or user in the ordinary course of its business . . .

G.L. c. 272, § 99(B)(3). Thus, for the exception to apply, the intercepting device at issue must consist of or include "telephone or telegraph" equipment, instruments, etc. *Id.*

Setting aside whether internet tracking occurs in the ordinary course of BIDMC's business, the electronic software-based internet tracking technology at issue here plainly is not telephone or telegraph equipment. For that reason, in the absence of an appellate decision extending the exception beyond the realm of telephones and telegraphs, under the plain language of the statute, the court declines to apply the exception here. *See Alves v. BJ's Wholesale Club, Inc.*, 2284CV02509-BLS1, slip op. at 10 (Super. Ct. June 21, 2023) ("*Alves*") (declining to extend exception to software-based session replay code technology).

*D. Legislative Intent*. Finally, BIDMC argues that interpreting the Massachusetts Wiretap Statute to encompass the ubiquitous internet tracking that practically all businesses presently employ would lead to absurd results the Legislature could not have intended when it enacted the statute in 1968. Reading the criminal caselaw that BIDMC cites for this proposition does not compel the denial it seeks, however.

*Commonwealth v. Morris*, 492 Mass. 498 (2023), and *Commonwealth v. Rainey*, 491 Mass. 632 (2023), upon which BIDMC relies, each involve statements made to police wherein the speakers necessarily understood that their statements were being memorialized for future use or presentation in court, despite the lack of explicit disclosure about electronic recording. *Morris*, 492 Mass. at 503-04; *Rainey*, 491 Mass. at 635, 640-41. In that narrow context, the

court determined that literal application of the Massachusetts Wiretap Statute would result in absurd and unintended consequences, at odds with the Legislature's intent in enacting the statute. *See Morris*, 492 Mass. at 506 ("nothing in the statute as a whole, including its codified preamble, supports the conclusion that the Legislature intended to criminalize the police officers' recording of the defendant's voluntary statement, which the defendant understood was being preserved for future use in connection with the investigation of the crime about which the defendant was speaking voluntarily"); *Rainey*, 491 Mass. at 643 (same as to victim's voluntarily-provided statement to police).

Here, unlike the criminal defendant and victim in *Morris* and *Rainey*, Plaintiff and BIDMC's other website users are not alleged to be proceeding with the implicit understanding that their communications are to be preserved and memorialized, electronically or by handwritten notes, by a government body, for important public safety reasons. Rather, the entire gist of the Complaint is that Plaintiff interacted with the BIDMC website with no concept that the data she inputted would be simultaneously and automatically intercepted and externally shared with multiple external parties. These facts alone distinguish this case from *Morris* and *Rainey*.

In further contrast to those cases, the statute's preamble arguably supports the right to freedom from private electronic surveillance at issue here. Its broad language provides:

> The general court . . . finds that the uncontrolled development and unrestricted use of modern electronic surveillance devices pose grave dangers to the privacy of all citizens of the commonwealth. Therefore, the secret use of such devices by private individuals must be prohibited.

G.L. c. 272, § 99. In fact, a broad interpretation of the statute's language is endorsed in *Commonwealth v. Moody*, 466 Mass. 196 (2013), a Supreme Judicial Court decision that

extended the Massachusetts Wiretap Statute's application to electronic text messages. *See id.* at 209 ("[i]n light of the broad statutory definitions of the terms 'wire communication' and 'interception,' we conclude that the Massachusetts wiretap statute provides protection for the electronic transmission of text messages").[8]

For the reasons explained above, and absent an appellate decision interpreting the Massachusetts Wiretap Statute in the narrow way that BIDMC suggests, this court concludes that the facts as alleged in the Complaint state a claim for a violation of the statute.

**3. <u>Report to Appeals Court</u>**

Under Mass. R. Civ. P. 64, a Superior Court judge may report an interlocutory decision "where he or she concludes that the finding or order 'so affects the merits of the controversy that the matter ought to be determined by the [A]ppeals [C]ourt before any further proceedings in the trial court.'" *Patel v. Martin*, 481 Mass. 29, 32 (2018) (quoting Mass. R. Civ. P. 64(a)). The Supreme Judicial Court has cautioned that "[i]nterlocutory matters should be reported only where it appears that they present serious questions likely to be material in the ultimate decision, and that subsequent proceedings in the trial court will be substantially facilitated by so doing." *Globe Newspaper Co. v. Massachusetts Bay Transp. Auth. Ret. Bd.*, 412 Mass. 770, 772 (1992) (quoting *John Gilbert Jr. Co. v. C.M. Fauci Co.*, 309 Mass. 271, 273 (1941)). Such is the case here. The parties here also have requested that the court report the matter to the Appeals Court.

Whether the Massachusetts Wiretap Statute applies to the internet tracking alleged here is a novel question unresolved at the appellate level in Massachusetts, and is the central and

[8] The most recent published case interpreting the Massachusetts Wiretap Statute is consistent with this view. *See Commonwealth v. Du*, No. 22-P-870, 2023 WL 6522435, at *6-*7 (Mass. App. Ct. Oct. 6, 2023) (court interpreted statute to prohibit surreptitious audio-visual video recording of drug transaction made by police using cell phone application).

dispositive issue in this case. Although the Massachusetts Wiretap Statute is broadly drafted, and states the Legislature's explicit intention to protect citizens from the grave danger of electronic surveillance by private individuals poses, it was enacted in 1968 — long before the internet, let alone internet tracking, became available. The Legislature did not, therefore, contemplate internet tracking as a form of secretly intercepting communications. BIDMC argues that internet tracking is practically ubiquitous across all businesses and organizations with websites, and that BIDMC's use of such tracking is a legitimate, ordinary part of its business. Had the Legislature been aware of internet tracking and its possible business uses in 1968, it might have written the statute to allow the type of tracking alleged in this case.

The novel question here has arisen in several other cases. As noted, this court already has denied motions to dismiss in two other internet-tracking wiretap cases. *See Boston Medical Center*, 2384CV00326-BLS1; *Boston Children's*, 2384CV00411-BLS1. Other Superior Court judges have issued similar decisions. *See Alves*, 2284CV02509-BLS1; *Doe v. Partners Healthcare System, Inc.*, 1984CV01651-BLS1, endorsement denying motion to dismiss (Super. Ct. Dec. 7, 2020). There are many other analogous cases presently pending in the Superior Court, including in this session.[9] If, as BIDMC argues, the Massachusetts Wiretap Statute does not apply to business-related internet tracking, significant judicial and party resources will be saved by the quick resolution of these cases before discovery and other stages of litigation.

---

[9] Other analogous cases pending in BLS1 include: *Progin, Janice v. UMass Memorial Health Care, Inc.*, 2284CV2889; *John Doe v. Boston Medical Center Corp.*, 2384CV326; *Jane Doe v. The Children's Hospital Corp.*, 2384CV411; *Kathleen Vita v. New England Baptist Hospital*, 2384CV00857; *Karen McManus v. Tufts Medical Center, Inc.*, 2384CV930; *Elizabeth Nova v. Boston Medical Center Corporation*, 2384CV1086; *Jane Doe v. Cape Cod Healthcare, Inc.*, 2384CV1236; *Jane Doe v Baystate Health Systems*, 2384CV1949; *John Doe v. UMass Memorial Health Care Inc.*, 2384CV2448; *Lisa Colleton v. UMass Memorial Health Care Inc.*, 2384CV2450

For all of these reasons, this matter should be determined by the Appeals Court before any proceedings continue in this court.

**ORDER**

For the foregoing reasons, it is hereby **ORDERED** that:

1. BIDMC's motion to dismiss is **DENIED**; and
2. The Court **REPORTS** the correctness of its ruling to the Appeals Court.

Dated: October 31, 2023

Hélène Kazanjian
Justice of the Superior Court

# EXHIBIT B

16

NOTIFY

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT
CIVIL ACTION
No. 2384CV00857-BLS1

11/1/23
notice sent
BH (2)

KATHLEEN VITA[1]

vs.

NEW ENGLAND BAPTIST HOSPITAL

**MEMORANDUM OF DECISION AND ORDER ON DEFENDANT'S MOTION TO DISMISS AND REPORT TO THE APPEALS COURT**

Plaintiff Kathleen Vita ("Plaintiff") commenced this putative class action against defendant New England Baptist Hospital ("NEBH"), alleging that it used internet tracking tools on its website that illegally redirected website users' personal information, and the contents of users' communications with NEBH's website, to third parties Google and Meta. On the basis of these allegations, the Complaint asserts a single claim for violation of the Massachusetts Wiretap Statute, G.L. c. 272, § 99. Presently before the court is NEBH's motion to dismiss. After a hearing on September 19, 2023, and consideration of the parties' submissions, the motion is DENIED, and, consistent with the parties' request, the matter is REPORTED to the Appeals Court.

## BACKGROUND

The Complaint and relevant documents attached to the motion to dismiss set forth the following facts.[2] NEBH operates a hospital with a main campus in Boston, and several other

[1] For herself and the class.

[2] NEBH's complete website Privacy Policy, which Plaintiff relies on in framing her Complaint, was attached to the motion to dismiss. *Marram v. Kobrick Offshore Fund, Ltd.*, 442 Mass. 43, 45 n.4 (2004).

locations in the Boston area, focusing on orthopedic care and complex orthopedic procedures. Plaintiff is an individual residing in Revere, Massachusetts.

NEBH maintains and controls a website for its hospital. The website allows users to obtain information about the services NEBH provides, including information about doctors, services, and treatments provided for particular medical conditions. Website users also can access and pay bills, and access private medical information through the website's patient portal. The website contains search bars that aid users in finding specific information on the site, and forms that users may submit to NEBH, such as the "Find a Doctor" form.

As relevant here, NEBH's website privacy policy ("Privacy Policy") states:

> New England Baptist Hospital (NEBH) is committed to protecting your privacy. The NEBH website allows you to visit most areas without identifying yourself or providing personal information. For those areas where you elect to provide identifiable information, we assure you that we make every effort to protect your privacy. . . .
>
> New England Baptist Hospital routinely gathers data on website activity, such as how many people visit the site, the pages they visit, where they come from, how long they stay, etc. The data is collected on an aggregate, anonymous basis, which means no personally identifiable information is associated with the data. This data helps us improve site content and overall usage. This information is not shared with other organizations. Except for authorized law enforcement investigations or other facially valid legal processes, we will not share any information we receive with outside parties. . . .
>
> We and our Third Party Service Provider collect and save the default information customarily logged by worldwide web server software. Our logs contain the following information for each request: date and time, originating IP address and domain name (the unique address assigned to your Internet service provider's computer that connects to the Internet), object requested, and completion status of the request. These logs may be kept for an indefinite amount of time, used at any time and in any way necessary to prevent security breaches and to ensure the integrity of the data on our servers.

(Formatting altered). Since 2021, NEBH's website also has included a pop-up notice that references the use of "cookies and other tools to enhance your experience on the

website," with a link to the Privacy Policy "for more information about these cookies and the data collected."

Notwithstanding this Privacy Policy, NEBH has implemented multiple software-based internet tracking technologies on its website that contemporaneously record and transmit data about users' interactions with NEBH's website to multiple unidentified third parties. The software is unrelated to the website's functionality and is invisible to users. Two such tracking technologies are Meta Pixel, which transmits data to Meta (the parent company of Facebook), and Google Analytics, which transmits data to Google.

Meta Pixel and Google Analytics operate through the automatic execution of pieces of JavaScript code, embedded in the NEBH website, which cause a website user's internet browser to record and send information to those third parties when a user visits and interacts with the site. The transmitted information can include: the website address (URL); the title of webpages visited; information about the content of the website; search terms or any other information inputted into a form; selections on drop-down menus and the contents thereof; scrolls down a webpage; and button clicks. A website user's internet protocol ("IP") address and web browser configurations are also revealed, which permits Google and Meta to associate the data it receives from the website visit to the identity of a particular individual known to them. The content of the user's communications with NEBH's website is added to Google's and Meta's collection of information already known about the individual, which can be used to target advertising to that individual. Google, Meta, and NEBH may also use the information collected for other commercial purposes. After a media exposé about the use of Meta Pixel on hospital websites in June 2022, NEBH removed it from its website at some unidentified point in time. As of the date the Complaint was filed, Google Analytics software remained on the NEBH website.

Plaintiff is a NEBH patient. Plaintiff regularly uses the NEBH website to obtain information about NEBH doctors (including their credentials and backgrounds) and to search for information on particular medical procedures.

**STANDARD OF REVIEW**

Rule 12(b)(6) allows for dismissal of a complaint when the factual allegations contained within it do not suggest a plausible entitlement to relief. *Iannacchino v. Ford Motor Co.*, 451 Mass. 623, 635-636 (2008); *Fraelick v. PerkettPR, Inc.*, 83 Mass. App. Ct. 698, 699-700 (2013). In ruling on the motions, the court accepts the factual allegations as true and draws all reasonable inferences in the non-moving party's favor. *Fraelick*, 83 Mass. App. Ct. at 699-700.

**DISCUSSION**

NEBH argues that Plaintiff's claims must be dismissed due to lack of standing and failure to meet the requirements of the Massachusetts Wiretap Statute. As discussed below, however, under this court's reading of the relevant caselaw and the plain language of the statute, the Complaint states a claim sufficient to survive dismissal under Rule 12(b)(6). Nevertheless, because of the novelty of the issue raised, which also has arisen in several analogous cases before this court, and for the further reasons discussed below, a report to the Appeals Court is appropriate.[3]

[3] On this same date the court also decides a similar motion to dismiss and reports the correctness of its ruling to the Appeals Court in *Kathleen Vita v. Beth Israel Deaconess Medical Center, Inc.*, 2384CV00480-BLS1.

1. **Standing**[4]

This court recently addressed standing in an analogous wiretap case — *Doe v. Boston Medical Center*, 2384CV00326-BLS1, slip op. at 4-5 (Mass. Super. Ct. Sept. 15, 2023) ("*Boston Medical Center*"). There, the court denied the defendant's motion to dismiss on standing grounds, concluding that "a properly alleged violation of the [Massachusetts Wiretap Statute], alone, constitute[s] injury sufficient to confer standing." *Id.* (citing *Pine v. Rust*, 404 Mass. 411, 418 (1989); *In re Lubanski*, 186 B.R. 160, 166-67 (Bankr. D. Mass. 1995)). For the same reasons enunciated in that decision, Plaintiff has standing to sue here, as well.

2. **Massachusetts Wiretap Statute**

General Laws c. 272, § 99(Q) provides a cause of action for "any aggrieved person whose oral or wire communications were intercepted, disclosed or used . . . or whose personal or property interests or privacy were violated by means of an interception," except as permitted or authorized by the Wiretap Statute. "Interception" is defined to mean "to secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire or oral communication through the use of any intercepting device by any person other than a person given prior authority by all parties to such communication." G.L. c. 272, § 99(B)(4).

NEBH argues that the action should be dismissed because, according to it: 1) the statute applies only to "conversations," not internet tracking; 2) NEBH's recording of website user activity was not secret; 3) the statutory "ordinary course of business" exception applies; and 4) application of the statute to the facts here would lead to absurd results the Legislature could not have intended. The court addresses each, in turn.

[4] The standard of review for challenging standing in a motion to dismiss under Rule 12(b)(1) is functionally the same as under Rule 12(b)(6). *Abate v. Fremont Inv. & Loan*, 470 Mass. 821, 828 (2015).

*A.* *Limitation of the statute to human-to-human conversation*. In prior analogous cases, this court concluded that the plain language of the statute encompasses the electronic activity alleged here. *See Boston Medical Center*, 2384CV00326-BLS1, slip op. at 6-7; *Doe v. Boston Children's Hospital*, 2384CV00411-BLS1, slip op. at 4-6 (Mass. Super. Ct. Sept. 15. 2023) ("*Boston Children's*"). Accordingly, for the same reasons articulated in those cases, the argument fails here, as well.

*B.* *Secrecy requirement*. As noted, an interception under the Massachusetts Wiretap Statute must be "secret." G.L. c. 272, § 99(B)(4). A "secret" recording is one that is "concealed," and "kept hidden or unexplained." *Curtatone v. Barstool Sports, Inc.*, 487 Mass. 655, 658 (2021) (dictionary citations omitted). An interception is not secret for purposes of the Massachusetts Wiretap Statute if the individual communicating has "actual [or constructive] knowledge of the recording," which is proved through "'clear and unequivocal objective manifestations of knowledge' in the [users'] statements or conduct." *Commonwealth v. Morris*, 492 Mass. 498, 515 (2023) (Budd., J., concurring) (quoting *Commonwealth v. Jackson*, 370 Mass. 502, 507 (1976)). *See Commonwealth v. Du*, No. 22-P-870, 2023 WL 652243, at *6 (Mass. App. Ct. Oct. 6, 2023).

NEBH argues that its Privacy Policy and related website pop-up disclose NEBH's collection of data, and its sharing of that data with a third party, such that the internet tracking activity alleged here is not secret. There are two problems with that argument. First, the Privacy Policy is unclear about the exact nature of the website data NEBH shares. The Privacy Policy informs users that NEBH collects certain user data that is kept anonymous and which "is not shared with other organizations," but then notes the existence of an external "Third Party Service Provider" that also collects data, but defines that collected data in a different way. The Privacy

Policy language is technical and obscures whether the NEBH data and the Third Party Service Provider data are related or overlap in some ways, and thus whether some of the purportedly private, unshared, "anonymous" data NEBH collects is nevertheless also shared with the Third Party Service Provider.[5] Second, the Privacy Policy discloses the existence of only a *single* "Third Party Service Provider," while the Complaint alleges that the data NEBH collects is contemporaneously shared with *multiple* external organizations (Google, Meta, and others). The existence of these additional third-party "eavesdroppers" are thus kept hidden from NEBH's website users.

In sum, the Privacy Policy and website pop-up, while disclosing some amount of data sharing, do not establish users' actual or constructive knowledge of the totality of the internet tracking alleged here.[6] Accordingly, on the facts as pleaded and taken as true, the Complaint sufficiently alleges a secret interception, i.e. that NEBH "aid[ed] another to secretly hear or secretly record the contents of any wire or oral communication." G.L. c. 272, § 99(B)(4).[7]

*C.* "*Ordinary course of business" exception*. The Massachusetts Wiretap Statute excepts from the definition of "intercepting device":

> any telephone or telegraph instrument, equipment, facility, or a component thereof, (a) furnished to a subscriber or user by a communications common carrier in the ordinary course of its business under its tariff and being used by the subscriber or user in the ordinary course of its business . . .

[5] Indeed, as a lay reader of the Privacy Policy, the court is unable to determine whether NEBH's collected data about "how many people visit the site, the pages they visit, where they come from, how long they stay, etc." includes some of the same information as it and the Third Party Service Provider's collection of "default information customarily logged by worldwide web server software."

[6] That a website user can reveal the internet tracking software code by employing "Developer Mode" also does not establish actual or constructive knowledge of the software code at issue.

[7] Because this case alleges third-party eavesdropping on website communications by undisclosed, contemporaneous third-parties, this case differs from *Curtatone v. Barstool Sports, Inc.*, 487 Mass. 655 (2023), which involved a consented-to recorded conversation between two people only. *See id.* at 657, 660.

G.L. c. 272, § 99(B)(3). Thus, for the exception to apply, the intercepting device at issue must consist of or include "telephone or telegraph" equipment, instruments, etc. *Id.*

Setting aside whether internet tracking occurs in the ordinary course of NEBH's business, the electronic software-based internet tracking technology at issue here plainly is not telephone or telegraph equipment. For that reason, in the absence of an appellate decision extending the exception beyond telephones and telegraphs, under the plain language of the statute, the court declines to apply the exception here. *See Alves v. BJ's Wholesale Club, Inc.*, 2284CV02509-BLS1, slip op. at 10 (Super. Ct. June 21, 2023) ("*Alves*") (declining to extend exception to software-based session replay code technology).

*D. Legislative Intent*. Finally, NEBH argues that interpreting the Massachusetts Wiretap Statute to encompass the ubiquitous internet tracking that practically all businesses presently employ would lead to absurd results the Legislature could not have intended when it enacted the statute in 1968. Reading the criminal caselaw that NEBH cites for this proposition does not compel the denial it seeks, however.

*Commonwealth v. Morris*, 492 Mass. 498 (2023), and *Commonwealth v. Rainey*, 491 Mass. 632 (2023), upon which NEBH relies, each involve statements made to police where the speakers necessarily understood that their statements were being memorialized for future use or presentation in court, despite the lack of explicit disclosure about electronic recording. *Morris*, 492 Mass. at 503-04; *Rainey*, 491 Mass. at 635, 640-41. In that narrow context, the court determined that literal application of the Massachusetts Wiretap Statute would result in absurd and unintended consequences, at odds with the Legislature's intent in enacting the statute. *See Morris*, 492 Mass. at 506 ("nothing in the statute as a whole, including its codified preamble, supports the conclusion that the Legislature intended to criminalize the police officers' recording

of the defendant's voluntary statement, which the defendant understood was being preserved for future use in connection with the investigation of the crime about which the defendant was speaking voluntarily"); *Rainey*, 491 Mass. at 643 (same as to victim's voluntarily-provided statement to police).

Here, unlike the criminal defendant and victim in *Morris* and *Rainey*, Plaintiff and NEBH's other website users are not alleged to be proceeding with the implicit understanding that their communications are to be preserved and memorialized, electronically or by handwritten notes, by a government body, for important public safety reasons. Rather, the entire gist of the Complaint is that Plaintiff interacted with the NEBH website with no concept that the data she inputted would be simultaneously and automatically intercepted and externally shared with multiple external parties. These facts alone distinguish this case from *Morris* and *Rainey*.

In further contrast to those cases, the statute's preamble arguably supports the right to freedom from private electronic surveillance at issue here. Its broad language provides:

> The general court . . . finds that the uncontrolled development and unrestricted use of modern electronic surveillance devices pose grave dangers to the privacy of all citizens of the commonwealth. Therefore, the secret use of such devices by private individuals must be prohibited.

G.L. c. 272, § 99. In fact, a broad interpretation of the statute's language is endorsed in *Commonwealth v. Moody*, 466 Mass. 196 (2013), a Supreme Judicial Court decision that extended the Massachusetts Wiretap Statute's application to electronic text messages. *See id.* at 209 ("[i]n light of the broad statutory definitions of the terms 'wire communication' and

'interception,' we conclude that the Massachusetts wiretap statute provides protection for the electronic transmission of text messages").[8]

For the reasons explained above, and absent an appellate decision interpreting the Massachusetts Wiretap Statute in the narrow way that NEBH suggests, this court concludes that the facts as alleged in the Complaint state a claim for a violation of the statute.

### 3. Report to Appeals Court

Under Mass. R. Civ. P. 64, a Superior Court judge may report an interlocutory decision "where he or she concludes that the finding or order 'so affects the merits of the controversy that the matter ought to be determined by the [A]ppeals [C]ourt before any further proceedings in the trial court.'" *Patel v. Martin*, 481 Mass. 29, 32 (2018) (quoting Mass. R. Civ. P. 64(a)). The Supreme Judicial Court has cautioned that "[i]nterlocutory matters should be reported only where it appears that they present serious questions likely to be material in the ultimate decision, and that subsequent proceedings in the trial court will be substantially facilitated by so doing." *Globe Newspaper Co. v. Massachusetts Bay Transp. Auth. Ret. Bd.*, 412 Mass. 770, 772 (1992) (quoting *John Gilbert Jr. Co. v. C.M. Fauci Co.*, 309 Mass. 271, 273 (1941)). Such is the case here. The parties here also have requested that the court report the matter to the Appeals Court.

Whether the Massachusetts Wiretap Statute applies to the internet tracking alleged here is a novel question unresolved at the appellate level in Massachusetts, and is the central and dispositive issue in this case. Although the Massachusetts Wiretap Statute is broadly drafted, and states the Legislature's explicit intention to protect citizens from the grave danger of

[8] The most recent published case interpreting the Massachusetts Wiretap Statute is consistent with this view. *See Commonwealth v. Du*, No. 22-P-870, 2023 WL 6522435, at *6-*7 (Mass. App. Ct. Oct. 6, 2023) (court interpreted statute to prohibit surreptitious audio-visual video recording of drug transaction made by police using cell phone application).

electronic surveillance by private individuals, it was enacted in 1968 — long before the internet, let alone internet tracking, became available. The Legislature did not, therefore, contemplate internet tracking as a form of secretly intercepting communications. NEBH argues that internet tracking is practically ubiquitous across all businesses and organizations with websites, and that NEBH's use of such tracking is a legitimate, ordinary part of its business. Had the Legislature been aware of internet tracking and its possible business uses in 1968, it might have written the statute to allow the type of tracking alleged in this case.

The novel question here has arisen in several other cases. As noted, this court already has denied motions to dismiss in two other internet-tracking wiretap cases. *See Boston Medical Center*, 2384CV00326-BLS1; *Boston Children's*, 2384CV00411-BLS1. Other Superior Court judges have issued similar decisions recently. *See Alves*, 2284CV02509-BLS1; *Doe v. Partners Healthcare System, Inc.*, 1984CV01651-BLS1, endorsement denying motion to dismiss (Super. Ct. Dec. 7, 2020). There are many other analogous cases presently pending in the Superior Court, including in this session.[9] If, as NEBH argues, the Massachusetts Wiretap Statute does not apply to business-related internet tracking, significant judicial and party resources will be saved by the quick resolution of these cases before discovery and other stages of litigation.

For all of these reasons, this matter should be determined by the Appeals Court before any proceedings continue in this court.

[9] Other analogous cases pending in BLS1 include: *Progin, Janice v. UMass Memorial Health Care, Inc.*, 2284CV2889; *John Doe v. Boston Medical Center Corp.*, 2384CV326; *Jane Doe v. The Children's Hospital Corp.*, 2384CV411; *Kathleen Vita v. Beth Israel Deaconess Medical Center, Inc.*, 2384CV00480; *Karen McManus v. Tufts Medical Center, Inc.*, 2384CV930; *Elizabeth Nova v. Boston Medical Center Corporation*, 2384CV1086; *Jane Doe v. Cape Cod Healthcare, Inc.*, 2384CV1236; *Jane Doe v Baystate Health Systems*, 2384CV1949; *John Doe v. UMass Memorial Health Care Inc.*, 2384CV2448; *Lisa Colleton v. UMass Memorial Health Care Inc.*, 2384CV2450

## ORDER

For the foregoing reasons, it is hereby **ORDERED** that:

1. NEBH's motion to dismiss is **DENIED**; and
2. The Court **REPORTS** the correctness of its ruling to the Appeals Court.

Dated: October 31, 2023

Hélène Kazanjian
Justice of the Superior Court

# EXHIBIT C

**Known Putative Class Actions Alleging Massachusetts Wiretap Act Violations Based on Public Website/Mobile Application Advertising/Analytics Software**
As of December 1, 2023

| Filed | Caption | Court/Case No. | Plaintiffs' Counsel |
|---|---|---|---|
| 5/23/2019 | Doe v. Partners Healthcare Sys., Inc.; Dana-Farber Cancer Inst., Inc.; et al. *(settled for $18.4M in 2022)* | Suffolk Superior BLS1 1984CV01651 | Simmons Hanly Conroy Kenney & Conley, P.C. |
| 5/23/2019 | Doe v. Tufts Medical Center, Inc., et al. *(voluntarily dismissed)* | Suffolk Superior BLS1 1984CV01648 | Simmons Hanly Conroy Kenney & Conley, P.C. |
| 10/11/2022 | Doe v. Southcoast Hospitals Group, Inc. | Bristol Superior 2273CV00673 | Sweeney Merrigan Law, LLP Ahmad, Zavitsanos & Mensing, P.C. Keller Postman LLC |
| 10/18/2022 | Doe, et al v. Atrius Health, Inc. | Suffolk Superior BLS1 2384CV02704[1] | Sweeney Merrigan Law, LLP Ahmad, Zavitsanos & Mensing, P.C. Keller Postman LLC |
| 10/19/2022 | Doe v. Emerson Hospital | Essex Superior 2277CV01000 | Sweeney Merrigan Law, LLP Ahmad, Zavitsanos & Mensing, P.C. Keller Postman LLC |
| 10/24/2022 | Doe v. UMass Memorial Health Care Inc. | Suffolk Superior BLS1 2384CV02448[2] | Sweeney Merrigan Law, LLP Ahmad, Zavitsanos & Mensing, P.C. Keller Postman LLC |
| 10/24/2022 | Alves v. Goodyear Tire and Rubber Co. *(dismissed for lack of personal jurisdiction – on appeal at 1st Cir.)* | U.S.D.C., D.Mass. 22-cv-11820 1st Cir. 23-1682 | Zimmerman Reed LLP Scott+Scott Attys at Law LLP |

[1] Originally filed in Norfolk Superior Court, No. 2282CV00982.
[2] Originally filed in Worcester Superior Court, No. 2285CV01205.

| Filed | Caption | Court/Case No. | Plaintiffs' Counsel |
|---|---|---|---|
| 10/27/2022 | Montecalvo v. Cabela's, Inc. | U.S.D.C., E.D. Pa. 23-cv-02282 and 23-md-03074[3] | Zimmerman Reed LLP<br>Scott+Scott Attys at Law LLP |
| 11/3/2022 | Alves v. BJ's Wholesale Club, Inc. | Suffolk Super. BLS1 2284CV02509 | Zimmerman Reed LLP<br>Scott+Scott Attys at Law LLP |
| 11/14/2022 | Colleton v. UMass Memorial Health Care, Inc. | Suffolk Superior BLS1 2384CV02450[4] | Colonna & Associates<br>Liddle Sheets Coulson P.C. |
| 11/15/2022 | Rosenthal v. Bloomingdale's Inc. *(dismissed for lack of personal jurisdiction – on appeal at 1st Cir.)* | U.S.D.C., D.Mass. 22-cv-11944<br>1st Cir. 23-1683 | Zimmerman Reed LLP<br>Scott+Scott Attys at Law LLP |
| 12/8/2022 | Doe v. Cape Cod Healthcare, Inc. | Suffolk Super. BLS1 2384CV01236[5] | Sweeney Merrigan Law, LLP |
| 12/20/2022 | Progin v. UMass Memorial Health Care Inc. et al | Suffolk Super. BLS1 2284CV02889 | Shapiro Haber & Urmy LLP |
| 1/23/2023 | Doe v. Steward Health Care System LLC | Suffolk Super. BLS1 2384CV00174 | Bailey and Glasser LLP |
| 2/6/2023 | Doe v. Boston Medical Center Corporation ***(stayed pending these appeals)*** | Suffolk Super. BLS1 2384CV00326 | Shapiro & Teitelbaum LLP<br>Berger Montague PC |

[3] Originally filed in the U.S. District Court, D. Mass., No. 22-cv-11837.
[4] Originally filed in Worcester Superior Court, No. 2285CV01293.
[5] Originally filed in Barnstable Superior Court, No. 2272CV00493.

| Filed | Caption | Court/Case No. | Plaintiffs' Counsel |
|---|---|---|---|
| 2/8/2023 | Price v. Carnival Corp. | U.S.D.C., S.D. Cal. 23-cv-00236 | Lynch Carpenter LLP<br>Freed Kanner London & Millen LLC<br>Hausfeld LLP<br>The Murray Law Firm<br>Scott + Scott Attys at Law LLP<br>Zimmerman Reed LLP |
| 2/9/2023 | Rubridge v. Carnival Corp. | U.S.D.C., S.D. Cal. 23-cv-01072 | Zimmerman Reed LLP<br>Scott+Scott Attys at Law LLP |
| 2/10/2023 | Doe v. Emerson Health System, Inc. *(voluntarily dismissed)* | Middlesex Superior 2381CV00443 | Bailey and Glasser LLP |
| 2/15/2023 | Doe v. The Children's Hosp. Corp. (Boston Children's Hospital) ***(stayed pending these appeals)*** | Suffolk Super. BLS1 2384CV00411 | Shapiro Haber & Urmy LLP |
| **2/24/2023** | **Vita v. Beth Israel Deaconess Medical Center, Inc.** ***(stayed pending appeal)*** | **Suffolk Super. BLS1 2384CV00480**<br>**Appeals Court 2023-P-1310** | Shapiro Haber & Urmy LLP |
| 3/3/2023 | Vita v. Blue Cross and Blue Shield of Mass., Inc., et al. | Suffolk Super. BLS1 2384CV00542 | Shapiro Haber & Urmy LLP |
| 3/10/2023 | Doe v. Atrius Health, Inc. | Suffolk Super. BLS1 2384CV00597 | Shapiro Haber & Urmy LLP |
| 3/27/2023 | Doe v. Lawrence General Hospital | Suffolk Super. BLS1 2384CV00728 | Shapiro Haber & Urmy LLP |

| Filed | Caption | Court/Case No. | Plaintiffs' Counsel |
|---|---|---|---|
| **4/7/2023** | **Vita v. New England Baptist Hospital** ***(stayed pending appeal)*** | **Suffolk Super. BLS1 2384CV00857** **Appeals Court 2023-P-1308** | **Shapiro Haber & Urmy LLP** |
| 4/19/2023 | McManus v. Tufts Medical Center, Inc. | Suffolk Super. BLS1 2384CV00930 | Shapiro Haber & Urmy LLP |
| 5/10/2023 | Nova v. Boston Medical Center Corporation ***(stayed pending these appeals)*** | Suffolk Super. BLS1 2384CV01086 | Shapiro Haber & Urmy LLP |
| 7/26/2023 | Gary v. Dynatrace, Inc. | U.S.D.C., D.Mass. 23-cv-11673 | Bursor & Fisher, P.A. |
| 8/23/2023 | Marden v. LifeMD Inc. | U.S.D.C., S.D.N.Y. 23-cv-7469 | Almeida Law Group LLC; Migliaccio Rathod |
| 8/29/2023 | Doe v. Baystate Health System, Inc. | Suffolk Super. BLS1 2384CV01949 | Shapiro & Teitelbaum LLP Berger Montague PC |
| 10/23/2023 | Doe v. Boston IVF, LLC | Middlesex Super. 2381CV02951 | Ketterer, Browne & Assoc., LLC Cohen & Malad, LLP Stranch, Jennings & Garvey, PLLC Turke & Strauss, LLP |

DM_US 202380993-1.056777.0081

# EXHIBIT D

# 2384CV00480 Vita, For Herself And The Class, Kathleen vs. Beth Israel Deaconess Medical Center, Inc.

- Case Type:
- Business Litigation
- Case Status:
- Open
- File Date
- 02/24/2023
- DCM Track:
- B - Special Track (BLS)
- Initiating Action:
- Fraud, Business Torts, etc.
- Status Date:
- 02/24/2023
- Case Judge:
-
- Next Event:
-

All Information | Party | Event | Docket | Disposition

## Party Information

**Vita, For Herself And The Class, Kathleen**
- Plaintiff

Alias

**Party Attorney**
- Attorney
- Blauner, Esq., Michelle H
- Bar Code
- 549049
- Address
- Shapiro Haber and Urmy LLP
One Boston Place
Boston, MA 02108
- Phone Number
- (617)208-4713

More Party Information

**Beth Israel Deaconess Medical Center, Inc.**
- Defendant

Alias

**Party Attorney**
- Attorney
- Gacioch, Esq., David Quinn
- Bar Code
- 660784
- Address
- McDermott Will and Emery LLP
200 Clarendon St
Floor 58
Boston, MA 02116
- Phone Number
- (617)535-4000
- Attorney
- Rodriguez, Esq., Annabel
- Bar Code
- 696001
- Address
- McDermott Will and Emery LLP
200 Clarendon St
Floor 58
Boston, MA 02116
- Phone Number
- (617)535-4063

More Party Information

## Events

| Date | Session | Location | Type | Event Judge | Result |
|---|---|---|---|---|---|
| 09/19/2023 02:00 PM | Business Litigation 1 | BOS-13th FL, CR 1309 (SC) | Rule 12 Hearing | Kazanjian, Hon. Helene | |

