**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| **JOHN DOE, JAMES DOE, JOSEPH DOE, and JANE DOE, individually and on behalf of all others similarly situated,** | § § § | |
| ***Plaintiffs,*** | § § | **C.A. No. 1:25-CV-13631-RGS** |
| **v.** | § § | |
| **EMERSON HOSPITAL,** | § § | |
| ***Defendant.*** | | |

**PLAINTIFFS' OPPOSITION**
**TO EMERSON HOSPITAL'S MOTION TO DISMISS**

## TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ ii

INTRODUCTION ........ 1

PRELIMINARY STATEMENT ........ 2

FACTS ........ 2

I. Plaintiffs are Emerson's Patients Who Used its Web Properties for their Treatment ........ 2

II. Despite its Promises to the Contrary, Emerson Secretly Captured Plaintiffs' Treatment Data from its Web Properties and Shared the Data with Facebook and Google for Emerson's Profit ........ 3

LEGAL STANDARD ........ 4

ARGUMENT ........ 4

I. The Second Amended Complaint Contains Specific Factual Allegations That Satisfy Pleading Standards ........ 4

A. The Complaint Pleads Concrete, Plaintiff-Specific Facts Showing Wrongful Disclosure of PII/PHI ........ 5

B. The Complaint's Patient Portal Allegations – Including the Epic Patient Gateway – Are Specifically Pleaded ........ 8

C. The Complaint Plausibly Alleges that Emerson's Website Activity Disclosed Individually Identifiable Health Information ........ 8

II. Plaintiffs Allege Plausible Claims and Cognizable Injuries under Chapter 93A ........ 11

A. Chapter 93A Applies to a Nonprofit Hospital When, as Here, the Challenged Conduct Occurred in a Business Context and "Trade or Commerce." ........ 11

B. Plaintiffs Plausibly Allege Unfair and Deceptive Conduct, and the Complaint Satisfies Rule 9(b) to the Extent it Applies ........ 13

C. Plaintiffs Plead Cognizable Injuries and Causation under Chapter 93A ........ 16

D. Plaintiffs Served a Complaint Demand Letter ........ 18

CONCLUSION ........ 20

## TABLE OF AUTHORITIES

### Cases

*Abruzzi Foods, Inc. v. Pasta & Cheese, Inc.*,
986 F.2d 605, 605 (1st Cir. 1993) .......... 14

*Am. Hosp. Ass'n. v. Becerra*,
738 F. Supp. 3d at 788, 804 (N.D. Tex. 2024) .......... 9, 10

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 1, 4

*Aspinall v. Philip Morris Cos.*,
442 Mass. 381, 394 (2004) .......... 14, 16

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) .......... 1

*Cancelmo v. S. N.H. Med. Ctr.*,
No. 24-CV-245-SE, 2025 WL 2783652, at *3 (D.N.H. Sept. 30, 2025) .......... 10

*Casavant v. Norwegian Cruise Line Ltd.*,
460 Mass. 500 (2011) .......... 18

*Doe v. Emerson Hosp.*,
No. 2277CV01000, 2023 WL 8869624, at *1 (Mass. Super. Ct. Nov. 22, 2023) .......... 1,7

*Doe v. Partners Healthcare Sys. Inc.*,
1984CV01651 (Mass. Super. Dec. 7, 2020) .......... 12

*Doe v. Tenet Healthcare Corp.*,
731 F. Supp. 3d 142, 150 (D. Mass. 2024) .......... 13

*H1 Lincoln, Inc. v. S. Wash. St., LLC*,
489 Mass. 1, 14 (2022) .......... 15

*Hartley v. Univ. of Chicago Med. Ctr.*,
No. 22 CV 5891, 2025 WL 2802317, at *4 (N.D. Ill. Oct. 1, 2025) .......... 10

*Linkage Corp. v. Trustees of Boston Univ.*,
425 Mass. 1, 26–27 (1997) .......... 11, 17

*Martin v. Mead Johnson Nutrition Co.*,
2010 WL 3928707, at *4 (D. Mass. 2010) .................................................................... 15

*Nightingale v. National Grid USA Serv. Co.*,
107 F.4th 1, 5 (1st Cir. 2024) ..................................................................................15, 16, 18

*Ocasio-Hernandez v. Fortuno-Burset*,
640 F.3d 1, 14 (1st Cir. 2011) ..........................................................................................4, 17

*Piccuiroo v. Gaitenby*,
20 Mass. App. Ct. 286, 292 (1985) .................................................................................... 20

*Planned Parenthood Fed'n of Am., Inc. v. Problem Pregnancy of Worcester, Inc.*,
398 Mass. 480, 492–93 (1986)........................................................................................... 11

*Reyad v. Caritas Norwood Hosp.*,
2011 WL 4837278, at *5 (Mass. Super. 2011) ................................................................. 12

*Saldivar v. Racine*,
818 F.3d 14, 18 (1st Cir. 2016) ........................................................................................... 4

*Shedd v. Sturdy Mem'l Hosp., Inc.*,
2022 WL 1102524, at *6–7 (Mass. Super. Apr. 5, 2022) ...........................................12, 17

*Slaney v. Westwood Auto, Inc.*,
366 Mass. 688 (1975) ......................................................................................................... 16

*Trustees of Boston Univ. v. ASM Commc'ns, Inc.*,
33 F. Supp.2d 66, 76 (D. Mass. 1998) ............................................................................... 11

*Villarini v. Dep't of Educ. of P.R.*,
628 F.3d 25, 29 (1st Cir. 2010) ........................................................................................... 4