## Docket Information

| Docket Date | Docket Text | File Ref Nbr. | Image Avail. |
|---|---|---|---|
| 02/24/2023 | Complaint electronically filed. | 1 | Image |
| 02/24/2023 | Civil action cover sheet filed. | 2 | Image |
| 03/02/2023 | General correspondence regarding NOTICE OF ACCEPTANCE INTO THE BUSINESS LITIGATION SESSION "BLS1" This matter has been accepted into the Suffolk Business Litigation Session. It has been assigned to BLS1. Dated: February 24, 2023 Notice sent 3/1/23 (See P#3 for complete notice) | 3 | Image |
| 03/29/2023 | Defendant Beth Israel Deaconess Medical Center, Inc.'s Assented to Motion to Extend Time to Answer or Otherwise Respond to the Complaint | 4 | Image |
| 03/29/2023 | Attorney appearance electronically filed. On this date Annabel Rodriguez, Esq. added for Defendant Beth Israel Deaconess Medical Center, Inc. | | Image |
| 03/29/2023 | Attorney appearance electronically filed. On this date David Quinn Gacioch, Esq. added for Defendant Beth Israel Deaconess Medical Center, Inc. | | Image |
| 04/01/2023 | Service Returned for<br><br>Applies To: Beth Israel Deaconess Medical Center, Inc. (Defendant) | 5 | Image |
| 04/05/2023 | Endorsement on Motion to Extend Time to Answer or Otherwise Respond to the Complaint (#4.0): ALLOWED defendant shall answer or otherwise respond to the complaint by 6/09/23.<br><br>(dated 4/03/23) notice sent 4/05/23 | | Image |
| 06/12/2023 | Defendant Beth Israel Deaconess Medical Center, Inc.'s Notice of Motion to Dismiss | | Image |
| 06/16/2023 | Plaintiff, Defendant Kathleen Vita, For Herself And The Class, Beth Israel Deaconess Medical Center, Inc.'s Joint Motion to set Briefing Schedule on Motion to Dismiss | 6 | Image |
| 06/23/2023 | Endorsement on Motion to set Briefing Schedule on Motion to Dismiss (#6.0): ALLOWED dated (6/21/23) Notice Sent 06/26/23 | | Image |
| 06/29/2023 | Plaintiff Kathleen Vita, For Herself And The Class's Assented to Motion to Exceed Page Limit For Opposition To Motion To Dismiss (Jury Trial Demanded) | 7 | Image |
| 07/12/2023 | Endorsement on Motion to Exceed Page Limit for Opposition to Motion to Dismiss (#7.0): ALLOWED The Court will allow the motion but discourages filing anything over 20 pages. Dated 7/10/23 Notice sent 7/12/23 | | Image |
| 08/04/2023 | Defendant Beth Israel Deaconess Medical Center, Inc.'s Notice of Filing | | Image |
| 08/04/2023 | Defendant Beth Israel Deaconess Medical Center, Inc.'s Motion to dismiss under some, not all counts for failure to state a claim | 8 | Image |
| 08/04/2023 | Beth Israel Deaconess Medical Center, Inc.'s Memorandum in support of the defendant's motion to dismiss for failure to state a claim | 9 | Image |
| 08/04/2023 | Declaration of David Quinn Gacioch in support of defendant's motion to dismiss for failure to state a claim | 10 | Image |
| 08/04/2023 | Exhibits/Appendix<br><br>A-D | | Image |
| 08/04/2023 | Reply/Sur-reply<br><br>Memorandum in support of defendant Beth Israel Deaconess Medical Center Inc.'s motion to dismiss the complaint | 11 | Image |

| Docket Date | Docket Text | File Ref Nbr. | Image Avail. |
|---|---|---|---|
| 08/04/2023 | Exhibits/Appendix<br><br>ADENDM | | Image |
| 08/04/2023 | Opposition to Defendant's Motion to Dismiss filed by Kathleen Vita, For Herself And The Class | 12 | Image |
| 09/13/2023 | Defendants Beth Israel Deaconess Medical Center, Inc.'s Submission of Letter to the Court | 13 | Image |
| 10/06/2023 | Defendant Beth Israel Deaconess Medical Center, Inc.'s Supplemental, Submission of of Defendants Regarding Their Pending Motions to Dismiss | 14 | Image |
| 10/16/2023 | Opposition to Defendant's Beth Israel Deaconess Medical Center INC. and New England Baptist Hospital's Request that the Court report issues for Interlocutory review filed by Kathleen Vita, For Herself And The Class | 15 | Image |
| 10/18/2023 | Reply/Sur-reply<br><br>To Plaintiff's Opposition To Interlocutory Appellate Review (Joint)<br><br>Applies To: Beth Israel Deaconess Medical Center, Inc. (Defendant) | 16 | Image |
| 10/31/2023 | MEMORANDUM & ORDER:<br><br>Memorandum of Decision and Order on Defendant's Motion to dismiss and report to the Appeals Court<br>See page #17<br><br>For the foregoing reasons, it is hereby ORDERED that:<br>1. BIDMC's Motion to dismiss is DENIED; and<br>2. The Court REPORTS the correctness of its ruling to the Appeals Court.<br>(Dated 10/31/2023)<br><br>Judge: Kazanjian, Hon. Helene<br><br>Notice sent 11/1/23 | 17 | Image |
| 11/06/2023 | Defendant Beth Israel Deaconess Medical Center, Inc.'s Notice of Filing of Transcript<br><br>Transcript of 9/19/23 received | 18 | Image |
| 11/06/2023 | Docket Note: Notice of Assembly of Record on Report to the Appeals Court sent to Counsel | | |
| 11/06/2023 | Notice to Clerk of the Appeals Court of Assembly of Record | | |
| 11/07/2023 | Plaintiff, Defendant Kathleen Vita, For Herself And The Class, Beth Israel Deaconess Medical Center, Inc.'s Joint Stipulation and<br>Proposed Order to Stay all Proceedings Pending Interlocutory Appeal | 19 | Image |
| 11/13/2023 | Endorsement on Stipulation and Proposed Order to Stay all Proceedings Pending Interlocutory Appeal (#19.0): ALLOWED<br>(Dated: 11/9/23) | | Image |
| 11/13/2023 | Notice of docket entry received from Appeals Court<br>n accordance with Massachusetts Rule of Appellate Procedure 10(a)(3), please note that the above-referenced case (2023-P-1310) was entered in this Court on November 13, 2023. | 20 | Image |

## Case Disposition

| Disposition | Date | Case Judge |
|---|---|---|
| Pending | | |

35

166

# EXHIBIT E

# 2384CV00857 Kathleen Vita For Herself And The Class vs. New England Baptist Hospital

- Case Type:
- Business Litigation
- Case Status:
- Open
- File Date
- 04/07/2023
- DCM Track:
-
- Initiating Action:
- Fraud, Business Torts, etc.
- Status Date:
- 04/07/2023
- Case Judge:
-
- Next Event:
-

All Information | Party | Event | Docket | Disposition

## Party Information

**Kathleen Vita For Herself And The Class**
- Plaintiff

Alias

**Party Attorney**
- Attorney
- Blauner, Esq., Michelle H
- Bar Code
- 549049
- Address
- Shapiro Haber and Urmy LLP
  One Boston Place
  Boston, MA 02108
- Phone Number
- (617)208-4713
- Attorney
- Haber, Esq., Edward F
- Bar Code
- 215620
- Address
- Shapiro Haber and Urmy LLP
  One Boston Place
  Suite 2600
  Boston, MA 02108
- Phone Number
- (617)439-3939
- Attorney
- Vallely, Esq., Patrick
- Bar Code
- 663866
- Address
- Shapiro Haber and Urmy LLP
  One Boston Place
  Suite 2600
  Boston, MA 02108
- Phone Number
- (617)439-3939

More Party Information

**New England Baptist Hospital**
- Defendant

Alias

**Party Attorney**
- Attorney
- Gacioch, Esq., David Quinn
- Bar Code
- 660784
- Address
- McDermott Will and Emery LLP

37

168

200 Clarendon St
Floor 58
Boston, MA 02116

- Phone Number
- (617)535-4000
- Attorney
- Rodriguez, Esq., Annabel
- Bar Code
- 696001
- Address
- McDermott Will and Emery LLP
  200 Clarendon St
  Floor 58
  Boston, MA 02116
- Phone Number
- (617)535-4063

More Party Information

## Events

| Date | Session | Location | Type | Event Judge | Result |
|---|---|---|---|---|---|
| 09/19/2023 02:00 PM | Business Litigation 1 | BOS-13th FL, CR 1309 (SC) | Rule 12 Hearing | Kazanjian, Hon. Helene | |

## Docket Information

| Docket Date | *Docket Text* | File Ref Nbr. | *Image Avail.* |
|---|---|---|---|
| 04/07/2023 | Complaint electronically filed. | 1 | Image |
| 04/07/2023 | Civil action cover sheet filed. | 2 | Image |
| 04/07/2023 | Plaintiff Kathleen Vita For Herself And The Class's Motion to Appoint special process server | 3 | Image |
| 04/07/2023 | Attorney appearance<br>On this date Edward F Haber, Esq. added for Plaintiff Kathleen Vita For Herself And The Class | | |
| 04/07/2023 | Attorney appearance<br>On this date Patrick Vallely, Esq. added for Plaintiff Kathleen Vita For Herself And The Class | | |
| 04/10/2023 | Docket Note: One summon send by mail | | |
| 04/19/2023 | General correspondence regarding NOTICE OF ACCEPTANCE INTO BUSINESS LITIGATION SESSION "BLS1"<br>This matter has been accepted into the Suffolk Business Litigation Session. It has been assigned to BLS1. Dated: April 11, 2023 Notice sent 4/19/23 (See P#4 for complete notice)<br><br>Judge: Salinger, Hon. Kenneth W | 4 | Image |
| 04/19/2023 | Endorsement on Motion to Appoint Special Process Server (#3.0): ALLOWED<br>(dated 4/14/2023) Notice sent 4/19/23 | | Image |
| 04/25/2023 | Attorney appearance electronically filed.<br>On this date David Quinn Gacioch, Esq. added for Defendant New England Baptist Hospital | | Image |
| 04/25/2023 | Attorney appearance electronically filed.<br>On this date Annabel Rodriguez, Esq. added for Defendant New England Baptist Hospital | | Image |
| 04/25/2023 | Defendant, Plaintiff New England Baptist Hospital, Kathleen Vita For Herself And The Class's Joint Motion to Extend time to answer or otherwise respond to the complaint | 5 | Image |
| 05/03/2023 | Endorsement on Motion to Extend time to answer or otherwise respond to the complaint (#5.0): ALLOWED<br>defendant shall answer or otherwise respond to the complaint by 7/10/23.<br><br>(dated 4/26/23) notice sent 5/03/23 | | Image |
| 06/23/2023 | Defendant New England Baptist Hospital's Notice of Motion to Dismiss | 6 | Image |
| 06/29/2023 | Plaintiff Kathleen Vita For Herself And The Class's Assented to Motion to Exceed Page Limit For Opposition To Motion To dismiss | 7 | Image |
| 07/28/2023 | Endorsement on Motion to exceed page limit for opposition to Motion to dismiss (#7.0): DENIED<br>(Dated 7/26/2023)<br>Notice sent 7/28/23 | | Image |

| Docket Date | *Docket Text* | File Ref Nbr. | *Image Avail.* |
|---|---|---|---|
| 08/04/2023 | Notice of Filing | | Image |
| 08/04/2023 | Defendant New England Baptist Hospital's Motion to dismiss the complaint | 8 | Image |
| 08/04/2023 | New England Baptist Hospital's Memorandum in support of Defendant's motion to dismiss the complaint | 9 | Image |
| 08/04/2023 | Declaration of David Quinn Gacioch in support of Defendant's motion to dismiss for failure to state a claim | 10 | Image |
| 08/04/2023 | Exhibits/Appendix | | Image |
| 08/04/2023 | New England Baptist Hospital's Reply Memorandum in support of Motion to dismiss the complaint | 11 | Image |
| 08/04/2023 | Exhibits/Appendix<br><br>Addendum | | Image |
| 08/04/2023 | Opposition to Motion to dismiss filed by Kathleen Vita For Herself And The Class | 12 | Image |
| 10/06/2023 | Defendant New England Baptist Hospital's Supplemental, Submission of of Defendants Regarding Their Pending Motions to Dismiss | 13 | Image |
| 10/16/2023 | Opposition to Defendant's Beth Israel Deaconess Medical Center INC. and New England Baptist Hospital's Request that the Court report issues for Interlocutory review filed by Kathleen Vita, For Herself And The Class filed by Kathleen Vita For Herself And The Class | 14 | Image |
| 10/18/2023 | Reply/Sur-reply<br><br>To Plaintiff's Opposition To Interlocutory Appellate Review (Joint)<br><br>Applies To: New England Baptist Hospital (Defendant) | 15 | Image |
| 10/31/2023 | MEMORANDUM & ORDER:<br><br>Memorandum of Decision and Order on Defendant's Motion to Dismiss and Report to the Appeals Court<br>See page #16<br><br>For the foregoing reasons, it is hereby ORDERED that:<br>1. NEBH's Motion to dismiss is DENIED; and<br>2. The Court REPORTS the correctness of its ruling to the appeals Court.<br>(Dated 10/31/2023)<br><br>Judge: Kazanjian, Hon. Helene<br><br>Notice sent 11/1/23 | 16 | Image |
| 11/06/2023 | Defendant New England Baptist Hospital's Notice of Filing of Transcript<br><br>Transcript of 9/19/23 received | 17 | Image |
| 11/06/2023 | Docket Note: Notice of Assembly of Record on Report to the Appeals Court sent to Counsel | | |
| 11/06/2023 | Notice to Clerk of the Appeals Court of Assembly of Record | | |
| 11/07/2023 | Plaintiff, Defendant Kathleen Vita For Herself And The Class, New England Baptist Hospital's Joint Stipulation and<br>Proposed Order to Stay all Proceedings Pending Interlocutory Appeal | 18 | Image |
| 11/13/2023 | Endorsement on Stipulation and Proposed Order to Stay all Proceedings Pending Interlocutory Appeal (#18.0): ALLOWED<br>(Dated: 11/9/23)<br>Notice sent 11/14/23 | | Image |
| 11/13/2023 | Notice of Entry of appeal received from the Appeals Court<br>In accordance with Massachusetts Rule of Appellate Procedure 10(a)(3), please note that the above-referenced case (2023-P-1308) was entered in this Court on November 13, 2023. | 19 | Image |

## Case Disposition

| Disposition | Date | Case Judge |
|---|---|---|
| Pending | | |

39 170

| Disposition | Date | Case Judge |
|---|---|---|
| | | |

# EXHIBIT F

## STATEMENT OF SUPPORT FOR DIRECT APPELLATE REVIEW

A series of largely parallel actions, alleging violations of the Massachusetts Wiretap Act, M.G.L. c. 272 §99, have been filed, to date, against more than a dozen Massachusetts hospitals and healthcare providers, a Massachusetts healthcare insurer, and at least two retailers. In each of those actions, plaintiffs claim that the defendants' use of common data analytics tools on public websites constitutes an illegal wiretap under Massachusetts law.

The undersigned hospitals, healthcare institutions, and other defendants in those putative class action lawsuits (listed in Attachment A and referred to as the "Wiretap Act Suits"), ask the Court to grant the application for direct appellate review filed by defendants Beth Israel Deaconess Medical Center, Inc. ("BIDMC") and New England Baptist Hospital ("NEBH"). The Superior Court noted, in its orders denying the BIDMC and NEBH motions to dismiss and reporting its decisions to the Appeals Court, that "[w]hether the Massachusetts Wiretap Statute applies to the internet tracking alleged here is a novel question unresolved at the appellate level in Massachusetts." Memorandum of Decision & Ord. on Defendant's Motion to Dismiss & Rep. to the Appeals Ct. at 10, *Vita v. New England Baptist Hosp.*, No. 2384CV00857-BLS1 (Suffolk Super. Ct. Oct. 31, 2023). As in the BIDMC and NEBH cases, that unresolved question is a central, and in some cases dispositive issue, in each of the Wiretap Act Suits.[1]

Whether the Wiretap Act imposes liability for the widespread business use of website analytics and internet tracking technology alleged in the BIDMC and NEBH cases has significant financial and public policy implications for the Massachusetts healthcare sector, in particular, and to businesses and other institutions in the Commonwealth more broadly. As it currently stands,

[1] With respect to the defendants signing this statement, Attachment A identifies the Wiretap Act Suits that include only Wiretap Act claims and those that include other causes of action as well.

most of the large healthcare institutions in the Commonwealth are defendants in the Wiretap Act Suits. With potential statutory damages of at least $1,000 per website visitor, under the plaintiffs' theory, these putative class actions threaten to impose catastrophic liability on Massachusetts' essential healthcare system, including nonprofit entities serving low-income communities. Under plaintiffs' reading of the Wiretap Act, other organizations and institutions also face potentially crippling liability for their use of ubiquitous website marketing and analytics tools, as liability under the Wiretap Act is not limited to the healthcare sector.

Because the question of whether the Wiretap Act applies to the internet tracking alleged in the BIDMC and NEBH complaints has profound implications, not just for these 18 Wiretap Act Suits, but for the entire Massachusetts healthcare and business communities, the undersigned ask the Court to grant the application for direct appellate review.

| **ATRIUS HEALTH, INC.** | **BAYSTATE HEALTH, INC.** |
|---|---|
| by its attorneys,<br><br>/s/ Anthony E. Fuller<br>Anthony E. Fuller (BBO #633246)<br>Kayla H. Ghantous (BBO #709197)<br>HOGAN LOVELLS US LLP<br>125 High Street, Suite 2010<br>Boston, MA 02110<br>Tel: (617) 371-1000<br>anthony.fuller@hoganlovells.com<br>kayla.ghantous@hoganlovells.com<br><br>Allison Holt Ryan (*admitted pro hac vice*)<br>Adam A. Cooke (BBO #679637)<br>HOGAN LOVELLS US LLP<br>Columbia Square<br>555 Thirteenth Street, NW<br>Washington, DC 20004<br>Tel: (202) 637-5600<br>allison.holt-ryan@hoganlovells.com<br>adam.a.cooke@hoganlovells.com | by its attorneys,<br><br>/s/ Frederick S. Rudesheim<br>Frederick S. Rudesheim<br>Stephen I. Hansen (BBO #679134)<br>SHOOK, HARDY & BACON LLP<br>One Federal Street, Suite 2540<br>Boston, MA 02110<br>Tel: (617) 531-1411<br>Fax: (617) 531-1602<br>frudesheim@shb.com<br>sjhansen@shb.com |

| | |
|---|---|
| **BJ'S WHOLESALE CLUB, INC.**<br><br>by its attorneys,<br><br>/s/ Geoffrey M. Raux<br>Geoffrey M. Raux (BBO #674788)<br>Miranda D. Curtis (BBO #709084)<br>FOLEY & LARDNER LLP<br>111 Huntington Avenue<br>Boston, MA 02199<br>Tel: (617) 342-4000<br>Fax: (617) 342-4001<br>graux@foley.com<br>mcurtis@foley.com<br><br>Kevin A. Reck (*admitted pro hac vice)*<br>Emily J. Lang (*admitted pro hac vice)*<br>FOLEY & LARDNER LLP<br>301 East Pine Street, Suite 1200<br>Orlando, FL 32801<br>Tel: (407) 244-3269<br>Fax: (407) 648-1743<br>kreck@foley.com<br>elang@foley.com | **BLUE CROSS AND BLUE SHIELD OF MASSACHUSETTS, INC. and BLUE CROSS AND BLUE SHIELD OF MASSACHUSETTS HMO BLUE, INC.**<br><br>by their attorneys,<br><br>/s/ Daniel S. Savrin<br>Daniel S. Savrin (BBO #555434)<br>Wayne E. George (BBO #656286)<br>MORGAN, LEWIS & BOCKIUS LLP<br>One Federal Street<br>Boston, MA 02110<br>Tel: (617) 341-7700<br>Fax: (617) 341-7701<br>daniel.saverin@morganlewis.com<br>wayne.george@morganlewis.com<br><br>Kathryn E. Deal (*admitted pro hac vice)*<br>Ezra D. Church (*admitted pro hac vice)*<br>MORGAN, LEWIS & BOCKIUS LLP<br>2222 Market Street<br>Philadelphia, PA 19103<br>Tel: (215) 963-5000<br>Fax: (215) 963-5001<br>ezra.church@morganlewis.com<br>kathryn.deal@morganlewis.com |
| **BOSTON IVF, LLC**<br><br>by its attorneys,<br><br>/s/ Christopher M. Iaquinto<br>Christopher M. Iaquinto (BBO No. 685718)<br>Holland & Knight LLP<br>10 St. James Avenue, 11th Floor<br>Boston, Massachusetts 02116<br>t: 617.305.2092<br>christopher.iaquinto@hklaw.com<br><br>Mark S. Melodia<br>Holland & Knight LLP<br>31 West 52nd Street, 12th floor<br>New York, New York 10019<br>mark.melodia@hklaw.com | **BOSTON MEDICAL CENTER CORPORATION**<br><br>by its attorneys,<br><br>/s/ Linn F. Freedman<br>Linn F. Freedman (BBO #639564<br>Wystan M. Ackerman (BBO #651086)<br>Wm Maxwell Daley (BBO #694729)<br>ROBINSON & COLE LLP<br>One Boston Place, 26th Floor<br>Boston, MA 02108<br>Tel: (800) 762-2678<br>Fax: (617) 557-5999<br>lfreedman@rc.com<br>wackerman@rc.com<br>wdaley@rc.com |

| | |
|---|---|
| **CAPE COD HEALTHCARE, INC.**<br><br>by its attorneys,<br><br>/s/ Adam Bookbinder<br>Adam J. Bookbinder (BBO #657593)<br>Samuel Rudman (BBO #698018)<br>CHOATE, HALL & STEWART LLP<br>Two International Place<br>Boston, MA 02110<br>Tel.: (617) 248-5000<br>Fax: (617) 248-4000<br>abookbinder@choate.com<br>srudman@choate.com<br><br>Timothy J. Lowe (*admitted pro hac vice*)<br>MCDONALD HOPKINS<br>39533 Woodward Ave, Suite 318<br>Bloomfield Hills, MI 48304<br>Tel.: (248) 220-1359<br>tlowe@mcdonaldhopkins.com | **THE CHILDREN'S HOSPITAL CORPORATION**<br><br>by its attorneys,<br><br>/s/ Frederick S. Rudesheim<br>Frederick S. Rudesheim<br>Emyr T. Remy (BBO #704156)<br>SHOOK, HARDY & BACON LLP<br>One Federal Street, Suite 2540<br>Boston, MA 02110<br>Tel: (617) 531-1411<br>Fax: (617) 531-1602<br>frudesheim@shb.com<br>remy@shb.com |
| **EMERSON HOSPITAL**<br><br>by its attorneys,<br><br>/s/ Justin R. Donoho<br>Justin R. Donoho<br>Emyr T. Remy (BBO #704156)<br>SHOOK, HARDY & BACON LLP<br>One Federal Street, Suite 2540<br>Boston, MA 02110<br>Tel: (617) 531-1411<br>Fax: (617) 531-1602<br>jdonoho@shb.com<br>remy@shb.com | **LAWRENCE GENERAL HOSPITAL**<br><br>by its attorneys,<br><br>/s/ Frederick S. Rudesheim<br>Frederick S. Rudesheim<br>Emyr T. Remy (BBO #704156)<br>SHOOK, HARDY & BACON LLP<br>One Federal Street, Suite 2540<br>Boston, MA 02110<br>Tel: (617) 531-1411<br>Fax: (617) 531-1602<br>frudesheim@shb.com<br>remy@shb.com |
| **SOUTHCOAST HOSPITALS GROUP, INC.**<br><br>by its attorneys,<br><br>/s/ William J. Egan<br>William J. Egan (BBO #636128)<br>Julianna M. Charpentier (BBO #703286)<br>ROBINSON & COLE LLP | **STEWARD HEALTH CARE SYSTEM LLC**<br><br>by its attorneys,<br><br>/s/ Howard M. Cooper<br>Howard M. Cooper (BBO #543842)<br>Ingrid S. Martin (BBO #653632)<br>Ian J. Pinta (BBO #667812) |

| | |
|---|---|
| One Boston Place, 25th Floor<br>Boston, MA 02108<br>Tel: (617) 557-5900<br>wegan@rc.com<br>jcharpentier@rc.com<br><br>Jordan O'Donnell (BBO #684001)<br>James F. Monagle (*admitted pro hac vice*)<br>MULLEN COUGHLIN LLC<br>3 Allied Drive, Suite 303<br>Dedham, MA 02026<br>jsodonnell@mullen.law<br>jmonagle@mullen.law | TODD & WELD LLP<br>One Federal Street, 27th Floor<br>Boston, MA 02110<br>Tel: (617) 720-2626<br>hcooper@toddweld.com<br>jmartin@toddweld.com<br>ipinta@toddweld.com |
| **TUFTS MEDICAL CENTER, INC.**<br><br>by its attorneys,<br><br>/s/ James H. Rollinson<br>James H. Rollinson (BBO #649407)<br>BAKER & HOSTETLER LLP<br>127 Public Street, Suite 2000<br>Cleveland, OH 44116<br>Tel: (216) 621-0200<br>Fax: (216) 626-0740<br>jrollinson@bakerlaw.com<br><br>Elizabeth A. Scully<br>BAKER & HOSTETLER LLP<br>1050 Connecticut Ave., N.W., Suite 1100<br>Washington, D.C. 20036<br>Tel: (202) 861-1500<br>Fax: (202) 861-1783<br>escully@bakerlaw.com | **UMASS MEMORIAL HEALTH CARE, INC.**<br><br>by its attorneys,<br><br>/s/ Stephen T. Paterniti<br>Stephen T. Paterniti (BBO #564860)<br>JACKSON LEWIS P.C.<br>75 Park Plaza, 4th Floor<br>Boston, MA 02116<br>Tel: (617) 305-1221<br>Stephen.Paterniti@jacksonlewis.com<br><br>James H. Rollinson (BBO #649407)<br>BAKER & HOSTETLER LLP<br>127 Public Street, Suite 2000<br>Cleveland, OH 44116<br>Tel: (216) 621-0200<br>Fax: (216) 626-0740<br>jrollinson@bakerlaw.com<br><br>Elizabeth A. Scully<br>BAKER & HOSTETLER LLP<br>1050 Connecticut Ave., N.W., Suite 1100<br>Washington, D.C. 20036<br>Tel: (202) 861-1500<br>Fax: (202) 861-1783<br>escully@bakerlaw.com |

## ATTACHMENT A

**Wiretap Act-Only Suits**

- Colleton v. UMass Mem. Health Care, Inc., No. 2384CV02450-BLS1 (Suffolk Super. Ct.)
- Progin v. UMass Mem. Health Care Inc., No. 2284CV02889-BLS1 (Suffolk Super. Ct.)
- Doe v. The Children's Hospital Corp., No. 2384CV00411-BLS1 (Suffolk Super. Ct.)
- Vita v. Blue Cross & Blue Shield of Mass., Inc., No. 2384CV00542-BLS1 (Suffolk Super. Ct.)
- Doe v. Atrius Health, Inc., No. 2384CV00597-BLS1 (Suffolk Super. Ct.)
- Doe v. Lawrence General Hospital, No. 2384CV00728-BLS1 (Suffolk Super. Ct.)
- McManus v. Tufts Medical Center, Inc., No. 2384CV00930-BLS1 (Suffolk Super. Ct.)
- Nova v. Boston Medical Center Corp., No. 2384CV01086-BLS1 (Suffolk Super. Ct.)

**Wiretap Act Suits with Additional Claims**

- Doe v. Boston IVF, LLC, No. 2381CV02951 (Middlesex Super. Ct.)
- Doe v. Southcoast Hospitals Group, Inc., No. 2273CV00673 (Bristol Super. Ct.)
- Doe, et al v. Atrius Health, Inc., No. 2384CV02704-BLS1 (Suffolk Super. Ct.)
- Doe v. Emerson Hospital, No. 2277CV01000 (Essex Super. Ct.)
- Doe v. UMass Mem. Health Care Inc., No. 2384CV02448-BLS1 (Suffolk Super. Ct.)
- Alves v. BJ's Wholesale Club, Inc., No. 2284CV02509-BLS1 (Suffolk Super. Ct.)
- Doe v. Cape Cod Healthcare, Inc., No. 2384CV01236-BLS1 (Suffolk Super. Ct.)
- Doe v. Steward Health Care System LLC, No. 2384CV00174-BLS1 (Suffolk Super. Ct.)
- Doe v. Boston Medical Center Corp., No. 2384CV00326-BLS1 (Suffolk Super. Ct.)
- Doe v. Baystate Health System, Inc., No. 2384CV01949-BLS1 (Suffolk Super. Ct.)

# EXHIBIT 5

Date Filed 12/8/2023 2:15 PM
Superior Court - Suffolk
Docket Number 2384CV01236 BC

12.12
NOTIFY

COMMONWEALTH OF MASSACHUSETTS

32

SUFFOLK, ss

SUPERIOR COURT
BUSINESS LITIGATION SESSION

JANE DOE, individually and on behalf of all others similarly situated,

Plaintiff,

v.

CAPE COD HEALTHCARE, INC.

Defendant,

C.A. NO. 2384-CV-01236-BLS1

**DEFENDANT'S UNOPPOSED MOTION TO STAY PROCEEDINGS UNTIL COMPLETION OF INTERLOCUTORY APPEALS IN PARALLEL WIRETAP ACT CASES**

Defendant Cape Cod HealthCare, Inc. ("CCHC") asks the Court to stay all proceedings in this case pending the completion of the interlocutory appeals in *Vita v. New England Baptist Hosp.*, No. 2384CV00857-BLS1 and *Vita v. Beth Israel Deaconess Medical Center, Inc.*, No. 2384CV00480-BLS1 (the "NEBH and BIDMC Cases"). Plaintiff has stated, through counsel, that she does not oppose this motion.

Plaintiff Jane Doe filed this putative class action on December 8, 2022 against Defendant CCHC, a non-profit healthcare system based in Hyannis, Massachusetts. Plaintiff brought the case on her own behalf, and on behalf of a putative class consisting of all Massachusetts residents who were CCHC patients and used its public website. Compl. ¶ 148. She alleges that CCHC used digital marketing tools on that public website that redirected website users' information to third parties, such as Facebook, without the users' knowledge or consent. Id. ¶¶ 3–8. The Complaint

12-13-23 ALLOWED. H. Kazanjian, J.

# EXHIBIT 6

Date Filed 11/3/2023 1:07 PM
Superior Court - Suffolk
Docket Number 2384CV00326

BC

11·07

NOTIFY

24

11-9-23 Denied. The court has reported this division in two substantially similar cases. (Dockets 2384CV480-BLS1 and 2384CV857-BLS1). Further proceedings in this case are stayed pending the outcome of the reported cases. (Kazanjian, J.)

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT
BUSINESS LITIGATION SECTION
CIVIL ACTION NO. 2384CV00326 BLS1

JOHN DOE 1 AND JOHN DOE 2, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,

*Plaintiffs*,

v.

BOSTON MEDICAL CENTER CORPORATION,

*Defendant.*

**DEFENDANT BOSTON MEDICAL CENTER CORPORATION'S MASS. R. CIV. P. 64 AND M.G.L. c. 231, § 111 MOTION TO REPORT THE COURT'S ORDER ON DEFENDANTS'S MOTION TO DISMISS FOR INTERLOCUTORY APPEAL**

Pursuant to Mass. R. Civ. P. 64 and M.G.L. c. 231, § 111, Defendant Boston Medical Center Corporation ("BMC") respectfully requests that the Court report its September 14, 2023, Memorandum and Order (the "Order") denying BMC's Motion to Dismiss under Mass. R. Civ. P. 12(b)(1) and (6) for interlocutory appeal to the Appeals Court. In short and as set forth in further detail in the contemporaneously filed memorandum of law, reporting the Order is appropriate here because it "so affects the merits of the controversy that the matter ought to be determined by the appeals court before any further proceedings in the trial court." Mass. R. Civ. P. 64(a); *see also Transamerica Ins. Group v. Turner Constr. Co.*, 33 Mass. App. Ct. 446, 447, n. 2 (1992). Moreover, reporting the Order will help "to secure the just, speedy, and inexpensive determination" of this action and others. Mass. R. Civ. P. 1. Accordingly, BMC respectfully requests that this Court report its Order to the Massachusetts Appeals Court for review and determination.

# EXHIBIT 7

Date Filed 12/11/2023 2:25 PM
Superior Court - Suffolk
Docket Number 2284CV02509

SL 12·14 NOTIFY

32

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
BUSINESS LITIGATION SESSION

JOE ALVES, individually and on Behalf of All Others Similarly Situated,

Plaintiff,

v.

BJ'S WHOLESALE CLUB, INC.,

Defendant.

CIVIL ACTION NO. 2284CV02509

## DEFENDANT'S MOTION TO STAY

Defendant BJ's Wholesale Club, Inc. ("Defendant") hereby moves to stay all discovery and class certification proceedings in the above-referenced action pending issuance of a decision by the Massachusetts Appeals Court interpreting the application of the Wiretap Act. The grounds for this Motion are more fully set forth in the Memorandum of Law filed herewith.

WHEREFORE, Defendant requests that this Court stay this action.

12-14-23 ALLOWED. H. Kazanjian, J.

Respectfully Submitted,

FOLEY & LARDNER LLP

/s/ Geoffrey M. Raux

Geoffrey M. Raux (BBO # 674788)
Miranda D. Curtis (BBO # 709084)
FOLEY & LARDNER LLP
111 Huntington Avenue
Boston, MA 02199
Phone: 617-342-4000
Fax: 617-342-4001

ELECTRONIC FILING. Attorneys must e-file all non-impounded documents. Impounded documents and submissions by self-represented litigants may be e-filed. No paper original or copy of any e-filed document is required. Additional information is located on our Electronic Filing page: http://www.mass.gov/courts/court-info/appealscourt/efiling-appeals-faq-gen.html

FILING OF CONFIDENTIAL OR IMPOUNDED INFORMATION. Any document containing confidential or impounded material must be filed in compliance with Mass. R. App. P. 16(d), 16(m), 18(a)(1)(A)(iv), 18(d), and 21.
Very truly yours,

The Clerk's Office

Dated: February 8, 2024

To:
**Sent:** Thursday, February 8, 2024 6:00 PM
**To:** Essex Clerks Office <Essex.clerksoffice@jud.state.ma.us>
**Subject:** 2023-J-0750 - Notice of Docket Entry

-COMMONWEALTH OF MASSACHUSETTS

A1

APPEALS COURT CLERK'S OFFICE

February 8, 2024

RE: No. 2023-J-0750
Lower Ct. No.: 2277CV01000

JOHN DOE
vs.
EMERSON HOSPITAL

NOTICE OF DOCKET ENTRY

Please take note that on February 8, 2024, the following entry was made on the docket of the above-referenced case:

ORDER (RE#1): This case is before the single justice on the defendant's petition for leave to take an interlocutory appeal of the denial of its motion to dismiss. See Caffyn v. Caffyn, 441 Mass. 487, 488 (2004); Edwin R. Sage Co. v. Foley, 12 Mass. App. Ct. 20, 21 (1981). In exercising my discretion in this regard, I am guided by "the principle that piecemeal appellate review is strongly disfavored." McMenimem v. Passatempo, 452 Mass. 178, 193 (2008). Here, the main issues raised in the defendant's motion to dismiss are before the Supreme Judicial Court in Vita v. New England Baptist Hosp., No. SJC-13542, the current case is stayed pending the Supreme Judicial Court's decision, and success by the hospital in that case would almost certainly mean that the defendant here would prevail as well. It is evident that the amicus announcement in Vita is broad enough to allow the defendant here to file an amicus brief raising its argument regarding intercepting devices. It would not be a prudent exercise of my discretion to allow an interlocutory appeal useful only if the hospital in Vita loses, the Supreme Judicial Court ignores the defendant's amicus brief, and the defendant here ultimately prevails on its narrow, additional theory. Accordingly, the petition is denied. (Ditkoff, J.) *Notice/Attest

REGISTRATION FOR ELECTRONIC FILING. Every attorney with an appeal pending in the Appeals Court must have an account with eFileMA.com. Registration with eFileMA.com constitutes consent to receive electronic notification from the Appeals Court and e-service of documents. Self-represented litigants are encouraged, but not required, to register for electronic filing.

| NOTICE OF STATUS REVIEW OF THE DOCKET | DOCKET NUMBER<br>2277CV01000 | Trial Court of Massachusetts<br>The Superior Court |
|---|---|---|
| CASE NAME:<br>John Doe In his/her capacity Individually and on befalf of all others similarly situated vs. Emerson Hospital | | Thomas H. Driscoll, Jr., Clerk of Courts<br>Essex County |
| TO:<br>File Copy<br>, | | COURT NAME & ADDRESS<br>Essex County Superior Court - Lawrence<br>43 Appleton Way<br>Lawrence, MA 01841 |

43

The Court has **ORDERED** a status review of the docket. Please report the status of the above entitled action with a **COPY** of this notice by **CHECKING** one of the following and return to above named Court.