*Vita v. Blue Cross & Blue Shield of Mass.*
No. 25-10420-LTS, Doc. No. 26, p. 4 (D. Mass. Oct. 17, 2025)…………………………7

*Vita v. New England Baptist Hosp.*,
494 Mass. 824, 827 (2024) ..........................................................................................14, 16

*Walker v. Boston Med. Ctr. Corp.*,
2015 WL 9946193, at *2 (Mass. Super. Nov. 20, 2015) ................................................. 17

**Statutes and Regulations**


18 U.S.C. § 2510 .......... 2

45 C.F.R. § 164.514(b)(2)(i) .......... 9

G. L. c. 214, § 1B .......... 15

G. L. c. 93A .......... *passim*


**Other Authorities**


Fed. R. Civ. P. 8 .......... 1, 2, 4

Fed. R. Civ. P. 9(b) .......... 13, 15

Fed. R. Civ. P. 12(b)(6) .......... 1, 2, 4

## INTRODUCTION

This is a case about a cardinal rule of the medical profession: a healthcare provider must maintain the confidentiality of its patients' health information. Emerson violated that rule.

Plaintiffs are Emerson patients who used the hospital's website to obtain healthcare. While Plaintiffs reasonably believed their sensitive medical information would be protected by Emerson, their communications proved anything but confidential. Unbeknownst to Plaintiffs, Emerson had installed software on its website—including the Meta Pixel tool and Google Analytics—that collected Plaintiffs' personal healthcare information and shared it with Facebook and Google.

Emerson cannot dispute Plaintiffs' well-pleaded allegations. In fact, the Superior Court already determined that the state law claims (unjust enrichment, initially asserted in this matter by Plaintiff John Doe) were sufficiently pleaded.[1] Instead, Emerson attempts to misstate and mischaracterize the Complaint's allegations. Because Plaintiffs adequately pleaded their causes of action, the Court should deny Emerson's motion to dismiss.

The following material facts are all stated in Plaintiffs' Second Amended Complaint. They provide fair notice of Plaintiffs' claims against Defendant Emerson Hospital. FED. R. CIV. P. 8; *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). Defendant's motion to dismiss should therefore be denied with the exception of Section II concerning the ECPA claim, which Plaintiffs do not contest dismissal. FED. R. CIV. P. 12(b)(6).

---

[1] *Doe v. Emerson Hosp.,* No. 2277CV01000, 2023 WL 8869624 (Mass. Super. Ct. Nov. 22, 2023).

## PRELIMINARY STATEMENT

In light of this Court's decision in *Goulart v. Cape Cod Healthcare, Inc.*, Case No. 25-cv-10445-RGS, Plaintiffs do not contest dismissal of their claim under the ECPA, 18 U.S.C. § 2510, as set forth in Count I of the Complaint. *See* Second Amended Complaint ("Compl."), Count I, ¶¶ 228-247. Emerson's Motion is otherwise meritless. The Complaint alleges with specificity that Emerson deployed third-party trackers that transmitted Plaintiffs' patient-facing communications and related identifiers to third parties, and those allegations more than satisfy Rule 8 and Rule 12(b)(6).

## FACTS

### I. Plaintiffs are Emerson's Patients Who Used its Web Properties for their Treatment

Emerson promised patients that "Protecting your medical information is an important priority for Emerson Hospital." Compl. at ¶¶ 2, 278 (citing to website URL). Emerson also assured patients that it would never use or share patients' "personal information for marketing purposes" without their "specific authorization." *Id*. Those promises were untrue.

Since at least 2022, Plaintiffs used Emerson's website to transmit information about their treatment at Emerson, including queries about treatments for a concussion, gastrointestinal issues, bicep tendon tear, prostate cancer, heart health, and spine and neurological issues. *Id.* at ¶¶ 14-17. Plaintiffs' communications contained information about their status as Emerson patients, including information about their doctors, conditions, treatment, and appointments. *Id.*

Plaintiffs shared their personal health information in reliance on Emerson's status as a medical provider. *Id.* at ¶¶ 273, 283. Plaintiffs also paid Emerson for their medical treatments. *Id.*

at ¶ 275(d). Plaintiffs expected that their patient statuses ensured the confidentiality of the medical information they shared with Emerson. *Id.* at ¶¶ 4, 257, 274.

## II. Despite its Promises to the Contrary, Emerson Secretly Captured Plaintiffs' Treatment Data from its Web Properties and Shared the Data with Facebook and Google for Emerson's Profit

Without informing its patients, Emerson secretly installed various digital tracking technologies on its website, including Facebook's Meta Pixel and Google Analytics, which caused the health information that patients entered on Emerson's website to be transmitted to Facebook, Google, and other third parties. *Id.* at ¶¶ 5, 18, 139-40, 166, 179, 256, 260. Emerson bartered Plaintiffs' and other patients' confidential health information to Facebook and Google in return for advertising benefits. *Id.* at ¶¶ 191, 193-205, 314. Plaintiffs did not know that Emerson was sharing their treatment information with Facebook and Google, nor did they consent to such disclosures. *Id.* at ¶ 167-178.

Plaintiffs reasonably believed that the private, personally identifiable medical information they provided via Emerson's website and patient portal would be kept confidential by Emerson. *Id.* at ¶¶ 182-192. Instead, without their knowledge or consent, Emerson used tracking tools throughout its website that collected Plaintiffs' private, personally identifiable medical information, such as "their status as patients, their physicians, their medical treatments, the hospitals they visited, and their personal identifiers and sent it to third parties like Facebook and Google. *Id.* at ¶ 4, 274.