☐ READY FOR TRIAL

☐ CASE IS SETTLED, ENCLOSED IS A STIPULATION OF DISMISSAL OR AGREEMENT FOR JUDGMENT.

☐ NEED A PRE-TRIAL CONFERENCE.

☐ PENDING IN BANKRUPTCY COURT. (***If pending in bankruptcy court, please provide a copy of the portion of the docket sheet that shows the status of the case.)***

☐ Discharged in Bankruptcy, copy of discharge enclosed.

A TRUE COPY, ATTEST
DEPUTY ASS'T. CLERK

☐ OTHER

**If a copy of this notice is NOT received by 04/17/2025, the complaint will automatically be dismissed.**

| DATE ISSUED | ASSOCIATE JUSTICE | ASSISTANT CLERK | SESSION PHONE# |
|---|---|---|---|
| 03/17/2025 | **Hon. Lynn C Rooney** | **Debra Vernava** | **(978)242-1900** |

| NOTICE TO APPEAR FOR RULE 16 CONFERENCE | DOCKET NUMBER 2277CV01000 | Massachusetts Trial Court The Superior Court Department |
|---|---|---|
| CASE NAME **John Doe In his/her capacity Individually and on befalf of all others similarly situated vs. Emerson Hospital** | | Thomas H. Driscoll, Jr., Clerk of Courts Essex County |
| TO: Jessica N. Wahl, Esq. 2049 Century Park East #3000 Los Angeles, CA 90067 | | COURT NAME AND ADDRESS Essex County Superior Court - Lawrence 43 Appleton Way Lawrence, MA 01841 |

The Court will hear the following event: **RULE 16 CONFERENCE**

Counsel should appear as follows: **Date: 09/03/2025**

**Time: 02:00 PM**

**Event Type: In Person**

**Session/ Courtroom Location: LAWRENCE-1st FL, CR 1 (SC)**

A TRUE COPY, ATTEST

DEPUTY ASS'T. CLERK

**Further Orders of the Court.**

| DATE ISSUED | ASSOCIATE JUSTICE | |
|---|---|---|
| 8/18/25 | Hon. Salim Tabit | |

Date Filed 8/26/2025 4:31 PM
Superior Court - Essex
Docket Number 2277CV01000



COMMONWEALTH OF MASSACHUSETTS

| | | |
|---|---|---|
| ESSEX, ss | ) | TRIAL COURT DEPARTMENT |
| | ) | SUPERIOR COURT |
| JOHN DOE, individually and on behalf of all others similarly situated, | ) | |
| Plaintiff, | ) | DOCKET NO. 2277CV01000D |
| v. | ) | |
| EMERSON HOSPITAL, | ) | A TRUE COPY, ATTEST |
| Defendant. | ) | DEPUTY ASS'T. CLERK |

**ASSENTED-TO MOTION FOR LEAVE TO ADMIT**
**JAD SHEIKALI *PRO HAC VICE***

Defendant Emerson Hospital, by and through its attorney of record, Lisa Oliver White, hereby moves this court pursuant to G.L. c. 221, § 46A for an Order admitting Jad Sheikali *pro hac vice* for the purpose of appearing and practicing in the above-captioned matter. In support of this motion, Lisa Oliver White states as follows:

1. I am counsel of record for Emerson Hospital in this matter and I am a member in good standing of the bar of this court;

2. Attorney Sheikali possesses detailed knowledge of specific relevant issues that will be invaluable in connection with the representation of Emerson Hospital in this matter;

3. The Declaration of Jad Sheikali is attached hereto as **Exhibit A**, indicating that (1) he is a member in good standing in every jurisdiction in which he is admitted to practice, (2) there are no disciplinary proceedings against him as a member of the bar in any jurisdiction, and (3) the jurisdictions in which Attorney Sheikali are admitted grant like *pro hac vice* privileges to members of the bar of the Commonwealth of Massachusetts; and

8.27.2025 Tal. J. ALLOWED

DOCKET NO. 2277CV01000D

4. The required *pro hac vice* fee of $355 has been sent to the Board of Bar Overseers in accordance with SJC Rule 3:15. Proof of payment is attached hereto as **Exhibit B.**

WHEREFORE, Defendant Emerson Hospital respectfully requests that the court grant leave for Jad Sheikali to appear and practice *pro hac vice* in the above-captioned matter.

Dated: August 26, 2025

Respectfully submitted,

EMERSON HOSPITAL

By its attorneys,

*/s/Lisa Oliver White*
Lisa Oliver White (BBO#666841)
Shook, Hardy & Bacon LLP
One Federal Street, Suite 2620
Boston, MA 02110
Telephone: (617) 531-1411
Facsimile: (617) 531-1602
Email: lowhite@shb.com

## RULE 9C CERTIFICATE OF CONFERENCE WITH COUNSEL

On August 26, 2025, counsel for Defendant communicated with counsel for Plaintiff in this matter concerning Emerson Hospital's intention to file this motion. Counsel for Plaintiff in this matter advised Defendant that they assent to the motion.

*/s/Lisa Oliver White*
Lisa Oliver White

Date Filed 8/26/2025 4:31 PM
Superior Court - Essex
Docket Number 2277CV01000

DOCKET NO. 2277CV01000D

**CERTIFICATE OF SERVICE**

I, Lisa Oliver White, hereby certify that on August 26, 2025, a true and accurate copy of the foregoing document was served via electronic mail upon the following counsel of record:

| | |
|---|---|
| **Counsel for Plaintiff**<br><br>J. Tucker Merrigan (BBO# 681627)<br>Erin E, McHugh (BBO# 703701)<br>Ryan M. Hawkins (BBO# 686289)<br>Thomas T. Merrigan (BBO# 343480)<br>**SWEENEY MERRIGAN LAW**<br>268 Summer St. LL<br>Boston, MA 02210<br>Tel: (617) 391-9001<br>Fax: (617) 357-9001<br>tucker@sweeneymerrigan.com<br>emchugh@sweeneymerrigan.com<br>rmh@sweeneymerrigan.com<br>tom@sweeneymerrigan.com<br><br>Alex Dravillas (*PHV6299686IL*)<br>**KELLER POSTMAN LLC**<br>150 N. Riverside Plaza, Suite 4100<br>Chicago, IL 60606<br>Tel: (312) 741-5220<br>adj@kellerpostman.com | Foster C. Johnson (*PHV24076463TX*)<br>David Warden (*PHV20856750TX*)<br>Nathan Campbell (*PHV24097455TX*)<br>Carl J. Gustafson (*PHV24125261TX*)<br>Justin C. Kenney (BBO# 706672)<br>**AHMAD, ZAVITSANOS & MENSING, P.C.**<br>1221 McKinney St., Suite 3460<br>Houston, TX 77010<br>Tel: (713) 655-1101<br>fjohnson@azalaw.com<br>dwarden@azalaw.com<br>ncampbell@azalaw.com<br>cgustafson@azlaw.com<br>jkenney@azalaw.com<br><br>Sara Aguiniga (*PHV1029692DC*)<br>**KELLER POSTMAN LLC**<br>1100 Vermont Ave., 12th Flr<br>Washington, DC 20005<br>Sara.aguiniga@kellerpostman.com |

*/s/Lisa Oliver White*
Lisa Oliver White

Date Filed 8/26/2025 4:31 PM
Superior Court - Essex
Docket Number 2277CV01000

# EXHIBIT A

Date Filed 8/26/2025 4:31 PM
Superior Court - Essex
Docket Number 2277CV01000

**COMMONWEALTH OF MASSACHUSETTS**

**ESSEX, ss**

**TRIAL COURT DEPARTMENT**
**SUPERIOR COURT**
**DOCKET NO. 2277CV01000D**

JOHN DOE, individually and on behalf of all others similarly situated,

Plaintiff,

v.

EMERSON HOSPITAL,

Defendant.

**DECLARATION OF JAD SHEIKALI**

I, Jad Sheikali, depose and state as follows:

1. I am a partner with the law firm of Shook, Hardy & Bacon, L.L.P. and a resident in its Chicago, Illinois office. I make this affidavit in support of my motion to be admitted *pro hac vice* as counsel to Defendant Emerson Hospital in this action.

2. I am an active member in good standing and currently eligible to practice law in the following jurisdictions:

| Jurisdiction | Year Admitted | Bar Number |
|---|---|---|
| State of Illinois | 2016 | 6324641 |
| State of Georgia | 2019 | 901094 |

3. There are no disciplinary proceedings pending against me as a member of the bar in any jurisdiction.

4. I am informed and believe that the bars of which I am a member grant like *pro hac vice* privileges to members of the bar of the Commonwealth of Massachusetts.

WHEREFORE, I respectfully request that I be admitted *pro hac vice* to act as counsel for Defendant Emerson Hospital for all purposes in this action.

Signed under the pains and penalties of perjury this 20th day of August 2025.

*/s/Jad Sheikali*
Jad Sheikali

Date Filed 8/26/2025 4:31 PM
Superior Court - Essex
Docket Number 2277CV01000

# Certificate of Admission
# To the Bar of Illinois

I, Cynthia A. Grant, Clerk of the Supreme Court of Illinois, do hereby certify that

Jad Sheikali

has been duly licensed and admitted to practice as an Attorney and Counselor at Law within this State; has duly taken the required oath to support the CONSTITUTION OF THE UNITED STATES and of the STATE OF ILLINOIS, and also the oath of office prescribed by law, that said name was entered upon the Roll of Attorneys and Counselors in my office on 11/10/2016 and is in good standing, so far as the records of this office disclose.

IN WITNESS WHEREOF, I have hereunto subscribed my name and affixed the seal of said Court, this 6th day of March, 2025.

Cynthia A. Grant

Clerk,
Supreme Court of the State of Illinois

ate Filed 8/26/2025 4:31 PM
uperior Court - Essex
ocket Number 2277CV01000

State Bar of Georgia

*Lawyers Serving the Public and the Justice System*

**Mr. Jad Sheikali**
**Shook Hardy & Bacon LLP**
**111 S Wacker Dr Ste 4700**
**Chicago, IL 60606**
**UNITED STATES**

| | |
|---|---|
| **CURRENT STATUS:** | **Active Member-Good Standing** |
| **DATE OF ADMISSION:** | **5/24/2019** |
| **BAR NUMBER:** | **901094** |
| **TODAY'S DATE:** | **03/06/2025** |

The prerequisites for practicing law in the State of Georgia are as follows:

- **Certified by the Office of Bar Admissions, either by Exam, or on Motion (Reciprocity).**
- **Sworn in to the Superior Court in Georgia, highest court required to practice law in Georgia.**
- **Enrolled with the State Bar of Georgia, arm of the Supreme Court of Georgia.**

This member is currently in "good standing" as termed and defined by State Bar Rule 1-204. The member is current in license fees and is not suspended or disbarred as of the date of this letter.

**STATE BAR OF GEORGIA**

**Official Representative of the State Bar of Georgia**

le Filed 8/26/2025 4:31 PM
perior Court - Essex
cket Number 2277CV01000

# EXHIBIT B

Date Filed 8/26/2025 4:31 PM
Superior Court - Essex
Docket Number 2277CV01000

# BOARD OF BAR OVERSEERS

One Beacon Street, 10th Floor, Boston, Massachusetts 02108

## REGISTRATION STATEMENT FOR PRO HAC VICE ATTORNEYS

ATTORNEY NAME (First, MI, Last, Suffix): Jad Sheikali

Email Address: jsheikali@shb.com

Complete Business/Mailing Address:

Shook, Hardy & Bacon LLP

111 S. Wacker Dr., Ste. 4700, Chicago, IL 60606

Business Phone Number: (312) 704-7754

RECEIVED

JAN 22 2025

Massachusetts Board of Bar Overseers Registration Dept.

Board of Bar Overseers
Administrative Use Only

Date Received: 01-22-25

Amount Paid: $355.00

Date Confirmation Emailed: 01-22-25

Court in Which pro hac vice admission is sought: Essex Superior

Contact number for court: (617) 788-8175

Party to be represented: Defendant Emerson Hospital

Docket number of case (if available): 2277CV01000

Jurisdictions to which you have been admitted: (Use second page for additional jurisdictions.)

| Type | Jurisdictions | License Numbers |
|---|---|---|
| State | Illinois | 6324641 |
| State | Georgia | 901094 |
| | | |

I certify that (check one): ☐ the party I am representing in the case for which I am seeking pro hac vice admission is an indigent client, and I understand that no pro hac vice is due, or ☑ I have included the required pro hac vice fee.

Further, I certify, under the pains and penalties of perjury, that I am admitted to practice and in good standing in every jurisdiction where I am admitted, and I acknowledge that I am subject to discipline by the Massachusetts Supreme Judicial Court and the Board of Bar Overseers. I understand I am limited in my legal practice in Massachusetts to the case identified above.

**I certify the information I have supplied the Board of Bar Overseers is true and complete.**

Jad Sheikali — 1/16/2025

Signature — Date

Date Filed 8/26/2025 4:31 PM
Superior Court - Essex
Docket Number 2277CV01000



Jurisdictions continued:

| Type | Jurisdictions | License Number |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

**Please mail the completed form to:**

**Board of Bar Overseers, One Beacon Street, 10th Floor**
**Boston, MA 02108**

Date Filed 8/27/2025 8:13 AM
Superior Court - Essex
Docket Number 2277CV01000



COMMONWEALTH OF MASSACHUSETTS

| | |
|---|---|
| ESSEX, ss | TRIAL COURT DEPARTMENT<br>SUPERIOR COURT |
| JOHN DOE, individually and on behalf of all others similarly situated,<br><br>Plaintiff, | DOCKET NO. 2277CV01000D |
| v. | |
| EMERSON HOSPITAL,<br><br>Defendant. | |

**JOINT MOTION TO CONVERT RULE 16 HEARING TO VIRTUAL**

Now come the parties pursuant to Superior Court Standing Order 1-22, and jointly request that the Mass. R. Civ. P. 16 conference in this matter, scheduled for September 3, 2025 at 2:00 p.m., be converted to a VIRTUAL hearing.

The parties state that there is good cause to convert this hearing to virtual. As reasons therefore, pro hac vice counsel for Defendant, Emerson Hospital, who intend to appear for the Rule 16 conference, reside out of state, and significant travel would be required in order to attend. Further, Lisa Oliver White, local counsel for Defendant, Emerson Hospital, has a personal engagement that afternoon regarding the first day of her child's school, and a virtual hearing would allow her to attend both.

All parties join in the present motion.

ALLOWED.
8-27-2025
Tobey, J.

A TRUE COPY, ATTEST
DEPUTY ASST. CLERK

Date Filed 8/27/2025 8:13 AM
Superior Court - Essex
Docket Number 2277CV01000

Dated: August 27, 2025

JOHN DOE

*/s/ Ryan M. Hawkins*

Ryan M. Hawkins (BBO# 686289)
J. Tucker Merrigan (BBO# 681627)
Erin E, McHugh (BBO# 703701)
Thomas T. Merrigan (BBO# 343480)
**SWEENEY MERRIGAN LAW**
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
rmh@sweeneymerrigan.com
tucker@sweeneymerrigan.com
emchugh@sweeneymerrigan.com
tom@sweeneymerrigan.com

Alex Dravillas (*PHV6299686IL*)
**KELLER POSTMAN LLC**
150 N. Riverside Plaza, Suite 4100
Chicago, IL 60606
Tel: (312) 741-5220
adj@kellerpostman.com

Foster C. Johnson (*PHV24076463TX*)
David Warden (*PHV20856750TX*)
Nathan Campbell (*PHV24097455TX*)
Carl J. Gustafson (*PHV24125261TX*)
Justin C. Kenney (BBO# 706672)
**AHMAD, ZAVITSANOS & MENSING, P.C.**
1221 McKinney St., Suite 3460
Houston, TX 77010
Tel: (713) 655-1101
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com
cgustafson@azlaw.com
jkenney@azalaw.com

Sara Aguiniga (*PHV1029692DC*)
**KELLER POSTMAN LLC**
1100 Vermont Ave., 12th Flr
Washington, DC 20005
Sara.aguiniga@kellerpostman.com

Respectfully submitted,

EMERSON HOSPITAL

*/s/Lisa Oliver White*

Lisa Oliver White (BBO# 666841)
Emyr T. Remy (BBO# 704156)
**SHOOK, HARDY & BACON L.L.P.**
One Federal Street, Suite 2620
Boston, MA 02110
Tel.: (617) 531-1411 | Fax: (617) 531-1602
remy@shb.com

Alfred J. Saikali (FL # 0178195)
**SHOOK, HARDY & BACON L.L.P.**
201 South Biscayne Blvd., Suite 3200
Miami, Florida 33131
Tel: (305) 358-5171 | Fax: (305) 358-7470
asaikali@shb.com

Tammy B. Webb (CA # 227593)
**SHOOK, HARDY & BACON L.L.P.**
555 Mission Street, Suite 2300
San Francisco, CA 94105
Tel: (415) 544-1900 | Fax: (415) 391-0281
twebb@shb.com

Justin R. Donoho (IL # 6299667)
Tara D. Kennedy (IL # 6320909)
Jad Sheikhali (IL # 6324641)
**SHOOK, HARDY & BACON L.L.P.**
111 South Wacker Drive, Suite 4700
Chicago, IL 60606
Tel: (312) 704-7713 | F: (312) 558-1195
jdonoho@shb.com
tkennedy@shb.com
jsheikali@shb.com

Jessica N. Wahl (CA # 321887)
**SHOOK, HARDY & BACON L.L.P.**
2049 Century Park East, Suite 3000
Los Angeles, CA 90067
Tel: (424) 324-3477 | Fax: (424) 204-9093
jwahl@shb.com

## CERTIFICATE OF SERVICE

I, Lisa Oliver White, hereby certify that on August 27, 2025, a true copy of the above document was served by email upon:

J. Tucker Merrigan (BBO# 681627)
Erin E, McHugh (BBO# 703701)
Ryan M. Hawkins (BBO# 686289)
Thomas T. Merrigan (BBO# 343480)
**SWEENEY MERRIGAN LAW**
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
emchugh@sweeneymerrigan.com
rmh@sweeneymerrigan.com
tom@sweeneymerrigan.com

Alex Dravillas (*PHV6299686IL*)
**KELLER POSTMAN LLC**
150 N. Riverside Plaza, Suite 4100
Chicago, IL 60606
Tel: (312) 741-5220
adj@kellerpostman.com

Foster C. Johnson (*PHV24076463TX*)
David Warden (*PHV20856750TX*)
Nathan Campbell (*PHV24097455TX*)
Carl J. Gustafson (*PHV24125261TX*)
Justin C. Kenney (BBO# 706672)
**AHMAD, ZAVITSANOS & MENSING, P.C.**
1221 McKinney St., Suite 3460
Houston, TX 77010
Tel: (713) 655-1101
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com
cgustafson@azlaw.com
jkenney@azalaw.com

Sara Aguiniga (*PHV1029692DC*)
**KELLER POSTMAN LLC**
1100 Vermont Ave., 12th Flr
Washington, DC 20005
Sara.aguiniga@kellerpostman.com

*/s/ Lisa Oliver White*
Lisa Oliver White

| NOTICE TO APPEAR FOR RULE 16 CONFERENCE | DOCKET NUMBER<br>2277CV01000 | Massachusetts Trial Court<br>The Superior Court Department |
|---|---|---|
| CASE NAME<br>John Doe In his/her capacity Individually and on befalf of all others similarly situated vs. Emerson Hospital | | Thomas H. Driscoll, Jr., Clerk of Courts<br>Essex County |
| TO:<br>File Copy | | COURT NAME AND ADDRESS<br>Essex County Superior Court - Lawrence<br>43 Appleton Way<br>Lawrence, MA 01841 |

The Court will hear the following event: **RULE 16 CONFERENCE**

Counsel should appear as follows:

**Date: 09/03/2025**

**Time: 02:00 PM**

**Event Type: Virtual**

**Session/ Courtroom Location:**

*The QR Code below can be used with a cell phone QR Code scanner to open the Zoom meeting from a cell phone.*

**Zoom Conference Call Details**
**Meeting ID: 160 155 7303**
**Meeting Password: 268564**
**Meeting URL: https://www.zoomgov.com/j/1601557303**

A TRUE COPY, ATTEST

[signature]

DEPUTY ASS'T. CLERK

**Further Orders of the Court.**

| DATE ISSUED | ASSOCIATE JUSTICE | |
|---|---|---|
| 8/27/25 | Hon. Salim Tabit | |

| CLERK'S NOTICE | DOCKET NUMBER<br>2277CV01000 | Trial Court of Massachusetts<br>The Superior Court |
|---|---|---|
| CASE NAME:<br>**John Doe Individually and on Behalf of All others similarly situated vs. Emerson Hospital** | | Thomas H. Driscoll, Jr., Clerk of Courts<br>Essex County |
| TO: File Copy<br>, | | COURT NAME & ADDRESS<br>Essex County Superior Court - Lawrence<br>43 Appleton Way<br>Lawrence, MA 01841 |

You are hereby notified that on 09/03/2025 the following entry was made on the above referenced docket:

**ORDER: PROCEDURAL ORDER**
**As stated on the record this date, the plaintiff is granted leave to file an Amended Complaint, which Amended Complaint shall be filed on or before 11/3/25. Any motion to remove this case to federal court shall be filed on or before 12/3/25.**

**So Ordered.**

**/s/ Salim R. Tabit, J.**

**Judge: Tabit, Hon. Salim**

A TRUE COPY, ATTEST
[signature]
DEPUTY ASST. CLERK

| DATE ISSUED | ASSOCIATE JUSTICE/ ASSISTANT CLERK | SESSION PHONE# |
|---|---|---|
| 09/04/2025 | Hon. Salim Tabit | (978)242-1900 |

| NOTICE TO APPEAR FOR RULE 16 CONFERENCE | DOCKET NUMBER 2277CV01000 | Massachusetts Trial Court The Superior Court Department |
|---|---|---|
| CASE NAME John Doe In his/her capacity Individually and on befalf of all others similarly situated vs. Emerson Hospital | | Thomas H. Driscoll, Jr., Clerk of Courts Essex County |
| TO: Jessica N. Wahl, Esq. 2049 Century Park East #3000 Los Angeles, CA 90067 | | COURT NAME AND ADDRESS Essex County Superior Court - Lawrence 43 Appleton Way Lawrence, MA 01841 |

The Court will hear the following event: **RULE 16 CONFERENCE**

Counsel should appear as follows: **Date: 09/03/2025**

**Time: 02:00 PM**

**Event Type: Virtual**

**Session/ Courtroom Location:**

*The QR Code below can be used with a cell phone QR Code scanner to open the Zoom meeting from a cell phone.*

**Zoom Conference Call Details**
**Meeting ID: 160 155 7303**
**Meeting Password: 268564**
**Meeting URL: https://www.zoomgov.com/j/1601557303**

FILED
ESSEX SUPERIOR COURT
2025 SEP 11 P 1:58

**Further Orders of the Court.**

A TRUE COPY, ATTEST
[signature]
DEPUTY ASST. CLERK

| DATE ISSUED | ASSOCIATE JUSTICE | |
|---|---|---|
| 8/27/25 | Hon. Salim Tabit | |

| CLERK'S NOTICE | DOCKET NUMBER<br>2277CV01000 | Trial Court of Massachusetts<br>The Superior Court |
|---|---|---|
| CASE NAME:<br>**John Doe In his/her capacity Individually and on befalf of all others similarly situated vs. Emerson Hospital** | | Thomas H. Driscoll, Jr., Clerk of Courts<br>Essex County |
| TO:<br>Jessica N. Wahl, Esq.<br>2049 Century Park East<br>#3000<br>Los Angeles, CA 90067 | | COURT NAME & ADDRESS<br>Essex County Superior Court - Lawrence<br>43 Appleton Way<br>Lawrence, MA 01841 |

You are hereby notified that on 08/27/2025 the following entry was made on the above referenced docket:

**Endorsement on Motion to continue / reschedule an event Plaintiff John Doe In his/her capacity Individually and on behalf of all others similarly situated's Joint Motion to Convert Rule 16 Hearing to Virtual (#51.0): ALLOWED**
**ALLOWED. Dated 8/27/2025.**

A TRUE COPY, ATTEST

DEPUTY ASS'T. CLERK

| DATE ISSUED | ASSOCIATE JUSTICE/ ASSISTANT CLERK | SESSION PHONE# |
|---|---|---|
| 08/27/2025 | Hon. Salim Tabit | (978)242-1900 |

| CLERK'S NOTICE | DOCKET NUMBER<br>2277CV01000 | Trial Court of Massachusetts<br>The Superior Court |
|---|---|---|
| CASE NAME:<br>**John Doe In his/her capacity Individually and on befalf of all others similarly situated vs. Emerson Hospital** | | Thomas H. Driscoll, Jr., Clerk of Courts<br>Essex County |
| TO:<br>Jessica N. Wahl, Esq.<br>2049 Century Park East<br>#3000<br>Los Angeles, CA 90067 | | COURT NAME & ADDRESS<br>Essex County Superior Court - Lawrence<br>43 Appleton Way<br>Lawrence, MA 01841 |

You are hereby notified that on 08/27/2025 the following entry was made on the above referenced docket:

**Endorsement on Motion for Defendant Emerson Hospital's Motion for leave to admit Jad Sheikali Pro Hac Vice (#50.0): ALLOWED**
**ALLOWED. Dated 8/27/2025.**

A TRUE COPY, ATTEST

DEPUTY ASS'T. CLERK

| DATE ISSUED | ASSOCIATE JUSTICE/ ASSISTANT CLERK | SESSION PHONE# |
|---|---|---|
| **08/27/2025** | **Hon. Salim Tabit** | **(978)242-1900** |

Date/Time Printed: 08-27-2025 13:18:58

SCR0151 02/2023

Date Filed 9/19/2025 2:49 PM
Superior Court - Essex
Docket Number 2277CV01000



COMMONWEALTH OF MASSACHUSETTS

| | | |
|---|---|---|
| ESSEX, S.S. | § | TRIAL COURT DEPARTMENT |
| | § | SUPERIOR COURT |
| JOHN DOE, Individually and on Behalf of | § | |
| All Others Similarly Situated, | § | C.A. No. 2277CV01000 |
| | § | |
| *Plaintiff,* | § | A TRUE COPY, ATTEST |
| | § | |
| v. | § | |
| | § | DEPUTY ASST. CLERK |
| EMERSON HOSPITAL, | § | |
| | § | |
| *Defendant.* | § | |
| | § | |

**MOTION FOR ADMISSION PRO HAC VICE**

Jonathan Tucker Merrigan, a member in good standing in the bar of this Court, as provided in the Local Rules, respectfully moves for the admission *pro hac vice* of attorney Joseph Y. Ahmad, for the purpose of entering an appearance on behalf of John Doe, individually and on behalf of all others similarly situated. In support of this motion, the undersigned counsel states as follows:

1. I am a member in good standing of the bar of this Court and have filed an appearance in the above-captioned action.

2. I move for the admission *pro hac vice* of Joseph Y. Ahmad to appear before this Court as co-counsel for the Plaintiff in this the above captioned case.

3. The Affidavit of Joseph Y. Ahamd attached hereto, indicates that (1) he is a member of good standing in every jurisdiction in which he is admitted to practice, (2) there are no disciplinary proceedings against him as a member of the bar in any jurisdiction, and (3) he is familiar with the local rules of this Court.

9-22-2025 Tod, J. Allowed

Date Filed 9/19/2025 2:49 PM
Superior Court - Essex
Docket Number 2277CV01000

4. The required pro hac vice fee of $355 has been paid to the Board of Bar Overseers in accordance with SJC Rule 3:14.

WHEREFORE, Jonathan Tucker Merrigan respectfully requests that this Honorable Court grant leave for Joseph Y. Ahmad to be admitted *pro hac vice* to appear on behalf of Plaintiff John Doe, Individually and on behalf of all other similarly situated plaintiffs in this action.

Dated: September 5, 2025

Respectfully Submitted
By Plaintiff's Counsel:

*/s/ Jonathan T. Merrigan*
J. Tucker Merrigan, BBO #681627
Sweeney Merrigan Law, LLP
268 Summer Street, LL
Boston, MA 02210
Tel.: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com

## CERTIFICATE OF SERVICE

I, J. Tucker Merrigan, certify that on September 5, 2025, I served a true and correct copy of the foregoing document by electronic mail on defendant's counsel of record.

*/s/ Jonathan T. Merrigan*
J. Tucker Merrigan, BBO #681627

Date Filed 9/19/2025 2:49 PM
Superior Court - Essex
Docket Number 2277CV01000

53.1

COMMONWEALTH OF MASSACHUSETTS

| | | |
|---|---|---|
| ESSEX, S.S. | § | TRIAL COURT DEPARTMENT |
| | § | SUPERIOR COURT |
| JOHN DOE, Individually and on Behalf of All Others Similarly Situated, | § | C.A. No. 2277CV01000 |
| *Plaintiff,* | § | |
| v. | § | |
| EMERSON HOSPITAL, | § | |
| *Defendant.* | § | |

A TRUE COPY, ATTEST
DEPUTY ASS'T CLERK

## AFFIDAVIT OF JOSEPH Y. AHMAD

I, Joseph Y. Ahmad, state and depose as follows:

1. I am an attorney licensed to practice in the states of Texas, New York, and Michigan.

2. I am a Partner at Ahmad, Zavitsanos & Mensing, PLLC located 1221 McKinney St., Suite 2500, Houston, Texas 77010. My telephone number is (713) 655-1101.

3. I am admitted to practice law in the following jurisdictions:

| | |
|---|---|
| ▪ Michigan State Bar (Bar No. P41250) | November 24, 1987 |
| ▪ New York State Bar (Bar No. 5292214) | December 3, 2014 |
| ▪ Texas State Bar (Bar No. 00941100) | November 3, 1989 |
| ▪ US Court of Appeals for the Fifth Circuit | December 1, 1992 |
| ▪ US Court of Appeals for the Second Circuit | April 21, 2017 |
| ▪ US Court of Federal Claims | October 31, 2017 |
| ▪ US District Court-District of Colorado | August 9, 2004 |
| ▪ US District Court-Eastern District of Michigan | February 23, 2021 |
| ▪ US District Court-Western District of Michigan | November 24, 1987 |
| ▪ US District Court-District of New Mexico | November 26, 2019 |
| ▪ US District Court-Northern District of New York | June 4, 2015 |
| ▪ US District Court-Southern District of New York | December 8, 2015 |
| ▪ US District Court-District of North Dakota | August 27, 2013 |
| ▪ US District Court-Northern District of Oklahoma | December 29, 2021 |
| ▪ US District Court-Eastern District of Texas | September 15, 1994 |
| ▪ US District Court-Northern District of Texas | September 19, 1994 |

| | |
|---|---|
| ▪ US District Court-Southern District of Texas | March 22, 1990 |
| ▪ US District Court-Southern District of Texas - Bankruptcy | March 22, 1990 |
| ▪ US District Court-Western District of Texas | March 24, 1994 |
| ▪ US District Court-Eastern District of Wisconsin | December 15, 2000 |
| ▪ US Supreme Court | January 11, 1999 |

4. I am a member of good standing and duly licensed and admitted to practice in each of the jurisdictions listed above.

5. I have never been suspended or disbarred in my jurisdictions.

6. I am familiar with the Local Rules in Massachusetts.

7. If the Court allows the Motion for me to appear pro hac vice in this matter, I will represent the Plaintiffs in this proceeding until the final determination thereof, and with reference to all matters, incidents, or proceedings, I agree that I shall be subject to the orders and the disciplinary action and the civil jurisdiction of this Court in all respects as if I were admitted.

Signed under the pains and penalties of perjury this 5th day of September 2025.

[signature]
Joseph Y. Ahmad, Esq.

Date Filed 9/19/2025 2:49 PM
Superior Court - Essex
Docket Number 2277CV01000

# BOARD OF BAR OVERSEERS

One Beacon Street, 10th Floor, Boston, Massachusetts 02108

## REGISTRATION STATEMENT FOR PRO HAC VICE ATTORNEYS

ATTORNEY NAME (First, MI, Last, Suffix): Joseph Y. Ahmad

Email Address: joeahmad@azalaw.com

Complete Business/Mailing Address:
Ahmad, Zavitsanos & Mensing, PLLC
1221 McKinney St., Suite 2500, Houston, Texas 77010

Business Phone Number: (713) 655-1101

RECEIVED
MAY 15 2025
Massachusetts Board of Bar Overseers Registration Dept.

Board of Bar Overseers
Administrative Use Only

Date Received: 05-15-25

Amount Paid: $355.00

Date Confirmation Emailed: 05-15-25

Court in Which pro hac vice admission is sought: Essex Superior Court

Contact number for court: (978) 744-5500

Party to be represented: John Doe

Docket number of case (if available): 2277CV01000

Jurisdictions to which you have been admitted: (Use second page for additional jurisdictions.)

| Type | Jurisdictions | License Numbers |
|---|---|---|
| State | Texas | 00941100 |
| State | New York | 5292214 |
| State | Michigan | P41250 |

I certify that (check one): ☐ the party I am representing in the case for which I am seeking pro hac vice admission is an indigent client, and I understand that no pro hac vice is due, or ☑ I have included the required pro hac vice fee.

Further, I certify, under the pains and penalties of perjury, that I am admitted to practice and in good standing in every jurisdiction where I am admitted, and I acknowledge that I am subject to discipline by the Massachusetts Supreme Judicial Court and the Board of Bar Overseers. I understand I am limited in my legal practice in Massachusetts to the case identified above.

I certify the information I have supplied the Board of Bar Overseers is true and complete.

[signature] 5-9-2025

Signature Date

Date Filed 9/19/2025 2:49 PM
Superior Court - Essex
Docket Number 2277CV01000



Jurisdictions continued:

| Type | Jurisdictions | License Number |
|---|---|---|
| Federal | US Court of Appeals for the Fifth Circuit | |
| Federal | US Court of Appeals for the Second Circuit | |
| Federal | US Court of Federal Claims | |
| Federal | US District Court-District of Colorado | |
| Federal | US District Court-Eastern District of Michigan | |
| | Please See Attachment A (cont.) | |

**Please mail the completed form to:**

**Board of Bar Overseers, One Beacon Street, 10th Floor
Boston, MA 02108**

Date Filed 9/19/2025 2:49 PM
Superior Court - Essex
Docket Number 2277CV01000

# Attachment A

| Type | Jurisdictions | License Number |
|---|---|---|
| Federal | US District Court-Western District of Michigan | |
| Federal | US District Court-District of New Mexico | |
| Federal | US District Court-Northern District of New York | |
| Federal | US District Court-Southern District of New York | |
| Federal | US District Court-District of North Dakota | |
| Federal | US District Court-Northern District of Oklahoma | |
| Federal | US District Court-Eastern District of TX | |
| Federal | US District Court-Northern District of TX | |
| Federal | US District Court-Southern District of TX | Fed No. 11604 |
| Federal | US District Court-Southern District of TX – Bankruptcy | Fed No. 11604 |
| Federal | US District Court-Western District of TX | |
| Federal | US District Court-Eastern District of Wisconsin | |
| Federal | US Supreme Court | |

Date Filed 9/19/2025 2:49 PM
Superior Court - Essex
Docket Number 2277CV01000

# The Supreme Court of Texas

AUSTIN

CLERK'S OFFICE

**I, BLAKE HAWTHORNE,** Clerk of the Supreme Court of Texas, certify that the records of this office show that

**Joseph Y. Ahmad**

was duly admitted and licensed as an attorney and counselor at law by the Supreme Court of Texas on the 3rd day of November, 1989.

I further certify that the records of this office show that, as of this date

**Joseph Y. Ahmad**

is presently enrolled with the State Bar of Texas as an active member in good standing.

**IN TESTIMONY WHEREOF** witness my signature and the seal of the Supreme Court of Texas at the City of Austin, this, the 13th day of August, 2025.