Emerson knew that by embedding Meta Pixel and Google Analytics on its web properties, and by embedding Google Firebase code into its Epic mobile application, it was permitting Facebook and Google to collect, use, and share Plaintiffs' and the Class Members' personal health information, including sensitive medical information and personally identifiable data. *Id.* at ¶ 166.

Defendant decided to barter its patients' personal health information to Facebook in exchange for access to the Meta Pixel tool. *Id.; see also id.* at ¶ 163. This includes "enhanced online advertising services, including (but not limited to) retargeting and enhanced analytics functions." *Id.* at ¶ 201. While that bargain may have benefited Defendant and Facebook, it betrayed the rights of Plaintiffs and Class Members. *Id.* at ¶ 166.

## LEGAL STANDARD

"To survive a motion to dismiss, [plaintiffs'] complaint 'must contain sufficient factual matter ... to state a claim that is plausible on its face." *Saldivar v. Racine*, 818 F.3d 14, 18 (1st Cir. 2016), quoting *Ashcroft*, 556 U.S. at 678 (second alteration in original). A claim has factual plausibility "when the plaintiff pleads sufficient factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Sepúlveda-Villarini v. Dep't of Educ. of Puerto Rico*, 628 F.3d 25, 29 (1st Cir. 2010). All inferences are drawn in favor of the non-movant, and the Court considers the "cumulative effect" of the allegations. *See Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 14 (1st Cir. 2011).

## ARGUMENT

### I. The Second Amended Complaint Contains Specific Factual Allegations That Satisfy Pleading Standards

Emerson's Motion rests on three incorrect premises. First, Emerson claims the Second Amended Complaint fails to allege plaintiff-specific facts, but it pleads who did what, when, where, and how—more than enough under Rule 8 and Rule 12(b)(6). Second, Emerson argues Plaintiffs' patient-portal allegations are conclusory, yet the Complaint alleges that Emerson's tracking tools captured and transmitted patient portal interactions and identifiers to third parties. Third, Emerson contends that information from Emerson's public website cannot be protected health information, but the Complaint plausibly alleges the disclosure of individually identifiable

health information, including through Emerson's portal-related and authenticated mobile application. Accordingly, the Motion should be denied.

### A. The Complaint Pleads Concrete, Plaintiff-Specific Facts Showing Wrongful Disclosure of PII/PHI

Emerson's lead contention is that Plaintiffs rely on "generic" descriptions and "say almost nothing about [their] experience." Mem. p. 1. That is facially incorrect. The Complaint alleges Plaintiff-specific usage of Emerson's website, patient portals, and the Epic mobile application, including the kinds of interactions undertaken (searching for doctors and services, paying bills, filling out forms, scheduling appointments, and reviewing medical records) and the medical conditions implicated. For example, Plaintiff Joseph Doe alleges he used Emerson's website and patient portals, including the Epic mobile application's "Patient Gateway," to "search for information about doctors, schedule appointments, pay for medical services, and fill out forms related to his medical conditions," including "prostate cancer screening and heart health," and that these interactions "resulted in the disclosure of his Personal Health Information to third parties without his consent."[2] Compl. ¶ 17. The Complaint further alleges that "tracking technologies across [Emerson's] webpages and portal-related Epic mobile application" caused "the medical information Plaintiffs entered," their IP addresses and browser fingerprints, and their "interactions" with the webpages and mobile app-accessible portal to be transmitted to third-party advertisers without consent. *Id*. at ¶ 18.

Beyond Plaintiff-specific usage, the Complaint provides detailed, technology-specific allegations explaining how Emerson's embedded code functioned to divert the "contents" of

---

[2] Similar factually specific allegations are made in the Complaint for each of the named Plaintiffs. *See, e.g.,* Compl. ¶¶ 14-17.

patient communications in real time to Facebook and Google. The Complaint describes how source code—including Meta Pixel and Google Analytics—executes hidden HTTP requests triggered by Plaintiffs' user interactions (search terms, button clicks, form submissions), and routes the content of those communications and associated identifiers to third parties. Compl. ¶¶ 32-41. It alleges that when patients type queries such as "heart failure treatment," the GET requests append those terms to full-string URLs, which are then transmitted to Facebook/Google via the embedded tracking code, thereby disclosing the substance of the patient's communications along with personally identifying data. *Id.* at ¶¶ 41, 53, 154. The Complaint further pleads that Emerson used Google tracking tools "on nearly every page of its websites," resulting in the transmission of communications about "specific medical providers, treatments, conditions, appointments, bill payments, and registrations and logins to Defendant's patient portal." *Id.* at ¶ 162.

The Complaint ties these mechanisms to Plaintiffs' own specific interactions: "when Plaintiffs and Class Members visited Defendant's websites, their PII/PHI was transmitted to Facebook, including such engagement as using the website's search bar, using the website's 'Find a Doctor' function, and typing content into online forms," together with Facebook ID, IP addresses, and device IDs. Compl. ¶ 165. The Complaint further pleads that Plaintiffs encountered these tracking tools in 2022 on www.emersonhospital.org and, for at least 2019–2022, within the Epic mobile application, with contemporaneous transmissions to Google "from inside of the Patient Gateway patient portal." *Id.* at ¶ 168. These are not merely "naked assertions" as Emerson incorrectly claims—they are concrete factual allegations linking Plaintiffs' actual interactions to specific data flows and third-party recipients.