BLAKE HAWTHORNE, Clerk

Clerk, Supreme Court of Texas

No. 9220C.1

This certification expires thirty days from this date, unless sooner revoked or rendered invalid by operation of rule or law.

Date Filed 9/19/2025 2:49 PM
Superior Court - Essex
Docket Number 2277CV01000

53.2

COMMONWEALTH OF MASSACHUSETTS

| | | |
|---|---|---|
| ESSEX, S.S. | § | TRIAL COURT DEPARTMENT |
| | § | SUPERIOR COURT |
| JOHN DOE, Individually and on Behalf of | § | |
| All Others Similarly Situated, | § | C.A. No. 2277CV01000 |
| | § | |
| *Plaintiff,* | § | |
| | § | A TRUE COPY, ATTEST |
| v. | § | |
| | § | |
| EMERSON HOSPITAL, | § | DEPUTY ASS'T. CLERK |
| | § | |
| *Defendant.* | § | |
| | § | |

**AFFIDAVIT IN COMPLIANCE WITH SUPERIOR COURT RULE 9A**

I, J. Tucker Merrigan, hereby depose and say the following:

1. I am an attorney at the law firm of Sweeney Merrigan Law, LLP, 268 Summer Street, LL, Boston, Massachusetts 02210;

2. On September 05, 2025, I emailed a copy of the within, *Motion for Admission Pro Hac Vice of Joseph Y. Ahmad, with accompanying Affidavit* on all counsel involved in this action;

3. On September 05, 2025, defense counsel indicated via email that they do not object to the Motions for Pro Hac Vice; and

4. The original pleadings are now being filed with the Court.

Signed under the penalties of perjury this September 19, 2025.

*/s/ Jonathan T. Merrigan*
J. Tucker Merrigan, BBO #68162

Date Filed 9/19/2025 2:49 PM
Superior Court - Essex
Docket Number 2277CV01000

53.3

COMMONWEALTH OF MASSACHUSETTS

| | | |
|---|---|---|
| ESSEX, S.S. | § | TRIAL COURT DEPARTMENT |
| | § | SUPERIOR COURT |
| JOHN DOE, Individually and on Behalf of All Others Similarly Situated, | § | |
| | § | C.A. No. 2277CV01000 |
| *Plaintiff,* | § | |
| v. | § | |
| EMERSON HOSPITAL, | § | |
| *Defendant.* | § | |

A TRUE COPY, ATTEST
DEPUTY ASS'T CLERK

**RULE 9A NOTICE OF FILING AND LISTING OF DOCUMENTS**

I, J. Tucker Merrigan, one of the counsel for Plaintiff John Doe, Individually and on Behalf of All Others Similarly Situated, hereby state that the following list of documents have been submitted for filing with the Court pursuant to Superior Court Rule 9A:

1. Motion for Admission Pro Hac Vice of Joseph Y. Ahmad, with accompanying Affidavit;
2. Affidavit in Compliance with Superior Court Rule 9A; and
3. Certificate of Service.

Respectfully Submitted
The Plaintiffs
By their Attorney,

*/s/ Jonathan T. Merrigan*
J. Tucker Merrigan, BBO #681627
**Sweeney Merrigan Law, LLP**
268 Summer Street, LL
Boston, MA 02210
Tel.: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com

Dated: September 19, 2025

Date Filed 9/19/2025 2:49 PM
Superior Court - Essex
Docket Number 2277CV01000

53.4

## CERTIFICATE OF SERVICE

I, J. Tucker Merrigan, hereby certify that on September 19, 2025, in accordance with Superior Court Rule 9A, I served the within document(s):

1. Affidavit in Compliance with Superior Court Rule 9A; and
2. Rule 9A Notice of Filing and Listing of Documents,

on all counsel of record, via electronic mail to the following parties of interest:

Emyr Remy (BBO # 704156)
remy@shb.com
Shook, Hardy & Bacon, L.L.P.
One Federal Street, Suite 2540
Boston, MA 02110
Tel: 617.531.1411
Fax: 617.531.1602

Justin R. Donoho
Tara D. Kennedy
jdonoho@shb.com
tkennedy@shb.com
Shook, Hardy & Bacon, L.L.P.
111 South Wacker Drive, Suite 4700
Chicago, IL 60606
Tel: 312.704.7713
Fax: 312.558.1195

Jessica N. Wahl
jwahl@shb.com
Shook, Hardy & Bacon, L.L.P.
2049 Century Park East, Suite 3000
Los Angeles, CA 90067
Tel: 424.324.3477
Fax: 424.204.9093

Alfred J. Saikali (FL # 0178195)
SHOOK, HARDY & BACON L.L.P.
201 South Biscayne Blvd., Suite 3200
Miami, Florida 33131
Tel: (305) 358-5171
Fax: (305) 358-7470
asaikali@shb.com

Tammy B. Webb
tbwebb@shb.com
Shook, Hardy & Bacon, L.L.P.
555 Mission Street, Suite 2300
San Francisco, CA 94105
Tel: 415.544.1900
Fax: 415.391.0281

/s/ Jonathan T. Merrigan
J. Tucker Merrigan, BBO #681627

COMMONWEALTH OF MASSACHUSETTS

**ESSEX, ss** **SUPERIOR COURT DEPARTMENT**
**DOCKET NO. 2277CV01000**

JOHN DOE, JAMES DOE, JOSEPH DOE, and JANE DOE, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

EMERSON HOSPITAL,

Defendant.

A TRUE COPY, ATTEST
DEPUTY ASS'T CLERK

**NOTICE OF FILING OF NOTICE OF REMOVAL**

PLEASE TAKE NOTICE that Defendant Emerson Hospital, pursuant to 28 U.S.C. §§ 1332, 1441, and 1446, filed a Notice of Removal in the above-referenced action to the United States District Court for the District of Massachusetts. A copy of the Notice of Removal is attached as **Exhibit 1**.

Date: December 2, 2025

Respectfully submitted,

*/s/ Lisa Oliver White*
Lisa Oliver White, BBO# 666841
Shook, Hardy & Bacon L.L.P.
One Federal Street, Suite 2620
Boston, MA 02110
Tel: (617) 531-1411
lowhite@shb.com

Tammy B. Webb (CA # 227593)
Shook, Hardy & Bacon L.L.P.
555 Mission Street, Suite 2300
San Francisco, CA 94105
Tel: (415) 544-1900
twebb@shb.com

## CERTIFICATE OF SERVICE

I hereby certify that on December 2, 2025, the foregoing was served via electronic mail to all parties of record:

J. Tucker Merrigan (BBO # 681627)
Ryan M. Hawkins (BBO # 686289)
Erin E. McHugh (BBO # 703701)
Sweeney Merrigan Law
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
rmh@sweeneymerrigan.com
tucker@sweeneymerrigan.com
emchugh@sweeneymerrigan.com
tom@sweeneymerrigan.com

Foster C. Johnson
David Warden
Nathan Campbell
Ahmad, Zavitsanos & Mensing, P.C.
1221 McKinney St., Suite 3460
Houston, TX 77010
Tel: (713) 655-1101
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

Seth Meyer
Alex Dravillas
Keller Postman LLC
150 North Riverside Plaza, Suite 4100
Chicago, IL 60606
Tel: (312) 741-5220
sam@kellerpostman.com
ajd@kellerpostman.com

*/s/ Lisa Oliver White*
Lisa Oliver White

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| JOHN DOE, JAMES DOE, JOSEPH DOE, and JANE DOE, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>EMERSON HOSPITAL,<br><br>Defendant. | Case No.: |

A TRUE COPY, ATTEST
DEPUTY ASS'T. CLERK

**NOTICE OF REMOVAL**

Defendant Emerson Hospital ("Defendant" or "Emerson"), by and through undersigned counsel, files this Notice of Removal of this action from the Superior Court of Massachusetts, Essex County, Civil Action No. 2277CV01000, to the United States District Court for the District of Massachusetts, pursuant to 28 U.S.C. §§ 1331, 1441, and 1446. In support of this Notice of Removal, Defendant states as follows:

**INTRODUCTION**

1. Plaintiffs filed the action styled *John Doe, individually and on behalf of all others similarly situated v. Emerson Hospital,* Civil Action No. 2277CV01000 in the Superior Court for Essex County, Massachusetts, on October 19, 2022.

2. On January 30, 2023, Plaintiffs filed their First Amended Class Action Complaint and Demand for Jury Trial ("FAC").

3. On November 3, 2025, Plaintiff filed a Second Amended Complaint ("SAC"), which added new Doe Plaintiffs and new claims, including a claim under the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2510, *et seq.* Defendant was served with

## GROUNDS FOR REMOVAL – FEDERAL QUESTION JURISDICTION

9. For the first time in Plaintiffs' SAC, Plaintiffs assert a claim against Defendant under federal law. Specifically, Plaintiffs allege violations of the ECPA. *See* **Exhibit A**, SAC at ¶¶ 228–46.

10. Pursuant to 28 U.S.C. § 1441(a), "any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending."

11. This Court has subject matter jurisdiction over Plaintiffs' purported ECPA claim because it "aris[es] under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331; *see also, e.g., MediterraneanCoins, GmbH v. eBay.com*, 2005 WL 3096374, at *3 (N.D. Cal. Nov. 14, 2005) (recognizing that the defendant "properly removed" the case from state to federal court based on federal question jurisdiction, where the amended complaint alleged a claim under the ECPA).

12. This action is removable pursuant to 28 U.S.C. §1441(a) because it is within the original jurisdiction of this Court under 28 U.S.C. § 1331 in that it involves claims arising under the laws of the United States.

13. Further, this Court has supplemental jurisdiction over Plaintiffs' state law claims because those claims "derive from a common nucleus of operative fact" such that the claims form part of the same case or controversy. 28 U.S.C. § 1367.

## PROCEDURE AND VENUE

14. Venue lies in the United States District Court for the District of Massachusetts – Boston Division, pursuant to 28 U.S.C. § 1441(a), because the original action was filed within this District and Division. The Superior Court of Massachusetts, Essex County, is located within

Date: December 2, 2025

Respectfully submitted,

*/s/ Lisa Oliver White*

Lisa Oliver White, BBO # 666841
Shook, Hardy & Bacon L.L.P.
One Federal Street, Suite 2620
Boston, MA 02110
Tel: (617) 531-1411
lowhite@shb.com

Tammy B. Webb*
Shook, Hardy & Bacon L.L.P.
555 Mission Street, Suite 2300
San Francisco, CA 94105
Tel: (415) 544-1900
twebb@shb.com

Jad Sheikali*
Tara D. Kennedy*
Avery M. Epstein*
Shook, Hardy & Bacon L.L.P.
111 South Wacker Drive
Chicago, IL 60606
Tel: (312) 704-7700
jsheikali@shb.com
tkennedy@shb.com
aepstein@shb.com

* Pro hac vice motion to be filed

*Counsel for Defendant*

# EXHIBIT A

1

COMMONWEALTH OF MASSACHUSETTS

ESSEX, S.S. SUPERIOR COURT

JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,

Plaintiff

v.

EMERSON HOSPITAL,

Defendant.

C.A. No. 2277CV01000

10/19/2022

RECEIVED

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff John Doe ("Plaintiff"), individually and on behalf of all other persons similarly situated, brings suit against Defendant Emerson Hospital ("Defendant"), and upon personal knowledge as to Plaintiff's own conduct and on information and belief as to all other matters based upon investigation by counsel, alleges as follows:

### NATURE OF ACTION AND ALLEGATIONS

1. This case arises from Defendant's systematic violation of the medical privacy rights of its patients, exposing highly sensitive personal information to third parties without those patients' knowledge or consent.

2. Defendant's "Notice of Privacy Practices" tells patients that "[p]rotecting your medical information is an important priority for Emerson Hospital."[1] Indeed, Defendant assures patients that Defendant will *never* use or share patients' "personal information for marketing

[1] https://www.emersonhospital.org/patients-visitors/patient-rights-responsibilities/patient-privacy

## PARTIES TO THE ACTION

7. Defendant Emerson Hospital is a Massachusetts corporation with its principal office at Nine Acres Corner, Concord, Massachusetts, 01742. Defendant is a private health system serving over 300,000 individuals in 25 towns in Massachusetts.[3] Defendant owns and manages numerous healthcare facilities in Massachusetts, including Emerson Hospital, health centers in Westford, Groton, and Sudbury, the Center for Specialty Care in Concord, the Clough Family Center for Rehabilitation and Sports Therapies, the Hermel Breast Health Center, the Steinberg Wellness Center for Mind and Body, urgent care centers in Hudson and Littleton, and numerous ancillary facilities, including Cantu Concussion Center.[4]

8. Plaintiff, John Doe, is an individual residing in Essex County, Massachusetts, has been treated by Defendant's physicians, and has been a patient Cantu Concussion Center,[5] and thus also a patient of Defendant.

## JURISDICTION AND VENUE

9. This Court has personal jurisdiction over Defendant because it regularly conducts business throughout Massachusetts and has its principal place of business at Nine Acres Corner, Concord, Massachusetts, 01742. G.L. c. 223A, § 2; G.L. c. 223A, § 3.

10. Venue is appropriate in this Court because Plaintiff, John Doe, resides in Essex County and the acts or conduct giving rise to the cause of action took place in Essex County. G.L. c. 223, § 8(4).

[3] https://www.emersonhospital.org/about-emerson/from-our-president-ceo
[4] https://www.emersonhospital.org/about-emerson/from-our-president-ceo; *see also* *https://www.emersonhospital.org/locations*
[5] https://www.emersonhospital.org/locations/concussion-center

routing mechanisms embedded in the websites operated by Defendant without patients' knowledge, authorization, or consent.

**B. The nature of Defendant's unauthorized disclosure of patients' health care information.**

19. Defendant's disclosures of patients' personal healthcare information occur because Defendant intentionally deploys source code on the websites it operates, including https://www.emersonhospital.org/find-a-doctor, that causes patients' personally identifiable information (as well as the exact contents of their communications) to be transmitted to third parties.

20. By design, third parties receive and record the exact contents of patient communications before the full response from Defendant to patients has been rendered on the screen of the patient's computer device and while the communication between Defendant and the patient remains ongoing.

21. Websites like those maintained by Defendant are hosted by a computer server through which the business in charge of the website exchanges and communicates with internet users via their web browsers.

22. The basic command that web browsers use to exchange data and user communications is called a GET request.[7] For example, when a patient types "heart failure treatment" into the search box on Defendant's website and hits 'Enter,' the patient's web browser makes a connection with the server for Defendant's website and sends the following request: "GET search/q=heart+failure+treatment."

23. The other basic transmission command utilized by web browsers is POST, which is typically employed when a user enters data into a form on a website and clicks 'Enter' or some

[7] https://www.w3schools.com/tags/ref_httpmethods.asp

for every third party they wish to send user data and communications. This source code operates invisibly in the background when users visit a site employing such code.

### C. Tracking pixels provide third parties with a trove of personally identifying data permitting them to uniquely identify the individuals browsing a website.

30. Tracking pixels are lines of source code embedded in websites such as Defendant's. Tracking pixels are particularly pernicious because they result in the disclosure of a variety of data that permits third parties to determine the unique personal identities of website visitors. While most users believe that the internet provides them with anonymity when, for example, they browse a hospital website for treatment information about a medical condition, that is not the case when the hospital website has embedded third party tracking devices, as Defendant has.

31. For example, an IP address is a number that identifies a computer connected to the internet. IP addresses are used to identify and route communications on the internet. IP addresses of individual users are used by internet service providers, websites, and tracking companies to facilitate and track internet communications and content. IP addresses also offer advertising companies like Facebook a unique and semi-persistent identifier across devices—one that has limited privacy controls.[8]

32. Because of their uniquely identifying character, IP address are considered protected personally identifiable information. Tracking pixels can (and typically do) collect website visitors' IP addresses.

33. Likewise, internet cookies also provide personally identifiable information. Cookies are small text files that web servers can place on a user's browser and computer when a user's browser interacts with a website server. Cookies are typically designed to acquire and

---

[8] https://adtechexplained.com/the-future-of-ip-address-as-an-advertising-identifier/

employs much more subtle techniques.[10] Additionally, unlike cookies, users cannot clear their fingerprint and therefore cannot control how their personal information is collected.[11]

38. In 2017, researchers demonstrated that browser fingerprinting techniques can successfully identify 99.24 percent of all users.[12]

39. Browser-fingerprints are considered personal identifiers, and tracking pixels can collect browser-fingerprints from website visitors.

40. A fourth kind of personally identifying information is the unique user identifier (such as Facebook's "Facebook ID") that permits companies like Facebook to quickly and automatically identify the personal identity of its user across the internet whenever the identifier is encountered. A Facebook ID is a number string that is connected to a user's Facebook profile.[13] Anyone with access to a user's Facebook ID can locate a user's Facebook profile.[14]

41. Unique personal identifiers such as a person's Facebook are likewise capable of collection through pixel trackers.

**D. Facebook**

42. Facebook, a social media platform founded in 2004 and today operated by Meta Platforms, Inc., was originally designed as a social networking website for college students.

43. Facebook describes itself as a "real identity" platform.[15] This means that users are permitted only one account and must share "the name they go by in everyday life."[16] To that end, Facebook requires users to provide their first and last name, along with their birthday,

---

[10] https://pixelprivacy.com/resources/browser-fingerprinting/
[11] https://www.blog.google/products/chrome/building-a-more-private-web/
[12] https://www.ndss-symposium.org/ndss2017/ndss-2017-programme/cross-browser-fingerprinting-os-and-hardware-level-features/
[13] https://www.facebook.com/help/211813265517027
[14] https://smallseotools.com/find-facebook-id/
[15] https://www.wsj.com/articles/how-many-users-does-facebook-have-the-company-struggles-to-figure-it-out-11634846701#:~:text=Facebook%20said%20in%20its%20most,of%20them%20than%20developed%20ones.
[16] https://transparency.fb.com/policies/community-standards/account-integrity-and-authentic-identity/

demographics (e.g., age, gender, education, job title, etc.), interests, (e.g., preferred food, movies), connections (e.g., particular events or Facebook pages), and behaviors (e.g., purchases, device usage, and pages visited). This audience can be created by Facebook, the advertiser, or both working in conjunction.

48. Ad Targeting has been extremely successful due to Facebook's ability to target individuals at a granular level. For example, among many possible target audiences, "Facebook offers advertisers 1.5 million people 'whose activity on Facebook suggests that they're more likely engage with/distribute liberal political content' and nearly seven million Facebook users who 'prefer high-value goods in Mexico.'"[23] Aided by highly granular data used to target specific users, Facebook's advertising segment quickly became Facebook's most successful business unit, with millions of companies and individuals utilizing Facebook's advertising services.

**E. Facebook's Meta Pixel tool allows Facebook to track the personal data of individuals across a broad range of third-party websites.**

49. To power its advertising business, Facebook uses a variety of tracking tools to collect data about individuals, which it can then share with advertisers. These tools include software development kits incorporated into third-party applications, its "Like" and "Share" buttons (known as "social plug-ins"), and other methodologies, which it then uses to power its advertising business.

50. One of Facebook's most powerful tools is called the "Meta Pixel."

51. The Meta Pixel is a snippet of code embedded on a third-party website that tracks users' activities as users navigate through a website.[24] Once activated, the Meta Pixel "tracks the

[23] https://www.nytimes.com/2018/04/11/technology/facebook-privacy-hearings.html
[24] https://developers.facebook.com/docs/meta-pixel/

or code from blocking Pixel's execution and to ensure that visitors will be tracked.[30]

57. Once Meta Pixel is installed on a business's website, the Meta Pixel tracks users as they navigate through the website and logs which pages are visited, which buttons are clicked, the specific information entered in forms (including personal information), as well as "optional values" set by the business website.[31] Meta Pixel tracks this data regardless of whether a user is logged into Facebook.[32]

58. For Facebook, the Meta Pixel tool embedded on third-party websites acts as a conduit for information, sending the information it collects to Facebook through scripts running in a user's internet browser, similar to how a "bug" or wiretap can capture audio information. The information is sent in data packets, which include personally identifying data such as a user's IP address.

59. For example, the Meta Pixel is configured to automatically collect "HTTP Headers" and "Pixel-specific data."[33] HTTP headers collect data including "IP addresses, information about the web browser, page location, document, referrer and person using the website."[34] Pixel-specific data includes such data as the "Pixel ID and the Facebook Cookie."[35]

60. Meta Pixel takes the information it harvests and sends it to Facebook with personally identifiable information, such as a user's IP address, name, email, phone number, and specific Facebook ID, which identifies an individual's Facebook user account. Anyone who has access to this Facebook ID can use this identifier to quickly and easily locate, access, and view a user's corresponding Facebook profile. Facebook stores this information on its servers, and, in

---

[30] https://developers.facebook.com/docs/meta-pixel/get-started
[31] https://developers.facebook.com/docs/meta-pixel/
[32] https://themarkup.org/pixel-hunt/2022/06/15/facebook-and-anti-abortion-clinics-are-collecting-highly-sensitive-info-on-would-be-patients
[33] https://developers.facebook.com/docs/meta-pixel/
[34] https://developers.facebook.com/docs/meta-pixel/
[35] https://developers.facebook.com/docs/meta-pixel/

from using the data.[40] In fact, Facebook explicitly uses the hashed information it gathers to link pixel data to Facebook profiles.[41]

66. Facebook also receives personally identifying information in the form of user's unique IP addresses that stay the same as users visit multiple websites. When browsing a third-party website that has embedded Facebook code, a user's unique IP address is forwarded to Facebook by GET requests, which are triggered by Facebook code snippets. The IP address enables Facebook to keep track of the website page visits associated with that address.

67. Facebook also places cookies on visitors' computers. It then uses these cookies to store information about each user. For example, the "c_user" cookie is a unique identifier that identifies a Facebook user's ID. The c_user cookie value is the Facebook equivalent of a user identification number. Each Facebook user has one—and only one—unique c_user cookie. Facebook uses the c_user cookie to record user activities and communications.

68. The data supplied by the c_user cookie allows Facebook to identify the Facebook account associated with the cookie. One simply needs to log into Facebook, and then type www.facebook.com/#, with the c_user identifier in place of the "#." For example, the c_user cookie for Mark Zuckerberg is 4. Logging into Facebook and typing www.facebook.com/4 in the web browser retrieves Mark Zuckerberg's Facebook page: www.facebook.com/zuck.

69. Similarly, the "lu" cookie identifies the last Facebook user who logged in using a specific browser. Like IP addresses, cookies are included with each request that a user's browser makes to Facebook's servers. Facebook employs similar cookies such as "datr," "fr," "act," "presence," "spin," "wd," "xs," and "fbp" cookies to track users on websites across the

[40] https://www.facebook.com/business/help/611774685654668?id=1205376682832142
[41] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites

incorporated into a third-party website, unbeknownst to users and without their consent, Facebook gains the ability to surreptitiously gather every user interaction with the website ranging from what the user clicks on to the personal information entered on a website search bar. Facebook aggregates this data against all websites.[44] Facebook benefits from obtaining this information because it improves its advertising network, including its machine-learning algorithms and its ability to identify and target users with ads.

73. Facebook provides websites using Meta Pixel with the data it captures in the "Meta Pixel page" in Events Manager, as well as tools and analytics to reach these individuals through future Facebook ads.[45] For example, websites can use this data to create "custom audiences" to target the specific Facebook user, as well as other Facebook users who match "custom audience's" criteria.[46] Businesses that use Meta Pixel can also search through Meta Pixel data to find specific types of users to target, such as men over a certain age.

74. Meta Pixel is wildly popular and embedded on millions of websites. Shockingly, Meta Pixel is incorporated on many websites that are used to store and convey sensitive medical information, that by law must be kept private. Recently, investigative journalists have determined that Meta Pixel is embedded on the websites of many of the top hospitals in the United States and on the password-protected patient portals of many healthcare systems.[47] This results in sensitive medical information being collected and then sent to Facebook when a user interacts with these hospital websites. For example, when a user on many of these hospital websites clicks on a "Schedule Online" button next to a doctor's name, Meta Pixel sends the text of the button, the doctor's name, and the search term (such as "cardiology") used to find the

---

[44] https://www.facebook.com/business/help/742478679120153?id=1205376682832142
[45] https://www.facebook.com/business/help/742478679120153?id=1205376682832142
[46] https://developers.facebook.com/docs/marketing-api/reference/custom-audience/
[47] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites




79. All this data is disclosed to Facebook in real time as patients transmit their information, along with other data, such as patient's unique Facebook ID that is captured by the c_user cookie, which allows Facebook to link this information to patients' unique Facebook accounts. Defendant also discloses other personally identifying information to Facebook, such as patient IP addresses, cookie identifiers, browser-fingerprints, and device identifiers.

80. Defendant discloses such personally identifying information and sensitive medical information even when patients are searching for doctors to assist with them conditions such as substance abuse and addiction.




82. Defendant also discloses patient information from other sections of its website including (but not limited to) communications that are captured by the website's search bar, communications that are captured when a patient searches for "Services" offered by Defendant, communications made by patients using the website's Bill Pay/Financials function, and communications made when patients are researching specific medical conditions such as COVID-19.

83. By compelling visitors to its websites to disclose personally identifying data and sensitive medical information to Facebook and other third parties, Defendant knowingly discloses information that allows Facebook and other advertisers to link its patients' Personal

when there was no indication that their sensitive medical information would be collected and transmitted to Facebook in the first place.

90. While Defendant purports to have "Privacy Practices," those Privacy Practices are effectively hidden from patients, buried inside a link labeled "Notice of Privacy Practices" that is concealed at the bottom of Defendant's homepage in type so small as to be unreadable to many visitors:




91. Defendant's "Notice of Privacy Practices" gives no indication to patients that Defendant routinely allows Facebook to capture and exploit patients' Personal Health Information. Indeed, Defendant expressly promises[48] in its "Notice of Privacy Practices" that it would never share patient's medical information with marketing companies without express authorization from patients:

[48] https://www.emersonhospital.org/patients-visitors/patient-rights-responsibilities/patient-privacy

statements do not create an enforceable contract against consumers. Further, Defendant expressly promised its patients that it would never sell or use their Personal Health Information for marketing purposes without express authorization.

96. Accordingly, Defendant lacked authorization to intercept, collect, and disclose Plaintiff and Class Members' Personal Health Information to Facebook or aid in the same.

**G. The disclosures of personal patient data to Facebook are unnecessary.**

97. There is no information anywhere on the websites operated by Defendant that would alert patients that their most private information (such as their identifiers, their medical conditions, and their medical providers) is being automatically transmitted to Facebook. Nor are any of the disclosures of patient Personal Health Information to Facebook necessary for Defendant to maintain its healthcare website.

98. For example, it is possible for a healthcare website to provide a doctor search function without allowing disclosures to third-party advertising companies about patient sign ups or appointments. It is also possible for a website developer to utilize tracking tools without allowing disclosure of patients' Personal Healthcare Information to companies like Facebook.

99. Despite these possibilities, Defendant willfully chose to implement Meta Pixel on its websites and aid in the disclosure of personally identifiable information and sensitive medical information about its patients, as well as the contents of their communications with Defendant, to third-parties, including Facebook.

**H. Plaintiff and Class Members have a reasonable expectation of privacy in their Personal Health Information, especially with respect to sensitive medical information.**

100. Plaintiff and Class Members have a reasonable expectation of privacy in their Personal Health Information, including personally identifying data and sensitive medical information. Defendant's surreptitious interception, collection, and disclosure of patients'

rollout of the iPhone operating software—which asks users for clear, affirmative consent before allowing companies to track users—85 percent of worldwide users and 94 percent of U.S. users chose not to share data when prompted.[50]

107. The concern about sharing personal medical information is compounded by the reality that advertisers view this type of information as particularly valuable. Indeed, having access to the data women share with their healthcare providers allows advertisers to obtain data on children before they are even born. As one recent article noted, "What is particularly worrying about this process of datafication of children is that companies like [Facebook] are harnessing and collecting multiple typologies of children's data and have the potential to store a plurality of data traces under unique ID profiles."[51]

108. Many privacy law experts have expressed serious concerns about patients' sensitive medical information being disclosed to third-party companies like Facebook. As those critics have pointed out, having a patient's personal health information disseminated in ways the patient is unaware of could have serious repercussions, including affecting their ability to obtain life insurance, how much they might pay for such coverage, the rates they might be charged on loans, and the likelihood of their being discriminated against.

**I. Plaintiff's Personal Health Data that Defendant collected, disclosed, and used is Plaintiff's property, has economic value, and its illicit disclosure has caused Plaintiff harm.**

109. It is common knowledge that there is an economic market for consumers' personal data—including the kind of data that Defendant has collected and disclosed from Plaintiff and Class Members.

110. In 2013, the *Financial Times* reported that the data-broker industry profits from

[50] https://www.wired.co.uk/article/apple-ios14-facebook
[51] https://thereader.mitpress.mit.edu/tech-companies-are-profiling-us-from-before-birth/

example, Facebook has offered to pay individuals for their voice recordings,[58] and has paid teenagers and adults up to $20 a month plus referral fees to install an app that allows Facebook to collect data on how individuals use their smart phones.[59]

115. A myriad of other companies and apps such as DataCoup, Nielsen Computer, Killi, and UpVoice also offer consumers money in exchange for access to their personal data.[60]

116. Given the monetary value that data companies like Facebook have already paid for personal information in the past, Defendant has deprived Plaintiff and the Class Members of the economic value of their sensitive medical information by collecting, using, and disclosing that information to Facebook and other third parties without consideration for Plaintiff and the Class Member's property.

**J. Defendant is enriched by making unlawful, unauthorized, and unnecessary disclosures of its patients' protected health information.**

117. In exchange for disclosing Personal Health Information about its patients, Defendant is compensated by Facebook with enhanced online advertising services, including (but not limited to) retargeting and enhanced analytics functions.

118. Retargeting is a form of online targeted advertising that targets users with ads based on their previous internet actions, which is facilitated through the use of cookies and tracking pixels. Once an individual's data is disclosed and shared with a third-party marketing company, the advertiser is able to show ads to the user elsewhere on the internet.

119. For example, retargeting could allow a web-developer to show advertisements on other websites to customers or potential customers based on the specific communications

[58] https://www.theverge.com/2020/2/20/21145584/facebook-pay-record-voice-speech-recognition-viewpoints-pronunciations-app
[59] https://www.cnbc.com/2019/01/29/facebook-paying-users-to-install-app-to-collect-data-techcrunch.html
[60] https://www.creditdonkey.com/best-apps-data-collection.html; *see also* *https://www.monetha.io/blog/rewards/earn-money-from-your-data/*

for users to completely delete their accounts. Under immense public pressure, Facebook eventually returned to its prior Terms of Service.

126. In 2011, Facebook settled charges with the Federal Trade Commission relating to its sharing of Facebook user information with advertisers, as well as its false claim that third-party apps were able to access only the data they needed to operate when—in fact—the apps could access nearly all of a Facebook user's personal data. The resulting Consent Order prohibited Facebook from misrepresenting the extent to which consumers can control the privacy of their information, the steps that consumers must take to implement such controls, and the extent to which Facebook makes user information available to third parties.[61]

127. Facebook found itself in another privacy scandal in 2015 when it was revealed that Facebook could not keep track of how many developers were using previously downloaded Facebook user data. That same year, it was also revealed that Facebook had violated users' privacy rights by harvesting and storing Illinois' users' facial data from photos without asking for their consent or providing notice. Facebook ultimately settled claims related to this unlawful act for $650 million.[62]

128. In 2018, Facebook was again in the spotlight for failing to protect users' privacy. Facebook representatives testified before Congress that a company called Cambridge Analytics may have harvested the data of up to 87 million users in connection with the 2016 election. This led to another FTC investigation in 2019 into Facebook's data collection and privacy practices, resulting in a record-breaking five-billion-dollar settlement.

129. Likewise, a different 2018 report revealed that Facebook had violated users'

---

[61] https://www.ftc.gov/legal-library/browse/cases-proceedings/092-3184-182-3109-c-4365-facebook-inc-matter
[62] A similar case is pending in Texas.

could then use the data for all kinds of activities including targeted advertising. In 2021, Flo settled with the Federal Trade Commission for lying to its users about secretly sharing their data with Facebook, as well as with a host of other internet advertisers, including Google, Fabric, AppsFlyer, and Flurry. The FTC reported that Flo "took no action to limit what these companies could do with users' information."[67]

133. More recently, Facebook employees admitted to lax protections for sensitive user data. Facebook engineers on the ad business product team conceded in a 2021 privacy review that "We do not have an adequate level of control and explainability over how our systems use data, and thus we can't confidently make controlled policy changes or external commitments such as 'we will not use X data for Y purpose."[68]

134. These revelations were confirmed by an article published by the Markup in 2022, which found during the course of its investigation that Facebook's purported "filtering" failed to discard even the most obvious forms of sexual health information. Worse, the article found that the data that the Meta Pixel was sending Facebook from hospital websites not only included details such as patients' medications, descriptions of their allergic reactions, details about their upcoming doctor's appointments, but also included patients' names, addresses, email addresses, and phone numbers.[69]

135. Despite knowing that the Meta Pixel code embedded in its websites was sending patients' Personal Health Information to Facebook, Defendant did nothing to protect its patients from egregious intrusions into its patients' privacy, choosing instead to benefit at those patients' expense.

---

[67] https://slate.com/technology/2022/06/health-data-brokers-privacy.html
[68] https://www.vice.com/en/article/akvmke/facebook-doesnt-know-what-it-does-with-your-data-or-where-it-goes
[69] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites

## CLASS ACTION ALLEGATIONS

141. Defendant's conduct violates the law and breaches its express and implied privacy promises.

142. Defendant's unlawful conduct has injured Plaintiff and Class Members.

143. Defendant's conduct is ongoing.

144. Plaintiff brings this action individually and as a class action against Defendant.

145. Plaintiff seeks class certification for the following proposed Class:

> **The Emerson Hospital Class:** During the fullest period allowed by law, all Massachusetts residents who are, or were, patients of Emerson Hospital or any of its affiliates and who exchanged communications at Emerson Hospital's websites, including www.emersonhospital.org and any other Emerson Hospital affiliated website that caused disclosures of patient personally identifiable information and communications to third parties, including (but not limited to) Facebook.

146. Excluded from the proposed Class are: (1) any Judge or Magistrate presiding over this action and members of their families; (2) the Defendant, Defendant's subsidiaries, affiliates, parents, successors, predecessors, and any entity in which the Defendant or its parent has a controlling interest and their current or former employees, officers, and directors; and (3) Plaintiff's counsel and Defendant's counsel.

147. Plaintiff reserves the right to redefine the Class and/or add Subclasses at, or prior to, the class certification stage, in response to discovery or pursuant to instruction by the Court.

148. This action is properly maintainable as a class action as specifically defined in Massachusetts Rule of Civil Procedure 23.

149. **Numerosity:** While the exact number of Class Members is unknown to Plaintiff at this time, the Class, based on information and belief, consists of thousands of people dispersed throughout the Commonwealth of Massachusetts, such that joinder of all members is

has no interests that are antagonist to, or in conflict with, the interests of other members of the Class. Plaintiff's claims arise out of the same set of facts and conduct as all other Class Members. Plaintiff and all Class Members are patients of Defendant who used the websites set up by Defendant for patients and are victims of Defendant's respective unauthorized disclosures to third parties including Facebook. All claims of Plaintiff and Class Members are based on Defendant's wrongful conduct and unauthorized disclosures.

153. **Adequacy of Representation:** Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are coincident with, and not antagonistic to, those of other Class Members he seeks to represent. Plaintiff has no disabling conflicts with Class Members. Accordingly, Plaintiff is an adequate representative of the Class and, along with counsel, will fairly and adequately protect the interests of the Class and any Subclasses.

154. **Superiority:** A class action is the superior method for fair and efficient adjudication of the controversy. Although all Class Members have claims against Defendant, the likelihood that individual Class Members will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation. Serial adjudication in numerous venues is not efficient, timely, or proper. Judicial resources would be unnecessarily depleted by prosecution of individual claims. The prosecution of separate actions by individual Class Members could create a risk of inconsistent or varying adjudications with respect to individual members of the Cass, which could establish incompatible standards of conduct for Defendant or adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the members of the Class Members who are not parties to the

163. All alleged communications between Plaintiff or Class Members and Defendant qualify as wire communications under Massachusetts law because each communication is made using personal computing devices (e.g., computers, smartphones, tablets) that send and receive communications in whole or in part through the use of facilities used for the transmission of communications aided by wire, cable, or other like connections.