Finally, the Complaint specifies the categories of intercepted "contents," including the precise text of patient search queries; communications about doctors, conditions, treatments,

scheduling, billing; and the text of specific buttons clicked (Log-Ins, Registrations, Requests for Appointments), as well as timestamps—precisely the kind of substantive information that constitutes the "contents" of a communication. Compl. ¶ 233. It also specifies the transmission conduits (Meta Pixel, Google Analytics, Google Firebase) used on Defendant's systems (Epic mobile application, web properties, Defendant's computer servers), again tying Defendant's wrongful operation to Plaintiffs' interactions. *Id.* at ¶¶ 234-35. Taken together, these detailed, plaintiff-linked factual allegations plausibly support the asserted disclosures of PII/PHI.

Emerson's attempted reliance on an unpublished decision from Judge Sorokin is inapposite. *See* Mem., pp. 5-6. The plaintiff in *Vita v. Blue Cross & Blue Shield of Mass.* alleged *only* that her status as a policyholder was disclosed via use of the defendant's website. No. 25-10420-LTS, Doc. No. 26, p. 4 (D. Mass. Oct. 17, 2025). Unlike this case, the plaintiff in *Vita* did not include "any information about or examples of the content of [her] communications," which she specifically refrained from alleging to "maintain her medical privacy." *Id*. at pp. 3-4. Notably, Judge Sorokin contrasted the plaintiff's threadbare allegations in *Vita* with Plaintiffs' First Amended Complaint ***previously filed in this very matter***:

> In Doe v. Emerson Hospital . . . the plaintiff had included more specific factual allegations than Vita makes here, including that (1) he used the defendant's website to "transmit information about his treatment at [the defendant hospital], which included queries about treatment for a concussion," and (2) his communications "contained information about his status as a[] . . . patient [of the defendant hospital], including information about his doctors, conditions, treatment, and appointments."

*Id*. at p. 5 n. 6 (citing *Doe v. Emerson Hosp.*, No. 2277CV01000, 2023 WL 8869624, at *1 (Mass. Super. Ct. Nov. 22, 2023)). The live Complaint now contains similar allegations (and more) for each of the Plaintiffs, and this Court should likewise find such allegations sufficiently pleaded. *Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 14 (1st Cir. 2011).

### B. The Complaint's Patient Portal Allegations – Including the Epic Patient Gateway – Are Specifically Pleaded

Emerson next argues that Plaintiffs' allegations about "patient portals" are "wholly conclusory." Mem. p. 6. The Complaint, however, pleads with specificity that Emerson "deployed Google Firebase code within the Epic mobile application that it offered to the public," and that this "captured communications and interactions from inside of the password-protected Patient Gateway patient portal." Compl. ¶ 56. The captured information shared with Google includes "the specific pages visited and used within the portal" and "actions taken inside the portal, including communications with treating physicians, scheduling of appointments, and review of medication," together with device-level identifiers and geo-location information. *Id*. The Complaint further alleges simultaneous transmissions concerning "registrations and logins to Defendant's patient portal." *Id*. at ¶ 162. It specifically identifies that clicking the "Log in" buttons of the password-protected portions of the site—including "its patient portal and bill pay functions"—confirmed to Facebook and Google that users were Emerson patients and shared their PHI with such third parties. *Id*. at ¶ 148.

These are concrete allegations about who (Defendant and third parties including Facebook and Google), where (the password-protected portal and Epic app), what (logins, communications with physicians, appointments, medications, and other PHI), and how (Firebase code capturing and diverting the communications). Emerson's attempt to cast the portal allegations as too sparse ignores these detailed averments that plausibly allege operation inside the authenticated portal environment and contemporaneous diversion of PHI.

### C. The Complaint Plausibly Alleges that Emerson's Website Activity Disclosed Individually Identifiable Health Information

Emerson's final argument concerning pleading sufficiency relies on the premise that "information on a healthcare provider's public website does not qualify as PHI" and that public

browsing cannot identify an individual's PHI. Mem. at p. 7. But the Complaint alleges a different factual scenario: Emerson embedded tracking technologies across its web properties, including on both its authenticated mobile application and the logins to authenticated webpages, that diverted both the content of patient communications (the precise text of search queries; provider, condition, and treatment selections; form fields; button clicks; and full-string URLs with paths and query strings) and personally identifying data (Facebook IDs, IP addresses, cookies, device IDs, browser fingerprints, geolocation) to Facebook and Google in real time. Compl. ¶¶ 140-147. The Complaint explains that these identifiers, individually and in combination, enable identification of the natural person and are recognized as HIPAA identifiers, citing 45 C.F.R. § 164.514(b)(2)(i). *Id.* at ¶¶ 63-67, 90-94.

By alleging that Emerson disclosed both the identity-linked data (e.g., Facebook ID, IP, device information, fingerprint) and the substance of communications revealing past, present, or future health conditions and healthcare (e.g., searches for "pregnancy," "cancer," "substance abuse," doctor-specific scheduling, treatments, prescriptions, results), the Complaint pleads facts showing disclosure of "individually identifiable health information." Compl. ¶¶ 163-166, 182. The Complaint also alleges that these transmissions occurred simultaneously with patient communications, including logins and use of the portal and bill pay functions, further tying identity to healthcare activity. *Id*. at ¶¶ 162, 166. And it pleads that Emerson's disclosures "confirm[ed] to [Facebook, Google, and other third parties] that the website users are Emerson patients," including by capturing portal logins and health-service queries. *Id*. at ¶¶ 148-149.