164. An "interception" under the statute means "to secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire … communication through the use of any intercepting device by any person other than a person given prior authority by all parties to such communication." G.L. c. 272, § 99B(4).

165. Defendant engaged in and continues to engage in an "interception" by aiding others (including Facebook) to secretly record the contents of Plaintiff's and Class Members' wire communications.

166. An "intercepting device" is "any device or apparatus which is capable of transmitting, receiving, amplifying, or recording a wire … communication." G.L. c. 272, § 99B(3).

167. The "intercepting devices" used in this case include, but are not limited to:

a. Plaintiff and Class Members' personal computing devices;

b. Plaintiff and Class Members' web browsers;

c. Plaintiff and Class Members' browser-managed files;

d. Facebook's Meta Pixel;

e. Internet cookies;

f. Defendant's computer servers;

g. Third-party source code utilized by Defendant; and

j. The precise dates and times when patients click to Log-In on Defendant's website(s);

k. Information that is a general summary or informs third parties of the general subject of communications that Defendant sends back to patients in response to search queries and requests for information about specific doctors, conditions, treatments, billing, payment, and other information; and

l. Any other content that Defendant has aided third parties in scraping from webpages or communication forms at web properties.

171. Plaintiff and Class Members reasonably expected that their Personal Health Information was not being intercepted, recorded, and disclosed to Facebook and other third parties.

172. Neither Plaintiff nor Class Members consented to the disclosure of their Personal Health Information by Defendant to Facebook and other third parties. Nor could they have consented, given that Defendant never sought Plaintiff or Class Members' consent.

173. Plaintiff and Class Members' electronic communications were intercepted during transmission, without their consent, for the unlawful and/or wrongful purpose of monetizing their Personal Health Information, including using their sensitive medical information to develop marketing and advertising strategies.

174. Under the statute, aggrieved persons are entitled to recover appropriate injunctive relief and "(1) actual damages but not less than liquidated damages computed at the rate of $100 per day for each violation or $1,000, whichever is higher; (2) punitive damages; and (3) a reasonable attorney's fee and other litigation disbursements reasonably incurred."

180. G.L. c. 111, § 70E provides that every patient or resident of a Massachusetts health care facility shall have the right to "confidentiality of all records and communications to the extent provided by law."

181. Maintaining the confidentiality of the doctor-patient relationship is a cardinal rule of the medical profession which has come to be justifiably relied on by patients seeking advice and treatments.

182. Plaintiff and Class Members are patients of Defendant.

183. Defendant owes Plaintiff and Class Members a duty of confidentiality.

184. Despite its duty not to disclose Personal Health Information without informed consent and written authorization, Defendant disclosed information relating to Plaintiff and Class Members' medical treatment to third parties without their knowledge, consent, or authorization.

185. The information disclosed included personally identifiable information, Plaintiff and Class Members' statuses as patients of Defendant, and the exact contents of communications exchanged between Plaintiff and/or Class Members with Defendant, including but not limited to information about treating doctors, potential doctors, conditions, treatments, appointments, search terms, bill payment, and logins to Defendant's website.

186. The disclosure of personally identifiable medical information constitutes an unreasonable, substantial, and serious interference with Plaintiff and Class Members' rights to privacy.

187. Plaintiff and Class Members did not consent to, authorize, or know about Defendant's disclosure of their Personal Health Information to Facebook and other third parties at the time it occurred. Plaintiff and Class Members never agreed that their sensitive medical information could be collected, used, and monetized by Facebook.

c. Defendants took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff and Class Members' knowledge, consent, or authorization and without sharing the benefit of such value;

d. Plaintiff and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain the confidentiality of their Personal Health Information; and

e. Defendant's actions diminished the value of Plaintiff and Class Members' personal information.

192. Plaintiff and Class Members have suffered harm and injury, including but not limited to the invasion of their privacy rights.

193. Plaintiff and Class Members have been damaged as a direct and proximate result of Defendant's invasion of their privacy and are entitled to seek just compensation, including monetary damages.

194. Plaintiff and Class Members seek appropriate relief for their injuries, including but not limited to damages that will reasonably compensate Plaintiff and Class Members for the harm to their privacy interests as well as a disgorgement of profits made by Defendant as a result of its intrusions on Plaintiff and Class Members' privacy.

195. Plaintiff and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's actions, which caused injury to Plaintiff and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

196. Plaintiff and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

c. Defendants took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff and Class Members' knowledge, consent, or authorization and without sharing the benefit of such value;

d. Plaintiff and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain the confidentiality of their Personal Health Information; and

e. Defendant's actions diminished the value of Plaintiff and Class Members' personal information.

**COUNT IV**
**Breach of Express Contract**
**(On Behalf of Plaintiff and the Class)**

204. Plaintiff re-alleges and incorporates by reference all paragraphs above as if fully set forth herein.

205. Plaintiff bring this claim on behalf of herself and all members of the Class.

206. Plaintiff and Class Members entered into written agreements with Defendant as part of the medical services Defendant provided to Plaintiff and Class Members. The agreements involved a mutual exchange of consideration whereby Defendant provided these services in exchange for payment from Class Members, Class Members' insurance carriers, and/or government programs remitting payment on Class Members' behalf.

207. Plaintiff and Class Members and/or their insurance carriers paid Defendant for its services and performed under these agreements.

208. Defendant's disclosure of Plaintiff and Class Members' Private Health Information without their consent constitutes a material breach of the terms of these agreements by Defendant.

Plaintiff and Class Members accepted Defendant's offers and provided their Private Health Information to Defendant as part of acquiring Defendant's medical services.

217. In entering into such implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendant's complied with relevant laws and regulations, and would not allow third parties to collect or exploit their communications with Defendant without their consent.

218. Plaintiff and Class Members who paid money to Defendant reasonably believed and expected that Defendant would use part of those funds to operate its websites free of surreptitious collection and exploitation of communications between the parties. Defendant failed to do so.

219. Under the implied contracts, Defendant and/or its affiliated healthcare providers promised and were obligated to: (a) provide healthcare to Plaintiff and Class Members; and (b) protect Plaintiff and the Class Members' Private Health Information provided to obtain such healthcare. In exchange, Plaintiff and Class Members agreed to pay money for these services, and to turn over their Private Health Information through the use of Defendant's websites.

220. Both the provision of medical services healthcare and the protection of Plaintiff and Class Members' Private Health Information were material aspects of these implied contracts.

221. The implied contracts for the provision of medical services—contracts that include the contractual obligations to maintain the privacy of Plaintiff and Class Members' Private Health Information unless they consent—are also acknowledged, memorialized, and embodied in multiple documents, including (among other documents) Defendant's published Notice of Privacy Practices.

227. As a result of Defendant's failure to fulfill the data privacy promised in these contracts, Plaintiff and Class Members did not receive the full benefit of their bargains, and instead received healthcare and other services that were of a diminished value compared to those described in the contracts. Plaintiff and Class Members were therefore damaged in an amount at least equal to the difference in the value of the healthcare with data privacy they paid for and the healthcare they received.

228. Had Defendant disclosed that it would allow third parties to secretly collect Plaintiff and Class Members' Private Health Information without consent, neither the Plaintiff, the Class Members, nor any reasonable person would have purchased healthcare from Defendant and/or its affiliated healthcare providers.

229. As a direct and proximate result of these failures, Plaintiff and the Class Members have been harmed and have suffered, and will continue to suffer, actual damages and injuries, including, without limitation, the release and disclosure of their Private Health Information, the loss of control of their Private Health Information, and the loss of the benefit of the bargain they had struck with Defendant.

230. Plaintiff and the Class Members are entitled to compensatory and consequential damages suffered as a result.

231. Plaintiff and the Class Members are also entitled to injunctive relief requiring Defendant to cease all website operations that allow for the third-party capture of Private Health Information.

239. Defendant should be compelled to disgorge in a common fund for the benefit of Plaintiff and Class Members all unlawful or inequitable proceeds that Defendant received, and such other relief as the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demand a trial by jury on all issues so triable.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of themselves and all others similarly situated, ask for judgment in his favor, and that the Court enter an order as follows:

a. Certifying the Class and appointing Plaintiff as the Class's representatives;

b. Appoint the law firms of Sweeny Merrigan Law, Keller Postman LLC, and Ahmad, Zavitsanos, & Mensing P.C. as proposed interim class counsel;

c. Finding that Defendant's conduct as alleged herein was unlawful;

d. Awarding such injunctive and other equitable relief as the Court deems just and proper, including enjoining Defendant from making any further disclosure of Plaintiff or Class Members' communications to third parties without the Plaintiff or Class Members' express, informed, and written consent;

e. Awarding statutory damages of $1,000 per Plaintiff and Class Members pursuant to G.L. c. 272, § 99;

f. Imposing a constructive trust against Defendant through which Plaintiff and Class Members can be compensated for any unjust enrichment gained by Defendant;

g. Awarding damages for violations of Plaintiff and Class Members' right to privacy;

h. Awarding Plaintiff and Class Members statutory, actual, compensatory, consequential, punitive, and nominal damages, as well as restitution and/or disgorgement of profits unlawfully obtained;

i. Awarding Plaintiff and Class Members pre-judgment and post-judgment interest as provided by law;

j. Awarding Plaintiff and Class Members reasonable attorney's fees, costs, and expenses;

**RESPECTFULLY SUBMITTED,**
**COUNSEL FOR PLAINTIFF JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED**

*/s/ Jonathan T. Merrigan*
J. Tucker Merrigan, BBO# 681627
Victoria Santoro Mair, BBO# 679120
Erin E. McHugh, BBO# 703701
Sweeney Merrigan Law
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Foster C. Johnson (*pro hac vice forthcoming*)
David Warden (*pro hac vice forthcoming*)
Nathan Campbell (*pro hac vice forthcoming*)
AHMAD, ZAVITSANOS, & MENSING, P.C.
1221 McKinney Street, Suite 3460
Houston, Texas 77010
(713) 655-1101
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

Seth Meyer (*pro hac vice forthcoming*)
Alex Dravillas (*pro hac vice forthcoming*)
Keller Postman LLC
150 N. Riverside Plaza
Suite 4100
Chicago, Illinois 60606
(312) 741-5220
sam@kellerpostman.com
adj@kellerpostman.com

Dated: October 19, 2022

purposes" without "specific authorization."[2] Contrary to these assurances, however, Defendant does not follow these policies, nor the law prohibiting such disclosures.

3. As recently as October 17, 2023, Defendant disclosed information about its patients—including their status as patients, their physicians, their medical treatments, the hospitals they visited, and their personal identities—to Facebook and other third parties without its patients' knowledge, authorization, or consent.

4. Defendant disclosed this protected health information through the deployment of various digital marketing and automatic rerouting tools embedded on its websites that purposefully and intentionally redirect patients' personal health information to third parties who exploit that information for advertising purposes. Defendant's use of these rerouting tools caused its patients' personally identifiable information and the contents of its patients' communications exchanged with Defendant to be automatically redirected to third parties in violation of those patients' reasonable expectations of privacy, their rights as patients, their rights as citizens of Massachusetts, and both the express and implied promises of Defendant.

5. Defendant's conduct in disclosing such protected health information about its patients to Facebook and other third parties violates Massachusetts law, including G.L. c. 272, § 99 (Interception of Wire and Oral Communications), G.L. c.214, § 1B (Right to Privacy), and G.L. c. 111, § 70E (Patients' and Residents' Rights).

6. On behalf of himself and all similarly situated persons who are current citizens of Massachusetts, Plaintiff seeks an order enjoining Defendant from further unauthorized disclosures of his personal information; awarding liquidated damages in the amount of $1,000 per violation, attorney's fees and costs; and granting any other preliminary or equitable relief the Court deems appropriate.

---

[2] https://www.emersonhospital.org/patients-visitors/patient-rights-responsibilities/patient-privacy

## FACTUAL BACKGROUND

**A. Defendant routinely discloses the protected health information of its patients to third parties including Facebook.**

11. Plaintiff John Doe is a patient of Defendant who has received treatment from Defendant at the Cantu Concussion Center.[6]

12. Under G.L. c. 214, § 1B, all persons "have a right against unreasonable, substantial, or serious interference" with their privacy.

13. Medical patients in Massachusetts such as John Doe have a legal interest in preserving the confidentiality of their communications with healthcare providers and have reasonable expectations of privacy that their personally identifiable information and communications will not be disclosed to third parties by Defendant without their express written consent and authorization.

14. As a health care provider, Defendant has fiduciary, common law, and statutory duties to protect the confidentiality of patient information and communications.

15. Defendant expressly and impliedly promises patients that it will maintain and protect the confidentiality of personally identifiable patient information and communications.

16. Defendant operates websites for patients, including www.emersonhospital.org.

17. Defendant's websites are designed for interactive communication with patients, including scheduling appointments, searching for physicians, paying bills, requesting medical records, learning about medical issues treatment options, and joining support groups.

18. Notwithstanding patients' reasonable expectations of privacy, Defendant's legal duties of confidentiality, and Defendant's express promises to the contrary, Defendant disclosed the contents of patients' communications and protected healthcare information via automatic re-

---

[6] https://www.emersonhospital.org/locations/concussion-center

"respiratory problems" into the query box of a website search engine, and the search engine transmits this information using a GET request method, then the words "respiratory" and "problems" will be appended to the query string at the end of the URL of the webpage showing the search results.

24. The other basic transmission command utilized by web browsers is POST, which is typically employed when a user enters data into a form on a website and clicks 'Enter' or some other form of submission button. POST sends the data entered in the form to the server hosting the website that the user is visiting.

25. In response to receiving a GET or POST command, the server for the website with which the user is exchanging information will send a set of instructions to the web browser and command the browser with source code that directs the browser to render the website's responsive communication.

26. Unbeknownst to most users, however, the website's server may also redirect the user's communications to third parties. Indeed, Google warns website developers and publishers that installing its ad tracking software on webpages employing GET requests will result in users' personally identifiable information being disclosed to Google.[8] Typically, users are provided no notice that these disclosures are being made.

27. Third parties (such as Facebook and Google) use the information they receive to track user data and communications for marketing purposes.

28. In many cases, third-party marketing companies acquire the content of user communications through a 1x1 pixel (the smallest dot on a user's screen) called a tracking pixel, a web-bug, or a web beacon. These tracking pixels are tiny and are purposefully camouflaged to remain invisible to users.

---

[8] https://support.google.com/platformspolicy/answer/6156630?hl=en

also offer advertising companies like Facebook a unique and semi-persistent identifier across devices—one that has limited privacy controls.[9]

34. Because of their uniquely identifying character, IP address are considered protected personally identifiable information. Tracking pixels can (and typically do) collect website visitors' IP addresses.

35. Likewise, internet cookies also provide personally identifiable information. Cookies are small text files that web servers can place on a user's browser and computer when a user's browser interacts with a website server. Cookies are typically designed to acquire and record an individual internet user's communications and activities on websites and were developed by programmers to aid with online advertising.

36. Cookies are designed to operate as a means of identification for internet users. Advertising companies like Facebook and Google have developed methods for monetizing and profiting from cookies. These companies use third-party tracking cookies to help them acquire and record user data and communications in order to sell targeted advertising that is customized to a user's personal communications and browsing history. To build individual profiles of internet users, third party advertising companies assign each user a unique (or a set of unique) identifiers to each user.

37. Cookies are considered personal identifiers protected, and tracking pixels can collect cookies from website visitors.

38. A third type of personally identifying information is what data companies refer to as a "browser-fingerprint." A browser-fingerprint is information collected about a computing device that can be used to identify the specific device.

---

[9] https://adtechexplained.com/the-future-of-ip-address-as-an-advertising-identifier/

43. Unique personal identifiers such as a person's Facebook are likewise capable of collection through pixel trackers.

**D. Facebook's Business Model: Exploiting Users' Personal Data to Sell Advertising.**

44. Facebook, a social media platform founded in 2004 and today operated by Meta Platforms, Inc., was originally designed as a social networking website for college students.

45. Facebook describes itself as a "real identity" platform.[16] This means that users are permitted only one account and must share "the name they go by in everyday life."[17] To that end, Facebook requires users to provide their first and last name, along with their birthday, telephone number and/or email address, and gender, when creating an account.[18]

46. In 2007, realizing the value of having direct access to millions of consumers, Facebook began monetizing its platform by launching "Facebook Ads," proclaiming this service to be a "completely new way of advertising online," that would allow "advertisers to deliver more tailored and relevant ads."[19] Facebook has since evolved into one of the largest advertising companies in the world.[20] Facebook can target users so effectively because it surveils user activity both on and off its website through the use of tracking pixels.[21] This allows Facebook to make inferences about users based on their interests, behavior, and connections.[22]

47. Today, Facebook provides advertising on its own social media platforms, as well as other websites through its Facebook Audience Network. Facebook has more than 2.9 billion users.[23]

---

[16] https://www.wsj.com/articles/how-many-users-does-facebook-have-the-company-struggles-to-figure-it-out-11634846701#:~:text=Facebook%20said%20in%20its%20most,of%20them%20than%20developed%20ones.
[17] https://transparency.fb.com/policies/community-standards/account-integrity-and-authentic-identity/
[18] https://www.facebook.com/help/406644739431633
[19] https://about.fb.com/news/2007/11/facebook-unveils-facebook-ads/
[20] https://www.pewresearch.org/fact-tank/2021/06/01/facts-about-americans-and-facebook/
[21] https://www.facebook.com/business/help/742478679120153?id=1205376682832142
[22] https://www.facebook.com/business/ads/ad-targeting
[23] https://www.statista.com/statistics/264810/number-of-monthly-active-facebook-users-worldwide/

offers advertisers 1.5 million people 'whose activity on Facebook suggests that they're more likely engage with/distribute liberal political content' and nearly seven million Facebook users who 'prefer high-value goods in Mexico.'"[24] Aided by highly granular data used to target specific users, Facebook's advertising segment quickly became Facebook's most successful business unit, with millions of companies and individuals utilizing Facebook's advertising services.

**E. Facebook's Meta Pixel tool allows Facebook to track the personal data of individuals across a broad range of third-party websites.**

52. To power its advertising business, Facebook uses a variety of tracking tools to collect data about individuals, which it can then share with advertisers. These tools include software development kits incorporated into third-party applications, its "Like" and "Share" buttons (known as "social plug-ins"), and other methodologies, which it then uses to power its advertising business.

53. One of Facebook's most powerful tools is called the "Meta Pixel." Once a third-party like Defendant installs the Meta Pixel on its website, by default it begins sending user information to Facebook automatically.[25]

54. The Meta Pixel is a snippet of code embedded on a third-party website that tracks users' activities as users navigate through a website.[26] Once activated, the Meta Pixel "tracks the people and type of actions they take."[27] Meta Pixel can track and log each page a user visits, what buttons they click, as well as specific information that users input into a website.[28] The Meta Pixel code works by sending Facebook a detailed log of a user's interaction with a website

[24] https://www.nytimes.com/2018/04/11/technology/facebook-privacy-hearings.html
[25] https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector
[26] https://developers.facebook.com/docs/meta-pixel/
[27] https://www.facebook.com/business/goals/retargeting
[28] https://www.facebook.com/business/help/742478679120153?id=1205376682832142

manner, Facebook tracks users browsing histories on third-party websites, and compiles these browsing histories into personal profiles which are sold to advertisers to generate revenue.[32]

58. For example, if Meta Pixel is incorporated on a shopping website, it may log what searches a user performed, which items of clothing a user clicked on, whether they added an item to their cart, as well as what they purchased. Along with this data, Facebook collects identifying information like IP addresses, Facebook IDs, and other data that allow Facebook to identify the user. All this personally identifying data is available each time the Meta Pixel forwards a user's interactions with a third-party website to Facebook's servers. Once Facebook receives this information, Facebook processes it, analyzes it, and assimilates it into datasets like its Core Audiences and Custom Audiences. Facebook can then sell this information to companies who wish to display advertising for products similar to what the user looked at on the original shopping website.

59. These communications with Facebook happen silently, without users' knowledge. By default, the transmission of information to Facebook's servers is invisible. Facebook's Meta Pixel allows third-party websites to capture and send personal information a user provides to match them with Facebook or Instagram profiles, even if they are not logged into Facebook at the time.[33]

60. In exchange for installing its Meta Pixel, Facebook provides website owners like Defendant with analytics about the ads they've placed on Facebook and Instagram and tools to target people who have visited their website.[34] The Meta Pixel collects data on website visitors

---

[32] *In re Facebook*, 956 F.3d at 596.
[33] https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector
[34] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites

that the company maintains "shadow profiles" on nonusers of Facebook.[42]

66. For Facebook, the Meta Pixel tool embedded on third-party websites acts as a conduit for information, sending the information it collects to Facebook through scripts running in a user's internet browser, similar to how a "bug" or wiretap can capture audio information.

67. For example, the Meta Pixel is configured to automatically collect "HTTP Headers" and "Pixel-specific data."[43] HTTP headers collect data including "IP addresses, information about the web browser, page location, document, referrer and person using the website."[44] Pixel-specific data includes such data as the "Pixel ID and the Facebook Cookie."[45]

68. Meta Pixel takes the information it harvests and sends it to Facebook with personally identifiable information, such as a user's IP address, name, email, phone number, and specific Facebook ID, which identifies an individual's Facebook user account. Anyone who has access to this Facebook ID can use this identifier to quickly and easily locate, access, and view a user's corresponding Facebook profile. Facebook stores this information on its servers, and, in some instances, maintains this information for years.[46]

69. Facebook has a number of ways to uniquely identify the individuals whose data is being forwarded from third-party websites through the Meta Pixel.

70. If a user has a Facebook account, the user data collected is linked to the individual user's Facebook account. For example, if the user is logged into their Facebook account when the user visits a third-party website where the Meta Pixel is installed, many common browsers will attach third-party cookies allowing Facebook to link the data collected by Meta Pixel to the

---

[42] https://techcrunch.com/2018/04/11/facebook-shadow-profiles-hearing-lujan-zuckerberg/
[43] https://developers.facebook.com/docs/meta-pixel/
[44] https://developers.facebook.com/docs/meta-pixel/
[45] https://developers.facebook.com/docs/meta-pixel/
[46] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites

75. Facebook also places cookies on visitors' computers. It then uses these cookies to store information about each user. For example, the "c_user" cookie is a unique identifier that identifies a Facebook user's ID. The c_user cookie value is the Facebook equivalent of a user identification number. Each Facebook user has one—and only one—unique c_user cookie. Facebook uses the c_user cookie to record user activities and communications.

76. The data supplied by the c_user cookie allows Facebook to identify the Facebook account associated with the cookie. One simply needs to log into Facebook, and then type www.facebook.com/#, with the c_user identifier in place of the "#." For example, the c_user cookie for Mark Zuckerberg is 4. Logging into Facebook and typing www.facebook.com/4 in the web browser retrieves Mark Zuckerberg's Facebook page: www.facebook.com/zuck.

77. Similarly, the "lu" cookie identifies the last Facebook user who logged in using a specific browser. Like IP addresses, cookies are included with each request that a user's browser makes to Facebook's servers. Facebook employs similar cookies such as "datr," "fr," "act," "presence," "spin," "wd," "xs," and "fbp" cookies to track users on websites across the internet.[52] These cookies allow Facebook to easily link the browsing activity of its users to their real-world identities, and such highly sensitive data as medical information, religion, and political preferences.[53]

78. Facebook also uses browser fingerprinting to uniquely identify individuals. Web browsers have several attributes that vary between users, like the browser software system, plugins that have been installed, fonts that are available on the system, the size of the screen, color depth, and more. Together, these attributes create a fingerprint that is highly distinctive. The likelihood that two browsers have the same fingerprint is at least as low as 1 in 286,777, and

---

[52] https://techexpertise.medium.com/facebook-cookies-analysis-e1cf6ffbdf8a#:~:text=browser%20session%20ends.-,%E2%80%9Cdatr%E2%80%9D,security%20and%20site%20integrity%20features.

[53] https://securehomes.esat.kuleuven.be/~gacar/fb_tracking/fb_plugins.pdf

through future Facebook ads.[55] For example, websites can use this data to create "custom audiences" to target the specific Facebook user, as well as other Facebook users who match "custom audience's" criteria.[56] Businesses that use Meta Pixel can also search through Meta Pixel data to find specific types of users to target, such as men over a certain age.

82. Meta Pixel is wildly popular and embedded on millions of websites. Businesses install the Meta Pixel software code to help drive and decode key performance metrics from visitor traffic to their websites.[57] Businesses also use the Meta Pixel to build custom audiences on Facebook that can be used for their own advertising purposes.[58]

83. Shockingly, Meta Pixel is incorporated on many websites that are used to store and convey sensitive medical information, that by law must be kept private. Recently, investigative journalists have determined that Meta Pixel is embedded on the websites of many of the top hospitals in the United States.[59] This results in sensitive medical information being collected and then sent to Facebook when a user interacts with these hospital websites. For example, when a user on many of these hospital websites clicks on a "Schedule Online" button next to a doctor's name, Meta Pixel sends the text of the button, the doctor's name, and the search term (such as "cardiology") used to find the doctor to Facebook. If the hospital's website has a drop-down menu to select a medical condition in connection with locating a doctor or making an appointment, that condition is also transmitted to Facebook through Meta Pixel.

84. Facebook has designed the Meta Pixel such that Facebook receives information about patient activities on hospital websites as they occur in real time. Indeed, the moment that a

---

[55] https://www.facebook.com/business/help/742478679120153?id=1205376682832142
[56] https://developers.facebook.com/docs/marketing-api/reference/custom-audience/
[57] https://instapage.com/blog/meta-pixel
[58] https://instapage.com/blog/meta-pixel
[59] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites

conditions, including the doctor's specialty, the patient's condition, the patient's hometown, the patient's language preference, and other information that the patient provides.




88. All this data about the medical treatments that patients are seeking is disclosed to Facebook simultaneously in real time as patients transmit their information, along with other data, such as patient's unique Facebook ID that is captured by the c_user cookie, which allows Facebook to link this information to patients' unique Facebook accounts. Defendant also discloses other personally identifying information to Facebook, such as patient IP addresses, cookie identifiers, browser-fingerprints, and device identifiers.

89. Defendant disclosed such personally identifying information and sensitive medical information even when patients are searching for doctors to assist with them conditions such as substance abuse and addiction.



REQUEST AN APPOINTMENT

Fill out the below form to request an appointment with Dr. Roomi. A member of our staff will get back to you during normal business hours.

Privacy Policy

| | |
|---|---|
| First name: | John |
| Last name: | Doe |
| Home address: | 268 Summer St LL |
| City: | Boston |
| State: | MA |
| Zip code: | 02210 |
| Email: | johndoe@yahoo.com |
| Phone number: | 555.555.5555 |

I'm not a robot

reCAPTCHA
Privacy - Terms

SUBMIT

92. Defendant also disclosed patient information from other sections of its website including (but not limited to) communications that were captured by the website's search bar, communications that were captured when a patient searched for "Services" offered by Defendant, communications made by patients using the website's Bill Pay/Financials function, and communications made when patients are researched specific medical conditions such as COVID-19.

93. As the above demonstrates, knowing what information a patient is reviewing on Defendant's website can reveal deeply personal and private information. For example, a simple search for "pregnancy" on Defendant's website tells Facebook that the patient is likely pregnant.

96. The transmitted URLs contain both the "path" and the "query string" arising from patients' interactions with Defendant's websites. The path identifies where a file can be found on a website. For example, a patient reviewing information about the "Clinical Services" that Defendant offers patients such as "Maternity" will generate a URL with the path https://www.emersonhospital.org/clinical-services/maternity.

97. Likewise, a query string provides a list of parameters. An example of a URL that provides a query string is https://www.emersonhospital.org/site-search?searchtext=HIV. The query string parameters in this search indicate that a search was done at Defendant's website for information about HIV. In other words, the Meta Pixel captures information that connects a particular user to a particular healthcare provider.

98. Defendant also provides Facebook with details about online forms that patients fill out in the form of POST requests, such as when a patient utilizes the Emerson Hospital website's "Find A Doctor" function.[60] All the information that patients provide when filling out these forms are also disclosed to Facebook.

99. The contents of patients' search terms shared with Facebook plainly relate to (and disclose) the past, present, or future physical or mental health or condition of individual patients who interact with Defendant's website. Worse, no matter how sensitive the area of the Defendant's website that a patient reviews, the referral URL is acquired by Facebook along with cookies that precisely identify the patient.

100. The nature of the collected data is also important. Defendant's unauthorized disclosures result in Facebook obtaining a comprehensive browsing history of an individual patient, no matter how sensitive the patient's medical condition. Facebook is then able to correlate that history with the time of day and other user actions on Defendant's website. This

[60] https://www.emersonhospital.org/find-a-doctor

with patients' interactions with its websites. Defendant made the decision to barter its patients' Personal Health Care Information to Facebook because it wanted access to the Meta Pixel tool. While that bargain may have benefited Defendant and Facebook, it also betrayed the privacy rights of Plaintiff and Class Members.

**F. Plaintiff and the Class Members did not consent to the interception and disclosure of their protected health information.**

105. Plaintiff and Class Members had no idea when they interacted with Defendant's websites that their personal data, including sensitive medical data, was being collected and transmitted to Facebook. That is because, among other things, Meta Pixel is seamlessly integrated into Defendant's websites and is invisible to patients visiting those websites.

106. For example, when Plaintiff John Doe visited Defendant's website in 2022 at www.emersonhospital.org, there was no indication that Meta Pixel was embedded on that website or that it would collect and transmit his sensitive medical data to Facebook.

107. Plaintiff and his fellow Class Members could not consent to Defendant's conduct when there was no indication that their sensitive medical information would be collected and transmitted to Facebook in the first place.

108. While Defendant purports to have "Privacy Practices," those Privacy Practices are effectively hidden from patients, buried inside a link labeled "Notice of Privacy Practices" that is concealed at the bottom of Defendant's homepage in type so small as to be unreadable to many visitors:

USES OR DISCLOSURES OF INFORMATION THAT REQUIRE YOUR WRITTEN PERMISSION

Using and/or sharing health information for most purposes other than treatment, payment or health care operations requires your specific authorization. The following will occur only with authorization from the individual:

- most uses and disclosures of psychotherapy notes
- uses and sharing of personal health information for marketing purposes, including communications related to subsidized treatment
- disclosures that constitute a sale of personal health information

110. Even if a patient stumbled upon Defendant's carefully hidden "Notice of Privacy Practices," nothing in that notice would be understood by any reasonable patient to mean that Defendant is routinely allowing Facebook to capture and exploit patients' Personal Health Information.

111. Defendant's "Notice of Privacy Practices" states that "using and/or sharing health information for most purposes other than treatment, payment or health care operations requires [the patient's] specific authorization" and assures patients that Defendant would only use or share patients' Personal Health Information for marketing purposes "with authorization from the individual."[62]

112. Defendant does not have a legal right to share Plaintiff and Class Members' Protected Health Information with Facebook, because this information is protected from such disclosure by law. Defendant is not permitted to disclose patients' Protected Health Information to an advertising and marketing company like Facebook without express written authorization from patients.

[62] https://www.emersonhospital.org/patients-visitors/patient-rights-responsibilities/patient-privacy

to provide medical services to its patients.

118. Despite this, Defendant willfully chose to implement Meta Pixel on its websites and aid in the disclosure of personally identifiable information and sensitive medical information about its patients, as well as the contents of their communications with Defendant, to third-parties, including Facebook.

**H. Plaintiff and Class Members have a reasonable expectation of privacy in their Personal Health Information, especially with respect to sensitive medical information.**

119. Plaintiff and Class Members have a reasonable expectation of privacy in their Personal Health Information, including personally identifying data and sensitive medical information. Defendant's surreptitious interception, collection, and disclosure of patients' Personal Health Information to Facebook violated Plaintiff and Class Member's privacy interests.

120. Patient health information is specifically protected by law. The prohibitions against disclosing patient Personal Health Information include prohibitions against disclosing personally identifying data such patient names, IP addresses, and other unique characteristics or codes. And Massachusetts law subject medical providers who treat conditions such as substance abuse to heightened duties of confidentiality. G.L. c. 111B, § 11. This legal framework applies to health care providers, such as Defendant.

121. Given the application of these laws to Defendant, Plaintiff and the Members of the Class had a reasonable expectation of privacy in their protected health information.

122. Several studies examining the collection and disclosure of consumers' sensitive medical information confirm that the disclosure of sensitive medical information violates expectations of privacy that have been established as general social norms.

123. Privacy polls and studies also uniformly show that the overwhelming majority of

patient is unaware of could have serious repercussions, including affecting their ability to obtain life insurance, how much they might pay for such coverage, the rates they might be charged on loans, and the likelihood of their being discriminated against.

**I. Plaintiff's Personal Health Data that Defendant collected, disclosed, and used is Plaintiff's property, has economic value, and its illicit disclosure has caused Plaintiff harm.**

128. It is common knowledge that there is an economic market for consumers' personal data—including the kind of data that Defendant has collected and disclosed from Plaintiff and Class Members.

129. In 2013, the *Financial Times* reported that the data-broker industry profits from the trade of thousands of details about individuals, and that within that context, "age, gender and location information" were being sold for approximately "$0.50 per 1,000 people."[66]

130. In 2015, *TechCrunch* reported that "to obtain a list containing the names of individuals suffering from a particular disease," a market participant would have to spend about "$0.30" per name.[67] That same article noted that "Data has become a strategic asset that allows companies to acquire or maintain a competitive edge" and that the value of a single user's data can vary from $15 to more than $40 per user.[68]

131. In a 2021 Washington Post article, the legal scholar Dina Srinivasan said that consumers "should think of Facebook's cost as [their] data and scrutinize the power it has to set its own price."[69] This price is only increasing. According to Facebook's own financial statements, the value of the average American's data in advertising sales rose from $19 to $164

[66] https://ig.ft.com/how-much-is-your-personal-data-worth/
[67] https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/
[68] https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/
[69] https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/

**J. Defendant is enriched by making unlawful, unauthorized, and unnecessary disclosures of its patients' protected health information.**

136. In exchange for disclosing Personal Health Information about its patients, Defendant is compensated by Facebook with enhanced online advertising services, including (but not limited to) retargeting and enhanced analytics functions.

137. Retargeting is a form of online targeted advertising that targets users with ads based on their previous internet actions, which is facilitated through the use of cookies and tracking pixels. Once an individual's data is disclosed and shared with a third-party marketing company, the advertiser is able to show ads to the user elsewhere on the internet.

138. For example, retargeting could allow a web-developer to show advertisements on other websites to customers or potential customers based on the specific communications exchanged by a patient or their activities on a website. Using the Meta Pixel, a website could target ads on Facebook itself or on the Facebook advertising network. The same or similar advertising can be accomplished via disclosures to other third-party advertisers and marketers.

139. Once personally identifiable information relating to patient communications is disclosed to third parties like Facebook, Defendant loses the ability to control how that information is subsequently disseminated and exploited.

140. The monetization of the data being disclosed by Defendant, both by Defendant and Facebook, demonstrates the inherent value of the information being collected.

**K. Facebook's history of egregious privacy violations.**

141. Defendant knew or should have known that Facebook could not be trusted with its patients' sensitive medical information.

142. Due to its ability to target individuals based on granular data, Facebook's ad-targeting capabilities have frequently come under scrutiny. For example, in June 2022,

for their consent or providing notice. Facebook ultimately settled claims related to this unlawful act for $650 million.[76]

147. In 2018, Facebook was again in the spotlight for failing to protect users' privacy. Facebook representatives testified before Congress that a company called Cambridge Analytics may have harvested the data of up to 87 million users in connection with the 2016 election. This led to another FTC investigation in 2019 into Facebook's data collection and privacy practices, resulting in a record-breaking five-billion-dollar settlement.

148. Likewise, a different 2018 report revealed that Facebook had violated users' privacy by granting access to user information to over 150 companies.[77] Some companies were even able to read users' private messages.

149. In June 2020, after promising users that app developers would not have access to data if users were not active in the prior 90 days, Facebook revealed that it still enabled third-party developers to access this data.[78] This failure to protect users' data enabled thousands of developers to see data on inactive users' accounts if those users were Facebook friends with someone who was an active user.