Emerson solely relies upon *Becerra* to argue that browsing activity on a public website cannot constitute PHI disclosure. Mem., pp. 7-8 (citing *Am. Hosp. Ass'n. v. Becerra,* 738 F. Supp. 3d at 788, 804 (N.D. Tex. 2024)). But *Becerra* is a non-binding district court opinion

that has not been adopted by any courts within the First Circuit. *See Cancelmo v. S. N.H. Med. Ctr.*, No. 24-CV-245-SE, 2025 WL 2783652, at *3 (D.N.H. Sept. 30, 2025) (noting *Becerra* but not adopting its holding).

Moreover, *Becerra* is wholly inapplicable to the facts alleged here. The district court in *Becerra* rejected guidance issued by the Department of Health and Human Services ("HHS") defining information about visits to websites, in combination with the IP addresses of the visitors, as individually identifiable health information. 738 F. Supp. 3d at 788, 804 (N.D. Tex. 2024). But as stated by another court in a case involving a medical center's use of Meta's data collection tools on its public website, "[c]ontext matters, and the *Becerra* court was considering generally applicable HHS guidance about public websites, not specific allegations about specific individuals' use of specific websites." *Hartley v. Univ. of Chicago Med. Ctr.*, No. 22 CV 5891, 2025 WL 2802317, at *4 (N.D. Ill. Oct. 1, 2025). Thus, the *Becerra* court's "holding that information collected from public healthcare websites does not *always* amount to individually identifiable health information does not also mean that information from public websites can *never* amount to such information." *Id.* (emphasis in original). Courts in this District have likewise rejected similar arguments, holding that queries entered into a public website that are intercepted via Meta Pixel can constitute violations of privacy expectations. *See, e.g., Doe v. Tenet Healthcare Corp.,* 731 F. Supp. 3d 142, 150 (D. Mass. 2024) ("When a patient uses a healthcare provider's website to communicate or transfer confidential health or personal data, she has a reasonable expectation under HIPAA, as well as the privacy policies, that the information will be kept private and not sold to third-party companies . . .").

Contrary to Emerson's assertion, the Complaint here does not merely rely on abstract "browsing" of a public website in a vacuum; it alleges a technical regime that paired user identity

(via Facebook ID, IP addresses, and other persistent identifiers) with the actual contents of communications about conditions, treatments, providers, scheduling, billing, and results that were made on or in authenticated web properties, thereby rendering the information individually identifiable and health-related. Compl. ¶¶ 53-55, 140-152. Those factual allegations plausibly implicate wrongful disclosure of PHI and support Plaintiffs' claims at the pleading stage.

## II. Plaintiffs Allege Plausible Claims and Cognizable Injuries under Chapter 93A

### A. Chapter 93A Applies to a Nonprofit Hospital When, as Here, the Challenged Conduct Occurred in a Business Context and "Trade or Commerce."

Emerson contends that Chapter 93A categorically does not apply to it because it is a "non-profit charitable healthcare organization." That is not the governing standard. Massachusetts courts have repeatedly rejected any blanket exemption for "charitable" entities. Rather, the inquiry is whether the challenged conduct occurred "in trade or commerce" and in a "business context." *See, e.g., Planned Parenthood Fed'n of America, Inc. v. Problem Pregnancy of Worcester, Inc.*, 398 Mass. 480, 492–493 (1986) (an entity's charitable status is not dispositive of whether c. 93A applies); *Linkage Corp. v. Trustees of Boston Univ.*, 425 Mass. 1, 26–27 (1997) (93A applies when the institution "inserted itself into the marketplace" such that the challenged conduct is in a business context). "A transaction is 'commercial' for the purposes of [Chapter 93A] if it involves the 'arm's-length' exchange of services for compensation." *Trustees of Boston University v. ASM Communications, Inc.,* 33 F. Supp. 2d 66, 76 (D.Mass. 1998).

Plaintiffs allege Emerson deliberately engaged in a commercial, arm's-length exchange with third-party advertising and analytics vendors by using patients' PII/PHI as the "currency" to obtain marketing benefits. Specifically, the Complaint alleges Emerson's conduct as a willful deployment of tracking and rerouting tools that intentionally transmitted patient identity and health-related information to Meta and Google "in return for marketing benefits," including

enhanced advertising services like retargeting and enhanced analytics—alleging Emerson "could not gain access" to those tools without first disclosing patient data and that Emerson made that bargain because it "wanted access" to those marketing capabilities. Compl. ¶¶ 5, 163-166, 201-205, 323. And, all of this occurred in the context of marketing Emerson's paid services to boost Emerson's bottom line. This is classic "trade or commerce" under Chapter 93A, whose definition is broad and expressly encompasses advertising and the distribution of services. *See Reyad v. Caritas Norwood Hosp.*, 2011 WL 4837278, at * 5 (Mass. Super. 2011) (denying dismissal where plaintiff alleged hospital's conduct was economically motivated - seeking profit from hospitalist program amid impending sale - thus potentially outside charitable exemption to c. 93A). Emerson's position that the conduct was merely incidental or "necessary" to providing healthcare at a minimum presents a factual dispute not resolvable on a motion to dismiss and is contradicted by the Complaint's allegations of economically motivated marketing conduct. Compl. ¶¶ 163, 166, 201, 323. Indeed, Plaintiffs pled the opposite: "Nor are any of the disclosures of patient PII/PHI to Facebook and Google necessary for Defendant to maintain its healthcare website or provide medical services to patients." Compl. ¶ 179.