150. On February 18, 2021, the New York State Department of Financial Services released a report detailing the significant privacy concerns associated with Facebook's data collection practices, including the collection of health data. The report noted that while Facebook maintained a policy that instructed developers not to transmit sensitive medical information, Facebook received, stored, and analyzed this information anyway. The report concluded that "[t]he information provided by Facebook has made it clear that Facebook's internal controls on this issue have been very limited and were not effective … at preventing the

[76] A similar case is pending in Texas.
[77] https://www.cnbc.com/2018/12/19/facebook-gave-amazon-microsoft-netflix-special-access-to-data-nyt.html
[78] https://fortune.com/2020/07/01/facebook-user-data-apps-blunder/

details such as patients' medications, descriptions of their allergic reactions, details about their upcoming doctor's appointments, but also included patients' names, addresses, email addresses, and phone numbers.[83]

154. Despite knowing that the Meta Pixel code embedded in its websites was sending patients' Personal Health Information to Facebook, Defendant did nothing to protect its patients from egregious intrusions into its patients' privacy, choosing instead to benefit at those patients' expense.

**TOLLING, CONCEALMENT, AND ESTOPPEL**

155. The applicable statutes of limitation have been tolled as a result of Defendant's knowing and active concealment and denial of the facts alleged herein.

156. Defendant seamlessly incorporated Meta Pixel and other trackers into its websites, providing no indication to users that they were interacting with a website enabled by Meta Pixel. Defendant had knowledge that its websites incorporated Meta Pixel and other trackers yet failed to disclose that by interacting with Meta-Pixel enabled websites that Plaintiff and Class Members' sensitive medical information would be intercepted, collected, used by, and disclosed to Facebook.

157. Plaintiff and Class Members could not with due diligence have discovered the full scope of Defendants' conduct, because there were no disclosures or other indication that they were interacting with websites employing Meta Pixel.

158. The earliest that Plaintiff and Class Members, acting with due diligence, could have reasonably discovered this conduct would have been on June 15, 2022, following the release of the Markup's investigation.

[83] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites

167. This action is properly maintainable as a class action as specifically defined in Massachusetts Rule of Civil Procedure 23.

168. **Numerosity:** While the exact number of Class Members is unknown to Plaintiff at this time, the Class, based on information and belief, consists of thousands of people dispersed throughout the Commonwealth of Massachusetts, such that joinder of all members is impracticable. The exact number of Class Members can be determined by review of information maintained by Defendants.

169. **Commonality and Predominance:** There are questions of law and fact common to Class Members and which predominate over any questions affecting only individual members. A class action will generate common answers to the questions below, which are apt to drive resolution:

a. Whether Defendant's acts and practices violated Plaintiff and Class Members' privacy rights;

b. Whether Defendant's acts and practices violate G.L. c. 272, § 99;

c. Whether Defendant's acts and practices violate G.L. c. 214, § 1B;

d. Whether Defendant's acts and practices violate G.L. c. 111, § 70E;

e. Whether Defendant knowingly allowed the surreptitious collection and disclosure of Plaintiff and Class Members' Personal Health Information to Facebook;

f. Whether Defendant's acts and practices constitute a breach of fiduciary duty;

g. Whether Defendant profited from disclosures of patient Personal Health Information to third parties including Facebook;

h. Whether Defendant was unjustly enriched;

i. Whether Defendant's acts and practices harmed and continue to harm Plaintiff and Class Members and, if so, the extent of that injury;

j. Whether Plaintiff and Class Members are entitled to equitable relief including, but not limited to, injunctive relief, restitution, and disgorgement; and

k. Whether Plaintiff and Class Members are entitled to actual, statutory, punitive or

members of the Cass, which could establish incompatible standards of conduct for Defendant or adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the members of the Class Members who are not parties to the adjudications. If a class action is not permitted, Class Members will continue to suffer losses and Defendant's misconduct will continue without proper remedy.

174. Plaintiff anticipates no unusual difficulties in the management of this litigation as a class action. The Class is readily ascertainable and direct notice can be provided from the records maintained by Defendant, electronically or by publication, the cost of which is properly imposed on Defendant.

175. For the above reasons, among others, a class action is superior to other available methods for the fair and efficient adjudication of this action.

## CAUSES OF ACTION

### COUNT I
### Interception of Wire Communications in Violation of G.L. c. 272, § 99
### (On Behalf of Plaintiff and the Class)

176. Plaintiff re-alleges and incorporates by reference all paragraphs above as if fully set forth herein.

177. Plaintiff brings this claim on behalf of himself and all members of the Class.

178. All conditions precedent to this action have been performed or have occurred.

179. G.L. c. 272, § 99 prohibits any person from willfully and secretly intercepting the contents of any wire communications through the use of any intercepting device unless given prior authority by all parties to a communication to do so.

d. Facebook's Meta Pixel;

e. Internet cookies;

f. Defendant's computer servers;

g. Third-party source code utilized by Defendant; and

h. Computer servers of third parties (including Facebook) to which Plaintiff and Class Members' communications were disclosed.

187. Under the statute, "contents" are defined to mean "any information concerning the identity of the parties to such communication or the existence, contents, substance, purport, or meaning of that communication." G.L. c. 272, § 99B(5).

188. Defendant aided in, and continues to aid in, the interception of contents in that the data from the communications between Plaintiff and/or Class Members and Defendant that were redirected to and recorded by the third parties include information which identifies the parties to each communication, their existence, and their contents.

189. Defendant aided in the interception of "contents" in at least the following forms:

a. The parties to the communications;

b. The precise text of patient search queries;

c. Personally identifying information such as patients' IP addresses, Facebook IDs, browser fingerprints, and other unique identifiers;

d. The precise text of patient communications about specific doctors;

e. The precise text of patient communications about specific medical conditions;

f. The precise text of patient communications about specific treatments;

g. The precise text of patient communications about scheduling appointments with medical providers;

193. Under the statute, aggrieved persons are entitled to recover appropriate injunctive relief and "(1) actual damages but not less than liquidated damages computed at the rate of $100 per day for each violation or $1,000, whichever is higher; (2) punitive damages; and (3) a reasonable attorney's fee and other litigation disbursements reasonably incurred."

194. In addition to statutory damages, Defendant's breach caused Plaintiff and Class Members the following damages:

a. Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private;

b. Defendant eroded the essential confidential nature of the doctor-patient relationship;

c. Defendant took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members' knowledge or informed consent and without sharing the benefit of such value;

d. Plaintiff and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain confidentiality; and

e. Defendant's actions diminished the value of Plaintiff and Class Members' personal information.

**COUNT II**
**Invasion of Privacy in Violation of G.L. c. 214, § 1B**
**(On Behalf of Plaintiff and the Class)**

195. Plaintiff re-alleges and incorporates by reference all paragraphs above as if fully set forth herein.

196. Plaintiff bring this claim on behalf of himself and all members of the Class.

197. G.L. c. 214, § 1B provides that "a person shall have a right against unreasonable, substantial, or serious interference with his privacy. The superior court shall have jurisdiction in equity to enforce such right and in connection therewith to award damages."

at the time it occurred. Plaintiff and Class Members never agreed that their sensitive medical information could be collected, used, and monetized by Facebook.

207. Defendant's intentional disclosure of patients' Personal Health Information to a third-party advertising company like Facebook without consent would be highly offensive to a reasonable person. Plaintiff and Class Members reasonably expected that their Personal Health Information would not be collected, used, and monetized by third party advertising companies.

208. Defendant's disclosure of Personal Health Information from thousands of individuals was highly offensive because it violated expectations of privacy that have been established by social norms. Privacy polls and studies show that Americans believe that one of the most important privacy rights is the need for an individual's affirmative consent before their personal data is collected, shared, or used.

209. Given the nature of the Personal Health Information that Defendant disclosed to Facebook, such as patients' names, email addresses, phone numbers, information entered into forms, doctor's names, potential doctor's names, the search terms used to locate doctors (i.e. "Alzheimer's"), the condition selected from dropdown menus (i.e. "Heart Disease"), medications, and details about upcoming doctor's appointments, this kind of intrusion would be (and in fact is) highly offensive to a reasonable person.

210. Defendant's breach caused Plaintiff and Class Members, at minimum, the following damages:

a. Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private;

b. Defendants eroded the essential confidential nature of the doctor-patient and provider-patient relationship;

## COUNT III
## Breach of Fiduciary Duty and/or Common Law Duty of Confidentiality
## (On Behalf of Plaintiff and the Class)

216. Plaintiff re-alleges and incorporates by reference all paragraphs above as if fully set forth herein.

217. Plaintiff brings this claim on behalf of himself and all members of the Class.

218. All conditions precedent to this action have been performed or occurred.

219. In *Alberts v. Devine*, 479 N.E.2d 113, 120 (1985), the Massachusetts Supreme Court held that a duty of confidentiality arises from the physician-patient relationship and that a violation of that duty gives rise to a cause of action sounding in tort.

220. As medical provider for Plaintiff and Class Members, Defendant owes Plaintiff and Class Members a fiduciary duty of confidentiality in the data and content of communications exchanged between Defendant and Plaintiff or Class Members.

221. Defendant breached its duty of confidentiality by disclosing Personal Health Information about Plaintiff and Class Members, including their status as patients, the content of their communications, and information about their doctors, potential doctors, conditions, treatments, appointments, search terms, and bill payment.

222. Defendant's breach caused Plaintiff and Class Members the following damages:

a. Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private;

b. Defendants eroded the essential confidential nature of the doctor-patient and provider-patient relationship;

Plaintiff's and Class Members' Personal Health Information from unauthorized disclosure to third parties such as Facebook. These facts give rise to the inference that Defendant took on obligations outside the plain terms of any express contracts that they may have had with Plaintiff and Class Members.

227. Plaintiff and the Class Members entered into valid and enforceable implied contracts with Defendant when they sought medical treatment from Defendant. Specifically, through their course of conduct, Defendant, Plaintiff, and Class Members entered into implied contracts for the provision of medical care and treatment, which included an implied agreement for Defendant to retain and protect the privacy of Plaintiff's and Class Members' Personal Health Information.

228. Defendant required and obtained Plaintiff's and Class Members' Personal Health Information as part of the physician-patient relationship, evincing an implicit promise by Defendant to act reasonably to protect the confidentiality of Plaintiff's and Class Members' Personal Health Information. Defendant, through its privacy policies, codes of conduct, company security practices, and other conduct, implicitly that it would safeguard Plaintiff's and Class Members' Personal Health Information in exchange for access to that information and the opportunity to treat Plaintiff and Class Members.

229. Implied in the exchange was a promise by Defendant to ensure that the Personal Health Information of Plaintiff and Class Members in its possession would only be used for medical treatment purposes and would not be shared with third parties such as Facebook without the knowledge or consent of Plaintiff and Class Members. By asking for and obtaining Plaintiff's and Class Members' Personal Health Information, Defendant assented to protecting the confidentiality of that information. Defendant's implicit agreement to safeguard the

234. Defendant was therefore required to reasonably safeguard and protect the Personal Health Information of Plaintiff and Class Members from unauthorized disclosure and/or use by third parties.

235. Plaintiff and Class Members accepted Defendant's medical services offer and fully performed their obligations under the implied contract with Defendant by providing their Personal Health Information to Defendant among other obligations. Plaintiff and Class Members would not have provided and entrusted their Personal Health Information to Defendant in the absence of their implied contracts with Defendant and would have instead retained the opportunity to control their Personal Health Information for uses other than the benefits offered by Defendant.

236. Plaintiff and Class Members relied on Defendant's implied promises to safeguard their Personal Health Information to their detriment. Defendant breached the implied contracts with Plaintiff and Class Members by failing to reasonably safeguard and protect Plaintiff's and Class Members' Personal Health Information from disclosure to Facebook and other third parties.

237. Defendant's failure to implement adequate measures to protect the Personal Health Information of Plaintiff and Class Members and Defendant's intentional disclosure of the same to Facebook violated the purpose of the agreement between the parties: Plaintiff's and Class Members' provision of money and Personal Health Information in exchange for medical services and other benefits.

238. Instead of safeguarding Plaintiff's and Class Members' Personal Health Information, Defendant intentionally shared that information with Facebook thereby breaching the implied contracts it had with Plaintiff and Class Members.

independent duty to handle Plaintiff's and Class Members' Personal Health Information with due care and consistent with industry standards to prevent the foreseeable harm that arises from a breach of that duty.

244. Consumers of healthcare value their privacy, the privacy of their dependents, and the ability to keep their Private Health Information associated with obtaining healthcare private. To customers such as Plaintiff and the Class Members, healthcare that allows third parties to secretly collect their Private Health Information without consent is fundamentally less useful and less valuable than healthcare that refrains from such practices. Plaintiff and Class Members would not have entrusted their Private Health Information to Defendant and entered into these implied contracts with Defendant without an understanding that their Private Health Information would be safeguarded and protected or entrusted their Private Health Information to Defendant in the absence of its implied promise to do so.

245. A meeting of the minds occurred when Plaintiff and the Class Members agreed to, and did, provide their Private Health Information to Defendant and/or its affiliated healthcare providers, and paid for the provided healthcare in exchange for, amongst other things, (a) the provision of healthcare and medical services and (b) the protection of their Private Health Information.

246. Plaintiff and the Class Members performed their obligations under the contract when they paid for their healthcare services and provided their Private Health Information.

247. Defendant materially breached its contractual obligation to protect the nonpublic Private Health Information Defendant gathered when it allowed third parties to collect and exploit that information without Plaintiff's and Class Members' consent.

amount at least equal to the difference in the value of the healthcare services with data privacy they paid for and the healthcare services they received.

250. As a result of Defendant's material breaches, Plaintiff and Class Members were deprived of the benefit of their bargain with Defendant because they spent more on medical services with Defendant than they would have if they had known that Defendant was not providing the reasonable data security and confidentiality of patient communications that Defendant represented that it was providing in its privacy policies. Defendant's failure to honor its promises that it would protect the confidentiality of patient communications thus resulted in Plaintiff and Class Members overpaying Defendant for the services they received.

251. The services that Plaintiff and Class Members ultimately received in exchange for the monies paid to Defendant were worth quantifiably less than the services that Defendant promised to provide, which included Defendant's promise that any patient communications with Defendant would be treated as confidential and would never be disclosed to third parties for marketing purposes without the express consent of patients.

252. The medical services that Defendant offers are available from many other health care systems who do protect the confidentiality of patient communications. Had Defendant disclosed that it would allow third parties to secretly collect Plaintiff and Class Members' Private Health Information without consent, neither the Plaintiff, the Class Members, nor any reasonable person would have purchased healthcare from Defendant and/or its affiliated healthcare providers.

253. Defendant's conduct in sharing Plaintiff's and Class Members' Personal Health Information with Facebook also diminished the sales value of that information. There is a robust market for the type of information that Plaintiff and Class Members shared with Defendant

258. Plaintiff hereby pleads this Count in the alternative to Counts IV.

259. Plaintiff brings this claim on behalf of himself and all members of the Class.

260. Plaintiff and Class Members conferred a benefit on Defendant in the form of valuable sensitive medical information that Defendant collected from Plaintiff and Class Members under the guise of keeping this information private. Defendant collected, used, and disclosed this information for its own gain, including for advertisement purposes, sale, or trade for valuable services from third parties. Additionally, Plaintiff and the Class Members conferred a benefit on Defendant in the form of monetary compensation.

261. Plaintiff and the Class Members would not have used the Defendant's services, or would have paid less for those services, if they had known that Defendant would collect, use, and disclose this information to third parties.

262. Defendant unjustly retained those benefits at the expense of Plaintiff and Class Members because Defendant's conduct damaged Plaintiff and Class Members, all without providing any commensurate compensation to Plaintiff and Class Members.

263. The benefits that Defendant derived from Plaintiff and Class Members rightly belong to Plaintiff and Class Members. It would be inequitable under unjust enrichment principles for Defendant to be permitted to retain any of the profit or other benefits it derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

264. Defendant should be compelled to disgorge in a common fund for the benefit of Plaintiff and Class Members all unlawful or inequitable proceeds that Defendant received, and such other relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demand a trial by jury on all issues so triable.

**RESPECTFULLY SUBMITTED,
COUNSEL FOR PLAINTIFF JOHN DOE,
INDIVIDUALLY AND ON BEHALF OF ALL
OTHERS SIMILARLY SITUATED**

*/s/ Jonathan T. Merrigan*
J. Tucker Merrigan, BBO# 681627
Victoria Santoro Mair, BBO# 679120
Erin E. McHugh, BBO# 703701
Sweeney Merrigan Law
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Foster C. Johnson (*pro hac vice forthcoming*)
David Warden (*pro hac vice forthcoming*)
Nathan Campbell (*pro hac vice forthcoming*)
AHMAD, ZAVITSANOS, & MENSING, P.C.
1221 McKinney Street, Suite 3460
Houston, Texas 77010
(713) 655-1101
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

Seth Meyer (*pro hac vice forthcoming*)
Alex Dravillas (*pro hac vice forthcoming*)
Keller Postman LLC
150 N. Riverside Plaza
Suite 4100
Chicago, Illinois 60606
(312) 741-5220
sam@kellerpostman.com
ajd@kellerpostman.com

Dated: January 30, 2022

from a user when they are on a website and sends it to Facebook. If the website user is a Facebook subscriber, Facebook can use the data gathered, in conjunction with other information it collects from its subscribers, to identify the website user and target ads to them. Emerson has since removed the Meta Pixel from its website.

During the period the Meta Pixel was on the Emerson website, it recorded a user's IP address, the buttons clicked, as well as the information entered in the website's pages, including the "Find a Doctor," "Site Search," and "Request an Appointment" pages, the last of which features a questionnaire that contains information such as the doctor's name, the patient's name, telephone number, physical address, and email address. The website's "Notice of Privacy Practices" did not inform users that it was utilizing the Meta Pixel but instead promised that it would never share patient health information with marketing companies without express authorization from patients. In exchange for installing its Meta Pixel, Facebook provided Emerson with enhanced online advertising services, including retargeting (a form of online targeted advertising) and enhanced analytics functions.

Plaintiff is an individual with a Facebook account as well as an Emerson patient who received treatment at the hospital's Cantu Concussion Center. In 2022, Plaintiff used Emerson's website to transmit information about his treatment at Emerson, which included queries about treatment for a concussion. Plaintiff's communications contained information about his status as an Emerson patient, including information about his doctors, conditions, treatment, and appointments. Plaintiff was unaware that this information was being shared with Facebook through the Meta Pixel.

Emerson's alleged conduct. Specifically, Emerson argues that Plaintiff (as a Facebook user) consented to the very conduct complained of because, when he signed up for a Facebook account, he agreed to Meta's Terms of Service, Privacy Policy, and Cookie Policy ("Meta Policies").

Plaintiff's argument is unsound for two reasons. First, it depends on documents, see Wong Decl., Exs. 2-4, that the court cannot consider because it is doubtful that they were relied upon in framing the FAC. Neither Plaintiff's allegations regarding Facebook's collection and use of user data nor his passing reference to Facebook's 2009 terms of service, see FAC, ¶ 144, is sufficient for these purposes.[4] Second, even if the court could take these documents into consideration, it is unclear how accepting the Meta Policies could constitute consent to *Emerson's* interception and disclosure of Plaintiff's private healthcare information, particularly where Emerson allegedly promised on its website never to share a patient's personal information for marketing purposes without specific authorization.[5] Thus, at this stage of the litigation, the court cannot conclude that the Meta Policies establish consent as a matter of law such that Plaintiff suffered no injuries.

[4] Prior to the hearing on the matter, Plaintiff moved to strike Exhibits 1-5 attached to the Declaration of Alan Y. Wong, which Emerson submitted in support of its motion to dismiss. Plaintiff did not move to strike Exhibit 6 (the Emerson Hospital Patient Privacy Policy), which is referenced in the FAC. Plaintiff argued that Exhibits 1-5 cannot be considered by the court on a motion to dismiss. In response, Emerson filed an opposition in which it argued that the motion should be denied: (1) for failure to comply with Superior Court Rule 9C; and (2) because Exhibits 1-4 are properly before the court (it agreed to strike Exhibit 5). See Docket No. 18.5. The court denied the motion for failure to comply with Rule 9C. At the hearing, the court vacated the denial but counsel for Emerson was not prepared to argue. The parties subsequently agreed that the court could rule on the motion without argument and based on the briefing alone. Accordingly, the court allows the motion to strike. Exhibits 1 (a press release) and 2-4 (the Meta Policies) are stricken for the reason stated above; it is not evident that they were relied upon by Plaintiff in framing the FAC. The Court strikes Exhibit 5 as agreed to by Emerson.

[5] Emerson argues that this purported promise only concerned the use of medical and treatment records, which are not at issue here. However, the relevant section on Emerson's website promises not to share "health information" without authorization. See Wong Decl., Ex. 6. At this stage, it is unclear whether a user of the website would read the phrase "health information" so narrowly.

. Plaintiff and Class Members' statuses as *patients* of Defendant, and the exact contents of communications exchanged between Plaintiff and/or Class Members with Defendant, including but not limited to information about treating doctors, potential doctors, conditions, *treatments*, appointments, search terms, bill payment, and logins to Defendant's website." FAC, ¶¶ 203–204 (emphasis added). See also id. at ¶ 103 ("The information that Plaintiff John Doe transmitted included queries about treatment for his concussion."); ¶ 11 (Plaintiff "is a patient of Defendant who has received treatment at Defendant at Cantu Concession Center").

Emerson alternatively argues that a fiduciary relationship cannot exist between a health system (as opposed to a specific doctor) and a patient. However, the cases from the Commonwealth it cites for this proposition are not directly on point. See Petrell v. Rakoczy, 2005 WL 1683600, at *4 (Mass. Super. July 11, 2005); Van Brode Grp., Inc. v. Bowditch & Dewey, 36 Mass. App. Ct. 509, 516 (1994).[7] Moreover, "the determination of whether a fiduciary duty exists is largely fact specific," Baker, 91 Mass. App. Ct. at 846, and therefore such an argument is best addressed on a more complete record. See Shedd v. Sturdy Mem'l Hosp., Inc., No. 2173CV00498C, 2022 WL 1102524, at *9 (Mass. Super. Apr. 5, 2022) (Squires-Lee, J.) (on motion to dismiss in data breach case against hospital, rejecting argument that fiduciary duty did not exist given fact intensive nature of that determination).[8]

C. Implied Contract

---

[7] Emerson also cites two cases from other jurisdictions in its Reply and Notice of Supplemental Authority. See Kurowski v. Rush Sys. for Health, 2023 WL 2349606 (N.D. Ill. Mar. 3, 2023); Cousin v. Sharp Healthcare, No. 22-CV-2040-MMA (DDL), 2023 WL 4484441, at *4-5, *10 (S.D. Cal. July 12, 2023). The Court is not persuaded by these decisions at this stage of the litigation.

[8] The Court notes that at least two trial court decisions have indicated that a pharmacy may owe its customers a fiduciary duty, which suggests Emerson's position is not correct. See Kelley v. CVS Pharmacy, Inc., No. CIV. A. 98-0897-BLS2, 2007 WL 2781163, at *5-6 (Mass. Super. Aug. 24, 2007) (Gants, J.); Weld v. CVS Pharmacy, Inc., No. CIV. A. 98-0897F, 1999 WL 494114, at *5 (Mass. Super. June 29, 1999) (Fremont-Smith, J.) (same).

defendant's use of the Meta Pixel, concluding that it was plausible that the parties entered into an implied contract by their actions); Shedd, 2022 WL 1102524, at *9-10 (in data breach case, denying motion to dismiss implied contract claim); Rudolph v. Hudson's Bay Co., No. 18-CV-8472 (PKC), 2019 WL 2023713, at *10-11 (S.D.N.Y. May 7, 2019) (same); Castillo v. Seagate Tech., LLC, 2016 WL 9280242, at *9 (N.D. Cal. Sept. 14, 2016) (same).[9] In light of these decisions and the absence of case law from the Commonwealth clearly on point, the court concludes that the better course is to assess this claim on a fuller record. The allegations sufficiently suggest that Emerson may have entered into an implied contract which included an agreement not to disclose health information to third parties, like Facebook, without consent.[10]

D. Unjust Enrichment

"In order to recover for unjust enrichment, a plaintiff must prove that (1) it conferred a measurable benefit upon the defendant; (2) it reasonably expected compensation from the defendant; and (3) the defendant accepted the benefit with the knowledge, actual or chargeable, of the plaintiff's reasonable expectation." See Stewart Title Guar. Co. v. Kelly, 97 Mass. App. Ct. 325, 335 (2020). "Unjust enrichment, as a basis for restitution, requires more than benefit. The benefit must be *unjust*, a quality that turns on the reasonable expectations of the parties." Santagate v. Tower, 64 Mass. App. Ct. 324, 336 (2005), quoting Community Builders, Inc. v. Indian Motocycle Assocs., 44 Mass. App. Ct. 537, 560 (1998) (emphasis in original).

[9] The Court acknowledges that, as Emerson argues, these data breach decisions are not entirely analogous to the situation presented here.

[10] At the hearing, Emerson contended that the claim fails because it is based on Emerson's HIPAA obligations and there can be no consideration for doing what the law requires. At this stage of the litigation, the Court is not persuaded by this argument.

any intrusion "against any legitimate purpose" therefor. Id. at 383. Typically, whether an intrusion is unreasonable, substantial, or serious is a question of fact. Id.

Emerson argues that the claim fails because the FAC reveals little about the information that Plaintiff entered on its website and fails to identify how the data, once sent to Facebook, was used. The court is not persuaded. Plaintiff alleges that in order to obtain advertising benefits, Emerson disclosed information relating to Plaintiff's medical treatment to third parties without his knowledge, consent, or authorization, including information about Plaintiff's status as an Emerson patient, and the exact content of communications exchanged between Plaintiff and Emerson (e.g., information about treating doctors, potential doctors, conditions, treatments, appointments, search terms, bill payment). These allegations suffice to advance Plaintiff's claim for invasion of privacy. See generally Ayash v. Dana-Farber Cancer Inst., 443 Mass. 367, 383 (2005) ("statute . . . proscribes disclosure of facts about an individual that are of a highly personal or intimate nature when there exists no legitimate countervailing interest") (internal quotes omitted). See also Doe v. Boston Med. Ctr. Corp., No. 2384CV00326-BLS-1, 2023 WL 7105628, at *5 (Mass. Super. Sep. 14, 2023) (Kazanjian, J.) (declining to dismiss invasion of privacy claim based on similar allegations).[12]

F. Wiretap Claim

General Laws c. 272, § 99(Q) provides a cause of action for "[a]ny aggrieved person whose oral or wire communications were intercepted, disclosed or used . . . or whose personal or property interests or privacy were violated by means of an interception," except as permitted or authorized by the Wiretap Statute. "Interception" is defined to mean "to secretly hear, secretly

[12] At the hearing, Emerson suggested that this decision is distinguishable because the plaintiff allegedly used a patient portal, which is not the alleged here. The Court does not read the decision and other recent decisions from this Court on the same subject as limited to interactions with patient portals.

information for marketing purposes without specific authorization and the Meta Policies do not disclose that the Meta Pixel had been installed on the Emerson website.

In so ruling, the Court notes that two recent Superior Court cases involving similar wiretap claims were reported to the Appeals Court under Mass. R. Civ. P. 64, seeking clarification on a motion to dismiss as to whether the Wiretap Statute applies to the internet tracking alleged. See Vita v. New England Baptist Hosp., 2384CV00857 (Kazanjian, J.); Vita v. Beth Israel Deaconess Med. Ctr., Inc., 2384CV00480 (Kazanjian, J.). Depending on the outcome of the appellate review, the court's ruling here may have to be revisited.

**ORDER**

Defendant's motion to dismiss is **DENIED.**

**SO ORDERED.**

Janice W. Howe
Justice of the Superior Court

Date: November 22, 2023

SHOOK HARDY & BACON LLP
DEC 04 2023
RECEIVED

COMMONWEALTH OF MASSACHUSETTS

ESSEX, ss

SUPERIOR COURT DEPARTMENT
CIVIL ACTION NO. 2277CV01000

JOHN DOE,
INDIVIDUALLY AND ON BEHALF OF
ALL OTHERS SIMILARLY SITUATED,

Plaintiff

v.

EMERSON HOSPITAL,

Defendant.

**EMERSON'S ANSWER TO PLAINTIFF'S FIRST AMENDED**
**CLASS ACTION COMPLAINT, DEFENSES, AND JURY DEMAND**

Defendant Emerson Hospital ("Emerson") submits, as set forth below, its Answer to the First Amended Complaint of Plaintiff John Doe, individually and on behalf of all others similarly situated, Emerson's affirmative and other defenses, and Emerson's jury demand. All allegations not expressly admitted are denied, and pursuant to Mass. R. Civ. P. 8(b), all statements that Emerson lacks knowledge or information sufficient to form a belief about the truth of an allegation have the effect of a denial. Emerson is not required to respond to section headings within the First Amended Complaint; however, to the extent these section headings contain assertions or allegations or otherwise require a response, they are denied, and the use of Plaintiff's section headings in this document is for convenience only.

**NATURE OF ACTION AND ALLEGATIONS**

1. This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Emerson denies the allegations.

## FACTUAL BACKGROUND

11. Emerson is without knowledge or sufficient information to form a belief as to the truth of the allegations in the paragraph, and on that basis denies the allegations.

12. G.L. c. 214 § 1B speaks for itself and any characterization inconsistent therewith is denied. Emerson denies any remaining allegations.

13. This paragraph contains a legal conclusion to which no response is required. To the extent a response is required, Emerson denies the allegations.

14. This paragraph contains a legal conclusion to which no response is required. To the extent a response is required, Emerson denies the allegations.

15. This paragraph contains a legal conclusion to which no response is required. To the extent a response is required, Emerson denies the allegations.

16. Admitted.

17. Emerson admits that Emerson's websites contain the features they contain. Emerson further states that its websites speak for themselves and are the best evidence of their contents, and Emerson denies any characterizations of its websites. Emerson denies all remaining allegations contained in this paragraph.

18. This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Emerson denies the allegations.

19. Denied.

20. Denied.

29. Emerson is without knowledge or sufficient information to form a belief as to the truth of the allegations in the paragraph, and on that basis denies the allegations.

30. Emerson is without knowledge or sufficient information to form a belief as to the truth of the allegations in the paragraph, and on that basis denies the allegations.

31. Emerson is without knowledge or sufficient information to form a belief as to the truth of the allegations in the paragraph, and on that basis denies the allegations.

32. Emerson is without knowledge or sufficient information to form a belief as to the truth of the allegations in the paragraph, and on that basis denies the allegations.

33. Emerson admits that IP addresses are used to route communications on the internet. Emerson denies that an IP address is sufficiently unique to identify a computer. Emerson further states that the website referenced in this paragraph and its footnote speaks for itself and is the best evidence of its contents. Emerson denies any characterization of this website. Emerson is without knowledge or sufficient information to form a belief as to the truth of the remaining allegations in the paragraph, and on that basis denies the allegations.

34. Emerson denies that an IP address has a uniquely identifying character, and that an IP address is protected personally identifiable information. Emerson is without knowledge or sufficient information to form a belief as to the truth of the remaining allegations in the paragraph, and on that basis denies the allegations.

35. Emerson is without knowledge or sufficient information to form a belief as to the truth of the allegations in the paragraph, and on that basis denies the allegations.

43. Emerson is without knowledge or sufficient information to form a belief as to the truth of the allegations in the paragraph, and on that basis denies the allegations.

44. Emerson is without knowledge or sufficient information to form a belief as to the truth of the allegations in the paragraph, and on that basis denies the allegations.

45. The websites referenced in this paragraph and its footnotes speak for themselves and are the best evidence of their contents. Emerson denies any characterization of these websites. Emerson is without knowledge or sufficient information to form a belief as to the truth of the remaining allegations in the paragraph, and on that basis denies the allegations.

46. The websites referenced in this paragraph and its footnotes speak for themselves and are the best evidence of their contents. Emerson denies any characterization of these websites. Emerson is without knowledge or sufficient information to form a belief as to the truth of the remaining allegations in the paragraph, and on that basis denies the allegations.

47. The website referenced in this paragraph and its footnote speaks for itself and is the best evidence of its contents. Emerson denies any characterization of this website. Emerson is without knowledge or sufficient information to form a belief as to the truth of the remaining allegations in the paragraph, and on that basis denies the allegations.

48. Emerson is without knowledge or sufficient information to form a belief as to the truth of the allegations in the paragraph, and on that basis denies the allegations.

49. Emerson is without knowledge or sufficient information to form a belief as to the truth of the allegations in the paragraph, and on that basis denies the allegations.

this case. Emerson is without knowledge or sufficient information to form a belief as to the truth of the remaining allegations in the paragraph, and on that basis denies the allegations.

56. The case referenced in this paragraph and its footnote speaks for itself and is the best evidence of its contents. Emerson denies any characterization of this case. Emerson is without knowledge or sufficient information to form a belief as to the truth of the remaining allegations in the paragraph, and on that basis denies the allegations.

57. The case referenced in this paragraph and its footnote speaks for itself and is the best evidence of its contents. Emerson denies any characterization of this case. Emerson is without knowledge or sufficient information to form a belief as to the truth of the remaining allegations in the paragraph, and on that basis denies the allegations.

58. Emerson is without knowledge or sufficient information to form a belief as to the truth of the allegations in the paragraph, and on that basis denies the allegations.

59. The website referenced in this paragraph and its footnote speaks for itself and is the best evidence of its contents. Emerson denies any characterization of this website. Emerson is without knowledge or sufficient information to form a belief as to the truth of the remaining allegations in the paragraph, and on that basis denies the allegations.

60. The websites referenced in this paragraph and its footnotes speak for themselves and are the best evidence of their contents. Emerson denies any characterization of these websites. Emerson is without knowledge or sufficient information to form a belief as to the truth of the remaining allegations in the paragraph, and on that basis denies the allegations.

67. The websites referenced in this paragraph and its footnotes speak for themselves and are the best evidence of their contents. Emerson denies any characterization of these websites. Emerson is without knowledge or sufficient information to form a belief as to the truth of the remaining allegations in the paragraph, and on that basis denies the allegations.

68. The website referenced in this paragraph and its footnote speaks for itself and is the best evidence of its contents. Emerson denies any characterization of this website. Emerson is without knowledge or sufficient information to form a belief as to the truth of the remaining allegations in the paragraph, and on that basis denies the allegations.

69. Emerson is without knowledge or sufficient information to form a belief as to the truth of the allegations in the paragraph, and on that basis denies the allegations.

70. Emerson is without knowledge or sufficient information to form a belief as to the truth of the allegations in the paragraph, and on that basis denies the allegations.

71. The websites referenced in this paragraph and its footnotes speak for themselves and are the best evidence of their contents. Emerson denies any characterization of these websites. Emerson is without knowledge or sufficient information to form a belief as to the truth of the remaining allegations in the paragraph, and on that basis denies the allegations.

72. The website referenced in this paragraph and its footnote speaks for itself and is the best evidence of its contents. Emerson denies any characterization of this website. Emerson is without knowledge or sufficient information to form a belief as to the truth of the remaining allegations in the paragraph, and on that basis denies the allegations.

80. The website referenced in this paragraph and its footnote speaks for itself and is the best evidence of its contents. Emerson denies any characterization of this website. Emerson is without knowledge or sufficient information to form a belief as to the truth of the remaining allegations in the paragraph, and on that basis denies the allegations.

81. The websites referenced in this paragraph and its footnotes speak for themselves and are the best evidence of their contents. Emerson denies any characterization of these websites. Emerson is without knowledge or sufficient information to form a belief as to the truth of the remaining allegations in the paragraph, and on that basis denies the allegations.

82. The websites referenced in this paragraph and its footnotes speak for themselves and are the best evidence of their contents. Emerson denies any characterization of these websites. Emerson is without knowledge or sufficient information to form a belief as to the truth of the remaining allegations in the paragraph, and on that basis denies the allegations.

83. The website referenced in this paragraph and its footnote speaks for itself and is the best evidence of its contents. Emerson denies any characterization of this website. Emerson is without knowledge or sufficient information to form a belief as to the truth of the remaining allegations in the paragraph, and on that basis denies the allegations.

84. Emerson is without knowledge or sufficient information to form a belief as to the truth of the allegations in the paragraph, and on that basis denies the allegations.