The cases Emerson cites are inapplicable to the Complaint. For example, *Shedd v. Sturdy Mem'l Hosp., Inc.* involved a ransomware-driven data breach and a hospital's alleged failure to safeguard information it was required to obtain and keep to provide and bill for care. 2022 WL 1102524, at *6-7 (Mass. Super. Apr. 5, 2022). The court held that "there are no factual allegations that would take the receipt and maintenance of confidential patient information, necessary to render and bill for medical services, outside of Sturdy Memorial's core mission." *Id*. at 7. Emerson's reliance on *Doe v. Partners Healthcare Sys. Inc.*, 1984CV01651 (Mass. Super. Dec. 7, 2020) is similarly misplaced. To the extent that any insight into the court's rationale can be gleaned

from its brief margin opinion, it is that the websites at issue were "informational" and served the hospital's "core mission." Lastly, *All Seasons Services, Inc. v. Commissioner of Health and Hospitals of Boston*, decided on summary judgment, was premised on an allegedly tainted bid evaluation process for operating vending machines and a canteen facility at the hospital that was not awarded to plaintiff, the highest bidder. 416 Mass. 269, 271-272 (1993). In granting summary judgment, the Massachusetts Supreme Judicial Court held that facts did not establish that the hospital sought to profit from its bid solicitation with All Seasons and that the "[c]ontracting for food service services is merely incidental to the hospital's primary function of providing medical services." *Id.* at 271.

By contrast, the Complaint pleads materially different conduct: it alleges Emerson used AdTech to track and disclose patients' sensitive medical information to third parties "in return for marketing benefits," Compl. ¶ 323, including through patient-facing digital tools such as the Epic mobile application, not merely to maintain a basic informational website. It alleges an actual commercial quid pro quo—collection and disclosure of patient data "for sale, or trade for valuable services from third parties", Compl. ¶ 314, —which is the kind of marketplace exchange and monetization that takes the conduct outside the "incidental to mission" rationale on which Emerson relies. Indeed, Emerson's explicit promise not to engage in the conduct at issue also demonstrates that the conduct was not in furtherance of its core mission. Plaintiffs' allegations plausibly place Emerson's conduct in a "business context" and "trade or commerce," making 93A applicable at the pleading stage.

### B. Plaintiffs Plausibly Allege Unfair and Deceptive Conduct, and the Complaint Satisfies Rule 9(b) to the Extent it Applies

Emerson argues that even if it may be subject to Chapter 93A, Plaintiffs fail to plead an unfair or deceptive act with adequate specificity and must satisfy Rule 9(b). That contention

fails for three independent reasons. First, the Complaint pleads concrete deceptive representations and omissions about privacy and marketing. An act is deceptive if it has the "capacity or tendency" to deceive and need not constitute intentional fraud. *Abruzzi Foods, Inc. v. Pasta & Cheese, Inc.*, 986 F.2d 605, 605 (1st Cir. 1993). Deception includes conduct likely to cause a reasonable consumer to act differently. *Aspinall v. Philip Morris Cos.*, 442 Mass. 381, 394 (2004). And unfairness is a fact-intensive inquiry guided by whether the conduct falls within the penumbra of established notions of unfairness, is immoral or unscrupulous, and causes substantial consumer injury. *H1 Lincoln, Inc. v. S. Wash. St., LLC*, 489 Mass. 1, 14 (2022).

The Complaint pleads that Emerson repeatedly assured patients that it prioritized medical privacy and would not use or share personal health information for marketing purposes without authorization, yet it did exactly that. *See, e.g.*, Compl. ¶¶ 2–6, 170–174, 278–279, 323. Plaintiffs allege Emerson's "Notice of Privacy Practices" stated that "using and/or sharing health information for most purposes other than treatment, payment or health care operations requires [the patient's] specific authorization," and that Emerson would use/share PHI for marketing only "with authorization from the individual." *Id.* ¶ 173. Plaintiffs further allege that those statements were false and misleading because Emerson, in fact, deployed tracking tools that caused the transmission of patient identifiers and sensitive medical information to third parties, including Meta and Google, without patient authorization and in exchange for marketing/advertising benefits. *Id.* ¶¶ 4–5, 163–166, 174–176, 323. Those allegations plausibly describe conduct that is deceptive and "immoral, unethical, oppressive, or unscrupulous," particularly in the medical context. *See Vita v. New England Baptist Hosp.*, 494 Mass. 824, 827 (2024) (recognizing the serious privacy threat posed by third-party tracking for advertising). In *Vita v. New England Baptist Hosp.*, the Supreme Judicial Court, in describing the conduct Plaintiffs allege here, stated;

> We also emphasize that the Legislature has provided other statutory and common-law causes of action to address allegedly false, misleading, or deceptive activity on the Internet, including statutory and common-law protections more directly applicable to misrepresentations or misuse of private medical information. For example, G. L. c. 214, § 1B, provides a 'right against unreasonable, substantial or serious interference with [an individual's] privacy.' *Deception or misrepresentation in a privacy policy may also support a cognizable claim under G. L. c. 93A, and the powerful remedies that statute provides*.

494 Mass. 824, 849-850 (2024) (emphasis added).

Second, the Complaint pleads the "time, place, and content" of the alleged misconduct with sufficient particularity. It identifies the content of the misleading statements (that privacy is a priority; that marketing uses/disclosures require "specific authorization"; and that most uses beyond treatment, payment, or operations require authorization), Compl. ¶¶ 2, 170-173, the place (Emerson's website and linked privacy notices, and the patient-facing web ecosystem including the portal and Epic mobile application), *Id*. ¶¶ 170-173, and how Plaintiffs used Emerson's digital properties (to research specific health conditions, search for doctors, schedule appointments, pay for services, complete forms, and access records and test results), including approximate time periods and examples of the medical contexts involved. *Id*. ¶¶ 14-17, 30.