85. Emerson admits that it installed Meta Pixel on its public-facing website. Emerson denies the remaining allegations.

86. Denied.

95. Emerson is without knowledge or sufficient information to form a belief as to the truth of the allegations in the paragraph, and on that basis denies the allegations.

96. Emerson is without knowledge or sufficient information to form a belief as to the truth of the allegations in the paragraph, and on that basis denies the allegations.

97. Emerson is without knowledge or sufficient information to form a belief as to the truth of the allegations in the paragraph, and on that basis denies the allegations.

98. The website referenced in this paragraph and its footnote speaks for itself and is the best evidence of its contents. Emerson denies any characterization of this website. Emerson is without knowledge or sufficient information to form a belief as to the truth of the remaining allegations in the paragraph, and on that basis denies the allegations.

99. Denied.

100. Denied.

101. Denied.

102. This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Emerson denies the allegations.

103. Emerson is without knowledge or sufficient information to form a belief as to the truth of the allegations in the paragraph, and on that basis denies the allegations.

104. Denied.

112. This paragraph contains a legal conclusion to which no response is required. To the extent a response is required, Emerson denies the allegations.

113. Emerson is without knowledge or sufficient information to form a belief as to the truth of the allegations in the paragraph, and on that basis denies the allegations.

114. This paragraph contains a legal conclusion to which no response is required. To the extent a response is required, Emerson denies the allegations.

115. This paragraph contains a legal conclusion to which no response is required. To the extent a response is required, Emerson denies the allegations.

116. The websites referenced in this paragraph speak for themselves and are the best evidence of their contents. Emerson denies any characterization of these websites. Emerson further states that this paragraph contains a legal conclusion to which no response is required. To the extent a response is required, Emerson denies the allegations. Emerson denies any remaining allegations.

117. Emerson is without knowledge or sufficient information to form a belief as to the truth of the allegations in the paragraph, and on that basis denies the allegations.

118. Emerson admits that it installed the Meta Pixel on its public-facing website. Emerson denies the remaining allegations.

119. This paragraph contains a legal conclusion to which no response is required. To the extent a response is required, Emerson denies the allegations.

127. Emerson is without knowledge or sufficient information to form a belief as to the truth of the allegations in the paragraph, and on that basis denies the allegations.

128. Emerson is without knowledge or sufficient information to form a belief as to the truth of the allegations in the paragraph, and on that basis denies the allegations.

129. The website referenced in this paragraph and its footnote speaks for itself and is the best evidence of its contents. Emerson denies any characterization of this website. Emerson is without knowledge or sufficient information to form a belief as to the truth of the remaining allegations in the paragraph, and on that basis denies the allegations.

130. The websites referenced in this paragraph and its footnotes speak for themselves and are the best evidence of their contents. Emerson denies any characterization of these websites. Emerson is without knowledge or sufficient information to form a belief as to the truth of the remaining allegations in the paragraph, and on that basis denies the allegations.

131. The websites referenced in this paragraph and its footnotes speak for themselves and are the best evidence of their contents. Emerson denies any characterization of these websites. Emerson is without knowledge or sufficient information to form a belief as to the truth of the remaining allegations in the paragraph, and on that basis denies the allegations.

132. The website referenced in this paragraph and its footnote speaks for itself and is the best evidence of its contents. Emerson denies any characterization of this website. Emerson is without knowledge or sufficient information to form a belief as to the truth of the remaining allegations in the paragraph, and on that basis denies the allegations.

143. Emerson is without knowledge or sufficient information to form a belief as to the truth of the allegations in the paragraph, and on that basis denies the allegations.

144. Emerson is without knowledge or sufficient information to form a belief as to the truth of the allegations in the paragraph, and on that basis denies the allegations.

145. The website referenced in this paragraph and its footnote speaks for itself and is the best evidence of its contents. Emerson denies any characterization of this website. Emerson is without knowledge or sufficient information to form a belief as to the truth of any remaining allegations in the paragraph, and on that basis denies the allegations.

146. The website referenced in this paragraph and its footnote speaks for itself and is the best evidence of its contents. Emerson denies any characterization of this website. Emerson is without knowledge or sufficient information to form a belief as to the truth of the allegations in the paragraph, and on that basis denies the allegations.

147. Emerson is without knowledge or sufficient information to form a belief as to the truth of the allegations in the paragraph, and on that basis denies the allegations.

148. The website referenced in this paragraph and its footnote speaks for itself and is the best evidence of its contents. Emerson denies any characterization of this website. Emerson is without knowledge or sufficient information to form a belief as to the truth of the remaining allegations in the paragraph, and on that basis denies the allegations.

149. The website referenced in this paragraph and its footnote speaks for itself and is the best evidence of its contents. Emerson denies any characterization of this website. Emerson is

## TOLLING, CONCEALMENT, AND ESTOPPEL

155. This paragraph contains a legal conclusion to which no response is required. To the extent a response is required, Emerson denies the allegations.

156. Emerson admits that it installed the Meta Pixel on its public-facing website. Emerson denies the remaining allegations.

157. Emerson is without knowledge or sufficient information to form a belief as to the truth of the allegations in the paragraph, and on that basis denies the allegation.

158. This paragraph contains a legal conclusion to which no response is required. To the extent a response is required, Emerson denies the allegations.

159. This paragraph contains a legal conclusion to which no response is required. To the extent a response is required, Emerson denies the allegations.

## CLASS ACTION ALLEGATIONS

160. Denied.

161. Denied.

162. Denied.

163. This paragraph contains a legal conclusion to which no response is required. To the extent a response is required, Emerson denies the allegations, and denies that Plaintiff, or any member of the putative Class, is entitled to any of the relief requested in the Complaint. Emerson further denies that a Class should be certified.

173. This paragraph contains a legal conclusion to which no response is required. To the extent a response is required, Emerson denies the allegations.

174. This paragraph contains a legal conclusion to which no response is required. To the extent a response is required, Emerson denies the allegations.

175. This paragraph contains a legal conclusion to which no response is required. To the extent a response is required, Emerson denies the allegations.

## CAUSES OF ACTION

### COUNT I
### Interception of Wire Communications in Violation of G.L. c. 272, § 99
### (On Behalf of Plaintiff and the Class)

176. Emerson realleges and incorporates its responses to the allegations in paragraphs 1 to 175 of the First Amended Complaint as if fully set forth herein.

177. This paragraph contains a legal conclusion to which no response is required. To the extent a response is required, Emerson denies the allegations.

178. This paragraph contains a legal conclusion to which no response is required. To the extent a response is required, Emerson denies the allegations.

179. The statute speaks for itself and any characterization inconsistent therewith is denied. To the extent further response is required, Emerson denies the allegations.

180. The statute speaks for itself and any characterization inconsistent therewith is denied. To the extent further response is required, Emerson denies the allegations.

194. Denied.

## COUNT II

**Invasion of Privacy in Violation of G.L. c. 214, § 1B**
**(On Behalf of Plaintiff and the Class)**

195. Emerson realleges and incorporates its responses to the allegations in paragraphs 1 to 194 of the First Amended Complaint as if fully set forth herein.

196. This paragraph contains a legal conclusion to which no response is required. To the extent a response is required, Emerson denies the allegations.

197. The statute speaks for itself and any characterization inconsistent therewith is denied. To the extent further response is required, Emerson denies the allegations.

198. This paragraph contains a legal conclusion to which no response is required. To the extent a response is required, Emerson denies the allegations.

199. The statute speaks for itself and any characterization inconsistent therewith is denied. To the extent further response is required, Emerson denies the allegations.

200. This paragraph contains a legal conclusion to which no response is required. To the extent a response is required, Emerson denies the allegations.

201. Emerson is without knowledge or sufficient information to form a belief as to the truth of the allegations in the paragraph, and on that basis denies the allegation.

202. This paragraph contains a legal conclusion to which no response is required. To the extent a response is required, Emerson denies the allegations.

215. Denied that Plaintiff, or any member of the putative class, is entitled to any of the relief requested in the Complaint or any relief whatsoever.

## COUNT III

**Breach of Fiduciary Duty and/or Common Law Duty of Confidentiality (On Behalf of Plaintiff and the Class)**

216. Emerson realleges and incorporates its responses to the allegations in paragraphs 1 to 215 of the First Amended Complaint as if fully set forth herein.

217. This paragraph contains a legal conclusion to which no response is required. To the extent a response is required, Emerson denies the allegations.

218. This paragraph contains a legal conclusion to which no response is required. To the extent a response is required, Emerson denies the allegations.

219. This paragraph contains a legal conclusion to which no response is required. To the extent a response is required, Emerson denies the allegations.

220. This paragraph contains a legal conclusion to which no response is required. To the extent a response is required, Emerson denies the allegations.

221. Denied.

222. Denied.

232. This paragraph contains a legal conclusion to which no response is required. To the extent a response is required, Emerson denies the allegations.

233. This paragraph contains a legal conclusion to which no response is required. To the extent a response is required, Emerson denies the allegations.

234. This paragraph contains a legal conclusion to which no response is required. To the extent a response is required, Emerson denies the allegations.

235. This paragraph contains a legal conclusion to which no response is required. To the extent a response is required, Emerson denies the allegations.

236. This paragraph contains a legal conclusion to which no response is required. To the extent a response is required, Emerson denies the allegations.

237. Denied.

238. Denied.

239. Denied.

240. This paragraph contains a legal conclusion to which no response is required. To the extent a response is required, Emerson denies the allegations.

241. This paragraph contains a legal conclusion to which no response is required. To the extent a response is required, Emerson denies the allegations.

242. This paragraph contains a legal conclusion to which no response is required. To the extent a response is required, Emerson denies the allegations.

255. Denied.

256. Denied.

## COUNT V

### Unjust Enrichment
### (On Behalf of Plaintiff and the Class)

257. Emerson realleges and incorporates its responses to the allegations in paragraphs 1 to 256 of the First Amended Complaint as if fully set forth herein.

258. This paragraph contains a legal conclusion to which no response is required. To the extent a response is required, Emerson denies the allegations.

259. This paragraph contains a legal conclusion to which no response is required. To the extent a response is required, Emerson denies the allegations.

260. Denied.

261. Emerson is without knowledge or sufficient information to form a belief as to the truth of the allegations in the paragraph, and on that basis denies the allegations.

262. Denied.

263. Denied.

264. Denied.

**SIXTH AFFIRMATIVE DEFENSE**

Plaintiff's claims, and those of the putative class members, are barred, in whole or in part, by the economic loss rule.

**SEVENTH AFFIRMATIVE DEFENSE**

Plaintiff's claims, and those of the putative class members, are barred, in whole or in part, or reduced by their failure to avoid or mitigate damages.

**EIGHTH AFFIRMATIVE DEFENSE**

Plaintiff's claims, and those of the putative class members, are barred, in whole or in part, by their own contributory negligence.

**NINTH AFFIRMATIVE DEFENSE**

Plaintiff's claims, and those of the putative class members, are barred, in whole or in part, by the doctrine of laches.

**TENTH AFFIRMATIVE DEFENSE**

Plaintiff's claims, and those of the putative class members, are barred, in whole or in part, by the failure to join necessary and indispensable parties.

**ELEVENTH AFFIRMATIVE DEFENSE**

Plaintiff's claims, and those of the putative class members, are barred, in whole or in part, by their consent.

**TWELFTH AFFIRMATIVE DEFENSE**

Plaintiff's claims, and those of the putative class members, are barred, in whole or in part, by release.

## NINETEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims, and those of the putative class members, are barred, in whole or in part, to the extent any events giving rise to the claims had an insufficient connection with Massachusetts.

## TWENTIETH AFFIRMATIVE DEFENSE

Plaintiff's claims, and those of the putative class members, are barred, in whole or in part, by misjoinder of the parties.

## TWENTY-FIRST AFFIRMATIVE DEFENSE

Plaintiff's claims, and those of the putative class members, are barred, in whole or in part, because applying state law as urged by Plaintiffs would violate the United States Constitution, including but not limited to the First and Fourteenth Amendments.

## TWENTY-SECOND AFFIRMATIVE DEFENSE

Plaintiff's claims, and those of the putative class members, are barred, in whole or in part, because imposition of punitive, statutory, and/or aggregated, class-wide damages in this case would be excessive and violate Emerson's Due Process and other Constitutional rights, under both the United States and Massachusetts Constitutions.

## TWENTY-THIRD AFFIRMATIVE DEFENSE

Plaintiff's claims, and those of the putative class members, are barred, in whole or in part, because Plaintiff's complaint is not appropriately brought as a class action lawsuit.

## TWENTY-FOURTH AFFIRMATIVE DEFENSE

Plaintiff's claims, and those of the putative class members, are barred, in whole or in part, by a failure to state a claim upon which relief can be granted.

**THIRTY-SECOND AFFIRMATIVE DEFENSE**

Plaintiff's claims and those of the putative class members are barred, in whole or in part, because Emerson is a charitable organization and recovery is barred or limited pursuant to G.L. c. 231 §85K.

**THIRTY-THIRD AFFIRMATIVE DEFENSE**

Plaintiff's claims and those of the putative class members are barred, in whole or in part, because Emerson was without knowledge of the identity of the users of their informational websites.

**THIRTY-FOURTH AFFIRMATIVE DEFENSE**

Plaintiff's claims and those of the putative class members are barred, in whole or in part, by agreements that they independently entered into with third parties and/or by their prior disclosure of information to third parties.

**THIRTY-FIFTH AFFIRMATIVE DEFENSE**

Plaintiff's claims and those of the putative class members are barred, in whole or in part, to the extent they allege that Emerson aided parties not in the case in committing an interception.

**THIRTY-SIXTH AFFIRMATIVE DEFENSE**

Plaintiff's claims and those of the putative class members are barred, in whole or in part, because Emerson cannot be held liable for aiding a third party in committing an "interception" unless Plaintiff proves that the third party committed an actionable interception, and Emerson cannot be required to defend the actions of third parties.

**OTHER DEFENSES**

Neither the Massachusetts Rules of Civil Procedure nor the Massachusetts Superior Court Rules require Emerson to set forth defenses other than the affirmative defenses set forth in Mass.

Dated: December 12, 2023

Respectfully submitted,

**EMERSON HOSPITAL**

By: */s/Justin R. Donoho*

Justin R. Donoho (IL # 6299667)
**SHOOK, HARDY & BACON L.L.P.**
111 South Wacker Drive, Suite 4700
Chicago, IL 60606
Tel: (312) 704-7713 | F: (312) 558-1195
jdonoho@shb.com

Emyr T. Remy, BBO# 704156
**SHOOK, HARDY & BACON L.L.P.**
One Federal Street, Suite 2540
Boston, MA 02110
Tel.: (617) 531-1411 | Fax: (617) 531-1602
remy@shb.com

Alfred J. Saikali (FL # 0178195)
**SHOOK, HARDY & BACON L.L.P.**
201 South Biscayne Blvd., Suite 3200
Miami, Florida 33131
Tel: (305) 358-5171 | Fax: (305) 358-7470
asaikali@shb.com

Tammy B. Webb (CA # 227593)
**SHOOK, HARDY & BACON L.L.P.**
555 Mission Street, Suite 2300
San Francisco, CA 94105
Tel: (415) 544-1900 | Fax: (415) 391-0281
twebb@shb.com

Jenn O. Hatcher (MO # 69742)
**SHOOK, HARDY & BACON L.L.P.**
2555 Grand Boulevard
Kansas City, MO 64108
Tel: (816) 474-6550 | F: (816) 421-5547
jhatcher@shb.com

Jessica N. Wahl (CA # 321887)
**SHOOK, HARDY & BACON L.L.P.**
2049 Century Park East, Suite 3000
Los Angeles, CA 90067
Tel: (424) 324-3477 | Fax: (424) 204-9093
jwahl@shb.com

COMMONWEALTH OF MASSACHUSETTS

ESSEX, S.S. SUPERIOR COURT

| | | |
|---|---|---|
| JOHN DOE, JAMES DOE, JOSEPH DOE, AND JANE DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>Plaintiffs<br><br>v.<br><br>EMERSON HOSPITAL,<br><br>Defendant. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | C.A. No. 2277CV01000 |

**SECOND AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs John Doe, James Doe, Joseph Doe, and Jane Doe, ("Plaintiffs"), individually and on behalf of all other persons similarly situated ("Class Members"), bring suit against Defendant Emerson Hospital ("Defendant" or "Emerson"), and upon personal knowledge as to Plaintiffs' own conduct and on information and belief as to all other matters based upon investigation by counsel, allege as follows:

## NATURE OF ACTION AND ALLEGATIONS

1. This case arises from Defendant's systematic violation of the medical privacy rights of its patients, exposing highly sensitive personal information to third parties without those patients' knowledge or consent.

2. Until recently, Defendant's "Notice of Privacy Practices" ("Privacy Notice") told patients that "[p]rotecting your medical information is an important priority for Emerson

system serving over 300,000 individuals in 25 towns in Massachusetts.[3] Defendant owns and manages numerous healthcare facilities in Massachusetts, including Emerson Hospital, health centers in Westford, Groton, and Sudbury, the Center for Specialty Care in Concord, the Clough Family Center for Rehabilitation and Sports Therapies, the Hermel Breast Health Center, the Steinberg Wellness Center for Mind and Body, urgent care centers in Hudson and Littleton, and numerous ancillary facilities, including Cantu Concussion Center.[4]

8. Plaintiff, John Doe, is an individual residing in Essex County, Massachusetts, has been treated by Defendant's physicians, and has been a patient at the Cantu Concussion Center,[5] and thus also a patient of Defendant.

9. Plaintiff, James Doe, is an individual residing in Middlesex County, Massachusetts, has been treated by Defendant's physicians, and has been a patient at the Emerson Hospital in Concord,[6] and thus also a patient of Defendant.

10. Plaintiff, Joseph Doe, is an individual residing in Middlesex County, Massachusetts, has been treated by Defendant's physicians, and has been a patient at the Emerson Hospital in Concord,[7] and Emerson Health Westford,[8] and thus also a patient of Defendant.

11. Plaintiff, Jane Doe, is an individual residing in Middlesex County, Massachusetts, has been treated by Defendant's physicians, and has been a patient at the Emerson Hospital in Concord,[9] and thus also a patient of Defendant.

---

[3] https://www.emersonhospital.org/about-emerson/from-our-president-ceo
[4] https://www.emersonhospital.org/about-emerson/from-our-president-ceo; *see also* https://www.emersonhospital.org/locations
[5] https://www.emersonhospital.org/locations/concussion-center
[6] https://emersonhealth.org/locations/emerson-hospital-main-campus/
[7] https://emersonhealth.org/locations/emerson-hospital-main-campus/
[8] https://emersonhealth.org/locations/emerson-health-westford/
[9] https://emersonhealth.org/locations/emerson-hospital-main-campus/

website and patient portals, including through the Epic application, to search for information about doctors, pay for medical services, search and view medical records and test results, and fill out forms related to his medical conditions. Specifically, he has used the website and patient portals to seek treatment and communicate with his physicians regarding a variety of medical conditions over the years, including gastrointestinal issues and his bicep tendon tear. This has resulted in the disclosure of his Personal Health Information to third parties without his consent.

16. Plaintiff Joseph Doe is a patient of Defendant who receives treatment at Emerson Hospital in Concord,[12] and Emerson Health Westford,[13] Since at least 2022, Plaintiff has been using Defendant's website at www.emersonhospital.org and accessing Defendant's patient portals. Plaintiff Joseph Doe has also used Defendant's Epic mobile application to access its "Patient Gateway" patient portal. Plaintiff Joseph Doe has used Defendant's website and patient portals, including through the Epic mobile application, to search for information about doctors, schedule appointments, pay for medical services, and fill out forms related to his medical conditions. Specifically, he has used the website for a variety of medical conditions over the years, including prostate cancer screening and heart health. This has resulted in the disclosure of his Personal Health Information to third parties without his consent.

17. Plaintiff Jane Doe is a patient of Defendant who receives treatment at Emerson Hospital in Concord.[14] Since at least when the portals were first implemented, Plaintiff has been using Defendant's website at www.emersonhospital.org and accessing Defendant's patient portals. Jane Doe also used Defendant's Epic mobile application since the time that application was released to access its "Patient Gateway" patient portal. Plaintiff Jane Doe has used Defendant's website and patient portals, including through its Epic mobile application, to search

[12] https://emersonhealth.org/locations/emerson-hospital-main-campus/
[13] https://emersonhealth.org/locations/emerson-health-westford/
[14] https://emersonhealth.org/locations/emerson-hospital-main-campus/

22. As a health care provider, Defendant has ethical fiduciary, common law, and statutory duties to protect the confidentiality of patient information and communications.

23. Defendant expressly and impliedly promises patients that it will maintain and protect the confidentiality of PII/PHI and communications.

24. Defendant operates websites for patients, including www.emersonhospital.org.

25. Defendant's websites and portals are designed for interactive communication with patients, including scheduling appointments, searching for physicians, paying bills, requesting medical records, learning about medical issues treatment options, and joining support groups.

26. Defendant encourages patients to use digital tools on its website and mobile application to seek and receive health services.

27. The home page of Defendant's website is designed for use by patients. The homepage provides patients with tools to seek treatment, such as finding a doctor, researching services and treatments, paying bills, and learning about Defendant's services.

28. Defendant also maintains two patient portals, which allow patients to make appointments, access medical records, view lab results, and exchange communications with their health care providers. Collectively herein, Defendant's website and patient portals are defined as Defendant's "Web Properties."

29. Notwithstanding patients' reasonable expectations of privacy, Defendant's legal duties of confidentiality, and Defendant's express promises to the contrary, Defendant has disclosed disclose the contents of patients' communications and protected healthcare information via automatic re-routing mechanisms embedded in the websites and mobile application operated by Defendant without patients' knowledge, authorization, or consent.

**C. Defendant misuses sophisticated software to automatically collect and disclose patient PII/PHI to third-party advertising companies like Google and Facebook.**

34. Web browsers are software applications that allow users to exchange electronic communications over the internet.

35. Each exchange of an electronic communication over the internet typically consists of an HTTP request from a client device and an HTTP response from a server. When a user types a URL into a web browser, for example, the URL is sent as an HTTP request to the server corresponding to the web address, and the server then returns an HTTP response that consists of a web page to display in the client device's web browser.

36. In addition to specifying the URL, HTTP requests can also send data to the host server, including users' cookies. Cookies are text files stored on client devices to record data, often containing sensitive, personally identifiable information.

37. In turn, HTTP responses may consist, among other things, of a web page, another kind of file, text information, or error codes. A web page consists primarily of "Markup" and "Source Code." The markup of a web page comprises the visible portion of that web page. Markup is displayed by a web browser in the form of words, paragraphs, images, and videos displayed on a users' device screen. A web page's source code is a set of instructions that commands browsers to take certain actions, either when the web page loads or when a specified event triggers the code.

38. For example, typing https://www.emersonhospital.org/ into a browser sends an HTTP request to Defendant's website, which returns a HTTP response in the form of the home page of Defendant's website:

42. When a server receives a GET request, the information becomes appended to the next URL (or "Uniform Resource Locator") accessed by the user. For example, if a user enters "respiratory problems" into the query box of a website search engine, and the search engine transmits this information using a GET request method, then the words "respiratory" and "problems" will be appended to the query string at the end of the URL of the webpage showing the search results.

43. The other basic transmission command utilized by web browsers is POST, which is typically employed when a user enters data into a form on a website and clicks 'Enter' or some other form of submission button. POST sends the data entered in the form to the server hosting the website that the user is visiting.

44. In response to receiving a GET or POST command, the server for the website with which the user is exchanging information will send a set of instructions to the web browser and command the browser with source code that directs the browser to render the website's responsive communication.

45. Unbeknownst to users, however, the website's server may also redirect the user's communications to third parties, like Facebook and Google. Indeed, Google warns website developers and publishers that installing its ad tracking software on webpages employing GET requests will result in users' personally identifiable information being disclosed to Google.[16] Typically, users are provided no notice that these disclosures are being made.

46. Third parties (such as Facebook and Google) use the information they receive to track user data and communications for marketing purposes.

47. In many cases, third-party marketing companies acquire the content of user communications through a 1x1 pixel (the smallest dot on a user's screen) called a tracking pixel,

[16] https://support.google.com/platformspolicy/answer/6156630?hl=en

53. This is not the only HTTP request, however, that is created by a patient's interaction with Defendant's website. In fact, when the web page is instructed to send an HTTP request to Defendant requesting search results, the embedded source code, acting as a tap, is triggered, intercepting the patient's communication. As a result, Defendant's websites are also instructed to disclose the intercepted communication through the HTTP request directly to Facebook, Google, and other third parties informing them of the patient's exact search and the patient's identifiable information.

54. In addition to employing the Meta Pixel to track patients, Defendant's web properties and patient portal login used Google Analytics, to track and disclose patient activity—including Plaintiffs'—without their consent. Unbeknownst, the installation of this code resulted in disclosures of patients' personal health information, including their search terms; scheduling of appointments; submission of weight loss support group sign up; weight loss info session sign up; and Parkinson's virtual education sign up.

55. In addition, through Google Analytics, Defendant disclosed Plaintiffs' activity by tracking and disclosing their IP addresses, cookies, geolocation, and other unique device identifiers. Defendant routinely disclosed patients' PII/PHI to Google using this technology.

56. Defendant similarly deployed Google Firebase code within the Epic mobile application that it offered to the public. The deployment of this tracking technology functioned similarly to the use of Google Analytics across Emerson's websites, except that it captured communications and interactions from inside of the password-protected Patient Gateway patient portal. This resulted in significant amounts of patients' medical information being shared with Google, including the specific pages visited and used within the portal, as well as the actions taken inside the portal, including communications with treating physicians, scheduling of

they browse a hospital website for treatment information about a medical condition, that is not the case when the hospital website has embedded third party tracking devices, as Defendant has.

63. For example, an IP address is a numerical identifier that identifies each computer connected to the internet. IP addresses are used to identify and route communications on the internet. IP addresses of individual users are used by internet service providers, websites, and tracking companies to facilitate and track internet communications and content. IP addresses also offer advertising companies like Facebook a unique and semi-persistent identifier across devices—one that has limited privacy controls.[17]

64. Because of their uniquely identifying characteristics, IP addresses are considered protected personally identifiable information by HIPAA. *See* 45 CFR § 164.514(b)(2)(i)(O). Tracking pixels can (and typically do) collect website visitors' IP addresses.

65. Likewise, internet cookies also provide personally identifiable information. Cookies are small text files that web servers can place on a user's browser and computer when a user's browser interacts with a website server. Cookies are typically designed to acquire and record an individual internet user's communications and activities on websites and were developed by programmers to aid with online advertising.

66. Cookies are designed to operate as a means of identification for internet users. Advertising companies like Facebook and Google have developed methods for monetizing and profiting from cookies. These companies use third-party tracking cookies to help them acquire and record user data and communications in order to sell targeted advertising that is customized to a user's personal communications and browsing history. To build individual profiles of internet users, third party advertising companies assign each user a unique (or a set of unique) identifiers to each user.

[17] https://adtechexplained.com/the-future-of-ip-address-as-an-advertising-identifier/

and record user data and communications in order to sell advertising that is customized to a user's communications and habits. To build individual profiles of internet users, third party data companies assign each user a unique identifier or set of unique identifiers.

76. Traditionally, first-party and third-party cookies were kept separate. An internet security policy known as the same-origin policy required web browsers to prevent one web server from accessing the cookies of a separate web server. For example, although Defendant can deploy source code that uses Facebook third-party cookies to help Facebook acquire and record a patient's communications, Defendant is not permitted direct access to Facebook third-party cookie values. The reverse *was* also true: Facebook was not provided direct access to the values associated with first-party cookies set by companies like Defendant. But data companies have designed a way to hack around the same-origin policy so that third-party data companies like Facebook can gain access to first-party cookies.

77. JavaScript source code developed by third party data companies and placed on a webpage by a developer such as Defendant can bypass the same-origin policy to send a first-party cookie value in a tracking pixel to the third-party data company. This technique is known as "cookie synching," and it allows two cooperating websites to learn each other's cookie identification numbers for the same user. Once the cookie synching operation is completed, the two websites can exchange any information that they have collected and recorded about a user that is associated with a cookie identifier number. The technique can also be used to track an individual who has chosen to deploy third-party cookie blockers.

78. In effect, cookie synching is a method through which Facebook, Google, and other third-party marketing companies set and access third-party cookies that masquerade as first-party cookies. By designing these special third-party cookies that are set for first-party

86. Defendant uses and causes the disclosure of patient cookie identifiers with each re-directed communication described herein, including patient communications concerning individual providers, conditions, and treatments.

87. A third type of personally identifiable information is what data companies refer to as a "browser-fingerprint." A browser-fingerprint is information collected about a computing device that can be used to identify the specific device.

88. These browser-fingerprints can be used to uniquely identify individual users when a computing device's IP address is hidden or cookies are blocked and can provide a wide variety of data. As Google explained, "With fingerprinting, developers have found ways to use tiny bits of information that vary between users, such as what device they have or what fonts they have installed to generate a unique identifier which can then be used to match a user across websites."[18] The value of browser-fingerprinting to advertisers (and trackers who want to monetize aggregated data) is that they can be used to track website users just as cookies do, but it employs much more subtle techniques.[19] Additionally, unlike cookies, users cannot clear their fingerprint and therefore cannot control how their personal information is collected.[20]

89. In 2017, researchers demonstrated that browser fingerprinting techniques can successfully identify 99.24 percent of all users.[21]

90. Browser-fingerprints are considered protected personal identifiers under HIPAA (*see* 45 C.F.R. § 164.514(b)(2)(i)(M), (R)),and tracking pixels can collect browser-fingerprints from website visitors.

---

[18] https://www.blog.google/products/chrome/building-a-more-private-web/
[19] https://pixelprivacy.com/resources/browser-fingerprinting/
[20] https://www.blog.google/products/chrome/building-a-more-private-web/
[21] https://www.ndss-symposium.org/ndss2017/ndss-2017-programme/cross-browser-fingerprinting-os-and-hardware-level-features/

96. Facebook describes itself as a "real identity" platform.[24] This means that users are permitted only one account and must share "the name they go by in everyday life."[25] To that end, Facebook requires users to provide their first and last name, along with their birthday, telephone number and/or email address, and gender, when creating an account.[26]

97. In 2007, realizing the value of having direct access to millions of consumers, Facebook began monetizing its platform by launching "Facebook Ads," proclaiming this service to be a "completely new way of advertising online," that would allow "advertisers to deliver more tailored and relevant ads."[27] Facebook has since evolved into one of the largest advertising companies in the world.[28] Facebook can target users so effectively because it surveils user activity both on and off its website through the use of tracking pixels.[29] This allows Facebook to make inferences about users based on their interests, behavior, and connections.[30]

98. Today, Facebook provides advertising on its own social media platforms, as well as other websites through its Facebook Audience Network. Facebook has more than 2.9 billion users.[31]

99. Facebook maintains profiles on users that include users' real names, locations, email addresses, friends, likes, and communications. These profiles are associated with personal identifiers, including IP addresses, cookies, and other device identifiers. Facebook also tracks non-users across the web through its internet marketing products and source code. Facebook employs algorithms, powered by machine learning tools, to determine what advertisements to

[24] https://www.wsj.com/articles/how-many-users-does-facebook-have-the-company-struggles-to-figure-it-out-11634846701#:~:text=Facebook%20said%20in%20its%20most,of%20them%20than%20developed%20ones.
[25] https://transparency.fb.com/policies/community-standards/account-integrity-and-authentic-identity/
[26] https://www.facebook.com/help/406644739431633
[27] https://about.fb.com/news/2007/11/facebook-unveils-facebook-ads/
[28] https://www.pewresearch.org/fact-tank/2021/06/01/facts-about-americans-and-facebook/
[29] https://www.facebook.com/business/help/742478679120153?id=1205376682832142
[30] https://www.facebook.com/business/ads/ad-targeting
[31] https://www.statista.com/statistics/264810/number-of-monthly-active-facebook-users-worldwide/

services.

103. Defendant knew or should have known that Facebook could not be trusted with its patients' sensitive medical information given its history of violating consumers' privacy through unauthorized use of their personal information in general, and for marketing purposes, specifically.

104. Despite knowing that the Meta Pixel code embedded in its websites was sending patients' PII/PHI to Facebook, Defendant did nothing to protect its patients from egregious intrusions into its patients' privacy, choosing instead to benefit at those patients' expense.

105. Additionally, there is widespread knowledge within the health care community that installation of the Meta Pixel tool on hospital websites results in the disclosure of patients' PII/PHI to Facebook, as evidenced by multiple data breaches experienced by hospitals where data gathered by the Meta Pixel code was stolen by cybercriminals. There is also widespread recognition that such disclosures are not only illegal but fundamentally unethical, given the privacy rights involved.

**F. Facebook's Meta Pixel tool allows Facebook to track the personal data of individuals across a broad range of third-party websites.**

106. To power its advertising business, Facebook uses a variety of tracking tools to collect data about individuals, which it can then share with advertisers. These tools include software development kits incorporated into third-party applications, its "Like" and "Share" buttons (known as "social plug-ins"), and other methodologies, which it then uses to power its advertising business.

107. One of Facebook's most powerful tools is called the "Meta Pixel." Once a third-party like Defendant installs the Meta Pixel on its website, by default it begins sending user

the web page and the search terms used to find it.[39] When users enter a URL address into their web browser using the 'http' web address format, or click hyperlinks embedded on a web page, they are actually telling their web browsers (the client) which resources to request and where to find them. Thus, the URL provides significaut information regarding a user's browsing history, including the identity of the individual internet user and the web server, as well as the name of the web page and the search terms that the user used to find it.

114. These search terms and the resulting URLs divulge a user's personal interests, queries, and habits on third-party websites operating outside of Facebook's own platform. In this manner, Facebook tracks users browsing histories on third-party websites, and compiles these browsing histories into personal profiles which are sold to advertisers to generate revenue.[40]

115. For example, if Meta Pixel is incorporated on a shopping website, it may log what searches a user performed, which items of clothing a user clicked on, whether they added an item to their cart, as well as what they purchased. Along with this data, Facebook also receives personally identifying information like IP addresses, Facebook IDs, and other data that allow Facebook to identify the user. All this personally identifying data is available each time the Meta Pixel forwards a user's interactions with a third-party website to Facebook's servers. Once Facebook receives this information, Facebook processes it, analyzes it, and assimilates it into datasets like its Core Audiences and Custom Audiences. Facebook can then sell this information to companies who wish to display advertising for products similar to what the user looked at on the original shopping website.

116. These communications with Facebook happen silently, without users' knowledge. By default, the transmission of information to Facebook's servers is invisible. Facebook's Meta

[39] *In re Facebook*, 956 F.3d at 596.
[40] *In re Facebook*, 956 F.3d at 596.

every website page (including the website's persistent header) to reduce the chance of browsers or code from blocking Pixel's execution and to ensure that visitors will be tracked.[48]

123. Once Meta Pixel is installed on a business's website, the Meta Pixel tracks users as they navigate through the website and logs which pages are visited, which buttons are clicked, the specific information entered in forms (including PII/PHI), as well as "optional values" set by the business website.[49] Facebook builds user profiles on users that include the user's real name, address, location, email addresses, friends, likes, and communications that Facebook associates with personal identifiers, such as IP addresses and the Facebook ID. Meta Pixel tracks this data regardless of whether a user is logged into Facebook.[50]

124. Facebook tracks non-Facebook users through its widespread internet marketing products and source code and Mark Zuckerberg has conceded that the company maintains "shadow profiles" on nonusers of Facebook.[51]

125. For Facebook, the Meta Pixel tool embedded on third-party websites acts as a conduit for information, sending the information it collects to Facebook through scripts running in a user's internet browser, similar to how a "bug" or wiretap can capture audio information.