Emerson's demand for page-by-page, minute-by-minute browsing histories and the precise contents of each transmission is an improper "proof-at-pleading" requirement—especially where the relevant mechanics and logs are uniquely within Emerson's control. *See Martin v. Mead Johnson Nutrition Co.*, 2010 WL 3928707, at *4 (D. Mass. 2010) (rejecting Rule 9(b) "proof-at-pleading" attack; holding plaintiff need not allege the *exact* amount of loss or other evidentiary particulars where she sufficiently pleads the time, place, and content of the alleged misconduct). "Massachusetts law clearly rejects the broad assertion that the elements of a chapter 93A claim must track those of analogous common-law claims." *Nightingale v. National Grid USA Service Company, Inc.*, 107 F.4th 1, 5 (1st Cir. 2024).

Third, Count VI is not defeated by Emerson's assertion that Plaintiffs did not plead they "read" the privacy policy. Chapter 93A does not require common-law reliance in the manner of fraud; it requires unfair or deceptive conduct and a causal connection to injury. *See Nightingale*, 107 F.4th at 5 ("plaintiff did not need to prove actual reliance on the dealer's alleged misrepresentations, because there was a difference between a '[chapter] 93A cause of action [and] a common-law action for deceit and fraud.'") (brackets in original); *Aspinall*, 442 Mass. at 394 ("A successful G.L. c. 93A action based on deceptive acts or practices does not require proof that a plaintiff relied on the representation, or that the defendant intended to deceive the plaintiff, or even knowledge on the part of the defendant that the representation was false.") (citations omitted); *Slaney v. Westwood Auto, Inc.*, 366 Mass. 688 (1975) ("proof of actual reliance by the plaintiff on a representation is not required" in a G.L. c. 93A action). In any event, Plaintiffs plead causation: they allege they entrusted PHI to Emerson and used its services and digital tools in reliance on Emerson's role as a healthcare provider and its privacy assurances, and that they would not have used Emerson's services (or would have paid less) had they known Emerson would disclose PHI to third parties for marketing benefits. Finally, the SJC has confirmed that deception in a privacy policy can support a cognizable claim under c. 93A. *Vita*, 494 Mass. at 849–850. That is precisely what Plaintiffs allege here.

### C. Plaintiffs Plead Cognizable Injuries and Causation under Chapter 93A

Emerson next claims that Plaintiffs have not alleged any causally related injury. Under Massachusetts law, a Chapter 93A plaintiff must plead an "identifiable" injury caused by the unfair/deceptive practice. In *Vita*, the Massachusetts Supreme Judicial Court stated:

> Make no mistake, the hospitals' alleged conduct here raises serious concerns, and may indeed violate various other statutes and give rise to common-law causes of action more specifically directed at the improper handling of confidential information, particularly confidential medical information. And we do not in any

> way minimize the serious threat to privacy presented by the proliferation of third-party tracking of an individual's website browsing activity for advertising purposes.

494 Mass. at 827.

Here, the Complaint pleads multiple plausible injuries recognized under Massachusetts law. Plaintiffs allege that Emerson's conduct caused, among other harms: deprivation of their right to privacy; release and disclosure of their personal health information; loss of control over that information; diminution in the value of their PHI/PII; and loss of the benefit of the bargain (i.e., medical services paid for that included confidentiality). Compl. ¶ 325; see also ¶¶ 275(a)–(e), 314–316.

Emerson's motion also ignores that a Massachusetts Superior Court—addressing materially similar allegations in this matter—held that Plaintiffs adequately pleaded breach of fiduciary duty, breach of implied contract, unjust enrichment, and invasion of privacy. *Doe v. Emerson Hospital*, 2023 WL 8869624, at * 3-5 (Mass. Super. Nov. 22, 2023). *See Linkage Corp. v. Trustees of Boston Univ.*, 425 Mass. 1, 26–27 (1997) (breach of contract a basis for c.93A violation but not a pleading requirement).[3] Emerson instead attempts to mischaracterize the

[3] Massachusetts and other courts recognize that Plaintiffs' allegations plead cognizable injuries. *See Walker v. Boston Med. Center Corp.*, 2015 WL 9946193, at *2 (Mass. Super. Nov. 20, 2015) ("Plaintiff's general allegation of injury from the data breach" involving access to "confidential medical information by unauthorized persons, is sufficient."); *Shedd v. Sturdy Memorial Hospital,* 2022 WL 1102524, at *5 (Mass. Super. Apr. 5, 2022) (allegations that plaintiff's "confidential health information, such as medical records and prescription history information" had been disclosed without her authorization more than sufficient to survive a motion to dismiss); *Eggiman v. Bank of America, N.A.* 2023 WL 2647071, at *4 (D. Mass. 2023) ("In the data -breach context, courts applying Massachusetts law have characterized these types of injuries as economic losses."); *In re Anthem, Inc. Data Breach Litig.*, 162 F. Supp. 3d 953, 995 (N.D. Cal. 2016) (holding "Loss of Value" of health information represents "a cognizable form of economic injury.").

Complaint's factual allegations. Because Plaintiffs plausibly state their claims, the motion should be denied.