126. For example, the Meta Pixel is configured to automatically collect "HTTP Headers" and "Pixel-specific data."[52] HTTP headers collect data including "IP addresses, information about the web browser, page location, document, referrer and person using the website."[53] Pixel-specific data includes such data as the "Pixel ID and the Facebook Cookie."[54]

127. Meta Pixel takes the information it harvests and sends it to Facebook with

[48] https://developers.facebook.com/docs/meta-pixel/get-started
[49] https://developers.facebook.com/docs/meta-pixel/
[50] https://themarkup.org/pixel-hunt/2022/06/15/facebook-and-anti-abortion-clinics-are-collecting-highly-sensitive-info-on-would-be-patients
[51] https://techcrunch.com/2018/04/11/facebook-sbadow-profiles-hearing-lujan-zuckerberg/
[52] https://developers.facebook.com/docs/meta-pixel/
[53] https://developers.facebook.com/docs/meta-pixel/
[54] https://developers.facebook.com/docs/meta-pixel/

makes to Facebook's servers. Facebook employs similar cookies such as "datr," "fr," "act," "presence," "spin," "wd," "xs," and "fbp" cookies to track users on websites across the internet.[56] These cookies allow Facebook to easily link the browsing activity of its users to their real-world identities, and such highly sensitive data as medical information, religion, and political preferences.[57]

132. Facebook also uses browser fingerprinting to uniquely identify individuals. Web browsers have several attributes that vary between users, like the browser software system, plugins that have been installed, fonts that are available on the system, the size of the screen, color depth, and more. Together, these attributes create a fingerprint that is highly distinctive. The likelihood that two browsers have the same fingerprint is at least as low as 1 in 286,777, and the accuracy of the fingerprint increases when combined with cookies and the user's IP address. Facebook recognizes a visitor's browser fingerprint each time a Facebook button is loaded on a third-party website page. Using these various methods, Facebook can identify individual users, watch as they browse third-party websites like www.emersonhospital.org and target users with advertising based on their web activity.

133. Facebook then sells advertising space by highlighting its ability to target users. Facebook can target users so effectively because it surveils user activity both on and off its official website. This allows Facebook to make inferences about users far beyond what they explicitly disclose, like their "interests," "behavior," and "connections."[58] Facebook compiles this information into a generalized dataset called "Core Audiences," which advertisers use to create highly specific targeted advertising. Indeed, Facebook utilizes precisely the type of

---

[56] https://techexpertise.medium.com/facebook-cookies-analysis-e1cf6ffbdf8a#:~:text=browser%20session%20ends.-,%E2%80%9Cdatr%E2%80%9D,security%20and%20site%20integrity%20features.
[57] https://securehomes.esat.kuleuven.be/~gacar/fb_tracking/fb_plugins.pdf
[58] https://www.facebook.com/business/ads/ad-targeting

Pixel data to find specific types of users to target, such as men over a certain age.

137. Businesses install the Meta Pixel software code to help drive and decode key performance metrics from visitor traffic to their websites.[62] Businesses also use the Meta Pixel to build custom audiences on Facebook that can be used for advertising purposes.[63]

138. For example, when a user on many hospital websites clicks on a "Schedule Online" button next to a doctor's name, Meta Pixel sends the text of the button, the doctor's name, and the search term (such as "cardiology") used to find the doctor to Facebook. If the hospital's website has a drop-down menu to select a medical condition in connection with locating a doctor or making an appointment, that condition is also transmitted to Facebook through Meta Pixel.

139. Facebook has designed the Meta Pixel such that Facebook receives information about patient activities on hospital websites as they occur in real time. Indeed, the moment that a patient takes any action on a webpage that includes the Meta Pixel—such as clicking a button to register, login, logout, or to create an appointment—Facebook code embedded on that page redirects the content of the patient's communications to Facebook while the exchange of information between the patient and hospital is still occurring.

140. Defendant is among the hospital systems who have embedded Meta Pixel on their websites. As recently as May 2024, Defendant had incorporated the Meta Pixel on pages throughout its website, resulting in the substantial (and unauthorized) disclosure of its patients' communications to Facebook and other third parties.

141. When a patient entered their personal information through Defendant's websites that incorporate Meta Pixel, including to locate a doctor or make an appointment, this

---

[62] https://instapage.com/blog/meta-pixel
[63] https://instapage.com/blog/meta-pixel

Facebook ID that is captured by the c_user cookie, which allows Facebook to link this information to patients' unique Facebook accounts. Defendant also discloses other personally identifying information to Facebook, such as patient IP addresses, cookie identifiers, browser-fingerprints, and device identifiers.

145. Defendant discloses such personally identifying information and sensitive medical information even when patients are searching for doctors to assist with them conditions such as substance abuse and addiction.




146. Likewise, a patient who desires an appointment with a specific doctor is asked to fill out an extensive online questionnaire, which includes information such as the doctor's name, the patient's name, telephone number, physical address, and email address. All this information

when patients click on the "Log in" buttons of the password protected portions of its website, including its patient portal and bill pay functions, confirming to these companies that the website users are Emerson patients. For example, Defendant allows patients to search for information about "Specialties & Services" such as "Cardiology," "Obstetrics, Gynecology & Midwifery," "Neurology," and "Gastroenterology."[64] A patient searching for information about cancer treatment or pregnancy, however, not only shares their Personal Health Information with Defendant, but also unknowingly shares their Personal Health Information with Facebook and Google, such as the fact that the patient is pregnant:




149. Defendant has disclosed patient PII/PHI collected across their websites and mobile application including (but not limited to) the following communications:

- when patients search via Defendant's search bars for their required care (e.g., for "substance abuse");

[64] https://emersonhealth.org/specialties-services/?

in this search indicate that a search was done at Defendant's website for information about cancer. In other words, the Meta Pixel captures information that connects a particular user with a particular health condition to a particular healthcare provider.

152. Defendant also provides Facebook and Google with details about online forms that patients fill out in the form of POST requests, including forms such as when a patient utilizes the Emerson Hospital website's "Find A Doctor" function.[65] All the information that patients provide when filling out these forms are also disclosed to Facebook and Google.

153. As the above demonstrates, knowing what information a patient is reviewing on Defendant's website can reveal deeply personal and private information. For example, a simple search for "pregnancy" on Defendant's website allows Meta Pixel to capture that search term and tells Facebook that the patient is likely pregnant. Indeed, Facebook might know that the patient is pregnant before the patient's close family and friends. But there is nothing visible on Defendant's website that would indicate to patients that, when they use Defendant's search function, their personally identifiable data and the precise content of their communications with Defendant are being automatically captured and made available to Facebook, who can then use that information for advertising purposes even when patients search for treatment options for sensitive medical conditions such as cancer or substance abuse.

154. The amount of data collected is significant. Via the Meta Pixel, when patients interact with its website, Defendant discloses a full-string, detailed URL to Facebook, which contains the name of the website, folder and sub-folders on the webserver, and the name of the precise file requested. For example, when a patient types a search term into the search bar on Defendant's website, the website returns links to information relevant to the search term. When

[65] https://www.emersonhospital.org/find-a-doctor

Facebook Meta Pixel, Defendant provides patients and prospective patients with no notice that Defendant is disclosing the contents of their communications to these third parties. Likewise, Defendant does not obtain consent from patients and prospective patients before forwarding their communications to these companies.

159. These disclosures to third parties other than Facebook are equally disturbing. Google Analytics, for example, has been described by the Wall Street Journal as "far and away the web's most dominant analytics platform," which "tracks you whether or not you are logged in."[66] Like Facebook, Google tracks internet users with IP addresses, cookies, geolocation, and other unique device identifiers. Defendant routinely discloses patients' personal health information to such Google services as Google Analytics, Google DoubleClick, and Google AdWords.

160. Google cookies provide personally identifiable data about patients who visit Defendant's website to Google. Defendant transmits personally identifiable Google cookie data to Google.

161. Google warns web-developers that Google marketing tools are not appropriate for health-related webpages and websites. Indeed, Google warns web developers that "Health" is a prohibited category that should not be used by advertisers to target ads to users or promote advertisers' products or services.

162. Defendant deploys Google tracking tools on nearly every page of its websites, resulting in the disclosure of communications exchanged with patients to be transmitted to Google. These transmissions occur simultaneously with patients' communications with Defendant and include communications that Plaintiffs and Class Members made about specific medical providers, treatments, conditions, appointments, bill payments, and registrations and

[66] https://www.wsj.com/articles/who-has-more-of-your-personal-data-than-facebook-try-google-1524398401

online forms. During these same transmissions, Defendant's websites would also provide Facebook with Plaintiffs' and Class Members' Facebook ID, IP addresses, device IDs, and other information that Plaintiffs and Class Members provided. This is precisely the type of information that state and federal law require healthcare providers to de-identify to protect the privacy of patients.

166. Defendant knew that by embedding Meta Pixel and Google Analytics on to its Web Properties, and by embedding Google Firebase code into its Epic mobile application, it was permitting Facebook and Google to collect, use, and share Plaintiffs' and the Class Members' PII/PHI, including sensitive medical information and personally identifiable data. Defendant was also aware that such information would be shared with Facebook and Google simultaneously with patients' interactions with its websites. Defendant made the decision to barter its patients' PII/PHI to Facebook and Google because it wanted access valuable analytics information and tools, including the Meta Pixel and Google Analytics. Indeed, Defendant could not gain access to those analytics or tools without first disclosing it's patients' information and data to Facebook and Google. While that bargain may have benefited Defendant, Google, and Facebook, it also betrayed the rights of Plaintiffs and Class Members.

**H. Plaintiffs and the Class Members did not consent to the interception and disclosure of their protected health information.**

167. Plaintiffs and Class Members had no idea when they interacted with Defendant's websites and mobile application that their personal data, including sensitive medical data, was being collected and transmitted to Facebook and Google. That is because, among other things, Meta Pixel and Google Analytics is seamlessly integrated into Defendant's websites and is invisible to patients visiting those websites. The same was true for the integration of Google Firebase code into the Epic mobile application.

Information. Indeed, Defendant expressly promised[68] in its "Notice of Privacy Practices" that it would never share patient's medical information with marketing companies without express authorization from patients:

> **USES OR DISCLOSURES OF INFORMATION THAT REQUIRE YOUR WRITTEN PERMISSION**
>
> Using and/or sharing health information for most purposes other than treatment, payment or health care operations requires your specific authorization. The following will occur only with authorization from the individual:
>
> - most uses and disclosures of psychotherapy notes
> - uses and sharing of personal health information for marketing purposes, including communications related to subsidized treatment
> - disclosures that constitute a sale of personal health information

172. Even if a patient stumbled upon Defendant's carefully hidden "Notice of Privacy Practices," nothing in that notice would be understood by any reasonable patient to mean that Defendant was routinely allowing Facebook and Google to capture and exploit patients' Personal Health Information.

173. Defendant's "Notice of Privacy Practices" stated that "using and/or sharing health information for most purposes other than treatment, payment or health care operations requires [the patient's] specific authorization" and assured patients that Defendant would only use or share patients' Personal Health Information for marketing purposes "with authorization from the individual."[69]

174. These statements were false, deceptive, and misleading. Defendant in fact tracked patients' and potential patients' IP addresses, cookies, browser-fingerprints, and device

[68] https://www.emersonhospital.org/patients-visitors/patient-rights-responsibilities/patient-privacy
[69] https://www.emersonhospital.org/patients-visitors/patient-rights-responsibilities/patient-privacy

would alert patients that their most private information (such as their identifiers, their medical conditions, and their medical providers) is being automatically transmitted to Facebook or Google. Nor are any of the disclosures of patient PII/PHI to Facebook and Google necessary for Defendant to maintain its healthcare website or provide medical services to patients.

180. For example, it is possible for a healthcare website to provide a doctor search function without allowing disclosures to third-party advertising companies about patient sign ups or appointments. It is also possible for a website developer to utilize tracking tools without allowing disclosure of patients' Personal Healthcare Information to companies like Facebook. Likewise, it is possible for Defendant to provide medical services to patients without sharing their Personal Health Information with Facebook so that this information can be exploited for advertising purposes. Indeed, after Plaintiffs filed the original complaint, Defendant removed the Meta Pixel from its website, confirming that use of the Meta Pixel is unnecessary for Defendant to provide medical services to its patients.

181. Despite the wholly unnecessary nature of the Meta Pixel for Defendant to run its business, Defendant willfully chose to implement Meta Pixel on its websites and aid in the disclosure of personally identifiable information and sensitive medical information about its patients, as well as the contents of their communications with Defendant, to third-parties, including Facebook and Google.

**J. Plaintiffs and Class Members have a reasonable expectation of privacy in their PII/PHI, especially with respect to sensitive medical information.**

182. Patient confidentiality "is a cardinal rule of the medical profession, faithfully adhered to in most instances, and thus has come to be justifiably relied upon by patients seeking advice and treatment." *Alberts v. Devine*, 395 Mass. 59, 65 (1985).

183. As patients, Plaintiffs and Class Members have a reasonable expectation of

privacy of which the patient would otherwise not be aware."[71]

186. The AMA's ethics opinions have further cautioned physicians and hospitals that "[d]isclosing information to third parties for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship." [72]

187. Several studies examining the collection and disclosure of consumers' sensitive medical information confirm that the disclosure of sensitive medical information violates expectations of privacy that have been established as general social norms.

188. Privacy polls and studies also uniformly show that the overwhelming majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its customers' data.

189. For example, a recent study by *Consumer Reports* showed that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumers' data, and the same percentage believed that internet companies and websites should be required to provide consumers with a complete list of the data that has been collected about them.[73]

190. Users act consistently with these preferences. For example, following a new rollout of the iPhone operating software—which asks users for clear, affirmative consent before allowing companies to track users—85 percent of worldwide users and 94 percent of U.S. users chose not to share data when prompted.[74]

---

[71] https://www.ama-assn.org/sites/ama-assn.org/files/corp/media-browser/code-of-medical-ethics-chapter-3.pdf (opinion 3.1.1).
[72] https://www.ama-assn.org/sites/ama-assn.org/files/corp/media-browser/code-of-medical-ethics-chapter-3.pdf (opinion 3.2.4).
[73] https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907/
[74] https://www.wired.co.uk/article/apple-ios14-facebook

"$0.30" per name.[77] That same article noted that "Data has become a strategic asset that allows companies to acquire or maintain a competitive edge" and that the value of a single user's data can vary from $15 to more than $40 per user.[78]

196. In a 2021 Washington Post article, the legal scholar Dina Srinivasan said that consumers "should think of Facebook's cost as [their] data and scrutinize the power it has to set its own price."[79] This price is only increasing. According to Facebook's own financial statements, the value of the average American's data in advertising sales rose from $19 to $164 per year between 2013 and 2020.[80]

197. Despite the protections afforded by law, there is an active market for health information. Medical information obtained from health providers garners substantial value because of the fact that it is not generally available to third party data marketing companies because of the strict restrictions on disclosure of such information by state laws and provider standards, including the Hippocratic oath. Even with these restrictions, however, a multi-billion-dollar market exists for the sale and purchase of such private medical information.[81]

198. Further, individuals can sell or monetize their own data if they so choose. For example, Facebook has offered to pay individuals for their voice recordings,[82] and has paid teenagers and adults up to $20 a month plus referral fees to install an app that allows Facebook to collect data on how individuals use their smart phones.[83]

199. A myriad of other companies and apps such as DataCoup, Nielsen Computer,

[77] https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/
[78] https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/
[79] https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/
[80] https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/
[81] https://revealnews.org/blog/your-medical-data-is-for-sale-and-theres-nothing-you-can-do-about-it/; *see also https://slate.com/technology/2022/06/health-data-brokers-privacy.html*
[82] https://www.theverge.com/2020/2/20/21145584/facebook-pay-record-voice-speech-recognition-viewpoints-prounciations-app
[83] https://www.cnbc.com/2019/01/29/facebook-paying-users-to-install-app-to-collect-data-techcrunch.html

205. The monetization of the data being disclosed by Defendant demonstrates the inherent value of the information being collected.

## TOLLING, CONCEALMENT, AND ESTOPPEL

206. The applicable statutes of limitation have been tolled as a result of Defendant's knowing and active concealment and denial of the facts alleged herein.

207. Defendant seamlessly incorporated Meta Pixel, Google Analytics, and other tracking pixels into its websites, providing no indication to users that they were interacting with a website enabled by such tracking technologies. Defendant likewise deployed Google Firebase code on its mobile application, without providing any warning of the same. Defendant had knowledge that its websites and mobile application incorporated Meta Pixel, Google Analytics, and other trackers yet failed to disclose that by interacting with its websites and application that Plaintiffs and Class Members' sensitive medical information would be intercepted, collected, used by, and disclosed to Facebook.

208. Plaintiffs and Class Members could not with due diligence have discovered the full scope of Defendants' conduct, because there were no disclosures or other indication that they were interacting with websites or an application employing Meta Pixel and other trackers.

209. The earliest that Plaintiffs and Class Members, acting with due diligence, could have reasonably discovered this conduct would have been on June 15, 2022, following the release of the Markup's investigation.

210. All applicable statutes of limitation have also been tolled by operation of the discovery rule and the doctrine of continuing tort. Defendant's illegal interception and disclosure of patients' Personal Health Information has continued. What's more, Defendant was under a duty to disclose the nature and significance of their data collection practices but did not do so.

by review of information maintained by Defendants.

220. **Commonality and Predominance:** There are questions of law and fact common to Class Members and which predominate over any questions affecting only individual members. A class action will generate common answers to the questions below, which are apt to drive resolution:

a. Whether Defendant's acts and practices violated Plaintiffs' and Class Members' privacy rights;

b. Whether Defendant's acts and practices violate 18 U.S.C. § 2510, et seq.;

c. Whether Defendant's acts and practices violate G.L. c. 214, § 1B;

d. Whether Defendant's acts and practices violate G.L. c. 111, § 70E;

e. Whether Defendant knowingly allowed the surreptitious collection and disclosure of Plaintiffs and Class Members' PII/PHI to Facebook and other third parties;

f. Whether Defendant's acts and practices constitute a breach of fiduciary duty;

g. Whether Defendant profited from disclosures of patient PII/PHI to third parties including Facebook;

h. Whether Defendant was unjustly enriched;

i. Whether Defendant's acts and practices harmed and continue to harm Plaintiffs and Class Members and, if so, the extent of that injury;

j. Whether Plaintiffs and Class Members are entitled to equitable relief including, but not limited to, injunctive relief, restitution, and disgorgement; and

k. Whether Plaintiffs and Class Members are entitled to actual, statutory, punitive or other forms of damages, and other monetary relief.

221. These common questions of law and fact predominate over any questions affecting only the individual Class Members.

222. Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs individually and on behalf of the other Class Members. Identical statutory and common law violations, business practices, and injuries are involved.

wrongful conduct. Moreover, serial adjudication in numerous venues is not efficient, timely, or proper. Judicial resources would be unnecessarily depleted by prosecution of individual claims. The prosecution of separate actions by individual Class Members could create a risk of inconsistent or varying adjudications with respect to individual members of the Cass, which could establish incompatible standards of conduct for Defendant or adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the members of the Class Members who are not parties to the adjudications. If a class action is not permitted, Class Members will continue to suffer losses and Defendant's misconduct will continue without proper remedy.

226. Plaintiffs anticipate no unusual difficulties in the management of this litigation as a class action. The Class is readily ascertainable and direct notice can be provided from the records maintained by Defendant, electronically or by publication, the cost of which is properly imposed on Defendant.

227. For the above reasons, among others, a class action is superior to other available methods for the fair and efficient adjudication of this action.

## CAUSES OF ACTION

### COUNT I
### Interception of Wire Communications in Violation of 18 U.S.C. § 2510, *et seq* (On Behalf of Plaintiffs and the Class)

228. Plaintiffs re-allege and incorporates by reference all paragraphs above as if fully set forth herein.

229. The Electronic Communications Privacy Act (the "ECPA"), 18 U.S.C. § 2510, protects individuals against eavesdropping committed with an improper purpose.

e. the precise text of patient communications about specific medical conditions;

f. the precise text of patient communications about specific treatments;

g. the precise text of patient communications about scheduling appointments with medical providers;

h. the precise text of patient communications about billing and payment;

i. the precise text of specific buttons on Defendant's website(s) that patients click to exchange communications, including Log-Ins, Registrations, Requests for Appointments, Search, and other buttons;

j. the precise dates and times when patients click to Log-In on Defendant's website(s);

k. The precise dates and times when patients visit Defendant's websites;

l. information that is a general summary or informs third parties of the general subject of communications that Defendant sent back to patients in response to search queries and requests for information about specific doctors, conditions, treatments, billing, payment, and other information; and

m. any other content that Defendant has aided third parties in scraping from webpages, communication forms at web properties, or its mobile application.

234. Plaintiffs and Class Members's communications with Defendant constitute "electronic communications" because they were wholly or partially transmitted by wire, electromagnetic, and/or photoelectronic systems including but not limited to:

a. Plaintiffs and Class Members' personal computing devices;

b. Plaintiffs and Class Members' web browsers;

c. Plaintiffs and Class Members' browser-managed files;

239. Defendant's acquisition of patient communications that were used and disclosed to Facebook and Google was done for purposes of committing criminal and tortious acts in violation of the laws of the United States and Massachusetts including, among other things:

a. Criminal violation of HIPAA, 42 U.S.C. § 1320d-6;

b. Invasion of privacy in violation of G.L. c. 214, § 1B;

c. Breach of confidentiality of medical records in violation of G.L. c. 111, § 70E; and

d. Breach of the common law duty of confidentiality.

240. For example, under 42 U.S.C. § 1320d-6, it is a criminal violation for a person to "use[] or cause[] to be used a unique health identifier" or to "disclose[] individually identifiable health information to another person … without authorization" from the patient.

241. The penalty for violation is enhanced where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." 42 U.S.C. § 1320d-6.

242. Defendant's conduct violated 42 U.S.C. § 1320d-6 in that it:

a. Used and caused to be used cookie identifiers associated with specific patients without patient authorization; and
b. Disclosed individually identifiable health information to Facebook and Google without patient authorization.

243. Defendant accessed, obtained, and disclosed Plaintiffs' and Class Members' Personal Health Information for the purpose of committing the crimes and torts described herein because it would not have been able to obtain analytics and advertising tools from Facebook, Google, and others if it had complied with the law. Specifically, Defendant could not have obtained those tools and analytics unless it first disclosed patients' information and data in violation of 42 U.S.C. § 1320d-6. Defendant understood that its deployment of Meta Pixel,

252. G.L. c. 111, § 70E provides that every patient or resident of a Massachusetts health care facility shall have the right to "confidentiality of all records and communications to the extent provided by law."

253. Maintaining the confidentiality of the doctor-patient relationship is a cardinal rule of the medical profession which has come to be justifiably relied on by patients seeking advice and treatments.

254. Plaintiffs and Class Members are patients of Defendant.

255. Defendant owes Plaintiffs and Class Members a duty of confidentiality.

256. Despite its duty not to disclose Personal Health Information without informed consent and written authorization, Defendant disclosed information relating to Plaintiffs and Class Members' medical treatment to third parties without their knowledge, consent, or authorization.

257. The information disclosed included personally identifiable information, Plaintiffs and Class Members' statuses as patients of Defendant, and the exact contents of communications exchanged between Plaintiffs and/or Class Members with Defendant, including but not limited to information about treating doctors, potential doctors, conditions, treatments, appointments, search terms, bill payment, and logins to Defendant's website.

258. The disclosure of personally identifiable medical information constitutes an unreasonable, substantial, and serious interference with Plaintiffs and Class Members' rights to privacy.

259. Plaintiffs and Class Members did not consent to, authorize, or know about Defendant's disclosure of their Personal Health Information to Facebook, Google, and other third

b. Defendants eroded the essential confidential nature of the doctor-patient and provider-patient relationship;

c. Defendants took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs and Class Members' knowledge, consent, or authorization and without sharing the benefit of such value;

d. Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain the confidentiality of their Personal Health Information; and

e. Defendant's actions diminished the value of Plaintiffs and Class Members' personal information.

264. Plaintiffs and Class Members have suffered harm and injury, including but not limited to the invasion of their privacy rights.

265. Plaintiffs and Class Members have been damaged as a direct and proximate result of Defendant's invasion of their privacy and are entitled to seek just compensation, including monetary damages.

266. Plaintiffs and Class Members seek appropriate relief for their injuries, including but not limited to damages that will reasonably compensate Plaintiffs and Class Members for the harm to their privacy interests as well as a disgorgement of profits made by Defendant as a result of its intrusions on Plaintiffs and Class Members' privacy.

267. Plaintiffs and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's actions, which caused injury to Plaintiffs and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

c. Defendants took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs and Class Members' knowledge, consent, or authorization and without sharing the benefit of such value;

d. Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain the confidentiality of their Personal Health Information; and

e. Defendant's actions diminished the value of Plaintiffs and Class Members' personal information.

**COUNT IV**
**Breach of Implied Contract**
**(On Behalf of Plaintiffs and the Class)**

276. Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

277. Plaintiffs bring this claim on behalf of themselves and all members of the Class.

278. Defendant's website promised patients that "[p]rotecting your medical information is an important priority for Emerson Hospital."[85] Indeed, Defendant assured patients that Defendant would *never* use or share patients' "personal information for marketing purposes" without "specific authorization."[86]

279. Defendant solicited and invited Plaintiffs and Class Members to provide their Personal Health Information on its website as part of Defendant's regular business practices. Plaintiffs and Class Members accepted Defendant's offers and provided their Personal Health Information, which included personally identifiable information such as their names, telephone numbers, IP addresses, Facebook IDs, browser fingerprints, and device identifiers, to Defendant

[85] https://www.emersonhospital.org/patients-visitors/patient-rights-responsibilities/patient-privacy
[86] https://www.emersonhospital.org/patients-visitors/patient-rights-responsibilities/patient-privacy

obtaining Plaintiffs' and Class Members' Personal Health Information, Defendant assented to protecting the confidentiality of that information. Defendant's implicit agreement to safeguard the confidentiality of Plaintiffs' and Class Members' Personal Health Information was necessary to effectuate the contract between the parties.

283. Plaintiffs and Class Members provided their Personal Health Information in reliance on Defendant's implied promise that this information would be safeguarded and not be shared with third parties without their consent.

284. These exchanges constituted an agreement and meeting of the minds between the parties: Plaintiffs and Class Members would provide their Personal Health Information in exchange for the medical treatment and other benefits provided by Defendant (including the protection of their confidential personal and medical information). A portion of the price of each payment that Plaintiffs and the Class Members made to Defendant for medical services was intended to ensure the confidentiality of their Personal Health Information.

285. In entering into such implied contracts, Plaintiffs and Class Members reasonably believed and expected that Defendant would comply with its promises to protect the confidentiality of their Personal Health Information as well as applicable laws and regulations governing the disclosure of such information and that Defendant would not allow third parties to collect or exploit their communications with Defendant without their consent.

286. It is clear by these exchanges that the parties intended to enter into an agreement and mutual assent occurred. Plaintiffs and Class Members would not have disclosed their Personal Health Information to Defendant but for the prospect of Defendant's promise of medical treatment and other benefits. Conversely, Defendant presumably would not have taken

291. Instead of safeguarding Plaintiffs' and Class Members' Personal Health Information, Defendant intentionally shared that information with Facebook and Google, thereby breaching the implied contracts it had with Plaintiffs and Class Members.

292. Plaintiffs and Class Members who paid money to Defendant reasonably believed and expected that Defendant would use part of those funds to operate its websites free of surreptitious collection and exploitation of communications between the parties. Defendant failed to do so. Plaintiffs and Class Members would not have purchased medical services from Defendant if they knew that Defendant would share their Personal Health Information with Facebook and Google without their knowledge or written consent.

293. Plaintiffs and Class Members who paid money to Defendant reasonably believed and expected that Defendant would use part of those funds to operate its websites free of surreptitious collection and exploitation of communications between the parties. Defendant failed to do so.

294. Under the implied contracts, Defendant and/or its affiliated healthcare providers promised and were obligated to: (a) provide healthcare to Plaintiffs and Class Members; and (b) protect Plaintiffs and the Class Members' Personal Health Information provided to obtain such healthcare. In exchange, Plaintiffs and Class Members agreed to pay money for these services, and to turn over their Personal Health Information through the use of Defendant's websites.

295. Both the provision of medical services healthcare and the protection of Plaintiffs and Class Members' Private Health Information were material aspects of these implied contracts.

296. The implied contracts for the provision of medical services—contracts that include the contractual obligations to maintain the privacy of Plaintiffs and Class Members'

provision of healthcare and medical services and (b) the protection of their Private Health Information.

300. Plaintiffs and the Class Members performed their obligations under the contract when they paid for their healthcare services and provided their Private Health Information.

301. Defendant materially breached its contractual obligation to protect the nonpublic Private Health Information Defendant gathered when it allowed third parties to collect and exploit that information without Plaintiffs' and Class Members' consent.

302. Defendant also materially breached its contractual obligation to protect Plaintiffs' and Class Members' non-public Personal Health Information when it failed to implement adequate security measures and policies to protect the confidentiality of that information. For example, on information and belief, Defendant (1) failed to implement internal policies and procedures prohibiting the disclosure of patients' Personal Health Information without consent to third-party advertising companies like Facebook and Google, (2) failed to implement adequate reviews of the software code and java script installed on its websites to ensure that patients' Personal Health Information was not being automatically routed without consent to third party advertising companies like Facebook and Google, (3) failed to provide adequate notice to the public that visitors to its websites risked having their Personal Health Information shared with third party advertising companies like Facebook and Google, (4) failed to take other industry standard privacy protection measures such as providing a "cookie" acceptance button on its website homepages, (5) failed to provide visitors to its websites with a means to opt out of the automatic transfer of data regarding their website interactions to third party advertising companies like Facebook and Google, (6) failed to implement internal policies and educational programs to ensure that Defendant's website managers and coders were familiar with the legal

306. The medical services that Defendant offers are available from many other health care systems who do protect the confidentiality of patient communications. Had Defendant disclosed that it would allow third parties to secretly collect Plaintiffs and Class Members' Private Health Information without consent, neither the Plaintiffs, the Class Members, nor any reasonable person would have purchased healthcare from Defendant and/or its affiliated healthcare providers.

307. Defendant's conduct in sharing Plaintiffs' and Class Members' Personal Health Information with third parties also diminished the sales value of that information. There is a robust market for the type of information that Plaintiffs and Class Members shared with Defendant (which Defendant then disclosed with third parties). Facebook itself has offered to pay the public to acquire similar information in the past so that Facebook could use such information for marketing purposes. Plaintiffs and Class Members were harmed both by the dissemination of their Personal Health Information and by losing the sales value of that information.

308. As a direct and proximate result of these failures, Plaintiffs and the Class Members have been harmed and have suffered, and will continue to suffer, actual damages and injuries, including, without limitation, the release and disclosure of their Personal Health Information, the loss of control of their Personal Health Information, the diminution in value of their Personal Health Information, and the loss of the benefit of the bargain they had struck with Defendant.

309. Plaintiffs and the Class Members are entitled to compensatory and consequential damages suffered as a result.

316. Defendant unjustly retained those benefits at the expense of Plaintiffs and Class Members because Defendant's conduct damaged Plaintiffs and Class Members, all without providing any commensurate compensation to Plaintiffs and Class Members.

317. The benefits that Defendant derived from Plaintiffs and Class Members rightly belong to Plaintiffs and Class Members. It would be inequitable under unjust enrichment principles for Defendant to be permitted to retain any of the profit or other benefits it derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

318. Defendant should be compelled to disgorge in a common fund for the benefit of Plaintiffs and Class Members all unlawful or inequitable proceeds that Defendant received, and such other relief as the Court may deem just and proper.

**COUNT VI**
**Violation of M.G.L. c. 93A for Unfair and Deceptive Acts or Practices in the Commonwealth of Massachusetts**
**(On Behalf of Plaintiffs and the Class)**

319. Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

320. At all relevant times, Defendant was engaged in trade or commerce in Massachusetts.

321. Defendant's willful and knowing use of tracking technologies on its web properties and mobile application was unscrupulous in that it constituted and encouraged illegal conduct, including:

a. the secret interception of wire communications in violation of 18 U.S.C. § 2510, *et seq.*;

b. Criminal violation of HIPAA, 42 U.S.C. § 1320d-6;

c. Invasion of privacy in violation of G.L. c. 214, § 1B; and

326. Plaintiffs, through their attorneys, sent Defendant a written demand for relief under M.G.L. c. 93A § 9, par. 3, identifying the claimants and reasonably describing the unlawful, unfair, and deceptive acts or practices relied upon, and the damages sustained as a result.

327. In response, Defendant has refused to grant reasonable relief upon demand. Its refusal was made in bad faith with knowledge or reason to know that its acts and practices violated M.G.L. c. 93A § 2.

328. WHEREFORE, Plaintiffs demand judgement against Defendant, damages, punitive damages, treble damages, attorneys' fees, pre-and-post judgment interest, other litigation disbursements, disgorgement of profits, injunctive relief, and such other further relief as is just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, ask for judgment in their favor, and that the Court enter an order as follows:

a. Certifying the Class and appointing Plaintiffs as the Class's representatives;

b. Appoint the law firms of Sweeny Merrigan Law, Keller Postman LLC, and Ahmad, Zavitsanos, & Mensing P.C. as class counsel;

c. Finding that Defendant's conduct as alleged herein was unlawful;

d. Awarding such injunctive and other equitable relief as the Court deems just and proper, including enjoining Defendant from making any further disclosure of Plaintiffs or Class Members' communications to third parties without the Plaintiffs or Class Members' express, informed, and written consent;

e. Awarding statutory damages of $10,000 per Plaintiffs and Class Members pursuant to 18 U.S.C. § 2520;

rmh@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Foster C. Johnson (*pro hac vice forthcoming*)
David Warden (*pro hac vice forthcoming*)
Nathan Campbell (*pro hac vice forthcoming*)
AHMAD, ZAVITSANOS, & MENSING, P.C.
1221 McKinney Street, Suite 3460
Houston, Texas 77010
(713) 655-1101
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

Seth Meyer (*pro hac vice forthcoming*)
Alex Dravillas (*pro hac vice forthcoming*)
Keller Postman LLC
150 N. Riverside Plaza
Suite 4100
Chicago, Illinois 60606
(312) 741-5220
sam@kellerpostman.com
ajd@kellerpostman.com

Dated: November 3, 2025

# EXHIBIT B

Date Filed 12/2/2025 11:16 AM
Superior Court - Essex
Docket Number 2277CV01000



JS 44 (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

John Doe, James Doe, Joseph Doe, and Jane Doe

**(b)** County of Residence of First Listed Plaintiff: Essex
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Sweeney Merrigan Law, 268 Summer St. LL, Boston, MA 02210, 617-391-9001

## DEFENDANTS

Emerson Hospital

County of Residence of First Listed Defendant: Middlesex
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*
Shook, Hardy & Bacon, LLP, One Federal Street, Suite 2620, Boston MA 02110, 617-531-1411

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question *(U.S. Government Not a Party)*
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)* *(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**TORTS**

PERSONAL INJURY
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Personal Injury - Medical Malpractice

PERSONAL INJURY
- ☐ 365 Personal Injury - Product Liability
- ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
- ☐ 440 Other Civil Rights
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 448 Education

**PRISONER PETITIONS**

Habeas Corpus:
- ☐ 463 Alien Detainee
- ☐ 510 Motions to Vacate Sentence
- ☐ 530 General
- ☐ 535 Death Penalty

Other:
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition
- ☐ 560 Civil Detainee - Conditions of Confinement

**FORFEITURE/PENALTY**
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Management Relations
- ☐ 740 Railway Labor Act
- ☐ 751 Family and Medical Leave Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Employee Retirement Income Security Act

**IMMIGRATION**
- ☐ 462 Naturalization Application
- ☐ 465 Other Immigration Actions

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 835 Patent - Abbreviated New Drug Application
- ☐ 840 Trademark
- ☐ 880 Defend Trade Secrets Act of 2016

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- ☐ 375 False Claims Act
- ☐ 376 Qui Tam (31 USC 3729(a))
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit (15 USC 1681 or 1692)
- ☐ 485 Telephone Consumer Protection Act
- ☐ 490 Cable/Sat TV
- ☐ 850 Securities/Commodities/ Exchange
- ☒ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 893 Environmental Matters
- ☐ 895 Freedom of Information Act
- ☐ 896 Arbitration
- ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- ☐ 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☐ 1 Original Proceeding
- ☒ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Electronic Communications Privacy Act, 18 U.S. C. § 2510, et seq.

Brief description of cause:

## VII. REQUESTED IN COMPLAINT:

☒ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $ Unknown

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):* JUDGE ______ DOCKET NUMBER ______

DATE: December 2, 2025

SIGNATURE OF ATTORNEY OF RECORD: Lisa Oliver White

**FOR OFFICE USE ONLY**

RECEIPT # ______ AMOUNT ______ APPLYING IFP ______ JUDGE ______ MAG. JUDGE ______