While Emerson unfortunately characterizes Plaintiffs' injuries as a "boilerplate list of harms," this contention goes to the weight of the injury, not to whether one has been plausibly alleged. *See Nightingale,* 107 F.4th at 9 (privacy invasions tied to misuse of personal information cognizable under 93A even where defendants argue the invasion is not "appreciable" or "significant"). At the pleading stage, Plaintiffs need not quantify damages with precision under Chapter 93A; it is enough that they plausibly allege economic and noneconomic harm caused by Emerson's practices. Compl. ¶¶ 324–325.

Finally, the causal link is straightforward and sufficiently pleaded. Plaintiffs allege that Emerson's deceptive privacy assurances and omissions induced them to provide and entrust PHI and to use Emerson's services and web properties. Absent those assurances, Plaintiffs allege that they would have withheld information, retained control over it, chosen other providers, or paid less. Compl. ¶ 324. Plaintiffs further allege that Emerson's deployment of specific tracking tools caused their PHI/PII to be transmitted to third parties. *Id.* ¶¶ 5, 163–166, 174–176. Those allegations plausibly plead causation under Chapter 93A.

**D. Plaintiffs Served a Complaint Demand Letter**

Finally, Emerson contends that Plaintiffs' demand letter is deficient for allegedly not identifying Emerson's specific violations, Plaintiffs specific injuries, and Plaintiffs specific interactions with its patient-facing web ecosystem. Mem. p. 18. Chapter 93A, however, does not require this type of heightened demand letter requirements. "The demand letter required under G.L. c. 93A does not require claimants to set forth every specific statutory or regulatory violation alleged, so long as it fairly notifies the prospective respondent of the actions or practices of the respondent and the injury suffered by those actions." C*asavant v. Norwegian*

*Cruise Line Ltd.*, 460 Mass. 500 (2011) (demand letter sufficiently where it reasonably described the unfair conduct (Norwegian's refusal to refund the ticket price) and identified the injury (loss of the purchase price)).

Plaintiffs' September 2, 2025 demand letter fairly and clearly notifies Emerson of its alleged unfair and deceptive actions and practices and of the injuries suffered. The demand letter details the alleged deception and unfairness; namely, the installation of third-party tracking technologies (including Google Analytics and Meta Pixel) on Emerson's websites and patient portals, and the resulting disclosure of patients' PII/PHI to third parties without knowledge or consent. *See* Exh. E, Plfs. Chapter 93A Demand Letter. It further identifies the "deceptive practices" as Emerson's assurances in privacy policies and its Notice of Privacy Practices (i.e., promises not to share information with marketing companies without authorization) contrasted with the alleged reality of "barter[ing]" patient information for marketing/analytics benefits. *Id.*

Here, the letter ties Emerson's conduct to concrete categories of harm: deprivation of privacy, disclosure and loss of control over private health information, diminution in the value of that information, and loss of the benefit of the bargain with Emerson—along with the need to expend resources to remediate those injuries. *Id.* It also explains why the information at issue is uniquely sensitive (health information) and identifies the alleged conduct as unfair/unscrupulous, including by articulating related legal violations arising from the same tracker-based disclosures, further sharpening Emerson's notice of the theory of liability. *Id.* The demand letter "reasonably set forth the acts relied on" and described the injuries in a way that gave Emerson a meaningful opportunity to evaluate the facts and law and make a reasonable settlement offer. *Id.* The focus is whether the description of the defendant's conduct and resulting harm is clear enough to give the defendant a fair opportunity to review the facts and

law, decide whether relief should be granted, and make a reasonable settlement offer to limit damage. *See Piccuiroo v. Gaitenby*, 20 Mass. App. Ct. 286, 292 (1985) (demand letter adequate where description of conduct made apparent the source of the injury and afforded defendant opportunity to assess liability and settle). In short, the letter did exactly what § 9 demand letters are meant to do: identify the challenged practices and injury with enough specificity to encourage negotiation and allow the defendant to limit exposure through a timely, reasonable tender.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court: (1) allow Emerson's Motion to Dismiss as to Count I (ECPA), which Plaintiffs do not oppose; and (2) otherwise deny the Motion in its entirety.

**COUNSEL FOR PLAINTIFF JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED**

**Respectfully submitted,**

*/s/ J. Tucker Merrigan*
J. Tucker Merrigan, BBO# 681627
Ryan M. Hawkins, BBO# 686289
Brett R. Corson, BBO# 677644
**Sweeney Merrigan Law, LLP**
268 Summer Street, LL
Boston, MA 02210
(413) 774-5300
tucker@sweeneymerrigan.com
rmh@sweeneymerrigan.com
brc@sweeneymerrigan.com

Seth Meyer*
Alex Dravillas*
**Keller Postman LLC**
150 N. Riverside Plaza
Suite 4100
Chicago, Illinois 60606
(312) 741-5220
sam@kellerpostman.com
ajd@kellerpostman.com

Foster C. Johnson*
David Warden*
Nathan Campbell*
Justin Kenney*
**Ahmad Zavitsanos & Mensing PLLC**
1221 McKinney Street, Suite 2500
Houston, Texas 77010
(713) 655-1101
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com
jkenney@azalaw.com

**Pro Hac Vice Forthcoming*

January 28, 2026

**CERTIFICATE OF SERVICE**

I, Ryan M. Hawkins, do hereby certify that on January 28, 2026, a true and correct copy of the foregoing document was served upon all counsel of record via the CM/ECF system of the United States District Court for the District of Massachusetts.

*Ryan M. Hawkins*___
Ryan M. Hawkins